2023-1229

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC,

Plaintiffs-Appellees

v.

SHAWN PAUL CALVIT, PATRICK DALE LELEAUX, M.D., INSULINIC LLC, INSULINIC OF LAFAYETTE LLC, INSULINIC OF HIALEAH LLC, INSULINIC OF HAWAII, LLC, INSULINIC OF GRETNA, LLC, AND INSULINIC OF HAMMOND, LLC,

Defendants-Appellants

Appeal from the United States District Court for the Southern District of Texas in Civil Action No. 4:22-CV-03062, Chief Judge Lee H. Rosenthal

**APPENDIX TO PRINCIPAL BRIEF OF DEFENDANTS-APPELLANTS SHAWN PAUL CALVIT, PATRICK DALE LELEAUX, M.D., INSULINIC LLC, INSULINIC OF LAFAYETTE LLC, INSULINIC OF HIALEAH LLC, AND INSULINIC OF HAWAII, LLC (VOLUME 1)**

Winston O. Huff
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, TX 75201
Telephone: (214) 855-7508
Facsimile: (214) 855-7584
whuff@munsch.com

# TABLE OF CONTENTS

| Tab | Docket Number and Document | Appendix Page No. |
|-----|----------------------------|-------------------|
| 1 | 77 – Order of Preliminary Injunction | APPX0001-0002 |
| 2 | 76 – Memorandum and Opinion Entering Findings of Fact and Conclusion of Law | APPX0003-0023 |
| 3 | 81 – Notice of Appeal | APPX0024-0026 |
| 4 | 82 – Notice of Filing an Appeal to the Federal Circuit | APPX0027-0048 |
| 5 | 4 – Motion for Temporary Restraining Order | APPX0049-0127 |
| 6 | 18 – Memorandum and Temporary Restraining Order | APPX0128-0129 |
| 7 | 19 - Order | APPX0130 |
| 8 | 20 – Defendants' Motion for Expedited Discovery | APPX0131-0142 |
| 9 | 24 – Plaintiff Well Cell Global LLC's Response to Motion for Expedited Discovery | APPX0143-0154 |
| 10 | 27 – Memorandum and Temporary Restraining  Order | APPX0155-0156 |
| 11 | 29 – Memorandum and Order | APPX0157-0160 |
| 12 | 34 – Memorandum and Temporary Restraining Order | APPX0161 |
| 13 | 35 – Defendants' Motion to Dismiss | APPX0162-0271 |
| 14 | 38 – Memorandum and Temporary Restraining Order | APPX0272-0273 |

4892-0709-8958v.1

| Tab | Docket Number and Document | Appendix Page No. |
|-----|---------------------------|-------------------|
| 15 | 40 – Plaintiff Well Cell Global LLC's Response to Defendants' Motion to Dismiss | APPX0274-0340 |
| 16 | 43 – Plaintiffs' First Amended Original Complaint and Request for Injunctive Relief | APPX0341-0519 |
| 17 | 44 – Defendants' Motion to Strike Affidavit of Scott A. Hepford | APPX0520-0529 |
| 18 | 45 – Defendants' Motion to Strike Unsworn Declaration of Kelly McDaniel | APPX0530-0540 |

4892-0709-8958v.1

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By:*/s/ Winston O. Huff*
Winston O. Huff
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201
Telephone: (214) 855-7508
Facsimile: (214) 855-7584
whuff@munsch.com

**ATTORNEYS FOR DEFENDANTS,
SHAWN PAUL CALVIT,
INSULINIC OF LAFAYETTE LLC,
INSULINIC OF HIALEAH LLC,
AND INSULINIC OF HAWAII LLC**

## CERTIFICATE OF SERVICE

This is to certify that on February 6, 2023, copies of the foregoing Appendix to Principal Brief of Defendants-Appellants was served on counsel for Plaintiffs-Appellees Well Cell Global LLC and Well Cell Support LLC via the Court's ECF system and via electronic mail upon the following:

Lema Barazi
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
litigation@lloydmousilli.com
lema@lloydmousilli.com

/s/ Winston O. Huff
Counsel for Defendants

4892-0709-8958v.1

**TAB 1**

United States District Court
Southern District of Texas
**ENTERED**
November 10, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC and WELL CELL SUPPORT LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-22-3062 |
| SHAWN PAUL CALVIT, MARC PIERRE DESGRAVES IV, CHARLES ALEXANDER ELLIOTT, PATRICK DALE LELEAUX, M.D., INSULINIC OF LAFAYETTE LLC, INSULINIC OF HIALEAH LLC, INSULINIC OF HAWAII, LLC, INSULINIC OF GRETNA, LLC, and INSULINIC OF HAMMOND, LLC, | § § § § § § § § § § | |
| Defendants. | § § | |

## ORDER OF PRELIMINARY INJUNCTION

For the reasons stated in the court's memorandum and opinion, (Docket Entry No. 76), the court grants, in part, plaintiffs' motion for a preliminary injunction. (Docket Entry No. 4).

The court finds that a $50,000.00 surety bond is a sufficient and proper amount of security pursuant to Federal Rule of Civil Procedure 65(c). Contingent on the plaintiffs posting this bond, it is ordered:

Defendants Shawn Paul Calvit, Marc Pierre Desgraves IV, Charles Alexander Elliot, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, Insulinic of Hawaii, LLC, and any of their assigns, agents, representatives, and any persons in active concert or participation with any of them, who receive actual notice of this order, by personal service or otherwise, are hereby restrained and enjoined from performing any of the following, or by assisting anyone else from performing the following:

1.      Practicing the therapy disclosed in U.S. Patent No. 10,533,990;

2.     Using any of the knowledge, information, training, or materials taught, delivered, described, or otherwise imparted from Well Cell, in whole or in part, as part of any medical procedure, treatment, therapeutic modality, or otherwise;

3.     Practicing Well Cell's propriety method of insulin resensitization, the microburst insulin infusion modality, or any other form of exogenous intravenous insulin infusion designed to treat diabetes or other metabolic disorders;

4.     Disclosing the plaintiffs' trade secrets, including their confidential business contacts and their specialized medical training, including their training modules, videos, and handbooks, and methods of conducting their business for Well Cell's proprietary method of insulin resensitization for the treatment of diabetes to any person or entity in the United States; and

5.     Representing, by any means whatsoever, that any products manufactured, distributed, advertised, offered or sold by the defendants are Well Cell's products or vice versa, and from otherwise acting in a way likely to cause confusion, mistake, or deception on the part of purchasers or consumers as to the origin or sponsorship of such products.

Each of Shawn Paul Calvit, Marc Pierre Desgraves IV, Charles Alexander Elliot, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, Insulinic of Hawaii, LLC, and any of their assigns, agents, representatives, and any persons in active concert or participation with any of them, who receive actual notice of this order, by personal service or otherwise, are ordered to:

1.     Immediately deliver to the plaintiffs any documents reflecting their specialized medical training, including their training modules, videos, and handbooks, and methods of conducting their business involving Well Cell's proprietary method of insulin resensitization for the treatment of diabetes.

SIGNED on November 10, 2022, at Houston, Texas.

_____

Lee H. Rosenthal

Chief United States District Judge

APPX0002

**TAB 2**

United States District Court
Southern District of Texas
**ENTERED**
November 10, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|   |   |   |
|---|---|---|
| WELL CELL GLOBAL LLC and WELL CELL SUPPORT LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-22-3062 |
| SHAWN PAUL CALVIT, MARC PIERRE DESGRAVES IV, CHARLES ALEXANDER ELLIOTT, PATRICK DALE LELEAUX, M.D., INSULINIC OF LAFAYETTE LLC, INSULINIC OF HIALEAH LLC, INSULINIC OF HAWAII, LLC, INSULINIC OF GRETNA, LLC, and INSULINIC OF HAMMOND, LLC, | § § § § § § § § § § | |
| Defendants. | § § | |

**MEMORANDUM AND OPINION
ENTERING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Well Cell Global is a Texas healthcare company that conducts research and development related to the treating individuals with diabetes and other metabolic disorders. Well Cell Global's commercialization arm, Well Cell Support,[1] manages Well Cell Global's portfolio of intellectual property. Well Cell Global claims that its treatment differs from conventional insulin treatments for metabolic disorders because Well Cell Global's modality, which it calls "physiologic insulin resensitization," focuses on treating the root causes of metabolic disorders rather than suppressing the symptoms of those disorders. Well Cell Support, via a master license, licenses Well Cell Global's intellectual property to health care facilities, including clinics. The licensees included the defendants, Insulinic of Lafayette (Louisiana), and Insulinic of Hialeah (Florida), from September

---

[1] The court distinguishes Well Cell Global and Well Cell Support for clarity when needed and otherwise refers to the plaintiffs together as "Well Cell."

and November 2021 until the purported termination of the licenses in July 2022.  Well Cell alleges that, after it terminated its license agreements with the Insulinic defendants in July 2022, they continued unlawfully to use Well Cell's intellectual property, including its pumps and its training materials, and plan to continue to do so without a license or other right.[2]  Well Cell seeks a preliminary injunction ordering the defendants to cease their unlawful conduct until a permanent injunction hearing.   Well Cell argues that it will suffer irreparable harm from the defendants' unlawful use, including the loss of customer goodwill, and that the public is at risk of harm from the defendants' unlicensed use of the Well Cell medical treatment for insulin dependent diabetics.

Based on the parties' motions and briefs, the record, the evidence presented in the preliminary injunction hearing, and the applicable law, the court grants the motion for a preliminary injunction in part.  The findings and conclusions are set out below. [3]

## I.       The Evidence in the Record[4]

On October 31 and November 1, 2022, the court held an evidentiary hearing on Well Cell's motion for a preliminary injunction.   (*See* Docket Entry Nos. 70 (Transcript of Preliminary Injunction Hearing, Oct. 31, 2022 ("Oct. 31, 2022 Tr.")), 71 (Transcript of Preliminary Injunction Hearing, Nov. 1, 2022 ("Nov. 1, 2022 Tr."))).   Well Cell called Scott Hepford, Well Cell's managing member and CEO, as its sole witness.  The defendants cross-examined Hepford but did not call witnesses of their own.

---

[2] The defendants are Shawn Paul Calvit, Marc Pierre Desgraves IV, Charles Alexander Elliot, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and Insulinic of Hawaii LLC.

[3]  Any findings of fact that are more properly conclusions of law are so deemed.  Any conclusions of law that are more properly findings of fact are so deemed.

[4] The parties' exhibits largely overlap.  Because Well Cell did not file its exhibits on CM/ECF, the court cites to the defendants' filed versions.  The defendants have highlighted certain material in those documents. The court does not consider the highlighting to be part of the record and disregards it when citing to the exhibits.

2

At the hearing, the court admitted the following exhibits:

**A.      Well Cell's Admitted Exhibits**

| Well Cell Exhibit No. | Description |
|---|---|
| 1 | Asset Purchase Agreement between Diabetes Relief LLC and Well Cell Global LLC, dated July 24, 2020 |
| 2 | Certificate of Registration—Diabetes Relief Website |
| 3 | Certification of Registration—Overcoming Metabolic Failure |
| 4 | Certificate of Registration—Glucose Homeostasis V.2 |
| 5 | Patent Registration—'595 Patent |
| 6 | Patent Registration—'990 Patent |
| 7 | All Patent Assignments and Patent Notice for '990 Patent |
| 8 | Master License Agreement—Well Cell Global to Well Cell Support |
| 9 | License Agreement—Well Cell Support/Insulinic of Lafayette |
| 10 | License Agreement—Well Cell Support/Insulinic of Hialeah |
| 11 | Unpaid Invoices for Insulinic of Lafayette and Hialeah |
| 12 | Notice of Default from Scott Hepford to Shawn Calvit, dated June 9, 2022 |
| 13 | Insulinic Press Release, dated Aug. 26, 2022 |
| 14 | Cease and Desist Letter, dated Sept. 7, 2022 |
| 15 | Letter to Shawn Calvit re: Demand to Comply with Termination Obligations, dated Sept. 30, 2022 |
| 16 | Diabestesrelief.com Website, as of Sept. 7, 2022 |
| 17 | Insulinic.com Website, as of Sept. 7, 2022 |
| 18 | Defendant Well Cell Global LLC's Response to Plaintiff Carr's TCPA Mot. to Dismiss and Exh. 4 to the same, dated Jan. 20, 2021 |
| 19 | Deposition Transcript of Scott Hepford, dated Sept. 28, 2022 |
| 20 | Deposition Transcript of Shawn Calvit, dated Sept. 28, 2022 |

**B.      The Defendants' Admitted Exhibits**

| Defs. Exhibit No. | Description |
|---|---|
| 1 | Deposition Transcript of Scott Hepford, dated Sept. 28, 2022 |
| 2 | 2022 Filing with the State of Texas for Diabetes Relief LLC |
| 3 | Patent Registration—'595 Patent |
| 4 | Patent Registration—'990 Patent |
| 5 | Certification of Registration—Overcoming Metabolic Failure |
| 6 | Certificate of Registration—Glucose Homeostasis V.2 |
| 7 | Asset Purchase Agreement between Diabetes Relief LLC and Well Cell Global LLC, dated July 24, 2020 |
| 8 | Verification of Scott Hepford, dated Aug. 24, 2020 |
| 10 | Master License Agreement—Well Cell Global to Well Cell Support |
| 11 | Deposition Transcript of Shawn Calvit, dated Sept. 28, 2022 |
| 12 | License Agreement—Well Cell Support/Insulinic of Lafayette |

| 13 | License Agreement—Well Cell Support/Insulinic of Hialeah |
| 14 | Nondisclosure, Noncircumvention, and Confidentiality Agreement between Diabetes Relief LLC and Shawn Calvit, dated April 15, 2021. |
| 17 | Notice of Default from Scott Hepford to Shawn Calvit, dated June 9, 2022 |
| 19 | Email from Lloyd & Mousilli to Shawn Calvit with Cease and Desist Letter, dated September 7, 2022 |
| 20 | Exhibits to Well Cell's Mot. for TRO and Prelim. Injunction (Docket Entry Nos. 4-1 through 4-10) |
| 21 | Exhibits to Well Cell's Response to Carr's TCPA Mot. to Dismiss, dated Jan. 20, 2021 |
| 23 | Affidavit of Scott Hepford (Docket Entry No. 14) |
| 24 | Insulinic.com Website, as of Sept. 7, 2022 |
| 25 | Insulinic Press Release, dated Aug. 26, 2022 |
| 30 | Well Cell Support, LLC Receipt for Infusion Pumps Order from Infinity Health, dated Nov. 4, 2021 |

## II.     The Legal Standard

A preliminary injunction is an "extraordinary remedy." *Texans for Free Enter. V. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013).   "For a preliminary injunction to issue, a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm absent the injunction, (3) that the harm she will suffer without the injunction outweighs the cost to comply with the injunction, and (4) that the injunction is in the public interest." *Harrison v. Young*, No. 19-10874, 2022 WL 3906582, at *3 (5th Cir. Aug. 31, 2022).

### C.     Well Cell's Motion to Reopen Evidence

Following the hearing, Well Cell moved to reopen evidence and supplement the record with an agreement purporting to assign retroactively the patents in suit from Diabetes Relief to Well Cell Global.  (Docket Entry No. 66).  The defendants opposed the motion.  (Docket Entry No. 72).  The court grants the motion, but notes that, as explained below, this agreement is without effect for purposes of Well Cell's motion.

4

### D.   Defendants' Motions to Strike Portions of the Affidavit of Scott Hepford and Unsworn Declaration of Kelly McDaniel

The defendants have moved to strike certain paragraphs from the declaration of Scott Hepford and unsworn declaration of Kelly McDaniel done in support of Well Cell's motion. (Docket Entry Nos. 44, 45).  Well Cell has not yet filed oppositions to these motions.  The court does not rely on the disputed contents of the Hepford affidavit or McDaniel declaration in this opinion.

The motions to strike are denied as moot.

## III.   Findings of Fact

### A.  Background

The patents and copyrights that Well Cell asserts in this lawsuit were originally issued and assigned to Diabetes Relief LLC.  On July 24, 2020, Diabetes Relief and Well Cell Global entered into an asset purchase agreement,[5] in which Well Cell Global agreed to purchase Diabetes Relief's assets, including its intellectual property.  (Docket Entry No. 48-2 § 1(a)).  The intellectual property includes U.S. Patent Nos. 9,652,595 and 10,533,990.  (*Id.* § 1(a)(ii)(1)–(2)).  The asset purchase agreement provides that "[a]t Closing and upon the Purchaser paying the Purchase Price in full to the Seller, the Seller will deliver the Assets to the Purchaser."  (*Id.* § 6).  The agreement provides that "[t]he Closing of the purchase and sale of the Assets will take place on July 24, 2020."  (*Id.* § 5).  "Closing" is defined as "the completion of the purchase and sale of the Assets as described in this Agreement by the payment of agreed consideration and the transfer of title to

---

[5] The asset purchase agreement was the subject of litigation brought by one of Diabetes Relief's members, Hunter Carr, against its other members, Hepford and Dr. Stanley Lewis.  (Oct. 31, 2022 Tr. at 30:18–22, 31:1–4).  Well Cell's counsel has represented that litigation relates, at this point, only to the value of Carr's shares in Diabetes Relief and not the validity of the asset purchase agreement.  (*Id.* at 33:12–21).  The defendants have not put forward evidence calling that assessment of the state of the litigation into question.

the Assets." (*Id.* § 1(b)).  The agreement further provided that the balance of the purchase price

would be paid according to a schedule, the final payment of which has not been made.  (*Id.* § 10;

*see also* Nov. 1, 2022 Tr. at 178:17–18 ("Well Cell has not paid the entire purchase price yet.")).

The agreement provides that Diabetes Relief will perform certain obligations with respect to the

asset transfer:

> At Closing and upon the Purchaser paying the Purchase Price in full to the Seller,
> the Seller will provide the Purchaser with duly executed forms and documents
> evidencing transfer of the Assets, where required including, but not limited to, bills
> of sale, assignments, assurances and consents.  The Seller will also cooperate with
> the Purchaser as needed in order to effect the required registration, recording and
> filing with public authorities of the transfer of ownership of the Assets to the
> Purchaser.

(Docket Entry No. 48-2 § 7).

Following the hearing on the preliminary junction, (*see* Docket Entry No. 66 ¶ 9), Diabetes

Relief and Well Cell entered into an agreement, entitled "Nunc Pro Tunc Assignment," assigning

the patents in suit to Well Cell Global, purportedly effective as of July 24, 2020.  (Docket Entry

No. 67).

In September and November of 2021, Well Cell Support entered into license agreements

with Insulinic of Lafayette and Insulinic of Hialeah.  Shawn Calvit, whose background includes

laboratory sales but who does not have experience in developing or administering medical

treatments, is an owner and the managing member of both entities.  (Docket Entry No. 48-4

(Deposition Transcript of Shawn Paul Calvit, Sept. 28, 2022 ("Calvit Tr.")) at 50:16–22, 109:24–

110:7).  The provisions of those agreements were largely identical.  The license agreement granted

the Lafayette and Hialeah Insulinic entities certain rights to use Well Cell's patents and trade

secrets.  (Docket Entry Nos. 48-5, 48-6).

The agreements provide that the "LICENSEE agrees that LICENSOR has complete

authority to change any . . . rules it deems necessary for use under this Agreement."  (Docket Entry

APPX0008

No. 48-5 § 3(C)).  They further provide that "LICENSOR may terminate this Agreement . . . upon

TEN (10) days' notice if LICENSEE . . . refuses to comply with any of the terms and conditions

set forth in this Agreement and fails to cure such default within THIRTY (30) days."  (*Id.* § 4(B)).

On June 9, 2022, Hepford, as Manager of Well Cell Support, sent a notice of default to

Calvit and the Insulinic entities.  The notice stated:

> You are in violation of Paragraph 5B and your assurance that you []at all material
> times have been in compliance in all material respects with all laws, regulations,
> rules, orders, judgments, decrees, and other requirements and policies imposed by
> any governmental entity applicable to it, its owners, its properties, or the operation
> of its business transactions.  This especially applied to all matters involved involved
> with billing for services performed under your license agreements.

(Docket Entry No. 47-10).  On September 7, 2022, Well Cell's counsel sent Calvit and the Insulinic

entities a letter by email demanding they cease and desist from using the intellectual property and

trade secrets covered by the agreements.  (Docket Entry No. 47-12).  The letter stated that Well

Cell would initiate litigation if verification of compliance with the letter was not delivered within

24 hours.  (*Id.* at 4).

Well Cell filed this lawsuit on September 8, 2022.  (Docket Entry No. 1).  The next day,

Well Cell filed a motion for a temporary restraining order and preliminary injunction.  (Docket

Entry No. 4).  The court granted the application for a temporary restraining order following a

hearing, (Docket Entry No. 17), and later extended that order with the parties' agreement.  On

October 31 and November 1, 2022, the court held an evidentiary hearing on Well Cell's motion

for a preliminary injunction.  At the hearing, the parties argued their positions and Well Cell offered

the testimony of Scott Hepford, its managing member and CEO.  The defendants cross-examined

Hepford but did not call any of their own witnesses.  In the period between the issuance of the

TRO and the preliminary injunction hearing, the defendants moved to dismiss Well Cell's

complaint, (Docket Entry No. 35), and Well Cell filed an amended complaint.  (Docket Entry No.

43).

**B.      A Substantial Likelihood of Success on the Merits**

**1.      Well Cell's Standing to Assert Its Claims[6]**

The defendants attack Well Cell's standing to assert the '595 and '990 Patents and the other

intellectual property purportedly acquired from Diabetes Relief through the asset purchase

agreement, on the basis that Well Cell lacks legal title to that property.  (Docket Entry No. 47 at

16).

**a.  Patent Claims**

The defendants argue that the patents in suit are assigned to Diabetes Relief, which is not

a party to this lawsuit, and have not been assigned to Well Cell Global or Well Cell Support.  (*Id.*

at 16–19).  The defendants are correct that legal title is essential to maintaining an infringement

action at law for damages.  *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed. Cir.

1991) ("The general rule is that one seeking to recover money damages for infringement of a

United States patent (an action 'at law') must have held the legal title to the patent during the time

of the infringement.").  A *nunc pro tunc* assignment of a patent—such as that recently executed

between Diabetes Relief and Well Cell Global—does not convey standing if standing was lacking

when the suit was filed.  *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1366 (Fed. Cir.

2010).

The asset purchase agreement provides that Diabetes Relief will assign title to the patents

to Well Cell Global upon "Closing and upon Purchaser paying the Purchase Price in full to the

---

[6] Although Well Cell's proposed findings of fact and conclusions of law include findings related to its
trademark infringement and breach-of-contract claims, those claims are not properly before the court
because they were not the subject of Well Cell's motion for a preliminary injunction.

APPX0010

Seller." (Docket Entry No. 48-2 § 6). Although the deal has "closed," payment of the full purchase price appears to be a condition precedent to the delivery of Diabetes Relief's assets, including its patents, to Well Cell Global. The agreement defines "Closing" as "the payment of agreed consideration," and states that "Closing . . . will take place on July 24, 2020." The agreement also states that the "agreed consideration," which appears to be the "Purchase Price," will not be paid in full until 2024. In any event, no document clearly demonstrates that assignment of the patents from Diabetes Relief to Well Cell Global or Well Cell Support has occurred. (*Cf.* Nov. 1, 2022 Tr. at 175:11–176:2).

Although an agreement to assign does not—until the assignment is made—vest a party with legal title to a patent, it may convey equitable title and support equitable relief for infringement. *See Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1580 (Fed. Cir. 1991) ("[A] federal district court has jurisdiction to determine a 'claim for infringement,' asserted by an adjudged equitable title holder, as a prerequisite to awarding equitable relief for that infringement."). An agreement that promises to assign a patent in the future, if enforceable, may permit the promisee—here, Well Cell Global—to bring an action in equity with respect to the patent. *Id.* at 1581 ("[A]n agreement to assign in the future . . . may vest the promisee with *equitable* rights in those inventions . . . ."); *Gellman v. Telular Corp.*, 449 F. App'x 941, 945 (Fed. Cir. 2011) ("The district court was therefore correct in its conclusion that the Unsigned Agreement, if enforceable as a contract, could do no more than create an equitable claim for the Lebowitz Trust. And as already mentioned equitable claims do not themselves confer standing [for an action at law for damages].").

The asset purchase agreement provides that Diabetes Relief will assign the patents to Well Cell upon "Closing and upon the Purchaser paying the Purchase Price in full to the Seller." (Docket

APPX0011

Entry No. 48-2 § 6).   Based on this promise to transfer legal title to Well Cell, the court finds that Well Cell possesses equitable title to the '595 and '990 Patents and has standing to seek an injunction against the defendants.

### b.  The Copyright Claims

Only the "legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right."   17 U.S.C. § 501(b).   The certificates of registration for the copyrights were issued to Diabetes Relief and have not been subsequently assigned in writing, as required under 17 U.S.C. § 204(a).  *See also Lyrick Studios, Inc. v. Big Idea Prods., Inc.*, 420 F.3d 388, 391–92 (5th Cir. 2005) (discussing § 204(a) requirements).   Under the terms of the asset purchase agreement, Well Cell is not the legal owner of the copyrights in question.   The paradigmatic example of a beneficial owner of a copyright is one who assigns legal title to another in exchange for the payment of royalties, establishing an equitable trust relationship.  *Batiste v. Island Records Inc*., 179 F.3d 217, 221 n.2 (5th Cir. 1999). In fact, the "only . . . example of an approved 'beneficial owner' suit is set forth in the legislative history of the Copyright Act, which describes the term 'beneficial owner' as 'includ[ing], for example, an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees.'"  *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 393, 414 (2d Cir. 2018) (quoting H.R. Rep. No. 94-1476, at 159).   The Second Circuit's careful analysis of beneficial ownership under the Copyright Act concluded that a beneficial owner must have an interest that "derives its value directly from another person's use of an exclusive right, such that the interest is necessarily 'diluted' by infringement." *Id.* at 415 (quoting reference omitted).

The evidence shows that Diabetes Relief has prospectively assigned its copyrights to Well Cell Global, but the assignment will not be complete until Well Cell Global makes payment in full to Diabetes Relief.   Well Cell Global's future interest in the copyrights is not a beneficial

10

APPX0012

ownership, because its interest is not derived from Diabetes Relief's use of an exclusive right. Well Cell Global has not provided authority stating that a party who has contracted to acquire legal title to copyrights from another party may maintain an action as the beneficial owner of the copyright before an assignment or other transfer of the copyright.

The court finds that, on the current record, Well Cell does not have standing to pursue its copyright claims.

### c.   The Trade Secrets Claims

Courts applying Texas law have held that "one 'owns' a trade secret when one knows of it, as long as it remains a secret." *In re Cayman Island Firm of Deloitte & Touche*, No. 04-01-00491-CV, 2001 WL 1042233, at *3 (Tex. App.—San Antonio Sept. 12, 2001, no pet.) (quoting *DTM Research, LLC v. AT&T Corp.*, 245 F.3d 327, 332 (4th Cir. 2001); *Williams Consol. I, Ltd. v. Smith*, No. 8-cv-766, 2009 WL 10698215, at *6 (S.D. Tex. Oct. 19, 2009) (same), *report and recommendation adopted*, No. 4:08-CV-766, 2009 WL 10698262 (S.D. Tex. Nov. 19, 2009); *NTGSH JV, LLC v. Williams*, No. 20-cv-2469, 2021 WL 4440325, at *2 (S.D. Tex. Sept. 22, 2021) ("[A] party has standing to sue for trade secret misappropriation when it is a closely aligned corporate affiliate of the legal owner [of the trade secrets] and maintains the integrity of the trade secret." (quoting *Smith*, 2009 WL 10698215, at *6)).

Based on the close relationship between Well Cell Global and Diabetes Relief, and Well Cell Global's efforts to protect its intellectual property as trade secrets, Well Cell has standing to assert its trade secrets claims.

### 2.      The Termination of the License Agreement

At the preliminary injunction hearing, Hepford testified that a billing group that the defendants had selected to perform billing for services had informed Well Cell that the defendants had engaged in improper billing practices.  The improper practices included billing for more

11

complicated procedures than had actually been performed.  (Nov. 1, 2022 Tr. at 45:9–25).[7]  The

improper billing practices reported included improper billing for services covered by Medicare.

(*Id.* at 46:12–24).  The notice of default sent to Calvit explicitly referred to "matters involved with

billing for services performed under your license agreements" as reasons for termination.  (Docket

Entry No. 47-10).

The defendants have not presented evidence sufficient to rebut or call into question Well

Cell's contention that the license agreements were properly terminated.  The court finds that Well

Cell terminated the license agreements, at the latest, on September 7, 2022, prior to its filing of

this suit.  (Docket Entry No. 47-12).

### 3.    The Substantive Claims

### a.    Copyright Infringement

As stated above, on the current record, Well Cell lacks standing to assert its copyright

claims and is therefore unlikely to prevail on those claims.

### b.    Patent Infringement

To establish patent infringement, a party must show that the alleged infringer "without

authority makes, uses, offers to sell, or sells any patented invention." 35 U.S.C. § 271(a).

> A determination of infringement involves two steps: First, the court
> determines the scope and meaning of the asserted patent claims. The
> court then compares the properly construed claims to the allegedly
> infringing device to determine whether all of the claim limitations
> are present, either literally or by a substantial equivalent.

*Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1318–19 (Fed. Cir. 2011).

---

[7] The court considers Hepford's testimony as evidence that the statement was made, not for the statement's truth regarding the impropriety of the billing.

APPX0014

The burden shifting framework applicable to challenges to patent validity applies in the context of a preliminary injunction.  "With regard to the first factor—establishing a likelihood of success on the merits—the patentee seeking a preliminary injunction in a patent infringement suit must show that it will likely prove infringement, and that it will likely withstand challenges, if any, to the validity of the patent." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009).  "[T]he patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation." *Id.*  "[I]f a patentee moves for a preliminary injunction and the alleged infringer does not challenge validity, the very existence of the patent with its concomitant presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue."  *Id.* at 1377.  Although their brief in opposition to Well Cell's motion suggests that the defendants may ultimately challenge the validity of Well Cell's patents, (Docket Entry No. 47 at 19–20), the defendants stated at the preliminary injunction hearing that they do not, at this time, challenge the validity of the patents.  (Oct. 31, 2022 Tr. at 13:18–21).  The patents are presumptively valid.

The defendants did challenge the allegation that they are infringing Well Cell's patents. They argue that neither patent prohibits them from using the insulin infusion pumps or the IV tubing infusion cassettes they acquired from Well Cell, because those components are not the subject of Well Cell's patents.  (Docket Entry No. 47 at 20).

The abstract of the '595 Patent describes it as a "kit for individualized intravenous exogenous insulin-based therapy, which includes a portable data storage in communication with [a] client device processor."  (Docket Entry No. 47-2 at 1).  In his deposition, Hepford stated that the '595 Patent is a "kit" patent.  (Docket Entry No. 48-1 (Deposition Transcript of Scott Hepford, Sept. 21, 2022 ("Hepford Tr.")) at 253:14–16).  At the hearing, Hepford testified that, along with

the '990 Patent, the '595 Patent claims "an algorithm." (Nov. 1, 2022 Tr. at 150:20–22).  He

testified at his deposition that the physical technologies enumerated in the '595 Patent are not the

focus of Well Cell's licenses to the Insulinic defendants:

> This . . . patent, along with trade secrets, know-how, show-how and a bunch of other
> things go into educating providers to be able to perform a highly individualized
> modality that shifts and moves whether they have meters.  We provide meters.
> That's irrelevant to the point of the technology, the technique, the know-how, show-
> how is what is actually being licensed.
>
> So having an actual individualized meter is irrelevant.  The protocols overarching
> articulate what to do with it.  So it is not the thing.  It is how the thing is used.

(*Id.* at 255:1–12).  The "kit" is only "part of the modality" that Well Cell licenses to clinics.  (*Id.*

at 257:6–8).  Hepford insisted that the patent was not "a checklist of what goes in a bag and goes

out the door to a licensee." (*Id.* at 270:21–24).

Exactly what the '595 Patent claims proved difficult for Hepford to explain.  Hepford

repeatedly blurred the lines between the patent claims and other information provided or taught to

Well Cell's licensees.  At the hearing, discussions of the '595 Patent often turned back to other

aspects of Well Cell's treatment modality.  For example, counsel for the defendants asked, "Can

you tell me how this pump [mentioned in the patent] . . . how it compares the blood glucose test

results to the plurality of therapeutic ranges?"  Hepford responded:

> Again, you're conflating two totally different things.  That's not speaking to the
> pump.  This is the overarching modality; and that encompasses what we've taught
> the person, plus the dosing protocols, all the charts, their handheld computer, the
> device itself.  And all of those things also have templates, care plan templates, that
> they're using to program all this stuff into.  It helps them organize all their
> information that they're gathering to make a medical decision and make
> adjustments on devices and dosing ranges.

(Nov. 1, 2022 Tr. at 181:12–24).  Hepford's deposition contained similar exchanges in which he

was unable to describe with precision what he called "patent lawyer legalese." (Hepford Tr.. at

266:10).

14

> Like the words on here [that is, the '595 Patent] represent everything that is ultimately in the patent or that's in—yes, in the patent, but also in the kit. And that kit is a component of everything that they are taught.
>
> But if I hand them what you have on this page, no one understands that. So that's where the know-how, show-how trade secret comes in at being able to actually apply the words that are on this page into the whole thing that they get licensed to actually go use.

(*Id.* at 270:8–16).

Hepford's testimony suggests that the use of the pumps and IV cassettes provided to the defendants under the license agreements does not on its own indicate infringement of the '595 Patent. Without greater understanding of the actual scope of the '595 Patent, which Hepford was unable to provide, the court cannot assess whether the defendants are likely infringing the '595 Patent.

It is Well Cell's burden to demonstrate a likelihood of success on the merits. It has not done so with respect to the '595 Patent.

The abstract of the '990 Patents states that it is "[a]n individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing." (Docket Entry No. 47-3 at 1). The '990 Patent claims protocols used to determine dosing ranges as part of Well Cell's patented "modality." (Nov. 1, 2022 Tr. at 149:6–20). Although the '990 Patent does not include the most specific aspects of the modality, Hepford testified that someone could perform the protocols and administer the appropriate doses of insulin to individual patients using only the information conveyed in the '990 Patent. (*Id.* at 149:21–150:5). The '990 Patent refers to "administrative data storage," which is apparently an "encrypted data room." The evidence shows that the defendants had access to this "room" and the stored data, and could have easily copied both, and had to copy both to continue to use the Well Cell treatment after their licenses were terminated. (*Id.* at 192:13–193:19).

15

Hepford testified that language used by the defendants on their website matches the language found in Well Cell's administrative data storage.  (*Id.* at 194:4–16).

Calvit's testimony indicates that the defendants continue to perform therapies aimed at treating metabolic conditions with exogenous intravenous insulin therapy.  Calvit testified that the therapy the defendants now perform "[is] similar in that we are still putting IV into somebody's veins, but the timing, the amounts, and their process is different."  (Calvit Tr. at 101:9–12).  He tesfieid that the process was different because, with Well Cell's modality, "you keep the patient continuously doing an infusion non-stop for, I think, a period of three hours, and the other process, if I'm not mistaken, has them start for a certain period of time, then stops, gives . . . like a rest of thirty minutes or something like that, then starts up again."  (*Id.* at 103:4–10).  Calvit's testimony indicated that the defendants used their purportedly different therapy with the pumps acquired from Well Cell, until they were instructed to cease using those pumps.  (*Id.* at 105:7–11).  This testimony would indicate the pumps were fungible, but elsewhere Calvit testified that the defendants' new pumps "offered more flexibility on modalities."  (*Id.* at 106:9–10).

Calvit's minimal ability to differentiate the current therapy offered by the defendants does not effectively rebut the charge that the defendants are infringing the '990 Patent.  The asserted differences between the defendants' current practices and the Well Cell modality do not, at this stage, appear sufficient to allow the defendants to escape the charge that they are infringing the '990 Patent.

The court finds that the record shows that the defendants are likely infringing by practicing the therapy disclosed by the '990 Patent.

16

The court finds that Well Cell has demonstrated a likelihood of success on its claim for infringement of the '990 Patent but has not shown a likelihood of success on its claim for infringement of the '595 Patent.

### c.    Trade Secrets Claims

To show a violation of either the DTSA or TUTSA, a party must show that "(1) the trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant used the trade secret without authorization from the plaintiff." *CAE Integrated, L.L.C. v. Moov Techs., Inc*., 44 F.4th 257, 262 (5th Cir. 2022). The DTSA requires a showing that the product was used in interstate commerce.  18 U.S.C. § 1836. Both statutes define trade secrets and misappropriation similarly.  *See* 18 U.S.C. § 1839; Tex. Civ. Prac. & Rem. Code § 134A.002.

At common law, "[m]isappropriation of trade secrets is shown by proof (1) that a trade secret existed; (2) that the trade secret was acquired through a confidential relationship; (3) that the defendant used the trade secret without authorization from the plaintiff; and (4) that the owner sustained damages." *SPS Austin, Inc. v. Wilbourn*, No. 03-20-00054-CV, 2021 WL 5456659, at *9 (Tex. App.—Austin Nov. 19, 2021, no pet.) (citing *Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs., LLC*, 404 S.W.3d 737, 744 (Tex. App.—El Paso 2013, no pet.).

To determine whether information is a trade secret protected from disclosure or use, a court must examine six "relevant but nonexclusive" criteria: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Gen. Univ. Sys., Inc. v. Lee*, 379 F.3d 131,

APPX0019

150 (5th Cir. 2004) (citing *In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003)); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc*., 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd). All six factors need not be satisfied "because trade secrets do not fit neatly into each factor every time." *Gen. Univ. Sys*., 379 F.3d at 150 (quoting *Bass*, 113 S.W.3d at 740).

Calvit testified in his deposition that he believed that Well Cell's trade secrets include "[its] process for physiologic insulin resensitization and their patent on their pumps," specifically, how the insulin resensitization procedure "is done in reference to their patent." (Calvit Tr. at 178:14–23). When Calvit met with representatives of Diabetes Relief, he had to, and did, sign a nondisclosure agreement before the meeting. (*Id.* 175:9–17). He understood that the purpose of that agreement was "[t]o not tell other people about someone's business." (*Id.*). Calvit also testified that at least some of the people he brought to a didactic training session at Well Cell also signed a nondisclosure agreement with Well Cell. (*Id.* at 194:18–24). Calvit understood that anyone who attended a training session on the Well Cell insulin infusion treatment had to sign a nondisclosure agreement to get access to the training and technology. (*Id.* at 195:15–20).

Well Cell took extensive steps to keep its insulin infusion treatment and other knowledge secret from competitors. Hepford testified that the patents were deliberately drawn with enough specificity to be issued, while not revealing the details of Well Cell's modality. (*See, e.g.*, Nov. 1, 2022 Tr. at 133:10–15 ("This [information revealed in the '595 Patent] . . . is the range. There's . . .the far extreme limits. What they're taught, then, in how to apply [the patent] is the know-how, the show-how, the trade secrets."); *see also id.* at 149:3–20).

Calvit testified in his deposition that the Hawai'i Insulinic clinic had no license from Well Cell. (Calvit Tr. at 211:2–8). He testified that he knew that a press release had been issued announcing the imminent opening of that clinic. (*Id.* at 225:24–226:4). Calvit confirmed that the

18

Hawai'i clinic would offer "insulin infusion treatment," but that it would use a modality other than Well Cell's "physiologic insulin resensitization." (*Id.* at 226:2–16). Calvit testified that the Hawai'i clinic would instead perform "microburst insulin infusion." (*Id.* at 227:8–18). Calvit repeatedly asserted that the microburst process was different from Well Cell's process, but he was unable to explain with any detail how the processes were different. (*Id.* at 231:4–10). He claimed that the Hawai'i clinic would perform insulin infusion therapies but that, even as the opening of the clinic approached, he had not told Well Cell. Calvit testified that he intended to let Well Cell know about the Hawai'i clinic, but he had not done so because "[it] weren't prepared and ready to open up." (*Id.* at 225:4–10). Calvit's testimony and the evidence that the defendant Insulinic clinics were marketing themselves using Well Cell's kits and descriptions and approaches leads the court to conclude that the defendants were attempting to conceal information about what they were doing in their clinics, including the Hawai'i clinic, from Well Cell.

Finally, Calvit's conclusory testimony that the microburst insulin infusion modality does not involve the misappropriation of Well Cell's trade secrets is not credible. The record shows that the defendants are likely continuing to use the knowledge, training, equipment, and processes they obtained from Well Cell under the now-terminated license agreements.

The court finds that Well Cell has shown a likelihood of success on the merits of its trade-secret claims.

## C.    Irreparable Harm

Well Cell argues that the continued infringement of its intellectual property risks doctor, patient, and consumer confusion and irreparable harm to its reputation and business goodwill. (Docket Entry No. 4 ¶ 84). These harms are inherently difficult to quantify and are paradigmatic examples of irreparable harm in the commercial context. *See, e.g.*, *Emerald City Mgmt., L.L.C. v. Kahn*, 624 F. App'x 223, 224 (5th Cir. 2015).

19

When a party seeks injunctive relief with respect to its patents, there must be a "showing of some causal nexus between [the alleged] infringement and the alleged irreparable harm." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012).  The court finds that Well Cell has shown this nexus.  The '990 Patent relates to Well Cell's proprietary treatments.  The misuse of that intellectual property risks harm to Well Cell.  Hepford testified that, given the past relationship between Calvit, Calvit's Insulinic clinics, and Well Cell, if Calvit "does things that are illegal and improper and ultimately ends up getting in trouble for that . . . and then . . . point[s] his fingers back and say[s], but these guys, they were the ones that taught me all this stuff," then Well Cell is put at risk.  (Hepford Tr. at 170:1–8).  Hepford continued,

> And the worst part in this is that he actually puts his patients' health at risk because he is not able to maintain their care, thus also putting us at risk of not being able to provide licenses to everyone if ultimately we are in trouble along with him doing all the bad things that he is doing.

(*Id.* at 170:16–22).  Hepford convincingly testified that the defendants' unlicensed use of Well Cell's modality risks irreparable harm to Well Cell and to the members of the public who seek medical treatment from the Insulinic clinics.

### D.      Balance of Equities

The balance of equities weighs in favor of Well Cell.  The defendants have not argued that the entry of a temporary restraining order would cause them irreparable harm.  Calvit testified that Well Cell's technologies are only part of the services offered at their clinics.  The balance of equities favors issuance of a preliminary injunction forbidding the defendants from using any of the Well Cell proprietary information, equipment, training, and treatments.

### E.      Public Interest

The public interest favors protection of intellectual property and therefore weighs in favor of issuing the preliminary injunction Well Cell seeks.  The public interest is also served by

APPX0022

prohibiting the defendants from using the Well Cell technology without a license to do so to treat individuals suffering from diabetes or other metabolic disorders.  The defendants do not contend that the inability to offer Well Cell's technologies at their clinics risks harm to their economic interests, given their ability to offer other treatments; risks harm to patients; or is otherwise against the public interest.

## IV.     Conclusions of Law

The court enters the following conclusions of law:

1.     Well Cell has standing to assert its patent and trade-secrets claims.

2.     Well Cell is substantially likely to prevail on the merits of its patent-infringement claims regarding the '990 Patent.

3.     Well Cell is substantially likely to prevail on the merits of its trade-secrets claims.

4.     Well Cell will suffer irreparable harm absent a preliminary injunction.

5.     The balance of equities favors the entry of a preliminary injunction with respect to Well Cell's trade-secrets and '990 Patent claims.

6.     The public interest would not be disserved by entry of a preliminary injunction with respect to Well Cell's trade-secrets claims.

The court will separately enter an order of preliminary injunction.  The order will include a bond of $50,000.  The parties must appear at a hearing for a permanent injunction on **Tuesday, January 31, 2023, at 10:00 a.m., in Courtroom 11B**.

SIGNED on November 10, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

APPX0023

**TAB 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC, | § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § | CIVIL ACTION NO. 4:22-CV-03062 |
| SHAWN PAUL CALVIT, MARC PIERRE DESGRAVES IV, CHARLES ALEXANDER ELLIOTT, PATRICK DALE LELEAUX, M.D., INSULINIC LLC, INSULINIC OF LAFAYETTE LLC, INSULINIC OF HIALEAH LLC, INSULINIC OF HAWAII, LLC, INSULINIC OF GRETNA, LLC, AND INSULINIC OF HAMMOND, LLC, | § § § § § § § § § § § § | |
| *Defendants*. | § | |

## NOTICE OF APPEAL

Notice is hereby given that Defendants, Shawn Paul Calvit, Marc Pierre Desgraves IV,

Charles Alexander Elliott, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and Insulinic of

Hawaii LLC (collectively, the "Defendants"), appeal to the United States Court of Appeals for the

Federal Circuit from the order entered in this action on the 10th day of November, 2022 (Docket

No. 77), granting the Plaintiff's Motion for Temporary and Preliminary Injunction (Docket No. 4).

Date:   December 2, 2022.

APPX0024

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Justin K. Ratley*
    Justin K. Ratley
    State Bar No. 24093011
    700 Milam, Suite 800
    Houston, Texas 77002
    Telephone: (713) 222-1470
    Facsimile: (713) 222-1475
    jratley@munsch.com

    **ATTORNEYS FOR DEFENDANTS,**
    **SHAWN PAUL CALVIT,**
    **MARC PIERRE DESGRAVES IV,**
    **CHARLES ALEXANDER ELLIOTT,**
    **INSULINIC OF LAFAYETTE LLC,**
    **INSULINIC OF HIALEAH LLC,**
    **AND INSULINIC OF HAWAII LLC**

Of Counsel:
Elizabeth F. Eoff
State Bar No. 24095062
SDTX ID No. 2951585
Julie B. McClintock
State Bar No. 24115668
SDTX ID No. 3779016
Munsch Hardt Kopf & Harr, P.C.
700 Milam, Suite 800
Houston, Texas 77002
Telephone: (713) 222-1493
Facsimile: (713) 222-1475
eeoff@munsch.com
jmcclintock@munsch.com

Winston O. Huff
State Bar No. 2406875
SDTX ID No. 3608998
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201
Telephone: (214) 855-7508
Facsimile: (214) 855-7584
whuff@munsch.com

APPX0025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record on December 2, 2022, using the CM/ECF system.

Lema Barazi
Feras Mousilli
Elizabeth Revere
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
litigation@lloydmousilli.com
lema@lloydmousilli.com
feras@lloydmousilli.com
beth@lloydmousilli.com

*/s/ Justin K. Ratley*
Justin K. Ratley

APPX0026

**TAB 4**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| Well Cell Global LLC, et al. | § | |
| | § | |
| *versus* | § | Case Number: 4:22−cv−03062 |
| | § | |
| Shawn Paul Calvit, et al. | § | |

## Notice of Filing an Appeal to the Federal Circuit.

    An appeal to the Federal Circuit has been filed. A completed Form 7, the notice of appeal, the order being appealed, and the public docket sheet are being provided to the Federal Circuit in accordance with the District Court's procedures.

Date: December 5, 2022

Nathan Ochsner, Clerk

Form 7

FORM 7.   Appeal Information Sheet

---

# FEDERAL CIRCUIT APPEAL INFORMATION SHEET

[✓] United States District Court for the  Southern District of Texas

[ ] United States Court of International Trade

[ ] United States Court of Federal Claims

[ ] United States Court of Appeals for Veterans Claims

Type of case: Copyright Infringement

Well Cell Global LLC and Well Cell Support LLC  v.  Calvit, et al

(List all parties.  Use an asterisk to indicate dismissed or withdrawn parties.  Use a separate sheet if needed.  Explain any discrepancy with the caption used on the judgment, order, or opinion.)

Docket No. 4:22-cv-3062                          Date of Judgment or Order  11/10/2022

Cross or related appeal? N/A                    Date of Notice of Appeal     12/2/2022

Appellant is: [ ] Plaintiff  [✓] Defendant  [ ] Other (explain)

FEES:   Court of Appeals docket fee paid?   [✓] Yes   [ ] No

U.S. Appeal?                          [ ] Yes   [✓] No

In forma pauperis?                   [ ] Yes   [✓] No

Is this matter under seal?   [ ] Yes   [✓] No

COUNSEL: (List name, firm, address, and telephone of lead counsel for each party.  Indicate party represented.  Use separate sheet if needed.)

See attachment

COURT REPORTER: (Name and telephone):  G. Dye, M. Capetillo 713-250-5500

IMPORTANT: Attach a copy of the judgment or order appealed from and any supporting opinion or memorandum.  Forward together with a copy of the notice of appeal and certified docket entries.

Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, DC  20439

122

APPX0028

**4:22-cv-03062** Well Cell Global LLC v. Calvit et al
Lee H Rosenthal, presiding
**Date filed:** 09/08/2022
**Date of last filing:** 12/02/2022

# Parties

**Shawn Paul Calvit**
100 Meadow Lane
Lafayette, LA 70506
*Added: 09/08/2022*
*(Defendant)*

represented by

**Elizabeth Frances Eoff**
Munsch Hardt Kopf & Harr, P.C.
700 Milam
Suite 2700
Houston, TX 77002
713-222-1493
eeoff@munsch.com
*Assigned: 09/14/2022*
*ATTORNEY TO BE NOTICED*

**Winston Oliver Huff**
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard St.
Ste. 3800
Dallas, TX 75201
214-855-7500
whuff@munsch.com
*Assigned: 11/04/2022*
*ATTORNEY TO BE NOTICED*

**Julie Brooke McClintock**
Munsch Hardt Kopf & Harr, PC
700 Milam St.
Suite 800
Houston, TX 77002
713-222-4099
jmcclintock@munsch.com
*Assigned: 11/04/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Keith Ratley**
Munsch Hardt Kopf & Harr, PC
700 Milam St.
Suite 2700
Houston, TX 77002
713-222-4087
jratley@munsch.com
*Assigned: 09/13/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

APPX0029

**Marc Pierre Desgraves, IV**
9541 Pagosa Street
Commerce City, CO 80022
*Added: 09/08/2022*
*(Defendant)*

represented by

**Justin Keith Ratley**
Munsch Hardt Kopf & Harr, PC
700 Milam St.
Suite 2700
Houston, TX 77002
713-222-4087
jratley@munsch.com
*Assigned: 10/04/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Alexander Elliott**
930 Makaiwa Street
Honolulu, HI 96816
*Added: 09/08/2022*
*(Defendant)*

represented by

**Justin Keith Ratley**
Munsch Hardt Kopf & Harr, PC
700 Milam St.
Suite 2700
Houston, TX 77002
713-222-4087
jratley@munsch.com
*Assigned: 10/04/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Insulinic LLC**
*Added: 10/25/2022*
*(Defendant)*

**Insulinic of Gretna, LLC**
*Added: 10/25/2022*
*(Defendant)*

**Insulinic of Hammond, LLC**
*Added: 10/25/2022*
*(Defendant)*

**Insulinic of Hawaii, LLC**
1360 S. Beretania Street
Suite 500
Honolulu, HI 98614
*Added: 09/08/2022*
*(Defendant)*

represented by

**Elizabeth Frances Eoff**
Munsch Hardt Kopf & Harr, P.C.
700 Milam
Suite 2700
Houston, TX 77002
713-222-1493
eeoff@munsch.com
*Assigned: 09/14/2022*
*ATTORNEY TO BE NOTICED*

**Winston Oliver Huff**
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard St.
Ste. 3800
Dallas, TX 75201

APPX0030

214-855-7500
whuff@munsch.com
*Assigned: 11/04/2022*
*ATTORNEY TO BE NOTICED*

**Julie Brooke McClintock**
Munsch Hardt Kopf & Harr, PC
700 Milam St.
Suite 800
Houston, TX 77002
713-222-4099
jmcclintock@munsch.com
*Assigned: 11/04/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Keith Ratley**
Munsch Hardt Kopf & Harr, PC
700 Milam St.
Suite 2700
Houston, TX 77002
713-222-4087
jratley@munsch.com
*Assigned: 09/13/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Insulinic of Hialeah LLC**
220 Johnston Street Building
Lafayette, LA 70501
*Added: 09/08/2022*
*(Defendant)*                    represented by

**Elizabeth Frances Eoff**
Munsch Hardt Kopf & Harr, P.C.
700 Milam
Suite 2700
Houston, TX 77002
713-222-1493
eeoff@munsch.com
*Assigned: 09/14/2022*
*ATTORNEY TO BE NOTICED*

**Winston Oliver Huff**
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard St.
Ste. 3800
Dallas, TX 75201
214-855-7500
whuff@munsch.com
*Assigned: 11/04/2022*
*ATTORNEY TO BE NOTICED*

**Julie Brooke McClintock**
Munsch Hardt Kopf & Harr, PC
700 Milam St.

Suite 800
Houston, TX 77002
713-222-4099
jmcclintock@munsch.com
*Assigned: 11/04/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Keith Ratley**
Munsch Hardt Kopf & Harr, PC
700 Milam St.
Suite 2700
Houston, TX 77002
713-222-4087
jratley@munsch.com
*Assigned: 09/13/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| | | |
|---|---|---|
| **Insulinic of Lafayette LLC**<br>220 Johnston Street Building<br>Lafayette, LA 70501<br>*Added: 09/08/2022*<br>*(Defendant)* | represented by | **Elizabeth Frances Eoff**<br>Munsch Hardt Kopf & Harr, P.C.<br>700 Milam<br>Suite 2700<br>Houston, TX 77002<br>713-222-1493<br>eeoff@munsch.com<br>*Assigned: 09/14/2022*<br>*ATTORNEY TO BE NOTICED* |

**Winston Oliver Huff**
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard St.
Ste. 3800
Dallas, TX 75201
214-855-7500
whuff@munsch.com
*Assigned: 11/04/2022*
*ATTORNEY TO BE NOTICED*

**Julie Brooke McClintock**
Munsch Hardt Kopf & Harr, PC
700 Milam St.
Suite 800
Houston, TX 77002
713-222-4099
jmcclintock@munsch.com
*Assigned: 11/04/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Keith Ratley**
Munsch Hardt Kopf & Harr, PC
700 Milam St.
Suite 2700
Houston, TX 77002
713-222-4087
jratley@munsch.com
*Assigned: 09/13/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dr. Patrick Dale LeLeaux**
*Added: 10/25/2022*
*(Defendant)*

**MD Patrick Dale LeLeaux**
*Added: 10/28/2022*
*(Defendant)*

**Well Cell Global LLC**
11511 Katy Freeway
Suite 102
Houston, TX 77079
*Added: 09/08/2022*          represented by
*(Plaintiff)*

**Lema Barazi**
Lloyd Mousilli PLLC
11807 Westheimer Rd
Ste 550 PMB 944
Houston, TX 77077
713-306-4650
Lema@lloydmousilli.com
*Assigned: 09/08/2022*
*ATTORNEY TO BE NOTICED*

**Well Cell Support LLC**
*Added: 10/25/2022*
*(Plaintiff)*
                             represented by

**Lema Barazi**
Lloyd Mousilli PLLC
11807 Westheimer Rd
Ste 550 PMB 944
Houston, TX 77077
713-306-4650
Lema@lloydmousilli.com
*Assigned: 10/25/2022*
*ATTORNEY TO BE NOTICED*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC | § | |
| AND WELL CELL SUPPORT LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-03062 |
| | § | |
| SHAWN PAUL CALVIT, | § | |
| MARC PIERRE DESGRAVES IV, | § | |
| CHARLES ALEXANDER ELLIOTT, | § | |
| PATRICK DALE LELEAUX, M.D., | § | |
| INSULINIC LLC, INSULINIC OF | § | |
| LAFAYETTE LLC, INSULINIC OF | § | |
| HIALEAH LLC, INSULINIC OF | § | |
| HAWAII, LLC, INSULINIC OF | § | |
| GRETNA, LLC, AND INSULINIC OF | § | |
| HAMMOND, LLC, | § | |
| | § | |
| *Defendants*. | § | |

## **NOTICE OF APPEAL**

Notice is hereby given that Defendants, Shawn Paul Calvit, Marc Pierre Desgraves IV, Charles Alexander Elliott, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and Insulinic of Hawaii LLC (collectively, the "Defendants"), appeal to the United States Court of Appeals for the Federal Circuit from the order entered in this action on the 10th day of November, 2022 (Docket No. 77), granting the Plaintiff's Motion for Temporary and Preliminary Injunction (Docket No. 4).

Date:   December 2, 2022.

1

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Justin K. Ratley*

    Justin K. Ratley
    State Bar No. 24093011
    700 Milam, Suite 800
    Houston, Texas 77002
    Telephone: (713) 222-1470
    Facsimile: (713) 222-1475
    jratley@munsch.com

    **ATTORNEYS FOR DEFENDANTS,**
    **SHAWN PAUL CALVIT,**
    **MARC PIERRE DESGRAVES IV,**
    **CHARLES ALEXANDER ELLIOTT,**
    **INSULINIC OF LAFAYETTE LLC,**
    **INSULINIC OF HIALEAH LLC,**
    **AND INSULINIC OF HAWAII LLC**

Of Counsel:
Elizabeth F. Eoff
State Bar No. 24095062
SDTX ID No. 2951585
Julie B. McClintock
State Bar No. 24115668
SDTX ID No. 3779016
Munsch Hardt Kopf & Harr, P.C.
700 Milam, Suite 800
Houston, Texas 77002
Telephone: (713) 222-1493
Facsimile: (713) 222-1475
eeoff@munsch.com
jmcclintock@munsch.com

Winston O. Huff
State Bar No. 2406875
SDTX ID No. 3608998
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201
Telephone: (214) 855-7508
Facsimile: (214) 855-7584
whuff@munsch.com

APPX0035

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record on December 2, 2022, using the CM/ECF system.

Lema Barazi
Feras Mousilli
Elizabeth Revere
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
litigation@lloydmousilli.com
lema@lloydmousilli.com
feras@lloydmousilli.com
beth@lloydmousilli.com

*/s/ Justin K. Ratley*
Justin K. Ratley

APPX0036

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| WELL CELL GLOBAL LLC and WELL CELL SUPPORT LLC, | § § § |
| Plaintiffs, | § § |
| v. | § § § CIVIL ACTION NO. H-22-3062 |
| SHAWN PAUL CALVIT, MARC PIERRE DESGRAVES IV, CHARLES ALEXANDER ELLIOTT, PATRICK DALE LELEAUX, M.D., INSULINIC OF LAFAYETTE LLC, INSULINIC OF HIALEAH LLC, INSULINIC OF HAWAII, LLC, INSULINIC OF GRETNA, LLC, and INSULINIC OF HAMMOND, LLC, | § § § § § § § § § § |
| Defendants. | § § |

**ORDER OF PRELIMINARY INJUNCTION**

For the reasons stated in the court's memorandum and opinion, (Docket Entry No. 76), the court grants, in part, plaintiffs' motion for a preliminary injunction. (Docket Entry No. 4).

The court finds that a $50,000.00 surety bond is a sufficient and proper amount of security pursuant to Federal Rule of Civil Procedure 65(c). Contingent on the plaintiffs posting this bond, it is ordered:

Defendants Shawn Paul Calvit, Marc Pierre Desgraves IV, Charles Alexander Elliot, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, Insulinic of Hawaii, LLC, and any of their assigns, agents, representatives, and any persons in active concert or participation with any of them, who receive actual notice of this order, by personal service or otherwise, are hereby restrained and enjoined from performing any of the following, or by assisting anyone else from performing the following:

1.       Practicing the therapy disclosed in U.S. Patent No. 10,533,990;

2. Using any of the knowledge, information, training, or materials taught, delivered, described, or otherwise imparted from Well Cell, in whole or in part, as part of any medical procedure, treatment, therapeutic modality, or otherwise;

3. Practicing Well Cell's propriety method of insulin resensitization, the microburst insulin infusion modality, or any other form of exogenous intravenous insulin infusion designed to treat diabetes or other metabolic disorders;

4. Disclosing the plaintiffs' trade secrets, including their confidential business contacts and their specialized medical training, including their training modules, videos, and handbooks, and methods of conducting their business for Well Cell's proprietary method of insulin resensitization for the treatment of diabetes to any person or entity in the United States; and

5. Representing, by any means whatsoever, that any products manufactured, distributed, advertised, offered or sold by the defendants are Well Cell's products or vice versa, and from otherwise acting in a way likely to cause confusion, mistake, or deception on the part of purchasers or consumers as to the origin or sponsorship of such products.

Each of Shawn Paul Calvit, Marc Pierre Desgraves IV, Charles Alexander Elliot, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, Insulinic of Hawaii, LLC, and any of their assigns, agents, representatives, and any persons in active concert or participation with any of them, who receive actual notice of this order, by personal service or otherwise, are ordered to:

1. Immediately deliver to the plaintiffs any documents reflecting their specialized medical training, including their training modules, videos, and handbooks, and methods of conducting their business involving Well Cell's proprietary method of insulin resensitization for the treatment of diabetes.

SIGNED on November 10, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

2

APPEAL,APPEAL_NAT

# U.S. District Court
## SOUTHERN DISTRICT OF TEXAS (Houston)
## CIVIL DOCKET FOR CASE #: 4:22-cv-03062
## Internal Use Only

Well Cell Global LLC v. Calvit et al
Assigned to: Chief Judge Lee H Rosenthal
Demand: $10,000,000
Cause: 17:101 Copyright Infringement

Date Filed: 09/08/2022
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Well Cell Global LLC**                    represented by **Lema Barazi**
                                            Lloyd Mousilli PLLC
                                            11807 Westheimer Rd
                                            Ste 550 PMB 944
                                            Houston, TX 77077
                                            713-306-4650
                                            Email: Lema@lloydmousilli.com
                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Well Cell Support LLC**                   represented by **Lema Barazi**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Shawn Paul Calvit**                       represented by **Julie Brooke McClintock**
                                            Munsch Hardt Kopf & Harr, PC
                                            700 Milam St.
                                            Suite 800
                                            Houston, TX 77002
                                            713-222-4099
                                            Email: jmcclintock@munsch.com
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Justin Keith Ratley**
                                            Munsch Hardt Kopf & Harr, PC
                                            700 Milam St.
                                            Suite 2700
                                            Houston, TX 77002
                                            713-222-4087
                                            Email: jratley@munsch.com
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Elizabeth Frances Eoff**

Munsch Hardt Kopf & Harr, P.C.
700 Milam
Suite 2700
Houston, TX 77002
713-222-1493
Email: eeoff@munsch.com
*ATTORNEY TO BE NOTICED*

**Winston Oliver Huff**
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard St.
Ste. 3800
Dallas, TX 75201
214-855-7500
Email: whuff@munsch.com
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Marc Pierre Desgraves, IV**                       represented by   **Justin Keith Ratley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Charles Alexander Elliott**                       represented by   **Justin Keith Ratley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Insulinic of Lafayette LLC**                       represented by   **Julie Brooke McClintock**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Keith Ratley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Frances Eoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Oliver Huff**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Insulinic of Hialeah LLC**                       represented by   **Julie Brooke McClintock**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

APPX0040

**Justin Keith Ratley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Frances Eoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Oliver Huff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Insulinic of Hawaii, LLC**                    represented by    **Julie Brooke McClintock**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Keith Ratley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Frances Eoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Oliver Huff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dr. Patrick Dale LeLeaux**

**Defendant**

**Insulinic LLC**

**Defendant**

**Insulinic of Hammond, LLC**

**Defendant**

**Insulinic of Gretna, LLC**

**Defendant**

**MD Patrick Dale LeLeaux**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/08/2022 | 1 | COMPLAINT against Shawn Paul Calvit, Marc Pierre Desgraves, IV, Charles Alexander Elliott, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of |

| | | |
|---|---|---|
| | | Lafayette LLC (Filing fee $ 402 receipt number ATXSDC-28744837) filed by Well Cell Global LLC. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit) (Barazi, Lema) (Entered: 09/08/2022) |
| 09/08/2022 | 2 | Request for Issuance of Summons as to All Defendants, filed. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(Barazi, Lema) (Entered: 09/08/2022) |
| 09/09/2022 | 3 | Summons Issued as to All Defendants. Issued summons delivered to plaintiff by NEF, filed. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons) (BrandisIsom, 4) (Entered: 09/09/2022) |
| 09/09/2022 | 🔒 4 | MOTION for Temporary Restraining Order by Well Cell Global LLC, filed. Motion Docket Date 9/30/2022. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit) (Barazi, Lema) (Entered: 09/09/2022) |
| 09/09/2022 | 5 | PROPOSED ORDER *to Show Cause for Preliminary Injunction and Temporary Restraining Order* re: 4 MOTION for Temporary Restraining Order, filed.(Barazi, Lema) (Entered: 09/09/2022) |
| 09/09/2022 | 6 | NOTICE of Setting as to 4 MOTION for Temporary Restraining Order. Parties notified. Motion Hearing set for 9/13/2022 at 05:00 PM in Courtroom 11B before Chief Judge Lee H Rosenthal, filed. Plaintiff must serve defendants the complaint and motion for TRO. (leddins, 4) Modified on 9/9/2022 (leddins, 4). (Entered: 09/09/2022) |
| 09/12/2022 | 7 | Request for Issuance of Summons as to Insulinic of Hialeah LLC, filed.(Barazi, Lema) (Entered: 09/12/2022) |
| 09/12/2022 | 8 | ORDER Scheduling Rule 16 Conference With the Court and Setting Out the Requirements for Initial Pretrial Work (Patent Case). Initial Conference set for 12/16/2022 at 10:30 AM by video before Chief Judge Lee H Rosenthal. (Signed by Chief Judge Lee H Rosenthal) (Attachments: # 1 Attachments) Parties notified. (JacquelineMata, 4) (Entered: 09/12/2022) |
| 09/12/2022 | 9 | US Patent and Trademark Office Notified. AO 120, filed. (Attachments: # 1 Complaint) (JacquelineMata, 4) (Entered: 09/12/2022) |
| 09/13/2022 | 10 | Summons Issued as to Insulinic of Hialeah LLC. Issued summons delivered to plaintiff by NEF, filed.(hlerma, 4) (Entered: 09/13/2022) |
| 09/13/2022 | 11 | PROPOSED ORDER *Temporary Restraining Order* re: 4 MOTION for Temporary Restraining Order, filed.(Barazi, Lema) (Entered: 09/13/2022) |
| 09/13/2022 | 12 | NOTICE of Appearance by Justin Keith Ratley on behalf of Shawn Paul Calvit, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. (Ratley, Justin) (Entered: 09/13/2022) |
| 09/13/2022 | 13 | NOTICE of Appearance by Elizabeth F. Eoff on behalf of Insulinic of Hawaii, LLC, filed. (Eoff, Elizabeth) (Entered: 09/13/2022) |
| 09/13/2022 | 🔒 14 | AFFIDAVIT of Scott Hepford re: 4 MOTION for Temporary Restraining Order, filed. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Barazi, Lema) (Entered: 09/13/2022) |
| 09/13/2022 | 17 | Minute entry for proceedings before the Hon. Lee H. Rosenthal. The court held a hearing on plaintiffs motion for a temporary restraining order, (Docket Entry No. 4). |

| | | The court grants the motion and separately enters an order. A hearing on plaintiffs motion for a preliminary injunction will be held on Friday, September 23, 2022, at 1:00 p.m., in Courtroom 11-B. Appearances: Lema Barazi for Pltf. and Justin Ratley/Elizabeth Eoff for Defts. (Court Reporter: G. Dye), filed.(leddins, 4) (Entered: 09/15/2022) |
|---|---|---|
| 09/14/2022 | 15 | PROPOSED ORDER *Temporary Restraining Order* re: 4 MOTION for Temporary Restraining Order, filed.(Barazi, Lema) (Entered: 09/14/2022) |
| 09/14/2022 | 16 | PROPOSED ORDER re: 4 MOTION for Temporary Restraining Order, filed. (Ratley, Justin) (Entered: 09/14/2022) |
| 09/15/2022 | 18 | MEMORANDUM AND TEMPORARY RESTRAINING ORDER entered: This order expires on September 27, 2022, or when the court otherwise orders. The court sets a hearing on Well Cell's application for a preliminary injunction on Friday, September 23, 2022, at 1:00 p.m., in Courtroom 11-B.(Signed by Chief Judge Lee H Rosenthal) Parties notified.(leddins, 4) (Entered: 09/15/2022) |
| 09/15/2022 | 19 | ORDER entered: In its temporary restraining order, (Docket Entry No. 18), the court did not order Well Cell to provide security as required by Federal Rule of Civil Procedure 65(c). The parties did not address the security requirement in their briefing or during the September 13, 2022, hearing.No later than 1:00 p.m. on Friday, September 16, the parties must submit proposals for the security.(Signed by Chief Judge Lee H Rosenthal) Parties notified.(leddins, 4) (Entered: 09/15/2022) |
| 09/15/2022 | 20 | Opposed MOTION to Expedite Discovery by Shawn Paul Calvit, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. Motion Docket Date 10/6/2022. (Attachments: # 1 Exhibit A, # 2 Proposed Order)(Ratley, Justin) (Entered: 09/15/2022) |
| 09/16/2022 | 21 | ORDER entered: Shawn Paul Calvit, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, and Insulinic of Lafayette LLC move for expedited discovery. (Docket Entry No. 20). The court will not require Well Cell to serve its responses to the defendants discovery requests until hearing from Well Cell. The moving defendants proposed deadline, September 20, 2022, is unrealistic and will not be ordered.The court orders Well Cell to file its opposition to the motion for expedited discovery by 5:00 p.m. on Monday, September 19, 2022. (Signed by Chief Judge Lee H Rosenthal) Parties notified.(leddins, 4) (Entered: 09/16/2022) |
| 09/16/2022 | 22 | MOTION for Bond by Well Cell Global LLC, filed. Motion Docket Date 10/7/2022. (Attachments: # 1 Proposed Order)(Barazi, Lema) (Entered: 09/16/2022) |
| 09/16/2022 | 23 | MOTION for Bond by Shawn Paul Calvit, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. Motion Docket Date 10/7/2022. (Attachments: # 1 Exhibit A, # 2 Proposed Order)(Ratley, Justin) (Entered: 09/16/2022) |
| 09/19/2022 | 24 | RESPONSE in Opposition to 20 Opposed MOTION to Expedite Discovery, filed by Well Cell Global LLC. (Attachments: # 1 Proposed Order)(Barazi, Lema) (Entered: 09/19/2022) |
| 09/20/2022 | 25 | ORDER Regarding Security Amounts..(Signed by Chief Judge Lee H Rosenthal) Parties notified.(kpicota, 4) (Entered: 09/20/2022) |
| 09/20/2022 | | Deposit made into the Registry of the Court by Well Cell Global LLC in the amount of $10,000.00, receipt number HOU11355 re: 25 Order on Motion for Bond,, filed. (rhawkins, 4) (Entered: 09/20/2022) |

| 09/21/2022 | 26 | Agreed MOTION for Entry of Order re: Patent Protective Order by Well Cell Global LLC, filed. Motion Docket Date 10/12/2022. (Attachments: # 1 Proposed Order)(Barazi, Lema) (Entered: 09/21/2022) |
| --- | --- | --- |
| 09/21/2022 | 27 | MEMORANDUM AND TEMPORARY RESTRAINING ORDER. Preliminary Injunction Hearing set for 9/23/2022 at 01:00 PM in Courtroom 11B before Chief Judge Lee H Rosenthal. (Signed by Chief Judge Lee H Rosenthal) Parties notified. (gclair, 4) (Entered: 09/21/2022) |
| 09/21/2022 | 28 | PROTECTIVE ORDER entered granting 26 Agreed MOTION for Entry of Order re: Patent Protective Order.(Signed by Chief Judge Lee H Rosenthal) Parties notified.(leddins, 4) (Entered: 09/22/2022) |
| 09/22/2022 | 29 | MEMORANDUM AND ORDER entered: The court grants in part defendants motion for expedited discovery, (Docket Entry No. 20), with respect to Request Nos. 2, 3, and 6, as modified in the text of the order. Well Cell must respond by September 28, 2022. The court otherwise denies the motion. The preliminary injunction hearing is reset to October 3, 2022, at 10:30 a.m. in Courtroom 11-B. The TRO will be extended to that date.(Signed by Chief Judge Lee H Rosenthal) Parties notified.(leddins, 4) Modified on 9/22/2022 (leddins, 4). (Entered: 09/22/2022) |
| 09/22/2022 | 30 | MOTION to Seal Exhibits to Hepford Affidavit ECF 14 by Well Cell Global LLC, filed. Motion Docket Date 10/13/2022. (Barazi, Lema) (Entered: 09/22/2022) |
| 09/23/2022 | 31 | Agreed AMENDED 30 MOTION by Well Cell Global LLC, filed. Motion Docket Date 10/14/2022. (Attachments: # 1 Proposed Order)(Barazi, Lema) (Entered: 09/23/2022) |
| 09/23/2022 | 32 | NOTICE of Resetting. Parties notified. Injunction Hearing reset for 10/11/2022 at 02:00 PM in Courtroom 11B before Chief Judge Lee H Rosenthal, filed. (leddins, 4) (Entered: 09/23/2022) |
| 09/26/2022 | 33 | ORDER entered GRANTING 31 Agreed AMENDED 30 MOTION to Seal.(Signed by Chief Judge Lee H Rosenthal) Parties notified.(leddins, 4) (Entered: 09/26/2022) |
| 09/26/2022 | 34 | MEMORANDUM AND TEMPORARY RESTRAINING ORDER entered. The court orders Well Cell to tender $10,000.00 to the United States District Court assecurity for any injury to the defendants caused by the courts temporary restraining order, if the defendants are later determined to have been wrongfully enjoined. This order expires on October 11, 2022, or when the court otherwise orders. The court sets a hearing on Well Cells application for a preliminary injunction on Tuesday, October 11, 2022, at 2:00 p.m., in Courtroom 11-B.(Signed by Chief Judge Lee H Rosenthal) Parties notified.(leddins, 4) Modified on 10/6/2022 (leddins, 4). (Entered: 09/26/2022) |
| 10/04/2022 | 35 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Shawn Paul Calvit, Marc Pierre Desgraves, IV, Charles Alexander Elliott, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. Motion Docket Date 10/25/2022. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Proposed Order)(Ratley, Justin) (Entered: 10/04/2022) |
| 10/07/2022 | 36 | NOTICE of Resetting. Parties notified. Injunction Hearing set for 10/18/2022 at 10:00 AM in Courtroom 11B before Chief Judge Lee H Rosenthal, filed. (leddins, 4) (Entered: 10/07/2022) |
| 10/11/2022 | 37 | NOTICE of Resetting. Parties notified. Injunction Hearing reset for 10/31/2022 at 01:30 PM in Courtroom 11B before Chief Judge Lee H Rosenthal, filed. (leddins, 4) |

| | | (Entered: 10/11/2022) |
|---|---|---|
| 10/13/2022 | 38 | MEMORANDUM AND TEMPORARY RESTRAINING ORDER entered. (Signed by Chief Judge Lee H Rosenthal) Parties notified.(leddins, 4) Modified on 10/13/2022 (leddins, 4). (Entered: 10/13/2022) |
| 10/25/2022 | 39 | MOTION for Leave to File Response to Motion to Dismiss in Excess of Page Limit by Well Cell Global LLC, filed. Motion Docket Date 11/15/2022. (Attachments: # 1 Proposed Order)(Barazi, Lema) (Entered: 10/25/2022) |
| 10/25/2022 | 40 | RESPONSE in Opposition to 35 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , filed by Well Cell Global LLC. (Attachments: # 1 Proposed Order, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(Barazi, Lema) (Entered: 10/25/2022) |
| 10/25/2022 | 41 | SEALED EXHIBITS re: 40 Response in Opposition to Motion by Well Cell Global LLC, filed. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit) (Barazi, Lema) (Entered: 10/25/2022) |
| 10/25/2022 | 42 | **DOCKETED IN ERROR** AMENDED COMPLAINT with Jury Demand against All Defendants filed by Well Cell Global LLC, Well Cell Support LLC. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit)(Barazi, Lema) Modified on 10/27/2022 (RachelWillborg, 4). (Entered: 10/25/2022) |
| 10/27/2022 | 43 | First AMENDED COMPLAINT with Jury Demand against All Defendants filed by Well Cell Support LLC, Well Cell Global LLC. Related document: 1 Complaint, filed by Well Cell Global LLC. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit)(Barazi, Lema) (Entered: 10/27/2022) |
| 10/28/2022 | 44 | MOTION to Strike 4 MOTION for Temporary Restraining Order *the Affidavt of Scott A. Hepford* by Shawn Paul Calvit, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. Motion Docket Date 11/18/2022. (Attachments: # 1 Exhibit A, # 2 Proposed Order)(Ratley, Justin) (Entered: 10/28/2022) |
| 10/28/2022 | 45 | MOTION to Strike 4 MOTION for Temporary Restraining Order *the Unsworn Declaration of Kelly McDaniel* by Shawn Paul Calvit, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. Motion Docket Date 11/18/2022. (Attachments: # 1 Exhibit A, # 2 Proposed Order)(Ratley, Justin) (Entered: 10/28/2022) |
| 10/28/2022 | 46 | MOTION for Leave to File Defendants' Supplemental Response to Plaintiff's Request for Preliminary Injunction by Shawn Paul Calvit, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. Motion Docket Date 11/18/2022. (Attachments: # 1 Proposed Order)(Ratley, Justin) (Entered: 10/28/2022) |
| 10/28/2022 | 47 | RESPONSE to 4 MOTION for Temporary Restraining Order filed by Shawn Paul Calvit, Marc Pierre Desgraves, IV, Charles Alexander Elliott, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 8, # 7 Exhibit 9, # 8 Exhibit 15, # 9 Exhibit 16, # 10 Exhibit 17, # 11 Exhibit 18, # 12 Exhibit 19, # 13 Exhibit 20, # 14 Exhibit 21, # 15 Exhibit 22, # 16 Exhibit 23, # 17 Exhibit 24, # 18 Exhibit 25, # 19 Exhibit 26, # 20 Exhibit 27, # 21 Exhibit 28, # 22 |

| | | |
|---|---|---|
| | | Exhibit 29, # 23 Exhibit 31, # 24 Exhibit 32, # 25 Exhibit 33, # 26 Exhibit 34) (Ratley, Justin) (Entered: 10/28/2022) |
| 10/28/2022 | 48 | SEALED EXHIBITS re: 47 Response to Motion,,, by Shawn Paul Calvit, Marc Pierre Desgraves, IV, Charles Alexander Elliott, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. (Attachments: # 1 Exhibit 1, # 2 Exhibit 7, # 3 Exhibit 10, # 4 Exhibit 11, # 5 Exhibit 12, # 6 Exhibit 13, # 7 Exhibit 14, # 8 Exhibit 30) (Ratley, Justin) (Entered: 10/28/2022) |
| 10/28/2022 | 49 | Exhibit List by Shawn Paul Calvit, Marc Pierre Desgraves, IV, Charles Alexander Elliott, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC(Ratley, Justin) (Entered: 10/28/2022) |
| 10/28/2022 | 50 | PROPOSED ORDER re: 47 Response to Motion,,,, filed.(Ratley, Justin) (Entered: 10/28/2022) |
| 10/31/2022 | 51 | RETURN of Service Executed as to Hunter Carr on 10/28/2022 re: Witness Subpoena, filed.(Ratley, Justin) (Entered: 10/31/2022) |
| 10/31/2022 | 52 | NOTICE of Witness List by Well Cell Global LLC, Well Cell Support LLC, filed. (Barazi, Lema) (Entered: 10/31/2022) |
| 10/31/2022 | 53 | Hearing EXHIBITS by Well Cell Global LLC, Well Cell Support LLC, filed. (Barazi, Lema) (Entered: 10/31/2022) |
| 10/31/2022 | 54 | PROPOSED ORDER Preliminary Injunction, filed.(Barazi, Lema) (Entered: 10/31/2022) |
| 10/31/2022 | 55 | ORDER granting 39 Motion for Leave to File a Response in Excess of Page Limitation. (Signed by Chief Judge Lee H Rosenthal) Parties notified.(kpicota, 4) (Entered: 10/31/2022) |
| 10/31/2022 | 56 | RETURN of Service of SUMMONS Executed as to Charles Alexander Elliott served on 10/8/2022, answer due 10/31/2022, filed.(Barazi, Lema) (Entered: 10/31/2022) |
| 10/31/2022 | 61 | Minute entry for proceedings before the Hon. Lee H. Rosenthal. Preliminary injunction hearing held on October 31, 2022. The court heard testimony from Scott Hepford. The court granted the defendants motion for leave to file a response in excess of page limitation. (Docket Entry No. 46). Hearing will resume on November 1, 2022, at 9:00 a.m. Appearances:Lema Barazi for Pltf. and Justin Ratley/Elizabeth Eoff for Defts.(Court Reporter: M. Capetillo), filed.(leddins, 4) (Entered: 11/04/2022) |
| 11/01/2022 | 57 | Agreed MOTION for Entry of Order re: TRO by Well Cell Global LLC, Well Cell Support LLC, filed. Motion Docket Date 11/22/2022. (Attachments: # 1 Proposed Order)(Barazi, Lema) (Entered: 11/01/2022) |
| 11/01/2022 | 62 | Minute entry for proceedings before the Hon. Lee H. Rosenthal. Preliminary injunction hearing held on November 1, 2022. The court heard testimony from Scott Hepford. The parties must submit proposed findings of fact and conclusions of law by 12:00 pm on Friday, November 4, 2022 Appearances: Lema Barazi. for Pltf. and Justin Ratley/Elizabeth Eoff for Defts. (Court Reporter: M. Capetillo), filed.(leddins, 4) (Entered: 11/04/2022) |
| 11/02/2022 | 58 | AO 435 TRANSCRIPT REQUEST by Justin Ratley for Transcript of Injunction Hearing / 10/31/22 - 11/1/22 / Rosenthal. Daily (24 hours) turnaround requested. Court Reporter/Transcriber: Mary Capetillo, filed. (Ratley, Justin) (Entered: 11/02/2022) |

| 11/02/2022 | 59 | AO 435 TRANSCRIPT REQUEST by Justin Ratley for Transcript of Injunction Hearing / 10/31/22 - 11/1/22 / Rosenthal. Daily (24 hours) turnaround requested. Court Reporter/Transcriber: Nichole Forrest, filed. (Ratley, Justin) (Entered: 11/02/2022) |
|---|---|---|
| 11/04/2022 | 60 | NOTICE of Appearance by Winston O. Huff and Julie B. McClintock on behalf of Shawn Paul Calvit, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. (Ratley, Justin) (Entered: 11/04/2022) |
| 11/04/2022 | 63 | MEMORANDUM AND TEMPORARY RESTRAINING ORDER entered GRANTING 57 Agreed MOTION for Entry of Order re: TRO.TRO Deadline extended to November 9. The parties must submit proposed findings of fact and conclusions of law by 12:00 pm on Monday, November 7, 2022 (Signed by Chief Judge Lee H Rosenthal) Parties notified.(leddins, 4) Modified on 11/4/2022 (leddins, 4). (Entered: 11/04/2022) |
| 11/04/2022 | 64 | NOTICE of Appearance by Julie B. McClintock on behalf of Shawn Paul Calvit, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. (McClintock, Julie) (Entered: 11/04/2022) |
| 11/04/2022 | 65 | NOTICE of Appearance by Winston O. Huff on behalf of Shawn Paul Calvit, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. (Huff, Winston) (Entered: 11/04/2022) |
| 11/04/2022 | 66 | MOTION to Reopen Evidence by Well Cell Global LLC, Well Cell Support LLC, filed. Motion Docket Date 11/25/2022. (Attachments: # 1 Proposed Order)(Barazi, Lema) (Entered: 11/04/2022) |
| 11/04/2022 | 67 | SEALED EXHIBITS *Ex. A UNDER SEAL 2020-07-24 NUNC PRO TUNIC ASSIGNMENT HIGHLY CONFIDENTIAL* re: 66 MOTION to Reopen Evidence by Well Cell Global LLC, Well Cell Support LLC, filed. (Barazi, Lema) (Entered: 11/04/2022) |
| 11/07/2022 | 68 | PROPOSED ORDER *Findings of Fact and Conclusions of Law and Order on Plaintiffs Application for a Preliminary Injunction*, filed.(Barazi, Lema) (Entered: 11/07/2022) |
| 11/07/2022 | 69 | Proposed Findings of Fact/Conclusions of Law by Shawn Paul Calvit, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC(Ratley, Justin) (Entered: 11/07/2022) |
| 11/07/2022 | 70 | Transcript (Sealed) of proceedings held on held on 10-31-2022. Court Reporter/Transcriber Mary Capetillo, filed. (MaryCapetillo, 4) (Entered: 11/07/2022) |
| 11/07/2022 | 71 | Transcript (Sealed) of proceedings held on held on 11/1/2022. Court Reporter/Transcriber Mary Capetillo, filed. (MaryCapetillo, 4) (Entered: 11/07/2022) |
| 11/08/2022 | 72 | RESPONSE to 66 MOTION to Reopen Evidence filed by Shawn Paul Calvit, Marc Pierre Desgraves, IV, Charles Alexander Elliott, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC. (Attachments: # 1 Proposed Order) (Ratley, Justin) (Entered: 11/08/2022) |
| 11/08/2022 | 73 | SEALED EXHIBITS re: 72 Response to Motion, by Shawn Paul Calvit, Marc Pierre Desgraves, IV, Charles Alexander Elliott, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. (Ratley, Justin) (Entered: 11/08/2022) |

| 11/08/2022 | 74 | Request for Issuance of Summons as to Patrick Dale LeLeaux, filed.(Barazi, Lema) (Entered: 11/08/2022) |
| 11/09/2022 | 75 | Summons Issued as to Patrick Dale LeLeaux. Issued summons delivered to plaintiff by NEF, filed.(RhondaMooreKonieczny, 4) (Entered: 11/09/2022) |
| 11/10/2022 | 76 | MEMORANDUM AND OPINION entered Finding of Facts and Conclusions of Law: MOOTING 44 MOTION to Strike 4 MOTION for Temporary Restraining Order *the Affidavt of Scott A. Hepford*, GRANTIG 66 MOTION to Reopen Evidence, MOOTING 45 MOTION to Strike 4 MOTION for Temporary Restraining Order *the Unsworn Declaration of Kelly McDaniel*. The court will separately enter an order of preliminary injunction. The order will include a bond of $50,000. The parties must appear at a hearing for a permanent injunction on Tuesday, January 31, 2023, at 10:00 a.m., in Courtroom 11B.(Signed by Chief Judge Lee H Rosenthal) Parties notified.(leddins, 4) (Entered: 11/10/2022) |
| 11/10/2022 | 77 | ORDER of PRELIMINARY INJUNCTION entered. (Signed by Chief Judge Lee H Rosenthal) Parties notified.(leddins, 4) (Entered: 11/10/2022) |
| 11/10/2022 | 78 | SUPPLEMENT to 35 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Shawn Paul Calvit, Marc Pierre Desgraves, IV, Charles Alexander Elliott, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. (Attachments: # 1 Affidavit of Elizabeth Eoff, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Proposed Order)(Ratley, Justin) (Entered: 11/10/2022) |
| 11/11/2022 | 79 | Surety BOND in the amount of $50,000.00; SureTec Insurance Company; by Well Cell Global LLC, Well Cell Support LLC, filed. (jdav, 4) (Entered: 11/11/2022) |
| 12/02/2022 | 80 | MOTION to Stay *Preliminary Injunction Pending Appeal and Request for Expedited Consideration* by Shawn Paul Calvit, Marc Pierre Desgraves, IV, Charles Alexander Elliott, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC, filed. Motion Docket Date 12/23/2022. (Attachments: # 1 Exhibit 1, # 2 Proposed Order)(Ratley, Justin) (Entered: 12/02/2022) |
| 12/02/2022 | 81 | NOTICE OF APPEAL to US Court of Appeals for the Federal Circuit re: 77 Preliminary Injunction by Shawn Paul Calvit, Marc Pierre Desgraves, IV, Charles Alexander Elliott, Insulinic of Hawaii, LLC, Insulinic of Hialeah LLC, Insulinic of Lafayette LLC (Filing fee $ 505, receipt number ATXSDC-29149869), filed. (Ratley, Justin) (Entered: 12/02/2022) |

APPX0048

**TAB 5**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **WELL CELL GLOBAL LLC** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **CIVIL CASE NO.** |
| | § | **4:22-cv-03062-LHR** |
| **SHAWN PAUL CALVIT, MARC PIERRE** | § | **JURY DEMANDED** |
| **DESGRAVES IV, CHARLES** | § | |
| **ALEXANDER ELLIOTT, INSULINIC OF** | § | |
| **LAFAYETTE LLC, INSULINIC OF** | § | |
| **HIALEAH LLC, INSULINIC HAWAII,** | § | |
| **LLC** | § | |
| *Defendants* | § | |
| | § | |

---

**PLAINTIFF'S VERIFIED EMERGENCY APPLICATION FOR A TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

**TO THE HONORABLE COURT:**

      **Plaintiff, Well Cell Global LLC** (**"Plaintiff"** or **"Well Cell"**) files this *Plaintiff's Verified Application for an Emergency Temporary Restraining Order and Preliminary Injunction* (the **"Verified Application"**) and, pursuant to Federal Rule of Civil Procedure 65(a) respectfully requests that this Court issue a restraining order (**"TRO"**) and preliminary injunction (**"PI"**) against **Defendants Shawn Paul Calvit, Marc Pierre Desgraves IV, Charles Alexander Elliott**, **Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, Insulinic Hawaii, LLC** (collectively, **"Defendants"**) from infringing on Plaintiff's intellectual property. In support thereof, Plaintiff would respectfully show unto the Court as follows:

APPX0049

## I.    SUMMARY

1.     This is an emergency action to stop Defendants from misusing Well Cell's intellectual property to deceive the public—especially diabetic patients—into believing that Defendants and their various "Insulinic" clinics are affiliated with Well Cell or its trusted brand.

2.     Well Cell also seeks emergency injunctive relief to prohibit Defendants from unlawfully infringing on Well Cell's intellectual property, which includes federal patents, federal trademark registrations, federal copyright registrations, and trade secrets (the **"Well Cell IP"**).

3.     Well Cell, a leading pioneer in the medical industry specializing in developing cutting-edge technology for the treatment of diabetes, has been operating for numerous years and has established immense goodwill throughout the country, especially among the diabetic population and experts in the field.

4.     Despite Well Cell's incontestable rights, and in a bad-faith attempt to capitalize on the success of Well Cell, Defendants are operating "Insulinic" clinics in Louisiana, Florida, and Hawaii (the **"Infringing Clinics"**) which infringe the Well Cell IP by (a) using Well Cell's copyrighted works throughout the clinics, on their websites, and in marketing materials, (b) using Well Cell's patented products and services, and by (C) using and benefiting from Well Cell's proprietary and confidential trade secrets.

5.     Defendants' numerous infringements on the Well Cell IP is causing serious and irreparable harm not only to Well Cell, but to diabetes patients who visit the Infringing Clinics and receive subpar and potentially life-threatening treatment from individuals who are not properly trained in administering Well Cell's proprietary medical technology. It is especially important to note that Well Cell has not trained anyone at Defendant Insulinic Hawaii, LLC

2

("**Insulinic HI**") on the use of its proprietary medical technology. *Misuse of the proprietary medical technology can be fatal*. Defendants' conduct must be enjoined.

6.     This Court should find that Well Cell is likely to succeed on the merits of its claims, as this is a blatant case of patent infringement, copyright infringement, and trade secret misappropriation. Well Cell owns lawful patents on its proprietary medical technology and valid copyright registrations related to said technology.

7.     Defendants have copy-and-pasted large swaths of Well Cell's copyrighted material to Defendants' websites and marketing materials, in clear violation of Well Cell's copyrights. Defendants are also openly using Well Cell's patented products and confidential trade secrets at the Infringing Clinics.

8.     Well Cell made diligent efforts to resolve the instant dispute without court intervention, however Defendants have refused to stop their unlawful conduct. Because Defendants have ignored Well Cell's multiple requests to cease and desist from their repeated and unlawful infringements, Well Cell has no alternative but to seek remedy through this Court's injunctive powers.

9.     For these reasons, Well Cell respectfully requests this Court enjoin Defendant's multiple infringements immediately.

## II.    LEGAL STANDARD FOR A TEMPORARY RESTRAINING ORDER

10.    Well Cell seeks a TRO for the purpose of preventing the irreparable harm that will occur if Defendants are allowed to continue their unlawful infringement on the Well Cell IP. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974).

APPX0051

11.     The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). Injunctive relief is "an extraordinary remedy" that may be awarded only upon "a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008). In order to merit such relief, Well Cell, as the moving party, must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury to the moving party; (3) the threatened injury outweighs any damages the injunction may cause defendant; and (4) the injunction is in the public interest. *See Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014); *Mayo Found. for Med. Educ. & Research v. BP Am. Prod. Co.*, 2:20-CV-34-Z, 2020 WL 759212, at \*2 (N.D. Tex. Feb. 14, 2020) (applying same standard to temporary restraining order that governs preliminary injunction analysis).

12.     "The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted." *Clark,* 812 F.2d at 993. However, "[n]one of the four requirements have a fixed quantitative value." *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 582 (E.D. La. 2016) (citing *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975)). Instead, "a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* Thus, in applying the four-part test, the Court must conduct "a delicate balancing," which weighs "the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury that possibly could flow from the denial of preliminary relief." *Id*. Ultimately, whether to grant a request for a temporary restraining order "is left to the sound discretion" of the Court. *Nianga v. Wolfe*, 435 F. Supp. 3d 739, 743 (N.D. Tex. 2020).

### III.   FACTUAL BACKGROUND

13.     Well Cell is a leading pioneer in the medical industry and specializes in developing ground-breaking technology for the treatment of diabetes and licensing its proprietary technology to other entities so that they may operate comprehensive diabetes clinics throughout the world. *See* Affidavit of Scott A. Hepford (**"Hepford Aff."**) ¶ 3, attached hereto as **Exhibit 1** and fully incorporated by reference. In fact, Well Cell owns a highly valuable and significant intellectual property portfolio—including patents, copyrights, trademarks, and trade secrets— which it carefully and consistently safeguards. *Id.*

14.     On September 13, 2021, Well Cell Support LLC (**"WCS"**), an affiliate of Well Cell to which a master license was granted with the ability to sell licenses to use Well Cell's intellectual property to other entities, issued one license to Defendant Insulinic LA to operate at one specific office location in Lafayette, Louisiana. *Id.*at ¶ 7. On November 1, 2021, WCS issued one license to Defendant Insulinic FL to operate at one specific office location in Hialeah, FL. *Id.*

15.     The license agreements (the **"License Agreements"**) issued to Defendants Insulinic LA and Insulinic FL pertained only to Well Cell's patented technology, patent-pending technology, and proprietary and confidential trade secrets associated with such technology. *Id.*

16.     Significantly, the License Agreements entered into by WCS and Insulinic LA and Insulinic FL *did not* cover rights nor grant use to any copyrighted materials owned by Well Cell. *See Id.*

17.     On June 9, 2022, after being informed about Defendant Calvit's wrongful billing practices, among other concerning matters that constituted a breach of the License Agreements, Well Cell issued a letter to Defendant Calvit informing him the licenses would be terminated if corrective measures were not taken. *Id.*at ¶ 9.

18.     Because Defendants Calvit, Insulinic LA, and Insulinic FL did not properly address nor cure their breaches of the License Agreements, Well Cell ended its business relationship with Defendants in July 2022 and terminated the License Agreements. *Id.*at ¶ 10.

19.     Despite the fact that Well Cell ended its business relationship with Defendants in July 2022 and terminated the License Agreements with WCS, Defendants decided to misappropriate Well Cell's intellectual property in order to open a competing business in Hawaii (Insulinic HI) and to continue to unlawfully operate Insulinic's existing clinics in Louisiana and Florida (Insulinic LA and Insulinic FL) utilizing the Well Cell intellectual property belonging exclusively to Well Cell. *Id.*at ¶ 11; *See* Declaration of Kelly McDaniel (**"McDaniel Decl."**) ¶¶ 9-17, attached hereto as **Exhibit 2** and fully incorporated by reference.

20.     On September 7, 2022, Well Cell and WCS, through the undersigned legal counsel, sent a demand letter to Defendants, confirming that the License Agreements between the parties terminated as of July 19, 2022 due to Insulinic LA's and Insulinic FL's failure to cure, as set forth in the Notice of Default and the applicable provisions of the License Agreements and requesting that Defendants immediately cease and desist from infringing upon Well Cell's intellectual property. *See* **Exhibit 3**, Letter from Well Cell's counsel Lloyd & Mousilli to Defendants dated September 7, 2022, attached hereto and fully incorporated by reference. Unfortunately, Defendants failed to substantively respond to Well Cell's cease and desist letter and continue to infringe on Well Cell's rights to this day.

21.     Thus, after Well Cell's repeated attempts to amicably resolve its multiple claims against Defendants failed, Well Cell has resorted to filing the instant lawsuit in order to protect its rights and seek proper redress.

## IV.   ARGUMENT & AUTHORITIES

### A.  There is Substantial Likelihood Well Cell Will Prevail on the Merits of its Claims

22.      Well Cell has asserted multiple claims against Defendants in its Complaint, including allegations of copyright infringement, patent infringement, and misappropriation of trade secrets, among others. Dkt. No. 1 at ¶¶ 32-127. Well Cell is substantially likely to succeed on the merits of all of its claims. To succeed on its Verified Application, Well Cell need only demonstrate a likelihood of success on "at least one" claim. *See Texas v. United States*, 86 F. Supp. 3d 591, 672 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), as revised (Nov. 25, 2015).

### i.  Well Cell is Likely to Succeed on the Merits of its Copyright Infringement Claims

23.      To qualify for a preliminary injunction in a copyright infringement action, Well Cell must show a substantial likelihood of success on the merits of its infringement claim. A copyright infringement is established by showing (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361(1991).

24.      Evidence of copying may be (1) direct evidence that defendants copied elements of the protected works or (2) circumstantial evidence that defendants "had access to the material and that there is a substantial similarity between the two works." *Lakedreams v. Taylor,* 932 F.2d 1103, 1107-08 (5th Cir. 1991). "This is the rare case in which there is direct evidence that defendants copied plaintiff's work." *Fed'n of State Massage Therapy Boards v. Mendez Master Training Ctr., Inc.*, 393 F. Supp. 3d 557, 567 (S.D. Tex. 2019). Also, Defendants' copying of Well Cell's copyrighted works is so expansive, there can be no dispute they are "substantially similar." *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259 (5th Cir. 2014).

25.     At all times relevant hereto, Well Cell has been and still is the holder of the exclusive rights under the Copyright Act of 1976 (17 U.S.C. §§ 101 et. seq., and all amendments thereto) (the **"Copyright Act"**) to reproduce, distribute, display, or license the reproduction, distribution, and/or display of the website diabetesrelief.com (the **"Website"**) and all of its contents, as set forth in **Exhibit 4** attached hereto and fully incorporated by reference, and the 2-D artwork entitled "Overcoming Metabolic Failure," as depicted in **Exhibit 5** attached hereto and fully incorporated by reference (**"Overcoming Metabolic Failure Drawing"**), throughout the United States.

26.     On or about September 14, 2017, the United States Copyright Office issued a certificate of registration, registration number of TX-8-452-464, for the Website to Diabetes Relief LLC.[1]

27.     On or about May 17, 2018, the United States Copyright Office issued a certificate of registration, registration number of VAu 1-330-086, for the Overcoming Metabolic Failure Drawing to Diabetes Relief LLC.[2]

28.     On or about July 24, 2020, Well Cell purchased all of the assets of Diabetes Relief LLC for millions of dollars, including all intellectual property, such as the copyrights to the Website and the Overcoming Metabolic Failure Drawing (collectively, the **"Well Cell Copyrighted Works"**). Since the purchase, Well Cell has continued to expand upon the intellectual property purchased from Diabetes Relief LLC to create an innovative and copyright and patent protected solution to treating diabetes.

29.     Diabetes Relief LLC and Well Cell used the collective experience, talent, and creativity of its owners and employees to create the Well Cell Copyrighted Works developed over years of

---

[1] *See* Ex. 4, the Copyright Registration for the Website, which is fully incorporated herein by reference.
[2] *See* Ex. 5, the Copyright Registration for the Overcoming Metabolic Failure Drawing, which is fully incorporated by reference.

hard work and through significant financial investments of Well Cell, including the initial multi-million purchase and subsequent additional investments to further develop the business and its intellectual property.

30.     Well Cell never gave Defendants a license to use the Well Cell Copyrighted Works. The License Agreements entered into by Well Cell Support LLC, an affiliate of Well Cell to whom a master license was granted with the ability to sell licenses to use Well Cell's intellectual property to other entities, and Insulinic LA and Insulinic FL did not cover rights to use the Well Cell Copyrighted Works. Furthermore, even if the Well Cell Copyrighted Works were covered by the License Agreements, Well Cell Support LLC (**"WCS"**) terminated the License Agreements with Insulinic LA and Insulinic FL on or about July 19, 2022, therefore, Defendants certainly had no rights to use or display the Well Cell Copyrighted Works after July 19, 2022. Hepford Aff. ¶ 10.

31.     Despite the fact that Well Cell ended its business relationship with Defendants in July 2022 and terminated the License Agreements with WCS, Defendants decided to misappropriate the Well Cell Copyrighted Works and other intellectual property belonging exclusively to Well Cell in order to open a competing business in Hawaii (Insulinic HI) and to continue to unlawfully operate Insulinic's existing clinics in Louisiana and Florida (Insulinic LA and Insulinic FL) utilizing the Well Cell Copyrighted Works and other intellectual property belonging to Well Cell. *See* Hepford Aff. ¶ 11; *see* McDaniel Decl. ¶¶ 9-17.

32.     From July 19, 2022 to the present date, Defendants have used and displayed information from the Well Cell Copyrighted Works on Defendants' website, insulinic.com. A true and correct copy of sections of the Insulinic.com website is attached hereto as **Exhibit 6** and fully incorporated by reference.[3] On the homepage of insulinic.com, Defendants display exact copies

---

[3] These printouts from the insulinic.com website are as of September 7, 2022.

PLAINTIFF'S VERIFIED EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

APPX0057

of the illustrations found in the Overcoming Metabolic Failure Drawing under the headings "Abnormal Physiology" and "Restored Physiology." *Id.* These same infringing illustrations are also contained in the video that plays on the homepage of insulinic.com website from the 1:20 to 2:06 mark. *Id.* These infringing illustrations are also contained on the insulinic.com/science webpage. *Id.* All of these illustrations are separate instances of copyright infringement of Well Cell's exclusive right to use the Overcoming Metabolic Failure Drawing.

33.     Insulinic's website also contains instances of copyright infringement of Well Cell's exclusive right to use the Website and of its contents. The symptoms and statistics found on the insulinic.com website under the "what patients are reporting" sections are exact replicas of the statistics and symptoms listed as improved on the Website for Well Cell's clients under the section "Our Patients Report."[4] The description of the "science" and "treatment plan" found on insulinic.com and insulinic.com/science are also stolen from the copyrighted Website as shown on Exhibit 6. *Id.* Insulinic describes its science as a patented treatment protocol just as Well Cell does on the Website, despite the fact that all patents in question actually belong exclusively to Well Cell. *Id.* Insulinic also claims to have a "metabolic" approach to managing diabetes consisting of "Physiologic Insulin Resensitization," the same technology pioneered and advanced by Well Cell and represented on its Website, including the exact same listed processes of "hormone optimization," "weight management," and "wellness and nutrition." *Id.* The descriptions found under each of the stolen subheadings on the Insulinic website are also each exactly identical or nearly identical to the copyrighted content found on the Website. *Id.* Therefore, nearly the entire insulinic.com website consists of copyright infringements of Well Cell's exclusive rights to the Website.

---

[4] *See* Exhibit 6; and Exhibit "7," printouts of the diabetesrelief.com website as of September 7, 2022.

34.     Additionally, on or about August 26, 2022, Defendants put out a press release that contained copyrighted information from the Website, including testimonials from clients of Well Cell (**"Insulinic Press Release"**). A true and correct copy of the Insulinic Press Release is attached hereto as **Exhibit 8** and fully incorporated by reference.

35.     The Insulinic Press Release contains testimonials of "Wayne K." and "Bruce B." who are clients of Well Cell and the content of the testimonials and description of the patients are exact duplicates of the copyrighted content on the Website. Therefore, the Insulinic Press Release is another instance of copyright infringement of Well Cell's exclusive right to use the Website.

36.     Defendants continue to infringe upon the Well Cell Copyrighted Works, despite the fact that Defendants knew through the License Agreements and former business relationship with Well Cell that such intellectual property belonged exclusively to Well Cell. Yet, to date, Defendants continue to infringe upon the Well Cell Copyrighted Works. Thus, Defendants' behavior as set forth herein constitutes willful infringement and reckless disregard for the federal registrations.

37.     In stealing the Well Cell Copyrighted Works, Defendants willfully and intentionally sought to appropriate Well Cell's intellectual property for their own profit without bearing the cost of developing or purchasing their own work product. Well Cell's intellectual property is worth millions of dollars and Defendants sought to realize the same profit without investing the same amount of time, money, and creative thought, and to take away potential profits away from Well Cell that it would have realized but for Defendants' wrongful acts.

38.     The Well Cell Copyrighted Works are original works, copyrighted under the Copyright Act. As Well Cell specifically purchased all copyrights of Diabetes Relief LLC, it has the

exclusive rights and privileges to reproduce, distribute, and display the Well Cell Copyrighted Works.

39.    Well Cell has never authorized Defendants, by license or otherwise, to copy, reproduce, distribute, or display any of the copyrighted material from the Well Cell Copyrighted Works, nor to prepare derivative works based on the Well Cell Copyrighted Works. To the extent the License Agreements between WCS and Insulinic LA and Insulinic FL covered any aspect of the Well Cell Copyrighted Works, which they do not, those licenses terminated as of July 19, 2022.

40.    Defendants infringed Well Cell's exclusive rights in the Well Cell Copyrighted Works by copying, reproducing, duplicating, distributing, and displaying it and/or derivative works derived therefrom without Well Cell's permission, including but not limited to the Insulinic website insulinic.com and the Insulinic Press Release, which contain multiple instances of infringement as set forth herein.

41.    Each infringing copy, duplication, sale, license, or display of the Well Cell Copyrighted Works, as well as the threat of continuing the same, constitutes a separate claim against Defendants under the Copyright Act. Well Cell has sustained, and will continue to sustain, substantial damage to the value of its copyrights in that the previously described activities of Defendants have diminished and will continue to diminish the revenues and goodwill in the industry that Well Cell would otherwise receive for use of and license of the Well Cell Copyrighted Works. In addition, Defendants have realized unlawful and unjust profits from their unauthorized and illegal copying, duplication, distribution, and display of the Well Cell Copyrighted Works.

42.    Despite being put on notice several times, Defendants continue to infringe the copyrights in the Well Cell Copyrighted Works, which constitute willful infringement and reckless

disregard for the copyrights. As a direct result of the conduct of Defendants, Well Cell has suffered and continues to suffer direct and consequential damages in an amount to be determined by a jury. Well Cell also continues to suffer irreparable harm for which monetary damages are inadequate.

43.     Defendants Calvit, Desgraves, and Elliot are personally liable for the foregoing copyright infringement because "all participants in copyright infringement are jointly and severally liable [as tortfeasors]." *Mendez Master Training*, 393 F. Supp. 3d at 575. In the copyright context, the Court need not pierce the corporate veil to find individual liability. "A corporate officer may be held jointly and severally liable with the corporation if the officer '(1) had the right and ability to control the infringing activity; and (2) had a direct financial interest in the activity." *Id.* Here, Defendants Calvit, Desgraves, and Elliot are the only members of the Infringing Clinics. Aff. Hepford ¶ 11. They unquestionably had the ability to control the infringing activity and had direct financial interest in the operation of the Infringing Clinics. *Id.*

44.     On information and belief, Defendants are profiting from their unauthorized use of the Well Cell Copyrighted Works in the current operation of their clinics in Florida, Louisiana and Hawaii, utilizing the Well Cell Copyrighted Works and other intellectual property belonging to Well Cell as set forth in the Insulinic Press Release and on Insulinic's website.

45.     As a direct and proximate result of the Defendants' infringing conduct alleged herein, Well Cell has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless Defendants' infringing conduct is enjoined by this Court, Defendants will continue to infringe the Well Cell Copyrighted Works. Plaintiff therefore is entitled to preliminary and permanent injunctive relief restraining and enjoining Defendants' ongoing infringing conduct.

APPX0061

### i. **Well Cell is Likely to Succeed on the Merits of its Patent Infringement Claims**

46.     To qualify for a preliminary injunction in a patent infringement action, Well Cell must show a substantial likelihood of success on the merits of its infringement claim.

47.     To establish a patent infringement claim, a plaintiff must prove that the defendant, without authority, has made, used, offered to sell, or sold the patented invention. 35 U.S.C. § 271(a); *See also MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, 505 F. Supp. 2d 359, 366 (S.D. Tex. 2007), aff'd, 264 F. App'x 900 (Fed. Cir. 2008).

48.     "A determination of patent infringement requires a two-step analysis: first, the meaning of the claim language is construed, then the facts are applied to determine if the accused device falls within the scope of the claims as interpreted." *MBO Lab., Inc. v. Becton, Dickinson & Co.,* 474 F.3d 1323, 1329 (Fed.Cir. 2007).

49.     Here, the meaning of the claim is a clear case for direct patent infringement as Well Cell formerly issued licenses to Insulinic FL and Insulinic LA for their use of their patent-protected insulin infusion pumps, kits, and IV tubing infusion cassettes for the Insulinic Defendants' use at those two specific locations. Well Cell's insulin infusion pumps, kits, and IV tubing infusion cassettes are protected by two patents, United States Patent Nos. 9,654,595 and 10,533,990 B2. After Well Cell and WCS terminated the License Agreements with Insulinic FL and Insulinic LA in July 2022, Defendants continued to use the patent-protected insulin infusion pumps, kits, and IV tubing infusion cassettes of Well Cell at their clinics in FL and LA, and their new competing clinic in HI, Insulinic HI. Well Cell has begun searching business entities in multiple states and has found various other "Insulinic" entities associated with Calvit that may also be unlawfully infringing or planning to unlawfully infringe upon Well Cell's patents.

50.     The second step, "comparison of the claims to the accused device, is a question of fact, and requires a determination that every claim limitation or its equivalent be found in the accused device." *Planet Bingo, LLC v. GameTech Int'l, Inc*., 472 F.3d 1338, 1343 (Fed.Cir.2006). Here, the infringing products are Well Cell's proprietary and patent-protected insulin infusion pumps, kits, and IV tubing infusion cassettes and each and every claim limitation is found in the infringing devices, which are being used without Well Cell's authorization and all License Agreements with the Insulinic Defendants have been terminated. Defendants continue to use these products despite knowing they were especially made or especially adapted for practicing the invention of Well Cell's patents.

51.     Therefore, Defendants' unauthorized commercial manufacture, use, importation, offer for sale, and sale of insulin infusion pumps, kits, and IV tubing infusion cassettes are unlawful infringements on Plaintiff's United States Patent Nos. 9,654,595 and 10,533,990 B2.

52.     Specifically, United States Patent Number 9,652,595 (**"the 595 Patent"**), entitled "kit that improves impaired hepatic glucose processing in patients," was duly and legally issued on May 16, 2017, and names Hunter Michael Alan Carr, Scott Hepford, and Carol Ann Wilson, as the inventors. A true and correct copy of the 595 Patent is attached hereto as **Exhibit 9** and fully incorporated by reference.

53.     The 595 Patent claims, among other things, to be a kit for individualized intravenous exogenous insulin-based therapy, which includes portable data storage in communication with a client device processor. The data storage can have computer instructions, a database of metabolic factors, a library of weight management protocols, a diabetic treatment model, and a library of care plan templates. The kit for individualized intravenous exogenous insulin-based therapy

includes a blood glucose meter, a plurality of intravenous catheters fluidly engageable with a fluid source, and a plurality of metabolic enhancements.

54.     United States Patent Number 10,533,990 B2 (the **"990 Patent"**), entitled "physiologic insulin-sensitivity improvement," was duly and legally issued on January 14, 2020, and names Hunter Michael Alan Carr, Scott Hepford, Carol Ann Wilson, and Stanley Tories Lewis, Jr., as the inventors. A true and correct copy of the 990 Patent is attached hereto as **Exhibit 10** and fully incorporated by reference.

55.     The 990 Patent claims, among other things, to constitute an individualized intravenous exogenous insulin–based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing. The therapy includes treatment sessions involving the assessment of metabolic factors, forming a subject profile, and matching the subject profile to a diabetic treatment model. Using the diabetic treatment model, a quantity and frequency of intravenous insulin bolus, dosage amounts of magnesium, and dosage amounts of potassium can be calculated. The methods that improve impaired hepatic glucose processing in subjects and patients can simultaneously introduce separated insulin bolus from an insulin reservoir, dosage amounts of magnesium, and dosage amounts of potassium. The subject profile can create a weight management protocol that uses a metabolic enhancement, wherein the individualized intravenous exogenous insulin – based therapy produces a subject or a patient with improved cellular ATP functioning.

56.     The 595 Patent and the 990 Patent were assigned to Diabetes Relief LLC. Well Cell specifically bought all rights to the 595 Patent and the 990 Patent when it purchased the assets of Diabetes Relief LLC for millions of dollars on or about July 24, 2020.

57.     At all times relevant hereto, Well Cell was and is the owner of the entire right, title, and interest in the 595 Patent and the 990 Patent.

58.     Well Cell holds an exclusive license under the 595 Patent and the 990 Patent, including the right to sublicense, make, have made, use, develop, have developed, offer for sale, sell and import products covered by the 595 Patent and the 990 Patent, and the right to assert, defend, maintain and enforce the 595 Patent and the 990 Patent.

59.     Upon information and belief, Defendants have and continue to infringe upon the 595 Patent and the 990 Patent by making, having made, using, and selling, and offering for sale insulin infusion pumps, kits, and IV tubing infusion cassettes in the United States and importing into the United States insulin infusion pumps and IV tubing infusion cassettes that embody or use the inventions claimed in the 595 Patent and the 990 Patent. The insulin infusion pumps and IV tubing infusion cassettes being utilized by Defendants infringe upon the 990 Patent because they deliver individualized intravenous exogenous insulin–based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing.  The insulin infusion pumps, kits and IV tubing infusion cassettes being utilized by Defendants infringe upon the 595 Patent because they utilize software that includes portable data storage in communication with a client device processor, which has computer instructions, a database of metabolic factors, a library of weight management protocols, a diabetic treatment model, and a library of care plan templates. The insulin infusion pumps, kits and IV tubing infusion cassettes being utilized by Defendants infringe upon the 595 Patent because they contain individualized intravenous exogenous insulin-based therapy, including a blood glucose meter, a plurality of intravenous catheters fluidly engageable with a fluid source, a plurality of metabolic enhancements, and mixing the plurality of boluses from 4 to 8 minutes.

60.     Upon information and belief, Defendants have been and are inducing infringement of the 595 Patent and the 990 Patent in violation of 35 U.S.C. § 271(b) by actively and knowingly inducing others to make, use, sell, offer for sale, or import insulin infusion pumps, kits, and IV tubing infusion cassettes that embody or use the inventions claimed in the insulin infusion pumps, kits, and IV tubing infusion cassettes. Specifically, Insulinic's website and the Insulinic Press Release evidence that Defendants are marketing to practitioners that they can utilize their insulin infusion pumps, kits, and IV tubing infusion cassettes for diabetes testing and management for their patients at their centers in Louisiana, Florida and Hawaii.[5]

61.     Upon information and belief, Defendants have been and are continuing to infringe the 595 Patent and the 990 Patent, actively and knowingly, by selling or offering to sell insulin infusion pumps, kits, and IV tubing infusion cassettes, knowing them to be especially made or especially adapted for practicing the invention of the 595 Patent and the 990 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use in violation of 35 U.S.C. § 271(c). Specifically, Insulinic LA and Insulinic FL entered into License Agreements with WCS, (an affiliate of Well Cell, who was granted a master license to the 595 Patent and the 990 Patent in order to issue sublicenses to domestic users), to use and have the right to sell or offer for sale Well Cell's insulin infusion pumps, kits, and IV tubing infusion cassettes. WCS and Well Cell terminated the License Agreements with Insulinic LA and Insulinic Hialeah effective July 19, 2022. *See* Hepford Aff. ¶ 10. However, Defendants continued to use, market, sell, and offer for sale the insulin infusion pumps, kits, and IV tubing infusion cassettes after termination of the agreements and the parties' business relationship. *See* Hepford Aff. ¶ 11; *see* McDaniel Decl. ¶¶ 9-17.

---

[5] *See* Exhs. 8 and 9.

62.    WCS and Well Cell also sent Defendants a letter on September 7, 2022 confirming the termination of the License Agreements and requesting that Defendants immediately cease and desist from all infringing conduct.[6] Yet, Defendants continue to use, market, sell, and offer for sale infringing products that have no non-infringing use to this day. *Id.*

63.    Upon information and belief, Defendants have been and are infringing, contributing to the infringement of, and inducing the infringement of the 595 Patent and the 990 Patent by making, using, selling, or offering for sale in the United States, or importing into the United States, including within this judicial district, insulin infusion pumps, kits, and IV tubing infusion cassettes.

64.    Defendants have known of the existence of the 595 Patent and the 990 Patent, and their acts of infringement have been willful and in reckless disregard for the 595 Patent and the 990 Patent, without any reasonable basis for believing that they had a right to engage in the infringing conduct.

65.    Defendants' infringement has been, and continues to be knowing, intentional, and willful.

66.    As a direct and proximate result of the Defendants' infringing conduct alleged herein, Well Cell has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless Defendants' infringing conduct is enjoined by this Court pursuant to 35 U.S.C. § 283, Defendants will continue to infringe the 595 Patent and the 990 Patent. Plaintiff therefore is entitled to temporary, preliminary and permanent injunctive relief restraining and enjoining Defendants' ongoing infringing conduct.

---

[6] *See* Ex. 3, Letter from Lloyd & Mousilli to Defendants dated September 7, 2022.

67.     In infringing upon the 595 Patent and the 990 Patent, Defendants willfully and intentionally sought to misappropriate Well Cell's intellectual property for their own profit without bearing the cost of developing or purchasing their own technology. Well Cell's intellectual property is worth millions of dollars and Defendants sought to realize the same profit without investing the same amount of time, money, and creative thought, and to take away potential profits away from Well Cell that it would have realized but for Defendants' wrongful acts.

68.     Well Cell has sustained, and will continue to sustain, substantial damage to the value of the 595 Patent and the 990 Patent in that the previously described activities of Defendants have diminished and will continue to diminish the revenues that Well Cell would otherwise receive for use of and license of the 595 Patent and the 990 Patent. In addition, Defendants have realized unlawful and unjust profits from their unauthorized and illegal use, sale, and offer for sale of the infringing products. Therefore, Well Cell has made a sufficient showing of a substantial likelihood of success on the merits of its patent infringement claims.

69.     As a direct and proximate result of the Defendants' infringing conduct alleged herein, Well Cell has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless Defendants' infringing conduct is enjoined by this Court, Defendants will continue to infringe the Well Cell Copyrighted Works. Plaintiff therefore is entitled to preliminary and permanent injunctive relief restraining and enjoining Defendants' ongoing infringing conduct.

### ii.   Well Cell is Likely to Succeed on the Merits of its Trade Secret Misappropriation Claims

70.     To qualify for a temporary restraining order or preliminary injunction in a trade secret misappropriation action, Well Cell must show a substantial likelihood of success on the merits of

APPX0068

its trade secret claim. Well Cell has alleged claims against Defendants for trade secret misappropriation under the Defend Trade Secrets Act (**"DTSA"**) and Texas Uniform Trade Secrets Act (**"TUTSA"**). Dkt. No. 1 at ¶¶ 85-109.

71.     To state a claim under the DTSA, a plaintiff must allege: (1) a trade secret; (2) misappropriation; and (3) use in interstate commerce. 18 U.S.C. § 1836; *Blue Star Press, LLC v. Blasko*, No. SA-17-CA-111-OLG (HJB), 2018 WL 1904835, at *2 (W.D. Tex. Mar. 6, 2018). Similarly, to establish trade secret misappropriation under Texas law, a plaintiff must show: (1) a trade secret; (2) Defendants acquired the trade secret by breach of a confidential relationship or other improper means; and (3) Defendants used the trade secret without authorization. *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 449 (5th Cir. 2007).

72.     At the temporary restraining order phase, a court does not determine whether the information at issue is a trade secret; rather, it determines "whether the applicant has established that the information is entitled to trade-secret protection until the trial on the merits." *First Command Financial Planning, Inc. v. Velez*, 2017 WL 2999405, at *8 (N.D. Tex. May 8, 2017). To establish entitlement to trade secret protection, the owner must take "reasonable measures under the circumstances to keep the information secret" and the information must derive economic value from not being generally known or readily ascertainable through proper means. 18 U.S.C. § 1839(3); Tex. Civ. Prac. & Rem. Code § 134A.002(6).

73.     Well Cell possessed trade secrets in the form of business contacts, including clients, physicians, vendors, investors, borrowers, lenders, agents, brokers, banks, lending corporations, buyers, and sellers (collectively, **"the Contacts"**). *See* Hepford Aff. ¶ 3

74.     The Contacts were developed through extensive time, labor, skill, and money, such that they are proprietary and valuable, and are not easily duplicated or readily ascertainable by the public or competitors. *Id.*

75.     The Contacts had significant economic value that derived from the fact that their collective contact information was not generally known or readily ascertainable by third parties, including Well Cell's competitors. *Id.* If the company's competitors had access to this information, they would be able to profit without undertaking the significant efforts and financial investments that Well Cell undertook over the years to discover, meet with, interview, and do business with the Contacts and then to compile the information.

76.     Well Cell has in place reasonable measures to protect the secrecy of its trade secrets. *Id.* For example, Well Cell had Defendant Calvit, who is the principal member behind Defendants Insulinic LA, Insulinic FL, and Insulinic HI, sign a Non-Disclosure Agreement requiring that he keep all confidential information revealed to him pursuant to the agreement "confidential" and not "disclose, reveal, or make use of any information … nor to do business with any of the revealed contacts without the written consent of the introducing party or parties." *Id.* at ¶ 8. Well Cell's trade secrets were only shared with individuals under confidentiality agreements. *Id.* at ¶ 3.

77.     Well Cell's trade secrets are related to products and/or services used in, and intended for use in, interstate commerce. The Contacts were shared with Defendant Calvit between the states of Texas, Louisiana, Florida, and Hawaii and the Contacts themselves consist of individuals and entities in the states of Texas, Louisiana, Florida, Hawaii and other states, and were developed through the interstate activity of Well Cell. Well Cell sought investments and clients from

around the country, and sought to develop licensing agreements for diabetes clinics that would market and sell Well Cell's products across state lines.

78.     Well Cell disclosed the Contacts to Defendant Calvit under the context of the Non-Disclosure Agreement and Defendant Calvit took the Contacts for himself and his other business entities without Well Cell's consent, and in violation of his duties under the Non-Disclosure Agreement to compete with Well Cell after the termination of the parties' business relationships. Defendant Calvit misappropriated the Contacts for his own benefit to open a new competing business in Hawaii. *See* Hepford Aff. ¶ 11; *see* McDaniel Decl. ¶¶ 9-17.   Defendant Calvit, in concert with Defendants Desgraves and Elliot, stole the contact information of physicians, vendors, and investors to run their competing business, Insulinic HI. Defendants Calvit, Desgraves, and Elliot also used the Contacts to run their competing businesses Insulinic LA and Insulinic FL.

79.     Well Cell did not know what Defendants were doing and Defendants knew that Well Cell was unaware of their unlawful conduct. Accordingly, Defendants misappropriated Well Cell's trade secrets.

80.     Defendants knew that they did not have Well Cell's consent to do so, and Defendant Calvit knew that he was violating his duties under the Non-Disclosure Agreement.

81.     Well Cell has suffered, and will continue to suffer, irreparable harm for which monetary damages are inadequate as a direct and proximate result of Defendants' misappropriation of its trade secrets. Well Cell has shown a substantial likelihood of success on the merits of each element of its claims under the DTSA and the TUTSA.

82.     As a direct and proximate result of Defendants' unlawful misappropriation of Well Cell's trade secrets alleged herein, Well Cell has sustained and will continue to sustain substantial,

immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless Defendants' conduct is enjoined by this Court, Defendants will continue to misappropriate and unlawfully benefit from Well Cell's trade secrets. Plaintiff therefore is entitled to preliminary and permanent injunctive relief restraining and enjoining Defendants' ongoing unlawful conduct.

### B. There is Substantial Threat of Irreparable Harm to Well Cell Absent an Injunction

83.     Well Cell has suffered, and will continue to suffer, irreparable harm for which monetary damages are inadequate as a direct and proximate result of Defendants' copyright infringement, patent infringement, misappropriation of its trade secrets.

84.     Well Cell's good will, which it has invested millions of dollars and years of hard work to develop, will be irreparably damaged. Well Cell will suffer great reputational harm if Defendants continue to operate their website, insulin.com, and their clinics Insulinic LA, Insulinic FL, and Insulinic HI with use of Well Cell's copyrighted information, patent-protected technology and devices, and trade secret information. Well Cell terminated its License Agreements with Insulinic LA and Insulinic FL due to their wrongful billing practices among other concerning matters. Hepford Aff. ¶¶ 9-10. Well Cell is also highly concerned for patient safety regarding Defendants' operation of Insulinic HI as Well Cell has not trained any individuals at Insulinic HI on the use of Well Cell's proprietary medical technology. *Id.* at ¶¶ 11-13. Well's Cell's patent-protected technology is highly specialized and requires specific medical training for any physicians or nurses who intend to use it. *Id.* Improper use of the medical technology on patients can have life-threatening consequences.

85.     If Defendants continue to use Well Cell's proprietary medical technology without their authorization and without proper medical training and cause injuries or fatalities to patients, Well

Cell will suffer great reputational harm for which monetary damages could never be adequate. By unlawfully utilizing Well Cell's proprietary medical technology and direct "copy and paste" information from Well Cell's copyright protected Website and Overcoming Metabolic Failure Drawing (including copyright protected information on Well Cell's ground-breaking technology and direct testimonials from its patients) on the Insulinic website and in the Insulinic Press Release, Defendants are giving physicians, consumers, patients, and vendors the direct impression that they are affiliated with Well Cell and properly authorized by and trained by Well Cell, which is not the case. McDaniel Decl. ¶¶ 9-17. The harm to Well Cell and the public at large is serious, imminent, and irreparable.

86.     Therefore, temporary injunctive relief must be issued at once to stop Defendants' unlawful conduct.

## C. The Threatened Injury Outweighs any Damages the Injunction may cause Defendants.

87.     As set forth above, the threatened injury to Well Cell and the public is grave. Well Cell will suffer irreversible damage to is reputation and its business if Defendants are allowed to continue unlawfully using Well Cell's copyright and patent-protected information, medical technology, and devices. The public will also suffer if diabetes patients are put at risk of fatal harm by unauthorized use of this highly specialized medical technology. On the other hand, any alleged harm suffered by Defendants is *de minimis*. All that will be required of Defendants is to immediately cease and desist using information and devices that are protected by Well Cell's intellectual property rights, which Defendants have absolutely no right to use and for which Defendants are not paying any license fees.

### D.  The Public Interest Will be Greatly Served by a Preliminary Injunction

88.     "[I]t is unquestionable that the public has a strong interest in protecting copyrights, and that this interest is served by enjoining any future infringement by Defendant[s]." *Atl. Recording Corp. v. Smith*, 2008 WL 7951248, at *2 (S.D. Tex. Jan. 7, 2008).

89.     The "touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010), aff'd, 564 U.S. 91, 131 S. Ct. 2238, 180 L. Ed. 2d 131 (2011). "The public has an interest in a strong patent system and it is generally in the public interest to uphold patent rights against an adjudicated infringer." *SynQor, Inc v. Artesyn Techs., Inc.*, No. 2:07-CV-497-TJW-CE, 2011 WL 238645, at *4 (E.D. Tex. Jan. 24, 2011) (*Citing i4i*, 598 F.3d at 863.).

90.     Here, Well Cell has brought claims for copyright infringement and patent infringement and the public undeniably has a strong interest in protecting those federal statutory rights. *Atl. Recording,* 2008 WL 7951248, at *2; *SynQuor*, at 2011 WL 238645, at *4; *i4i,* 598 F.3d at 863. Congress has specifically authorized temporary, preliminary and permanent injunctions for violations of intellectual property holders' copyright infringement claims and patent infringement claims. *See* 17 U.S. Code § 502; 35 U.S. Code § 271. Similarly, the DTSA and the TUTSA also include specific provisions allowing for temporary and permanent injunctions included by their respective legislatures. *See* Tex. Civ. Prac. & Rem. Code § 134A.003 and 18 U.S.C. § 1836(b)(3)(A). The public interest in protecting the rights of intellectual property holders, such as Well Cell, especially ones who have gone to great lengths to protect them through properly issued copyright registrations and patents, is well established.

91.     Moreover, in this case, Defendants' numerous infringements on the Well Cell IP is causing serious and irreparable harm not only to Well Cell, but to diabetes patients who visit the Infringing Clinics and receive subpar and potentially life-threatening treatment from individuals who are not properly trained in administering Well Cell's proprietary medical technology. As Well Cell has not trained anyone at Insulinic HI on the use of its proprietary medical technology, there could be severe consequences for Defendants' continued unrestrained infringement on Well Cell's intellectual property rights as *misuse of the proprietary medical technology can be fatal*.

92.     Therefore, the public interest in this particular case will be greatly served, more so than in a typical copyright or patent infringement suit. Defendants' conduct must be immediately enjoined by this Court in order to protect not only Well Cell, but the public.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Well Cell Global LLC respectfully requests that this Court award injunctive relief to it in the form of an order:

(1)     Enjoining Defendants their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons and entities who receive actual notice of the Court's order by personal service or otherwise, on a nationwide basis, from:

a.      manufacturing, distributing, marketing, advertising, promoting, displaying, performing, or selling or authorizing any third party to manufacture, distribute, market, advertise, promote, display, perform, or sell any infringing content and any products, works, or other materials that include,

copy, are derived from, or otherwise embody the Well Cell Copyrighted Works;

b.   reproducing, distributing, performing, or publicly displaying the Well Cell Copyrighted Works, creating any derivative works based on the Well Cell Copyrighted Works, or engaging in any activity that infringes Plaintiff's rights in its Well Cell Copyrighted Works;

c.   aiding, assisting, or abetting any other individual or entity in doing any act prohibited by sub-paragraphs (a) or (b).

(2)   Requiring Defendants to immediately and permanently remove all content which infringes upon the Well Cell Copyrighted Works, including any and all information from the Website and the Overcoming Metabolic Failure Drawing from the Insulinic website, insulnic.com, and the Insulinic Press Release;

(3)   Requiring Defendants to certify that all content which infringes upon the Well Cell Copyrighted Works, including any and all information from the Website and the Overcoming Metabolic Failure Drawing has been removed and/or destroyed from all forms of media;

(4)   Requiring Defendants to issue a public retraction of the Insulinic Press Release in all news media where it was original shared, copied, or reproduced stating that it contained content that infringed on the Well Cell Copyrighted Works.

(5)   Enjoining Defendants, their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons or entities from infringing, contributing to the infringement of, or inducing infringement of the 595 Patent

and the 990 Patent, by making, using, selling, or offering for sale in the United States, or importing into the United States, including within this judicial district, insulin infusion pumps, kits, and IV tubing infusion cassettes for the treatment of diabetes.

(6)     Requiring Defendants, their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons and entities who receive actual notice of the Court's order by personal service or otherwise, to immediately deliver to Well Cell all products which infringe upon the 595 Patent and the 990 Patent, including any insulin infusion pumps, kits, and IV tubing infusion cassettes for the treatment of diabetes.

(7)     Enjoining the Defendants, their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons and entities who receive actual notice of the Court's order by personal service or otherwise, from disclosing Well Cell's trade secrets, including the Contacts to any person or entity in the United States.

Dated:  September 9, 2022.                  Respectfully submitted,

                                            By:____/s/ *Lema Barazi*_____
                                            LEMA BARAZI
                                            Attorney-in-charge
                                            State Bar No. 24056016
                                            S.D. Texas Bar No. 1358290
                                            lema@lloydmousilli.com
                                            **LLOYD & MOUSILLI, PLLC**
                                            11807 Westheimer Road
                                            Suite 550 PMB 944

PLAINTIFF'S VERIFIED EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Houston, TX 77077
Tel: (512) 609-0059
Fax: (413) 473-6164
Service: litigation@lloydmousilli.com

OF COUNSEL:

Feras Mousilli
State Bar No. 24043837
feras@lloydmousilli.com
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
Tel: (512) 609-0059
Fax: (413) 473-6164

Elizabeth Revere
State Bar No. 00791513
S.D. Texas Bar No.18329
beth@lloydmousilli.com
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
Tel: (512) 609-0059
Fax: (413) 473-6164

**ATTORNEYS FOR PLAINTIFF**
**WELL CELL GLOBAL**

PLAINTIFF'S VERIFIED EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record, pursuant to the District's ECF service rules on **September 9, 2022,** *via electronic mail* on the following:

Scott M. Guidry
Guidry Group
Scott@guidry.group
Attorneys for Defendants Insulinic Lafayette
LLC, Insulinic Hialeah LLC, Insulinic Hawaii
LLC

Charles Alexander Elliott
930 Makaiwa Street
Honolulu, Hawaii 96816
elliottw@hawaii.rr.com
elliottw100@msn.com
idaaelliott@gmail.com

Shawn Paul Calvit
100 Meadow Lane
Lafayette, Louisiana 70506.
shawnc@insulinic.com

Marc Pierre Desgraves IV
9541 Pagosa Street
Commerce City, Colorado 80022
mdesgraves@insulinic.com

/s/ *Lema Barazi*
Lema Barazi

APPX0079

# AFFIDAVIT OF SCOTT A. HEPFORD

| | |
|---|---|
| **THE STATE OF TEXAS** | § |
| | § |
| **COUNTY OF HARRIS** | § |

BEFORE ME, the undersigned authority, on this day personally appeared **SCOTT A. HEPFORD**, and being duly sworn upon his oath by me, deposed and stated as follows:

1.     "My name is SCOTT A. HEPFORD. I am over the age of eighteen. I am of sound mind and competent to make this Affidavit. The facts set forth herein are based on my personal knowledge and are true and correct.

2.     "I am a citizen and resident of Harris County, Texas. I am a Member and Manager of Well Cell Global LLC (**"Well Cell"**), a Texas Limited Liability Company that owns certain intellectual property rights formerly owned by Diabetes Relief LLC ("**DRL**"), a Texas Series Limited Liability Company of which I am also a Member and Manager.

3.     "Well Cell specializes in developing ground-breaking technology for the treatment of diabetes and licensing its proprietary technology to other entities so that they may operate comprehensive diabetes clinics throughout the world. Well Cell owns patents, copyrights, trademarks, and trade secrets pertaining to its proprietary technology for the treatment of diabetes which it always protects diligently. Well Cell possesses trade secrets in the form of business contacts, including clients, physicians, vendors, investors, borrowers, lenders, agents, brokers, banks, lending corporations, buyers, and sellers. These trade secrets are closely guarded by Well Cell and have been developed through extensive time, labor, skill, and money. Well Cell's trade secrets are of immeasurable value and are not easily duplicated nor readily

1

EXHIBIT
1

ascertainable. Well Cell never shares its trade secrets with third-parties without a robust confidentiality agreement in place.

4.      "I am also a Member and Manager of Well Cell Support LLC (**"WCS"**), a Texas Limited Liability Company that is authorized by Well Cell to issue licenses for its patented technology and processes for the treatment of diabetes and other metabolic disorders.

5.      "I am familiar with the matters in controversy in the litigation against Shawn Calvit (**"Mr. Calvit"**) and several of his "Insulinic" business entities and other individuals in the United States District Court for the Southern District of Texas ("**SDTX**") (herein referred to as the **"Insulinic Litigation"**).

6.      "I submit this Affidavit in support of Well Cell's emergency application for injunctive relief, filed in the SDTX in the Insulinic Litigation.

7.      "WCS issued a license to Insulinic of Lafayette LLC (**"Insulinic LA"**) on September 13, 2021, and to Insulinic of Hialeah LLC (**"Insulinic FL"**) on November 1, 2021 for their use of Well Cell's patented technology, patent-pending technology, and proprietary and confidential trade secrets. The licenses contained Rules and Regulations required to be followed by Licensee, which were violated by Mr. Calvit, Insulinic LA and Insulinic FL.

8.      "Prior to issuing the licenses referenced above, Mr. Calvit signed a five-year confidentiality, nondisclosure, non-circumvention agreement on April 19, 2021, with Diabetes Relief LLC.

9.      "On June 9, 2022, I sent a notice of default with intention to revoke the Insulinic licenses issued to Insulinic LA and Insulinic FL and gave them 30 days to cure their breaches of the license agreements. Discussions between Mr. Calvit, who is a principal member of Insulinic LA

and Insulinic FL and Well Cell principals ensued and we made efforts to help Insulinic LA and Insulinic FL become compliant with the license agreement rules and requirements.

10.   "In July 2022, after Mr. Calvit, Insulinic LA, and Insulinic FL failed to remedy their breaches of the license agreement, Well Cell ended its business relationship and terminated the license agreements.

11.   "While I and others were attempting to work with Mr. Calvit to rectify matters and reinstate the licenses, Mr. Calvit was secretly making plans to steal the intellectual property belonging to Well Cell and open competing clinics using the formerly licensed technology, which is patent protected by Well Cell. One clinic I know about is in Hawaii and named Insulinic Hawaii, LLC (**"Insulinic HI"**).

12.   "I know that Mr. Calvit formed Insulinic HI on June 9, 2022. I also know that Shawn Calvit, Marc Pierre Desgraves IV, and Charles Alexander Elliot are Members of Insulinic HI. I believe Shawn Calvit, Marc Pierre Desgraves IV, and Charles Alexander Elliot are also Members of Insulinic LA and Insulinic FL.

13.   "Mr. Calvit and representatives from his Insulinic clinics had received training by me and others and instructions for using Well Cell's patented technology, all of which included know-how, show-how, and trade secrets belonging to Well Cell.

14.   "WCS had previously issued a license to a Hawaiian business entity on March 30, 2022, and I personally went to Hawaii to train the representatives for that clinic during the time period 8/21-31/22. That clinic is a legitimate licensee of WCS and could be harmed by the acts of Defendants.

15.   "Attached hereto as **Exhibit "A"** is a press release issued August 26, 2022 by "Insulinic" (**"Insulinic Press Release"**) about a grand opening of a new clinic in Hawaii, which refers to patented technology that is actually owned and patented by Well Cell, not Insulinic, and that uses quotations from a DRL Website protected by a Registered Copyright TX8-452-464 for the

3

website and its contents, which is currently owned by Well Cell. Attached hereto as **Exhibit "B"**

is the Certificate of Registration for the DRL Website, along with the page of patient testimonials

contained on the DRL Website, which are also contained in Insulinic's Press Release and which

Insulinic falsely claims are testimonials of their clients in the Insulinic Press Release.

16.     "As further evidence of Mr. Calvit's efforts to open a competing clinic, attached hereto as

**Exhibit "C"** is a copy of Facebook postings I copied from Mr. Calvit's Facebook page on

September 4, 2022, which concern Mr. Calvit's opening of a clinic in Hawaii, all during the time

of discussions surrounding the "cease and desist" notices.

17.     "I know that Mr. Calvit has violated, and has plans to further violate Well Cell's

protected intellectual property unless he is restrained immediately. I also know that Well Cell is

suffering irreparable harm as a result of Shawn Calvit, Marc Pierre Desgraves IV, and Charles

Alexander Elliot's infringement on and theft of Well Cell's invaluable intellectual property, and

Well Cell will continue to suffer irreparable harm if they are not immediately stopped."

FURTHER AFFIANT SAYETH NOT.

SCOTT A. HEPFORD

SUBSCRIBED AND SWORN TO BEFORE ME, on this the _9th_ day of September
2022, by Scott A. Hepford, to me personally known, to certify which witness my hand and
official seal of office

Notary Public, State of Texas

CAROL ANN WILSON
Notary Public, State of Texas
Comm. Expires 12-31-2020
Notary ID 1207125

4

**EXHIBIT A to AFFIDAVIT OF SCOTT A. HEPFORD**

**PRESS RELEASE from Insulinic of Hawaii by Shawn Calvit**

Found at https://business.cochawaii.org/news/details/new-diabetes-management-clinic-here-on-oahu-now-08-26-2022



EXHIBIT

**A**

**EXHIBIT B TO AFFIDAVIT OF SCOTT A. HEPFORD**

**CERTIFICATE OF REGISTRATION OF DIABETES RELIEF WEBSITE AND**

**PAGE FROM TESTIMONIALS POSTED AT THE WEBSITE**

### Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayn Tayle Clyyth*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-452-464**

**Effective Date of Registration:**
September 14, 2017

---

**Title**
_____

Title of Work:   Diabetes Relief Website

**Completion/Publication**
_____

Year of Completion:   2017
Date of 1st Publication:   July 01, 2017
Nation of 1ˢᵗ Publication:   United States

**Author**
_____

•   Author:   Diabetes Relief LLC
Author Created:   text
Work made for hire:   Yes
Citizen of:   United States
Year Born:   2015

**Copyright Claimant**
_____

Copyright Claimant:   Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States
Transfer statement:   Various employees and associates

**Rights and Permissions**
_____

Organization Name:   Diabetes Relief LLC
Name:   Carol Ann Wilson
Email:   carol@diabetesrelief.com
Telephone:   (281)600-5000
Alt. Telephone:   (281)600-6000
Address:   11511 Katy Fwy
Suite 101
Houston, TX 77079 United States

Page 1 of 2

EXHIBIT
**B**

diabetesrelief.com

**Here is What Patients Have to Say About Diabetes Relief**

**Diabetes Relief**SM *Get Your Life Back*SM

FOR PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT USHOMEFOR
PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT US1-866-589-8639Click
Here to Call Us!

 **Diabetes Relief**
*Get your life back*

"My blood sugar is now controlled and my eyesight has improved so much I went from
legally blind without glasses to now being able to read the captions on the TV with no glasses, and I'm down from
6 vials of insulin per month to only 3."

**Bruce B., Brazoria, TX**
Type 2 Diabetic – 27 years

"I'm now taking 50% less insulin, my A1c is down 3.5 points, my neuropathy is gone and my energy is way up."

**Alan H., Colorado Springs, CO**
Type 2 Diabetic – 20+ years
Coronary Artery Diseases
Triple bypass, 13 cardiac stents

"Since I been getting treatment at Diabetes Relief, I have no more problems with neuropathy. My legs and feet
use to burn, like it was on fire, but now I feel so good… I sleep well at night for the first time in years. I also
experience weight loss."

**John J., Houston, TX**
Type 2 Diabetic for 5+ years
Hypertension
Neuropathy

"I haven't felt this good in years. It's like my neuropathy just disappeared and my energy level has increased."

**Wayne K., Houston, TX**
Type 2 Diabetic – 18 years
Neuropathy – 10 years
Retinopathy – 2 years

"It has given me my life back."

**Michael W., Crosby, TX**
Type 1 Diabetic – 7 years
Neuropathy – 2 years
Thyroid Disease – 9 years

"It's almost a miracle that my foot healed so well. I started treatment and within 3 weeks it had healed. The
wound had been there for 3 months prior to treatment"

**Greg B., Houston, TX**
Type 2 Diabetic – 10 years
Hypertension – 5 years
Neuropathy – 8 years

"I have more energy and my eyesight has improved so much that I only use bifocals now and before I had to use
trifocals."

1/2

APPX0086

**EXHIBIT C TO AFFIDAVIT OF SCOTT A. HEPFORD**

**Facebook Postings by Shawn Calvit on September 4, 2022,**

**as copied by Scott A. Hepford**



EXHIBIT

C

## UNSWORN DECLARATION OF KELLY MCDANIEL

Pursuant to 28 U.S. Code § 1746, I, **KELLY MCDANIEL**, declare under penalty of perjury the following is true and correct:

1.      "My name is KELLY MCDANIEL. I am over eighteen (18) years of age and I have never been convicted of a crime. I am of sound mind and capable of making this Declaration. The facts set forth herein are within my personal knowledge and are true and correct.

2.      "I am Kelly McDaniel. I am familiar with the matters involved in the case of Well Cell Global LLC (**"Well Cell"**) versus Shawn Calvit, the "Insulinic" business entities, and others in the Southern District of Texas (**"Insulinic Litigation"**).

3.      "I am a Certified Diabetes Care and Education Specialist (**"CDCES"**) living in Oʻahu, Hawaiʻi. I have been a Hawaiʻi resident for 10 years and provided health care services across the six main islands for the duration of that time. During my career here, I have developed a thorough understanding of the healthcare landscape in Hawaiʻi, and it has been disheartening to witness what happens as a result of limited access to healthcare services for diabetes that focus on education, prevention, and effective treatment modalities.

4.      "More specifically, Type 2 Diabetes runs rampant across the islands and people suffer from complications that markedly affect their quality of life. For this reason, the people of Hawaiʻi have a palpable desperation for relief from this progressive disease and Hawaiʻi has become a target for those profiting from the medical management of Type 2 Diabetes. I witnessed this firsthand as the Hawaiʻi Territory Clinical Manager for my former employer, who are the makers of a tubeless insulin pump. I often heard in the industry that Hawaiʻi has the largest untapped market for Type 2 Diabetes. I separated from the company because I did not

Unsworn Declaration of Kelly McDaniel

APF

**EXHIBIT 2**

feel comfortable meeting the expected territory growth rates since I was given a warning to increase territory growth but chose not too even though I knew it may result in my termination.

5.      "Separating from my former position provided the space for me to learn more about Physiologic Insulin Resensitization (**"PIR"**) therapy, a treatment modality I was introduced to in February 2022. Targeting insulin resistance has been the focus of my education and research platforms for the latter half of my career, so a colleague asked me to review a recent publication on PIR as he was considering investing in it.

6.      "The results of the study were astonishing, and the mechanism of action made sense, so I fully supported my colleague in this investment. I also asked him to keep me involved when it came time to open his clinic, since I am deeply connected to our diabetes community in Hawaiʻi and wanted to ensure PIR was introduced in a manner that included care coordination with referring providers and a sustainability piece for patients and their families.

7.      "On August 23, 2022, I became affiliated with a new clinic for Well Cell that was to introduce PIR in a clinical setting and I agreed to become trained in the process. I completed the required online didactic modules the week prior and this was the date we started in-person training on Oʻahu with the Well Cell Team.

8.      "The first day was a review of the material covered in the online didactic, and the remainder of training was spent in clinic delivering PIR therapy under supervision of the lead clinical trainer from Well Cell. Over the course of my training, I learned about the history of IV insulin infusion for the purpose of restoring insulin sensitivity and the role Scott Hepford played in developing the algorithm/protocol to make this therapy accessible for use. We also discussed his efforts to ensure PIR therapy is delivered by capable health care providers, as it requires specific skill sets in terms of understanding glucose metabolism, pathophysiology of insulin

resistance, and a willingness to let go of the "cookie cutter approach" commonly found across the healthcare arena.

9.    "Shortly after completing training on September 1, 2022, I was chatting with a colleague from another branch of my practice and she mentioned there was another new clinic opening up. She started telling me about this "IV insulin therapy" and how it can reverse neuropathy and proceeded to send me the link to the clinic's website. I immediately clicked on the link—which was to Insulinic--and I was directed to a website containing the words "Physiologic Insulin Resensitization" on the header. Knowing this was a term coined by Scott Hepford, my mind started questioning what was going on here. I continued to scroll down the page to find images that were specifically created for the Well Cell training, which led me to believe they were opening up another clinic here with this group.

10.    "At this point I was still on the phone with my colleague, and she shared another link, this time to the press release sent out via the Hawai'i Chamber of Commerce. I was intrigued by the approach the clinic was taking to introduce PIR therapy in tandem with a "nerve conduction and vascular flow diagnostic test," but what really piqued my interest was the title of the press release, "New Diabetes Management Clinic Here on Oahu NOW!"

11.    "My personal quest to shift diabetes care and education to be more meaningful and effective, combined with the longstanding relationships I have formed with diabetes care specialists and people living with diabetes across the islands, has made me the unofficial gatekeeper of innovations in diabetes care for Hawai'i. Because of this, I am invested in vetting anyone who comes here to offer new services and subsequently pursue a partnership with these folks if they have something valuable to offer our community. That being said, I reached out to Insulinic the very next day, September 2, 2022, to learn more.

12.     "I was able to reach Marc Desgraves, Chief Financial Officer for Insulinic, and we had a brief but informative conversation. I asked about the "insulin IV infusion modality" they are offering and he led with a general mention of the "peer reviewed and university studies" on the subject. He then proceeded to tell me the therapy "uses insulin as a hormone, not a drug, gives the pancreas a rest and gets insulin into the system faster, allowing people to wean off Metformin and other medications." The verbiage using insulin as a hormone, not a drug, supported my initial belief that Insulinic is affiliated with Well Cell, because these are the exact words used by Scott Hepford in one of the first online didactic modules. However, Marc did not mention Well Cell once during our conversation; I found this to be odd considering the details he shared throughout the remainder of our conversation.

13.     "Marc Desgraves informed me they had five operational clinics on the mainland--TX, AL, GA, FL, and LA--and the Hawai'i clinic would be opening soon. He was unable to give me a date due to "recent changes with their Medical Director relationship."  I let him know I was at the clinic site hoping to catch someone there, but the suite was empty. He said contractors would be in and out for the next few days and he would also be stopping by intermittently and could meet with me in person to talk more.

14.     "In a phone conversation later that day, I informed him that I was scheduled to travel to Maui and may not be able to meet until next week. He said that would work great, corporate was scheduled to come in for training, and the entire core team would be present, so I could stop by on their lunch break. I thanked him for the opportunity and said I would be in touch once I solidified my schedule.

15.     "In closing, I left that conversation thoroughly perplexed. Things were not adding up in terms of the content on their website, the information Mark was sharing, and no mention of Well

Unsworn Declaration of Kelly McDaniel

Cell, Diabetes Relief, or Scott Hepford. Knowing what PIR therapy entails in terms of clinical expertise, I was deeply concerned about who would be delivering the therapy and even more concerned about who is training them if they aren't claiming to be affiliated with Well Cell.

16.    "To my knowledge, Well Cell is the only organization that is authorized to license clinics to deliver this specialized therapy and Well Cell holds the patents on this technology.

17.    "In an effort to protect our community, I am sharing the information above should Insulinic be involved in any type of wrongdoing by opening a clinic that offers PIR unbeknownst to Well Cell.

18.    "I submit this Declaration in support of Well Cell's emergency application for injunctive relief."

Executed on September 9, 2022

_Kelly McDaniel_
**KELLY MCDANIEL, Declarant**



**LLOYD&MOUSILLI**
ATTORNEYS AND COUNSELORS AT LAW

**Lema Barazi**
713.306.4650
lema@lloydmousilli.com

September 7, 2022

*<u>Via Electronic Mail & Certified Mail</u>*
Shawn Calvit, Individually
100 Meadowlane
Lafayette, LA 70506
shawnc@insulinic.com

Insulinic of Lafayette LLC
220 Johnston Street Building
Lafayette, LA 70501

Insulinic of Hialeah LLC
220 Johnston Street Building
Lafayette, LA 70501

**Re: Termination of License and Demand to Cease and Desist**

Dear Mr. Calvit,

Please be advised that the undersigned law firm has been retained by Well Cell Support LLC, Well Cell Global LLC, and affiliates (hereinafter, **"Well Cell"**) to assert claims against Shawn Paul Calvit, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC and any other affiliated persons or entities involved in the unlawful behavior described herein (hereinafter, **"Insulinic"**) for patent infringement, copyright infringement, and misappropriation of trade secrets. Well Cell hereby demands that you immediately comply with the demands stated herein. This letter is notice of our client's claims and an attempt to resolve this matter before litigation.

**Unauthorized Use of Intellectual Property**

We are in possession of evidence of Insulinic's continued unauthorized use of Well Cell proprietary information and technology, collectively referred to as "Physiologic Insulin Sensitization" treatment (**"PIS"**).

While Insulinic was formerly a licensee of PIS and related research, development, including patented and patent pending processes and technologies (**"License Material"**), that license has been previously terminated. All continued use of PIS and the associated License Materials is unauthorized and willful infringement of Well Cell intellectual property.

Well Cell hereby demands that Insulinic cease any and all use of the License Material immediately and confirm in writing compliance with this demand.

**Termination of Licenses**

On June 9, 2022, Insulinic was put on written notice of breach of material terms of the licensing agreements (**"Well Cell License"**) for the License Materials.

**EXHIBIT**
**3**

September 7, 2022
Termination of License and
Demand to Cease and Desist
Page 2 of 3

Furthermore, Section B of the Well Cell License that Insulinic entered into outlines specific guidelines and rules for authorized licensees to operate under to remain in compliance. Insulinic was required, but failed, to adhere to strict standards regarding following certain protocols, record keeping, reporting and procedures at all times, or risk termination of the Well Cell License. These breaches include, but are not limited to, improper medical billing coding, which can cause irreparable harm to Well Cell and its ability to continue to operate.

In accordance with the Well Cell License, Insulinic was provided ten days of written notice for the thirty-day cure period of all violations and provide confirmation of compliance. Insulinic failed to correct the material breaches outlined within the cure period. Accordingly, any and all licenses, express or implied, previously granted to Insulinic by Well Cell were terminated before July 29, 2022.

Any continued use of the License Materials is unauthorized, unlawful, and constitutes willful infringement of both federally registered and common law intellectual property and trade secrets.

## Continuing Obligations

Insulinic is reminded that despite the termination of any and all licenses, express or implied, or related grants of rights, Insulinic has continuing obligations to Well Cell under the Well Cell License. Sections 8a and b of the Well Cell License consist of a two-year non-competition obligation. This non-compete obligation expires on July 29, 2024.

The Well Cell License confidentiality provisions under Section 16 for the License Material are also still in full force and effect.

## Demand to Cease and Desist Copyright Infringement

Insulinic is hereby demanded to immediately cease and desist from the unlawful use of Well Cell's registered copyrights. Copies of Well Cell's relevant copyright registration are attached as Exhibit A (**"Copyrighted Materials"**). Evidence of Insulinic infringement of the Well Cell's registered copyrights is attached as Exhibit B. This letter serves as formal written notice of copyright infringement as required per 17 U.S. Code § 501(b) before initiating litigation.

Copyright infringement is a strict liability offense and Insulinic is responsible for any infringing act, regardless of intent. Although Insulinic may stop using the Copyrighted Materials, Insulinic remains liable for past infringement. Statutory damages for copyright infringement are up to $150,000 per instance as set in Section 504(c)(2).

## Demand to Cease and Desist Patent Infringement

Insulinic has been on written notice that the License Materials contained patented material belonging to Well Cell. As of July 29, 2022, any use by Insulinic of the technology and processes that are the subject of Patent No. 9,654,595 and Patent No. 10,533,990 B2 (**"Well Cell Patents"**) has been unauthorized and constitutes patent infringement under 35 U.S. Code § 271. Well Cell

APPX0094

September 7, 2022
Termination of License and
Demand to Cease and Desist
Page 3 of 3

has a good faith belief that Insulinic is continuing the use of the patented process based on advertising materials Insulinic has disseminated. An example of such advertising materials is attached as Exhibit C.

Any continued use by Insulinic of technology or processes based on Well Cell Patents is unauthorized and constitutes willful infringement, with relief for treble damages and attorney fees.

### Next Steps

These actions by Insulinic are causing irreparable harm to Well Cell and the value of the intellectual property developed. Immediate action is required by Insulinic to avoid further escalation.

**Insulinic must provide verified evidence of full compliance with all of the demands stated herein within 24 hours. Failure to do so will result in immediate litigation.**

Well Cell will use all available remedies under the law to protect its highly valuable intellectual property and all rights Well Cell is entitled to.

All further communication regarding the matters stated herein should be directed to the undersigned.

Sincerely,

Lloyd & Mousilli
Attorneys at Law

Lema Barazi for the Firm

Enclosures

APPX0095

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code,* attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Kay~ ~ ~*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-452-464**

**Effective Date of Registration:**
September 14, 2017

---

## Title

**Title of Work:**   Diabetes Relief Website

## Completion/Publication

**Year of Completion:**   2017
**Date of 1st Publication:**   July 01, 2017
**Nation of 1ˢᵗ Publication:**   United States

## Author

- **Author:**   Diabetes Relief LLC
  **Author Created:**   text
  **Work made for hire:**   Yes
  **Citizen of:**   United States
  **Year Born:**   2015

## Copyright Claimant

**Copyright Claimant:**   Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States
**Transfer statement:**   Various employees and associates

## Rights and Permissions

**Organization Name:**   Diabetes Relief LLC
**Name:**   Carol Ann Wilson
**Email:**   carol@diabetesrelief.com
**Telephone:**   (281)600-5000
**Alt. Telephone:**   (281)600-6000
**Address:**   11511 Katy Fwy
Suite 101
Houston, TX 77079 United States

EXHIBIT
**A**

Page 1 of 2

diabetesrelief.com testimonials/

## Here is What Patients Have to Say About Diabetes Relief

**Diabetes Relief**<sup>SM</sup> *Get Your Life Back*<sup>SM</sup>

FOR PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT USHOMEFOR PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT US1-866-589-8639Click Here to Call Us!



"My blood sugar is now controlled and my eyesight has improved so much I went from legally blind without glasses to now being able to read the captions on the TV with no glasses, and I'm down from 6 vials of insulin per month to only 3."

**Bruce B., Brazoria, TX**
Type 2 Diabetic – 27 years

"I'm now taking 50% less insulin, my A1c is down 3.5 points, my neuropathy is gone and my energy is way up."

**Alan H., Colorado Springs, CO**
Type 2 Diabetic – 20+ years
Coronary Artery Diseases
Triple bypass, 13 cardiac stents

"Since I been getting treatment at Diabetes Relief, I have no more problems with neuropathy. My legs and feet use to burn, like it was on fire, but now I feel so good… I sleep well at night for the first time in years. I also experience weight loss."

**John J., Houston, TX**
Type 2 Diabetic for 5+ years
Hypertension
Neuropathy

"I haven't felt this good in years. It's like my neuropathy just disappeared and my energy level has increased."

**Wayne K., Houston, TX**
Type 2 Diabetic  – 18 years
Neuropathy – 10 years
Retinopathy – 2 years

"It has given me my life back."

**Michael W., Crosby, TX**
Type 1 Diabetic – 7 years
Neuropathy – 2 years
Thyroid Disease – 9 years

"It's almost a miracle that my foot healed so well. I started  treatment and within 3 weeks it had healed. The wound had been there for 3 months prior to treatment"

**Greg B., Houston, TX**
Type 2 Diabetic – 10 years
Hypertension – 5 years
Neuropathy – 8 years

"I have more energy and my eyesight has improved so much that I only use bifocals now and before I had to use trifocals."

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director



**Registration Number**

## VA 2-185-843

**Effective Date of Registration:**
November 15, 2019
**Registration Decision Date:**
January 14, 2020

---

## Title
          **Title of Work:**  Glucose Homeostasis V.2

## Completion/Publication
        **Year of Completion:**  2019
    **Date of 1st Publication:**  October 15, 2019
  **Nation of 1ˢᵗ Publication:**  United States

## Author
    •       **Author:**  Diabetes Relief LLC
    **Author Created:**  technical drawing
  **Work made for hire:**  Yes
       **Citizen of:**  United States

## Copyright Claimant
    **Copyright Claimant:**  Diabetes Relief LLC
    11511 Katy Fwy, Suite 100, Houston, TX, 77079, United States

## Rights and Permissions
          **Name:**  Scott A Hepford
          **Email:**  scott@diabetesrelief.com
    **Telephone:**  (281)600-5000
      **Address:**  11511 Katy Fwy
    Suite 100
    Houston, TX 77079 United States

## Certification

APPX0098

**Name:** Carol Wilson
**Date:** November 15, 2019

**Copyright Office notes:**  Regarding authorship information: Registered work is Artwork/Illustration

# Glucose Homeostasis

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC 2019. All rights reserved.

APPX0100

Revision – 10.15.19

**Registration #:**   VA0002185843
**Service Request #:**   1-8260679031



Diabetes Relief LLC
11511 Katy Fwy
Suite 100
Houston, TX 77079 United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay A. Tugle*

Acting United States Register of Copyrights and Director

**Registration Number**

## VAu 1-330-086

**Effective Date of Registration:**
May 17, 2018

---

## Title

**Title of Work:**   Overcoming Metabolic Failure

## Completion/Publication

**Year of Completion:**   2018

## Author

**Author:**   Diabetes Relief LLC
**Author Created:**   2-D artwork
**Work made for hire:**   Yes
**Citizen of:**   United States
**Domiciled in:**   United States

## Copyright Claimant

**Copyright Claimant:**   Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States

## Rights and Permissions

**Organization Name:**   Diabetes Relief LLC
**Name:**   Carol A Wilson
**Email:**   carolwilson@earthlink.net
**Telephone:**   (281)642-4050
**Alt. Telephone:**   (281)600-6000
**Address:**   8902 Sunnywood Dr
Houston, TX 77088 United States

## Certification

**Name:**   Carol Wilson

**Registration #:**   VAu001330086
**Service Request #:**   1-6592582541

Diabetes Relief LLC
Carol A Wilson
11511 Katy Fwy, Suite 101
Houston, TX 77079 United States

APPX0103



APPX0104



(http://insulinic.com)

FOLLOW US :
f (https://www.facebook.com/insulinic)   🐦 (https://twitter.com/insulinic)

# The Science Behind Physiologic Insulin Resensitization

- Insulinic utilizes a unique and groundbreaking patented approach where insulin is administered as a hormone rather than a drug addressing the primary cause of Diabetes which is metabolic failure
- By utilizing insulin in a manner that bio-mimics normal physiology, this modality is designed to reduce insulin resistance which helps blood sugar more readily enter each cell and be converted into energy
- Increasing cellular energy allows damaged tissues and organs to grow, repair, and regenerate. Thus, our approach not only stabilizes but in many instances has reversed complications of diabetes and other metabolic disorders.

## PIR For Insulin Resistance

PIR for insulin resistance
(http://insulinic.com/wp-content/uploads/2022/03/1.-PIR-for-insulin-resistance-1.pdf)

## Dynamic Diabetes Solution

Dynamic Diabetes Solutions-Pulse Insulin Resensitization (PIR)
(http://insulinic.com/wp-content/uploads/2022/03/4.-Article-Dynamic-Diabetes-Solutions-
Pulse-Insulin-Resensitization-PIR-Published-Medical-_-Clinical-Research-Dr.-Loveridge-
08.13.2021.pdf)

## Improved Kidney Function

EXHIBIT

**B**

Improved Kidney Function
(http://insulinic.com/wp-content/uploads/2022/03/3.-Villaverde-Improved-Kidney-
Function-Following-Physiologic-Insulin-Resensitization-Treatment-Modality_07.30.21.pdf)

# Reversal Of Diabetic Neuropathy

Reversal of Diabetic Neuropathy
(http://insulinic.com/wp-content/uploads/2022/03/2.-Loveridge-Reversal-of-Diabetic-Neuropathy-Utilizing-Physiologic-Insulin-Resensitization-Case-Series_07.20.2021-Copy.pdf)



## Stay Connected With Insulinic

f (https://www.facebook.com/insulinic)    (https://twitter.com/insulinic)

## Quick Links

Home(http://insulinic.com/shawn/)

APPX0106

About Us(http://insulinic.com/shawn/about/)

Services(http://insulinic.com/shawn/services/)

Contact(http://insulinic.com/shawn/contact/)

## Make an Appointment

Getting an accurate diagnosis can be one of the most impactful experiences that you can have.

**Contact Now
(http://insulinic.com/shawn/contact/)**

Copyright © 2021 Insulinic | Powered by Tech Reshape (https://www.techreshape.com)

APPX0107



# New Diabetes Management Clinic Here on Oahu NOW! 

📅 August 26, 2022   🏷️ Chamber, Members

Aloha!

Insulinic Hawaii ( https://insulinic.com/ ) is a new innovative approach to diabetes management. Our first Hawaii location opens **Sept. 12th at 1360 S. Beretania**. The Insulinic mission is to serve the vast and growing Hawaiian diabetes population by **first** assisting Primary Care, Internal Medicine, Nephrology, and Podiatry providers with a diagnostic test that measures nerve conduction and vascular flow.  Nerve conduction and vascular flow are two key biomarkers that when measured can indicate the severity of diabetes. Our diagnostic testing provides unprecedented data in 1 test giving physicians a 10-page report with over 25 metabolic health markers ( https://insulinic.com/tm-flow-system/ ).  Insulinic of Hawaii, at no cost to the provider, will supply the diagnostic equipment and associated nursing staff to perform this 20 minute test.  Insulinic believes in a care team approach and a collaboration of care. The ordering provider will interpret the diagnostic test results to inform treatment options and serve as a baseline to measure treatment progress.   **Reimbursement for report interpretation by the ordering physician** can be billed by utilizing CPT codes: 95921 Autonomic Nervous System Test, 95923 Sudomotor Assessment, and 93923 Ankle Brachial Index.  An additional differentiator and vital component of the Insulinic program is our Medicare approved insulin IV infusion modality, which is a patented approach that resensitizes cells by using insulin as a hormone rather than a drug. This approach has been scientifically proven to improve and reverse symptoms experienced by insulin resistant diabetics.  At Insulinic, we aim to help patients reverse insulin resistance, which is the root cause of many metabolic disorders. We are requesting a call to action from you to join us in the fight against diabetes in our great state of Hawaii!

### What our patients are saying:

*"I haven't felt this good in years. It's like my neuropathy just disappeared, and my energy level has increased."* -Wayne K.,  Type 2 Diabetic- 18 years, Neuropathy- 10 years, Retinopathy- 2 years

*"My blood sugar is now controlled, and my eyesight has improved so much. I went from legally blind without glasses to now being about to read  the captions on the TV with no glasses, and I'm down from six vials of insulin per month to only three."* -Bruce B., Type 2 Diabetic- 27 years

We'd love to drop by your office to show you more of how we can collaborate on care for diabetics here on Oahu!



---



**Insulinic Hawaii**

**Marc Desgraves Chief Financial Officer**

📅 August 26, 2022

📞 (808) 210-4444

@ Send Email

EXHIBIT

**C**

APPX0108

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Karyn Temple Claggett*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-452-464**

**Effective Date of Registration:**
September 14, 2017

## Title
_____

| | |
|---|---|
| **Title of Work:** | Diabetes Relief Website |

## Completion/Publication
_____

| | |
|---|---|
| **Year of Completion:** | 2017 |
| **Date of 1st Publication:** | July 01, 2017 |
| **Nation of 1st Publication:** | United States |

## Author
_____

| | |
|---|---|
| **Author:** | Diabetes Relief LLC |
| **Author Created:** | text |
| **Work made for hire:** | Yes |
| **Citizen of:** | United States |
| **Year Born:** | 2015 |

## Copyright Claimant
_____

| | |
|---|---|
| **Copyright Claimant:** | Diabetes Relief LLC |
| | 11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States |
| **Transfer statement:** | Various employees and associates |

## Rights and Permissions
_____

| | |
|---|---|
| **Organization Name:** | Diabetes Relief LLC |
| **Name:** | Carol Ann Wilson |
| **Email:** | carol@diabetesrelief.com |
| **Telephone:** | (281)600-5000 |
| **Alt. Telephone:** | (281)600-6000 |
| **Address:** | 11511 Katy Fwy |
| | Suite 101 |
| | Houston, TX 77079 United States |

**EXHIBIT 4**

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Kay A. Teigle*

Acting United States Register of Copyrights and Director

**Registration Number**

## VAu 1-330-086

**Effective Date of Registration:**
May 17, 2018

## Title

**Title of Work:**   Overcoming Metabolic Failure

## Completion/Publication

**Year of Completion:**   2018

## Author

**Author:** Diabetes Relief LLC
**Author Created:** 2-D artwork
**Work made for hire:** Yes
**Citizen of:** United States
**Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States

## Rights and Permissions

**Organization Name:** Diabetes Relief LLC
**Name:** Carol A Wilson
**Email:** carolwilson@earthlink.net
**Telephone:** (281)642-4050
**Alt. Telephone:** (281)600-6000
**Address:** 8902 Sunnywood Dr
Houston, TX 77088 United States

## Certification

**Name:** Carol Wilson

EXHIBIT
5

**Registration #:**   VAu001330086
**Service Request #:**   1-6592582541

Diabetes Relief LLC
Carol A Wilson
11511 Katy Fwy, Suite 101
Houston, TX 77079 United States

APPX0111



APPX0112



(http://insulinic.com)

FOLLOW US :

f (https://www.facebook.com/insulinic)    🐦 (https://twitter.com/insulinic)

## Physiologic Insulin Resensitization

A groundbreaking approach designed to address the root cause of metabolic disorders instead of only suppressing the symptoms.

### Insulin Resistance

### The Root Cause of Metabolic Failure

- Occurs when your body's cells ignore insulin's signal to open
- Cells not opening to absorb glucose causes high blood sugar
- Excessive blood sugars can create the following symptoms:

  - Neuropathy
  - Weight gain
  - Lack of energy
  - Kidney failure

  - Uncontrolled blood sugar
  - Slow Healing Wounds
  - Memory Loss
  - Frequent Urination

EXHIBIT
6



## Reversing Insulin Resistance

Physiologic Insulin Resensitization utilizes Insulin as a HORMONE rather than a DRUG

- Using insulin as a hormone is like having a master key for your Bodys cells
- Glucose (sugars) enter your cells and convert into energy
- Increasing cellular energy allows damaged tissues and organs to grow, repair, and regenerate
- Thus, our approach not only stabilizes but in many instances has reversed complications of diabetes and other metabolic disorders

## WE ADDRESS THE ROOT CAUSE OF METABOLIC FAILURE BY REVERSING INSULIN RESISTANCE



## What Patients are Reporting

**Improved Neuropathy** 95%

**Improvement in at least one diabetic complication** 76%

**HbA1c reduction** 63%

**Reduced diabetic medications** 41%

- Neuropathy diminished
- Energy restored
- Weight controlled
- Erectile function restored
- Retinopathy diminished

- Amputations prevented
- Medications reduced
- Blood sugar controlled
- Mood and sleep improved
- Wounds healed

- Hair and nail growth
- Dementia mitigated
- Alzheimer's alleviated
- Stroke recovery accelerated

Insulinic Health Solutions

- **Fatty Liver reduced**

Insulin
(https://sevencosmos.com/delta/2022/aug/inl/)

---

Insulin Hawaii
(https://sevencosmos.com/delta/2022/aug/inl/)

Insulin Hammond
(https://sevencosmos.com/delta/2022/aug/inl/)

Insulinic of Tampa Bay

## Stay Connected With Insulinic



(https://www.facebook.com/insulinic)

(https://twitter.com/insulinic)

### Quick Links

Home(http://insulinic.com/shawn/)

About Us(http://insulinic.com/shawn/about/)

Services(http://insulinic.com/shawn/services/)

Contact(http://insulinic.com/shawn/contact/)

### Make an Appointment

Getting an accurate diagnosis can be one of the most impactful experiences that you can have.

Contact Now
(http://insulinic.com/shawn/contact/)

Copyright © 2021 Insulinic | Powered by Tech Reshape (https://www.techreshape.com)

insulinic.com

APPX0116



(http://insulinic.com)

# The Science Behind Physiologic Insulin Resensitization

- Insulinic utilizes a unique and groundbreaking patented approach where insulin is administered as a hormone rather than a drug addressing the primary cause of Diabetes which is metabolic failure
- By utilizing insulin in a manner that bio-mimics normal physiology, this modality is designed to reduce insulin resistance which helps blood sugar more readily enter each cell and be converted into energy
- Increasing cellular energy allows damaged tissues and organs to grow, repair, and regenerate. Thus, our approach not only stabilizes but in many instances has reversed complications of diabetes and other metabolic disorders.

## PIR For Insulin Resistance

PIR for insulin resistance
(http://insulinic.com/wp-content/uploads/2022/03/1.-PIR-for-insulin-resistance-1.pdf)

## Dynamic Diabetes Solution

Dynamic Diabetes Solutions-Pulse Insulin Resensitization (PIR)
(http://insulinic.com/wp-content/uploads/2022/03/4.-Article-Dynamic-Diabetes-Solutions-
Pulse-Insulin-Resensitization-PIR-Published-Medical-_-Clinical-Research-Dr.-Loveridge-
08.13.2021.pdf)

## Improved Kidney Function

Improved Kidney Function
(http://insulinic.com/wp-content/uploads/2022/03/3.-Villaverde-Improved-Kidney-
Function-Following-Physiologic-Insulin-Resensitization-Treatment-Modality_07.30.21.pdf)

APPX0117

science

# Reversal Of Diabetic Neuropathy

Reversal of Diabetic Neuropathy
(http://insulinic.com/wp-content/uploads/2022/03/2.-Loveridge-Reversal-of-Diabetic-Neuropathy-Utilizing-Physiologic-Insulin-Resensitization-Case-Series_07.20.2021-Copy.pdf)



## Stay Connected With Insulinic

(http
s://w
ww.f
aceb
ook.
com
/insu
linic)

(http
s://t
witte
r.co
m/in
sulin
ic)

## Quick Links

Home(http://insulinic.com/shawn/)

APPX0118

About Us(http://insulinic.com/shawn/about/)

Services(http://insulinic.com/shawn/services/)

Contact(http://insulinic.com/shawn/contact/)

## Make an Appointment

Getting an accurate diagnosis can be one of the most impactful experiences that you can have.

**Contact Now
(http://insulinic.com/shawn/contact/)**

Copyright © 2021 Insulinic | Powered by Tech Reshape (https://www.techreshape.com)

APPX0119





🛒 🔍 ☰    **(866) 589-8639**    Schedule Now

## A Patented Approach to Metabolic Restoration

What makes Diabetes Relief different? Our unique approach to treating type 1 and type 2 diabetes is designed to offer real results and real relief. Diabetes Relief is an advanced diabetes healthcare center that treats patients using a combination of patented and traditional medicine. Our revolutionary treatment system includes an individualized, physician-directed metabolic restoration program and a proprietary metabolic-reconditioning supplement.

Our mission is to improve more than your symptoms. Our mission is to fight the root cause of diabetes: **metabolic failure.** Everything we do is guided by professional evaluation from specialized practitioners and personal counseling to promote lifestyle changes.





### 1. Metabolic Restoration

We use FDA-approved infusion pumps programmed uniquely and specifically for our patented treatment program, which retrains the signaling and communication processes between the liver and pancreas, thus kick-starting the metabolism and improving all diabetic complications. [/one_half_last]

‹                                                                                          ›

⬛ EXHIBIT 7




**(866) 589-8639**     Schedule Now

# A Patented Approach
# to Metabolic Restoration

What makes Diabetes Relief different? Our unique approach to treating type 1 and type 2 diabetes is designed to offer real results and real relief. Diabetes Relief is an advanced diabetes healthcare center that treats patients using a combination of patented and traditional medicine. Our revolutionary treatment system includes an individualized, physician-directed metabolic restoration program and a proprietary metabolic-reconditioning supplement.

Our mission is to improve more than your symptoms. Our mission is to fight the root cause of diabetes: **metabolic failure.** Everything we do is guided by professional evaluation from specialized practitioners and personal counseling to promote lifestyle changes.





### 2. Hormone Optimization

Diabetes Relief provides diagnostic testing to identify hormonal imbalances contributing to metabolic failure. We include bioidentical hormones to optimize and improve lipids levels associated with improved brain, bone, heart, breast, and prostate health, which combine to improve quality of life and well-being.

‹                                                                                           ›

APPX0122



__ **(866) 589-8639**          Schedule Now

# A Patented Approach
# to Metabolic Restoration

What makes Diabetes Relief different? Our unique approach to treating type 1 and type 2 diabetes is designed to offer real results and real relief. Diabetes Relief is an advanced diabetes healthcare center that treats patients using a combination of patented and traditional medicine. Our revolutionary treatment system includes an individualized, physician-directed metabolic restoration program and a proprietary metabolic-reconditioning supplement.

Our mission is to improve more than your symptoms. Our mission is to fight the root cause of diabetes: **metabolic failure.** Everything we do is guided by professional evaluation from specialized practitioners and personal counseling to promote lifestyle changes.





### 3. Weight Management

Obesity complicates many symptoms of diabetes, such as hypertension and hyperglycemia. Diabetes Relief provides a customized weight-loss treatment plan for each patient that is comprised of intramuscular injections, patented metabolism-optimization treatment, diet, and exercise.

‹                                                                                              ›

APPX0123

 **Diabetes Relief** *Get your life back*

 **(866) 589-8639**    Schedule Now

## A Patented Approach to Metabolic Restoration

What makes Diabetes Relief different? Our unique approach to treating type 1 and type 2 diabetes is designed to offer real results and real relief. Diabetes Relief is an advanced diabetes healthcare center that treats patients using a combination of patented and traditional medicine. Our revolutionary treatment system includes an individualized, physician-directed metabolic restoration program and a proprietary metabolic-reconditioning supplement.

Our mission is to improve more than your symptoms. Our mission is to fight the root cause of diabetes: **metabolic failure.** Everything we do is guided by professional evaluation from specialized practitioners and personal counseling to promote lifestyle changes.





### 4. Wellness and Nutrition

Our total-patient care plan provides attention to diet and exercise while also monitoring medications, vitamins, and mineral needs. The program is designed to work in tandem with traditional medicine in order to reduce medications and eliminate the risk of harmful side effects, while preventing, improving, and potentially reversing serious complications.

⟨    ⟩

APPX0124



# New Diabetes Management Clinic Here on Oahu NOW! 

📅 August 26, 2022   🏷 [Chamber](#), [Members](#)

Aloha!

Insulinic Hawaii ( [https://insulinic.com/](https://insulinic.com/) ) is a new innovative approach to diabetes management. Our first Hawaii location opens **Sept. 12th at 1360 S. Beretania**. The Insulinic mission is to serve the vast and growing Hawaiian diabetes population by **first** assisting Primary Care, Internal Medicine, Nephrology, and Podiatry providers with a diagnostic test that measures nerve conduction and vascular flow. Nerve conduction and vascular flow are two key biomarkers that when measured can indicate the severity of diabetes. Our diagnostic testing provides unprecedented data in 1 test giving physicians a 10-page report with over 25 metabolic health markers ( [https://insulinic.com/tm-flow-system/](https://insulinic.com/tm-flow-system/) ). Insulinic of Hawaii, at no cost to the provider, will supply the diagnostic equipment and associated nursing staff to perform this 20 minute test. Insulinic believes in a care team approach and a collaboration of care. The ordering provider will interpret the diagnostic test results to inform treatment options and serve as a baseline to measure treatment progress. **Reimbursement for report interpretation by the ordering physician** can be billed by utilizing CPT codes: 95921 Autonomic Nervous System Test, 95923 Sudomotor Assessment, and 93923 Ankle Brachial Index. An additional differentiator and vital component of the Insulinic program is our Medicare approved insulin IV infusion modality, which is a patented approach that resensitizes cells by using insulin as a hormone rather than a drug. This approach has been scientifically proven to improve and reverse symptoms experienced by insulin resistant diabetics. At Insulinic, we aim to help patients reverse insulin resistance, which is the root cause of many metabolic disorders. We are requesting a call to action from you to join us in the fight against diabetes in our great state of Hawaii!

### What our patients are saying:

*"I haven't felt this good in years. It's like my neuropathy just disappeared, and my energy level has increased."* -Wayne K., Type 2 Diabetic- 18 years, Neuropathy- 10 years, Retinopathy- 2 years

*"My blood sugar is now controlled, and my eyesight has improved so much. I went from legally blind without glasses to now being about to read the captions on the TV with no glasses, and I'm down from six vials of insulin per month to only three."* -Bruce B., Type 2 Diabetic- 27 years

We'd love to drop by your office to show you more of how we can collaborate on care for diabetics here on Oahu!



**Insulinic Hawaii**

**Marc Desgraves Chief Financial Officer**

📅 [August 26, 2022](#)

📞 [(808) 210-4444](#)

@ [Send Email](#)


Powered by
GrowthZone

---

EXHIBIT

8

APPX0125



US009652595B1

(12) **United States Patent**
Carr et al.

(10) **Patent No.:** US 9,652,595 B1
(45) **Date of Patent:** May 16, 2017

(54) **KIT THAT IMPROVES IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS**

(71) Applicant: **DIABETES RELIEF LLC**, Houston, TX (US)

(72) Inventors: **Hunter Michael Alan Carr**, Houston, TX (US); **Scott Hepford**, Houston, TX (US); **Carol Ann Wilson**, Houston, TX (US)

(73) Assignee: **Diabetes Relief LLC**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/362,963**

(22) Filed: **Nov. 29, 2016**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/042,087, filed on Feb. 11, 2016.

(60) Provisional application No. 62/117,393, filed on Feb. 17, 2015.

(51) **Int. Cl.**
| | |
|---|---|
| *A61M 5/168* | (2006.01) |
| *G06F 19/00* | (2011.01) |
| *A61M 5/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ........ *G06F 19/3468* (2013.01); *G06F 19/322* (2013.01)

(58) **Field of Classification Search**
CPC ...................... G06F 19/3468; G06F 19/322
USPC .......................................................... 436/95
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2014/0005633 A1 * 1/2014 Finan .................. A61M 5/1723
604/504

* cited by examiner

*Primary Examiner* — Rebecca M Fritchman
(74) *Attorney, Agent, or Firm* — Buskop Law Group P.C.; Wendy Buskop

(57) **ABSTRACT**

A kit for individualized intravenous exogenous insulin-based therapy, which includes a portable data storage in communication with client device processor. The data storage can have computer instructions, a database of metabolic factors, a library of weight management protocols, a diabetic treatment model, and a library of care plan templates. The kit for individualized intravenous exogenous insulin-based therapy includes a blood glucose meter, a plurality of intravenous catheters fluidly engageable with a fluid source, and a plurality of metabolic enhancements.

**20 Claims, 19 Drawing Sheets**

DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

**EXHIBIT 9**


(12) **United States Patent**　　(10) **Patent No.:**　　**US 10,533,990 B2**

Carr et al.　　(45) **Date of Patent:**　　***Jan. 14, 2020**

(54) **PHYSIOLOGIC INSULIN-SENSITIVITY IMPROVEMENT**

(71) Applicant: **DIABETES RELIEF LLC**, Houston, TX (US)

(72) Inventors: **Hunter Michael Alan Carr**, Houston, TX (US); **Scott Hepford**, Houston, TX (US); **Carol Ann Wilson**, Houston, TX (US); **Stanley Tories Lewis, Jr.**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/710,537**

(22) Filed: **Sep. 20, 2017**

(65) **Prior Publication Data**

US 2019/0086394 A1　　Mar. 21, 2019

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/042,087, filed on Feb. 11, 2016.

(60) Provisional application No. 62/117,393, filed on Feb. 17, 2015.

(51) **Int. Cl.**
| | |
|---|---|
| *G01N 33/50* | (2006.01) |
| *G01N 33/487* | (2006.01) |
| *G06F 19/00* | (2018.01) |
| *G16H 20/17* | (2018.01) |
| *G01N 33/60* | (2006.01) |
| *G16H 30/40* | (2018.01) |
| *G16H 50/50* | (2018.01) |

(52) **U.S. Cl.**
CPC ... *G01N 33/5091* (2013.01); *G01N 33/48792* (2013.01); *G01N 33/5038* (2013.01); *G01N 33/60* (2013.01); *G06F 19/30* (2013.01); *G16H 20/17* (2018.01); *G16H 30/40* (2018.01); *G16H 50/50* (2018.01); *G01N 2800/042* (2013.01); *G01N 2800/70* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2014/0005633 A1　　1/2014　Finan

*Primary Examiner* — G Steven Vanni
(74) *Attorney, Agent, or Firm* — Rao Deboer Osterrieder, PLLC; Erik J. Osterrieder

(57) **ABSTRACT**

An individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing. The therapy includes treatment sessions involving the assessment of metabolic factors, forming a subject profile, and matching the subject profile to a diabetic treatment model. Using the diabetic treatment model, a quantity and frequency of intravenous insulin bolus, dosage amounts of magnesium, and dosage amounts of potassium can be calculated. The methods that improve impaired hepatic glucose processing in subjects and patients can simultaneously introduce separated insulin bolus from an insulin reservoir, dosage amounts of magnesium, and dosage amounts of potassium. The subject profile can create a weight management protocol that uses a metabolic enhancement, wherein the individualized intravenous exogenous insulin-based therapy produces a subject or a patient with improved cellular ATP functioning.

**20 Claims, 13 Drawing Sheets**

**EXHIBIT 10**

**TAB 6**

United States District Court
Southern District of Texas
**ENTERED**
September 15, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-22-3062 |
| | § | |
| SHAWN PAUL CALVIT, MARC PIERRE | § | |
| DESGRAVES IV, CHARLES ALEXANDER | § | |
| ELLIOT, INSULINIC OF LAFAYETTE | § | |
| LLC, INSULINIC OF HIALEAH LLC, | § | |
| INSULINIC HAWAII, LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM AND TEMPORARY RESTRAINING ORDER**

Well Cell owns U.S. Patent Nos. 9,654,595 and 10,533,990 B2 (the '595 and '990 Patents), covering certain products used for treating diabetes. In September 2021, Well Cell entered into license agreements with the Insulinic Lafayette, LLC and Insulinic of Hialeah, LLC defendants. These agreements covered the two Well Cell patents and certain trade secrets. In July 2022, Well Cell acted to terminate the license agreements. In this lawsuit, Well Cell sought a temporary restraining order and a preliminary and permanent injunction to prevent the defendants from making, using, or selling products relating to the '595 and '990 Patents.

The court held a hearing on the TRO application on September 13, 2022, at which all parties who had appeared were present.[1] The court finds that Well Cell has shown a substantial likelihood of success on the merits, a substantial threat of irreparable harm absent the TRO, that the harm Well Cell will suffer without the TRO outweighs the costs to the defendants to comply, and that issuing the TRO is in the public interest.

---

[1] No appearance has yet been made on behalf of Marc Pierre Desgraves or Charles Alexander Elliot.

The court orders that Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, Insulinic Hawaii, LLC, Shawn Paul Calvit, Marc Pierre Desgraves IV, and Charles Alexander Elliott, and their principals, agents, officers, directors, members, employees, representatives, successors, and other persons acting in concert and participation with them, are enjoined from:

    a.    making, using, selling, or offering for sale in the United States, or importing into the United States, including within this judicial district, infusion pumps, kits, and IV tubing infusion cassettes for the treatment of diabetes related to U.S. Patent Nos. 9,654,595 and 10,533,990 B2; and

    b.    representing, by any means, that any products manufactured, distributed, advertised, offered, or sold by the defendants are Well Cell's products or vice versa, and from otherwise acting in a way likely to cause confusion, mistake, or deception on the part of purchasers or consumers as to the origin or sponsorship of such products.

This order expires on September 27, 2022, or when the court otherwise orders.  The court sets a hearing on Well Cell's application for a preliminary injunction on **Friday, September 23, 2022, at 1:00 p.m., in Courtroom 11-B**.

SIGNED on September 15, 2022, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge

2

**TAB 7**

United States District Court
Southern District of Texas
**ENTERED**
September 15, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-22-3062 |
| | § | |
| SHAWN PAUL CALVIT, MARC PIERRE | § | |
| DESGRAVES IV, CHARLES ALEXANDER | § | |
| ELLIOT, INSULINIC OF LAFAYETTE | § | |
| LLC, INSULINIC OF HIALEAH LLC, | § | |
| INSULINIC HAWAII, LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**ORDER**

In its temporary restraining order, (Docket Entry No. 18), the court did not order Well Cell

to provide security as required by Federal Rule of Civil Procedure 65(c).  The parties did not

address the security requirement in their briefing or during the September 13, 2022, hearing.

No later than **1:00 p.m.** on **Friday, September 16**, the parties must submit proposals for

the security.

SIGNED on September 15, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

**TAB 8**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-03062 |
| | § | |
| SHAWN PAUL CALVIT, MARC | § | |
| PIERRE DESGRAVES IV, CHARLES | § | |
| ALEXANDER ELLIOTT, INSULINIC | § | |
| OF LAFAYETTE LLC, INSULINIC OF | § | |
| HIALEAH LLC, AND INSULINIC | § | |
| HAWAII, LLC, | § | |
| | § | |
| *Defendants*. | | |

## DEFENDANTS' MOTION FOR EXPEDITED DISCOVERY

Defendants Shawn Paul Calvit, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and

Insulinic Hawaii, LL, ("Clinic Defendants'") respectfully seek permission to conduct limited

discovery into certain preliminary injunction issues on an expedited basis (in advance of the Rule

26(f) conference) so that the parties can prepare for the preliminary injunction hearing.  The Clinic

Defendants specifically seek an order from the Court:

(1)    allowing the Defendant Clinics to serve less than 10 requests for production on
Plaintiff; and

(2)    and requiring Plaintiff to respond to the request for production and produce
documents by September 20, 2022.

## INTRODUCTION

On September 8, 2022, the Plaintiff filed this lawsuit asserting claims for copyright

infringement, patent infringement, trade secret misappropriation under the Defend Trade Secrets

Act, trade secret misappropriation under the Texas Uniform Trade Secrets Act, unfair competition

in violation of Texas Business and Commerce Code § 17.46, unfair competition in violation of

Texas common law, unfair competition by misappropriation in violation of Texas common law,

and unjust enrichment in violation of Texas common law against Defendants. Dkt. 1. On

September 15, 2022, the Court issued a Temporary Restraining Order preventing the Clinic

Defendants from using certain equipment related to two patents allegedly owned by the Plaintiff.

Dkt. 18. The Court also set this matter for a preliminary injunction hearing to be held on September

23, 2022, at 1:00 p.m. Dkt. 18.

The claims brought by the Plaintiff are premised on: (1) Plaintiff being the rightful owner

of the intellectual property at issue; and (2) Plaintiff alleged having properly terminated its license

agreements for intellectual property. Accordingly, the Clinic Defendants request permission to

conduct limited written discovery prior to the hearing on the preliminary injunction.

## ARGUMENT

The Clinic Defendants seek expedited discovery because the Plaintiff refuses to provide

documents evidencing basic evidentiary prerequisites prior to the preliminary-injunction hearing

absent a court order. Specifically, the Clinic Defendants ask the Court to order the Plaintiff to

produce documents responsive to the document requests attached as Exhibit A by September 20,

2022, which generally request information regarding: (1) whether the Plaintiff is the proper party

to assert the claims before the Court; (2) whether the relevant license agreements have been

rightfully terminated; and (3) the basis for allegations, which were solely asserted on the Plaintiff's

"information and belief."

The Court has broad discretion to allow discovery to commence immediately and to set

deadlines for responding to discovery or complying with discovery obligations.  FED. R. CIV. P

26(d)( 1 ), 30(a)(2)(A)(iii) & 34(b)(2)(A).  In fact, the Advisory Committee note to Rule 26(d)

2

APPX0132

provides that "[early discovery] will be appropriate in some cases, such as those involving requests for preliminary injunction or motions challenging personal jurisdiction." *St. Louis Group, Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236 (S.D. Tex.  2011) (citing FED. R. CIV. P 26(d) advisory committee's note).

"An increasing majority of district courts, including several in the Fifth Circuit, have adopted a 'good cause' standard to determine whether to permit such expedited discovery." *Combat Zone Corp. v. John/Jane Does 1-2*, No. 2:12-cv-00509, 2012 WL 6684711, at *1 (E.D. Tex. Dec. 21, 2012) (collecting cases). "In a 'good cause' analysis, a court must examine the discovery request on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *St. Louis Group, Inc.,* 275 F.R.D. at 239 (citation omitted). There are five factors that courts often consider when determining if good cause exists: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3)  the purpose for requesting the expedited discovery; (4) the burden on the [party] to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Greenthal v. Joyce*, 4:16-CV-41, 2016 WL 362312, at *2 (S.D. Tex. Jan. 29, 2016).

Good cause exists to grant the Clinic Defendants' request for limited, expedited discovery because a preliminary injunction request is pending, and the Clinic Defendants' proposed discovery requests are narrowly tailored to discover the core information relevant to that request for preliminary injunction. Indeed, the focus of this discovery is meant to understand how a party not named in the patent or copyright has authority to enforce those rights and on what basis Plaintiff alleges the patents and copyrights are being infringed.  This information is sought on an expedited basis to promote judicial economy during the hearing set for September 23, 2022, and it should not be burdensome for the Plaintiff to comply with these requests because each of the

APPX0133

requests is tied to allegations made by the Plaintiff in the Complaint and on which they carry the

burden at the preliminary injunction.

## PRAYER

The Clinic Defendants respectfully requests that the Court sign an Order granting the

Motion for Expedited Discovery.  The Clinic Defendants further requests such other relief, both

at law and in equity, to which The Clinic Defendants are justly entitled.

Date:  September 15, 2022

Respectfully submitted,

MUNSCH HARDT KOPF & HARR, P.C.

By: _s/ Justin K. Ratley_
     Justin K. Ratley
     State Bar No. 24093011
     700 Milam, Suite 800
     Houston, Texas 77002
     Telephone: (713) 222-1493
     Facsimile: (713) 222-1475
     jratley@munsch.com

**ATTORNEYS FOR DEFENDANTS,**
**SHAWN PAUL CALVIT, INSULINIC OF**
**LAFAYETTE LLC, INSULINIC OF HIALEAH**
**LLC, AND INSULINC OF HAWAII LLC**

OF COUNSEL:

Elizabeth F. Eoff
State Bar No. 24095062
SDTX ID No. 2951585
MUNSCH HARDT KOPF & HARR, P.C.
700 Milam, Suite 800
Houston, Texas 77002
Telephone: (713) 222-1493
Facsimile: (713) 222-1475
eeoff@munsch.com

APPX0134

## CERTIFICATE OF CONFERENCE

I hereby certify that on September 13, 2022, immediately following the hearing on the Temporary Restraining Order we conferred with opposing counsel regarding the scope of a potential document exchange. I followed up with opposing counsel on September 15, 2022, and requested an agreement to obtain certain basic documents related to their claims and counsel for Plaintiff stated they would not provide the Clinic Defendants with documents absent a court order. I followed up again after they rejected my request for written discovery and they have not responded to my email.

*/s/ Elizabeth F. Eoff*
Elizabeth F. Eoff

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record on September 15, 2022, using the CM/ECF system which will send notification of such filing to all counsel of record who have registered as filing users of the system.

Lema Barazi
Feras Mousilli
Elizabeth Revere
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
litigation@lloydmousilli.com
lema@lloydmousilli.com
feras@lloydmousilli.com
beth@lloydmousilli.com

*/s/ Elizabeth F. Eoff*
Elizabeth F. Eoff

APPX0135

# Exhibit A

APPX0136

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-03062 |
| | § | |
| SHAWN PAUL CALVIT, MARC | § | |
| PIERRE DESGRAVES IV, CHARLES | § | |
| ALEXANDER ELLIOTT, INSULINIC | § | |
| OF LAFAYETTE LLC, INSULINIC OF | § | |
| HIALEAH LLC, INSULINIC HAWAII, | § | |
| LLC, | § | |
| | § | |
| *Defendants*. | | |

**FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
WELL CELL GLOBAL LLC**

Pursuant to Federal Rule of Civil Procedure 34, Shawn Paul Calvit, Insulinic of Lafayette

LLC, Insulinic of Hialeah LLC, Insulinic Hawaii, LLC, (collectively, the "Clinics") serve the

following Requests for Production on Well Cell Global LLC ("Well Cell"). Well Cell's written

responses and the responsive documents, shall be served within four (4) days after service of these

Requests. The Clinics request that Well Cell produce responsive documents in electronic, native

format on a portable data storage device or by FTP download. Hardcopy documents or electronic

documents produced on a portable data storage device should be delivered to Munsch Hardt Kopf

& Harr P.C. 700 Milam St, Suite 800, Houston, Texas 77002, Attention: Elizabeth Eoff. Electronic

documents produced by FTP download should be sent to: eeoff@munsch.com.

APPX0137

Respectfully submitted,

MUNSCH HARDT KOPF & HARR, P.C.

By: _/s/ Justin K. Ratley_
    Justin K. Ratley
    State Bar No. 24093011
    700 Milam, Suite 800
    Houston, Texas 77002
    Telephone: (713) 222-1493
    Facsimile: (713) 222-1475
    jratley@munsch.com

**ATTORNEYS FOR DEFENDANTS,
SHAWN PAUL CALVIT, INSULINIC
OF LAFAYETTE LLC, INSULINIC OF
HIALEAH LLC, AND INSULINC OF HAWAII
LLC**

OF COUNSEL:

Elizabeth F. Eoff
State Bar No. 24095062
SDTX ID No. 2951585
Munsch Hardt Kopf & Harr, P.C.
700 Milam, Suite 800
Houston, Texas 77002
Telephone: (713) 222-1493
Facsimile: (713) 222-1475
eeoff@munsch.com

4858-1722-9363v.1

APPX0138

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record on September 15, 2022, via email and/or the CM/ECF system.

Lema Barazi
Feras Mousilli
Elizabeth Revere
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
litigation@lloydmousilli.com
lema@lloydmousilli.com
feras@lloydmousilli.com
beth@lloydmousilli.com

/s/ *Justin K. Ratley*
Justin K. Ratley

3

APPX0139

# I.   **DEFINITIONS**

Notwithstanding any definition stated below, each word, term, or phrase used in the Requests is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure (the "Rules").

For purposes of these Requests, the following list of definitions shall apply and be used by the person responding to the Requests.

1.    "Clinics" refers to Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and Insulinic Hawaii, LLC.

2.    "Well Cell" or "Plaintiff" refers to Well Cell Global LLC.

3.    "595 Patent" refers to U.S. Patent Nos. 9,654,595.

4.    "990 Patent" refers to U.S. Patent Nos. 10,533,990 B2.

5.    "WCS" refers to Well Support LLC.

6.    "You," "Your," and "Yours" refers to Plaintiff Well Cell, as well as any of its present or former agents, attorneys, representatives, officers, directors, employees, partners, subsidiaries, affiliates, predecessors, successors, assigns, and all persons acting on your behalf.

7.    "Documents" is used as defined in the Rules and is further defined to mean and include all original and non-identical copies of hand written, typed, printed, recorded, whether electronically, magnetically or otherwise, pictorial, graphic or other matter, including, but not limited to, emails, text messages, electronic messaging, memos, letters, telegrams, telexes, telecopies, facsimile transmissions, correspondence, books of account, ledgers, invoices, purchase orders, receipts, cancelled checks, bills of lading, contracts, agreements, leases, minutes of meetings, notes, bills of sale, promissory notes, opinions, reports, summaries, digests, diaries, daybooks, day timers, surveys, forecasts, statistics, graphs, charts, photographs, tape recordings, videotapes, plans, drawings, specifications, and financial or other accounting statements or records, purchase orders, charts, minutes, logs, offers, orders, computers printouts and/or reports and applicable programs therefore, tapes, cards or other means by which data are stored or preserved, any applicable programs therefore (from which you may reproduce or cause to be reproduced such data in written form), shorthand or stenographers notebooks, papers, and all drafts, or otherwise, as well as all copies of any of the foregoing which differ in any way from the original.

8.    "Complaint" shall mean Plaintiff Well Cell's Original Complaint and Request for Injunctive Relief.

9.    "Possession, custody, or control" of an item means that the person either has physical possession of the item or has a right to possession that is equal or superior to the

4

person who has physical possession of the item.

10.     Any term not defined herein has the same meaning as in the Complaint.

## **REQUESTS FOR PRODUCTION**

1.     Communications between Well Cell or WCS and any third-party biller or medical biller related to the Clinics, including communications with Dawn Davis.

RESPONSE:

2.     Any license and assignment related to the 595 Patent, including any exclusive license and assignment between Well Cell and Diabetes Relief LLC or assignment from any inventor listed on the 595 Patent to any entity. In other words, any document that shows a chain of ownership or authority to enforce from the original inventors to the Plaintiff in this case.

RESPONSE:

3.     Any license and assignment related to the 990 Patent, including any exclusive license and assignment between Well Cell and Diabetes Relief LLC or assignment from any inventor listed on the 990 Patent to any entity.  In other words, any document that shows a chain of ownership or authority to enforce from the original inventors to the Plaintiff in this case.

RESPONSE:

4.     Any Documents and communications underlying the claim that the Clinics or Mr. Clavit is infringing on the 595 Patent or the 990 Patent.  *See* Complaint ¶¶ 74-80.

RESPONSE:

5.     Any assignment from "Wayne K." and "Bruce B." of their testimonial comments, which You claim were infringed.  *See* Complaint ¶ 39.¶

RESPONSE:

6.     Documents sufficient to show the corporate relationship between Well Cell and WCS, including any assignment, in whole or in part, of the License Agreements from WCS to Well Cell.

RESPONSE:

7.     Documents and communications underlying the claim that the Clinics or Mr. Clavit is committing or inducing copyright infringement of Well Cell Copyrighted Works.  *See* Complaint ¶¶ 57-59.

RESPONSE:

8.     Documents sufficient to show the assets purchased by Well Cell from Diabetes Relief LLC, including any intellectual property.

RESPONSE:

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-03062 |
| | § | |
| SHAWN PAUL CALVIT, MARC | § | |
| PIERRE DESGRAVES IV, CHARLES | § | |
| ALEXANDER ELLIOTT, INSULINIC | § | |
| OF LAFAYETTE LLC, INSULINIC OF | § | |
| HIALEAH LLC, AND INSULINIC | § | |
| HAWAII, LLC, | § | |
| | § | |
| *Defendants*. | | |

## <u>ORDER GRANTING DEFENDANTS' MOTION FOR EXPEDITED DISCOVERY</u>

The Court has considered the Motion for Expedited Discovery ("Discovery Motion") filed

by Defendants' Shawn Paul Calvit, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and

Insulinic Hawaii, LLC, ("Defendants'") requesting discovery from Well Cell Global, LLC and

concludes that the Discovery Motion should be GRANTED.

Signed on _____, 2022, at Houston, Texas

_____
United States District Judge

APPX0142

**TAB 9**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **WELL CELL GLOBAL LLC** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **CIVIL CASE NO.** |
| | § | **4:22-cv-03062-LHR** |
| **SHAWN PAUL CALVIT, MARC PIERRE** | § | **JURY DEMANDED** |
| **DESGRAVES IV, CHARLES** | § | |
| **ALEXANDER ELLIOTT, INSULINIC OF** | § | |
| **LAFAYETTE LLC, INSULINIC OF** | § | |
| **HIALEAH LLC, INSULINIC HAWAII,** | § | |
| **LLC** | § | |
| *Defendants* | § | |
| | § | |

---

**PLAINTIFF WELL CELL GLOBAL LLC'S RESPONSE TO MOTION FOR
EXPEDITED DISCOVERY**

---

**TO THE HONORABLE COURT:**

   **COMES NOW PLAINTIFF, WELL CELL GLOBAL LLC,** (**"Plaintiff** or **"Well
Cell"**), in the above-styled matter and files this *Plaintiff Well Cell Global LLC's Response to
Motion for Expedited Discovery* (**"Motion"**). In support thereof, Plaintiff would respectfully
show the Court the following:

## I.   FACTUAL AND PROCEDURAL BACKGROUND

1.   On September 8, 2002, Plaintiff commenced an action against Defendants Shawn Paul
Calvit, Marc Pierre Desgraves IV, Charles Alexander Elliott, Insulinic of Lafayette LLC,
Insulinic of Hialeah LLC, Insulinic Hawaii, LLC (collectively, **"Defendants"**) for copyright
infringement, patent-infringement, trade secret misappropriation under the Defend Trade Secrets
Act, trade secret misappropriation under the Texas Uniform Trade Secrets Act, unfair

competition in violation of Texas Business and Commerce Code § 17.46, unfair competition in violation of Texas common law, unfair competition by misappropriation in violation of Texas common law, and unjust enrichment in violation of Texas common law, and seeking temporary, preliminary, and permanent injunctive relief to prevent Defendants from infringing upon Plaintiff's intellectual property rights. *See* ECF No. 1. Plaintiff filed an Application for Temporary Restraining Order against Defendants on September 9, 2022 (**"Application"**), enjoining and restraining them from the commission of certain acts that infringe upon Plaintiff's copyright-protected and patent-protected intellectual property, as set forth more fully in the Application and incorporated herein by this reference. *See* ECF No. 4.

2.      On September 13, 2022, the Court held a hearing on Plaintiff's Application. Defendants Shawn Paul Calvit, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and Insulinic Hawaii, LLC, (collectively the **"Clinic Defendants"**) were represented by counsel at the hearing.

3.      The Court found that Plaintiff has put forth sufficient evidence in its Application and at the hearing on its Application that Well Cell owns U.S. Patent Nos. 9,654,595 and 10,533,990 B2 (the "**595 and 990 Patents**"), covering certain products used for treating diabetes. *See* ECF No. 18. In September 2021, Well Cell entered into license agreements with the Insulinic Lafayette, LLC and Insulinic of Hialeah, LLC defendants. *Id.* These agreements covered the two Well Cell patents and certain trade secrets. *Id.* In July 2022, Well Cell acted to terminate the license agreements. *Id.*

4.      The Court found that Well Cell had shown in its Application and at the hearing on its Application a substantial likelihood of success on the merits of its claims, a substantial threat of irreparable harm absent a temporary restraining order, that the harm Well Cell will suffer without the temporary restraining order outweighs the costs to the Defendants to comply, and that issuing

the temporary restraining order is in the public interest. *Id.* Therefore, the Court issued a Temporary Restraining Order (**"TRO"**) on September 15, 2022 enjoining and restraining the Defendants from infringing upon Well Cell's 595 and 990 patents by (a) "making, using, selling, or offering for sale in the United States, or importing into the United States, including within this judicial district, infusion pumps, kits, and IV tubing infusion cassettes for the treatment of diabetes elated to U.S. Patent Nos. 9,654,595 and 10,533,990 B2" or (b) "representing, by any means, that any products manufactured, distributed, advertised, offered, or sold by the defendants are Well Cell's products or vice versa, and from otherwise acting in a way likely to cause confusion, mistake, or deception on the part of purchasers or consumers as to the origin or sponsorship of such products." *Id.*

5.      The Court also set a hearing on Well Cell's application for a preliminary injunction for September 23, 2022. *Id.* Well Cell seeks a preliminary injunction preventing Defendants from: (1) infringing upon the 595 and 990 Patents, (2) infringing upon its copyrights, registration numbers TX-8-452-464 and VAu 1-330-086 and (3) misappropriating its trade secrets until a trial on the merits. *See* ECF No. 1. Well Cell also seeks a preliminary injunction requiring Defendants to: (1) return devices to Well Cell that infringe upon the 595 and 990 Patents; (2) remove information from the Insulinic website and the Insulinic Press Release (as defined therein) that infringes upon Well Cell's copyrights; and (3) issue a retraction for the Insulinic Press Release.

6.      The Clinic Defendants filed a Motion for Expedited Discovery (**"Motion"**) on September 15, 2022 requesting permission to send 10 requests for production of documents, which Plaintiff would have to respond to by September 20, 2022. *See* ECF No. 20. The Court ordered that this 4-

day turnaround time was "unrealistic" and would not be granted in its Order of September 16, 2022. *See* ECF No. 21.

7.      The Clinic Defendants have already been permitted to take the deposition of Plaintiff's CEO, Scott Hepford, which will take place on September 21, 2022, and the Clinic Defendants will be able to obtain any information necessary for the hearing on the preliminary injunction at that deposition. Plaintiff will be seeking the deposition of Defendant Shawn Calvit (**"Mr. Calvit"**) on September 22, 2022.

8.      There is no need for expedited written discovery in this case as the Clinic Defendants already have all documents relevant to the issuance of a preliminary injunction in their possession, custody, or control, and the parties need to focus all of their efforts and resources on conducting the oral depositions and preparing for the hearing on the preliminary injunction. Thus, Plaintiff files this Response requesting that the Clinic Defendants' Motion be denied.

## II.   LEGAL STANDARD

9.      Federal Rule of Civil Procedure 26(d)(1) provides that "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)" unless the Court orders otherwise. Fed. R. Civ. P. 26(d)(l). The Court has broad discretion to deny requests for expedited discovery in advance of the Rule 26(f) conference and to set appropriate deadlines for responding to discovery or complying with discovery obligations. Fed. R. Civ. P. 26(d)(l), 30(a)(2)(A)(iii) & 34(b)(2)(A).

10.     Although the Federal Rules do not provide a standard for the court to use in exercising its authority to order expedited discovery, it is generally accepted that courts use one of the following two standards to determine whether a party is entitled to conduct such discovery: (1) the preliminary-injunction-style analysis set out in *Notaro v. Koch*, 95 F.R.D. 403

(S.D.N.Y.1982); or (2) the "good cause" standard. *St. Louis Group, Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 239 (S.D. Tex. 2011).

11.      The *Notaro* preliminary injunction-style analysis is the more rigid standard. *Id.* "Under that standard, a court analyzes the following factors: '(1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of the irreparable injury; and (4) some evidence that the injury that will result without expedited discovery is greater than the injury the party will suffer if the expedited relief is granted.'" *Id.* (citing *Edgenet, Inc. v. Home Depot U.S.A., Inc.*, 259 F.R.D. 385, 386 (E.D.Wis. 2009) (citing *Notaro*, 95 F.R.D. at 405)).

12.      "In a 'good cause' analysis, a court must examine the discovery request on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *St. Louis Group, Inc.*, 275 F.R.D. at 239 (citation omitted). "Good cause may be found 'where the need for expedited discovery in consideration of the administration of justice, outweighs the prejudice to the responding party.'" *Id.* (quoting *Energy Prod. Corp. v. Northfield Ins. Co.*, 2010 WL 3184232, at * 3 (E.D.La. Aug. 6, 2010)). The burden of showing good cause is on the party seeking the expedited discovery. *Id.*

13.      There are five factors that courts often consider when determining if good cause exists: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the [party] to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Greenthal v. Joyce*, 4:16-CV-41, 2016 WL 362312, at *2 (S.D. Tex. Jan. 29, 2016).

14.      The Fifth Circuit has not adopted either standard. Thus, the appropriate standard to utilize is within the discretion of the district court. However, "[i]rrespective of the standard applied,

'[e]xpedited discovery is not the norm.'" *St. Louis Group*, 275 F.R.D. at 240 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618, 623 (N.D. Ill. 2000)).

### III.   ARGUMENT AND AUTHORITIES

15.     The Clinic Defendants' request for expedited discovery must be denied by the Court under either standard. First, the Clinic Defendants have not even addressed the *Notaro* preliminary injunction-style analysis, taking for granted that the Court will follow the good cause analysis instead. *See* ECF No. 20. The Clinic Defendants know that they cannot meet this exacting standard as they cannot show: "(1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of the irreparable injury; and (4) some evidence that the injury that will result without expedited discovery is greater than the injury the party will suffer if the expedited relief is granted." *St. Louis Group*, 275 F.R.D. at 239. As it is the Clinic Defendants' burden to put forth evidence on this standard, their request must be summarily denied if the Court elects to use the *Notaro* preliminary-inunction style analysis, which Plaintiff contends is the appropriate standard given the fact that the preliminary injunction sought in this case merely prevents Defendants from continuing to commit copyright-infringement and patent-infringement in violation of clear federal law.

16.     Moreover, even under the more relaxed 'good cause' standard, the Clinic Defendants' request must also fail. Although there is a preliminary injunction pending, the Clinic Defendants are already taking a deposition of Plaintiff's CEO. Further, the proposed written discovery is overbroad and unnecessary for the resolution of the application for a preliminary injunction. "The subject matter related to requests for expedited discovery should be narrowly tailored in scope." *St. Louis Group*, 275 F.R.D. at 240. (citing *Dimension Data N. Am., Inc. v. NetStar-1,*

*Inc.*, 226 F.R.D. 528, 532 (E.D.N.C. 2005) (considering that the discovery request was not narrowly tailored in denying plaintiffs' motion for expedited discovery); *see also Monsanto Co. v. Woods*, 250 F.R.D. 411, 413 (E.D.Mo.2008) (citing *Irish Lesbian &Gay Org. v. Giuliani*, 918 F.Supp. 728, 730–31 (S.D.N.Y.1996)) ("[C]ourts generally deny motions for expedited discovery when the movant's discovery requests are overly broad.").

17.    Here, the Clinic Defendants simply have not met their burden in establishing "good cause.' Contrary to the Clinic Defendants' assertion in their Motion that they are merely seeking limited discovery necessary for the resolution of the preliminary injunction, they are in fact seeking overly broad discovery, covering the entire merits of the underlying dispute between the parties. *See* Ex. A to ECF No. 20, the Clinic Defendants' proposed First Set of Requests for Production of Documents to Plaintiff.

18.    The Clinic Defendants seek all documents related to: (1) all communications between Well Cell or WCS and any medical biller related to the Insulinic Clinics; (2) all licenses and assignments related to the 595 and 990 Patents; (3) all "[d]ocuments and communications underlying the claim that the Clinics or Mr. Calvit is infringing on the 595 Patent or the 990 Patent"; (4) assignments of client testimonials; (5) all documents related to the corporate relationship between Well Cell and WCS; (6) all "[d]ocuments and communications underlying the claim that the Clinics or Mr. Calvit is committing or inducing copyright infringement of Well Cell Copyrighted Works"; and (7) all documents related to "the assets purchased by Well Cell from Diabetes Relief LLC." *Id.* If these burdensome and onerous discovery requests are granted, it is unclear what discovery would remain for the Clinic Defendants to propound in the underlying litigation as they would require Plaintiff to produce all documents and communications related all of its claims for copyright-infringement and patent-infringement in

this case. Responding to these overly broad discovery requests would also require Well Cell to gather and its attorneys to review, analyze, bates stamp, and produce potentially thousands of pages of documents in advance of the hearing, set four days from today. This written discovery is sought far in advance of the Rule 26(f) conference, when discovery would ordinarily be permitted. Fed. R. Civ. P. 26(d)(l). Having to engage in full written discovery on the merits of the underlying claims on such an expedited basis would be an undue burden on Well Cell, an enormous waste of the parties' resources, and far more information than is necessary for the Court to grant the preliminary injunction.

19.     Furthermore, the majority of the discovery requests also involve confidential and proprietary information of Well Cell, that it cannot turn over to a competitor who is known to be infringing upon its intellectual property rights and its trade secrets and compromising patient-safety without a protective order agreed to by all parties and entered by the Court allowing it to mark documents as "Attorney's Eyes Only," and ensuring these documents can never end up in the hands of the wrongdoers, the Clinic Defendants and the other Defendants.

20.     As for the documents actually necessary for the hearing on the preliminary injunction, the Clinic Defendants already have such documents in their custody, possession and control. The Clinic Defendants already have in their possession all documents, contracts, licensing agreements, non-disclosure agreements and communications with Well Cell and WCS. Furthermore, Well Cell included as exhibits to its Complaint, its Application, and a business-records affidavit from Scott Hepford: (1) the cease and desist letter and confirmation of termination of the License Agreements between the parties; (2) the 595 and 990 Patents; (3) the Registrations for the Well Cell Copyrighted Works; (4) documents evidencing proof of infringing content on the Insulinic website and the Insulinic Press Release; (5) the Licensing

APPX0150

Agreements with Defendant Insulinic of Hialeah, LLC and Defendant Insulinic of Lafayette, LLC; (6) the Non-Disclosure Agreement with Defendant Shawn Calvit; (6) and proof that Insulinic of Hawaii is infringing upon Well Cell's intellectual property rights as well. *See* ECF No. 1 and exhibits thereto, ECF No. 4 and exhibits thereto, and ECF No. 14 and exhibits thereto. Well Cell has been extremely thorough in its application to this Court for a preliminary injunctions and has ensured that the Court has everything it needs to determine that Well Cell has met the elements for the issuance of a preliminary injunction against the Clinic Defendants.

21.     The Clinic Defendants are inappropriately attempting to propound overly broad discovery requests covering the entire merits of the litigation upon Plaintiff on an expedited basis, due in a mere 4 days, which even the Court recognized is unrealistic. *See* ECF No. 21. This certainly is not the norm and is rarely granted. *St. Louis Group*, 275 F.R.D. at 240. This would be an extreme burden upon Plaintiff and an inordinate waste of the parties' resources when they need to focus all efforts on preparing for the preliminary injunction hearing and conducting the oral depositions that have already been permitted in advance of the hearing. Furthermore, the Clinic Defendants have failed to meet their burden under either the *Notaro* preliminary injunction-style standard or the 'good cause' standard as set forth herein. Thus, the Clinic Defendants' request for expedited discovery in the form of requests for production of documents must be denied even if the timeline for production is greater than 4 days.

## IV.  PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that this Court deny the Clinic Defendants' Motion for Expedited Discovery. Plaintiff further prays for such other and further relief, both general or special, at law or in equity, to which it may show itself to be justly entitled.

Dated:  September 19, 2022.

Respectfully submitted,

By:___/s/ *Lema Barazi*_____

LEMA BARAZI
Attorney-in-charge
State Bar No. 24056016
S.D. Texas Bar No. 1358290
lema@lloydmousilli.com
**LLOYD & MOUSILLI, PLLC**
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
Tel: (512) 609-0059
Fax: (413) 473-6164
Service: litigation@lloydmousilli.com

OF COUNSEL:

Feras Mousilli
State Bar No. 24043837
feras@lloydmousilli.com
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
Tel: (512) 609-0059
Fax: (413) 473-6164

Elizabeth Revere
State Bar No. 00791513
S.D. Texas Bar No.18329
beth@lloydmousilli.com
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
Tel: (512) 609-0059
Fax: (413) 473-6164

**ATTORNEYS FOR PLAINTIFF**
**WELL CELL GLOBAL LLC**

PLAINTIFF WELL CELL GLOBAL LLC'S RESPONSE TO MOTION FOR EXPEDITED DISCOVERY

APPX0152

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record, pursuant to the District's ECF service rules on **September 19, 2022,** *via electronic filing system* on the following:

Justin K. Ratley
*jratley@munsch.com*
Elizabeth F. Eoff
*eeoff@munsch.com*
MUNSCH HARDT KOPF & HARR, P.C.
700 Milam, Suite 800
Houston, Texas 77002
Tel: 713.222.1493
Fax: 713.222.1475
*Attorneys for Defendants Shawn Paul Calvit, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and Insulinic of Hawaii LLC*

Charles Alexander Elliott
930 Makaiwa Street
Honolulu, Hawaii 96816
*elliottw100@msn.com*
*idaaelliott@gmail.com*

Marc Pierre Desgraves IV
9541 Pagosa Street
Commerce City, Colorado 80022
*mdesgraves@insulinic.com*

/s/ *Lema Barazi*
Lema Barazi

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **WELL CELL GLOBAL LLC** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **CIVIL CASE NO.** |
| | § | **4:22-cv-03062-LHR** |
| | § | **JURY DEMANDED** |
| **SHAWN PAUL CALVIT, MARC PIERRE** | § | |
| **DESGRAVES IV, CHARLES** | § | |
| **ALEXANDER ELLIOTT, INSULINIC OF** | § | |
| **LAFAYETTE LLC, INSULINIC OF** | § | |
| **HIALEAH LLC, INSULINIC HAWAII,** | § | |
| **LLC** | § | |
| *Defendants* | § | |
| | § | |

---

**PROPOSED ORDER**

---

On this date came before this Court Defendants, Shawn Paul Calvit, Insulinic of

Lafayette LLC, Insulinic of Hialeah LLC, and Insulinic Hawaii LLC, (**"Clinic Defendants"**),

Motion for Expedited Discovery (**"Motion"**), and Plaintiff Well Cell Global LLC's (**"Plaintiff"**)

Response to Motion for Expedited Discovery. After considering the filings, argument and

evidence, the Court determined that Clinic Defendants' Motion should be DENIED, therefore:

IT IS HEREBY ORDERED that Clinic Defendants' Motion for Expedited Discovery is

hereby DENIED.

SIGNED on _____, at Houston, Texas.


_____
The Honorable Lee H. Rosenthal
United States District Judge

1

APPX0154

**TAB 10**

United States District Court
Southern District of Texas
**ENTERED**
September 21, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-22-3062 |
| | § | |
| SHAWN PAUL CALVIT, MARC PIERRE | § | |
| DESGRAVES IV, CHARLES ALEXANDER | § | |
| ELLIOT, INSULINIC OF LAFAYETTE | § | |
| LLC, INSULINIC OF HIALEAH LLC, | § | |
| INSULINIC HAWAII, LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM AND TEMPORARY RESTRAINING ORDER**

Well Cell owns U.S. Patent Nos. 9,654,595 and 10,533,990 B2 (the '595 and '990 Patents), covering certain products used for treating diabetes.  In September 2021, Well Cell entered into license agreements with the Insulinic Lafayette, LLC and Insulinic of Hialeah, LLC defendants. These agreements covered the two Well Cell patents and certain trade secrets.  In July 2022, Well Cell acted to terminate the license agreements.  In this lawsuit, Well Cell sought a temporary restraining order and a preliminary and permanent injunction to prevent the defendants from making, using, or selling products relating to the '595 and '990 Patents.

The court held a hearing on the TRO application on September 13, 2022, at which all parties who had appeared were present.[1]  The court finds that Well Cell has shown a substantial likelihood of success on the merits, a substantial threat of irreparable harm absent the TRO, that the harm Well Cell will suffer without the TRO outweighs the costs to the defendants to comply, and that issuing the TRO is in the public interest.

---

[1]  No appearance has yet been made on behalf of Marc Pierre Desgraves or Charles Alexander Elliot.

The court orders that Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, Insulinic

Hawaii, LLC, Shawn Paul Calvit, Marc Pierre Desgraves IV, and Charles Alexander Elliott, and

their principals, agents, officers, directors, members, employees, representatives, successors, and

other persons acting in concert and participation with them, are enjoined from:

      a.      making, using, selling, or offering for sale in the United States, or importing into the United States, including within this judicial district, infusion pumps, kits, and IV tubing infusion cassettes for the treatment of diabetes related to U.S. Patent Nos. 9,654,595 and 10,533,990 B2; and

      b.      representing, by any means, that any products manufactured, distributed, advertised, offered, or sold by the defendants are Well Cell's products or vice versa, and from otherwise acting in a way likely to cause confusion, mistake, or deception on the part of purchasers or consumers as to the origin or sponsorship of such products.

The court orders Well Cell to tender $10,000.00 to the United States District Court as

security for any injury to the defendants caused by the court's temporary restraining order, if the

defendants are later determined to have been wrongfully enjoined.

This order expires on September 27, 2022, or when the court otherwise orders.

The court sets a hearing on Well Cell's application for a preliminary injunction on **Friday,**

**September 23, 2022, at 1:00 p.m., in Courtroom 11-B**.

      SIGNED on September 21, 2022, at Houston, Texas.

                               Lee H. Rosenthal

                               Lee H. Rosenthal

                               Chief United States District Judge

APPX0156

**TAB 11**

United States District Court
Southern District of Texas
**ENTERED**
September 22, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-22-3062 |
| | § | |
| SHAWN PAUL CALVIT, MARC PIERRE | § | |
| DESGRAVES IV, CHARLES ALEXANDER | § | |
| ELLIOT, INSULINIC OF LAFAYETTE | § | |
| LLC, INSULINIC OF HIALEAH LLC, | § | |
| INSULINIC HAWAII, LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM AND ORDER

The defendants Shawn Paul Calvit, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and Insulinic Hawaii, LLC move for expedited discovery to be completed before the preliminary injunction hearing currently set for September 23, 2022. (Docket Entry. No. 20). Well Cell opposes the motion. (Docket Entry No. 24).

The defendants seek:

1. Communications between Well Cell or WCS and any third-party biller or medical biller related to the Clinics, including communications with Dawn Davis.

2. Any license and assignment related to the 595 Patent, including any exclusive license and assignment between Well Cell and Diabetes Relief LLC or assignment from any inventor listed on the 595 Patent to any entity. In other words, any document that shows a chain of ownership or authority to enforce from the original inventors to the Plaintiff in this case.

3. Any license and assignment related to the 990 Patent, including any exclusive license and assignment between Well Cell and Diabetes Relief LLC or assignment from any inventor listed on the 990 Patent to any entity. In other words, any

document that shows a chain of ownership or authority to enforce from the original inventors to the Plaintiff in this case.

4. Any Documents and communications underlying the claim that the Clinics or Mr. Clavit is infringing on the 595 Patent or the 990 Patent. *See* Complaint ¶¶ 74-80.

5. Any assignment from "Wayne K." and "Bruce B." of their testimonial comments, which You claim were infringed. *See* Complaint ¶ 39.¶

6. Documents sufficient to show the corporate relationship between Well Cell and WCS, including any assignment, in whole or in part, of the License Agreements from WCS to Well Cell.

7. Documents and communications underlying the claim that the Clinics or Mr. Clavit is committing or inducing copyright infringement of Well Cell Copyrighted Works. *See* Complaint ¶¶ 57-59.

8. Documents sufficient to show the assets purchased by Well Cell from Diabetes Relief LLC, including any intellectual property.

(Docket Entry No. 20-1 at 5).

Ordinarily, a party may not seek discovery before the Rule 26(f) conference. Fed. R. Civ. P. 26(d)(1). The defendants ask the court to evaluate their request under the "good cause" standard sometimes used by courts in the Fifth Circuit. (Docket Entry No. 20 at 3). Under that standard, the court "must examine the discovery request on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *St. Louis Group, Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 239 (S.D. Tex. 2011). Well Cell argues that the court may use either the good cause standard or the standard announced in *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982), also in common use. (Docket Entry No. 24 ¶ 10). Under *Notaro*, the court evaluates the requested discovery by factors similar to those of the preliminary injunction analysis: "(1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of the irreparable injury; and (4) some evidence

APPX0158

that the injury that will result without expedited discovery is greater than the injury the party will suffer if the expedited relief is granted." *Notaro*, 95 F.R.D. at 405.

To a certain extent, the court agrees with both parties.  Under either standard, the court agrees with Well Cell that the discovery sought by the defendants is overbroad and would essentially require the expedited and burdensome production of most documents relevant to the merits of the litigation.  The court also agrees with Well Cell that the deposition of Well Cell's CEO should provide much of the information necessary for the defendants to address the medical billing issues that prompted Well Cell to terminate the license agreement.  In addition, at the hearing on Well Cell's motion for a temporary restraining order, the defendants suggested that they had already removed any Well Cell copyrighted material from their web pages, suggesting that they already have some of the information they now seek.

The court agrees with the defendants that Well Cell must be able to show that it owns or has been assigned the patents in question to demonstrate its standing to enforce them.  *Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001) ("If a party lacks title to a patent, that party has no standing to bring an infringement action under that patent.").  This threshold question makes the discovery sought in Requests Nos. 2, 3, and 6 appropriate.  With respect to Requests 2 and 3, the court modifies them to read:

> Documents sufficient to show a chain of ownership or authority to enforce the '595 and '590 Patents from the original inventors to the Plaintiff in this case.

Producing this limited set of documents should not require Well Cell to conduct an extensive and expensive search of its files.

The motion, (Docket Entry No. 20), is granted in part.  The court orders Well Cell to respond on an expedited basis to Request Nos. 2 and 3, as modified above, and Request No. 6. The response is due by September 28, 2022.

3

The court may extend a TRO for good cause.  Fed. R. Civ. P. 65(b)(2).  The court finds good cause for extending the TRO while Well Cell locates documents and responds to the defendants' requests, because such an extension fairly balances the defendants' need for information with Well Cell's concerns regarding the defendants' use of its intellectual property.  The preliminary injunction hearing is reset to **October 3, 2022, at 10:30 a.m.** in Courtroom 11-B.  The TRO will be extended to that date.

The motion, (Docket Entry No. 20), is otherwise denied.

SIGNED on September 22, 2022, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge

4

**TAB 12**

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-22-3062 |
| | § | |
| SHAWN PAUL CALVIT, MARC PIERRE | § | |
| DESGRAVES IV, CHARLES ALEXANDER | § | |
| ELLIOT, INSULINIC OF LAFAYETTE | § | |
| LLC, INSULINIC OF HIALEAH LLC, | § | |
| INSULINIC HAWAII, LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM AND TEMPORARY RESTRAINING ORDER**

Well Cell owns U.S. Patent Nos. 9,654,595 and 10,533,990 B2 (the '595 and '990 Patents), covering certain products used for treating diabetes. In September 2021, Well Cell entered into license agreements with the Insulinic Lafayette, LLC and Insulinic of Hialeah, LLC defendants. These agreements covered the two Well Cell patents and certain trade secrets. In July 2022, Well Cell acted to terminate the license agreements. In this lawsuit, Well Cell sought a temporary restraining order and a preliminary and permanent injunction to prevent the defendants from making, using, or selling products relating to the '595 and '990 Patents.

The court held a hearing on the TRO application on September 13, 2022, at which all parties who had appeared were present.[1] The court finds that Well Cell has shown a substantial likelihood of success on the merits, a substantial threat of irreparable harm absent the TRO, that the harm Well Cell will suffer without the TRO outweighs the costs to the defendants to comply, and that issuing the TRO is in the public interest.

---

[1] No appearance has yet been made on behalf of Marc Pierre Desgraves or Charles Alexander Elliot.

**TAB 13**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-03062 |
| | § | |
| SHAWN PAUL CALVIT, MARC | § | |
| PIERRE DESGRAVES IV, CHARLES | § | |
| ALEXANDER ELLIOTT, INSULINIC | § | |
| OF LAFAYETTE LLC, INSULINIC OF | § | |
| HIALEAH LLC, AND INSULINIC | § | |
| HAWAII, LLC, | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANTS' MOTION TO DISMISS

Defendants, Shawn Paul Calvit, Insulinic of Lafayette LLC ("Lafayette"), Marc Pierre Desgraves IV ("Desgraves"), Charles Alexander Elliott ("Elliot"), Insulinic of Hialeah LLC ("Hialeah"), and Insulinc of Hawaii LLC ("Hawaii") (collectively, the "Defendants"), file Defendants' Motion to Dismiss Plaintiff's claims under Rule 12 of the FEDERAL RULES OF CIVIL PROCEDURE.

# TABLE OF CONTENTS

**PAGE**

Summary Of The Argument ...............................................................................................1

Short Statement Of The Nature And Stage Of The Proceedings.....................................2

Statement Of The Issues To Be Ruled On .......................................................................2

A.      Whether Plaintiff's claims against Defendants should be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure because the Court lacks subject-matter jurisdiction ..........................................................................................................2

B.      Whether Plaintiff's claims against Defendant Arc Pierre Desgraves IV and Defendant Charles Alexander Elliott should be dismissed under Rule 12(b)(2) of the Federal Rules of Civil Procedure because the Court lacks personal jurisdiction..........................................2

C.      Whether Plaintiff's claims against Defendants should be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure because the Plaintiff failed to state a claim upon which relief can be granted...........................................................................................................2

Standard of Review............................................................................................................2

Argument ...........................................................................................................................5

A.      Plaintiff's claims for patent and copyright infringement against Defendants should be dismissed under Rule 12 of the Federal Rules of Civil Procedure because the Court does not have subject matter jurisdiction ....................................................................................5

B.      Plaintiff's claims against Defendant Arc Pierre Desgraves IV and Defendant Charles Alexander Elliott should be dismissed under Rule 12 of the Federal Rules of Civil Procedure for lack of personal jurisdiction ........................................................................6

C.      Plaintiff's Claims Against The Defendants Should Be Dismissed Under Rule 12 Of The Federal Rules Of Civil Procedure For Failure To State A Claim .......................................7

    1.      The Cause Of Action For Patent Infringement Should Be Dismissed .........................7

       a.      The Plaintiff Does Not Adequately Identify The Accused Product Or Process That Infringes The 595 Patent Or The 990 Patent ...........................................................7

       b.      Plaintiff Cannot State a Claim for Infringement Because the Asserted Patents Are Drawn to Patent-Ineligible Subject Matter ................................................................9

          i.      The 595 Patent is Invalid Under 35 U.S.C. § 101.............................................11

             (a)      Claim 1 of the 595 Patent is Directed to an Abstract Idea Under Alice Step One....................................................................................................11

             (b)      Claim 1 of the 595 Patent Does Not Contain an Inventive Concept Under Alice Step Two ...................................................................................11

          ii.      The 990 Patent is Invalid Under 35 U.S.C. § 101.............................................12

             (a)      Claim 19 of the 990 Patent is Directed to an Abstract Idea Under Alice Step One....................................................................................................13

i

(b) Claim 19 of the 990 Patent Does Not Contain an Inventive Concept Under Alice Step Two ....................................................................................................14

c. Plaintiff Fails to Adequately Plead Willful Infringement............................................15

d. Plaintiff Exhausted Its Monopoly on the Patents in Suit ............................................16

2. Plaintiff Has Failed To State A Claim In Respect To Its Allegations For Infringement Of Copyrighted Works.................................................................................................17

a. Plaintiff Does Not Own the Underlying Website Works .............................................17

b. Plaintiff Cannot Claim Rights to 2D Drawing............................................................19

3. There is No Contributory or Vicarious Infringement Without Finding Direct Infringement.....................................................................................................................20

4. Plaintiff Has Failed To State A Claim In Respect To Its Trade Secret Allegations Under Federal And Texas Law .....................................................................................................20

5. Plaintiff Has Failed To State A Claim In Respect To Its Allegations Under The DTPA ................................................................................................................................22

6. Plaintiff Has Failed To State A Claim In Respect To Its Allegations For Unfair Competition......................................................................................................................23

7. Plaintiff Has Failed To State A Claim For Unjust Enrichment .....................................24

8. Plaintiff Has Failed To State A Claim For Injunctive Relief.........................................25

Conclusion & Prayer.......................................................................................................................25

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*,
No. A-14-CA-00847-SS, 2016 WL 900577 (W.D. Tex. Mar. 2, 2016) ................................22

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ....................................................................................................10, 11, 13

*Amazon.com Inc. v. Barnesandnoble.com, Inc.*,
239 F. 3d 1343 (Fed. Cir. 2001) ........................................................................................8

*AMID, Inc. v. Medic Alert Foundation United States, Inc.*,
241 F.Supp.3d 788 (S.D. Tex. 2017) ..................................................................................17

*Artrip v. Ball Corp.*,
735 F. App'x 708 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 1177 (2019) ..............................7

*Artrip v. Ball, Corp.*,
735 Fed. Appx. 708 (Fed. Cir. 2018) ..................................................................................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................................................4, 8

*Atlas IP, LLC v. JEA*,
No. 17-20243-CIV, 2017 WL 5643312 (S.D. Fla. June 21, 2017) ...........................................7

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) ...........................................................................................12

*In re Bass*,
113 S.W.3d 735 (Tex. 2003) ..................................................................................................21

*BCOWW Holdings, LLC v. Collins*,
No. SA-17-CA-00379-FB, 2017 WL 3868184 (W.D. Tex. Sept. 5, 2017) ...........................21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...............................................................................................................8

*Blue Star Press, LLC v. Blasko*,
No. SA-17-CA-111-OLG (HJB), 2018 U.S. Dist. LEXIS 158544, 2018 WL
1904835 (W.D. Tex. Mar. 6, 2018) ......................................................................................20

*Boltex Mfg. Co., L.P. v. Galperti, Inc.*,
827 F. App'x 401 (5th Cir. 2020) .........................................................................................23

iii

*Cameron v. Terrell & Garrett, Inc.*
   618 S.W.2d 535 (Tex. 1981) ............................................................. 23

*Chair King, Inc. v. Houston Cellular Corporation*,
   131 F.3d 507 (5th Cir. 1997) ............................................................. 3

*Chapterhouse, LLC v. Shopify, Inc.*,
   No. 2:18-CV-300, 2018 WL 6981828 (E.D. Tex. Dec. 11, 2018) ............................. 8

*Cicalese v. Univ. Tex. Med. Branch*,
   924 F.3d 762 (5th Cir. 2019) ............................................................. 4

*Cuvillier v. Taylor*,
   503 F.3d 397 (5th Cir. 2007) ............................................................. 4

*Darden v. Peters*,
   402 F. Supp. 2d 638 (E.D.N.C. 2005), aff'd, 488 F.3d 277 (4th Cir. 2007) ............... 18

*DaVinci Editrice S.R.L. v. Ziko Games, LLC*,
   2014 U.S. Dist. LEXIS 110139, 111 U.S.P.Q.2D (BNA) 1692, 2014 WL
   3900139 (S.D. Tex. August 8, 2014) ..................................................... 24

*Davis v. State Farm Lloyds*,
   2015 WL 4475860 (N.D. Tex. July 21, 2015) ............................................. 23

*Dig. Drilling Data Sys., L.L.C. v. Petrolink Servs.*,
   965 F.3d 365 (5th Cir. 2020) ............................................................ 24

*Doe v. Boys Clubs of Greater Dallas, Inc.*,
   907 S.W.2d 472 (Tex. 1995) ............................................................. 23

*Drone Labs, LLC v. Dedrone Holdings, LLC*,
   2019 WL 4345955 (N.D. Cal. 2019) ........................................................ 7

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ..................................................................... 25

*Elec. Scripting Prod. v. HTC Am. Inc.*,
   No. 17-cv-5806-RS, 2018 WL 1367324 (N.D. Cal. Mar. 16, 2018) ............................ 7

*Electric Power Grp. v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016) ...................................................... 10, 12

*Engenium Sols., Inc. v. Symphonic Techs., Inc.*,
   924 F. Supp. 2d 757 (S.D. Tex. 2013) ................................................... 17

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
   955 F.3d 1317 (Fed. Cir. 2020) ........................................... 11, 13, 14, 15

iv

*FairWarning IP, LLC v. Iatric Sys.*,
  839 F.3d 1089 (Fed. Cir. 2016)........................................................15

*Frith v. Guardian Life Ins. Co. of America*,
  9 F.Supp.2d 734 (S.D. Tex. 1998) ...................................................23

*Gaal v. BASF Wyandotte Corp.*,
  533 S.W.2d 152 (Tex. App. 1976).....................................................21

*Gardemal v. Westin Hotel Co.*,
  186 F.3d 588 (5th Cir. 1999) .............................................................4

*Gen. Universal Sys., Inc. v. HAL, Inc.*,
  500 F.3d 444 (5th Cir. 2007) ...........................................................21

*Guy Carpenter & co. v. Provenzale*,
  334 F.3d 459 (5th Cir. 2003) ...........................................................21

*Hyde Corp. v. Huffines*,
  314 S.W.2d 763 (1958)......................................................................21

*Idema v. Dreamworks, Inc.*,
  162 F.Supp.2d 1129 (C.D. Cal. 2001) .............................................20

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
  920 F.3d 890 (5th Cir. 2019) .............................................................5

*Intel Corp. v. ULSI System Technology, Inc.*,
  995 F.2d (Fed. Cir. 1993).................................................................16

*Intellectual Ventures I, LLC v. Capital One Bank (USA), N.A.*,
  792 F.3d 1363 (Fed. Cir. 2015)........................................................10

*Lance Roof Inspection Serv., Inc. v. Hardin*,
  653 F. Supp. 1097 (S.D. Tex. 1986) ............................................21, 22

*London v. Carson Pirie Scott & Co.*.
  946 F.2d 1534 (Fed. Cir. 1991)..........................................................8

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
  925 F.3d 1225 (Fed. Cir. 2019)..........................................................5

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995), aff'd. 517 U.S. 370 (1996)......................8

*McCoy v. Mitsuboshi Cutlery, Inc.*,
  67 F.3d 917 (Fed.Cir.1995), *cert. denied,* 516 U.S. 1174 (1996)............16

v

*McFadin v. Gerber*,
  587 F.3d 753 (5th Cir. 2009) ...........................................................................6, 7

*Metallurgical, Indus. Inc. v. Fourtek, Inc.*,
  790 F2d 1195 (5th Cir. 1986) ..............................................................................22

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  125 S. Ct. 2764 (2005).........................................................................................20

*Middle South Energy, Inc. v. City of New Orleans*,
  800 F.2d 488 (5th Cir. 1986) .................................................................................3

*Novitaz, Inc. v. inMarket Media, LLC.*,
  2017 WL 2311407 (N.D. Cal. May 26, 2017) .......................................................8

*Numed, Inc. v. McNutt*,
  724 S.W.2d 432 (Tex. App. 1987)........................................................................21

*Parity Networks, LLC v. Cisco Sys.*,
  No. 19-cv-667, 2019 U.S. Dist. LEXIS 144094, 2019 WL 3940952 (W.D.
  Tex. July 26, 2019) ..............................................................................................15

*Paterson v. Weinberger*,
  644 F.2d 521 (5th Cir. 1981) .................................................................................3

*Quanta Comput., Inc. v. LG Elecs., Inc.*,
  553 U.S. 617, 128 S. Ct. 2109 (2008)..................................................................17

*R. Ready Prods., Inc. v. Cantrell*,
  85 F. Supp. 2d 672 (S.D. Tex. 2000) ...................................................................17

*Sandoval v. New Line Cinema Corp.*,
  147 F.3d 215 (2d Cir. 1998).................................................................................19

*SAP America, Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018)............................................................................10

*Seastrunk v. Darwell Integrated Tech., Inc.*,
  No. 3:05-CV-0531-G, 2005 U.S. Dist. LEXIS 14191 (N.D. Tex. 2005) .................5

*Smiley Team II, Inc. v. Gen. Star Ins. Co.*,
  2021 WL 5202412 (S.D. Tex. Nov. 9, 2021) .......................................................23

*Straus v. DVC Worldwide, Inc.*,
  484 F.Supp. 2d 620 (S.D. Tex. 2007) ..................................................................19

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*,
  823 F. Supp. 2d 578 (S.D. Tex. 2011) ............................................................21, 24

vi

*United States v. Univis Lens Co.*,
    316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942) ................................................... 16

*Univ. of Fla. Research Found., Inc. v. GE Co.*,
    916 F.3d 1363 (Fed. Cir. 2019) ......................................................................... 12

*V-Formation, Inc. v. Benetton Group SpA*,
    401 F.3d 1307 (Fed. Cir. 2005) ........................................................................... 8

**Statutes**

17 U.S.C. § 102 ........................................................................................................ 20

17 U.S.C. § 408 ........................................................................................................ 18

18 U.S.C. § 1836 ...................................................................................................... 20

35 U.S.C. § 101 ........................................................................................... 9, 10, 11, 12

**Other Authorities**

Fourteenth Amendment ............................................................................................... 6

FED. R. CIV. P. 8 ......................................................................................................... 4

FED. R. CIV. P. 9 ....................................................................................................... 23

FED. R. CIV. P. 12 ............................................................................................. 4, 5, 6, 7

APPX0169

## SUMMARY OF THE ARGUMENT

In 2021, a non-party controlled by Plaintiff allegedly granted the Defendants the right to use Plaintiff's alleged proprietary information ("Licensor Assets") pursuant to various agreements ("License Agreements"). Seven days before the filing of the lawsuit, Plaintiff claims that it terminated the Defendants' rights to make use of the Licensor Assets. The Plaintiff has attempted to leverage the termination of those agreements to pursue various causes of action by claiming the Defendants, some of whom are not subject to this Court's personal jurisdiction, have improperly accessed, used, or claimed to have used the Licensor Assets, including certain patents, copyrights, and trade-secret information. Whether those allegations are with merit (they are not) depends upon: (1) Plaintiff's actual ownership of the Licensor Assets; (2) the validity of the claims that certain information is patented or protected by copyright; (3) Defendants' alleged improper use of the Licensor Assets; and (4) whether the Court has personal and subject matter jurisdiction.

The Defendants own three internal-medicine clinics located in Florida, Louisiana, and Hawaii which provide or intend to provide intravenous treatment to patients for diabetic and metabolic health issues. Defendants had the option to use the Licensor Assets at the Florida and Louisiana clinics prior to the alleged termination of License Agreements as part of the overall care they provide to patients. With respect to the Defendant Hawaii Clinic, it has never opened for business or entered into any agreements with Plaintiff. Now, however, Plaintiff contorts the importance of and its claim to ownership of certain patents and copyrights, none of which have been infringed, to bring this lawsuit. Summarily, Plaintiff is trying to prevent Defendants from using *any* IV pump or *any* IV tubing cassette to provide *any* treatment to their patients. However, the Plaintiff has failed to sufficiently plead that this Court has jurisdiction and it has failed to state

1

a claim upon which relief can be granted.  Accordingly, the Defendants ask the Court to dismiss each of the claims at issue.

### SHORT STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

On September 8, 2022, Plaintiff filed an Original Complaint and Request for Injunctive Relief seeking injunctive relief and alleging (1) copyright infringement, (2) contributory copyright infringement, (3) patent infringement, (4) violations of the Defend Trade Secrets Act, (5) violations of the Texas Uniform Trade Secrets Act, (6) unfair competition in violation of Texas Business and Commerce Code  Section 17.46, (7) unfair competition, (8) unfair misappropriation, and (9) unjust enrichment.[1]  Counsel for certain of the Defendants filed a notice of appearance on September 13, 2022.[2]  As of the filing of this motion, a hearing on Plaintiff's requested Preliminary Injunction is set for October 11, 2022, at 2:00 p.m.[3] Limited expedited discovery has been performed.

### STATEMENT OF THE ISSUES TO BE RULED ON

**A.**    Whether Plaintiff's claims against Defendants should be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure because the Court lacks subject-matter jurisdiction.

**B.**    Whether Plaintiff's claims against Defendant Arc Pierre Desgraves IV and Defendant Charles Alexander Elliott should be dismissed under Rule 12(b)(2) of the Federal Rules of Civil Procedure because the Court lacks personal jurisdiction.

**C.**    Whether Plaintiff's claims against Defendants should be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure because the Plaintiff failed to state a claim upon which relief can be granted.

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) authorizes the dismissal of a case for lack of jurisdiction over the subject matter.[4] A motion to dismiss pursuant to Rule 12(b)(1) for lack of

---

[1]ECF No. 1, Original Complaint.
[2]ECF Nos. 12 & 13.
[3]ECF No. 34, Memorandum and Temporary Restraining Order.
[4]*See* FED. R. CIV. P. 12(b)(1).

APPX0171

subject matter jurisdiction must be considered by the court before any other challenge because "the court must find jurisdiction before determining the validity of a claim."[5] In ruling on a motion to dismiss under Rule 12(b)(1), the Court may rely on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts."[6] The standard for reviewing a motion under Rule 12(b)(1), however, depends on whether the defendant makes a facial or factual attack on the plaintiffs' complaint.[7] The defendant makes a facial attack by the mere filing of a Rule 12(b)(1) motion.[8] In that case, the trial court must look at the sufficiency of the allegations in the complaint, which are presumed to be true.[9] The defendant makes a factual attack, on the other hand, by providing affidavits, testimony, or other evidentiary materials challenging the jurisdiction of the court.[10] In a factual attack, the plaintiffs are also required to submit facts in support of jurisdiction and have the burden of proving, by a preponderance of the evidence, that the trial court has subject matter jurisdiction over the claims.[11] When a plaintiff lacks standing to sue in federal court, it is appropriate for the court to dismiss the action, pursuant to Rule 12(b)(1), for want of subject matter jurisdiction.[12]

Federal Rule of Civil Procedure 12(b)(2) requires that a court dismiss a claim if the court does not have personal jurisdiction over the defendant.[13] "When a nonresident defendant moves

---

[5]*Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (internal citation omitted); *see also RuhrgasAG v. Marathon Oil Company*, 526 U.S. 574, 577, 119 S. Ct. 1563, 143 L. Ed. 2d 760 (1999) ("The requirement that jurisdiction be established as a threshold matter . . . is inflexible and without exception") (citation and internal quotation marks omitted).
[6]*MCG, Inc. v. Great Western Energy Corporation*, 896 F.2d 170, 176 (5th Cir. 1990) (internal citation omitted).
[7]*Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).
[8]*Id.*
[9]*Id.*
[10]*Id.*
[11]*Middle South Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986).
[12]*See Chair King, Inc. v. Houston Cellular Corporation*, 131 F.3d 507, 509 (5th Cir. 1997).
[13]FED. R. CIV. P. 12(b)(2).

APPX0172

to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the district court's jurisdiction over the defendant."[14]

Federal Rule of Civil Procedure 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."[15] Rule 12 must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."[16] "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[17] Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[18] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[19] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[20] "A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'"[21] "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court."[22] A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint,

---

[14]*Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 592 (5th Cir. 1999).
[15]FED. R. CIV. P.  12(b)(6).
[16]FED. R. CIV. P. 8(a)(2).
[17]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[18]*Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).
[19]*Id.* (citing *Twombly*, 550 U.S. at 556).
[20]*Id.* (quoting *Twombly*, 550 U.S. at 556).
[21]*Cicalese v. Univ. Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555).
[22]*Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (alterations omitted) (quoting *Twombly*, 550 U.S. at 558).

4

(2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201."[23]

## ARGUMENT

**A.   Plaintiff's claims for patent and copyright infringement against Defendants should be dismissed under Rule 12 of the Federal Rules of Civil Procedure because the Court does not have subject matter jurisdiction.**

Plaintiff alleges it "has been and still is the holder of the exclusive rights under the Copyright Act"[24] Plaintiff also alleges that at all times, it was the "owner of the entire right, title, and interest of the 595 Patent and 990 Patent."[25] However, the documents attached to the Complaint do not substantiate these claims. Exhibit A to the Complaint shows that the copyrights are owned by Diabetes Relief, LLC—not Well Cell Global, LLC, the Plaintiff. Exhibits 8 and 9 to the Complaint show that the assignee for both the 595 Patent and the 990 Patent are Diabetes Relief, LLC—not Well Cell Global, LLC, the Plaintiff.[26]

If the party asserting infringement is not the patent's original patentee, "the critical determination regarding a party's ability to sue in its own name is whether an agreement transferring patent rights to that party is, in effect, an assignment or a mere license."[27] In distinguishing between "an assignment" and a "mere license," we "examine whether the agreement transferred all substantial rights to the patents."[28] This inquiry depends on the substance of what was granted.[29] The Copyright Act is similar, under it an assignment of copyright does not *per se* include the right to bring accrued claims related to the copyright.[30] In both cases, facts must

---

[23]*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).
[24]ECF No. 1, Complaint ¶ 33.
[25]ECF No. 1, Complaint ¶ 72.
[26]ECF No. 1-9, Page 1 of the 595 Patent; ECF No. 1-10, Page 1 of the 990 Patent.
[27]*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1229 (Fed. Cir. 2019).
[28]*Id*.
[29]*Id*.
[30]*Seastrunk v. Darwell Integrated Tech., Inc.*, No. 3:05-CV-0531-G, 2005 U.S. Dist. LEXIS 14191, at *8 (N.D. Tex. 2005).

APPX0174

be pleaded to clearly show the holder of legal title. Here, the documents Plaintiff attached to the Complaint expressly negate Plaintiff's assertion that it is the owner of patents or copyrights at issue and, importantly, Plaintiff does not plead that the ownership of the patents or copyrights was assigned to them by Diabetes Relief LLC. [31]

Due to the conflict between the documents attached to the Complaint and the language of the Complaint, there exists a serious question: whether Plaintiff has the ability or standing to enforce the claimed copyright and the patents. Either Plaintiff's pleading has failed to sufficiently state a basis for these claims under Rule 12(b)(6), discussed *infra*, or Plaintiff lacks standing and there is no subject matter jurisdiction under Rule 12(b)(1). In either case, the infringement actions, and any other claims dependent on those claims, must be dismissed.

**B.** **Plaintiff's claims against Defendant Arc Pierre Desgraves IV and Defendant Charles Alexander Elliott should be dismissed under Rule 12 of the Federal Rules of Civil Procedure for lack of personal jurisdiction.**

The Court lacks personal jurisdiction over Defendants Desgraves and Elliot. Neither Desgraves nor Elliott are alleged by the Plaintiff to be Texas citizens.[32] Furthermore, neither is alleged to have entered an agreement with Plaintiff setting jurisdiction in this Court or to have made any specific action in the State of Texas with respect to the claims asserted in the Complaint.[33] A federal court in Texas can only exercise personal jurisdiction over a nonresident defendant if the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.[34] Here, to establish personal jurisdiction, the plaintiff must show that (1) the defendant purposefully availed himself of the benefits and protections of the forum state by

---

[31]ECF No. 1, Complaint ¶¶ 42, 71 (pleading that Plaintiff bought rights to the patent and copyrighted material but not that it is the owner of patent).
[32]ECF No. 1, Complaint ¶¶ 10-11.
[33]ECF No. 1, Complaint ¶¶ 10-11.
[34]*See McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009).

APPX0175

establishing "minimum contacts" with the forum state, and (2) the exercise of personal jurisdiction over that defendant does not offend traditional notions of "fair play and substantial justice."[35]

Plaintiff has failed to establish even a rudimentary basis for exercising jurisdiction over Desgraves and Elliott, and thus they should be dismissed as the Court lacks personal jurisdiction over them.

**C.      Plaintiff's Claims Against The Defendants Should Be Dismissed Under Rule 12 Of The Federal Rules Of Civil Procedure For Failure To State A Claim.**

**1.      The Cause Of Action For Patent Infringement Should Be Dismissed.**

**a.      The Plaintiff Does Not Adequately Identify The Accused Product Or Process That Infringes The 595 Patent Or The 990 Patent.**

The Plaintiff's failure to adequately plead all elements of a patent-infringement claim warrants dismissal of those claims under Rule 12(b)(6).[36] Simply reciting some elements of an asserted claim or patent, without tying the alleged infringement to the actual accused product or process to the patent at issue, is insufficient.[37] Likewise, general descriptions of infringing use or conduct, without more, is also insufficient.[38] Reliance on "broad functional language" and failing specifically to identify alleged infringing products or process, or give "defendants fair notice of how they infringe[]" is not sufficient to maintain a cause of action.[39] Further, allegations that "merely parrot claim language" are not "factual allegations" and represent only "[t]hreadbare

---

[35]*Id.*

[36]*See Drone Labs, LLC v. Dedrone Holdings, LLC*, 2019 WL 4345955, *4 (N.D. Cal. 2019) ("Because [Plaintiff] has failed to adequately allege the 'transponder' claim limitation … the Court finds that dismissal … is warranted").

[37]See *Atlas IP, LLC v. JEA*, No. 17-20243-CIV, 2017 WL 5643312, at *4 (S.D. Fla. June 21, 2017) (dismissing patent infringement complaint for failure to state a claim when complaint failed to plausibly allege accused product did not have all claim elements).

[38]*Id.*

[39]*Artrip v. Ball Corp.*, 735 F. App'x 708, 714–15 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 1177 (2019); *Elec. Scripting Prod. v. HTC Am. Inc.*, No. 17-cv-5806-RS, 2018 WL 1367324, at *5 (N.D. Cal. Mar. 16, 2018) ("Without sufficient factual allegations that would permit a court to infer that a required element of the patent claim was satisfied, it is hard to see how infringement would be probable").

APPX0176

recitals of the elements of a cause of action, supported by mere conclusory statements," which "do not suffice."[40]

Here, Plaintiff fails to articulate with any specificity or plausibility how Defendants are actually infringing either the 990 Patent or the 595 Patent. The Complaint alleges on "information and belief" that Defendants are infringing by "making, having made, using, and selling, and offering for sale infusion pumps, kits, and IV tubing infusion cassettes."[41] Importantly, Plaintiff makes no representation it owns, nor identifies, any patents for pumps or IV tubing infusion cassettes.[42]

The claims of the patent specifically define the subject matter that the inventor regards as his invention.[43] An infringement analysis involves two steps: (1) determining the scope of the claim; and (2) comparing the properly construed claim with the accused infringing method to determine whether all of the claim limitations are present either literally or by a substantial equivalent.[44] If an accused product or process fails to meet even a single claim limitation, that product or process cannot infringe.[45] Plaintiff has not identified any product or method practiced by Defendants that infringe the 595 and 990 Patents and this does not satisfy the pleading requirements to survive a motion to dismiss pursuant to Rule 12(b)(6).[46]

---

[40]*Novitaz, Inc. v. inMarket Media, LLC.*, 2017 WL 2311407, at *4 (N.D. Cal. May 26, 2017); *See* also *Chapterhouse, LLC v. Shopify, Inc.*, No. 2:18-CV-300, 2018 WL 6981828, at *2 (E.D. Tex. Dec. 11, 2018) (granting motion to dismiss where the complaint contained only "mere conclusory statement[s]" as to how claim elements were met, and stating that "in order to pass the *Iqbal/Twombly* standard, there must be accompanying factual details").

[41]ECF No. 1, Complaint at ¶ 74.

[42]Ex. A, the 595 Patent; Ex. B, the 990 Patent.

[43]*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd. 517 U.S. 370 (1996).

[44]*Amazon.com Inc. v. Barnesandnoble.com, Inc.*, 239 F. 3d 1343, 1350 (Fed. Cir. 2001); *see also V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1312 (Fed. Cir. 2005) (for an accused process to infringe, it must have or practice each and every element or "limitation" set forth in that claim).

[45]*Id.*; *see London v. Carson Pirie Scott & Co.*. 946 F.2d 1534, 1538-39 (Fed. Cir. 1991) ([t] here can be no infringement as a matter of law if a claim limitation is totally missing from the accused device).

[46]*See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *See Artrip v. Ball, Corp.*, 735 Fed. Appx. 708 (Fed. Cir. 2018)(failure to identify the accused machines by name or image did not fairly provide defendant with adequate notice of infringement).

APPX0177

Plaintiff alleges Defendants are infringing the 990 Patent because the equipment used by the Defendants is being used to "deliver individualized intravenous exogenous insulin–based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing."[47] This simply parrots a portion of the preambles of the claims of the 990 Patent.[48] Likewise, for the 595 Patent, Plaintiff alleges Defendants infringe because insulin infusion pumps, kits and IV tubing infusion cassettes allegedly used by Defendants:

> utilize software that includes portable data storage in communication with a client device processor, which has computer instructions, a database of metabolic factors, a library of weight management protocols, a diabetic treatment model, and a library of care plan templates; and

> contain individualized intravenous exogenous insulin-based therapy, including a blood glucose meter, a plurality of intravenous catheters fluidly engageable with a fluid source, a plurality of metabolic enhancements, and mixing the plurality of boluses from 4 to 8 minutes.[49]

This allegation merely parrots very limited portions of a few of the Claim limitations of the 595 Patent.[50] Accordingly, the cause of action for patent infringement should be dismissed because it is not sufficiently pleaded.

> **b.    Plaintiff Cannot State a Claim for Infringement Because the Asserted Patents Are Drawn to Patent-Ineligible Subject Matter.**

Even if the Plaintiff had properly pleaded a claim for patent infringement, its claims would still fail because the asserted patents include unpatentable subject matter. The patent statute provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor."[51] But Section 101 "contains an important implicit exception: Laws of nature, natural

---

[47]ECF No.1, Complaint at ¶74.
[48]Ex. B. (990 Patent, Claims 1 and 19).
[49]ECF No. 1 at ¶74.
[50]Ex. A (595 Patent).
[51]35 U.S.C. § 101.

APPX0178

phenomena, and abstract ideas are not patentable."[52] A claim is invalid under Section 101 where: (1) it is "directed to" a patent-ineligible concept, such as an abstract idea, and (2) the particular elements of the claim, considered "both individually and as an ordered combination," do not "transform the nature of the claim into a patent-eligible application," i.e., do not set forth an "inventive concept."[53]

The *Alice* Court conveys a two-step process for determining whether a claim is invalid under Section 101. At *Alice* Step One, courts "must first determine whether the claims at issue are directed to a patent-ineligible concept."[54] This requires "looking at the 'focus' of the claims, their 'character as a whole,'" to determine if they are directed to excluded subject matter.[55] At *Alice* Step Two, courts search for an "inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself" by looking at "[w]hat else is. . . in the claims," beyond the abstract idea to which the claims are directed.[56] There is nothing inventive about applying an abstract idea using "well-understood, routine, conventional activit[ies] previously known to the industry."[57] Nor does "[a] simple instruction to apply an abstract idea on a computer . . . provide a sufficient inventive concept."[58]

---

[52]*Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (internal quotation mark and citation omitted).
[53]*Alice*, 573 U.S. at 217 (internal quotation marks and citation omitted); *SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166-67 (Fed. Cir. 2018).
[54]*Alice*, 583 U.S. at 218.
[55]*Electric Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (internal citation omitted).
[56]*Alice*, 573 U.S. at 217-18 (internal quotation mark and citation omitted).
[57]*Id.* at 225.
[58]*Intellectual Ventures I, LLC v. Capital One Bank (USA), N.A.*, 792 F.3d 1363, 1367 (Fed. Cir. 2015).

APPX0179

i.   **The 595 Patent is Invalid Under 35 U.S.C. § 101.**

The 595 Patent has a total of twenty claims of which Claim 1 is the sole independent claim. An independent claim is a standalone claim that contains all the limitations necessary to define an invention.

(a)   *Claim 1 of the 595 Patent is Directed to an Abstract Idea Under Alice Step One.*

The Federal Circuit has repeatedly found actions that "can be performed in the human mind, or by a human using a pen and paper" to be abstract.[59] The 595 Patent claims fit in this category squarely. The claims of the 595 Patent are computer-related, claiming an administrative processor (a computer) and portable data storage, are used instead of a human processor, a file folder and paper instructions for use by the human administrator.

Claim 1 compares a library of weight management protocols to a diabetic treatment model and library of care plan templates. The processor, data storage, and Care Plan templates are configured to compare the measured factors and test results to reference material and produce a populated care plan. This is akin to written reference material, protocols and instructions for use by a human. The claims are drawn towards an abstract idea of a "kit" of interrelated parts that when assembled provide a computerized process for pulling together and analyzing patient data to enable a client or physician to make changes to a treatment regimen. This fails *Alice* Step One.

(b)   *Claim 1 of the 595 Patent Does Not Contain an Inventive Concept Under Alice Step Two.*

The 595 Patent's claims do not recite an inventive concept that provides "something more," either individually or as an ordered combination, to transform the claim to include patentable subject matter. For example, the 595 Patent only contemplates using generic hardware.

---

[59] *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020) (internal citation omitted).

11

Claim 1 requires a blood glucose meter, an intravenous catheter, an administrative processor, and portable data storage. Even if the claims did not cover an abstract idea – which they do – their features involve only well-known, routine, and conventional hardware.

In *Electric Power,* the Federal Circuit held under Step Two that "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes."[60] Similarly, in *Univ. of Fla. Research Found., Inc. v. GE Co.*, the Federal Circuit held that the claims failed Step Two because they were not "a technical improvement over prior art."[61] Instead, they merely "recite[d] the abstract idea of 'collecting, analyzing, manipulating, and displaying data,' and propose[d] using 'a general-purpose computer to carry it out.'"[62]

Here, the claims of the 595 Patent do not include any specialized hardware or a new computer processing technique. The focus of Claim 1 of the 595 Patent is not an improvement of computer capabilities; instead it merely uses a computer processor as a tool to compile patient data, compare patient data against reference material, and make changes to a treatment regimen. The mere fact that Plaintiff proposes automating the process using a computer does not make the abstract concept "significantly more than the abstract idea itself."[63]

### ii.     The 990 Patent is Invalid Under 35 U.S.C. § 101.

The 990 Patent has twenty claims of which Claim 1 and Claim 19 are independent claims. Claim 1 is a method for, and Claim 19 is a system for, "individualized intravenous exogenous insulin-based therapy."[64] Claim 19 is representative of Claim 1.

---

[60]*Electric Power Grp.*, 830 F.3d at 1355.
[61]*Univ. of Fla. Research Found., Inc. v. GE Co.*, 916 F.3d 1363, 1369 (Fed. Cir. 2019).
[62]*Id.*
[63]*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (further holding that the inventive concept "cannot simply be an instruction to implement or apply the abstract idea on a computer.").
[64]Ex. B (990 Patent, Claims 1 and 19).

APPX0181

**(a)**    **Claim 19 of the 990 Patent is Directed to an Abstract Idea Under Alice Step One.**

The claims of the 990 Patent are drawn towards an abstract idea of a computerized process for pulling together and analyzing patient data information to enable a client or physician to make changes to a treatment regimen based on measured data, glucose level, insulin-sensitivity factor, and an individual's target blood glucose level. The focus of Claim 19 is not an improvement of the capabilities of a computer because it merely uses a computer processor as a tool to compile patient data and compare measured patient data against models of therapeutic information and thereby make changes to a treatment regimen. This fails *Alice* Step One.

As explained *infra*, actions that "can be performed in the human mind, or by a human using a pen and paper" are found to be abstract and unpatentable.[65] Claim 19 fits in this category squarely. Claim 19 initially requires an administrative processor connected to an administrative data storage that is connected to a network. This is akin to a human administrative processor having a physical file, or filing cabinet, and a network of people to share information. Claim 19 includes a plurality of care plan templates, a plurality of therapeutic ranges of blood glucose levels, and a plurality of weight management protocols in the administrative data storage which could be stored in file folders and organized by a human. Claim 19 requires computer instructions in the administrative data storage configured to instruct the administrative processor to compare the test results and assess factors to models and schedules and determine a treatment regimen. This is akin to a written instructions in a file instructing a human to compare patient data to reference material, recording information in the patient's care plan, and tracking implementation of the subject's care plan.  This fails *Alice* Step One.

---

[65] *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020) (internal citation omitted).

APPX0182

>   *(b)*     **Claim 19 of the 990 Patent Does Not Contain an Inventive Concept Under Alice Step Two.**

The 990 Patent's claims do not recite an inventive concept that provides "something more," either individually or as an ordered combination, to transform the claim to include patentable subject matter. The 990 Patent only contemplates using generic hardware. Even if the claims did not cover an abstract idea, which they do, their features involve only well-known, routine, and conventional hardware and software.

In *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, a patent holder sued for infringement of a patent that claimed "a method and system for limiting and controlling access to resources in a telecommunications system."[66] The defendant's products "include[d] 'a security system that can grant apps access to a subset of services on the phone, with the end user controlling the permissions granted to each app.'"[67] The Federal Circuit concluded that the method and system for receiving an access request and determining whether access should be granted were abstract ideas.[68] The Federal Circuit reasoned that "[c]ontrolling access to resources is exactly the sort of process that 'can be performed in the human mind, or by a human using a pen and paper,' which we have repeatedly found unpatentable."[69] The plaintiff in *Ericsson* argued that because the claimed resource-access method was limited to mobile telephone systems, the method was not an abstract idea. The court rejected the argument, finding that that the limit to that system did not make the claimed method any less abstract.[70] Because the claims did not "recite an inventive concept sufficient to transform that idea into patent-eligible subject matter," failing step two, they were not patent eligible.[71]

---

[66]*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317 (Fed. Cir. 2020).
[67]*Id.* at 1320.
[68]*Id.* At 1326.
[69]*Id.* at 1327 (citation omitted).
[70]*Id.*
[71]*Id.* at 1331.

APPX0183

In *Credit Acceptance Corp. v. Westlake Servs.*, the patent involved maintaining a database of a seller's inventory, gathering financial information from a consumer, and presenting financing options to the consumer for each item of available inventory.[72] Using an approach similar to *Ericsson*, the Federal Circuit held that the claimed invention was an abstract idea, noting that the "mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology."[73] The court concluded that the "use and arrangement of conventional and generic computer components recited in the claims—such as a database, user terminal, and server—do not transform the claim, as a whole, into 'significantly more' than a claim to the abstract idea itself."[74]

Here, Claim 19 does not include any specialized hardware or a new storage or processing technique. Claim 19 requires nothing more than storing reference material, storing a patient's measured factors, comparing the measured factors to the reference material, and populating a care plan template. The automation of Claim 19 using a computer is irrelevant—the "claims here do not propose a solution or overcome a problem 'specifically arising in the realm of computer [technology],'" and therefore are not "transform[ed] into a patent-eligible application."[75]

c.    **Plaintiff Fails to Adequately Plead Willful Infringement.**

To state a claim for willful infringement, a plaintiff must allege facts plausibly showing that the accused infringer: "(1) knew of the patent-in-suit; (2) after acquiring that knowledge, it infringed the patent; and (3) in doing so, it knew, or should have known, that its conduct amounted to infringement of the patent."[76] Plaintiff fails to plead each of the three elements.

---

[72]*Id.* at 1047.
[73]*Id.* at 1055, 1057.
[74]*Id.* at 1056.
[75]*FairWarning IP, LLC v. Iatric Sys.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016).
[76]*Parity Networks, LLC v. Cisco Sys.*, No. 19-cv-667, 2019 U.S. Dist. LEXIS 144094, 2019 WL 3940952, at *3 (W.D. Tex. July 26, 2019).

APPX0184

Plaintiff merely alleges in the Complaint that Defendants "have known of the existence of the 595 Patent and the 990 Patent, and their acts of infringement have been willful and in reckless disregard for the 595 patent and the 990 Patent, without any reasonable basis for believing that they had a right to engage in the infringing conduct."[77] This allegation of willfulness is conclusory and fails to specify the elements of willfulness, let alone recite any factual allegations that would satisfy the three required elements. Accordingly, the Plaintiff's claims for willful infringement should be dismissed.

### d.    Plaintiff Exhausted Its Monopoly on the Patents in Suit.

The law is well settled that an authorized sale of a patented product places that product beyond the reach of the patent.[78] The purchaser of such a product may use or resell the product free of the patent. The patent exhaustion doctrine applies to the disposition of a product under a license, just as it would to an outright sale.[79]

Accordingly, there is no basis in law for the Plaintiff to claim that the Defendants are not entitled to use the products patented by third parties which it sold to them.  Lafayette and Hialeah purchased startup kits comprised each of 8 pumps and 800 IV tubing infusion cassettes for $120,000.[80]  Even if Plaintiff possessed a patent for that equipment (it does not), Plaintiff's right to preclude Lafayette and Hialeah from using that equipment expired when it sold to them the products subject to the kit.

Under the same reasoning, Plaintiff cannot preclude the use of a process it sold Lafayette and Hialeah. Indeed, a patented method may be sold such that the sale of which exhausts patent

---

[77]ECF No. 1, Complaint ¶ 78.
[78]*McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 921 (Fed.Cir.1995), *cert. denied,* 516 U.S. 1174 (1996). *Intel Corp. v. ULSI System Technology, Inc.,* 995 F.2d, 1556 (Fed. Cir. 1993) (*citing United States v. Univis Lens Co.,* 316 U.S. 241, 252, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942).
[79]*United States v. Univis Lens Co.,* 316 U.S. 241, 252 (1942).
[80]Ex. C, Proof of Purchase.

16

rights, the same a patented apparatuses or material.[81] Accordingly, Plaintiff's right to preclude Lafayette and Hialeah from using its process expired when it sold it to them.

2.    **Plaintiff Has Failed To State A Claim In Respect To Its Allegations For Infringement Of Copyrighted Works.**

Plaintiff claims two copyrights at issue. One copyright, published July 1, 2017, is for the text contained in the Diabetes Relief Website ("Website") (U.S. Copyright Registration TX 8-452-464). A second registration, filed in 2018, is for 2-D artwork, a graphic drawing illustrating relative levels of insulin to glucagon at three physiological states (Drawings) (U.S. Copyright Registration VAu 1-330-086)[82].   In order to show copyright infringement, Plaintiff must show both (1) ownership of valid copyrighted material, and (2) copying by Defendant.[83]

a.    **Plaintiff Does Not Own the Underlying Website Works.**

Copyright ownership is shown by: (1) proof of originality and copyrightability, and (2) compliance with the applicable statutory requirements.[84] Because Plaintiff is not the author or proper claimant of the Website patient testimonials, Plaintiff cannot show ownership.

A valid copyright certificate of registration is prima facie evidence of validity, but once the defendant offers proof that the plaintiff's work was copied from other works or similar probative evidence, the burden shifts back to the plaintiff to demonstrate originality.[85]  Here that certificate is registered to Diabetes Relief – not Well Cell.

Plaintiff alleges Defendants copied the content of two patient testimonials from a press release posted on the Website, including the content of the testimonials and the description of the patients, specifically,

---

[81]*Quanta Comput., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 628-29, 128 S. Ct. 2109, 2117 (2008).
[82]"Website" and "Drawings" collectively known as ("Works").
[83]*AMID, Inc. v. Medic Alert Foundation United States, Inc.*, 241 F.Supp.3d 788, 801 (S.D. Tex. 2017).
[84]*Engenium Sols., Inc. v. Symphonic Techs., Inc.*, 924 F. Supp. 2d 757, 776 (S.D. Tex. 2013).
[85]*R. Ready Prods., Inc. v. Cantrell*, 85 F. Supp. 2d 672, 682 (S.D. Tex. 2000).

17

*"I haven't felt this good in years. It's like my neuropathy just disappeared, and my energy level has increased." -Wayne K., Type 2 Diabetic > 18 years, Neuropathy – 10 years, Retinopathy – 2 years*

*"My blood sugar is now controlled, and my eyesight has improved so much. I went from legally blind without glasses to now being about to read the captions on the TV with no glasses, and I'm down from six vials of insulin per month to only three." – Bruce B., Type 2 Diabetic-27 years.*

Plaintiff does not have proof of the deposit they were required to have made when it registered the "text" of the Diabetes Relief Website.[86] Defendants cannot know what "text" is claimed as it relates to the Diabetes Relief Website, including the testimonials, under Registration TX 8-452-464. Not all parts of a website are necessarily property of the website owner. Some portions of the website may not be unique enough to merit copyright protection and are merely in the public domain.[87]

Although the Copyright Office does not explicitly recognize a website as a type of copyrightable subject matter under the Copyright Act, a website may be registered, or a specific web page may be registered if it satisfies the statutory requirements for a compilation or a collective work.[88] A compilation or collective work may be registered if there is a sufficient amount of creative expression in the selection, coordination, or arrangement of the content appearing on the individual web pages or the website as a whole.[89] A registration may cover both the website as a whole and the individual works on the site if the claimant fully owns the copyrights in both the compilation and the underlying works at the time of registration.[90] A claim in a compilation or a collective work extends only to the specific elements provided in the deposit that

---

[86] 17 U.S.C. § 408(b)(1),(2); Copyright Registration of Websites and Website Content, Registration of Copyrights Form (Circular 66) ("The Copyright Office mandates that "[a] complete copy of a published work is one that contains all elements of the unit of publication, including those which, if considered separately, would not be copyrightable subject matter").

[87] *Darden v. Peters*, 402 F. Supp. 2d 638, 643 (E.D.N.C. 2005), aff'd, 488 F.3d 277 (4th Cir. 2007).

[88] Copyright Registration of Websites and Website Content, Registration of Copyrights Form (Circular 66).

[89] *Id*.

[90] *Id*.

the claimant fully owns. It does not cover previous or subsequent iterations of the same website. *Id.* Defendants cannot overcome their lack of ownership by attributing words to the rightful author is not sufficient to claim ownership of another's original work. Plaintiff is not the proper claimant of the underlying work if it cannot show it had permission to use another's original work.

Even if it can be shown that the copyright was owned by Plaintiff, any alleged copying was not improper. First, *w*here the unauthorized use of the copyrighted work is de minimis, there is no cause of action for copyrighted infringement.[91] A de minimis use defense to actionable copying occurs when the technical violation of a right is so trivial the law will not impose legal consequences.[92] Even if the Court finds Plaintiff alleged Defendants copied protectable works, it should consider Defendants' actions a technical violation and impose no legal consequences.

Second, any alleged use by the Defendants is a "fair use." The defense of fair use resembles the de minimis doctrine but the fair use analysis requires the Court to weigh four non-exclusive factors: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.[93]

### b.    Plaintiff Cannot Claim Rights to 2D Drawing.

Any work or portion of a work that is an idea, procedure, process, system, method of operation, concept, principle, or discovery does not constitute copyrightable subject matter and

---

[91]*Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998).
[92]*Straus v. DVC Worldwide, Inc.*, 484 F.Supp. 2d 620 (S.D. Tex. 2007) (internal citation omitted).
[93]17 U.S.C. § 107.

APPX0188

cannot be registered.[94] If protectable at all, Plaintiff's 2D drawings can only be considered to be thinly protected.[95]

But even if the Court determines that the drawings are the subject matter of copyright protection, factor two of the fair use analysis applies. The diagram or illustration is one of fact to assist the patient in understanding the physiological response to the treatment. Because its sole purpose is to convey such scientific information to patients, it is of paramount importance that it be as accurate as possible in relation to the equipment and method of the patented technology.

### 3.     There is No Contributory or Vicarious Infringement Without Finding Direct Infringement.

Without finding a properly pleaded claim for direct infringement, there can be no contributory or vicarious infringement. Induced copyright infringement, contributory copyright infringement, and vicarious copyright infringement require an underlying act of direct copyright infringement.[96] Accordingly, if the Court dismisses the direct infringement claims, then it should also dismiss the contributory or vicarious infringement claims.

### 4.     Plaintiff Has Failed To State A Claim In Respect To Its Trade Secret Allegations Under Federal And Texas Law.

To state a claim under the Defense of Trade Secret Act ("DTSA"), a plaintiff must allege: (1) a trade secret; (2) misappropriation; and (3) use in interstate commerce.[97] Similarly, to establish trade secret misappropriation under Texas law, a plaintiff must show: (1) a trade secret;

---

[94]*See* 17 U.S.C. § 102(b) (2000) (stating that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work").
[95]*Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1178 (C.D. Cal. 2001) (Where a copyrighted work is composed largely of 'unprotectable' elements, or elements 'limited' by 'merger,' 'scenes a faire,' and/or other limiting doctrines, it receives a 'thin' rather than a 'broad' scope of protection.).
[96]*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 125 S. Ct. 2764, 2782 (2005) (stating that induced infringement requires active steps to encourage direct infringement).
[97]18 U.S.C. § 1836; *Blue Star Press, LLC v. Blasko*, No. SA-17-CA-111-OLG (HJB), 2018 U.S. Dist. LEXIS 158544, 2018 WL 1904835, at *2 (W.D. Tex. Mar. 6, 2018).

APPX0189

(2) Defendants acquired the trade secret by breach of a confidential relationship or other improper means; and (3) Defendants used the trade secret without authorization.[98] Plaintiff has failed to adequately state a claim under both Texas and Federal Law.

Courts in Texas identify trade secrets, proprietary information, and confidential information separately but provide them similar protection if the requirements—including that of secrecy—are met. The burden of proving secrecy is on the party claiming secret status.[99] To determine the existence of a trade secret, a fact-finder must examine six relevant but non-exclusive criteria: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.[100]

Paragraph 90 of the Complaint contains the purported trade secrets:

> Well Cell possessed trade secrets in the form of business contacts, including clients, physicians, vendors, investors, borrowers, lenders, agents, brokers, banks, lending corporations, buyers, and sellers (collectively, "the Contacts").

Customer and vendor lists can be trade secrets.[101] However, a customer list of readily ascertainable names and addresses will not be protected as a trade secret.[102] To establish entitlement to trade

---

[98]*Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 449 (5th Cir. 2007).

[99]*Ultraflo Corp. v. Pelica*n Tank Parts, Inc., 926 F.Supp. 2d 935, 959 (S.D. Tex. 2013).

[100]*In re Bass*, 113 S.W.3d 735, 740 (Tex. 2003).

[101]*BCOWW Holdings, LLC v. Collins*, No. SA-17-CA-00379-FB, 2017 WL 3868184, at *14 (W.D. Tex. Sept. 5, 2017); *see also Hyde Corp. v. Huffines*, 314 S.W.2d 763, 766 (1958). *Gaal v. BASF Wyandotte Corp.*, 533 S.W.2d 152, 155 (Tex. App. 1976) (holding that customer list of readily ascertainable names and addresses was not trades secret).

[102]*Guy Carpenter & co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003)(upholding the district court's determination that the customer list was not a trade secret under Texas law, reasoning that a customer list was readily ascertainable); see also *Numed, Inc. v. McNutt*, 724 S.W.2d 432, 435 (Tex. App. 1987)(finding no trade secret where customer list can be compiled by calling hospitals and doctors and asking the identify of their supplier); *see also Lance Roof Inspection Serv., Inc. v. Hardin*, 653 F. Supp. 1097, 1100 (S.D. Tex. 1986) (finding that customer list was not

21

secret protection, the owner must take "reasonable measures under the circumstances to keep the information secret" and the information must derive economic value from not being generally known or readily ascertainable through proper means.[103] The character of information in trade secrets caselaw is more sophisticated and indicates a considerable expense and effort undertaken to develop the information.[104]

Plaintiff—an insulin pump distributor and licensor—alleges its trade secrets are comprised of a broad sweep of what it calls business contacts, which it asserts includes clients, physicians, vendors, investors, borrowers, lenders, agents, brokers, banks, lending corporations, buyers and sellers.[105] But Plaintiff fails to identify with any particularity a single example of a business contact that was provided to Defendants or identify any information associated with any one of the "contacts" which has been misappropriated. Indeed, Plaintiff fails to articulate any connection between the provision of a pump distributor and licensor's business contacts and how Defendants' use of those contacts contributed to opening or operating their businesses, nor has Plaintiff articulated any basis to show how an internal medicine clinic would compete with a pump distributor and licensor.

**5.      Plaintiff Has Failed To State A Claim In Respect To Its Allegations Under The DTPA.**

Plaintiff asserts a cause of action for unfair competition in violation of the Texas Business and Commerce Code, Section 17.46.[106]   However, Plaintiff has not and cannot articulate how it is

---

protectable trade secret where the names of plaintiff's customers were either commonly known within the industry or were readily ascertainable).
[103]*Id.*
[104]*See, e.g., Metallurgical, Indus. Inc. v. Fourtek, Inc.*, 790 F2d 1195, 1195 (5th Cir. 1986)(modifications to zinc furnace and recovery process); *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-00847-SS, 2016 WL 900577, at *2, 4 (W.D. Tex. Mar. 2, 2016) (customer list where great difficulty and expense were taken to compile the contact information and broker rates).
[105]ECF No. 1, Complaint at ¶ 86.
[106]ECF No. 1, Complaint at ¶¶ 110-114.

APPX0191

a consumer of Defendants such that it has a cause of action under the Texas Deceptive Trade Practices Act ("DTPA"). "Claims alleging violations of the Texas Insurance Code and the Deceptive Trade Practices Act . . . are subject to the requirements of Rule 9(b)."[107] With no allegations that the Defendants misrepresented any facts, Plaintiff cannot satisfy the plausibility standard under Rule 8, let alone the stricter requirements of Rule 9(b).[108]

The elements of a cause of action under the DTPA are: "(1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages."[109] To qualify as a consumer, "a person must have sought or acquired goods or services by purchase or lease," and "the goods and services purchased or leased must form the basis of the complaint."[110] Here, there is no allegation in the Complaint that Plaintiff sought or acquired goods or services from any of the Defendants.[111]

### 6. Plaintiff Has Failed To State A Claim In Respect To Its Allegations For Unfair Competition.

Plaintiff has failed to articulate with any specificity an independent tort to form the basis of this cause of action.  Unfair competition requires that the "plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct business."[112]  "Although the illegal act need not necessarily violate criminal law, it must be an independent tort."[113]

---

[107]*Frith v. Guardian Life Ins. Co. of America*, 9 F.Supp.2d 734, 742-43 (S.D. Tex. 1998).
[108]*See, e.g., Davis v. State Farm Lloyds*, 2015 WL 4475860, at *4 (N.D. Tex. July 21, 2015) (rejecting similarly threadbare allegations of negligent misrepresentation under the Rule 8(a) pleading standard); *Smiley Team II, Inc. v. Gen. Star Ins. Co.*, 2021 WL 5202412, at *3 (S.D. Tex. Nov. 9, 2021) (simply parroting DTPA language is insufficient to meet Rule 8(a)'s pleading standard), report and recommendation adopted, 2021 WL 5987267 (S.D. Tex. Dec. 16, 2021).
[109]*Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995) (citing Tex. Bus. & Com. Code § 17.50(a)(1)).
[110]Tex. Bus. & Com. Code § 17.45(4); *Cameron v. Terrell & Garrett, Inc*. 618 S.W.2d 535, 539 (Tex. 1981).
[111]ECF No. 1, Complaint.
[112]*Boltex Mfg. Co., L.P. v. Galperti, Inc.*, 827 F. App'x 401, 410 (5th Cir. 2020).
[113]*Id*.

23

Plaintiff's sole basis for this cause of action is infringement, which it has already alleged in its Complaint.  Plaintiff articulates no facts to support its allegations.  Further, to the extent the general phrase infringement eludes to copyright or patent infringement, the federal law would preempt this common law claim and the Court should dismiss it for the same reason articulated under those headings.

Likewise, Plaintiff has also failed to state a claim for unfair competition by misappropriation. The elements of unfair competition by misappropriation are not "qualitatively different from those necessary to establish copyright infringement."[114] As such, for the same reasons Plaintiff's copyright infringement cause of action should be dismissed, so too should this cause of action.  But importantly, to the extent this claim relates to use of the copyright, the state law claim for unfair competition by misappropriation is preempted by the Federal Copyright Act.[115]

### 7.       Plaintiff Has Failed To State A Claim For Unjust Enrichment.

Under Texas law an unjust enrichment claim requires showing that one party "has obtained a benefit from another by fraud, duress, or the taking of an undue advantage."[116] Plaintiff's basis for this cause of action is that Defendants operated clinics and a website.[117] The Complaint makes no allegation and pleads no facts to support any conduct by fraud, duress, or taking an undue advantage.[118] But importantly, to the extent this claim relates to use of copyrighted work, the state law claim for unjust enrichment by misappropriation is preempted by the Federal Copyright Act.[119]

---

[114]*Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 823 F. Supp. 2d 578, 586 (S.D. Tex. 2011).
[115]*Id.* at 586-587.
[116]*Dig. Drilling Data Sys., L.L.C. v. Petrolink Servs.*, 965 F.3d 365, 379 (5th Cir. 2020).
[117]ECF No. 1, Complaint at ¶¶ 125-127.
[118]ECF No. 1, Complaint.
[119]*DaVinci Editrice S.R.L. v. Ziko Games, LLC*, 2014 U.S. Dist. LEXIS 110139, 111 U.S.P.Q.2D (BNA) 1692, 2014 WL 3900139 (S.D. Tex. August 8, 2014).

APPX0193

**8.      Plaintiff Has Failed To State A Claim For Injunctive Relief.**

The Court should also dismiss Plaintiff's request for a preliminary and permanent injunction because Plaintiff's cursory allegations of irreparable harm cannot state a claim for injunctive relief. To obtain an injunction, a party must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[120] Plaintiff provides essentially the same bare-bones, boilerplate paragraph for each statement requesting injunctive relief.[121] Plaintiff contends that the Defendants' "infringing conduct alleged herein" is causing Plaintiff "substantial, immediate, and irreparable injury" but fails to provide plausible support of the factors required for injunctive relief. These allegations lack any factual basis. And the Complaint's bare request for a preliminary and permanent injunction in its Prayer for Relief does not add anything more.

## CONCLUSION & PRAYER

For the foregoing reasons, the Defendants request that Well Cell's Complaint be dismissed for failure to state a claim under Rule 12(b)(6), lack of personal jurisdiction under Rule 12(b)(2), and lack of subject matter jurisdiction and standing under Rule 12(b)(1).

Date:   October 4, 2022.

---

[120]*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).
[121]ECF No. 1, Complaint. ¶¶ 52, 80, 94, and 106.

APPX0194

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By:_/s/ Justin K. Ratley_
    Justin K. Ratley
    State Bar No. 24093011
    700 Milam, Suite 800
    Houston, Texas 77002
    Telephone: (713) 222-1470
    Facsimile: (713) 222-1475
    jratley@munsch.com
**ATTORNEYS FOR DEFENDANTS,**
**SHAWN PAUL CALVIT,**
**MARC PIERRE DESGRAVES IV,**
**CHARLES ALEXANDER ELLIOTT,**
**INSULINIC OF LAFAYETTE LLC,**
**INSULINIC OF HIALEAH LLC,**
**AND INSULINIC OF HAWAII LLC**

Of Counsel:
Elizabeth F. Eoff
State Bar No. 24095062
SDTX ID No. 2951585
Munsch Hardt Kopf & Harr, P.C.
700 Milam, Suite 800
Houston, Texas 77002
Telephone: (713) 222-1493
Facsimile: (713) 222-1475
eeoff@munsch.com

26

APPX0195

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record on October 4, 2022, using the CM/ECF system.

Lema Barazi
Feras Mousilli
Elizabeth Revere
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
litigation@lloydmousilli.com
lema@lloydmousilli.com
feras@lloydmousilli.com
beth@lloydmousilli.com

/s/ Justin K. Ratley
Justin K. Ratley

APPX0196

# Exhibit A

APPX0197



US009652595B1

(12) **United States Patent**
Carr et al.

(10) Patent No.: **US 9,652,595 B1**
(45) Date of Patent: **May 16, 2017**

(54) **KIT THAT IMPROVES IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS**

(71) Applicant: **DIABETES RELIEF LLC**, Houston, TX (US)

(72) Inventors: **Hunter Michael Alan Carr**, Houston, TX (US); **Scott Hepford**, Houston, TX (US); **Carol Ann Wilson**, Houston, TX (US)

(73) Assignee: **Diabetes Relief LLC**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/362,963**

(22) Filed: **Nov. 29, 2016**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/042,087, filed on Feb. 11, 2016.

(60) Provisional application No. 62/117,393, filed on Feb. 17, 2015.

(51) Int. Cl.
*A61M 5/168* (2006.01)
*G06F 19/00* (2011.01)
*A61M 5/00* (2006.01)

(52) **U.S. Cl.**
CPC ........ *G06F 19/3468* (2013.01); *G06F 19/322* (2013.01)

(58) **Field of Classification Search**
CPC ............................ G06F 19/3468; G06F 19/322
USPC .......................................................... 436/95
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2014/0005633 A1* 1/2014 Finan .................. A61M 5/1723
604/504

* cited by examiner

*Primary Examiner* — Rebecca M Fritchman
(74) *Attorney, Agent, or Firm* — Buskop Law Group P.C.; Wendy Buskop

(57) **ABSTRACT**

A kit for individualized intravenous exogenous insulin-based therapy, which includes a portable data storage in communication with client device processor. The data storage can have computer instructions, a database of metabolic factors, a library of weight management protocols, a diabetic treatment model, and a library of care plan templates. The kit for individualized intravenous exogenous insulin-based therapy includes a blood glucose meter, a plurality of intravenous catheters fluidly engageable with a fluid source, and a plurality of metabolic enhancements.

**20 Claims, 19 Drawing Sheets**

**FIGURE 1A**

DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

| WEIGHT (kg) | POTASSIUM TO SALINE DOSAGE (meg/ml) | MAGNESIUM TO SALINE DOSAGE (mg/ml) | INSULIN TO SALINE DOSAGE (UNITS/ml) | INSULIN RESERVOIR VOLUME (ml) | INSULIN BOLUS DOSAGE MIN (mU) | INSULIN BOLUS DOSAGE MAX (mU) | INSULIN BOLUS DOSAGE VOLUME MIN (ml) | INSULIN BOLUS DOSAGE VOLUME MAX (ml) | TIMEDIAL TIME PERIODS BETWEEN BOLUS INTRODUCTION (MIN:SEC) | QUANTITY OF BOLUS PER TREATMENT CYCLE (#) |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 - 45 | 0.01 | 1 | 9 | 10 | 400 | 450 | 0.04 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 46 - 50 | 0.01 | 1 | 10 | 10 | 460 | 500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 51 - 55 | 0.01 | 1 | 11 | 10 | 510 | 550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 56 - 60 | 0.01 | 1 | 12 | 10 | 560 | 600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 61 - 65 | 0.01 | 1 | 13 | 10 | 610 | 650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 66 - 70 | 0.01 | 1 | 14 | 10 | 660 | 700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 71 - 75 | 0.01 | 1 | 15 | 10 | 710 | 750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 76 - 80 | 0.01 | 1 | 16 | 10 | 760 | 800 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 81 - 85 | 0.01 | 1 | 17 | 10 | 810 | 850 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 86 - 90 | 0.01 | 1 | 18 | 10 | 860 | 900 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 91 - 95 | 0.01 | 1 | 19 | 10 | 910 | 950 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 96 - 100 | 0.01 | 1 | 20 | 10 | 960 | 1000 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 101 - 105 | 0.02 | 2 | 21 | 10 | 1010 | 1050 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 106 - 110 | 0.02 | 2 | 22 | 10 | 1060 | 1100 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 111 - 115 | 0.02 | 2 | 23 | 10 | 1110 | 1150 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 116 - 120 | 0.02 | 2 | 24 | 10 | 1160 | 1200 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 121 - 125 | 0.02 | 2 | 25 | 10 | 1210 | 1250 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 126 - 130 | 0.02 | 2 | 26 | 10 | 1260 | 1300 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 131 - 135 | 0.02 | 2 | 27 | 10 | 1310 | 1350 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 136 - 140 | 0.02 | 2 | 28 | 10 | 1360 | 1400 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 141 - 145 | 0.02 | 2 | 29 | 10 | 1410 | 1450 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 146 - 150 | 0.02 | 2 | 30 | 10 | 1460 | 1500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 151 - 155 | 0.02 | 2 | 31 | 10 | 1510 | 1550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 156 - 160 | 0.02 | 2 | 32 | 10 | 1560 | 1600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |

U.S. Patent          May 16, 2017          Sheet 2 of 19          US 9,652,595 B1

FIGURE 1B

DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

| WEIGHT (kg) | POTASSIUM TO SALINE DOSAGE (meq/ml) | MAGNESIUM TO SALINE DOSAGE (mg/ml) | INSULIN TO SALINE DOSAGE (UNITS/ml) | INSULIN RESERVOIR VOLUME (ml) | INSULIN BOLUS DOSAGE MIN (mU) | INSULIN BOLUS DOSAGE MAX (mU) | INSULIN BOLUS DOSAGE VOLUME MIN (ml) | INSULIN BOLUS DOSAGE VOLUME MAX (ml) | UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION (MIN:SEC) | QUANTITY OF BOLUS PER TREATMENT CYCLE (#) |
|---|---|---|---|---|---|---|---|---|---|---|
| 161 - 165 | 0.02 | 2 | 33 | 10 | 1610 | 1650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 166 - 170 | 0.02 | 2 | 34 | 10 | 1660 | 1700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 171 - 175 | 0.02 | 2 | 35 | 10 | 1710 | 1750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 176 - 180 | 0.02 | 2 | 36 | 10 | 1760 | 1800 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 181 - 185 | 0.02 | 2 | 37 | 10 | 1810 | 1850 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 186 - 190 | 0.02 | 2 | 38 | 10 | 1860 | 1900 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 191 - 195 | 0.02 | 2 | 39 | 10 | 1910 | 1950 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 196 - 200 | 0.02 | 2 | 40 | 10 | 1960 | 2000 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 201 - 205 | 0.03 | 3 | 41 | 10 | 2010 | 2050 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 206 - 210 | 0.03 | 3 | 42 | 10 | 2060 | 2100 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 211 - 215 | 0.03 | 3 | 43 | 10 | 2110 | 2150 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 216 - 220 | 0.03 | 3 | 44 | 10 | 2160 | 2200 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 221 - 225 | 0.03 | 3 | 45 | 10 | 2210 | 2250 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 226 - 230 | 0.03 | 3 | 46 | 10 | 2260 | 2300 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 231 - 235 | 0.03 | 3 | 47 | 10 | 2310 | 2350 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 236 - 240 | 0.03 | 3 | 48 | 10 | 2360 | 2400 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 241 - 245 | 0.03 | 3 | 49 | 10 | 2410 | 2450 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 246 - 250 | 0.03 | 3 | 50 | 10 | 2460 | 2500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 251 - 255 | 0.03 | 3 | 51 | 10 | 2510 | 2550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 256 - 260 | 0.03 | 3 | 52 | 10 | 2560 | 2600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 261 - 265 | 0.03 | 3 | 53 | 10 | 2610 | 2650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 266 - 270 | 0.03 | 3 | 54 | 10 | 2660 | 2700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 271 - 275 | 0.03 | 3 | 55 | 10 | 2710 | 2750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |

## FIGURE 2

**BOLUS VOLUME DOSAGE ADJUSTMENT PROTOCOL BASED ON TESTED BLOOD GLUCOSE LEVEL**

| IF | BLOOD GLUCOSE LEVEL (mg/dl) | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200> |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**DURING HOURS 1 & 2 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE INCREASES OR DECREASES BETWEEN THE INITIAL BLOOD GLUCOSE LEVEL CHECK AND THE 30 MIN AND 60 MIN CHECKS OF EACH HOUR, THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| THEN | ADJUST DOSAGE (mU/kg) | 0 | 0 | 0 | 0 | 0 | 2-4 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 |

**DURING THE FIRST 30 MIN OF HOUR 3 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE INCREASES OR DECREASES BETWEEN THE INITIAL BLOOD GLUCOSE LEVEL CHECK AND THE 30 MIN CHECKS OF THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| THEN | ADJUST DOSAGE (mU/kg) | 0 | 0 | 0 | 0 | 0 | 2-4 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 |

**DURING THE LAST 30 MIN OF HOUR 3 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE INCREASES BETWEEN THE 30 MIN AND 60 MIN CHECK THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| THEN | INCREASE DOSAGE | 0 | 0 | 0 | 0 | 0 | 2-4 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 |

IF BLOOD GLUCOSE LEVEL DECREASES BETWEEN THE 30 MIN AND 60 MIN CHECK THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| THEN | DECREASE DOSAGE | 0 | 0 | 0 | 1-2 | 1-2 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 6-8 |

**EXEMPLARY TREATMENT SESSIONS DURING HOUR 1**

SCHEDULE FOR BOLUS INTRODUCTION WITH AN UNEQUAL TIME PERIOD

| SUBJECT | BLOOD GLUCOSE LEVEL (mg/dl) | INSULIN SENSITIVITY FACTOR | BOLUS 1 | BOLUS 2 | BOLUS 3 | BOLUS 4 | BOLUS 5 | BOLUS 6 | BOLUS 7 | BOLUS 8 | BOLUS 9 | BOLUS 10 | BOLUS 11 | BOLUS 12 | BOLUS 13 | BOLUS 14 | BOLUS 15 | BOLUS 16 | BOLUS 17 | BOLUS 18 | BOLUS 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUBJECT #1: | 440 | EXTREMELY RESISTANT | 240 sec | 240 sec | 240 sec | 240 sec | 240 sec | 240 sec | 240 sec | 240 sec | 240 sec | 240 sec | | | | | | | | | |
| SUBJECT #2: | 210 | RESISTANT | 300 sec | 310 sec | 305 sec | 300 sec | 290 sec | 295 sec | 320 sec | 300 sec | 290 sec | | | | | | | | | | |
| SUBJECT #3: | 186 | SENSITIVE | 300 sec | 300 sec | 300 sec | 300 sec | 300 sec | 300 sec | 300 sec | | | | | | | | | | | | |

**FIGURE 3**

## GLUCOSE DOSAGE ADJUSTMENT PROTOCOL

| BLOOD GLUCOSE LEVEL (mg/dl) | GLUCOSE (gm) |
|---|---|
| > 100 - 100 | 50 - 60 |
| 101 - 125 | 44 - 55 |
| 126 - 150 | 40 - 50 |
| 151 - 175 | 35 - 45 |
| 176 - 200 | 30 - 40 |
| 201 - 225 | 25 - 35 |
| 226 - 250 | 20 - 30 |
| 251 - 275 | 15 - 25 |
| 276 - 300 | 10 - 20 |
| 301 - 325 | 5 - 15 |
| 326 - 350 | .01 - 10 |
| 351 - 375 | .01 - 5 |
| 376 - 400 | .01 - 5 |
| 401 - 425 | .01 - 5 |
| 426 - 450 | .01 - 5 |
| 451 - 475 | .01 - 5 |
| 476 - 500 | .01 - 5 |
| 501 - 525 | .01 - 5 |
| 526 - 550 | .01 - 5 |

APPX0202

FIGURE 4

## METABOLIC ENHANCEMENT PROTOCOL

| Respiratory Quotient ($CO_2/O_2$) | Dosage |
|---|---|
| 1.20 < | C: 3 DAILY |
| 1.19 - 1.00 | A: 1 DAILY |
| 0.99 - 0.90 | A: 1 DAILY |
| 0.89 - 0.80 | B: 2 DAILY |
| 0.79 - 0.70 | B: 2 DAILY |
| .69 < | B: 2 DAILY |

\* METABOLIC ENHANCEMENT CONTENTS:

| Ingredient | Min Amount Per Dosage | Max Amount Per Dosage |
|---|---|---|
| VITAMIN D (AS CHOLECALCIFEROL) | 600 IU | 2,000 IU |
| VITAMIN B6 (AS PYRIDOXAL-5-PHOSPHATE) | 10 mg | 100 mg |
| FOLATE (FOLIC ACID) | 200 mcg | 2000 mcg |
| VITAMIN B12 (AS CYANOCOBALAMIN) | 1,000 mcg | 5,000 mcg |
| N-ACETYL L-CYSTEINE (NAC) | 200 mg | 600 mg |
| COENZYME Q10 (CoQ10) | 60 mg | 400 mg |
| ALPHA LIPOIC ACID (ALA) | 50 mg | 400 mg |
| NICOTINAMIDE ADENINE DINUCLEOTIDE (NADH) | .5 mg | 5 mg |
| CHROMIUM PICOLINATE | 200 mcg | 300 mcg |

## FIGURE 5A

| | |
|---|---|
| CREATING A SUBJECT PROFILE FOR A SUBJECT | 500 |
| ASSESSING METABOLIC FACTORS OF THE SUBJECT AND STORING THE METABOLIC FACTORS IN THE SUBJECT PROFILE | 502 |
| CREATING A CARE PLAN WITH A PLURALITY OF TREATMENT SESSIONS FOR THE SUBJECT WITH A PLAN GOAL | 504 |
| INTRODUCING GLUCOSE TO THE SUBJECT TO STIMULATE GASTROINTESTINAL HORMONE PRODUCTION, RESULTING IN THE RELEASE OF ENZYMES FROM THE SUBJECT'S LIVER AND CAUSING THE BLOOD GLUCOSE LEVELS OF THE SUBJECT TO BE IN A THERAPEUTIC RANGE | 506 |
| TESTING THE SUBJECT FOR BLOOD GLUCOSE LEVELS TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO THE PLURALITY OF THERAPEUTIC RANGES AND VERIFY THE SUBJECT IS IN THE THERAPEUTIC RANGE | 508 |
| COMPARING TESTED BLOOD GLUCOSE LEVELS TO A DIABETIC TREATMENT MODEL | 510 |
| MAPPING TESTED BLOOD GLUCOSE LEVELS AND INSULIN SENSITIVE FACTORS OF A SUBJECT TO THE SUBJECT'S WEIGHT USING THE DIABETIC TREATMENT MODEL TO DETERMINE A SCHEDULE FOR BOLUS INTRODUCTION, WHEREIN THE SCHEDULE FOR BOLUS INTRODUCTION HAS AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS | 512 |
| INTRODUCING TO THE SUBJECT A PLURALITY OF BOLUS OF INSULIN AND SALINE SEQUENTIALLY USING THE SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS | 513 |
| COMPARING THE SUBJECT PROFILE TO A PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL FOR THE SUBJECT BASED UPON ASSESSED METABOLIC FUNCTIONS OF THE SUBJECT AND SAVING THE WEIGHT MANAGEMENT PROTOCOL IN THE CARE PLAN | 514 |
| IMPLEMENTING THE IDENTIFIED WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN AFTER A FIRST TREATMENT SESSION TO MANAGE WEIGHT OF THE SUBJECT WITH A METABOLIC ENHANCEMENT CAUSING IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT WHILE INFUSING INSULIN AND MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION IN THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS TO IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING | 516 |
| COMPARING A RESPIRATORY QUOTIENT OF THE SUBJECT IN A RESTING STATE TO A PLURALITY OF METABOLISM SCORES | 518 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT FOR EACH TREATMENT SESSION AS IDENTIFIED IN THE CARE PLAN WITH SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE A SUBJECT'S RESPIRATORY QUOTIENT | 520 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE THE RESPIRATORY QUOTIENT | 522 |

(5B)

APPX0204

## FIGURE 5B          (5A)

| | |
|---|---|
| COMPARING A MEASURED CARDIAC FUNCTION OF THE SUBJECT IN A RESTING STATE TO A PRESET NORM OF CARDIAC FUNCTION | 524 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN USING THE PRESET NORM OF CARDIAC FUNCTION | 526 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE CARDIAC FUNCTION | 528 |
| MEASURING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE PRIOR TO BOLUS INTRODUCTION AND COMPARING THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION TO A PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS | 530 |
| COMPARING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE AS BOLUS ARE SEQUENTIALLY INTRODUCED TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 532 |
| COMPARING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE AFTER ALL BOLUS HAVE BEEN INTRODUCED IN A FIRST TREATMENT SESSION TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 534 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN TO TREAT PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 536 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 538 |
| VIEWING AN INITIAL RETINAL IMAGE OF THE SUBJECT CAPTURED BY A NON-MYDRIATIC CAMERA WITH THE SUBJECT IN A RESTING STATE TO IDENTIFY A DIABETIC RETINOPATHY | 540 |
| VIEWING A POST TREATMENT RETINAL IMAGE OF THE SUBJECT IN A RESTING STATE AFTER A FIRST TREATMENT SESSION | 541 |
| COMPARING THE INITIAL RETINAL IMAGE TO THE POST TREATMENT RETINAL IMAGE | 542 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IF NO CHANGE IN THE DIABETIC RETINOPATHY HAS OCCURRED | 544 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO REDUCE THE EFFECTS OF DIABETIC RETINOPATHY BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE THE EFFECTS OF DIABETIC RETINOPATHY | 546 |
| DIMENSIONALLY MEASURING WOUNDS BY LENGTH, WIDTH, AND DEPTH AND IDENTIFYING WOUND CHARACTERISTICS WITH THE SUBJECT IN A RESTING STATE | 550 |
| DIMENSIONALLY MEASURING WOUNDS AFTER AT LEAST ONE TREATMENT SESSION TO IDENTIFY SKIN INTEGRITY AND CHANGES IN CLINICAL WOUND CHARACTERISTICS | 552 |

(5C)

(5B)

| | |
|---|---|
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN FOR WOUND TREATMENT USING THE IDENTIFIED SKIN INTEGRITY AND CHANGES IN CLINICAL WOUND CHARACTERISTICS | 554 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE WOUND HEALING BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE WOUND SIZE AND WOUND CHARACTERISTICS | 556 |
| COMPARING C-PEPTIDES OF THE SUBJECT TO A PRESET NORM OF C-PEPTIDES TO IDENTIFY AN INSULIN SENSITIVITY FACTOR | 560 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT FOR THE INSULIN SENSITIVITY FACTOR | 562 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE AN INSULIN SENSITIVITY FACTOR USING ANALYSIS OF C-PEPTIDES BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION | 564 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF MAGNESIUM AND INTRODUCING THE DOSAGE AMOUNTS OF MAGNESIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 570 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF POTASSIUM AND INTRODUCING THE DOSAGE AMOUNTS OF POTASSIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 572 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF SOMATOSTATIN AND INTRODUCING THE DOSAGE AMOUNTS OF SOMATOSTATIN SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 574 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF GLUCAGON AND INTRODUCING THE DOSAGE AMOUNTS OF GLUCAGON SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 576 |
| SCHEDULING DIAGNOSTIC TESTS AFTER A FIRST TREATMENT SESSION TO MODIFY THE CARE PLAN FOR IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT AND IMPROVED HEPATIC GLUCOSE PROCESSING | 578 |

*FIGURE 5C*



*FIGURE 6*



*FIGURE 7A*

| ADMINISTRATIVE DATA STORAGE | 604 |
| SUBJECT PROFILE | 610 |
| METABOLIC FACTORS | 605 |
| BLOOD GLUCOSE LEVEL | 612 |
| RESPIRATORY QUOTIENT | 614 |
| INSULIN SENSITIVITY FACTOR | 616 |
| INDIVIDUAL TARGET BLOOD GLUCOSE LEVEL | 618 |

PLURALITY OF CARE PLAN TEMPLATES — 620

COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO CREATE A CUSTOMIZED CARE PLAN FROM ONE OF THE PLURALITY OF CARE PLAN TEMPLATES, WHEREIN THE CUSTOMIZED CARE PLAN INDICATES A PLURALITY OF TREATMENT SESSIONS FOR THE SUBJECT WITH THE SUBJECT PROFILE AND A PLAN GOAL, EACH CUSTOMIZED CARE PLAN INDICATING A SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION, EACH BOLUS CONTAINING SALINE AND INSULIN AND EACH BOLUS INTRODUCED INTRAVENOUSLY AND SEQUENTIALLY TO A SUBJECT — 200

COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO A DIABETIC TREATMENT MODEL AFTER INTRODUCING GLUCOSE TO A SUBJECT TO STIMULATE GASTROINTESTINAL HORMONE PRODUCTION, RESULTING IN THE RELEASE OF ENZYMES FROM THE SUBJECT'S LIVER AND CAUSING THE BLOOD GLUCOSE LEVELS OF THE SUBJECT TO BE IN A THERAPEUTIC RANGE — 202

PLURALITY OF THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS — 203



FIGURE 7B



FIGURE 8A



**FIGURE 8B**

APPX0210



FIGURE 8C



FIGURE 9

## FIGURE 10A



| | |
|---|---|
| PORTABLE DATA STORAGE | 903 |
| THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS | 203 |
| SUBJECT PROFILE | 610 |
| SUBJECT HISTORY | 1002 |
| SUBJECT PHYSICAL REPORTS | 1004 |
| SUBJECT PREEXISTING WEIGHT | 1005 |
| SUBJECT NAME | 1006 |
| SUBJECT CONTACT INFORMATION | 1008 |
| INDICATION | 1010 |
| MEASURED METABOLIC FACTORS | 605 |
| GLUCOSE LEVEL | 612 |
| RESPIRATORY QUOTIENT | 614 |
| WEIGHT | 615 |
| INSULIN SENSITIVITY FACTOR | 616 |
| LIBRARY OF CARE PLAN TEMPLATES | 620 |
| PLAN GOAL | 890 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO CREATE A SUBJECT PROFILE FOR A SUBJECT SUSPECTED OF HAVING METABOLIC SYNDROME | 904 |
| DATABASE | 906 |
| TARGET BLOOD GLUCOSE LEVEL | 618 |
| LIBRARY OF WEIGHT MANAGEMENT PROTOCOLS | 908 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE MEASURED METABOLIC FACTORS OF THE SUBJECT TO THE DATABASE OF THE METABOLIC FACTORS FOR LIKE GROUPS OF THE PATIENTS AND CALCULATE IF THE MEASURED METABOLIC FACTORS MEET, EXCEED, OR FALL BELOW THE BLOOD GLUCOSE LEVEL, THE RESPIRATORY QUOTIENT, THE INSULIN SENSITIVITY FACTOR, AND THE TARGET BLOOD GLUCOSE LEVEL FOR THE SUBJECT SUSPECTED OF HAVING THE METABOLIC SYNDROME TO CONFIRM THE SUBJECT HAS THE METABOLIC SYNDROME | 910 |
| DIABETIC TREATMENT MODEL | 911 |
| BOLUS VOLUME DOSAGE AMOUNTS | 912 |
| SCHEDULE TEMPLATES | 913 |

## FIGURE 10B

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO CREATE A CARE PLAN USING ONE OF THE CARE PLAN TEMPLATES FOR THE SUBJECT AND SETTING A PLAN GOAL USING THE DIABETIC TREATMENT MODEL, THE CARE PLAN INDICATING A CUSTOMIZED SCHEDULE FOR BOLUS INTRODUCTION WITH AT LEAST ONE UNEQUAL TIME PERIOD AND A QUANTITY AND A FREQUENCY OF A PLURALITY OF BOLUS CONTAINING SALINE AND INSULIN FOR SEQUENTIAL INTRAVENOUS INTRODUCTION TO THE SUBJECT AND SAVE IN THE SUBJECT PROFILE |

_903_
_914_

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO INDICATE A QUANTITY OF GLUCOSE FOR THE SUBJECT WITH METABOLIC SYNDROME TO STIMULATE A GASTROINTESTINAL HORMONE PRODUCTION RESULTING IN A RELEASE OF ENZYMES FROM A LIVER OF THE SUBJECT AND CAUSING BLOOD GLUCOSE LEVELS OF THE SUBJECT TO BE IN A THERAPEUTIC RANGE |

_916_

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE BLOOD GLUCOSE TEST RESULTS TO A PLURALITY OF THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS STORED IN THE PORTABLE DATA STORAGE AND VERIFY THAT THE SUBJECT WITH THE METABOLIC SYNDROME IS IN A THERAPEUTIC RANGE OF THE PLURALITY THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS |

_918_

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE BLOOD GLUCOSE TEST RESULTS TO THE DIABETIC TREATMENT MODEL AND MAP THE BLOOD GLUCOSE TEST RESULTS AND INSULIN SENSITIVE FACTORS OF THE SUBJECT WITH THE METABOLIC SYNDROME TO THE MEASURED WEIGHT OF THE SUBJECT USING THE DIABETIC TREATMENT MODEL TO GENERATE AN INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION USING THE SCHEDULE TEMPLATES |

_920_

| |
|---|
| INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION |

_922_

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE SUBJECT PROFILE TO THE LIBRARY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL FOR THE SUBJECT BASED UPON MEASURED METABOLIC FACTORS OF THE SUBJECT AND SAVING THE WEIGHT MANAGEMENT PROTOCOL IN THE CARE PLAN |

_924_

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO CHANGE THE WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN AFTER A FIRST TREATMENT SESSION TO MANAGE WEIGHT OF THE SUBJECT USING AT LEAST ONE OF THE PLURALITY OF METABOLIC ENHANCEMENTS TO CAUSE IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT WHILE INFUSING THE PLURALITY OF BOLUS AND MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION IN THE GENERATED INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS TO IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING |

_926_

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE RESPIRATORY QUOTIENT OF THE SUBJECT IN A RESTING STATE TO A PLURALITY OF MEASURED METABOLIC FACTORS |

_930_

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY A QUANTITY OF THE PLURALITY OF BOLUS FOR THE SUBJECT FOR EACH TREATMENT SESSION AS IDENTIFIED IN THE CARE PLAN WITH THE GENERATED INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION TO IMPROVE THE RESPIRATORY QUOTIENT OF THE SUBJECT |

_932_

APPX0214

## FIGURE 10C

903

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE GENERATED INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN THE BOLUS INTRODUCTION TO IMPROVE THE RESPIRATORY QUOTIENT OF THE SUBJECT | 934 |

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE A MEASURED CARDIAC FUNCTION OF THE SUBJECT IN A RESTING STATE TO A PLURALITY OF PRESET NORMS OF CARDIAC FUNCTION STORED IN A LIBRARY OF CARDIAC FUNCTIONS | 936 |

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY A QUANTITY OF THE PLURALITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN USING THE PRESET NORMS OF CARDIAC FUNCTION | 938 |

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND A DURATION OF AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION TO IMPROVE CARDIAC FUNCTION OF THE SUBJECT | 940 |

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MEASURE A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT PRIOR TO THE BOLUS INTRODUCTION AND COMPARING THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION TO A PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS IN A LIBRARY OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS | 942 |

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT AS BOLUS ARE SEQUENTIALLY INTRODUCED TO THE PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 944 |

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT AFTER ALL BOLUS HAVE BEEN INTRODUCED IN THE FIRST TREATMENT SESSION TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 946 |

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN TO DIMINISH THE SUBJECT'S PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 948 |

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE SCHEDULE OF THE BOLUS INTRODUCTION HAVING  AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT | 950 |

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE TO SCAN AN INITIAL RETINAL IMAGE OF THE SUBJECT TO IDENTIFY CHARACTERISTICS FOR A DIABETIC RETINOPATHY | 952 |

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO SCAN A POST TREATMENT RETINAL IMAGE OF THE SUBJECT AFTER THE FIRST TREATMENT SESSION AND COMPARE THE INITIAL RETINAL IMAGE TO THE POST TREATMENT RETINAL IMAGE | 954 |

APPX0215

## FIGURE 10D

903

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY A QUANTITY OF BOLUS FOR THE SUBJECT IF NO CHANGE IN THE IDENTIFIED CHARACTERISTICS FOR DIABETIC RETINOPATHY HAS OCCURRED |

956

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO REDUCE EFFECTS OF DIABETIC RETINOPATHY BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE AT LEAST ONE EFFECT OF DIABETIC RETINOPATHY |

960

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO SCAN AND CALCULATE DIMENSIONALLY WOUNDS OF THE SUBJECT BY LENGTH, WIDTH, AND DEPTH, AND IDENTIFY WOUND CHARACTERISTICS OF THE SUBJECT |

962

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO SCAN AND DIMENSIONALLY MEASURE WOUNDS OF THE SUBJECT AFTER AT LEAST ONE TREATMENT SESSION TO IDENTIFY SKIN INTEGRITY AND CHANGES IN WOUND CHARACTERISTICS OF THE SUBJECT |

964

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN FOR WOUND TREATMENT USING THE IDENTIFIED SKIN INTEGRITY AND CHANGES IN WOUND CHARACTERISTICS OF THE SUBJECT |

966

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE TO MODIFY THE SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE WOUND HEALING BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN THE BOLUS INTRODUCTION TO REDUCE WOUND SIZE AND WOUND CHARACTERISTICS OF THE SUBJECT |

968

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO USE A HOMEOSTATIC MODEL TO IDENTIFY AN INSULIN SENSITIVITY FACTOR OF A SUBJECT |

970

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE QUANTITY OF BOLUS FOR THE SUBJECT FOR THE INSULIN SENSITIVITY FACTOR |

972

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE TO MODIFY THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO INCREASE THE INSULIN SENSITIVITY FACTOR BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION |

974

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO DETERMINE A QUANTITY AND A FREQUENCY OF DOSAGE AMOUNTS OF MAGNESIUM AND INTRODUCE THE DOSAGE AMOUNTS OF MAGNESIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN ONE PAIR OF BOLUS |

976

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO DETERMINE A QUANTITY AND A FREQUENCY OF DOSAGE AMOUNTS OF POTASSIUM AND INTRODUCE THE DOSAGE AMOUNTS OF POTASSIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE GENERATED INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN ONE PAIR OF BOLUS |

978

APPX0216



903

980
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO DETERMINE A QUANTITY AND A FREQUENCY OF DOSAGE AMOUNTS OF SOMATOSTATIN AND INTRODUCE THE DOSAGE AMOUNTS OF SOMATOSTATIN SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN ONE PAIR OF BOLUS

982
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO DETERMINE A QUANTITY AND A FREQUENCY OF DOSAGE AMOUNTS OF GLUCAGON AND INTRODUCE THE DOSAGE AMOUNTS OF GLUCAGON SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN ONE PAIR OF BOLUS

984
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO SCHEDULE DIAGNOSTIC TESTS AFTER THE FIRST TREATMENT SESSION TO MODIFY THE CARE PLAN FOR IMPROVED CELLULAR ATP FUNCTIONING OF THE SUBJECT AND IMPROVED HEPATIC GLUCOSE PROCESSING

986
LIBRARY OF CARDIAC FUNCTIONS

988
PRESET NORMS OF CARDIAC FUNCTION

990
LIBRARY OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS

992
PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS

*FIGURE 10E*

APPX0217

US 9,652,595 B1

**1**

# KIT THAT IMPROVES IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS

## CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation in Part of co-pending U.S. patent application Ser. No. 15/042,087 filed on Feb. 11, 2016, entitled "METHODS THAT IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUB-JECTS", which claims priority to and the benefit of U.S. Provisional Patent Application Ser. No. 62/117,393 filed on Feb. 17, 2015, entitled "METHODS THAT IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUB-JECTS". These references are incorporated herein in their entirety.

## FIELD

The present embodiments generally relate to a kit for individualized intravenous exogenous insulin-based therapy.

## BACKGROUND

Diabetes Mellitus is a disease or disorder of the body's metabolic functions, characterized by abnormally high levels of blood glucose and inadequate levels of insulin. In 2012, 29.1 million Americans, or 9.3 percent of the population had diabetes, up from 25.8 million, or 8.3 percent, in 2010. New cases diagnosed in 2012 were 1.7 million, and in 2010 it was 1.9 million. Diabetes Mellitus Type 1, formerly known as juvenile diabetes, is usually diagnosed in children and young adults, and only 5 percent of people with diabetes have this form of the disease.

In Type 1 diabetes, the body does not produce insulin, a hormone necessary to convert sugar, starches, and other food into energy needed for daily life. Diabetes Mellitus Type 2 is far more common, and affects 90-95 percent of all diabetics in the United States of America. In Type 2 diabetes, the body does not use insulin properly, which is called insulin resistance. At first, the pancreas makes extra insulin to make up for it, but, over time the pancreas is not able to keep up and can't make enough insulin to keep blood glucose at normal levels. The long-term adverse effects include blindness, loss of kidney function, nerve damage, loss of sensation, and poor circulation in the periphery, and amputation of the extremities. As of Mar. 6, 2013, the total cost of diagnosed diabetes in the United States in 2012 was $245 billion dollars.

In the treatment of Diabetes Mellitus, many varieties of insulin formulations have been suggested and used, such as regular insulin, isophane insulin (designated NPH®), insulin zinc suspensions (such as SEMILENTE®, LENTE®, and ULTRALENTE®), and biphasic isophane insulin. As diabetic patients are treated with insulin for several decades, there is a major need for safe and life quality improving insulin formulations. Some of the commercially available insulin formulations are characterized by a fast onset of action and other formulations have a relatively slow onset but show a more or less prolonged action. Fast-acting insulin formulations are usually solutions of insulin, while retarded acting insulin formulations can have suspensions containing insulin in crystalline and/or amorphous form precipitated by addition of zinc salts alone, by addition of protamine, or by a combination of both.

In addition, some patients are using formulations having both a fast onset of action and a more prolonged action. Such

**2**

a formulation can be an insulin solution, wherein protamine insulin crystals are suspended. Some patients do prepare the final formulation themselves by mixing a fast acting insulin solution with a protracted acting insulin suspension formulation in the ratio desired by the patient in question.

Glucose control is typically measured by a blood test, which determines the level of hemoglobin A1c, which has been the desired result of insulin therapy in diabetic patients for many years. However, it is clear that tight circulating glucose control was insufficient in 25 percent or more of the study participants to protect them from the onset or progression of diabetic retinopathy, nephropathy, or neuropathy. One method of glucose control is Pulsed Insulin Therapy.

The core concept of Pulsed Insulin Therapy has been known for at least 20 years, by various names including Pulsatile Intravenous Insulin Therapy (PIVIT), Chronic Intermittent Intravenous Insulin Therapy (CIIIT), Metabolic Activation Therapy (MAT), and Hepatic Activation. In such therapies a patient's blood glucose is raised and lowered by about 50 mg/dL to 75 mg/dL over a period of several hours by alternating between doses of insulin and sugars or high carbohydrates foods. Although the mechanisms of action have not been clearly explained, it is apparent from the clinical results that the technique has usefulness in treating diabetic implications, including blindness and other ocular manifestations, nerve disease, cardiovascular disease, diabetic nephropathy, and poor wound healing.

Given the long history of these procedures, one would have expected that the treatment parameters would have been optimized long ago to produce the most favorable results. It turns out, however, that the known treatment parameters are insufficient in that regard.

A need exists for a kit that improves impaired hepatic glucose processing in subjects and produce superior results to those previously obtainable.

The present embodiments meet these needs.

## BRIEF DESCRIPTION OF THE FIGURES

The detailed description will be better understood in conjunction with the accompanying drawings as follows:

FIG. 1A shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 40 kilograms to 160 kilograms.

FIG. 1B shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 161 kilograms to 275 kilograms.

FIG. 2 shows a bolus volume dosage adjustment protocol based on tested blood glucose levels as produced by a diabetic treatment model.

FIG. 3 depicts glucose dosage adjustment protocol as produced by a diabetic treatment model.

FIG. 4 depicts a metabolic enhancement protocol as produced by a diabetic treatment model and an exemplary metabolic enhancement by component.

FIGS. 5A-5C depict steps of a method of the invention according to one or more embodiments.

FIG. 6 depicts a system of the invention according to one or more embodiments.

FIGS. 7A and 7B depict an administrative data storage usable in the system according to one or more embodiments.

FIGS. 8A-8C provide exemplary subject profiles with an automatically generated care plan template and an automatically generated report according to one or more embodiments.

FIG. 9 depicts the kit according to one or more embodiments.

US 9,652,595 B1

**3**

FIGS. **10A-10E** depict a portable data storage according to one or more embodiments.

The present embodiments are detailed below with reference to the listed Figures.

## DETAILED DESCRIPTION OF THE EMBODIMENTS

Before explaining the present embodiments in detail, it is to be understood that the invention is not limited to the particular embodiments and that it can be practiced or carried out in various ways.

The present embodiments relate to a kit for individualized intravenous exogenous insulin-based therapy that improves impaired hepatic glucose processing in subjects.

In embodiments, the kit for individualized intravenous exogenous insulin-based therapy can include portable data storage.

The portable data storage can have computer instructions for instructing a client device processor of a client device to create a subject profile for a subject suspected of having metabolic syndrome.

The subject profile can have a subject history and subject physical reports including a subject weight, a subject name, subject contact information, an indication that a subject is suspected of having the metabolic syndrome, measured metabolic factors including a glucose level, a respiratory quotient, an insulin sensitivity factor, a weight, and hyperglycemia.

The portable data storage can have a database of metabolic factors for groups of patients using the blood glucose level, the respiratory quotient, the insulin sensitivity factor and target glucose levels.

The portable data storage can have a library of weight management protocols in the portable data storage for subjects with the metabolic syndrome.

Computer instructions in the portable data storage can instruct the client device processor to compare the measured metabolic factors of the subject to the database of the metabolic factors for like groups of the patients and calculate if the measured metabolic factors meet, exceed, or fall below the blood glucose level, the respiratory quotient, the insulin sensitivity factor, and the target blood glucose level for the subject suspected of having the metabolic syndrome to confirm the subject has the metabolic syndrome.

The portable data storage can include a diabetic treatment model with bolus volume dosage amounts and schedule templates for a bolus introduction. The schedule templates for the bolus introduction contain at least one unequal time period between at least one pair of bolus, and the schedule templates provide the at least one unequal time period with a quantity and a frequency of a plurality of bolus for a sequential intravenous introduction to the subject with a confirmed metabolic syndrome. Each bolus contains a predetermined concentration of saline and insulin based on the diabetic treatment model.

The portable data storage can have a library of care plan templates.

Computer instructions in the portable data storage can instruct the client device processor to create a care plan using one of the care plan templates for the subject and setting a plan goal using the diabetic treatment model, the care plan indicating a customized schedule for bolus introduction with at least one unequal time period and a quantity and a frequency of a plurality of bolus containing saline and insulin for sequential intravenous introduction to the subject and save in the subject profile.

**4**

Computer instructions in the portable data storage can instruct the client device processor to indicate a quantity of glucose for the subject with metabolic syndrome to stimulate a gastrointestinal hormone production resulting in a release of enzymes from a liver of the subject and causing blood glucose levels of the subject to be in a therapeutic range of the plurality therapeutic ranges for blood glucose levels.

The kit for individualized intravenous exogenous insulin-based therapy can have a blood glucose meter for testing the subject after glucose consumption for blood glucose levels and transmitting blood glucose test results to the portable data storage.

Computer instructions to in the portable data storage can instruct the client device processor to compare blood glucose test results to a plurality of therapeutic ranges for blood glucose levels stored in the portable data storage and verify that the subject with the metabolic syndrome is in a therapeutic range of the plurality therapeutic ranges for blood glucose levels.

Computer instructions in the portable data storage can instruct the client device processor to compare the blood glucose test results to the diabetic treatment model and map the blood glucose test results and insulin sensitive factors of the subject with the metabolic syndrome to the measured weight **615** of the subject using the diabetic treatment model to generate an individualized schedule for bolus introduction using the schedule templates.

The kit for individualized intravenous exogenous insulin-based therapy can have a plurality of intravenous catheters in communication with the client device fluidly engageable with a fluid source to deliver to a patient a plurality of bolus sequentially using the generated individualized schedule for bolus introduction with at least one unequal time period between at least one pair of bolus.

Computer instructions in the portable data storage can instruct the client device processor to compare the subject profile to the library of weight management protocols to identify a weight management protocol for the subject based upon measured metabolic factors of the subject and saving the weight management protocol in the care plan.

The kit for individualized intravenous exogenous insulin-based therapy can have a plurality of metabolic enhancements.

Computer instructions in the portable data storage can instruct the client device processor to change the weight management protocol and the care plan after a first treatment session to manage weight of the subject using at least one of the plurality of metabolic enhancements **888** to cause improved cellular ATP functioning for the subject while infusing the plurality of bolus and modifying a quantity and a duration of unequal time periods between bolus introduction in the generated individualized schedule for bolus introduction having at least one unequal time period between at least one pair of bolus to improve impaired hepatic glucose processing.

When three treatment session are performed using the kit as described herein patients report energy resorted, medications reduced, wounds healed, amputations prevented, weight controlled, blood sugar controlled, blood pressure reduced, neuropathy diminished, retinopathy diminished, mood improved, sleep improved and erectile function restored.

The individualized intravenous exogenous insulin-based therapy can use a plurality of treatment sessions, generally **3** but up to 12 may be needed, each treatment session lasting from 1 hour to 3 hours.

US 9,652,595 B1

| 5 | 6 |

The goal of the individualized intravenous exogenous insulin-based therapy is to repair, recondition, and maintain a subject's impaired metabolism so that it functions and is maintained to provide a quality of life similar to that of a non-diabetic person.

To initiate the therapy a subject profile can be created.

Each treatment session can involve assessing for a subject's metabolic factors and storing the metabolic factors in the subject's profile. The subject profile can be stored in an administrative data storage connected to an administrative processor accessible via a network from a client device.

Each treatment session can involve matching the subject profile to a diabetic treatment model to create a schedule for bolus introduction with at least one unequal time period between bolus introductions.

The schedule can provide a quantity and frequency of intravenous insulin bolus, a quantity and frequency of dosage amounts of magnesium, and a quantity and frequency of dosage amounts of potassium for the subject.

Each treatment session can involve introducing to the subject insulin bolus sequentially, at frequencies determined from the diabetic treatment model, wherein each insulin bolus can be separated by irregular time periods.

Simultaneously with the sequential insulin bolus introduction, dosage amounts of magnesium and dosage amounts of potassium can be introduced to the subject. The magnesium and potassium can be introduced orally, transdermally, or by inhaling simultaneous with the insulin bolus introduction.

A weight management protocol can be identified from a library of weight management protocols given a subject's profile. The subject can be required to follow the weight management protocol and use a specific metabolic enhancement that can be in pill form, powder form, a transdermal patch, or another form known in the industry.

After 3 to 6 treatments using a care plan connected to the diabetic treatment model with a schedule for bolus instruction and at least one unequal period of time, the subject can have at least 10 percent and up to 50 percent improved cellular ATP functioning that can last up to 90 days from the last treatment.

The present embodiments also relate to a kit for infusing insulin intravenously to a subject to improve impaired hepatic glucose processing.

The term "5-MTHF" as used herein can refer to Levomefolic Acid, which is a primary form of folic acid used for DNA reproduction.

The term "A1C" as used herein refers to a blood test that shows how well individual diabetes is being controlled relative to a non-diabetic patient. In some cases, it can be a 3-month average of plasma glucose concentration from glycated hemoglobin.

The term "Adenosine triphosphate (ATP)" as used herein refers a substance that transports chemical energy within cells for metabolism.

The term "Alpha Lipoic Acid" as used herein refers to an antioxidant that helps with the extraction of energy from food.

The term "blood glucose level therapeutic range" as used herein refers to a subject's designated target blood glucose level of 160 to 240 mg/dl during a treatment session.

The term "bolus" as used herein refers to a single dose of a medical substance and/or drug given all at once.

The term "catheter" as used herein refers to a thin tube that can be inserted into the body to remove bodily fluids or add fluids to a patient during a treatment session.

The term "CoEnzyme Q10" as used herein refers to a chemical that extracts energy from food in the human digestive process.

The term "Complete Blood Count" (CBC) as used herein refers to a blood test to evaluate cellular aspects of the blood and provide concentrations of components in the blood.

The term "C-peptide" as used herein refers to a chemical produced in the pancreas that appears in a 1:1 molecular ratio to insulin and that can be detected when a blood lab panel is performed on a blood sample.

The term "data storage" as used herein refers to a non-transitory computer readable medium, such as a hard disk drive, solid state drive, flash drive, tape drive, and the like. The term "non-transitory computer readable medium" excludes any transitory signals but includes any non-transitory data storage circuitry, e.g., buffers, cache, and queues, within transceivers of transitory signals.

The term "diabetic retinopathy" as used herein refers to a complication of diabetes that affects the eyes.

The term "diabetic treatment model" as used herein refers to a plurality of look up tables reflecting initial blend dosing adjustment protocols that reflect weight of the subject, types of insulin (long term and short term), a volume of bolus of insulin per treatment session, a quantity of bolus, a frequency of bolus for a treatment session and bolus intervals, dosage amounts of magnesium (including quantity and frequency) and dosage amounts of potassium (including quantity and frequency). The diabetic treatment model includes glucose dosage amounts which are milligrams/deciliter (mg/dl) based on blood glucose of the subject. The diabetic treatment model generates a schedule for bolus introduction with at least one unequal time period between at least one pair of bolus. In embodiments, the diabetic treatment model can be located in the administrative data storage.

For example, the diabetic treatment model receives from a doctor, nurse or technician the weight of a subject, such as 102 kilograms, and a blood glucose of the subject, such as 120 mg/dl. The diabetic treatment model then generates (i) a type of insulin to be introduced to the subject, such as short term insulin, (ii) a volume of bolus of insulin per treatment session for the subject, such as 05 milliliters, (iii) a quantity of bolus per treatment session, such as 12, and (iv) a frequency of bolus introduction, which in embodiments, can be random for a treatment session of 3 hours. The time intervals between sequential bolus introductions can range from 2 minutes to 10 minutes between bolus. In embodiment, the time intervals can be a random sequence.

The diabetic treatment model generates dosage amounts of magnesium, such as 2 milligrams per milliliter of saline (for intravenous introduction to the subject) during the treatment session.

The diabetic treatment model generates dosage amounts of potassium, such as 0.02 meq/millimeter of saline (for an intravenous introduction) during the treatment session.

The diabetic treatment model calculates glucose dosage amounts for a subject, which can range from 44 grams to 55 grams during the first 30 minutes of a treatment session and then different or the same glucose dosage amounts using real time blood glucose level tests of the subject, which can be performed providing new test results and recalculations of dosage amount of bolus every 30 minutes.

The term "dosage amounts of magnesium" as used herein refers to dosage amounts of magnesium in a saline carrier or in a pill form, for example, one that dissolves under the tongue of the subject.

US 9,652,595 B1

7

The term "dosage amounts of potassium" as used herein refers to dosage amounts of magnesium in a saline carrier, in a pill form, or as a banana. If a pill form is used, it can be in the form of a pill that dissolves under the tongue of the subject.

The term "Echocardiograph" as used herein refers to a multi-dimensional sonography of the heart that measures the heart's mechanical functionality.

The term "exogenous" as used herein refers to materials or reactions that occur outside of the body.

The term "glucagon" as used herein refers to a counter regulatory hormone essential for glucose metabolism in humans in particular.

The term "glucose" as used herein refers to the simple carbohydrate commonly referred to as "sugar".

The term "hyperglycemia" as used herein refers to high blood glucose level present in a subject's blood test.

The term "improved cellular ATP functioning" as used herein refers to "Adenosine Triphosphatase" ("ATPase") functioning, which are one or more enzymes that catalyze the formation of adenosine triphosphate ("ATP") from adenosine diphosphate ("ADP") and the functioning is indicative of the energy generated by a cell when it consumes glucose during metabolic processing.

The term "individual target blood glucose level" as used herein refers to a medical beneficial range that the patient or subject can achieve at least during treatments session created by the diabetic treatment model, during the entire infusion therapy, such as a range from 125 mg/dl to 225 mg/dl, which can be adjusted to a more narrow range, such from 180 mg/dl to 225 mg/dl for a specific subject.

The term "insulin" as used herein refers to a chemical that is a counter regulatory hormone essential for glucose metabolism.

The term "insulin bolus" as used herein refers to a dosage quantity of insulin given intravenously to a patient.

The term "insulin reservoir" as used herein can be a flexible pouch of insulin having multiple insulin bolus.

The term "insulin sensitivity factor" as used herein refers to how a subject responds after receiving one unit of insulin as a measure of decrease in blood glucose.

The term "Lipid Panel" as used herein refers to a blood test that measures a concentration of lipids, fats, and fatty substances used as a source of energy by a human body.

The term "metabolic factors" as used herein refers to a weight, such as 125 pounds, blood tests, such as a Comprehensive Metabolic Panel, a CBC panel, a C-peptide test, an A1c test (known as a "lipid panel"), a urinalysis, a nerve conduction velocity test, an individual target blood glucose level, such as 110 mg/dl, a respiratory quotient, such as a ratio of the amount of carbon dioxide released based on oxygen consumed during a preset period of time, and an insulin sensitivity factor, such as a value indicating how a subject responds after receiving one unit of insulin as a measure of decrease in blood glucose.

The term "metabolic enhancement" as used herein refers to a blend of components that bond to enzymes in the patient and increases the enzyme activity for a patient or subject. The metabolic enhancement can be (1) a pill containing the components of the metabolic enhancement, (2) a drink containing the components of the metabolic enhancement, (3) a shake containing the components of the metabolic enhancement, (4) a food item, such an energy bar, fortified with the metabolic enhancement, (5) a transdermal patch or similar application delivering the components of the metabolic enhancement, and combinations thereof.

8

In one example, the metabolic enhancement can be a blend of methylcobalamin, (such as 5 mg), pyridoxal-5-phosphate (such as 35 mg), 5-MTHF (known as an activated form of folic acid) (such as 1 mg), Alpha Lipoic Acid (such as 50 mg), NADH (such as 5 mg), CoEnzyme Q10 (such as 75 mg), N-Acetyl L-Cysteine (NAC) (such as 250 mg), Vitamin D (such as Cholecalciferol) (such as 2000 International Units (IU)) and Chromium Picolinate (such as 300 mcg).

The term "methylcobalamin" as used herein refers to one of two coenzyme forms of vitamin $B_{12}$.

The term "N-Acetyl Cysteine" as used herein refers to an amino acid that helps build proteins in the body.

The term "NADH" as used herein refers to Nicotinamide Adenine Dinucleotide which binds as a coenzyme to proteins and serves in respiratory metabolism.

The term "Nerve Conduction Velocity (NCV)" as use herein refers to a test to determine how fast electrical signals move throughout a nerve.

The term "non-transitory computer readable medium" as used herein excludes any transitory signals but includes any non-transitory data storage circuitry, e.g., buffers, cache, and queues, within transceivers of transitory signals.

The term "Peripheral Autonomic Neuropathy" as use herein refers to the symptoms that occur when there is damage to the nerves, such as weakness and numbness of a limb.

The term "plan goal" as used herein can refer to a purpose for the insulin therapy as identified by the subject and/or a medical professional associated with the therapy and inserted into the care plan generated by the diabetic treatment model.

The term "portable data storage" as used herein can refer to a non-transitory computer readable medium, such as a hard disk drive, solid state drive, flash drive, tape drive, and the like.

The term "processor" as used herein can refer to a computer, a laptop, a plurality of connected processors, a tablet computer, a cellular telephone or smart phone, a portable processing device, or any similar device known in the industry.

The term "respiratory quotient" as used herein refers to the ratio of: carbon dioxide given off by a human and oxygen consumed by a human, particularly under known resting conditions.

The term "saline" as used herein refers to a sterile solution of 900 grams of sodium chloride in 100 ml of water.

The term "schedule for bolus introduction" as used herein refers to the plurality of specific time intervals between bolus introductions in a treatment session. For the invention, the "schedule for bolus introduction" requires at least one "unequal time period" between at least one pair of bolus per treatment session.

As an example of the schedule for bolus introduction for a treatment session: three bolus can be delivered to the subject sequentially, each bolus separated by a 4 minute time interval. Then, using the schedule for bolus introduction, a fourth bolus is delivered to the subject after a 6.5 minute time interval. The 6.5 minute time interval is referred to herein as "an unequal time period" because it is different from the 4 minute time intervals on the schedule for bolus introduction.

In embodiments, all the time intervals between pairs of bolus can be different for a subject. In embodiments, just one time interval between one pair of bolus can be different according to the schedule for bolus introduction.

US 9,652,595 B1

9

In embodiments, many variations in time intervals on the schedule for bolus introduction can be computed by the diabetic treatment model using the weight of the subject, insulin sensitivity factor of the subject and tested blood glucose levels of the subject.

Another example of the schedule for bolus introduction having an unequal time period can be 3 pairs of bolus that are sequentially introduced require 5 minute intervals of time between introductions then a seventh bolus requires a 6 minute interval of time prior to introduction to the subject. The 6 minute interval of time is an "unequal time period". The diabetic treatment model can indicate that the schedule for bolus introduction can require all remaining time periods for the treatment session between pairs of bolus to be equal (the opposite of unequal periods of time). The plurality of time periods of the schedule for bolus introduction (the time between each pair of bolus) is generated by the diabetic treatment model.

The term "subject profile" as used herein can refer to the name of an individual and the associated measured metabolic factors. The subject profile can include a subject history and a subject physical report of the subject, a subject name and contact information, as well as a subject's blood test results. In embodiments, the subject profile can include a date, a name, an address, an email address, a telephone number, an ethnicity, a gender/sex, a type of diabetes, a date of birth, a weight, a height, a blood pressure, a temperature, a heart rate, a blood type, a blood glucose level, insurance information, a responsible party name and contact information, a driver's license number or copy of the driver's license, employer information, insurance information, medical history including surgery and ancestor information and allergies, current medications, other test results, including but not limited to urinalysis, emergency contact information, and a primary care physician name and contact information. In embodiments, the subject profile can be inputted into a data storage associated with a processor.

The term "treatment session" as used herein refers to a plurality of treatment cycles during which a plurality of bolus are infused to a patient. Each treatment cycle can range from 40 minutes to 180 minutes. Each treatment session can range from 1 treatment cycle and up to 6 treatment cycles.

The term "unequal time period" as used herein refers to a unit of time between a pair of bolus in a treatment session that is different in length from a time period between another pair of bolus in a treatment session.

The term "weight management protocol" as used herein refers to a system of eating certain foods with a preset calorie content to ensure the patient or subject loses an amount of weight per week that aligns with the subject's metabolic factors.

The invention improves impaired hepatic glucose processing in subjects, which can be a human or a non-human, such as an animal.

In embodiments, the kit can include creating a subject profile with assessed metabolic factors.

The kit can include inserting the subject profile into a diabetic treatment model to determine: a quantity and frequency of sequential intravenous insulin bolus to a subject using a schedule for bolus introduction having at least one unequal time period between a pair of bolus, as well as determining a quantity and frequency of dosage amounts of magnesium and a quantity and frequency of dosage amounts of potassium.

The kit can include selecting a weight management protocol using the subject profile and specific metabolic func-

10

tions of the subject. For example, the metabolic function of respiratory quotient can be used to create a specific customized weight management protocol.

The subject can then follow the weight management protocol while taking a metabolic enhancement. The weight management protocol initially can use a complete metabolic measurement system for cardio-pulmonary exercise stress and resting energy expenditure testing which can give a patient a resting metabolism score. The resting metabolic scores can range from 0.75 to 0.85 for fats, from 0.78 to 0.82 for protein, and from 0.88 to 0.92 for carbohydrates. Based on these resting metabolic scores, a subject's diet can be customized based on what the subject's body can actually metabolize.

A resting metabolic carbohydrate score in excess of 1.20 can indicate the subject's body is undergoing ketogenesis (metabolic production of ketones or ketone bodies or formation of acid ketone [substances that are made when the body breaks down fat for energy, any organic compound in which two carbon atoms are linked by the carbon of a carbonyl group (C—O), the simplest ketone and the most important in medicine is dimethyl ketone (acetone)] bodies, as in uncontrolled diabetes, starvation, or as a result of a diet with a very high fat content), and a different customized diet can be created for the subject or the patient.

The invention improves impaired hepatic glucose processing in subjects, by providing individualized intravenous exogenous insulin-based therapy that not only produces body tissue with improve cellular ATP functioning in the short term, by improves the ATP function by at least 10 percent and up to 40 percent, for a period of time that ranges from 7 days to 90 days from the last treatment session of the individualized intravenous exogenous insulin-based therapy.

It should be noted that in embodiments, the dosage amounts of magnesium and potassium can be introduced to the subject intravenously from a second reservoir simultaneously as the insulin bolus are introduced.

Glucose is introduced to the subject as part of the therapy. The glucose is taken by the subject prior to receiving the insulin bolus. When glucose is used the dosage amounts of potassium and dosage amounts of magnesium can be adjusted based on the subject profile. The bolus introduction can be monitored and blood glucose levels tested allowing a therapist to change the quality and time intervals between bolus based on the diabetic treatment model until the blood glucose level of the subject reaches an individual target blood glucose level.

In embodiments, the unequal time periods between bolus introductions according to the schedule can range from 4 minute to 8 minute periods but can be as low as 1 minute and as high as 10 minutes. The unequal time periods can include minutes and seconds.

In embodiments, from 60 grams of glucose to 100 grams of glucose can be introduced to the subject to establish a blood glucose level of at least 125 mg/dl prior to introducing the bolus of insulin and dosage amounts of potassium and magnesium.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a respiratory quotient of the subject from a metabolism score with the subject in a resting state and applying the results into the diabetic treatment model to (i) modify the concentration of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

APPX0222

US 9,652,595 B1

11

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure the success of individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a cardiac function measured by echocardiograph with the subject in a resting state and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a peripheral autonomic neuropathy and microcirculation with the subject in a resting state prior to bolus injection and simultaneously as bolus are injected and after bolus have been injected and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a retinal image captured by a non-mydriatic camera with the subject in a resting state to identify diabetic retinopathy after a series of bolus treatments are performed and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing wounds to wound characteristics by dimensionally measuring wounds by length, width, and depth and related clinical characteristics with the subject in a resting state after a series of bolus treatments are performed and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing C-peptides, such as with the University of Oxford's HOMA2 Calculator, which act as a marker for insulin production and insulin sensitivity factor and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both, or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the metabolic enhancement can have a nerve function improver to decrease homocysteine (a naturally occurring amino acid in all humans that is found in blood plasma) levels and improve cardio vascular health.

In embodiments, the weight management protocol can include additional nutritional supplements.

In embodiments, the insulin bolus can be intravenously infused using a needle or a catheter located in the subject's body, hand, or forearm.

Now turning to the Figures, FIG. 1A shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 40 kilograms to 160 kilograms.

12

A dosing protocol for insulin bolus, dosage amounts of potassium and dosage amounts of magnesium as generated by the diabetic treatment model using weight of a subject from 40 kilograms to 160 kilograms is shown. This chart can be used for one person or for a plurality of subjects.

Weight appears in the first column then a dosage amount of a ratio of potassium to saline, a dosage amount of a ratio of magnesium to saline, a dosage amount of a ratio of insulin to create the amount of insulin to saline to be used for a treatment session and an insulin reservoir volume is depicted mapped to the weight of the subject and to the potassium to saline dosage, and magnesium to saline dosage and insulin to saline dosage.

The insulin reservoir volume is a liquid volume containing (i) the insulin and saline, (ii) the insulin, saline and potassium, (iii) the insulin, saline and magnesium, or (iv) the insulin, saline, potassium and magnesium, used in the bolus for the subject.

An insulin bolus dosage minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A schedule for bolus introduction with a plurality of unequal time periods (in seconds) between bolus introduction is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A quantity of bolus per treatment cycle is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

FIG. 1B shows a diabetic treatment model with bolus volume dosage mounts for a subject with a weight from 161 kilograms to 275 kilograms.

A dosing protocol for insulin bolus, dosage amounts of potassium and dosage amounts of magnesium as generated by the diabetic treatment model using weight of a subject from 161 kilograms to 275 kilograms is shown. This chart can be used for one person or for a plurality of subjects.

Weight appears in the first column then a dosage amount of a ratio of potassium to saline, a dosage amount of a ratio of magnesium to saline, a dosage amount of a ratio of insulin to create the amount of insulin to saline to be used for a treatment session, and an insulin reservoir volume is depicted mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

The insulin reservoir volume is a liquid volume containing (i) the insulin and saline, (ii) the insulin, saline and potassium, (iii) the insulin, saline and magnesium, or (iv) the insulin, saline, potassium and magnesium, used in the bolus for the subject.

APPX0223

US 9,652,595 B1

13

An insulin bolus dosage minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A schedule for bolus introduction with a plurality of unequal time periods (in seconds) between bolus introductions is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A quantity of bolus per treatment cycle is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

FIG. 2 shows a bolus volume dosage adjustment protocol based on tested blood glucose levels as produced by the diabetic treatment model.

A dosage adjustment protocol of insulin is shown for three time intervals: (i) a first time interval for hours 1 and 2 of each treatment session, (ii) a second time interval for a first 30 minutes of hour 3 of each treatment session, and (iii) a third time interval for a last 30 minutes of hour 3 of each treatment session.

A table of tested blood glucose level in view of dosage amounts of insulin are shown, which is generated by the diabetic treatment model.

This portion of the diabetic treatment model indicates that the amount of insulin or quantity of bolus can be increased or decreased based on real time test results of a subject's blood glucose level.

FIG. 3 depicts a glucose dosage adjustment protocol as produced by the diabetic treatment model.

A patient's tested blood glucose level ranging from 100 to 550 mg/dl is shown.

In the glucose dosage adjustment protocol, an amount of glucose to be administered using the kit is depicted as mapped to a tested blood glucose level. The amount of glucose ranges from slightly above no glucose shown as 0.01 grams to 60 grams of glucose.

FIG. 4 depicts a metabolic enhancement protocol as produced by the diabetic treatment model and an exemplary metabolic enhancement by component.

The metabolic enhancement protocol shows dosage amounts of metabolic enhancement and respiratory quotients for a patient. The metabolic enhancement can be provided to a subject in dosage amounts as pills, in powder form, as a drink, a transdermal patch, or a delivery system known in the art.

The respiratory quotients range from 0.69 to 1.20. The dosage amounts of metabolic enhancement can range from 1 dose to 3 dosages daily, as shown corresponding to the tests of the subject showing the respiratory quotients.

Ingredients for an exemplary metabolic enhancement usable according to the diabetic treatment model are shown with minimum amounts per dosage and maximum amounts per dosage for the metabolic enhancement.

14

In embodiments, the ingredients for a usable metabolic enhancement can be formed from a synergistic combination of nine ingredients, namely:

Vitamin D—as Cholecalciferol ranging in amounts from 600 IU to 2000 IU.

Vitamin $B_6$—as Pyridoxal-5-Phosphate ranging in amounts from 10 mg to 100 mg.

Folic Acid—as Folate ranging in amounts from 200 mcg to 2000 mcg.

Vitamin $B_{12}$—as Cyanocobalamin ranging in amounts from 1000 mcg to 5000 mcg.

An amino acid that builds proteins in a subject—as N-Acetyl L-Cysteine (NAC) ranging in amounts from 200 mg to 600 mg.

A coenzyme that extracts energy from food for a subject—as Coenzyme Q10 (CoQ10) ranging in amounts from 60 mg to 400 mg.

An antioxidant that extracts energy from food for a subject—as Alpha lipoic acid ranging in amounts from 50 mg to 400 mg.

A protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for a subject—as Nicotinamide Adenine Dinucleotide (NADH) ranging in amounts from 0.5 mg to 5 mg.

A glucose utilization component to prevent or treat chromium deficiency in a subject and which additionally improves glucose utilization by insulin—as Chromium Picolinate ranging in amounts from 200 mg to 300 mg.

The following are non-limiting examples.

Example 1

A comparative analysis was generated for Fred Smith, Fred S. a 69-year-old man with Type 2 diabetes of 25 years' duration. Fred Smith arrived in a wheelchair, because walking was too painful for him. Fred Smith's left foot had all the toes amputated, and a non-healing wound on his other foot had caused his doctor to recommend amputation of a toe on his right foot.

Conventional wound care treatment, including aggressive wound care, wound debridement, and hyperbaric treatment had failed. Fred Smith also developed a debilitating peripheral neuropathy.

At this point Fred Smith weighed 107.95 kilograms and began an intensive treatment protocol of three treatment sessions per week, the first week includes two treatment sessions the second and third weeks include one treatment session per week thereafter for weeks 4 through 12. During each treatment session, Fred Smith received insulin and saline intravenously, alternating with glucose. Fred Smith received 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram, at a first set of unequal time periods of 5.3 minutes, 4 minutes, and 5.1 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Fred Smith received a total of 16 treatments during the three-month period, after the 6th treatment, he began to regain feeling in his feet.

Fred Smith due to the treatment was no longer in a wheelchair at the end of three months and was able to simply use a cane to get around.

Fred was able to decrease his hospital costs by $255,000 from the prior year without treatment.

Additionally, Fred was able to decrease one of his blood pressure medications.

US 9,652,595 B1

**15**

Post treatment, Fred's A1c test result was down 2.7 points. Fred no longer experienced hypoglycemic events and he had reduced his long-acting insulin by 20 percent and his short-acting insulin by 50 percent.

The primary care physician noted that Fred's wound had healed and no amputation was needed.

### Example 2

A comparative analysis was generated for Marianne Rutledge, a 60-year-old woman with Type 2 diabetes of 12 years duration, who suffered from severe kidney disease and was fearful of becoming a dialysis patient.

Upon arrival Marianne Rutledge's blood test results showed an A1C of 10.2, blood glucose of 240 mg/dl, her blood pressure measured 150/92, and she weighed 212 pounds, or 96.3 kilograms.

Marianne Rutledge began an intensive treatment protocol of two treatment sessions per week the first two weeks, and one treatment session per week thereafter for weeks 3 through 12. During each treatment session, Marianne Rutledge received insulin and saline intravenously, alternating with glucose. Marianne Rutledge received 36 bolus per treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram, at a first set of unequal time periods of 5.1 minutes, 4.6 minutes, and 5.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Marianne Rutledge received a total of 13 treatments during the three-month period, after the 2nd treatment, she noticed an extreme increase in her energy and stamina, and as she continued the treatment sessions, she reported that she looked forward to the next treatment session because it made her feel better than she had felt since she was diagnosed with diabetes and kidney disease.

Marianne Rutledge continued the therapy with regular treatment sessions each week, 3 to 4 hours each session, with the protocol of insulin and saline intravenously, alternating with glucose and using the schedule for bolus introduction having at least one unequal time period. After six months of treatment, her kidney function improved to the point that her doctor no longer considered dialysis probable.

### Example 3

Victoria Lord, a Type 2 diabetic on dialysis had vision problems including retinopathy and she also suffered from neuropathy and had trouble sleeping. A comparative analysis was generated for Victoria Lord, whose initial vital signs were blood glucose level 250, blood pressure 120/80, heart rate of 72, and HgbA1c of 9.2.

Victoria Lord began an intensive therapy of two treatment sessions on intravenous insulin alternating with oral glucose on consecutive days for the first two weeks then weekly treatment sessions thereafter for the next 10 weeks, then to be reevaluated.

Each treatment session consisted of 36 bolus. During each treatment session, Victoria Lord received insulin and saline intravenously, alternating with glucose. Victoria received the 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.0 minutes, 6.9 minutes, and 5.3 minutes, with each set

**16**

of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After her first four treatments over two weeks, she reported that her neuropathy decreased, which was confirmed by autonomic tests. Her blood glucose was decreased to 110, and she reported such extremely increased energy that she no longer required an afternoon nap. She also reported that she was sleeping better. Her lab tests after 14 treatments over 12 weeks showed HgbA1c of 6.5, down from 9.2, or a decrease of about 30 percent.

### Example 4

Jim Pierce had severe foot neuropathy and had experienced no feeling in his feet for several years. He had been diagnosed with Type 2 Diabetes about 15 years ago and was insulin dependent. A friend knew of his debilitating neuropathy and recommended that he begin the therapy.

Jim Pierce reported that when his neuropathy began, it was so painful; he could not even stand for a sheet to touch his toes when he went to bed at night. As his neuropathy progressed, he lost all feeling in his feet and began to suffer injuries from falling. His doctor continued to treat him with insulin and prescription drugs, such as Gabapentin.

Jim Pierce's test results were reviewed, and he was put on a therapy of two treatment sessions on consecutive days for three weeks, two treatment sessions on consecutive days for two weeks after that, and then one treatment session per week for the balance of the first 12-week period.

Jim Pierce received 36 bolus during each treatment session using the schedule for bolus introduction having at least one unequal time period. During each treatment session Jim Pierce received insulin and saline intravenously, alternating with glucose.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.5 minutes, 5.1 minutes, and 5.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After the first two treatments, Jim Pierce reported that the feeling began to return to his feet.

After he completed 8 treatments sessions, his doctor reduced his Gabapentin, and after 12 weeks, he no longer took Gabapentin for his neuropathy. He reduced his insulin from 50 units every night to 30 units every night. His lab reports showed Hgb A1c 7.2, down from 10.5. After six months of the continued therapy he was able to do a three-mile hike on his vacation.

### Example 5

Sarah Hardin is a pre-diabetic with a genetic disposition to metabolic disorder and disease, including diabetes. Sarah's pre-treatment metabolic rate or respiratory quotient (RQ), was 0.84. After her initial test results were reviewed, she began one treatment session per week for 12 weeks.

Each of Sarah's treatment sessions consisted of 36 bolus and during each treatment session, Sarah received insulin and saline intravenously, alternating with glucose. Sarah received 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.2 minutes, 4.7 minutes, and 6.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

APPX0225

US 9,652,595 B1

17

Soon after starting the treatment therapy, Sarah Hardin noticed improvement in hair and nail growth, and she documented it with photographs.

Sarah reported that her energy increased to the point that she no longer needed help taking care of her children. After 5 treatment sessions, a comparative analysis was performed and her RQ increased to 0.93, which demonstrated that she was burning carbohydrates for energy.

Example 6

Tatum Norris, age 18, a Type 1 diabetic diagnosed at age 10, had severe neuropathy and was housebound because of his pain. He began two treatment sessions on consecutive days, then 1 treatment session a week thereafter.

Each treatment session consisted of 36 bolus. During each treatment session, Tatum received insulin and saline intravenously, alternating with glucose. Tatum received 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.4 minutes, 5.3 minutes, and 5.2 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

A Nerve Conduction Velocity (NCV) with Electromyopathy (EMG) was conducted pre-treatment on Tatum and repeated 90 days after his initial treatment, which showed a marked decrease in his diabetic neuropathy.

After 8 or 10 treatments, Tatum began driving a car again and he was able to sit in movie theaters because the pain was now manageable. Tatum reported that he could now go visit his mom in Dallas and even hang out with friends.

Example 7

Carmen Valdez, a 70-year-old Type 2 diabetic who had been diagnosed four years earlier, was on three types of blood pressure medication (Amlodipine, Lisinopril, and Lopressor) and three medications to control her blood sugar (Lantus, Metformin, and Onglyza). After her initial test results were reviewed, she began treatment sessions of two treatment sessions on consecutive days for the first two weeks and one treatment session per week thereafter for 12 weeks. Her pre-treatment RQ test result was 0.79.

During each treatment session, Carmen received insulin and saline intravenously, alternating with glucose. Carmen received 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 6.4 minutes, 7.2 minutes, and 7.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Carmen reported that she was surprised that she immediately experienced greatly increased energy and stamina, as well as a lowering of her daily blood pressure according to her self-tests, after only the first two treatments.

After three months, Carmen Valdez was able to discontinue taking Amlodipine, Lantus and Onglyzaone. At that point her RQ measured 0.95.

Example 8

Harold Carson, a 65-year-old insulin-dependent Type 2 diabetic of 25 years, became insulin resistant and his medications were no longer working well. Mr. Carson was taking

18

three 750-mg Glucophage tablets daily, 150 units of Humalog (short-acting) insulin daily, and a nighttime injection of 40 units of Humulin N (long-acting) insulin. He also took statin drugs for cholesterol and blood pressure medication.

After initial tests, his C-peptide was remarkable at 2.0. He began treatment sessions of two on consecutive days for two weeks, and then continued with weekly treatments for a total of 12 weeks.

During each treatment session, Mr. Carson received insulin and saline intravenously, alternating with glucose. He received 36 bolus per treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.7 minutes, 6.1 minutes, and 5.9 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After he began the treatment sessions, he reported that he immediately noticed a better night's sleep, that his mental clarity was sharper, and even his golf score improved.

After two months of treatment he decreased his insulin usage by 70 percent (from 150 units daily to 45 units daily) and his C-peptide test resulted in a significant improvement of 2.8.

Harold Carson's RQ was 0.75 pre-treatment and a perfect 1.00 after two months of treatment. Harold reported that his dry skin improved, the neuropathy in his legs vanished, and his wife reported that his hair had grown "unbelievably" after he began the treatment therapy.

Example 9

Stephen Henderson, a pre-diabetic with metabolic disorder and hyperlipidemia, had initial test results of Triglycerides 1290, LDL 183, and Cholesterol 271; his RQ was 0.74. He began treatment sessions once a week for 12 weeks. During each treatment session, Mr. Henderson received insulin and saline intravenously, alternating with glucose. Mr. Henderson received 36 bolus each treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 4.8 minutes, 4.8 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Stephen reported that after only two treatments, his energy level increased and prior hair loss abruptly stopped. After five treatments, he noticed significant hair growth. His test results after 12 treatment sessions were Triglycerides 123, LDL 86, Cholesterol 144, and RQ 0.98.

Stephen also reported that he noticed significant improvement in quantitative and qualitative analysis capability.

Example 10

Alan Henderson traveled from Denver to Houston for his treatments. At age 71 he had a history of 13 heart stints, he had been a Type 2 diabetic for 20 years, and he was insulin dependent.

After initial testing and a review of his results, Alan Henderson began treatment sessions of two per week on consecutive days for two weeks, then one treatment session weekly for 10 more weeks.

During each treatment session, Alan received insulin, saline, potassium, and magnesium intravenously, alternating

APPX0226

US 9,652,595 B1

19

with glucose. Alan received 36 bolus each treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 6.4 minutes, 6.8 minutes, and 7.1 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Alan's initial RQ was measured at 0.78, and his Hgb A1c was 13.4.

Over the course of three months, after his 12-week, 14-treatment therapy, he decreased his fast-acting insulin (Novalog) by 55 percent, down from 15-18 units to 10-12 units with meals and his long-acting insulin (Lantus) decreased by 65 percent, down from 75 units twice daily to 40 units daily.

After the first three months of treatment, Alan's Hgb A1c was down to 7.3 (more than 6-point decrease), and his RQ was 0.90.

Alan Henderson also suffered from diabetic neuropathy, for which he had been prescribed Gabapentin (six capsules per day) and a Lidocaine patch. After two months he reduced the amount of Gabapentin he was taking, and then completely eliminated it. He discontinued use of the Lidocaine patch. He reports that he now has no pain or neuropathy in his hands or feet, and his energy level is "way up."

Example 11

George Gilbert had a wound on his foot for three months that would not heal. He was also a Type 2 diabetic on Metformin orally. After review of his test results, he began treatment sessions of two sessions on consecutive days for the first week and weekly treatment sessions thereafter.

During each treatment session, George received insulin, saline, glucagon, and somatostatin intravenously, alternating with oral glucose. George received 36 bolus each treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.7 minutes, 5.4 minutes, and 5.0 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After only three weeks of the treatment, he reduced the amount of Metformin he was taking, his wound healed, and his doctor made photographs of the wound before and after for the hospital record. George calls the treatment a "miracle."

Example 12

Toby Rasmussen, a pre-diabetic of 8 years duration, began treatment sessions because of vision problems and a family history of diabetes. His initial RQ was 0.85. His Hgb A1c measured 7.0. He began treatment sessions once a week for 12 weeks.

During each treatment session, Toby received insulin and saline intravenously, alternating with glucose. Toby received 36 bolus each treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.3 minutes, 5.2 minutes, and 6.4 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

20

Toby reports that after the 12 treatments, he has more energy and his eyesight has improved so much that he now uses only bifocals instead of trifocals. After treatments, his RQ measured 0.98 and his A1c measured 6.1.

Example 13

Hank Anderson, a Type 2 diabetic of 27 years, had an Hgb A1c reading of 9.0, and was using Lantus insulin of 170 units during the day and another 70 units at night. He also reported severe leg cramps.

A comparative analysis was performed on Hank Anderson, and he began treatment sessions weekly. During each treatment session, Hank received insulin and saline intravenously, alternating with glucose. He also received potassium 40 meq orally with each treatment session and daily on non-treatment days. Mr. Anderson received 36 bolus per treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.6 minutes, 5.1 minutes, and 5.4 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After 12 weeks of weekly treatment sessions, Hank reported that since starting the treatment, his blood sugar is now controlled and his eyesight has improved so much that he went from legally blind without glasses to being able to read captions on a television with no glasses.

Hank was able to discontinue his nightly Lantus and his insulin went down from 6 vials of insulin per month to only 3, a significant costs saving.

Hank Anderson's A1c after 12 weeks of treatment sessions measured 8.3.

Example 14

John Grayson, a Type 1 insulin-dependent diabetic, initially reported problems with his kidneys, eyes, low energy, mood swings, and erectile dysfunction. His RQ was 0.88 and his magnesium level was 1.5

After his test results were reviewed, John started treatment sessions of two sessions on consecutive days with weekly treatment sessions thereafter for a period of three months. During each treatment session, Hank received insulin and saline intravenously, alternating with oral glucose and somatostatin. Hank received 36 bolus per treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.0 minutes, 5.2 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Mr. Grayson also received magnesium chloride tablets of 40 mg orally with each treatment session and daily on non-treatment days.

After the first two treatments, Mr. Grayson decreased his insulin use by 5-10 units per sliding scale and was extremely happy to report that he experienced increased blood flow.

After the third treatment, Mrs. Grayson was deliriously excited about his improvement, especially with the blood flow.

FIGS. 5A-5C depict steps of a method of the invention according to one or more embodiments.

The method for providing an individualized intravenous exogenous insulin-based therapy can include creating a

APPX0227

US 9,652,595 B1

21

subject profile for a subject, as shown in box **500**. The subject profile can include: a subject history, such as having type II diabetes for the past three years and cataract surgery 4 years ago, a subject's physical reports including weight of the subject and optionally objective physician reports, CT scans and other diagnostic reports, a subject's name, such as Carol Wilson, a subject's contact information such as a name, an address and a telephone number, and a subject's blood test results.

The method can include assessing metabolic factors of the subject and storing the metabolic factors in the subject profile, as shown in box **502**. The metabolic factors needed in the subject file can include: a glucose level, such as an initial glucose level, a respiratory quotient, such as an initial respiratory quotient, an insulin sensitivity factor, such as an initial or pre-treatment insulin senility factor, and an individual target blood glucose level which the subject desires to achieve with the treatments using the diabetic treatment model.

The method can include creating a care plan with a plurality of treatment sessions for the subject and a plan goal, as shown in box **504**. The care plan can indicate a schedule for bolus introduction with at least one unequal time period and the care plan can include a quantity and frequency of a plurality of bolus containing saline and insulin for sequential intravenous introduction to a subject.

The method can include introducing glucose to the subject to stimulate gastrointestinal hormone production, resulting in the release of enzymes from the subject's liver and causing blood glucose levels of the subject to be in a therapeutic range, as shown in box **506**.

The method can include testing the subject for blood glucose levels to compare tested blood glucose levels to the plurality of therapeutic ranges and verify the subject is in the therapeutic range, as shown in box **508**.

The method can include comparing tested blood glucose levels to a diabetic treatment model, as shown in box **510**.

The method can include mapping tested blood glucose levels and insulin sensitive factors of the subject to the subject weight using the diabetic treatment model to determine a schedule for bolus introduction, wherein the schedule for bolus introduction has at least one unequal time period between at least one pair of bolus, as shown in box **512**.

The method can include introducing to the subject a plurality of bolus of insulin and saline sequentially using the schedule for bolus introduction having at least one unequal time period between at least one pair of bolus, as shown in box **513**.

The method can include comparing the subject profile to a plurality of weight management protocols to identify a weight management protocol for the subject based upon assessed metabolic functions of the subject and saving the weight management protocol in the care plan, as shown in box **514**.

The method can include implementing the identified weight management protocol and the care plan after a first treatment session to manage weight of the subject with a metabolic enhancement causing improved cellular ATP functioning for the subject while infusing insulin and modifying a quantity and duration of unequal time periods between bolus introduction in the schedule for bolus introduction having at least one unequal time period between at least one pair of bolus to improve impaired hepatic glucose processing, as shown in box **516**.

The method can include using in the schedule for bolus introduction having at least one unequal time period, time periods varying from 2 minutes to 10 minutes. The unequal

22

time periods can be time intervals from 1 percent to 30 percent different in length of time from each other.

The method can include introducing from 60 grams of glucose to 100 grams of glucose to the subject prior to initial bolus introduction to establish a blood glucose level of at least 125 mg/dl prior to introducing the plurality of bolus in a first treatment session.

The method can include comparing a respiratory quotient of the subject in a resting state to a plurality of metabolism scores, as shown in box **518**.

The method can include modifying a quantity of bolus for the subject for each treatment session as identified in the care plan with schedule for bolus introduction having at least one unequal time period between bolus to improve a subject's respiratory quotient, as shown in box **520**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period between bolus introduction by modifying a quantity and duration of unequal time periods between bolus introductions to improve the respiratory quotient, as shown in box **522**.

The method can include comparing a measured cardiac function of the subject in a resting state to a preset norm of cardiac function, as shown in box **524**.

The method can include modifying a quantity of bolus for the subject identified in the care plan using the preset norm of cardiac function, as shown in box **526**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period by modifying a quantity and duration of unequal time periods between bolus introductions to improve cardiac function, as shown in box **528**.

The method can include measuring a peripheral autonomic neuropathy and microcirculation of the subject in a resting state prior to bolus introduction comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of peripheral autonomic neuropathies and microcirculations, as shown in box **530**.

The method can include comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state as bolus are sequentially introduced to the measured peripheral autonomic neuropathy and microcirculation, as shown in box **532**.

The method can include comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state after all bolus have been introduced in a first treatment session to the measured peripheral autonomic neuropathy and microcirculation, as shown in box **534**.

The method can include modifying a quantity of bolus for the subject identified in the care plan to treat peripheral autonomic neuropathy and microcirculation, as shown in box **536**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period by modifying a quantity and duration of unequal time periods between bolus introduction to improve the measured peripheral autonomic neuropathy and microcirculation, as shown in box **538**.

The method can include viewing an initial retinal image of the subject captured by a non-mydriatic camera with the subject in a resting state to identify a diabetic retinopathy, as shown inbox **540**.

The method can include viewing a post treatment retinal image of the subject in a resting state after a first treatment session, as shown in box **541**.

US 9,652,595 B1

23

The method can include comparing the initial retinal image to the post treatment retinal image, as shown in box **542**.

The method can include modifying a quantity of bolus for the subject if no change in the diabetic retinopathy has occurred, as shown in box **544**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period between bolus to reduce the effects of diabetic retinopathy by modifying a quantity and duration of unequal time periods between bolus introductions to reduce the effects of diabetic retinopathy, as shown in box **546**.

The method can include dimensionally measuring wounds by length, width, depth and identifying wound characteristics with the subject in a resting state, as shown in box **550**.

The method can include dimensionally measuring wounds after at least one treatment session to identify skin integrity and changes in clinical wound characteristics, as shown in box **552**.

The method can include modifying a quantity of bolus for the subject identified in the care plan for wound treatment using the identified skin integrity and changes in clinical wound characteristics, as shown in box **554**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period between bolus to improve wound healing by modifying a quantity and duration of unequal time periods between bolus introduction to reduce wound size and wound characteristics, as shown in box **556**.

The method can include comparing C-peptides of the subject to a preset norm of C-peptides to identify an insulin sensitivity factor, as shown in box **560**.

The method can include modifying a quantity of bolus for the subject for the insulin sensitivity factor, as shown in box **562**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period between bolus to improve an insulin sensitivity factor using analysis of C-peptides by modifying a quantity and duration of unequal time periods between bolus introductions, as shown in box **564**.

In embodiments, the method can use at least one of: methylcobalamin, pyridoxal-5-phosphate, 5-MTHF, alpha lipoic acid, NADH, coenzyme Q10, chromium picolinate, and N-Acetyl cysteine, and vitamin $D_3$ as the metabolic enhancement.

In embodiments, a needle or a catheter can be used to introduce the bolus into the subject's hand or forearm to deliver the insulin bolus.

The method can include determining a quantity and frequency of dosage amounts of magnesium and introducing the dosage amounts of magnesium simultaneously to the subject with the plurality of bolus using the schedule for bolus introduction having at least one unequal time period, as shown in box **570**.

The method can include determining a quantity and frequency of dosage amounts of potassium and introducing the dosage amounts of potassium simultaneously to the subject with the plurality of bolus using the schedule for bolus introduction having at least one unequal time period, as shown in box **572**.

The method can include determining a quantity and frequency of dosage amounts of somatostatin and introducing the dosage amounts of somatostatin simultaneously to

24

the subject with the plurality of bolus using the schedule for bolus introduction having at least one unequal time period, as shown in box **574**.

In embodiments, the somatostatin can be administered orally or intravenously.

The method can include determining a quantity and frequency of dosage amounts of glucagon and introducing the dosage amounts of glucagon simultaneously to the subject with the plurality of bolus using the schedule for bolus introduction having at least one unequal time period, as shown in box **576**.

In embodiments, the glucagon can be administered orally or intravenously

The method can include scheduling diagnostic tests after a first treatment session to modify the care plan for improved cellular ATP functioning for the subject and improved hepatic glucose processing, as shown in box **578**.

FIG. 6 depicts a system of the invention according to one or more embodiments.

The system for individualized intravenous exogenous insulin-based therapy can have an administrative processor **602** connected to an administrative data storage **604**.

The administrative processor, which can be a computer, can be connected to a network **606**. In embodiments, the connection can be a wired or wireless connection. The network can be a cellular network, a satellite network, a global communication network, a local area network, a wide area network, a similar network known in the industry, or combinations thereof.

The system can connect to a plurality of client devices **608a**, **608b**, and **608c**. The client devices can be computers, laptops, tablet computers, cellular phones or smart phones, or another digital input device that is cable of bidirectional communication and can be used to input subject information into a subject profile, which can be disposed in the administrative data storage **604**.

In embodiments, the system can connect to a hospital processor **607** and/or an insurance processor **609**. The hospital processor, the insurance processor or both can be in communication with the network **606** and can provide accelerated payment to the diabetic treatment center and provide improved data visibility for improved overall patient care by hospital doctors and medical staff treating the subject.

In embodiments, the system can connect to a doctor processor **611**, which can be a computer. In embodiments, the doctor processor can be a group of processors, wherein each processor in the group can be connected to a different doctor specialist. In other embodiments, the doctor processor can be a processor accessible by a group of physicians.

In embodiments, the administrative processor can be a cloud based computing system.

FIGS. 7A and 7B depict an administrative data storage usable in the system according to one or more embodiments.

The administrative data storage **604** can contain at least one subject profile **610**.

Each subject profile can contain a plurality of metabolic factors **605** of the subject, which can include, but is not limited to, a blood glucose level **612**, a respiratory quotient **614**, an insulin sensitivity factor **616**, and an individual target blood glucose level **618**.

The administrative data storage **604** can contain a plurality of care plan templates **620**.

In embodiments, the administrative data storage can contain various computer instructions, which can be used to instruct the administrative processor to perform various tasks.

APPX0229

US 9,652,595 B1

25

The administrative data storage 604 can contain computer instructions 200 configured to instruct the administrative processor to create a customized care plan from one of the plurality of care plan templates, wherein the customized care plan indicates a plurality of treatment sessions for the subject with the subject profile and a plan goal, each customized care plan indicating a schedule for bolus introduction having at least one unequal time period between bolus introduction, each bolus containing saline and insulin and each bolus introduced intravenously and sequentially to a subject

The administrative data storage 604 can contain computer instructions 202 configured to instruct the administrative processor to compare tested blood glucose levels to a diabetic treatment model after introducing glucose to a subject to stimulate gastrointestinal hormone production, release of enzymes from the subject's liver and cause blood glucose levels of the subject to be in a therapeutic range.

The administrative data storage 604 can contain a plurality of therapeutic ranges for blood glucose levels 203.

The administrative data storage 604 can contain computer instructions 204 configured to instruct the administrative processor to compare tested blood glucose levels to the plurality of therapeutic ranges for blood glucose levels and verify the subject is in the therapeutic range.

The administrative data storage 604 can contain a plurality of weight management protocols 205.

The administrative data storage 604 can contain computer instructions 206 configured to instruct the administrative processor to compare a subject profile to the plurality of weight management protocols to identify a weight management protocol based upon metabolic functions of the subject.

The administrative data storage 604 can contain computer instructions 207 configured to instruct the administrative processor to save the identified weight management protocol in the generated customized care plan after saline with insulin in a plurality of bolus using the schedule for bolus introduction having at least one unequal time period have been administered to a subject.

It should be noted that the unequal time periods are determined by the diabetic treatment model and the care plan.

The administrative data storage 604 can contain computer instructions 208 configured to instruct the administrative processor to track weight management of the subject after a first treatment session and use of an identified weight management protocol and the care plan along with a metabolic enhancement to identify improved cellular ATP functioning for the subject and improve impaired hepatic glucose processing.

The administrative data storage 604 can contain a plurality of metabolism scores 209, a plurality of preset norms of cardiac function 210, a plurality of preset norms of peripheral autonomic neuropathies and microcirculations 211, a retinal image of the subject 212, weight characteristics 214 and a plurality of preset norms of C-peptides 215.

In embodiments, at least one of the metabolic enhancements can be a synergistic combination of: Vitamin D ranging in amounts from 600 IU to 2000 IU, Vitamin B₆ ranging in amounts from 10 mg to 100 mg, Folic Acid ranging in amounts from 200 mcg to 2000 mcg, Vitamin B₁₂ ranging in amounts from 1000 mcg to 5000 mcg, an amino acid that builds proteins in a subject ranging in amounts from 200 mg to 600 mg, a coenzyme that extracts energy from food for a subject ranging in amounts from 60 mg to 400 mg, an antioxidant that extracts energy from food for a subject

26

ranging in amounts from 50 mg to 400 mg, a protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for a subject ranging in amounts from 0.5 mg to 5 mg, and a glucose utilization component to prevent or treat chromium deficiency in a subject which improves glucose utilization by insulin ranging in amounts from 200 mg to 300 mg.

A metabolic enhancement can consist of Cholecalciferol, Pyridoxal-5-Phosphate, Folate, Cyanocobalamin, N-Acetyl L-Cysteine (NAC), Coenzyme Q10 (CoQ10), an Alpha lipoic acid, Nicotinamide Adenine Dinucleotide (NADH), and Chromium Picolinate.

FIGS. 8A-8C provide exemplary subject profiles with an automatically generated care plan template and an automatically generated report according to one or more embodiments.

The care plan can be viewed in real time 24 hours a day, 7 days a week as each test is updated and the metabolic assessments are completed.

FIG. 8A shows a subject profile 610 with fields for a name 802, a patient ID number 804, a date of birth 806, a gender 808, an ethnicity 810, a blood type 812, allergies 814, a diagnosis 816, insurance 818, a primary care physician (PCP) 820, a primary care physician phone number 822, a primary care physician fax number 824, a patient address 826, a patient phone number 828, a patient email address 830, and a patient emergency contact 832.

The subject profile 610 can include a narrative 834, which can be written by a medical professional, documenting the condition of the patient and the medical history of the patient with the subject profile.

The subject profile 610 can include assessed metabolic factors of the patient 605, which can include fasting blood sugar 836, A1c level in the blood 838, C-peptide level in the blood 840, a magnesium level in the blood 842, a potassium level in the blood 844, and urinalysis test results 846.

The subject profile 610 can include an insulin sensitivity factor 848 for the subject and diagnostic tests results 850.

The diagnostic test results 850 can include blood glucose level 612, respiratory quotient 614, blood pressure 852, weight 854, nerve conduction velocity 856, retinal image of the subject 212, autonomic test results for neuropathy 858, cognitive test results 860, and cardiac test results 862 indicating cardiac function. The cardiac tests can be EKG or 2D Echo tests.

The subject profile 610 can include current medications 864 of the subject, such as aspirin or prescription medications the subject is currently using.

The subject profile 610 can have a home button 950, a save button 952, a previous page button 954, a next page button 956, and an exit button 958. The buttons can be interchangeable with icons depending on software used on an industry standard computer screen.

FIG. 8B shows the subject profile with a care plan template.

In embodiments, the care plan template can be filled in partially or completely and can be editable.

The care plan template 620 can have an infusion schedule 866, which can indicate infusions by week, showing a quality of treatments and on which days the treatments must occur.

The care plan template 620 can include an infusion formulation 868, which can be a combination of insulin, saline, potassium, magnesium, glucagon, and somatostatin.

The care plan template 620 can include treatment cycles 870, a quantity of bolus per treatment cycle 872, and unequal time periods between bolus introductions in seconds 874.

27

The care plan template 620 can include a blood glucose level therapeutic range 876.

In embodiments, additional therapies can be tracked in the care plan, including but not limited to, a quantity and frequency of dosage amounts of potassium 878, a quantity and frequency of dosage amounts of magnesium 880, a quantity and frequency of dosage amounts of glucagon 882, and a quantity and frequency of dosage amounts of somatostatin 884.

The care plan template 620 can include diagnostic tests 886, which can be scheduled after a first treatment session.

The care plan template 620 can include metabolic enhancements 888, which can be a particular supplement and instructions on dosage amounts and frequency for the subject in view of the diagnostic tests or other data in the care plan.

The care plan template 620 can include a weight management protocol 205, which can be selected from the plurality of weight management protocols in the administrative data storage.

The care plan template 620 can include an education schedule 889, which can consist of a curriculum of education modules to be viewed or read by a subject by a certain date, which can be automatically transmitted to a client device of the subject on a predetermined schedule.

The care plan template 620 can include at least one plan goal 890, such as an increased metabolism for a subject, such as by 10 percent.

FIG. 8C shows the subject profile with a report.

The report 892 can show improved cellular ATP functioning for the subject identifying improve impaired hepatic glucose processing.

The report 892 can include a post treatment narrative 894, which can be completed by a health care professional, indicating subjective and analytical assessments of metabolic factors of the subject.

The report 892 can include post treatment assessed metabolic factors 896 of the patient, a post treatment insulin sensitivity factor 898, a post treatment patient testimonial 900, post treatment diagnostic tests results 902 and post treatment medications 904.

The report 892 can include an insulin sensitivity factor 848 for the subject and diagnostic tests results 850.

The diagnostic test results 850 can include blood glucose level 612, respiratory quotient 614, blood pressure 852, weight 854, nerve conduction velocity 856, retinal image of the subject 212, autonomic test results for neuropathy 858, cognitive test results 860, and cardiac test results 862 indicating cardiac function. The cardiac tests can be EKG or 2D Echo tests.

The report can include assessed metabolic factors of the patient 605, which can include fasting blood sugar 836, A1c level in the blood 838, C-peptide level in the blood 840, a magnesium level in the blood 842, a potassium level in the blood 844, and urinalysis test results 846.

FIG. 9 depicts a kit for individualized intravenous exogenous insulin-based therapy according to one or more embodiments.

The kit 1000 can include a portable data storage 903 in communication with a client device processor 607. A client device 608 can contain the client device processor 607. The client device processor 607 can be in communication with a plurality of intravenous catheters 632 fluidly engageable with a fluid source 634.

The plurality of intravenous catheters 632 deliver to a patient a plurality of bolus sequentially using the generated

28

individualized schedule for bolus introduction with at least one unequal time period between at least one pair of bolus.

In embodiments, the kit can use a blood glucose meter 630 for testing the subject after glucose consumption for blood glucose levels and transmitting blood glucose test results to the portable data storage, a plurality of metabolic enhancements 888, a glucose source 1012 comprising from 60 grams of glucose to 100 grams of glucose, a quantity of dosage amounts of magnesium 1014, a quantity dosage of potassium 1016, a quantity dosage of somatostatin 1018, and a quantity dosage of glucagon 1020.

The metabolic enhancement 888 can be a methylcobalamin, a pyridoxal-5-phosphate, a 5-MTHF, an alpha lipoic acid, a NADH, a coenzyme Q10, a chromium picolinate, and a N-Acetyl cysteine, and a vitamin $D_3$.

In embodiments, the metabolic enhancements 888 can contain a synergistic combination of: Vitamin D ranging in amounts from 600 IU to 2000 IU, Vitamin $B_6$ ranging in amounts from 10 mg to 100 mg, Folic Acid ranging in amounts from 200 mcg to 2000 mcg, Vitamin $B_{12}$ ranging in amounts from 1000 mcg to 5000 mcg, an amino acid that builds proteins in the subject ranging in amounts from 200 mg to 600 mg, a coenzyme that extracts energy from food for the subject ranging in amounts from 60 mg to 400 mg, an antioxidant that extracts energy from food for the subject ranging in amounts from 50 mg to 400 mg, a protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for the subject ranging in amounts from 0.5 mg to 5 mg, and a glucose utilization component to prevent or treat chromium deficiency in the subject which improves glucose utilization by insulin ranging in amounts from 200 mg to 300 mg.

In embodiments, the metabolic enhancements 888 can contain Cholecalciferol, Pyridoxal-5-Phosphate, Folate, Cyanocobalamin, N-Acetyl L-Cysteine (NAC), Coenzyme Q10 (CoQ10), an Alpha lipoic acid, Nicotinamide Adenine Dinucleotide (NADH), Chromium Picolinate, or combinations thereof.

FIGS. 10A-10E depict a portable data storage according to one or more embodiments.

The portable data storage 903 can have therapeutic ranges for blood glucose levels, a subject profile, a library of care plan templates, and a plan goal.

The subject profile 610 can have a subject history 1002, subject physical reports 1004 including a subject preexisting weight 1005, a subject name 1006, subject contact information 1008, an indication 1010 that a subject is suspected of having the metabolic syndrome, and measured metabolic factors 605.

The measured metabolic factors can include a glucose level 612, a respiratory quotient 614, an insulin sensitivity factor 616, and a weight 615.

In embodiments, the portable data storage 903 can have a library of care plan templates 620 and a plan goal 890.

The portable data storage 903 can have computer instructions 904 to instruct a client device processor of a client device to create a subject profile for a subject suspected of having metabolic syndrome.

The portable data storage 903 can have a database 906 of metabolic factors for groups of patients using the blood glucose level 612, the respiratory quotient 614, the insulin sensitivity factor 616 and target blood glucose levels 618.

In embodiments, the portable data storage 903 can have a library of weight management protocols 908 and for subjects with the metabolic syndrome.

The portable data storage 903 can have computer instructions 910 to instruct the client device processor to compare

US 9,652,595 B1

29

the measured metabolic factors of the subject to the database of the metabolic factors for like groups of the patients and calculate if the measured metabolic factors meet, exceed, or fall below the blood glucose level, the respiratory quotient, the insulin sensitivity factor, and the target blood glucose level for the subject suspected of having the metabolic syndrome to confirm the subject has the metabolic syndrome.

The portable data storage **903** can have a diabetic treatment model **911** with bolus volume dosage amounts **912** and schedule templates **913** for a bolus introduction.

The schedule templates **913** for the bolus introduction can contain at least one unequal time period between at least one pair of bolus, and the schedule templates provide the at least one unequal time period with a quantity and a frequency of a plurality of bolus for a sequential intravenous introduction to the subject with a confirmed metabolic syndrome. Each bolus can contain a predetermined concentration of saline and insulin based on the diabetic treatment model **911**.

The portable data storage **903** can have computer instructions **914** to instruct the client device processor to create a care plan using one of the care plan templates for the subject and setting a plan goal **890** using the diabetic treatment model, the care plan indicating a customized schedule for bolus introduction with the at least one unequal time period and a quantity and a frequency of a plurality of bolus containing saline and insulin for sequential intravenous introduction to the subject and save in the subject profile.

The portable data storage **903** can include computer instructions **916** to instruct the client device processor to indicate a quantity of glucose for the subject with metabolic syndrome to stimulate a gastrointestinal hormone production resulting in a release of enzymes from a liver of the subject and causing blood glucose levels of the subject to be in a therapeutic range.

The portable data storage **903** can include computer instructions **918** to instruct the client device processor to compare blood glucose test results to a plurality of therapeutic ranges for blood glucose levels stored in the portable data storage and verify that the subject with the metabolic syndrome is in a therapeutic range of the plurality therapeutic ranges for blood glucose levels.

The portable data storage **903** can include computer instructions **920** to instruct the client device processor to compare the blood glucose test results to the diabetic treatment model and map the blood glucose test results and insulin sensitive factors of the subject with the metabolic syndrome to the measured weight of the subject using the diabetic treatment model to generate an individualized schedule for bolus introduction using the schedule templates.

In embodiments, the individualized schedule for the bolus introduction **922** can have the at least one unequal time period, wherein time periods vary from 2 minutes to 10 minutes, and wherein the unequal time periods are time intervals from 1 percent to 30 percent different in length of time from each other.

The portable data storage **903** can include computer instructions **924** to instruct the client device processor to compare the subject profile to the library of weight management protocols to identify a weight management protocol for the subject based upon measured metabolic factors of the subject and saving the weight management protocol in the care plan.

The portable data storage **903** can include computer instructions **926** to instruct the client device processor to change the weight management protocol and the care plan

30

after a first treatment session to manage weight of the subject using at least one of the plurality of metabolic enhancements to cause improved cellular ATP functioning for the subject while infusing the plurality of bolus and modifying a quantity and a duration of unequal time periods between bolus introduction in the generated individualized schedule for bolus introduction having at least one unequal time period between at least one pair of bolus to improve impaired hepatic glucose processing.

The portable data storage **903** can include computer instructions **930** to instruct the client device processor to compare the respiratory quotient of the subject in a resting state to a plurality of measured metabolic factors.

The portable data storage **903** can include computer instructions **932** to instruct the client device processor to modify a quantity of the plurality of bolus for the subject for each treatment session as identified in the care plan with the generated individualized schedule for bolus introduction having at least one unequal time period between bolus introduction to improve the respiratory quotient of the subject.

The portable data storage **903** can include computer instructions **934** to instruct the client device processor to modify the generated individualized schedule for bolus introduction having at least one unequal time period between bolus introduction by modifying a quantity and a duration of unequal time periods between the bolus introduction to improve the respiratory quotient of the subject.

The portable data storage **903** can include computer instructions **936** to instruct the client device processor to compare a measured cardiac function of the subject in a resting state to a plurality of preset norms of cardiac function in a library of cardiac functions.

The portable data storage **903** can include computer instructions **938** to instruct the client device processor to modify a quantity of the plurality of bolus for the subject identified in the care plan using the preset norms of cardiac function.

The portable data storage **903** can include computer instructions **940** to instruct the client device processor to modify the generated individualized schedule of bolus introduction having at least one unequal time period by modifying a quantity and a duration of at least one unequal time period between bolus introduction to improve cardiac function of the subject.

The portable data storage **903** can include computer instructions **942** to instruct the client device processor to measure a peripheral autonomic neuropathy and microcirculation of the subject prior to the bolus introduction and comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of peripheral autonomic neuropathies and microcirculations in a library of peripheral autonomic neuropathies and microcirculations.

The portable data storage **903** can include computer instructions **944** to instruct the client device processor to compare the measured peripheral autonomic neuropathy and microcirculation of the subject as bolus are sequentially introduced to the preset norms of peripheral autonomic neuropathy and microcirculation.

The portable data storage **903** can include computer instructions **946** to instruct the client device processor to compare the peripheral autonomic neuropathy and microcirculation of the subject after all bolus have been introduced in the first treatment session to the measured peripheral autonomic neuropathy and microcirculation.

US 9,652,595 B1

31

The portable data storage **903** can include computer instructions **948** to instruct the client device processor to modify the quantity of bolus for the subject identified in the care plan to diminish the subject's peripheral autonomic neuropathy and microcirculation.

The portable data storage **903** can include computer instructions **950** to instruct the client device processor to modify the schedule of the bolus introduction having at least one unequal time period by modifying a quantity and a duration of unequal time periods between bolus introduction to improve measured peripheral autonomic neuropathy and microcirculation of the subject.

The portable data storage **903** can include computer instructions **952** to instruct the client device to scan an initial retinal image of the subject to identify characteristics for a diabetic retinopathy.

The portable data storage **903** can include computer instructions **954** to instruct the client device processor to scan a post treatment retinal image of the subject after the first treatment session and compare the initial retinal image to the post treatment retinal image.

The portable data storage **903** can include computer instructions **956** to instruct the client device processor to modify a quantity of bolus for the subject if no change in the identified characteristics for diabetic retinopathy has occurred.

The portable data storage **903** can include computer instructions **960** to instruct the client device processor to modify the generated individualized schedule of bolus introduction having at least one unequal time period between bolus to reduce effects of diabetic retinopathy by modifying a quantity and a duration of unequal time periods between bolus introduction to reduce at least one effect of diabetic retinopathy.

The portable data storage **903** can include computer instructions **962** to instruct the client device processor to scan and calculate dimensionally wounds of the subject by length, width, and depth, and identify wound characteristics of the subject.

The portable data storage **903** can include computer instructions **964** to instruct the client device to scan and dimensionally measure wounds of the subject after at least one treatment session to identify skin integrity and changes in wound characteristics of the subject.

The portable data storage **903** can include computer instructions **966** to instruct the client device processor to modify a quantity of bolus for the subject identified in the care plan for wound treatment using the identified skin integrity and changes in wound characteristics of the subject.

The portable data storage **903** can include computer instructions **968** to instruct the client device to modify the schedule for bolus introduction having the at least one unequal time period between bolus to improve wound healing by modifying a quantity and a duration of unequal time periods between the bolus introduction to reduce wound size and wound characteristics of the subject.

The portable data storage **903** can include computer instructions **970** to instruct the client device processor to use a homeostatic model to identify an insulin sensitivity factor of a subject.

The portable data storage **903** can include computer instructions **972** to instruct the client device processor to modify the quantity of bolus for the subject for the insulin sensitivity factor.

The portable data storage **903** can include computer instructions **974** to instruct the client device to modify the

32

generated individualized schedule of bolus introduction having at least one unequal time period between bolus to increase the insulin sensitivity factor by modifying a quantity and a duration of unequal time periods between bolus introduction.

The portable data storage **903** can include computer instructions **976** to instruct the client device processor to determine a quantity and a frequency of dosage amounts of magnesium and introduce the dosage amounts of magnesium simultaneously to the subject with the plurality of bolus using the generated individualized schedule of bolus introduction having at least one unequal time period between one pair of bolus.

The portable data storage **903** can include computer instructions **978** to instruct the client device processor to determine a quantity and a frequency of dosage amounts of potassium and introduce the dosage amounts of potassium simultaneously to the subject with the plurality of bolus using the generated individualized schedule for bolus introduction having at least one unequal time period between one pair of bolus.

The portable data storage **903** can include computer instructions **980** to instruct the client device processor to determine a quantity and a frequency of dosage amounts of somatostatin and introduce the dosage amounts of somatostatin simultaneously to the subject with the plurality of bolus using the generated individualized schedule of bolus introduction having at least one unequal time period between one pair of bolus.

The portable data storage **903** can include computer instructions **982** to instruct the client device processor to determine a quantity and a frequency of dosage amounts of glucagon and introduce the dosage amounts of glucagon simultaneously to the subject with the plurality of bolus using the generated individualized schedule of bolus introduction having at least one unequal time period between one pair of bolus.

The portable data storage **903** can include computer instructions **984** to instruct the client device processor to schedule diagnostic tests after the first treatment session to modify the care plan for improved cellular ATP functioning of the subject and improved hepatic glucose processing.

The portable data storage **903** can include the library of cardiac functions **986**, which can include the preset norms of cardiac function **988**.

The portable data storage **903** can include the library of peripheral autonomic neuropathies and microcirculations **990**, which can include the preset norms of peripheral autonomic neuropathies and microcirculations **992**.

While these embodiments have been described with emphasis on the embodiments, it should be understood that within the scope of the appended claims, the embodiments might be practiced other than as specifically described herein.

What is claimed is:

1. A kit for individualized intravenous exogenous insulin-based therapy to improve cellular ATP function comprising:
   a. a blood glucose meter for measuring metabolic factors of a subject forming measured metabolic factors;
   b. an intravenous catheter to deliver a plurality of insulin bolus volume dosage amounts sequentially using an individualized schedule with at least one unequal time period between at least one pair of insulin bolus volume dosage amounts;

APPX0233

US 9,652,595 B1

33

c. an administrative processor configured to create a subject profile comprising:

(i) a subject name;

(ii) an indication that the subject is suspected of having metabolic syndrome; and

(iii) measured metabolic factors comprising: a blood glucose level, a respiratory quotient, an insulin sensitivity factor, individual target glucose level, and a weight;

(iv) a portable data storage configured to instruct the administrative processor to compare the measured metabolic factors for groups of patients to a database of metabolic factors using the blood glucose level, the respiratory quotient, the insulin sensitivity factor and the target glucose level and calculate if the measured metabolic factors meet, exceed, or fall below the blood glucose level, the respiratory quotient, the insulin sensitivity factor, and the target blood glucose level for the subject suspected of having the metabolic syndrome to confirm the subject has the metabolic syndrome;

(v) a library of weight management protocols in the portable data storage for subjects with the metabolic syndrome to compare and identify a weight management protocol for each subject based upon measured metabolic factors of each subject and saving the weight management protocol into a care plan for each subject;

d. a diabetic treatment model;

e. a Library of Care Plan templates configured to produce a populated care plan for each subject profile and setting a plan goal using the diabetic treatment model and the care plan generating a customized schedule for each insulin bolus volume dosage amount and an amount of glucose to be consumed by a subject;

f. a glucose dosage amount to stimulate a gastrointestinal hormone production in the subject resulting in a release of enzymes from a liver and causing blood glucose levels of the subject to be in a therapeutic range;

g. the administrative processor configured to:

(i) compare the blood glucose test results to the plurality of therapeutic ranges for blood glucose levels stored in the portable data storage and verify that the subject with the metabolic syndrome is in a therapeutic range of the plurality therapeutic ranges for blood glucose levels; and

(ii) compare the measured metabolic factors to the blood glucose test results to the diabetic treatment model and map the blood glucose test results and insulin sensitivity factors to measured weight of the subject to generate an individualized schedule for the insulin bolus volume dosage amounts introduction; and

wherein the portable data storage is configured to instruct the administrative processor to change a weight management protocol and a care plan after a first treatment session to manage weight of the subject using at least one of a plurality of metabolic enhancements to cause improved cellular ATP functioning for the subject while infusing the plurality of insulin bolus volume dosage amounts and modifying a quantity and a duration of unequal time periods between the insulin bolus volume dosage amounts in the generated individualized schedule to improve impaired hepatic glucose processing.

2. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, wherein the subject profile further comprises

34

a. a subject history;

b. subject physical reports including a subject preexisting weight; and

c. subject contact information.

3. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, wherein the generated individualized schedule for the bolus introduction has the at least one unequal time period, wherein time periods vary from 2 minutes to 10 minutes, and wherein the unequal time periods are time intervals from 1 percent to 30 percent different in length of time from each other.

4. The kit for individualized intravenous exogenous insulin-based therapy of claim 1, comprising a glucose source.

5. The kit for individualized intravenous exogenous insulin-based therapy of claim 4, wherein the glucose source comprises from 60 grams of glucose to 100 grams of glucose.

6. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, further comprising:

a. computer instructions in the portable data storage for instructing the client device processor to compare the respiratory quotient of the subject in a resting state to a plurality of measured metabolic factors;

b. computer instructions in the portable data storage for instructing the client device processor to modify a quantity of the plurality of bolus for the subject for each treatment session as identified in the care plan with the generated individualized schedule for the bolus introduction having the at least one unequal time period between the bolus introduction to improve the respiratory quotient of the subject; and

c. computer instructions in the portable data storage for instructing the client device processor to modify the generated individualized schedule for the bolus introduction having the at least one unequal time period between the bolus introduction by modifying the quantity and the duration of the at least one unequal time period between the bolus introduction to improve the respiratory quotient of the subject.

7. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, further comprising:

a. computer instructions in the portable data storage to instruct the client device processor to compare a measured cardiac function of the subject in a resting state to a plurality of preset norms of cardiac function in a library of cardiac functions;

b. computer instructions in the portable data storage to instruct the client device processor to modify a quantity of the plurality of bolus for the subject identified in the care plan using the preset norms of cardiac function; and

c. computer instructions in the portable data storage to instruct the client device processor to modify the generated individualized schedule of the bolus introduction having at least one unequal time period by modifying a quantity and a duration of the at least one unequal time period between bolus introduction to improve cardiac function of the subject.

8. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, further comprising:

a. computer instructions in the portable data storage to instruct the client device processor to measure a peripheral autonomic neuropathy and microcirculation of the subject prior to the bolus introduction and comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of

APPX0234

US 9,652,595 B1

35

peripheral autonomic neuropathies and microcirculations in a library of peripheral autonomic neuropathies and microcirculations;

b. computer instructions in the portable data storage to instruct the client device processor to compare the measured peripheral autonomic neuropathy and microcirculation of the subject as bolus are sequentially introduced to the preset norms of peripheral autonomic neuropathy and microcirculation;

c. computer instructions in the portable data storage to instruct the client device processor to compare the peripheral autonomic neuropathy and microcirculation of the subject after all bolus have been introduced in the first treatment session to the measured peripheral autonomic neuropathy and microcirculation;

d. computer instructions in the portable data storage to instruct the client device processor to modify the quantity of bolus for the subject identified in the care plan to diminish the subject's peripheral autonomic neuropathy and microcirculation; and

e. computer instructions in the portable data storage to instruct the client device processor to modify the schedule of the bolus introduction having the at least one unequal time period by modifying a quantity and a duration of the at least one unequal time period between bolus introduction to improve measured peripheral autonomic neuropathy and microcirculation of the subject.

**9.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, further comprising:

a. computer instructions in the portable data storage to instruct the client device to scan an initial retinal image of the subject to identify characteristics for a diabetic retinopathy;

b. computer instructions in the portable data storage to instruct the client device processor to scan a post treatment retinal image of the subject after the first treatment session and compare the initial retinal image to the post treatment retinal image;

c. computer instructions in the portable data storage to instruct the client device processor to modify a quantity of bolus for the subject if no change in the identified characteristics for diabetic retinopathy has occurred; and

d. computer instructions in the portable data storage to instruct the client device processor to modify the generated individualized schedule of the bolus introduction having the at least one unequal time period between bolus to reduce effects of diabetic retinopathy by modifying a quantity and a duration of the at least one unequal time period between the bolus introduction to reduce at least one effect of diabetic retinopathy.

**10.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, further comprising:

a. computer instructions in the portable data storage to instruct the client device processor to scan and calculate dimensionally wounds of the subject by length, width, and depth, and identify wound characteristics of the subject;

b. computer instructions in the portable data storage to instruct the client device processor to scan and dimensionally measure wounds of the subject after at least one treatment session to identify skin integrity and changes in wound characteristics of the subject;

c. computer instructions in the portable data storage to instruct the client device processor to modify a quantity of bolus for the subject identified in the care plan for

36

wound treatment using the identified skin integrity and changes in wound characteristics of the subject; and

d. computer instructions in the portable data storage to instruct the client device to modify the schedule for bolus introduction having the at least one unequal time period between bolus to improve wound healing by modifying a quantity and a duration of the at least one unequal time period between the bolus introduction to reduce wound size and wound characteristics of the subject.

**11.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, further comprising:

a. computer instructions in the portable data storage to instruct the client device processor to use a homeostatic model to identify an insulin sensitivity factor of a subject;

b. computer instructions in the portable data storage to instruct the client device processor to modify the quantity of bolus for the subject for the insulin sensitivity factor; and

c. computer instructions in the portable data storage to instruct the client device to modify the generated individualized schedule of bolus introduction having the at least one unequal time period between bolus to increase the insulin sensitivity factor by modifying a quantity and a duration of the at least one unequal time period between bolus introduction.

**12.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, wherein the at least one of the plurality of metabolic enhancements is a methylcobalamin, a pyridoxal-5-phosphate, a 5-MTHF, an alpha lipoic acid, a NADH, a coenzyme Q10, a chromium picolinate, and a N-Acetyl cysteine, and a vitamin D3.

**13.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, comprising a quantity of dosage amounts of magnesium and computer instructions in the portable data storage to instruct the client device processor to determine a quantity and a frequency of dosage amounts of magnesium and introduce the dosage amounts of magnesium simultaneously to the subject with the plurality of bolus using the generated individualized schedule of the bolus introduction having at least one unequal time period between one pair of bolus.

**14.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, comprising a quantity of dosage amounts of potassium and computer instructions in the portable data storage to instruct the client device processor to determine a quantity and a frequency of dosage amounts of potassium and introduce the dosage amounts of potassium simultaneously to the subject with the plurality of bolus using the generated individualized schedule for the bolus introduction having at least one unequal time period between one pair of bolus.

**15.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, comprising a quantity of dosage amounts of somatostatin and computer instructions in the portable data storage to instruct the client device processor to determine a quantity and a frequency of dosage amounts of somatostatin and introduce the dosage amounts of somatostatin simultaneously to the subject with the plurality of bolus using the generated individualized schedule of the bolus introduction having at least one unequal time period between one pair of bolus.

**16.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, comprising a quantity of dosage amounts of glucagon and computer instructions in the portable data storage to instruct the client device pro-

APPX0235

US 9,652,595 B1

37

cessor to determine a quantity and a frequency of dosage amounts of glucagon and introduce the dosage amounts of glucagon simultaneously to the subject with the plurality of bolus using the generated individualized schedule of the bolus introduction having at least one unequal time period between one pair of bolus.

17. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, comprising computer instructions in the portable data storage to instruct the client device processor to schedule diagnostic tests after the first treatment session to modify the care plan for improved cellular ATP functioning of the subject and improved hepatic glucose processing.

18. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, wherein the at least one of the plurality of metabolic enhancements comprises a synergistic combination of: Vitamin D ranging in amounts from 600 IU to 2000 IU, Vitamin B6 ranging in amounts from 10 mg to 100 mg, Folic Acid ranging in amounts from 200 mcg to 2000 mcg, Vitamin B12 ranging in amounts from 1000 mcg to 5000 mcg, a coenzyme that extracts energy from food for the subject ranging in amounts from 60 mg to 400

38

mg, a protein binding component that binds to proteins and serves as a metabolic enhancement for the subject ranging in amounts from 0.5 mg to 5 mg, and a glucose utilization component to prevent or treat chromium deficiency in the subject which improves glucose utilization by insulin ranging in amounts from 200 mg to 300 mg.

19. The kit for the individualized intravenous exogenous insulin-based therapy of claim 18, wherein the at least one of the plurality of metabolic enhancements comprises an amino acid that builds proteins in the subject ranging in amounts from 200 mg to 600 mg, and an antioxidant that extracts energy from food for the subject ranging in amounts from 50 mg to 400 mg.

20. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, wherein the at least one of the plurality of metabolic enhancements comprises: cholecalciferol, pyridoxal-5-phosphate, folacin, cyanocobalamin, n-acetyl L-cysteine (NAC), Coenzyme Q10 (CoQ10), an alpha lipoic acid, nicotinamide adenine dinucleotide (NADH), chromium picolinate, or combinations thereof.

* * * * *

# Exhibit B

APPX0237



US010533990B2

(12) **United States Patent**　　　　　(10) **Patent No.:**　　**US 10,533,990 B2**
Carr et al.　　　　　　　　　　　　　　(45) **Date of Patent:**　　*Jan. 14, 2020

(54) **PHYSIOLOGIC INSULIN-SENSITIVITY IMPROVEMENT**

(71) Applicant: **DIABETES RELIEF LLC**, Houston, TX (US)

(72) Inventors: **Hunter Michael Alan Carr**, Houston, TX (US); **Scott Hepford**, Houston, TX (US); **Carol Ann Wilson**, Houston, TX (US); **Stanley Tories Lewis, Jr.**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/710,537**

(22) Filed: **Sep. 20, 2017**

(65) **Prior Publication Data**

US 2019/0086394 A1　　Mar. 21, 2019

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/042,087, filed on Feb. 11, 2016.

(60) Provisional application No. 62/117,393, filed on Feb. 17, 2015.

(51) **Int. Cl.**
| | |
|---|---|
| *G01N 33/50* | (2006.01) |
| *G01N 33/487* | (2006.01) |
| *G06F 19/00* | (2018.01) |
| *G16H 20/17* | (2018.01) |
| *G01N 33/60* | (2006.01) |
| *G16H 30/40* | (2018.01) |
| *G16H 50/50* | (2018.01) |

(52) **U.S. Cl.**
CPC ... *G01N 33/5091* (2013.01); *G01N 33/48792* (2013.01); *G01N 33/5038* (2013.01); *G01N 33/60* (2013.01); *G06F 19/30* (2013.01); *G16H 20/17* (2018.01); *G16H 30/40* (2018.01); *G16H 50/50* (2018.01); *G01N 2800/042* (2013.01); *G01N 2800/70* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2014/0005633 A1　　1/2014　Finan

*Primary Examiner* — G Steven Vanni
(74) *Attorney, Agent, or Firm* — Rao Deboer Osterrieder, PLLC; Erik J. Osterrieder

(57) **ABSTRACT**

An individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing. The therapy includes treatment sessions involving the assessment of metabolic factors, forming a subject profile, and matching the subject profile to a diabetic treatment model. Using the diabetic treatment model, a quantity and frequency of intravenous insulin bolus, dosage amounts of magnesium, and dosage amounts of potassium can be calculated. The methods that improve impaired hepatic glucose processing in subjects and patients can simultaneously introduce separated insulin bolus from an insulin reservoir, dosage amounts of magnesium, and dosage amounts of potassium. The subject profile can create a weight management protocol that uses a metabolic enhancement, wherein the individualized intravenous exogenous insulin-based therapy produces a subject or a patient with improved cellular ATP functioning.

**20 Claims, 13 Drawing Sheets**

**U.S. Patent**     Jan. 14, 2020     Sheet 1 of 13     US 10,533,990 B2

## FIGURE 1A

DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

| WEIGHT (kg) | POTASSIUM TO SALINE DOSAGE (meq/ml) | MAGNESIUM TO SALINE DOSAGE (mg/ml) | INSULIN TO SALINE DOSAGE (UNITS/ml) | INSULIN RESERVOIR VOLUME (ml) | INSULIN BOLUS DOSAGE MIN (mU) | INSULIN BOLUS DOSAGE MAX (mU) | INSULIN BOLUS DOSAGE VOLUME MIN (ml) | INSULIN BOLUS DOSAGE VOLUME MAX (ml) | UNEDIAL TIME PERIODS BETWEEN BOLUS INTRODUCTION (MIN/SEC) | QUANTITY OF BOLUS PER TREATMENT CYCLE (#) |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 - 45 | 0.01 | 1 | 9 | 10 | 400 | 450 | 0.04 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 46 - 50 | 0.01 | 1 | 10 | 10 | 460 | 500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 51 - 55 | 0.01 | 1 | 11 | 10 | 510 | 550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 56 - 60 | 0.01 | 1 | 12 | 10 | 560 | 600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 61 - 65 | 0.01 | 1 | 13 | 10 | 610 | 650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 66 - 70 | 0.01 | 1 | 14 | 10 | 660 | 700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 71 - 75 | 0.01 | 1 | 15 | 10 | 710 | 750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 76 - 80 | 0.01 | 1 | 16 | 10 | 760 | 800 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 81 - 85 | 0.01 | 1 | 17 | 10 | 810 | 850 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 86 - 90 | 0.01 | 1 | 18 | 10 | 860 | 900 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 91 - 95 | 0.01 | 1 | 19 | 10 | 910 | 950 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 96 - 100 | 0.01 | 1 | 20 | 10 | 960 | 1000 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 101 - 105 | 0.02 | 2 | 21 | 10 | 1010 | 1050 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 106 - 110 | 0.02 | 2 | 22 | 10 | 1060 | 1100 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 111 - 115 | 0.02 | 2 | 23 | 10 | 1110 | 1150 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 116 - 120 | 0.02 | 2 | 24 | 10 | 1160 | 1200 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 121 - 125 | 0.02 | 2 | 25 | 10 | 1210 | 1250 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 126 - 130 | 0.02 | 2 | 26 | 10 | 1260 | 1300 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 131 - 135 | 0.02 | 2 | 27 | 10 | 1310 | 1350 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 136 - 140 | 0.02 | 2 | 28 | 10 | 1360 | 1400 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 141 - 145 | 0.02 | 2 | 29 | 10 | 1410 | 1450 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 146 - 150 | 0.02 | 2 | 30 | 10 | 1460 | 1500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 151 - 155 | 0.02 | 2 | 31 | 10 | 1510 | 1550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 156 - 160 | 0.02 | 2 | 32 | 10 | 1560 | 1600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |

**U.S. Patent**   Jan. 14, 2020   Sheet 2 of 13   US 10,533,990 B2

## FIGURE 1B

### DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

| WEIGHT (kg) | POTASSIUM TO SALINE DOSAGE (meq/ml) | MAGNESIUM TO SALINE DOSAGE (mg/ml) | INSULIN TO SALINE DOSAGE (UNITS/ml) | INSULIN RESERVOIR VOLUME (ml) | INSULIN BOLUS DOSAGE MIN (mU) | INSULIN BOLUS DOSAGE MAX (mU) | INSULIN BOLUS DOSAGE VOLUME MIN (ml) | INSULIN BOLUS DOSAGE VOLUME MAX (ml) | UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION (MIN-SEC) | QUANTITY OF BOLUS PER TREATMENT CYCLE (#) |
|---|---|---|---|---|---|---|---|---|---|---|
| 161 - 165 | 0.02 | 2 | 33 | 10 | 1610 | 1650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 166 - 170 | 0.02 | 2 | 34 | 10 | 1660 | 1700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 171 - 175 | 0.02 | 2 | 35 | 10 | 1710 | 1750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 176 - 180 | 0.02 | 2 | 36 | 10 | 1760 | 1800 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 181 - 185 | 0.02 | 2 | 37 | 10 | 1810 | 1850 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 186 - 190 | 0.02 | 2 | 38 | 10 | 1860 | 1900 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 191 - 195 | 0.02 | 2 | 39 | 10 | 1910 | 1950 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 196 - 200 | 0.02 | 2 | 40 | 10 | 1960 | 2000 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 201 - 205 | 0.03 | 3 | 41 | 10 | 2010 | 2050 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 206 - 210 | 0.03 | 3 | 42 | 10 | 2060 | 2100 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 211 - 215 | 0.03 | 3 | 43 | 10 | 2110 | 2150 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 216 - 220 | 0.03 | 3 | 44 | 10 | 2160 | 2200 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 221 - 225 | 0.03 | 3 | 45 | 10 | 2210 | 2250 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 226 - 230 | 0.03 | 3 | 46 | 10 | 2260 | 2300 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 231 - 235 | 0.03 | 3 | 47 | 10 | 2310 | 2350 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 236 - 240 | 0.03 | 3 | 48 | 10 | 2360 | 2400 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 241 - 245 | 0.03 | 3 | 49 | 10 | 2410 | 2450 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 246 - 250 | 0.03 | 3 | 50 | 10 | 2460 | 2500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 251 - 255 | 0.03 | 3 | 51 | 10 | 2510 | 2550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 256 - 260 | 0.03 | 3 | 52 | 10 | 2560 | 2600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 261 - 265 | 0.03 | 3 | 53 | 10 | 2610 | 2650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 266 - 270 | 0.03 | 3 | 54 | 10 | 2660 | 2700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 271 - 275 | 0.03 | 3 | 55 | 10 | 2710 | 2750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |

FIGURE 2

## GLUCOSE DOSAGE ADJUSTMENT PROTOCOL

| BLOOD GLUCOSE LEVEL (mg/dl) | GLUCOSE (gm) |
|---|---|
| >100 - 100 | 50 - 60 |
| 101 - 125 | 44 - 55 |
| 126 - 150 | 40 - 50 |
| 151 - 175 | 35 - 45 |
| 176 - 200 | 30 - 40 |
| 201 - 225 | 25 - 35 |
| 226 - 250 | 20 - 30 |
| 251 - 275 | 15 - 25 |
| 276 - 300 | 10 - 20 |
| 301 - 325 | 5 - 15 |
| 326 - 350 | .01 - 10 |
| 351 - 375 | .01 - 5 |
| 376 - 400 | .01 - 5 |
| 401 - 425 | .01 - 5 |
| 426 - 450 | .01 - 5 |
| 451 - 475 | .01 - 5 |
| 476 - 500 | .01 - 5 |
| 501 - 525 | .01 - 5 |
| 526 - 550 | .01 - 5 |

FIGURE 3

## METABOLIC ENHANCEMENT PROTOCOL

| Respiratory Quotient ($CO_2/O_2$) | Dosage |
|---|---|
| 1.20 < | C: 3 DAILY |
| 1.19 - 1.00 | A: 1 DAILY |
| 0.99 - 0.90 | A: 1 DAILY |
| 0.89 - 0.80 | B: 2 DAILY |
| 0.79 - 0.70 | B: 2 DAILY |
| .69 < | B: 2 DAILY |

\* METABOLIC ENHANCEMENT CONTENTS:

| Ingredient | Min Amount Per Dosage | Max Amount Per Dosage |
|---|---|---|
| VITAMIN D (AS CHOLECALCIFEROL) | 600 IU | 2,000 IU |
| VITAMIN B6 (AS PYRIDOXAL-5-PHOSPHATE) | 10 mg | 100 mg |
| FOLATE (FOLIC ACID) | 200 mcg | 2000 mcg |
| VITAMIN B12 (AS CYANOCOBALAMIN) | 1,000 mcg | 5,000 mcg |
| N-ACETYL L-CYSTEINE (NAC) | 200 mg | 600 mg |
| COENZYME Q10 (CoQ10) | 60 mg | 400 mg |
| ALPHA LIPOIC ACID (ALA) | 50 mg | 400 mg |
| NICOTINAMIDE ADENINE DINUCLEOTIDE (NADH) | .5 mg | 5 mg |
| CHROMIUM PICOLINATE | 200 mcg | 300 mcg |

FIGURE 4

APPX0243

## FIGURE 5A

| | |
|---|---|
| CREATING A SUBJECT PROFILE FOR A SUBJECT | 500 |
| ASSESSING METABOLIC FACTORS OF THE SUBJECT AND STORING THE METABOLIC FACTORS IN THE SUBJECT PROFILE | 502 |
| CREATING A CARE PLAN WITH A PLURALITY OF TREATMENT SESSIONS FOR THE SUBJECT WITH A PLAN GOAL | 504 |
| INTRODUCING GLUCOSE TO THE SUBJECT TO STIMULATE GASTROINTESTINAL HORMONE PRODUCTION, RESULTING IN THE RELEASE OF ENZYMES FROM THE SUBJECT'S LIVER AND CAUSING THE BLOOD GLUCOSE LEVELS OF THE SUBJECT TO BE IN A THERAPEUTIC RANGE | 506 |
| TESTING THE SUBJECT FOR BLOOD GLUCOSE LEVELS TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO THE PLURALITY OF THERAPEUTIC RANGES AND VERIFY THE SUBJECT IS IN THE THERAPEUTIC RANGE | 508 |
| COMPARING TESTED BLOOD GLUCOSE LEVELS TO A DIABETIC TREATMENT MODEL | 510 |
| MAPPING TESTED BLOOD GLUCOSE LEVELS AND INSULIN SENSITIVE FACTORS OF A SUBJECT TO THE SUBJECT'S WEIGHT USING THE DIABETIC TREATMENT MODEL TO DETERMINE A SCHEDULE FOR BOLUS INTRODUCTION, WHEREIN THE SCHEDULE FOR BOLUS INTRODUCTION HAS AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS | 512 |
| INTRODUCING TO THE SUBJECT A PLURALITY OF BOLUS OF INSULIN AND SALINE SEQUENTIALLY USING THE SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS | 513 |
| COMPARING THE SUBJECT PROFILE TO A PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL FOR THE SUBJECT BASED UPON ASSESSED METABOLIC FUNCTIONS OF THE SUBJECT AND SAVING THE WEIGHT MANAGEMENT PROTOCOL IN THE CARE PLAN | 514 |
| IMPLEMENTING THE IDENTIFIED WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN AFTER A FIRST TREATMENT SESSION TO MANAGE WEIGHT OF THE SUBJECT WITH A METABOLIC ENHANCEMENT CAUSING IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT WHILE INFUSING INSULIN AND MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION IN THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS TO IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING | 516 |
| COMPARING A RESPIRATORY QUOTIENT OF THE SUBJECT IN A RESTING STATE TO A PLURALITY OF METABOLISM SCORES | 518 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT FOR EACH TREATMENT SESSION AS IDENTIFIED IN THE CARE PLAN WITH SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE A SUBJECT'S RESPIRATORY QUOTIENT | 520 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE THE RESPIRATORY QUOTIENT | 522 |

(5B)

## FIGURE 5B

(5A)

| | |
|---|---|
| COMPARING A MEASURED CARDIAC FUNCTION OF THE SUBJECT IN A RESTING STATE TO A PRESET NORM OF CARDIAC FUNCTION | 524 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN USING THE PRESET NORM OF CARDIAC FUNCTION | 526 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE CARDIAC FUNCTION | 528 |
| MEASURING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE PRIOR TO BOLUS INTRODUCTION AND COMPARING THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION TO A PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS | 530 |
| COMPARING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE AS BOLUS ARE SEQUENTIALLY INTRODUCED TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 532 |
| COMPARING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE AFTER ALL BOLUS HAVE BEEN INTRODUCED IN A FIRST TREATMENT SESSION TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 534 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN TO TREAT PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 536 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 538 |
| VIEWING AN INITIAL RETINAL IMAGE OF THE SUBJECT CAPTURED BY A NON-MYDRIATIC CAMERA WITH THE SUBJECT IN A RESTING STATE TO IDENTIFY A DIABETIC RETINOPATHY | 540 |
| VIEWING A POST TREATMENT RETINAL IMAGE OF THE SUBJECT IN A RESTING STATE AFTER A FIRST TREATMENT SESSION | 541 |
| COMPARING THE INITIAL RETINAL IMAGE TO THE POST TREATMENT RETINAL IMAGE | 542 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IF NO CHANGE IN THE DIABETIC RETINOPATHY HAS OCCURRED | 544 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO REDUCE THE EFFECTS OF DIABETIC RETINOPATHY BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE THE EFFECTS OF DIABETIC RETINOPATHY | 546 |
| DIMENSIONALLY MEASURING WOUNDS BY LENGTH, WIDTH, AND DEPTH AND IDENTIFYING WOUND CHARACTERISTICS WITH THE SUBJECT IN A RESTING STATE | 550 |
| DIMENSIONALLY MEASURING WOUNDS AFTER AT LEAST ONE TREATMENT SESSION TO IDENTIFY SKIN INTEGRITY AND CHANGES IN CLINICAL WOUND CHARACTERISTICS | 552 |

(5C)

(5B)

| | |
|---|---|
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN FOR WOUND TREATMENT USING THE IDENTIFIED SKIN INTEGRITY AND CHANGES IN CLINICAL WOUND CHARACTERISTICS | 554 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE WOUND HEALING BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE WOUND SIZE AND WOUND CHARACTERISTICS | 556 |
| COMPARING C-PEPTIDES OF THE SUBJECT TO A PRESET NORM OF C-PEPTIDES TO IDENTIFY AN INSULIN SENSITIVITY FACTOR | 560 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT FOR THE INSULIN SENSITIVITY FACTOR | 562 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE AN INSULIN SENSITIVITY FACTOR USING ANALYSIS OF C-PEPTIDES BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION | 564 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF MAGNESIUM AND INTRODUCING THE DOSAGE AMOUNTS OF MAGNESIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 570 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF POTASSIUM AND INTRODUCING THE DOSAGE AMOUNTS OF POTASSIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 572 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF SOMATOSTATIN AND INTRODUCING THE DOSAGE AMOUNTS OF SOMATOSTATIN SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 574 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF GLUCAGON AND INTRODUCING THE DOSAGE AMOUNTS OF GLUCAGON SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 576 |
| SCHEDULING DIAGNOSTIC TESTS AFTER A FIRST TREATMENT SESSION TO MODIFY THE CARE PLAN FOR IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT AND IMPROVED HEPATIC GLUCOSE PROCESSING | 578 |

*FIGURE 5C*

APPX0246



FIGURE 6

## FIGURE 7A



| ADMINISTRATIVE DATA STORAGE | 604 |
| SUBJECT PROFILE | 610 |
| METABOLIC FACTORS | 605 |
| BLOOD GLUCOSE LEVEL | 612 |
| RESPIRATORY QUOTIENT | 614 |
| INSULIN SENSITIVITY FACTOR | 616 |
| INDIVIDUAL TARGET BLOOD GLUCOSE LEVEL | 618 |
| PLURALITY OF CARE PLAN TEMPLATES | 620 |

COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO CREATE A CUSTOMIZED CARE PLAN FROM ONE OF THE PLURALITY OF CARE PLAN TEMPLATES, WHEREIN THE CUSTOMIZED CARE PLAN INDICATES A PLURALITY OF TREATMENT SESSIONS FOR THE SUBJECT WITH THE SUBJECT PROFILE AND A PLAN GOAL, EACH CUSTOMIZED CARE PLAN INDICATING A SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION, EACH BOLUS CONTAINING SALINE AND INSULIN AND EACH BOLUS INTRODUCED INTRAVENOUSLY AND SEQUENTIALLY TO A SUBJECT — 200

COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO A DIABETIC TREATMENT MODEL AFTER INTRODUCING GLUCOSE TO A SUBJECT TO STIMULATE GASTROINTESTINAL HORMONE PRODUCTION, RESULTING IN THE RELEASE OF ENZYMES FROM THE SUBJECT'S LIVER AND CAUSING THE BLOOD GLUCOSE LEVELS OF THE SUBJECT TO BE IN A THERAPEUTIC RANGE — 202

PLURALITY OF THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS — 203

APPX0247

| | |
|---|---|
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO THE PLURALITY OF THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS AND VERIFY THE SUBJECT IS IN THE THERAPEUTIC RANGE | 604 204 |
| PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS | 205 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE A SUBJECT PROFILE TO THE PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL BASED UPON METABOLIC FUNCTIONS OF THE SUBJECT | 206 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO SAVE THE IDENTIFIED WEIGHT MANAGEMENT PROTOCOL IN THE GENERATED CUSTOMIZED CARE PLAN AFTER SALINE WITH INSULIN IN A PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD HAVE BEEN ADMINISTERED TO A SUBJECT | 207 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO TRACK WEIGHT MANAGEMENT OF THE SUBJECT AFTER A FIRST TREATMENT SESSION AND USE OF AN IDENTIFIED WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN ALONG WITH A METABOLIC ENHANCEMENT TO IDENTIFY IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT AND IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING | 208 |
| PLURALITY OF METABOLISM SCORES | 209 |
| PLURALITY OF PRESET NORMS OF CARDIAC FUNCTION | 210 |
| PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS | 211 |
| RETINAL IMAGE OF THE SUBJECT | 212 |
| WOUND CHARACTERISTICS | 214 |
| PLURALITY OF PRESET NORMS OF C-PEPTIDES | 215 |

*FIGURE 7B*

APPX0248



FIGURE 8A



FIGURE 8B



FIGURE 8C

US 10,533,990 B2

**1**

## PHYSIOLOGIC INSULIN-SENSITIVITY IMPROVEMENT

### CROSS REFERENCE TO RELATED APPLICATION

The current application is a Continuation In Part of co-pending U.S. patent application Ser. No. 15/042,087 filed Feb. 11, 2016 and claims priority to and the benefit of expired U.S. Provisional Patent Application Ser. No. 62/117,393 filed on Feb. 17, 2015, entitled "METHODS THAT IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS". This reference is incorporated herein in its entirety.

### FIELD

The present embodiments generally relate to improved methods and systems that improve impaired hepatic glucose processing in subjects.

### BACKGROUND

Diabetes Mellitus is a disease or disorder of the body's metabolic functions, characterized by abnormally high levels of blood glucose and inadequate levels of insulin. In 2012, 29.1 million Americans, or 9.3 percent of the population had diabetes, up from 25.8 million, or 8.3 percent, in 2010. New cases diagnosed in 2012 were 1.7 million, and in 2010 it was 1.9 million. Diabetes Mellitus Type 1, formerly known as juvenile diabetes, is usually diagnosed in children and young adults, and only 5 percent of people with diabetes have this form of the disease.

In Type 1 diabetes, the body does not produce insulin, a hormone necessary to convert sugar, starches, and other food into energy needed for daily life. Diabetes Mellitus Type 2 is far more common, and affects 90-95 percent of all diabetics in the United States of America. In Type 2 diabetes, the body does not use insulin properly, which is called insulin resistance. At first, the pancreas makes extra insulin to make up for it, but, over time the pancreas is not able to keep up and can't make enough insulin to keep blood glucose at normal levels. The long-term adverse effects include blindness, loss of kidney function, nerve damage, loss of sensation, and poor circulation in the periphery, and amputation of the extremities. As of Mar. 6, 2013, the total cost of diagnosed diabetes in the United States in 2012 was $245 billion dollars.

In the treatment of Diabetes Mellitus, many varieties of insulin formulations have been suggested and used, such as regular insulin, isophane insulin (designated NPH®), insulin zinc suspensions (such as SEMILENTE®, LENTE®, and ULTRALENTE®), and biphasic isophane insulin. As diabetic patients are treated with insulin for several decades, there is a major need for safe and life quality improving insulin formulations. Some of the commercially available insulin formulations are characterized by a fast onset of action and other formulations have a relatively slow onset but show a more or less prolonged action. Fast-acting insulin formulations are usually solutions of insulin, while retarded acting insulin formulations can have suspensions containing insulin in crystalline and/or amorphous form precipitated by addition of zinc salts alone, by addition of protamine, or by a combination of both.

In addition, some patients are using formulations having both a fast onset of action and a more prolonged action. Such a formulation can be an insulin solution, wherein protamine

**2**

insulin crystals are suspended. Some patients do prepare the final formulation themselves by mixing a fast acting insulin solution with a protracted acting insulin suspension formulation in the ratio desired by the patient in question.

Glucose control is typically measured by a blood test, which determines the level of hemoglobin A1c, which has been the desired result of insulin therapy in diabetic patients for many years. However, it is clear that tight circulating glucose control was insufficient in 25 percent or more of the study participants to protect them from the onset or progression of diabetic retinopathy, nephropathy, or neuropathy. One method of glucose control is Pulsed Insulin Therapy.

The core concept of Pulsed Insulin Therapy has been known for at least 20 years, by various names including Pulsatile Intravenous Insulin Therapy (PIVIT), Chronic Intermittent Intravenous Insulin Therapy (CIIIT), Metabolic Activation Therapy (MAT), and Hepatic Activation. In such therapies a patient's blood glucose is raised and lowered by about 50 mg/dL to 75 mg/dL over a period of several hours by alternating between doses of insulin and sugars or high carbohydrates foods. Although the mechanisms of action have not been clearly explained, it is apparent from the clinical results that the technique has usefulness in treating diabetic implications, including blindness and other ocular manifestations, nerve disease, cardiovascular disease, diabetic nephropathy, and poor wound healing.

Given the long history of these procedures, one would have expected that the treatment parameters would have been optimized long ago to produce the most favorable results. It turns out, however, that the known treatment parameters are insufficient in that regard.

A need exists for methods and systems that improve impaired hepatic glucose processing in subjects and produce superior results to those previously obtainable.

The present embodiments meet these needs.

### BRIEF DESCRIPTION OF THE FIGURES

The detailed description will be better understood in conjunction with the accompanying drawings as follows:

FIG. 1A shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 40 kilograms to 160 kilograms.

FIG. 1B shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 161 kilograms to 275 kilograms.

FIG. 2 shows a bolus volume dosage adjustment protocol based on tested blood glucose levels as produced by a diabetic treatment model.

FIG. 3 depicts glucose dosage adjustment protocol as produced by a diabetic treatment model.

FIG. 4 depicts a metabolic enhancement protocol as produced by a diabetic treatment model and an exemplary metabolic enhancement by component.

FIGS. 5A-5C depict steps of a method of the invention according to one or more embodiments.

FIG. 6 depicts a system of the invention according to one or more embodiments.

FIGS. 7A and 7B depict an administrative data storage usable in the system according to one or more embodiments.

FIGS. 8A-8C provide exemplary subject profiles with an automatically generated care plan template and an automatically generated report according to one or more embodiments.

US 10,533,990 B2

3

The present embodiments are detailed below with reference to the listed Figures.

## DETAILED DESCRIPTION OF THE EMBODIMENTS

Before explaining the present methods and systems in detail, it is to be understood that the methods and the systems are not limited to the particular embodiments and that it can be practiced or carried out in various ways.

The present embodiments relate to improved methods and systems that improve impaired hepatic glucose processing in subjects.

The present embodiments further relate to an individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject to improve impaired hepatic glucose processing.

When three treatment session are performed using the method as described herein patients report energy resorted, medications reduced, wounds healed, amputations prevented, weight controlled, blood sugar controlled, blood pressure reduced, neuropathy diminished, retinopathy diminished, mood improved, sleep improved and erectile function restored.

The individualized intravenous exogenous insulin-based therapy uses a plurality of treatment sessions, generally 3 but up to 12 may be needed, each treatment session lasting from 1 hour to 3 hours.

The goal of the individualized intravenous exogenous insulin-based therapy is to repair, recondition, and maintain a subject's impaired metabolism so that it functions and is maintained to provide a quality of life similar to that of a non-diabetic person.

To initiate the therapy a subject profile can be created. Each treatment session can involve assessing for a subject's metabolic factors and storing the metabolic factors in the subject's profile. The subject profile can be stored in an administrative data storage connected to an administrative processor accessible via a network from a client device.

Each treatment session can involve matching the subject profile to a diabetic treatment model to create a schedule of bolus introduction with at least one unequal time period between bolus introductions.

The schedule can provide a quantity and frequency of intravenous insulin bolus, a quantity and frequency of dosage amounts of magnesium, and a quantity and frequency of dosage amounts of potassium for the subject.

Each treatment session can involve introducing to the subject insulin bolus sequentially, at frequencies determined from the diabetic treatment model, wherein each insulin bolus can be separated by irregular time periods.

Simultaneously with the sequential insulin bolus introduction, dosage amounts of magnesium and dosage amounts of potassium can be introduced to the subject. The magnesium and potassium can be introduced orally, transdermally, or by inhaling simultaneous with the insulin bolus introduction.

A weight management protocol can be identified from a library of weight management protocols given a subject's profile. The subject can be required to follow the weight management protocol and use a specific metabolic enhancement that can be in pill form, powder form, a transdermal patch, or another form known in the industry.

After 3 to 6 treatments using a care plan connected to the diabetic treatment model with a schedule for bolus instruction and at least one unequal period of time, the subject can

4

have at least 10 percent and up to 50 percent improved cellular ATP functioning that can last up to 90 days from the last treatment.

The present embodiments also relate to methods for infusing insulin intravenously to a subject to improve impaired hepatic glucose processing.

The term "5-MTHF" as used herein can refer to Levomefolic Acid, which is a primary form of folic acid used for DNA reproduction.

The term "A1C" as used herein refers to a blood test that shows how well individual diabetes is being controlled relative to a non-diabetic patient.

The term "Adenosine triphosphate (ATP)" as used herein refers a substance that transports chemical energy within cells for metabolism.

The term "Alpha Lipoic Acid" as used herein refers to an antioxidant that helps with the extraction of energy from food.

The term "biomarkers specific to diabetes" can refer to the three classifications of up to 89 different biomarkers that relate to metabolic rates of individuals. Some of the enzymes include glucokinase, 6-phosphofructo-1 kinase, 6-phosphofructo-2 kinase; citrate cleavage enzyme; pyruvate kinase, HMG-CoA reductase, glycophosphoralase, fructose 2,6,biphosphatase, glycogen phosphoralase, pyruvate dehydrogenase complex, and others known in the art.

The term "blood glucose level therapeutic range" as used herein refers to a subject's designated target blood glucose level of 160 to 240 mg/dl during a treatment session.

The term "bolus" as used herein refers to a single dose of a medical substance and/or drug given all at once.

The term "catheter" as used herein refers to a thin tube that can be inserted into the body to remove bodily fluids or add fluids to a patient during a treatment session.

The term "CoEnzy me Q10" as used herein refers to a chemical that extracts energy from food in the human digestive process.

The term "Complete Blood Count" (CBC) as used herein refers to a blood test to evaluate cellular aspects of the blood and provide concentrations of components in the blood.

The term "C-peptide" as used herein refers to a chemical produced in the pancreas that appears in a 1:1 molecular ratio to insulin and that can be detected when a blood lab panel is performed on a blood sample.

The term "data storage" as used herein refers to a non-transitory computer readable medium, such as a hard disk drive, solid state drive, flash drive, tape drive, and the like. The term "non-transitory computer readable medium" excludes any transitory signals but includes any non-transitory data storage circuitry, e.g., buffers, cache, and queues, within transceivers of transitory signals.

The term "diabetic retinopathy" as used herein refers to a complication of diabetes that affects the eyes.

The term "diabetic treatment model" as used herein refers to a plurality of look up tables reflecting initial blend dosing adjustment protocols that reflect weight of the subject, types of insulin (long term and short term), a volume of bolus of insulin per treatment session, a quantity of bolus, a frequency of bolus for a treatment session and bolus intervals, dosage amounts of magnesium (including quantity and frequency) and dosage amounts of potassium (including quantity and frequency). The diabetic treatment model includes glucose dosage amounts which are milligrams/deciliter (mg/dl) based on blood glucose of the subject. The diabetic treatment model generates a schedule of bolus introduction with at least one unequal time period between

APPX0253

US 10,533,990 B2

5

at least one pair of bolus. In embodiments, the diabetic treatment model can be located in the administrative data storage.

For example, the diabetic treatment model receives from a doctor, nurse or technician the weight of a subject, such as 102 kilograms, and a blood glucose of the subject, such as 120 mg/dl. The diabetic treatment model then generates (i) a type of insulin to be introduced to the subject, such as short term insulin, (ii) a volume of bolus of insulin per treatment session for the subject, such as 0.5 milliliters, (iii) a quantity of bolus per treatment session, such as 12, and (iv) a frequency of bolus introduction, which in embodiments, can be random for a treatment session of 3 hours. The time intervals between sequential bolus introductions can range from 2 minutes to 10 minutes between bolus. In embodiment, the time intervals can be a random sequence.

The diabetic treatment model generates dosage amounts of magnesium, such as 2 milligrams per milliliter of saline (for intravenous introduction to the subject) during the treatment session.

The diabetic treatment model generates dosage amounts of potassium, such as 0.02 meq/millimeter of saline (for an intravenous introduction) during the treatment session.

The diabetic treatment model calculates glucose dosage amounts for a subject, which can range from 44 grams to 55 grams during the first 30 minutes of a treatment session and then different or the same glucose dosage amounts using real time blood glucose level tests of the subject, which can be performed providing new test results and recalculations of dosage amount of bolus every 30 minutes.

The diabetic treatment model evaluates for Type 2 Diabetes, pre-Diabetes, Metabolic Syndrome, Metabolic Disorder, Impaired Glucose Tolerance, and Impaired Fasting Glycemia.

The term "dosage amounts of magnesium" as used herein refers to dosage amounts of magnesium in a saline carrier or in a pill form, for example, one that dissolves under the tongue of the subject.

The term "dosage amounts of potassium" as used herein refers to dosage amounts of magnesium in a saline carrier, in a pill form, or as a banana. If a pill form is used, it can be in the form of a pill that dissolves under the tongue of the subject.

The term "Echocardiograph" as used herein refers to a multi-dimensional sonography of the heart that measures the heart's mechanical functionality.

The term "exogenous" as used herein refers to materials or reactions that occur outside of the body.

The term "glucagon" as used herein refers to a counter regulatory hormone essential for glucose metabolism in humans in particular.

The term "glucose" as used herein refers to the simple carbohydrate commonly referred to as "sugar".

The term "hyperglycemia" as used herein refers to high blood glucose level present in a subject's blood test.

The term "improved cellular ATP functioning" as used herein refers to "Adenosinie Triphosphatase" ("ATPase") functioning, which are one or more enzymes that catalyze the formation of adenosine triphosphate ("ATP") from adenosine diphosphate ("ADP") and the functioning is indicative of the energy generated by a cell when it consumes glucose during metabolic processing.

The term "individual target blood glucose level" as used herein refers to a medical beneficial range that the patient or subject can achieve at least during treatments session created by the diabetic treatment model, during the entire infusion therapy, such as a range from 125 mg/dl to 225 mg/dl, which

6

can be adjusted to a more narrow range, such from 180 mg/dl to 225 mg/dl for a specific subject.

The term "insulin" as used herein refers to a chemical that is a counter regulatory hormone essential for glucose metabolism.

The term "insulin bolus" as used herein refers to a dosage quantity of insulin given intravenously to a patient.

The term "insulin reservoir" as used herein can be a flexible pouch of insulin having multiple insulin bolus.

The term "insulin sensitivity factor" as used herein refers to how a subject responds after receiving one unit of insulin as a measure of decrease in blood glucose.

The term "Lipid Panel" as used herein refers to a blood test that measures a concentration of lipids, fats, and fatty substances used as a source of energy by a human body.

The term "metabolic factors" as used herein refers to a weight, such as 125 pounds, blood tests, such as a Comprehensive Metabolic Panel, a CBC panel, a C-peptide test, an A1c test (known as a "lipid panel"), a urinalysis, a nerve conduction velocity test, an individual target blood glucose level, such as 110 mg/dl, a respiratory quotient, such as a ratio of the amount of carbon dioxide released based on oxygen consumed during a preset period of time, and an insulin sensitivity factor, such as a value indicating how a subject responds after receiving one unit of insulin as a measure of decrease in blood glucose.

The term "metabolic enhancement" as used herein refers to a blend of components that bond to enzymes in the patient and increases the enzyme activity for a patient or subject. The metabolic enhancement can be (1) a pill containing the components of the metabolic enhancement, (2) a drink containing the components of the metabolic enhancement, (3) a shake containing the components of the metabolic enhancement, (4) a food item, such an energy bar, fortified with the metabolic enhancement, (5) a transdermal patch or similar application delivering the components of the metabolic enhancement, and combinations thereof.

In one example, the metabolic enhancement can be a blend of methylcobalamin, (such as 5 mg), pyridoxal-5-phosphate (such as 35 mg), 5-MTHF (known as an activated form of folic acid) (such as 1 mg), Alpha Lipoic Acid (such as 50 mg), NADH (such as 5 mg), CoEnzyme Q0 (such as 75 mg), N-Acetyl L-Cysteine (NAC) (such as 250 mg), Vitamin D (such as Cholecalciferol) (such as 2000 International Units (IU)) and Chromium Picolinate (such as 300 mcg).

The term "methylcobalamin" as used herein refers to one of two coenzyme forms of vitamin $B_{12}$.

The term "N-Acetyl Cysteine" as used herein refers to an amino acid that helps build proteins in the body.

The term "NADH" as used herein refers to Nicotinamide Adenine Dinucleotide which binds as a coenzyme to proteins and serves in respiratory metabolism.

The term "Nerve Conduction Velocity (NCV)" as use herein refers to a test to determine how fast electrical signals move throughout a nerve.

The term "non-transitory computer readable medium" as used herein excludes any transitory signals but includes any non-transitory data storage circuitry, e.g., buffers, cache, and queues, within transceivers of transitory signals.

The term "Peripheral Autonomic Neuropathy" as use herein refers to the symptoms that occur when there is damage to the nerves, such as weakness and numbness of a limb.

The term "plan goal" as used herein can refer to a purpose for the insulin therapy as identified by the subject and/or a

APPX0254

US 10,533,990 B2

7

medical professional associated with the therapy and inserted into the care plan generated by the diabetic treatment model.

The term "processor" as used herein can refer to a computer, a laptop, a plurality of connected processors, a tablet computer, a cellular telephone or smart phone, a portable processing device, or any similar device known in the industry.

The term "respiratory quotient" as used herein refers to the ratio of: carbon dioxide given off by a human and oxygen consumed by a human, particularly under known resting conditions.

The term "saline" as used herein refers to a sterile solution of 900 grams of sodium chloride in 100 ml of water.

The term "schedule for bolus introduction" as used herein refers to the plurality of specific time intervals between bolus introductions in a treatment session. For the invention, the "schedule for bolus introduction" requires at least one "unequal time period" between at least one pair of bolus per treatment session.

As an example of the schedule for bolus introduction for a treatment session: three bolus can be delivered to the subject sequentially, each bolus separated by a 4 minute time interval. Then, using the schedule for bolus introduction, a fourth bolus is delivered to the subject after a 6.5 minute time interval. The 6.5 minute time interval is referred to herein as "an unequal time period" because it is different from the 4 minute time intervals on the schedule for bolus introduction.

In embodiments, all the time intervals between pairs of bolus can be different for a subject. In embodiments, just one time interval between one pair of bolus can be different according to the schedule for bolus introduction.

In embodiments, many variations in time intervals on the schedule for bolus introduction can be computed by the diabetic treatment model using the weight of the subject, insulin sensitivity factor of the subject and tested blood glucose levels of the subject.

Another example of the schedule of bolus introduction having an unequal time period can be 3 pairs of bolus that are sequentially introduced require 5 minute intervals of time between introductions then a seventh bolus requires a 6 minute interval of time prior to introduction to the subject. The 6 minute interval of time is an "unequal time period". The diabetic treatment model can indicate that the schedule for bolus introduction can require all remaining time periods for the treatment session between pairs of bolus to be equal (the opposite of unequal periods of time). The plurality of time periods of the schedule for bolus introduction (the time between each pair of bolus) is generated by the diabetic treatment model.

The term "subject profile" as used herein can refer to the name of an individual and the associated measured metabolic factors. The subject profile can include a subject history and a subject physical report of the subject, a subject name and contact information, as well as a subject's blood test results. In embodiments, the subject profile can include a date, a name, an address, an email address, a telephone number, an ethnicity, a gender/sex, a type of diabetes, a date of birth, a weight, a height, a blood pressure, a temperature, a heart rate, a blood type, a blood glucose level, insurance information, a responsible party name and contact information, a driver's license number or copy of the driver's license, employer information, insurance information, medical history including surgery and ancestor information and allergies, current medications, other test results, including but not limited to urinalysis, emergency contact information,

8

and a primary care physician name and contact information. In embodiments, the subject profile can be inputted into a data storage associated with a processor.

The term "treatment session" as used herein refers to a plurality of treatment cycles during which a plurality of bolus are infused to a patient. Each treatment cycle can range from 40 minutes to 180 minutes. Each treatment session can range from 1 treatment cycle and up to 6 treatment cycles.

The term "unequal time period" as used herein refers to a unit of time between a pair of bolus in a treatment session that is different in length from a time period between another pair of bolus in a treatment session.

The term "weight management protocol" as used herein refers to a system of eating certain foods with a preset calorie content to ensure the patient or subject loses an amount of weight per week that aligns with the subject's metabolic factors.

The invention improves impaired hepatic glucose processing in subjects, which can be a human or a non-human, such as an animal.

In embodiments, the method can include creating a subject profile with assessed metabolic factors.

The method can include inserting the subject profile into a diabetic treatment model to determine: a quantity and frequency of sequential intravenous insulin bolus to a subject using a schedule of bolus introduction having at least one unequal time period between a pair of bolus, as well as determining a quantity and frequency of dosage amounts of magnesium and a quantity and frequency of dosage amounts of potassium.

The method can include selecting a weight management protocol using the subject profile and specific metabolic functions of the subject. For example, the metabolic function of respiratory quotient can be used to create a specific customized weight management protocol.

The subject can then follow the weight management protocol while taking a metabolic enhancement. The weight management protocol initially can use a complete metabolic measurement system for cardio-pulmonary exercise stress and resting energy expenditure testing which can give a patient a resting metabolism score. The resting metabolic scores can range from 0.75 to 0.85 for fats, from 0.78 to 0.82 for proteins, and from 0.88 to 0.92 for carbohydrates. Based on these resting metabolic scores, a subject's diet can be customized based on what the subject's body can actually metabolize.

A resting metabolic carbohydrate score in excess of 1.20 can indicate the subject's body is undergoing ketogenesis (metabolic production of ketones or ketone bodies or formation of acid ketone [substances that are made when the body breaks down fat for energy, any organic compound in which two carbon atoms are linked by the carbon of a carbonyl group ($C$—$O$), the simplest ketone and the most important in medicine is dimethyl ketone (acetone)] bodies, as in uncontrolled diabetes, starvation, or as a result of a diet with a very high fat content), and a different customized diet can be created for the subject or the patient.

The invention improves impaired hepatic glucose processing in subjects, by providing individualized intravenous exogenous insulin-based therapy that not only produces body tissue with improve cellular ATP functioning in the short term, by improves the ATP function by at least 10 percent and up to 40 percent, for a period of time that ranges from 7 days to 90 days from the last treatment session of the individualized intravenous exogenous insulin-based therapy.

APPX0255

US 10,533,990 B2

9

10

It should be noted that in embodiments, the dosage amounts of magnesium and potassium can be introduced to the subject intravenously from a second reservoir simultaneously as the insulin bolus are introduced.

Glucose is introduced to the subject as part of the therapy. The glucose is taken by the subject prior to receiving the insulin bolus. When glucose is used the dosage amounts of potassium and dosage amounts of magnesium can be adjusted based on the subject profile. The bolus introduction can be monitored and blood glucose levels tested allowing a therapist to change the quality and time intervals between bolus based on the diabetic treatment model until the blood glucose level of the subject reaches an individual target blood glucose level.

In embodiments, the unequal time periods between bolus introductions according to the schedule can range from 4 minutes to 8 minutes periods but can be as low as 1 minute and as high as 10 minutes. The unequal time periods can include minutes and seconds.

In embodiments, from 60 grams of glucose to 100 grams of glucose can be introduced to the subject to establish a blood glucose level of at least 125 mg/dl prior to introducing the bolus of insulin and dosage amounts of potassium and magnesium.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy method for infusing insulin intravenously to a subject by comparing a respiratory quotient of the subject from a metabolism score with the subject in a resting state and applying the results into the diabetic treatment model to (i) modify the concentration of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure the success of individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a cardiac function measured by echocardiograph with the subject in a resting state and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a peripheral autonomic neuropathy and microcirculation with the subject in a resting state prior to bolus injection and simultaneously as bolus are injected and after bolus have been injected and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a retinal image captured by a non-mydriatic camera with the subject in a resting state to identify diabetic retinopathy after a series of bolus treatments are performed and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing wounds to wound characteristics by dimensionally measuring wounds by length, width, and depth and related clinical characteristics with the subject in a resting state after a series of bolus treatments are performed and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing C-peptides, such as with the University of Oxford's HOMA2 Calculator, which act as a marker for insulin production and insulin sensitivity factor and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both, or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the metabolic enhancement can have a nerve function improver to decrease homocysteine (a naturally occurring amino acid in all humans that is found in blood plasma) levels and improve cardio vascular health.

In embodiments, the weight management protocol can include additional nutritional supplements.

In embodiments, the insulin bolus can be intravenously infused using a needle or a catheter located in the subject's body, hand, or forearm.

Now turning to the Figures, FIG. 1A shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 40 kilograms to 160 kilograms.

A dosing protocol for insulin bolus, dosage amounts of potassium and dosage amounts of magnesium as generated by the diabetic treatment model using weight of a subject from 40 kilograms to 160 kilograms is shown. This chart can be used for one person or for a plurality of subjects.

Weight appears in the first column then a dosage amount of a ratio of potassium to saline, a dosage amount of a ratio of magnesium to saline, a dosage amount of a ratio of insulin to create the amount of insulin to saline to be used for a treatment session and an insulin reservoir volume is depicted mapped to the weight of the subject and to the potassium to saline dosage, and magnesium to saline dosage and insulin to saline dosage.

The insulin reservoir volume is a liquid volume containing (i) the insulin and saline, (ii) the insulin, saline and potassium, (iii) the insulin, saline and magnesium, or (iv) the insulin, saline, potassium and magnesium, used in the bolus for the subject.

An insulin bolus dosage minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

APPX0256

US 10,533,990 B2

11

An insulin bolus dosage volume maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A schedule of bolus introduction with a plurality of unequal time periods (in seconds) between bolus introduction is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A quantity of bolus per treatment cycle is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

FIG. 1B shows a diabetic treatment model with bolus volume dosage mounts for a subject with a weight from 161 kilograms to 275 kilograms.

A dosing protocol for insulin bolus, dosage amounts of potassium and dosage amounts of magnesium as generated by the diabetic treatment model using weight of a subject from 161 kilograms to 275 kilograms is shown. This chart can be used for one person or for a plurality of subjects.

Weight appears in the first column then a dosage amount of a ratio of potassium to saline, a dosage amount of a ratio of magnesium to saline, a dosage amount of a ratio of insulin to create the amount of insulin to saline to be used for a treatment session, and an insulin reservoir volume is depicted mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

The insulin reservoir volume is a liquid volume containing (i) the insulin and saline, (ii) the insulin, saline and potassium, (iii) the insulin, saline and magnesium, or (iv) the insulin, saline, potassium and magnesium, used in the bolus for the subject.

An insulin bolus dosage minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A schedule of bolus introduction with a plurality of unequal time periods (in seconds) between bolus introductions is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A quantity of bolus per treatment cycle is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

FIG. 2 shows a bolus volume dosage adjustment protocol based on tested blood glucose levels as produced by the diabetic treatment model.

A dosage adjustment protocol of insulin is shown for three time intervals: (i) a first time interval for hours 1 and 2 of each treatment session, (ii) a second time interval for a first

12

30 minutes of hour 3 of each treatment session, and (iii) a third time interval for a last 30 minutes of hour 3 of each treatment session.

A table of tested blood glucose level in view of dosage amounts of insulin are shown, which is generated by the diabetic treatment model.

This portion of the diabetic treatment model indicates that the amount of insulin or quantity of bolus can be increased or decreased based on real time test results of a subject's blood glucose level.

FIG. 3 depicts a glucose dosage adjustment protocol as produced by the diabetic treatment model.

A patient's tested blood glucose level ranging from 100 to 550 mg/dl is shown.

In the glucose dosage adjustment protocol, an amount of glucose to be administered using the method and system is depicted as mapped to a tested blood glucose level. The amount of glucose ranges from slightly above no glucose shown as 0.01 grams to 60 grams of glucose.

FIG. 4 depicts a metabolic enhancement protocol as produced by the diabetic treatment model and an exemplary metabolic enhancement by component.

The metabolic enhancement protocol shows dosage amounts of metabolic enhancement and respiratory quotients for a patient. The metabolic enhancement can be provided to a subject in dosage amounts as pills, in powder form, as a drink, a transdermal patch, or a delivery system known in the art.

The respiratory quotients range from 0.69 to 1.20. The dosage amounts of metabolic enhancement can range from 1 dose to 3 dosages daily, as shown corresponding to the tests of the subject showing the respiratory quotients.

Ingredients for an exemplary metabolic enhancement usable according to the diabetic treatment model are shown with minimum amounts per dosage and maximum amounts per dosage for the metabolic enhancement.

In embodiments, the ingredients for a usable metabolic enhancement can be formed from a synergistic combination of nine ingredients, namely:

Vitamin D—as Cholecalciferol ranging in amounts from 600 IU to 2000 IU.

Vitamin $B_6$—as Pyridoxal-5-Phosphate ranging in amounts from 10 mg to 100 mg.

Folic Acid—as Folate ranging in amounts from 200 mcg to 2000 mcg.

Vitamin $B_{12}$—as Cyanocobalamin ranging in amounts from 1000 mcg to 5000 mcg.

An amino acid that builds proteins in a subject—as N-Acetyl L-Cysteine (NAC) ranging in amounts from 200 mg to 600 mg.

A coenzyme that extracts energy from food for a subject—as Coenzyme Q10 (CoQ10) ranging in amounts from 60 mg to 400 mg.

An antioxidant that extracts energy from food for a subject—as Alpha lipoic acid ranging in amounts from 50 mg to 400 mg.

A protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for a subject—as Nicotinamide Adenine Dinucleotide (NADH) ranging in amounts from 0.5 mg to 5 mg.

A glucose utilization component to prevent or treat chromium deficiency in a subject and which additionally improves glucose utilization by insulin—as Chromium Picolinate ranging in amounts from 200 mg to 300 mg.

APPX0257

US 10,533,990 B2

**13**

The following are non-limiting examples.

### EXAMPLE 1

A comparative analysis was generated for Fred Smith, Fred S. a 69-year-old man with Type 2 diabetes of 25 years' duration. Fred Smith arrived in a wheelchair, because walking was too painful for him. Fred Smith's left foot had all the toes amputated, and a non-healing wound on his other foot had caused his doctor to recommend amputation of a toe on his right foot.

Conventional wound care treatment, including aggressive wound care, wound debridement, and hyperbaric treatment had failed. Fred Smith also developed a debilitating peripheral neuropathy.

At this point Fred Smith weighed 107.95 kilograms and began an intensive treatment protocol of three treatment sessions per week, the first week includes two treatment sessions the second and third weeks include one treatment session per week thereafter for weeks 4 through 12. During each treatment session, Fred Smith received insulin and saline intravenously, alternating with glucose. Fred Smith received 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram, at a first set of unequal time periods of 5.3 minutes, 4 minutes, and 5.1 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Fred Smith received a total of 16 treatments during the three-month period, after the 6th treatment, he began to regain feeling in his feet.

Fred Smith due to the treatment was no longer in a wheelchair at the end of three months and was able to simply use a cane to get around.

Fred was able to decrease his hospital costs by $255,000 from the prior year without treatment.

Additionally, Fred was able to decrease one of his blood pressure medications.

Post treatment, Fred's A1c test result was down 2.7 points. Fred no longer experienced hypoglycemic events and he had reduced his long-acting insulin by 20 percent and his short-acting insulin by 50 percent.

The primary care physician noted that Fred's wound had healed and no amputation was needed.

### EXAMPLE 2

A comparative analysis was generated for Marianne Rutledge, a 60-year-old woman with Type 2 diabetes of 12 years duration, who suffered from severe kidney disease and was fearful of becoming a dialysis patient.

Upon arrival Marianne Rutledge's blood test results showed an A1C of 10.2, blood glucose of 240 mg/dl, her blood pressure measured 150/92, and she weighed 212 pounds, or 96.3 kilograms.

Marianne Rutledge began an intensive treatment protocol of two treatment sessions per week the first two weeks, and one treatment session per week thereafter for weeks 3 through 12. During each treatment session, Marianne Rutledge received insulin and saline intravenously, alternating with glucose. Marianne Rutledge received 36 bolus per treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram, at a first set of unequal time periods of 5.1 minutes, 4.6 minutes, and 5.6 minutes, with each set

**14**

of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Marianne Rutledge received a total of 13 treatments during the three-month period, after the 2nd treatment, she noticed an extreme increase in her energy and stamina, and as she continued the treatment sessions, she reported that she looked forward to the next treatment session because it made her feel better than she had felt since she was diagnosed with diabetes and kidney disease.

Marianne Rutledge continued the therapy with regular treatment sessions each week, 3 to 4 hours each session, with the protocol of insulin and saline intravenously, alternating with glucose and using the schedule of bolus introduction having at least one unequal time period. After six months of treatment, her kidney function improved to the point that her doctor no longer considered dialysis probable.

### EXAMPLE 3

Victoria Lord, a Type 2 diabetic on dialysis had vision problems including retinopathy and she also suffered from neuropathy and had trouble sleeping. A comparative analysis was generated for Victoria Lord, whose initial vital signs were blood glucose level 250, blood pressure 120/80, heart rate of 72, and HgbA1c of 9.2.

Victoria Lord began an intensive therapy of two treatment sessions on intravenous insulin alternating with oral glucose on consecutive days for the first two weeks then weekly treatment sessions thereafter for the next 10 weeks, then to be reevaluated.

Each treatment session consisted of 36 bolus. During each treatment session, Victoria Lord received insulin and saline intravenously, alternating with glucose. Victoria received the 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.0 minutes, 6.9 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After her first four treatments over two weeks, she reported that her neuropathy decreased, which was confirmed by autonomic tests. Her blood glucose was decreased to 110, and she reported such extremely increased energy that she no longer required an afternoon nap. She also reported that she was sleeping better. Her lab tests after 14 treatments over 12 weeks showed Hgb A1c of 6.5, down from 9.2, or a decrease of about 20 percent.

### EXAMPLE 4

Jim Pierce had severe foot neuropathy and had experienced no feeling in his feet for several years. He had been diagnosed with Type 2 Diabetes about 15 years ago and was insulin dependent. A friend knew of his debilitating neuropathy and recommended that he begin the therapy.

Jim Pierce reported that when his neuropathy began, it was so painful; he could not even stand for a sheet to touch his toes when he went to bed at night. As his neuropathy progressed, he lost all feeling in his feet and began to suffer injuries from falling. His doctor continued to treat him with insulin and prescription drugs, such as Gabapentin.

Jim Pierce's test results were reviewed, and he was put on a therapy of two treatment sessions on consecutive days for three weeks, two treatment sessions on consecutive days for two weeks after that, and then one treatment session per week for the balance of the first 12-week period.

APPX0258

US 10,533,990 B2

**15**

Jim Pierce received 36 bolus during each treatment session using the schedule of bolus introduction having at least one unequal time period. During each treatment session Jim Pierce received insulin and saline intravenously, alternating with glucose.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.5 minutes, 5.1 minutes, and 5.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After the first two treatments, Jim Pierce reported that the feeling began to return to his feet.

After he completed 8 treatments sessions, his doctor reduced his Gabapentin, and after 12 weeks, he no longer took Gabapentin for his neuropathy. He reduced his insulin from 50 units every night to 30 units every night. His lab reports showed Hgb A1c 7.2, down from 10.5. After six months of the continued therapy he was able to do a three-mile hike on his vacation.

EXAMPLE 5

Sarah Hardin is a pre-diabetic with a genetic disposition to metabolic disorder and disease, including diabetes. Sarah's pre-treatment metabolic rate or respiratory quotient (RQ), was 0.84. After her initial test results were reviewed, she began one treatment session per week for 12 weeks.

Each of Sarah's treatment sessions consisted of 36 bolus and during each treatment session, Sarah received insulin and saline intravenously, alternating with glucose. Sarah received 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.2 minutes, 4.7 minutes, and 6.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Soon after starting the treatment therapy, Sarah Hardin noticed improvement in hair and nail growth, and she documented it with photographs.

Sarah reported that her energy increased to the point that she no longer needed help taking care of her children. After 5 treatment sessions, a comparative analysis was performed and her RQ increased to 0.93, which demonstrated that she was burning carbohydrates for energy.

EXAMPLE 6

Tatum Norris, age 18, a Type 1 diabetic diagnosed at age 10, had severe neuropathy and was housebound because of his pain. He began two treatment sessions on consecutive days, then 1 treatment session a week thereafter.

Each treatment session consisted of 36 bolus. During each treatment session, Tatum received insulin and saline intravenously, alternating with glucose. Tatum received 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.4 minutes, 5.3 minutes, and 5.2 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

A Nerve Conduction Velocity (NCV) with Electromyopathy (EMG) was conducted pre-treatment on Tatum and repeated 90 days after his initial treatment, which showed a marked decrease in his diabetic neuropathy.

**16**

After 8 or 10 treatments, Tatum began driving a car again and he was able to sit in movie theaters because the pain was now manageable. Tatum reported that he could now go visit his mom in Dallas and even hang out with friends.

EXAMPLE 7

Carmen Valdez, a 70-year-old Type 2 diabetic who had been diagnosed four years earlier, was on three types of blood pressure medication (Amlodipine, Lisinopril, and Lopressor) and three medications to control her blood sugar (Lantus, Metformin, and Onglyza). After her initial test results were reviewed, she began treatment sessions of two treatment sessions on consecutive days for the first two weeks and one treatment session per week thereafter for 12 weeks. Her pre-treatment RQ test result was 0.79.

During each treatment session, Carmen received insulin and saline intravenously, alternating with glucose. Carmen received 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 6.4 minutes, 7.2 minutes, and 7.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Carmen reported that she was surprised that she immediately experienced greatly increased energy and stamina, as well as a lowering of her daily blood pressure according to her self-tests, after only the first two treatments.

After three months, Carmen Valdez was able to discontinue taking Amlodipine, Lantus and Onglyazone. At that point her RQ measured 0.95.

EXAMPLE 8

Harold Carson, a 65-year-old insulin-dependent Type 2 diabetic of 25 years, became insulin resistant and his medications were no longer working well. Mr. Carson was taking three 750-mg Glucophage tablets daily, 150 units of Humalog (short-acting) insulin daily, and a nighttime injection of 40 units of Humulin N (long-acting) insulin. He also took statin drugs for cholesterol and blood pressure medication.

After initial tests, his C-peptide was remarkable at 2.0. He began treatment sessions of two on consecutive days for two weeks, and then continued with weekly treatments for a total of 12 weeks.

During each treatment session, Mr. Carson received insulin and saline intravenously, alternating with glucose. He received 36 bolus per treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.7 minutes, 6.1 minutes, and 5.9 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After he began the treatment sessions, he reported that he immediately noticed a better night's sleep, that his mental clarity was sharper, and even his golf score improved.

After two months of treatment he decreased his insulin usage by 70 percent (from 150 units daily to 45 units daily) and his C-peptide test resulted in a significant improvement of 2.8.

Harold Carson's RQ was 0.75 pre-treatment and a perfect 1.00 after two months of treatment. Harold reported that his dry skin improved, the neuropathy in his legs vanished, and

APPX0259

US 10,533,990 B2

17

his wife reported that his hair had grown "unbelievably" after he began the treatment therapy.

### EXAMPLE 9

Stephen Henderson, a pre-diabetic with metabolic disorder and hyperlipidemia, had initial test results of Triglycerides 1290, LDL 183, and Cholesterol 271; his RQ was 0.74. He began treatment sessions once a week for 12 weeks. During each treatment session, Mr. Henderson received insulin and saline intravenously, alternating with glucose. Mr. Henderson received 36 bolus each treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 4.8 minutes, 4.8 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Stephen reported that after only two treatments, his energy level increased and prior hair loss abruptly stopped. After five treatments, he noticed significant hair growth. His test results after 12 treatment sessions were Triglycerides 123, LDL 86, Cholesterol 144, and RQ 0.98.

Stephen also reported that he noticed significant improvement in quantitative and qualitative analysis capability.

### EXAMPLE 10

Alan Henderson traveled from Denver to Houston for his treatments. At age 71 he had a history of 13 heart stints, he had been a Type 2 diabetic for 20 years, and he was insulin dependent.

After initial testing and a review of his results, Alan Henderson began treatment sessions of two per week on consecutive days for two weeks, then one treatment session weekly for 10 more weeks.

During each treatment session, Alan received insulin, saline, potassium, and magnesium intravenously, alternating with glucose. Alan received 36 bolus each treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 6.4 minutes, 6.8 minutes, and 7.1 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Alan's initial RQ was measured at 0.78, and his Hgb A1c was 13.4.

Over the course of three months, after his 12-week, 14-treatment therapy, he decreased his fast-acting insulin (Novalog) by 55 percent, down from 15-18 units to 10-12 units with meals and his long-acting insulin (Lantus) decreased by 65 percent, down from 75 units twice daily to 40 units daily.

After the first three months of treatment, Alan's Hgb A1c was down to 7.3 (more than 6-point decrease), and his RQ was 0.90.

Alan Henderson also suffered from diabetic neuropathy, for which he had been prescribed Gabapentin (six capsules per day) and a Lidocaine patch. After two months he reduced the amount of Gabapentin he was taking, and then completely eliminated it. He discontinued use of the Lidocaine patch. He reports that he now has no pain or neuropathy in his hands or feet, and his energy level is "way up."

### EXAMPLE 11

George Gilbert had a wound on his foot for three months that would not heal. He was also a Type 2 diabetic on

18

Metformin orally. After review of his test results, he began treatment sessions of two sessions on consecutive days for the first week and weekly treatment sessions thereafter.

During each treatment session, George received insulin, saline, glucagon, and somatostatin intravenously, alternating with oral glucose. George received 36 bolus each treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.7 minutes, 5.4 minutes, and 5.0 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After only three weeks of the treatment, he reduced the amount of Metformin he was taking, his wound healed, and his doctor made photographs of the wound before and after for the hospital record. George calls the treatment a "miracle."

### EXAMPLE 12

Toby Rasmussen, a pre-diabetic of 8 years duration, began treatment sessions because of vision problems and a family history of diabetes. His initial RQ was 0.85. His Hgb A1c measured 7.0. He began treatment sessions once a week for 12 weeks.

During each treatment session, Toby received insulin and saline intravenously, alternating with glucose. Toby received 36 bolus each treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.3 minutes, 5.2 minutes, and 6.4 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Toby reports that after the 12 treatments, he has more energy and his eyesight has improved so much that he now uses only bifocals instead of trifocals. After treatments, his RQ measured 0.98 and his A1c measured 6.1.

### EXAMPLE 13

Hank Anderson, a Type 2 diabetic of 27 years, had an Hgb A1c reading of 9.0, and was using Lantus insulin at 170 units during the day and another 70 units at night. He also reported severe leg cramps.

A comparative analysis was performed on Hank Anderson, and he began treatment sessions weekly. During each treatment session, Hank received insulin and saline intravenously, alternating with glucose. He also received potassium 40 meq orally with each treatment session and daily on non-treatment days. Mr. Anderson received 36 bolus per treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.6 minutes, 5.1 minutes, and 5.4 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After 12 weeks of weekly treatment sessions, Hank reported that since starting the treatment, his blood sugar is now controlled and his eyesight has improved so much that he went from legally blind without glasses to being able to read captions on a television with no glasses.

Hank was able to discontinue his nightly Lantus and his insulin went down from 6 vials of insulin per month to only 3, a significant costs saving.

APPX0260

US 10,533,990 B2

19

Hank Anderson's A1c after 12 weeks of treatment sessions measured 8.3.

## EXAMPLE 14

John Grayson, a Type 1 insulin-dependent diabetic, initially reported problems with his kidneys, eyes, low energy, mood swings, and erectile dysfunction. His RQ was 0.88 and his magnesium level was 1.5

After his test results were reviewed, John started treatment sessions of two sessions on consecutive days with weekly treatment sessions thereafter for a period of three months. During each treatment session, Hank received insulin and saline intravenously, alternating with oral glucose and somatostatin. Hank received 36 bolus per treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.0 minutes, 5.2 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Mr. Grayson also received magnesium chloride tablets of 40 mg orally with each treatment session and daily on non-treatment days.

After the first two treatments, Mr. Grayson decreased his insulin use by 5-10 units per sliding scale and was extremely happy to report that he experienced increased blood flow.

After the third treatment, Mrs. Grayson was deliriously excited about his improvement, especially with the blood flow.

FIGS. 5A-5C depict steps of a method of the invention according to one or more embodiments.

The method for providing an individualized intravenous exogenous insulin-based therapy can include creating a subject profile for a subject, as shown in box 500. The subject profile can include: a subject history, such as having type II diabetes for the past three years and cataract surgery 4 years ago, a subject's physical reports including weight of the subject and optionally objective physician reports, CT scans and other diagnostic reports, a subject's name, such as Carol Wilson, a subject's contact information such as a name, an address and a telephone number, and a subject's blood test results.

The method can include assessing metabolic factors of the subject and storing the metabolic factors in the subject profile, as shown in box 502. The metabolic factors needed in the subject file can include: a glucose level, such as an initial glucose level, a respiratory quotient, such as an initial respiratory quotient, an insulin sensitivity factor, such as an initial or pre-treatment insulin senility factor, and an individual target blood glucose level which the subject desires to achieve with the treatments using the diabetic treatment model.

The method can include creating a care plan with a plurality of treatment sessions for the subject and a plan goal, as shown in box 504. The care plan can indicate a schedule of treatment sessions with at least one unequal time period and the care plan can include a quantity and frequency of a plurality of bolus containing saline and insulin for sequential intravenous introduction to a subject.

The method can include introducing glucose to the subject to stimulate gastrointestinal hormone production, resulting in the release of enzymes from the subject's liver and causing blood glucose levels of the subject to be in a therapeutic range, as shown in box 506.

20

The method can include testing the subject for blood glucose levels to compare tested blood glucose levels to the plurality of therapeutic ranges and verify the subject is in the therapeutic range, as shown in box 508.

The method can include comparing tested blood glucose levels to a diabetic treatment model, as shown in box 510.

The method can include mapping tested blood glucose levels and insulin sensitive factors of the subject to the subject weight using the diabetic treatment model to determine a schedule for bolus introduction, wherein the schedule for bolus introduction has at least one unequal time period between at least one pair of bolus, as shown in box 512.

The method can include introducing to the subject a plurality of bolus of insulin and saline sequentially using the schedule for bolus introduction having at least one unequal time period between at least one pair of bolus, as shown in box 513.

The method can include comparing the subject profile to a plurality of weight management protocols to identify a weight management protocol for the subject based upon assessed metabolic functions of the subject and saving the weight management protocol in the care plan, as shown in box 514.

The method can include implementing the identified weight management protocol and the care plan after a first treatment session to manage weight of the subject with a metabolic enhancement causing improved cellular ATP functioning for the subject while infusing insulin and modifying a quantity and duration of unequal time periods between bolus introduction in the schedule of bolus introduction having at least one unequal time period between at least one pair of bolus to improve impaired hepatic glucose processing, as shown in box 516.

The method can include using in the schedule of bolus introduction having at least one unequal time period, time periods varying from 2 minutes to 10 minutes. The unequal time periods can be time intervals from 1 percent to 30 percent different in length of time from each other.

The method can include introducing from 60 grams of glucose to 100 grams of glucose to the subject prior to initial bolus introduction to establish a blood glucose level of at least 125 mg/dl prior to introducing the plurality of bolus in a first treatment session.

The method can include comparing a respiratory quotient of the subject in a resting state to a plurality of metabolism scores, as shown in box 518.

The method can include modifying a quantity of bolus for the subject for each treatment session as identified in the care plan with schedule of bolus introduction having at least one unequal time period between bolus to improve a subject's respiratory quotient, as shown in box 520.

The method can include modifying the schedule of bolus introduction having at least one unequal time period between bolus introduction by modifying a quantity and duration of unequal time periods between bolus introductions to improve the respiratory quotient, as shown in box 522.

The method can include comparing a measured cardiac function of the subject in a resting state to a preset norm of cardiac function, as shown in box 524.

The method can include modifying a quantity of bolus for the subject identified in the care plan using the preset norm of cardiac function, as shown in box 526.

The method can include modifying the schedule of bolus introduction having at least one unequal time period by

APPX0261

US 10,533,990 B2

21

modifying a quantity and duration of unequal time periods between bolus introductions to improve cardiac function, as shown in box **528**.

The method can include measuring a peripheral autonomic neuropathy and microcirculation of the subject in a resting state prior to bolus introduction comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of peripheral autonomic neuropathies and microcirculations, as shown in box **530**.

The method can include comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state as bolus are sequentially introduced to the measured peripheral autonomic neuropathy and microcirculation, as shown in box **532**.

The method can include comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state after all bolus have been introduced in a first treatment session to the measured peripheral autonomic neuropathy and microcirculation, as shown in box **534**.

The method can include modifying a quantity of bolus for the subject identified in the care plan to treat peripheral autonomic neuropathy and microcirculation, as shown in box **536**.

The method can include modifying the schedule of bolus introduction having at least one unequal time period by modifying a quantity and duration of unequal time periods between bolus introduction to improve the measured peripheral autonomic neuropathy and microcirculation, as shown in box **538**.

The method can include viewing an initial retinal image of the subject captured by a non-mydriatic camera with the subject in a resting state to identify a diabetic retinopathy, as shown inbox **540**.

The method can include viewing a post treatment retinal image of the subject in a resting state after a first treatment session, as shown in box **541**.

The method can include comparing the initial retinal image to the post treatment retinal image, as shown in box **542**.

The method can include modifying a quantity of bolus for the subject if no change in the diabetic retinopathy has occurred, as shown in box **544**.

The method can include modifying the schedule of bolus introduction having at least one unequal time period between bolus to reduce the effects of diabetic retinopathy by modifying a quantity and duration of unequal time periods between bolus introductions to reduce the effects of diabetic retinopathy, as shown in box **546**.

The method can include dimensionally measuring wounds by length, width, depth and identifying wound characteristics with the subject in a resting state, as shown in box **550**.

The method can include dimensionally measuring wounds after at least one treatment session to identify skin integrity and changes in clinical wound characteristics, as shown in box **552**.

The method can include modifying a quantity of bolus for the subject identified in the care plan for wound treatment using the identified skin integrity and changes in clinical wound characteristics, as shown in box **554**.

The method can include modifying the schedule of bolus introduction having at least one unequal time period between bolus to improve wound healing by modifying a quantity and duration of unequal time periods between bolus introduction to reduce wound size and wound characteristics, as shown in box **556**.

22

The method can include comparing C-peptides of the subject to a preset norm of C-peptides to identify an insulin sensitivity factor, as shown in box **560**.

The method can include modifying a quantity of bolus for the subject for the insulin sensitivity factor, as shown in box **562**.

The method can include modifying the schedule of bolus introduction having at least one unequal time period between bolus to improve an insulin sensitivity factor using analysis of C-peptides by modifying a quantity and duration of unequal time periods between bolus introductions, as shown in box **564**.

In embodiments, the method can use at least one of: methylcobalamin, pyridoxal-5-phosphate, 5-MTHF, alpha lipoic acid, NADH, coenzyme Q10, chromium picolinate, and N-Acetyl cysteine, and vitamin $D_3$ as the metabolic enhancement.

In embodiments, a needle or a catheter can be used to introduce the bolus into the subject's hand or forearm to deliver the insulin bolus.

The method can include determining a quantity and frequency of dosage amounts of magnesium and introducing the dosage amounts of magnesium simultaneously to the subject with the plurality of bolus using the schedule of bolus introduction having at least one unequal time period, as shown in box **570**.

The method can include determining a quantity and frequency of dosage amounts of potassium and introducing the dosage amounts of potassium simultaneously to the subject with the plurality of bolus using the schedule of bolus introduction having at least one unequal time period, as shown in box **572**.

The method can include determining a quantity and frequency of dosage amounts of somatostatin and introducing the dosage amounts of somatostatin simultaneously to the subject with the plurality of bolus using the schedule of bolus introduction having at least one unequal time period, as shown in box **574**.

In embodiments, the somatostatin can be administered orally or intravenously.

The method can include determining a quantity and frequency of dosage amounts of glucagon and introducing the dosage amounts of glucagon simultaneously to the subject with the plurality of bolus using the schedule of bolus introduction having at least one unequal time period, as shown in box **576**.

In embodiments, the glucagon can be administered orally or intravenously

The method can include scheduling diagnostic tests after a first treatment session to modify the care plan for improved cellular ATP functioning for the subject and improved hepatic glucose processing, as shown in box **578**.

FIG. **6** depicts a system of the invention according to one or more embodiments.

The system for individualized intravenous exogenous insulin-based therapy can have an administrative processor **602** connected to an administrative data storage **604**.

The administrative processor, which can be a computer, can be connected to a network **606**. In embodiments, the connection can be a wired or wireless connection. The network can be a cellular network, a satellite network, a global communication network, a local area network, a wide area network, a similar network known in the industry, or combinations thereof.

The system can connect to a plurality of client devices **608**a, **608**b, and **608**c. The client devices can be computers, laptops, tablet computers, cellular phones or smart phones,

APPX0262

US 10,533,990 B2

23

or another digital input device that is cable of bidirectional communication and can be used to input subject information into a subject profile, which can be disposed in the administrative data storage **604**.

In embodiments, the system can connect to a hospital processor **607** and/or an insurance processor **609**. The hospital processor, the insurance processor or both can be in communication with the network **606** and can provide accelerated payment to the diabetic treatment center and provide improved data visibility for improved overall patient care by hospital doctors and medical staff treating the subject.

In embodiments, the system can connect to a doctor processor **611**, which can be a computer. In embodiments, the doctor processor can be a group of processors, wherein each processor in the group can be connected to a different doctor specialist. In other embodiments, the doctor processor can be a processor accessible by a group of physicians.

In embodiments, the administrative processor can be a cloud based computing system.

FIGS. **7A** and **7B** depict an administrative data storage usable in the system according to one or more embodiments.

The administrative data storage **604** can contain at least one subject profile **610**.

Each subject profile can contain a plurality of metabolic factors **605** of the subject, which can include, but is not limited to, a blood glucose level **612**, a respiratory quotient **614**, an insulin sensitivity factor **616**, and an individual target blood glucose level **618**.

The administrative data storage **604** can contain a plurality of care plan templates **620**.

In embodiments, the administrative data storage can contain various computer instructions, which can be used to instruct the administrative processor to perform various tasks.

The administrative data storage **604** can contain computer instructions **200** configured to instruct the administrative processor to create a customized care plan from one of the plurality of care plan templates, wherein the customized care plan indicates a plurality of treatment sessions for the subject with the subject profile and a plan goal, each customized care plan indicating a schedule of bolus introduction having at least one unequal time period between bolus introduction, each bolus containing saline and insulin and each bolus introduced intravenously and sequentially to a subject

The administrative data storage **604** can contain computer instructions **202** configured to instruct the administrative processor to compare tested blood glucose levels to a diabetic treatment model after introducing glucose to a subject to stimulate gastrointestinal hormone production, release of enzymes from the subject's liver and cause blood glucose levels of the subject to be in a therapeutic range.

The administrative data storage **604** can contain a plurality of therapeutic ranges for blood glucose levels **203**.

The administrative data storage **604** can contain computer instructions **204** configured to instruct the administrative processor to compare tested blood glucose levels to the plurality of therapeutic ranges for blood glucose levels and verify the subject is in the therapeutic range.

The administrative data storage **604** can contain a plurality of weight management protocols **205**.

The administrative data storage **604** can contain computer instructions **206** configured to instruct the administrative processor to compare a subject profile to the plurality of

24

weight management protocols to identify a weight management protocol based upon metabolic functions of the subject.

The administrative data storage **604** can contain computer instructions **207** configured to instruct the administrative processor to save the identified weight management protocol in the generated customized care plan after saline with insulin in a plurality of bolus using the schedule of bolus introduction having at least one unequal time period have been administered to a subject.

It should be noted that the unequal time periods are determined by the diabetic treatment model and the care plan.

The administrative data storage **604** can contain computer instructions **208** configured to instruct the administrative processor to track weight management of the subject after a first treatment session and use of an identified weight management protocol and the care plan along with a metabolic enhancement to identify improved cellular ATP functioning for the subject and improve impaired hepatic glucose processing.

The administrative data storage **604** can contain a plurality of metabolism scores **209**, a plurality of preset norms of cardiac function **210**, a plurality of preset norms of peripheral autonomic neuropathies and microcirculations **211**, a retinal image of the subject **212**, wound characteristics **214** and a plurality of preset norms of C-peptides **215**.

In embodiments, at least one the metabolic enhancements can be a synergistic combination of: Vitamin D ranging in amounts from 600 IU to 2000 IU, Vitamin $B_6$ ranging in amounts from 10 mg to 100 mg, Folic Acid ranging in amounts from 200 mcg to 2000 mcg, Vitamin $B_{12}$ ranging in amounts from 1000 mcg to 5000 mcg, an amino acid that builds proteins in a subject ranging in amounts from 200 mg to 600 mg, a coenzyme that extracts energy from food for a subject ranging in amounts from 60 mg to 400 mg, an antioxidant that extracts energy from food for a subject ranging in amounts from 50 mg to 400 mg, a protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for a subject ranging in amounts from 0.5 mg to 5 mg, and a glucose utilization component to prevent or treat chromium deficiency in a subject which improves glucose utilization by insulin ranging in amounts from 200 mg to 300 mg.

A metabolic enhancement can consist of Cholecalciferol, Pyridoxal-5-Phosphate, Folate, Cyanocobalamin, N-Acetyl L-Cysteine (NAC), Coenzyme Q10 (CoQ10), an Alpha lipoic acid, Nicotinamide Adenine Dinucleotide (NADH), and Chromium Picolinate.

FIGS. **8A-8C** provide exemplary subject profiles with an automatically generated care plan template and an automatically generated report according to one or more embodiments.

The care plan can be viewed in real time 24 hours a day, 7 days a week as each test is updated and the metabolic assessments are completed.

FIG. **8A** shows a subject profile **610** with fields for a name **802**, a patient ID number **804**, a date of birth **806**, a gender **808**, an ethnicity **810**, a blood type **812**, allergies **814**, a diagnosis **816**, insurance **818**, a primary care physician (PCP) **820**, a primary care physician phone number **822**, a primary care physician fax number **824**, a patient address **826**, a patient phone number **828**, a patient email address **830**, and a patient emergency contact **832**.

APPX0263

US 10,533,990 B2

25

The subject profile **610** can include a narrative **834**, which can be written by a medical professional, documenting the condition of the patient and the medical history of the patient with the subject profile.

The subject profile **610** can include assessed metabolic factors of the patient **605**, which can include fasting blood sugar **836**, A1c level in the blood **838**, C-peptide level in the blood **840**, a magnesium level in the blood **842**, a potassium level in the blood **844**, and urinalysis test results **846**.

The subject profile **610** can include an insulin sensitivity factor **848** for the subject and diagnostic tests results **850**.

The diagnostic test results **850** can include blood glucose level **612**, respiratory quotient **614**, blood pressure **852**, weight **854**, nerve conduction velocity **856**, retinal image of the subject **212**, autonomic test results for neuropathy **858**, cognitive test results **860**, and cardiac test results **862** indicating cardiac function. The cardiac tests can be EKG or 2D Echo tests.

The subject profile **610** can include current medications **864** of the subject, such as aspirin or prescription medications the subject is currently using.

The subject profile **610** can have a home button **950**, a save button **952**, a previous page button **954**, a next page button **956**, and an exit button **958**. The buttons can be interchangeable with icons depending on software used on an industry standard computer screen.

FIG. **8B** shows the subject profile with a care plan template.

In embodiments, the can plan template can be filled in partially or completely and can be editable.

The care plan template **620** can have an infusion schedule **866**, which can indicate infusions by week, showing a quality of treatments and on which days the treatments must occur.

The care plan template **620** can include an infusion formulation **868**, which can be a combination of insulin, saline, potassium, magnesium, glucagon, and somatostatin.

The care plan template **620** can include treatment cycles **870**, a quantity of bolus per treatment cycle **872**, and unequal time periods between bolus introductions in seconds **874**.

The care plan template **620** can include a blood glucose level therapeutic range **876**.

In embodiments, additional therapies can be tracked in the care plan, including but not limited to, a quantity and frequency of dosage amounts of potassium **878**, a quantity and frequency of dosage amounts of magnesium **880**, a quantity and frequency of dosage amounts of glucagon **882**, and a quantity and frequency of dosage amounts of somatostatin **884**.

The care plan template **620** can include diagnostic tests **886**, which can be scheduled after a first treatment session.

The care plan template **620** can include metabolic enhancements **888**, which can be a particular supplement and instructions on dosage amounts and frequency for the subject in view of the diagnostic tests or other data in the care plan.

The care plan template **620** can include a weight management protocol **205**, which can be selected from the plurality of weight management protocols in the administrative data storage.

The care plan template **620** can include an education schedule **889**, which can consist of a curriculum of education modules to be viewed or read by a subject by a certain date, which can be automatically transmitted to a client device of the subject on a predetermined schedule.

26

The care plan template **620** can include at least one plan goal **890**, such as an increased metabolism for a subject, such as by 10 percent.

FIG. **8C** shows the subject profile with a report.

The report **892** can show improved cellular ATP functioning for the subject identifying improve impaired hepatic glucose processing.

The report **892** can include a post treatment narrative **894**, which can be completed by a health care professional, indicating subjective and analytical assessments of metabolic factors of the subject.

The report **892** can include post treatment assessed metabolic factors **896** of the patient, a post treatment insulin sensitivity factor **898**, a post treatment patient testimonial **900**, post treatment diagnostic tests results **902** and post treatment medications **904**.

The report **892** can include an insulin sensitivity factor **848** for the subject and diagnostic tests results **850**.

The diagnostic test results **850** can include blood glucose level **612**, respiratory quotient **614**, blood pressure **852**, weight **854**, nerve conduction velocity **856**, retinal image of the subject **212**, autonomic test results for neuropathy **858**, cognitive test results **860**, and cardiac test results **862** indicating cardiac function. The cardiac tests can be EKG or 2D Echo tests.

The report can include assessed metabolic factors of the patient **605**, which can include fasting blood sugar **836**, A1c level in the blood **838**, C-peptide level in the blood **840**, a magnesium level in the blood **842**, a potassium level in blood **844**, and urinalysis test results **846**.

While these embodiments have been described with emphasis on the embodiments, it should be understood that within the scope of the appended claims, the embodiments might be practiced other than as specifically described herein.

What is claimed is:

1. A method for individualized intravenous exogenous insulin-based treatment, comprising the steps of:

creating a subject profile for a subject, the subject profile comprising:

(i) a subject history;

(ii) subject physical reports including a subject weight;

(iii) subject name;

(iv) subject contact information; and

(v) subject blood test results;

assessing metabolic factors of the subject and storing the metabolic factors in the subject profile, wherein the metabolic factors include: a glucose level, an insulin-sensitivity factor, and an individual target blood glucose level;

creating a care plan with a plurality of treatment sessions for the subject and a plan goal, wherein the care plan uses the assessed metabolic factors and indicates a schedule of bolus introductions with at least one unequal time period and a quantity and frequency of a plurality of boluses containing saline and insulin for sequential intravenous introduction to the subject;

introducing glucose to the subject to stimulate gastrointestinal hormone production that results in a release of enzymes from the subject's liver and causing blood glucose levels of the subject to be in a therapeutic range;

testing the subject for blood glucose levels, comparing tested blood glucose levels to a plurality of therapeutic ranges, and verifying that the subject is in at least one of the plurality of therapeutic ranges;

US 10,533,990 B2

27

comparing the tested blood glucose levels to a diabetic treatment model;

mapping the tested blood glucose levels and the assessed metabolic factors of the subject by using the diabetic treatment model to determine the schedule for bolus introductions;

introducing, sequentially, to the subject a plurality of boluses by using the determined schedule for bolus introductions based on the mapping;

comparing the subject profile to a plurality of weight management protocols to identify a weight management protocol for the subject based upon the assessed metabolic functions of the subject and saving the weight management protocol in the care plan; and

implementing the weight management protocol and the determined schedule of bolus introductions for the subject to improve insulin sensitivity, cellular ATP functioning, or both, of the subject.

2. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising assessing at least one biomarker specific to diabetes of the subject and optionally storing the at least one biomarker in the subject profile.

3. The method for individualized intravenous exogenous insulin-based treatment of claim 1, wherein the schedule of bolus introductions having the at least one unequal time period uses time periods varying from 2 minutes to 10 minutes, and wherein the unequal time periods are time intervals from 1 percent to 30 percent different in length of time from each other.

4. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising introducing from 60 grams of glucose to 100 grams of glucose to the subject to establish a blood glucose level of at least 125 mg/dl prior to introducing the plurality of boluses in the first treatment session.

5. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising:

comparing a measured cardiac function of the subject in a resting state to a plurality of preset norms of cardiac function;

modifying a quantity of bolus for the subject identified in the care plan using the plurality of preset norms of cardiac function; and

modifying the schedule of bolus introductions by modifying the quantity and duration of unequal time periods between the bolus introductions to improve cardiac function.

6. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising:

measuring a peripheral autonomic neuropathy and microcirculation of the subject in a resting state prior to a bolus introduction and comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of peripheral autonomic neuropathies and microcirculations;

comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state as boluses are sequentially introduced to the measured peripheral autonomic neuropathy;

comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state after all boluses have been introduced in the first treatment session to the measured peripheral autonomic neuropathy and microcirculation;

28

modifying a quantity of boluses for the subject identified in the care plan to treat peripheral autonomic neuropathy and microcirculation; and

modifying the schedule of bolus introductions by modifying the quantity and duration of unequal time periods between the bolus introductions to improve the measured peripheral autonomic neuropathy and microcirculation.

7. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising:

viewing an initial retinal image of the subject captured by a non-mydriatic camera with the subject in a resting state to identify a diabetic retinopathy;

viewing a post treatment retinal image of the subject in a resting state after the first treatment session;

comparing the initial retinal image to the post treatment retinal image;

modifying a quantity of bolus for the subject if no change in the diabetic retinopathy has occurred; and

modifying the schedule of bolus introductions by modifying the quantity and duration of unequal time periods between the bolus introductions to reduce the effects of diabetic retinopathy.

8. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising:

dimensionally measuring wounds by length, width, and depth and identifying wound characteristics of the subject in a resting state;

dimensionally measuring wounds after at least one treatment session to identify skin integrity and changes in clinical wound characteristics;

modifying a quantity of bolus for the subject identified in the care plan for wound treatment using the identified skin integrity and changes in clinical wound characteristics; and

modifying the schedule of bolus introductions by modifying the quantity and duration of unequal time periods between the bolus introductions to reduce wound size and wound characteristics.

9. The method for individualized intravenous exogenous insulin-based treatment of claim 1, comprising:

comparing C-peptides of the subject to a plurality of preset norms of C-peptides to identify an insulin sensitivity factor;

modifying a quantity of bolus for the subject for the insulin sensitivity factor; and

modifying the schedule of bolus introductions to improve the insulin sensitivity factor using analysis of the C-peptides by modifying the quantity and duration of unequal time periods between the bolus introductions.

10. The method for individualized intravenous exogenous insulin-based treatment of claim 1, wherein the implementing the weight management protocol comprises implementing use of a metabolic enhancement comprising methylcobalamin, pyridoxal-5-phosphate, 5-MTHF, alpha lipoic acid, NADH, coenzyme Q10, chromium picolinate, N-Acetyl cysteine, vitamin $D_3$, or combinations thereof.

11. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising determining a quantity and frequency of dosage amounts of magnesium and introducing the dosage amounts of magnesium simultaneously to the subject with the plurality of boluses using the schedule of bolus introductions.

12. The method for individualized intravenous exogenous insulin-based treatment of claim 1, determining a quantity and frequency of dosage amounts of potassium and intro-

APPX0265

US 10,533,990 B2

29

ducing the dosage amounts of potassium simultaneously to the subject with the plurality of boluses using the schedule of bolus introductions.

**13**. The method for individualized intravenous exogenous insulin-based treatment of claim **1**, determining a quantity and frequency of dosage amounts of somatostatin and introducing the dosage amounts of somatostatin simultaneously to the subject with the plurality of boluses using the schedule of bolus introductions.

**14**. The method for individualized intravenous exogenous insulin-based treatment of claim **1**, determining a quantity and frequency of dosage amounts of glucagon and introducing the dosage amounts of glucagon simultaneously to the subject with the plurality of boluses using the schedule of bolus introductions.

**15**. The method for individualized intravenous exogenous insulin-based treatment of claim **1**, comprising scheduling diagnostic tests after the first treatment session to modify the care plan to improved the insulin sensitivity, cellular ATP functioning, or both, of the subject.

**16**. The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising modifying the determined schedule of bolus introductions.

**17**. The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising measuring at least one of the metabolic factors, at least one biomarker, or both.

**18**. The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising comparing the determined schedule of bolus introductions to the diabetic treatment model.

**19**. A system for individualized intravenous exogenous insulin-based therapy comprising:

an administrative processor connected to an administrative data storage, the administrative processor connected to a network;

a plurality of client devices, wherein the plurality of client devices is configured for inputting subject information into at least one subject profile in the administrative data storage, and wherein the at least one subject profile has a glucose level, an insulin sensitivity factor, and an individual target blood glucose level;

a plurality of care plan templates in the administrative data storage;

computer instructions in the administrative data storage, wherein the computer instructions are configured to instruct the administrative processor to create

30

a care plan for a subject from one of the plurality of care plan templates, and wherein the care plan indicates:

(i) a plurality of treatment sessions for the subject with the at least one subject profile with a plan goal; and

(ii) a schedule of bolus introductions having at least one unequal time period between bolus introductions, wherein each bolus contains saline and insulin and each bolus is introduced intravenously and sequentially to the subject;

computer instructions in the administrative data storage configured to instruct the administrative processor to compare tested blood glucose levels to a diabetic treatment model after introducing glucose to the subject to stimulate gastrointestinal hormone production that result in a release of enzymes from the subject's liver;

a plurality of therapeutic ranges for blood glucose levels in the administrative data storage;

computer instructions in the administrative data storage configured to instruct the administrative processor to compare the tested blood glucose levels to the plurality of therapeutic ranges and verify that the subject is in at least one of the plurality of therapeutic ranges;

a plurality of weight management protocols in the administrative data storage;

computer instructions in the administrative data storage configured to instruct the administrative processor to compare the at least one subject profile for the subject to the plurality of weight management protocols to identify a weight management protocol based upon metabolic functions of the subject and to save the weight management protocol to the care plan;

computer instructions in the administrative data storage configured to map the tested blood glucose levels and the assessed metabolic factors of the subject by using the diabetic treatment model to determine the schedule for bolus introductions; and

computer instructions in the administrative data storage configured to instruct the administrative processor to track implementation of the weight management protocol and the determined schedule of bolus introductions of the subject after a first treatment session.

**20**. The system for individualized intravenous exogenous insulin-based therapy of claim **19**, further comprising computer instructions in the administrative data storage configured to assess at least one biomarker specific to diabetes of the subject and optionally to store the at least one biomarker in the at least one subject profile for the subject.

* * * * *

# Exhibit C

**11/4/2021**

Well Cell Support, LLC                                                  **60,000.00

Sixty Thousand and 00/100************************************************************************

Well Cell Support, LLC

account 662055869

Well Cell Support, LLC                    Infusion Pump order            11/4/2021            60,000.00

Infinity Health Sol    account 662055869                                                     60,000.00

Well Cell Support, LLC                    Infusion Pump order            11/4/2021            60,000.00

Infinity Health Sol    account 662055869                                                     60,000.00

## Completed Transaction

Posted date: **08/27/2021**

Description: **Wire withdrawal from account**

Action: **Withdraw**

Bank:

Transaction ID: **37019484202**

Amount: **-$60,000.00**

*Pumps for Insuline of Lafayette*

10:23am ET 09/16/22

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-03062 |
| | § | |
| SHAWN PAUL CALVIT, MARC | § | |
| PIERRE DESGRAVES IV, CHARLES | § | |
| ALEXANDER ELLIOTT, INSULINIC | § | |
| OF LAFAYETTE LLC, INSULINIC OF | § | |
| HIALEAH LLC, INSULINIC HAWAII, LLC, | § | |
| | § | |
| *Defendants*. | § | |

### DEFENDANTS' PROPOSED ORDER GRANTING MOTION TO DISMISS

Defendants, Shawn Paul Calvit, Insulinic of Lafayette LLC, Marc Pierre Desgraves IV,

Charles Alexander Elliott, Insulinic of Hialeah LLC, and Insulinc of Hawaii LLC (collectively,

the "Defendants"), file Defendants' Motion to Dismiss Plaintiff's claims under Rule 12 (Docket

Entry No. 35).

IT IS HEREBY ORDERED that the Defendants' Motion to Dismiss is granted and Plaintiff

Well Cell Global LLC's claims are dismissed.

SIGNED on _____, at Houston, Texas.


_____
The Honorable Lee H. Rosenthal
United States District Judge

The court orders that Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, Insulinic Hawaii, LLC, Shawn Paul Calvit, Marc Pierre Desgraves IV, and Charles Alexander Elliott, and their principals, agents, officers, directors, members, employees, representatives, successors, and other persons acting in concert and participation with them, are enjoined from:

    a.    making, using, selling, or offering for sale in the United States, or importing into the United States, including within this judicial district, infusion pumps, kits, and IV tubing infusion cassettes for the treatment of diabetes related to U.S. Patent Nos. 9,654,595 and 10,533,990 B2; and

    b.    representing, by any means, that any products manufactured, distributed, advertised, offered, or sold by the defendants are Well Cell's products or vice versa, and from otherwise acting in a way likely to cause confusion, mistake, or deception on the part of purchasers or consumers as to the origin or sponsorship of such products.

The court orders Well Cell to tender $10,000.00 to the United States District Court as security for any injury to the defendants caused by the court's temporary restraining order, if the defendants are later determined to have been wrongfully enjoined.

This order expires on October 11, 2022, or when the court otherwise orders.

The court sets a hearing on Well Cell's application for a preliminary injunction on **Tuesday, October 11, 2022, at 2:00 p.m., in Courtroom 11-B**.

    SIGNED on September 26, 2022, at Houston, Texas.

 

    Lee H. Rosenthal
    Chief United States District Judge

2

APPX0271

**TAB 14**

United States District Court
Southern District of Texas
**ENTERED**
October 13, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **WELL CELL GLOBAL LLC** § | | |
| *Plaintiff* § | | |
| § | | |
| **v.** § | | **CIVIL CASE NO.** |
| § | | **4:22-cv-03062-LHR** |
| **SHAWN PAUL CALVIT, MARC PIERRE** § | | **JURY DEMANDED** |
| **DESGRAVES IV, CHARLES** § | | |
| **ALEXANDER ELLIOTT, INSULINIC OF** § | | |
| **LAFAYETTE LLC, INSULINIC OF** § | | |
| **HIALEAH LLC, INSULINIC HAWAII,** § | | |
| **LLC** § | | |
| *Defendants* § | | |

---

### MEMORANDUM AND TEMPORARY RESTRAINING ORDER

---

Well Cell owns U.S. Patent Nos. 9,654,595 and 10,533,990 B2 (the '595 and '990 Patents), covering certain products used for treating diabetes. In September 2021, Well Cell entered into license agreements with the Insulinic Lafayette, LLC and Insulinic of Hialeah, LLC defendants. These agreements covered the two Well Cell patents and certain trade secrets. In July 2022, Well Cell acted to terminate the license agreements. In this lawsuit, Well Cell sought a temporary restraining order and a preliminary and permanent injunction to prevent the defendants from making, using, or selling products relating to the '595 and '990 Patents.

The Court held a hearing on the TRO application on September 13, 2022, at which all parties who had appeared were present.[1] The Court finds that Well Cell has shown a substantial likelihood of success on the merits, a substantial threat of irreparable harm absent the TRO, that the harm Well Cell will suffer without the TRO outweighs the costs to the defendants to comply, and that issuing the TRO is in the public interest.

---

[1] No appearance has yet been made on behalf of Marc Pierre Desgraves or Charles Alexander Elliott.

On September 15, 2022, the Court issued an Order that Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, Insulinic Hawaii, LLC, Shawn Paul Calvit, Marc Pierre Desgraves IV, and Charles Alexander Elliott, and their principals, agents, officers, directors, members, employees, representatives, successors, and other persons acting in concert and participation with them, are enjoined from:

a. making, using, selling, or offering for sale in the United States, or importing into the United States, including within this judicial district, infusion pumps, kits, and IV tubing infusion cassettes for the treatment of diabetes related to U.S. Patent Nos. 9,654,595 and 10,533,990 B2; and

b. representing, by any means, that any products manufactured, distributed, advertised, offered, or sold by the defendants are Well Cell's products or vice versa, and from otherwise acting in a way likely to cause confusion, mistake, or deception on the part of purchasers or consumers as to the origin or sponsorship of such products.

(Docket Entry No. 18).

The Court further ordered Well Cell to tender $10,000.00 to the United States District Court as security for any injury to the defendants caused by the court's temporary restraining order, if the defendants are later determined to have been wrongfully enjoined. (Docket Entry No. 25). Well Cell paid said security on September 20, 2022.

The preliminary injunction hearing is reset to **October 31, 2022 at 1:30 p.m. in Courtroom 11-B**. By agreement of the parties, the TRO will also be extended until October 31, 2022.

SIGNED on _____October 13, 2022_____, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

2

**TAB 15**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **WELL CELL GLOBAL LLC** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **CIVIL CASE NO.** |
| | § | **4:22-cv-03062-LHR** |
| **SHAWN PAUL CALVIT, MARC PIERRE** | § | **JURY DEMANDED** |
| **DESGRAVES IV, CHARLES** | § | |
| **ALEXANDER ELLIOTT, INSULINIC OF** | § | |
| **LAFAYETTE LLC, INSULINIC OF** | § | |
| **HIALEAH LLC, INSULINIC HAWAII,** | § | |
| **LLC** | § | |
| *Defendants* | § | |
| | § | |

---

**PLAINTIFF WELL CELL GLOBAL LLC'S RESPONSE TO
DEFENDANTS' MOTION TO DISMISS**

---

LEMA BARAZI
Attorney-in-charge
State Bar No. 24056016
S.D. Texas Bar No. 1358290
lema@lloydmousilli.com
**LLOYD & MOUSILLI, PLLC**
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
Tel: (512) 609-0059
Fax: (413) 473-6164
Service: litigation@lloydmousilli.com

**ATTORNEYS FOR PLAINTIFF
WELL CELL GLOBAL LLC**

# TABLE OF CONTENTS

Contents

I.  NATURE AND STAGE OF PROCEEDING ........................................................... 6

II.  ISSUES TO BE DECIDED ................................................................................. 9

III.  STANDARD OF REVIEW ................................................................................. 9

IV.  ARGUMENT AND AUTHORITIES ................................................................. 10

  A.  This Court Has Subject Matter Jurisdiction over Plaintiff's Claims ................................ 10

  B.  This Court has Personal Jurisdiction over Defendant Desgraves and Defendant Elliott.. 13

  C.  Plaintiff Has Pled Sufficient Facts to Defeat a Rule 12(b)(6) Motion on Each of Its Claims ................................................................................................................................ 18

    1. The Cause of Action for Patent Infringement Must Not be Dismissed ..................... 18

      a)  The 595 Patent is Not Directed at an Abstract Idea .................................... 21

      b)  The 595 Patent Does Contain an Inventive Concept ................................ 22

      c)  The 990 Patent is Not Directed at an Abstract Idea .................................... 23

      d)  The 900 Patent Does Contain Inventive Concepts .................................... 25

      e)  Plaintiff Has Not Exhausted its Monopoly on the Patents in Suit ........................... 27

      f)  Plaintiff Sufficiently Identified the Accused Products that Infringe the 595 Patent and the 990 Patent and the Willfulness of Defendants' Infringement .................... 28

    2. Plaintiff Has Made Sufficient Allegations Regarding Its Copyright Infringement Claims ..30

    3. Plaintiff Has Made Sufficient Allegations Regarding Its Trade Secret Claims ............. 32

    4. Plaintiff Has Made Sufficient Allegations Regarding Its Claims for Violations of the DTPA, Unfair Competition, and Unjust Enrichment    ……………………..……………33

V.  PRAYER ....................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*A.M. Castle & Co. v. Byrne*, 123 F. Supp. 3d 909 (S.D. Tex. 2015) ........................................ 33

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.,* 728 F.3d 1336 (Fed.Cir.2013) ... 19

*Accord Matassarin v. Grosvenor,* No. CV SA-13-CA-913-RP, 2015 WL 12734174 (W.D. Tex. -
San Antonio Oct. 19, 2015) ........................................................................................ 31

*Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014) .............................................. 20, 21

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ............................................................................. 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .............................................................. 10

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ....................................................... 15

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .................................................. 31

*Campbell v. Wells Fargo Bank*, 781 F.2d 440 (5th Cir. 1986) ............................................ 10

*Cantrell v. Wallick,* 117 U.S. 689 (1886) .......................................................................... 18

*Carson v. Dynegy, Inc.*, 344 F.3d 446 (5th Cir.2003) ......................................................... 34

*CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc*., 97 F.3d 1504 (1st Cir.1996) .............. 31

*Collins v. Morgan Stanley Dean Witter & Co.*, 224 F.3d 496 (5th Cir. 2000).......................... 9

*Colony Ins. Co. v. Peachtree Constr., Ltd.,* 647 F.3d 248 (5th Cir. 2011) .............................. 10

*Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044 (Fed. Cir. 2017) .................. 26, 27

*Crowe v. Henry*, 43 F.3d 198 (5th Cir. 1995) .................................................................... 10

*Daboub v. Gibbons*, 42 F.3d 285 (5th Cir.1995) ................................................................ 34

*Davis v. Fort Bend Cnty.,* 893 F.3d 300 (5th Cir. 2018), *aff'd sub nom* ................................. 31

*Diamond v. Diehr*, 450 U.S. 175 (1981) ............................................................................ 22

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd*., 955 F.3d 1317 (Fed. Cir. 2020) ........ 25, 26

*Fort Bend Cnty., Texas v. Davis,* 139 S. Ct. 1843, 204 L. Ed. 2d 116 (2019) ......................... 31

*Gatch Wire Goods Co. v. W. A. Laidlaw Wire Co.*, 108 F.2d 433 (7th Cir. 1939).................... 18

*Gen. Talking Pictures Corp. v. W. Elec. Co*., 304 U.S. 175, aff'd on reh'g, 305 U.S. 124 (1938)
.................................................................................................................... 27, 28

*Gen. Universal Sys., Inc. v. HAL, Inc.,* 500 F.3d 444 (5th Cir. 2007) .................................... 33

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 131 S.Ct. 2846, 180 L.Ed.2d
796 (2011).......................................................................................................... 14

*Gottschalk v. Benson*, 409 U.S. 63 (1972)......................................................................... 21

*Guidry v. U.S. Tobacco Company*, Inc., 188 F.3d 619 (5th Cir. 1999).................................... 16

*Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459 (5th Cir.2003)........................................ 33

APPX0276

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191 (5th Cir. 2007) ........................................ 10

*Intell. Ventures I LLC v. J. Crew Grp., Inc.,* No. 6:16-CV-196-JRG, 2016 WL 4591794 (E.D. Tex. Aug. 24, 2016)........................................................................................................ 22

*Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd*., 818 F.3d 193 (5th Cir. 2016) 14

*Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602 (5th Cir. 2008)...................................... 13

*Jones v. Greninger*, 188 F.3d 322 (5th Cir. 1999) ................................................................... 9

*Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045 (5th Cir. 1982) ........... 9

*Keeton v. Hustler Magazine*, Inc., 465 U.S. 770 (1984)............................................................ 15

*Lewis v. Fresne*, 252 F.3d 352 (5th Cir. 2001)...................................................................... 14

*Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015 (5th Cir. 1996)........................................... 10

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S.Ct. 1289 (2012)..... 20, 22

*McFadin v. Gerber*, 587 F.3d 753 (5th Cir. 2009) .................................................................. 14

*MCG, Inc. v. Great Western Energy Corp.*, 896 F.2d 170 (5th Cir. 1990) ................................ 12

*McGee v. Int'l Life Ins. Co.*, 355 U.S. 220 (1957) .................................................................. 15

*Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45 (5th Cir.1995)................................. 30, 31

*Paterson v. Weinberger*, 644 F.2d 521 (5th Cir. 1981) ........................................................... 12

*Phoenix Licensing, L.L.C. v. CenturyLink, Inc.*, No. 2:14-CV-965-JRG-RSP, 2015 WL 5786582 (E.D. Tex. Sept. 30, 2015)................................................................................... 19, 20

*Pittsburg Water Heater Co. v. Sullivan*, 282 S.W. 576 (Tex. 1926) ........................................ 16

*R. Ready Prods., Inc. v. Cantrell*, 85 F. Supp. 2d 672 (S.D. Tex. 2000) ................................. 31

*Richards v. Mitcheff*, 696 F.3d 635 (7th Cir. 2012) ............................................................... 31

*Sandoval v. New Line Cinema Corp.*, 147 F.3d 215 (2d Cir. 1998)......................................... 32

*Scheuer v. Rhodes*, 416 U.S. 232 (1974)............................................................................... 9

*SimpleAir, Inc. v. Google Inc.*, 136 F. Supp. 3d 745 (E.D. Tex. 2015)..................................... 21

*Texva, Inc. v. Boone,* 300 S.W.3d 879 (Tex. App. 2009) ........................................................ 17

*Travelers Health Ass'n v. Virginia*, 339 U.S. 643 (1950) ....................................................... 15

*Turner v. Pleasant*, 663 F.3d 770 (5th Cir. 2011) ............................................................ 9, 10

*U.S. v. Univis Lens Co.,* 316 U.S. 241 (1942)....................................................................... 28

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 823 F. Supp. 2d 578 (S.D. Tex. 2011)................... 34

*Vander Zee v. Reno,* 73 F.3d 1365 (5th Cir.1996).................................................................. 9

*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235 (5th Cir. 2008).......... 14

*Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999) .............................................. 18

*Wilson v. Belin*, 20 F.3d 644 (5th Cir. 1994) ....................................................................... 13

PLAINTIFF WELL CELL GLOBAL LLC'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

**Statutes**

17 U.S.C. § 410 ................................................................................................................. 30

17 U.S.C. §§ 101 et. seq. ............................................................................................. 10, 30

18 U.S.C. § 1836 .......................................................................................................... 11, 32

28 U.S.C. § 1331 ................................................................................................................ 11

28 U.S.C. § 1332 ................................................................................................................ 11

28 U.S.C. § 1338 ................................................................................................................ 11

28 U.S.C. § 1367 ................................................................................................................ 11

35 U.S.C. §§ 1 et seq. ....................................................................................................... 10

Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A.001 ........................... 11

**Rules**

Fed. R. Civ. P. 12 ........................................................................................................ 10, 19

APPX0278

COMES NOW, **PLAINTIFF WELL CELL GLOBAL LLC,** (**"Plaintiff** or **"Well Cell"**), in the above-styled matter and files this *Plaintiff Well Cell Global LLC's Response to Defendants' Motion to Dismiss* (**"Response"**). In support thereof, Plaintiff respectfully shows the Court the following:

## I.    NATURE AND STAGE OF PROCEEDING

1.    On September 8, 2002, Plaintiff commenced an action against Defendants Shawn Paul Calvit, Marc Pierre Desgraves IV, Charles Alexander Elliott, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, Insulinic Hawaii, LLC (collectively, **"Defendants"**) for copyright infringement, patent-infringement, trade secret misappropriation under the Defend Trade Secrets Act, trade secret misappropriation under the Texas Uniform Trade Secrets Act, unfair competition in violation of Texas Business and Commerce Code § 17.46, unfair competition in violation of Texas common law, unfair competition by misappropriation in violation of Texas common law, and unjust enrichment in violation of Texas common law, and seeking temporary, preliminary, and permanent injunctive relief to prevent Defendants from infringing upon Plaintiff's intellectual property rights. *See* Dkt. No. 1. Plaintiff filed an Application for Temporary Restraining Order against Defendants on September 9, 2022 (**"Application"**), enjoining and restraining them from the commission of certain acts that infringe upon Plaintiff's copyright-protected and patent-protected intellectual property, as set forth more fully in the Application and incorporated herein by reference. *See* Dkt. No. 4. 3.

2.    Well Cell, a leading pioneer in the medical industry specializing in developing cutting-edge technology for the treatment of diabetes, has been operating for numerous years and has established immense goodwill throughout the country, especially among the diabetic population and experts in the field.

3.      Despite Well Cell's incontestable rights, and in a bad-faith attempt to capitalize on the success of Well Cell, Defendants are operating "Insulinic" clinics in Louisiana, Florida, and Hawaii (the **"Infringing Clinics"**) which infringe Well Cell's intellectual property by (a) using Well Cell's copyrighted works throughout the clinics, on their websites, and in marketing materials, (b) using Well Cell's patented products and services, and by (c) using and benefiting from Well Cell's proprietary and confidential trade secrets.

4.      Thus, Well Cell sought emergency injunctive relief to prohibit Defendants from unlawfully infringing on Well Cell's intellectual property, which includes federal patents, federal trademark registrations, federal copyright registrations, and trade secrets (the "**Well Cell IP**").

5.      On September 13, 2022, the Court held a hearing on Plaintiff's Application. Defendants Shawn Paul Calvit, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and Insulinic Hawaii, LLC, (collectively the **"Clinic Defendants"**) appeared through counsel at the hearing.

6.      The Court found that Plaintiff had put forth sufficient evidence in its Application and at the hearing on its Application that Well Cell owns U.S. Patent Nos. 9,654,595 and 10,533,990 B2 (the "**595 and 990 Patents**"), covering certain products used for treating diabetes. *See* Dkt. No. 18. In September 2021, Well Cell entered into license agreements with the Insulinic Lafayette, LLC (**"Insulinic LA"**) and Insulinic of Hialeah, LLC (**"Insulinic FL"**) defendants. *Id.* These agreements covered the two Well Cell patents and certain trade secrets. *Id.* In July 2022, Well Cell acted to terminate the license agreements. *Id.*

7.      The Court found that Well Cell had shown in its Application and at the hearing on its Application a substantial likelihood of success on the merits of its claims, a substantial threat of irreparable harm absent a temporary restraining order, that the harm Well Cell will suffer without the temporary restraining order outweighs the costs to the Defendants to comply, and that issuing

the temporary restraining order is in the public interest. *Id.* Therefore, the Court issued a Temporary Restraining Order (**"TRO"**) on September 15, 2022 enjoining and restraining the Defendants from infringing upon Well Cell's 595 and 990 patents by (a) "making, using, selling, or offering for sale in the United States, or importing into the United States, including within this judicial district, infusion pumps, kits, and IV tubing infusion cassettes for the treatment of diabetes elated to U.S. Patent Nos. 9,654,595 and 10,533,990 B2" or (b) "representing, by any means, that any products manufactured, distributed, advertised, offered, or sold by the defendants are Well Cell's products or vice versa, and from otherwise acting in a way likely to cause confusion, mistake, or deception on the part of purchasers or consumers as to the origin or sponsorship of such products." *Id.*

8.      The Court also set a hearing on Well Cell's application for a preliminary injunction, which has been continued to October 31, 2022. *See* Dkt. 38. Well Cell seeks a preliminary injunction preventing Defendants from: (1) infringing upon the 595 and 990 Patents, (2) infringing upon its copyrights, registration numbers TX-8-452-464 and VAu 1-330-086, and (3) misappropriating its trade secrets until a trial on the merits. *See* Dkt. No. 1. Well Cell also seeks a preliminary injunction requiring Defendants to: (1) return devices to Well Cell that infringe upon the 595 and 990 Patents, (2) remove information from the Insulinic website and the Insulinic Press Release (as defined therein) that infringes upon Well Cell's copyrights, and (3) issue a retraction for the Insulinic Press Release.

9.      Defendants filed a Motion to Dismiss each and every one of Plaintiff's claims for failure to state a claim on which relief can be granted on October 4, 2022. *See* Dkt. No. 35. Defendants also seek dismissal of Plaintiff's claims on grounds of lack of subject matter jurisdiction and lack of personal jurisdiction. *Id.*

10.     Plaintiff has alleged a sufficient factual and legal basis on each of its claims, as this Court has already found on Plaintiff's patent infringement claims in granting the TRO, which requires a higher standard of proof. *See* Dkt. No. 18. This also grants the Court exclusive jurisdiction over Plaintiff's patent infringement claims and supplemental jurisdiction on its remaining claims. Defendants' Motion to Dismiss is entirely without merit and should be denied by this Court.

## II.     ISSUES TO BE DECIDED

11.     The issues to be decided by this Court are: (1) whether Plaintiff's claims against Defendants should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction; (2) whether Plaintiff's claims against Defendants Marc Pierre Desgraves IV (**"Desgraves"**) and Charles Alexander Elliott (**"Elliott"**) should be dismissed under Rule 12(b)(2) for lack of personal jurisdiction; and (3) whether Plaintiff's claims against Defendants should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

## III.     STANDARD OF REVIEW

12.     A motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011); *See also, Collins v. Morgan Stanley Dean Witter & Co.*, 224 F.3d 496, 498 (5th Cir. 2000) (*quoting Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982)). The issue raised by a 12(b)(6) motion is not whether the plaintiff will ultimately prevail but whether the plaintiff can offer evidence to support her claims. *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Thus, the court should not dismiss the claims "unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." *Id; See also Vander Zee v. Reno,* 73 F.3d 1365, 1368 (5th Cir.1996).

13.     When deciding a Rule 12(b)(6) motion, a court must accept well-pleaded facts as true and view them in a light most favorable to the non-movant. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). In other words, a motion to dismiss admits the facts alleged in the complaint but challenges the plaintiff's right to any relief based on those facts. Fed. R. Civ. P. 12(b)(6); *Crowe v. Henry*, 43 F.3d 198, 203 (5th Cir. 1995). Accordingly, the complaint must be liberally construed in favor of the plaintiff, all reasonable inferences are to be drawn in favor of the plaintiff, and all factual allegations pleaded in the complaint must be taken as true. *Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986). Furthermore, in ruling on a Rule 12(b)(6) motion, "courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996); *See also*, Fed. R. Civ. P. 12(d).

14.     Dismissal is appropriate only if the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To satisfy this standard, the complaint must provide more than conclusions, but it "need not contain detailed factual allegations." *Turner*, 663 F.3d at 775; *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011). It must only allege enough facts to move the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Determining whether the plausibility standard has been met is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 663 (2009).

## IV.     ARGUMENT AND AUTHORITIES

**A.     This Court Has Subject Matter Jurisdiction over Plaintiff's Claims.**

15.     This action arises under the under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq., the patent laws of the United States, 35 U.S.C. §§ 1 et seq., the Defend Trade Secrets Act of 2016, 18

U.S.C. §§ 1836, et seq. (**"DTSA"**), the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A.001 (**"TUTSA"**), the Texas Business & Commerce Code, federal and state common law, and Texas statutory law.

16.     This Court has exclusive subject matter jurisdiction for the patent infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court also has exclusive subject matter jurisdiction for the copyright infringement claims pursuant to the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq. Additionally, this Court has subject matter jurisdiction over this action for the misappropriation of trade secrets under the DTSA pursuant to 28 U.S.C. § 1331.

17.     This Court has supplemental jurisdiction over the Texas statutory and common law claims pursuant to 28 U.S.C. § 1367 because such claims are related to the federal claims for copyright infringement, patent infringement, and misappropriation of trade secrets in that they form part of the same case or controversy and are derived from a common nucleus of operative facts.

18.     This Court also has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship among the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

19.     Defendants' sole basis for contesting Plaintiff's grounds for subject matter jurisdiction is their unfounded contention that Plaintiff lacks standing to enforce its patent infringement and copyright infringement claims. However, there are sufficient allegations in the Complaint regarding Plaintiff's standing to bring its patent and copyright infringement claims.

20.     In ruling on a motion to dismiss under Rule 12(b)(1), the Court may rely on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts." *MCG, Inc. v. Great Western Energy Corp.*, 896 F.2d 170, 176 (5th Cir. 1990) (internal citation omitted). As admitted

by Defendants in their Motion, they have made only a facial attack on the alleged lack of subject matter jurisdiction by the mere filing of a Motion to Dismiss, they have not made a factual attack by submitting any factual evidence, thus the Court need only look at the sufficiency of the allegations in the Complaint, which are presumed to be true. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

21.     There is nothing ambiguous about Plaintiff's allegations regarding its standing to pursue its patent and copyright infringement claims in the Complaint. Plaintiff states that the 595 Patent, the 990 Patent, and the federal copyrights alleged in the Complaint were previously held by Diabetes Relief LLC because they were assigned to Diabetes Relief LLC from the original inventors.[1] However, "on or about July 24, 2020, Well Cell purchased all of the assets of Diabetes Relief LLC for millions of dollars, including all intellectual property," specifically including all copyrights held by Diabetes Relief LLC, the 595 Patent, and the 990 Patent. *See* Dkt. 1, Well Cell's Compl. at ¶¶33, 71. As the Court must accept these allegations as true, the inquiry regarding standing should end there.

22.     However, to the extent there is any legitimate question regarding Well Cell's authority to enforce these intellectual property rights. Subsequent to the filing of the Complaint, Well Cell produced a copy of the Asset Purchase Agreement between it and Diabetes Relief LLC (**"Asset Purchase Agreement"**), as well as assignments from each of the inventors of the 595 Patent and the 990 Patent, so that a full chain of custody is established for all copyrights and patents in question. Page 1 of the Asset Purchase Agreement defines the "assets" being purchased as including "all Copyrights and Trade Secrets" as well as "issued patents," specifically enumerating

---

[1] *See* Dkt. 1, Well Cell's Compl. at ¶¶33, 66, 69, 71; Ex. 1 to Dkt. 1, the Registration for the website diabetesrelief.com; Ex. 2 to Dkt. 1, the Registration for the 2-D artwork entitled "Overcoming Metabolic Failure"; Ex. 8 to Dkt. 1, the 595 Patent; Ex. 9 to Dkt. 1, the 990 Patent.

the 595 Patent and the 990 Patent.[2] The assignments from all inventors for the 595 Patent and the

990 Patent to Diabetes Relief LLC have also been produced as part of the expedited discovery

authorized in this case.[3] Thus, Defendants are in possession of documents evidencing the full chain

of custody from the inventors, to Diabetes Relief LLC, to Well Cell.

23.     Therefore, it is evident that Well Cell does in fact have standing to pursue its copyright and

patent infringement claims and Defendants' pursuit of a Motion to Dismiss on this basis despite

possession of these documents is a waste of the parties' resources and this Court's time.

**B.      This Court has Personal Jurisdiction over Defendant Desgraves and Defendant
          Elliott.**

24.     There is personal jurisdiction if the state's long-arm statute extends to the defendant and

exercise of such jurisdiction is consistent with due process. *Johnston v. Multidata Sys. Int'l Corp.*,

523 F.3d 602, 609 (5th Cir. 2008). "Because the Texas long-arm statute extends to the limits of

federal due process, the two-step inquiry collapses into one federal due process analysis." *Id.* Due

process requires that the defendant have "minimum contacts" with the forum state (i.e., that the

defendant has purposely availed himself of the privilege of conducting activities within the forum

state) and that exercising jurisdiction is consistent with "traditional notions of fair play and

substantial justice." *Id.* (*quoting Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994)).

25.     "Minimum contacts" can give rise to either specific jurisdiction or general jurisdiction.

*Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001). Specific jurisdiction may exist "over a

nonresident defendant whose contacts with the forum state are singular or sporadic only if the

---

[2] *See* **Exhibit 1 Filed under Seal Pursuant to Protective Order (Dkt. 28)**, Asset Purchase
Agreement between Diabetes Relief, LLC and Well Cell at Pg. 1.
[3] *See* **Exhibit 2 Filed under Seal Pursuant to Protective Order (Dkt. 28)**, Assignment from
Inventors of the 595 Patent to Diabetes Relief, LLC; **Exhibit 3 Filed under Seal Pursuant to
Protective Order (Dkt. 28)**, Assignment from Inventors of the 990 Patent to Diabetes Relief,
LLC.

cause of action asserted arises out of or is related to those contacts." *Int'l Energy Ventures Mgmt.,*

*L.L.C. v. United Energy Grp., Ltd*., 818 F.3d 193, 212 (5th Cir. 2016) (*citing McFadin v. Gerber*,

587 F.3d 753, 759 (5th Cir. 2009)). In other words, such jurisdiction exists "when a nonresident

defendant has purposefully directed its activities at the forum state and the litigation results from

alleged injuries that arise out of or relate to those activities." *Walk Haydel & Assocs., Inc. v.

Coastal Power Prod. Co.*, 517 F.3d 235, 243 (5th Cir. 2008) (internal quotation marks omitted).

"[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the

very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*,

564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011) (quotations omitted).

26.    This Court has specific jurisdiction over Defendants Desgraves and Defendant Elliott as

they have minimum contacts with the forum state in their business relationships with Well Cell

and their tortious conduct, which is aimed at the forum state of Texas. Defendants merely make a

conclusory statement that there is no personal jurisdiction over Defendants Desgraves and Elliott

without any law or facts to support their position, apart from the undisputed fact that they do not

live in Texas. The analysis of personal jurisdiction over a defendant extends far beyond their home

state.

27.    As stated in Plaintiff's complaint, this Court has personal jurisdiction over Defendants

Desgraves and Elliott because they have committed acts directed at Texas that have caused tortious

injury to Well Cell in Texas, specifically, misappropriation of Well Cell's intellectual property,

with the knowledge that Well Cell would thereby be harmed. *See* Dkt. 1, Well Cell's Compl. ¶20.

Defendants Desgraves and Elliott committed acts of intellectual property infringement in Texas.

*Id.* at ¶22. Accordingly, Defendants Desgraves's and Elliott's tortious acts giving rise to this

lawsuit have been directed at Texas and the harm to Well Cell has occurred and will continue to occur within Texas. *Id.* at ¶20

28.     This Court must accept these well plead facts in Plaintiff's Complaint as true.

29.     The minimum contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 475 (1985). The United States Supreme Court has specified that a nonresident's contacts are not unilateral or random and fortuitous when the defendant "has created 'continuing obligations' between himself and residents of the forum," which shields the nonresident with the benefits and protections of the forum's laws. *Burger King*, 471 U.S. at 475 (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 648, (1950)). Further, the Court has stated that jurisdiction is proper "where the contacts proximately result from actions by the defendant himself that create a substantial connection with the forum State." *Id.* A substantial connection can result from even a single act. *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957).

30.     The United States Supreme Court has also recognized "it is beyond dispute that [a forum] has a significant interest in redressing injuries that actually occur within the State." *Keeton v. Hustler Magazine*, Inc., 465 U.S. 770, 776 (1984). "When a nonresident defendant commits a tort within the state, or an act outside the state that causes tortious injury within the state, that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state, including federal courts, to exercise personal adjudicative jurisdiction over the tortfeasor and the causes of actions arising from its offenses or quasi-offenses." *Guidry v. U.S. Tobacco Company*, Inc., 188 F.3d 619, 628 (5th Cir. 1999). "Even an act done outside the state that has consequences or effects within the state will suffice as a basis for

jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." *Id.*

31.     In the instant case, there were multiple, significant acts by Defendants Desgraves and Elliott directed at Texas sufficient to confer specific jurisdiction on them. To begin, it is important to note that Well Cell is a limited liability company organized under the laws of the State of Texas with its principal place of business in Houston, Texas. Under the decisions of practically all the courts, a limited liability company is deemed a resident of both the State under whose law it is formed and the State where it has its principal place of business. *Pittsburg Water Heater Co. v. Sullivan*, 282 S.W. 576, 579 (Tex. 1926). Thus, Plaintiff is undeniably a resident of Texas both due to its state of formation and its principal place of business and Defendants should have reasonably expected to be subject to the jurisdiction of Texas courts by their contacts with Texas regarding Plaintiff and its operations and their tortious conduct therein.

32.     The egregious acts committed by Defendants in this case occurred on a nationwide basis. For example, the infringing information that Defendants utilized on the Insulinic website was published on the worldwide web and seen by people throughout the nation and even globally. *See* Dkt. 1, Well Cell's Compl. at ¶¶37-38. Defendants also issued an infringing press release online, which was also seen throughout the nation. *Id.* at ¶39. Defendants' acts of patent infringement also occurred throughout the country. *Id.* at ¶¶66-82. Defendants Desgraves and Elliott are principal members of Insulinic FL, Insulinic LA, Insulinic HI, and other Insulinic entities that are currently being investigated. *Id.* at ¶50. Well Cell has alleged alter-ego theories of liability against them making them personally liable for actions taken by the entity defendants. *Id.* The Insulinic entities that Defendants Desgraves and Elliott manage are causing harm in multiple states and their infringing products are involved in interstate commerce. *Id.* at ¶¶66-82. However, the place where

APPX0289

Defendants Desgraves's and Elliott's harm is most felt, the place at which their tortious acts are specifically directed, is Texas. Well Cell is a Texas limited liability company with its principal place of business in Texas and Defendants Desgraves and Elliott knew that as their Insulinic FL and Insulinic LA entities entered into Licensing Agreements with Well Cell in 2021 and the parties had numerous interactions over the course of their business relationship. *Id.* at ¶24.

33.     In *TexVa*, the court held that the contacts of nonresident corporate officers were sufficient to establish personal jurisdiction. *Texva, Inc. v. Boone,* 300 S.W.3d 879, 887-891 (Tex. App. 2009). In *TexVa*, the defendants had numerous contacts with Texas and its residents, agreed to do business with a Texas resident, made false representations to the plaintiff who resided in Texas, and breached fiduciary duties to the corporation, a resident of Texas. *Id.* at 887-890. Overall, the Texas Supreme Court found that because the defendants were alleged to have engaged in tortious conduct directed at the forum state that "even if [defendants] were acting in their corporate capacity when they performed these actions, they can be held personally liable for those tortious acts and subject to jurisdiction in Texas." *Id.* at 891. The court had "no difficulty concluding that the litigation in this case arises from the appellees' [defendants'] contacts with the forum" as defendants contact with Texas related to their business relationship with plaintiffs and the underlying litigation concerned whether one of the parties has breached an agreement or a fiduciary duty arising from that business relationship. *Id.* at 890. Here, Well Cell has made claims for patent and copyright infringement and misappropriation of trade secrets, for which Defendants Desgraves and Elliott are personally liable. Similar to the *TexVa* case, Defendants Desgraves and Elliott have sufficient minimum contacts with Texas and its residents as they purposefully pursued multiple business relationships with Well Cell, misappropriated trade secrets of Well Cell, and committed acts of patent and copyright infringement on a nationwide basis that were aimed at Well Cell, a

resident of Texas. These contacts are clearly related to this litigation as the causes of action against

Defendants Desgraves and Elliott relate directly to their business dealings with Well Cell and their

tortious acts against it. Defendants Desgraves and Elliott have purposefully availed themselves of

the privilege of conducting activities within Texas and have invoked the benefits and protections

of its laws, thus it is proper for this Court to confer specific jurisdiction over them.

34.     Once a plaintiff establishes minimum contacts between the defendant and the forum state,

the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and

unreasonable. *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999). Defendants have

put forth no evidence or argument whatsoever that the assertion of jurisdiction over them is unfair

or unreasonable. Thus, Defendants' Motion to Dismiss on the basis of lack of personal jurisdiction

must be denied.

**C.     Plaintiff Has Pled Sufficient Facts to Defeat a Rule 12(b)(6) Motion on Each of Its Claims.**

       **1.   The Cause of Action for Patent Infringement Must Not be Dismissed.**

35.     As the United States Supreme Court stated in *Cantrell v. Wallick*: "For the grant of letters

patent is prima facie evidence that the patentee is the first inventor of the device described in the

letters patent, and of its novelty." 117 U.S. 689, 695-696, (1886). "The issue of the patent is enough

to show, until the contrary appears, that all the conditions under which a discovery is patentable in

accordance with the statutes have been met. Hence, the burden of proving want of novelty is upon

him who avers it." *Gatch Wire Goods Co. v. W. A. Laidlaw Wire Co.*, 108 F.2d 433, 435 (7th Cir.

1939).

36.     A complaint for direct patent infringement containing (1) an allegation of jurisdiction; (2)

a statement that the plaintiff owns the patent; (3) a statement that defendant has been infringing

the patent by making, selling, and/or using the device embodying the patent; (4) a statement that

the plaintiff has given the defendant notice of its infringement; and (5) a demand for an injunction

and damages is likely to fulfill the plausibility requirements to defeat a motion to dismiss for failure

to state a claim, though not all five factors are required to state a claim for relief. *See* Fed. R. Civ.

P. 12(b). Plaintiff has made sufficient allegations in its complaint regarding each of the required

elements.

37.     "[T]he issue of patentable subject matter requires a legal analysis that can—and often

does—'contain underlying factual issues.'" *Phoenix Licensing, L.L.C. v. CenturyLink, Inc.*, No.

2:14-CV-965-JRG-RSP, 2015 WL 5786582, at *2 (E.D. Tex. Sept. 30, 2015) (*quoting Accenture

Global Servs., GmbH v. Guidewire Software, Inc.,* 728 F.3d 1336 (Fed.Cir.2013)). The issue of

the validity of the 595 Patent and the 990 Patent is woefully premature in this case as the parties

have not yet had any briefing or hearing on claim construction. As the court stated in *Phoenix

Licensing*:

> While handling the issue of section 101 eligibility at the pleading stage is
> permissible, those issues are often inextricably tied to claim construction. Thus, it
> seems a definitive ruling on eligibility before claim construction is only warranted
> in narrow circumstances, making such a ruling the exception rather than the rule.

*Id.* The court in *Phoenix Licensing* went on to state that "the Court cannot simply assume

Defendants' characterization of the claims and implicit positions on the meaning of claim terms

are correct without a meaningful ability to examine fully what a person of ordinary skill in the art

would interpret those terms to mean." *Id.* Here, the Court does not have nearly enough information

to determine the validity of the 595 Patent and the 990 Patent based upon Defendants' bare boned

assertions that they are "abstract ideas" or do "not contain an inventive conceptive." *See* Dkt. 35.

"Simply put, a proper analysis under *Mayo* would be premature and improper given the extent of

the parties' present claim construction disputes." *Id. citing Mayo Collaborative Services v.

Prometheus Laboratories, Inc.*, 132 S.Ct. 1289, 1293–94 (2012) (requiring the Court to determine

whether additional elements in the claims supply an "inventive concept" that ensures the patent covers something significantly more than the patent-ineligible matter itself).

38.     "The difficulty of making a substantive ruling on the validity of an issued patent in what is—in essence—a complete vacuum cannot be understated. While the claim language of some patents may be so clear that the court need only undertake a facial analysis to render it invalid at the pleading stage, that will not be the norm and is certainly not the case here." *Id.* Here, as in *Phoenix Landing*, Plaintiff's "Complaint and the issued patents set forth a plausible claim for relief" on their face, which is all that is required at the Motion to Dismiss stage. *Id.*

39.     In fact, this Court has already found a likelihood of success on the merits of Plaintiff's patent infringement claims, which is a far higher standard than that necessary to survive a motion to dismiss, which requires only a plausible claim for relief taking all facts in Plaintiff's Complaint as true and drawing all inferences in its favor. *See* Dkt. 18.

40.     Defendants' discussion of the *Alice* requirements for analysis of the validity of a patent is misplaced, as *Alice* sets forth standards to be considered on motions for summary judgment, which occur at a much later stage in patent-infringement litigation after substantial discovery and claims analysis has occurred. *See Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 214 (2014).

41.     Moreover, while exclusions on patentability exist for abstract ideas, "at the same time, we tread carefully in construing this exclusionary principle lest it swallow all of patent law. *Id. citing Mayo*, 132 S.Ct. at 1293–94. At some level, "all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* "Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* "[A]pplication[s]" of such concepts "'to a new and useful end,'" we have said, remain eligible for patent protection." *Id. citing Gottschalk v. Benson*, 409 U.S. 63, 67 (1972).

### a) The 595 Patent is Not Directed at an Abstract Idea.

42.     Moreover, even if *Alice* applied, Defendants' assertion that any computer process is patent ineligible because it is automatically akin to something that can be done in the human mind is flatly wrong. For example, in *Simple Air, Inc. vs. Google*, the district court found that the patents in question "were not directed toward an abstract idea, because they are directed toward patent-eligible methods and systems of 'using a central broadcast server' to package and transmit 'data from an online information source to remote computing devices.'" *SimpleAir, Inc. v. Google Inc.*, 136 F. Supp. 3d 745, 750 (E.D. Tex. 2015). The district court held that the defendant's conclusory argument that the patents were directed at the abstract idea of "packaging and transmitting information" was not enough to meet their burden. *Id.* Even though the patents at issue contained an implementation of an abstract idea at some level, however, every invention can be reduced to some form of an abstract idea *Id. citing Alice*, 134 S.Ct. at 2354 ("At some level, 'all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'").

43.     Similarly, here, the 595 Patent is far more complex than Defendants indicate in their conclusory briefing with an oversimplified recitation of what claim 1 of the 595 Patent is. Claim 1 of the 595 Patent actually covers: (a) a blood glucose meter for measuring metabolic factors; (b) an intravenous catheter to deliver a plurality of insulin bolus volume dosage amounts sequentially using an individualized schedule with at least one unequal time period between at least one pair of insulin bolus volume dosage amounts; (c) an administrative processor that assembles a multitude of different information and processes; (d) a diabetic treatment model; (e) a library of care plan templates that are configured to produce customized results for each subject profile; (f) a specific calculus of a glucose dosage amount to stimulate a gastrointestinal hormone production in the subject; and (g) an administrative processor configured to compare a multitude of test results, metabolic factors, and insulin sensitivity factors in order to create an individualized schedule for

APPX0294

insulin bolus volume dosage. *See* Ex. 8 to Dkt. 1, the 595 Patent. Contrary to Defendants' claims, it is not simply a computer processor performing non-novel data functions.

### b) The 595 Patent Does Contain an Inventive Concept.

44. Defendants' argument that the 595 Patent does not contain an inventive concept even if it were directed at an abstract idea, which it is not, is also nothing more than a conclusory statement that falls far short of their burden. The 595 Patent does far more than collect and display data as Defendants imply and Defendants offer no proof for their argument that it only features hardware that was well-known, routine, and conventional at the time of its issuance. *See* Dkt. 35 at Pgs. 11-12. Defendants "take an overly generalized view of the claim language that vitiates meaningful limitations." *Intell. Ventures I LLC v. J. Crew Grp., Inc.,* No. 6:16-CV-196-JRG, 2016 WL 4591794, at *6 (E.D. Tex. Aug. 24, 2016) (history omitted).

45. Claim elements must be evaluated both individually and as an ordered combination. *See Mayo*, 132 S. Ct. at 1291; *Diamond v. Diehr*, 450 U.S. 175 (1981) (patent claims "must be considered as a whole."). Here, the invention lies in the combined use of blood glucose meters, an intravenous catheter which delivers an individualized schedule with at least one unpredictable dosage of insulin bolous volume, an administrative processer to compare a variety of test results and metabolic factors, a library of unique and novel diabetic treatment care plans, and a specific calculus of a glucose dosage amount to stimulate a gastrointestinal hormone production in the subject, in order to create an individualized schedule for insulin bolus volume dosage. Far from conventional, this novel combination resulted in a brand-new way to treat and manage diabetes, using insulin as hormone therapy rather than a drug to address the root cause of diabetes, which is metabolic therapy. Defendants admit on their own website, in their plagiarism of Plaintiff's copyrighted works, and their attempts to claim Plaintiff's patented medical technology as their own that this approach to treating diabetes is "a unique and groundbreaking patented approach."

*See* Ex. 3 to Dkt. 1. To now claim that this patented technology is non-inventive, well-known, and conventional is disingenuous at best. Defendants have not and cannot put forth any evidence to support their position that the 595 Patent in non-inventive thus their Motion to Dismiss on this basis must be denied.

### c)   The 990 Patent is Not Directed at an Abstract Idea.

46.      Once again, Defendants' entire argument rests upon the flawed premise that no invention is patentable if it utilizes a computer processor for any of its steps, which could not be further from the truth. Defendants are, again, oversimplifying the novel combination of a multitude of methods and processes which constitute the unique invention and focus solely on the fact that a computer or data storage device is used for certain elements in an attempt to misguide this Court as to the true nature of the 990 Patent. The 990 Patent consists of 20 different claims, which would take over 10 pages to type out in full detail. However, for the sake of brevity, Plaintiff will include just the summary of the invention found in the abstract of the 990 Patent here:

> An individualized intravenous exogenous insulin – based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing. The therapy includes treatment sessions involving the assessment of metabolic factors, forming a subject profile, and matching the subject profile to a diabetic treatment model. Using the diabetic treatment model, a quantity and frequency of intravenous insulin bolus, dosage amounts of magnesium, and dosage amounts of potassium can be calculated. The methods that improve impaired hepatic glucose processing in subjects and patients can simultaneously introduce separated insulin bolus from an insulin reservoir, dosage amounts of magnesium, and dosage amounts of potassium. The subject profile can create a weight management protocol that uses a metabolic enhancement, wherein the individualized intravenous exogenous insulin – based therapy produces a subject or a patient with improved cellular ATP functioning.

*See* Ex. 9 to Dkt. 1, the 990 Patent. It is evident from a mere cursory review of the 990 Patent that it is directed at far more than computer processes, but is a custom care plan for a unique and novel method for the treatment of diabetes that uses a combination of novel treatment sessions, individualized intravenous exogenous insulin-based therapy, assessment of metabolic factors, the

creation of a unique metabolic profile that is then combined with other test results and factors to create an individualized delivery schedule, which contains at least one unpredictable component.

47.     The 990 Patent claim 19 alone is the sole focus of Defendants' attack even though they admit that claim 1 is an independent claim, which is the method for Plaintiff's unique care model for the treatment of diabetes using their ground-breaking and unique medical technology. This fact alone warrants denial of Defendants' Motion to Dismiss. However, even claim 19 is oversimplified by Defendants and meaningful claim limitations are ignored by them. Claim 19 does not just involve a computer-processor collecting and assembling patient information as a person could do with file folders, as Defendants suggest. Rather, claim 19 involves a unique combination of elements to create "a system for individualized intravenous exogenous configured to map the tested blood glucose levels and insulin - based therapy comprising" of not only administrative processors and data storage networks, but a plurality of client devices (which are configured by the creation of a unique client profile); a plurality of novel client care plan templates; a plurality of individualized treatment sessions with the uniquely crated client profile and plan goal; and a lengthy set of inventive code instructions for the computer system to calculate and compare a variety of measured glucose levels and metabolic factors including an individualized weight management protocol with an inventive therapeutic range of blood glucose levels such that after introducing glucose to the subject a stimulation of gastrointestinal hormone production is ensured that thereafter results in a release of enzymes in the subject's liver. *See* Ex. 9 to Dkt. 1, the 990 Patent at Pg. 29. They are then configured to map the tested blood glucose levels and assessed metabolic factors of the subject by using a novel diabetic treatment model to determine the schedule for bolus insulin introductions. *Id.* This system then creates a further unique and individualized schedule for the bolus introductions of insulin in the subject after the initial

treatment session. *Id.* Therefore, it is evident that the 990 Patent is a novel invention directed at the creation of ground-breaking medical technology utilizing a unique system for the treatment of diabetes that uses insulin as hormone-therapy rather than a drug, and it is not in any way directed at the abstract idea of administrative data storage.

### d)  The 900 Patent Does Contain Inventive Concepts.

48.     Defendants' argument that the 990 Patent does not contain an inventive concept even if it were directed at an abstract idea, which it is not, is yet again nothing more than a conclusory statement that falls far short of Defendants' burden. Defendants claim it contemplates only using generic hardware, however, there is no attempt at even identifying what that alleged "generic hardware" is, perhaps because Defendants are fully aware that the $10,000 insulin pumps for which they formerly paid tens of thousands of dollars in licensing fees are far from "generic." The 990 Patent does far more than collect and calculate data as Defendants imply and they have once again failed to offer any proof for their argument that it only features hardware that was well-known, routine, and conventional at the time of its issuance. *See* Dkt. 35 at Pgs. 14-15.

49.     Defendants' cited cases are wholly inapplicable to the case at hand. Their first case of *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.* involves a smartphone app that allowed the end user to control access to other apps on the phone as an alleged security system. *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1320 (Fed. Cir. 2020). The court found that the security app was directed to the abstract idea of controlling access to information and that although the patent contained terminology for four different processes, it really was only one process, simply an access controller that determined whether to grant or deny access upon receiving a request. *Id.* at 1326. Even with such a simplistic application, the court found that if Ericsson had alleged the "three-layer architecture" of its app in its patent, then it may have been enough for an inventive concept, however it failed to do so. *Id.* at 1327-28. The facts of *Ericsson*

have nothing to do with this case, as Well Cell's 990 Patent involves far more complicated processes and layers, involving a multitude of different technologies and layers to the decision making-processes involved. Moreover, Well Cell's 990 Patent is aimed at presenting a "particularized solution" to the specific problem of poor management of Type 1 diabetes in insulin resistance patients, which is specifically set forth in its 990 Patent, unlike the plaintiff in *Ericsson* who failed to include allegations of a particularized solution in its patent. *Id.* at 1330.

50.     Defendants' other cited case of *Credit Acceptance Corp. v. Westlake Servs.*, is also not analogous to the facts of this case. *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044 (Fed. Cir. 2017). First, in that case the parties had gone through full proceedings with the Patent Board so the claims construction had been fully developed. *Id.* at 1052. Second, in that case the patent in question was for a computer process for providing financing options to potential buyers and the court concluded that it was directed to the abstract idea of processing an application for financing a purchase. *Id.* at 1054. The court found that the computer process in that case was no different than a human pulling the customer's credit history and presenting them with available financing options. *Id.* at 1055. There was no inventive concept involved because the patent relied solely on generic and conventional computer hardware and it did nothing to materially enhance the standard manual process of pulling consumer credit and providing financing options to a buyer. *Id.* at 1056-57. Once again, that case is so far removed from the facts of the instant case, it is questionable why it was even cited by Defendants. Nevertheless, the 990 Patent involves an entirely different set of processes, software, and hardware, which are based on novel and complex ideas for the treatment of diabetes, unlike anything else that existed at the time of issuance. The hardware used by Plaintiffs is not generic computer drives, but an insulin pumping system unlike any other one on the market. Thus, Defendants' Motion to Dismiss must be denied.

### e)   Plaintiff Has Not Exhausted its Monopoly on the Patents in Suit.

51.     The U.S. Supreme Court stated that "patent owners may grant licenses extending to all uses

or limited to use in a defined field." *Gen. Talking Pictures Corp. v. W. Elec. Co*., 304 U.S. 175,

181, aff'd on reh'g, 305 U.S. 124 (1938). "Unquestionably, the owner of a patent may grant licenses

to manufacture, use, or sell upon conditions not inconsistent with the scope of the monopoly." *Id.*

52.     Defendants' argument that Plaintiff has exhausted its monopoly on the patents in suit due

to its grant of a license to two of the Defendants is a blatant misrepresentation of the law and the

facts. Well Cell Support LLC, the entity that was was granted a master license by Well Cell Global,

granted Insulinic FL and Insulinic LA a ***license*** to use Well Cell's patent-protected medical

technology, only. *See* Dkt. 1. at ¶¶24-25. The licensing agreements only grant Insulinic FL and

Insulinic LA the right to use Well Cell's patent-protected technology and they specifically state

that the pumps must be returned to Well Cell after 240 hours of use or if they become non-

operational for any reason.[4] The licensing agreements also state that evidence of tampering with

the pumps shall be grounds for termination of the agreements and that the pumps must be returned

upon termination of the agreements for any reason.

53.     Defendants' only cited case for their proposition that the exhaustion of monopoly by sale

doctrine purportedly applies to licenses is a case wherein the alleged licensor actually failed to

retain any ownership rights in its manufactured products; rather its purported license agreements

were actually illegal price-fixing agreements in violation of the Sherman Act. *U.S. v. Univis Lens

Co.,* 316 U.S. 241, 251 (1942). Thus, the Court found that all plaintiff's license agreements must

---

[4] *See* **Exhibit 4, Filed under Seal Pursuant to Protective Order (Dkt. 28)**, License Agreement
between Well Cell Support and Insulinic FL dated November 1, 2021, at Pgs. 13-14; **Exhibit 5,
Filed under Seal Pursuant to Protective Order (Dkt. 28)**, License Agreement between Well
Cell Support and Insulinic LA dated September 13, 2021, at Pgs. 12-13.

APPX0300

be enjoined from being enforced. *Id.* at 1094-95. The Court further found that the license agreements were not saved by application of the Miller-Tydings Act because the licensor only manufactured blanks, not the finished lenses to which the resale prices applied. *Id.* Here, the licensor did retain ownership rights in the patent-protected technology and did not sell the licensee the pumps outright or grant them any ability to resell the pumps at all.

54.     Therefore, there has been and could be no invalidation of the license agreements under the Sherman Act. In fact, the license agreements repeatedly state that the pumps, kits, IV tubing, and all equipment provided under the agreements are patent-protected and proprietary trade secrets of Well Cell and obliges the licensees to treat it as such. *See* Ex. 4 at Pg 2; Ex. 5 at Pg. 3. The license agreements also repeatedly emphasize that the proprietary pumps must be returned and impose a $10,000 fee for the failure to return any pump. *See* Ex. 4 at Pgs. 8-10; Ex. 5 at Pgs. 10-11. Here, there is no sale of Well Cell's patented technology sufficient to exhaust its monopoly and if Defendants did sell any of Well Cell's patented technology, it would have been in breach of the license agreements and such an unauthorized sale could not terminate Well's Cell's patent. *Gen. Talking Pictures Corp.*, 304 U.S. 175, 181-82.

> **f)   Plaintiff Sufficiently Identified the Accused Products that Infringe the 595 Patent and the 990 Patent and the Willfulness of Defendants' Infringement.**

55.     Defendants contend they are not put on "fair notice" of how they infringe, however, Defendants are well aware that the insulin pumps, kits and IV tubing infusion cassettes that ***they paid to license*** from Well Cell Support are the patent-protected technology of Well Cell and that they were obliged to return them upon termination of the license agreements. *See* Dkt. 1. at ¶¶24-25, 76-78; Ex. 4 at Pgs. 8-10; Ex. 5 at Pgs. 10-11. This is not case where Defendants manufactured their own products unknowingly infringing upon Well Cell's Patents in Suit, but a case of flagrant and willful patent-infringement wherein Defendants had full knowledge that Well Cell's medical

technology was patent-protected, as set forth in the license agreements and as Defendants shockingly try to co-opt as their own patent-protected technology on the infringing Insulinic website. *See* Dkt. 1. at ¶¶76-79; Ex. 3 to Dkt. 1.

56.     In addition to the cease and desist letters Plaintiff sent to Defendants prior to initiating this lawsuit, Plaintiff described in detail in its Complaint the application of the 595 Patent and the 990 Patent to Well Cell's insulin pumps, kits, and IV tubing infusion cassettes, which Defendants have illegally absconded with after the termination of the license agreements. *See* Dkt. 1. at ¶74. The insulin infusion pumps, kits, and IV tubing infusion cassettes being utilized by Defendants infringe upon the 990 Patent because they deliver individualized intravenous exogenous insulin–based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing. *Id.* The insulin infusion pumps, kits, and IV tubing infusion cassettes being utilized by Defendants infringe upon the 595 Patent because they utilize software that includes portable data storage in communication with a client device processor, which has computer instructions, a database of metabolic factors, a library of weight management protocols, a diabetic treatment model, and a library of care plan templates. *Id.* The insulin infusion pumps, kits, and IV tubing infusion cassettes being utilized by Defendants infringe upon the 595 Patent because they contain individualized intravenous exogenous insulin-based therapy, including a blood glucose meter, a plurality of intravenous catheters fluidly engageable with a fluid source, a plurality of metabolic enhancements, and mixing the plurality of boluses from 4 to 8 minutes. *Id.*

57.     Accordingly, Plaintiff has put Defendants on fair notice of the claims against them, including evidence of the willfulness of Defendants' infringement, and their Motion to Dismiss the patent infringement claims against them must be denied.

### 2. Plaintiff Has Made Sufficient Allegations Regarding Its Copyright Infringement Claims.

58.    A valid copyright certificate of registration constitutes prima facie evidence of the validity

of a copyright. *See Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir.1995) (*citing*

17 U.S.C. § 410(c)). At all relevant times, Well Cell has been and still is the holder of the exclusive

rights under the Copyright Act of 1976 (17 U.S.C. §§ 101 et. seq., and all amendments thereto)

(the **"Copyright Act"**) to reproduce, distribute, display, or license the reproduction, distribution,

and/or display of the website diabetesrelief.com (the **"Website"**) and all of its contents, as set forth

in  U.S.  Copyright  Registration  TX  8-452-464,  and  the  2-D  artwork  entitled  "Overcoming

Metabolic Failure," as depicted in U.S. Copyright Registration VAu 1-330-086 (**"Overcoming

Metabolic Failure Drawing"**) throughout the United States.[5]

59.    Defendant erroneously claims that the burden has shifted to Plaintiff to rebut invalidity of

the copyrights, however, Defendant never set forth any proof of invalidity in order to shift the

burden away from Defendants. "In cases in which the originality of a plaintiff's registered work is

at issue, the defendant must offer proof 'that the plaintiff's product was copied from other works

or similarly probative evidence'." *R. Ready Prods., Inc. v. Cantrell*, 85 F. Supp. 2d 672, 682 (S.D.

Tex. 2000) (*citing CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc*., 97 F.3d 1504, 1513 (1st

Cir.1996)). Defendants have proffered no such proof. Further, even if the burden were on Plaintiff,

a portion of the deposit made with the U.S. Copyright Office containing the client testimonials at

issue was in fact attached to Plaintiff's Complaint. *See* Ex. 6 to Dkt. 1.

60.    With respect to the Overcoming Metabolic Failure Drawing, Defendants inaccurately state

without any legal support that a 2-D drawing cannot be the subject of copyright protection, despite

---

[5] *See* Dkt. 1 at ¶32; Ex. 1 to Dkt. 1 the Registration for the Website; Ex. 2 to Dkt. 1, the
Registration for the Overcoming Metabolic Failure Drawing.

the U.S. Copyright Office's decision that it was worthy of protection, which constitutes prima facie evidence of its validity. *See Norma Ribbon*, 51 F.3d at 47.

61.     Next, Defendants throw out the argument of the fair use doctrine in their spaghetti on the wall approach, without any substantive discussion of the applicable elements. As stated by the U.S. Supreme Court, "fair use is an affirmative defense" upon which its proponent has the burden of proof. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). Because this is an affirmative defense, Defendants are not permitted to move for dismissal under Rule 12(b)(6) based on it, except in very limited circumstances not present here. *Richards v. Mitcheff*, 696 F.3d 635, 637-38 (7th Cir. 2012) ("Complaints need not anticipate defenses and attempt to defeat them."); *Accord Matassarin v. Grosvenor,* No. CV SA-13-CA-913-RP, 2015 WL 12734174, at *4 (W.D. Tex. - San Antonio Oct. 19, 2015). "After all, [defendants] may waive or forfeit [their] defense, and then the case should proceed." *Richards* 696 F.3d at 638; *See also, Davis v. Fort Bend Cnty.,* 893 F.3d 300, 307-308 (5th Cir. 2018), *aff'd sub nom. Fort Bend Cnty., Texas v. Davis,* 139 S. Ct. 1843, 204 L. Ed. 2d 116 (2019) (holding that defendant waived affirmative defense by failing to raise it).

62.     Setting aside Defendants' improper assertion of an affirmative defense, the elements of fair use all weigh in Plaintiff's favor. The defense of fair use requires the Court to weigh four non-exclusive factors: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998). Here, (1) Defendant's use of Well Cell's copyrighted works was commercial in nature for their own profit; (2) the nature of

the copyrighted work is a drawing and website that Plaintiff and its predecessor in interest spent significant time, money and efforts developing; (3) Defendants plagiarized the entirety of the 2-D drawing and multiple instances of large swaths of information from the Website; and (4) the use by a competitor in the industry of so many portions of Well Cell's copyrighted works significantly diminishes their value to Well Cell in the market. *See* Dkt. 1 at ¶¶32-53.

63.     Defendants' remaining arguments regarding the Website and their infringement of the client testimonials in their press release relate back to Plaintiff's standing to bring the copyright infringement claims which has been addressed in Section III, A, *supra*. Additionally, Defendants focus only on the client testimonials and fail to even reference or attempt to negate the multitude of other instances of copyright infringement found on the Insulinic website as set forth in Plaintiff's Complaint. *See* Dkt. 1. at ¶38. Therefore, Defendants' request to dismiss the copyright infringement claims must also be denied.

### 3.   Plaintiff Has Made Sufficient Allegations Regarding Its Trade Secret Claims.

64.     To state a claim under the Defense of Trade Secret Act ("DTSA"), a plaintiff must allege: (1) a trade secret; (2) misappropriation; and (3) use in interstate commerce. 18 U.S.C. § 1836. Similarly, to establish trade secret misappropriation under Texas law, a plaintiff must show: (1) a trade secret; (2) defendants acquired the trade secret by breach of a confidential relationship or other improper means; and (3) defendants used the trade secret without authorization. *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 449 (5th Cir. 2007).

65.     Defendants admit that "items such as customer lists, pricing information, client information, customer preferences, and buyer contacts may be trade secrets if they meet the criteria for such." *A.M. Castle & Co. v. Byrne*, 123 F. Supp. 3d 909, 916 (S.D. Tex. 2015); *See, e.g.*, *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir.2003) (holding that a customer list may be protectable as a trade secret if it is secret and the court examines and determines if it is

protectable based on three factors: "(1) what steps, if any, an employer has taken to maintain the confidentiality of a customer list; (2) whether a departing employee acknowledges that the customer list is confidential; and (3) whether the content of the list is readily ascertainable."). Defendants' Motion to Dismiss does nothing more than recite the elements of a trade secret without any attempt to explain why Plaintiff's alleged trade secrets do not qualify.

66.     On the other hand, Plaintiff's Complaint sets out in detail the business contacts, which constitute its trade secrets, including clients, physicians, vendors, investors, borrowers, lenders, agents, brokers, banks, lending corporations, buyers and sellers. *See* Dkt 1. at ¶86. It also lays out its steps to protect said trade secrets, including the confidentiality provisions of the license agreements with the Insulinic Defendants and the non-disclosure agreements signed by Defendant Shawn Calvit and others with whom it shared its trade secrets. *Id.* at ¶89. Defendants assert that Plaintiff's Complaint lacks the required specificity because Plaintiff does list the business contacts that were misappropriated; such a proposition is preposterous as no plaintiff would ever list the details of its trade secrets in a public filing, which is why Defendants have no legal support for their argument. Tellingly, Defendants do not deny that the business contacts were shared with them.

67.     As Defendants have failed to set forth any sufficient argument to defeat the well-plead allegations of Plaintiff's trade secrets in its Complaint, their request to dismiss such claims must be denied.

### 4.  Plaintiff Has Made Sufficient Allegations Regarding Its Claims for Violations of the DTPA, Unfair Competition, and Unjust Enrichment.

68.     Defendants' Motion to Dismiss Plaintiff's remaining claims of violations of the Texas Deceptive Trade Practices Act (**"DTPA"**), unfair competition and unjust enrichment make it clear that this Motion to Dismiss is a thinly-veiled attempt to needlessly drive-up attorneys' fees in this

matter. Defendants do nothing more than throw up the elements of each of these claims and then allege in a conclusory fashion that Plaintiff failed to meet them or that its claims are preempted by federal law. *See* Dkt. 35 at 22-24. Plaintiff has made sufficient allegations on each of its causes of action as set forth extensively in its Complaint and this Response. Further, Defendants claim of preemption by federal copyright law is yet another misrepresentation of the law. As set forth in Defendants' cited case, "[a] state law claim is preempted by the federal copyright law when it falls within the subject matter of copyright and when the state law cause of action protects rights that are 'equivalent' to any of the exclusive rights protected by copyright." *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 823 F. Supp. 2d 578, 585–86 (S.D. Tex. 2011) (*quoting Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir.2003)). "A state law claim is equivalent to rights protected under the Copyright Act if it involves 'elements that would not establish qualitatively different conduct by the defendants than the elements for an action under the Copyright Act'." *Ultraflo Corp.*, 823 F. Supp. 2d at 586 (*ciring Daboub v. Gibbons*, 42 F.3d 285, 290 (5th Cir.1995) (describing the "extra element" test)). Defendants do not attempt to offer any support for their position that Plaintiff's claims under Texas' causes of action for unfair competition and unjust enrichment protect equivalent rights to the Copyright Act.

69.      As Defendants have utterly failed to meet their burden on a motion to dismiss with respect to these claims, their request to dismiss them should be summarily denied by this Court.

## V.      PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that this Court deny Defendant's Motion to Dismiss Plaintiff's Complaint for failure to state a claim under Rule 12(b)(6), lack of personal jurisdiction under Rule 12(b)(2), and lack of subject matter jurisdiction

and standing under Rule 12(b)(1). Plaintiff further prays for such other and further relief, both general or special, at law or in equity, to which it may show itself to be justly entitled.

Dated:  October 25, 2022.                    Respectfully submitted,

By:____/s/ *Lema Barazi*_____
LEMA BARAZI
Attorney-in-charge
State Bar No. 24056016
S.D. Texas Bar No. 1358290
lema@lloydmousilli.com
**LLOYD & MOUSILLI, PLLC**
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
Tel: (512) 609-0059
Fax: (413) 473-6164
Service: litigation@lloydmousilli.com

OF COUNSEL:

Feras Mousilli
State Bar No. 24043837
feras@lloydmousilli.com
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
Tel: (512) 609-0059
Fax: (413) 473-6164

Elizabeth Revere
State Bar No. 00791513
S.D. Texas Bar No.18329
beth@lloydmousilli.com
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
Tel: (512) 609-0059
Fax: (413) 473-6164

**ATTORNEYS FOR PLAINTIFF
WELL CELL GLOBAL LLC**

APPX0308

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record, pursuant to the District's Dkt. service rules on **October 25, 2022,** *via electronic filing system* on the following:

Justin K. Ratley
*jratley@munsch.com*
Elizabeth F. Eoff
*eeoff@munsch.com*
MUNSCH HARDT KOPF & HARR, P.C.
700 Milam, Suite 800
Houston, Texas 77002
Tel: 713.222.1493
Fax: 713.222.1475
*Attorneys for Defendants Shawn Paul Calvit,*
*Insulinic of Lafayette LLC, Insulinic of Hialeah LLC,*
*and Insulinic of Hawaii LLC*

/s/ *Lema Barazi*
Lema Barazi

Plaintiff Well Cell Global LLC's Response to Defendants' Motion to Dismiss

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **WELL CELL GLOBAL LLC** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **CIVIL CASE NO.** |
| | § | **4:22-cv-03062-LHR** |
| **SHAWN PAUL CALVIT, MARC PIERRE** | § | **JURY DEMANDED** |
| **DESGRAVES IV, CHARLES** | § | |
| **ALEXANDER ELLIOTT, INSULINIC OF** | § | |
| **LAFAYETTE LLC, INSULINIC OF** | § | |
| **HIALEAH LLC, INSULINIC HAWAII,** | § | |
| **LLC** | § | |
| *Defendants* | § | |
| | § | |

---

### ORDER

---

Upon consideration of Defendants, Shawn Paul Calvit, Insulinic of Lafayette LLC, Marc Pierre Desgraves IV, Charles Alexander Elliott, Insulinic of Hialeah LLC, and Insulinic of Hawaii LLC's (collectively, the **"Defendants"**) Motion to Dismiss (**"Motion"**), and Plaintiff Well Cell Global LLC's Response to Defendants' Motion to Dismiss (**"Response"**), and after considering the response and arguments of counsel, if any, the Court finds that Defendants' Motion should be DENIED;

**IT IS THEREFORE ORDERED THAT** Defendants' Motion to Dismiss is **DENIED**.

Signed on _____, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

1

**Exhibit 1**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Asset Purchase Agreement between Diabetes Relief, LLC and Well Cell at Pg. 1.

**Exhibit 2**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Assignment from Inventors of the 595 Patent to Diabetes Relief, LLC;

**Exhibit 3**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Assignment from Inventors of the 990 Patent to Diabetes Relief, LLC.

**Exhibit 4,**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
License Agreement between Well Cell Support and Insulinic FL dated November 1, 2021, at Pgs. 13-14;

**Exhibit 5,**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
License Agreement between Well Cell Support and Insulinic LA dated September 13, 2021,

Any party may submit Confidential Information to the court under seal by identifying the document by name and designating the document "sealed" in the CM/ECF system of the court

APPX0316

**Exhibit 1**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Asset Purchase Agreement between Diabetes Relief, LLC and Well Cell at Pg. 1.

APPX0317

**Exhibit 2**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Assignment from Inventors of the 595 Patent to Diabetes Relief, LLC;

**Exhibit 3**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Assignment from Inventors of the 990 Patent to Diabetes Relief, LLC.

APPX0319

**Exhibit 4,**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
License Agreement between Well Cell Support and Insulinic FL dated November 1, 2021, at Pgs. 13-14;

**Exhibit 5,**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
License Agreement between Well Cell Support and Insulinic LA dated September 13, 2021,

Any party may submit Confidential Information to the court under seal by identifying the document by name and designating the document "sealed" in the CM/ECF system of the court

**Exhibit 1**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Asset Purchase Agreement between Diabetes Relief, LLC and Well Cell at Pg. 1.

**Exhibit 2**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Assignment from Inventors of the 595 Patent to Diabetes Relief, LLC;

**Exhibit 3**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Assignment from Inventors of the 990 Patent to Diabetes Relief, LLC.

**Exhibit 4,**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
License Agreement between Well Cell Support and Insulinic FL dated November 1, 2021, at Pgs. 13-14;

**Exhibit 5,**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
License Agreement between Well Cell Support and Insulinic LA dated September 13, 2021,

APPX0327

Any party may submit Confidential Information to the court under seal by identifying the document by name and designating the document "sealed" in the CM/ECF system of the court

**Exhibit 1**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Asset Purchase Agreement between Diabetes Relief, LLC and Well Cell at Pg. 1.

**Exhibit 2**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Assignment from Inventors of the 595 Patent to Diabetes Relief, LLC;

**Exhibit 3**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Assignment from Inventors of the 990 Patent to Diabetes Relief, LLC.

**Exhibit 4,**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
License Agreement between Well Cell Support and Insulinic FL dated November 1, 2021, at Pgs. 13-14;

**Exhibit 5,**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
License Agreement between Well Cell Support and Insulinic LA dated September 13, 2021,

Any party may submit Confidential Information to the court under seal by identifying the document by name and designating the document "sealed" in the CM/ECF system of the court

**Exhibit 1**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Asset Purchase Agreement between Diabetes Relief, LLC and Well Cell at Pg. 1.

**Exhibit 2**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Assignment from Inventors of the 595 Patent to Diabetes Relief, LLC;

**Exhibit 3**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
Assignment from Inventors of the 990 Patent to Diabetes Relief, LLC.

**Exhibit 4,**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
License Agreement between Well Cell Support and Insulinic FL dated November 1, 2021, at Pgs. 13-14;

**Exhibit 5,**
**Filed under Seal Pursuant to Protective Order (Dkt. 28)**,
License Agreement between Well Cell Support and Insulinic LA dated September 13, 2021,

Any party may submit Confidential Information to the court under seal by identifying the document by name and designating the document "sealed" in the CM/ECF system of the court

**TAB 16**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, AND WELL CELL SUPPORT LLC, | § § § | |
| *Plaintiff,* | § | |
| v. | § § | **CIVIL CASE NO. 4:22-cv-03062-LHR** |
| SHAWN PAUL CALVIT, MARC PIERRE DESGRAVES IV, CHARLES ALEXANDER ELLIOTT, PATRICK DALE LELEAUX, M.D., INSULINIC LLC, INSULINIC OF LAFAYETTE LLC, INSULINIC OF HIALEAH LLC, INSULINIC HAWAII, LLC, INSULINIC OF GRETNA, LLC AND INSULINIC OF HAMMOND, LLC | § § § § § § § § § § | **JURY DEMANDED** |
| *Defendants.* | | |

---

**PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL
SUPPORT LLC'S FIRST AMENDED ORIGINAL COMPLAINT
AND REQUEST FOR INJUNCTIVE RELIEF**

---

**TO THE HONORABLE COURT:**

 **COME NOW, Plaintiffs, Well Cell Global LLC ("Well Cell") and Well Cell Support LLC ("Well Cell Support") (collectively, "Plaintiffs" or "Well Cell Plaintiffs"),** in the above-styled matter and file this *Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief*, with jury demand, against **Defendants Shawn Paul Calvit, Marc Pierre Desgraves IV, Charles Alexander Elliott, Insulinic LLC, Dr. Patrick Dale LeLeaux, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, Insulinic Hawaii, LLC, Insulinic of Gretna, LLC and Insulinic of Hammond, LLC (collectively, "Defendants").** Plaintiffs allege copyright infringement, patent infringement, trade secret misappropriation under the Defend Trade Secrets Act, trade secret misappropriation under

1

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL
COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0341

the Texas Uniform Trade Secrets Act, unfair competition in violation of Texas Business and Commerce Code § 17.46, unfair competition in violation of Texas common law, unfair competition by misappropriation in violation of Texas common law, unjust enrichment in violation of Texas common law, and breach of contract against Defendants. In support thereof, Plaintiffs would respectfully show unto the Court as follows:

## I.      SUMMARY OF THE ACTION

1.      The Well Cell Plaintiffs bring this action to stop Defendants from misusing Well Cell's intellectual property to deceive the public—especially diabetic patients—into believing that Defendants and their various "Insulinic" clinics are affiliated with Well Cell or its trusted brand.

2.      Well Cell, a leading pioneer in the medical industry specializing in developing cutting-edge technology for the treatment of diabetes, has been operating for numerous years and has established immense goodwill throughout the country, especially among the diabetic population and experts in the field.

3.      Well Cell owns a sizeable intellectual property portfolio and is the rights-holder to federal patents, federal trademark registrations, federal copyright registrations, and trade secrets, all of which pertain to its proprietary technology (collectively, the **"Well Cell IP"**).

4.      Despite Well Cell's incontestable rights, and in a bad-faith attempt to capitalize on the success of Well Cell, Defendants are operating "Insulinic" clinics in Louisiana, Florida, and Hawaii (the **"Infringing Clinics"**) which infringe the Well Cell IP by (a) using Well Cell's copyrighted works throughout the clinics, on their websites, and in marketing materials, (b) using Well Cell's patented products and services, and by (c) using and benefiting from Well Cell's proprietary and confidential trade secrets.

2

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0342

5.      Defendants have also registered and are using the domain name <Insulinic.com> (the **"Infringing Website"**) to advertise their Infringing Clinics.

6.      For these reasons, the Well Cell Plaintiffs bring this action for copyright infringement under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq., patent infringement under the patent laws of the United States, 35 U.S.C. §§ 1 et seq., trade secret misappropriation under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, et seq., and the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A.001, unfair competition in violation of Texas Business and Commerce Code § 17.46, unfair competition in violation of Texas common law, unfair competition by misappropriation in violation of Texas common law, unjust enrichment in violation of Texas common law, and breach of contract against Defendants.

7.      Among other relief, the Well Cell Plaintiffs respectfully ask the Court to: (a) award Well Cell statutory damages for each incident of patent and copyright infringement on the Well Cell IP; (b) order Defendants to disgorge all of their profits from their operation of the Infringing Clinics, trebled; (c) award Well Cell a reasonable royalty of 10% of all revenues earned by Defendants in connection with the Infringing Clinics, and to treble that award; (d) award Well Cell punitive damages, attorneys' fees, and costs; and (e) permanently enjoin Defendants and everyone working in concert with them from using the Well Cell IP in any way, or any derivative work, without Well Cell's prior, written consent.

## II.      PARTIES

8.      Well Cell Global LLC (**"Well Cell"**) is a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business at 11511 Katy Freeway, Suite 102, Houston, Texas 77079.

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL
COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0343

9.      Well Cell Support LLC (**"Well Cell Support"**) is a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business at 11511 Katy Freeway, Suite 102, Houston, Texas 77079.

10.     Shawn Paul Calvit (**"Defendant Calvit"**) is an individual and, on information and belief, resides at 100 Meadow Lane, Lafayette, Louisiana 70506. Defendant Calvit is the principal behind each of the Infringing Clinics.

11.     Marc Pierre Desgraves IV (**"Defendant Desgraves"**) is an individual and, on information and belief, resides at 9541 Pagosa Street, Commerce City, Colorado 80022. Defendant Desgraves is the Chief Financial Officer and Member of Insulinic Hawaii, LLC.

12.     Charles Alexander Elliott (**"Defendant Elliott"**) is an individual and, on information and belief, resides at 930 Makaiwa Street, Honolulu, Hawaii 96816. Defendant Elliott is a Member of Insulinic Hawaii, LLC.

13.     Patrick Dale LeLeaux, M.D. (**"Defendant LeLeaux"**) is an individual and, on information and belief, resides at 1307 Crowley Rayne Hwy, Suite E, Crowley, Louisiana 70526.

14.     Insulinic LLC (**"Defendant Insulinic"**) is a limited liability company organized and existing under the laws of the State of Louisiana, with its principal office at 220 Johnston Street Building, Lafayette, Louisiana 70501.

15.     Insulinic of Lafayette LLC (**"Defendant Insulinic LA"**) is a limited liability company organized and existing under the laws of the State of Louisiana, with its principal office at 220 Johnston Street Building, Lafayette, Louisiana 70501.

16.     Insulinic of Hialeah LLC (**"Defendant Insulinic FL"**) is a limited liability company organized and existing under the laws of the State of Florida, with its principal office at 220 Johnston Street Building, Lafayette, Louisiana 70501.

4

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original
Complaint and Request for Injunctive Relief

APPX0344

17.     Insulinic Hawaii, LLC (**"Defendant Insulinic HI"**) is a limited liability company organized and existing under the laws of the State of Hawaii, with its principal office at 1360 S. Beretania Street, Suite 500, Honolulu, Hawaii 98614.

18.     Insulinic of Gretna LLC (**"Defendant Insulinic Gretna"**) is a limited liability company organized and existing under the laws of the State of Louisiana, with its principal office at 220 Johnston Street Building, Lafayette, Louisiana 70501.

19.     Insulinic of Hammond LLC (**"Defendant Insulinic Hammond"**) is a limited liability company organized and existing under the laws of the State of Louisiana, with its principal office at 220 Johnston Street Building, Lafayette, Louisiana 70501.

### III.     JURISDICTION AND VENUE

20.     This action arises under the under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq., the patent laws of the United States, 35 U.S.C. §§ 1 et seq., the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, et seq. (**"DTSA"**), the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A.001 (**"TUTSA"**), the Texas Business & Commerce Code, federal and state common law, and Texas statutory law.

21.     This Court has exclusive subject matter jurisdiction for the copyright infringement claims pursuant to the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq. This Court has exclusive subject matter jurisdiction for the patent infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has subject matter jurisdiction over this action for the misappropriation of trade secrets under the DTSA pursuant to 28 U.S.C. § 1331.

22.     This Court has supplemental jurisdiction over the Texas statutory and common law claims pursuant to 28 U.S.C. § 1367 because such claims are related to the federal claims for copyright

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL
COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0345

infringement, patent infringement, and misappropriation of trade secrets in that they form part of the same case or controversy and are derived from a common nucleus of operative facts.

23.     This Court also has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship among the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

24.     This Court has personal jurisdiction over Defendants Calvit, Insulinic LA, and Insulinic FL, because they have purposely availed themselves of the privileges and benefits of conducting business in Texas. This Court also has personal jurisdiction over Defendants Calvit, Insulinic LA, and Insulinic FL because each signed a licensing agreement governing the intellectual property at issue in this case, wherein they expressly consented to the personal jurisdiction of this Court for any dispute related to the agreement. Further, Defendants Calvit, Insulinic LA, and Insulinic FL have committed acts directed at Texas that have caused tortious injury to Well Cell in Texas, specifically, misappropriation of Well Cell's intellectual property, with the knowledge that Well Cell would thereby be harmed. Accordingly, Defendants Calvit's, Insulinic LA's, Insulinic FL's tortious acts giving rise to this lawsuit have been directed at Texas and the harm to Well Cell has occurred and will continue to occur within Texas.

25.     This Court has personal jurisdiction over Defendants Desgraves, Elliott, LeLeaux, Insulinic, Insulinic HI, Insulinic Gretna, and Insulinic Hammond because they have committed acts directed at Texas that have caused tortious injury to Well Cell in Texas, specifically, misappropriation of Well Cell's intellectual property, with the knowledge that Well Cell would thereby be harmed. Accordingly, Defendants Desgraves, Elliott, LeLeaux, Insulinic, Insulinic HI, Insulinic Gretna, and Insulinic Hammond's tortious acts giving rise to this lawsuit have been directed at Texas and the harm to Well Cell have occurred and will continue to occur within Texas.

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL
COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0346

26.     Venue is proper as to Defendants Calvit, Insulinic LA, and Insulinic FL because this District is where a substantial part of the events or omissions giving rise to the claims occurred. 28 U.S.C. § 1332(a)(2). Venue is also proper in this District because Defendants Calvit, Insulinic LA, and Insulinic FL each signed a licensing agreement governing the intellectual property at issue in this case, wherein they expressly consented to venue in this District. In addition, Defendants Calvit, Insulinic LA, and Insulinic FL committed acts of intellectual property infringement in this District and Plaintiff suffered harm in this District.

27.     Venue is proper as to Defendants Desgraves, Elliott, LeLeaux, Insulinic, Insulinic HI, Insulinic Gretna, and Insulinic Hammond because, on information and belief, a substantial part of the events giving rise to the intellectual property misappropriation occurred within this District. In addition, Defendants Desgraves, Elliott, LeLeaux, Insulinic, Insulinic HI, Insulinic Gretna, and Insulinic Hammond committed acts of intellectual property infringement in this District and Plaintiff suffered harm in this District.

## IV.   OPERATIVE FACTUAL BACKGROUND

28.     Well Cell is a leading pioneer in the medical industry and specializes in developing ground-breaking technology for the treatment of diabetes and licensing its proprietary technology to other entities so that they may operate comprehensive diabetes clinics throughout the world. In fact, Well Cell owns a highly valuable and significant intellectual property portfolio—including patents, copyrights, trademarks, and trade secrets—which it carefully and consistently safeguards.

29.     On September 13, 2021, Well Cell Support, an affiliate of Well Cell to which a master license was granted with the ability to sell licenses to use Well Cell's intellectual property to other entities, issued one license to Defendant Insulinic LA to operate at one specific office location in

7

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0347

Lafayette, Louisiana. On November 1, 2021, Well Cell Support issued one license to Defendant Insulinic FL to operate at one specific office location in Hialeah, FL.

30.     The license agreements (the **"License Agreements"**) issued to Defendants Insulinic LA and Insulinic FL pertained only to Well Cell's patented technology, patent-pending technology, and proprietary and confidential trade secrets associated with such technology.

31.     Significantly, the License Agreements entered into by Well Cell Support and Insulinic LA and Insulinic FL *did not* cover rights nor grant use to any copyrighted materials owned by Well Cell.

32.     On June 9, 2022, after being informed about Defendant Calvit's wrongful billing practices, among other concerning matters that constituted a breach of the License Agreements, Well Cell Support issued a letter to Defendant Calvit informing him the licenses would be terminated if corrective measures were not taken.

33.     Because Defendants Calvit, Insulinic LA, and Insulinic FL did not properly address nor cure their breaches of the License Agreements, Well Cell Support ended its business relationship with Defendants in July 2022 and terminated the License Agreements.

34.     Despite the fact that Well Cell Support ended its business relationship with Defendants in July 2022 and terminated the License Agreements, Defendants decided to misappropriate Well Cell's intellectual property in order to open competing businesses in Hawaii (Insulinic HI) and Louisiana (Insulinic Gretna, and Insulinic Hammond) and to continue to unlawfully operate existing clinics in Louisiana and Florida (Insulinic LA and Insulinic FL) utilizing the Well Cell intellectual property belonging exclusively to Well Cell.

35.     On September 7, 2022, Well Cell and Well Cell Support, through the undersigned legal counsel, sent a demand letter to Defendants, confirming that the License Agreements between the

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0348

parties terminated as of July 19, 2022 due to Insulinic LA's and Insulinic FL's failure to cure, as set forth in the Notice of Default and the applicable provisions of the License Agreements and requesting that Defendants immediately cease and desist from infringing upon Well Cell's intellectual property. Unfortunately, Defendants failed to substantively respond to the Well Cell Plaintiff's cease and desist letter and continue to infringe on Well Cell's rights to this day.

36.     Thus, after the Well Cell Plaintiff's repeated attempts to amicably resolve their multiple claims against Defendants failed, the Well Cell Plaintiffs have resorted to filing the instant lawsuit in order to protect their rights and seek proper redress.

## V.     CAUSES OF ACTION

### A.  COPYRIGHT INFRINGEMENT

37.     Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

38.     At all times relevant hereto, Well Cell has been and still is the holder of the exclusive rights under the Copyright Act of 1976 (17 U.S.C. §§ 101 et. seq., and all amendments thereto) (the **"Copyright Act"**) to reproduce, distribute, display, or license the reproduction, distribution, and/or display of the website diabetesrelief.com (the **"Website"**) and all of its contents, as set forth in **Exhibit 1** attached hereto, the 2-D artwork entitled "Overcoming Metabolic Failure," as depicted in **Exhibit 2** attached hereto (**"Overcoming Metabolic Failure Drawing"**), and the technical drawing entitled "Glucose Homeostasis V.2." (**"Glucose Homeostasis Drawing"**) as depicted in **Exhibit 13** attached hereto throughout the United States.[1] On or about September 14,

---

[1] The Certificate of Registration for the Website is attached hereto as Exhibit 1. The Certificate of Registration for the Overcoming Metabolic Failure Drawing is attached hereto as Exhibit 2. The Certificate of Registration for the Glucose Homeostasis Drawing is attached hereto as Exhibit 13.

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0349

2017, the United States Copyright Office issued a certificate of registration, registration number of TX-8-452-464, for the Website to Diabetes Relief LLC. *See* Ex. 1. On or about May 17, 2018, the United States Copyright Office issued a certificate of registration, registration number of VAu 1-330-086, for the Overcoming Metabolic Failure Drawing to Diabetes Relief LLC. *See* Ex. 2. On or about January 14, 2020, the United States Copyright Office issued a certificate of registration, registration number of VA 2-185-843, for the Glucose Homeostasis Drawing to Diabetes Relief, LLC. *See* Ex. 13. On or about July 24, 2020, Well Cell purchased all of the assets of Diabetes Relief LLC for millions of dollars, including all of its intellectual property, including the copyrights to the Website, the Overcoming Metabolic Failure Drawing and the Glucose Homeostasis Drawing (collectively, the **"Well Cell Copyrighted Works"**). Since the purchase, Well Cell has continued to expand upon the intellectual property purchased from Diabetes Relief LLC to create an innovative and copyright and patent protected solution to treating diabetes.

39.     Diabetes Relief LLC and Well Cell used the collective experience, talent, and creativity of its owners and employees to create the Well Cell Copyrighted Works developed over years of hard work and through significant financial investments of Well Cell, including the initial multi-million purchase and subsequent additional investments to further develop the business and its intellectual property.

40.     Well Cell never gave Defendants a license to use the Well Cell Copyrighted Works. The License Agreements entered into by Well Cell Support, an affiliate of Well Cell to whom a master license was granted with the ability to sell licenses to use Well Cell's intellectual property to other entities, and Insulinic LA and Insulinic FL did not cover rights to use the Well Cell Copyrighted Works. Furthermore, even if the Well Cell Copyrighted Works were covered by the License Agreements, Well Cell Support terminated the License Agreements with Insulinic LA and

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0350

Insulinic FL on or about July 19, 2022, therefore, Defendants certainly had no rights to use or display the Well Cell Copyrighted Works after July 19, 2022.

41.     Yet, after Well Cell Support ended its business relationship with Defendants in July 2022 and terminated the License Agreements, Defendants decided to misappropriate the Well Cell Copyrighted Works and other intellectual property belonging exclusively to Well Cell in order to open a competing business in Hawaii (Insulinic HI) and to continue to unlawfully operate existing clinics in Louisiana and Florida (Insulinic LA and Insulinic FL) utilizing the Well Cell Copyrighted Works and other intellectual property belonging to Well Cell.

42.     From July 19, 2022 to the present date, Defendants have used and displayed information from the Well Cell Copyrighted Works on the Infringing Website, insulinic.com, as shown in Exhibit 3.[2] On the homepage of the Infringing Website, Defendants display exact copies of the illustrations found in the Overcoming Metabolic Failure Drawing under the headings "Abnormal Physiology" and "Restored Physiology." *Id.* These same infringing illustrations are also contained in the video that plays on the homepage of the Infringing Website from the 1:20 to 2:06 mark. *Id.* These infringing illustrations are also contained on the insulinic.com/science webpage. *Id.* All of these illustrations are separate instances of copyright infringement of Well Cell's exclusive right to use the Overcoming Metabolic Failure Drawing.

43.     The Infringing Website also contains instances of copyright infringement of Well Cell's exclusive right to use the Website and of its contents. The symptoms and statistics found on the Infringing Website under the "what patients are reporting" sections are exact replicas of the statistics and symptoms listed as improved on the Website for Well Cell's clients under the section

---

[2] Exhibit "3" consists of printouts from the website insulinic.com as of September 7, 2022.

11

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0351

"Our Patients Report."[3] The description of the "science" and "treatment plan" found on insulinic.com and insulinic.com/science are also stolen from the copyrighted Website as shown on Exhibit 4. *Id.* Defendants describe their science as a patented treatment protocol just as Well Cell does on the Website, despite the fact that all patents in question actually belong exclusively to Well Cell. *Id.* Defendants also claim to have a "metabolic" approach to managing diabetes consisting of "Physiologic Insulin Resensitization," the same technology pioneered and advanced by Well Cell and represented on its Website, including the exact same listed processes of "hormone optimization," "weight management," and "wellness and nutrition." *Id.* The descriptions found under each of the stolen subheadings on the Infringing Website are also each exactly identical or nearly identical to the copyrighted content found on the Website. *Id.* Therefore, nearly the entire Infringing Website consists of copyright infringements of Well Cell's exclusive rights to the Website.

44.     Additionally, on or about August 26, 2022, Defendants put out a press release that contained copyrighted information from the Website, including testimonials from clients of Well Cell (**"Insulinic Press Release"**).[4] The Insulinic Press Release contains testimonials of "Wayne K." and "Bruce B." who are clients of Well Cell and the content of the testimonials and description of the patients are exact duplicates of the copyrighted content on the Website.[5] Therefore the Insulinic Press Release is another instance of copyright infringement of Well Cell's exclusive right to use the Website.

---

[3] *See* Exhibit 3; and Exhibit "4," printouts of the diabatesrelief.com website as of September 7, 2022.

[4] *See* Exhibit "5," the press release issued by Insulinic on August 26, 2022.
[5] *Id.*; Exhibit "6," printout of the Website diabetesrelief.com/testimonials.

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL
COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0352

45.     Defendants continue to infringe upon the Well Cell Copyrighted Works, despite the fact that Defendants knew through the License Agreements and former business relationship with Well Cell that such intellectual property belonged exclusively to Well Cell. Yet, to date, Defendants continue to infringe upon the Well Cell Copyrighted Works. Thus, Defendants' behavior as set forth herein constitutes willful infringement and reckless disregard for the federal registrations.

46.     In stealing the Well Cell Copyrighted Works, Defendants willfully and intentionally sought to appropriate Well Cell's intellectual property for their own profit without bearing the cost of developing or purchasing their own work product. Well Cell's intellectual property is worth millions of dollars and Defendants sought to realize the same profit without investing the same amount of time, money, and creative thought, and to take away potential profits away from Well Cell that it would have realized but for Defendants' wrongful acts.

47.     The Well Cell Copyrighted Works are original works, copyrighted under the Copyright Act. *See* Ex. 1 and Ex. 2. As Well Cell specifically purchased all copyrights of Diabetes Relief LLC, it has the exclusive rights and privileges to reproduce, distribute, and display the Well Cell Copyrighted Works.

48.     Well Cell has never authorized Defendants, by license or otherwise, to copy, reproduce, distribute, or display any of the copyrighted material from the Well Cell Copyrighted Works, nor to prepare derivative works based on the Well Cell Copyrighted Works. To the extent the License Agreements between Well Cell Support and Insulinic LA and Insulinic FL covered any aspect of the Well Cell Copyrighted Works, those licenses terminated as of July 19, 2022.

49.     Defendants infringed Well Cell's exclusive rights in the Well Cell Copyrighted Works by copying, reproducing, duplicating, distributing, or displaying it and/or derivative works derived therefrom without Well Cell's permission, including but not limited to the Insulinic website

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0353

insulinic.com and the Insulinic Press Release, which contain multiple instances of infringement as set forth herein.

50.     Each infringing copy, duplication, sale, license, or display of the Well Cell Copyrighted Works, as well as the threat of continuing the same, constitutes a separate claim against Defendants under the Copyright Act. Well Cell has sustained, and will continue to sustain, substantial damage to the value of its copyrights in that the previously described activities of Defendants have diminished and will continue to diminish the revenues and goodwill in the industry that Well Cell would otherwise receive for use of and license of the Well Cell Copyrighted Works. In addition, Defendants have realized unlawful and unjust profits from their unauthorized and illegal copying, duplication, distribution, and display of the Well Cell Copyrighted Works.

51.     On September 7, 2022, Well Cell and Well Cell Support, through their legal counsel, sent a demand letter to Defendants, confirming that the License Agreements between the parties terminated as of July 19, 2022 due to Insulinic LA's and Insulinic FL's failure to cure, as set forth in the Notice of Default and the applicable provisions of the License Agreements and requesting that Defendants immediately cease and desist from infringing upon Well Cell's exclusive rights in the Well Cell Copyrighted Works and all other intellectual property belonging to Well Cell.[6]

52.     However, Defendants continue to infringe the copyrights in the Well Cell Copyrighted Works listed on Exhibit 1 and Exhibit 2, which constitute willful infringement and reckless disregard for the copyrights. As a direct result of the conduct of Defendants, Well Cell has suffered and continues to suffer direct and consequential damages in an amount to be determined by a jury.

---

[6] *See* Exhibit 7, Letter from Well Cell's counsel Lloyd & Mousilli to Defendants dated September 7, 2022.

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0354

53.     On information and belief, Defendants are each acting in concert with one another to infringe upon the Well Cell Copyrighted Works.

54.     On information and belief, Insulinic, Insulinic HI, Insulinic LA, and Insulinic FL operated as a single business enterprise and were structured and organized in such a manner that they functioned merely as an adjunct, tool, or business conduit of the other entities, with centralized control, shared finances, and mutual purpose.

55.     Defendants Calvit, Desgraves, Elliott are the alter-ego of Insulinic, Insulinic HI, Insulinic LA, and Insulinic FL and they treated these LLCs as their alter-ego at all times relevant hereto rather than as separate entities. Defendants Calvit, Desgraves, and Elliott are the members of each of the entities and it would be inequitable to allow them to evade personal liability for the debts of Insulinic HI, Insulinic LA, and Insulinic FL and allowing such an evasion would sanction a fraud and promote an injustice.

56.     On information and belief, Defendants are profiting from their unauthorized use of the Well Cell Copyrighted Works in the current operation of their clinics in Florida, Louisiana, and Hawaii, utilizing the Well Cell Copyrighted Works and other intellectual property belonging to Well Cell as set forth in the Insulinic Press Release and on the Infringing Website.

57.     As a direct and proximate result of the Defendants' infringing conduct alleged herein, Well Cell has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless Defendants' infringing conduct is enjoined by this Court, Defendants will continue to infringe the Well Cell Copyrighted Works. Plaintiff therefore is entitled to preliminary and permanent injunctive relief restraining and enjoining Defendants' ongoing infringing conduct.

15

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0355

58.     By reason of the copyright infringement described above, Well Cell is entitled to its actual damages and to Defendants' profits attributable to their misappropriation of Well Cell's protected works, in an amount to be proved at trial, and all other relief allowed under the Copyright Act.

59.     Well Cell also seeks the recovery of its attorneys' fees and costs in pursuing this action against Defendants, as authorized in 17 U.S.C. § 505.

60.     In the alternative, at the election of Well Cell, at the time of trial, it is entitled to recover from Defendants statutory damages as set forth in 17 U.S.C. § 504 of up to $150,000.00 per copyright infringed for Defendants' willful copyright infringement, plus attorneys' fees and costs.

### B.  CONTRIBUOTRY COPYRIGHT INFRIGEMENT

61.     Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

62.     Upon information and belief, all Defendants used and copied the Well Cell Copyrighted Works without Well Cell's permission.

63.     Upon information and belief, all Defendants' unauthorized use of the Well Cell Copyrighted works was done so that Defendants would be able to take, for their own profit and advantage, the Well Cell Copyrighted Works.

64.     Upon information and belief, all Defendants induced, participated, and aided and abetted in, and profited from, the use and copying of the Well Cell Copyrighted Works.

65.     By reason of the foregoing copying, all Defendants used, copied or aided and assisted in the use and copying of the Well Cell Copyrighted Works without permission of Well Cell, which is an infringement of Well Cell's copyrights.

66.     In stealing the Well Cell Copyrighted Works, the Defendants willfully and intentionally sought to appropriate Well Cell's hard work and significant financial investment in the intellectual

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0356

property for their own profit without bearing the cost of developing or purchasing their own work product.

67.     Well Cell has suffered actual damages as a direct and proximate result of Defendants' wrongful actions set forth herein. Well Cell seeks recovery of all profits of Defendants plus all losses of Well Cell, the exact sum to be proven at the time of trial.

68.     Well Cell also seeks the recovery of its attorneys' fees and costs in pursuing this action against Defendants as authorized in 17 U.S.C. § 505.

69.     In the alternative, at the election of Well Cell, at the time of trial, it is entitled to recover from Defendants statutory damages as set forth in 17 U.S.C. § 504 of up to $150,000.00 per copyright infringed for Defendants' willful copyright infringement, plus attorneys' fees and costs.

## C.  PATENT INFRINGEMENT

70.     Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

71.     This is an action for infringement of Well Cell's United States Patent Nos. 9,654,595 and 10,533,990 B2 under the Patent Act, 35 U.S.C. § 271, based on Defendants' unauthorized commercial manufacture, use, importation, offer for sale, or sale of insulin infusion pumps, kits, and/or IV tubing infusion cassettes, in the United States in violation of 35 U.S.C. § 271(a).

72.     United States Patent Number 9,652,595 (the **"595 Patent"**), entitled "kit that improves impaired hepatic glucose processing in patients," was duly and legally issued on May 16, 2017, and names Hunter Michael Alan Carr, Scott Hepford, and Carol Ann Wilson, as the inventors.[7]

---

[7] Attached as Exhibit "8" is a true and correct copy of the 595 Patent.

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL
COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0357

73.     The 595 Patent claims, among other things, to be a kit for individualized intravenous exogenous insulin-based therapy, which includes portable data storage in communication with a client device processor. The data storage can have computer instructions, a database of metabolic factors, a library of weight management protocols, a diabetic treatment model, and a library of care plan templates. The kit for individualized intravenous exogenous insulin-based therapy includes a blood glucose meter, a plurality of intravenous catheters fluidly engageable with a fluid source, and a plurality of metabolic enhancements.

74.     United States Patent Number 10,533,990 B2 (the **"990 Patent"**), entitled "physiologic insulin-sensitivity improvement," was duly and legally issued on January 14, 2020, and names Hunter Michael Alan Carr, Scott Hepford, Carol Ann Wilson, and Stanley Tories Lewis, Jr., as the inventors.[8]

75.     The 990 Patent claims, among other things, to constitute an individualized intravenous exogenous insulin–based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing. The therapy includes treatment sessions involving the assessment of metabolic factors, forming a subject profile, and matching the subject profile to a diabetic treatment model. Using the diabetic treatment model, a quantity and frequency of intravenous insulin bolus, dosage amounts of magnesium, and dosage amounts of potassium can be calculated. The methods that improve impaired hepatic glucose processing in subjects and patients can simultaneously introduce separated insulin bolus from an insulin reservoir, dosage amounts of magnesium, and dosage amounts of potassium. The subject profile can create a weight management protocol that uses a metabolic enhancement, wherein the individualized intravenous

---

[8] Attached as Exhibit "9" is a true and correct copy of the 990 Patent.

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0358

exogenous insulin – based therapy produces a subject or a patient with improved cellular ATP functioning.

76.     The 595 Patent and the 990 Patent were assigned to Diabetes Relief LLC. Well Cell specifically bought all rights to the 595 Patent and the 990 Patent when it purchased the assets of Diabetes Relief LLC for millions of dollars on or about July 24, 2020.

77.     At all times relevant hereto, Well Cell was and is the owner of the entire right, title, and interest in the 595 Patent and the 990 Patent.

78.     Well Cell holds an exclusive license under the 595 Patent and the 990 Patent, including the right to sublicense, make, have made, use, develop, have developed, offer for sale, sell and import products covered by the 595 Patent and the 990 Patent, and the right to assert, defend, maintain and enforce the 595 Patent and the 990 Patent.

79.     Upon information and belief, Defendants have and continue to infringe upon the 595 Patent and the 990 Patent by making, having made, using, selling, or offering for sale insulin infusion pumps, kits, and/or IV tubing infusion cassettes in the United States and importing into the United States insulin infusion pumps and IV tubing infusion cassettes that embody or use the inventions claimed in the 595 Patent and the 990 Patent. The insulin infusion pumps and IV tubing infusion cassettes being utilized by Defendants infringe upon the 990 Patent because they deliver individualized intravenous exogenous insulin–based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing.  The insulin infusion pumps, kits and IV tubing infusion cassettes being utilized by Defendants infringe upon the 595 Patent because they utilize software that includes portable data storage in communication with a client device processor, which has computer instructions, a database of metabolic factors, a library of weight management protocols, a diabetic treatment model, and a library of care plan templates.

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original
Complaint and Request for Injunctive Relief

APPX0359

The insulin infusion pumps, kits, and IV tubing infusion cassettes being utilized by Defendants infringe upon the 595 Patent because they contain individualized intravenous exogenous insulin-based therapy, including a blood glucose meter, a plurality of intravenous catheters fluidly engageable with a fluid source, and a plurality of metabolic enhancements.

80.    Upon information and belief, Defendants have been and are inducing infringement of the 595 Patent and the 990 Patent in violation of 35 U.S.C. § 271(b) by actively and knowingly inducing others to make, use, sell, offer for sale, or import insulin infusion pumps, kits, and/or IV tubing infusion cassettes that embody or use the inventions claimed in the insulin infusion pumps, kits, and IV tubing infusion cassettes. Specifically, the Infringing Website and the Insulinic Press Release evidence that Defendants are marketing to practitioners that they can utilize their insulin infusion pumps, kits, and IV tubing infusion cassettes for diabetes testing and management for their patients at their centers in Louisiana, Florida, and Hawaii.[9]

81.    Upon information and belief, Defendants have been and are continuing to infringe the 595 Patent and the 990 Patent, actively and knowingly, by selling or offering to sell insulin infusion pumps, kits, and/or IV tubing infusion cassettes, knowing them to be especially made or especially adapted for practicing the invention of the 595 Patent and the 990 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use in violation of 35 U.S.C. § 271(c). Specifically, Insulinic LA and Insulinic FL entered into License Agreements with Well Cell Support, (an affiliate of Well Cell which was granted a master license to the 595 Patent and the 990 Patent in order to issue sublicenses to domestic users), to use Well Cell's insulin infusion pumps, kits, and IV tubing infusion cassettes. Well Cell Support terminated the License Agreements with Insulinic LA and Insulinic FL effective July 19, 2022. However, Defendants

---

[9] *See* Exhs. 3 and 5.

APPX0360

continued to use, market, sell, or offer for sale the insulin infusion pumps, kits, and/or IV tubing infusion cassettes after termination of the agreements and the parties' business relationship. The Well Cell Plaintiffs sent Defendants a letter on September 7, 2022 confirming the termination of the License Agreements and requesting that Defendants immediately cease and desist from all infringing conduct.[10] Yet, Defendants continue to use, market, sell, or offer for sale infringing products that have no non-infringing use to this day.

82.     Upon information and belief, Defendants have been and are infringing, contributing to the infringement of, and/or inducing the infringement of the 595 Patent and the 990 Patent by making, using, selling, or offering for sale in the United States, or importing into the United States, including within this judicial district, insulin infusion pumps, kits, and/or IV tubing infusion cassettes.

83.     Defendants have known of the existence of the 595 Patent and the 990 Patent, and their acts of infringement have been willful and in reckless disregard for the 595 Patent and the 990 Patent, without any reasonable basis for believing that they had a right to engage in the infringing conduct.

84.     Defendants' infringement has been, and continues to be knowing, intentional, and willful.

85.     As a direct and proximate result of the Defendants' infringing conduct alleged herein, Well Cell has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless Defendants' infringing conduct is enjoined by this Court pursuant to 35 U.S.C. § 283, Defendants will continue to infringe the 595 Patent and the 990 Patent. Well Cell therefore is entitled to preliminary and permanent injunctive relief restraining and enjoining Defendants' ongoing infringing conduct.

---

[10] *See* Exhibit 7.

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL
COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0361

86.     In infringing upon the 595 Patent and the 990 Patent, Defendants willfully and intentionally sought to misappropriate Well Cell's intellectual property for their own profit without bearing the cost of developing or purchasing their own technology. Well Cell's intellectual property is worth millions of dollars and Defendants sought to realize the same profit without investing the same amount of time, money, and creative thought, and to take away potential profits away from Well Cell that it would have realized but for Defendants' wrongful acts.

87.     Well Cell has sustained, and will continue to sustain, substantial damage to the value of the 595 Patent and the 990 Patent in that the previously described activities of Defendants have diminished and will continue to diminish the revenues that Well Cell would otherwise receive for use of and license of the 595 Patent and the 990 Patent. In addition, Defendants have realized unlawful and unjust profits from their unauthorized and illegal use, sale, and/or offer for sale of the infringing products.

88.     By reason of the patent infringement described above, Well Cell is entitled to its actual damages and to Defendants' profits attributable to their misappropriation of Well Cell's protected works pursuant to 35 U.S.C. § 284, in an amount to be proved at trial, and all other relief allowed under the Patent Act.

89.     This case is exceptional and, therefore, Plaintiff is entitled to an award of attorney fees pursuant to 35 U.S.C. § 285.

### D.  VIOLATIONS OF THE DEFEND TRADE SECRETS ACT

90.     Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

APPX0362

91.     Well Cell possesses trade secrets in the form of business contacts, including clients, physicians, vendors, investors, borrowers, lenders, agents, brokers, banks, lending corporations, buyers, and sellers (collectively, **"the Contacts"**).

92.     The Contacts were developed through extensive time, labor, skill, and money, such that they are proprietary and valuable, and are not easily duplicated or readily ascertainable by the public or competitors.

93.     The Contacts had significant economic value that derived from the fact that their collective contact information was not generally known or readily ascertainable by third parties, including Well Cell's competitors. If the company's competitors had access to this information, they would be able to profit without undertaking the significant efforts and financial investments that Well Cell undertook over the years to discover, meet with, interview, and do business with the Contacts and then to compile the information.

94.     Well Cell also possesses trade secrets in the form of specialized medical training it has personally developed for the use of its patent-protected medical technology contained in its training modules, videos, and handbooks, and its methods of conducting its business for its proprietary method of insulin resensitization for the treatment of diabetes. These information and processes had significant economic value in that the information was not generally known or readily ascertainable by third parties, including Well Cell's competitors. If the company's competitors had access to this information, they would be able to profit without undertaking the significant efforts and financial investments that Well Cell undertook over the years to develop these information and processes.

95.     Well Cell has in place reasonable measures to protect the secrecy of its trade secrets. For example, Well Cell had Defendant Calvit, who is the principal member behind Defendants

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0363

Insulinic, Insulinic LA, Insulinic FL, Insulinic HI, Insulinic Gretna, and Insulinic Hammond, and Defendant LeLeaux sign Non-Disclosure Agreements requiring that each of them keep all confidential information revealed to them pursuant to the agreement "confidential" and not "disclose, reveal, or make use of any information … nor to do business with any of the revealed contacts without the written consent of the introducing party or parties." Well Cell's trade secrets were only shared with individuals under confidentiality agreements.

96.     Well Cell's trade secrets are related to products and/or services used in, and intended for use in, interstate commerce. The trade secrets were shared with Defendant Calvit and Defendant LeLeaux between the states of Texas, Louisiana, Florida, and Hawaii and the Contacts themselves consist of individuals and entities in the states of Texas, Louisiana, Florida, Hawaii and other states, and were developed through the interstate activity of Well Cell. Well Cell sought investments and clients from around the country, and sought to develop licensing agreements for diabetes clinics that would market and sell Well Cell's products across state lines.

97.     Well Cell disclosed the trade secrets to Defendant Calvit and Defendant LeLeaux under the context of the Non-Disclosure Agreements and Defendants took the trade secrets for themselves and their other business entities without Well Cell's consent, and in violation of their duties under the Non-Disclosure Agreement to compete with Well Cell after the termination of the parties' business relationships. Defendant Calvit misappropriated the Well Cell's trade secrets for his own benefit to open a new competing business in Hawaii in concert with Defendant LeLeaux. Defendant Calvit, in concert with Defendants Desgraves and Elliott, stole the contact information of physician, vendors, and investors and Well Cell's other trade secrets related to its methodology for the utilization and implementation of its proprietary method of insulin resensitization for the treatment of diabetes to run their competing business, Insulinic HI, with the assistance of

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0364

Defendant LeEaux. Defendants Calvit, Desgraves, and Elliott also used Well Cell's trade secrets to run their competing businesses Insulinic LA and Insulinic FL, along with Defendant LeEaux's assistance.

98.     Well Cell did not know what Defendants were doing and Defendants knew that Well Cell was unaware of their unlawful conduct. Accordingly, Defendants misappropriated Well Cell's trade secrets.

99.     Defendants knew that they did not have Well Cell's consent to do so, and Defendants knew that they were violating their duties under the Non-Disclosure Agreements.

100.    Well Cell has suffered, and will continue to suffer, irreparable harm for which monetary damages are inadequate as a direct and proximate result of Defendants' misappropriation of its trade secrets.

101.    Well Cell has also suffered losses as a direct and proximate result of Defendants' actions in the form of lost profits that Well Cell would have gained but more Defendants' misappropriation of trade secrets for use in their competing businesses, and damage to the value of their trade secrets, among other direct and consequential damages.

102.    Defendants misappropriated Well Cell's trade secrets willfully and maliciously, thus Well Cell requests an award of exemplary damages in an amount equal to twice the award of any other monetary damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

103.    Defendants misappropriated Well Cell's trade secrets willfully and maliciously, thus Well Cell requests its reasonable attorney's fees in this action pursuant to 18 U.S.C. § 1836(b)(3)(D).

### E.  VIOLATIONS OF THE TEXAS UNIFORM TRADE SECRETS ACT

104.    Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original
Complaint and Request for Injunctive Relief

APPX0365

105.    Well Cell possesses trade secrets in the form of the Contacts and specialized medical training Well Cell has personally developed for the use of its patent-protected medical technology contained in its training modules, videos, and handbooks, and its methods of conducting its business for its proprietary method of insulin resensitization for the treatment of diabetes.

106.    Well Cell's trade secrets were developed through extensive time, labor, skill, and money, such that they are proprietary and valuable, and are not easily duplicated or readily ascertainable by the public or competitors.

107.    The Contacts had significant economic value that derived from the fact that their collective contact information was not generally known or readily ascertainable by third parties, including Well Cell's competitors. If the company's competitors had access to this information, they would be able to profit without undertaking the significant efforts and financial investments that Well Cell undertook over the years to discover, meet with, interview, and do business with the Contacts and then to compile the information.

108.    Well Cell's trade secrets related to its methodology for the utilization and implementation of its proprietary method of insulin resensitization for the treatment of diabetes had significant economic value in that the information was not generally known or readily ascertainable by third parties, including Well Cell's competitors. If the company's competitors had access to this information, they would be able to profit without undertaking the significant efforts and financial investments that Well Cell undertook over the years to develop these information and processes.

109.    Well Cell has in place reasonable measures to protect the secrecy of its trade secrets. For example, Well Cell had Defendant Calvit, who is the principal member behind Defendants Insulinic, Insulinic LA, Insulinic FL, Insulinic HI, Insulinic Gretna, and Insulinic Hammond, and Defendant LeLeaux sign Non-Disclosure Agreements requiring that each of them keep all

26

APPX0366

confidential information revealed to them pursuant to the agreement "confidential" and not "disclose, reveal, or make use of any information … nor to do business with any of the revealed contacts without the written consent of the introducing party or parties." Well Cell's trade secrets were only shared with individuals under confidentiality agreements.

110.    Well Cell disclosed the trade secrets to Defendant Calvit and Defendant LeLeaux under the context of the Non-Disclosure Agreements and Defendants took the trade secrets for themselves and their other business entities without Well Cell's consent, and in violation of their duties under the Non-Disclosure Agreements to compete with Well Cell after the termination of the parties' business relationships. Defendant Calvit misappropriated Well Cell's trade secrets for his own benefit to open a new competing business in Hawaii in concert with Defendant LeLeaux. Defendant Calvit, in concert with Defendants Desgraves and Elliott, stole the contact information of physician, vendors, and investors and Well Cell's other trade secrets related to its methodology for the utilization and implementation of its proprietary method of insulin resensitization for the treatment of diabetes to run their competing business, Insulinic HI with the assistance of Defendant LeLeaux. Defendants Calvit, Desgraves, and Elliott also used the Contacts to run their competing businesses Insulinic LA and Insulinic FL, along with Defendant LeLeaux's assistance.

111.    Well Cell did not know what Defendants were doing and Defendants knew that Well Cell was unaware of their unlawful conduct. Accordingly, Defendants misappropriated Well Cell's trade secrets.

112.    Defendants knew that they did not have Well Cell's consent to do so, and Defendants knew that they were violating their duties under the Non-Disclosure Agreements.

APPX0367

113.    Well Cell has suffered, and will continue to suffer, irreparable harm for which monetary damages are inadequate as a direct and proximate result of Defendants' misappropriation of its trade secrets.

114.    Well Cell has also suffered losses as a direct and proximate result of Defendants' actions in the form of lost profits that Well Cell would have gained but more Defendants' misappropriation of trade secrets for use in their competing businesses, and damage to the value of their trade secrets, among other direct and consequential damages.

115.    Defendants misappropriated Well Cell's trade secrets willfully and maliciously, thus Well Cell requests an award of exemplary damages in an amount equal to twice the award of any other monetary damages pursuant to Tex. Civ. Prac. & Rem. Code § 134A.004.

116.    Defendants misappropriated Well Cell's trade secrets willfully and maliciously, thus Well Cell requests its reasonable attorney's fees in this action pursuant to Tex. Civ. Prac. & Rem. Code § 134A.005.

### F.   UNFAIR COMPETITION IN VIOLATION OF TEX. BUS. & CODE § 17.46

117.    Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

118.    In violation of Texas Business and Commerce Code § 17.46, Defendants have engaged in unfair competition by operating the Infringing Clinics and the Infringing Website in such a manner as to cause confusion and misunderstanding as to the source, sponsorship, approval, or certification of the Infringing Clinics and the Infringing Website and/or cause confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another with respect to their Infringing Clinics and Infringing Website.

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0368

119.     As a direct and proximate result of Defendant's unfair competition, Well Cell has suffered irreparable harm to the Well Cell IP and its reputation in the industry. Unless Defendants' conduct is restrained, Well Cell will continue to be irreparably harmed.

120.     Well Cell has no adequate remedy at law that will compensate it for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

121.     As a direct and proximate result of Defendants' unfair competition, Well Cell has suffered damages, including lost profits and damages to the valuable Well Cell IP and other damages in an amount to be proved at trial.

### G.  UNFAIR COMPETITION IN VIOLATION OF TEXAS COMMON LAW

122.     Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

123.     Defendants' acts as alleged herein constitute infringement and are likely to cause confusion and/or deceive consumers into falsely believing that there exists an affiliation, connection, or association between the Infringing Clinics and Well Cell. These acts also constitute unfair competition.

124.     Defendants' acts as alleged herein have caused and will continue to cause Well Cell irreparable harm for which Well Cell has no adequate remedy at law, in that (i) Well Cell has unique and valuable property rights in the Well Cell IP; (ii) Defendants' patent infringement, copyright infringement, and trade secret misappropriation constitutes a substantial interference with Well Cell's goodwill and customer relationships; and (iii) Defendants' activities, and the harm resulting to Well Cell, continues. Therefore, Well Cell is entitled to preliminary and permanent injunctive relief.

APPX0369

### H.  UNFAIR COMPETITION BY MISAPPROPRIATION IN VIOLATION OF TEXAS COMMON LAW

125.    Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

126.    The acts complained of herein constitute unfair competition by misappropriation, in violation of the common law of the State of Texas and elsewhere.

127.    Well Cell created the Well Cell IP and the goods and services on which they are authorized to appear in the United States through extensive time, labor, skill, and money.

128.    Defendants' use of the Well Cell IP in its unauthorized Infringing Clinics and Infringing Website creates competition with Well Cell, thereby conferring Defendants with a special advantage in that competition because Defendants are burdened with little or none of the expense incurred by Well Cell.

129.    As a direct and proximate result of Defendants' unfair competition, Well Cell has suffered irreparable harm to the valuable Well Cell IP and its reputation in the industry. Unless Defendants' conduct is restrained, Well Cell will continue to be irreparably harmed.

130.    Well Cell has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

131.    As a direct and proximate result of Defendants' unfair competition, Well Cell has suffered damages, including lost profits and damages to the valuable Well Cell IP and other damages in an amount to be proved at trial.

### I.  UNJUST ENRICHMENT IN VIOLATION OF TEXAS COMMON LAW

132.    Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0370

133.    By operating the Infringing Clinics and Infringing Website bearing Well Cell's valuable Well Cell IP, Defendants have been unjustly enriched to Well Cell's detriment in violation of the common law of Texas and elsewhere.

134.    Under principles of equity, Well Cell is entitled to damages, restitution and/or disgorgement of Defendants' ill-gotten gains.

### J.  BREACH OF CONTRACT CLAIM BY WELL CELL SUPPORT AGAINST DEFENDANT INSULINIC LA AND DEFENDANT SHAWN CALVIT

135.    Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

136.    Well Cell Support entered into a written contract with Defendant Insulinic LA on or about September 13, 2021 wherein Well Cell Support granted Insulinic LA a license for the use of Well Cell's patented and patent-pending treatment modalities for diabetes, including pumps, kits, and IV tubing for insulin resensitization as covered by the 595 Patent and the 990 Patent (**"Insulinic LA License Agreement"**).

137.    Well Cell Support fulfilled its obligations under the Insulinic LA License Agreement by granting Insulinic LA a license to use its patent-protected medical technology for the treatment of diabetes, providing Insulinic LA with insulin pumps and IV tubing, and providing specific medical training to Insulinic LA's personnel for the use of its specialized medical technology.

138.    Defendant Calvit is and was at all times the alter-ego of Insulinic LA as specifically alleged herein. To the extent the contract is interpreted not to be between Well Cell Support and Defendant Calvit individually, he should still be liable on an alter-ego theory and any other result would be unjust and promote a fraud and an injustice.

31

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0371

139.    On or about June 9, 2022, Well Cell Support put Insulinic LA on notice that it was in default under the Insulinic LA License Agreement due to its failure to abide by the terms of the written contract related to improper billing practices and reporting, among other matters. Insulinic LA failed to cure its default within thirty (30) days, thus the Insulinic LA License Agreement was terminated effective July 19, 2022.

140.    Notwithstanding, Well Cell Support's termination of the Insulinic LA License Agreement, Insulinic LA continued to use the insulin pumps, kits, and IV tubing when it no longer had a license to do so in breach of the Insulinic LA License Agreement. Well Cell Support has also demanded the return of the insulin pumps and Insulinic LA has refused to return them in violation of the written terms of the Insulinic LA License Agreement.

141.    The Insulinic LA License Agreement also contains a non-competition clause which states that Insulinic LA, its owner(s) and any key personnel, including Defendant Calvit, Defendant Desgraves, Defendant Elliott, and Defendant LeLeaux "shall not control, consult to, or be employed by another diabetes or metabolic disorder treatment center or clinic, either by soliciting any of its accounts or by operating within any of LICENSOR's particular areas of practice" throughout the duration of the agreement and for a period of two years after the termination of the agreement. Thus, Defendants Insulinic LA, Calvit, Desgraves, Elliott and LeLeaux are prohibited from competing with Well Cell Support until at least July 19, 2024.

142.    Yet, in breach of the Insulinic LA License Agreement, Defendants Insulinic LA, Calvit, Desgraves, Elliott, and LeLeaux continue to control, consult to, or be employed by diabetes or metabolic disorder treatment centers or clinics that compete with Well Cell Support in its areas of practice, including but not limited to Insulinic LA, Insulinic FL, Insulinic HI, Insulinic Hammond and Insulinic Gretna.

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original
Complaint and Request for Injunctive Relief

APPX0372

143.    Each of these breaches of contract are material breaches.

144.    As a direct and proximate result of Defendants Insulinic LA, Calvit, Desgraves, Elliott, and LeLeaux breaching the Insulinic LA License Agreement, Well Cell Support incurred legally compensable damages, including direct and consequential damages, attorneys' fees, costs, and other legal injuries, all of which are in excess of the minimal jurisdictional limits of this Court.

### K. BREACH OF CONTRACT CLAIM BY WELL CELL SUPPORT AGAINST DEFENDANT INSULINIC FL AND DEFENDANT SHAWN CALVIT

145.    Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

146.    Well Cell Support entered into a contract with Defendant Insulinic FL on or about September 13, 2021, wherein Well Cell Support granted Insulinic FL a license for the use of Well Cell's patented and patent-pending treatment modalities for diabetes, including pumps, kits, and IV tubing for insulin resensitization as covered by the 595 Patent and the 990 Patent (**"Insulinic FL License Agreement"**).

147.    Well Cell Support fulfilled its obligations under the Insulinic FL License Agreement by granting Insulinic FL a license to use its patent-protected medical technology for the treatment of diabetes, providing Insulinic FL with insulin pumps and IV tubing, and providing specific medical training to Insulinic FL's personnel for the use of its specialized medical technology.

148.    Defendant Calvit is and was at all times the alter-ego of Insulinic FL as specifically alleged herein. To the extent the contract is interpreted not to be between Well Cell Support and Defendant Calvit individually, he should still be liable on an alter-ego theory and any other result would be unjust and promote a fraud and an injustice.

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0373

149.     On or about June 9, 2022, Well Cell Support put Insulinic FL on notice that it was in default under the Insulinic FL License Agreement due to its failure to abide by the terms of the written contract related to improper billing practices and reporting, among other matters. Insulinic FL failed to cure its default within thirty (30) days, thus the Insulinic FL License Agreement was terminated effective July 19, 2022.

150.     Notwithstanding, Well Cell Support's termination of the Insulinic FL License Agreement, Insulinic FL continued to use the insulin pumps, kits, and IV tubing when it no longer had a license to do so in breach of the Insulinic FL License Agreement. Well Cell Support has also demanded the return of the insulin pumps and Insulinic FL has refused to return them in violation of the written terms of the Insulinic FL License Agreement.

151.     The Insulinic FL License Agreement also contains a non-competition clause which states that Insulinic FL, its owner(s) and any key personnel, including Defendant Calvit, Defendant Desgraves, Defendant Elliott, and Defendant LeLeaux "shall not control, consult to, or be employed by another diabetes or metabolic disorder treatment center or clinic, either by soliciting any of its accounts or by operating within any of LICENSOR's particular areas of practice" throughout the duration of the agreement and for a period of two years after the termination of the agreement. Thus, Defendants Insulinic FL, Calvit, Desgraves, Elliott, and LeLeaux are prohibited from competing with Well Cell Support until at least July 19, 2024.

152.     Yet, in breach of the Insulinic FL License Agreement, Defendants Insulinic LA, Calvit, Desgraves, Elliott, and LeLeaux continue to control, consult to, or be employed by diabetes or metabolic disorder treatment centers or clinics that compete with Well Cell Support in its areas of practice, including but not limited to Insulinic LA, Insulinic FL, Insulinic HI, Insulinic Hammond, and Insulinic Gretna.

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0374

153.     Each of these breaches of contract are material breaches.

154.     As a direct and proximate result of Defendants Insulinic FL, Calvit, Desgraves, Elliott, and LeLeaux breaching the Insulinic FL License Agreement, Well Cell Support incurred legally compensable damages including direct and consequential damages, attorneys' fees, costs, and other legal injuries, all of which are in excess of the minimal jurisdictional limits of this Court.

### L. TRADEMARK INFRINGEMENT, UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN IN VIOLATION OF SECTION 43(A) OF THE LANHAM ACT

155.     Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

156.     Well Cell has for many years expended considerable sums of money, as well as the time and effort of its employees and agents, to purchase the rights to and further develop the marks "Diabetes Relief," "DR$_x$,"[11] and "Physiologic Insulin Resensitization," to advertise, and to create websites, all of which present Well Cell and the services it provides in a favorable light to promote sales and services to its customers. Well Cell has used these marks on a nationwide basis, in fact on a worldwide basis, since at least February 1, 2016 in various channels of commerce including, selling and marketing medical modalities for the treatment of diabetes and providing training and teaching services related to these medical modalities.

157.     The Defendants engage in competing businesses in Florida, Louisiana, and Hawaii.

158.     Defendants deliberately and intentionally used Well Cell's marks "Diabetes Relief," "DR$_x$," and "Physiologic Insulin Resensitization," including but not limited to their use on the insulinic.com website and on the Insulinic Facebook page, knowing that these were marks

---

[11] *See* Exhibit "10," for the trademark DR$_x$ belonging to Well Cell.

35

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0375

exclusively belonging to Well Cell and previously used by Well Cell in interstate commerce throughout the United States and abroad.[12]

159.    Defendants' use of Well Cell's marks, in interstate commerce, has deceived the public into thinking that Well Cell was the sponsor or origin of the diabetes treatment services offered by Defendants in their Insulinic businesses.

160.    Defendants' use of Well Cell's marks "Diabetes Relief,", "DR$_x$," and "Physiologic Insulin Resensitization," in connection with their competing diabetes treatment businesses was deliberate and intentional.

161.    The aforementioned conduct of Defendants was specifically designed to divert consumers and customers of Well Cell's business to Defendants' businesses.

162.    Defendants' use of the phrases or marks "Diabetes Relief," "DR$_x$," and "Physiologic Insulin Resensitization," was without Well Cell's consent nor authorization.

163.    Defendants' use of the phrases or marks "Diabetes Relief," "DR$_x$," and "Physiologic Insulin Resensitization," in connection with their competing businesses has damaged and will continue to damage Well Cell's business and reputation by means of lost sales and diminution of goodwill and business reputation.

164.    Defendants' use of the phrases or marks "Diabetes Relief," "DR$_x$," and "Physiologic Insulin Resensitization," in connection with their competing businesses did cause, and is likely to continue to cause, confusion, mistake, has and will deceive third-parties as to the affiliation, connection or association of defendants with Well Cell and as to whether or not Well Cell has anything to do with the origin, sponsorship, services, or other commercial activities of the Defendants.

---

[12] *See* Ex. 3 at Pg. 1, 4, and 5; Exhibit "11," printouts of the website insulinic.com as of September 28, 2022; and Exhibit "12," printouts from the Insulinic Facebook page and a video that displays on the Insulinic Facebook page as of September 29, 2022.

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL
COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0376

165.    Defendants' aforementioned use of the phrases or marks "Diabetes Relief," "DR$_x$," and "Physiologic Insulin Resensitization," misrepresented the nature, characteristics, qualities, and/or geographic origin of Defendants' services and commercial activities.

166.    Defendants have violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), in that they have in connection with Defendants' goods or services, used the phrases or marks "Diabetes Relief," "DR$_x$," and "Physiologic Insulin Resensitization," which represent a false designation of origin, false or misleading description, and/or a misrepresentation of fact likely to cause confusion, mistake, or deception both as to the affiliation, connection, or association of Defendants with Well Cell, and as to the origin, sponsorship, association, or approval of the Defendants' services, goods, and commercial activities by Well Cell.

167.    The Defendants' acts constitute the use in commerce of false designations of origin and false and/or misleading descriptions or representations, tending to falsely or misleadingly describe and/or represent the Defendants' products and services as those of Well Cell, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

168.    Defendants have violated 15 U.S.C. § 1125(a)(1)(B) in that their commercial advertising or promotion for Defendants' businesses misrepresents the nature, characteristics, qualities, and/or geographic origin of Well Cell's and Defendants' goods, services, or commercial activities.

169.    Defendants' wrongful acts will continue unless and until enjoined by this Court.

170.    Defendants' acts have caused and will continue to cause irreparable injury to Well Cell. Well Cell has no adequate remedy at law and is thus damaged in an amount yet to be determined.

171.    Well Cell is entitled to the recovery of damages from the Defendants jointly and severally, pursuant to 15 U.S.C. § 1125(a). Damages include the actual damages sustained by Well Cell, Defendants' profits, and the costs of this action together with Well Cell's reasonable and necessary

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0377

attorneys' fees. In the alternative, Well Cell is entitled to recover damages in such sums as the Court may find just according to the circumstances of the case.

## M. TRADEMARK DILUTION IN VIOLATION OF SECTION 43(C) OF THE LANHAM ACT

172.    Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

173.    Defendants' use of the phrases or marks "Diabetes Relief," "DR$_x$," and "Physiologic Insulin Resensitization," has caused and continues to cause dilution of the distinctive quality of Well Cell's marks. Defendants' use of "Diabetes Relief," "DR$_x$," and "Physiologic Insulin Resensitization," is a violation of 15 U.S.C. § 1125(c), Well Cell's marks being distinctive and famous within the meaning of the statute and Defendants' use of "Diabetes Relief," "DR$_x$," and "Physiologic Insulin Resensitization," in commerce having begun well after Well Cell's marks became distinctive and famous.

174.    Well Cell's marks, "Diabetes Relief," "DR$_x$," and "Physiologic Insulin Resensitization," are all distinctive marks that have been in use for many years and play a prominent role in its marketing, advertising, and the popularity of its products and services across the country and worldwide.

175.    Defendants willfully intended to trade on Well Cell's reputation and/or cause dilution of Well Cell's marks by their use of the phrases or marks "Diabetes Relief," "DR$_x$," and "Physiologic Insulin Resensitization."

176.    Defendants intended to harm the reputation of Well Cell's famous marks through the aforementioned actions.

177.    Defendants' wrongful acts will continue unless and until enjoined by this Court.

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0378

178.     Defendants' acts have caused and will continue to cause irreparable injury to Well Cell. Well Cell has no adequate remedy at law and is thus damaged in an amount yet to be determined.

179.     Well Cell is entitled to the recovery of damages from Defendants jointly and severally, pursuant to 15 U.S.C. § 1117(a). Damages recoverable are actual damages sustained by Well Cell, Defendants' profits, and the costs of the action together with Well Cell's reasonable and necessary attorneys' fees. In the alternative, Well Cell is entitled to recover damages in such sum as the Court may find just according to the circumstances of the case.

### N.  TEXAS ANTI-DILUTION STATUTE – TEX. BUS. & COM. CODE § 16.103

180.     Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding paragraphs and hereby incorporates them by reference as if fully set forth herein.

181.     Due to Well Cell's extensive use of the marks "Diabetes Relief," "$DR_x$," and "Physiologic Insulin Resensitization," in interstate commerce on a nationwide and global basis and its significant marketing and promotional activities of Well Cell's brand and marks, the Well Cell marks have achieved widespread acceptance and recognition among the consuming public and the trade throughout the United States and abroad.

182.     Through Well Cell's prominent, long, and continuous use in commerce, including commerce within Texas, the Well Cell marks "Diabetes Relief," "$DR_x$," and "Physiologic Insulin Resensitization" have become and continue to be famous and distinctive.

183.     After Well Cell's marks "Diabetes Relief," "$DR_x$," and "Physiologic Insulin Resensitization," became famous, Defendants, without authorization from Well Cell, began using marks that are confusingly similar to the Well Cell's marks. Defendants' use of unauthorized reproductions of the Well Cell marks dilutes and/or is likely to dilute the distinctive quality of those marks and to lessen the capacity of such marks to identify and distinguish Well Cell's

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0379

products and/or services. Defendants' unlawful use of the Well Cell marks in connection with their

inferior products and/or services also is likely to tarnish the Well Cell marks and cause blurring in

the minds of consumers between Well Cell and Defendants, thereby lessening the value of the

Well Cell brand and marks as unique identifiers of Well Cell's products and/or services.

184.    By the acts described above, Defendants have caused and will continue to cause irreparable

injury to Well Cell's goodwill and business reputation, in violation of the Texas Anti-Dilution

Statute, Tex. Bus. & Com. Code § 16.103, for which there is no adequate remedy at law.

185.    Defendants' wrongful acts will continue unless and until enjoined by this Court.

186.    The acts of Defendants alleged above were committed willfully, with full knowledge of

Well Cell's rights, and with the intention of deceiving and misleading the public and causing harm

to Well Cell.

187.    As a direct and proximate result of Defendants' unlawful acts, Well Cell has suffered and

will continue to suffer damages in an amount yet to be determined.

188.    In light of the foregoing, Well Cell is entitled to injunctive relief prohibiting Defendants

from using Well Cell's marks, and to recover all damages, including its reasonable and necessary

attorneys' fees, that Well Cell has sustained and will sustain, and all gains, profits and advantages

obtained by Defendants as a result of their infringing acts alleged above in an amount not yet

known, and the costs of this action.

## O.  COMMON LAW TRADEMARK INFRINGEMENT UNDER TEXAS LAW

189.    Plaintiffs hereby restate and re-allege every fact and allegation set forth in the preceding

paragraphs and hereby incorporates them by reference as if fully set forth herein.

190.    Well Cell owns all rights, title, and interest in and to the marks "Diabetes Relief," "DR$_x$,"

and "Physiologic Insulin Resensitization," including all common law rights in such marks.

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original
Complaint and Request for Injunctive Relief

APPX0380

191.    Defendants, without authorization from Well Cell, have used and are continuing to use spurious designations that are identical to, substantially indistinguishable from, or confusingly similar to the Well Cell marks.

192.     The foregoing acts of Defendants are intended to cause, have caused, and are likely to continue to cause confusion, mistake, and deception among consumers, the public, and the trade as to whether Defendants' products and/or services originate from, or are affiliated with, sponsored by, or endorsed by Well Cell.

193.    Defendants' acts constitute trademark infringement in violation of the common law of the State of Texas.

194.    The acts of Defendants alleged above were committed willfully, with full knowledge of Well Cell's rights, and with the intention of deceiving and misleading the public and causing harm to Well Cell.

195.    Upon information and belief, Defendants have profited from their unlawful actions and have been unjustly enriched to the detriment of Well Cell. Defendants' unlawful actions have caused Well Cell damages in an amount to be determined at trial.

196.    As a result of Defendants' unlawful acts as described herein, Well Cell has suffered and will continue to suffer irreparable harm to its goodwill and business reputation and Well Cell has no adequate remedy at law.

197.    Defendants will continue their unlawful acts unless Defendants are preliminarily and permanently enjoined from their unlawful conduct.

198.    As a direct and proximate result of Defendants' unlawful acts, Well Cell has suffered and will continue to suffer damages in an amount yet to be determined.

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0381

199.    In light of the foregoing, Well Cell is entitled to injunctive relief prohibiting Defendants from using Well Cell's marks, and to recover all damages, including its reasonable and necessary attorney's fees, that Well Cell has sustained and will sustain, and all gains, profits and advantages obtained by Defendants as a result of their infringing acts alleged above in an amount not yet known, and the costs of this action.

## VI.    JURY DEMAND

200.    Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully request a trial by jury on all issues so triable.

## VII.    PRAYERS

**WHEREFORE,** Plaintiffs Well Cell Global LLC and Well Cell Support LLC request that Defendants be cited to appear and answer, and that on final trial, Plaintiffs have the following judgement:

1.   That Defendants have violated Section 501 of the Copyright Act (17 U.S.C. § 501)

2.   Granting an injunction temporarily, preliminarily, and permanently enjoining the Defendants, their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons and entities who receive actual notice of the Court's order by personal service or otherwise, from:

   a.   manufacturing, distributing, marketing, advertising, promoting, displaying, performing, or selling or authorizing any third party to manufacture, distribute, market, advertise, promote, display, perform, or sell any infringing content and any products, works, or other materials that include, copy, are derived from, or otherwise embody the Well Cell Copyrighted Works;

42

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0382

b. reproducing, distributing, performing, or publicly displaying the Well Cell Copyrighted Works, creating any derivative works based on the Well Cell Copyrighted Works, or engaging in any activity that infringes Plaintiff's rights in its Well Cell Copyrighted Works;

c. aiding, assisting, or abetting any other individual or entity in doing any act prohibited by sub-paragraphs (a) or (b);

d. and requiring Defendants to immediately and permanently remove all infringing content from the Infringing Website, insulnic.com, and the Insulinic Press Release;

e. to issue a public retraction of the Insulinic Press Release in all news media where it was original shared, copied, or reproduced stating that it contained content that infringed on the Well Cell Copyrighted Works.

3. That Defendants be required to provide a full accounting to Well Cell for all profits derived from their use and display of the Well Cell Copyrighted Works and their production, reproduction, and preparation of derivative works based on, distribution, and display of the Well Cell Copyrighted Works in all media, from all sources, worldwide;

4. That Defendants be ordered to pay Well Cell all damages, including future damages, that Well Cell has sustained or will sustain as a result of the acts complained of herein, and that Well Cell be awarded any profits derived by Defendants as a result of said acts, or as determined by said accounting;

5. That Defendants be ordered to destroy or deliver up for destruction all materials in Defendants' possession, custody, or control used by Defendants in connection with

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original Complaint and Request for Injunctive Relief

APPX0383

Defendants' infringing conduct, including without limitation all remaining copies of work containing infringing content and any products and works that embody any reproduction or other copy or colorable imitation of the Well Cell Copyrighted Work, as well as all means for manufacturing them;

6. That Defendants, at its own expense, be ordered to recall any products or materials containing infringing content from any distributors, retailers, vendors, or others that have distributed them on Defendants' behalf, and any products, works or other materials that include, copy, are derived from, or otherwise embody the Well Cell Copyrighted Work, and that Defendants be ordered to destroy or deliver up for destruction all materials returned to it;

7. Adjudging that Defendants have infringed, actively induced infringement of, and contributorily infringed the 595 Patent and the 990 Patent, in violation of 35 U.S.C. § 271(a), (b), and (c);

8. Granting an injunction temporarily, preliminarily, and permanently enjoining Defendants, their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons or entities from infringing, contributing to the infringement of, or inducing infringement of the 595 Patent and the 990 Patent.

9. Ordering Defendants to account and pay damages adequate to compensate Plaintiff for Defendants' infringement of the 595 Patent and the 990 Patent, including for any infringing acts not presented at trial and pre-judgment and post-judgment interest and costs, pursuant to 35 U.S.C. § 284;

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL
COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0384

10. Ordering an accounting for any infringing sales not presented at trial and an award by the court of additional damages for any such infringing sales;

11. Ordering that the damages award for the patent infringements be increased up to three times the actual amount assessed, pursuant to 35 U.S.C. § 284;

12. Declaring this case exceptional and awarding Plaintiff Well Cell its reasonable attorneys' fees, pursuant to 35 U.S.C. § 285;

13. Granting an injunction temporarily, preliminarily, and permanently enjoining the Defendants, their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons and entities who receive actual notice of the Court's order by personal service or otherwise, from disclosing Well Cell's trade secrets, including the Contacts pursuant to Tex. Civ. Prac. & Rem. Code § 134A.003 and 18 U.S.C. § 1836(b)(3)(A);

14. Granting an injunction temporarily, preliminarily, and permanently enjoining the Defendants, their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons and entities who receive actual notice of the Court's order by personal service or otherwise, from using the marks "Diabetes Relief," "DR$_x$," and "Physiologic Insulin Resensitization,";

15. Judgment awarding Well Cell it's actual damages as a result of Defendants' infringement of its marks, all profits of Defendants' as a result of their use of Well Cell's marks, and Well Cell's reasonable and necessary attorney's fees pursuant to 15 U.S.C. § 1125(a),(c), Tex. Bus. & Com. Code § 16.103, and Texas common law;

---

PLAINTIFFS WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC'S FIRST AMENDED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

APPX0385

16. Judgment be entered against Defendants and in favor of Well Cell for its actual damages on all of its claims;

17. Lost profits;

18. Exemplary damages;

19. Pre-judgment interest as provided by law;

20. Post-judgment interest as provided by law;

21. Reasonable attorneys' fees;

22. Costs of suit;

23. All other relief to which Plaintiffs may show themselves entitled, either at law or in equity, either general or special, under the facts set forth in their claims.

Dated:  October 27, 2022.                     Respectfully submitted,


By:___/s/ *Lema Barazi*_____
LEMA BARAZI
Attorney-in-charge
State Bar No. 24056016
S.D. Texas Bar No. 1358290
lema@lloydmousilli.com
**LLOYD & MOUSILLI, PLLC**
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
Tel: (512) 609-0059
Fax: (413) 473-6164
Service: litigation@lloydmousilli.com

OF COUNSEL:

Feras Mousilli
State Bar No. 24043837
feras@lloydmousilli.com
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077

APPX0386

Tel: (512) 609-0059
Fax: (413) 473-6164

Elizabeth Revere
State Bar No. 00791513
S.D. Texas Bar No.18329
beth@lloydmousilli.com
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
Tel: (512) 609-0059
Fax: (413) 473-6164

**ATTORNEYS FOR PLAINITFFS**
**WELL CELL GLOBAL LLC AND**
**WELL CELL SUPPORT LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record, pursuant to the District's ECF service rules on **October 27, 2022, *via electronic filing system*** on the following:

Justin K. Ratley
*jratley@munsch.com*
Elizabeth F. Eoff
*eeoff@munsch.com*
MUNSCH HARDT KOPF & HARR, P.C.
700 Milam, Suite 800
Houston, Texas 77002
Tel: 713.222.1493
Fax: 713.222.1475
*Attorneys for Defendants Shawn Paul Calvit,*
*Insulinic of Lafayette LLC, Insulinic of Hialeah LLC,*
*and Insulinic of Hawaii LLC*

/s/ *Lema Barazi*
Lema Barazi

Plaintiffs Well Cell Global LLC and Well Cell Support LLC's First Amended Original
Complaint and Request for Injunctive Relief

APPX0387

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Kayn Teyle Clayett*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-452-464

**Effective Date of Registration:**
September 14, 2017

---

## Title
‎

| | |
|---|---|
| **Title of Work:** | Diabetes Relief Website |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2017 |
| **Date of 1st Publication:** | July 01, 2017 |
| **Nation of 1st Publication:** | United States |

## Author

| | |
|---|---|
| • **Author:** | Diabetes Relief LLC |
| **Author Created:** | text |
| **Work made for hire:** | Yes |
| **Citizen of:** | United States |
| **Year Born:** | 2015 |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | Diabetes Relief LLC |
| | 11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States |
| **Transfer statement:** | Various employees and associates |

---

## Rights and Permissions

| | |
|---|---|
| **Organization Name:** | Diabetes Relief LLC |
| **Name:** | Carol Ann Wilson |
| **Email:** | carol@diabetesrelief.com |
| **Telephone:** | (281)600-5000 |
| **Alt. Telephone:** | (281)600-6000 |
| **Address:** | 11511 Katy Fwy |
| | Suite 101 |
| | Houston, TX 77079 United States |

Page 1 of 2

EXHIBIT 1

PX0388

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Karyn A. Temple*

Acting United States Register of Copyrights and Director

**Registration Number**

## VAu 1-330-086

**Effective Date of Registration:**
May 17, 2018

---

## Title

**Title of Work:** Overcoming Metabolic Failure

## Completion/Publication

**Year of Completion:** 2018

## Author

- **Author:** Diabetes Relief LLC
  **Author Created:** 2-D artwork
  **Work made for hire:** Yes
  **Citizen of:** United States
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States

## Rights and Permissions

**Organization Name:** Diabetes Relief LLC
**Name:** Carol A Wilson
**Email:** carolwilson@earthlink.net
**Telephone:** (281)642-4050
**Alt. Telephone:** (281)600-6000
**Address:** 8902 Sunnywood Dr
Houston, TX 77088 United States

## Certification

**Name:** Carol Wilson

**EXHIBIT 2**

Page 1 of 2

APPX0389

**Registration #:** VAu001330086
**Service Request #:** 1-6592582541

Diabetes Relief LLC
Carol A Wilson
11511 Katy Fwy, Suite 101
Houston, TX 77079 United States

APPX0390



APPX0391



(http://insulinic.com)

f (https://www.facebook.com/insulinic)    🐦 (https://twitter.com/insulinic)

# The Science Behind Physiologic Insulin Resensitization

- Insulinic utilizes a unique and groundbreaking  patented approach where insulin is administered as a hormone rather than a drug addressing the primary cause of Diabetes which is metabolic failure
- By utilizing insulin in a manner that bio-mimics normal physiology, this modality is designed to reduce insulin resistance which helps blood sugar more readily enter each cell and be converted into energy
- Increasing cellular energy allows damaged tissues and organs to grow, repair, and regenerate. Thus, our approach not only stabilizes but in many instances has reversed complications of diabetes and other metabolic disorders.

## PIR For Insulin Resistance

PIR for insulin resistance
(http://insulinic.com/wp-content/uploads/2022/03/1.-PIR-for-insulin-resistance-1.pdf)

## Dynamic Diabetes Solution

Dynamic Diabetes Solutions-Pulse Insulin Resensitization (PIR)
(http://insulinic.com/wp-content/uploads/2022/03/4.-Article-Dynamic-Diabetes-Solutions-
Pulse-Insulin-Resensitization-PIR-Published-Medical-_-Clinical-Research-Dr.-Loveridge-
08.13.2021.pdf)

## Improved Kidney Function

Improved Kidney Function
(http://insulinic.com/wp-content/uploads/2022/03/3.-Villaverde-Improved-Kidney-
Function-Following-Physiologic-Insulin-Resensitization-Treatment-Modality_07.30.21.pdf)

EXHIBIT
3

# Reversal Of Diabetic Neuropathy

Reversal of Diabetic Neuropathy
(http://insulinic.com/wp-content/uploads/2022/03/2.-Loveridge-Reversal-of-Diabetic-Neuropathy-Utilizing-Physiologic-Insulin-Resensitization-Case-Series_07.20.2021-Copy.pdf)



## Stay Connected With Insulinic

(http s://w ww.f aceb ook. com /insu linic)

(http s://t witte r.co m/in sulin ic)

## Quick Links

Home(http://insulinic.com/shawn/)

APPX0393

About Us(http://insulinic.com/shawn/about/)

Services(http://insulinic.com/shawn/services/)

Contact(http://insulinic.com/shawn/contact/)

## Make an Appointment

Getting an accurate diagnosis can be one of the most impactful experiences that you can have.

**Contact Now
(http://insulinic.com/shawn/contact/)**

Copyright © 2021 Insulinic | Powered by Tech Reshape (https://www.techreshape.com)



(http://insulinic.com)

f (https://www.facebook.com/insulinic)   🐦 (https://twitter.com/insulinic)

## Physiologic Insulin Resensitization

A groundbreaking approach designed to address the root cause of metabolic disorders instead of only suppressing the symptoms.

### Insulin Resistance

### The Root Cause of Metabolic Failure

- Occurs when your body's cells ignore insulin's signal to open
- Cells not opening to absorb glucose causes high blood sugar
- Excessive blood sugars can create the following symptoms:

  - Neuropathy
  - Weight gain
  - Lack of energy
  - Kidney failure

  - Uncontrolled blood sugar
  - Slow Healing Wounds
  - Memory Loss
  - Frequent Urination

APPX0395



## Reversing Insulin Resistance

Physiologic Insulin Resensitization utilizes Insulin as a HORMONE rather than a DRUG

- Using insulin as a hormone is like having a master key for your Bodys cells
- Glucose (sugars) enter your cells and convert into energy
- Increasing cellular energy allows damaged tissues and organs to grow, repair, and regenerate
- Thus, our approach not only stabilizes but in many instances has reversed complications of diabetes and other metabolic disorders

## WE ADDRESS THE ROOT CAUSE OF METABOLIC FAILURE BY REVERSING INSULIN RESISTANCE

APPX0396



## What Patients are Reporting

**Improved Neuropathy** 95%

**Improvement in at least one diabetic complication** 76%

**HbA1c reduction** 63%

**Reduced diabetic medications** 41%

- Neuropathy diminished
- Energy restored
- Weight controlled
- Erectile function restored
- Retinopathy diminished

- Amputations prevented
- Medications reduced
- Blood sugar controlled
- Mood and sleep improved
- Wounds healed

- Hair and nail growth
- Dementia mitigated
- Alzheimer's alleviated
- Stroke recovery accelerated

APPX0397

- **Fatty Liver reduced**

Insulin
(https://sevencosmos.com/delta/2022/aug/inl/)

---

Insulin Hawaii
(https://sevencosmos.com/delta/2022/aug/inl/)

Insulin Hammond
(https://sevencosmos.com/delta/2022/aug/inl/)

Insulinic of Tampa Bay

## Stay Connected With Insulinic



(https://www.facebook.com/insulinic)

(https://twitter.com/insulinic)

### Quick Links

Home(http://insulinic.com/shawn/)

About Us(http://insulinic.com/shawn/about/)

Services(http://insulinic.com/shawn/services/)

Contact(http://insulinic.com/shawn/contact/)

### Make an Appointment

Getting an accurate diagnosis can be one of the most impactful experiences that you can have.

Contact Now
(http://insulinic.com/shawn/contact/)

Copyright © 2021 Insulinic | Powered by Tech Reshape (https://www.techreshape.com)

APPX0398





About Our Treatment | Diabetes Relief

  **(866) 589-8639**          Schedule Now

## A Patented Approach
## to Metabolic Restoration

What makes Diabetes Relief different? Our unique approach to treating type 1 and type 2 diabetes is designed to offer real results and real relief. Diabetes Relief is an advanced diabetes healthcare center that treats patients using a combination of patented and traditional medicine. Our revolutionary treatment system includes an individualized, physician-directed metabolic restoration program and a proprietary metabolic-reconditioning supplement.

Our mission is to improve more than your symptoms. Our mission is to fight the root cause of diabetes: **metabolic failure.** Everything we do is guided by professional evaluation from specialized practitioners and personal counseling to promote lifestyle changes.





### 1. Metabolic Restoration

We use FDA-approved infusion pumps programmed uniquely and specifically for our patented treatment program, which retrains the signaling and communication processes between the liver and pancreas, thus kick-starting the metabolism and improving all diabetic complications. [/one_half_last]

‹                                                                                          ›

• • • • •

EXHIBIT 4





**(866) 589-8639**        Schedule Now

# A Patented Approach
# to Metabolic Restoration

What makes Diabetes Relief different? Our unique approach to treating type 1 and type 2 diabetes is designed to offer real results and real relief. Diabetes Relief is an advanced diabetes healthcare center that treats patients using a combination of patented and traditional medicine. Our revolutionary treatment system includes an individualized, physician-directed metabolic restoration program and a proprietary metabolic-reconditioning supplement.

Our mission is to improve more than your symptoms. Our mission is to fight the root cause of diabetes: **metabolic failure.** Everything we do is guided by professional evaluation from specialized practitioners and personal counseling to promote lifestyle changes.





### 2. Hormone Optimization

Diabetes Relief provides diagnostic testing to identify hormonal imbalances contributing to metabolic failure. We include bioidentical hormones to optimize and improve lipids levels associated with improved brain, bone, heart, breast, and prostate health, which combine to improve quality of life and well-being.

APPX0401



__ **(866) 589-8639**    Schedule Now

# A Patented Approach
# to Metabolic Restoration

What makes Diabetes Relief different? Our unique approach to treating type 1 and type 2 diabetes is designed to offer real results and real relief. Diabetes Relief is an advanced diabetes healthcare center that treats patients using a combination of patented and traditional medicine. Our revolutionary treatment system includes an individualized, physician-directed metabolic restoration program and a proprietary metabolic-reconditioning supplement.

Our mission is to improve more than your symptoms. Our mission is to fight the root cause of diabetes: **metabolic failure.** Everything we do is guided by professional evaluation from specialized practitioners and personal counseling to promote lifestyle changes.





### 3. Weight Management

Obesity complicates many symptoms of diabetes, such as hypertension and hyperglycemia. Diabetes Relief provides a customized weight-loss treatment plan for each patient that is comprised of intramuscular injections, patented metabolism-optimization treatment, diet, and exercise.

⟨    ⟩

APPX0402





(866) 589-8639    Schedule Now

# A Patented Approach
## to Metabolic Restoration

What makes Diabetes Relief different? Our unique approach to treating type 1 and type 2 diabetes is designed to offer real results and real relief. Diabetes Relief is an advanced diabetes healthcare center that treats patients using a combination of patented and traditional medicine. Our revolutionary treatment system includes an individualized, physician-directed metabolic restoration program and a proprietary metabolic-reconditioning supplement.

Our mission is to improve more than your symptoms. Our mission is to fight the root cause of diabetes: **metabolic failure.** Everything we do is guided by professional evaluation from specialized practitioners and personal counseling to promote lifestyle changes.





### 4. Wellness and Nutrition

Our total-patient care plan provides attention to diet and exercise while also monitoring medications, vitamins, and mineral needs. The program is designed to work in tandem with traditional medicine in order to reduce medications and eliminate the risk of harmful side effects, while preventing, improving, and potentially reversing serious complications.

‹    ›

APPX0403



(866) 589-8639

Schedule Now

 



# Physiology-Based Approach

For Type 1 & Type 2 Diabetics

Discover More On Our Free Webinar

## Our Difference

We've devised a revolutionary new approach that goes far beyond diet, exercise, and medicine. We use this innovative new care plan that addresses the root cause of diabetic complications: Metabolic failure. Register for one of our webinars to learn more

## Learn More

Do you suffer from low energy, foot problems, bad eyesight and/or uncontrollable blood sugar? For years pharmaceutical companies and medical professionals have offered pills, tonics, diets, exercises and lectures to diabetics. What we're finally doing is providing relief.

Register for one of our up coming webinars to learn more.

APPX1404

Get Your Questions
Answered

CONTACT US

# An Incredible Story...

Gordon & Bailey are both patients at Diabetes Relief and have an incredible story to share.

Take a look!



APPX0405



View Our Patients Testimonials

Click Here

Learn More About Our Treatment

Click Here

## Our Patients Report

- Neuropathy diminished
- Energy restored
- Weight controlled
- Erectile function restored
- Retinopathy diminished
- Amputations prevented
- Medications reduced
- Blood sugar controlled
- Mood and sleep improved
- Wounds healed
- Hair and nail growth
- Dementia mitigated

APPX1408

- Alzheimer's alleviated
- Stroke recovery accelerated
- Fatty Liver reduced

# 95%
**Reported improved neuropathy**

# 76%
**Improvement in at least one diabetic complication**

# 63%
**Reported HbA1c reduction**

# 41%
**Reduced medications**

# 24%
**Maintained status and did not get worse**

FIND A LOCATION TO GET RELIEF TODAY!

Privacy Policy

APPX0407



# New Diabetes Management Clinic Here on Oahu NOW!



📅 August 26, 2022  🏷 [Chamber](), [Members]()

Aloha!

Insulinic Hawaii ( https://insulinic.com/ ) is a new innovative approach to diabetes management. Our first Hawaii location opens **Sept. 12th at 1360 S. Beretania**. The Insulinic mission is to serve the vast and growing Hawaiian diabetes population by **first** assisting Primary Care, Internal Medicine, Nephrology, and Podiatry providers with a diagnostic test that measures nerve conduction and vascular flow. Nerve conduction and vascular flow are two key biomarkers that when measured can indicate the severity of diabetes. Our diagnostic testing provides unprecedented data in 1 test giving physicians a 10-page report with over 25 metabolic health markers ( https://insulinic.com/tm-flow-system/ ). Insulinic of Hawaii, at no cost to the provider, will supply the diagnostic equipment and associated nursing staff to perform this 20 minute test. Insulinic believes in a care team approach and a collaboration of care. The ordering provider will interpret the diagnostic test results to inform treatment options and serve as a baseline to measure treatment progress. **Reimbursement for report interpretation by the ordering physician** can be billed by utilizing CPT codes: 95921 Autonomic Nervous System Test, 95923 Sudomotor Assessment, and 93923 Ankle Brachial Index. An additional differentiator and vital component of the Insulinic program is our Medicare approved insulin IV infusion modality, which is a patented approach that resensitizes cells by using insulin as a hormone rather than a drug. This approach has been scientifically proven to improve and reverse symptoms experienced by insulin resistant diabetics. At Insulinic, we aim to help patients reverse insulin resistance, which is the root cause of many metabolic disorders. We are requesting a call to action from you to join us in the fight against diabetes in our great state of Hawaii!

## What our patients are saying:

*"I haven't felt this good in years. It's like my neuropathy just disappeared, and my energy level has increased." -Wayne K., Type 2 Diabetic- 18 years, Neuropathy- 10 years, Retinopathy- 2 years*

*"My blood sugar is now controlled, and my eyesight has improved so much. I went from legally blind without glasses to now being about to read the captions on the TV with no glasses, and I'm down from six vials of insulin per month to only three." -Bruce B., Type 2 Diabetic- 27 years*

We'd love to drop by your office to show you more of how we can collaborate on care for diabetics here on Oahu!



Powered by
GrowthZone



**Insulinic Hawaii**

**Marc Desgraves Chief Financial Officer**

📅 August 26, 2022

📞 (808) 210-4444

@ Send Email

---

**EXHIBIT 5**

APPX0408

⊙ **diabetesrelief.com** /testimonials/

**Here is What Patients Have to Say About Diabetes Relief**

**Diabetes Relief<sup>SM</sup>** *Get Your Life Back<sup>SM</sup>*

FOR PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT USHOMEFOR
PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT US1-866-589-8639Click
Here to Call Us!



"My blood sugar is now controlled and my eyesight has improved so much I went from
legally blind without glasses to now being able to read the captions on the TV with no glasses, and I'm down from
6 vials of insulin per month to only 3."

**Bruce B., Brazoria, TX**
Type 2 Diabetic – 27 years

"I'm now taking 50% less insulin, my A1c is down 3.5 points, my neuropathy is gone and my energy is way up."

**Alan H., Colorado Springs, CO**
Type 2 Diabetic – 20+ years
Coronary Artery Diseases
Triple bypass, 13 cardiac stents

"Since I been getting treatment at Diabetes Relief, I have no more problems with neuropathy. My legs and feet
use to burn, like it was on fire, but now I feel so good… I sleep well at night for the first time in years. I also
experience weight loss."

**John J., Houston, TX**
Type 2 Diabetic for 5+ years
Hypertension
Neuropathy

"I haven't felt this good in years. It's like my neuropathy just disappeared and my energy level has increased."

**Wayne K., Houston, TX**
Type 2 Diabetic  – 18 years
Neuropathy – 10 years
Retinopathy – 2 years

"It has given me my life back."

**Michael W., Crosby, TX**
Type 1 Diabetic – 7 years
Neuropathy – 2 years
Thyroid Disease – 9 years

"It's almost a miracle that my foot healed so well. I started  treatment and within 3 weeks it had healed. The
wound had been there for 3 months prior to treatment"

**Greg B., Houston, TX**
Type 2 Diabetic – 10 years
Hypertension – 5 years
Neuropathy – 8 years

"I have more energy and my eyesight has improved so much that I only use bifocals now and before I had to use
trifocals."

**EXHIBIT
6**

<040>2



Lema Barazi
713.306.4650
lema@lloydmousilli.com

September 7, 2022

**_Via Electronic Mail & Certified Mail_**
Shawn Calvit, Individually
100 Meadowlane
Lafayette, LA 70506
shawnc@insulinic.com

Insulinic of Lafayette LLC
220 Johnston Street Building
Lafayette, LA 70501

Insulinic of Hialeah LLC
220 Johnston Street Building
Lafayette, LA 70501

### Re: Termination of License and Demand to Cease and Desist

Dear Mr. Calvit,

Please be advised that the undersigned law firm has been retained by Well Cell Support LLC, Well Cell Global LLC, and affiliates (hereinafter, **"Well Cell"**) to assert claims against Shawn Paul Calvit, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC and any other affiliated persons or entities involved in the unlawful behavior described herein (hereinafter, **"Insulinic"**) for patent infringement, copyright infringement, and misappropriation of trade secrets. Well Cell hereby demands that you immediately comply with the demands stated herein. This letter is notice of our client's claims and an attempt to resolve this matter before litigation.

### Unauthorized Use of Intellectual Property

We are in possession of evidence of Insulinic's continued unauthorized use of Well Cell proprietary information and technology, collectively referred to as "Physiologic Insulin Sensitization" treatment (**"PIS"**).

While Insulinic was formerly a licensee of PIS and related research, development, including patented and patent pending processes and technologies (**"License Material"**), that license has been previously terminated. All continued use of PIS and the associated License Materials is unauthorized and willful infringement of Well Cell intellectual property.

Well Cell hereby demands that Insulinic cease any and all use of the License Material immediately and confirm in writing compliance with this demand.

### Termination of Licenses

On June 9, 2022, Insulinic was put on written notice of breach of material terms of the licensing agreements (**"Well Cell License"**) for the License Materials.

APPX(

**EXHIBIT
7**

September 7, 2022
Termination of License and
Demand to Cease and Desist
Page 2 of 3

Furthermore, Section B of the Well Cell License that Insulinic entered into outlines specific guidelines and rules for authorized licensees to operate under to remain in compliance. Insulinic was required, but failed, to adhere to strict standards regarding following certain protocols, record keeping, reporting and procedures at all times, or risk termination of the Well Cell License. These breaches include, but are not limited to, improper medical billing coding, which can cause irreparable harm to Well Cell and its ability to continue to operate.

In accordance with the Well Cell License, Insulinic was provided ten days of written notice for the thirty-day cure period of all violations and provide confirmation of compliance. Insulinic failed to correct the material breaches outlined within the cure period. Accordingly, any and all licenses, express or implied, previously granted to Insulinic by Well Cell were terminated before July 29, 2022.

Any continued use of the License Materials is unauthorized, unlawful, and constitutes willful infringement of both federally registered and common law intellectual property and trade secrets.

### Continuing Obligations

Insulinic is reminded that despite the termination of any and all licenses, express or implied, or related grants of rights, Insulinic has continuing obligations to Well Cell under the Well Cell License. Sections 8a and b of the Well Cell License consist of a two-year non-competition obligation. This non-compete obligation expires on July 29, 2024.

The Well Cell License confidentiality provisions under Section 16 for the License Material are also still in full force and effect.

### Demand to Cease and Desist Copyright Infringement

Insulinic is hereby demanded to immediately cease and desist from the unlawful use of Well Cell's registered copyrights. Copies of Well Cell's relevant copyright registration are attached as Exhibit A (**"Copyrighted Materials"**). Evidence of Insulinic infringement of the Well Cell's registered copyrights is attached as Exhibit B. This letter serves as formal written notice of copyright infringement as required per 17 U.S. Code § 501(b) before initiating litigation.

Copyright infringement is a strict liability offense and Insulinic is responsible for any infringing act, regardless of intent. Although Insulinic may stop using the Copyrighted Materials, Insulinic remains liable for past infringement. Statutory damages for copyright infringement are up to $150,000 per instance as set in Section 504(c)(2).

### Demand to Cease and Desist Patent Infringement

Insulinic has been on written notice that the License Materials contained patented material belonging to Well Cell. As of July 29, 2022, any use by Insulinic of the technology and processes that are the subject of Patent No. 9,654,595 and Patent No. 10,533,990 B2 (**"Well Cell Patents"**) has been unauthorized and constitutes patent infringement under 35 U.S. Code § 271. Well Cell

APPX0411

September 7, 2022
Termination of License and
Demand to Cease and Desist
Page 3 of 3

has a good faith belief that Insulinic is continuing the use of the patented process based on advertising materials Insulinic has disseminated. An example of such advertising materials is attached as Exhibit C.

Any continued use by Insulinic of technology or processes based on Well Cell Patents is unauthorized and constitutes willful infringement, with relief for treble damages and attorney fees.

<u>**Next Steps**</u>

These actions by Insulinic are causing irreparable harm to Well Cell and the value of the intellectual property developed. Immediate action is required by Insulinic to avoid further escalation.

**Insulinic must provide verified evidence of full compliance with all of the demands stated herein within 24 hours. Failure to do so will result in immediate litigation.**

Well Cell will use all available remedies under the law to protect its highly valuable intellectual property and all rights Well Cell is entitled to.

All further communication regarding the matters stated herein should be directed to the undersigned.

Sincerely,

Lloyd & Mousilli
Attorneys at Law

Lema Barazi for the Firm

Enclosures

APPX0412

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Karyn Temple Claggett*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-452-464**

**Effective Date of Registration:**
September 14, 2017

---

## Title

Title of Work: Diabetes Relief Website

## Completion/Publication

Year of Completion: 2017
Date of 1st Publication: July 01, 2017
Nation of 1st Publication: United States

## Author

- Author: Diabetes Relief LLC
Author Created: text
Work made for hire: Yes
Citizen of: United States
Year Born: 2015

## Copyright Claimant

Copyright Claimant: Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States
Transfer statement: Various employees and associates

## Rights and Permissions

Organization Name: Diabetes Relief LLC
Name: Carol Ann Wilson
Email: carol@diabetesrelief.com
Telephone: (281)600-5000
Alt. Telephone: (281)600-6000
Address: 11511 Katy Fwy
Suite 101
Houston, TX 77079 United States

EXHIBIT
**A**

**diabetesrelief.com** testimonials/

**Here is What Patients Have to Say About Diabetes Relief**

**Diabetes Relief**<sup>SM</sup> *Get Your Life Back*<sup>SM</sup>

FOR PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT USHOMEFOR
PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT US1-866-589-8639Click
Here to Call Us!



"My blood sugar is now controlled and my eyesight has improved so much I went from
legally blind without glasses to now being able to read the captions on the TV with no glasses, and I'm down from
6 vials of insulin per month to only 3."

**Bruce B., Brazoria, TX**
Type 2 Diabetic – 27 years

"I'm now taking 50% less insulin, my A1c is down 3.5 points, my neuropathy is gone and my energy is way up."

**Alan H., Colorado Springs, CO**
Type 2 Diabetic – 20+ years
Coronary Artery Diseases
Triple bypass, 13 cardiac stents

"Since I been getting treatment at Diabetes Relief, I have no more problems with neuropathy. My legs and feet
use to burn, like it was on fire, but now I feel so good… I sleep well at night for the first time in years. I also
experience weight loss."

**John J., Houston, TX**
Type 2 Diabetic for 5+ years
Hypertension
Neuropathy

"I haven't felt this good in years. It's like my neuropathy just disappeared and my energy level has increased."

**Wayne K., Houston, TX**
Type 2 Diabetic  – 18 years
Neuropathy – 10 years
Retinopathy – 2 years

"It has given me my life back."

**Michael W., Crosby, TX**
Type 1 Diabetic – 7 years
Neuropathy – 2 years
Thyroid Disease – 9 years

"It's almost a miracle that my foot healed so well. I started  treatment and within 3 weeks it had healed. The
wound had been there for 3 months prior to treatment"

**Greg B., Houston, TX**
Type 2 Diabetic – 10 years
Hypertension – 5 years
Neuropathy – 8 years

"I have more energy and my eyesight has improved so much that I only use bifocals now and before I had to use
trifocals."

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director



**Registration Number**

## VA 2-185-843

**Effective Date of Registration:**
November 15, 2019
**Registration Decision Date:**
January 14, 2020

---

## Title
 
Title of Work: Glucose Homeostasis V.2

## Completion/Publication

Year of Completion: 2019
Date of 1st Publication: October 15, 2019
Nation of 1st Publication: United States

## Author

- Author: Diabetes Relief LLC
  Author Created: technical drawing
  Work made for hire: Yes
  Citizen of: United States

## Copyright Claimant

Copyright Claimant: Diabetes Relief LLC
11511 Katy Fwy, Suite 100, Houston, TX, 77079, United States

## Rights and Permissions

Name: Scott A Hepford
Email: scott@diabetesrelief.com
Telephone: (281)600-5000
Address: 11511 Katy Fwy
Suite 100
Houston, TX 77079 United States

## Certification

**Name:**  Carol Wilson
**Date:**  November 15, 2019

**Copyright Office notes:**  Regarding authorship information: Registered work is Artwork/Illustration

# Glucose Homeostasis

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC 2019. All rights reserved.

APPX0417

Revision – 10.15.19

**Registration #:**  VA0002185843
**Service Request #:**  1-8260679031



Diabetes Relief LLC
11511 Katy Fwy
Suite 100
Houston, TX 77079 United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay A. Teigh*

Acting United States Register of Copyrights and Director

**Registration Number**

## VAu 1-330-086

**Effective Date of Registration:**
May 17, 2018

## Title

**Title of Work:** Overcoming Metabolic Failure

## Completion/Publication

**Year of Completion:** 2018

## Author

- **Author:** Diabetes Relief LLC
- **Author Created:** 2-D artwork
- **Work made for hire:** Yes
- **Citizen of:** United States
- **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States

## Rights and Permissions

**Organization Name:** Diabetes Relief LLC
**Name:** Carol A Wilson
**Email:** carolwilson@earthlink.net
**Telephone:** (281)642-4050
**Alt. Telephone:** (281)600-6000
**Address:** 8902 Sunnywood Dr
Houston, TX 77088 United States

## Certification

**Name:** Carol Wilson

**Registration #:**   VAu001330086
**Service Request #:**   1-6592582541

Diabetes Relief LLC
Carol A Wilson
11511 Katy Fwy, Suite 101
Houston, TX 77079 United States



APPX0421



(http://insulinic.com)

FOLLOW US :
f (https://www.facebook.com/insulinic)    🐦 (https://twitter.com/insulinic)

# The Science Behind Physiologic Insulin Resensitization

- Insulinic utilizes a unique and groundbreaking  patented approach where insulin is administered as a hormone rather than a drug addressing the primary cause of Diabetes which is metabolic failure
- By utilizing insulin in a manner that bio-mimics normal physiology, this modality is designed to reduce insulin resistance which helps blood sugar more readily enter each cell and be converted into energy
- Increasing cellular energy allows damaged tissues and organs to grow, repair, and regenerate. Thus, our approach not only stabilizes but in many instances has reversed complications of diabetes and other metabolic disorders.

## PIR For Insulin Resistance

PIR for insulin resistance
(http://insulinic.com/wp-content/uploads/2022/03/1.-PIR-for-insulin-resistance-1.pdf)

## Dynamic Diabetes Solution

Dynamic Diabetes Solutions-Pulse Insulin Resensitization (PIR)
(http://insulinic.com/wp-content/uploads/2022/03/4.-Article-Dynamic-Diabetes-Solutions-
Pulse-Insulin-Resensitization-PIR-Published-Medical-_-Clinical-Research-Dr.-Loveridge-
08.13.2021.pdf)

## Improved Kidney Function

EXHIBIT

**B**

Improved Kidney Function
(http://insulinic.com/wp-content/uploads/2022/03/3.-Villaverde-Improved-Kidney-
Function-Following-Physiologic-Insulin-Resensitization-Treatment-Modality_07.30.21.pdf)

# Reversal Of Diabetic Neuropathy

Reversal of Diabetic Neuropathy
(http://insulinic.com/wp-content/uploads/2022/03/2.-Loveridge-Reversal-of-Diabetic-
Neuropathy-Utilizing-Physiologic-Insulin-Resensitization-Case-Series_07.20.2021-
Copy.pdf)



## Stay Connected With Insulinic

(http
s://w
ww.f
aceb
ook.
com
/insu
linic)

(http
s://t
witte
r.co
m/in
sulin
ic)

## Quick Links

Home(http://insulinic.com/shawn/)

APPX0423

About Us(http://insulinic.com/shawn/about/)

Services(http://insulinic.com/shawn/services/)

Contact(http://insulinic.com/shawn/contact/)

## Make an Appointment

Getting an accurate diagnosis can be one of the most impactful experiences that you can have.

**Contact Now
(http://insulinic.com/shawn/contact/)**

Copyright © 2021 Insulinic | Powered by Tech Reshape (https://www.techreshape.com)



# New Diabetes Management Clinic Here on Oahu NOW! 

📅 August 26, 2022 🏷️ [Chamber](), [Members]()

Aloha!

Insulinic Hawaii ( https://insulinic.com/ ) is a new innovative approach to diabetes management. Our first Hawaii location opens **Sept. 12th at 1360 S. Beretania**. The Insulinic mission is to serve the vast and growing Hawaiian diabetes population by **first** assisting Primary Care, Internal Medicine, Nephrology, and Podiatry providers with a diagnostic test that measures nerve conduction and vascular flow. Nerve conduction and vascular flow are two key biomarkers that when measured can indicate the severity of diabetes. Our diagnostic testing provides unprecedented data in 1 test giving physicians a 10-page report with over 25 metabolic health markers ( https://insulinic.com/tm-flow-system/ ). Insulinic of Hawaii, at no cost to the provider, will supply the diagnostic equipment and associated nursing staff to perform this 20 minute test. Insulinic believes in a care team approach and a collaboration of care. The ordering provider will interpret the diagnostic test results to inform treatment options and serve as a baseline to measure treatment progress. **Reimbursement for report interpretation by the ordering physician can be billed by utilizing CPT codes: 95921 Autonomic Nervous System Test, 95923 Sudomotor Assessment, and 93923 Ankle Brachial Index.** An additional differentiator and vital component of the Insulinic program is our Medicare approved insulin IV infusion modality, which is a patented approach that resensitizes cells by using insulin as a hormone rather than a drug. This approach has been scientifically proven to improve and reverse symptoms experienced by insulin resistant diabetics. At Insulinic, we aim to help patients reverse insulin resistance, which is the root cause of many metabolic disorders. We are requesting a call to action from you to join us in the fight against diabetes in our great state of Hawaii!

## What our patients are saying:

*"I haven't felt this good in years. It's like my neuropathy just disappeared, and my energy level has increased."* -Wayne K.,  Type 2 Diabetic- 18 years, Neuropathy- 10 years, Retinopathy- 2 years

*"My blood sugar is now controlled, and my eyesight has improved so much. I went from legally blind without glasses to now being about to read  the captions on the TV with no glasses, and I'm down from six vials of insulin per month to only three."* -Bruce B., Type 2 Diabetic- 27 years

We'd love to drop by your office to show you more of how we can collaborate on care for diabetics here on Oahu!



---



**Insulinic Hawaii**

**Marc Desgraves Chief Financial Officer**

📅 August 26, 2022

📞 (808) 210-4444

@ Send Email

---

EXHIBIT

C

APPX0425

US009652595B1

(12) **United States Patent**
Carr et al.

(10) Patent No.: **US 9,652,595 B1**
(45) **Date of Patent:** **May 16, 2017**

(54) **KIT THAT IMPROVES IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS**

(71) Applicant: **DIABETES RELIEF LLC**, Houston, TX (US)

(72) Inventors: **Hunter Michael Alan Carr**, Houston, TX (US); **Scott Hepford**, Houston, TX (US); **Carol Ann Wilson**, Houston, TX (US)

(73) Assignee: **Diabetes Relief LLC**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/362,963**

(22) Filed: **Nov. 29, 2016**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/042,087, filed on Feb. 11, 2016.

(60) Provisional application No. 62/117,393, filed on Feb. 17, 2015.

(51) **Int. Cl.**
*A61M 5/168* (2006.01)
*G06F 19/00* (2011.01)
*A61M 5/00* (2006.01)

(52) **U.S. Cl.**
CPC ........ *G06F 19/3468* (2013.01); *G06F 19/322* (2013.01)

(58) **Field of Classification Search**
CPC ............................ G06F 19/3468; G06F 19/322
USPC .......................................... 436/95
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2014/0005633 A1* 1/2014 Finan .................. A61M 5/1723
604/504

* cited by examiner

*Primary Examiner* — Rebecca M Fritchman
(74) *Attorney, Agent, or Firm* — Buskop Law Group P.C.; Wendy Buskop

(57) **ABSTRACT**

A kit for individualized intravenous exogenous insulin-based therapy, which includes a portable data storage in communication with client device processor. The data storage can have computer instructions, a database of metabolic factors, a library of weight management protocols, a diabetic treatment model, and a library of care plan templates. The kit for individualized intravenous exogenous insulin-based therapy includes a blood glucose meter, a plurality of intravenous catheters fluidly engageable with a fluid source, and a plurality of metabolic enhancements.

**20 Claims, 19 Drawing Sheets**

DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS



DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

**EXHIBIT**

**8**

**FIGURE 1A**

## DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

| WEIGHT (kg) | POTASSIUM TO SALINE DOSAGE (meq/ml) | MAGNESIUM TO SALINE DOSAGE (mg/ml) | INSULIN TO SALINE DOSAGE (UNITS/ml) | INSULIN RESERVOIR VOLUME (ml) | INSULIN BOLUS DOSAGE MIN (mU) | INSULIN BOLUS DOSAGE MAX (mU) | INSULIN BOLUS DOSAGE VOLUME MIN (ml) | INSULIN BOLUS DOSAGE VOLUME MAX (ml) | INTERVAL TIME PERIODS BETWEEN BOLUS INTRODUCTION (MIN:SEC) | QUANTITY OF BOLUS PER TREATMENT CYCLE (#) |
|---|---|---|---|---|---|---|---|---|---|---|
| 40-45 | 0.01 | 1 | 9 | 10 | 400 | 450 | 0.04 | 0.05 | 240 sec - 480 sec | 4-16 |
| 46-50 | 0.01 | 1 | 10 | 10 | 460 | 500 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 51-55 | 0.01 | 1 | 11 | 10 | 510 | 550 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 56-60 | 0.01 | 1 | 12 | 10 | 560 | 600 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 61-65 | 0.01 | 1 | 13 | 10 | 610 | 650 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 66-70 | 0.01 | 1 | 14 | 10 | 660 | 700 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 71-75 | 0.01 | 1 | 15 | 10 | 710 | 750 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 76-80 | 0.01 | 1 | 16 | 10 | 760 | 800 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 81-85 | 0.01 | 1 | 17 | 10 | 810 | 850 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 86-90 | 0.01 | 1 | 18 | 10 | 860 | 900 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 91-95 | 0.01 | 1 | 19 | 10 | 910 | 950 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 96-100 | 0.01 | 1 | 20 | 10 | 960 | 1000 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 101-105 | 0.02 | 2 | 21 | 10 | 1010 | 1050 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 106-110 | 0.02 | 2 | 22 | 10 | 1060 | 1100 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 111-115 | 0.02 | 2 | 23 | 10 | 1110 | 1150 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 116-120 | 0.02 | 2 | 24 | 10 | 1160 | 1200 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 121-125 | 0.02 | 2 | 25 | 10 | 1210 | 1250 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 126-130 | 0.02 | 2 | 26 | 10 | 1260 | 1300 | 0.06 | 0.05 | 240 sec - 480 sec | 4-16 |
| 131-135 | 0.02 | 2 | 27 | 10 | 1310 | 1350 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 136-140 | 0.02 | 2 | 28 | 10 | 1360 | 1400 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 141-145 | 0.02 | 2 | 29 | 10 | 1410 | 1450 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 146-150 | 0.02 | 2 | 30 | 10 | 1460 | 1500 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 151-155 | 0.02 | 2 | 31 | 10 | 1510 | 1550 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |
| 156-160 | 0.02 | 2 | 32 | 10 | 1560 | 1600 | 0.05 | 0.05 | 240 sec - 480 sec | 4-16 |

FIGURE 1B

DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

| WEIGHT (lb) | POTASSIUM TO SALINE DOSAGE (meq/ml) | MAGNESIUM TO SALINE DOSAGE (mg/ml) | INSULIN TO SALINE DOSAGE (UNITS/ml) | INSULIN RESERVOIR VOLUME (ml) | INSULIN BOLUS DOSAGE MIN (mU) | INSULIN BOLUS DOSAGE MAX (mU) | INSULIN BOLUS DOSAGE VOLUME MIN (ml) | INSULIN BOLUS DOSAGE VOLUME MAX (ml) | UNUSUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION (MIN:SEC) | QUANTITY OF BOLUS PER TREATMENT CYCLE (#) |
|---|---|---|---|---|---|---|---|---|---|---|
| 161-165 | 0.02 | 2 | 33 | 10 | 1610 | 1650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 166-170 | 0.02 | 2 | 34 | 10 | 1660 | 1700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 171-175 | 0.02 | 2 | 35 | 10 | 1710 | 1750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 176-180 | 0.02 | 2 | 36 | 10 | 1760 | 1800 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 181-185 | 0.02 | 2 | 37 | 10 | 1810 | 1850 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 186-190 | 0.02 | 2 | 38 | 10 | 1860 | 1900 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 191-195 | 0.02 | 2 | 39 | 10 | 1910 | 1950 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 196-200 | 0.02 | 2 | 40 | 10 | 1960 | 2000 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 201-205 | 0.03 | 3 | 41 | 10 | 2010 | 2050 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 206-210 | 0.03 | 3 | 42 | 10 | 2060 | 2100 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 211-215 | 0.03 | 3 | 43 | 10 | 2110 | 2150 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 216-220 | 0.03 | 3 | 44 | 10 | 2160 | 2200 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 221-225 | 0.03 | 3 | 45 | 10 | 2210 | 2250 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 226-230 | 0.03 | 3 | 46 | 10 | 2260 | 2300 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 231-235 | 0.03 | 3 | 47 | 10 | 2310 | 2350 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 236-240 | 0.03 | 3 | 48 | 10 | 2360 | 2400 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 241-245 | 0.03 | 3 | 49 | 10 | 2410 | 2450 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 246-250 | 0.03 | 3 | 50 | 10 | 2460 | 2500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 251-255 | 0.03 | 3 | 51 | 10 | 2510 | 2550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 256-260 | 0.03 | 3 | 52 | 10 | 2560 | 2600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 261-265 | 0.03 | 3 | 53 | 10 | 2610 | 2650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 266-270 | 0.03 | 3 | 54 | 10 | 2660 | 2700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 271-275 | 0.03 | 3 | 55 | 10 | 2710 | 2750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |

APPX0428

## FIGURE 2



BOLUS VOLUME DOSAGE ADJUSTMENT PROTOCOL BASED ON TESTED BLOOD GLUCOSE LEVEL

| | IF | BLOOD GLUCOSE LEVEL (mg/dl) | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200> |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**DURING HOURS 1 & 2 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE INCREASES OR DECREASES BETWEEN THE INITIAL BLOOD GLUCOSE LEVEL CHECK AND THE 30 MIN AND 60 MIN CHECKS OF EACH HOUR, THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| THEN | ADJUST DOSAGE (mU/kg) | 0 | 0 | 0 | 0 | 0 | 2-4 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 |

**DURING THE FIRST 30 MIN OF HOUR 3 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE INCREASES OR DECREASES BETWEEN THE INITIAL BLOOD GLUCOSE LEVEL CHECK AND THE 30 MIN CHECKS OF THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| THEN | ADJUST DOSAGE (mU/kg) | 0 | 0 | 0 | 0 | 0 | 2-4 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 |

**DURING THE LAST 30 MIN OF HOUR 3 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE INCREASES BETWEEN THE 30 MIN AND 60 MIN CHECK THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| THEN | INCREASE DOSAGE | 0 | 0 | 0 | 0 | 0 | 2-4 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 |

IF BLOOD GLUCOSE LEVEL DECREASES BETWEEN THE 30 MIN AND 60 MIN CHECK THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| THEN | DECREASE DOSAGE | 0 | 0 | 0 | 1-2 | 1-2 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 6-8 |

**EXEMPLARY TREATMENT SESSIONS DURING HOUR 1**

| | | | SCHEDULE FOR BOLUS INTRODUCTION WITH AN UNEQUAL TIME PERIOD | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| SUBJECT | BLOOD GLUCOSE LEVEL (mg/dl) | INSULIN SENSITIVITY FACTOR | BOLUS 1 | BOLUS 2 | BOLUS 3 | BOLUS 4 | BOLUS 5 | BOLUS 6 | BOLUS 7 | BOLUS 8 | BOLUS 9 | BOLUS 10 | BOLUS 11 | BOLUS 12 | BOLUS 13 | BOLUS 14 | BOLUS 15 | BOLUS 16 | BOLUS 17 | BOLUS 18 | BOLUS 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUBJECT #1: | 440 | EXTREMELY RESISTANT | 300 sec | 300 sec | 300 sec | 300 sec | 305 sec | 300 sec | 295 sec | 320 sec | 300 sec | 290 sec | | | | | | | | | | |
| SUBJECT #2: | 210 | RESISTANT | 300 sec | 110 sec | 300 sec | 305 sec | 300 sec | 300 sec | 300 sec | | | | | | | | | | | | | |
| SUBJECT #3: | 186 | SENSITIVE | 300 sec | 300 sec | 300 sec | 300 sec | 300 sec | 300 sec | | | | | | | | | | | | | | |

U.S. Patent          May 16, 2017          Sheet 4 of 19          US 9,652,595 B1

**FIGURE 3**

## GLUCOSE DOSAGE ADJUSTMENT PROTOCOL

| BLOOD GLUCOSE LEVEL (mg/dl) | GLUCOSE (gm) |
|---|---|
| > 100 - 100 | 50 - 60 |
| 101 - 125 | 44 - 55 |
| 126 - 150 | 40 - 50 |
| 151 - 175 | 35 - 45 |
| 176 - 200 | 30 - 40 |
| 201 - 225 | 25 - 35 |
| 226 - 250 | 20 - 30 |
| 251 - 275 | 15 - 25 |
| 276 - 300 | 10 - 20 |
| 301 - 325 | 5 - 15 |
| 326 - 350 | .01 - 10 |
| 351 - 375 | .01 - 5 |
| 376 - 400 | .01 - 5 |
| 401 - 425 | .01 - 5 |
| 426 - 450 | .01 - 5 |
| 451 - 475 | .01 - 5 |
| 476 - 500 | .01 - 5 |
| 501 - 525 | .01 - 5 |
| 526 - 550 | .01 - 5 |

FIGURE 4

## METABOLIC ENHANCEMENT PROTOCOL

| Respiratory Quotient ($CO_2/O_2$) | Dosage |
|---|---|
| 1.20 < | C: 3 DAILY |
| 1.19 - 1.00 | A: 1 DAILY |
| 0.99 - 0.90 | A: 1 DAILY |
| 0.89 - 0.80 | B: 2 DAILY |
| 0.79 - 0.70 | B: 2 DAILY |
| .69 < | B: 2 DAILY |

* METABOLIC ENHANCEMENT CONTENTS:

| Ingredient | Min Amount Per Dosage | Max Amount Per Dosage |
|---|---|---|
| VITAMIN D (AS CHOLECALCIFEROL) | 600 IU | 2,000 IU |
| VITAMIN B6 (AS PYRIDOXAL-5-PHOSPHATE) | 10 mg | 100 mg |
| FOLATE (FOLIC ACID) | 200 mcg | 2000 mcg |
| VITAMIN B12 (AS CYANOCOBALAMIN) | 1,000 mcg | 5,000 mcg |
| N-ACETYL L-CYSTEINE (NAC) | 200 mg | 600 mg |
| COENZYME Q10 (CoQ10) | 60 mg | 400 mg |
| ALPHA LIPOIC ACID (ALA) | 50 mg | 400 mg |
| NICOTINAMIDE ADENINE DINUCLEOTIDE (NADH) | .5 mg | 5 mg |
| CHROMIUM PICOLINATE | 200 mcg | 300 mcg |

## FIGURE 5A

| | |
|---|---|
| CREATING A SUBJECT PROFILE FOR A SUBJECT | 500 |
| ASSESSING METABOLIC FACTORS OF THE SUBJECT AND STORING THE METABOLIC FACTORS IN THE SUBJECT PROFILE | 502 |
| CREATING A CARE PLAN WITH A PLURALITY OF TREATMENT SESSIONS FOR THE SUBJECT WITH A PLAN GOAL | 504 |
| INTRODUCING GLUCOSE TO THE SUBJECT TO STIMULATE GASTROINTESTINAL HORMONE PRODUCTION, RESULTING IN THE RELEASE OF ENZYMES FROM THE SUBJECT'S LIVER AND CAUSING THE BLOOD GLUCOSE LEVELS OF THE SUBJECT TO BE IN A THERAPEUTIC RANGE | 506 |
| TESTING THE SUBJECT FOR BLOOD GLUCOSE LEVELS TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO THE PLURALITY OF THERAPEUTIC RANGES AND VERIFY THE SUBJECT IS IN THE THERAPEUTIC RANGE | 508 |
| COMPARING TESTED BLOOD GLUCOSE LEVELS TO A DIABETIC TREATMENT MODEL | 510 |
| MAPPING TESTED BLOOD GLUCOSE LEVELS AND INSULIN SENSITIVE FACTORS OF A SUBJECT TO THE SUBJECT'S WEIGHT USING THE DIABETIC TREATMENT MODEL TO DETERMINE A SCHEDULE FOR BOLUS INTRODUCTION, WHEREIN THE SCHEDULE FOR BOLUS INTRODUCTION HAS AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS | 512 |
| INTRODUCING TO THE SUBJECT A PLURALITY OF BOLUS OF INSULIN AND SALINE SEQUENTIALLY USING THE SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS | 513 |
| COMPARING THE SUBJECT PROFILE TO A PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL FOR THE SUBJECT BASED UPON ASSESSED METABOLIC FUNCTIONS OF THE SUBJECT AND SAVING THE WEIGHT MANAGEMENT PROTOCOL IN THE CARE PLAN | 514 |
| IMPLEMENTING THE IDENTIFIED WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN AFTER A FIRST TREATMENT SESSION TO MANAGE WEIGHT OF THE SUBJECT WITH A METABOLIC ENHANCEMENT CAUSING IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT WHILE INFUSING INSULIN AND MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION IN THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS TO IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING | 516 |
| COMPARING A RESPIRATORY QUOTIENT OF THE SUBJECT IN A RESTING STATE TO A PLURALITY OF METABOLISM SCORES | 518 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT FOR EACH TREATMENT SESSION AS IDENTIFIED IN THE CARE PLAN WITH SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE A SUBJECT'S RESPIRATORY QUOTIENT | 520 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE THE RESPIRATORY QUOTIENT | 522 |

5B

## FIGURE 5B   (5A)

| | |
|---|---|
| COMPARING A MEASURED CARDIAC FUNCTION OF THE SUBJECT IN A RESTING STATE TO A PRESET NORM OF CARDIAC FUNCTION | 524 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN USING THE PRESET NORM OF CARDIAC FUNCTION | 526 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE CARDIAC FUNCTION | 528 |
| MEASURING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE PRIOR TO BOLUS INTRODUCTION AND COMPARING THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION TO A PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS | 530 |
| COMPARING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE AS BOLUS ARE SEQUENTIALLY INTRODUCED TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 532 |
| COMPARING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE AFTER ALL BOLUS HAVE BEEN INTRODUCED IN A FIRST TREATMENT SESSION TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 534 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN TO TREAT PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 536 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 538 |
| VIEWING AN INITIAL RETINAL IMAGE OF THE SUBJECT CAPTURED BY A NON-MYDRIATIC CAMERA WITH THE SUBJECT IN A RESTING STATE TO IDENTIFY A DIABETIC RETINOPATHY | 540 |
| VIEWING A POST TREATMENT RETINAL IMAGE OF THE SUBJECT IN A RESTING STATE AFTER A FIRST TREATMENT SESSION | 541 |
| COMPARING THE INITIAL RETINAL IMAGE TO THE POST TREATMENT RETINAL IMAGE | 542 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IF NO CHANGE IN THE DIABETIC RETINOPATHY HAS OCCURRED | 544 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO REDUCE THE EFFECTS OF DIABETIC RETINOPATHY BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE THE EFFECTS OF DIABETIC RETINOPATHY | 546 |
| DIMENSIONALLY MEASURING WOUNDS BY LENGTH, WIDTH, AND DEPTH AND IDENTIFYING WOUND CHARACTERISTICS WITH THE SUBJECT IN A RESTING STATE | 550 |
| DIMENSIONALLY MEASURING WOUNDS AFTER AT LEAST ONE TREATMENT SESSION TO IDENTIFY SKIN INTEGRITY AND CHANGES IN CLINICAL WOUND CHARACTERISTICS | 552 |

(5C)

(5B)

| | |
|---|---|
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN FOR WOUND TREATMENT USING THE IDENTIFIED SKIN INTEGRITY AND CHANGES IN CLINICAL WOUND CHARACTERISTICS | 554 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE WOUND HEALING BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE WOUND SIZE AND WOUND CHARACTERISTICS | 556 |
| COMPARING C-PEPTIDES OF THE SUBJECT TO A PRESET NORM OF C-PEPTIDES TO IDENTIFY AN INSULIN SENSITIVITY FACTOR | 560 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT FOR THE INSULIN SENSITIVITY FACTOR | 562 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE AN INSULIN SENSITIVITY FACTOR USING ANALYSIS OF C-PEPTIDES BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION | 564 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF MAGNESIUM AND INTRODUCING THE DOSAGE AMOUNTS OF MAGNESIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 570 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF POTASSIUM AND INTRODUCING THE DOSAGE AMOUNTS OF POTASSIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 572 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF SOMATOSTATIN AND INTRODUCING THE DOSAGE AMOUNTS OF SOMATOSTATIN SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 574 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF GLUCAGON AND INTRODUCING THE DOSAGE AMOUNTS OF GLUCAGON SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 576 |
| SCHEDULING DIAGNOSTIC TESTS AFTER A FIRST TREATMENT SESSION TO MODIFY THE CARE PLAN FOR IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT AND IMPROVED HEPATIC GLUCOSE PROCESSING | 578 |

*FIGURE 5C*



**FIGURE 6**

**FIGURE 7A**





| |
|---|
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO THE PLURALITY OF THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS AND VERIFY THE SUBJECT IS IN THE THERAPEUTIC RANGE |
| PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE A SUBJECT PROFILE TO THE PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL BASED UPON METABOLIC FUNCTIONS OF THE SUBJECT |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO SAVE THE IDENTIFIED WEIGHT MANAGEMENT PROTOCOL IN THE GENERATED CUSTOMIZED CARE PLAN AFTER SALINE WITH INSULIN IN A PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD HAVE BEEN ADMINISTERED TO A SUBJECT |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO TRACK WEIGHT MANAGEMENT OF THE SUBJECT AFTER A FIRST TREATMENT SESSION AND USE OF AN IDENTIFIED WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN ALONG WITH A METABOLIC ENHANCEMENT TO IDENTIFY IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT AND IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING |
| PLURALITY OF METABOLISM SCORES |
| PLURALITY OF PRESET NORMS OF CARDIAC FUNCTION |
| PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS |
| RETINAL IMAGE OF THE SUBJECT |
| WOUND CHARACTERISTICS |
| PLURALITY OF PRESET NORMS OF C-PEPTIDES |

604
204
205
206
207
208
209
210
211
212
214
215

*FIGURE 7B*

APPX0436



FIGURE 8A

**FIGURE 8B**



APPX0438



FIGURE 8C



FIGURE 9

## FIGURE 10A



| | |
|---|---|
| PORTABLE DATA STORAGE | 903 |
| THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS | 203 |
| SUBJECT PROFILE | 610 |
| SUBJECT HISTORY | 1002 |
| SUBJECT PHYSICAL REPORTS | 1004 |
| SUBJECT PREEXISTING WEIGHT | 1005 |
| SUBJECT NAME | 1006 |
| SUBJECT CONTACT INFORMATION | 1008 |
| INDICATION | 1010 |
| MEASURED METABOLIC FACTORS | 605 |
| GLUCOSE LEVEL | 612 |
| RESPIRATORY QUOTIENT | 614 |
| WEIGHT | 615 |
| INSULIN SENSITIVITY FACTOR | 616 |
| LIBRARY OF CARE PLAN TEMPLATES | 620 |
| PLAN GOAL | 890 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO CREATE A SUBJECT PROFILE FOR A SUBJECT SUSPECTED OF HAVING METABOLIC SYNDROME | 904 |
| DATABASE | 906 |
| TARGET BLOOD GLUCOSE LEVEL | 618 |
| LIBRARY OF WEIGHT MANAGEMENT PROTOCOLS | 908 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE MEASURED METABOLIC FACTORS OF THE SUBJECT TO THE DATABASE OF THE METABOLIC FACTORS FOR LIKE GROUPS OF THE PATIENTS AND CALCULATE IF THE MEASURED METABOLIC FACTORS MEET, EXCEED, OR FALL BELOW THE BLOOD GLUCOSE LEVEL, THE RESPIRATORY QUOTIENT, THE INSULIN SENSITIVITY FACTOR, AND THE TARGET BLOOD GLUCOSE LEVEL FOR THE SUBJECT SUSPECTED OF HAVING THE METABOLIC SYNDROME TO CONFIRM THE SUBJECT HAS THE METABOLIC SYNDROME | 910 |
| DIABETIC TREATMENT MODEL | 911 |
| BOLUS VOLUME DOSAGE AMOUNTS | 912 |
| SCHEDULE TEMPLATES | 913 |

## FIGURE 10B

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO CREATE A CARE PLAN USING ONE OF THE CARE PLAN TEMPLATES FOR THE SUBJECT AND SETTING A PLAN GOAL USING THE DIABETIC TREATMENT MODEL, THE CARE PLAN INDICATING A CUSTOMIZED SCHEDULE FOR BOLUS INTRODUCTION WITH AT LEAST ONE UNEQUAL TIME PERIOD AND A QUANTITY AND A FREQUENCY OF A PLURALITY OF BOLUS CONTAINING SALINE AND INSULIN FOR SEQUENTIAL INTRAVENOUS INTRODUCTION TO THE SUBJECT AND SAVE IN THE SUBJECT PROFILE — 903, 914

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO INDICATE A QUANTITY OF GLUCOSE FOR THE SUBJECT WITH METABOLIC SYNDROME TO STIMULATE A GASTROINTESTINAL HORMONE PRODUCTION RESULTING IN A RELEASE OF ENZYMES FROM A LIVER OF THE SUBJECT AND CAUSING BLOOD GLUCOSE LEVELS OF THE SUBJECT TO BE IN A THERAPEUTIC RANGE — 916

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE BLOOD GLUCOSE TEST RESULTS TO A PLURALITY OF THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS STORED IN THE PORTABLE DATA STORAGE AND VERIFY THAT THE SUBJECT WITH THE METABOLIC SYNDROME IS IN A THERAPEUTIC RANGE OF THE PLURALITY THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS — 918

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE BLOOD GLUCOSE TEST RESULTS TO THE DIABETIC TREATMENT MODEL AND MAP THE BLOOD GLUCOSE TEST RESULTS AND INSULIN SENSITIVE FACTORS OF THE SUBJECT WITH THE METABOLIC SYNDROME TO THE MEASURED WEIGHT OF THE SUBJECT USING THE DIABETIC TREATMENT MODEL TO GENERATE AN INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION USING THE SCHEDULE TEMPLATES — 920

INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION — 922

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE SUBJECT PROFILE TO THE LIBRARY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL FOR THE SUBJECT BASED UPON MEASURED METABOLIC FACTORS OF THE SUBJECT AND SAVING THE WEIGHT MANAGEMENT PROTOCOL IN THE CARE PLAN — 924

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO CHANGE THE WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN AFTER A FIRST TREATMENT SESSION TO MANAGE WEIGHT OF THE SUBJECT USING AT LEAST ONE OF THE PLURALITY OF METABOLIC ENHANCEMENTS TO CAUSE IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT WHILE INFUSING THE PLURALITY OF BOLUS AND MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION IN THE GENERATED INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS TO IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING — 926

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE RESPIRATORY QUOTIENT OF THE SUBJECT IN A RESTING STATE TO A PLURALITY OF MEASURED METABOLIC FACTORS — 930

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY A QUANTITY OF THE PLURALITY OF BOLUS FOR THE SUBJECT FOR EACH TREATMENT SESSION AS IDENTIFIED IN THE CARE PLAN WITH THE GENERATED INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION TO IMPROVE THE RESPIRATORY QUOTIENT OF THE SUBJECT — 932

## FIGURE 10C

| | |
|---|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE GENERATED INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN THE BOLUS INTRODUCTION TO IMPROVE THE RESPIRATORY QUOTIENT OF THE SUBJECT | 934 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE A MEASURED CARDIAC FUNCTION OF THE SUBJECT IN A RESTING STATE TO A PLURALITY OF PRESET NORMS OF CARDIAC FUNCTION STORED IN A LIBRARY OF CARDIAC FUNCTIONS | 936 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY A QUANTITY OF THE PLURALITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN USING THE PRESET NORMS OF CARDIAC FUNCTION | 938 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND A DURATION OF AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION TO IMPROVE CARDIAC FUNCTION OF THE SUBJECT | 940 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MEASURE A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT PRIOR TO THE BOLUS INTRODUCTION AND COMPARING THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION TO A PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS IN A LIBRARY OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS | 942 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT AS BOLUS ARE SEQUENTIALLY INTRODUCED TO THE PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 944 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT AFTER ALL BOLUS HAVE BEEN INTRODUCED IN THE FIRST TREATMENT SESSION TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 946 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN TO DIMINISH THE SUBJECT'S PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 948 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE SCHEDULE OF THE BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT | 950 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE TO SCAN AN INITIAL RETINAL IMAGE OF THE SUBJECT TO IDENTIFY CHARACTERISTICS FOR A DIABETIC RETINOPATHY | 952 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO SCAN A POST TREATMENT RETINAL IMAGE OF THE SUBJECT AFTER THE FIRST TREATMENT SESSION AND COMPARE THE INITIAL RETINAL IMAGE TO THE POST TREATMENT RETINAL IMAGE | 954 |

903

## FIGURE 10D

903
956
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY A QUANTITY OF BOLUS FOR THE SUBJECT IF NO CHANGE IN THE IDENTIFIED CHARACTERISTICS FOR DIABETIC RETINOPATHY HAS OCCURRED

960
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO REDUCE EFFECTS OF DIABETIC RETINOPATHY BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE AT LEAST ONE EFFECT OF DIABETIC RETINOPATHY

962
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO SCAN AND CALCULATE DIMENSIONALLY WOUNDS OF THE SUBJECT BY LENGTH, WIDTH, AND DEPTH, AND IDENTIFY WOUND CHARACTERISTICS OF THE SUBJECT

964
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO SCAN AND DIMENSIONALLY MEASURE WOUNDS OF THE SUBJECT AFTER AT LEAST ONE TREATMENT SESSION TO IDENTIFY SKIN INTEGRITY AND CHANGES IN WOUND CHARACTERISTICS OF THE SUBJECT

966
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN FOR WOUND TREATMENT USING THE IDENTIFIED SKIN INTEGRITY AND CHANGES IN WOUND CHARACTERISTICS OF THE SUBJECT

968
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE TO MODIFY THE SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE WOUND HEALING BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN THE BOLUS INTRODUCTION TO REDUCE WOUND SIZE AND WOUND CHARACTERISTICS OF THE SUBJECT

970
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO USE A HOMEOSTATIC MODEL TO IDENTIFY AN INSULIN SENSITIVITY FACTOR OF A SUBJECT

972
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE QUANTITY OF BOLUS FOR THE SUBJECT FOR THE INSULIN SENSITIVITY FACTOR

974
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE TO MODIFY THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO INCREASE THE INSULIN SENSITIVITY FACTOR BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION

976
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO DETERMINE A QUANTITY AND A FREQUENCY OF DOSAGE AMOUNTS OF MAGNESIUM AND INTRODUCE THE DOSAGE AMOUNTS OF MAGNESIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN ONE PAIR OF BOLUS

978
COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO DETERMINE A QUANTITY AND A FREQUENCY OF DOSAGE AMOUNTS OF POTASSIUM AND INTRODUCE THE DOSAGE AMOUNTS OF POTASSIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE GENERATED INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN ONE PAIR OF BOLUS



| 903 |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO DETERMINE A QUANTITY AND A FREQUENCY OF DOSAGE AMOUNTS OF SOMATOSTATIN AND INTRODUCE THE DOSAGE AMOUNTS OF SOMATOSTATIN SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN ONE PAIR OF BOLUS — 980 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO DETERMINE A QUANTITY AND A FREQUENCY OF DOSAGE AMOUNTS OF GLUCAGON AND INTRODUCE THE DOSAGE AMOUNTS OF GLUCAGON SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN ONE PAIR OF BOLUS — 982 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO SCHEDULE DIAGNOSTIC TESTS AFTER THE FIRST TREATMENT SESSION TO MODIFY THE CARE PLAN FOR IMPROVED CELLULAR ATP FUNCTIONING OF THE SUBJECT AND IMPROVED HEPATIC GLUCOSE PROCESSING — 984 |
| LIBRARY OF CARDIAC FUNCTIONS — 986 |
| PRESET NORMS OF CARDIAC FUNCTION — 988 |
| LIBRARY OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS — 990 |
| PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS — 992 |

**FIGURE 10E**

US 9,652,595 B1

**1**

# KIT THAT IMPROVES IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS

## CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation in Part of co-pending U.S. patent application Ser. No. 15/042,087 filed on Feb. 11, 2016, entitled "METHODS THAT IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS", which claims priority to and the benefit of U.S. Provisional Patent Application Ser. No. 62/117,343 filed on Feb. 17, 2015, entitled "METHODS THAT IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS". These references are incorporated herein in their entirety.

## FIELD

The present embodiments generally relate to a kit for individualized intravenous exogenous insulin-based therapy.

## BACKGROUND

Diabetes Mellitus is a disease or disorder of the body's metabolic functions, characterized by abnormally high levels of blood glucose and inadequate levels of insulin. In 2012, 29.1 million Americans, or 9.3 percent of the population had diabetes, up from 25.8 million, or 8.3 percent, in 2010. New cases diagnosed in 2012 were 1.7 million, and in 2010 it was 1.9 million. Diabetes Mellitus Type 1, formerly known as juvenile diabetes, is usually diagnosed in children and young adults, and only 5 percent of people with diabetes have this form of the disease.

In Type 1 diabetes, the body does not produce insulin, a hormone necessary to convert sugar, starches, and other food into energy needed for daily life. Diabetes Mellitus Type 2 is far more common, and affects 90-95 percent of all diabetics in the United States of America. In Type 2 diabetes, the body does not use insulin properly, which is called insulin resistance. At first, the pancreas makes extra insulin to make up for it, but, over time the pancreas is not able to keep up and can't make enough insulin to keep blood glucose at normal levels. The long-term adverse effects include blindness, loss of kidney function, nerve damage, loss of sensation, and poor circulation in the periphery, and amputation of the extremities. As of Mar. 6, 2013, the total cost of diagnosed diabetes in the United States in 2012 was $245 billion dollars.

In the treatment of Diabetes Mellitus, many varieties of insulin formulations have been suggested and used, such as regular insulin, isophane insulin (designated NPH®), insulin zinc suspensions (such as SEMILENTE®, LENTE®, and ULTRALENTE®), and biphasic isophane insulin. As diabetic patients are treated with insulin for several decades, there is a major need for safe and life quality improving insulin formulations. Some of the commercially available insulin formulations are characterized by a fast onset of action and other formulations have a relatively slow onset but show a more or less prolonged action. Fast-acting insulin formulations are usually solutions of insulin, while retarded acting insulin formulations can have suspensions containing insulin in crystalline and/or amorphous form precipitated by addition of zinc salts alone, by addition of protamine, or by a combination of both.

In addition, some patients are using formulations having both a fast onset of action and a more prolonged action. Such

**2**

a formulation can be an insulin solution, wherein protamine insulin crystals are suspended. Some patients do prepare the final formulation themselves by mixing a fast acting insulin solution with a protracted acting insulin suspension formulation in the ratio desired by the patient in question.

Glucose control is typically measured by a blood test, which determines the level of hemoglobin A1c, which has been the desired result of insulin therapy in diabetic patients for many years. However, it is clear that tight circulating glucose control was insufficient in 25 percent or more of the study participants to protect them from the onset or progression of diabetic retinopathy, nephropathy, or neuropathy. One method of glucose control is Pulsed Insulin Therapy.

The core concept of Pulsed Insulin Therapy has been known for at least 20 years, by various names including Pulsatile Intravenous Insulin Therapy (PIVIT), Chronic Intermittent Intravenous Insulin Therapy (CIIIT), Metabolic Activation Therapy (MAT), and Hepatic Activation. In such therapies a patient's blood glucose is raised and lowered by about 50 mg/dL to 75 mg/dL over a period of several hours by alternating between doses of insulin and sugars or high carbohydrates foods. Although the mechanisms of action have not been clearly explained, it is apparent from the clinical results that the technique has usefulness in treating diabetic implications, including blindness and other ocular manifestations, nerve disease, cardiovascular disease, diabetic nephropathy, and poor wound healing.

Given the long history of these procedures, one would have expected that the treatment parameters would have been optimized long ago to produce the most favorable results. It turns out, however, that the known treatment parameters are insufficient in that regard.

A need exists for a kit that improves impaired hepatic glucose processing in subjects and produce superior results to those previously obtainable.

The present embodiments meet these needs.

## BRIEF DESCRIPTION OF THE FIGURES

The detailed description will be better understood in conjunction with the accompanying drawings as follows:

FIG. 1A shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 40 kilograms to 160 kilograms.

FIG. 1B shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 161 kilograms to 275 kilograms.

FIG. 2 shows a bolus volume dosage adjustment protocol based on tested blood glucose levels as produced by a diabetic treatment model.

FIG. 3 depicts glucose dosage adjustment protocol as produced by a diabetic treatment model.

FIG. 4 depicts a metabolic enhancement protocol as produced by a diabetic treatment model and an exemplary metabolic enhancement by component.

FIGS. 5A-5C depict steps of a method of the invention according to one or more embodiments.

FIG. 6 depicts a system of the invention according to one or more embodiments.

FIGS. 7A and 7B depict an administrative data storage usable in the system according to one or more embodiments.

FIGS. 8A-8C provide exemplary subject profiles with an automatically generated care plan template and an automatically generated report according to one or more embodiments.

FIG. 9 depicts the kit according to one or more embodiments.

US 9,652,595 B1

3

FIGS. 10A-10E depict a portable data storage according to one or more embodiments.

The present embodiments are detailed below with reference to the listed Figures.

## DETAILED DESCRIPTION OF THE EMBODIMENTS

Before explaining the present embodiments in detail, it is to be understood that the invention is not limited to the particular embodiments and that it can be practiced or carried out in various ways.

The present embodiments relate to a kit for individualized intravenous exogenous insulin-based therapy that improves impaired hepatic glucose processing in subjects.

In embodiments, the kit for individualized intravenous exogenous insulin-based therapy can include portable data storage.

The portable data storage can have computer instructions for instructing a client device processor of a client device to create a subject profile for a subject suspected of having metabolic syndrome.

The subject profile can have a subject history and subject physical reports including a subject weight, a subject name, subject contact information, an indication that a subject is suspected of having the metabolic syndrome, measured metabolic factors including a glucose level, a respiratory quotient, an insulin sensitivity factor, a weight, and hyperglycemia.

The portable data storage can have a database of metabolic factors for groups of patients using the blood glucose level, the respiratory quotient, the insulin sensitivity factor and target glucose levels.

The portable data storage can have a library of weight management protocols in the portable data storage for subjects with the metabolic syndrome.

Computer instructions in the portable data storage can instruct the client device processor to compare the measured metabolic factors of the subject to the database of the metabolic factors for like groups of the patients and calculate if the measured metabolic factors meet, exceed, or fall below the blood glucose level, the respiratory quotient, the insulin sensitivity factor, and the target blood glucose level for the subject suspected of having the metabolic syndrome to confirm the subject has the metabolic syndrome.

The portable data storage can include a diabetic treatment model with bolus volume dosage amounts and schedule templates for a bolus introduction. The schedule templates for the bolus introduction contain at least one unequal time period between at least one pair of bolus, and the schedule templates provide the at least one unequal time period with a quantity and a frequency of a plurality of bolus for a sequential intravenous introduction to the subject with a confirmed metabolic syndrome. Each bolus contains a predetermined concentration of saline and insulin based on the diabetic treatment model.

The portable data storage can have a library of care plan templates.

Computer instructions in the portable data storage can instruct the client device processor to create a care plan using one of the care plan templates for the subject and setting a plan goal using the diabetic treatment model, the care plan indicating a customized schedule for bolus introduction with at least one unequal time period and a quantity and a frequency of a plurality of bolus containing saline and insulin for sequential intravenous introduction to the subject and save in the subject profile.

4

Computer instructions in the portable data storage can instruct the client device processor to indicate a quantity of glucose for the subject with metabolic syndrome to stimulate a gastrointestinal hormone production resulting in a release of enzymes from a liver of the subject and causing blood glucose levels of the subject to be in a therapeutic range of the plurality therapeutic ranges for blood glucose levels.

The kit for individualized intravenous exogenous insulin-based therapy can have a blood glucose meter for testing the subject after glucose consumption for blood glucose levels and transmitting blood glucose test results to the portable data storage.

Computer instructions to in the portable data storage can instruct the client device processor to compare blood glucose test results to a plurality of therapeutic ranges for blood glucose levels stored in the portable data storage and verify that the subject with the metabolic syndrome is in a therapeutic range of the plurality therapeutic ranges for blood glucose levels.

Computer instructions in the portable data storage can instruct the client device processor to compare the blood glucose test results to the diabetic treatment model and map the blood glucose test results and insulin sensitive factors of the subject with the metabolic syndrome to the measured weight 615 of the subject using the diabetic treatment model to generate an individualized schedule for bolus introduction using the schedule templates.

The kit for individualized intravenous exogenous insulin-based therapy can have a plurality of intravenous catheters in communication with the client device fluidly engageable with a fluid source to deliver to a patient a plurality of bolus sequentially using the generated individualized schedule for bolus introduction with at least one unequal time period between at least one pair of bolus.

Computer instructions in the portable data storage can instruct the client device processor to compare the subject profile to the library of weight management protocols to identify a weight management protocol for the subject based upon measured metabolic factors of the subject and saving the weight management protocol in the care plan.

The kit for individualized intravenous exogenous insulin-based therapy can have a plurality of metabolic enhancements.

Computer instructions in the portable data storage can instruct the client device processor to change the weight management protocol and the care plan after a first treatment session to manage weight of the subject using at least one of the plurality of metabolic enhancements 888 to cause improved cellular ATP functioning for the subject while infusing the plurality of bolus and modifying a quantity and a duration of unequal time periods between bolus introduction in the generated individualized schedule for bolus introduction having at least one unequal time period between at least one pair of bolus to improve impaired hepatic glucose processing.

When three treatment session are performed using the kit as described herein patients report energy resorted, medications reduced, wounds healed, amputations prevented, weight controlled, blood sugar controlled, blood pressure reduced, neuropathy diminished, retinopathy diminished, mood improved, sleep improved and erectile function restored.

The individualized intravenous exogenous insulin-based therapy can use a plurality of treatment sessions, generally 3 but up to 12 may be needed, each treatment session lasting from 1 hour to 3 hours.

APPX0447

US 9,652,595 B1

5

The goal of the individualized intravenous exogenous insulin-based therapy is to repair, recondition, and maintain a subject's impaired metabolism so that it functions and is maintained to provide a quality of life similar to that of a non-diabetic person.

To initiate the therapy a subject profile can be created.

Each treatment session can involve assessing for a subject's metabolic factors and storing the metabolic factors in the subject's profile. The subject profile can be stored in an administrative data storage connected to an administrative processor accessible via a network from a client device.

Each treatment session can involve matching the subject profile to a diabetic treatment model to create a schedule for bolus introduction with at least one unequal time period between bolus introductions.

The schedule can provide a quantity and frequency of intravenous insulin bolus, a quantity and frequency of dosage amounts of magnesium, and a quantity and frequency of dosage amounts of potassium for the subject.

Each treatment session can involve introducing to the subject insulin bolus sequentially, at frequencies determined from the diabetic treatment model, wherein each insulin bolus can be separated by irregular time periods.

Simultaneously with the sequential insulin bolus introduction, dosage amounts of magnesium and dosage amounts of potassium can be introduced to the subject. The magnesium and potassium can be introduced orally, transdermally, or by inhaling simultaneous with the insulin bolus introduction.

A weight management protocol can be identified from a library of weight management protocols given a subject's profile. The subject can be required to follow the weight management protocol and use a specific metabolic enhancement that can be in pill form, powder form, a transdermal patch, or another form known in the industry.

After 3 to 6 treatments using a care plan connected to the diabetic treatment model with a schedule for bolus instruction and at least one unequal period of time, the subject can have at least 10 percent and up to 50 percent improved cellular ATP functioning that can last up to 90 days from the last treatment.

The present embodiments also relate to a kit for infusing insulin intravenously to a subject to improve impaired hepatic glucose processing.

The term "5-MTHF" as used herein can refer to Levomefolic Acid, which is a primary form of folic acid used for DNA reproduction.

The term "A1C" as used herein refers to a blood test that shows how well individual diabetes is being controlled relative to a non-diabetic patient. In some cases, it can be a 3-month average of plasma glucose concentration from glycated hemoglobin.

The term "Adenosine triphosphate (ATP)" as used herein refers a substance that transports chemical energy within cells for metabolism.

The term "Alpha Lipoic Acid" as used herein refers to an antioxidant that helps with the extraction of energy from food.

The term "blood glucose level therapeutic range" as used herein refers to a subject's designated target blood glucose level of 160 to 240 mg/dl during a treatment session.

The term "bolus" as used herein refers to a single dose of a medical substance and/or drug given all at once.

The term "catheter" as used herein refers to a thin tube that can be inserted into the body to remove bodily fluids or add fluids to a patient during a treatment session.

6

The term "CoEnzyme Q10" as used herein refers to a chemical that extracts energy from food in the human digestive process.

The term "Complete Blood Count" (CBC) as used herein refers to a blood test to evaluate cellular aspects of the blood and provide concentrations of components in the blood.

The term "C-peptide" as used herein refers to a chemical produced in the pancreas that appears in a 1:1 molecular ratio to insulin and that can be detected when a blood lab panel is performed on a blood sample.

The term "data storage" as used herein refers to a non-transitory computer readable medium, such as a hard disk drive, solid state drive, flash drive, tape drive, and the like. The term "non-transitory computer readable medium" excludes any transitory signals but includes any non-transitory data storage circuitry, e.g., buffers, cache, and queues, within transceivers of transitory signals.

The term "diabetic retinopathy" as used herein refers to a complication of diabetes that affects the eyes.

The term "diabetic treatment model" as used herein refers to a plurality of look up tables reflecting initial blend dosing adjustment protocols that reflect weight of the subject, types of insulin (long term and short term), a volume of bolus of insulin per treatment session, a quantity of bolus, a frequency of bolus for a treatment session and bolus intervals, dosage amounts of magnesium (including quantity and frequency) and dosage amounts of potassium (including quantity and frequency). The diabetic treatment model includes glucose dosage amounts which are milligrams/deciliter (mg/dl) based on blood glucose of the subject. The diabetic treatment model generates a schedule for bolus introduction with at least one unequal time period between at least one pair of bolus. In embodiments, the diabetic treatment model can be located in the administrative data storage.

For example, the diabetic treatment model receives from a doctor, nurse or technician the weight of a subject, such as 102 kilograms, and a blood glucose of the subject, such as 120 mg/dl. The diabetic treatment model then generates (i) a type of insulin to be introduced to the subject, such as short term insulin, (ii) a volume of bolus of insulin per treatment session for the subject, such as 05 milliliters, (iii) a quantity of bolus per treatment session, such as 12, and (iv) a frequency of bolus introduction, which in embodiments, can be random for a treatment session of 3 hours. The time intervals between sequential bolus introductions can range from 2 minutes to 10 minutes between bolus. In embodiment, the time intervals can be a random sequence.

The diabetic treatment model generates dosage amounts of magnesium, such as 2 milligrams per milliliter of saline (for intravenous introduction to the subject) during the treatment session.

The diabetic treatment model generates dosage amounts of potassium, such as 0.02 meq/millimeter of saline (for an intravenous introduction) during the treatment session.

The diabetic treatment model calculates glucose dosage amounts for a subject, which can range from 44 grams to 55 grams during the first 30 minutes of a treatment session and then different or the same glucose dosage amounts using real time blood glucose level tests of the subject, which can be performed providing new test results and recalculations of dosage amount of bolus every 30 minutes.

The term "dosage amounts of magnesium" as used herein refers to dosage amounts of magnesium in a saline carrier or in a pill form, for example, one that dissolves under the tongue of the subject.

APPX0448

US 9,652,595 B1

7

The term "dosage amounts of potassium" as used herein refers to dosage amounts of magnesium in a saline carrier, in a pill form, or as a banana. If a pill form is used, it can be in the form of a pill that dissolves under the tongue of the subject.

The term "Echocardiograph" as used herein refers to a multi-dimensional sonography of the heart that measures the heart's mechanical functionality.

The term "exogenous" as used herein refers to materials or reactions that occur outside of the body.

The term "glucagon" as used herein refers to a counter regulatory hormone essential for glucose metabolism in humans in particular.

The term "glucose" as used herein refers to the simple carbohydrate commonly referred to as "sugar".

The term "hyperglycemia" as used herein refers to high blood glucose level present in a subject's blood test.

The term "improved cellular ATP functioning" as used herein refers to "Adenosine Triphosphatase" ("ATPase") functioning, which are one or more enzymes that catalyze the formation of adenosine triphosphate ("ATP") from adenosine diphosphate ("ADP") and the functioning is indicative of the energy generated by a cell when it consumes glucose during metabolic processing.

The term "individual target blood glucose level" as used herein refers to a medical beneficial range that the patient or subject can achieve at least during treatments session created by the diabetic treatment model, during the entire infusion therapy, such as a range from 125 mg/dl to 225 mg/dl, which can be adjusted to a more narrow range, such from 180 mg/dl to 225 mg/dl for a specific subject.

The term "insulin" as used herein refers to a chemical that is a counter regulatory hormone essential for glucose metabolism.

The term "insulin bolus" as used herein refers to a dosage quantity of insulin given intravenously to a patient.

The term "insulin reservoir" as used herein can be a flexible pouch of insulin having multiple insulin bolus.

The term "insulin sensitivity factor" as used herein refers to how a subject responds after receiving one unit of insulin as a measure of decrease in blood glucose.

The term "Lipid Panel" as used herein refers to a blood test that measures a concentration of lipids, fats, and fatty substances used as a source of energy by a human body.

The term "metabolic factors" as used herein refers to a weight, such as 125 pounds, blood tests, such as a Comprehensive Metabolic Panel, a CBC panel, a C-peptide test, an A1c test (known as a "lipid panel"), a urinalysis, a nerve conduction velocity test, an individual target blood glucose level, such as 110 mg/dl, a respiratory quotient, such as a ratio of the amount of carbon dioxide released based on oxygen consumed during a preset period of time, and an insulin sensitivity factor, such as a value indicating how a subject responds after receiving one unit of insulin as a measure of decrease in blood glucose.

The term "metabolic enhancement" as used herein refers to a blend of components that bond to enzymes in the patient and increases the enzyme activity for a patient or subject. The metabolic enhancement can be (1) a pill containing the components of the metabolic enhancement, (2) a drink containing the components of the metabolic enhancement, (3) a shake containing the components of the metabolic enhancement, (4) a food item, such an energy bar, fortified with the metabolic enhancement, (5) a transdermal patch or similar application delivering the components of the metabolic enhancement, and combinations thereof.

8

In one example, the metabolic enhancement can be a blend of methylcobalamin, (such as 5 mg), pyridoxal-5-phosphate (such as 35 mg), 5-MTHF (known as an activated form of folic acid) (such as 1 mg), Alpha Lipoic Acid (such as 50 mg), NADH (such as 5 mg), CoEnzyme Q10 (such as 75 mg), N-Acetyl L-Cysteine (NAC) (such as 250 mg), Vitamin D (such as Cholecalciferol) (such as 2000 International Units (IU)) and Chromium Picolinate (such as 300 mcg).

The term "methylcobalamin" as used herein refers to one of two coenzyme forms of vitamin $B_{12}$.

The term "N-Acetyl Cysteine" as used herein refers to an amino acid that helps build proteins in the body.

The term "NADH" as used herein refers to Nicotinamide Adenine Dinucleotide which binds as a coenzyme to proteins and serves in respiratory metabolism.

The term "Nerve Conduction Velocity (NCV)" as use herein refers to a test to determine how fast electrical signals move throughout a nerve.

The term "non-transitory computer readable medium" as used herein excludes any transitory signals but includes any non-transitory data storage circuitry, e.g., buffers, cache, and queues, within transceivers of transitory signals.

The term "Peripheral Autonomic Neuropathy" as use herein refers to the symptoms that occur when there is damage to the nerves, such as weakness and numbness of a limb.

The term "plan goal" as used herein can refer to a purpose for the insulin therapy as identified by the subject and/or a medical professional associated with the therapy and inserted into the care plan generated by the diabetic treatment model.

The term "portable data storage" as used herein can refer to a non-transitory computer readable medium, such as a hard disk drive, solid state drive, flash drive, tape drive, and the like.

The term "processor" as used herein can refer to a computer, a laptop, a plurality of connected processors, a tablet computer, a cellular telephone or smart phone, a portable processing device, or any similar device known in the industry.

The term "respiratory quotient" as used herein refers to the ratio of: carbon dioxide given off by a human and oxygen consumed by a human, particularly under known resting conditions.

The term "saline" as used herein refers to a sterile solution of 900 grams of sodium chloride in 100 ml of water.

The term "schedule for bolus introduction" as used herein refers to the plurality of specific time intervals between bolus introductions in a treatment session. For the invention, the "schedule for bolus introduction" requires at least one "unequal time period" between at least one pair of bolus per treatment session.

As an example of the schedule for bolus introduction for a treatment session: three bolus can be delivered to the subject sequentially, each bolus separated by a 4 minute time interval. Then, using the schedule for bolus introduction, a fourth bolus is delivered to the subject after a 6.5 minute time interval. The 6.5 minute time interval is referred to herein as "an unequal time period" because it is different from the 4 minute time intervals on the schedule for bolus introduction.

In embodiments, all the time intervals between pairs of bolus can be different for a subject. In embodiments, just one time interval between one pair of bolus can be different according to the schedule for bolus introduction.

US 9,652,595 B1

9

In embodiments, many variations in time intervals on the schedule for bolus introduction can be computed by the diabetic treatment model using the weight of the subject, insulin sensitivity factor of the subject and tested blood glucose levels of the subject.

Another example of the schedule for bolus introduction having an unequal time period can be 3 pairs of bolus that are sequentially introduced require 5 minute intervals of time between introductions then a seventh bolus requires a 6 minute interval of time prior to introduction to the subject. The 6 minute interval of time is an "unequal time period". The diabetic treatment model can indicate that the schedule for bolus introduction can require all remaining time periods for the treatment session between pairs of bolus to be equal (the opposite of unequal periods of time). The plurality of time periods of the schedule for bolus introduction (the time between each pair of bolus) is generated by the diabetic treatment model.

The term "subject profile" as used herein can refer to the name of an individual and the associated measured metabolic factors. The subject profile can include a subject history and a subject physical report of the subject, a subject name and contact information, as well as a subject's blood test results. In embodiments, the subject profile can include a date, a name, an address, an email address, a telephone number, an ethnicity, a gender/sex, a type of diabetes, a date of birth, a weight, a height, a blood pressure, a temperature, a heart rate, a blood type, a blood glucose level, insurance information, a responsible party name and contact information, a driver's license number or copy of the driver's license, employer information, insurance information, medical history including surgery and ancestor information and allergies, current medications, other test results, including but not limited to urinalysis, emergency contact information, and a primary care physician name and contact information. In embodiments, the subject profile can be inputted into a data storage associated with a processor.

The term "treatment session" as used herein refers to a plurality of treatment cycles during which a plurality of bolus are infused to a patient. Each treatment cycle can range from 40 minutes to 180 minutes. Each treatment session can range from 1 treatment cycle and up to 6 treatment cycles.

The term "unequal time period" as used herein refers to a unit of time between a pair of bolus in a treatment session that is different in length from a time period between another pair of bolus in a treatment session.

The term "weight management protocol" as used herein refers to a system of eating certain foods with a preset calorie content to ensure the patient or subject loses an amount of weight per week that aligns with the subject's metabolic factors.

The invention improves impaired hepatic glucose processing in subjects, which can be a human or a non-human, such as an animal.

In embodiments, the kit can include creating a subject profile with assessed metabolic factors.

The kit can include inserting the subject profile into a diabetic treatment model to determine: a quantity and frequency of sequential intravenous insulin bolus to a subject using a schedule for bolus introduction having at least one unequal time period between a pair of bolus, as well as determining a quantity and frequency of dosage amounts of magnesium and a quantity and frequency of dosage amounts of potassium.

The kit can include selecting a weight management protocol using the subject profile and specific metabolic func-

10

tions of the subject. For example, the metabolic function of respiratory quotient can be used to create a specific customized weight management protocol.

The subject can then follow the weight management protocol while taking a metabolic enhancement. The weight management protocol initially can use a complete metabolic measurement system for cardio-pulmonary exercise stress and resting energy expenditure testing which can give a patient a resting metabolism score. The resting metabolic scores can range from 0.75 to 0.85 for fats, from 0.78 to 0.82 for protein, and from 0.88 to 0.92 for carbohydrates. Based on these resting metabolic scores, a subject's diet can be customized based on what the subject's body can actually metabolize.

A resting metabolic carbohydrate score in excess of 1.20 can indicate the subject's body is undergoing ketogenesis (metabolic production of ketones or ketone bodies or formation of acid ketone [substances that are made when the body breaks down fat for energy, any organic compound in which two carbon atoms are linked by the carbon of a carbonyl group (C—O), the simplest ketone and the most important in medicine is dimethyl ketone (acetone)] bodies, as in uncontrolled diabetes, starvation, or as a result of a diet with a very high fat content), and a different customized diet can be created for the subject or the patient.

The invention improves impaired hepatic glucose processing in subjects, by providing individualized intravenous exogenous insulin-based therapy that not only produces body tissue with improve cellular ATP functioning in the short term, by improves the ATP function by at least 10 percent and up to 40 percent, for a period of time that ranges from 7 days to 90 days from the last treatment session of the individualized intravenous exogenous insulin-based therapy.

It should be noted that in embodiments, the dosage amounts of magnesium and potassium can be introduced to the subject intravenously from a second reservoir simultaneously as the insulin bolus are introduced.

Glucose is introduced to the subject as part of the therapy. The glucose is taken by the subject prior to receiving the insulin bolus. When glucose is used the dosage amounts of potassium and dosage amounts of magnesium can be adjusted based on the subject profile. The bolus introduction can be monitored and blood glucose levels tested allowing a therapist to change the quality and time intervals between bolus based on the diabetic treatment model until the blood glucose level of the subject reaches an individual target blood glucose level.

In embodiments, the unequal time periods between bolus introductions according to the schedule can range from 4 minute to 8 minute periods but can be as low as 1 minute and as high as 10 minutes. The unequal time periods can include minutes and seconds.

In embodiments, from 60 grams of glucose to 100 grams of glucose can be introduced to the subject to establish a blood glucose level of at least 125 mg/dl prior to introducing the bolus of insulin and dosage amounts of potassium and magnesium.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a respiratory quotient of the subject from a metabolism score with the subject in a resting state and applying the results into the diabetic treatment model to (i) modify the concentration of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

US 9,652,595 B1

**11**

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure the success of individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a cardiac function measured by echocardiograph with the subject in a resting state and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a peripheral autonomic neuropathy and microcirculation with the subject in a resting state prior to bolus injection and simultaneously as bolus are injected and after bolus have been injected and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a retinal image captured by a non-mydriatic camera with the subject in a resting state to identify diabetic retinopathy after a series of bolus treatments are performed and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing wounds to wound characteristics by dimensionally measuring wounds by length, width, and depth and related clinical characteristics with the subject in a resting state after a series of bolus treatments are performed and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing C-peptides, such as with the University of Oxford's HOMA2 Calculator, which act as a marker for insulin production and insulin sensitivity factor and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both, or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the metabolic enhancement can have a nerve function improver to decrease homocysteine (a naturally occurring amino acid in all humans that is found in blood plasma) levels and improve cardio vascular health.

In embodiments, the weight management protocol can include additional nutritional supplements.

In embodiments, the insulin bolus can be intravenously infused using a needle or a catheter located in the subject's body, hand, or forearm.

Now turning to the Figures, FIG. 1A shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 40 kilograms to 160 kilograms.

**12**

A dosing protocol for insulin bolus, dosage amounts of potassium and dosage amounts of magnesium as generated by the diabetic treatment model using weight of a subject from 40 kilograms to 160 kilograms is shown. This chart can be used for one person or for a plurality of subjects.

Weight appears in the first column then a dosage amount of a ratio of potassium to saline, a dosage amount of a ratio of magnesium to saline, a dosage amount of a ratio of insulin to create the amount of insulin to saline to be used for a treatment session and an insulin reservoir volume is depicted mapped to the weight of the subject and to the potassium to saline dosage, and magnesium to saline dosage and insulin to saline dosage.

The insulin reservoir volume is a liquid volume containing (i) the insulin and saline, (ii) the insulin, saline and potassium, (iii) the insulin, saline and magnesium, or (iv) the insulin, saline, potassium and magnesium, used in the bolus for the subject.

An insulin bolus dosage minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A schedule for bolus introduction with a plurality of unequal time periods (in seconds) between bolus introduction is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A quantity of bolus per treatment cycle is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

FIG. 1B shows a diabetic treatment model with bolus volume dosage mounts for a subject with a weight from 161 kilograms to 275 kilograms.

A dosing protocol for insulin bolus, dosage amounts of potassium and dosage amounts of magnesium as generated by the diabetic treatment model using weight of a subject from 161 kilograms to 275 kilograms is shown. This chart can be used for one person or for a plurality of subjects.

Weight appears in the first column then a dosage amount of a ratio of potassium to saline, a dosage amount of a ratio of magnesium to saline, a dosage amount of a ratio of insulin to create the amount of insulin to saline to be used for a treatment session, and an insulin reservoir volume is depicted mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

The insulin reservoir volume is a liquid volume containing (i) the insulin and saline, (ii) the insulin, saline and potassium, (iii) the insulin, saline and magnesium, or (iv) the insulin, saline, potassium and magnesium, used in the bolus for the subject.

APPX0451

US 9,652,595 B1

13

An insulin bolus dosage minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A schedule for bolus introduction with a plurality of unequal time periods (in seconds) between bolus introductions is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A quantity of bolus per treatment cycle is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

FIG. **2** shows a bolus volume dosage adjustment protocol based on tested blood glucose levels as produced by the diabetic treatment model.

A dosage adjustment protocol of insulin is shown for three time intervals: (i) a first time interval for hours 1 and 2 of each treatment session, (ii) a second time interval for a first 30 minutes of hour 3 of each treatment session, and (iii) a third time interval for a last 30 minutes of hour 3 of each treatment session.

A table of tested blood glucose level in view of dosage amounts of insulin are shown, which is generated by the diabetic treatment model.

This portion of the diabetic treatment model indicates that the amount of insulin or quantity of bolus can be increased or decreased based on real time test results of a subject's blood glucose level.

FIG. **3** depicts a glucose dosage adjustment protocol as produced by the diabetic treatment model.

A patient's tested blood glucose level ranging from 100 to 550 mg/dl is shown.

In the glucose dosage adjustment protocol, an amount of glucose to be administered using the kit is depicted as mapped to a tested blood glucose level. The amount of glucose ranges from slightly above no glucose shown as 0.01 grams to 60 grams of glucose.

FIG. **4** depicts a metabolic enhancement protocol as produced by the diabetic treatment model and an exemplary metabolic enhancement by component.

The metabolic enhancement protocol shows dosage amounts of metabolic enhancement and respiratory quotients for a patient. The metabolic enhancement can be provided to a subject in dosage amounts as pills, in powder form, as a drink, a transdermal patch, or a delivery system known in the art.

The respiratory quotients range from 0.69 to 1.20. The dosage amounts of metabolic enhancement can range from 1 dose to 3 dosages daily, as shown corresponding to the tests of the subject showing the respiratory quotients.

Ingredients for an exemplary metabolic enhancement usable according to the diabetic treatment model are shown with minimum amounts per dosage and maximum amounts per dosage for the metabolic enhancement.

14

In embodiments, the ingredients for a usable metabolic enhancement can be formed from a synergistic combination of nine ingredients, namely:

Vitamin D—as Cholecalciferol ranging in amounts from 600 IU to 2000 IU.

Vitamin $B_6$—as Pyridoxal-5-Phosphate ranging in amounts from 10 mg to 100 mg.

Folic Acid—as Folate ranging in amounts from 200 mcg to 2000 mcg.

Vitamin $B_{12}$—as Cyanocobalamin ranging in amounts from 1000 mcg to 5000 mcg.

An amino acid that builds proteins in a subject—as N-Acetyl L-Cysteine (NAC) ranging in amounts from 200 mg to 600 mg.

A coenzyme that extracts energy from food for a subject—as Coenzyme Q10 (CoQ10) ranging in amounts from 60 mg to 400 mg.

An antioxidant that extracts energy from food for a subject—as Alpha lipoic acid ranging in amounts from 50 mg to 400 mg.

A protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for a subject—as Nicotinamide Adenine Dinucleotide (NADH) ranging in amounts from 0.5 mg to 5 mg.

A glucose utilization component to prevent or treat chromium deficiency in a subject and which additionally improves glucose utilization by insulin—as Chromium Picolinate ranging in amounts from 200 mg to 300 mg.

The following are non-limiting examples.

Example 1

A comparative analysis was generated for Fred Smith, Fred S. a 69-year-old man with Type 2 diabetes of 25 years' duration. Fred Smith arrived in a wheelchair, because walking was too painful for him. Fred Smith's left foot had all the toes amputated, and a non-healing wound on his other foot had caused his doctor to recommend amputation of a toe on his right foot.

Conventional wound care treatment, including aggressive wound care, wound debridement, and hyperbaric treatment had failed. Fred Smith also developed a debilitating peripheral neuropathy.

At this point Fred Smith weighed 107.95 kilograms and began an intensive treatment protocol of three treatment sessions per week, the first week includes two treatment sessions the second and third weeks include one treatment session per week thereafter for weeks 4 through 12. During each treatment session, Fred Smith received insulin and saline intravenously, alternating with glucose. Fred Smith received 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram, at a first set of unequal time periods of 5.3 minutes, 4 minutes, and 5.1 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Fred Smith received a total of 16 treatments during the three-month period, after the 6th treatment, he began to regain feeling in his feet.

Fred Smith due to the treatment was no longer in a wheelchair at the end of three months and was able to simply use a cane to get around.

Fred was able to decrease his hospital costs by $255,000 from the prior year without treatment.

Additionally, Fred was able to decrease one of his blood pressure medications.

US 9,652,595 B1

**15**

Post treatment, Fred's A1c test result was down 2.7 points. Fred no longer experienced hypoglycemic events and he had reduced his long-acting insulin by 20 percent and his short-acting insulin by 50 percent.

The primary care physician noted that Fred's wound had healed and no amputation was needed.

### Example 2

A comparative analysis was generated for Marianne Rutledge, a 60-year-old woman with Type 2 diabetes of 12 years duration, who suffered from severe kidney disease and was fearful of becoming a dialysis patient.

Upon arrival Marianne Rutledge's blood test results showed an A1C of 10.2, blood glucose of 240 mg/dl, her blood pressure measured 150/92, and she weighed 212 pounds, or 96.3 kilograms.

Marianne Rutledge began an intensive treatment protocol of two treatment sessions per week the first two weeks, and one treatment session per week thereafter for weeks 3 through 12. During each treatment session, Marianne Rutledge received insulin and saline intravenously, alternating with glucose. Marianne Rutledge received 36 bolus per treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram, at a first set of unequal time periods of 5.1 minutes, 4.6 minutes, and 5.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Marianne Rutledge received a total of 13 treatments during the three-month period, after the 2nd treatment, she noticed an extreme increase in her energy and stamina, and as she continued the treatment sessions, she reported that she looked forward to the next treatment session because it made her feel better than she had felt since she was diagnosed with diabetes and kidney disease.

Marianne Rutledge continued the therapy with regular treatment sessions each week, 3 to 4 hours each session, with the protocol of insulin and saline intravenously, alternating with glucose and using the schedule for bolus introduction having at least one unequal time period. After six months of treatment, her kidney function improved to the point that her doctor no longer considered dialysis probable.

### Example 3

Victoria Lord, a Type 2 diabetic on dialysis had vision problems including retinopathy and she also suffered from neuropathy and had trouble sleeping. A comparative analysis was generated for Victoria Lord, whose initial vital signs were blood glucose level 250, blood pressure 120/80, heart rate of 72, and HgbA1c of 9.2.

Victoria Lord began an intensive therapy of two treatment sessions on intravenous insulin alternating with oral glucose on consecutive days for the first two weeks then weekly treatment sessions thereafter for the next 10 weeks, then to be reevaluated.

Each treatment session consisted of 36 bolus. During each treatment session, Victoria Lord received insulin and saline intravenously, alternating with glucose. Victoria received the 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.0 minutes, 6.9 minutes, and 5.3 minutes, with each set

**16**

of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After her first four treatments over two weeks, she reported that her neuropathy decreased, which was confirmed by autonomic tests. Her blood glucose was decreased to 110, and she reported such extremely increased energy that she no longer required an afternoon nap. She also reported that she was sleeping better. Her lab tests after 14 treatments over 12 weeks showed HgbA1c of 6.5, down from 9.2, or a decrease of about 30 percent.

### Example 4

Jim Pierce had severe foot neuropathy and had experienced no feeling in his feet for several years. He had been diagnosed with Type 2 Diabetes about 15 years ago and was insulin dependent. A friend knew of his debilitating neuropathy and recommended that he begin the therapy.

Jim Pierce reported that when his neuropathy began, it was so painful; he could not even stand for a sheet to touch his toes when he went to bed at night. As his neuropathy progressed, he lost all feeling in his feet and began to suffer injuries from falling. His doctor continued to treat him with insulin and prescription drugs, such as Gabapentin.

Jim Pierce's test results were reviewed, and he was put on a therapy of two treatment sessions on consecutive days for three weeks, two treatment sessions on consecutive days for two weeks after that, and then one treatment session per week for the balance of the first 12-week period.

Jim Pierce received 36 bolus during each treatment session using the schedule for bolus introduction having at least one unequal time period. During each treatment session Jim Pierce received insulin and saline intravenously, alternating with glucose.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.5 minutes, 5.1 minutes, and 5.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After the first two treatments, Jim Pierce reported that the feeling began to return to his feet.

After he completed 8 treatments sessions, his doctor reduced his Gabapentin, and after 12 weeks, he no longer took Gabapentin for his neuropathy. He reduced his insulin from 50 units every night to 30 units every night. His lab reports showed Hgb A1c 7.2, down from 10.5. After six months of the continued therapy he was able to do a three-mile hike on his vacation.

### Example 5

Sarah Hardin is a pre-diabetic with a genetic disposition to metabolic disorder and disease, including diabetes. Sarah's pre-treatment metabolic rate or respiratory quotient (RQ), was 0.84. After her initial test results were reviewed, she began one treatment session per week for 12 weeks.

Each of Sarah's treatment sessions consisted of 36 bolus and during each treatment session, Sarah received insulin and saline intravenously, alternating with glucose. Sarah received 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.2 minutes, 4.7 minutes, and 6.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

APPX0453

US 9,652,595 B1

17

Soon after starting the treatment therapy, Sarah Hardin noticed improvement in hair and nail growth, and she documented it with photographs.

Sarah reported that her energy increased to the point that she no longer needed help taking care of her children. After 5 treatment sessions, a comparative analysis was performed and her RQ increased to 0.93, which demonstrated that she was burning carbohydrates for energy.

Example 6

Tatum Norris, age 18, a Type 1 diabetic diagnosed at age 10, had severe neuropathy and was housebound because of his pain. He began two treatment sessions on consecutive days, then 1 treatment session a week thereafter.

Each treatment session consisted of 36 bolus. During each treatment session, Tatum received insulin and saline intravenously, alternating with glucose. Tatum received 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.4 minutes, 5.3 minutes, and 5.2 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

A Nerve Conduction Velocity (NCV) with Electromyopathy (EMG) was conducted pre-treatment on Tatum and repeated 90 days after his initial treatment, which showed a marked decrease in his diabetic neuropathy.

After 8 or 10 treatments, Tatum began driving a car again and he was able to sit in movie theaters because the pain was now manageable. Tatum reported that he could now go visit his mom in Dallas and even hang out with friends.

Example 7

Carmen Valdez, a 70-year-old Type 2 diabetic who had been diagnosed four years earlier, was on three types of blood pressure medication (Amlodipine, Lisinopril, and Lopressor) and three medications to control her blood sugar (Lantus, Metformin, and Onglyza). After her initial test results were reviewed, she began treatment sessions of two treatment sessions on consecutive days for the first two weeks and one treatment session per week thereafter for 12 weeks. Her pre-treatment RQ test result was 0.79.

During each treatment session, Carmen received insulin and saline intravenously, alternating with glucose. Carmen received 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 6.4 minutes, 7.2 minutes, and 7.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Carmen reported that she was surprised that she immediately experienced greatly increased energy and stamina, as well as a lowering of her daily blood pressure according to her self-tests, after only the first two treatments.

After three months, Carmen Valdez was able to discontinue taking Amlodipine, Lantus and Onglyzaone. At that point her RQ measured 0.95.

Example 8

Harold Carson, a 65-year-old insulin-dependent Type 2 diabetic of 25 years, became insulin resistant and his medications were no longer working well. Mr. Carson was taking

18

three 750-mg Glucophage tablets daily, 150 units of Humalog (short-acting) insulin daily, and a nighttime injection of 40 units of Humulin N (long-acting) insulin. He also took statin drugs for cholesterol and blood pressure medication.

After initial tests, his C-peptide was remarkable at 2.0. He began treatment sessions of two on consecutive days for two weeks, and then continued with weekly treatments for a total of 12 weeks.

During each treatment session, Mr. Carson received insulin and saline intravenously, alternating with glucose. He received 36 bolus per treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.7 minutes, 6.1 minutes, and 5.9 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After he began the treatment sessions, he reported that he immediately noticed a better night's sleep, that his mental clarity was sharper, and even his golf score improved.

After two months of treatment he decreased his insulin usage by 70 percent (from 150 units daily to 45 units daily) and his C-peptide test resulted in a significant improvement of 2.8.

Harold Carson's RQ was 0.75 pre-treatment and a perfect 1.00 after two months of treatment. Harold reported that his dry skin improved, the neuropathy in his legs vanished, and his wife reported that his hair had grown "unbelievably" after he began the treatment therapy.

Example 9

Stephen Henderson, a pre-diabetic with metabolic disorder and hyperlipidemia, had initial test results of Triglycerides 1290, LDL 183, and Cholesterol 271; his RQ was 0.74. He began treatment sessions once a week for 12 weeks. During each treatment session, Mr. Henderson received insulin and saline intravenously, alternating with glucose. Mr. Henderson received 36 bolus each treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 4.8 minutes, 4.8 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Stephen reported that after only two treatments, his energy level increased and prior hair loss abruptly stopped. After five treatments, he noticed significant hair growth. His test results after 12 treatment sessions were Triglycerides 123, LDL 86, Cholesterol 144, and RQ 0.98.

Stephen also reported that he noticed significant improvement in quantitative and qualitative analysis capability.

Example 10

Alan Henderson traveled from Denver to Houston for his treatments. At age 71 he had a history of 13 heart stints, he had been a Type 2 diabetic for 20 years, and he was insulin dependent.

After initial testing and a review of his results, Alan Henderson began treatment sessions of two per week on consecutive days for two weeks, then one treatment session weekly for 10 more weeks.

During each treatment session, Alan received insulin, saline, potassium, and magnesium intravenously, alternating

APPX0454

US 9,652,595 B1

**19**

with glucose. Alan received 36 bolus each treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 6.4 minutes, 6.8 minutes, and 7.1 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Alan's initial RQ was measured at 0.78, and his Hgb A1c was 13.4.

Over the course of three months, after his 12-week, 14-treatment therapy, he decreased his fast-acting insulin (Novalog) by 55 percent, down from 15-18 units to 10-12 units with meals and his long-acting insulin (Lantus) decreased by 65 percent, down from 75 units twice daily to 40 units daily.

After the first three months of treatment, Alan's Hgb A1c was down to 7.3 (more than 6-point decrease), and his RQ was 0.90.

Alan Henderson also suffered from diabetic neuropathy, for which he had been prescribed Gabapentin (six capsules per day) and a Lidocaine patch. After two months he reduced the amount of Gabapentin he was taking, and then completely eliminated it. He discontinued use of the Lidocaine patch. He reports that he now has no pain or neuropathy in his hands or feet, and his energy level is "way up."

### Example 11

George Gilbert had a wound on his foot for three months that would not heal. He was also a Type 2 diabetic on Metformin orally. After review of his test results, he began treatment sessions of two sessions on consecutive days for the first week and weekly treatment sessions thereafter.

During each treatment session, George received insulin, saline, glucagon, and somatostatin intravenously, alternating with oral glucose. George received 36 bolus each treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.7 minutes, 5.4 minutes, and 5.0 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After only three weeks of the treatment, he reduced the amount of Metformin he was taking, his wound healed, and his doctor made photographs of the wound before and after for the hospital record. George calls the treatment a "miracle."

### Example 12

Toby Rasmussen, a pre-diabetic of 8 years duration, began treatment sessions because of vision problems and a family history of diabetes. His initial RQ was 0.85. His Hgb A1c measured 7.0. He began treatment sessions once a week for 12 weeks.

During each treatment session, Toby received insulin and saline intravenously, alternating with glucose. Toby received 36 bolus each treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.3 minutes, 5.2 minutes, and 6.4 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

**20**

Toby reports that after the 12 treatments, he has more energy and his eyesight has improved so much that he now uses only bifocals instead of trifocals. After treatments, his RQ measured 0.98 and his A1c measured 6.1.

### Example 13

Hank Anderson, a Type 2 diabetic of 27 years, had an Hgb A1c reading of 9.0, and was using Lantus insulin 170 units during the day and another 70 units at night. He also reported severe leg cramps.

A comparative analysis was performed on Hank Anderson, and he began treatment sessions weekly. During each treatment session, Hank received insulin and saline intravenously, alternating with glucose. He also received potassium 40 meq orally with each treatment session and daily on non-treatment days. Mr. Anderson received 36 bolus per treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.6 minutes, 5.1 minutes, and 5.4 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After 12 weeks of weekly treatment sessions, Hank reported that since starting the treatment, his blood sugar is now controlled and his eyesight has improved so much that he went from legally blind without glasses to being able to read captions on a television with no glasses.

Hank was able to discontinue his nightly Lantus and his insulin went down from 6 vials of insulin per month to only 3, a significant costs saving.

Hank Anderson's A1c after 12 weeks of treatment sessions measured 8.3.

### Example 14

John Grayson, a Type 1 insulin-dependent diabetic, initially reported problems with his kidneys, eyes, low energy, mood swings, and erectile dysfunction. His RQ was 0.88 and his magnesium level was 1.5

After his test results were reviewed, John started treatment sessions of two sessions on consecutive days and weekly treatment sessions thereafter for a period of three months. During each treatment session, Hank received insulin and saline intravenously, alternating with oral glucose and somatostatin. Hank received 36 bolus per treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.0 minutes, 5.2 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Mr. Grayson also received magnesium chloride tablets of 40 mg orally with each treatment session and daily on non-treatment days.

After the first two treatments, Mr. Grayson decreased his insulin use by 5-10 units per sliding scale and was extremely happy to report that he experienced increased blood flow.

After the third treatment, Mrs. Grayson was deliriously excited about his improvement, especially with the blood flow.

FIGS. **5A-5C** depict steps of a method of the invention according to one or more embodiments.

The method for providing an individualized intravenous exogenous insulin-based therapy can include creating a

APPX0455

US 9,652,595 B1

21

subject profile for a subject, as shown in box **500**. The subject profile can include: a subject history, such as having type II diabetes for the past three years and cataract surgery 4 years ago, a subject's physical reports including weight of the subject and optionally objective physician reports, CT scans and other diagnostic reports, a subject's name, such as Carol Wilson, a subject's contact information such as a name, an address and a telephone number, and a subject's blood test results.

The method can include assessing metabolic factors of the subject and storing the metabolic factors in the subject profile, as shown in box **502**. The metabolic factors needed in the subject file can include: a glucose level, such as an initial glucose level, a respiratory quotient, such as an initial respiratory quotient, an insulin sensitivity factor, such as an initial or pre-treatment insulin senility factor, and an individual target blood glucose level which the subject desires to achieve with the treatments using the diabetic treatment model.

The method can include creating a care plan with a plurality of treatment sessions for the subject and a plan goal, as shown in box **504**. The care plan can indicate a schedule for bolus introduction with at least one unequal time period and the care plan can include a quantity and frequency of a plurality of bolus containing saline and insulin for sequential intravenous introduction to a subject.

The method can include introducing glucose to the subject to stimulate gastrointestinal hormone production, resulting in the release of enzymes from the subject's liver and causing blood glucose levels of the subject to be in a therapeutic range, as shown in box **506**.

The method can include testing the subject for blood glucose levels to compare tested blood glucose levels to the plurality of therapeutic ranges and verify the subject is in the therapeutic range, as shown in box **508**.

The method can include comparing tested blood glucose levels to a diabetic treatment model, as shown in box **510**.

The method can include mapping tested blood glucose levels and insulin sensitive factors of the subject to the subject weight using the diabetic treatment model to determine a schedule for bolus introduction, wherein the schedule for bolus introduction has at least one unequal time period between at least one pair of bolus, as shown in box **512**.

The method can include introducing to the subject a plurality of bolus of insulin and saline sequentially using the schedule for bolus introduction having at least one unequal time period between at least one pair of bolus, as shown in box **513**.

The method can include comparing the subject profile to a plurality of weight management protocols to identify a weight management protocol for the subject based upon assessed metabolic functions of the subject and saving the weight management protocol in the care plan, as shown in box **514**.

The method can include implementing the identified weight management protocol and the care plan after a first treatment session to manage weight of the subject with a metabolic enhancement causing improved cellular ATP functioning for the subject while infusing insulin and modifying a quantity and duration of unequal time periods between bolus introduction in the schedule for bolus introduction having at least one unequal time period between at least one pair of bolus to improve impaired hepatic glucose processing, as shown in box **516**.

The method can include using in the schedule for bolus introduction having at least one unequal time period, time periods varying from 2 minutes to 10 minutes. The unequal

22

time periods can be time intervals from 1 percent to 30 percent different in length of time from each other.

The method can include introducing from 60 grams of glucose to 100 grams of glucose to the subject prior to initial bolus introduction to establish a blood glucose level of at least 125 mg/dl prior to introducing the plurality of bolus in a first treatment session.

The method can include comparing a respiratory quotient of the subject in a resting state to a plurality of metabolism scores, as shown in box **518**.

The method can include modifying a quantity of bolus for the subject for each treatment session as identified in the care plan with schedule for bolus introduction having at least one unequal time period between bolus to improve a subject's respiratory quotient, as shown in box **520**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period between bolus introduction by modifying a quantity and duration of unequal time periods between bolus introductions to improve the respiratory quotient, as shown in box **522**.

The method can include comparing a measured cardiac function of the subject in a resting state to a preset norm of cardiac function, as shown in box **524**.

The method can include modifying a quantity of bolus for the subject identified in the care plan using the preset norm of cardiac function, as shown in box **526**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period by modifying a quantity and duration of unequal time periods between bolus introductions to improve cardiac function, as shown in box **528**.

The method can include measuring a peripheral autonomic neuropathy and microcirculation of the subject in a resting state prior to bolus introduction comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of peripheral autonomic neuropathies and microcirculations, as shown in box **530**.

The method can include comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state as bolus are sequentially introduced to the measured peripheral autonomic neuropathy and microcirculation, as shown in box **532**.

The method can include comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state after all bolus have been introduced in a first treatment session to the measured peripheral autonomic neuropathy and microcirculation, as shown in box **534**.

The method can include modifying a quantity of bolus for the subject identified in the care plan to treat peripheral autonomic neuropathy and microcirculation, as shown in box **536**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period by modifying a quantity and duration of unequal time periods between bolus introduction to improve the measured peripheral autonomic neuropathy and microcirculation, as shown in box **538**.

The method can include viewing an initial retinal image of the subject captured by a non-mydriatic camera with the subject in a resting state to identify a diabetic retinopathy, as shown in box **540**.

The method can include viewing a post treatment retinal image of the subject in a resting state after a first treatment session, as shown in box **541**.

US 9,652,595 B1

23

The method can include comparing the initial retinal image to the post treatment retinal image, as shown in box **542**.

The method can include modifying a quantity of bolus for the subject if no change in the diabetic retinopathy has occurred, as shown in box **544**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period between bolus to reduce the effects of diabetic retinopathy by modifying a quantity and duration of unequal time periods between bolus introductions to reduce the effects of diabetic retinopathy, as shown in box **546**.

The method can include dimensionally measuring wounds by length, width, depth and identifying wound characteristics with the subject in a resting state, as shown in box **550**.

The method can include dimensionally measuring wounds after at least one treatment session to identify skin integrity and changes in clinical wound characteristics, as shown in box **552**.

The method can include modifying a quantity of bolus for the subject identified in the care plan for wound treatment using the identified skin integrity and changes in clinical wound characteristics, as shown in box **554**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period between bolus to improve wound healing by modifying a quantity and duration of unequal time periods between bolus introduction to reduce wound size and wound characteristics, as shown in box **556**.

The method can include comparing C-peptides of the subject to a preset norm of C-peptides to identify an insulin sensitivity factor, as shown in box **560**.

The method can include modifying a quantity of bolus for the subject for the insulin sensitivity factor, as shown in box **562**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period between bolus to improve an insulin sensitivity factor using analysis of C-peptides by modifying a quantity and duration of unequal time periods between bolus introductions, as shown in box **564**.

In embodiments, the method can use at least one of: methylcobalamin, pyridoxal-5-phosphate, 5-MTHF, alpha lipoic acid, NADH, coenzyme Q10, chromium picolinate, and N-Acetyl cysteine, and vitamin $D_3$ as the metabolic enhancement.

In embodiments, a needle or a catheter can be used to introduce the bolus into the subject's hand or forearm to deliver the insulin bolus.

The method can include determining a quantity and frequency of dosage amounts of magnesium and introducing the dosage amounts of magnesium simultaneously to the subject with the plurality of bolus using the schedule for bolus introduction having at least one unequal time period, as shown in box **570**.

The method can include determining a quantity and frequency of dosage amounts of potassium and introducing the dosage amounts of potassium simultaneously to the subject with the plurality of bolus using the schedule for bolus introduction having at least one unequal time period, as shown in box **572**.

The method can include determining a quantity and frequency of dosage amounts of somatostatin and introducing the dosage amounts of somatostatin simultaneously to

24

the subject with the plurality of bolus using the schedule for bolus introduction having at least one unequal time period, as shown in box **574**.

In embodiments, the somatostatin can be administered orally or intravenously.

The method can include determining a quantity and frequency of dosage amounts of glucagon and introducing the dosage amounts of glucagon simultaneously to the subject with the plurality of bolus using the schedule for bolus introduction having at least one unequal time period, as shown in box **576**.

In embodiments, the glucagon can be administered orally or intravenously.

The method can include scheduling diagnostic tests after a first treatment session to modify the care plan for improved cellular ATP functioning for the subject and improved hepatic glucose processing, as shown in box **578**.

FIG. 6 depicts a system of the invention according to one or more embodiments.

The system for individualized intravenous exogenous insulin-based therapy can have an administrative processor **602** connected to an administrative data storage **604**.

The administrative processor, which can be a computer, can be connected to a network **606**. In embodiments, the connection can be a wired or wireless connection. The network can be a cellular network, a satellite network, a global communication network, a local area network, a wide area network, a similar network known in the industry, or combinations thereof.

The system can connect to a plurality of client devices **608a**, **608b**, and **608c**. The client devices can be computers, laptops, tablet computers, cellular phones or smart phones, or another digital input device that is cable of bidirectional communication and can be used to input subject information into a subject profile, which can be disposed in the administrative data storage **604**.

In embodiments, the system can connect to a hospital processor **607** and/or an insurance processor **609**. The hospital processor, the insurance processor or both can be in communication with the network **606** and can provide accelerated payment to the diabetic treatment center and provide improved data visibility for improved overall patient care by hospital doctors and medical staff treating the subject.

In embodiments, the system can connect to a doctor processor **611**, which can be a computer. In embodiments, the doctor processor can be a group of processors, wherein each processor in the group can be connected to a different doctor specialist. In other embodiments, the doctor processor can be a processor accessible by a group of physicians.

In embodiments, the administrative processor can be a cloud based computing system.

FIGS. 7A and 7B depict an administrative data storage usable in the system according to one or more embodiments.

The administrative data storage **604** can contain at least one subject profile **610**.

Each subject profile can contain a plurality of metabolic factors **605** of the subject, which can include, but is not limited to, a blood glucose level **612**, a respiratory quotient **614**, an insulin sensitivity factor **616**, and an individual target blood glucose level **618**.

The administrative data storage **604** can contain a plurality of care plan templates **620**.

In embodiments, the administrative data storage can contain various computer instructions, which can be used to instruct the administrative processor to perform various tasks.

US 9,652,595 B1

25

The administrative data storage **604** can contain computer instructions **200** configured to instruct the administrative processor to create a customized care plan from one of the plurality of care plan templates, wherein the customized care plan indicates a plurality of treatment sessions for the subject with the subject profile and a plan goal, each customized care plan indicating a schedule for bolus introduction having at least one unequal time period between bolus introduction, each bolus containing saline and insulin and each bolus introduced intravenously and sequentially to a subject

The administrative data storage **604** can contain computer instructions **202** configured to instruct the administrative processor to compare tested blood glucose levels to a diabetic treatment model after introducing glucose to a subject to stimulate gastrointestinal hormone production, release of enzymes from the subject's liver and cause blood glucose levels of the subject to be in a therapeutic range.

The administrative data storage **604** can contain a plurality of therapeutic ranges for blood glucose levels **203**.

The administrative data storage **604** can contain computer instructions **204** configured to instruct the administrative processor to compare tested blood glucose levels to the plurality of therapeutic ranges for blood glucose levels and verify the subject is in the therapeutic range.

The administrative data storage **604** can contain a plurality of weight management protocols **205**.

The administrative data storage **604** can contain computer instructions **206** configured to instruct the administrative processor to compare a subject profile to the plurality of weight management protocols to identify a weight management protocol based upon metabolic functions of the subject.

The administrative data storage **604** can contain computer instructions **207** configured to instruct the administrative processor to save the identified weight management protocol in the generated customized care plan after saline with insulin in a plurality of bolus using the schedule for bolus introduction having at least one unequal time period have been administered to a subject.

It should be noted that the unequal time periods are determined by the diabetic treatment model and the care plan.

The administrative data storage **604** can contain computer instructions **208** configured to instruct the administrative processor to track weight management of the subject after a first treatment session and use of an identified weight management protocol and the care plan along with a metabolic enhancement to identify improved cellular ATP functioning for the subject and improve impaired hepatic glucose processing.

The administrative data storage **604** can contain a plurality of metabolism scores **209**, a plurality of preset norms of cardiac function **210**, a plurality of preset norms of peripheral autonomic neuropathies and microcirculations **211**, a retinal image of the subject **212**, vowquel characteristics **214** and a plurality of preset norms of C-peptides **215**.

In embodiments, at least one of the metabolic enhancements can be a synergistic combination of: Vitamin D ranging in amounts from 600 IU to 2000 IU, Vitamin $B_6$ ranging in amounts from 10 mg to 100 mg, Folic Acid ranging in amounts from 200 mcg to 2000 mcg, Vitamin $B_{12}$ ranging in amounts from 1000 mcg to 5000 mcg, an amino acid that builds proteins in a subject ranging in amounts from 200 mg to 600 mg, a coenzyme that extracts energy from food for a subject ranging in amounts from 60 mg to 400 mg, an antioxidant that extracts energy from food for a subject

26

ranging in amounts from 50 mg to 400 mg, a protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for a subject ranging in amounts from 0.5 mg to 5 mg, and a glucose utilization component to prevent or treat chromium deficiency in a subject which improves glucose utilization by insulin ranging in amounts from 200 mg to 300 mg.

A metabolic enhancement can consist of Cholecalciferol, Pyridoxal-5-Phosphate, Folate, Cyanocobalamin, N-Acetyl L-Cysteine (NAC), Coenzyme Q10 (CoQ10), an Alpha lipoic acid, Nicotinamide Adenine Dinucleotide (NADH), and Chromium Picolinate.

FIGS. 8A-8C provide exemplary subject profiles with an automatically generated care plan template and an automatically generated report according to one or more embodiments.

The care plan can be viewed in real time 24 hours a day, 7 days a week as each test is updated and the metabolic assessments are completed.

FIG. 8A shows a subject profile **610** with fields for a name **802**, a patient ID number **804**, a date of birth **806**, a gender **808**, an ethnicity **810**, a blood type **812**, allergies **814**, a diagnosis **816**, insurance **818**, a primary care physician (PCP) **820**, a primary care physician phone number **822**, a primary care physician fax number **824**, a patient address **826**, a patient phone number **828**, a patient email address **830**, and a patient emergency contact **832**.

The subject profile **610** can include a narrative **834**, which can be written by a medical professional, documenting the condition of the patient and the medical history of the patient with the subject profile.

The subject profile **610** can include assessed metabolic factors of the patient **605**, which can include fasting blood sugar **836**, A1c level in the blood **838**, C-peptide level in the blood **840**, a magnesium level in the blood **842**, a potassium level in the blood **844**, and urinalysis test results **846**.

The subject profile **610** can include an insulin sensitivity factor **848** for the subject and diagnostic tests results **850**.

The diagnostic test results **850** can include blood glucose level **612**, respiratory quotient **614**, blood pressure **852**, weight **854**, nerve conduction velocity **856**, retinal image of the subject **212**, autonomic test results for neuropathy **858**, cognitive test results **860**, and cardiac test results **862** indicating cardiac function. The cardiac tests can be EKG or 2D Echo tests.

The subject profile **610** can include current medications **864** of the subject, such as aspirin or prescription medications the subject is currently using.

The subject profile **610** can have a home button **950**, a save button **952**, a previous page button **954**, a next page button **956**, and an exit button **958**. The buttons can be interchangeable with icons depending on software used on an industry standard computer screen.

FIG. 8B shows the subject profile with a care plan template.

In embodiments, the care plan template can be filled in partially or completely and can be editable.

The care plan template **620** can have an infusion schedule **866**, which can indicate infusions by week, showing a quality of treatments and on which days the treatments must occur.

The care plan template **620** can include an infusion formulation **868**, which can be a combination of insulin, saline, potassium, magnesium, glucagon, and somatostatin.

The care plan template **620** can include treatment cycles **870**, a quantity of bolus per treatment cycle **872**, and unequal time periods between bolus introductions in seconds **874**.

27

The care plan template 620 can include a blood glucose level therapeutic range 876.

In embodiments, additional therapies can be tracked in the care plan, including but not limited to, a quantity and frequency of dosage amounts of potassium 878, a quantity and frequency of dosage amounts of magnesium 880, a quantity and frequency of dosage amounts of glucagon 882, and a quantity and frequency of dosage amounts of somatostatin 884.

The care plan template 620 can include diagnostic tests 886, which can be scheduled after a first treatment session.

The care plan template 620 can include metabolic enhancements 888, which can be a particular supplement and instructions on dosage amounts and frequency for the subject in view of the diagnostic tests or other data in the care plan.

The care plan template 620 can include a weight management protocol 205, which can be selected from the plurality of weight management protocols in the administrative data storage.

The care plan template 620 can include an education schedule 889, which can consist of a curriculum of education modules to be viewed or read by a subject by a certain date, which can be automatically transmitted to a client device of the subject on a predetermined schedule.

The care plan template 620 can include at least one plan goal 890, such as an increased metabolism for a subject, such as by 10 percent.

FIG. 8C shows the subject profile with a report.

The report 892 can show improved cellular ATP functioning for the subject identifying improve impaired hepatic glucose processing.

The report 892 can include a post treatment narrative 894, which can be completed by a health care professional, indicating subjective and analytical assessments of metabolic factors of the subject.

The report 892 can include post treatment assessed metabolic factors 896 of the patient, a post treatment insulin sensitivity factor 898, a post treatment patient testimonial 900, post treatment diagnostic tests results 902 and post treatment medications 904.

The report 892 can include an insulin sensitivity factor 848 for the subject and diagnostic tests results 850.

The diagnostic test results 850 can include blood glucose level 612, respiratory quotient 614, blood pressure 852, weight 854, nerve conduction velocity 856, retinal image of the subject 212, autonomic test results for neuropathy 858, cognitive test results 860, and cardiac test results 862 indicating cardiac function. The cardiac tests can be EKG or 2D Echo tests.

The report can include assessed metabolic factors of the patient 605, which can include fasting blood sugar 836, A1c level in the blood 838, C-peptide level in the blood 840, a magnesium level in the blood 842, a potassium level in the blood 844, and urinalysis test results 846.

FIG. 9 depicts a kit for individualized intravenous exogenous insulin-based therapy according to one or more embodiments.

The kit 1000 can include a portable data storage 903 in communication with a client device processor 607. A client device 608 can contain the client device processor 607. The client device processor 607 can be in communication with a plurality of intravenous catheters 632 fluidly engageable with a fluid source 634.

The plurality of intravenous catheters 632 deliver to a patient a plurality of bolus sequentially using the generated

28

individualized schedule for bolus introduction with at least one unequal time period between at least one pair of bolus.

In embodiments, the kit can use a blood glucose meter 630 for testing the subject after glucose consumption for blood glucose levels and transmitting blood glucose test results to the portable data storage, a plurality of metabolic enhancements 888, a glucose source 1012 comprising from 60 grams of glucose to 100 grams of glucose, a quantity of dosage amounts of magnesium 1014, a quantity dosage of potassium 1016, a quantity dosage of somatostatin 1018, and a quantity dosage of glucagon 1020.

The metabolic enhancement 888 can be a methylcobalamin, a pyridoxal-5-phosphate, a 5-MTHF, an alpha lipoic acid, a NADH, a coenzyme Q10, a chromium picolinate, and a N-Acetyl cysteine, and a vitamin $D_3$.

In embodiments, the metabolic enhancements 888 can contain a synergistic combination of: Vitamin D ranging in amounts from 600 IU to 2000 IU, Vitamin $B_6$ ranging in amounts from 10 mg to 100 mg, Folic Acid ranging in amounts from 200 mcg to 2000 mcg, Vitamin $B_{12}$ ranging in amounts from 1000 mcg to 5000 mcg, an amino acid that builds proteins in the subject ranging in amounts from 200 mg to 600 mg, a coenzyme that extracts energy from food for the subject ranging in amounts from 60 mg to 400 mg, an antioxidant that extracts energy from food for the subject ranging in amounts from 50 mg to 400 mg, a protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for the subject ranging in amounts from 0.5 mg to 5 mg, and a glucose utilization component to prevent or treat chromium deficiency in the subject which improves glucose utilization by insulin ranging in amounts from 200 mg to 300 mg.

In embodiments, the metabolic enhancements 888 can contain Cholecalciferol, Pyridoxal-5-Phosphate, Folate, Cyanocobalamin, N-Acetyl L-Cysteine (NAC), Coenzyme Q10 (CoQ10), an Alpha lipoic acid, Nicotinamide Adenine Dinucleotide (NADH), Chromium Picolinate, or combinations thereof.

FIGS. 10A-10E depict a portable data storage according to one or more embodiments.

The portable data storage 903 can have therapeutic ranges for blood glucose levels, a subject profile, a library of care plan templates, and a plan goal.

The subject profile 610 can have a subject history 1002, subject physical reports 1004 including a subject preexisting weight 1005, a subject name 1006, subject contact information 1008, an indication 1010 that a subject is suspected of having the metabolic syndrome, and measured metabolic factors 605.

The measured metabolic factors can include a glucose level 612, a respiratory quotient 614, an insulin sensitivity factor 616, and a weight 615.

In embodiments, the portable data storage 903 can have a library of care plan templates 620 and a plan goal 890.

The portable data storage 903 can have computer instructions 904 to instruct a client device processor of a client device to create a subject profile for a subject suspected of having metabolic syndrome.

The portable data storage 903 can have a database 906 of metabolic factors for groups of patients using the blood glucose level 612, the respiratory quotient 614, the insulin sensitivity factor 616 and target blood glucose levels 618.

In embodiments, the portable data storage 903 can have a library of weight management protocols 908 and for subjects with the metabolic syndrome.

The portable data storage 903 can have computer instructions 910 to instruct the client device processor to compare

APPX0459

US 9,652,595 B1

29

the measured metabolic factors of the subject to the database of the metabolic factors for like groups of the patients and calculate if the measured metabolic factors meet, exceed, or fall below the blood glucose level, the respiratory quotient, the insulin sensitivity factor, and the target blood glucose level for the subject suspected of having the metabolic syndrome to confirm the subject has the metabolic syndrome.

The portable data storage **903** can have a diabetic treatment model **911** with bolus volume dosage amounts **912** and schedule templates **913** for a bolus introduction.

The schedule templates **913** for the bolus introduction can contain at least one unequal time period between at least one pair of bolus, and the schedule templates provide the at least one unequal time period with a quantity and a frequency of a plurality of bolus for a sequential intravenous introduction to the subject with a confirmed metabolic syndrome. Each bolus can contain a predetermined concentration of saline and insulin based on the diabetic treatment model **911**.

The portable data storage **903** can have computer instructions **914** to instruct the client device processor to create a care plan using one of the care plan templates for the subject and setting a plan goal **890** using the diabetic treatment model, the care plan indicating a customized schedule for bolus introduction with the at least one unequal time period and a quantity and a frequency of a plurality of bolus containing saline and insulin for sequential intravenous introduction to the subject and save in the subject profile.

The portable data storage **903** can include computer instructions **916** to instruct the client device processor to indicate a quantity of glucose for the subject with metabolic syndrome to stimulate a gastrointestinal hormone production resulting in a release of enzymes from a liver of the subject and causing blood glucose levels of the subject to be in a therapeutic range.

The portable data storage **903** can include computer instructions **918** to instruct the client device processor to compare blood glucose test results to a plurality of therapeutic ranges for blood glucose levels stored in the portable data storage and verify that the subject with the metabolic syndrome is in a therapeutic range of the plurality therapeutic ranges for blood glucose levels.

The portable data storage **903** can include computer instructions **920** to instruct the client device processor to compare the blood glucose test results to the diabetic treatment model and map the blood glucose test results and insulin sensitive factors of the subject with the metabolic syndrome to the measured weight of the subject using the diabetic treatment model to generate an individualized schedule for bolus introduction using the schedule templates.

In embodiments, the individualized schedule for the bolus introduction **922** can have the at least one unequal time period, wherein time periods vary from 2 minutes to 10 minutes, and wherein the unequal time periods are time intervals from 1 percent to 30 percent different in length of time from each other.

The portable data storage **903** can include computer instructions **924** to instruct the client device processor to compare the subject profile to the library of weight management protocols to identify a weight management protocol for the subject based upon measured metabolic factors of the subject and saving the weight management protocol in the care plan.

The portable data storage **903** can include computer instructions **926** to instruct the client device processor to change the weight management protocol and the care plan

30

after a first treatment session to manage weight of the subject using at least one of the plurality of metabolic enhancements to cause improved cellular ATP functioning for the subject while infusing the plurality of bolus and modifying a quantity and a duration of unequal time periods between bolus introduction in the generated individualized schedule for bolus introduction having at least one unequal time period between at least one pair of bolus to improve impaired hepatic glucose processing.

The portable data storage **903** can include computer instructions **930** to instruct the client device processor to compare the respiratory quotient of the subject in a resting state to a plurality of measured metabolic factors.

The portable data storage **903** can include computer instructions **932** to instruct the client device processor to modify a quantity of the plurality of bolus for the subject for each treatment session as identified in the care plan with the generated individualized schedule for bolus introduction having at least one unequal time period between bolus introduction to improve the respiratory quotient of the subject.

The portable data storage **903** can include computer instructions **934** to instruct the client device processor to modify the generated individualized schedule for bolus introduction having at least one unequal time period between bolus introduction by modifying a quantity and a duration of unequal time periods between the bolus introduction to improve the respiratory quotient of the subject.

The portable data storage **903** can include computer instructions **936** to instruct the client device processor to compare a measured cardiac function of the subject in a resting state to a plurality of preset norms of cardiac function in a library of cardiac functions.

The portable data storage **903** can include computer instructions **938** to instruct the client device processor to modify a quantity of the plurality of bolus for the subject identified in the care plan using the preset norms of cardiac function.

The portable data storage **903** can include computer instructions **940** to instruct the client device processor to modify the generated individualized schedule of bolus introduction having at least one unequal time period by modifying a quantity and a duration of at least one unequal time period between bolus introduction to improve cardiac function of the subject.

The portable data storage **903** can include computer instructions **942** to instruct the client device processor to measure a peripheral autonomic neuropathy and microcirculation of the subject prior to the bolus introduction and comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of peripheral autonomic neuropathies and microcirculations in a library of peripheral autonomic neuropathies and microcirculations.

The portable data storage **903** can include computer instructions **944** to instruct the client device processor to compare the measured peripheral autonomic neuropathy and microcirculation of the subject as bolus are sequentially introduced to the preset norms of peripheral autonomic neuropathy and microcirculation.

The portable data storage **903** can include computer instructions **946** to instruct the client device processor to compare the peripheral autonomic neuropathy and microcirculation of the subject after all bolus have been introduced in the first treatment session to the measured peripheral autonomic neuropathy and microcirculation.

US 9,652,595 B1

31

The portable data storage **903** can include computer instructions **948** to instruct the client device processor to modify the quantity of bolus for the subject identified in the care plan to diminish the subject's peripheral autonomic neuropathy and microcirculation.

The portable data storage **903** can include computer instructions **950** to instruct the client device processor to modify the schedule of the bolus introduction having at least one unequal time period by modifying a quantity and a duration of unequal time periods between bolus introduction to improve measured peripheral autonomic neuropathy and microcirculation of the subject.

The portable data storage **903** can include computer instructions **952** to instruct the client device to scan an initial retinal image of the subject to identify characteristics for a diabetic retinopathy.

The portable data storage **903** can include computer instructions **954** to instruct the client device processor to scan a post treatment retinal image of the subject after the first treatment session and compare the initial retinal image to the post treatment retinal image.

The portable data storage **903** can include computer instructions **956** to instruct the client device processor to modify a quantity of bolus for the subject if no change in the identified characteristics for diabetic retinopathy has occurred.

The portable data storage **903** can include computer instructions **960** to instruct the client device processor to modify the generated individualized schedule of bolus introduction having at least one unequal time period between bolus to reduce effects of diabetic retinopathy by modifying a quantity and a duration of unequal time periods between bolus introduction to reduce at least one effect of diabetic retinopathy.

The portable data storage **903** can include computer instructions **962** to instruct the client device processor to scan and calculate dimensionally wounds of the subject by length, width, and depth, and identify wound characteristics of the subject.

The portable data storage **903** can include computer instructions **964** to instruct the client device to scan and dimensionally measure wounds of the subject after at least one treatment session to identify skin integrity and changes in wound characteristics of the subject.

The portable data storage **903** can include computer instructions **966** to instruct the client device processor to modify a quantity of bolus for the subject identified in the care plan for wound treatment using the identified skin integrity and changes in wound characteristics of the subject.

The portable data storage **903** can include computer instructions **968** to instruct the client device to modify the schedule for bolus introduction having the at least one unequal time period between bolus to improve wound healing by modifying a quantity and a duration of unequal time periods between the bolus introduction to reduce wound size and wound characteristics of the subject.

The portable data storage **903** can include computer instructions **970** to instruct the client device processor to use a homeostatic model to identify an insulin sensitivity factor of a subject.

The portable data storage **903** can include computer instructions **972** to instruct the client device processor to modify the quantity of bolus for the subject for the insulin sensitivity factor.

The portable data storage **903** can include computer instructions **974** to instruct the client device to modify the

32

generated individualized schedule of bolus introduction having at least one unequal time period between bolus to increase the insulin sensitivity factor by modifying a quantity and a duration of unequal time periods between bolus introduction.

The portable data storage **903** can include computer instructions **976** to instruct the client device processor to determine a quantity and a frequency of dosage amounts of magnesium and introduce the dosage amounts of magnesium simultaneously to the subject with the plurality of bolus using the generated individualized schedule of bolus introduction having at least one unequal time period between one pair of bolus.

The portable data storage **903** can include computer instructions **978** to instruct the client device processor to determine a quantity and a frequency of dosage amounts of potassium and introduce the dosage amounts of potassium simultaneously to the subject with the plurality of bolus using the generated individualized schedule for bolus introduction having at least one unequal time period between one pair of bolus.

The portable data storage **903** can include computer instructions **980** to instruct the client device processor to determine a quantity and a frequency of dosage amounts of somatostatin and introduce the dosage amounts of somatostatin simultaneously to the subject with the plurality of bolus using the generated individualized schedule of bolus introduction having at least one unequal time period between one pair of bolus.

The portable data storage **903** can include computer instructions **982** to instruct the client device processor to determine a quantity and a frequency of dosage amounts of glucagon and introduce the dosage amounts of glucagon simultaneously to the subject with the plurality of bolus using the generated individualized schedule of bolus introduction having at least one unequal time period between one pair of bolus.

The portable data storage **903** can include computer instructions **984** to instruct the client device processor to schedule diagnostic tests after the first treatment session to modify the care plan for improved cellular ATP functioning of the subject and improved hepatic glucose processing.

The portable data storage **903** can include the library of cardiac functions **986**, which can include the preset norms of cardiac function **988**.

The portable data storage **903** can include the library of peripheral autonomic neuropathies and microcirculations **990**, which can include the preset norms of peripheral autonomic neuropathies and microcirculations **992**.

While these embodiments have been described with emphasis on the embodiments, it should be understood that within the scope of the appended claims, the embodiments might be practiced other than as specifically described herein.

What is claimed is:

1. A kit for individualized intravenous exogenous insulin-based therapy to improve cellular ATP function comprising:
 a. a blood glucose meter for measuring metabolic factors of a subject forming measured metabolic factors;
 b. an intravenous catheter to deliver a plurality of insulin bolus volume dosage amounts sequentially using an individualized schedule with at least one unequal time period between at least one pair of insulin bolus volume dosage amounts;

APPX0461

US 9,652,595 B1

33

c. an administrative processor configured to create a subject profile comprising:
  (i) a subject name;
  (ii) an indication that the subject is suspected of having metabolic syndrome; and
  (iii) measured metabolic factors comprising: a blood glucose level, a respiratory quotient, an insulin sensitivity factor, individual target glucose level, and a weight;
  (iv) a portable data storage configured to instruct the administrative processor to compare the measured metabolic factors for groups of patients to a database of metabolic factors using the blood glucose level, the respiratory quotient, the insulin sensitivity factor and the target glucose level and calculate if the measured metabolic factors meet, exceed, or fall below the blood glucose level, the respiratory quotient, the insulin sensitivity factor, and the target blood glucose level for the subject suspected of having the metabolic syndrome to confirm the subject has the metabolic syndrome;
  (v) a library of weight management protocols in the portable data storage for subjects with the metabolic syndrome to compare and identify a weight management protocol for each subject based upon measured metabolic factors of each subject and saving the weight management protocol into a care plan for each subject;
d. a diabetic treatment model;
e. a Library of Care Plan templates configured to produce a populated care plan for each subject profile and setting a plan goal using the diabetic treatment model and the care plan generating a customized schedule for each insulin bolus volume dosage amount and an amount of glucose to be consumed by a subject;
f. a glucose dosage amount to stimulate a gastrointestinal hormone production in the subject resulting in a release of enzymes from a liver and causing blood glucose levels of the subject to be in a therapeutic range;
g. the administrative processor configured to:
  (i) compare the blood glucose test results to the plurality of therapeutic ranges for blood glucose levels stored in the portable data storage and verify that the subject with the metabolic syndrome is in a therapeutic range of the plurality therapeutic ranges for blood glucose levels; and
  (ii) compare the measured metabolic factors to the blood glucose test results to the diabetic treatment model and map the blood glucose test results and insulin sensitivity factors to measured weight of the subject to generate an individualized schedule for the insulin bolus volume dosage amounts introduction; and
wherein the portable data storage is configured to instruct the administrative processor to change a weight management protocol and a care plan after a first treatment session to manage weight of the subject using at least one of a plurality of metabolic enhancements to cause improved cellular ATP functioning for the subject while infusing the plurality of insulin bolus volume dosage amounts and modifying a quantity and a duration of unequal time periods between the insulin bolus volume dosage amounts in the generated individualized schedule to improve impaired hepatic glucose processing.

2. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, wherein the subject profile further comprises

34

a. a subject history;
b. subject physical reports including a subject preexisting weight; and
c. subject contact information.

3. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, wherein the generated individualized schedule for the bolus introduction has the at least one unequal time period, wherein time periods vary from 2 minutes to 10 minutes, and wherein the unequal time periods are time intervals from 1 percent to 30 percent different in length of time from each other.

4. The kit for individualized intravenous exogenous insulin-based therapy of claim 1, comprising a glucose source.

5. The kit for individualized intravenous exogenous insulin-based therapy of claim 4, wherein the glucose source comprises from 60 grams of glucose to 100 grams of glucose.

6. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, further comprising:
a. computer instructions in the portable data storage for instructing the client device processor to compare the respiratory quotient of the subject in a resting state to a plurality of measured metabolic factors;
b. computer instructions in the portable data storage for instructing the client device processor to modify a quantity of the plurality of bolus for the subject for each treatment session as identified in the care plan with the generated individualized schedule for the bolus introduction having the at least one unequal time period between the bolus introduction to improve the respiratory quotient of the subject; and
c. computer instructions in the portable data storage for instructing the client device processor to modify the generated individualized schedule for the bolus introduction having the at least one unequal time period between the bolus introduction by modifying the quantity and the duration of the at least one unequal time period between the bolus introduction to improve the respiratory quotient of the subject.

7. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, further comprising:
a. computer instructions in the portable data storage to instruct the client device processor to compare a measured cardiac function of the subject in a resting state to a plurality of preset norms of cardiac function in a library of cardiac functions;
b. computer instructions in the portable data storage to instruct the client device processor to modify a quantity of the plurality of bolus for the subject identified in the care plan using the preset norms of cardiac function; and
c. computer instructions in the portable data storage to instruct the client device processor to modify the generated individualized schedule of the bolus introduction having at least one unequal time period by modifying a quantity and a duration of the at least one unequal time period between bolus introduction to improve cardiac function of the subject.

8. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, further comprising:
a. computer instructions in the portable data storage to instruct the client device processor to measure a peripheral autonomic neuropathy and microcirculation of the subject prior to the bolus introduction and comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of

US 9,652,595 B1

35

peripheral autonomic neuropathies and microcirculations in a library of peripheral autonomic neuropathies and microcirculations;

b. computer instructions in the portable data storage to instruct the client device processor to compare the measured peripheral autonomic neuropathy and microcirculation of the subject as bolus are sequentially introduced to the preset norms of peripheral autonomic neuropathy and microcirculation;

c. computer instructions in the portable data storage to instruct the client device processor to compare the peripheral autonomic neuropathy and microcirculation of the subject after all bolus have been introduced in the first treatment session to the measured peripheral autonomic neuropathy and microcirculation;

d. computer instructions in the portable data storage to instruct the client device processor to modify the quantity of bolus for the subject identified in the care plan to diminish the subject's peripheral autonomic neuropathy and microcirculation; and

e. computer instructions in the portable data storage to instruct the client device processor to modify the schedule of the bolus introduction having the at least one unequal time period by modifying a quantity and a duration of the at least one unequal time period between bolus introduction to improve measured peripheral autonomic neuropathy and microcirculation of the subject.

**9.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, further comprising:

a. computer instructions in the portable data storage to instruct the client device to scan an initial retinal image of the subject to identify characteristics for a diabetic retinopathy;

b. computer instructions in the portable data storage to instruct the client device processor to scan a post treatment retinal image of the subject after the first treatment session and compare the initial retinal image to the post treatment retinal image;

c. computer instructions in the portable data storage to instruct the client device processor to modify a quantity of bolus for the subject if no change in the identified characteristics for diabetic retinopathy has occurred; and

d. computer instructions in the portable data storage to instruct the client device processor to modify the generated individualized schedule of the bolus introduction having the at least one unequal time period between bolus to reduce effects of diabetic retinopathy by modifying a quantity and a duration of the at least one unequal time period between the bolus introduction to reduce at least one effect of diabetic retinopathy.

**10.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, further comprising:

a. computer instructions in the portable data storage to instruct the client device processor to scan and calculate dimensionally wounds of the subject by length, width, and depth, and identify wound characteristics of the subject;

b. computer instructions in the portable data storage to instruct the client device processor to scan and dimensionally measure wounds of the subject after at least one treatment session to identify skin integrity and changes in wound characteristics of the subject;

c. computer instructions in the portable data storage to instruct the client device processor to modify a quantity of bolus for the subject identified in the care plan for

36

wound treatment using the identified skin integrity and changes in wound characteristics of the subject; and

d. computer instructions in the portable data storage to instruct the client device to modify the schedule for bolus introduction having the at least one unequal time period between bolus to improve wound healing by modifying a quantity and a duration of the at least one unequal time period between the bolus introduction to reduce wound size and wound characteristics of the subject.

**11.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, further comprising:

a. computer instructions in the portable data storage to instruct the client device processor to use a homeostatic model to identify an insulin sensitivity factor of a subject;

b. computer instructions in the portable data storage to instruct the client device processor to modify the quantity of bolus for the subject for the insulin sensitivity factor; and

c. computer instructions in the portable data storage to instruct the client device to modify the generated individualized schedule of bolus introduction having the at least one unequal time period between bolus to increase the insulin sensitivity factor by modifying a quantity and a duration of the at least one unequal time period between bolus introduction.

**12.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, wherein the at least one of the plurality of metabolic enhancements is a methylcobalamin, a pyridoxal-5-phosphate, a 5-MTHF, an alpha lipoic acid, a NADH, a coenzyme Q10, a chromium picolinate, and a N-Acetyl cysteine, and a vitamin D3.

**13.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, comprising a quantity of dosage amounts of magnesium and computer instructions in the portable data storage to instruct the client device processor to determine a quantity and a frequency of dosage amounts of magnesium and introduce the dosage amounts of magnesium simultaneously to the subject with the plurality of bolus using the generated individualized schedule of the bolus introduction having at least one unequal time period between one pair of bolus.

**14.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, comprising a quantity of dosage amounts of potassium and computer instructions in the portable data storage to instruct the client device processor to determine a quantity and a frequency of dosage amounts of potassium and introduce the dosage amounts of potassium simultaneously to the subject with the plurality of bolus using the generated individualized schedule for the bolus introduction having at least one unequal time period between one pair of bolus.

**15.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, comprising a quantity of dosage amounts of somatostatin and computer instructions in the portable data storage to instruct the client device processor to determine a quantity and a frequency of dosage amounts of somatostatin and introduce the dosage amounts of somatostatin simultaneously to the subject with the plurality of bolus using the generated individualized schedule of the bolus introduction having at least one unequal time period between one pair of bolus.

**16.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, comprising a quantity of dosage amounts of glucagon and computer instructions in the portable data storage to instruct the client device pro-

US 9,652,595 B1

37

cessor to determine a quantity and a frequency of dosage amounts of glucagon and introduce the dosage amounts of glucagon simultaneously to the subject with the plurality of bolus using the generated individualized schedule of the bolus introduction having at least one unequal time period between one pair of bolus.

**17**. The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, comprising computer instructions in the portable data storage to instruct the client device processor to schedule diagnostic tests after the first treatment session to modify the care plan for improved cellular ATP functioning of the subject and improved hepatic glucose processing.

**18**. The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, wherein the at least one of the plurality of metabolic enhancements comprises a synergistic combination of: Vitamin D ranging in amounts from 600 IU to 2000 IU, Vitamin B6 ranging in amounts from 10 mg to 100 mg, Folic Acid ranging in amounts from 200 mcg to 2000 mcg, Vitamin B12 ranging in amounts from 1000 mcg to 5000 mcg, a coenzyme that extracts energy from food for the subject ranging in amounts from 60 mg to 400

38

mg, a protein binding component that binds to proteins and serves as a metabolic enhancement for the subject ranging in amounts from 0.5 mg to 5 mg, and a glucose utilization component to prevent or treat chromium deficiency in the subject which improves glucose utilization by insulin ranging in amounts from 200 mg to 300 mg.

**19**. The kit for the individualized intravenous exogenous insulin-based therapy of claim **18**, wherein the at least one of the plurality of metabolic enhancements comprises an amino acid that builds proteins in the subject ranging in amounts from 200 mg to 600 mg, and an antioxidant that extracts energy from food for the subject ranging in amounts from 50 mg to 400 mg.

**20**. The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, wherein the at least one of the plurality of metabolic enhancements comprises: cholecalciferol, pyridoxal-5-phosphate, folacin, cyanocobalamin, n-acetyl L-cysteine (NAC), Coenzyme Q10 (CoQ10), an alpha lipoic acid, nicotinamide adenine dinucleotide (NADH), chromium picolinate, or combinations thereof.

* * * * *



US010533990B2

(12) **United States Patent**
  Carr et al.

(10) Patent No.: **US 10,533,990 B2**
(45) Date of Patent: *Jan. 14, 2020*

(54) **PHYSIOLOGIC INSULIN-SENSITIVITY IMPROVEMENT**

(71) Applicant: **DIABETES RELIEF LLC**, Houston, TX (US)

(72) Inventors: **Hunter Michael Alan Carr**, Houston, TX (US); **Scott Hepford**, Houston, TX (US); **Carol Ann Wilson**, Houston, TX (US); **Stanley Tories Lewis, Jr.**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/710,537**

(22) Filed: **Sep. 20, 2017**

(65) **Prior Publication Data**

US 2019/0086394 A1    Mar. 21, 2019

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/042,087, filed on Feb. 11, 2016.

(60) Provisional application No. 62/117,393, filed on Feb. 17, 2015.

(51) **Int. Cl.**

| *G01N 33/50* | (2006.01) |
| *G01N 33/487* | (2006.01) |
| *G06F 19/00* | (2018.01) |
| *G16H 20/17* | (2018.01) |
| *G01N 33/60* | (2006.01) |
| *G16H 30/40* | (2018.01) |
| *G16H 50/50* | (2018.01) |

(52) **U.S. Cl.**
CPC ... *G01N 33/5091* (2013.01); *G01N 33/48792* (2013.01); *G01N 33/5038* (2013.01); *G01N 33/60* (2013.01); *G06F 19/30* (2013.01); *G16H 20/17* (2018.01); *G16H 30/40* (2018.01); *G16H 50/50* (2018.01); *G01N 2800/042* (2013.01); *G01N 2800/70* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2014/0005633 A1    1/2014    Finan

*Primary Examiner* — G Steven Vanni
(74) *Attorney, Agent, or Firm* — Rao Deboer Osterrieder, PLLC; Erik J. Osterrieder

(57) **ABSTRACT**

An individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing. The therapy includes treatment sessions involving the assessment of metabolic factors, forming a subject profile, and matching the subject profile to a diabetic treatment model. Using the diabetic treatment model, a quantity and frequency of intravenous insulin bolus, dosage amounts of magnesium, and dosage amounts of potassium can be calculated. The methods that improve impaired hepatic glucose processing in subjects and patients can simultaneously introduce separated insulin bolus from an insulin reservoir, dosage amounts of magnesium, and dosage amounts of potassium. The subject profile can create a weight management protocol that uses a metabolic enhancement, wherein the individualized intravenous exogenous insulin-based therapy produces a subject or a patient with improved cellular ATP functioning.

**20 Claims, 13 Drawing Sheets**

**EXHIBIT 9**

## FIGURE 1A

### DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

| WEIGHT (kg) | POTASSIUM TO SALINE DOSAGE (meq/ml) | MAGNESIUM TO SALINE DOSAGE (mg/ml) | INSULIN TO SALINE DOSAGE (UNITS/ml) | INSULIN RESERVOIR VOLUME (ml) | INSULIN BOLUS DOSAGE MIN (mU) | INSULIN BOLUS DOSAGE MAX (mU) | INSULIN BOLUS DOSAGE VOLUME MIN (ml) | INSULIN BOLUS DOSAGE VOLUME MAX (ml) | UNIDIAL TIME PERIODS BETWEEN BOLUS INTRODUCTION (MIN/SEC) | QUANTITY OF BOLUS PER TREATMENT CYCLE (#) |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 - 45 | 0.01 | 1 | 9 | 10 | 400 | 450 | 0.04 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 46 - 50 | 0.01 | 1 | 10 | 10 | 460 | 500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 51 - 55 | 0.01 | 1 | 11 | 10 | 510 | 550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 56 - 60 | 0.01 | 1 | 12 | 10 | 560 | 600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 61 - 65 | 0.01 | 1 | 13 | 10 | 610 | 650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 66 - 70 | 0.01 | 1 | 14 | 10 | 660 | 700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 71 - 75 | 0.01 | 1 | 15 | 10 | 710 | 750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 76 - 80 | 0.01 | 1 | 16 | 10 | 760 | 800 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 81 - 85 | 0.01 | 1 | 17 | 10 | 810 | 850 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 86 - 90 | 0.01 | 1 | 18 | 10 | 860 | 900 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 91 - 95 | 0.01 | 1 | 19 | 10 | 910 | 950 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 96 - 100 | 0.01 | 1 | 20 | 10 | 960 | 1000 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 101 - 105 | 0.02 | 2 | 21 | 10 | 1010 | 1050 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 15 |
| 106 - 110 | 0.02 | 2 | 22 | 10 | 1060 | 1100 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 111 - 115 | 0.02 | 2 | 23 | 10 | 1110 | 1150 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 116 - 120 | 0.02 | 2 | 24 | 10 | 1160 | 1200 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 121 - 125 | 0.02 | 2 | 25 | 10 | 1210 | 1250 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 15 |
| 126 - 130 | 0.02 | 2 | 26 | 10 | 1260 | 1300 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 131 - 135 | 0.02 | 2 | 27 | 10 | 1310 | 1350 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 136 - 140 | 0.02 | 2 | 28 | 10 | 1360 | 1400 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 141 - 145 | 0.02 | 2 | 29 | 10 | 1410 | 1450 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 146 - 150 | 0.02 | 2 | 30 | 10 | 1460 | 1500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 151 - 155 | 0.02 | 2 | 31 | 10 | 1510 | 1550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 156 - 160 | 0.02 | 2 | 32 | 10 | 1560 | 1600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |

## FIGURE 1B

### DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

| WEIGHT (kg) | POTASSIUM TO SALINE DOSAGE (meq/ml) | MAGNESIUM TO SALINE DOSAGE (mg/ml) | INSULIN TO SALINE DOSAGE (UNITS/ml) | INSULIN RESERVOIR VOLUME (ml) | INSULIN BOLUS DOSAGE MIN (mU) | INSULIN BOLUS DOSAGE MAX (mU) | INSULIN BOLUS DOSAGE VOLUME MIN (ml) | INSULIN BOLUS DOSAGE VOLUME MAX (ml) | UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION (MIN:SEC) | QUANTITY OF BOLUS PER TREATMENT CYCLE (#) |
|---|---|---|---|---|---|---|---|---|---|---|
| 161 - 165 | 0.02 | 2 | 33 | 10 | 1610 | 1650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 166 - 170 | 0.02 | 2 | 34 | 10 | 1660 | 1700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 171 - 175 | 0.02 | 2 | 35 | 10 | 1710 | 1750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 176 - 180 | 0.02 | 2 | 36 | 10 | 1760 | 1800 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 181 - 185 | 0.02 | 2 | 37 | 10 | 1810 | 1850 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 186 - 190 | 0.02 | 2 | 38 | 10 | 1860 | 1900 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 191 - 195 | 0.02 | 2 | 39 | 10 | 1910 | 1950 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 196 - 200 | 0.02 | 2 | 40 | 10 | 1960 | 2000 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 201 - 205 | 0.03 | 3 | 41 | 10 | 2010 | 2050 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 206 - 210 | 0.03 | 3 | 42 | 10 | 2060 | 2100 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 211 - 215 | 0.03 | 3 | 43 | 10 | 2110 | 2150 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 216 - 220 | 0.03 | 3 | 44 | 10 | 2160 | 2200 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 221 - 225 | 0.03 | 3 | 45 | 10 | 2210 | 2250 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 226 - 230 | 0.03 | 3 | 46 | 10 | 2260 | 2300 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 231 - 235 | 0.03 | 3 | 47 | 10 | 2310 | 2350 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 236 - 240 | 0.03 | 3 | 48 | 10 | 2360 | 2400 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 241 - 245 | 0.03 | 3 | 49 | 10 | 2410 | 2450 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 246 - 250 | 0.03 | 3 | 50 | 10 | 2460 | 2500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 251 - 255 | 0.03 | 3 | 51 | 10 | 2510 | 2550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 256 - 260 | 0.03 | 3 | 52 | 10 | 2560 | 2600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 261 - 265 | 0.03 | 3 | 53 | 10 | 2610 | 2650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 266 - 270 | 0.03 | 3 | 54 | 10 | 2660 | 2700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 271 - 275 | 0.03 | 3 | 55 | 10 | 2710 | 2750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |

## FIGURE 2

### BOLUS VOLUME DOSAGE ADJUSTMENT PROTOCOL BASED ON TESTED BLOOD GLUCOSE LEVEL

| | BLOOD GLUCOSE LEVEL (mg/dl) | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 120 | 130 | 140 | 150 | 170 | 180 | 190 | 200> |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IF | | | | | | | | | | | | | | | | | | | |

**DURING HOURS 1 & 2 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE INCREASES OR DECREASES BETWEEN THE INITIAL BLOOD GLUCOSE LEVEL CHECK AND THE 30 MIN AND 60 MIN CHECKS OF EACH HOUR, THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| | | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 120 | 130 | 140 | 150 | 170 | 180 | 190 | 200> |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THEN | ADJUST DOSAGE (mU/kg) | 0 | 0 | 0 | 0 | 0 | 2-4 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 |

**DURING THE FIRST 30 MIN OF HOUR 3 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE INCREASES OR DECREASES BETWEEN THE INITIAL BLOOD GLUCOSE LEVEL CHECK AND THE 30 MIN CHECKS OF THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| | | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 120 | 130 | 140 | 150 | 170 | 180 | 190 | 200> |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THEN | ADJUST DOSAGE (mU/kg) | 0 | 0 | 0 | 0 | 0 | 2-4 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 |

**DURING THE LAST 30 MIN OF HOUR 3 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE LEVEL INCREASES BETWEEN THE 30 MIN AND 60 MIN CHECK, THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| | | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 120 | 130 | 140 | 150 | 170 | 180 | 190 | 200> |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THEN | INCREASE DOSAGE | 0 | 0 | 0 | 0 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 |

IF BLOOD GLUCOSE LEVEL DECREASES BETWEEN THE 30 MIN AND 60 MIN CHECK THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| | | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 120 | 130 | 140 | 150 | 170 | 180 | 190 | 200> |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THEN | DECREASE DOSAGE | 0 | 0 | 0 | 1-2 | 1-2 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 6-8 |

**EXEMPLARY TREATMENT SESSIONS DURING HOUR 1**

### SCHEDULE FOR BOLUS INTRODUCTION WITH AN UNEQUAL TIME PERIOD

| SUBJECT | BLOOD GLUCOSE LEVEL (mg/dl) | INSULIN SENSITIVITY FACTOR | BOLUS 1 | BOLUS 2 | BOLUS 3 | BOLUS 4 | BOLUS 5 | BOLUS 6 | BOLUS 7 | BOLUS 8 | BOLUS 9 | BOLUS 10 | BOLUS 11 | BOLUS 12 | BOLUS 13 | BOLUS 14 | BOLUS 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUBJECT #1 | 440 | EXTREMELY RESISTANT | | | | | | | | | | | | | | | |
| SUBJECT #2 | 210 | RESISTANT | | | | | | | | | | | | | | | |
| SUBJECT #3 | 186 | SENSITIVE | | | | | | | | | | | | | | | |

APPX0468

## GLUCOSE DOSAGE ADJUSTMENT PROTOCOL

| BLOOD GLUCOSE LEVEL (mg/dl) | GLUCOSE (gm) |
|---|---|
| >100 - 100 | 50 - 60 |
| 101 - 125 | 44 - 55 |
| 126 - 150 | 40 - 50 |
| 151 - 175 | 35 - 45 |
| 176 - 200 | 30 - 40 |
| 201 - 225 | 25 - 35 |
| 226 - 250 | 20 - 30 |
| 251 - 275 | 15 - 25 |
| 276 - 300 | 10 - 20 |
| 301 - 325 | 5 - 15 |
| 326 - 350 | .01 - 10 |
| 351 - 375 | .01 - 5 |
| 376 - 400 | .01 - 5 |
| 401 - 425 | .01 - 5 |
| 426 - 450 | .01 - 5 |
| 451 - 475 | .01 - 5 |
| 476 - 500 | .01 - 5 |
| 501 - 525 | .01 - 5 |
| 526 - 550 | .01 - 5 |

FIGURE 3

APPX0469

## METABOLIC ENHANCEMENT PROTOCOL

| Respiratory Quotient ($CO_2$/$O_2$) | Dosage |
|---|---|
| 1.20 < | C: 3 DAILY |
| 1.19 – 1.00 | A: 1 DAILY |
| 0.99 – 0.90 | A: 1 DAILY |
| 0.89 – 0.80 | B: 2 DAILY |
| 0.79 – 0.70 | B: 2 DAILY |
| .69 < | B: 2 DAILY |

\* METABOLIC ENHANCEMENT CONTENTS:

| Ingredient | Min Amount Per Dosage | Max Amount Per Dosage |
|---|---|---|
| VITAMIN D (AS CHOLECALCIFEROL) | 600 IU | 2,000 IU |
| VITAMIN B6 (AS PYRIDOXAL-5-PHOSPHATE) | 10 mg | 100 mg |
| FOLATE (FOLIC ACID) | 200 mcg | 2000 mcg |
| VITAMIN B12 (AS CYANOCOBALAMIN) | 1,000 mcg | 5,000 mcg |
| N-ACETYL L-CYSTEINE (NAC) | 200 mg | 600 mg |
| COENZYME Q10 (CoQ10) | 60 mg | 400 mg |
| ALPHA LIPOIC ACID (ALA) | 50 mg | 400 mg |
| NICOTINAMIDE ADENINE DINUCLEOTIDE (NADH) | .5 mg | 5 mg |
| CHROMIUM PICOLINATE | 200 mcg | 300 mcg |

FIGURE 4

APPX0470

## FIGURE 5A

| | |
|---|---|
| CREATING A SUBJECT PROFILE FOR A SUBJECT | 500 |
| ASSESSING METABOLIC FACTORS OF THE SUBJECT AND STORING THE METABOLIC FACTORS IN THE SUBJECT PROFILE | 502 |
| CREATING A CARE PLAN WITH A PLURALITY OF TREATMENT SESSIONS FOR THE SUBJECT WITH A PLAN GOAL | 504 |
| INTRODUCING GLUCOSE TO THE SUBJECT TO STIMULATE GASTROINTESTINAL HORMONE PRODUCTION, RESULTING IN THE RELEASE OF ENZYMES FROM THE SUBJECT'S LIVER AND CAUSING THE BLOOD GLUCOSE LEVELS OF THE SUBJECT TO BE IN A THERAPEUTIC RANGE | 506 |
| TESTING THE SUBJECT FOR BLOOD GLUCOSE LEVELS TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO THE PLURALITY OF THERAPEUTIC RANGES AND VERIFY THE SUBJECT IS IN THE THERAPEUTIC RANGE | 508 |
| COMPARING TESTED BLOOD GLUCOSE LEVELS TO A DIABETIC TREATMENT MODEL | 510 |
| MAPPING TESTED BLOOD GLUCOSE LEVELS AND INSULIN SENSITIVE FACTORS OF A SUBJECT TO THE SUBJECT'S WEIGHT USING THE DIABETIC TREATMENT MODEL TO DETERMINE A SCHEDULE FOR BOLUS INTRODUCTION, WHEREIN THE SCHEDULE FOR BOLUS INTRODUCTION HAS AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS | 512 |
| INTRODUCING TO THE SUBJECT A PLURALITY OF BOLUS OF INSULIN AND SALINE SEQUENTIALLY USING THE SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS | 513 |
| COMPARING THE SUBJECT PROFILE TO A PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL FOR THE SUBJECT BASED UPON ASSESSED METABOLIC FUNCTIONS OF THE SUBJECT AND SAVING THE WEIGHT MANAGEMENT PROTOCOL IN THE CARE PLAN | 514 |
| IMPLEMENTING THE IDENTIFIED WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN AFTER A FIRST TREATMENT SESSION TO MANAGE WEIGHT OF THE SUBJECT WITH A METABOLIC ENHANCEMENT CAUSING IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT WHILE INFUSING INSULIN AND MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION IN THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS TO IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING | 516 |
| COMPARING A RESPIRATORY QUOTIENT OF THE SUBJECT IN A RESTING STATE TO A PLURALITY OF METABOLISM SCORES | 518 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT FOR EACH TREATMENT SESSION AS IDENTIFIED IN THE CARE PLAN WITH SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE A SUBJECT'S RESPIRATORY QUOTIENT | 520 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE THE RESPIRATORY QUOTIENT | 522 |

(5B)

APPX0471

## FIGURE 5B

(5A)

| | |
|---|---|
| COMPARING A MEASURED CARDIAC FUNCTION OF THE SUBJECT IN A RESTING STATE TO A PRESET NORM OF CARDIAC FUNCTION | 524 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN USING THE PRESET NORM OF CARDIAC FUNCTION | 526 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE CARDIAC FUNCTION | 528 |
| MEASURING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE PRIOR TO BOLUS INTRODUCTION AND COMPARING THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION TO A PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS | 530 |
| COMPARING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE AS BOLUS ARE SEQUENTIALLY INTRODUCED TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 532 |
| COMPARING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE AFTER ALL BOLUS HAVE BEEN INTRODUCED IN A FIRST TREATMENT SESSION TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 534 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN TO TREAT PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 536 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 538 |
| VIEWING AN INITIAL RETINAL IMAGE OF THE SUBJECT CAPTURED BY A NON-MYDRIATIC CAMERA WITH THE SUBJECT IN A RESTING STATE TO IDENTIFY A DIABETIC RETINOPATHY | 540 |
| VIEWING A POST TREATMENT RETINAL IMAGE OF THE SUBJECT IN A RESTING STATE AFTER A FIRST TREATMENT SESSION | 541 |
| COMPARING THE INITIAL RETINAL IMAGE TO THE POST TREATMENT RETINAL IMAGE | 542 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IF NO CHANGE IN THE DIABETIC RETINOPATHY HAS OCCURRED | 544 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO REDUCE THE EFFECTS OF DIABETIC RETINOPATHY BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE THE EFFECTS OF DIABETIC RETINOPATHY | 546 |
| DIMENSIONALLY MEASURING WOUNDS BY LENGTH, WIDTH, AND DEPTH AND IDENTIFYING WOUND CHARACTERISTICS WITH THE SUBJECT IN A RESTING STATE | 550 |
| DIMENSIONALLY MEASURING WOUNDS AFTER AT LEAST ONE TREATMENT SESSION TO IDENTIFY SKIN INTEGRITY AND CHANGES IN CLINICAL WOUND CHARACTERISTICS | 552 |

(5C)

(5B)

| | |
|---|---|
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN FOR WOUND TREATMENT USING THE IDENTIFIED SKIN INTEGRITY AND CHANGES IN CLINICAL WOUND CHARACTERISTICS | 554 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE WOUND HEALING BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE WOUND SIZE AND WOUND CHARACTERISTICS | 556 |
| COMPARING C-PEPTIDES OF THE SUBJECT TO A PRESET NORM OF C-PEPTIDES TO IDENTIFY AN INSULIN SENSITIVITY FACTOR | 560 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT FOR THE INSULIN SENSITIVITY FACTOR | 562 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE AN INSULIN SENSITIVITY FACTOR USING ANALYSIS OF C-PEPTIDES BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION | 564 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF MAGNESIUM AND INTRODUCING THE DOSAGE AMOUNTS OF MAGNESIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 570 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF POTASSIUM AND INTRODUCING THE DOSAGE AMOUNTS OF POTASSIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 572 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF SOMATOSTATIN AND INTRODUCING THE DOSAGE AMOUNTS OF SOMATOSTATIN SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 574 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF GLUCAGON AND INTRODUCING THE DOSAGE AMOUNTS OF GLUCAGON SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 576 |
| SCHEDULING DIAGNOSTIC TESTS AFTER A FIRST TREATMENT SESSION TO MODIFY THE CARE PLAN FOR IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT AND IMPROVED HEPATIC GLUCOSE PROCESSING | 578 |

*FIGURE 5C*

APPX0473



FIGURE 6



FIGURE 7A

| ADMINISTRATIVE DATA STORAGE | 604 |
| SUBJECT PROFILE | 610 |
| METABOLIC FACTORS | 605 |
| BLOOD GLUCOSE LEVEL | 612 |
| RESPIRATORY QUOTIENT | 614 |
| INSULIN SENSITIVITY FACTOR | 616 |
| INDIVIDUAL TARGET BLOOD GLUCOSE LEVEL | 618 |
| PLURALITY OF CARE PLAN TEMPLATES | 620 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO CREATE A CUSTOMIZED CARE PLAN FROM ONE OF THE PLURALITY OF CARE PLAN TEMPLATES, WHEREIN THE CUSTOMIZED CARE PLAN INDICATES A PLURALITY OF TREATMENT SESSIONS FOR THE SUBJECT WITH THE SUBJECT PROFILE AND A PLAN GOAL, EACH CUSTOMIZED CARE PLAN INDICATING A SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION, EACH BOLUS CONTAINING SALINE AND INSULIN AND EACH BOLUS INTRODUCED INTRAVENOUSLY AND SEQUENTIALLY TO A SUBJECT | 200 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO A DIABETIC TREATMENT MODEL AFTER INTRODUCING GLUCOSE TO A SUBJECT TO STIMULATE GASTROINTESTINAL HORMONE PRODUCTION, RESULTING IN THE RELEASE OF ENZYMES FROM THE SUBJECT'S LIVER AND CAUSING THE BLOOD GLUCOSE LEVELS OF THE SUBJECT TO BE IN A THERAPEUTIC RANGE | 202 |
| PLURALITY OF THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS | 203 |

| | |
|---|---|
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO THE PLURALITY OF THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS AND VERIFY THE SUBJECT IS IN THE THERAPEUTIC RANGE | 604 / 204 |
| PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS | 205 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE A SUBJECT PROFILE TO THE PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL BASED UPON METABOLIC FUNCTIONS OF THE SUBJECT | 206 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO SAVE THE IDENTIFIED WEIGHT MANAGEMENT PROTOCOL IN THE GENERATED CUSTOMIZED CARE PLAN AFTER SALINE WITH INSULIN IN A PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD HAVE BEEN ADMINISTERED TO A SUBJECT | 207 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO TRACK WEIGHT MANAGEMENT OF THE SUBJECT AFTER A FIRST TREATMENT SESSION AND USE OF AN IDENTIFIED WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN ALONG WITH A METABOLIC ENHANCEMENT TO IDENTIFY IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT AND IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING | 208 |
| PLURALITY OF METABOLISM SCORES | 209 |
| PLURALITY OF PRESET NORMS OF CARDIAC FUNCTION | 210 |
| PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS | 211 |
| RETINAL IMAGE OF THE SUBJECT | 212 |
| WOUND CHARACTERISTICS | 214 |
| PLURALITY OF PRESET NORMS OF C-PEPTIDES | 215 |

*FIGURE 7B*



FIGURE 8A



FIGURE 8B

APPX0477



FIGURE 8C

APPX0478

US 10,533,990 B2

**1**

# PHYSIOLOGIC INSULIN-SENSITIVITY IMPROVEMENT

## CROSS REFERENCE TO RELATED APPLICATION

The current application is a Continuation In Part of co-pending U.S. patent application Ser. No. 15/042,087 filed Feb. 11, 2016 and claims priority to and the benefit of expired U.S. Provisional Patent Application Ser. No. 62/117,393 filed on Feb. 17, 2015, entitled "METHODS THAT IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS". This reference is incorporated herein in its entirety.

## FIELD

The present embodiments generally relate to improved methods and systems that improve impaired hepatic glucose processing in subjects.

## BACKGROUND

Diabetes Mellitus is a disease or disorder of the body's metabolic functions, characterized by abnormally high levels of blood glucose and inadequate levels of insulin. In 2012, 29.1 million Americans, or 9.3 percent of the population had diabetes, up from 25.8 million, or 8.3 percent, in 2010. New cases diagnosed in 2012 were 1.7 million, and in 2010 it was 1.9 million. Diabetes Mellitus Type 1, formerly known as juvenile diabetes, is usually diagnosed in children and young adults, and only 5 percent of people with diabetes have this form of the disease.

In Type 1 diabetes, the body does not produce insulin, a hormone necessary to convert sugar, starches, and other food into energy needed for daily life. Diabetes Mellitus Type 2 is far more common, and affects 90-95 percent of all diabetics in the United States of America. In Type 2 diabetes, the body does not use insulin properly, which is called insulin resistance. At first, the pancreas makes extra insulin to make up for it, but, over time the pancreas is not able to keep up and can't make enough insulin to keep blood glucose at normal levels. The long-term adverse effects include blindness, loss of kidney function, nerve damage, loss of sensation, and poor circulation in the periphery, and amputation of the extremities. As of Mar. 6, 2013, the total cost of diagnosed diabetes in the United States in 2012 was $245 billion dollars.

In the treatment of Diabetes Mellitus, many varieties of insulin formulations have been suggested and used, such as regular insulin, isophane insulin (designated NPH®), insulin zinc suspensions (such as SEMILENTE®, LENTE®, and ULTRALENTE®), and biphasic isophane insulin. As diabetic patients are treated with insulin for several decades, there is a major need for safe and life quality improving insulin formulations. Some of the commercially available insulin formulations are characterized by a fast onset of action and other formulations have a relatively slow onset but show a more or less prolonged action. Fast-acting insulin formulations are usually solutions of insulin, while retarded acting insulin formulations can have suspensions containing insulin in crystalline and/or amorphous form precipitated by addition of zinc salts alone, by addition of protamine, or by a combination of both.

In addition, some patients are using formulations having both a fast onset of action and a more prolonged action. Such a formulation can be an insulin solution, wherein protamine

**2**

insulin crystals are suspended. Some patients do prepare the final formulation themselves by mixing a fast acting insulin solution with a protracted acting insulin suspension formulation in the ratio desired by the patient in question.

Glucose control is typically measured by a blood test, which determines the level of hemoglobin A1c, which has been the desired result of insulin therapy in diabetic patients for many years. However, it is clear that tight circulating glucose control was insufficient in 25 percent or more of the study participants to protect them from the onset or progression of diabetic retinopathy, nephropathy, or neuropathy. One method of glucose control is Pulsed Insulin Therapy.

The core concept of Pulsed Insulin Therapy has been known for at least 20 years, by various names including Pulsatile Intravenous Insulin Therapy (PIVIT), Chronic Intermittent Intravenous Insulin Therapy (CIIIT), Metabolic Activation Therapy (MAT), and Hepatic Activation. In such therapies a patient's blood glucose is raised and lowered by about 50 mg/dL to 75 mg/dL over a period of several hours by alternating between doses of insulin and sugars or high carbohydrates foods. Although the mechanisms of action have not been clearly explained, it is apparent from the clinical results that the technique has usefulness in treating diabetic implications, including blindness and other ocular manifestations, nerve disease, cardiovascular disease, diabetic nephropathy, and poor wound healing.

Given the long history of these procedures, one would have expected that the treatment parameters would have been optimized long ago to produce the most favorable results. It turns out, however, that the known treatment parameters are insufficient in that regard.

A need exists for methods and systems that improve impaired hepatic glucose processing in subjects and produce superior results to those previously obtainable.

The present embodiments meet these needs.

## BRIEF DESCRIPTION OF THE FIGURES

The detailed description will be better understood in conjunction with the accompanying drawings as follows:

FIG. **1A** shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 40 kilograms to 160 kilograms.

FIG. **1B** shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 161 kilograms to 275 kilograms.

FIG. **2** shows a bolus volume dosage adjustment protocol based on tested blood glucose levels as produced by a diabetic treatment model.

FIG. **3** depicts glucose dosage adjustment protocol as produced by a diabetic treatment model.

FIG. **4** depicts a metabolic enhancement protocol as produced by a diabetic treatment model and an exemplary metabolic enhancement by component.

FIGS. **5A**-**5C** depict steps of a method of the invention according to one or more embodiments.

FIG. **6** depicts a system of the invention according to one or more embodiments.

FIGS. **7A** and **7B** depict an administrative data storage usable in the system according to one or more embodiments.

FIGS. **8A**-**8C** provide exemplary subject profiles with an automatically generated care plan template and an automatically generated report according to one or more embodiments.

APPX0479

US 10,533,990 B2

3

The present embodiments are detailed below with reference to the listed Figures.

DETAILED DESCRIPTION OF THE
EMBODIMENTS

Before explaining the present methods and systems in detail, it is to be understood that the methods and the systems are not limited to the particular embodiments and that it can be practiced or carried out in various ways.

The present embodiments relate to improved methods and systems that improve impaired hepatic glucose processing in subjects.

The present embodiments further relate to an individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject to improve impaired hepatic glucose processing.

When three treatment session are performed using the method as described herein patients report energy resorted, medications reduced, wounds healed, amputations prevented, weight controlled, blood sugar controlled, blood pressure reduced, neuropathy diminished, retinopathy diminished, mood improved, sleep improved and erectile function restored.

The individualized intravenous exogenous insulin-based therapy uses a plurality of treatment sessions, generally 3 but up to 12 may be needed, each treatment session lasting from 1 hour to 3 hours.

The goal of the individualized intravenous exogenous insulin-based therapy is to repair, recondition, and maintain a subject's impaired metabolism so that it functions and is maintained to provide a quality of life similar to that of a non-diabetic person.

To initiate the therapy a subject profile can be created.

Each treatment session can involve assessing for a subject's metabolic factors and storing the metabolic factors in the subject's profile. The subject profile can be stored in an administrative data storage connected to an administrative processor accessible via a network from a client device.

Each treatment session can involve matching the subject profile to a diabetic treatment model to create a schedule of bolus introduction with at least one unequal time period between bolus introductions.

The schedule can provide a quantity and frequency of intravenous insulin bolus, a quantity and frequency of dosage amounts of magnesium, and a quantity and frequency of dosage amounts of potassium for the subject.

Each treatment session can involve introducing to the subject insulin bolus sequentially, at frequencies determined from the diabetic treatment model, wherein each insulin bolus can be separated by irregular time periods.

Simultaneously with the sequential insulin bolus introduction, dosage amounts of magnesium and dosage amounts of potassium can be introduced to the subject. The magnesium and potassium can be introduced orally, transdermally, or by inhaling simultaneous with the insulin bolus introduction.

A weight management protocol can be identified from a library of weight management protocols given a subject's profile. The subject can be required to follow the weight management protocol and use a specific metabolic enhancement that can be in pill form, powder form, a transdermal patch, or another form known in the industry.

After 3 to 6 treatments using a care plan connected to the diabetic treatment model with a schedule for bolus instruction and at least one unequal period of time, the subject can

4

have at least 10 percent and up to 50 percent improved cellular ATP functioning that can last up to 90 days from the last treatment.

The present embodiments also relate to methods for infusing insulin intravenously to a subject to improve impaired hepatic glucose processing.

The term "5-MTHF" as used herein can refer to Levomefolic Acid, which is a primary form of folic acid used for DNA reproduction.

The term "A1C" as used herein refers to a blood test that shows how well individual diabetes is being controlled relative to a non-diabetic patient.

The term "Adenosine triphosphate (ATP) as used herein refers a substance that transports chemical energy within cells for metabolism.

The term "Alpha Lipoic Acid" as used herein refers to an antioxidant that helps with the extraction of energy from food.

The term "biomarkers specific to diabetes" can refer to the three classifications of up to 89 different biomarkers that relate to metabolic rates of individuals. Some of the enzymes include glucokinase, 6-phosphofructo-1 kinase, 6-phosphofructo-2 kinase; citrate cleavage enzyme; pyruvate kinase, HMG-CoA reductase, glycophosphoralase, fructose 2,6,bi-phosphatase, glycogen phosphoralase, pyruvate dehydrogenase complex, and others known in the art.

The term "blood glucose level therapeutic range" as used herein refers to a subject's designated target blood glucose level of 160 to 240 mg/dl during a treatment session.

The term "bolus" as used herein refers to a single dose of a medical substance and/or drug given all at once.

The term "catheter" as used herein refers to a thin tube that can be inserted into the body to remove bodily fluids or add fluids to a patient during a treatment session.

The term "CoEnzy me Q10" as used herein refers to a chemical that extracts energy from food in the human digestive process.

The term "Complete Blood Count" (CBC) as used herein refers to a blood test to evaluate cellular aspects of the blood and provide concentrations of components in the blood.

The term "C-peptide" as used herein refers to a chemical produced in the pancreas that appears in a 1:1 molecular ratio to insulin and that can be detected when a blood lab panel is performed on a blood sample.

The term "data storage" as used herein refers to a non-transitory computer readable medium, such as a hard disk drive, solid state drive, flash drive, tape drive, and the like. The term "non-transitory computer readable medium" excludes any transitory signals but includes any non-transitory data storage circuitry, e.g., buffers, cache, and queues, within transceivers of transitory signals.

The term "diabetic retinopathy" as used herein refers to a complication of diabetes that affects the eyes.

The term "diabetic treatment model" as used herein refers to a plurality of look up tables reflecting initial blend dosing adjustment protocols that reflect weight of the subject, types of insulin (long term and short term), a volume of bolus of insulin per treatment session, a quantity of bolus, a frequency of bolus for a treatment session and bolus intervals, dosage amounts of magnesium (including quantity and frequency) and dosage amounts of potassium (including quantity and frequency). The diabetic treatment model includes glucose dosage amounts which are milligrams/deciliter (mg/dl) based on blood glucose of the subject. The diabetic treatment model generates a schedule of bolus introduction with at least one unequal time period between

APPX0480

US 10,533,990 B2

5

at least one pair of bolus. In embodiments, the diabetic treatment model can be located in the administrative data storage.

For example, the diabetic treatment model receives from a doctor, nurse or technician the weight of a subject, such as 102 kilograms, and a blood glucose of the subject, such as 120 mg/dl. The diabetic treatment model then generates (i) a type of insulin to be introduced to the subject, such as short term insulin, (ii) a volume of bolus of insulin per treatment session for the subject, such as 0.5 milliliters, (iii) a quantity of bolus per treatment session, such as 12, and (iv) a frequency of bolus introduction, which in embodiments, can be random for a treatment session of 3 hours. The time intervals between sequential bolus introductions can range from 2 minutes to 10 minutes between bolus. In embodiment, the time intervals can be a random sequence.

The diabetic treatment model generates dosage amounts of magnesium, such as 2 milligrams per milliliter of saline (for intravenous introduction to the subject) during the treatment session.

The diabetic treatment model generates dosage amounts of potassium, such as 0.02 meq/millimeter of saline (for an intravenous introduction) during the treatment session.

The diabetic treatment model calculates glucose dosage amounts for a subject, which can range from 44 grams to 55 grams during the first 30 minutes of a treatment session and then different or the same glucose dosage amounts using real time blood glucose level tests of the subject, which can be performed providing new test results and recalculations of dosage amount of bolus every 30 minutes.

The diabetic treatment model evaluates for Type 2 Diabetes, pre-Diabetes, Metabolic Syndrome, Metabolic Disorder, Impaired Glucose Tolerance, and Impaired Fasting Glycemia.

The term "dosage amounts of magnesium" as used herein refers to dosage amounts of magnesium in a saline carrier or in a pill form, for example, one that dissolves under the tongue of the subject.

The term "dosage amounts of potassium" as used herein refers to dosage amounts of magnesium in a saline carrier, in a pill form, or as a banana. If a pill form is used, it can be in the form of a pill that dissolves under the tongue of the subject.

The term "Echocardiograph" as used herein refers to a multi-dimensional sonography of the heart that measures the heart's mechanical functionality.

The term "exogenous" as used herein refers to materials or reactions that occur outside of the body.

The term "glucagon" as used herein refers to a counter regulatory hormone essential for glucose metabolism in humans in particular.

The term "glucose" as used herein refers to the simple carbohydrate commonly referred to as "sugar".

The term "hyperglycemia" as used herein refers to high blood glucose level present in a subject's blood test.

The term "improved cellular ATP functioning" as used herein refers to "Adenosinie Triphosphatase" ("ATPase") functioning, which are one or more enzymes that catalyze the formation of adenosine triphosphate ("ATP") from adenosine diphosphate ("ADP") and the functioning is indicative of the energy generated by a cell when it consumes glucose during metabolic processing.

The term "individual target blood glucose level" as used herein refers to a medical beneficial range that the patient or subject can achieve at least during treatments session created by the diabetic treatment model, during the entire infusion therapy, such as a range from 125 mg/dl to 225 mg/dl, which

6

can be adjusted to a more narrow range, such from 180 mg/dl to 225 mg/dl for a specific subject.

The term "insulin" as used herein refers to a chemical that is a counter regulatory hormone essential for glucose metabolism.

The term "insulin bolus" as used herein refers to a dosage quantity of insulin given intravenously to a patient.

The term "insulin reservoir" as used herein can be a flexible pouch of insulin having multiple insulin bolus.

The term "insulin sensitivity factor" as used herein refers to how a subject responds after receiving one unit of insulin as a measure of decrease in blood glucose.

The term "Lipid Panel" as used herein refers to a blood test that measures a concentration of lipids, fats, and fatty substances used as a source of energy by a human body.

The term "metabolic factors" as used herein refers to a weight, such as 125 pounds, blood tests, such as a Comprehensive Metabolic Panel, a CBC panel, a C-peptide test, an A1c test (known as a "lipid panel"), a urinalysis, a nerve conduction velocity test, an individual target blood glucose level, such as 110 mg/dl, a respiratory quotient, such as a ratio of the amount of carbon dioxide released based on oxygen consumed during a preset period of time, and an insulin sensitivity factor, such as a value indicating how a subject responds after receiving one unit of insulin as a measure of decrease in blood glucose.

The term "metabolic enhancement" as used herein refers to a blend of components that bond to enzymes in the patient and increases the enzyme activity for a patient or subject. The metabolic enhancement can be (1) a pill containing the components of the metabolic enhancement, (2) a drink containing the components of the metabolic enhancement, (3) a shake containing the components of the metabolic enhancement, (4) a food item, such an energy bar, fortified with the metabolic enhancement, (5) a transdermal patch or similar application delivering the components of the metabolic enhancement, and combinations thereof.

In one example, the metabolic enhancement can be a blend of methylcobalamin, (such as 5 mg), pyridoxal-5-phosphate (such as 35 mg), 5-MTHF (known as an activated form of folic acid) (such as 1 mg), Alpha Lipoic Acid (such as 50 mg), NADH (such as 5 mg), CoEnzyme Q0 (such as 75 mg), N-Acetyl L-Cysteine (NAC) (such as 250 mg), Vitamin D (such as Cholecalciferol) (such as 2000 International Units (IU)) and Chromium Picolinate (such as 300 mcg).

The term "methylocobalamin" as used herein refers to one of two coenzyme forms of vitamin $B_{12}$.

The term "N-Acetyl Cysteine" as used herein refers to an amino acid that helps build proteins in the body.

The term "NADH" as used herein refers to Nicotinamide Adenine Dinucleotide which binds as a coenzyme to proteins and serves in respiratory metabolism.

The term "Nerve Conduction Velocity (NCV)" as use herein refers to a test to determine how fast electrical signals move throughout a nerve.

The term "non-transitory computer readable medium" as used herein excludes any transitory signals but includes any non-transitory data storage circuitry, e.g., buffers, cache, and queues, within transceivers of transitory signals.

The term "Peripheral Autonomic Neuropathy" as use herein refers to the symptoms that occur when there is damage to the nerves, such as weakness and numbness of a limb.

The term "plan goal" as used herein can refer to a purpose for the insulin therapy as identified by the subject and/or a

APPX0481

US 10,533,990 B2

7

medical professional associated with the therapy and inserted into the care plan generated by the diabetic treatment model.

The term "processor" as used herein can refer to a computer, a laptop, a plurality of connected processors, a tablet computer, a cellular telephone or smart phone, a portable processing device, or any similar device known in the industry.

The term "respiratory quotient" as used herein refers to the ratio of: carbon dioxide given off by a human and oxygen consumed by a human, particularly under known resting conditions.

The term "saline" as used herein refers to a sterile solution of 900 grams of sodium chloride in 100 ml of water.

The term "schedule for bolus introduction" as used herein refers to the plurality of specific time intervals between bolus introductions in a treatment session. For the invention, the "schedule for bolus introduction" requires at least one "unequal time period" between at least one pair of bolus per treatment session.

As an example of the schedule for bolus introduction for a treatment session: three bolus can be delivered to the subject sequentially, each bolus separated by a 4 minute time interval. Then, using the schedule for bolus introduction, a fourth bolus is delivered to the subject after a 6.5 minute time interval. The 6.5 minute time interval is referred to herein as "an unequal time period" because it is different from the 4 minute time intervals on the schedule for bolus introduction.

In embodiments, all the time intervals between pairs of bolus can be different for a subject. In embodiments, just one time interval between one pair of bolus can be different according to the schedule for bolus introduction.

In embodiments, many variations in time intervals on the schedule for bolus introduction can be computed by the diabetic treatment model using the weight of the subject, insulin sensitivity factor of the subject and tested blood glucose levels of the subject.

Another example of the schedule of bolus introduction having an unequal time period can be 3 pairs of bolus that are sequentially introduced require 5 minute intervals of time between introductions then a seventh bolus requires a 6 minute interval of time prior to introduction to the subject. The 6 minute interval of time is an "unequal time period". The diabetic treatment model can indicate that the schedule for bolus introduction can require all remaining time periods for the treatment session between pairs of bolus to be equal (the opposite of unequal periods of time). The plurality of time periods of the schedule for bolus introduction (the time between each pair of bolus) is generated by the diabetic treatment model.

The term "subject profile" as used herein can refer to the name of an individual and the associated measured metabolic factors. The subject profile can include a subject history and a subject physical report of the subject, a subject name and contact information, as well as a subject's blood test results. In embodiments, the subject profile can include a date, a name, an address, an email address, a telephone number, an ethnicity, a gender/sex, a type of diabetes, a date of birth, a weight, a height, a blood pressure, a temperature, a heart rate, a blood type, a blood glucose level, insurance information, a responsible party name and contact information, a driver's license number or copy of the driver's license, employer information, insurance information, medical history including surgery and ancestor information and allergies, current medications, other test results, including but not limited to urinalysis, emergency contact information,

8

and a primary care physician name and contact information. In embodiments, the subject profile can be inputted into a data storage associated with a processor.

The term "treatment session" as used herein refers to a plurality of treatment cycles during which a plurality of bolus are infused to a patient. Each treatment cycle can range from 40 minutes to 180 minutes. Each treatment session can range from 1 treatment cycle and up to 6 treatment cycles.

The term "unequal time period" as used herein refers to a unit of time between a pair of bolus in a treatment session that is different in length from a time period between another pair of bolus in a treatment session.

The term "weight management protocol" as used herein refers to a system of eating certain foods with a preset calorie content to ensure the patient or subject loses an amount of weight per week that aligns with the subject's metabolic factors.

The invention improves impaired hepatic glucose processing in subjects, which can be a human or a non-human, such as an animal.

In embodiments, the method can include creating a subject profile with assessed metabolic factors.

The method can include inserting the subject profile into a diabetic treatment model to determine: a quantity and frequency of sequential intravenous insulin bolus to a subject using a schedule of bolus introduction having at least one unequal time period between a pair of bolus, as well as determining a quantity and frequency of dosage amounts of magnesium and a quantity and frequency of dosage amounts of potassium.

The method can include selecting a weight management protocol using the subject profile and specific metabolic functions of the subject. For example, the metabolic function of respiratory quotient can be used to create a specific customized weight management protocol.

The subject can then follow the weight management protocol while taking a metabolic enhancement. The weight management protocol initially can use a complete metabolic measurement system for cardio-pulmonary exercise stress and resting energy expenditure testing which can give a patient a resting metabolism score. The resting metabolic scores can range from 0.75 to 0.85 for fats, from 0.78 to 0.82 for protein, and from 0.88 to 0.92 for carbohydrates. Based on these resting metabolic scores, a subject's diet can be customized based on what the subject's body can actually metabolize.

A resting metabolic carbohydrate score in excess of 1.20 can indicate the subject's body is undergoing ketogenesis (metabolic production of ketones or ketone bodies or formation of acid ketone [substances that are made when the body breaks down fat for energy, any organic compound in which two carbon atoms are linked by the carbon of a carbonyl group (C—O), the simplest ketone and the most important in medicine is dimethyl ketone (acetone)] bodies, as in uncontrolled diabetes, starvation, or as a result of a diet with a very high fat content), and a different customized diet can be created for the subject or the patient.

The invention improves impaired hepatic glucose processing in subjects, by providing individualized intravenous exogenous insulin-based therapy that not only produces body tissue with improve cellular ATP functioning in the short term, by improves the ATP function by at least 10 percent and up to 40 percent, for a period of time that ranges from 7 days to 90 days from the last treatment session of the individualized intravenous exogenous insulin-based therapy.

APPX0482

US 10,533,990 B2

9

It should be noted that in embodiments, the dosage amounts of magnesium and potassium can be introduced to the subject intravenously from a second reservoir simultaneously as the insulin bolus are introduced.

Glucose is introduced to the subject as part of the therapy. The glucose is taken by the subject prior to receiving the insulin bolus. When glucose is used the dosage amounts of potassium and dosage amounts of magnesium can be adjusted based on the subject profile. The bolus introduction can be monitored and blood glucose levels tested allowing a therapist to change the quality and time intervals between bolus based on the diabetic treatment model until the blood glucose level of the subject reaches an individual target blood glucose level.

In embodiments, the unequal time periods between bolus introductions according to the schedule can range from 4 minutes to 8 minutes periods but can be as low as 1 minute and as high as 10 minutes. The unequal time periods can include minutes and seconds.

In embodiments, from 60 grams of glucose to 100 grams of glucose can be introduced to the subject to establish a blood glucose level of at least 125 mg/dl prior to introducing the bolus of insulin and dosage amounts of potassium and magnesium.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy method for infusing insulin intravenously to a subject by comparing a respiratory quotient of the subject from a metabolism score with the subject in a resting state and applying the results into the diabetic treatment model to (i) modify the concentration of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure the success of individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a cardiac function measured by echocardiograph with the subject in a resting state and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a peripheral autonomic neuropathy and micro-circulation with the subject in a resting state prior to bolus injection and simultaneously as bolus are injected and after bolus have been injected and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a retinal image captured by a non-mydriatic camera with the subject in a resting state to identify diabetic retinopathy after a series of bolus treatments are performed and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

10

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing wounds to wound characteristics by dimensionally measuring wounds by length, width, and depth and related clinical characteristics with the subject in a resting state after a series of bolus treatments are performed and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing C-peptides, such as with the University of Oxford's HOMA2 Calculator, which act as a marker for insulin production and insulin sensitivity factor and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both, or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the metabolic enhancement can have a nerve function improver to decrease homocysteine (a naturally occurring amino acid in all humans that is found in blood plasma) levels and improve cardio vascular health.

In embodiments, the weight management protocol can include additional nutritional supplements.

In embodiments, the insulin bolus can be intravenously infused using a needle or a catheter located in the subject's body, hand, or forearm.

Now turning to the Figures, FIG. 1A shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 40 kilograms to 160 kilograms.

A dosing protocol for insulin bolus, dosage amounts of potassium and dosage amounts of magnesium as generated by the diabetic treatment model using weight of a subject from 40 kilograms to 160 kilograms is shown. This chart can be used for one person or for a plurality of subjects.

Weight appears in the first column then a dosage amount of a ratio of potassium to saline, a dosage amount of a ratio of magnesium to saline, a dosage amount of a ratio of insulin to create the amount of insulin to saline to be used for a treatment session and an insulin reservoir volume is depicted mapped to the weight of the subject and to the potassium to saline dosage, and magnesium to saline dosage and insulin to saline dosage.

The insulin reservoir volume is a liquid volume containing (i) the insulin and saline, (ii) the insulin, saline and potassium, (iii) the insulin, saline and magnesium, or (iv) the insulin, saline, potassium and magnesium, used in the bolus for the subject.

An insulin bolus dosage minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

US 10,533,990 B2

11 12

An insulin bolus dosage volume maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A schedule of bolus introduction with a plurality of unequal time periods (in seconds) between bolus introduction is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A quantity of bolus per treatment cycle is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

FIG. 1B shows a diabetic treatment model with bolus volume dosage mounts for a subject with a weight from 161 kilograms to 275 kilograms.

A dosing protocol for insulin bolus, dosage amounts of potassium and dosage amounts of magnesium as generated by the diabetic treatment model using weight of a subject from 161 kilograms to 275 kilograms is shown. This chart can be used for one person or for a plurality of subjects.

Weight appears in the first column then a dosage amount of a ratio of potassium to saline, a dosage amount of a ratio of magnesium to saline, a dosage amount of a ratio of insulin to create the amount of insulin to saline to be used for a treatment session, and an insulin reservoir volume is depicted mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

The insulin reservoir volume is a liquid volume containing (i) the insulin and saline, (ii) the insulin, saline and potassium, (iii) the insulin, saline and magnesium, or (iv) the insulin, saline, potassium and magnesium, used in the bolus for the subject.

An insulin bolus dosage minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A schedule of bolus introduction with a plurality of unequal time periods (in seconds) between bolus introductions is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A quantity of bolus per treatment cycle is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

FIG. 2 shows a bolus volume dosage adjustment protocol based on tested blood glucose levels as produced by the diabetic treatment model.

A dosage adjustment protocol of insulin is shown for three time intervals: (i) a first time interval for hours 1 and 2 of each treatment session, (ii) a second time interval for a first 30 minutes of hour 3 of each treatment session, and (iii) a third time interval for a last 30 minutes of hour 3 of each treatment session.

A table of tested blood glucose level in view of dosage amounts of insulin are shown, which is generated by the diabetic treatment model.

This portion of the diabetic treatment model indicates that the amount of insulin or quantity of bolus can be increased or decreased based on real time test results of a subject's blood glucose level.

FIG. 3 depicts a glucose dosage adjustment protocol as produced by the diabetic treatment model.

A patient's tested blood glucose level ranging from 100 to 550 mg/dl is shown.

In the glucose dosage adjustment protocol, an amount of glucose to be administered using the method and system is depicted as mapped to a tested blood glucose level. The amount of glucose ranges from slightly above no glucose shown as 0.01 grams to 60 grams of glucose.

FIG. 4 depicts a metabolic enhancement protocol as produced by the diabetic treatment model and an exemplary metabolic enhancement by component.

The metabolic enhancement protocol shows dosage amounts of metabolic enhancement and respiratory quotients for a patient. The metabolic enhancement can be provided to a subject in dosage amounts as pills, in powder form, as a drink, a transdermal patch, or a delivery system known in the art.

The respiratory quotients range from 0.69 to 1.20. The dosage amounts of metabolic enhancement can range from 1 dose to 3 dosages daily, as shown corresponding to the tests of the subject showing the respiratory quotients.

Ingredients for an exemplary metabolic enhancement usable according to the diabetic treatment model are shown with minimum amounts per dosage and maximum amounts per dosage for the metabolic enhancement.

In embodiments, the ingredients for a usable metabolic enhancement can be formed from a synergistic combination of nine ingredients, namely:

Vitamin D—as Cholecalciferol ranging in amounts from 600 IU to 2000 IU.

Vitamin $B_6$—as Pyridoxal-5-Phosphate ranging in amounts from 10 mg to 100 mg.

Folic Acid—as Folate ranging in amounts from 200 mcg to 2000 mcg.

Vitamin $B_{12}$—as Cyanocobalamin ranging in amounts from 1000 mcg to 5000 mcg.

An amino acid that builds proteins in a subject—as N-Acetyl L-Cysteine (NAC) ranging in amounts from 200 mg to 600 mg.

A coenzyme that extracts energy from food for a subject—as Coenzyme Q10 (CoQ10) ranging in amounts from 60 mg to 400 mg.

An antioxidant that extracts energy from food for a subject—as Alpha lipoic acid ranging in amounts from 50 mg to 400 mg.

A protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for a subject—as Nicotinamide Adenine Dinucleotide (NADH) ranging in amounts from 0.5 mg to 5 mg.

A glucose utilization component to prevent or treat chromium deficiency in a subject and which additionally improves glucose utilization by insulin—as Chromium Picolinate ranging in amounts from 200 mg to 300 mg.

US 10,533,990 B2

13

The following are non-limiting examples.

EXAMPLE 1

A comparative analysis was generated for Fred Smith, Fred S. a 69-year-old man with Type 2 diabetes of 25 years' duration. Fred Smith arrived in a wheelchair, because walking was too painful for him. Fred Smith's left foot had all the toes amputated, and a non-healing wound on his other foot had caused his doctor to recommend amputation of a toe on his right foot.

Conventional wound care treatment, including aggressive wound care, wound debridement, and hyperbaric treatment had failed. Fred Smith also developed a debilitating peripheral neuropathy.

At this point Fred Smith weighed 107.95 kilograms and began an intensive treatment protocol of three treatment sessions per week, the first week includes two treatment sessions the second and third weeks include one treatment session per week thereafter for weeks 4 through 12. During each treatment session, Fred Smith received insulin and saline intravenously, alternating with glucose. Fred Smith received 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram, at a first set of unequal time periods of 5.3 minutes, 4 minutes, and 5.1 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Fred Smith received a total of 16 treatments during the three-month period, after the 6th treatment, he began to regain feeling in his feet.

Fred Smith due to the treatment was no longer in a wheelchair at the end of three months and was able to simply use a cane to get around.

Fred was able to decrease his hospital costs by $255,000 from the prior year without treatment.

Additionally, Fred was able to decrease one of his blood pressure medications.

Post treatment, Fred's A1c test result was down 2.7 points. Fred no longer experienced hypoglycemic events and he had reduced his long-acting insulin by 20 percent and his short-acting insulin by 50 percent.

The primary care physician noted that Fred's wound had healed and no amputation was needed.

EXAMPLE 2

A comparative analysis was generated for Marianne Rutledge, a 60-year-old woman with Type 2 diabetes of 12 years duration, who suffered from severe kidney disease and was fearful of becoming a dialysis patient.

Upon arrival Marianne Rutledge's blood test results showed an A1C of 10.2, blood glucose of 240 mg/dl, her blood pressure measured 150/92, and she weighed 212 pounds, or 96.3 kilograms.

Marianne Rutledge began an intensive treatment protocol of two treatment sessions per week the first two weeks, and one treatment session per week thereafter for weeks 3 through 12. During each treatment session, Marianne Rutledge received insulin and saline intravenously, alternating with glucose. Marianne Rutledge received 36 bolus per treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram, at a first set of unequal time periods of 5.1 minutes, 4.6 minutes, and 5.6 minutes, with each set

14

of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Marianne Rutledge received a total of 13 treatments during the three-month period, after the 2nd treatment, she noticed an extreme increase in her energy and stamina, and as she continued the treatment sessions, she reported that she looked forward to the next treatment session because it made her feel better than she had felt since she was diagnosed with diabetes and kidney disease.

Marianne Rutledge continued the therapy with regular treatment sessions each week, 3 to 4 hours each session, with the protocol of insulin and saline intravenously, alternating with glucose and using the schedule of bolus introduction having at least one unequal time period. After six months of treatment, her kidney function improved to the point that her doctor no longer considered dialysis probable.

EXAMPLE 3

Victoria Lord, a Type 2 diabetic on dialysis had vision problems including retinopathy and she also suffered from neuropathy and had trouble sleeping. A comparative analysis was generated for Victoria Lord, whose initial vital signs were blood glucose level 250, blood pressure 120/80, heart rate of 72, and HgbA1c of 9.2.

Victoria Lord began an intensive therapy of two treatment sessions on intravenous insulin alternating with oral glucose on consecutive days for the first two weeks then weekly treatment sessions thereafter for the next 10 weeks, then to be reevaluated.

Each treatment session consisted of 36 bolus. During each treatment session, Victoria Lord received insulin and saline intravenously, alternating with glucose. Victoria received the 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.0 minutes, 6.9 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After her first four treatments over two weeks, she reported that her neuropathy decreased, which was confirmed by autonomic tests. Her blood glucose was decreased to 110, and she reported such extremely increased energy that she no longer required an afternoon nap. She also reported that she was sleeping better. Her lab tests after 14 treatments over 12 weeks showed Hgb A1c of 6.5, down from 9.2, or a decrease of about 30 percent.

EXAMPLE 4

Jim Pierce had severe foot neuropathy and had experienced no feeling in his feet for several years. He had been diagnosed with Type 2 Diabetes about 15 years ago and was insulin dependent. A friend knew of his debilitating neuropathy and recommended that he begin the therapy.

Jim Pierce reported that when his neuropathy began, it was so painful; he could not even stand for a sheet to touch his toes when he went to bed at night. As his neuropathy progressed, he lost all feeling in his feet and began to suffer injuries from falling. His doctor continued to treat him with insulin and prescription drugs, such as Gabapentin.

Jim Pierce's test results were reviewed, and he was put on a therapy of two treatment sessions on consecutive days for three weeks, two treatment sessions on consecutive days for two weeks after that, and then one treatment session per week for the balance of the first 12-week period.

APPX0485

US 10,533,990 B2

**15**

Jim Pierce received 36 bolus during each treatment session using the schedule of bolus introduction having at least one unequal time period. During each treatment session Jim Pierce received insulin and saline intravenously, alternating with glucose.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.5 minutes, 5.1 minutes, and 5.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After the first two treatments, Jim Pierce reported that the feeling began to return to his feet.

After he completed 8 treatments sessions, his doctor reduced his Gabapentin, and after 12 weeks, he no longer took Gabapentin for his neuropathy. He reduced his insulin from 50 units every night to 30 units every night. His lab reports showed Hgb A1c 7.2, down from 10.5. After six months of the continued therapy he was able to do a three-mile hike on his vacation.

EXAMPLE 5

Sarah Hardin is a pre-diabetic with a genetic disposition to metabolic disorder and disease, including diabetes. Sarah's pre-treatment metabolic rate or respiratory quotient (RQ), was 0.84. After her initial test results were reviewed, she began one treatment session per week for 12 weeks.

Each of Sarah's treatment sessions consisted of 36 bolus and during each treatment session, Sarah received insulin and saline intravenously, alternating with glucose. Sarah received 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.2 minutes, 4.7 minutes, and 6.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Soon after starting the treatment therapy, Sarah Hardin noticed improvement in hair and nail growth, and she documented it with photographs.

Sarah reported that her energy increased to the point that she no longer needed help taking care of her children. After 5 treatment sessions, a comparative analysis was performed and her RQ increased to 0.93, which demonstrated that she was burning carbohydrates for energy.

EXAMPLE 6

Tatum Norris, age 18, a Type 1 diabetic diagnosed at age 10, had severe neuropathy and was housebound because of his pain. He began two treatment sessions on consecutive days, then 1 treatment session a week thereafter.

Each treatment session consisted of 36 bolus. During each treatment session, Tatum received insulin and saline intravenously, alternating with glucose. Tatum received 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.4 minutes, 5.3 minutes, and 5.2 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

A Nerve Conduction Velocity (NCV) with Electromyopathy (EMG) was conducted pre-treatment on Tatum and repeated 90 days after his initial treatment, which showed a marked decrease in his diabetic neuropathy.

**16**

After 8 or 10 treatments, Tatum began driving a car again and he was able to sit in movie theaters because the pain was now manageable. Tatum reported that he could now go visit his mom in Dallas and even hang out with friends.

EXAMPLE 7

Carmen Valdez, a 70-year-old Type 2 diabetic who had been diagnosed four years earlier, was on three types of blood pressure medication (Amlodipine, Lisinopril, and Lopressor) and three medications to control her blood sugar (Lantus, Metformin, and Onglyza). After her initial test results were reviewed, she began treatment sessions of two treatment sessions on consecutive days for the first two weeks and one treatment session per week thereafter for 12 weeks. Her pre-treatment RQ test result was 0.79.

During each treatment session, Carmen received insulin and saline intravenously, alternating with glucose. Carmen received 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 6.4 minutes, 7.2 minutes, and 7.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Carmen reported that she was surprised that she immediately experienced greatly increased energy and stamina, as well as a lowering of her daily blood pressure according to her self-tests, after only the first two treatments.

After three months, Carmen Valdez was able to discontinue taking Amlodipine, Lantus and Onglyzaone. At that point her RQ measured 0.95.

EXAMPLE 8

Harold Carson, a 65-year-old insulin-dependent Type 2 diabetic of 25 years, became insulin resistant and his medications were no longer working well. Mr. Carson was taking three 750-mg Glucophage tablets daily, 150 units of Humalog (short-acting) insulin daily, and a nighttime injection of 40 units of Humulin N (long-acting) insulin. He also took statin drugs for cholesterol and blood pressure medication.

After initial tests, his C-peptide was remarkable at 2.0. He began treatment sessions of two on consecutive days for two weeks, and then continued with weekly treatments for a total of 12 weeks.

During each treatment session, Mr. Carson received insulin and saline intravenously, alternating with glucose. He received 36 bolus per treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.7 minutes, 6.1 minutes, and 5.9 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After he began the treatment sessions, he reported that he immediately noticed a better night's sleep, that his mental clarity was sharper, and even his golf score improved.

After two months of treatment he decreased his insulin usage by 70 percent (from 150 units daily to 45 units daily) and his C-peptide test resulted in a significant improvement of 2.8.

Harold Carson's RQ was 0.75 pre-treatment and a perfect 1.00 after two months of treatment. Harold reported that his dry skin improved, the neuropathy in his legs vanished, and

APPX0486

US 10,533,990 B2

<table>
<tr><td>17</td><td>18</td></tr>
</table>

his wife reported that his hair had grown "unbelievably" after he began the treatment therapy.

### EXAMPLE 9

Stephen Henderson, a pre-diabetic with metabolic disorder and hyperlipidemia, had initial test results of Triglycerides 1290, LDL 183, and Cholesterol 271; his RQ was 0.74. He began treatment sessions once a week for 12 weeks. During each treatment session, Mr. Henderson received insulin and saline intravenously, alternating with glucose. Mr. Henderson received 36 bolus each treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 4.8 minutes, 4.8 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Stephen reported that after only two treatments, his energy level increased and prior hair loss abruptly stopped. After five treatments, he noticed significant hair growth. His test results after 12 treatment sessions were Triglycerides 123, LDL 86, Cholesterol 144, and RQ 0.98.

Stephen also reported that he noticed significant improvement in quantitative and qualitative analysis capability.

### EXAMPLE 10

Alan Henderson traveled from Denver to Houston for his treatments. At age 71 he had a history of 13 heart stints, he had been a Type 2 diabetic for 20 years, and he was insulin dependent.

After initial testing and a review of his results, Alan Henderson began treatment sessions of two per week on consecutive days for two weeks, then one treatment session weekly for 10 more weeks.

During each treatment session, Alan received insulin, saline, potassium, and magnesium intravenously, alternating with glucose. Alan received 36 bolus each treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 6.4 minutes, 6.8 minutes, and 7.1 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Alan's initial RQ was measured at 0.78, and his Hgb A1c was 13.4.

Over the course of three months, after his 12-week, 14-treatment therapy, he decreased his fast-acting insulin (Novalog) by 55 percent, down from 15-18 units to 10-12 units with meals and his long-acting insulin (Lantus) decreased by 65 percent, down from 75 units twice daily to 40 units daily.

After the first three months of treatment, Alan's Hgb A1c was down to 7.3 (more than 6-point decrease), and his RQ was 0.90.

Alan Henderson also suffered from diabetic neuropathy, for which he had been prescribed Gabapentin (six capsules per day) and a Lidocaine patch. After two months he reduced the amount of Gabapentin he was taking, and then completely eliminated it. He discontinued use of the Lidocaine patch. He reports that he now has no pain or neuropathy in his hands or feet, and his energy level is "way up."

### EXAMPLE 11

George Gilbert had a wound on his foot for three months that would not heal. He was also a Type 2 diabetic on Metformin orally. After review of his test results, he began treatment sessions of two sessions on consecutive days for the first week and weekly treatment sessions thereafter.

During each treatment session, George received insulin, saline, glucagon, and somatostatin intravenously, alternating with oral glucose. George received 36 bolus each treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.7 minutes, 5.4 minutes, and 5.0 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After only three weeks of the treatment, he reduced the amount of Metformin he was taking, his wound healed, and his doctor made photographs of the wound before and after for the hospital record. George calls the treatment a "miracle."

### EXAMPLE 12

Toby Rasmussen, a pre-diabetic of 8 years duration, began treatment sessions because of vision problems and a family history of diabetes. His initial RQ was 0.85. His Hgb A1c measured 7.0. He began treatment sessions once a week for 12 weeks.

During each treatment session, Toby received insulin and saline intravenously, alternating with glucose. Toby received 36 bolus each treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.3 minutes, 5.2 minutes, and 6.4 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Toby reports that after the 12 treatments, he has more energy and his eyesight has improved so much that he now uses only bifocals instead of trifocals. After treatments, his RQ measured 0.98 and his A1c measured 6.1.

### EXAMPLE 13

Hank Anderson, a Type 2 diabetic of 27 years, had an Hgb A1c reading of 9.0, and was using Lantus insulin at 170 units during the day and another 70 units at night. He also reported severe leg cramps.

A comparative analysis was performed on Hank Anderson, and he began treatment sessions weekly. During each treatment session, Hank received insulin and saline intravenously, alternating with glucose. He also received potassium 40 meq orally with each treatment session and daily on non-treatment days. Mr. Anderson received 36 bolus per treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.6 minutes, 5.1 minutes, and 5.4 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After 12 weeks of weekly treatment sessions, Hank reported that since starting the treatment, his blood sugar is now controlled and his eyesight has improved so much that he went from legally blind without glasses to being able to read captions on a television with no glasses.

Hank was able to discontinue his nightly Lantus and his insulin went down from 6 vials of insulin per month to only 3, a significant costs saving.

APPX0487

US 10,533,990 B2

19

Hank Anderson's A1c after 12 weeks of treatment sessions measured 8.3.

### EXAMPLE 14

John Grayson, a Type 1 insulin-dependent diabetic, initially reported problems with his kidneys, eyes, low energy, mood swings, and erectile dysfunction. His RQ was 0.88 and his magnesium level was 1.5

After his test results were reviewed, John started treatment sessions of two sessions on consecutive days with weekly treatment sessions thereafter for a period of three months. During each treatment session, Hank received insulin and saline intravenously, alternating with oral glucose and somatostatin. Hank received 36 bolus per treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.0 minutes, 5.2 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Mr. Grayson also received magnesium chloride tablets of 40 mg orally with each treatment session and daily on non-treatment days.

After the first two treatments, Mr. Grayson decreased his insulin use by 5-10 units per sliding scale and was extremely happy to report that he experienced increased blood flow.

After the third treatment, Mrs. Grayson was deliriously excited about his improvement, especially with the blood flow.

FIGS. 5A-5C depict steps of a method of the invention according to one or more embodiments.

The method for providing an individualized intravenous exogenous insulin-based therapy can include creating a subject profile for a subject, as shown in box 500. The subject profile can include: a subject history, such as having type II diabetes for the past three years and cataract surgery 4 years ago, a subject's physical reports including weight of the subject and optionally objective physician reports, CT scans and other diagnostic reports, a subject's name, such as Carol Wilson, a subject's contact information such as a name, an address and a telephone number, and a subject's blood test results.

The method can include assessing metabolic factors of the subject and storing the metabolic factors in the subject profile, as shown in box 502. The metabolic factors needed in the subject file can include: a glucose level, such as an initial glucose level, a respiratory quotient, such as an initial respiratory quotient, an insulin sensitivity factor, such as an initial or pre-treatment insulin senility factor, and an individual target blood glucose level which the subject desires to achieve with the treatments using the diabetic treatment model.

The method can include creating a care plan with a plurality of treatment sessions for the subject and a plan goal, as shown in box 504. The care plan can indicate a schedule of treatment sessions with at least one unequal time period and the care plan can include a quantity and frequency of a plurality of bolus containing saline and insulin for sequential intravenous introduction to a subject.

The method can include introducing glucose to the subject to stimulate gastrointestinal hormone production, resulting in the release of enzymes from the subject's liver and causing blood glucose levels of the subject to be in a therapeutic range, as shown in box 506.

20

The method can include testing the subject for blood glucose levels to compare tested blood glucose levels to the plurality of therapeutic ranges and verify the subject is in the therapeutic range, as shown in box 508.

The method can include comparing tested blood glucose levels to a diabetic treatment model, as shown in box 510.

The method can include mapping tested blood glucose levels and insulin sensitive factors of the subject to the subject weight using the diabetic treatment model to determine a schedule for bolus introduction, wherein the schedule for bolus introduction has at least one unequal time period between at least one pair of bolus, as shown in box 512.

The method can include introducing to the subject a plurality of bolus of insulin and saline sequentially using the schedule for bolus introduction having at least one unequal time period between at least one pair of bolus, as shown in box 513.

The method can include comparing the subject profile to a plurality of weight management protocols to identify a weight management protocol for the subject based upon assessed metabolic functions of the subject and saving the weight management protocol in the care plan, as shown in box 514.

The method can include implementing the identified weight management protocol and the care plan after a first treatment session to manage weight of the subject with a metabolic enhancement causing improved cellular ATP functioning for the subject while infusing insulin and modifying a quantity and duration of unequal time periods between bolus introduction in the schedule of bolus introduction having at least one unequal time period between at least one pair of bolus to improve impaired hepatic glucose processing, as shown in box 516.

The method can include using in the schedule of bolus introduction having at least one unequal time period, time periods varying from 2 minutes to 10 minutes. The unequal time periods can be time intervals from 1 percent to 30 percent different in length of time from each other.

The method can include introducing from 60 grams of glucose to 100 grams of glucose to the subject prior to initial bolus introduction to establish a blood glucose level of at least 125 mg/dl prior to introducing the plurality of bolus in a first treatment session.

The method can include comparing a respiratory quotient of the subject in a resting state to a plurality of metabolism scores, as shown in box 518.

The method can include modifying a quantity of bolus for the subject for each treatment session as identified in the care plan with schedule of bolus introduction having at least one unequal time period between bolus to improve a subject's respiratory quotient, as shown in box 520.

The method can include modifying the schedule of bolus introduction having at least one unequal time period between bolus introduction by modifying a quantity and duration of unequal time periods between bolus introductions to improve the respiratory quotient, as shown in box 522.

The method can include comparing a measured cardiac function of the subject in a resting state to a preset norm of cardiac function, as shown in box 524.

The method can include modifying a quantity of bolus for the subject identified in the care plan using the preset norm of cardiac function, as shown in box 526.

The method can include modifying the schedule of bolus introduction having at least one unequal time period by

APPX0488

US 10,533,990 B2

21                                                                    22

modifying a quantity and duration of unequal time periods between bolus introductions to improve cardiac function, as shown in box **528**.

The method can include measuring a peripheral autonomic neuropathy and microcirculation of the subject in a resting state prior to bolus introduction comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of peripheral autonomic neuropathies and microcirculations, as shown in box **530**.

The method can include comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state as bolus are sequentially introduced to the measured peripheral autonomic neuropathy and microcirculation, as shown in box **532**.

The method can include comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state after all bolus have been introduced in a first treatment session to the measured peripheral autonomic neuropathy and microcirculation, as shown in box **534**.

The method can include modifying a quantity of bolus for the subject identified in the care plan to treat peripheral autonomic neuropathy and microcirculation, as shown in box **536**.

The method can include modifying the schedule of bolus introduction having at least one unequal time period by modifying a quantity and duration of unequal time periods between bolus introduction to improve the measured peripheral autonomic neuropathy and microcirculation, as shown in box **538**.

The method can include viewing an initial retinal image of the subject captured by a non-mydriatic camera with the subject in a resting state to identify a diabetic retinopathy, as shown in box **540**.

The method can include viewing a post treatment retinal image of the subject in a resting state after a first treatment session, as shown in box **541**.

The method can include comparing the initial retinal image to the post treatment retinal image, as shown in box **542**.

The method can include modifying a quantity of bolus for the subject if no change in the diabetic retinopathy has occurred, as shown in box **544**.

The method can include modifying the schedule of bolus introduction having at least one unequal time period between bolus to reduce the effects of diabetic retinopathy by modifying a quantity and duration of unequal time periods between bolus introductions to reduce the effects of diabetic retinopathy, as shown in box **546**.

The method can include dimensionally measuring wounds by length, width, depth and identifying wound characteristics with the subject in a resting state, as shown in box **550**.

The method can include dimensionally measuring wounds after at least one treatment session to identify skin integrity and changes in clinical wound characteristics, as shown in box **552**.

The method can include modifying a quantity of bolus for the subject identified in the care plan for wound treatment using the identified skin integrity and changes in clinical wound characteristics, as shown in box **554**.

The method can include modifying the schedule of bolus introduction having at least one unequal time period between bolus to improve wound healing by modifying a quantity and duration of unequal time periods between bolus introduction to reduce wound size and wound characteristics, as shown in box **556**.

The method can include comparing C-peptides of the subject to a preset norm of C-peptides to identify an insulin sensitivity factor, as shown in box **560**.

The method can include modifying a quantity of bolus for the subject for the insulin sensitivity factor, as shown in box **562**.

The method can include modifying the schedule of bolus introduction having at least one unequal time period between bolus to improve an insulin sensitivity factor using analysis of C-peptides by modifying a quantity and duration of unequal time periods between bolus introductions, as shown in box **564**.

In embodiments, the method can use at least one of: methylcobalamin, pyridoxal-5-phosphate, 5-MTHF, alpha lipoic acid, NADH, coenzyme Q10, chromium picolinate, and N-Acetyl cysteine, and vitamin $D_3$ as the metabolic enhancement.

In embodiments, a needle or a catheter can be used to introduce the bolus into the subject's hand or forearm to deliver the insulin bolus.

The method can include determining a quantity and frequency of dosage amounts of magnesium and introducing the dosage amounts of magnesium simultaneously to the subject with the plurality of bolus using the schedule of bolus introduction having at least one unequal time period, as shown in box **570**.

The method can include determining a quantity and frequency of dosage amounts of potassium and introducing the dosage amounts of potassium simultaneously to the subject with the plurality of bolus using the schedule of bolus introduction having at least one unequal time period, as shown in box **572**.

The method can include determining a quantity and frequency of dosage amounts of somatostatin and introducing the dosage amounts of somatostatin simultaneously to the subject with the plurality of bolus using the schedule of bolus introduction having at least one unequal time period, as shown in box **574**.

In embodiments, the somatostatin can be administered orally or intravenously.

The method can include determining a quantity and frequency of dosage amounts of glucagon and introducing the dosage amounts of glucagon simultaneously to the subject with the plurality of bolus using the schedule of bolus introduction having at least one unequal time period, as shown in box **576**.

In embodiments, the glucagon can be administered orally or intravenously

The method can include scheduling diagnostic tests after a first treatment session to modify the care plan for improved cellular ATP functioning for the subject and improved hepatic glucose processing, as shown in box **578**.

FIG. **6** depicts a system of the invention according to one or more embodiments.

The system for individualized intravenous exogenous insulin-based therapy can have an administrative processor **602** connected to an administrative data storage **604**.

The administrative processor, which can be a computer, can be connected to a network **606**. In embodiments, the connection can be a wired or wireless connection. The network can be a cellular network, a satellite network, a global communication network, a local area network, a wide area network, a similar network known in the industry, or combinations thereof.

The system can connect to a plurality of client devices **608**a, **608**b, and **608**c. The client devices can be computers, laptops, tablet computers, cellular phones or smart phones,

APPX0489

US 10,533,990 B2

23

or another digital input device that is cable of bidirectional communication and can be used to input subject information into a subject profile, which can be disposed in the administrative data storage **604**.

In embodiments, the system can connect to a hospital processor **607** and/or an insurance processor **609**. The hospital processor, the insurance processor or both can be in communication with the network **606** and can provide accelerated payment to the diabetic treatment center and provide improved data visibility for improved overall patient care by hospital doctors and medical staff treating the subject.

In embodiments, the system can connect to a doctor processor **611**, which can be a computer. In embodiments, the doctor processor can be a group of processors, wherein each processor in the group can be connected to a different doctor specialist. In other embodiments, the doctor processor can be a processor accessible by a group of physicians.

In embodiments, the administrative processor can be a cloud based computing system.

FIGS. **7A** and **7B** depict an administrative data storage usable in the system according to one or more embodiments.

The administrative data storage **604** can contain at least one subject profile **610**.

Each subject profile can contain a plurality of metabolic factors **605** of the subject, which can include, but is not limited to, a blood glucose level **612**, a respiratory quotient **614**, an insulin sensitivity factor **616**, and an individual target blood glucose level **618**.

The administrative data storage **604** can contain a plurality of care plan templates **620**.

In embodiments, the administrative data storage can contain various computer instructions, which can be used to instruct the administrative processor to perform various tasks.

The administrative data storage **604** can contain computer instructions **200** configured to instruct the administrative processor to create a customized care plan from one of the plurality of care plan templates, wherein the customized care plan indicates a plurality of treatment sessions for the subject with the subject profile and a plan goal, each customized care plan indicating a schedule of bolus introduction having at least one unequal time period between bolus introduction, each bolus containing saline and insulin and each bolus introduced intravenously and sequentially to a subject

The administrative data storage **604** can contain computer instructions **202** configured to instruct the administrative processor to compare tested blood glucose levels to a diabetic treatment model after introducing glucose to a subject to stimulate gastrointestinal hormone production, release of enzymes from the subject's liver and cause blood glucose levels of the subject to be in a therapeutic range.

The administrative data storage **604** can contain a plurality of therapeutic ranges for blood glucose levels **203**.

The administrative data storage **604** can contain computer instructions **204** configured to instruct the administrative processor to compare tested blood glucose levels to the plurality of therapeutic ranges for blood glucose levels and verify the subject is in the therapeutic range.

The administrative data storage **604** can contain a plurality of weight management protocols **205**.

The administrative data storage **604** can contain computer instructions **206** configured to instruct the administrative processor to compare a subject profile to the plurality of

24

weight management protocols to identify a weight management protocol based upon metabolic functions of the subject.

The administrative data storage **604** can contain computer instructions **207** configured to instruct the administrative processor to save the identified weight management protocol in the generated customized care plan after saline with insulin in a plurality of bolus using the schedule of bolus introduction having at least one unequal time period have been administered to a subject.

It should be noted that the unequal time periods are determined by the diabetic treatment model and the care plan.

The administrative data storage **604** can contain computer instructions **208** configured to instruct the administrative processor to track weight management of the subject after a first treatment session and use of an identified weight management protocol and the care plan along with a metabolic enhancement to identify improved cellular ATP functioning for the subject and improve impaired hepatic glucose processing.

The administrative data storage **604** can contain a plurality of metabolism scores **209**, a plurality of preset norms of cardiac function **210**, a plurality of preset norms of peripheral autonomic neuropathies and microcirculations **211**, a retinal image of the subject **212**, wound characteristics **214** and a plurality of preset norms of C-peptides **215**.

In embodiments, at least one metabolic enhancements can be a synergistic combination of: Vitamin D ranging in amounts from 600 IU to 2000 IU, Vitamin $B_6$ ranging in amounts from 10 mg to 100 mg, Folic Acid ranging in amounts from 200 mcg to 2000 mcg, Vitamin $B_{12}$ ranging in amounts from 1000 mcg to 5000 mcg, an amino acid that builds proteins in a subject ranging in amounts from 200 mg to 600 mg, a coenzyme that extracts energy from food for a subject ranging in amounts from 60 mg to 400 mg, an antioxidant that extracts energy from food for a subject ranging in amounts from 50 mg to 400 mg, a protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for a subject ranging in amounts from 0.5 mg to 5 mg, and a glucose utilization component to prevent or treat chromium deficiency in a subject which improves glucose utilization by insulin ranging in amounts from 200 mg to 300 mg.

A metabolic enhancement can consist of Cholecalciferol, Pyridoxal-5-Phosphate, Folate, Cyanocobalamin, N-Acetyl L-Cysteine (NAC), Coenzyme Q10 (CoQ10), an Alpha lipoic acid, Nicotinamide Adenine Dinucleotide (NADH), and Chromium Picolinate.

FIGS. **8A-8C** provide exemplary subject profiles with an automatically generated care plan template and an automatically generated report according to one or more embodiments.

The care plan can be viewed in real time 24 hours a day, 7 days a week as each test is updated and the metabolic assessments are completed.

FIG. **8A** shows a subject profile **610** with fields for a name **802**, a patient ID number **804**, a date of birth **806**, a gender **808**, an ethnicity **810**, a blood type **812**, allergies **814**, a diagnosis **816**, insurance **818**, a primary care physician (PCP) **820**, a primary care physician phone number **822**, a primary care physician fax number **824**, a patient address **826**, a patient phone number **828**, a patient email address **830**, and a patient emergency contact **832**.

APPX0490

US 10,533,990 B2

25

The subject profile 610 can include a narrative 834, which can be written by a medical professional, documenting the condition of the patient and the medical history of the patient with the subject profile.

The subject profile 610 can include assessed metabolic factors of the patient 605, which can include fasting blood sugar 836, A1c level in the blood 838, C-peptide level in the blood 840, a magnesium level in the blood 842, a potassium level in the blood 844, and urinalysis test results 846.

The subject profile 610 can include an insulin sensitivity factor 848 for the subject and diagnostic tests results 850.

The diagnostic test results 850 can include blood glucose level 612, respiratory quotient 614, blood pressure 852, weight 854, nerve conduction velocity 856, retinal image of the subject 212, autonomic test results for neuropathy 858, cognitive test results 860, and cardiac test results 862 indicating cardiac function. The cardiac tests can be EKG or 2D Echo tests.

The subject profile 610 can include current medications 864 of the subject, such as aspirin or prescription medications the subject is currently using.

The subject profile 610 can have a home button 950, a save button 952, a previous page button 954, a next page button 956, and an exit button 958. The buttons can be interchangeable with icons depending on software used on an industry standard computer screen.

FIG. 8B shows the subject profile with a care plan template.

In embodiments, the can plan template can be filled in partially or completely and can be editable.

The care plan template 620 can have an infusion schedule 866, which can indicate infusions by week, showing a quality of treatments and on which days the treatments must occur.

The care plan template 620 can include an infusion formulation 868, which can be a combination of insulin, saline, potassium, magnesium, glucagon, and somatostatin.

The care plan template 620 can include treatment cycles 870, a quantity of bolus per treatment cycle 872, and unequal time periods between bolus introductions in seconds 874.

The care plan template 620 can include a blood glucose level therapeutic range 876.

In embodiments, additional therapies can be tracked in the care plan, including but not limited to, a quantity and frequency of dosage amounts of potassium 878, a quantity and frequency of dosage amounts of magnesium 880, a quantity and frequency of dosage amounts of glucagon 882, and a quantity and frequency of dosage amounts of somatostatin 884.

The care plan template 620 can include diagnostic tests 886, which can be scheduled after a first treatment session.

The care plan template 620 can include metabolic enhancements 888, which can be a particular supplement and instructions on dosage amounts and frequency for the subject in view of the diagnostic tests or other data in the care plan.

The care plan template 620 can include a weight management protocol 205, which can be selected from the plurality of weight management protocols in the administrative data storage.

The care plan template 620 can include an education schedule 889, which can consist of a curriculum of education modules to be viewed or read by a subject by a certain date, which can be automatically transmitted to a client device of the subject on a predetermined schedule.

26

The care plan template 620 can include at least one plan goal 890, such as an increased metabolism for a subject, such as by 10 percent.

FIG. 8C shows the subject profile with a report.

The report 892 can show improved cellular ATP functioning for the subject identifying improve impaired hepatic glucose processing.

The report 892 can include a post treatment narrative 894, which can be completed by a health care professional, indicating subjective and analytical assessments of metabolic factors of the subject.

The report 892 can include post treatment assessed metabolic factors 896 of the patient, a post treatment insulin sensitivity factor 898, a post treatment patient testimonial 900, post treatment diagnostic tests results 902 and post treatment medications 904.

The report 892 can include an insulin sensitivity factor 848 for the subject and diagnostic tests results 850.

The diagnostic test results 850 can include blood glucose level 612, respiratory quotient 614, blood pressure 852, weight 854, nerve conduction velocity 856, retinal image of the subject 212, autonomic test results for neuropathy 858, cognitive test results 860, and cardiac test results 862 indicating cardiac function. The cardiac tests can be EKG or 2D Echo tests.

The report can include assessed metabolic factors of the patient 605, which can include fasting blood sugar 836, A1c level in the blood 838, C-peptide level in the blood 840, a magnesium level in the blood 842, a potassium level in blood 844, and urinalysis test results 846.

While these embodiments have been described with emphasis on the embodiments, it should be understood that within the scope of the appended claims, the embodiments might be practiced other than as specifically described herein.

What is claimed is:

1. A method for individualized intravenous exogenous insulin-based treatment, comprising the steps of:

creating a subject profile for a subject, the subject profile comprising:

(i) a subject history;

(ii) subject physical reports including a subject weight;

(iii) subject name;

(iv) subject contact information; and

(v) subject blood test results;

assessing metabolic factors of the subject and storing the metabolic factors in the subject profile, wherein the metabolic factors include: a glucose level, an insulin-sensitivity factor, and an individual target blood glucose level;

creating a care plan with a plurality of treatment sessions for the subject and a plan goal, wherein the care plan uses the assessed metabolic factors and indicates a schedule of bolus introductions with at least one unequal time period and a quantity and frequency of a plurality of boluses containing saline and insulin for sequential intravenous introduction to the subject;

introducing glucose to the subject to stimulate gastrointestinal hormone production that results in a release of enzymes from the subject's liver and causing blood glucose levels of the subject to be in a therapeutic range;

testing the subject for blood glucose levels, comparing tested blood glucose levels to a plurality of therapeutic ranges, and verifying that the subject is in at least one of the plurality of therapeutic ranges;

US 10,533,990 B2

27

comparing the tested blood glucose levels to a diabetic treatment model;

mapping the tested blood glucose levels and the assessed metabolic factors of the subject by using the diabetic treatment model to determine the schedule for bolus introductions;

introducing, sequentially, to the subject a plurality of boluses by using the determined schedule for bolus introductions based on the mapping;

comparing the subject profile to a plurality of weight management protocols to identify a weight management protocol for the subject based upon the assessed metabolic functions of the subject and saving the weight management protocol in the care plan; and

implementing the weight management protocol and the determined schedule of bolus introductions for the subject to improve insulin sensitivity, cellular ATP functioning, or both, of the subject.

2. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising assessing at least one biomarker specific to diabetes of the subject and optionally storing the at least one biomarker in the subject profile.

3. The method for individualized intravenous exogenous insulin-based treatment of claim 1, wherein the schedule of bolus introductions having the at least one unequal time period uses time periods varying from 2 minutes to 10 minutes, and wherein the unequal time periods are time intervals from 1 percent to 30 percent different in length of time from each other.

4. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising introducing from 60 grams of glucose to 100 grams of glucose to the subject to establish a blood glucose level of at least 125 mg/dl prior to introducing the plurality of boluses in the first treatment session.

5. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising:

comparing a measured cardiac function of the subject in a resting state to a plurality of preset norms of cardiac function;

modifying a quantity of bolus for the subject identified in the care plan using the plurality of preset norms of cardiac function; and

modifying the schedule of bolus introductions by modifying the quantity and duration of unequal time periods between the bolus introductions to improve cardiac function.

6. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising:

measuring a peripheral autonomic neuropathy and microcirculation of the subject in a resting state prior to a bolus introduction and comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of peripheral autonomic neuropathies and microcirculations;

comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state as boluses are sequentially introduced to the measured peripheral autonomic neuropathy;

comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state after all boluses have been introduced in the first treatment session to the measured peripheral autonomic neuropathy and microcirculation;

28

modifying a quantity of boluses for the subject identified in the care plan to treat peripheral autonomic neuropathy and microcirculation; and

modifying the schedule of bolus introductions by modifying the quantity and duration of unequal time periods between the bolus introductions to improve the measured peripheral autonomic neuropathy and microcirculation.

7. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising:

viewing an initial retinal image of the subject captured by a non-mydriatic camera with the subject in a resting state to identify a diabetic retinopathy;

viewing a post treatment retinal image of the subject in a resting state after the first treatment session;

comparing the initial retinal image to the post treatment retinal image;

modifying a quantity of bolus for the subject if no change in the diabetic retinopathy has occurred; and

modifying the schedule of bolus introductions by modifying the quantity and duration of unequal time periods between the bolus introductions to reduce the effects of diabetic retinopathy.

8. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising:

dimensionally measuring wounds by length, width, and depth and identifying wound characteristics of the subject in a resting state;

dimensionally measuring wounds after at least one treatment session to identify skin integrity and changes in clinical wound characteristics;

modifying a quantity of bolus for the subject identified in the care plan for wound treatment using the identified skin integrity and changes in clinical wound characteristics; and

modifying the schedule of bolus introductions by modifying the quantity and duration of unequal time periods between the bolus introductions to reduce wound size and wound characteristics.

9. The method for individualized intravenous exogenous insulin-based treatment of claim 1, comprising:

comparing C-peptides of the subject to a plurality of preset norms of C-peptides to identify an insulin sensitivity factor;

modifying a quantity of bolus for the subject for the insulin sensitivity factor; and

modifying the schedule of bolus introductions to improve the insulin sensitivity factor using analysis of the C-peptides by modifying the quantity and duration of unequal time periods between the bolus introductions.

10. The method for individualized intravenous exogenous insulin-based treatment of claim 1, wherein the implementing the weight management protocol comprises implementing use of a metabolic enhancement comprising methylcobalamin, pyridoxal-5-phosphate, 5-MTHF, alpha lipoic acid, NADH, coenzyme Q10, chromium picolinate, N-Acetyl cysteine, vitamin $D_3$, or combinations thereof.

11. The method for individualized intravenous exogenous insulin-based treatment of claim 1, further comprising determining a quantity and frequency of dosage amounts of magnesium and introducing the dosage amounts of magnesium simultaneously to the subject with the plurality of boluses using the schedule of bolus introductions.

12. The method for individualized intravenous exogenous insulin-based treatment of claim 1, determining a quantity and frequency of dosage amounts of potassium and intro-

APPX0492

US 10,533,990 B2

29

ducing the dosage amounts of potassium simultaneously to the subject with the plurality of boluses using the schedule of bolus introductions.

**13**. The method for individualized intravenous exogenous insulin-based treatment of claim **1**, determining a quantity and frequency of dosage amounts of somatostatin and introducing the dosage amounts of somatostatin simultaneously to the subject with the plurality of boluses using the schedule of bolus introductions.

**14**. The method for individualized intravenous exogenous insulin-based treatment of claim **1**, determining a quantity and frequency of dosage amounts of glucagon and introducing the dosage amounts of glucagon simultaneously to the subject with the plurality of boluses using the schedule of bolus introductions.

**15**. The method for individualized intravenous exogenous insulin-based treatment of claim **1**, comprising scheduling diagnostic tests after the first treatment session to modify the care plan to improved the insulin sensitivity, cellular ATP functioning, or both, of the subject.

**16**. The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising modifying the determined schedule of bolus introductions.

**17**. The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising measuring at least one of the metabolic factors, at least one biomarker, or both.

**18**. The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising comparing the determined schedule of bolus introductions to the diabetic treatment model.

**19**. A system for individualized intravenous exogenous insulin-based therapy comprising:

an administrative processor connected to an administrative data storage, the administrative processor connected to a network;

a plurality of client devices, wherein the plurality of client devices is configured for inputting subject information into at least one subject profile in the administrative data storage, and wherein the at least one subject profile has a glucose level, an insulin sensitivity factor, and an individual target blood glucose level;

a plurality of care plan templates in the administrative data storage;

computer instructions in the administrative data storage, wherein the computer instructions are configured to instruct the administrative processor to create

30

a care plan for a subject from one of the plurality of care plan templates, and wherein the care plan indicates:

(i) a plurality of treatment sessions for the subject with the at least one subject profile with a plan goal; and

(ii) a schedule of bolus introductions having at least one unequal time period between bolus introductions, wherein each bolus contains saline and insulin and each bolus is introduced intravenously and sequentially to the subject;

computer instructions in the administrative data storage configured to instruct the administrative processor to compare tested blood glucose levels to a diabetic treatment model after introducing glucose to the subject to stimulate gastrointestinal hormone production that result in a release of enzymes from the subject's liver;

a plurality of therapeutic ranges for blood glucose levels in the administrative data storage;

computer instructions in the administrative data storage configured to instruct the administrative processor to compare the tested blood glucose levels to the plurality of therapeutic ranges and verify that the subject is in at least one of the plurality of therapeutic ranges;

a plurality of weight management protocols in the administrative data storage;

computer instructions in the administrative data storage configured to instruct the administrative processor to compare the at least one subject profile for the subject to the plurality of weight management protocols to identify a weight management protocol based upon metabolic functions of the subject and to save the weight management protocol to the care plan;

computer instructions in the administrative data storage configured to map the tested blood glucose levels and the assessed metabolic factors of the subject by using the diabetic treatment model to determine the schedule for bolus introductions; and

computer instructions in the administrative data storage configured to instruct the administrative processor to track implementation of the weight management protocol and the determined schedule of bolus introductions of the subject after a first treatment session.

**20**. The system for individualized intravenous exogenous insulin-based therapy of claim **19**, further comprising computer instructions in the administrative data storage configured to assess at least one biomarker specific to diabetes of the subject and optionally to store the at least one biomarker in the at least one subject profile for the subject.

* * * * *





(http://insulinic.com)

FOLLOW US :
**f** (https://www.facebook.com/insulinic)   🐦 (https://twitter.com/insulinic)

# Physicians



EXHIBIT
11



# We Want to Work in Collaboration With You to Help Your Patients

Dear Doctor:

Do you have diabetic patients who, despite their best efforts to follow a conventional therapy regimen, still develop secondary complications that continue to progress and worsen? Do you worry about a patient who is at-risk of an amputation due to poor circulation or a slow healing wound? Do you worry about patients whose kidneys are failing due to diabetic nephropathy and for whom you fear dialysis is just around the corner? Do you worry about a patient who is enduring the relentless pain of diabetic neuropathy?

If you answered "yes" to any of these questions, we would like to help. If you give us just 90 days, we believe we can help the vast majority of your metabolically impaired patients.

At Diabetes Relief, patients are experiencing amazing clinical results with just a few sessions on our innovative,

APPX0490

patented infusion treatments. These improvements go far beyond controlling hyperglycemia and reducing HgbA1c. Our therapy restores insulin sensitivity by closely mimicking the body's natural physiology and reestablishing vital communication between the pancreas and the liver that is distorted in many diabetic patients. Do you have diabetic patients who, despite best efforts to follow a conventional therapy regimen, still develop secondary complications that continue to progress and worsen?

Our treatment incorporates features of traditional programs including the lifestyle modifications of diet and exercise. However, unlike traditional programs, our patients report experiencing increased energy, restful sleep, decreased diabetic neuropathy, decreased medications, in addition to lower HgbA1c. Your patients could experience these and many other benefits as well. And with less pain and more energy, patients are much more likely to adhere to diet and exercise regimens.

Our protocol applies today's technology to scientific principles known to doctors for decades. We believe our approach represents an enormous step forward in the treatment of diabetes and other metabolic disorders. We want to work in collaboration with you to help your patients.

Feel free to call me to discuss if Diabetes Relief's therapy might be right for your metabolically impaired patients. You can do more than just strive for better glycemic control and worry while your patients deteriorate and their complications progress. It's time for some relief; it's time for Diabetes Relief.

For your convenience, a referral form is available for download below.



## Medical Device

State-of-the-art diagnostic medical device testing the cardiovascular and autonomic nervous system
FDA Cleared
Small office footprint
Portable mobile cart



## Medical reports

Physician portal for immediate results
Instant easy-to-interpret 4-page report

APPX0497

Physicians.

Secure cloud-based database
40-Page archive report
Download Sample



## Medical Technician

Onsite technician
Employed by P4P
Screens patients
Schedules patients
Conducts Tests



## Billing

Determine insurance eligibility
Submit claims
Resolve disputes

APPX0498

# Watch Our Immersive Video

🎥 Watch video

# Interested in investing opportunities?

🎥 Read More

APPX0499

## OBGYN

Because OGBYN physicians often act as the primary care physician for women of childbearing age our service is a good wellness platform to help identify hidden disease in asymptomatic patients.

## Diabetic Medicine

Our protocol helps to diagnose diabetes as well as other hidden diseases associated with diabetes including neuropathies and PAD.

## Ophthalmalogy

Our service is a good wellness tool for ophthalmologists, especially in diabetes detection.

## Cardiology

Our tests help diagnose patients with known CAD/hypercholesterolemia/ hypertension especially with those of smoking and stroke history.

## Endocrinology

Our test provides a good wellness tool for all patients with diabetes/thyroid/cholesterol issues.

## Orthopedic

The P4P testing protocol has clinical relevance in the orthopedic space because it is a good wellness tool used pre-surgery to identify circulatory and diabetic issues.

APPX0500

## Gastroenterologist

Our service helps the gastroenterologist identify and quantify neuropathies associated with the autonomic nervous system and thus helpful in treating patients with abdominal pain, constipation, diarrhea or symptoms that follow irritable bowel.

## Pain Management

Pain management encompasses treating patients with pain and correctly identifying the pathology of that pain. Our clinical tool helps to identify whether that pain is vascular or neuropathic, or both allowing the clinician to develop a more personalized approach to the patient's pain management.

## General Practice

Good wellness tool for testing asymptomatic diseases in asymptomatic patients, 60% of adult patients qualify.

## Podiatry

Good wellness tool especially due to lower leg issues and large number of diabetic patients; pre-surgery tool.

## Geriatric Medicine

Our service is a good wellness tool for the geriatric physician in that all of their patient mix should qualify for testing. Elevated pulse wave pressures in ABI over the age of 70 correlate with increased risk of dementia.

## Pulmonology, to incl. Sleep Disorders

The link between COPD and autonomic dysfunction and heart disease makes our service a useful

APPX0501

diagnostic screening tool.

## Integrative Practice

Our service is a complete wellness tool that can easily be implemented into integrative practices.

## Neurology

All patients with neuropathies qualify for our service. Our service helps the Neurologist objectively quantify the neuropathy.

## Surgery

P4P is a good screening/wellness tool pre-surgery for detecting peripheral vascular disease and cardio risk assessments.

## Internal Medicine

Our service is a great wellness tool for testing hidden diseases in asymptomatic patients. In addition, we help diagnose the root causes of complex symptomologies related to the cardiovascular and autonomic nervous system. 60% of adult patients qualify.

## Urology

P4P helps rule out vascular causes of Erectile Dysfunction.

## Weight Management

Our service is a good wellness tool for weight management physicians. Most patients will likely qualify for our service because of the higher rates of diabetes/ thyroid/ cholesterol issues in

APPX0502

overweight patients.

## Nephrology (Kidney)

All patients with Stage III kidney disease qualify - the link is they have a higher risk for PVD.

## Wound Care

Excellent screening tool to determine arterial causes of lower extremity ulcers/wounds.

**1**



APPX0503

# Patient Completes Questionnaire

**2**



## Schedule for tests

**3**



APPX0504



## Patient follow-up appointment scheduled

**4**



## Insulinic submits claim on behalf of physician.

**5**

APPX0505



**Physician receives all remittances.**

**6**



**Insulinic Invoices Practice for Service.**

APPX0506

# Billing and Insurance

Our service is accepted by Medicare, Medicaid, and most major private insurance carriers.

We offer two options for billing.

# Option 1

Billing provided by Pulse 4 Pulse team via national platform AdvanceMD.
We have many years of experience working with insurance companies and have expertise in successfully submitting claims and minimizing denials for the billing codes associated with our service.

# Option 2

While we prefer to do the billing because of our experience with these specific codes we do let clients who request it do their own billing.  In this case, the practice bills through their existing system and Pulse 4 Pulse provides expert billing liaison.

# Billing Codes

There are up to 5 Billable Diagnostic Codes approved by Medicare, Medicaid, and most private payers.

- Ankle Brachial Test (93923)

- Autonomic Function Test (95921)

- Sudomotor Test (95923)

- Electrocardiogram (93040)

- Pulse Oximetry (94761)

Additional Billing Code

- Follow-up Office Visit (99214)

APPX0507

# Stay Connected With Insulinic



(http://www.facebook.com/insulinic)

(https://twitter.com/insulinic)

## Quick Links

Home(http://insulinic.com/shawn/)

About Us(http://insulinic.com/shawn/about/)

Services(http://insulinic.com/shawn/services/)

Contact(http://insulinic.com/shawn/contact/)

## Make an Appointment

Getting an accurate diagnosis can be one of the most impactful experiences that you can have.

**Contact Now
(http://insulinic.com/shawn/contact/)**

Copyright © 2021 Insulinic | Powered by Tech Reshape (https://www.techreshape.com)

  

# facebook



# Insulinic

28 followers • 4 following

WhatsApp         Message        Follow

Posts    About    Mentions    Reviews    Followers    Photos    More ▾    •••

## Intro

Our unique approach to treating metabolic disorders is designed to offer real results and real relie

**Page** · Medical & health

220 Johnston Street

(337) 254-9999

HR@insulinic.com

insulinic.com

Closed now ■

EXHIBIT 12





APPX0511





**Insulinic updated their phone number.**                    **Call now**

Like        Comment        Share

**Insulinic** updated their cover photo.
August 13, 2021 · 🌐



Like        Comment        Share

**Insulinic** updated their profile picture.
August 13, 2021 · 🌐

APPX0512



APPX0513

APPX0514



# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director



**Registration Number**

## VA 2-185-843

**Effective Date of Registration:**
November 15, 2019
**Registration Decision Date:**
January 14, 2020

---

## Title

**Title of Work:** Glucose Homeostasis V.2

## Completion/Publication

**Year of Completion:** 2019
**Date of 1st Publication:** October 15, 2019
**Nation of 1ˢᵗ Publication:** United States

## Author

- **Author:** Diabetes Relief LLC
  **Author Created:** technical drawing
  **Work made for hire:** Yes
  **Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** Diabetes Relief LLC
11511 Katy Fwy, Suite 100, Houston, TX, 77079, United States

---

## Rights and Permissions

**Name:** Scott A Hepford
**Email:** scott@diabetesrelief.com
**Telephone:** (281)600-5000
**Address:** 11511 Katy Fwy
Suite 100
Houston, TX 77079 United States

## Certification

EXHIBIT
13

Page 1 of 2
PPX0516

**Name:** Carol Wilson
**Date:** November 15, 2019

**Copyright Office notes:**   Regarding authorship information: Registered work is Artwork/Illustration

# Glucose Homeostasis

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC 2019. All rights reserved.

APPX0518

**Registration #:**   VA0002185843
**Service Request #:**   1-8260679031



Diabetes Relief LLC
11511 Katy Fwy
Suite 100
Houston, TX 77079 United States

**TAB 17**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-03062 |
| | § | |
| SHAWN PAUL CALVIT, MARC | § | |
| PIERRE DESGRAVES IV, CHARLES | § | |
| ALEXANDER ELLIOTT, INSULINIC | § | |
| OF LAFAYETTE LLC, INSULINIC OF | § | |
| HIALEAH LLC, AND INSULINIC | § | |
| HAWAII, LLC, | § | |
| | § | |
| *Defendants*. | § | |

### DEFENDANTS' MOTION TO STRIKE AFFIDAVIT OF SCOTT A. HEPFORD

Defendants, Shawn Paul Calvit, Insulinic of Lafayette LLC, and Insulinic of Hialeah LLC, and Insulinic Hawaii, LLC ("*Defendants*"), file this Motion to Strike the Affidavit of Scott A. Hepford attached to Plaintiff's Verified Application for an Emergency Temporary Restraining Order and Preliminary Injunction (Docket Entry No. 4), and would respectfully show the Court the following:

### SUMMARY

Defendants seek to strike portions of the September 9, 2022 Affidavit of Scott A. Hepford ("Hepford Affidavit") because each violates the Rules of Evidence. Therefore, Defendants move to strike paragraphs 11, 12, 14, and 17 of the Hepford Affidavit on the grounds he lacks personal knowledge to make such assertions, and thus, they should be ignored by the Court.

## ARGUMENT AND AUTHORITIES

Scott Hepford lacks personal knowledge of various statements in his affidavit and thus those paragraphs should be disregarded.

An affidavit must positively and unqualifiedly represent the facts stated therein to be true and within the affiant's personal knowledge.[1]  The mere recitation that the affidavit is based on personal knowledge is inadequate if the affidavit does not affirmatively show a factual basis for the knowledge.[2]  The affidavit must explain how the affiant has personal knowledge and the statements represented need factual specificity such as place, time, and exact nature of the alleged facts.[3] An assertion that the affidavit is "based on my personal knowledge" is not sufficient to prove that personal knowledge exists.[4]

The Hepford Affidavit includes numerous statements which are defective on the most basic of grounds—Mr. Hepburn lacks personal knowledge.  In paragraphs 11, 12, 14, and 17, Hepford makes inflammatory allegations completely devoid of any facts to show personal knowledge.[5]

Specifically, Hepford claims "Mr. Calvit was secretly making plans to steal the intellectual property belonging to Well Cell and open competing clinics using the formerly licensed technology."[6]  Yet, he provides no basis for this allegation.  Hepford claims he knows the ownership for Insulinic of Hawaii without providing any basis for personal knowledge.[7]  He also alleges that an unidentified entity in Hawaii "could be harmed by the acts of Defendants."[8]  Still, he provides no basis to show he has personal knowledge of any harm, he does not specify any harm

---

[1] *Humphreys v. Caldwell,* 888 S.W.2d 469, 470–71 (Tex. 1994).
[2] *Valenzuela v. State & Cnty. Mut. Fire Ins. Co.,* 317 S.W.3d 550, 553–54 (Tex. App.—Houston [14th Dist.] 2010, no pet.).
[3] *Id.*
[4] Exhibit A, Affidavit of Scott A. Hepford at ¶ 11, 12, 14, 17.
[5] Exhibit A, Affidavit of Scott A. Hepford at ¶ 11.
[6] Exhibit A, Affidavit of Scott A. Hepford at ¶ 11.
[7] Exhibit A, Affidavit of Scott A. Hepford at ¶ 12.
[8] Exhibit A, Affidavit of Scott A. Hepford at ¶ 14.

2

and thus the allegation is mere speculation without any personal knowledge. Then, he claims "I know that Mr. Calvit has violated, and has plans to further violate Well Cell's protected intellectual property unless he is retrained immediately."[9] Again he makes these inflammatory allegations without providing even a shred of support to show he has personal knowledge of these bold and untrue allegations.

Accordingly, the Hepford Affidavit contains numerous statements of alleged facts; which are not supported by personal knowledge. Therefore, the Court should strike paragraphs 11, 12, 14 and 17 of the Affidavit of Scott Hepford because it is improper evidence, which is not based on personal knowledge.

### **PRAYER**

Based on the foregoing, Defendants respectfully request that the Court strike paragraphs 11, 12, 14, and 17 of the Affidavit of Scott A. Hepford from Plaintiff's Verified Emergency Application for a Temporary Restraining Order and Preliminary Injunction (Docket Entry No. 4), and for such other and further relief, at law or in equity, to which Defendants may show themselves justly entitled.

Date:   October 28, 2022.

---

[9] Exhibit A, Affidavit of Scott A. Hepford at ¶ 17.

APPX0522

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**


By: */s/ Justin K. Ratley*

    Justin K. Ratley
    State Bar No. 24093011
    700 Milam, Suite 800
    Houston, Texas 77002
    Telephone: (713) 222-1493
    Facsimile: (713) 222-1475
    jratley@munsch.com

**ATTORNEYS FOR DEFENDANTS,
SHAWN PAUL CALVIT,
INSULINIC OF LAFAYETTE LLC,
INSULINIC OF HIALEAH LLC,
AND INSULINIC HAWAII, LLC**

OF COUNSEL:

Elizabeth F. Eoff
State Bar No. 24095062
SDTX ID No. 2951585
Munsch Hardt Kopf & Harr, P.C.
700 Milam, Suite 800
Houston, Texas 77002
Telephone: (713) 222-1493
Facsimile: (713) 222-1475
eeoff@munsch.com

4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record on October 28, 2022, using the CM/ECF system which will send notification of such filing to all counsel of record who have registered as filing users of the system.

Lema Barazi
Feras Mousilli
Elizabeth Revere
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
litigation@lloydmousilli.com
lema@lloydmousilli.com
feras@lloydmousilli.com
beth@lloydmousilli.com

*/s/ Justin K. Ratley*
Justin K. Ratley

5

APPX0524

**EXHIBIT A**

## AFFIDAVIT OF SCOTT A. HEPFORD

| | |
|---|---|
| **THE STATE OF TEXAS** | § |
| | § |
| **COUNTY OF HARRIS** | § |

BEFORE ME, the undersigned authority, on this day personally appeared **SCOTT A. HEPFORD**, and being duly sworn upon his oath by me, deposed and stated as follows:

1. "My name is SCOTT A. HEPFORD. I am over the age of eighteen. I am of sound mind and competent to make this Affidavit. The facts set forth herein are based on my personal knowledge and are true and correct.

2. "I am a citizen and resident of Harris County, Texas. I am a Member and Manager of Well Cell Global LLC (**"Well Cell"**), a Texas Limited Liability Company that owns certain intellectual property rights formerly owned by Diabetes Relief LLC ("**DRL**"), a Texas Series Limited Liability Company of which I am also a Member and Manager.

3. "Well Cell specializes in developing ground-breaking technology for the treatment of diabetes and licensing its proprietary technology to other entities so that they may operate comprehensive diabetes clinics throughout the world. Well Cell owns patents, copyrights, trademarks, and trade secrets pertaining to its proprietary technology for the treatment of diabetes which it always protects diligently. Well Cell possesses trade secrets in the form of business contacts, including clients, physicians, vendors, investors, borrowers, lenders, agents, brokers, banks, lending corporations, buyers, and sellers. These trade secrets are closely guarded by Well Cell and have been developed through extensive time, labor, skill, and money. Well Cell's trade secrets are of immeasurable value and are not easily duplicated nor readily

1

APPX0525

ascertainable. Well Cell never shares its trade secrets with third-parties without a robust confidentiality agreement in place.

4.  "I am also a Member and Manager of Well Cell Support LLC (**"WCS"**), a Texas Limited Liability Company that is authorized by Well Cell to issue licenses for its patented technology and processes for the treatment of diabetes and other metabolic disorders.

5.  "I am familiar with the matters in controversy in the litigation against Shawn Calvit (**"Mr. Calvit"**) and several of his "Insulinic" business entities and other individuals in the United States District Court for the Southern District of Texas ("**SDTX**") (herein referred to as the **"Insulinic Litigation"**).

6.  "I submit this Affidavit in support of Well Cell's emergency application for injunctive relief, filed in the SDTX in the Insulinic Litigation.

7.  "WCS issued a license to Insulinic of Lafayette LLC (**"Insulinic LA"**) on September 13, 2021, and to Insulinic of Hialeah LLC (**"Insulinic FL"**) on November 1, 2021 for their use of Well Cell's patented technology, patent-pending technology, and proprietary and confidential trade secrets. The licenses contained Rules and Regulations required to be followed by Licensee, which were violated by Mr. Calvit, Insulinic LA and Insulinic FL.

8.  "Prior to issuing the licenses referenced above, Mr. Calvit signed a five-year confidentiality, nondisclosure, non-circumvention agreement on April 19, 2021, with Diabetes Relief LLC.

9.  "On June 9, 2022, I sent a notice of default with intention to revoke the Insulinic licenses issued to Insulinic LA and Insulinic FL and gave them 30 days to cure their breaches of the license agreements. Discussions between Mr. Calvit, who is a principal member of Insulinic LA

2

and Insulinic FL and Well Cell principals ensued and we made efforts to help Insulinic LA and Insulinic FL become compliant with the license agreement rules and requirements.

10.     "In July 2022, after Mr. Calvit, Insulinic LA, and Insulinic FL failed to remedy their breaches of the license agreement, Well Cell ended its business relationship and terminated the license agreements.

11.     "While I and others were attempting to work with Mr. Calvit to rectify matters and reinstate the licenses, Mr. Calvit was secretly making plans to steal the intellectual property belonging to Well Cell and open competing clinics using the formerly licensed technology, which is patent protected by Well Cell. One clinic I know about is in Hawaii and named Insulinic Hawaii, LLC (**"Insulinic HI"**).

12.     "I know that Mr. Calvit formed Insulinic HI on June 9, 2022. I also know that Shawn Calvit, Marc Pierre Desgraves IV, and Charles Alexander Elliot are Members of Insulinic HI. I believe Shawn Calvit, Marc Pierre Desgraves IV, and Charles Alexander Elliot are also Members of Insulinic LA and Insulinic FL.

13.     "Mr. Calvit and representatives from his Insulinic clinics had received training by me and others and instructions for using Well Cell's patented technology, all of which included know-how, show-how, and trade secrets belonging to Well Cell.

14.     "WCS had previously issued a license to a Hawaiian business entity on March 30, 2022, and I personally went to Hawaii to train the representatives for that clinic during the time period 8/21-31/22. That clinic is a legitimate licensee of WCS and could be harmed by the acts of Defendants.

15.     "Attached hereto as **Exhibit "A"** is a press release issued August 26, 2022 by "Insulinic" (**"Insulinic Press Release"**) about a grand opening of a new clinic in Hawaii, which refers to patented technology that is actually owned and patented by Well Cell, not Insulinic, and that uses quotations from a DRL Website protected by a Registered Copyright TX8-452-464 for the

APPX0527

website and its contents, which is currently owned by Well Cell. Attached hereto as **Exhibit "B"** is the Certificate of Registration for the DRL Website, along with the page of patient testimonials contained on the DRL Website, which are also contained in Insulinic's Press Release and which Insulinic falsely claims are testimonials of their clients in the Insulinic Press Release.

16.    "As further evidence of Mr. Calvit's efforts to open a competing clinic, attached hereto as **Exhibit "C"** is a copy of Facebook postings I copied from Mr. Calvit's Facebook page on September 4, 2022, which concern Mr. Calvit's opening of a clinic in Hawaii, all during the time of discussions surrounding the "cease and desist" notices.

17.    "I know that Mr. Calvit has violated, and has plans to further violate Well Cell's protected intellectual property unless he is restrained immediately. I also know that Well Cell is suffering irreparable harm as a result of Shawn Calvit, Marc Pierre Desgraves IV, and Charles Alexander Elliot's infringement on and theft of Well Cell's invaluable intellectual property, and Well Cell will continue to suffer irreparable harm if they are not immediately stopped."

FURTHER AFFIANT SAYETH NOT.

SCOTT A. HEPFORD

SUBSCRIBED AND SWORN TO BEFORE ME, on this the _9th_ day of September 2022, by Scott A. Hepford, to me personally known, to certify which witness my hand and official seal of office

Notary Public, State of Texas

CAROL ANN WILSON
Notary Public, State of Texas
Comm. Expires 12-31-2020
Notary ID 1207125

APPX0528

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-03062 |
| | § | |
| SHAWN PAUL CALVIT, MARC | § | |
| PIERRE DESGRAVES IV, CHARLES | § | |
| ALEXANDER ELLIOTT, INSULINIC | § | |
| OF LAFAYETTE LLC, INSULINIC OF | § | |
| HIALEAH LLC, AND INSULINIC | § | |
| HAWAII, LLC, | § | |
| | § | |
| *Defendants*. | § | |

**ORDER GRANTING DEFENDANTS' MOTION TO STRIKE
THE AFFIDAVIT OF SCOTT A. HEPFORD**

Defendants, Shawn Paul Calvit, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and

Insulinic Hawaii, LLC's Motion to Strike the Affidavit of Scott A. Hepford attached to Plaintiff's

Verified Application for an Emergency Temporary Restraining Order and Preliminary Injunction

(Docket Entry No. 4), is hereby granted.

Date: _____, 2022.


_____
Honorable Judge Lee H. Rosenthal

**TAB 18**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-03062 |
| | § | |
| SHAWN PAUL CALVIT, MARC | § | |
| PIERRE DESGRAVES IV, CHARLES | § | |
| ALEXANDER ELLIOTT, INSULINIC | § | |
| OF LAFAYETTE LLC, INSULINIC OF | § | |
| HIALEAH LLC, AND INSULINIC | § | |
| HAWAII, LLC, | § | |
| | § | |
| *Defendants*. | § | |

**DEFENDANTS' MOTION TO STRIKE
UNSWORN DECLARATION OF KELLY MCDANIEL**

Defendants, Shawn Paul Calvit, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and Insulinc of Hawaii LLC ("*Defendants*"), file this Motion to Strike the Unsworn Declaration of Kelly McDaniel attached to Plaintiff's Verified Application for an Emergency Temporary Restraining Order and Preliminary Injunction (Docket Entry No. 4), and would respectfully show the Court the following:

<u>**SUMMARY**</u>

Defendants seek to strike portions of the Unsworn Declaration of Kelly McDaniel ("McDaniel Declaration") because it contains inadmissible evidence. Accordingly, Defendants object to and move to strike paragraphs number 8-10 and 12-16 because they contain inadmissible hearsay and/or lack personal knowledge to support the assertions.

## ARGUMENT AND AUTHORITIES

**A. The McDaniel Declaration contains inadmissible hearsay in paragraphs 8-10, 12-15, which should be struck.**

Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted.[1]  As a general rule, hearsay evidence is inadmissible unless it falls within one of several exceptions.[2]  Importantly, submitting evidence in the form of an affidavit or declaration does not relieve a party of the requirement that the affidavit set out facts that would be admissible, including the requirements surrounding hearsay testimony.[3]

Here, the McDaniel Declaration contains numerous inadmissible hearsay statements regarding what Ms. McDaniel was allegedly told, and this testimony should be ignored.

In paragraph 8, she testifies to discussions she had in a training.[4]  In paragraphs 9 and 10, she discusses what a colleague told her and what she read on a website.[5]  In paragraph 12-15 she discusses what she was allegedly told by an alleged chief financial officer for an unidentified Insulinic entity.[6]

The conversations she had with others outside of Court are classic hearsay and are asserted solely to prove the truth of the matter asserted and do not meet any exclusion or an exception to the hearsay rule.  Therefore these paragraphs should be struck.

---

[1] *See* TEX. R. EVID. 801(d).
[2] *See* TEX. R. EVID. 802
[3] *United States ex rel. King v. Solvay S.A.,* Civil Action H-06-2662, 2015 U.S. Dist. LEXIS 132286, *12 (S.D. Tex. Sept. 30, 2015).
[4] Exhibit A, McDaniel Declaration at ¶ 8.
[5] Exhibit A, McDaniel Declaration at ¶¶ 9-10.
[6] Exhibit A, McDaniel Declaration at ¶¶ 12-15.

2

**B.  The McDaniel Declaration contains statements in paragraphs 12 and 16, which are not supported by personal knowledge and should be struck.**

An affidavit must positively and unqualifiedly represent the facts stated therein to be true and within the affiant's personal knowledge.[7]  The mere recitation that the affidavit is based on personal knowledge is inadequate if the affidavit does not affirmatively show a factual basis for the knowledge.[8]

However, the McDaniel Declaration contains assertions that are not based on personal knowledge.  For example, McDaniel asserts that Marc Desgraves is the chief financial officer for Insulinic, without articulating any facts to support such a statement.[9]  McDaniel also fails to articulate the alleged "Insulinic" entity for which Mr. Desgraves held that role or how she would know.[10]  McDaniel also makes an unsupported statement regarding the ownership of patents, without any basis to support her assertions.  Specifically, in paragraph 16 she alleges Well Cell holds patents, but she provides no basis for her assertion.  Given the great weight of evidence in this case that shows Diabetes Relief, LLC actually owns the patents, there appears to be no legitimate basis for her to make such a remark.[11]

Because the McDaniel Declaration contains assertions of "facts" absent her personal knowledge, those paragraphs should be struck.

---

[7] *Humphreys v. Caldwell,* 888 S.W.2d 469, 470–71 (Tex. 1994).
[8] *Valenzuela v. State & Cnty. Mut. Fire Ins. Co.,* 317 S.W.3d 550, 553–54 (Tex. App.—Houston [14th Dist.] 2010, no pet.).
[9] Exhibit A, McDaniel Declaration at ¶ 12.
[10] Plaintiff's own pleadings identify numerous separate entities with "Insulinic" in the name.  *See* ECF 1 at 1.
[11] Exhibit A, McDaniel Declaration at ¶ 16.

APPX0532

## **PRAYER**

Based on the foregoing, Defendants respectfully request that the Court strike paragraphs number 8-10 and 12-16 in the Unsworn Declaration of Kelly McDaniel from Plaintiff's Verified Emergency Application for a Temporary Restraining Order and Preliminary Injunction (Docket Entry No. 4), and for such other and further relief, at law or in equity, to which Defendants may show themselves justly entitled.

Date:   October 28, 2022.

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By: _/s/ Justin K. Ratley_
    Justin K. Ratley
    State Bar No. 24093011
    700 Milam, Suite 800
    Houston, Texas 77002
    Telephone: (713) 222-1493
    Facsimile: (713) 222-1475
    jratley@munsch.com

**ATTORNEYS FOR DEFENDANTS,
SHAWN PAUL CALVIT,
MARC PIERRE DESGRAVES IV,
CHARLES ALEXANDER ELLIOTT,
INSULINIC OF LAFAYETTE LLC,
INSULINIC OF HIALEAH LLC,
AND INSULINIC HAWAII, LLC**

OF COUNSEL:

Elizabeth F. Eoff
State Bar No. 24095062
SDTX ID No. 2951585
Munsch Hardt Kopf & Harr, P.C.
700 Milam, Suite 800
Houston, Texas 77002
Telephone: (713) 222-1493
Facsimile: (713) 222-1475
eeoff@munsch.com

APPX0533

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record on October 28, 2022, using the CM/ECF system which will send notification of such filing to all counsel of record who have registered as filing users of the system.

Lema Barazi
Feras Mousilli
Elizabeth Revere
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
litigation@lloydmousilli.com
lema@lloydmousilli.com
feras@lloydmousilli.com
beth@lloydmousilli.com

/s/ Justin K. Ratley
Justin K. Ratley

APPX0534

EXHIBIT

A

## UNSWORN DECLARATION OF KELLY MCDANIEL

Pursuant to 28 U.S. Code § 1746, I, **KELLY MCDANIEL**, declare under penalty of perjury the following is true and correct:

1.      "My name is KELLY MCDANIEL. I am over eighteen (18) years of age and I have never been convicted of a crime. I am of sound mind and capable of making this Declaration. The facts set forth herein are within my personal knowledge and are true and correct.

2.      "I am Kelly McDaniel. I am familiar with the matters involved in the case of Well Cell Global LLC (**"Well Cell"**) versus Shawn Calvit, the "Insulinic" business entities, and others in the Southern District of Texas (**"Insulinic Litigation"**).

3.      "I am a Certified Diabetes Care and Education Specialist (**"CDCES"**) living in Oʻahu, Hawaiʻi. I have been a Hawaiʻi resident for 10 years and provided health care services across the six main islands for the duration of that time. During my career here, I have developed a thorough understanding of the healthcare landscape in Hawaiʻi, and it has been disheartening to witness what happens as a result of limited access to healthcare services for diabetes that focus on education, prevention, and effective treatment modalities.

4.      "More specifically, Type 2 Diabetes runs rampant across the islands and people suffer from complications that markedly affect their quality of life. For this reason, the people of Hawaiʻi have a palpable desperation for relief from this progressive disease and Hawaiʻi has become a target for those profiting from the medical management of Type 2 Diabetes. I witnessed this firsthand as the Hawaiʻi Territory Clinical Manager for my former employer, who are the makers of a tubeless insulin pump. I often heard in the industry that Hawaiʻi has the largest untapped market for Type 2 Diabetes. I separated from the company because I did not

1

feel comfortable meeting the expected territory growth rates since I was given a warning to increase territory growth but chose not too even though I knew it may result in my termination.

5.      "Separating from my former position provided the space for me to learn more about Physiologic Insulin Resensitization (**"PIR"**) therapy, a treatment modality I was introduced to in February 2022. Targeting insulin resistance has been the focus of my education and research platforms for the latter half of my career, so a colleague asked me to review a recent publication on PIR as he was considering investing in it.

6.      "The results of the study were astonishing, and the mechanism of action made sense, so I fully supported my colleague in this investment. I also asked him to keep me involved when it came time to open his clinic, since I am deeply connected to our diabetes community in Hawaiʻi and wanted to ensure PIR was introduced in a manner that included care coordination with referring providers and a sustainability piece for patients and their families.

7.      "On August 23, 2022, I became affiliated with a new clinic for Well Cell that was to introduce PIR in a clinical setting and I agreed to become trained in the process. I completed the required online didactic modules the week prior and this was the date we started in-person training on Oʻahu with the Well Cell Team.

8.      "The first day was a review of the material covered in the online didactic, and the remainder of training was spent in clinic delivering PIR therapy under supervision of the lead clinical trainer from Well Cell. Over the course of my training, I learned about the history of IV insulin infusion for the purpose of restoring insulin sensitivity and the role Scott Hepford played in developing the algorithm/protocol to make this therapy accessible for use. We also discussed his efforts to ensure PIR therapy is delivered by capable health care providers, as it requires specific skill sets in terms of understanding glucose metabolism, pathophysiology of insulin

resistance, and a willingness to let go of the "cookie cutter approach" commonly found across the healthcare arena.

9.      "Shortly after completing training on September 1, 2022, I was chatting with a colleague from another branch of my practice and she mentioned there was another new clinic opening up. She started telling me about this "IV insulin therapy" and how it can reverse neuropathy and proceeded to send me the link to the clinic's website. I immediately clicked on the link—which was to Insulinic--and I was directed to a website containing the words "Physiologic Insulin Resensitization" on the header. Knowing this was a term coined by Scott Hepford, my mind started questioning what was going on here. I continued to scroll down the page to find images that were specifically created for the Well Cell training, which led me to believe they were opening up another clinic here with this group.

10.     "At this point I was still on the phone with my colleague, and she shared another link, this time to the press release sent out via the Hawai'i Chamber of Commerce. I was intrigued by the approach the clinic was taking to introduce PIR therapy in tandem with a "nerve conduction and vascular flow diagnostic test," but what really piqued my interest was the title of the press release, "New Diabetes Management Clinic Here on Oahu NOW!"

11.     "My personal quest to shift diabetes care and education to be more meaningful and effective, combined with the longstanding relationships I have formed with diabetes care specialists and people living with diabetes across the islands, has made me the unofficial gatekeeper of innovations in diabetes care for Hawai'i. Because of this, I am invested in vetting anyone who comes here to offer new services and subsequently pursue a partnership with these folks if they have something valuable to offer our community. That being said, I reached out to Insulinic the very next day, September 2, 2022, to learn more.

12.    "I was able to reach Marc Desgraves, Chief Financial Officer for Insulinic, and we had a brief but informative conversation. I asked about the "insulin IV infusion modality" they are offering and he led with a general mention of the "peer reviewed and university studies" on the subject. He then proceeded to tell me the therapy "uses insulin as a hormone, not a drug, gives the pancreas a rest and gets insulin into the system faster, allowing people to wean off Metformin and other medications." The verbiage using insulin as a hormone, not a drug, supported my initial belief that Insulinic is affiliated with Well Cell, because these are the exact words used by Scott Hepford in one of the first online didactic modules. However, Marc did not mention Well Cell once during our conversation; I found this to be odd considering the details he shared throughout the remainder of our conversation.

13.    "Marc Desgraves informed me they had five operational clinics on the mainland--TX, AL, GA, FL, and LA--and the Hawaiʻi clinic would be opening soon. He was unable to give me a date due to "recent changes with their Medical Director relationship."  I let him know I was at the clinic site hoping to catch someone there, but the suite was empty. He said contractors would be in and out for the next few days and he would also be stopping by intermittently and could meet with me in person to talk more.

14.    "In a phone conversation later that day, I informed him that I was scheduled to travel to Maui and may not be able to meet until next week. He said that would work great, corporate was scheduled to come in for training, and the entire core team would be present, so I could stop by on their lunch break. I thanked him for the opportunity and said I would be in touch once I solidified my schedule.

15.    "In closing, I left that conversation thoroughly perplexed. Things were not adding up in terms of the content on their website, the information Mark was sharing, and no mention of Well

Cell, Diabetes Relief, or Scott Hepford. Knowing what PIR therapy entails in terms of clinical expertise, I was deeply concerned about who would be delivering the therapy and even more concerned about who is training them if they aren't claiming to be affiliated with Well Cell.

16.    "To my knowledge, Well Cell is the only organization that is authorized to license clinics to deliver this specialized therapy and Well Cell holds the patents on this technology.

17.    "In an effort to protect our community, I am sharing the information above should Insulinic be involved in any type of wrongdoing by opening a clinic that offers PIR unbeknownst to Well Cell.

18.    "I submit this Declaration in support of Well Cell's emergency application for injunctive relief."

Executed on September 9, 2022

_Kelly McDaniel_
**KELLY MCDANIEL, Declarant**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-03062 |
| | § | |
| SHAWN PAUL CALVIT, MARC | § | |
| PIERRE DESGRAVES IV, CHARLES | § | |
| ALEXANDER ELLIOTT, INSULINIC | § | |
| OF LAFAYETTE LLC, INSULINIC OF | § | |
| HIALEAH LLC, AND INSULINIC | § | |
| HAWAII, LLC, | § | |
| | § | |
| *Defendants*. | § | |

**ORDER GRANTING DEFENDANTS' MOTION TO STRIKE
UNSWORN DECLARATION OF KELLY MCDANIEL**

Defendants, Shawn Paul Calvit, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and

Insulinc of Hawaii LLC's Motion to Strike the Unsworn Declaration of Kelly McDaniel attached

to Plaintiff's Verified Application for an Emergency Temporary Restraining Order and

Preliminary Injunction (Docket Entry No. 4), is hereby granted.

Date: _____, 2022.


_____
Honorable Judge Lee H. Rosenthal