2023-1229

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

WELL CELL GLOBAL LLC AND WELL CELL SUPPORT LLC,

Plaintiffs-Appellees

v.

SHAWN PAUL CALVIT, PATRICK DALE LELEAUX, M.D., INSULINIC LLC, INSULINIC OF LAFAYETTE LLC, INSULINIC OF HIALEAH LLC, INSULINIC OF HAWAII, LLC, INSULINIC OF GRETNA, LLC, AND INSULINIC OF HAMMOND, LLC,

Defendants-Appellants

Appeal from the United States District Court for the Southern District of Texas in Civil Action No. 4:22-CV-03062, Chief Judge Lee H. Rosenthal

**APPENDIX TO PRINCIPAL BRIEF OF DEFENDANTS-APPELLANTS SHAWN PAUL CALVIT, PATRICK DALE LELEAUX, M.D., INSULINIC LLC, INSULINIC OF LAFAYETTE LLC, INSULINIC OF HIALEAH LLC, AND INSULINIC OF HAWAII, LLC (VOLUME 2)**

Winston O. Huff
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, TX 75201
Telephone: (214) 855-7508
Facsimile: (214) 855-7584
whuff@munsch.com

1

# TABLE OF CONTENTS

| Tab | Docket Number and Document | Appendix Page No. |
|-----|----------------------------|-------------------|
| 19  | 47 – Defendants' Supplemental Response to Plaintiff's Request for Preliminary Injunction | APPX0541-1283 |

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By:*/s/ Winston O. Huff*
Winston O. Huff
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201
Telephone: (214) 855-7508
Facsimile: (214) 855-7584
whuff@munsch.com

**ATTORNEYS FOR DEFENDANTS,
SHAWN PAUL CALVIT,
INSULINIC OF LAFAYETTE LLC,
INSULINIC OF HIALEAH LLC,
AND INSULINIC OF HAWAII LLC**

## CERTIFICATE OF SERVICE

This is to certify that on February 6, 2023, copies of the foregoing Appendix to Principal Brief of Defendants-Appellants was served on counsel for Plaintiffs-Appellees Well Cell Global LLC and Well Cell Support LLC via the Court's ECF system and via electronic mail upon the following:

Lema Barazi
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
litigation@lloydmousilli.com
lema@lloydmousilli.com

/s/ Winston O. Huff
Counsel for Defendants

4867-0599-1247v.1

**TAB 19**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-03062 |
| | § | |
| SHAWN PAUL CALVIT, MARC | § | |
| PIERRE DESGRAVES IV, CHARLES | § | |
| ALEXANDER ELLIOTT, INSULINIC | § | |
| OF LAFAYETTE LLC, INSULINIC OF | § | |
| HIALEAH LLC, AND INSULINIC | § | |
| HAWAII, LLC, | § | |
| | § | |
| *Defendants*. | § | |

## DEFENDANTS' SUPPLEMENTAL RESPONSE TO
## PLAINTIFF'S REQUEST FOR PRELIMIN ARY INJUNCTION

Defendants, Shawn Paul Calvit ("Calvit"), Marc Pierre Desgraves IV ("Desgraves"),

Charles Alexander Elliott ("Elliot"), Insulinic of Lafayette LLC ("Insulinic Lafayette" or

"Lafayette"), Insulinic of Hialeah LLC ("Insulinic Hialeah" or "Hialeah"), and Insulinc of Hawaii

LLC ("Insulinc Hawaii"), (collectively, *"Defendants"*), to Plaintiff's Verified Emergency

Application for a Temporary Restraining Order and Preliminary Injunction, ECF No. 4.

## TABLE OF CONTENTS

PAGE

SUMMARY OF THE ARGUMENT ........................................................................1

SHORT STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.................2

STATEMENT OF THE ISSUES TO BE RULED ON ...................................................2

STANDARD OF REVIEW ..................................................................................3

FACTUAL BACKGROUND .................................................................................3

    A.    Ownership of the relevant patents, copyrights, and alleged trade secrets ...............3

    B.    General Nature of the Patents ................................................................5

    C.    General Nature of the Copyrights ...........................................................8

    D.    The Insulinic Clinics ..........................................................................8

    E.    The relationship between the Defendants, Well Cell, WCS, and Diabetes Relief LLC ......................................................................................9

        1.    The Non-Disclosure Agreement ..................................................9

        2.    The License Agreements...........................................................10

    F.    Events leading to the Lawsuit ...............................................................12

    G.    The medical services, if any, provided by the Insulinic Clinics to patients...........13

ARGUMENT ................................................................................................15

    A.    Plaintiff has not and cannot establish a substantial likelihood of success on the merits......................................................................................16

        1.    Plaintiff cannot establish that it is the owner of the 595 Patent, the 990 Patent, the alleged copyrighted works, or any other claimed intellectual property, and therefore does not have standing to assert those claims ......16

        2.    Plaintiff is unlikely to prevail on its claim for patent infringement...........19

        3.    Plaintiff is unlikely to prevail on its claim for copyright infringement .....22

        4.    Plaintiff is unlikely to prevail on its claim for trade secrets based on its "contacts."................................................................................22

    B.    Plaintiff has not and cannot establish a substantial threat of irreparable injury if the injunction is not issued........................................................24

    C.    Plaintiff has not and cannot establish the threatened injury to it outweighs any damages the injunction may cause Defendants ...................................26

    D.    Plaintiff has not and cannot establish an injunction will not disserve the public interest...................................................................................27

CONCLUSION & PRAYER.................................................................................28

CERTIFICATE OF SERVICE ...............................................................................30

APPX0542

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*,
    No. 95-cv-03577, 2008 U.S. Dist. LEXIS 88892, 2008 WL 4647384 (N.D.
    Cal. Oct. 20, 2008) ................................................................................................25

*Alice Corp. v. CLS Bank Int'l*,
    573 U.S. 208 (2014) ..............................................................................................19

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
    878 F.2d 806 (5th Cir. 1989) ................................................................................24

*Arachnid, Inc. v. Merit Indus., Inc.*,
    939 F.2d 1574 (Fed.Cir.1991) ..............................................................................17

*Bandit Messenger of Austin, Inc. v. Contreras*,
    2000–2 Trade Cas. (CCH) 73,109, 2000 WL 1587664 (Tex. App. 2000) .............24

*In re Bass*,
    113 S.W.3d 735 (Tex. 2003) ................................................................................23

*BCOWW Holdings, LLC v. Collins*,
    No. SA-17-CA-00379-FB, 2017 WL 3868184 (W.D. Tex. Sept. 5, 2017) ............23

*Bianco v. Globus Med., Inc.*,
    2012 U.S. Dist. LEXIS 163020, 2012 WL 5611054 (E.D. Tex. Nov. 15, 2012) ...27

*Bluefield Water Ass'n, Inc. v. City of Starkville*,
    577 F.3d 250 (5th Cir. 2009) .............................................................................3, 26

*BMC Software, Inc. v. IBM*,
    2018 U.S. Dist. LEXIS 162295 (S.D. Tex. September 21, 2018) ..........................25

*Byrum v. Landreth*,
    566 F.3d 442 (5th Cir. 2009) .............................................................................3, 15

*City of Meridian, Miss. v. Algernon Blair, Inc.*,
    721 F.2d 525 (5th Cir. 1983) ................................................................................24

*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*,
    517 F.3d 1284 (Fed. Cir. 2008) ............................................................................17

*Filmtec Corp. v. Allied-Signal Inc.*,
    939 F.2d 1568 (Fed. Cir. 1991) ............................................................................17

APPX0543

*Gaal v. BASF Wyandotte Corp.*,
    533 S.W.2d 152 (Tex. App. 1976)............................................................23

*Guy Carpenter & co. v. Provenzale*,
    334 F.3d 459 (5th Cir. 2003) ...............................................................23

*Hanak v. Talon Ins. Agency, Ltd.*,
    470 F. Supp. 2d 695 (E.D. Tex. 2006) ...................................................17

*Hawes v. Stephens*,
    2017 U.S. Dist. LEXIS 184584 (E.D. Tex. Sept. 2017) .........................26

*Hyde Corp. v. Huffines*,
    314 S.W.2d 763 (1958).........................................................................23

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ..........................................................24, 26

*Lance Roof Inspection Serv., Inc. v. Hardin*,
    653 F. Supp. 1097 (S.D. Tex. 1986) .....................................................23

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    No. 2:06-CV-348-TJW, 2010 U.S. Dist. LEXIS 61645, 2010 WL 2574059
    (E.D. Tex. June 22, 2010) .....................................................................25

*MBO Lab., Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed.Cir. 2007)..............................................................19

*MGM Well Servs., Inc. v. Mega Lift Sys., LLC*,
    505 F. Supp. 2d 359 (S.D. Tex. 2007), aff'd, 264 F. App'x 900 (Fed. Cir.
    2008) ....................................................................................................19

*Minerals Separation, Ltd. v. Miami Copper Co.*
    (D.C.) 275 F. 572 (1921) ......................................................................16

*Motile Optics, LLC v. SAVV Entm't Sys.*,
    2017 U.S. Dist. LEXIS 191198 (E.D. Tex. Jan. 10, 2017).....................25

*Numed, Inc. v. McNutt*,
    724 S.W.2d 432 (Tex. App. 1987).........................................................23

*Sampson v. Murray*,
    415 U.S. 61, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974).............................24

*Wavetronix LLC v. Iteris, Inc.*,
    No. A-14-CA-970-SS, 2015 U.S. Dist. LEXIS 6993, 2015 WL 300726 (W.D.
    Tex. Jan. 22, 2014)...............................................................................19

APPX0544

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................................................26

**Statutes**

35 U.S.C. § 271(a) ....................................................................................................19

Copyright Act of 1976, 17 U.S.C. § 204(a) .............................................................16

Rev. St. § 4898 ........................................................................................................16

APPX0545

## SUMMARY OF THE ARGUMENT

Because Plaintiff does not have legal title to any of the alleged intellectual property at issue in Plaintiff's Verified Emergency Application for a Temporary Restraining Order and Preliminary Injunction, ECF No. 4, Plaintiff cannot meet its threshold burden to establish standing to pursue injunctive relief or a likelihood of success on the merits.  Plaintiff has failed to produce a single document in discovery to establish that it has standing to assert these claims and instead relies on an "agreement to agree" with the actual owner regarding the sale of those assets.  That alleged transaction is hotly contested by the parties involved, but even by the purported agreements own terms, the assignment of intellectual property would not occur until 2024.  Thus, Plaintiff lacks standing to pursue these claims.

Further, even if Plaintiff had established a legal right to pursue claims for the intellectual property at issue, Plaintiff cannot show a likelihood of success on the merits because the use was licensed.  Insulinic of Lafayette and Insulinic of Hialeah paid for the right to use all alleged intellectual property at issue to provide insulin infusion treatments at their internal medicine centers pursuant to license agreements.  A day after sending notice of the alleged termination of those license agreements, Plaintiff filed this suit alleging infringement.  Lafayette and Hialeah could not have infringed on any intellectual property licensed to them prior to notice of the alleged license termination.

Additionally, Plaintiff cannot establish a likelihood of success on the merits because the equipment and processes used by Defendants for insulin infusion treatments were incapable of infringing on any patent asserted by Plaintiff.  The patents at issue rely heavily on the interconnected nature of various components, which receive computer instructions to automate various protocols.  Conversely, Lafayette and Hialeah processes and equipment have no ability to automatically adjust treatments, are not interconnected, and never have been.

1

APPX0546

Finally, Plaintiff cannot establish irreparable harm because it has already established and offered a price to the market, including Defendants, for the use of all of its intellectual property and equipment for $75 per infusion.

Therefore, the Court should deny Plaintiff's request for preliminary injunction because Plaintiff cannot meet its burden on the required elements for a preliminary injunction.

### SHORT STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

On September 8, 2022, Plaintiff filed a Complaint and Request for Preliminary Injunctive Relief seeking a preliminary injunction preventing Defendants from: (1) infringing upon the 595 and 990 Patents, (2) infringing upon its copyrights, registration numbers TX-8-452-464 and VAu 1-330-086, and (3) misappropriating its trade secrets until a trial on the merits.[1]

A Temporary Restraining Order was previously entered and has been extended several times to accommodate the parties' and Court's schedule for a hearing on the request for Preliminary Injunction.[2] A hearing on Plaintiff's requested Preliminary Injunction is now set for October 31, 2022, at 1:30 p.m.[3]

The Defendants filed a Motion to Dismiss on October 4, 2022, which is incorporated by reference in this Response.[4] On October 25, 2022, the Plaintiff responded to the Motion to Dismiss.[5]

### STATEMENT OF THE ISSUES TO BE RULED ON

Whether a preliminary injunction should be granted against Defendants.

---

[1] *See* ECF No. 4; ECF No. 40 at ¶8.
[2] *See* ECF No. 18, 27, 29, 38.
[3] ECF No. 37, Memorandum and Temporary Restraining Order.
[4] ECF No. 35.
[5] ECF No. 40.

APPX0547

<u>STANDARD OF REVIEW</u>

For injunctive relief to issue, Plaintiff has the burden to establish (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.[6] None of the four requirements has a fixed quantitative value, but the party seeking a preliminary injunction must "clearly carry[y] the burden of persuasion on all four elements."[7]

<u>FACTUAL BACKGROUND</u>

**A.      Ownership of the relevant patents, copyrights, and alleged trade secrets.**

In January of 2015, Scott Hepford and Hunter Carr founded Diabetes Relief LLC ("Diabetes Relief").[8]  Diabetes Relief is an active entity with the State of Texas and is not a party to this lawsuit.[9]  The two patents at issue here, the 595 Patent and the 990 Patent, were issued to Diabetes Relief and are registered to the Diabetes Relief with the US Patent Office.[10]  Likewise, the two copyrights at issue here, registration numbers of TX-8-452-464 and registration number of VAu 1-330-086, were also issued to Diabetes Relief.[11]  Finally, the non-disclosure agreement on which Plaintiff bases its trade secrets claim is an agreement between Diabetes Relief and Shawn Calvit — no one else.[12]

Well Cell alleges that on July 24, 2020, Diabetes Relief and Well Cell entered into an Asset Purchase Agreement ("Asset Purchase Agreement") where Well Cell agreed to purchase all of

---

[6]*Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).
[7]*Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 252-53 (5th Cir. 2009) (quotations omitted).
[8]Ex. 1 at 24:13-17, (Hepford Dep.).
[9]Ex. 2 (2022 Filing with the State of Texas for Diabetes Relief LLC).
[10]Ex. 3 at INSU_PI_000406, (595 Patent); Ex. 4 at INSU_PI_000445 (990 Patent).
[11]Ex. 5 at INSU_PI_000474 (Copyright registration number of TX-8-452-464); Ex. 6 at INSU_PI_000480 (Copyright registration number of VAu 1-330-086).
[12]Ex. 14 at INSU_PI_000936 (Non-Disclosure Agreement).

APPX0548

Diabetes Relief's assets.[13]   Hunter Carr—one of the owners of Diabetes Relief—disputes the transaction and is currently litigating its validity.  However, even if the transfer was proper (which has not yet been decided by another court), the Asset Purchase Agreement does not automatically transfer ownership of the assets from Diabetes Relief to Well Cell.   Instead, Diabetes Relief promised it "will deliver" and "will provide" the intellectual property at issue in this lawsuit, upon payment in full of the "Purchase Price."[14] The provisions state:

> 6. At Closing and *upon the Purchaser paying the Purchase Price in full to the Seller, the Seller will deliver the Assets to the Purchaser.* The Seller will deliver to the Purchaser possession of the Assets, in the same condition as on the Execution Date, and Free and clear· of any liens, charges, rights of third parties, or any other encumbrances, except those attached as a result of the Purchaser's actions.
>
> 7. At Closing and *upon the Purchaser paying the Purchase Price in full to the Seller, the Seller will provide* the Purchaser with duly executed forms and documents evidencing transfer of the Assets, where required including, but not limited to, bills of sale, *assignments*, assurances and consents. The Seller will also cooperate with the Purchaser as needed in order to effect the required registration, recording and filing with public authorities of the transfer of ownership of the Assets to the Purchaser.[15]

The Asset Purchase Agreement defines the "Purchase Price" as:

> The Parties agree that the Purchase Price for the Assets is as follows subject to required adjustments that are agreed upon by the Parties: <u>Three Million. Seven Hundred Ninety-Three Thousand, Five Hundred Eleven and No/100 ($3,793,511.00).</u>[16]

The Asset Purchase Agreement then makes clear that part of the Purchase Price would be paid overtime and will not be paid "in full" until 2024.[17]  The payment provision states:

> 10. The Purchaser will pay according to the Asset Payment Table, attached hereto and incorporated within as Exhibit A. First payment

---

[13]Ex. 7 at INSU_PI_000483 (Asset Purchase Agreement, Section 2).
[14]Ex. 7 at INSU_PI_000485 (Asset Purchase Agreement, Section 7).
[15]Ex. 7 at INSU_PI_000485 (Asset Purchase Agreement, Section 6-7) (emphasis added)
[16]Ex. 7 at INSU_PI_000485 (Asset Purchase Agreement, Section 3).
[17]Ex. 7 at INSU_PI_000485 (Asset Purchase Agreement, Section 10); Ex. 7 at INSU_PI_000492 (Asset Purchase Agreement at Exhibit A).

APPX0549

> is due by August 15th, 2020 *and continues according to the schedule until July 15, 2024, or until balance of $3,447,679.00 less prepaid expense (whichever comes first) is paid in full.*[18]

Plaintiff failed to produce any evidence showing an assignment from Diabetes Relief to Plaintiff for any of the intellectual property at issue in this lawsuit.  Plaintiff also failed to provide any evidence the preconditions to transfer in the asset purchase agreement had occurred.  Importantly, Plaintiff has not and cannot show that the full purchase price has been paid.

In contrast, other evidence suggests that the Purchase Price has not been paid "in full" and ownership of the assets have not been transferred from Diabetes Relief to Well Cell.[19]  Indeed, in August of 2020, a month after the execution of the Asset Purchase Agreement, Scott Hepford represented and testified to a State Court in Texas that "the Well Cell transaction is currently on hold" because the co-owner of Diabetes Relief had filed a lawsuit objecting to the validity of the sale of the assets from Diabetes Relief to Well Cell.[20]  That case remains unresolved.[21]

## B.   General Nature of the Patents.

The 595 Patent is a kit or collection of items which can be used together to provide individualized intravenous exogenous insulin based therapy, which includes a portable data storage in communication with a client device processor.[22]  The 595 Patent is for a kit comprised of: a blood glucose monitor, an intravenous catheter, two administrative processors, portable data storage, diabetic treatment mode, a library of care plan templates, and a glucose dosage amount.[23]  Importantly, the components had to be connected in such a way that computer instructions in the portable data storage could instruct:

---

[18]Ex. 7 at INSU_PI_000485 (Asset Purchase Agreement, Section 10) (emphasis added).
[19]Ex. 8 at INSU_PI_000493-4 (Verification of Scott Hepford dated August 24, 2020).
[20]Ex. 8 at INSU_PI_000493-4 (Verification of Scott Hepford dated August 24, 2020).
[21]Ex. 9 (Letter filed on September 26, 2020, discussing that discovery disputes are ongoing).
[22]Ex. 3 (595 Patent).
[23]Ex. 3 at INSU_PI_000441-3 (595 Patent).

APPX0550

- A client device to compare respiratory quotient of the subject to a plurality of metabolic factors;[24]

- A client device to modify the bolus for each subject as identified in the care plant;[25]

- A client device to modify the generated individualized schedule of bolus to improve the respiratory quotient for a subject;[26]

- A client device to compare measured cardiac function of the subject;[27]

- A client device to modify the generated individualized schedule of bolus to improve the cardiac function of a subject;[28]

- A client device to measure peripheral autonomic neuropathy and microcirculation of a subject and compare the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms in a library;[29]

- A client device to scan an initial retinal image of the subject for diabetic retinopathy;[30]

- A client device to scan a post treatment retinal image of the subject after the first treatment session and compare it to the initial retinal image;[31]

- A client device to modify the quantity of bolus based on the retinal image;[32]

- A client device to scan and calculate dimensionally wounds of the subject;[33] and

- A client device to modify the quantity of bolus for the subject identified in the care plan for wound treatment using the identified skin integrity and changes in wound characteristics.[34]

The 990 Patent similarly relies on the interconnectedness of components and computer instructions to provide individualized intravenous exogenous insulin – based therapy for infusing

---

[24]Ex. 3 at INSU_PI_000442, (595 Patent).
[25]Ex. 3 at INSU_PI_000442, (595 Patent).
[26]Ex. 3 at INSU_PI_000442, (595 Patent).
[27]Ex. 3 at INSU_PI_000442, (595 Patent).
[28]Ex. 3 at INSU_PI_000442, (595 Patent).
[29]Ex. 3 at INSU_PI_000442-3, (595 Patent).
[30]Ex. 3 at INSU_PI_000443, (595 Patent).
[31]Ex. 3 at INSU_PI_000443, (595 Patent).
[32]Ex. 3 at INSU_PI_000443, (595 Patent).
[33]Ex. 3 at INSU_PI_000443, (595 Patent).
[34]Ex. 3 at INSU_PI_000443, (595 Patent).

6

APPX0551

insulin intravenously to a subject or a patient.[35]  The Method in the 990 Patent comprised of a step-by-step approach:

- Create a subject profile;

- Assess metabolic factors;

- Create a care plan;

- Introduce glucose;

- Test the subject's blood glucose levels;

- Compare the blood glucose levels to a diabetic treatment model;

- Map the blood glucose levels and assessed metabolic factors;

- Introduce boluses based on the mapping;

- Compare the subject profile to a plurality of weight management protocols based on the assessed metabolic factors and save the weight management protocol in the care plan;

- Implement the weight management protocol.[36]

However, to complete the patented process, the 990 Patent also requires:

- The administrative processor be connected to a network;

- A plurality of client devices configured for inputting subject information into the subject profile; using computer instructions;

- Computer instructions to compare tested blood glucose levels to a diabetic treatment model;

- Computer instructions to compare blood glucose levels to a plurality of therapeutic ranges;

- A plurality of weight management protocols;

- Computer instructions to compare the subject profile to the plurality of weight management protocols and save the weight management protocol to the care plan;

---

[35]Ex. 4, (990 Patent).
[36]Ex. 4 INSU_PI_000471, (990 Patent).

APPX0552

- Computer instructions to map blood glucose levels and assessed metabolic factors; and

- Computer instructions to track implementation of the weight management protocol and determine the determine the schedule of bolus for the subject.[37]

Importantly, neither Well Cell or Diabetes Relief claim to own any patents to infusion pumps or IV tubing cassettes.[38]

## C.    General Nature of the Copyrights.

The copyrighted work relates to information and testimonials on the website diabetesrelief.com.[39]   Despite, Well Cell's inability to claim any ownership, Defendants have removed any information claimed to be Well Cell's copyrighted information from any website affiliated with Insulinic.[40]

## D.    The Insulinic Clinics.

Insulinic Lafayette is a medical clinic established by Calvit in 2021.[41]  It has approximately 8 employees and/or contractors.[42]   The employees include office workers, physicians, nurse practitioners, and a licensed practical nurse or LPN.[43]  This clinic has approximately 150 to 200 patients.[44]  Approximately 80% of these patients receive diabetes treatment.[45]  On September 13, 2021, Insulinic Lafayette entered into an agreement with Well Cell Support, LLC ("WCS").[46]

Insulinic Hialeah is a medical clinic established by Calvit in 2021.[47]  This clinic manages the operation so the Integral Medical Clinic owned by non-party, Dr. Hernandez.[48]  This clinic

---

[37]Ex. 4 at INSU_PI_000473 (990 Patent).
[38]Ex. 1 at 336:3-337:7, (Hepford Dep.).
[39]Ex. 5 (Copyright registration number of TX-8-452-464); Ex. 6, (Copyright registration number of VAu 1-330-086).
[40]Ex. 11 at 316:15-21, (Calvit Dep.).
[41]Ex. 11 at 50:4-13, (Calvit Dep.).
[42]Ex. 11 at 51:13-15; 55:3-4, , (Calvit Dep.).
[43]Ex. 11 at 52:5-18; 55:3-4, (Calvit Dep.).
[44]Ex. 11 at 56:12-18, (Calvit Dep.).
[45]Ex. 11 at 56:22-24, (Calvit Dep.).
[46]Ex. 12 (License Agreement Insulinic Lafayette).
[47]Ex. 11. at 109:20-25, (Calvit Dep.).
[48]Ex. 11 at 110:17-111:1, (Calvit Dep.).

APPX0553

treats diabetes and metabolic disorder patients.[49]   It has approximately 3 employees and/or contractors.[50]  This clinic has approximately 25 patients.[51]  Most of these patients receive diabetes treatment.[52]  On November 21, 2021, Insulinic Hialeah entered into an agreement with WCS.[53] Insulinic Hialeah stopped providing insulin infusion treatments after of the temporary restraining order entered by this Court.[54]

Insulinic Hawaii is a medical clinic established by Calvit, Elliot, and Desgraves in June 2022.[55]  It has zero employees and/or contractors.[56]  This clinic has zero patients.[57]  It does not have an agreement with Well Cell or WCS.[58]  No pump purchased from Well Cell Global or Well Cell Support is located at Insulinic Hawaii.[59]

**E.     The relationship between the Defendants, Well Cell, WCS, and Diabetes Relief LLC.**

The Defendants have no contractual relationship with Well Cell, the entity seeking relief in this action.   Instead, each of the relevant agreements cited by the Plaintiff requesting the injunctive relief before the Court are with either Diabetes Relief LLC or WCS.

**1.     The Non-Disclosure Agreement.**

On April 15, 2021, Calvit and Diabetes Relief entered into the ("Non-Disclosure Agreement").[60]  Calvit testified that he entered into this agreement because Diabetes Relief wanted him to sign it before it would discuss doing business together.[61]

---

[49]Ex. 11 at 111:6-8 (Calvit Dep.).
[50]Ex. 11 at 111:9-13 (Calvit Dep.).
[51]Ex. 11 at 114:10-14 (Calvit Dep.).
[52]Ex. 11 at 114:15-17 (Calvit Dep.).
[53]Ex. 13 (License Agreement Insulinic Hialeah) .
[54]Ex. 11 at 117:13-24 (Calvit Dep.).
[55]Ex. 11 at 126:19-24 (Calvit Dep.).
[56]Ex. 11 at 127:8-13 (Calvit Dep.).
[57]Ex. 11 at 127:20-21 (Calvit Dep.).
[58]Ex. 11 at 165:6-8 (Calvit Dep.).
[59]Ex. 11 at 128:11-13 (Calvit Dep.).
[60]Ex. 14 at INSU_PI_000936 Non-Disclosure Agreement).
[61]Ex. 11 at 175:11-17 (Calvit Dep.).

APPX0554

2. **The License Agreements.**

In the fall of 2021, Insulinic Lafayette and Insulinic Hialeah executed License Agreements with WCS.[62]  Calvit testified that he bought licenses from Hepford because "they put out that they were patent holders [] of some pumps and things to treat diabetes…and presented the opportunity to buy pumps from them."[63]  Calvit needed to purchase the pumps from a supplier because he is not a reseller of pumps like Well Cell—he is the owner of certain medical clinics.[64]

Insulinic Lafayette and Insulinic Hialeah both purchased "Start-Up Packages" for $60,000 each under the License Agreements which included, amongst other things, 8 pumps for each location and IV tubing cassettes.[65]  The $60,000 Start-Up Package is outlined in Exhibit A ("License Agreement – Global Pricing Fee Matrix") to the License Agreements.[66] Exhibit B to the License Agreements further explain that the fee averages to a $75 per infusion average.[67]  What is included with each $75 infusion is:

---

[62]Ex. 12 (License Agreement Insulinic Lafayette); Ex. 13 (License Agreement Insulinic Hialeah).
[63]Ex. 11 at 41:18-25 (Calvit Dep.).
[64]Ex. 11 at 313:20-23 (Calvit Dep.).
[65]Ex. 12 (License Agreement Insulinic Lafayette); Ex. 13 (License Agreement Insulinic Hialeah); Ex. 30 (proof of payment).
[66]Ex. 12 at INSU_PI00918 (License Agreement Insulinic Lafayette at Exhibit A); Ex. 13 at INSU_PI00929, (License Agreement Insulinic Hialeah at Exhibit A).
[67]Ex. 12 at INSU_PI00919 Lafayette License Agreement at Exhibit B; Ex. 13 at INSU_PI00929, (License Agreement Insulinic Hialeah at Exhibit B).

APPX0555



## License Agreement - Global Pricing Sheet

### Effective December 1, 2020

**LICENSEE $60,000 Start-up Package: ($75 per infusion average)**
- **8 Required Proprietary Infusion Pumps**
  - 240-hour pump life (each)
  - 100 infusions per pump average (based on a mix of 2 & 3 hour infusions)
- **800 Required Proprietary IV Tubing Infusion Cassettes ("Sets") 1 Per Infusion**
- **Training at a qualified and approved Regional Training Center (RTC) for:**
  - 2 Physician Director
  - 6 licensed medical staff members
- **All licenses and protocol qualifications to conduct treatment**
- **Pre- and Post- Training Support, Ongoing QC Review & Practice Support**
- **License Knowledge Base** set up, ongoing access & support calls
- **Patent protection for Licensee**
- **3rd party billing expert phone seminar**
- **Supplements** (subject to availability)

Additionally, WCS represented that pursuant to the License Agreements Insulinic Lafayette and Insulinic Hialeah purchased "the right to operate utilizing LICENSOR's Assets, rights, and technologies… ."[68]  The License Agreements defined Licensor's Assets as:

> names, products, **intellectual property**, procedures, technology (including programmed pumps, sets, software, programs, networks, etc.), patents and other intellectual property, and know-how for use in the operations of LICENSOR-authorized clinics and treatment facilities (which may include LICENSEE) …[69]

The License Agreements had no defined term and was expected to exist for the life of the equipment purchased by Lafayette and Hialeah, which was generally 240 hours of use per pump.[70]

However, the License Agreements could be terminated under a narrow exception:

> LICENSOR may terminate this Agreement or any of its provisions upon TEN (10) days' notice if LICENSEE is in default or refuses to comply with any of the terms and conditions set forth in this

---

[68]Ex. 12 at INSU_PI00911 (License Agreement Insulinic Lafayette ¶ 2); Ex. 13 at INSU_PI00923 (License Agreement Insulinic Hialeah¶ 2).

[69]Ex. 12 at INSU_PI00911 (License Agreement Insulinic Lafayette ¶ 2); Ex. 13 at INSU_PI00923 (License Agreement Insulinic Hialeah¶ 2).

[70]Ex. 12 at INSU_PI00912 (License Agreement Insulinic Lafayette ¶ 4); Ex. 13 at INSU_PI00924 (License Agreement Insulinic Hialeah¶ 4).

APPX0556

Agreement and fails to cure such default within THIRTY (30) days.[71]

**F.    Events leading to the Lawsuit.**

On May 26, 2022, Dawn Davis, a third-party biller from medical services recommended by Plaintiff (or its affiliate), emailed Calvit and agents and representative of Plaintiff (or its affiliate) to discuss some medical billing code issues.[72]  Although there was no reason for a medical technology company to ever been in contact with Lafayette's and Hialeah's third-party biller,[73] Scott Hepford, the owner of Plaintiff (and its affiliate), received the email.

Plaintiff, a non-party to the License Agreements, and the third-party biller developed a scheme to terminate Lafayette's and Hialeah's licenses based on the billing codes they used with Medicare for services provided at their internal medicine clinics, despite clearly admitting that Plaintiff (nor its affiliates) **have ever or will ever provide Lafayette and Hialeah billing advice or guidance**.[74]

On June 9, 2022, Plaintiff's affiliate sent Calvit a notice of default alleging and threatened termination of the License Agreements if "violations" had not been cured.  In substance, the notice of default stated:

> You are in violation of Paragraph 5B and your assurance that you at all material times have been in compliance in all material respects with all laws, regulations, rules, orders, judgments, decrees, and other requirements and policies imposed by any governmental entity applicable to it, its owners, its properties, or the operation of its business transactions. This especially applied to all matters **involved with billing for services** performed under your license agreements.[75]

---

[71]Ex. 12 at INSU_PI00912 (License Agreement Insulinic Lafayette ¶ 4); Ex. 13 at INSU_PI00924 (License Agreement Insulinic Hialeah¶ 4).
[72]Ex. 15 at INSU_PI00938-9 (Email addressing billing code issues).
[73]*Id.*
[74]Ex. 16 at INSU_PI00940.
[75]Ex. 17 (emphasis added).

APPX0557

Calvit responded with a detailed response to each alleged billing issue.[76]   Furthermore, Calvit discussed the alleged breaches of the agreement with Scott Hepford and Hepford told him that Well Cell had no intention of terminating the agreement and they would talk things over. Calvit testified that Hepford told him "let's calm down, things have gotten out of – out of hand – [] we're not going to terminate your license."[77]

On September 7, 2022, Plaintiff's counsel sent a letter to Calvit, Lafayette, and Hialeah informing them of the termination of the License Agreements.[78]   The letter again stated that the termination was due to "improper medical billing coding."[79]   No other information was provided and suit was filed the next day on September 8, 2022.

The License Agreements provided no medical billing requirements or guidelines and by its own admission Plaintiff (and its affiliate) never provided any billing advice or guidance.[80]   Yet, Plaintiff chose that basis to purport to terminate the License Agreements.

**G.      The medical services, if any, provided by the Insulinic Clinics to patients**

The services provided by the Insulinic Clinic include: "all primary care, things that can be done," including "visits, wellness visits, weight loss, diabetes education, nutrition therapy, obesity counseling, infusions," and "physical therapy."[81]   This clinic provides many different types of infusion treatments to: treat the immune system, aid in weight loss, increase energy, deliver micronutrients, and treat diabetes.[82]

---

[76]Ex. 18 at INSU_PI00945.
[77]Ex. 11 at 201:6-10 (Calvit Dep.).
[78]Ex.19.
[79]*Id*. at 2.
[80]Ex. 12 (License Agreement Insulinic Lafayette); Ex. 13 (License Agreement Insulinic Hialeah).; Ex. 16 at INSU_PI00940.
[81]Ex. 11 at 53:22-54:25; 112:13-16 (Calvit Dep.).
[82]Ex. 11 at 54:8-11 (Calvit Dep.).

APPX0558

The type of treatments received by patients related to diabetes depends on the particular patient's needs.[83]   Importantly, Hepford concedes that insulin infusion treatments can be performed without improperly using Well Cell's alleged IP because hospitals all over the world perform these types of treatments.[84]   The types of treatment provided depends on the patient's glucose level and other related conditions, including whether the patient is obese, whether they need other nutrients such as B12, Gluthathione, or Nicotinamide adenine dinucleotide ("NAD"), a patient's chronic disease, neuropathy, kidney functions, and liver functions.[85]   The specific protocol or steps used to treat each patient depends on "what the doctors [sic] setup."[86] The patient's medical history, weight, test results, is written down by a person in their medical records.[87]

Insulinic Lafayette once used the "Well Cell Program," but during the Spring of 2021 Insulinic Lafayette started using a different program.[88]   The Well Cell Program uses a process called "physiologic insulin resensitization" whereas the Insulinic Clinics use a process called "Microburst Insulin Infusion."[89]   Insulinic Lafayette consulted a doctor in Houston who introduced it to "different processes to be able to work with."[90]   The doctor in Houston "showed [Insulinic Lafayette] other cocktails that could be beneficial to the patient and he introduced us to other existing protocols that were similar but different....that what Well Cell was utilizing."[91] Other doctors were also consulted and they provided information and guidance based on some

[83]Ex. 1 at 58:4-11 (Calvit Dep.) ("there's different programs that are done.").
[84]Ex. 1 at 335:5-336:2 (Hepford Dep.).
[85]Ex. 11 at 58:4-11; 56:14-22; 60:1-19; 117:4-8; 127:22-128:4 (Calvit Dep.).
[86]Ex. 11 at 59:3-11 (Calvit Dep.).
[87]Ex. 11 at 64:8- 70:16 (Calvit Dep.).
[88]Ex. 11 at 95:8- 96:4 (Calvit Dep.).
[89]Ex. 11 at 227:7-18 (Calvit Dep.).
[90]Ex. 11 at 95:25- 96:4 (Calvit Dep.).
[91]Ex. 11 at 96:9- 96:15 (Calvit Dep.).

APPX0559

research which was published prior to the creation of Well Cell Global and Diabetes Relief.[92]  The

new approach "added additional IV lines to introduce other medication that would help the patients

specifically on their chronic disease."[93]  The new approach also varies from the Well Cell Program

by changing the frequency of the administration, the concentration of the medication, the timing

of the infusion, and began using a different pump.[94]

Calvit testified that the Insulinic Clinics stopped using the Well Cell Program in total after

he received a notification that Well Cell said that he could not continue to use the pumps he had

purchased from Well Cell.[95]  He further confirmed that Insulinic Lafayette stopped using the

pumps he purchased from Well Cell Support after this Court ordered it to stop using them.[96]

## ARGUMENT

While the Motion to Dismiss filed on October 4, 2022, is sufficient in itself to give the

Court ground to deny the request for Preliminary Injunction, when we look outside of the

allegations in the Complaint, Plaintiff still is unable to meet its burden to show it is entitled to the

extraordinary remedy of injunctive relief.[97] Specifically, Plaintiff has not and cannot meet its

burden to establish: (1) a substantial likelihood of success on the merits, (2) a substantial threat of

irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is

denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an

injunction will not disserve the public interest.[98]

---

[92]Ex. 11 at 100:8-25 (Calvit Dep.).
[93]Ex. 11 at 97:21- 98:1 (Calvit Dep.).
[94]Ex. 11 at 99:25- 100:7; 101:4-12 (Calvit Dep.).
[95]Ex. 11 at 96:20- 96:25; 104:8-19 (Calvit Dep.) (Insulinic switched from using the Nimbus pump to the Curlin pump).
[96]Ex. 11 at 106:15-19 (Calvit Dep.).
[97]Defendants incorporate the arguments in the Motion to Dismiss into this Response (Dkt. 35), in order to avoid duplicative and repetitive arguments.
[98]*Byrum*, 566 F.3d at 445.

APPX0560

**A.** **Plaintiff has not and cannot establish a substantial likelihood of success on the merits.**

The basis of Plaintiff's request for Preliminary Injunction is its causes of action for patent infringement, copyright infringement, and misappropriation of trade secrets. The Defendants filed a motion to dismiss each of those claims on October 4, 2022, and incorporates each of those arguments here explaining why the Plaintiff's claims fail as a matter of law.[99]  Importantly, at the time of filing, Plaintiff has not provided the Court with much more than the bare allegations in its original complaint and request for injunctive relief to support its claim for a preliminary injunction.

**1.** **Plaintiff cannot establish that it is the owner of the 595 Patent, the 990 Patent, the alleged copyrighted works, or any other claimed intellectual property, and therefore does not have standing to assert those claims.**

Plaintiff does not own legal title to the patents, copyrights, or any other claimed intellectual property in this lawsuit.  The Court ordered the Plaintiff to produce documents sufficient to show the legal title to both the 595 Patent and the 990 Patent; the assignment of testimonials; and documents sufficient to show the assets purchased by Well Cell from Diabetes Relief.[100]  However, Plaintiff has not produced any document showing Diabetes Relief transferred any legal title for any of the claimed intellectual property.

The law requires an assignment of a patent or copyright may be made only by an instrument in writing.[101]  To constitute an assignment, the instrument must be a written transfer with the clear intent at the time to part with the legal interest in the patent. An instrument which does not purport to convey a present interest in a patent is not an assignment within the statute.[102]

"Although state law governs the interpretation of contracts generally, the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to

---

[99]ECF No. 35
[100]ECF No. 29.
[101]Rev. St. § 4898; 35 USCA § 47; Copyright Act of 1976, 17 U.S.C. § 204(a).
[102]*Minerals Separation, Ltd. v. Miami Copper Co.* (D.C.) 275 F. 572 (1921).

APPX0561

assign is . . . a matter of federal law."[103]  "Under federal law, contract interpretation 'dovetails precisely with general principles of contract law,' and 'under both bodies of law, the judicial task in construing a contract is to give effect to the mutual intentions of the parties.'"[104]  Whether the assignment is automatic "depends on the contractual language."[105]  A contract that "expressly grants rights in future inventions" transfers legal title automatically, while a contract that "obligate[s] the inventor to grant rights in the future, by contrast, 'may vest the promisee with equitable rights in those inventions once made,' but do not by themselves 'vest legal title to patents on the inventions in the promisee.'"[106]

Courts have held contracts to constitute automatic assignments when they provide an inventor "agrees to grant and does hereby grant" patent rights or "hereby conveys, transfers, and assigns" patent rights.[107]  Courts have held contracts to be agreements to assign when they provide "all rights ... will be assigned by" an inventor or provide an inventor "agree[s] to assign" patent rights.[108]  An agreement to assign does not constitute a transfer of legal title, but "may vest the promisee with equitable rights in those inventions once made."[109]

The particular document relied on by Plaintiff is an Asset Purchase Agreement between it and Diabetes Relief LLC dated July 24, 2020.[110]  Plaintiff claims to have purchased certain "Assets" from Diabetes Relief, including the patents and other intellectual property at issue here. However, in this agreement Diabetes Relief promised that it "will deliver" the assets and "will

---

[103]*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008) (citing *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed.Cir.2000); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1580-81 (Fed.Cir.1991)).

[104]*Hanak v. Talon Ins. Agency, Ltd.*, 470 F. Supp. 2d 695, 706 (E.D. Tex. 2006) (*citing NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 681, 244 U.S. App. D.C. 356 (D.C.Cir.1985).

[105]*Id.*

[106]*Id.*

[107]*Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1573 (Fed. Cir. 1991).

[108]*Arachnid, Inc.,* 939 F.2d 1580-83.

[109]*Id.*

[110]Ex. 7 at INSU_PI_000485 (Asset Purchase Agreement).

17

APPX0562

provide" the needed written assignment at issue in this lawsuit, upon payment of the full "Purchase

Price."[111] The provision states:

> 6. At Closing and *upon the Purchaser paying the Purchase Price in full to the Seller, the Seller will deliver* the Assets to the Purchaser. The Seller will deliver to the Purchaser possession of the Assets, in the same condition as on the Execution Date, and Free and clear· of any liens, charges, rights of third parties, or any other encumbrances, except those attached as a result of the Purchaser's actions.
>
> 7. At Closing and *upon the Purchaser paying the Purchase Price in full to the Seller, the Seller will provide* the Purchaser with duly executed forms and documents evidencing transfer of the Assets, where required including, but not limited to, bills of sale, *assignments*, assurances and consents….[112]

However, the full purchase price is not expected until 2024.  The payment provision states:

> 10. The Purchaser will pay according to the Asset Payment Table, attached hereto and incorporated within as Exhibit A. First payment is due by August 15th, 2020 and *continues according to the schedule until July 15, 2024*, or until balance of $3,447,679.00 less prepaid expense (whichever comes first) is paid *in full*.[113]

Evidence suggests that the Purchase Price has not been paid "in full" and ownership of the

assets have not been transferred from Diabetes Relief to Well Cell.[114]  Indeed, in August of 2020,

a month after the execution of the Asset Purchase Agreement, Scott Hepford represented to a State

Court in Texas that "the Well Cell transaction is currently on hold" because the co-owner of

Diabetes Relief had filed a lawsuit objecting to the validity of the sale of the assets from Diabetes

Relief to Well Cell.[115]

Without more than an agreement to assign the intellectual property at issue here, the Asset

Purchase Agreement fails to meet the requirements of an assignment of title because it does not

---

[111]Ex. 7 at INSU_PI_000485 (Asset Purchase Agreement, Section 6-7) (emphasis added).
[112]Ex. 7 at INSU_PI_000485 (Asset Purchase Agreement, Section 7).
[113]Ex. 7 at INSU_PI_000485 (Asset Purchase Agreement, Section 10); Ex. 7 at INSU_PI_000492 (Asset Purchase Agreement at Exhibit A).
[114]Ex. 8 at INSU_PI_000493-4 (Verification of Scott Hepford dated August 24, 2020).
[115]Ex. 8 at INSU_PI_000493-4 (Verification of Scott Hepford dated August 24, 2020).

APPX0563

establish that the Plaintiff is the unconditional owner of the patents, copyrights, and/or any other intellectual property.  Indeed, the purchase agreement is no more than an agreement to assign, expressing conditions, which have yet to occur.

      **2.**        **Plaintiff is unlikely to prevail on its claim for patent infringement.**

To establish a patent infringement claim, a plaintiff must prove that the defendant, without authority, has made, used, offered to sell, or sold the patented invention.[116] "A determination of patent infringement requires a two-step analysis: first, the meaning of the claim language is construed, then the facts are applied to determine if the accused device falls within the scope of the claims as interpreted."[117]

As a threshold matter, even if the Well Cell owned the patents (it does not as explain *infra*), there is a substantial question as to the validity of the patents and therefore Well Cell is unlikely to prevail on its claim for patent infringement.An accused infringer can still defeat the required element of demonstrating a likelihood of success on the merits by raising a substantial question as to validity of the patent in suit.[118]  A claim is invalid under Section 101 where: (1) it is "directed to" a patent-ineligible concept, such as an abstract idea, and (2) the particular elements of the claim, considered "both individually and as an ordered combination," do not "transform the nature of the claim into a patent-eligible application," i.e., do not set forth an "inventive concept."[119] The 595 Patent is a kit or collection of items which can be used together to provide individualized intravenous exogenous insulin based therapy, which includes a portable data storage in communication with client device processor.[120]  The 990 Patent is a process for individualized

---

[116]35 U.S.C. § 271(a); *See also MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, 505 F. Supp. 2d 359, 366 (S.D. Tex. 2007), aff'd, 264 F. App'x 900 (Fed. Cir. 2008).
[117]*MBO Lab., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1329 (Fed.Cir. 2007).
[118]*See Wavetronix LLC v. Iteris, Inc.*, No. A-14-CA-970-SS, 2015 U.S. Dist. LEXIS 6993, 2015 WL 300726, at *6 (W.D. Tex. Jan. 22, 2014).
[119]*Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (internal quotation mark and citation omitted).
[120]Ex. 3 at INSU_PI_000406, (595 Patent).

APPX0564

intravenous exogenous insulin – based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing.[121]   Here, there is nothing "inventive" about using a patient's medical record, weight, generic tables for treatment, and medical equipment—as a process (claim in the 990 Patent) or a kit (claim in the 585 Patent)—to individualize, even automatically, treatment provided through intravenous transfer.  This is how patients are provided with treatments, including IV treatments for patients with diabetes, all over the world.[122]

Second, even if the patents are valid (they are not), the services being performed by the Defendants do not infringe on them.  The Plaintiff alleges that Defendants are infringing by "making, having made, using, and selling, and offering for sale infusion pumps, kits, and IV tubing infusion cassettes."[123] However, Plaintiff does not own a patent on an insulin infusion pumps or IV tubing infusion cassettes and, therefore, neither the 595 Patent nor the 990 Patent prevents the Defendants from pumps or cassettes.[124]  Well Cell generically claims that the Defendants are using the 595 kit and using the 990 process, but does not point to any specific conduct or aspect of either patent being performed by Defendants which infringes on any components of these patents.  Instead, Plaintiff claims that the Defendants must be infringing on the patents simply because the clinics are still providing IV treatments using any pump or IV cassette of any kind to patients.  This allegation is at odds with Plaintiff's concession that hospitals all over the world provide intravenous treatment for diabetes to patients without improperly using the Plaintiff's patented kit or process.[125]

---

[121]; Ex. 4 at INSU_PI_000445 (990 Patent).
[122]Ex.1 at 335:5-336:2 (Hepford Dep.).
[123]ECF No. 1, Complaint at ¶ 74.
[124]Ex. 3 at INSU_PI_000406, (595 Patent); Ex. 4 at INSU_PI_000445 (990 Patent).
[125]Ex. 1 at 335:5-336:2, (Hepford Dep.).

APPX0565

Indeed, Defendants' processes and equipment never infringed on the 595 Patent or the 990 Patent because they never received any equipment that was capable of the interconnected and autonomous adjustment of treatment plans, weight management protocols, and bolus adjustments articulated in the 595 Patent and the 990 Patent.[126]

While certain of the Insulinic Clinics were trained by Well Cell on the process and kit purportedly contained in the 595 and 990 Patent, those clinics have started using a different program and process to treat patients.[127]   The Well Cell Program uses a process called "physiologic insulin resensitization" whereas the Insulinic Clinics use a process called "Microburst Insulin Infusion."[128]   The new process used was shown to them by a medical doctor not affiliated with Well Cell and which is beneficial to the patient because it includes a different cocktail of medicine and other existing protocols, including those based on research published prior to the creation of Well Cell and Diabetes Relief, that were similar but different….than what Well Cell was utilizing.[129]   The new approach "added additional IV lines to introduce other medication that would help the patients specifically on their chronic disease."[130]   The new approach also varies from the Well Cell Program by changing the frequency of the administration, the concentration of the medication, the timing of the infusion, and began using a different pump.[131]

Accordingly, not only does Plaintiff lack any grounds to prevent the usage of any pump or IV tubing cassette, which it sold Lafayette or Hialeah, but it also has no basis to support that the services being performed at any Insulinic clinic infringe on the 595 or 990 Patent.[132]

---

[126]*See* Ex. 11 at 372:06-373:05 (Calvit Dep.).
[127]Ex. 11 at 95:8-96:4 (Calvit Dep.).
[128]Ex. 11 at 227:7-18 (Calvit Dep.).
[129]Ex. 11 at 96:9-96:15; 100:8-25 (Calvit Dep.).
[130]Ex. 11 at 97:21-98:1 (Calvit Dep.).
[131]Ex. 11 at 99:25-100:7; 101:4-12 (Calvit Dep.).
[132]Ex. 1 at 336:3-337:7 (Hepford Dep.).

21

For these reasons, Plaintiff does not have a substantial likelihood of prevailing on the merits of its claim for patent infringement.

### 3. Plaintiff is unlikely to prevail on its claim for copyright infringement.

Copyright infringement is established by showing (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.[133]  Here, as explained *infra,* Plaintiff cannot establish that it the owner of a valid copyright.  Likewise, even if Well Cell did own the copyrights at issue, the Defendants are no longer in use of any of the subject material.  Any information claimed to be Well Cell's copyrighted information has been removed from any website affiliated with Insulinic.[134]  For these reasons, the Plaintiff does not have a substantial likelihood of prevailing on the merits of its claim for copyright infringement.

### 4. Plaintiff is unlikely to prevail on its claim for trade secrets based on its "contacts."

Plaintiff cannot establish that the Defendants have improperly used any "Contacts" provided to it.  In his deposition, Hepford testified that he could not identify any of the purported contact information which had been misused or that the list of "Contacts" claimed to be Well Cell's trade secret exists.[135]  For these reasons, Plaintiff does not have a substantial likelihood of prevailing on the merits of this claim.

As a threshold matter, no contractual relationship exists between Plaintiff Well Cell and the Defendants and therefore information shared with the Defendants by Plaintiff is not protected by any agreement to keep that information confidential.  Plaintiff's claim is based solely on a non-disclosure agreement between Shawn Calvit and Diabetes Relief.[136]

---

[134]Ex. 11 at 316:15-21 (Calvit Dep.).
[135]Ex. 1 at 204:22-205:15; 215:1-7, (Hepford Dep.).
[136]Ex. 14 (Non-Disclosure Agreement).

APPX0567

To prevail on the merits of its trade-secrets claim a party must establish: "(i) a trade secret existed; (ii) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; (iii) the trade secret was used without authorization; and (iv) the trade secret owner suffered damages as a result."[137]  Here, the Plaintiff is unlikely to prevail on the merits because no trade secret exits, there is not confidential relationship between Plaintiff and Defendants, and the Defendants have not improperly used any of the information they obtained from Plaintiff.

Additionally, Plaintiff alleges its trade secrets are comprised of a broad sweep of what it calls business contacts, which it asserts includes clients, physicians, vendors, investors, borrowers, lenders, agents, brokers, banks, lending corporations, buyers and sellers.[138]  While customer and vendor lists can be trade secrets, the list at issue here does not meet the requirements to qualify as a trade secret.[139] A customer list of readily ascertainable names and addresses will not be protected as a trade secret.[140]

Importantly, the random assortment of client names or contacts do not qualify as trade secret.[141] Not only does Plaintiff fail to identify with any specificity the contents of its "customer

---

[137]*Snowhite Textile & Furnishings, Inc.*, 2020 Tex. App. LEXIS 9811, 2020 WL 7332677, at *4 (citing Civ. Prac. & Rem. §§ 134A.002(1),(3),(6)) (case citations omitted);  *see also In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (quoting Restatement of Torts § 757 cmt. b. (1939) (outlining the six-factor test for a common law claim for trade secrets under Texas Law).

[138]ECF No. 1, Complaint at ¶ 86.

[139]*BCOWW Holdings, LLC v. Collins*, No. SA-17-CA-00379-FB, 2017 WL 3868184, at *14 (W.D. Tex. Sept. 5, 2017); *see also Hyde Corp. v. Huffines*, 314 S.W.2d 763, 766 (1958). *Gaal v. BASF Wyandotte Corp.*, 533 S.W.2d 152, 155 (Tex. App. 1976) (holding that customer list of readily ascertainable names and addresses was not trades secret).

[140]*Guy Carpenter & co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003)(upholding the district court's determination that the customer list was not a trade secret under Texas law, reasoning that a customer list was readily ascertainable); *see also Numed, Inc. v. McNutt*, 724 S.W.2d 432, 435 (Tex. App. 1987)(finding no trade secret where customer list can be compiled by calling hospitals and doctors and asking the identify of their supplier); *see also Lance Roof Inspection Serv., Inc. v. Hardin,* 653 F. Supp. 1097, 1100 (S.D. Tex. 1986) (finding that customer list was not protectable trade secret where the names of plaintiff's customers were either commonly known within the industry or were readily ascertainable).

[141]*Numed, Inc. v. McNutt,* 724 S.W.2d 432, 435 (Tex. App. 1987, no writ) (finding the compilation of Merrill Lynch's customer list qualifies for trade secret protection).

APPX0568

lists" or the advantage it has over its competitors, Plaintiff also admits that it is not aware of the existence of any list at all.[142]   Without more, Plaintiff's "customer list" is just the general knowledge, skills, and experience acquired through conducting business in the industry.  Customer contacts that reside only in the abstract, merely as "relationships" of the business does not rise to the level of protection afforded by the trade secret law, which demands that the trade secret owner takes serious steps to maintain the confidentiality of the contacts, and where the recipient acknowledges the information to be confidential trade secrets.[143]

For these reasons, Plaintiff does not have a substantial likelihood of prevailing on the merits of its claim for misappropriation of trade secrets.

**B.   Plaintiff has not and cannot establish a substantial threat of irreparable injury if the injunction is not issued.**

In general, an injury is irreparable only if it cannot be remedied through money damages.[144] "The party seeking a preliminary injunction must also show that the threatened harm is more than mere speculation."[145] "[T]he central inquiry in deciding whether there is a substantial threat of irreparable harm to the plaintiff is whether the plaintiff's injury could be compensated by money damages."[146] "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."[147]   Here, the ultimate harm done to Plaintiff can be reduced to monetary

---

[142]Ex. 1. at 204:22-205:15; 215:1-7 (Hepford Dep.).

[143]See *Bandit Messenger of Austin, Inc. v. Contreras,* 2000–2 Trade Cas. (CCH) 73,109, 2000 WL 1587664 (Tex. App. 2000) (finding no trade secret where employer did not show what specific steps were taken to maintain the confidentiality of the customer list).

[144]*City of Meridian, Miss. v. Algernon Blair, Inc.,* 721 F.2d 525, 529 (5th Cir. 1983).

[145]*Janvey,* 647 F.3d at 601 (5th Cir. 2011).

[146]*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,* 878 F.2d 806, 810 n.1 (5th Cir. 1989).

[147]*Sampson v. Murray,* 415 U.S. 61, 90-91, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974).

APPX0569

damages because the harm to Plaintiff is, at most, the lost revenue associated with the allegedly improper infusion treatments.[148]

Well Cell has demonstrated that it is willing to license the patent, copyright, and other related information and intellectual property, and therefore any alleged harm is quantifiable.[149] Indeed, the CEO of Well Cell testified that they have "hundreds" of different license agreements similar to the agreements at issue in this case.[150]  Here, the License Agreements set forth three schedules of costs associated with the right to "use of names, products, intellectual property, procedures, technology (including programmed pumps, sets, software, programs, networks, etc.), patents and other intellectual property, and know-how for use in the operations of clinics and treatment facilities.[151] Plaintiff's CEO testified that the company had valued the entirety of the intellectual property made available to the Defendants at $75.00 per infusion.[152]  Indeed, when asked what was included in the $75.00 per infusion price, Hepford agreed that this amount included "all licenses and protocol certifications," and then went on to explain that:

> the intent behind that is they are – the license to our technology, the
> license to our modality is tied to the purchasing of the devices that
> are used for doing the modality, and so when you are looking at -- it
> is everything they get trained on.· It is all of our protocols and

---

[148]*BMC Software, Inc. v. IBM*, 2018 U.S. Dist. LEXIS 162295, at *9 (S.D. Tex. September 21, 2018).
[149]*Motile Optics, LLC v. SAVV Entm't Sys.*, 2017 U.S. Dist. LEXIS 191198, *11-12 (E.D. Tex. Jan. 10, 2017) (finding harm was quantifiable when evidence showed that a patent was extensively licensed); *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, No. 95-cv-03577, 2008 U.S. Dist. LEXIS 88892, 2008 WL 4647384, at *10 (N.D. Cal. Oct. 20, 2008) ("As a general rule, courts will find that monetary damages are sufficient in such cases" where patentee has licensed patent); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 2:06-CV-348-TJW, 2010 U.S. Dist. LEXIS 61645, 2010 WL 2574059, at *2 (E.D. Tex. June 22, 2010) ("LaserDynamics' extensive licensing history, in which LaserDynamics has licensed the '981 patent to at least twenty-seven different companies for one-time, lump-sum payments demonstrates that money damages have been and will continue to be sufficient to remedy any infringement").
[150]Ex. 1 at 216:23-217:7 (Hepford Dep.).
[151]Ex. 12 at INSU_PI00911 (License Agreement Insulinic Lafayette ¶ 2); Ex. 13 at INSU_PI00923 (License Agreement Insulinic Hialeah¶ 2).
[152] *Compare* Ex. 1 at 220: 5-221:10 (Hepford Dep.) (explaining cost of infusions included all information needed to use the "modality of the Well Cell process) *with* Ex. 12 at INSU_PI00918 Lafayette License Agreement at Exhibit A and Ex. 13 at INSU_PI00928, (License Agreement Insulinic Hialeah at Exhibit A).

APPX0570

everything that helps them know how to administer the modality dynamically and efficaciously.[153]

Accordingly, if the Court were to find that the Insulinic Clinics are causing harm to Plaintiff by continuing to administer insulin infusions, then any lost revenue owed to the Plaintiff could be easily calculated at a rate of $75.00 per infusion.

Second, Plaintiff generically alleges that it will suffer harm to its "good will" and "reputation" if the Defendants are not enjoined.[154] However, a showing of "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant."[155]  Even if the Plaintiff could show a conceptually possible threat of irreparable injury, it cannot meet its burden to show a substantial threat of such injury before trial.[156]  Plaintiff has provided no evidence that it will suffer any harm to its "good will," "reputation," or any other damages.  Furthermore, even if the Plaintiff could show the lost goodwill of a business operated over a short period of time (it cannot) those damages are usually compensable in money damages.[157]

## C.  Plaintiff has not and cannot establish the threatened injury to it outweighs any damages the injunction may cause Defendants.

Even where an injunction is necessary to guard against irreparable injury, a court should not issue the injunction without first balancing the equities.[158]  In doing so, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."[159] Plaintiff has provided "only a brief and cursory argument

---

[153]Ex. 1  at 221: 1-10 (Hepford. Dep.).

[154]ECF No. 4, ¶ 84.

[155]*Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (quoting *Productos Carnic, C.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686-87 (5th Cir. 1980)).

[156]*Cf. Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 252-53 (5th Cir. 2009).

[157]*See Hawes v. Stephens*, 2017 U.S. Dist. LEXIS 184584, *2 (E.D. Tex. Sept. 2017).

[158]*See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

[159] *Winter*, 555 U.S. 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987)).

APPX0571

with regard to the balance of equities prong."[160]   Instead, the Plaintiff claims that the harm to

Defendants would be *de minimus* while essentially asking this Court to have the Defendants shut

their doors and stop treating patients.   Not only would this harm patients dependent upon the

Insulinic Clinics for treatment, this would also impact the owners of the relevant Insulinic Clinics

and their employees.   Accordingly, Plaintiff has not shown that the balance of equities tips in its

favor.

**D.     Plaintiff has not and cannot establish an injunction will not disserve the public
         interest**

Plaintiff has not shown that the public interest factor weights in its favor.  "[T]he touchstone

of the public interest factor is whether an injunction, both in scope and effect, strikes a workable

balance between protecting the patentee's rights and protecting the public from the injunction's

adverse effects."[161]   While there is a strong public interest in vindicating intellectual property

rights, those rights can be vindicated without the need for an injunction, as the Court may do here,

by awarding money damages that provides full relief to the property owner.[162]   Any negative

effects that not issuing an injunction would have on the public are speculative.   Well Cell claims

that the public has an interest in protecting Defendants' numerous infringements on the Well Cell

IP is causing serious and irreparable harm not only to Well Cell, but to diabetes patients who visit

the infringing clinics and receive subpar and potentially life-threatening treatment from individuals

who are not properly trained in administering Well Cell's proprietary medical technology.[163]   Well

---

[160]*Bianco v. Globus Med., Inc.*, 2012 U.S. Dist. LEXIS 163020, 2012 WL 5611054, at *3 (E.D. Tex. Nov. 15, 2012); see ECF No. 4 at ¶ 87.; see ECF No. 4 at ¶ 87.
[161]*Texas Advanced Optoelectronic Sols.*, 2016 U.S. Dist. LEXIS 53948, 2016 WL 1615741, at *5 (E.D. Tex. Apr. 22, 2016) (*citing i4i Ltd. P'ship*, 598 F.3d at 863).
[162]*See Bianco*, 2014 U.S. Dist. LEXIS 35256, 2014 WL 1049067, at *10.
[163]ECF No. 4 ¶ 88-92.

APPX0572

Cell's argument, however, does not convincingly "address how the public would be protected from the injunction's adverse effects."[164]

Plaintiff claims that some patients may be caused harm at the Insulinic of Hawaii clinic if its "modality" is administered without special training from the Plaintiff.[165]   However, there is no legitimate concerns over public safety.  Each patient who received treatment from the Defendants is cared for by a licensed medical professional—not a company.[166]  Indeed, all of Defendants' patients at Lafayette are under the care of a physician.  The physicians have developed treatment protocols unrelated to Well Cell's "modality" to treat their diabetes patients, including the use of an insulin infusion methodology that was derived from publicly available peer review studies.[167]  Next, Hialeah stopped all insulin infusions and has their patients on hold pending the outcome of the request for preliminary injunction.  Finally, Hawaii is not treating any patients yet, and therefore there is no risk that a patient will be put at risk.[168]   Accordingly, this factor also weighs against granting an injunction.

## CONCLUSION & PRAYER

For the foregoing reasons, Defendants respectfully request the Court deny the Plaintiff's request for injunctive relief.

Date:   October 28, 2022.

---

[164]*Texas Advanced Optoelectronic Sols.*, 2016 U.S. Dist. LEXIS 53948, 2016 WL 1615741, at *5 (E.D. Tex. Apr. 22, 2016).
[165]Contra ECF No. 4 at ¶5.
[166]Ex. 11  at 59:06-11, (Calvit Dep.).
[167]*See* Ex. 11 at 95:22-96:19; 100:14-101:12, (Calvit Dep.).
[168]Ex. 11 at 127:20-21, (Calvit Dep.).

APPX0573

Respectfully submitted,

MUNSCH HARDT KOPF & HARR, P.C.


By: */s/ Justin K. Ratley*
    Justin K. Ratley
    State Bar No. 24093011
    700 Milam, Suite 800
    Houston, Texas 77002
    Telephone: (713) 222-4087
    Facsimile: (713) 222-1475
    jratley@munsch.com

**ATTORNEYS FOR DEFENDANTS, SHAWN PAUL CALVIT, MARC PIERRE DESGRAVES IV, CHARLES ALEXANDER ELLIOTT, INSULINIC OF LAFAYETTE LLC, INSULINIC OF HIALEAH LLC, AND INSULINC OF HAWAII LLC**

OF COUNSEL:
Elizabeth F. Eoff
State Bar No. 24095062
SDTX ID No. 2951585
Munsch Hardt Kopf & Harr, P.C.
700 Milam, Suite 800
Houston, Texas 77002
Telephone: (713) 222-1493
Facsimile: (713) 222-1475
eeoff@munsch.com

29

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record on October 28, 2022, using the CM/ECF system which will send notification of such filing to all counsel of record who have registered as filing users of the system.

Lema Barazi
Feras Mousilli
Elizabeth Revere
LLOYD & MOUSILLI, PLLC
11807 Westheimer Road
Suite 550 PMB 944
Houston, TX 77077
litigation@lloydmousilli.com
lema@lloydmousilli.com
feras@lloydmousilli.com
beth@lloydmousilli.com

<div align="right">

*/s/ Justin K. Ratley*
Justin K. Ratley

</div>

APPX0575

| | | |
|---|---|---|
| **Form 401**<br><br>==Secretary of State==<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>**Filing Fee: See Instructions** | <br><br>**Statement of Change of<br>Registered Office/Agent** | **Filed in the Office of the**<br>==**Secretary of State of Texas**==<br>Filing #: ==802128958 01/28/2022==<br>Document #: 1115709630003<br>Image Generated Electronically<br>for Web Filing |

### Entity Information

The name of the entity is :

**==Diabetes Relief LLC==**

The file number issued to the entity by the secretary of state is: **802128958**

The registered agent and registered office of the entity as currently shown on the records of the secretary of state are:

**Robert Sonfield**

**2500 Wilcrest Dr. Ste 300, Houston, TX, USA 77042**

### Change to Registered Agent/Registered Office

The following changes are made to the registered agent and/or office information of the named entity:

#### Registered Agent Change

☐ A. The new registered agent is an organization by the name of:

OR

☑ B. The new registered agent is an individual resident of the state whose name is:

**Carol Ann Wilson**

#### Registered Office Change

☑ C. The business address of the registered agent and the registered office address is changed to:

**8902 Sunnywood Drive, Houston, TX, USA 77088**

The street address of the registered office as stated in this instrument is the same as the registered agent's business address.

#### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

☑ B. The consent of the registered agent is maintained by the entity.

### Statement of Approval

The change specified in this statement has been authorized by the entity in the manner required by the BOC or in the manner required by the law governing the filing entity, as applicable.

### Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its filing by the secretary of state. The delayed effective date is:

### Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date: ==**January 28, 2022**==                    _Scott A. Hepford_

```
4:22-CV-03062
Injunction Hearing

EX 02

DEFS "INSU" INC.
```

INSU_PI_000404

Signature of authorized person(s)

**FILING OFFICE COPY**



US009652595B1

(12) **United States Patent**
Carr et al.

(10) Patent No.: **US 9,652,595 B1**
(45) Date of Patent: May 16, 2017

(54) **KIT THAT IMPROVES IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS**

(71) Applicant: **DIABETES RELIEF LLC**, Houston, TX (US)

(72) Inventors: **Hunter Michael Alan Carr**, Houston, TX (US); **Scott Hepford**, Houston, TX (US); **Carol Ann Wilson**, Houston, TX (US)

(73) Assignee: **Diabetes Relief LLC**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/362,963**

(22) Filed: **Nov. 29, 2016**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/042,087, filed on Feb. 11, 2016.

(60) Provisional application No. 62/117,393, filed on Feb. 17, 2015.

(51) **Int. Cl.**
*A61M 5/168* (2006.01)
*G06F 19/00* (2011.01)
*A61M 5/00* (2006.01)

(52) **U.S. Cl.**
CPC ........ *G06F 19/3468* (2013.01); *G06F 19/322* (2013.01)

(58) **Field of Classification Search**
CPC .......................... G06F 19/3468; G06F 19/322
USPC ........................................................ 436/95
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2014/0005633 A1* 1/2014 Finan ................. A61M 5/1723
604/504

* cited by examiner

*Primary Examiner* — Rebecca M Fritchman
(74) *Attorney, Agent, or Firm* — Buskop Law Group P.C.; Wendy Buskop

(57) **ABSTRACT**

A kit for individualized intravenous exogenous insulin-based therapy, which includes a portable data storage in communication with client device processor. The data storage can have computer instructions, a database of metabolic factors, a library of weight management protocols, a diabetic treatment model, and a library of care plan templates. The kit for individualized intravenous exogenous insulin-based therapy includes a blood glucose meter, a plurality of intravenous catheters fluidly engageable with a fluid source, and a plurality of metabolic enhancements.

**20 Claims, 19 Drawing Sheets**

DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

4:22-CV-03062
Injunction Hearing
**EX 03**
DEFS "INSULINIC"

APPX0578

INSU_PI_000406

APPX0579

Case 4:22-cv-03062   Document 47-2   Filed on 10/28/22 in TXSD   Page 2 of 39

## FIGURE 1A

### DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

| WEIGHT (kg) | POTASSIUM TO SALINE DOSAGE (meq/ml) | MAGNESIUM TO SALINE DOSAGE (mg/ml) | INSULIN TO SALINE DOSAGE (UNITS/ml) | INSULIN RESERVOIR VOLUME (ml) | INSULIN BOLUS DOSAGE MIN (mU) | INSULIN BOLUS DOSAGE MAX (mU) | INSULIN BOLUS DOSAGE VOLUME MIN (ml) | INSULIN BOLUS DOSAGE VOLUME MAX (ml) | UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION CYCLE (MIN-SEC) | QUANTITY OF BOLUS PER TREATMENT CYCLE (#) |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 - 45 | 0.01 | 1 | 9 | 10 | 400 | 450 | 0.04 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 46 - 50 | 0.01 | 1 | 10 | 10 | 460 | 500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 51 - 55 | 0.01 | 1 | 11 | 10 | 510 | 550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 56 - 60 | 0.01 | 1 | 12 | 10 | 560 | 600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 61 - 65 | 0.01 | 1 | 13 | 10 | 610 | 650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 66 - 70 | 0.01 | 1 | 14 | 10 | 660 | 700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 71 - 75 | 0.01 | 1 | 15 | 10 | 710 | 750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 76 - 80 | 0.01 | 1 | 16 | 10 | 760 | 800 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 81 - 85 | 0.01 | 1 | 17 | 10 | 810 | 850 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 86 - 90 | 0.01 | 1 | 18 | 10 | 860 | 900 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 91 - 95 | 0.01 | 1 | 19 | 10 | 910 | 950 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 96 - 100 | 0.01 | 1 | 20 | 10 | 960 | 1000 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 101 - 105 | 0.02 | 2 | 21 | 10 | 1010 | 1050 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 106 - 110 | 0.02 | 2 | 22 | 10 | 1060 | 1100 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 111 - 115 | 0.02 | 2 | 23 | 10 | 1110 | 1150 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 116 - 120 | 0.02 | 2 | 24 | 10 | 1160 | 1200 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 121 - 125 | 0.02 | 2 | 25 | 10 | 1210 | 1250 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 126 - 130 | 0.02 | 2 | 26 | 10 | 1260 | 1300 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 131 - 135 | 0.02 | 2 | 27 | 10 | 1310 | 1350 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 136 - 140 | 0.02 | 2 | 28 | 10 | 1360 | 1400 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 141 - 145 | 0.02 | 2 | 29 | 10 | 1410 | 1450 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 146 - 150 | 0.02 | 2 | 30 | 10 | 1460 | 1500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 151 - 155 | 0.02 | 2 | 31 | 10 | 1510 | 1550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 156 - 160 | 0.02 | 2 | 32 | 10 | 1560 | 1600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |

INSU_PI_000407

APPX0580

Case 4:22-cv-03062 Document 47-2 Filed on 10/28/22 in TXSD Page 3 of 39

*FIGURE 1B*

## DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

| WEIGHT (kg) | POTASSIUM TO SALINE DOSAGE (meq/ml) | MAGNESIUM TO SALINE DOSAGE (mg/ml) | INSULIN TO SALINE DOSAGE (UNITS/ml) | INSULIN RESERVOIR VOLUME (ml) | INSULIN BOLUS DOSAGE MIN (ml) | INSULIN BOLUS DOSAGE MAX (ml) | INSULIN BOLUS DOSAGE VOLUME MIN (ml) | INSULIN BOLUS DOSAGE VOLUME MAX (ml) | UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION (MIN:SEC) | QUANTITY OF BOLUS PER TREATMENT CYCLE (#) |
|---|---|---|---|---|---|---|---|---|---|---|
| 161–165 | 0.02 | 2 | 33 | 10 | 1610 | 1650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 166–170 | 0.02 | 2 | 34 | 10 | 1660 | 1700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 171–175 | 0.02 | 2 | 35 | 10 | 1710 | 1750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 176–180 | 0.02 | 2 | 36 | 10 | 1760 | 1800 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 181–185 | 0.02 | 2 | 37 | 10 | 1810 | 1850 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 186–190 | 0.02 | 2 | 38 | 10 | 1860 | 1900 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 191–195 | 0.02 | 2 | 39 | 10 | 1910 | 1950 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 196–200 | 0.02 | 2 | 40 | 10 | 1960 | 2000 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 201–205 | 0.03 | 3 | 41 | 10 | 2010 | 2050 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 206–210 | 0.03 | 3 | 42 | 10 | 2060 | 2100 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 211–215 | 0.03 | 3 | 43 | 10 | 2110 | 2150 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 216–220 | 0.03 | 3 | 44 | 10 | 2160 | 2200 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 221–225 | 0.03 | 3 | 45 | 10 | 2210 | 2250 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 226–230 | 0.03 | 3 | 46 | 10 | 2260 | 2300 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 231–235 | 0.03 | 3 | 47 | 10 | 2310 | 2350 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 236–240 | 0.03 | 3 | 48 | 10 | 2360 | 2400 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 241–245 | 0.03 | 3 | 49 | 10 | 2410 | 2450 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 246–250 | 0.03 | 3 | 50 | 10 | 2460 | 2500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 251–255 | 0.03 | 3 | 51 | 10 | 2510 | 2550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 256–260 | 0.03 | 3 | 52 | 10 | 2560 | 2600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 261–265 | 0.03 | 3 | 53 | 10 | 2610 | 2650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 266–270 | 0.03 | 3 | 54 | 10 | 2660 | 2700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 271–275 | 0.03 | 3 | 55 | 10 | 2710 | 2750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |

INSU_PI_000408

Case 4:22-cv-03062   Document 47-2   Filed on 10/28/22 in TXSD   Page 4 of 39

APPX0581

## FIGURE 2

### BOLUS VOLUME DOSAGE ADJUSTMENT PROTOCOL BASED ON TESTED BLOOD GLUCOSE LEVEL

| | BLOOD GLUCOSE LEVEL (mg/dl) | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200> |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IF | | | | | | | | | | | | | | | | | | | | | |

**DURING HOURS 1 & 2 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE INCREASES OR DECREASES BETWEEN THE INITIAL BLOOD GLUCOSE LEVEL CHECK AND THE 30 MIN AND 60 MIN CHECKS OF EACH HOUR, THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| THEN | ADJUST DOSAGE (mU/kg) | | 0 | 0 | 0 | 0 | 2-4 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 |

**DURING THE FIRST 30 MIN OF HOUR 3 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE INCREASES OR DECREASES BETWEEN THE INITIAL BLOOD GLUCOSE LEVEL CHECK AND THE 30 MIN CHECKS OF THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| THEN | ADJUST DOSAGE (mU/kg) | | 0 | 0 | 0 | 0 | 2-4 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 |

**DURING THE LAST 30 MIN OF HOUR 3 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE LEVEL INCREASES BETWEEN THE 30 MIN AND 60 MIN CHECK THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| THEN | INCREASE DOSAGE | | 0 | 0 | 0 | 0 | 2-4 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 |

IF BLOOD GLUCOSE LEVEL DECREASES BETWEEN THE 30 MIN AND 60 MIN CHECK THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

| THEN | DECREASE DOSAGE | | 0 | 0 | 1-2 | 1-2 | 2-4 | 2-4 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 4-6 | 6-8 |

### EXEMPLARY TREATMENT SESSIONS DURING HOUR 1

| SUBJECT | BLOOD GLUCOSE LEVEL (mg/dl) | INSULIN SENSITIVITY FACTOR | SCHEDULE FOR BOLUS INTRODUCTION WITH AN UNEQUAL TIME PERIOD | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | BOLUS 1 | BOLUS 2 | BOLUS 3 | BOLUS 4 | BOLUS 5 | BOLUS 6 | BOLUS 7 | BOLUS 8 | BOLUS 9 | BOLUS 10 | BOLUS 11 |
| SUBJECT #1: | 440 | EXTREMELY RESISTANT | 360 sec | 240 sec | 240 sec | 240 sec | 240 sec | 240 sec | 240 sec | 240 sec | 240 sec | 240 sec | 240 sec |
| SUBJECT #2: | 210 | RESISTANT | 360 sec | 300 sec | 265 sec | 240 sec | 265 sec | 300 sec | 360 sec | | | | |
| SUBJECT #3: | 185 | SENSITIVE | 360 sec | 300 sec | 300 sec | 300 sec | 300 sec | 300 sec | | | | | |

INSU_PI_000409

APPX0582

**FIGURE 3**

## GLUCOSE DOSAGE ADJUSTMENT PROTOCOL

| BLOOD GLUCOSE LEVEL (mg/dl) | GLUCOSE (gm) |
|---|---|
| >100 - 100 | 50 - 60 |
| 101 - 125 | 44 - 55 |
| 126 - 150 | 40 - 50 |
| 151 - 175 | 35 - 45 |
| 176 - 200 | 30 - 40 |
| 201 - 225 | 25 - 35 |
| 226 - 250 | 20 - 30 |
| 251 - 275 | 15 - 25 |
| 276 - 300 | 10 - 20 |
| 301 - 325 | 5 - 15 |
| 326 - 350 | .01 - 10 |
| 351 - 375 | .01 - 5 |
| 376 - 400 | .01 - 5 |
| 401 - 425 | .01 - 5 |
| 426 - 450 | .01 - 5 |
| 451 - 475 | .01 - 5 |
| 476 - 500 | .01 - 5 |
| 501 - 525 | .01 - 5 |
| 526 - 550 | .01 - 5 |

Case 4:22-cv-03062   Document 47-2   Filed on 10/28/22 in TXSD   Page 6 of 39

*FIGURE 4*

## METABOLIC ENHANCEMENT PROTOCOL

| Respiratory Quotient ($CO_2$/$O_2$) | Dosage |
|---|---|
| 1.20 < | C: 3 DAILY |
| 1.19 - 1.00 | A: 1 DAILY |
| 0.99 - 0.90 | A: 1 DAILY |
| 0.89 - 0.80 | B: 2 DAILY |
| 0.79 - 0.70 | B: 2 DAILY |
| .69 < | B: 2 DAILY |

\* METABOLIC ENHANCEMENT CONTENTS:

| Ingredient | Min Amount Per Dosage | Max Amount Per Dosage |
|---|---|---|
| VITAMIN D (AS CHOLECALCIFEROL) | 600 IU | 2,000 IU |
| VITAMIN B6 (AS PYRIDOXAL-5-PHOSPHATE) | 10 mg | 100 mg |
| FOLATE (FOLIC ACID) | 200 mcg | 2000 mcg |
| VITAMIN B12 (AS CYANOCOBALAMIN) | 1,000 mcg | 5,000 mcg |
| N-ACETYL L-CYSTEINE (NAC) | 200 mg | 600 mg |
| COENZYME Q10 (CoQ10) | 60 mg | 400 mg |
| ALPHA LIPOIC ACID (ALA) | 50 mg | 400 mg |
| NICOTINAMIDE ADENINE DINUCLEOTIDE (NADH) | .5 mg | 5 mg |
| CHROMIUM PICOLINATE | 200 mcg | 300 mcg |

INSU_PI_000411

## FIGURE 5A

| | |
|---|---|
| CREATING A SUBJECT PROFILE FOR A SUBJECT | 500 |
| ASSESSING METABOLIC FACTORS OF THE SUBJECT AND STORING THE METABOLIC FACTORS IN THE SUBJECT PROFILE | 502 |
| CREATING A CARE PLAN WITH A PLURALITY OF TREATMENT SESSIONS FOR THE SUBJECT WITH A PLAN GOAL | 504 |
| INTRODUCING GLUCOSE TO THE SUBJECT TO STIMULATE GASTROINTESTINAL HORMONE PRODUCTION, RESULTING IN THE RELEASE OF ENZYMES FROM THE SUBJECT'S LIVER AND CAUSING THE BLOOD GLUCOSE LEVELS OF THE SUBJECT TO BE IN A THERAPEUTIC RANGE | 506 |
| TESTING THE SUBJECT FOR BLOOD GLUCOSE LEVELS TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO THE PLURALITY OF THERAPEUTIC RANGES AND VERIFY THE SUBJECT IS IN THE THERAPEUTIC RANGE | 508 |
| COMPARING TESTED BLOOD GLUCOSE LEVELS TO A DIABETIC TREATMENT MODEL | 510 |
| MAPPING TESTED BLOOD GLUCOSE LEVELS AND INSULIN SENSITIVE FACTORS OF A SUBJECT TO THE SUBJECT'S WEIGHT USING THE DIABETIC TREATMENT MODEL TO DETERMINE A SCHEDULE FOR BOLUS INTRODUCTION, WHEREIN THE SCHEDULE FOR BOLUS INTRODUCTION HAS AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS | 512 |
| INTRODUCING TO THE SUBJECT A PLURALITY OF BOLUS OF INSULIN AND SALINE SEQUENTIALLY USING THE SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS | 513 |
| COMPARING THE SUBJECT PROFILE TO A PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL FOR THE SUBJECT BASED UPON ASSESSED METABOLIC FUNCTIONS OF THE SUBJECT AND SAVING THE WEIGHT MANAGEMENT PROTOCOL IN THE CARE PLAN | 514 |
| IMPLEMENTING THE IDENTIFIED WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN AFTER A FIRST TREATMENT SESSION TO MANAGE WEIGHT OF THE SUBJECT WITH A METABOLIC ENHANCEMENT CAUSING IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT WHILE INFUSING INSULIN AND MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION IN THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS TO IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING | 516 |
| COMPARING A RESPIRATORY QUOTIENT OF THE SUBJECT IN A RESTING STATE TO A PLURALITY OF METABOLISM SCORES | 518 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT FOR EACH TREATMENT SESSION AS IDENTIFIED IN THE CARE PLAN WITH SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE A SUBJECT'S RESPIRATORY QUOTIENT | 520 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE THE RESPIRATORY QUOTIENT | 522 |

(5B)

APPX0584

INSU_PI_000412

## FIGURE 5B      (5A)

| | |
|---|---|
| COMPARING A MEASURED CARDIAC FUNCTION OF THE SUBJECT IN A RESTING STATE TO A PRESET NORM OF CARDIAC FUNCTION | 524 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN USING THE PRESET NORM OF CARDIAC FUNCTION | 526 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE  UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE CARDIAC FUNCTION | 528 |
| MEASURING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE PRIOR TO BOLUS INTRODUCTION AND COMPARING THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION TO A PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS | 530 |
| COMPARING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE AS BOLUS ARE SEQUENTIALLY INTRODUCED TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 532 |
| COMPARING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE AFTER ALL BOLUS HAVE BEEN INTRODUCED IN A FIRST TREATMENT SESSION TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 534 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN TO TREAT PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 536 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 538 |
| VIEWING AN INITIAL RETINAL IMAGE OF THE SUBJECT CAPTURED BY A NON-MYDRIATIC CAMERA WITH THE SUBJECT IN A RESTING STATE TO IDENTIFY A DIABETIC RETINOPATHY | 540 |
| VIEWING A POST TREATMENT RETINAL IMAGE OF THE SUBJECT IN A RESTING STATE AFTER A FIRST TREATMENT SESSION | 541 |
| COMPARING THE INITIAL RETINAL IMAGE TO THE POST TREATMENT RETINAL IMAGE | 542 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IF NO CHANGE IN THE DIABETIC RETINOPATHY HAS OCCURRED | 544 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO REDUCE THE EFFECTS OF DIABETIC RETINOPATHY BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE THE EFFECTS OF DIABETIC RETINOPATHY | 546 |
| DIMENSIONALLY MEASURING WOUNDS BY LENGTH, WIDTH, AND DEPTH AND IDENTIFYING WOUND CHARACTERISTICS WITH THE SUBJECT IN A RESTING STATE | 550 |
| DIMENSIONALLY MEASURING WOUNDS AFTER AT LEAST ONE TREATMENT SESSION TO IDENTIFY SKIN INTEGRITY AND CHANGES IN CLINICAL WOUND CHARACTERISTICS | 552 |

(5C)

APPX0585

INSU_PI_000413



(5B)

| | |
|---|---|
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN FOR WOUND TREATMENT USING THE IDENTIFIED SKIN INTEGRITY AND CHANGES IN CLINICAL WOUND CHARACTERISTICS | 554 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE WOUND HEALING BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE WOUND SIZE AND WOUND CHARACTERISTICS | 556 |
| COMPARING C-PEPTIDES OF THE SUBJECT TO A PRESET NORM OF C-PEPTIDES TO IDENTIFY AN INSULIN SENSITIVITY FACTOR | 560 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT FOR THE INSULIN SENSITIVITY FACTOR | 562 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE AN INSULIN SENSITIVITY FACTOR USING ANALYSIS OF C-PEPTIDES BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION | 564 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF MAGNESIUM AND INTRODUCING THE DOSAGE AMOUNTS OF MAGNESIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 570 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF POTASSIUM AND INTRODUCING THE DOSAGE AMOUNTS OF POTASSIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 572 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF SOMATOSTATIN AND INTRODUCING THE DOSAGE AMOUNTS OF SOMATOSTATIN SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 574 |
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF GLUCAGON AND INTRODUCING THE DOSAGE AMOUNTS OF GLUCAGON SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD | 576 |
| SCHEDULING DIAGNOSTIC TESTS AFTER A FIRST TREATMENT SESSION TO MODIFY THE CARE PLAN FOR IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT AND IMPROVED HEPATIC GLUCOSE PROCESSING | 578 |

*FIGURE 5C*

APPX0586

**INSU_PI_000414**



*FIGURE 6*

*FIGURE 7A*





| | |
|---|---|
| | 604 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO THE PLURALITY OF THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS AND VERIFY THE SUBJECT IS IN THE THERAPEUTIC RANGE | 204 |
| PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS | 205 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE A SUBJECT PROFILE TO THE PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL BASED UPON METABOLIC FUNCTIONS OF THE SUBJECT | 206 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO SAVE THE IDENTIFIED WEIGHT MANAGEMENT PROTOCOL IN THE GENERATED CUSTOMIZED CARE PLAN AFTER SALINE WITH INSULIN IN A PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD HAVE BEEN ADMINISTERED TO A SUBJECT | 207 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO TRACK WEIGHT MANAGEMENT OF THE SUBJECT AFTER A FIRST TREATMENT SESSION AND USE OF AN IDENTIFIED WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN ALONG WITH A METABOLIC ENHANCEMENT TO IDENTIFY IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT AND IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING | 208 |
| PLURALITY OF METABOLISM SCORES | 209 |
| PLURALITY OF PRESET NORMS OF CARDIAC FUNCTION | 210 |
| PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS | 211 |
| RETINAL IMAGE OF THE SUBJECT | 212 |
| WOUND CHARACTERISTICS | 214 |
| PLURALITY OF PRESET NORMS OF C-PEPTIDES | 215 |

*FIGURE 7B*

APPX0588

INSU_PI_000416

APPX0589

**FIGURE 8A**



Case 4:22-cv-03062  Document 47-2  Filed on 10/28/22 in TXSD  Page 13 of 39

APPX0590

INSU_PI_000418

**FIGURE 8B**



SUBJECT PROFILE

CARE PLAN TEMPLATE

INFUSION SCHEDULE 866
WEEK 1
WEEK 2
WEEK 3
WEEK 4-12
WEEK 12-52

INFUSION FORMULATION 868
INSULIN
SALINE
POTASSIUM
MAGNESIUM
GLUCAGON
SOMATOSTATIN

TREATMENT CYCLES 870

QUANTITY OF BOLUS PER TREATMENT CYCLE 872

UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION IN SECONDS 874

BLOOD GLUCOSE LEVEL THERAPEUTIC RANGE 876

ADDITIONAL THERAPIES
QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF POTASSIUM 878
QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF MAGNESIUM 880
QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF GLUCAGON 882
QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF SOMATOSTATIN 884

DIAGNOSTIC TESTS 886

METABOLIC ENHANCEMENTS 888

WEIGHT MANAGEMENT PROTOCOL 205

EDUCATION SCHEDULE 889

PLAN GOAL 890

620

APPX0591

Case 4:22-cv-03062   Document 47-2   Filed on 10/28/22 in TXSD   Page 14 of 39



FIGURE 8C

INSU_PI_000419

APPX0592

Case 4:22-cv-03062   Document 47-2   Filed on 10/28/22 in TXSD   Page 15 of 39



*FIGURE 9*

KIT FOR INDIVIDUALIZED INTRAVENOUS EXOGENOUS INSULIN-BASED THERAPY

1000

903 — PORTABLE DATA STORAGE

630 — BLOOD GLUCOSE METER

1016 — DOSAGE AMOUNTS OF POTASSIUM

607 — CLIENT DEVICE PROCESSOR
608 — CLIENT DEVICE

888 — METABOLIC ENHANCEMENTS

1018 — DOSAGE AMOUNTS OF SOMATOSTATIN

632 — INTRAVENOUS CATHETER

1012 — GLUCOSE SOURCE

1020 — DOSAGE AMOUNTS OF GLUCAGON

634 — FLUID SOURCE

1014 — DOSAGE AMOUNTS OF MAGNESIUM

INSU_PI_000420

## FIGURE 10A



| | |
|---|---|
| PORTABLE DATA STORAGE | 903 |
| THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS | 203 |
| SUBJECT PROFILE | 610 |
| SUBJECT HISTORY | 1002 |
| SUBJECT PHYSICAL REPORTS | 1004 |
| SUBJECT PREEXISTING WEIGHT | 1005 |
| SUBJECT NAME | 1006 |
| SUBJECT CONTACT INFORMATION | 1008 |
| INDICATION | 1010 |
| MEASURED METABOLIC FACTORS | 605 |
| GLUCOSE LEVEL | 612 |
| RESPIRATORY QUOTIENT | 614 |
| WEIGHT | 615 |
| INSULIN SENSITIVITY FACTOR | 616 |
| LIBRARY OF CARE PLAN TEMPLATES | 620 |
| PLAN GOAL | 890 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO CREATE A SUBJECT PROFILE FOR A SUBJECT SUSPECTED OF HAVING METABOLIC SYNDROME | 904 |
| DATABASE | 906 |
| TARGET BLOOD GLUCOSE LEVEL | 618 |
| LIBRARY OF WEIGHT MANAGEMENT PROTOCOLS | 908 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE MEASURED METABOLIC FACTORS OF THE SUBJECT TO THE DATABASE OF THE METABOLIC FACTORS FOR LIKE GROUPS OF THE PATIENTS AND CALCULATE IF THE MEASURED METABOLIC FACTORS MEET, EXCEED, OR FALL BELOW THE BLOOD GLUCOSE LEVEL, THE RESPIRATORY QUOTIENT, THE INSULIN SENSITIVITY FACTOR, AND THE TARGET BLOOD GLUCOSE LEVEL FOR THE SUBJECT SUSPECTED OF HAVING THE METABOLIC SYNDROME TO CONFIRM THE SUBJECT HAS THE METABOLIC SYNDROME | 910 |
| DIABETIC TREATMENT MODEL | 911 |
| BOLUS VOLUME DOSAGE AMOUNTS | 912 |
| SCHEDULE TEMPLATES | 913 |

APPX0593

INSU_PI_000421

*FIGURE 10B*

903

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO CREATE A CARE PLAN USING ONE OF THE CARE PLAN TEMPLATES FOR THE SUBJECT AND SETTING A PLAN GOAL USING THE DIABETIC TREATMENT MODEL, THE CARE PLAN INDICATING A CUSTOMIZED SCHEDULE FOR BOLUS INTRODUCTION WITH AT LEAST ONE UNEQUAL TIME PERIOD AND A QUANTITY AND A FREQUENCY OF A PLURALITY OF BOLUS CONTAINING SALINE AND INSULIN FOR SEQUENTIAL INTRAVENOUS INTRODUCTION TO THE SUBJECT AND SAVE IN THE SUBJECT PROFILE |
914

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO INDICATE A QUANTITY OF GLUCOSE FOR THE SUBJECT WITH METABOLIC SYNDROME TO STIMULATE A GASTROINTESTINAL HORMONE PRODUCTION RESULTING IN A RELEASE OF ENZYMES FROM A LIVER OF THE SUBJECT AND CAUSING BLOOD GLUCOSE LEVELS OF THE SUBJECT TO BE IN A THERAPEUTIC RANGE |
916

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE BLOOD GLUCOSE TEST RESULTS TO A PLURALITY OF THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS STORED IN THE PORTABLE DATA STORAGE AND VERIFY THAT THE SUBJECT WITH THE METABOLIC SYNDROME IS IN A THERAPEUTIC RANGE OF THE PLURALITY THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS |
918

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE BLOOD GLUCOSE TEST RESULTS TO THE DIABETIC TREATMENT MODEL AND MAP THE BLOOD GLUCOSE TEST RESULTS AND INSULIN SENSITIVE FACTORS OF THE SUBJECT WITH THE METABOLIC SYNDROME TO THE MEASURED WEIGHT OF THE SUBJECT USING THE DIABETIC TREATMENT MODEL TO GENERATE AN INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION USING THE SCHEDULE TEMPLATES |
920

| INDIVIDUALIZED SCHEDULE FOR  BOLUS INTRODUCTION |
922

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE SUBJECT PROFILE TO THE LIBRARY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL FOR THE SUBJECT BASED UPON MEASURED METABOLIC FACTORS OF THE SUBJECT AND SAVING THE WEIGHT MANAGEMENT PROTOCOL IN THE CARE PLAN |
924

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO CHANGE THE WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN AFTER A FIRST TREATMENT SESSION TO MANAGE WEIGHT OF THE SUBJECT USING AT LEAST ONE OF THE PLURALITY OF METABOLIC ENHANCEMENTS TO CAUSE IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT WHILE INFUSING THE PLURALITY OF BOLUS AND MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION IN THE GENERATED INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS TO IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING |
926

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE RESPIRATORY QUOTIENT OF THE SUBJECT IN A RESTING STATE TO A PLURALITY OF MEASURED METABOLIC FACTORS |
930

| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY A QUANTITY OF THE PLURALITY OF BOLUS FOR THE SUBJECT FOR EACH TREATMENT SESSION AS IDENTIFIED IN THE CARE PLAN WITH THE GENERATED INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION TO IMPROVE THE RESPIRATORY QUOTIENT OF THE SUBJECT |
932

INSU_PI_000422

*FIGURE 10C*

903

| |
|---|
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE GENERATED INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN THE BOLUS INTRODUCTION TO IMPROVE THE RESPIRATORY QUOTIENT OF THE SUBJECT — 934 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE A MEASURED CARDIAC FUNCTION OF THE SUBJECT IN A RESTING STATE TO A PLURALITY OF PRESET NORMS OF CARDIAC FUNCTION STORED IN A LIBRARY OF CARDIAC FUNCTIONS — 936 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY A QUANTITY OF THE PLURALITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN USING THE PRESET NORMS OF CARDIAC FUNCTION — 938 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND A DURATION OF AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION TO IMPROVE CARDIAC FUNCTION OF THE SUBJECT — 940 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MEASURE A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT PRIOR TO THE BOLUS INTRODUCTION AND COMPARING THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION TO A PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS IN A LIBRARY OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS — 942 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT AS BOLUS ARE SEQUENTIALLY INTRODUCED TO THE PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION — 944 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO COMPARE THE PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT AFTER ALL BOLUS HAVE BEEN INTRODUCED IN THE FIRST TREATMENT SESSION TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION — 946 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN TO DIMINISH THE SUBJECT'S PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION — 948 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE SCHEDULE OF THE BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT — 950 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE TO SCAN AN INITIAL RETINAL IMAGE OF THE SUBJECT TO IDENTIFY CHARACTERISTICS FOR A DIABETIC RETINOPATHY — 952 |
| COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO SCAN A POST TREATMENT RETINAL IMAGE OF THE SUBJECT AFTER THE FIRST TREATMENT SESSION AND COMPARE THE INITIAL RETINAL IMAGE TO THE POST TREATMENT RETINAL IMAGE — 954 |

INSU_PI_000423

## FIGURE 10D



COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY A QUANTITY OF BOLUS FOR THE SUBJECT IF NO CHANGE IN THE IDENTIFIED CHARACTERISTICS FOR DIABETIC RETINOPATHY HAS OCCURRED *903 *956*

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO REDUCE EFFECTS OF DIABETIC RETINOPATHY BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE AT LEAST ONE EFFECT OF DIABETIC RETINOPATHY *960*

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO SCAN AND CALCULATE DIMENSIONALLY WOUNDS OF THE SUBJECT BY LENGTH, WIDTH, AND DEPTH, AND IDENTIFY WOUND CHARACTERISTICS OF THE SUBJECT *962*

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO SCAN AND DIMENSIONALLY MEASURE WOUNDS OF THE SUBJECT AFTER AT LEAST ONE TREATMENT SESSION TO IDENTIFY SKIN INTEGRITY AND CHANGES IN WOUND CHARACTERISTICS OF THE SUBJECT *964*

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN FOR WOUND TREATMENT USING THE IDENTIFIED SKIN INTEGRITY AND CHANGES IN WOUND CHARACTERISTICS OF THE SUBJECT *966*

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE TO MODIFY THE SCHEDULE FOR BOLUS INTRODUCTION HAVING  AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE WOUND HEALING BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN THE BOLUS INTRODUCTION TO REDUCE WOUND SIZE AND WOUND CHARACTERISTICS OF THE SUBJECT *968*

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO USE A HOMEOSTATIC MODEL TO IDENTIFY AN INSULIN SENSITIVITY FACTOR OF A SUBJECT *970*

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO MODIFY THE QUANTITY OF BOLUS FOR THE SUBJECT FOR THE INSULIN SENSITIVITY FACTOR *972*

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE TO MODIFY THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO INCREASE THE INSULIN SENSITIVITY FACTOR BY MODIFYING A QUANTITY AND A DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION *974*

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO DETERMINE A QUANTITY AND A FREQUENCY OF DOSAGE AMOUNTS OF MAGNESIUM AND INTRODUCE THE DOSAGE AMOUNTS OF MAGNESIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN ONE PAIR OF BOLUS *976*

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO DETERMINE A QUANTITY AND A FREQUENCY OF DOSAGE AMOUNTS OF POTASSIUM AND INTRODUCE THE DOSAGE AMOUNTS OF POTASSIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE GENERATED INDIVIDUALIZED SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN ONE PAIR OF BOLUS *978*



COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO DETERMINE A QUANTITY AND A FREQUENCY OF DOSAGE AMOUNTS OF SOMATOSTATIN AND INTRODUCE THE DOSAGE AMOUNTS OF SOMATOSTATIN SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN ONE PAIR OF BOLUS ⌐980

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO DETERMINE A QUANTITY AND A FREQUENCY OF DOSAGE AMOUNTS OF GLUCAGON AND INTRODUCE THE DOSAGE AMOUNTS OF GLUCAGON SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE GENERATED INDIVIDUALIZED SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN ONE PAIR OF BOLUS ⌐982

COMPUTER INSTRUCTIONS TO INSTRUCT THE CLIENT DEVICE PROCESSOR TO SCHEDULE DIAGNOSTIC TESTS AFTER THE FIRST TREATMENT SESSION TO MODIFY THE CARE PLAN FOR IMPROVED CELLULAR ATP FUNCTIONING OF THE SUBJECT AND IMPROVED HEPATIC GLUCOSE PROCESSING ⌐984

LIBRARY OF CARDIAC FUNCTIONS ⌐986

PRESET NORMS OF CARDIAC FUNCTION ⌐988

LIBRARY OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS ⌐990

PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS ⌐992

903

*FIGURE 10E*

APPX0597

**INSU_PI_000425**

US 9,652,595 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# KIT THAT IMPROVES IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS

## CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation in Part of co-pending U.S. patent application Ser. No. 15/042,087 filed on Feb. 11, 2016, entitled "METHODS THAT IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS", which claims priority to and the benefit of U.S. Provisional Patent Application Ser. No. 62/117,393 filed on Feb. 17, 2015, entitled "METHODS THAT IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS". These references are incorporated herein in their entirety.

## FIELD

The present embodiments generally relate to a kit for individualized intravenous exogenous insulin-based therapy.

## BACKGROUND

Diabetes Mellitus is a disease or disorder of the body's metabolic functions, characterized by abnormally high levels of blood glucose and inadequate levels of insulin. In 2012, 29.1 million Americans, or 9.3 percent of the population had diabetes, up from 25.8 million, or 8.3 percent, in 2010. New cases diagnosed in 2012 were 1.7 million, and in 2010 it was 1.9 million. Diabetes Mellitus Type 1, formerly known as juvenile diabetes, is usually diagnosed in children and young adults, and only 5 percent of people with diabetes have this form of the disease.

In Type 1 diabetes, the body does not produce insulin, a hormone necessary to convert sugar, starches, and other food into energy needed for daily life. Diabetes Mellitus Type 2 is far more common, and affects 90-95 percent of all diabetics in the United States of America. In Type 2 diabetes, the body does not use insulin properly, which is called insulin resistance. At first, the pancreas makes extra insulin to make up for it, but, over time the pancreas is not able to keep up and can't make enough insulin to keep blood glucose at normal levels. The long-term adverse effects include blindness, loss of kidney function, nerve damage, loss of sensation, and poor circulation in the periphery, and amputation of the extremities. As of Mar. 6, 2013, the total cost of diagnosed diabetes in the United States in 2012 was $245 billion dollars.

In the treatment of Diabetes Mellitus, many varieties of insulin formulations have been suggested and used, such as regular insulin, isophane insulin (designated NPH®), insulin zinc suspensions (such as SEMILENTE®, LENTE®, and ULTRALENTE®), and biphasic isophane insulin. As diabetic patients are treated with insulin for several decades, there is a major need for safe and life quality improving insulin formulations. Some of the commercially available insulin formulations are characterized by a fast onset of action and other formulations have a relatively slow onset but show a more or less prolonged action. Fast-acting insulin formulations are usually solutions of insulin, while retarded acting insulin formulations can have suspensions containing insulin in crystalline and/or amorphous form precipitated by addition of zinc salts alone, by addition of protamine, or by a combination of both.

In addition, some patients are using formulations having both a fast onset of action and a more prolonged action. Such a formulation can be an insulin solution, wherein protamine insulin crystals are suspended. Some patients do prepare the final formulation themselves by mixing a fast acting insulin solution with a protracted acting insulin suspension formulation in the ratio desired by the patient in question.

Glucose control is typically measured by a blood test, which determines the level of hemoglobin A1c, which has been the desired result of insulin therapy in diabetic patients for many years. However, it is clear that tight circulating glucose control was insufficient in 25 percent or more of the study participants to protect them from the onset or progression of diabetic retinopathy, nephropathy, or neuropathy. One method of glucose control is Pulsed Insulin Therapy.

The core concept of Pulsed Insulin Therapy has been known for at least 20 years, by various names including Pulsatile Intravenous Insulin Therapy (PIVIT), Chronic Intermittent Intravenous Insulin Therapy (CIIIT), Metabolic Activation Therapy (MAT), and Hepatic Activation. In such therapies a patient's blood glucose is raised and lowered by about 50 mg/dL to 75 mg/dL over a period of several hours by alternating between doses of insulin and sugars or high carbohydrates foods. Although the mechanisms of action have not been clearly explained, it is apparent from the clinical results that the technique has usefulness in treating diabetic implications, including blindness and other ocular manifestations, nerve disease, cardiovascular disease, diabetic nephropathy, and poor wound healing.

Given the long history of these procedures, one would have expected that the treatment parameters would have been optimized long ago to produce the most favorable results. It turns out, however, that the known treatment parameters are insufficient in that regard.

A need exists for a kit that improves impaired hepatic glucose processing in subjects and produce superior results to those previously obtainable.

The present embodiments meet these needs.

## BRIEF DESCRIPTION OF THE FIGURES

The detailed description will be better understood in conjunction with the accompanying drawings as follows:

FIG. 1A shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 40 kilograms to 160 kilograms.

FIG. 1B shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 161 kilograms to 275 kilograms.

FIG. 2 shows a bolus volume dosage adjustment protocol based on tested blood glucose levels as produced by a diabetic treatment model.

FIG. 3 depicts glucose dosage adjustment protocol as produced by a diabetic treatment model.

FIG. 4 depicts a metabolic enhancement protocol as produced by a diabetic treatment model and an exemplary metabolic enhancement by component.

FIGS. 5A-5C depict steps of a method of the invention according to one or more embodiments.

FIG. 6 depicts a system of the invention according to one or more embodiments.

FIGS. 7A and 7B depict an administrative data storage usable in the system according to one or more embodiments..

FIGS. 8A-8C provide exemplary subject profiles with an automatically generated care plan template and an automatically generated report according to one or more embodiments.

FIG. 9 depicts the kit according to one or more embodiments.

APPX0598

INSU_PI_000426

US 9,652,595 B1

3

FIGS. **10A-10E** depict a portable data storage according to one or more embodiments.

The present embodiments are detailed below with reference to the listed Figures.

## DETAILED DESCRIPTION OF THE EMBODIMENTS

Before explaining the present embodiments in detail, it is to be understood that the invention is not limited to the particular embodiments and that it can be practiced or carried out in various ways.

The present embodiments relate to a kit for individualized intravenous exogenous insulin-based therapy that improves impaired hepatic glucose processing in subjects.

In embodiments, the kit for individualized intravenous exogenous insulin-based therapy can include portable data storage.

The portable data storage can have computer instructions for instructing a client device processor of a client device to create a subject profile for a subject suspected of having metabolic syndrome.

The subject profile can have a subject history and subject physical reports including a subject weight, a subject name, subject contact information, an indication that a subject is suspected of having the metabolic syndrome, measured metabolic factors including a glucose level, a respiratory quotient, an insulin sensitivity factor, a weight, and hyperglycemia.

The portable data storage can have a database of metabolic factors for groups of patients using the blood glucose level, the respiratory quotient, the insulin sensitivity factor and target glucose levels.

The portable data storage can have a library of weight management protocols in the portable data storage for subjects with the metabolic syndrome.

Computer instructions in the portable data storage can instruct the client device processor to compare the measured metabolic factors of the subject to the database of the metabolic factors for like groups of the patients and calculate if the measured metabolic factors meet, exceed, or fall below the blood glucose level, the respiratory quotient, the insulin sensitivity factor, and the target blood glucose level for the subject suspected of having the metabolic syndrome to confirm the subject has the metabolic syndrome.

The portable data storage can include a diabetic treatment model with bolus volume dosage amounts and schedule templates for a bolus introduction. The schedule templates for the bolus introduction contain at least one unequal time period between at least one pair of bolus, and the schedule templates provide the at least one unequal time period with a quantity and a frequency of a plurality of bolus for a sequential intravenous introduction to the subject with a confirmed metabolic syndrome. Each bolus contains a predetermined concentration of saline and insulin based on the diabetic treatment model.

The portable data storage can have a library of care plan templates.

Computer instructions in the portable data storage can instruct the client device processor to create a care plan using one of the care plan templates for the subject and setting a plan goal using the diabetic treatment model, the care plan indicating a customized schedule for bolus introduction with at least one unequal time period and a quantity and a frequency of a plurality of bolus containing saline and insulin for sequential intravenous introduction to the subject and save in the subject profile.

4

Computer instructions in the portable data storage can instruct the client device processor to indicate a quantity of glucose for the subject with metabolic syndrome to stimulate a gastrointestinal hormone production resulting in a release of enzymes from a liver of the subject and causing blood glucose levels of the subject to be in a therapeutic range of the plurality therapeutic ranges for blood glucose levels.

The kit for individualized intravenous exogenous insulin-based therapy can have a blood glucose meter for testing the subject after glucose consumption for blood glucose levels and transmitting blood glucose test results to the portable data storage.

Computer instructions to in the portable data storage can instruct the client device processor to compare blood glucose test results to a plurality of therapeutic ranges for blood glucose levels stored in the portable data storage and verify that the subject with the metabolic syndrome is in a therapeutic range of the plurality therapeutic ranges for blood glucose levels.

Computer instructions in the portable data storage can instruct the client device processor to compare the blood glucose test results to the diabetic treatment model and map the blood glucose test results and insulin sensitive factors of the subject with the metabolic syndrome to the measured weight **615** of the subject using the diabetic treatment model to generate an individualized schedule for bolus introduction using the schedule templates.

The kit for individualized intravenous exogenous insulin-based therapy can have a plurality of intravenous catheters in communication with the client device fluidly engageable with a fluid source to deliver to a patient a plurality of bolus sequentially using the generated individualized schedule for bolus introduction with at least one unequal time period between at least one pair of bolus.

Computer instructions in the portable data storage can instruct the client device processor to compare the subject profile to the library of weight management protocols to identify a weight management protocol for the subject based upon measured metabolic factors of the subject and saving the weight management protocol in the care plan.

The kit for individualized intravenous exogenous insulin-based therapy can have a plurality of metabolic enhancements.

Computer instructions in the portable data storage can instruct the client device processor to change the weight management protocol and the care plan after a first treatment session to manage weight of the subject using at least one of the plurality of metabolic enhancements **888** to cause improved cellular ATP functioning for the subject while infusing the plurality of bolus and modifying a quantity and a duration of unequal time periods between bolus introduction in the generated individualized schedule for bolus introduction having at least one unequal time period between at least one pair of bolus to improve impaired hepatic glucose processing.

When three treatment session are performed using the kit as described herein patients report energy resorted, medications reduced, wounds healed, amputations prevented, weight controlled, blood sugar controlled, blood pressure reduced, neuropathy diminished, retinopathy diminished, mood improved, sleep improved and erectile function restored.

The individualized intravenous exogenous insulin-based therapy can use a plurality of treatment sessions, generally **3** but up to 12 may be needed, each treatment session lasting from 1 hour to 3 hours.

APPX0599

US 9,652,595 B1

5

The goal of the individualized intravenous exogenous insulin-based therapy is to repair, recondition, and maintain a subject's impaired metabolism so that it functions and is maintained to provide a quality of life similar to that of a non-diabetic person.

To initiate the therapy a subject profile can be created.

Each treatment session can involve assessing for a subject's metabolic factors and storing the metabolic factors in the subject's profile. The subject profile can be stored in an administrative data storage connected to an administrative processor accessible via a network from a client device.

Each treatment session can involve matching the subject profile to a diabetic treatment model to create a schedule for bolus introduction with at least one unequal time period between bolus introductions.

The schedule can provide a quantity and frequency of intravenous insulin bolus, a quantity and frequency of dosage amounts of magnesium, and a quantity and frequency of dosage amounts of potassium for the subject.

Each treatment session can involve introducing to the subject insulin bolus sequentially, at frequencies determined from the diabetic treatment model, wherein each insulin bolus can be separated by irregular time periods.

Simultaneously with the sequential insulin bolus introduction, dosage amounts of magnesium and dosage amounts of potassium can be introduced to the subject. The magnesium and potassium can be introduced orally, transdermally, or by inhaling simultaneous with the insulin bolus introduction.

A weight management protocol can be identified from a library of weight management protocols given a subject's profile. The subject can be required to follow the weight management protocol and use a specific metabolic enhancement that can be in pill form, powder form, a transdermal patch, or another form known in the industry.

After 3 to 6 treatments using a care plan connected to the diabetic treatment model with a schedule for bolus instruction and at least one unequal period of time, the subject can have at least 10 percent and up to 50 percent improved cellular ATP functioning that can last up to 90 days from the last treatment.

The present embodiments also relate to a kit for infusing insulin intravenously to a subject to improve impaired hepatic glucose processing.

The term "5-MTHF" as used herein can refer to Levomefolic Acid, which is a primary form of folic acid used for DNA reproduction.

The term "A1C" as used herein refers to a blood test that shows how well individual diabetes is being controlled relative to a non-diabetic patient. In some cases, it can be a 3-month average of plasma glucose concentration from glycated hemoglobin.

The term "Adenosine triphosphate (ATP) as used herein refers a substance that transports chemical energy within cells for metabolism.

The term "Alpha Lipoic Acid" as used herein refers to an antioxidant that helps with the extraction of energy from food.

The term "blood glucose level therapeutic range" as used herein refers to a subject's designated target blood glucose level of 160 to 240 mg/dl during a treatment session.

The term "bolus" as used herein refers to a single dose of a medical substance and/or drug given all at once.

The term "catheter" as used herein refers to a thin tube that can be inserted into the body to remove bodily fluids or add fluids to a patient during a treatment session.

6

The term "CoEnzyme Q10" as used herein refers to a chemical that extracts energy from food in the human digestive process.

The term "Complete Blood Count" (CBC) as used herein refers to a blood test to evaluate cellular aspects of the blood and provide concentrations of components in the blood.

The term "C-peptide" as used herein refers to a chemical produced in the pancreas that appears in a 1:1 molecular ratio to insulin and that can be detected when a blood lab panel is performed on a blood sample.

The term "data storage" as used herein refers to a non-transitory computer readable medium, such as a hard disk drive, solid state drive, flash drive, tape drive, and the like. The term "non-transitory computer readable medium" excludes any transitory signals but includes any non-transitory data storage circuitry, e.g., buffers, cache, and queues, within transceivers of transitory signals.

The term "diabetic retinopathy" as used herein refers to a complication of diabetes that affects the eyes.

The term "diabetic treatment model" as used herein refers to a plurality of look up tables reflecting initial blend dosing adjustment protocols that reflect weight of the subject, types of insulin (long term and short term), a volume of bolus of insulin per treatment session, a quantity of bolus, a frequency of bolus for a treatment session and bolus intervals, dosage amounts of magnesium (including quantity and frequency) and dosage amounts of potassium (including quantity and frequency). The diabetic treatment model includes glucose dosage amounts which are milligrams/deciliter (mg/dl) based on blood glucose of the subject. The diabetic treatment model generates a schedule for bolus introduction with at least one unequal time period between at least one pair of bolus. In embodiments, the diabetic treatment model can be located in the administrative data storage.

For example, the diabetic treatment model receives from a doctor, nurse or technician the weight of a subject, such as 102 kilograms, and a blood glucose of the subject, such as 120 mg/dl. The diabetic treatment model then generates (i) a type of insulin to be introduced to the subject, such as short term insulin, (ii) a volume of bolus of insulin per treatment session for the subject, such as 05 milliliters, (iii) a quantity of bolus per treatment session, such as 12, and (iv) a frequency of bolus introduction, which in embodiments, can be random for a treatment session of 3 hours. The time intervals between sequential bolus introductions can range from 2 minutes to 10 minutes between bolus. In embodiments, the time intervals can be a random sequence.

The diabetic treatment model generates dosage amounts of magnesium, such as 2 milligrams per milliliter of saline (for intravenous introduction to the subject) during the treatment session.

The diabetic treatment model generates dosage amounts of potassium, such as 0.02 meq/milliliter of saline (for an intravenous introduction) during the treatment session.

The diabetic treatment model calculates glucose dosage amounts for a subject, which can range from 44 grams to 55 grams during the first 30 minutes of a treatment session and then different or the same glucose dosage amounts using real time blood glucose level tests of the subject, which can be performed providing new test results and recalculations of dosage amount of bolus every 30 minutes.

The term "dosage amounts of magnesium" as used herein refers to dosage amounts of magnesium in a saline carrier or in a pill form, for example, one that dissolves under the tongue of the subject.

APPX0600

INSU_PI_000428

US 9,652,595 B1

7

The term "dosage amounts of potassium" as used herein refers to dosage amounts of magnesium in a saline carrier, in a pill form, or as a banana. If a pill form is used, it can be in the form of a pill that dissolves under the tongue of the subject.

The term "Echocardiograph" as used herein refers to a multi-dimensional sonography of the heart that measures the heart's mechanical functionality.

The term "exogenous" as used herein refers to materials or reactions that occur outside of the body.

The term "glucagon" as used herein refers to a counter regulatory hormone essential for glucose metabolism in humans in particular.

The term "glucose" as used herein refers to the simple carbohydrate commonly referred to as "sugar".

The term "hyperglycemia" as used herein refers to high blood glucose level present in a subject's blood test.

The term "improved cellular ATP functioning" as used herein refers to "Adenosinie Triphosphatase" ("ATPase") functioning, which are one or more enzymes that catalyze the formation of adenosine triphosphate ("ATP") from adenosine diphosphate ("ADP") and the functioning is indicative of the energy generated by a cell when it consumes glucose during metabolic processing.

The term "individual target blood glucose level" as used herein refers to a medical beneficial range that the patient or subject can achieve at least during treatments session created by the diabetic treatment model, during the entire infusion therapy, such as a range from 125 mg/dl to 225 mg/dl, which can be adjusted to a more narrow range, such from 180 mg/dl to 225 mg/dl for a specific subject.

The term "insulin" as used herein refers to a chemical that is a counter regulatory hormone essential for glucose metabolism.

The term "insulin bolus" as used herein refers to a dosage quantity of insulin given intravenously to a patient.

The term "insulin reservoir" as used herein can be a flexible pouch of insulin having multiple insulin bolus.

The term "insulin sensitivity factor" as used herein refers to how a subject responds after receiving one unit of insulin as a measure of decrease in blood glucose.

The term "Lipid Panel" as used herein refers to a blood test that measures a concentration of lipids, fats, and fatty substances used as a source of energy by a human body.

The term "metabolic factors" as used herein refers to a weight, such as 125 pounds, blood tests, such as a Comprehensive Metabolic Panel, a CBC panel, a C-peptide test, an A1c test (known as a "lipid panel"), a urinalysis, a nerve conduction velocity test, an individual target blood glucose level, such as 110 mg/dl, a respiratory quotient, such as a ratio of the amount of carbon dioxide released based on oxygen consumed during a preset period of time, and an insulin sensitivity factor, such as a value indicating how a subject responds after receiving one unit of insulin as a measure of decrease in blood glucose.

The term "metabolic enhancement" as used herein refers to a blend of components that bond to enzymes in the patient and increases the enzyme activity for a patient or subject. The metabolic enhancement can be (1) a pill containing the components of the metabolic enhancement, (2) a drink containing the components of the metabolic enhancement, (3) a shake containing the components of the metabolic enhancement, (4) a food item, such an energy bar, fortified with the metabolic enhancement, (5) a transdermal patch or similar application delivering the components of the metabolic enhancement, and combinations thereof.

8

In one example, the metabolic enhancement can be a blend of methylcobalamin, (such as 5 mg), pyridoxal-5-phosphate (such as 35 mg), 5-MTHF (known as an activated form of folic acid) (such as 1 mg), Alpha Lipoic Acid (such as 50 mg), NADH (such as 5 mg), CoEnzyme Q10 (such as 75 mg), N-Acetyl L-Cysteine (NAC) (such as 250 mg), Vitamin D (such as Cholecalciferol) (such as 2000 International Units (IU)) and Chromium Picolinate (such as 300 mcg).

The term "methylcobalamin" as used herein refers to one of two coenzyme forms of vitamin $B_{12}$.

The term "N-Acetyl Cysteine" as used herein refers to an amino acid that helps build proteins in the body.

The term "NADH" as used herein refers to Nicotinamide Adenine Dinucleotide which binds as a coenzyme to proteins and serves in respiratory metabolism.

The term "Nerve Conduction Velocity (NCV)" as use herein refers to a test to determine how fast electrical signals move throughout a nerve.

The term "non-transitory computer readable medium" as used herein excludes any transitory signals but includes any non-transitory data storage circuitry, e.g., buffers, cache, and queues, within transceivers of transitory signals.

The term "Peripheral Autonomic Neuropathy" as use herein refers to the symptoms that occur when there is damage to the nerves, such as weakness and numbness of a limb.

The term "plan goal" as used herein can refer to a purpose for the insulin therapy as identified by the subject and/or a medical professional associated with the therapy and inserted into the care plan generated by the diabetic treatment model.

The term "portable data storage" as used herein can refer to a non-transitory computer readable medium, such as a hard disk drive, solid state drive, flash drive, tape drive, and the like.

The term "processor" as used herein can refer to a computer, a laptop, a plurality of connected processors, a tablet computer, a cellular telephone or smart phone, a portable processing device, or any similar device know in the industry.

The term "respiratory quotient" as used herein refers to the ratio of: carbon dioxide given off by a human and oxygen consumed by a human, particularly under known resting conditions.

The term "saline" as used herein refers to a sterile solution of 900 grams of sodium chloride in 100 ml of water.

The term "schedule for bolus introduction" as used herein refers to the plurality of specific time intervals between bolus introductions in a treatment session. For the invention, the "schedule for bolus introduction" requires at least one "unequal time period" between at least one pair of bolus per treatment session.

As an example of the schedule for bolus introduction for a treatment session: three bolus can be delivered to the subject sequentially, each bolus separated by a 4 minute time interval. Then, using the schedule for bolus introduction, a fourth bolus is delivered to the subject after a 6.5 minute time interval. The 6.5 minute time interval is referred to herein as "an unequal time period" because it is different from the 4 minute time intervals on the schedule for bolus introduction.

In embodiments, all the time intervals between pairs of bolus can be different for a session. In embodiments, just one time interval between one pair of bolus can be different according to the schedule for bolus introduction.

APPX0601

INSU_PI_000429

US 9,652,595 B1

9

In embodiments, many variations in time intervals on the schedule for bolus introduction can be computed by the diabetic treatment model using the weight of the subject, insulin sensitivity factor of the subject and tested blood glucose levels of the subject.

Another example of the schedule for bolus introduction having an unequal time period can be 3 pairs of bolus that are sequentially introduced require 5 minute intervals of time between introductions then a seventh bolus requires a 6 minute interval of time prior to introduction to the subject. The 6 minute interval of time is an "unequal time period". The diabetic treatment model can indicate that the schedule for bolus introduction can require all remaining time periods for the treatment session between pairs of bolus to be equal (the opposite of unequal periods of time). The plurality of time periods of the schedule for bolus introduction (the time between each pair of bolus) is generated by the diabetic treatment model.

The term "subject profile" as used herein can refer to the name of an individual and the associated measured metabolic factors. The subject profile can include a subject history and a subject physical report of the subject, a subject name and contact information, as well as a subject's blood test results. In embodiments, the subject profile can include a date, a name, an address, an email address, a telephone number, an ethnicity, a gender/sex, a type of diabetes, a date of birth, a weight, a height, a blood pressure, a temperature, a heart rate, a blood type, a blood glucose level, insurance information, a responsible party name and contact information, a driver's license number or copy of the driver's license, employer information, insurance information, medical history including surgery and ancestor information and allergies, current medications, other test results, including but not limited to urinalysis, emergency contact information, and a primary care physician name and contact information. In embodiments, the subject profile can be inputted into a data storage associated with a processor.

The term "treatment session" as used herein refers to a plurality of treatment cycles during which a plurality of bolus are infused to a patient. Each treatment cycle can range from 40 minutes to 180 minutes. Each treatment session can range from 1 treatment cycle and up to 6 treatment cycles.

The term "unequal time period" as used herein refers to a unit of time between a pair of bolus in a treatment session that is different in length from a time period between another pair of bolus in a treatment session.

The term "weight management protocol" as used herein refers to a system of eating certain foods with a preset calorie content to ensure the patient or subject loses an amount of weight per week that aligns with the subject's metabolic factors.

The invention improves impaired hepatic glucose processing in subjects, which can be a human or a non-human, such as an animal.

In embodiments, the kit can include creating a subject profile with assessed metabolic factors.

The kit can include inserting the subject profile into a diabetic treatment model to determine: a quantity and frequency of sequential intravenous insulin bolus to a subject using a schedule for bolus introduction having at least one unequal time period between a pair of bolus, as well as determining a quantity and frequency of dosage amounts of magnesium and a quantity and frequency of dosage amounts of potassium.

The kit can include selecting a weight management protocol using the subject profile and specific metabolic func-

10

tions of the subject. For example, the metabolic function of respiratory quotient can be used to create a specific customized weight management protocol.

The subject can then follow the weight management protocol while taking a metabolic enhancement. The weight management protocol initially can use a complete metabolic measurement system for cardio-pulmonary exercise stress and resting energy expenditure testing which can give a patient a resting metabolism score. The resting metabolic scores can range from 0.75 to 0.85 for fats, from 0.78 to 0.82 for protein, and from 0.88 to 0.92 for carbohydrates. Based on these resting metabolic scores, a subject's diet can be customized based on what the subject's body can actually metabolize.

A resting metabolic carbohydrate score in excess of 1.20 can indicate the subject's body is undergoing ketogenesis (metabolic production of ketones or ketone bodies or formation of acid ketone [substances that are made when the body breaks down fat for energy, any organic compound in which two carbon atoms are linked by the carbon of a carbonyl group (C—O), the simplest ketone and the most important in medicine is dimethyl ketone (acetone)] bodies, as in uncontrolled diabetes, starvation, or as a result of a diet with a very high fat content), and a different customized diet can be created for the subject or the patient.

The invention improves impaired hepatic glucose processing in subjects, by providing individualized intravenous exogenous insulin-based therapy that not only produces body tissue with improve cellular ATP functioning in the short term, by improves the ATP function by at least 10 percent and up to 40 percent, for a period of time that ranges from 7 days to 90 days from the last treatment session of the individualized intravenous exogenous insulin-based therapy.

It should be noted that in embodiments, the dosage amounts of magnesium and potassium can be introduced to the subject intravenously from a second reservoir simultaneously as the insulin bolus are introduced.

Glucose is introduced to the subject as part of the therapy. The glucose is taken by the subject prior to receiving the insulin bolus. When glucose is used the dosage amounts of potassium and dosage amounts of magnesium can be adjusted based on the subject profile. The bolus introduction can be monitored and blood glucose levels tested allowing a therapist to change the quality and time intervals between bolus based on the diabetic treatment model until the blood glucose level of the subject reaches an individual target blood glucose level.

In embodiments, the unequal time periods between bolus introductions according to the schedule can range from 4 minute to 8 minute periods but can be as low as 1 minute and as high as 10 minutes. The unequal time periods can include minutes and seconds.

In embodiments, from 60 grams of glucose to 100 grams of glucose can be introduced to the subject to establish a blood glucose level of at least 125 mg/dl prior to introducing the bolus of insulin and dosage amounts of potassium and magnesium.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a respiratory quotient of the subject from a metabolism score with the subject in a resting state and applying the results into the diabetic treatment model to (i) modify the concentration of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure the success of individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a cardiac function measured by echocardiograph with the subject in a resting state and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a peripheral autonomic neuropathy and microcirculation with the subject in a resting state prior to bolus injection and simultaneously as bolus are injected and after bolus have been injected and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a retinal image captured by a non-mydriatic camera with the subject in a resting state to identify diabetic retinopathy after a series of bolus treatments are performed and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing wounds to wound characteristics by dimensionally measuring wounds by length, width, and depth and related clinical characteristics with the subject in a resting state after a series of bolus treatments are performed and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the kit for improving impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing C-peptides, such as with the University of Oxford's HOMA2 Calculator, which act as a marker for insulin production and insulin sensitivity factor and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both, or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the metabolic enhancement can have a nerve function improver to decrease homocysteine (a naturally occurring amino acid in all humans that is found in blood plasma) levels and improve cardio vascular health.

In embodiments, the weight management protocol can include additional nutritional supplements.

In embodiments, the insulin bolus can be intravenously infused using a needle or a catheter located in the subject's body, hand, or forearm.

Now turning to the Figures, FIG. 1A shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 40 kilograms to 160 kilograms.

A dosing protocol for insulin bolus, dosage amounts of potassium and dosage amounts of magnesium as generated by the diabetic treatment model using weight of a subject from 40 kilograms to 160 kilograms is shown. This chart can be used for one person or for a plurality of subjects.

Weight appears in the first column then a dosage amount of a ratio of potassium to saline, a dosage amount of a ratio of magnesium to saline, a dosage amount of a ratio of insulin to create the amount of insulin to saline to be used for a treatment session and an insulin reservoir volume is depicted mapped to the weight of the subject and to the potassium to saline dosage, and magnesium to saline dosage and insulin to saline dosage.

The insulin reservoir volume is a liquid volume containing (i) the insulin and saline, (ii) the insulin, saline and potassium, (iii) the insulin, saline and magnesium, or (iv) the insulin, saline, potassium and magnesium, used in the bolus for the subject.

An insulin bolus dosage minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A schedule for bolus introduction with a plurality of unequal time periods (in seconds) between bolus introduction is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A quantity of bolus per treatment cycle is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

FIG. 1B shows a diabetic treatment model with bolus volume dosage mounts for a subject with a weight from 161 kilograms to 275 kilograms.

A dosing protocol for insulin bolus, dosage amounts of potassium and dosage amounts of magnesium as generated by the diabetic treatment model using weight of a subject from 161 kilograms to 275 kilograms is shown. This chart can be used for one person or for a plurality of subjects.

Weight appears in the first column then a dosage amount of a ratio of potassium to saline, a dosage amount of a ratio of magnesium to saline, a dosage amount of a ratio of insulin to create the amount of insulin to saline to be used for a treatment session, and an insulin reservoir volume is depicted mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

The insulin reservoir volume is a liquid volume containing (i) the insulin and saline, (ii) the insulin, saline and potassium, (iii) the insulin, saline and magnesium, or (iv) the insulin, saline, potassium and magnesium, used in the bolus for the subject.

US 9,652,595 B1

13

An insulin bolus dosage minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A schedule for bolus introduction with a plurality of unequal time periods (in seconds) between bolus introductions is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A quantity of bolus per treatment cycle is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

FIG. 2 shows a bolus volume dosage adjustment protocol based on tested blood glucose levels as produced by the diabetic treatment model.

A dosage adjustment protocol of insulin is shown for three time intervals: (i) a first time interval for hours 1 and 2 of each treatment session, (ii) a second time interval for a first 30 minutes of hour 3 of each treatment session, and (iii) a third time interval for a last 30 minutes of hour 3 of each treatment session.

A table of tested blood glucose level in view of dosage amounts of insulin are shown, which is generated by the diabetic treatment model.

This portion of the diabetic treatment model indicates that the amount of insulin or quantity of bolus can be increased or decreased based on real time test results of a subject's blood glucose level.

FIG. 3 depicts a glucose dosage adjustment protocol as produced by the diabetic treatment model.

A patient's tested blood glucose level ranging from 100 to 550 mg/dl is shown.

In the glucose dosage adjustment protocol, an amount of glucose to be administered using the kit is depicted as mapped to a tested blood glucose level. The amount of glucose ranges from slightly above no glucose shown as 0.01 grams to 60 grams of glucose.

FIG. 4 depicts a metabolic enhancement protocol as produced by the diabetic treatment model and an exemplary metabolic enhancement by component.

The metabolic enhancement protocol shows dosage amounts of metabolic enhancement and respiratory quotients for a patient. The metabolic enhancement can be provided to a subject in dosage amounts as pills, in powder form, as a drink, a transdermal patch, or a delivery system known in the art.

The respiratory quotients range from 0.69 to 1.20. The dosage amounts of metabolic enhancement can range from 1 dose to 3 dosages daily, as shown corresponding to the tests of the subject showing the respiratory quotients.

Ingredients for an exemplary metabolic enhancement usable according to the diabetic treatment model are shown with minimum amounts per dosage and maximum amounts per dosage for the metabolic enhancement.

14

In embodiments, the ingredients for a usable metabolic enhancement can be formed from a synergistic combination of nine ingredients, namely:

Vitamin D—as Cholecalciferol ranging in amounts from 600 IU to 2000 IU.

Vitamin $B_6$—as Pyridoxal-5-Phosphate ranging in amounts from 10 mg to 100 mg.

Folic Acid—as Folate ranging in amounts from 200 mcg to 2000 mcg.

Vitamin $B_{12}$—as Cyanocobalamin ranging in amounts from 1000 mcg to 5000 mcg.

An amino acid that builds proteins in a subject—as N-Acetyl L-Cysteine (NAC) ranging in amounts from 200 mg to 600 mg.

A coenzyme that extracts energy from food for a subject—as Coenzyme Q10 (CoQ10) ranging in amounts from 60 mg to 400 mg.

An antioxidant that extracts energy from food for a subject—as Alpha lipoic acid ranging in amounts from 50 mg to 400 mg.

A protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for a subject—as Nicotinamide Adenine Dinucleotide (NADH) ranging in amounts from 0.5 mg to 5 mg.

A glucose utilization component to prevent or treat chromium deficiency in a subject and which additionally improves glucose utilization by insulin—as Chromium Picolinate ranging in amounts from 200 mg to 300 mg.

The following are non-limiting examples.

Example 1

A comparative analysis was generated for Fred Smith, Fred S. a 69-year-old man with Type 2 diabetes of 25 years' duration. Fred Smith arrived in a wheelchair, because walking was too painful for him. Fred Smith's left foot had all the toes amputated, and a non-healing wound on his other foot had caused his doctor to recommend amputation of a toe on his right foot.

Conventional wound care treatment, including aggressive wound care, wound debridement, and hyperbaric treatment had failed. Fred Smith also developed a debilitating peripheral neuropathy.

At this point Fred Smith weighed 107.95 kilograms and began an intensive treatment protocol of three treatment sessions per week, the first week includes two treatment sessions the second and third weeks include one treatment session per week thereafter for weeks 4 through 12. During each treatment session, Fred Smith received insulin and saline intravenously, alternating with glucose. Fred Smith received 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram, at a first set of unequal time periods of 5.3 minutes, 4 minutes, and 5.1 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Fred Smith received a total of 16 treatments during the three-month period, after the 6th treatment, he began to regain feeling in his feet.

Fred Smith due to the treatment was no longer in a wheelchair at the end of three months and was able to simply use a cane to get around.

Fred was able to decrease his hospital costs by $255,000 from the prior year without treatment.

Additionally, Fred was able to decrease one of his blood pressure medications.

APPX0604

US 9,652,595 B1

**15**

Post treatment, Fred's A1c test result was down 2.7 points. Fred no longer experienced hypoglycemic events and he had reduced his long-acting insulin by 20 percent and his short-acting insulin by 50 percent.

The primary care physician noted that Fred's wound had healed and no amputation was needed.

Example 2

A comparative analysis was generated for Marianne Rutledge, a 60-year-old woman with Type 2 diabetes of 12 years duration, who suffered from severe kidney disease and was fearful of becoming a dialysis patient.

Upon arrival Marianne Rutledge's blood test results showed an A1C of 10.2, blood glucose of 240 mg/dl, her blood pressure measured 150/92, and she weighed 212 pounds, or 96.3 kilograms.

Marianne Rutledge began an intensive treatment protocol of two treatment sessions per week the first two weeks, and one treatment session per week thereafter for weeks 3 through 12. During each treatment session, Marianne Rutledge received insulin and saline intravenously, alternating with glucose. Marianne Rutledge received 36 bolus per treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram, at a first set of unequal time periods of 5.1 minutes, 4.6 minutes, and 5.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Marianne Rutledge received a total of 13 treatments during the three-month period, after the 2nd treatment, she noticed an extreme increase in her energy and stamina, and as she continued the treatment sessions, she reported that she looked forward to the next treatment session because it made her feel better than she had felt since she was diagnosed with diabetes and kidney disease.

Marianne Rutledge continued the therapy with regular treatment sessions each week, 3 to 4 hours each session, with the protocol of insulin and saline intravenously, alternating with glucose and using the schedule for bolus introduction having at least one unequal time period. After six months of treatment, her kidney function improved to the point that her doctor no longer considered dialysis probable.

Example 3

Victoria Lord, a Type 2 diabetic on dialysis had vision problems including retinopathy and she also suffered from neuropathy and had trouble sleeping. A comparative analysis was generated for Victoria Lord, whose initial vital signs were blood glucose level 250, blood pressure 120/80, heart rate of 72, and HgbA1c of 9.2.

Victoria Lord began an intensive therapy of two treatment sessions on intravenous insulin alternating with oral glucose on consecutive days for the first two weeks then weekly treatment sessions thereafter for the next 10 weeks, then to be reevaluated.

Each treatment session consisted of 36 bolus. During each treatment session, Victoria Lord received insulin and saline intravenously, alternating with glucose. Victoria received the 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.0 minutes, 6.9 minutes, and 5.3 minutes, with each set

**16**

of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After her first four treatments over two weeks, she reported that her neuropathy decreased, which was confirmed by autonomic tests. Her blood glucose was decreased to 110, and she reported such extremely increased energy that she no longer required an afternoon nap. She also reported that she was sleeping better. Her lab tests after 14 treatments over 12 weeks showed HgbA1c of 6.5, down from 9.2, or a decrease of about 30 percent.

Example 4

Jim Pierce had severe foot neuropathy and had experienced no feeling in his feet for several years. He had been diagnosed with Type 2 Diabetes about 15 years ago and was insulin dependent. A friend knew of his debilitating neuropathy and recommended that he begin the therapy.

Jim Pierce reported that when his neuropathy began, it was so painful; he could not even stand for a sheet to touch his toes when he went to bed at night. As his neuropathy progressed, he lost all feeling in his feet and began to suffer injuries from falling. His doctor continued to treat him with insulin and prescription drugs, such as Gabapentin.

Jim Pierce's test results were reviewed, and he was put on a therapy of two treatment sessions on consecutive days for three weeks, two treatment sessions on consecutive days for two weeks after that, and then one treatment session per week for the balance of the 12-week period.

Jim Pierce received 36 bolus during each treatment session using the schedule for bolus introduction having at least one unequal time period. During each treatment session Jim Pierce received insulin and saline intravenously, alternating with glucose.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.5 minutes, 5.1 minutes, and 5.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After the first two treatments, Jim Pierce reported that the feeling began to return to his feet.

After he completed 8 treatments sessions, his doctor reduced his Gabapentin, and after 12 weeks, he no longer took Gabapentin for his neuropathy. He reduced his insulin from 50 units every night to 30 units every night. His lab reports showed Hgb A1c 7.2, down from 10.5. After six months of the continued therapy he was able to do a three-mile hike on his vacation.

Example 5

Sarah Hardin is a pre-diabetic with a genetic disposition to metabolic disorder and disease, including diabetes. Sarah's pre-treatment metabolic rate or respiratory quotient (RQ), was 0.84. After her initial test results were reviewed, she began one treatment session per week for 12 weeks.

Each of Sarah's treatment sessions consisted of 36 bolus and during each treatment session, Sarah received insulin and saline intravenously, alternating with glucose. Sarah received 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.2 minutes, 4.7 minutes, and 6.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

US 9,652,595 B1

17

18

Soon after starting the treatment therapy, Sarah Hardin noticed improvement in hair and nail growth, and she documented it with photographs.

Sarah reported that her energy increased to the point that she no longer needed help taking care of her children. After 5 treatment sessions, a comparative analysis was performed and her RQ increased to 0.93, which demonstrated that she was burning carbohydrates for energy.

Example 6

Tatum Norris, age 18, a Type 1 diabetic diagnosed at age 10, had severe neuropathy and was housebound because of his pain. He began two treatment sessions on consecutive days, then 1 treatment session a week thereafter.

Each treatment session consisted of 36 bolus. During each treatment session, Tatum received insulin and saline intravenously, alternating with glucose. Tatum received 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.4 minutes, 5.3 minutes, and 5.2 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

A Nerve Conduction Velocity (NCV) with Electromyopathy (EMG) was conducted pre-treatment on Tatum and repeated 90 days after his initial treatment, which showed a marked decrease in his diabetic neuropathy.

After 8 or 10 treatments, Tatum began driving a car again and he was able to sit in movie theaters because the pain was now manageable. Tatum reported that he could now go visit his mom in Dallas and even hang out with friends.

Example 7

Carmen Valdez, a 70-year-old Type 2 diabetic who had been diagnosed four years earlier, was on three types of blood pressure medication (Amlodipine, Lisinopril, and Lopressor) and three medications to control her blood sugar (Lantus, Metformin, and Onglyza). After her initial test results were reviewed, she began treatment sessions of two treatment sessions on consecutive days for the first two weeks and one treatment session per week thereafter for 12 weeks. Her pre-treatment RQ test result was 0.79.

During each treatment session, Carmen received insulin and saline intravenously, alternating with glucose. Carmen received 36 bolus using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 6.4 minutes, 7.2 minutes, and 7.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Carmen reported that she was surprised that she immediately experienced greatly increased energy and stamina, as well as a lowering of her daily blood pressure according to her self-tests, after only the first two treatments.

After three months, Carmen Valdez was able to discontinue taking Amlodipine, Lantus and Onglyzaone. At that point her RQ measured 0.95.

Example 8

Harold Carson, a 65-year-old insulin-dependent Type 2 diabetic of 25 years, became insulin resistant and his medications were no longer working well. Mr. Carson was taking three 750-mg Glucophage tablets daily, 150 units of Humalog (short-acting) insulin daily, and a nighttime injection of 40 units of Humulin N (long-acting) insulin. He also took statin drugs for cholesterol and blood pressure medication.

After initial tests, his C-peptide was remarkable at 2.0. He began treatment sessions of two on consecutive days for two weeks, and then continued with weekly treatments for a total of 12 weeks.

During each treatment session, Mr. Carson received insulin and saline intravenously, alternating with glucose. He received 36 bolus per treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.7 minutes, 6.1 minutes, and 5.9 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After he began the treatment sessions, he reported that he immediately noticed a better night's sleep, that his mental clarity was sharper, and even his golf score improved.

After two months of treatment he decreased his insulin usage by 70 percent (from 150 units daily to 45 units daily) and his C-peptide test resulted in a significant improvement of 2.8.

Harold Carson's RQ was 0.75 pre-treatment and a perfect 1.00 after two months of treatment. Harold reported that his dry skin improved, the neuropathy in his legs vanished, and his wife reported that his hair had grown "unbelievably" after he began the treatment therapy.

Example 9

Stephen Henderson, a pre-diabetic with metabolic disorder and hyperlipidemia, had initial test results of Triglycerides 1290, LDL 183, and Cholesterol 271; his RQ was 0.74. He began treatment sessions once a week for 12 weeks. During each treatment session, Mr. Henderson received insulin and saline intravenously, alternating with glucose. Mr. Henderson received 36 bolus each treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 4.8 minutes, 4.8 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Stephen reported that after only two treatments, his energy level increased and prior hair loss abruptly stopped. After five treatments, he noticed significant hair growth. His test results after 12 treatment sessions were Triglycerides 123, LDL 86, Cholesterol 144, and RQ 0.98.

Stephen also reported that he noticed significant improvement in quantitative and qualitative analysis capability.

Example 10

Alan Henderson traveled from Denver to Houston for his treatments. At age 71 he had a history of 13 heart stints, he had been a Type 2 diabetic for 20 years, and he was insulin dependent.

After initial testing and a review of his results, Alan Henderson began treatment sessions of two per week on consecutive days for two weeks, then one treatment session weekly for 10 more weeks.

During each treatment session, Alan received insulin, saline, potassium, and magnesium intravenously, alternating

APPX0606

INSU_PI_000434

US 9,652,595 B1

**19**

with glucose. Alan received 36 bolus each treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 6.4 minutes, 6.8 minutes, and 7.1 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Alan's initial RQ was measured at 0.78, and his Hgb A1c was 13.4.

Over the course of three months, after his 12-week, 14-treatment therapy, he decreased his fast-acting insulin (Novalog) by 55 percent, down from 15-18 units to 10-12 units with meals and his long-acting insulin (Lantus) decreased by 65 percent, down from 75 units twice daily to 40 units daily.

After the first three months of treatment, Alan's Hgb A1c was down to 7.3 (more than 6-point decrease), and his RQ was 0.90.

Alan Henderson also suffered from diabetic neuropathy, for which he had been prescribed Gabapentin (six capsules per day) and a Lidocaine patch. After two months he reduced the amount of Gabapentin he was taking, and then completely eliminated it. He discontinued use of the Lidocaine patch. He reports that he now has no pain or neuropathy in his hands or feet, and his energy level is "way up."

### Example 11

George Gilbert had a wound on his foot for three months that would not heal. He was also a Type 2 diabetic on Metformin orally. After review of his test results, he began treatment sessions of two sessions on consecutive days for the first week and weekly treatment sessions thereafter.

During each treatment session, George received insulin, saline, glucagon, and somatostatin intravenously, alternating with oral glucose. George received 36 bolus each treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.7 minutes, 5.4 minutes, and 5.0 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After only three weeks of the treatment, he reduced the amount of Metformin he was taking, his wound healed, and his doctor made photographs of the wound before and after for the hospital record. George calls the treatment a "miracle."

### Example 12

Toby Rasmussen, a pre-diabetic of 8 years duration, began treatment sessions because of vision problems and a family history of diabetes. His initial RQ was 0.85. His Hgb A1c measured 7.0. He began treatment sessions once a week for 12 weeks.

During each treatment session, Toby received insulin and saline intravenously, alternating with glucose. Toby received 36 bolus each treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.3 minutes, 5.7 minutes, and 6.4 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

**20**

Toby reports that after the 12 treatments, he has more energy and his eyesight has improved so much that he now uses only bifocals instead of trifocals. After treatments, his RQ measured 0.98 and his A1c measured 6.1.

### Example 13

Hank Anderson, a Type 2 diabetic of 27 years, had an Hgb A1c reading of 9.0, and was using Lantus insulin at 170 units during the day and another 70 units at night. He also reported severe leg cramps.

A comparative analysis was performed on Hank Anderson, and he began treatment sessions weekly. During each treatment session, Hank received insulin and saline intravenously, alternating with glucose. He also received potassium 40 meq orally with each treatment session and daily on non-treatment days. Mr. Anderson received 36 bolus per treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.6 minutes, 5.1 minutes, and 5.4 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After 12 weeks of weekly treatment sessions, Hank reported that since starting the treatment, his blood sugar is now controlled and his eyesight has improved so much that he went from legally blind without glasses to being able to read captions on a television with no glasses.

Hank was able to discontinue his nightly Lantus and his insulin went down from 6 vials of insulin per month to only 3, a significant costs saving.

Hank Anderson's A1c after 12 weeks of treatment sessions measured 8.3.

### Example 14

John Grayson, a Type 1 insulin-dependent diabetic, initially reported problems with his kidneys, eyes, low energy, mood swings, and erectile dysfunction. His RQ was 0.88 and his magnesium level was 1.5

After his test results were reviewed, John started treatment sessions of two sessions on consecutive days with weekly treatment sessions thereafter for a period of three months. During each treatment session, Hank received insulin and saline intravenously, alternating with oral glucose and somatostatin. Hank received 36 bolus per treatment session using the schedule for bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.0 minutes, 5.2 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Mr. Grayson also received magnesium chloride tablets of 40 mg orally with each treatment session and daily on non-treatment days.

After the first two treatments, Mr. Grayson decreased his insulin use by 5-10 units per sliding scale and was extremely happy to report that he experienced increased blood flow.

After the third treatment, Mrs. Grayson was deliriously excited about his improvement, especially with the blood flow.

FIGS. 5A-5C depict steps of a method of the invention according to one or more embodiments.

The method for providing an individualized intravenous exogenous insulin-based therapy can include creating a

APPX0607

US 9,652,595 B1

21

subject profile for a subject, as shown in box **500**. The subject profile can include: a subject history, such as having type II diabetes for the past three years and cataract surgery 4 years ago, a subject's physical reports including weight of the subject and optionally objective physician reports, CT scans and other diagnostic reports, a subject's name, such as Carol Wilson, a subject's contact information such as a name, an address and a telephone number, and a subject's blood test results.

The method can include assessing metabolic factors of the subject and storing the metabolic factors in the subject profile, as shown in box **502**. The metabolic factors needed in the subject file can include: a glucose level, such as an initial glucose level, a respiratory quotient, such as an initial respiratory quotient, an insulin sensitivity factor, such as an initial or pre-treatment insulin senility factor, and an individual target blood glucose level which the subject desires to achieve with the treatments using the diabetic treatment model.

The method can include creating a care plan with a plurality of treatment sessions for the subject and a plan goal, as shown in box **504**. The care plan can indicate a schedule for bolus introduction with at least one unequal time period and the care plan can include a quantity and frequency of a plurality of bolus containing saline and insulin for sequential intravenous introduction to a subject.

The method can include introducing glucose to the subject to stimulate gastrointestinal hormone production, resulting in the release of enzymes from the subject's liver and causing blood glucose levels of the subject to be in a therapeutic range, as shown in box **506**.

The method can include testing the subject for blood glucose levels to compare tested blood glucose levels to the plurality of therapeutic ranges and verify the subject is in the therapeutic range, as shown in box **508**.

The method can include comparing tested blood glucose levels to a diabetic treatment model, as shown in box **510**.

The method can include mapping tested blood glucose levels and insulin sensitive factors of the subject to the subject weight using the diabetic treatment model to determine a schedule for bolus introduction, wherein the schedule for bolus introduction has at least one unequal time period between at least one pair of bolus, as shown in box **512**.

The method can include introducing to the subject a plurality of bolus of insulin and saline sequentially using the schedule for bolus introduction having at least one unequal time period between at least one pair of bolus, as shown in box **513**.

The method can include comparing the subject profile to a plurality of weight management protocols to identify a weight management protocol for the subject based upon assessed metabolic functions of the subject and saving the weight management protocol in the care plan, as shown in box **514**.

The method can include implementing the identified weight management protocol and the care plan after a first treatment session to manage weight of the subject with a metabolic enhancement causing improved cellular ATP functioning for the subject while infusing insulin and modifying a quantity and duration of unequal time periods between bolus introduction in the schedule for bolus introduction having at least one unequal time period between at least one pair of bolus to improve impaired hepatic glucose processing, as shown in box **516**.

The method can include using in the schedule for bolus introduction having at least one unequal time period, time periods varying from 2 minutes to 10 minutes. The unequal

22

time periods can be time intervals from 1 percent to 30 percent different in length of time from each other.

The method can include introducing from 60 grams of glucose to 100 grams of glucose to the subject prior to initial bolus introduction to establish a blood glucose level of at least 125 mg/dl prior to introducing the plurality of bolus in a first treatment session.

The method can include comparing a respiratory quotient of the subject in a resting state to a plurality of metabolism scores, as shown in box **518**.

The method can include modifying a quantity of bolus for the subject for each treatment session as identified in the care plan with schedule for bolus introduction having at least one unequal time period between bolus to improve a subject's respiratory quotient, as shown in box **520**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period between bolus introduction by modifying a quantity and duration of unequal time periods between bolus introductions to improve the respiratory quotient, as shown in box **522**.

The method can include comparing a measured cardiac function of the subject in a resting state to a preset norm of cardiac function, as shown in box **524**.

The method can include modifying a quantity of bolus for the subject identified in the care plan using the preset norm of cardiac function, as shown in box **526**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period by modifying a quantity and duration of unequal time periods between bolus introductions to improve cardiac function, as shown in box **528**.

The method can include measuring a peripheral autonomic neuropathy and microcirculation of the subject in a resting state prior to bolus introduction comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of peripheral autonomic neuropathies and microcirculations, as shown in box **530**.

The method can include comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state as bolus are sequentially introduced to the measured peripheral autonomic neuropathy and microcirculation, as shown in box **532**.

The method can include comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state after all bolus have been introduced in a first treatment session to the measured peripheral autonomic neuropathy and microcirculation, as shown in box **534**.

The method can include modifying a quantity of bolus for the subject identified in the care plan to treat peripheral autonomic neuropathy and microcirculation, as shown in box **536**.

The method can include modifying the schedule for bolus introduction having at least one unequal time period by modifying a quantity and duration of unequal time periods between bolus introduction to improve the measured peripheral autonomic neuropathy and microcirculation, as shown in box **538**.

The method can include viewing an initial retinal image of the subject captured by a non-mydriatic camera with the subject in a resting state to identify a diabetic retinopathy, as shown inbox **540**.

The method can include viewing a post treatment retinal image of the subject in a resting state after a first treatment session, as shown in box **541**.

APPX0608

**INSU_PI_000436**

US 9,652,595 B1

23

The method can include comparing the initial retinal image to the post treatment retinal image, as shown in box 542.

The method can include modifying a quantity of bolus for the subject if no change in the diabetic retinopathy has occurred, as shown in box 544.

The method can include modifying the schedule for bolus introduction having at least one unequal time period between bolus to reduce the effects of diabetic retinopathy by modifying a quantity and duration of unequal time periods between bolus introductions to reduce the effects of diabetic retinopathy, as shown in box 546.

The method can include dimensionally measuring wounds by length, width, depth and identifying wound characteristics with the subject in a resting state, as shown in box 550.

The method can include dimensionally measuring wounds after at least one treatment session to identify skin integrity and changes in clinical wound characteristics, as shown in box 552.

The method can include modifying a quantity of bolus for the subject identified in the care plan for wound treatment using the identified skin integrity and changes in clinical wound characteristics, as shown in box 554.

The method can include modifying the schedule for bolus introduction having at least one unequal time period between bolus to improve wound healing by modifying a quantity and duration of unequal time periods between bolus introduction to reduce wound size and wound characteristics, as shown in box 556.

The method can include comparing C-peptides of the subject to a preset norm of C-peptides to identify an insulin sensitivity factor, as shown in box 560.

The method can include modifying a quantity of bolus for the subject for the insulin sensitivity factor, as shown in box 562.

The method can include modifying the schedule for bolus introduction having at least one unequal time period between bolus to improve insulin sensitivity factor using analysis of C-peptides by modifying a quantity and duration of unequal time periods between bolus introductions, as shown in box 564.

In embodiments, the method can use at least one of: methylcobalamin, pyridoxal-5-phosphate, 5-MTHF, alpha lipoic acid, NADH, coenzyme Q10, chromium picolinate, and N-Acetyl cysteine, and vitamin $D_3$ as the metabolic enhancement.

In embodiments, a needle or a catheter can be used to introduce the bolus into the subject's hand or forearm to deliver the insulin bolus.

The method can include determining a quantity and frequency of dosage amounts of magnesium and introducing the dosage amounts of magnesium simultaneously to the subject with the plurality of bolus using the schedule for bolus introduction having at least one unequal time period, as shown in box 570.

The method can include determining a quantity and frequency of dosage amounts of potassium and introducing the dosage amounts of potassium simultaneously to the subject with the plurality of bolus using the schedule for bolus introduction having at least one unequal time period, as shown in box 572.

The method can include determining a quantity and frequency of dosage amounts of somatostatin and introducing the dosage amounts of somatostatin simultaneously to

24

the subject with the plurality of bolus using the schedule for bolus introduction having at least one unequal time period, as shown in box 574.

In embodiments, the somatostatin can be administered orally or intravenously.

The method can include determining a quantity and frequency of dosage amounts of glucagon and introducing the dosage amounts of glucagon simultaneously to the subject with the plurality of bolus using the schedule for bolus introduction having at least one unequal time period, as shown in box 576.

In embodiments, the glucagon can be administered orally or intravenously

The method can include scheduling diagnostic tests after a first treatment session to modify the care plan for improved cellular ATP functioning for the subject and improved hepatic glucose processing, as shown in box 578.

FIG. 6 depicts a system of the invention according to one or more embodiments.

The system for individualized intravenous exogenous insulin-based therapy can have an administrative processor 602 connected to an administrative data storage 604.

The administrative processor, which can be a computer, can be connected to a network 606. In embodiments, the connection can be a wired or wireless connection. The network can be a cellular network, a satellite network, a global communication network, a local area network, a wide area network, a similar network known in the industry, or combinations thereof.

The system can connect to a plurality of client devices 608a, 608b, and 608c. The client devices can be computers, laptops, tablet computers, cellular phones or smart phones, or another digital input device that is cable of bidirectional communication and can be used to input subject information into a subject profile, which can be disposed in the administrative data storage 604.

In embodiments, the system can connect to a hospital processor 607 and/or an insurance processor 609. The hospital processor, the insurance processor or both can be in communication with the network 606 and can provide accelerated payment to the diabetic treatment center and provide improved data visibility for improved overall patient care by hospital doctors and medical staff treating the subject.

In embodiments, the system can connect to a doctor processor 611, which can be a computer. In embodiments, the doctor processor can be a group of processors, wherein each processor in the group can be connected to a different doctor specialist. In other embodiments, the doctor processor can be a processor accessible by a group of physicians.

In embodiments, the administrative processor can be a cloud based computing system.

FIGS. 7A and 7B depict an administrative data storage usable in the system according to one or more embodiments.

The administrative data storage 604 can contain at least one subject profile 610.

Each subject profile can contain a plurality of metabolic factors 605 of the subject, which can include, but is not limited to, a blood glucose level 612, a respiratory quotient 614, an insulin sensitivity factor 616, and an individual target blood glucose level 618.

The administrative data storage 604 can contain a plurality of care plan templates 620.

In embodiments, the administrative data storage can contain various computer instructions, which can be used to instruct the administrative processor to perform various tasks.

APPX0609

INSU_PI_000437

US 9,652,595 B1

25

The administrative data storage **604** can contain computer instructions **200** configured to instruct the administrative processor to create a customized care plan from one of the plurality of care plan templates, wherein the customized care plan indicates a plurality of treatment sessions for the subject with the subject profile and a plan goal, each customized care plan indicating a schedule for bolus introduction having at least one unequal time period between bolus introduction, each bolus containing saline and insulin and each bolus introduced intravenously and sequentially to a subject

The administrative data storage **604** can contain computer instructions **202** configured to instruct the administrative processor to compare tested blood glucose levels to a diabetic treatment model after introducing glucose to a subject to stimulate gastrointestinal hormone production, release of enzymes from the subject's liver and cause blood glucose levels of the subject to be in a therapeutic range.

The administrative data storage **604** can contain a plurality of therapeutic ranges for blood glucose levels **203**.

The administrative data storage **604** can contain computer instructions **204** configured to instruct the administrative processor to compare tested blood glucose levels to the plurality of therapeutic ranges for blood glucose levels and verify the subject is in the therapeutic range.

The administrative data storage **604** can contain a plurality of weight management protocols **205**.

The administrative data storage **604** can contain computer instructions **206** configured to instruct the administrative processor to compare a subject profile to the plurality of weight management protocols to identify a weight management protocol based upon metabolic functions of the subject.

The administrative data storage **604** can contain computer instructions **207** configured to instruct the administrative processor to save the identified weight management protocol in the generated customized care plan after saline with insulin in a plurality of bolus using the schedule for bolus introduction having at least one unequal time period have been administered to a subject.

It should be noted that the unequal time periods are determined by the diabetic treatment model and the care plan.

The administrative data storage **604** can contain computer instructions **208** configured to instruct the administrative processor to track weight management of the subject after a first treatment session and the identified weight management protocol and the care plan along with a metabolic enhancement to identify improved cellular ATP functioning for the subject and improve impaired hepatic glucose processing.

The administrative data storage **604** can contain a plurality of metabolism scores **209**, a plurality of preset norms of cardiac function **210**, a plurality of preset norms of peripheral autonomic neuropathies and microcirculations **211**, a retinal image of the subject **212**, wound characteristics **214** and a plurality of preset norms of C-peptides **215**.

In embodiments, at least one the metabolic enhancements can be a synergistic combination of: Vitamin D ranging in amounts from 600 IU to 2000 IU, Vitamin $B_6$ ranging in amounts from 10 mg to 100 mg, Folic Acid ranging in amounts from 200 mcg to 2000 mcg, Vitamin $B_{12}$ ranging in amounts from 1000 mcg to 5000 mcg, an amino acid that builds proteins in a subject ranging in amounts from 200 mg to 600 mg, a coenzyme that extracts energy from food for a subject ranging in amounts from 60 mg to 400 mg, an antioxidant that extracts energy from food for a subject

26

ranging in amounts from 50 mg to 400 mg, a protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for a subject ranging in amounts from 0.5 mg to 5 mg, and a glucose utilization component to prevent or treat chromium deficiency in a subject which improves glucose utilization by insulin ranging in amounts from 200 mg to 300 mg.

A metabolic enhancement can consist of Cholecalciferol, Pyridoxal-5-Phosphate, Folate, Cyanocobalamin, N-Acetyl L-Cysteine (NAC), Coenzyme Q10 (CoQ10), an Alpha lipoic acid, Nicotinamide Adenine Dinucleotide (NADH), and Chromium Picolinate.

FIGS. 8A-8C provide exemplary subject profiles with an automatically generated care plan template and an automatically generated report according to one or more embodiments.

The care plan can be viewed in real time 24 hours a day, 7 days a week as each test is updated and the metabolic assessments are completed.

FIG. 8A shows a subject profile **610** with fields for a name **802**, a patient ID number **804**, a date of birth **806**, a gender **808**, an ethnicity **810**, a blood type **812**, allergies **814**, a diagnosis **816**, insurance **818**, a primary care physician (PCP) **820**, a primary care physician phone number **822**, a primary care physician fax number **824**, a patient address **826**, a patient phone number **828**, a patient email address **830**, and a patient emergency contact **832**.

The subject profile **610** can include a narrative **834**, which can be written by a medical professional, documenting the condition of the patient and the medical history of the patient with the subject profile.

The subject profile **610** can include assessed metabolic factors of the patient **605**, which can include fasting blood sugar **836**, A1c level in the blood **838**, C-peptide level in the blood **840**, a magnesium level in the blood **842**, a potassium level in the blood **844**, and urinalysis test results **846**.

The subject profile **610** can include an insulin sensitivity factor **848** for the subject and diagnostic tests results **850**.

The diagnostic test results **850** can include blood glucose level **612**, respiratory quotient **614**, blood pressure **852**, weight **854**, nerve conduction velocity **856**, retinal image of the subject **212**, autonomic test results for neuropathy **858**, cognitive test results **860**, and cardiac test results **862** indicating cardiac function. The cardiac tests can be EKG or 2D Echo tests.

The subject profile **610** can include current medications **864** of the subject, such as aspirin or prescription medications the subject is currently using.

The subject profile **610** can have a home button **950**, a save button **952**, a previous page button **954**, a next page button **956**, and an exit button **958**. The buttons can be interchangeable with icons depending on software used on an industry standard computer screen.

FIG. 8B shows the subject profile with a care plan template.

In embodiments, the can plan template can be filled in partially or completely and can be editable.

The care plan template **620** can have an infusion schedule **866**, which can indicate infusions by week, showing a quality of treatments and on which days the treatments must occur.

The care plan template **620** can include an infusion formulation **868**, which can be a combination of insulin, saline, potassium, magnesium, glucagon, and somatostatin.

The care plan template **620** can include treatment cycles **870**, a quantity of bolus per treatment cycle **872**, and unequal time periods between bolus introductions in seconds **874**.

APPX0610

INSU_PI_000438

US 9,652,595 B1

27

28

The care plan template 620 can include a blood glucose level therapeutic range 876.

In embodiments, additional therapies can be tracked in the care plan, including but not limited to, a quantity and frequency of dosage amounts of potassium 878, a quantity and frequency of dosage amounts of magnesium 880, a quantity and frequency of dosage amounts of glucagon 882, and a quantity and frequency of dosage amounts of somatostatin 884.

The care plan template 620 can include diagnostic tests 886, which can be scheduled after a first treatment session.

The care plan template 620 can include metabolic enhancements 888, which can be a particular supplement and instructions on dosage amounts and frequency for the subject in view of the diagnostic tests or other data in the care plan.

The care plan template 620 can include a weight management protocol 205, which can be selected from the plurality of weight management protocols in the administrative data storage.

The care plan template 620 can include an education schedule 889, which can consist of a curriculum of education modules to be viewed or read by a subject by a certain date, which can be automatically transmitted to a client device of the subject on a predetermined schedule.

The care plan template 620 can include at least one plan goal 890, such as an increased metabolism for a subject, such as by 10 percent.

FIG. 8C shows the subject profile with a report.

The report 892 can show improved cellular ATP functioning for the subject identifying improve impaired hepatic glucose processing.

The report 892 can include a post treatment narrative 894, which can be completed by a health care professional, indicating subjective and analytical assessments of metabolic factors of the subject.

The report 892 can include post treatment assessed metabolic factors 896 of the patient, a post treatment insulin sensitivity factor 898, a post treatment patient testimonial 900, post treatment diagnostic tests results 902 and post treatment medications 904.

The report 892 can include an insulin sensitivity factor 848 for the subject and diagnostic tests results 850.

The diagnostic test results 850 can include blood glucose level 612, respiratory quotient 614, blood pressure 852, weight 854, nerve conduction velocity 856, retinal image of the subject 212, autonomic test results for neuropathy 858, cognitive test results 860, and cardiac test results 862 indicating cardiac function. The cardiac tests can be EKG or 2D Echo tests.

The report can include assessed metabolic factors of the patient 605, which can include fasting blood sugar 836, A1c level in the blood 838, C-peptide level in the blood 840, a magnesium level in the blood 842, a potassium level in the blood 844, and urinalysis test results 846.

FIG. 9 depicts a kit for individualized intravenous exogenous insulin-based therapy according to one or more embodiments.

The kit 1000 can include a portable data storage 903 in communication with a client device processor 607. A client device 608 can contain the client device processor 607. The client device processor 607 can be in communication with a plurality of intravenous catheters 632 fluidly engageable with a fluid source 634.

The plurality of intravenous catheters 632 deliver to a patient a plurality of bolus sequentially using the generated

individualized schedule for bolus introduction with at least one unequal time period between at least one pair of bolus.

In embodiments, the kit can use a blood glucose meter 630 for testing the subject after glucose consumption for blood glucose levels and transmitting blood glucose test results to the portable data storage, a plurality of metabolic enhancements 888, a glucose source 1012 comprising from 60 grams of glucose to 100 grams of glucose, a quantity of dosage amounts of magnesium 1014, a quantity dosage of potassium 1016, a quantity dosage of somatostatin 1018, and a quantity dosage of glucagon 1020.

The metabolic enhancement 888 can be a methylcobalamin, a pyridoxal-5-phosphate, a 5-MTHF, an alpha lipoic acid, a NADH, a coenzyme Q10, a chromium picolinate, and a N-Acetyl cysteine, and a vitamin $D_3$.

In embodiments, the metabolic enhancements 888 can contain a synergistic combination of: Vitamin D ranging in amounts from 600 IU to 2000 IU, Vitamin $B_6$ ranging in amounts from 10 mg to 100 mg, Folic Acid ranging in amounts from 200 mcg to 2000 mcg, Vitamin $B_{12}$ ranging in amounts from 1000 mcg to 5000 mcg, an amino acid that builds proteins in the subject ranging in amounts from 200 mg to 600 mg, a coenzyme that extracts energy from food for the subject ranging in amounts from 60 mg to 400 mg, an antioxidant that extracts energy from food for the subject ranging in amounts from 50 mg to 400 mg, a protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for the subject ranging in amounts from 0.5 mg to 5 mg, and a glucose utilization component to prevent or treat chromium deficiency in the subject which improves glucose utilization by insulin ranging in amounts from 200 mg to 300 mg.

In embodiments, the metabolic enhancements 888 can contain Cholecalciferol, Pyridoxal-5-Phosphate, Folate, Cyanocobalamin, N-Acetyl L-Cysteine (NAC), Coenzyme Q10 (CoQ10), an Alpha lipoic acid, Nicotinamide Adenine Dinucleotide (NADH), Chromium Picolinate, or combinations thereof.

FIGS. 10A-10E depict a portable data storage according to one or more embodiments.

The portable data storage 903 can have therapeutic ranges for blood glucose levels, a subject profile, a library of care plan templates, and a plan goal.

The subject profile 610 can have a subject history 1002, subject physical reports 1004 including a subject preexisting weight 1005, a subject name 1006, subject contact information 1008, an indication 1010 that a subject is suspected of having the metabolic syndrome, and measured metabolic factors 605.

The measured metabolic factors can include a glucose level 612, a respiratory quotient 614, an insulin sensitivity factor 616, and a weight 615.

In embodiments, the portable data storage 903 can have a library of care plan templates 620 and a plan goal 890.

The portable data storage 903 can have computer instructions 904 to instruct a client device processor of a client device to create a subject profile for a subject suspected of having metabolic syndrome.

The portable data storage 903 can have a database 906 of metabolic factors for groups of patients using the blood glucose level 612, the respiratory quotient 614, the insulin sensitivity factor 616 and target blood glucose levels 618.

In embodiments, the portable data storage 903 can have a library of weight management protocols 908 and for subjects with the metabolic syndrome.

The portable data storage 903 can have computer instructions 910 to instruct the client device processor to compare

APPX0611

INSU_PI_000439

US 9,652,595 B1

29

the measured metabolic factors of the subject to the database of the metabolic factors for like groups of the patients and calculate if the measured metabolic factors meet, exceed, or fall below the blood glucose level, the respiratory quotient, the insulin sensitivity factor, and the target blood glucose level for the subject suspected of having the metabolic syndrome to confirm the subject has the metabolic syndrome.

The portable data storage 903 can have a diabetic treatment model 911 with bolus volume dosage amounts 912 and schedule templates 913 for a bolus introduction.

The schedule templates 913 for the bolus introduction can contain at least one unequal time period between at least one pair of bolus, and the schedule templates provide the at least one unequal time period with a quantity and a frequency of a plurality of bolus for a sequential intravenous introduction to the subject with a confirmed metabolic syndrome. Each bolus can contain a predetermined concentration of saline and insulin based on the diabetic treatment model 911.

The portable data storage 903 can have computer instructions 914 to instruct the client device processor to create a care plan using one of the care plan templates for the subject and setting a plan goal 890 using the diabetic treatment model, the care plan indicating a customized schedule for bolus introduction with the at least one unequal time period and a quantity and a frequency of a plurality of bolus containing saline and insulin for sequential intravenous introduction to the subject and save in the subject profile.

The portable data storage 903 can include computer instructions 916 to instruct the client device processor to indicate a quantity of glucose for the subject with metabolic syndrome to stimulate a gastrointestinal hormone production resulting in a release of enzymes from a liver of the subject and causing blood glucose levels of the subject to be in a therapeutic range.

The portable data storage 903 can include computer instructions 918 to instruct the client device processor to compare blood glucose test results to a plurality of therapeutic ranges for blood glucose levels stored in the portable data storage and verify that the subject with the metabolic syndrome is in a therapeutic range of the plurality therapeutic ranges for blood glucose levels.

The portable data storage 903 can include computer instructions 920 to instruct the client device processor to compare the blood glucose test results to the diabetic treatment model and map the blood glucose test results and insulin sensitive factors of the subject with the metabolic syndrome to the measured weight of the subject using the diabetic treatment model to generate an individualized schedule for bolus introduction using the schedule templates.

In embodiments, the individualized schedule for the bolus introduction 922 have the at least one unequal time period, wherein time periods vary from 2 minutes to 10 minutes, and wherein the unequal time periods are time intervals from 1 percent to 30 percent different in length of time from each other.

The portable data storage 903 can include computer instructions 924 to instruct the client device processor to compare the subject profile to the library of weight management protocols to identify a weight management protocol for the subject based upon measured metabolic factors of the subject and saving the weight management protocol in the care plan.

The portable data storage 903 can include computer instructions 926 to instruct the client device processor to change the weight management protocol and the care plan

30

after a first treatment session to manage weight of the subject using at least one of the plurality of metabolic enhancements to cause improved cellular ATP functioning for the subject while infusing the plurality of bolus and modifying a quantity and a duration of unequal time periods between bolus introduction in the generated individualized schedule for bolus introduction having at least one unequal time period between at least one pair of bolus to improve impaired hepatic glucose processing.

The portable data storage 903 can include computer instructions 930 to instruct the client device processor to compare the respiratory quotient of the subject in a resting state to a plurality of measured metabolic factors.

The portable data storage 903 can include computer instructions 932 to instruct the client device processor to modify a quantity of the plurality of bolus for the subject for each treatment session as identified in the care plan with the generated individualized schedule for bolus introduction having at least one unequal time period between bolus introduction to improve the respiratory quotient of the subject.

The portable data storage 903 can include computer instructions 934 to instruct the client device processor to modify the generated individualized schedule for bolus introduction having at least one unequal time period between bolus introduction by modifying a quantity and a duration of unequal time periods between the bolus introduction to improve the respiratory quotient of the subject.

The portable data storage 903 can include computer instructions 936 to instruct the client device processor to compare a measured cardiac function of the subject in a resting state to a plurality of preset norms of cardiac function in a library of cardiac functions.

The portable data storage 903 can include computer instructions 938 to instruct the client device processor to modify a quantity of the plurality of bolus for the subject identified in the care plan using the preset norms of cardiac function.

The portable data storage 903 can include computer instructions 940 to instruct the client device processor to modify the generated individualized schedule of bolus introduction having at least one unequal time period by modifying a quantity and a duration of at least one unequal time period between bolus introduction to improve cardiac function of the subject.

The portable data storage 903 can include computer instructions 942 to instruct the client device processor to measure a peripheral autonomic neuropathy and microcirculation of the subject prior to the bolus introduction and comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of peripheral autonomic neuropathies and microcirculations in a library of peripheral autonomic neuropathies and microcirculations.

The portable data storage 903 can include computer instructions 944 to instruct the client device processor to compare the measured peripheral autonomic neuropathy and microcirculation of the subject as bolus are sequentially introduced to the preset norms of peripheral autonomic neuropathy and microcirculation.

The portable data storage 903 can include computer instructions 946 to instruct the client device processor to compare the peripheral autonomic neuropathy and microcirculation of the subject after all bolus have been introduced in the first treatment session to the measured peripheral autonomic neuropathy and microcirculation.

US 9,652,595 B1

31

The portable data storage **903** can include computer instructions **948** to instruct the client device processor to modify the quantity of bolus for the subject identified in the care plan to diminish the subject's peripheral autonomic neuropathy and microcirculation.

The portable data storage **903** can include computer instructions **950** to instruct the client device processor to modify the schedule of the bolus introduction having at least one unequal time period by modifying a quantity and a duration of unequal time periods between bolus introduction to improve measured peripheral autonomic neuropathy and microcirculation of the subject.

The portable data storage **903** can include computer instructions **952** to instruct the client device to scan an initial retinal image of the subject to identify characteristics for a diabetic retinopathy.

The portable data storage **903** can include computer instructions **954** to instruct the client device processor to scan a post treatment retinal image of the subject after the first treatment session and compare the initial retinal image to the post treatment retinal image.

The portable data storage **903** can include computer instructions **956** to instruct the client device processor to modify a quantity of bolus for the subject if no change in the identified characteristics for diabetic retinopathy has occurred.

The portable data storage **903** can include computer instructions **960** to instruct the client device processor to modify the generated individualized schedule of bolus introduction having at least one unequal time period between bolus to reduce effects of diabetic retinopathy by modifying a quantity and a duration of unequal time periods between bolus introduction to reduce at least one effect of diabetic retinopathy.

The portable data storage **903** can include computer instructions **962** to instruct the client device processor to scan and calculate dimensionally wounds of the subject by length, width, and depth, and identify wound characteristics of the subject.

The portable data storage **903** can include computer instructions **964** to instruct the client device to scan and dimensionally measure wounds of the subject after at least one treatment session to identify skin integrity and changes in wound characteristics of the subject.

The portable data storage **903** can include computer instructions **966** to instruct the client device processor to modify a quantity of bolus for the subject identified in the care plan for wound treatment using the identified skin integrity and changes in wound characteristics of the subject.

The portable data storage **903** can include computer instructions **968** to instruct the client device to modify the schedule for bolus introduction having the at least one unequal time period between bolus to improve wound healing by modifying a quantity and a duration of unequal time periods between the bolus introduction to reduce wound size and wound characteristics of the subject.

The portable data storage **903** can include computer instructions **970** to instruct the client device processor to use a homeostatic model to identify an insulin sensitivity factor of a subject.

The portable data storage **903** can include computer instructions **972** to instruct the client device processor to modify the quantity of bolus for the subject for the insulin sensitivity factor.

The portable data storage **903** can include computer instructions **974** to instruct the client device to modify the

32

generated individualized schedule of bolus introduction having at least one unequal time period between bolus to increase the insulin sensitivity factor by modifying a quantity and a duration of unequal time periods between bolus introduction.

The portable data storage **903** can include computer instructions **976** to instruct the client device processor to determine a quantity and a frequency of dosage amounts of magnesium and introduce the dosage amounts of magnesium simultaneously to the subject with the plurality of bolus using the generated individualized schedule of bolus introduction having at least one unequal time period between one pair of bolus.

The portable data storage **903** can include computer instructions **978** to instruct the client device processor to determine a quantity and a frequency of dosage amounts of potassium and introduce the dosage amounts of potassium simultaneously to the subject with the plurality of bolus using the generated individualized schedule for bolus introduction having at least one unequal time period between one pair of bolus.

The portable data storage **903** can include computer instructions **980** to instruct the client device processor to determine a quantity and a frequency of dosage amounts of somatostatin and introduce the dosage amounts of somatostatin simultaneously to the subject with the plurality of bolus using the generated individualized schedule of bolus introduction having at least one unequal time period between one pair of bolus.

The portable data storage **903** can include computer instructions **982** to instruct the client device processor to determine a quantity and a frequency of dosage amounts of glucagon and introduce the dosage amounts of glucagon simultaneously to the subject with the plurality of bolus using the generated individualized schedule of bolus introduction having at least one unequal time period between one pair of bolus.

The portable data storage **903** can include computer instructions **984** to instruct the client device processor to schedule diagnostic tests after the first treatment session to modify the care plan for improved cellular ATP functioning of the subject and improved hepatic glucose processing.

The portable data storage **903** can include the library of cardiac functions **986**, which can include the preset norms of cardiac function **988**.

The portable data storage **903** can include the library of peripheral autonomic neuropathies and microcirculations **990**, which can include the preset norms of peripheral autonomic neuropathies and microcirculations **992**.

While these embodiments have been described with emphasis on the embodiments, it should be understood that within the scope of the appended claims, the embodiments might be practiced other than as specifically described herein.

What is claimed is:

1. A kit for individualized intravenous exogenous insulin-based therapy to improve cellular ATP function comprising:
   a. a blood glucose meter for measuring metabolic factors of a subject forming measured metabolic factors;
   b. an intravenous catheter to deliver a plurality of insulin bolus volume dosage amounts sequentially using an individualized schedule with at least one unequal time period between at least one pair of insulin bolus volume dosage amounts;

APPX0613

INSU_PI_000441

33

c. an administrative processor configured to create a subject profile comprising:

(i) a subject name;

(ii) an indication that the subject is suspected of having metabolic syndrome; and

(iii) measured metabolic factors comprising: a blood glucose level, a respiratory quotient, an insulin sensitivity factor, individual target glucose level, and a weight;

(iv) a portable data storage configured to instruct the administrative processor to compare the measured metabolic factors for groups of patients to a database of metabolic factors using the blood glucose level, the respiratory quotient, the insulin sensitivity factor and the target glucose level and calculate if the measured metabolic factors meet, exceed, or fall below the blood glucose level, the respiratory quotient, the insulin sensitivity factor, and the target blood glucose level for the subject suspected of having the metabolic syndrome to confirm the subject has the metabolic syndrome;

(v) a library of weight management protocols in the portable data storage for subjects with the metabolic syndrome to compare and identify a weight management protocol for each subject based upon measured metabolic factors of each subject and saving the weight management protocol into a care plan for each subject;

d. a diabetic treatment model;

e. a Library of Care Plan templates configured to produce a populated care plan for each subject profile and setting a plan goal using the diabetic treatment model and the care plan generating a customized schedule for each insulin bolus volume dosage amount and an amount of glucose to be consumed by a subject;

f. a glucose dosage amount to stimulate a gastrointestinal hormone production in the subject resulting in a release of enzymes from a liver and causing blood glucose levels of the subject to be in a therapeutic range;

g. the administrative processor configured to:

(i) compare the blood glucose test results to the plurality of therapeutic ranges for blood glucose levels stored in the portable data storage and verify that the subject with the metabolic syndrome is in a therapeutic range of the plurality therapeutic ranges for blood glucose levels; and

(ii) compare the measured metabolic factors to the blood glucose test results to the diabetic treatment model and map the blood glucose test results and insulin sensitivity factors to measured weight of the subject to generate an individualized schedule for the insulin bolus volume dosage amounts introduction; and

wherein the portable data storage is configured to instruct the administrative processor to change a weight management protocol and a care plan after a first treatment session to manage weight of the subject using at least one of a plurality of metabolic enhancements to cause improved cellular ATP functioning for the subject while infusing the plurality of insulin bolus volume dosage amounts and modifying a quantity and a duration of unequal time periods between the insulin bolus volume dosage amounts in the generated individualized schedule to improve impaired hepatic glucose processing.

2. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, wherein the subject profile further comprises

34

a. a subject history;

b. subject physical reports including a subject preexisting weight; and

c. subject contact information.

3. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, wherein the generated individualized schedule for the bolus introduction has the at least one unequal time period, wherein time periods vary from 2 minutes to 10 minutes, and wherein the unequal time periods are time intervals from 1 percent to 30 percent different in length of time from each other.

4. The kit for individualized intravenous exogenous insulin-based therapy of claim 1, comprising a glucose source.

5. The kit for individualized intravenous exogenous insulin-based therapy of claim 4, wherein the glucose source comprises from 60 grams of glucose to 100 grams of glucose.

6. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, further comprising:

a. computer instructions in the portable data storage for instructing the client device processor to compare the respiratory quotient of the subject in a resting state to a plurality of measured metabolic factors;

b. computer instructions in the portable data storage for instructing the client device processor to modify a quantity of the plurality of bolus for the subject for each treatment session as identified in the care plan with the generated individualized schedule for the bolus introduction having the at least one unequal time period between the bolus introduction to improve the respiratory quotient of the subject; and

c. computer instructions in the portable data storage for instructing the client device processor to modify the generated individualized schedule for the bolus introduction having the at least one unequal time period between the bolus introduction by modifying the quantity and the duration of the at least one unequal time period between the bolus introduction to improve the respiratory quotient of the subject.

7. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, further comprising:

a. computer instructions in the portable data storage to instruct the client device processor to compare a measured cardiac function of the subject in a resting state to a plurality of preset norms of cardiac function in a library of cardiac functions;

b. computer instructions in the portable data storage to instruct the client device processor to modify a quantity of the plurality of bolus for the subject identified in the care plan using the preset norms of cardiac function; and

c. computer instructions in the portable data storage to instruct the client device processor to modify the generated individualized schedule of the bolus introduction having at least one unequal time period by modifying a quantity and a duration of the at least one unequal time period between bolus introduction to improve cardiac function of the subject.

8. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, further comprising:

a. computer instructions in the portable data storage to instruct the client device processor to measure a peripheral autonomic neuropathy and microcirculation of the subject prior to the bolus introduction and comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of

APPX0614

INSU_PI_000442

US 9,652,595 B1

35

peripheral autonomic neuropathies and microcirculations in a library of peripheral autonomic neuropathies and microcirculations;

b. computer instructions in the portable data storage to instruct the client device processor to compare the measured peripheral autonomic neuropathy and microcirculation of the subject as bolus are sequentially introduced to the preset norms of peripheral autonomic neuropathy and microcirculation;

c. computer instructions in the portable data storage to instruct the client device processor to compare the peripheral autonomic neuropathy and microcirculation of the subject after all bolus have been introduced in the first treatment session to the measured peripheral autonomic neuropathy and microcirculation;

d. computer instructions in the portable data storage to instruct the client device processor to modify the quantity of bolus for the subject identified in the care plan to diminish the subject's peripheral autonomic neuropathy and microcirculation; and

e. computer instructions in the portable data storage to instruct the client device processor to modify the schedule of the bolus introduction having the at least one unequal time period by modifying a quantity and a duration of the at least one unequal time period between bolus introduction to improve measured peripheral autonomic neuropathy and microcirculation of the subject.

9. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, further comprising:

a. computer instructions in the portable data storage to instruct the client device to scan an initial retinal image of the subject to identify characteristics for a diabetic retinopathy;

b. computer instructions in the portable data storage to instruct the client device processor to scan a post treatment retinal image of the subject after the first treatment session and compare the initial retinal image to the post treatment retinal image;

c. computer instructions in the portable data storage to instruct the client device processor to modify a quantity of bolus for the subject if no change in the identified characteristics for diabetic retinopathy has occurred; and

d. computer instructions in the portable data storage to instruct the client device processor to modify the generated individualized schedule of the bolus introduction having the at least one unequal time period between bolus to reduce effects of diabetic retinopathy by modifying a quantity and a duration of the at least one unequal time period between the bolus introduction to reduce at least one effect of diabetic retinopathy.

10. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, further comprising:

a. computer instructions in the portable data storage to instruct the client device processor to scan and calculate dimensionally wounds of the subject by length, width, and depth, and identify wound characteristics of the subject;

b. computer instructions in the portable data storage to instruct the client device processor to scan and dimensionally measure wounds of the subject after at least one treatment session to identify skin integrity and changes in wound characteristics of the subject;

c. computer instructions in the portable data storage to instruct the client device processor to modify a quantity of bolus for the subject identified in the care plan for

36

wound treatment using the identified skin integrity and changes in wound characteristics of the subject; and

d. computer instructions in the portable data storage to instruct the client device to modify the schedule for bolus introduction having the at least one unequal time period between bolus to improve wound healing by modifying a quantity and a duration of the at least one unequal time period between the bolus introduction to reduce wound size and wound characteristics of the subject.

11. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, further comprising:

a. computer instructions in the portable data storage to instruct the client device processor to use a homeostatic model to identify an insulin sensitivity factor of a subject;

b. computer instructions in the portable data storage to instruct the client device processor to modify the quantity of bolus for the subject for the insulin sensitivity factor; and

c. computer instructions in the portable data storage to instruct the client device to modify the generated individualized schedule of bolus introduction having the at least one unequal time period between bolus to increase the insulin sensitivity factor by modifying a quantity and a duration of the at least one unequal time period between bolus introduction.

12. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, wherein the at least one of the plurality of metabolic enhancements is a methylcobalamin, a pyridoxal-5-phosphate, a 5-MTHF, an alpha lipoic acid, a NADH, a coenzyme Q10, a chromium picolinate, and a N-Acetyl cysteine, and a vitamin D3.

13. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, comprising a quantity of dosage amounts of magnesium and computer instructions in the portable data storage to instruct the client device processor to determine a quantity and a frequency of dosage amounts of magnesium and introduce the dosage amounts of magnesium simultaneously to the subject with the plurality of bolus using the generated individualized schedule of the bolus introduction having at least one unequal time period between one pair of bolus.

14. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, comprising a quantity of dosage amounts of potassium and computer instructions in the portable data storage to instruct the client device processor to determine a quantity and a frequency of dosage amounts of potassium and introduce the dosage amounts of potassium simultaneously to the subject with the plurality of bolus using the generated individualized schedule for the bolus introduction having at least one unequal time period between one pair of bolus.

15. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, comprising a quantity of dosage amounts of somatostatin and computer instructions in the portable data storage to instruct the client device processor to determine a quantity and a frequency of dosage amounts of somatostatin and introduce the dosage amounts of somatostatin simultaneously to the subject with the plurality of bolus using the generated individualized schedule of the bolus introduction having at least one unequal time period between one pair of bolus.

16. The kit for the individualized intravenous exogenous insulin-based therapy of claim 1, comprising a quantity of dosage amounts of glucagon and computer instructions in the portable data storage to instruct the client device pro-

APPX0615

INSU_PI_000443

US 9,652,595 B1

37

cessor to determine a quantity and a frequency of dosage amounts of glucagon and introduce the dosage amounts of glucagon simultaneously to the subject with the plurality of bolus using the generated individualized schedule of the bolus introduction having at least one unequal time period between one pair of bolus.

**17.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, comprising computer instructions in the portable data storage to instruct the client device processor to schedule diagnostic tests after the first treatment session to modify the care plan for improved cellular ATP functioning of the subject and improved hepatic glucose processing.

**18.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, wherein the at least one of the plurality of metabolic enhancements comprises a synergistic combination of: Vitamin D ranging in amounts from 600 IU to 2000 IU, Vitamin B6 ranging in amounts from 10 mg to 100 mg, Folic Acid ranging in amounts from 200 mcg to 2000 mcg, Vitamin B12 ranging in amounts from 1000 mcg to 5000 mcg, a coenzyme that extracts energy from food for the subject ranging in amounts from 60 mg to 400

38

mg, a protein binding component that binds to proteins and serves as a metabolic enhancement for the subject ranging in amounts from 0.5 mg to 5 mg, and a glucose utilization component to prevent or treat chromium deficiency in the subject which improves glucose utilization by insulin ranging in amounts from 200 mg to 300 mg.

**19.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **18**, wherein the at least one of the plurality of metabolic enhancements comprises an amino acid that builds proteins in the subject ranging in amounts from 200 mg to 600 mg, and an antioxidant that extracts energy from food for the subject ranging in amounts from 50 mg to 400 mg.

**20.** The kit for the individualized intravenous exogenous insulin-based therapy of claim **1**, wherein the at least one of the plurality of metabolic enhancements comprises: chole-calciferol, pyridoxal-5-phosphate, folacin, cyanocobalamin, n-acetyl L-cysteine (NAC), Coenzyme Q10 (CoQ10), an alpha lipoic acid, nicotinamide adenine dinucleotide (NADH), chromium picolinate, or combinations thereof.

* * * * *



US010533990B2

(12) **United States Patent**
Carr et al.

(10) Patent No.: **US 10,533,990 B2**
(45) Date of Patent: *Jan. 14, 2020

(54) **PHYSIOLOGIC INSULIN-SENSITIVITY IMPROVEMENT**

(71) Applicant: **DIABETES RELIEF LLC**, Houston, TX (US)

(72) Inventors: **Hunter Michael Alan Carr**, Houston, TX (US); **Scott Hepford**, Houston, TX (US); **Carol Ann Wilson**, Houston, TX (US); **Stanley Tories Lewis, Jr.**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/710,537**

(22) Filed: **Sep. 20, 2017**

(65) **Prior Publication Data**
US 2019/0086394 A1    Mar. 21, 2019

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/042,087, filed on Feb. 11, 2016.

(60) Provisional application No. 62/117,393, filed on Feb. 17, 2015.

(51) **Int. Cl.**
| | |
|---|---|
| *G01N 33/50* | (2006.01) |
| *G01N 33/487* | (2006.01) |
| *G06F 19/00* | (2018.01) |
| *G16H 20/17* | (2018.01) |
| *G01N 33/60* | (2006.01) |
| *G16H 30/40* | (2018.01) |
| *G16H 50/50* | (2018.01) |

(52) **U.S. Cl.**
CPC ... *G01N 33/5091* (2013.01); *G01N 33/48792* (2013.01); *G01N 33/5038* (2013.01); *G01N 33/60* (2013.01); *G06F 19/30* (2013.01); *G16H 20/17* (2018.01); *G16H 30/40* (2018.01); *G16H 50/50* (2018.01); *G01N 2800/042* (2013.01); *G01N 2800/70* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2014/0005633 A1    1/2014  Finan

*Primary Examiner* — G Steven Vanni
(74) *Attorney, Agent, or Firm* — Rao Deboer Osterrieder, PLLC; Erik J. Osterrieder

(57) **ABSTRACT**

An individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing. The therapy includes treatment sessions involving the assessment of metabolic factors, forming a subject profile, and matching the subject profile to a diabetic treatment model. Using the diabetic treatment model, a quantity and frequency of intravenous insulin bolus, dosage amounts of magnesium, and dosage amounts of potassium can be calculated. The methods that improve impaired hepatic glucose processing in subjects and patients can simultaneously introduce separated insulin bolus from an insulin reservoir, dosage amounts of magnesium, and dosage amounts of potassium. The subject profile can create a weight management protocol that uses a metabolic enhancement, wherein the individualized intravenous exogenous insulin-based therapy produces a subject or a patient with improved cellular ATP functioning.

**20 Claims, 13 Drawing Sheets**

4:22-CV-03062
Injunction Hearing
**EX 04**
DEFS "INSULINIC"

APPX0617

**INSU_PI_000445**

FIGURE 1A

## DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

| WEIGHT (kg) | POTASSIUM TO SALINE DOSAGE (meq/ml) | MAGNESIUM TO SALINE DOSAGE (mg/ml) | INSULIN TO SALINE DOSAGE (UNITS/ml) | INSULIN RESERVOIR VOLUME (ml) | INSULIN BOLUS DOSAGE MIN (mU) | INSULIN BOLUS DOSAGE MAX (mU) | INSULIN BOLUS DOSAGE VOLUME MIN (ml) | INSULIN BOLUS DOSAGE VOLUME MAX (ml) | UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION (MIN:SEC) | QUANTITY OF BOLUS PER TREATMENT CYCLE (#) |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 - 45 | 0.01 | 1 | 9 | 10 | 400 | 450 | 0.04 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 46 - 50 | 0.01 | 1 | 10 | 10 | 460 | 500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 51 - 55 | 0.01 | 1 | 11 | 10 | 510 | 550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 56 - 60 | 0.01 | 1 | 12 | 10 | 560 | 600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 61 - 65 | 0.01 | 1 | 13 | 10 | 610 | 650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 66 - 70 | 0.01 | 1 | 14 | 10 | 660 | 700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 71 - 75 | 0.01 | 1 | 15 | 10 | 710 | 750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 76 - 80 | 0.01 | 1 | 16 | 10 | 760 | 800 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 81 - 85 | 0.01 | 1 | 17 | 10 | 810 | 850 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 86 - 90 | 0.01 | 1 | 18 | 10 | 860 | 900 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 91 - 95 | 0.01 | 1 | 19 | 10 | 910 | 950 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 96 - 100 | 0.01 | 1 | 20 | 10 | 960 | 1000 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 101 - 105 | 0.02 | 2 | 21 | 10 | 1010 | 1050 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 106 - 110 | 0.02 | 2 | 22 | 10 | 1060 | 1100 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 111 - 115 | 0.02 | 2 | 23 | 10 | 1110 | 1150 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 15 |
| 116 - 120 | 0.02 | 2 | 24 | 10 | 1160 | 1200 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 121 - 125 | 0.02 | 2 | 25 | 10 | 1210 | 1250 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 15 |
| 126 - 130 | 0.02 | 2 | 26 | 10 | 1260 | 1300 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 131 - 135 | 0.02 | 2 | 27 | 10 | 1310 | 1350 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 136 - 140 | 0.02 | 2 | 28 | 10 | 1360 | 1400 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 141 - 145 | 0.02 | 2 | 29 | 10 | 1410 | 1450 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 146 - 150 | 0.02 | 2 | 30 | 10 | 1460 | 1500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 151 - 155 | 0.02 | 2 | 31 | 10 | 1510 | 1550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 155 - 160 | 0.02 | 2 | 32 | 10 | 1560 | 1600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |

INSU_PI_000446

*FIGURE 1B*

DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

| WEIGHT (kg) | POTASSIUM TO SALINE DOSAGE (meq/ml) | MAGNESIUM TO SALINE DOSAGE (mg/ml) | INSULIN TO SALINE DOSAGE (UNITS/ml) | INSULIN RESERVOIR VOLUME (ml) | INSULIN BOLUS DOSAGE MIN (mU) | INSULIN BOLUS DOSAGE MAX (mU) | INSULIN BOLUS DOSAGE VOLUME MIN (ml) | INSULIN BOLUS DOSAGE VOLUME MAX (ml) | UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION (MIN:SEC) | QUANTITY OF BOLUS PER TREATMENT CYCLE (#) |
|---|---|---|---|---|---|---|---|---|---|---|
| 161 - 165 | 0.02 | 2 | 33 | 10 | 1610 | 1650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 166 - 170 | 0.02 | 2 | 34 | 10 | 1660 | 1700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 171 - 175 | 0.02 | 2 | 35 | 10 | 1710 | 1750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 176 - 180 | 0.02 | 2 | 36 | 10 | 1760 | 1800 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 181 - 185 | 0.02 | 2 | 37 | 10 | 1810 | 1850 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 186 - 190 | 0.02 | 2 | 38 | 10 | 1860 | 1900 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 191 - 195 | 0.02 | 2 | 39 | 10 | 1910 | 1950 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 196 - 200 | 0.02 | 2 | 40 | 10 | 1960 | 2000 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 201 - 205 | 0.03 | 3 | 41 | 10 | 2010 | 2050 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 206 - 210 | 0.03 | 3 | 42 | 10 | 2060 | 2100 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 211 - 215 | 0.03 | 3 | 43 | 10 | 2110 | 2150 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 216 - 220 | 0.03 | 3 | 44 | 10 | 2160 | 2200 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 221 - 225 | 0.03 | 3 | 45 | 10 | 2210 | 2250 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 226 - 230 | 0.03 | 3 | 46 | 10 | 2260 | 2300 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 231 - 235 | 0.03 | 3 | 47 | 10 | 2310 | 2350 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 236 - 240 | 0.03 | 3 | 48 | 10 | 2360 | 2400 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 241 - 245 | 0.03 | 3 | 49 | 10 | 2410 | 2450 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 246 - 250 | 0.03 | 3 | 50 | 10 | 2460 | 2500 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 251 - 255 | 0.03 | 3 | 51 | 10 | 2510 | 2550 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 256 - 260 | 0.03 | 3 | 52 | 10 | 2560 | 2600 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 261 - 265 | 0.03 | 3 | 53 | 10 | 2610 | 2650 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 266 - 270 | 0.03 | 3 | 54 | 10 | 2660 | 2700 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |
| 271 - 275 | 0.03 | 3 | 55 | 10 | 2710 | 2750 | 0.05 | 0.05 | 240 sec - 480 sec | 4 - 16 |

APPX0619

INSU_PI_000447

## FIGURE 2

**BOLUS VOLUME DOSAGE ADJUSTMENT PROTOCOL BASED ON TESTED BLOOD GLUCOSE LEVEL**

| | BLOOD GLUCOSE LEVEL (mg/dl) | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**DURING HOURS 1 & 2 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE INCREASES OR DECREASES BETWEEN THE INITIAL BLOOD GLUCOSE LEVEL CHECK AND THE 30 MIN AND 60 MIN CHECKS OF EACH HOUR, THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

THEN ADJUST DOSAGE (mU/kg): 0 0 0 0 2-4 2-4 2-4 2-4 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6

**DURING THE FIRST 30 MIN OF HOUR 3 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE INCREASES OR DECREASES BETWEEN THE INITIAL BLOOD GLUCOSE LEVEL CHECK AND THE 30 MIN CHECKS OF THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

THEN ADJUST DOSAGE (mU/kg): 0 0 0 0 2-4 2-4 2-4 2-4 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6

**DURING THE LAST 30 MIN OF HOUR 3 OF EACH TREATMENT SESSION**

IF BLOOD GLUCOSE LEVEL INCREASES BETWEEN THE 30 MIN AND 60 MIN CHECK THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

THEN INCREASE DOSAGE: 0 0 0 0 2-4 2-4 2-4 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6

IF BLOOD GLUCOSE LEVEL DECREASES BETWEEN THE 30 MIN AND 60 MIN CHECK THEN THE INFUSION DOSAGE SHOULD BE ADJUSTED ACCORDINGLY.

THEN DECREASE DOSAGE: 0 1-2 1-2 2-4 2-4 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6 4-6 6-8

**EXEMPLARY TREATMENT SESSIONS DURING HOUR 1**

| SUBJECT | BLOOD GLUCOSE LEVEL (mg/dl) | INSULIN SENSITIVITY FACTOR | SCHEDULE FOR BOLUS INTRODUCTION WITH AN UNEQUAL TIME PERIOD |
|---|---|---|---|
| SUBJECT #1 | 440 | | |
| SUBJECT #2 | 210 | | |
| SUBJECT #3 | 106 | | |

**FIGURE 3**

## GLUCOSE DOSAGE ADJUSTMENT PROTOCOL

| BLOOD GLUCOSE LEVEL (mg/dl) | GLUCOSE (gm) |
|---|---|
| > 100 - 100 | 50 - 60 |
| 101 - 125 | 44 - 55 |
| 126 - 150 | 40 - 50 |
| 151 - 175 | 35 - 45 |
| 176 - 200 | 30 - 40 |
| 201 - 225 | 25 - 35 |
| 226 - 250 | 20 - 30 |
| 251 - 275 | 15 - 25 |
| 276 - 300 | 10 - 20 |
| 301 - 325 | 5 - 15 |
| 326 - 350 | .01 - 10 |
| 351 - 375 | .01 - 5 |
| 376 - 400 | .01 - 5 |
| 401 - 425 | .01 - 5 |
| 426 - 450 | .01 - 5 |
| 451 - 475 | .01 - 5 |
| 476 - 500 | .01 - 5 |
| 501 - 525 | .01 - 5 |
| 526 - 550 | .01 - 5 |

*FIGURE 4*

## METABOLIC ENHANCEMENT PROTOCOL

| Respiratory Quotient (CO$_2$/O$_3$) | Dosage |
| --- | --- |
| 1.20 < | C: 3 DAILY |
| 1.19 - 1.00 | A: 1 DAILY |
| 0.99 - 0.90 | A: 1 DAILY |
| 0.89 - 0.80 | B: 2 DAILY |
| 0.79 - 0.70 | B: 2 DAILY |
| .69 < | B: 2 DAILY |

\* METABOLIC ENHANCEMENT CONTENTS:

| Ingredient | Min Amount Per Dosage | Max Amount Per Dosage |
| --- | --- | --- |
| VITAMIN D (AS CHOLECALCIFEROL) | 600 IU | 2,000 IU |
| VITAMIN B6 (AS PYRIDOXAL-5-PHOSPHATE) | 10 mg | 100 mg |
| FOLATE (FOLIC ACID) | 200 mcg | 2000 mcg |
| VITAMIN B12 (AS CYANOCOBALAMIN) | 1,000 mcg | 5,000 mcg |
| N-ACETYL-L-CYSTEINE (NAC) | 200 mg | 600 mg |
| COENZYME Q10 (CoQ10) | 60 mg | 400 mg |
| ALPHA LIPOIC ACID (ALA) | 50 mg | 400 mg |
| NICOTINAMIDE ADENINE DINUCLEOTIDE (NADH) | .5 mg | 5 mg |
| CHROMIUM PICOLINATE | 200 mcg | 300 mcg |

APPX0622

INSU_PI_000450

## FIGURE 5A

| | |
|---|---|
| CREATING A SUBJECT PROFILE FOR A SUBJECT | 500 |
| ASSESSING METABOLIC FACTORS OF THE SUBJECT AND STORING THE METABOLIC FACTORS IN THE SUBJECT PROFILE | 502 |
| CREATING A CARE PLAN WITH A PLURALITY OF TREATMENT SESSIONS FOR THE SUBJECT WITH A PLAN GOAL | 504 |
| INTRODUCING GLUCOSE TO THE SUBJECT TO STIMULATE GASTROINTESTINAL HORMONE PRODUCTION, RESULTING IN THE RELEASE OF ENZYMES FROM THE SUBJECT'S LIVER AND CAUSING THE BLOOD GLUCOSE LEVELS OF THE SUBJECT TO BE IN A THERAPEUTIC RANGE | 506 |
| TESTING THE SUBJECT FOR BLOOD GLUCOSE LEVELS TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO THE PLURALITY OF THERAPEUTIC RANGES AND VERIFY THE SUBJECT IS IN THE THERAPEUTIC RANGE | 508 |
| COMPARING TESTED BLOOD GLUCOSE LEVELS TO A DIABETIC TREATMENT MODEL | 510 |
| MAPPING TESTED BLOOD GLUCOSE LEVELS AND INSULIN SENSITIVE FACTORS OF A SUBJECT TO THE SUBJECT'S WEIGHT USING THE DIABETIC TREATMENT MODEL TO DETERMINE A SCHEDULE FOR BOLUS INTRODUCTION, WHEREIN THE SCHEDULE FOR BOLUS INTRODUCTION HAS AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS | 512 |
| INTRODUCING TO THE SUBJECT A PLURALITY OF BOLUS OF INSULIN AND SALINE SEQUENTIALLY USING THE SCHEDULE FOR BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS | 513 |
| COMPARING THE SUBJECT PROFILE TO A PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL FOR THE SUBJECT BASED UPON ASSESSED METABOLIC FUNCTIONS OF THE SUBJECT AND SAVING THE WEIGHT MANAGEMENT PROTOCOL IN THE CARE PLAN | 514 |
| IMPLEMENTING THE IDENTIFIED WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN AFTER A FIRST TREATMENT SESSION TO MANAGE WEIGHT OF THE SUBJECT WITH A METABOLIC ENHANCEMENT CAUSING IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT WHILE INFUSING INSULIN AND MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION IN THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN AT LEAST ONE PAIR OF BOLUS TO IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING | 516 |
| COMPARING A RESPIRATORY QUOTIENT OF THE SUBJECT IN A RESTING STATE TO A PLURALITY OF METABOLISM SCORES | 518 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT FOR EACH TREATMENT SESSION AS IDENTIFIED IN THE CARE PLAN WITH SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE A SUBJECT'S RESPIRATORY QUOTIENT | 520 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE THE RESPIRATORY QUOTIENT | 522 |

(5B)

APPX0623

**INSU_PI_000451**

### FIGURE 5B

(5A)

| | |
|---|---|
| COMPARING A MEASURED CARDIAC FUNCTION OF THE SUBJECT IN A RESTING STATE TO A PRESET NORM OF CARDIAC FUNCTION | 524 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN USING THE PRESET NORM OF CARDIAC FUNCTION | 526 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE CARDIAC FUNCTION | 528 |
| MEASURING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE PRIOR TO BOLUS INTRODUCTION AND COMPARING THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION TO A PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS | 530 |
| COMPARING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE AS BOLUS ARE SEQUENTIALLY INTRODUCED TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 532 |
| COMPARING A PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION OF THE SUBJECT IN A RESTING STATE AFTER ALL BOLUS HAVE BEEN INTRODUCED IN A FIRST TREATMENT SESSION TO THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 534 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN TO TREAT PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 536 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO IMPROVE THE MEASURED PERIPHERAL AUTONOMIC NEUROPATHY AND MICROCIRCULATION | 538 |
| VIEWING AN INITIAL RETINAL IMAGE OF THE SUBJECT CAPTURED BY A NON-MYDRIATIC CAMERA WITH THE SUBJECT IN A RESTING STATE TO IDENTIFY A DIABETIC RETINOPATHY | 540 |
| VIEWING A POST TREATMENT RETINAL IMAGE OF THE SUBJECT IN A RESTING STATE AFTER A FIRST TREATMENT SESSION | 541 |
| COMPARING THE INITIAL RETINAL IMAGE TO THE POST TREATMENT RETINAL IMAGE | 542 |
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IF NO CHANGE IN THE DIABETIC RETINOPATHY HAS OCCURRED | 544 |
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO REDUCE THE EFFECTS OF DIABETIC RETINOPATHY BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE THE EFFECTS OF DIABETIC RETINOPATHY | 546 |
| DIMENSIONALLY MEASURING WOUNDS BY LENGTH, WIDTH, AND DEPTH AND IDENTIFYING WOUND CHARACTERISTICS WITH THE SUBJECT IN A RESTING STATE | 550 |
| DIMENSIONALLY MEASURING WOUNDS AFTER AT LEAST ONE TREATMENT SESSION TO IDENTIFY SKIN INTEGRITY AND CHANGES IN CLINICAL WOUND CHARACTERISTICS | 552 |

(5C)

APPX0624

**INSU_PI_000452**

(5B)

| |
|---|
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT IDENTIFIED IN THE CARE PLAN FOR WOUND TREATMENT USING THE IDENTIFIED SKIN INTEGRITY AND CHANGES IN CLINICAL WOUND CHARACTERISTICS |

554

| |
|---|
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE WOUND HEALING BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION TO REDUCE WOUND SIZE AND WOUND CHARACTERISTICS |

556

| |
|---|
| COMPARING C-PEPTIDES OF THE SUBJECT TO A PRESET NORM OF C-PEPTIDES TO IDENTIFY AN INSULIN SENSITIVITY FACTOR |

560

| |
|---|
| MODIFYING A QUANTITY OF BOLUS FOR THE SUBJECT FOR THE INSULIN SENSITIVITY FACTOR |

562

| |
|---|
| MODIFYING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS TO IMPROVE AN INSULIN SENSITIVITY FACTOR USING ANALYSIS OF C-PEPTIDES BY MODIFYING A QUANTITY AND DURATION OF UNEQUAL TIME PERIODS BETWEEN BOLUS INTRODUCTION |

564

| |
|---|
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF MAGNESIUM AND INTRODUCING THE DOSAGE AMOUNTS OF MAGNESIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD |

570

| |
|---|
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF POTASSIUM AND INTRODUCING THE DOSAGE AMOUNTS OF POTASSIUM SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD |

572

| |
|---|
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF SOMATOSTATIN AND INTRODUCING THE DOSAGE AMOUNTS OF SOMATOSTATIN SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD |

574

| |
|---|
| DETERMINING A QUANTITY AND FREQUENCY OF DOSAGE AMOUNTS OF GLUCAGON AND INTRODUCING THE DOSAGE AMOUNTS OF GLUCAGON SIMULTANEOUSLY TO THE SUBJECT WITH THE PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD |

576

| |
|---|
| SCHEDULING DIAGNOSTIC TESTS AFTER A FIRST TREATMENT SESSION TO MODIFY THE CARE PLAN FOR IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT AND IMPROVED HEPATIC GLUCOSE PROCESSING |

578

*FIGURE 5C*



FIGURE 6



FIGURE 7A

| ADMINISTRATIVE DATA STORAGE | 604 |
| SUBJECT PROFILE | 610 |
| METABOLIC FACTORS | 605 |
| BLOOD GLUCOSE LEVEL | 612 |
| RESPIRATORY QUOTIENT | 614 |
| INSULIN SENSITIVITY FACTOR | 616 |
| INDIVIDUAL TARGET BLOOD GLUCOSE LEVEL | 618 |
| PLURALITY OF CARE PLAN TEMPLATES | 620 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO CREATE A CUSTOMIZED CARE PLAN FROM ONE OF THE PLURALITY OF CARE PLAN TEMPLATES, WHEREIN THE CUSTOMIZED CARE PLAN INDICATES A PLURALITY OF TREATMENT SESSIONS FOR THE SUBJECT WITH THE SUBJECT PROFILE AND A PLAN GOAL, EACH CUSTOMIZED CARE PLAN INDICATING A SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD BETWEEN BOLUS INTRODUCTION, EACH BOLUS CONTAINING SALINE AND INSULIN AND EACH BOLUS INTRODUCED INTRAVENOUSLY AND SEQUENTIALLY TO A SUBJECT | 200 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO A DIABETIC TREATMENT MODEL AFTER INTRODUCING GLUCOSE TO A SUBJECT TO STIMULATE GASTROINTESTINAL HORMONE PRODUCTION, RESULTING IN THE RELEASE OF ENZYMES FROM THE SUBJECT'S LIVER AND CAUSING THE BLOOD GLUCOSE LEVELS OF THE SUBJECT TO BE IN A THERAPEUTIC RANGE | 202 |
| PLURALITY OF THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS | 203 |

Case 4:22-cv-03062   Document 47-3   Filed on 10/28/22 in TXSD   Page 11 of 29



| | |
|---|---|
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE TESTED BLOOD GLUCOSE LEVELS TO THE PLURALITY OF THERAPEUTIC RANGES FOR BLOOD GLUCOSE LEVELS AND VERIFY THE SUBJECT IS IN THE THERAPEUTIC RANGE | 604 / 204 |
| PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS | 205 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO COMPARE A SUBJECT PROFILE TO THE PLURALITY OF WEIGHT MANAGEMENT PROTOCOLS TO IDENTIFY A WEIGHT MANAGEMENT PROTOCOL BASED UPON METABOLIC FUNCTIONS OF THE SUBJECT | 206 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO SAVE THE IDENTIFIED WEIGHT MANAGEMENT PROTOCOL IN THE GENERATED CUSTOMIZED CARE PLAN AFTER SALINE WITH INSULIN IN A PLURALITY OF BOLUS USING THE SCHEDULE OF BOLUS INTRODUCTION HAVING AT LEAST ONE UNEQUAL TIME PERIOD HAVE BEEN ADMINISTERED TO A SUBJECT | 207 |
| COMPUTER INSTRUCTIONS CONFIGURED TO INSTRUCT THE ADMINISTRATIVE PROCESSOR TO TRACK WEIGHT MANAGEMENT OF THE SUBJECT AFTER A FIRST TREATMENT SESSION AND USE OF AN IDENTIFIED WEIGHT MANAGEMENT PROTOCOL AND THE CARE PLAN ALONG WITH A METABOLIC ENHANCEMENT TO IDENTIFY IMPROVED CELLULAR ATP FUNCTIONING FOR THE SUBJECT AND IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING | 208 |
| PLURALITY OF METABOLISM SCORES | 209 |
| PLURALITY OF PRESET NORMS OF CARDIAC FUNCTION | 210 |
| PLURALITY OF PRESET NORMS OF PERIPHERAL AUTONOMIC NEUROPATHIES AND MICROCIRCULATIONS | 211 |
| RETINAL IMAGE OF THE SUBJECT | 212 |
| WOUND CHARACTERISTICS | 214 |
| PLURALITY OF PRESET NORMS OF C-PEPTIDES | 215 |

*FIGURE 7B*

APPX0627

INSU_PI_000455



FIGURE 8A



FIGURE 8B



FIGURE 8C

US 10,533,990 B2

1

# PHYSIOLOGIC INSULIN-SENSITIVITY IMPROVEMENT

## CROSS REFERENCE TO RELATED APPLICATION

The current application is a Continuation In Part of co-pending U.S. patent application Ser. No. 15/042,087 filed Feb. 11, 2016 and claims priority to and the benefit of expired U.S. Provisional Patent Application Ser. No. 62/117, 393 filed on Feb. 17, 2015, entitled "METHODS THAT IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS". This reference is incorporated herein in its entirety.

## FIELD

The present embodiments generally relate to improved methods and systems that improve impaired hepatic glucose processing in subjects.

## BACKGROUND

Diabetes Mellitus is a disease or disorder of the body's metabolic functions, characterized by abnormally high levels of blood glucose and inadequate levels of insulin. In 2012, 29.1 million Americans, or 9.3 percent of the population had diabetes, up from 25.8 million, or 8.3 percent, in 2010. New cases diagnosed in 2012 were 1.7 million, and in 2010 it was 1.9 million. Diabetes Mellitus Type 1, formerly known as juvenile diabetes, is usually diagnosed in children and young adults, and only 5 percent of people with diabetes have this form of the disease.

In Type 1 diabetes, the body does not produce insulin, a hormone necessary to convert sugar, starches, and other food into energy needed for daily life. Diabetes Mellitus Type 2 is far more common, and affects 90-95 percent of all diabetics in the United States of America. In Type 2 diabetes, the body does not use insulin properly, which is called insulin resistance. At first, the pancreas makes extra insulin to make up for it, but, over time the pancreas is not able to keep up and can't make enough insulin to keep blood glucose at normal levels. The long-term adverse effects include blindness, loss of kidney function, nerve damage, loss of sensation, and poor circulation in the periphery, and amputation of the extremities. As of Mar. 6, 2013, the total cost of diagnosed diabetes in the United States in 2012 was $245 billion dollars.

In the treatment of Diabetes Mellitus, many varieties of insulin formulations have been suggested and used, such as regular insulin, isophane insulin (designated NPH®), insulin zinc suspensions (such as SEMILENTE®, LENTE®, and ULTRALENTE®), and biphasic isophane insulin. As diabetic patients are treated with insulin for several decades, there is a major need for safe and life quality improving insulin formulations. Some of the commercially available insulin formulations are characterized by a fast onset of action and other formulations have a relatively slow onset but show a more or less prolonged action. Fast-acting insulin formulations are usually solutions of insulin, while retarded acting insulin formulations can have suspensions containing insulin in crystalline and/or amorphous form precipitated by addition of zinc salts alone, by addition of protamine, or by a combination of both.

In addition, some patients are using formulations having both a fast onset of action and a more prolonged action. Such a formulation can be an insulin solution, wherein protamine

2

insulin crystals are suspended. Some patients do prepare the final formulation themselves by mixing a fast acting insulin solution with a protracted acting insulin suspension formulation in the ratio desired by the patient in question.

Glucose control is typically measured by a blood test, which determines the level of hemoglobin A1c, which has been the desired result of insulin therapy in diabetic patients for many years. However, it is clear that tight circulating glucose control was insufficient in 25 percent or more of the study participants to protect them from the onset or progression of diabetic retinopathy, nephropathy, or neuropathy. One method of glucose control is Pulsed Insulin Therapy.

The core concept of Pulsed Insulin Therapy has been known for at least 20 years, by various names including Pulsatile Intravenous Insulin Therapy (PIVIT), Chronic Intermittent Intravenous Insulin Therapy (CIIIT), Metabolic Activation Therapy (MAT), and Hepatic Activation. In such therapies a patient's blood glucose is raised and lowered by about 50 mg/dL to 75 mg/dL over a period of several hours by alternating between doses of insulin and sugars or high carbohydrates foods. Although the mechanisms of action have not been clearly explained, it is apparent from the clinical results that the technique has usefulness in treating diabetic implications, including blindness and other ocular manifestations, nerve disease, cardiovascular disease, diabetic nephropathy, and poor wound healing.

Given the long history of these procedures, one would have expected that the treatment parameters would have been optimized long ago to produce the most favorable results. It turns out, however, that the known treatment parameters are insufficient in that regard.

A need exists for methods and systems that improve impaired hepatic glucose processing in subjects and produce superior results to those previously obtainable.

The present embodiments meet these needs.

## BRIEF DESCRIPTION OF THE FIGURES

The detailed description will be better understood in conjunction with the accompanying drawings as follows:

FIG. 1A shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 40 kilograms to 160 kilograms.

FIG. 1B shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 161 kilograms to 275 kilograms.

FIG. 2 shows a bolus volume dosage adjustment protocol based on tested blood glucose levels as produced by a diabetic treatment model.

FIG. 3 depicts glucose dosage adjustment protocol as produced by a diabetic treatment model.

FIG. 4 depicts a metabolic enhancement protocol as produced by a diabetic treatment model and an exemplary metabolic enhancement by component.

FIGS. 5A-5C depict steps of a method of the invention according to one or more embodiments.

FIG. 6 depicts a system of the invention according to one or more embodiments.

FIGS. 7A and 7B depict an administrative data storage usable in the system according to one or more embodiments.

FIGS. 8A-8C provide exemplary subject profiles with an automatically generated care plan template and an automatically generated report according to one or more embodiments.

APPX0631

INSU_PI_000459

US 10,533,990 B2

3

The present embodiments are detailed below with reference to the listed Figures.

## DETAILED DESCRIPTION OF THE EMBODIMENTS

Before explaining the present methods and systems in detail, it is to be understood that the methods and the systems are not limited to the particular embodiments and that it can be practiced or carried out in various ways.

The present embodiments relate to improved methods and systems that improve impaired hepatic glucose processing in subjects.

The present embodiments further relate to an individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject to improve impaired hepatic glucose processing.

When three treatment session are performed using the method as described herein patients report energy resorted, medications reduced, wounds healed, amputations prevented, weight controlled, blood sugar controlled, blood pressure reduced, neuropathy diminished, retinopathy diminished, mood improved, sleep improved and erectile function restored.

The individualized intravenous exogenous insulin-based therapy uses a plurality of treatment sessions, generally 3 but up to 12 may be needed, each treatment session lasting from 1 hour to 3 hours.

The goal of the individualized intravenous exogenous insulin-based therapy is to repair, recondition, and maintain a subject's impaired metabolism so that it functions and is maintained to provide a quality of life similar to that of a non-diabetic person.

To initiate the therapy a subject profile can be created.

Each treatment session can involve assessing for a subject's metabolic factors and storing the metabolic factors in the subject's profile. The subject profile can be stored in an administrative data storage connected to an administrative processor accessible via a network from a client device.

Each treatment session can involve matching the subject profile to a diabetic treatment model to create a schedule of bolus introduction with at least one unequal time period between bolus introductions.

The schedule can provide a quantity and frequency of intravenous insulin bolus, a quantity and frequency of dosage amounts of magnesium, and a quantity and frequency of dosage amounts of potassium for the subject.

Each treatment session can involve introducing to the subject insulin bolus sequentially, at frequencies determined from the diabetic treatment model, wherein each insulin bolus can be separated by irregular time periods.

Simultaneously with the sequential insulin bolus introduction, dosage amounts of magnesium and dosage amounts of potassium can be introduced to the subject. The magnesium and potassium can be introduced orally, transdermally, or by inhaling simultaneous with the insulin bolus introduction.

A weight management protocol can be identified from a library of weight management protocols given a subject's profile. The subject can be required to follow the weight management protocol and use a specific metabolic enhancement that can be in pill form, powder form, a transdermal patch, or another form known in the industry.

After 3 to 6 treatments using a care plan connected to the diabetic treatment model with a schedule for bolus instruction and at least one unequal period of time, the subject can

4

have at least 10 percent and up to 50 percent improved cellular ATP functioning that can last up to 90 days from the last treatment.

The present embodiments also relate to methods for infusing insulin intravenously to a subject to improve impaired hepatic glucose processing.

The term "5-MTHF" as used herein can refer to Levomefolic Acid, which is a primary form of folic acid used for DNA reproduction.

The term "A1C" as used herein refers to a blood test that shows how well individual diabetes is being controlled relative to a non-diabetic patient.

The term "Adenosine triphosphate (ATP)" as used herein refers a substance that transports chemical energy within cells for metabolism.

The term "Alpha Lipoic Acid" as used herein refers to an antioxidant that helps with the extraction of energy from food.

The term "biomarkers specific to diabetes" can refer to three classifications of up to 89 different biomarkers that relate to metabolic rates of individuals. Some of the enzymes include glucokinase, 6-phosphofructo-1 kinase, 6-phosphofructo-2 kinase; citrate cleavage enzyme; pyruvate kinase, HMG-CoA reductase, glycophosphoralase, fructose 2,6,bi-phosphatase, glycogen phosphoralase, pyruvate dehydrogenase complex, and others known in the art.

The term "blood glucose level therapeutic range" as used herein refers to a subject's designated target blood glucose level of 160 to 240 mg/dl during a treatment session.

The term "bolus" as used herein refers to a single dose of a medical substance and/or drug given all at once.

The term "catheter" as used herein refers to a thin tube that can be inserted into the body to remove bodily fluids or add fluids to a patient during a treatment session.

The term "CoEnzy me Q10" as used herein refers to a chemical that extracts energy from food in the human digestive process.

The term "Complete Blood Count" (CBC) as used herein refers to a blood test to evaluate cellular aspects of the blood and provide concentrations of components in the blood.

The term "C-peptide" as used herein refers to a chemical produced in the pancreas that appears in a 1:1 molecular ratio to insulin and that can be detected when a blood lab panel is performed on a blood sample.

The term "data storage" as used herein refers to a non-transitory computer readable medium, such as a hard disk drive, solid state drive, flash drive, tape drive, and the like. The term "non-transitory computer readable medium" excludes any transitory signals but includes any non-transitory data storage circuitry, e.g., buffers, cache, and queues, within transceivers of transitory signals.

The term "diabetic retinopathy" as used herein refers to a complication of diabetes that affects the eyes.

The term "diabetic treatment model" as used herein refers to a plurality of look up tables reflecting initial blend dosing, adjustment protocols that reflect weight of the subject, types of insulin (long term and short term), a volume of bolus of insulin per treatment session, a quantity of bolus, a frequency of bolus for a treatment session and bolus intervals, dosage amounts of magnesium (including quantity and frequency) and dosage amounts of potassium (including quantity and frequency). The diabetic treatment model includes glucose dosage amounts which are milligrams/deciliter (mg/dl) based on blood glucose of the subject. The diabetic treatment model generates a schedule of bolus introduction with at least one unequal time period between

APPX0632

INSU_PI_000460

US 10,533,990 B2

5

at least one pair of bolus. In embodiments, the diabetic treatment model can be located in the administrative data storage.

For example, the diabetic treatment model receives from a doctor, nurse or technician the weight of a subject, such as 102 kilograms, and a blood glucose of the subject, such as 120 mg/dl. The diabetic treatment model then generates (i) a type of insulin to be introduced to the subject, such as short term insulin, (ii) a volume of bolus of insulin per treatment session for the subject, such as 0.5 milliliters, (iii) a quantity of bolus per treatment session, such as 12, and (iv) a frequency of bolus introduction, which in embodiments, can be random for a treatment session of 3 hours. The time intervals between sequential bolus introductions can range from 2 minutes to 10 minutes between bolus. In embodiment, the time intervals can be a random sequence.

The diabetic treatment model generates dosage amounts of magnesium, such as 2 milligrams per milliliter of saline (for intravenous introduction to the subject) during the treatment session.

The diabetic treatment model generates dosage amounts of potassium, such as 0.02 meq/millimeter of saline (for an intravenous introduction) during the treatment session.

The diabetic treatment model calculates glucose dosage amounts for a subject, which can range from 44 grams to 55 grams during the first 30 minutes of a treatment session and then different or the same glucose dosage amounts using real time blood glucose level tests of the subject, which can be performed providing new test results and recalculations of dosage amount of bolus every 30 minutes.

The diabetic treatment model evaluates for Type 2 Diabetes, pre-Diabetes, Metabolic Syndrome, Metabolic Disorder, Impaired Glucose Tolerance, and Impaired Fasting Glycemia.

The term "dosage amounts of magnesium" as used herein refers to dosage amounts of magnesium in a saline carrier or in a pill form, for example, one that dissolves under the tongue of the subject.

The term "dosage amounts of potassium" as used herein refers to dosage amounts of magnesium in a saline carrier, in a pill form, or as a banana. If a pill form is used, it can be in the form of a pill that dissolves under the tongue of the subject.

The term "Echocardiograph" as used herein refers to a multi-dimensional sonography of the heart that measures the heart's mechanical functionality.

The term "exogenous" as used herein refers to materials or reactions that occur outside of the body.

The term "glucagon" as used herein refers to a counter regulatory hormone essential for glucose metabolism in humans in particular.

The term "glucose" as used herein refers to the simple carbohydrate commonly referred to as "sugar".

The term "hyperglycemia" as used herein refers to high blood glucose level present in a subject's blood test.

The term "improved cellular ATP functioning" as used herein refers to "Adenosine Triphosphatase" ("ATPase") functioning, which are one or more enzymes that catalyze the formation of adenosine triphosphate ("ATP") from adenosine diphosphate ("ADP") and the functioning is indicative of the energy generated by a cell when it consumes glucose during metabolic processing.

The term "individual target blood glucose level" as used herein refers to a medical beneficial range that the patient or subject can achieve at least during treatments session created by the diabetic treatment model, during the entire infusion therapy, such as a range from 125 mg/dl to 225 mg/dl, which

6

can be adjusted to a more narrow range, such from 180 mg/dl to 225 mg/dl for a specific subject.

The term "insulin" as used herein refers to a chemical that is a counter regulatory hormone essential for glucose metabolism.

The term "insulin bolus" as used herein refers to a dosage quantity of insulin given intravenously to a patient.

The term "insulin reservoir" as used herein can be a flexible pouch of insulin having multiple insulin bolus.

The term "insulin sensitivity factor" as used herein refers to how a subject responds after receiving one unit of insulin as a measure of decrease in blood glucose.

The term "Lipid Panel" as used herein refers to a blood test that measures a concentration of lipids, fats, and fatty substances used as a source of energy by a human body.

The term "metabolic factors" as used herein refers to a weight, such as 125 pounds, blood tests, such as a Comprehensive Metabolic Panel, a CBC panel, a C-peptide test, an A1c test (known as a "lipid panel"), a urinalysis, a nerve conduction velocity test, an individual target blood glucose level, such as 110 mg/dl, a respiratory quotient, such as a ratio of the amount of carbon dioxide released based on oxygen consumed during a preset period of time, and an insulin sensitivity factor, such as a value indicating how a subject responds after receiving one unit of insulin as a measure of decrease in blood glucose.

The term "metabolic enhancement" as used herein refers to a blend of components that bond to enzymes in the patient and increases the enzyme activity for a patient or subject. The metabolic enhancement can be (1) a pill containing the components of the metabolic enhancement, (2) a drink containing the components of the metabolic enhancement, (3) a shake containing the components of the metabolic enhancement, (4) a food item, such an energy bar, fortified with the metabolic enhancement, (5) a transdermal patch or similar application delivering the components of the metabolic enhancement, and combinations thereof.

In one example, the metabolic enhancement can be a blend of methylcobalamin, (such as 5 mg), pyridoxal-5-phosphate (such as 35 mg), 5-MTHF (known as an activated form of folic acid) (such as 1 mg), Alpha Lipoic Acid (such as 50 mg), NADH (such as 5 mg), CoEnzyme Q0 (such as 75 mg), N-Acetyl L-Cysteine (NAC) (such as 250 mg), Vitamin D (such as Cholecalciferol) (such as 2000 International Units (IU)) and Chromium Picolinate (such as 300 mcg).

The term "methylcobalamin" as used herein refers to one of two coenzyme forms of vitamin $B_{12}$.

The term "N-Acetyl Cysteine" as used herein refers to an amino acid that helps build proteins in the body.

The term "NADH" as used herein refers to Nicotinamide Adenine Dinucleotide which binds as a coenzyme to proteins and serves in respiratory metabolism.

The term "Nerve Conduction Velocity (NCV)" as use herein refers to a test to determine how fast electrical signals move throughout a nerve.

The term "non-transitory computer readable medium" as used herein excludes any transitory signals but includes any non-transitory data storage circuitry, e.g., buffers, cache, and queues, within transceivers of transitory signals.

The term "Peripheral Autonomic Neuropathy" as use herein refers to the symptoms that occur when there is damage to the nerves, such as weakness and numbness of a limb.

The term "plan goal" as used herein can refer to a purpose for the insulin therapy as identified by the subject and/or a

APPX0633

US 10,533,990 B2

7

medical professional associated with the therapy and inserted into the care plan generated by the diabetic treatment model.

The term "processor" as used herein can refer to a computer, a laptop, a plurality of connected processors, a tablet computer, a cellular telephone or smart phone, a portable processing device, or any similar device known in the industry.

The term "respiratory quotient" as used herein refers to the ratio of: carbon dioxide given off by a human and oxygen consumed by a human, particularly under known resting conditions.

The term "saline" as used herein refers to a sterile solution of 900 grams of sodium chloride in 100 ml of water.

The term "schedule for bolus introduction" as used herein refers to the plurality of specific time intervals between bolus introductions in a treatment session. For the invention, the "schedule for bolus introduction" requires at least one "unequal time period" between at least one pair of bolus per treatment session.

As an example of the schedule for bolus introduction for a treatment session: three bolus can be delivered to the subject sequentially, each bolus separated by a 4 minute time interval. Then, using the schedule for bolus introduction, a fourth bolus is delivered to the subject after a 6.5 minute time interval. The 6.5 minute time interval is referred to herein as "an unequal time period" because it is different from the 4 minute time intervals on the schedule for bolus introduction.

In embodiments, all the time intervals between pairs of bolus can be different for a subject. In embodiments, just one time interval between one pair of bolus can be different according to the schedule for bolus introduction.

In embodiments, many variations in time intervals on the schedule for bolus introduction can be computed by the diabetic treatment model using the weight of the subject, insulin sensitivity factor of the subject and tested blood glucose levels of the subject.

Another example of the schedule of bolus introduction having an unequal time period can be 3 pairs of bolus that are sequentially introduced require 5 minute intervals of time between introductions then a seventh bolus requires a 6 minute interval of time prior to introduction to the subject. The 6 minute interval of time is an "unequal time period". The diabetic treatment model can indicate that the schedule for bolus introduction can require all remaining time periods for the treatment session between pairs of bolus to be equal (the opposite of unequal periods of time). The plurality of time periods of the schedule for bolus introduction (the time between each pair of bolus) is generated by the diabetic treatment model.

The term "subject profile" as used herein can refer to the name of an individual and the associated measured metabolic factors. The subject profile can include a subject history and a subject physical report of the subject, a subject's name and contact information, as well as a subject's blood test results. In embodiments, the subject profile can include a date, a name, an address, an email address, a telephone number, an ethnicity, a gender/sex, a type of diabetes, a date of birth, a weight, a height, a blood pressure, a temperature, a heart rate, a blood type, a blood glucose level, insurance information, a responsible party name and contact information, a driver's license number or copy of the driver's license, employer information, insurance information, medical history including surgery and ancestor information and allergies, current medications, other test results, including but not limited to urinalysis, emergency contact information,

8

and a primary care physician name and contact information. In embodiments, the subject profile can be inputted into a data storage associated with a processor.

The term "treatment session" as used herein refers to a plurality of treatment cycles during which a plurality of bolus are infused to a patient. Each treatment cycle can range from 40 minutes to 180 minutes. Each treatment session can range from 1 treatment cycle and up to 6 treatment cycles.

The term "unequal time period" as used herein refers to a unit of time between a pair of bolus in a treatment session that is different in length from a time period between another pair of bolus in a treatment session.

The term "weight management protocol" as used herein refers to a system of eating certain foods with a preset calorie content to ensure the patient or subject loses an amount of weight per week that aligns with the subject's metabolic factors.

The invention improves impaired hepatic glucose processing in subjects, which can be a human or a non-human, such as an animal.

In embodiments, the method can include creating a subject profile with assessed metabolic factors.

The method can include inserting the subject profile into a diabetic treatment model to determine: a quantity and frequency of sequential intravenous insulin bolus to a subject using a schedule of bolus introduction having at least one unequal time period between a pair of bolus, as well as determining a quantity and frequency of dosage amounts of magnesium and a quantity and frequency of dosage amounts of potassium.

The method can include selecting a weight management protocol using the subject profile and specific metabolic functions of the subject. For example, the metabolic function of respiratory quotient can be used to create a specific customized weight management protocol.

The subject can then follow the weight management protocol while taking a metabolic enhancement. The weight management protocol initially can use a complete metabolic measurement system for cardio-pulmonary exercise stress and resting energy expenditure testing which can give a patient a resting metabolism score. The resting metabolic scores can range from 0.75 to 0.85 for fats, from 0.78 to 0.82 for protein, and from 0.88 to 0.92 for carbohydrates. Based on these resting metabolic scores, a subject's diet can be customized based on what the subject's body can actually metabolize.

A resting metabolic carbohydrate score in excess of 1.20 can indicate the subject's body is undergoing ketogenesis (metabolic production of ketones or ketone bodies or formation of acid ketone [substances that are made when the body breaks down fat for energy, any organic compound in which two carbon atoms are linked by the carbon of a carbonyl group (C—O), the simplest ketone and the most important in medicine is dimethyl ketone (acetone)] bodies, as in uncontrolled diabetes, starvation, or as a result of a diet with a very high fat content), and a different customized diet can be created for the subject or the patient.

The invention improves impaired hepatic glucose processing in subjects, by providing individualized intravenous exogenous insulin-based therapy that not only produces body tissue which improve cellular ATP functioning in the short term, by improves the ATP function by at least 10 percent and up to 40 percent, for a period of time that ranges from 7 days to 90 days from the last treatment session of the individualized intravenous exogenous insulin-based therapy.

US 10,533,990 B2

9 10

It should be noted that in embodiments, the dosage amounts of magnesium and potassium can be introduced to the subject intravenously from a second reservoir simultaneously as the insulin bolus are introduced.

Glucose is introduced to the subject as part of the therapy. The glucose is taken by the subject prior to receiving the insulin bolus. When glucose is used the dosage amounts of potassium and dosage amounts of magnesium can be adjusted based on the subject profile. The bolus introduction can be monitored and blood glucose levels tested allowing a therapist to change the quality and time intervals between bolus based on the diabetic treatment model until the blood glucose level of the subject reaches an individual target blood glucose level.

In embodiments, the unequal time periods between bolus introductions according to the schedule can range from 4 minutes to 8 minutes periods but can be as low as 1 minute and as high as 10 minutes. The unequal time periods can include minutes and seconds.

In embodiments, from 60 grams of glucose to 100 grams of glucose can be introduced to the subject to establish a blood glucose level of at least 125 mg/dl prior to introducing the bolus of insulin and dosage amounts of potassium and magnesium.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy method for infusing insulin intravenously to a subject by comparing a respiratory quotient of the subject from a metabolism score with the subject in a resting state and applying the results into the diabetic treatment model to (i) modify the concentration of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure the success of individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a cardiac function measured by echocardiograph with the subject in a resting state and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a peripheral autonomic neuropathy and microcirculation with the subject in a resting state prior to bolus injection and simultaneously as bolus are injected and after bolus have been injected and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing a retinal image captured by a non-mydriatic camera with the subject in a resting state to identify diabetic retinopathy after a series of bolus treatments are performed and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing wounds to wound characteristics by dimensionally measuring wounds by length, width, and depth and related clinical characteristics with the subject in a resting state after a series of bolus treatments are performed and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the methods that improve impaired hepatic glucose processing in subjects can measure success of the individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject by comparing C-peptides, such as with the University of Oxford's HOMA2 Calculator, which act as a marker for insulin production and insulin sensitivity factor and applying the results into the diabetic treatment model to (i) modify the dosage amounts of the potassium, the magnesium, or both, or (ii) modify the number and frequency of the bolus infusions of insulin.

In embodiments, the metabolic enhancement can have a nerve function improver to decrease homocysteine (a naturally occurring amino acid in all humans that is found in blood plasma) levels and improve cardio vascular health.

In embodiments, the weight management protocol can include additional nutritional supplements.

In embodiments, the insulin bolus can be intravenously infused using a needle or a catheter located in the subject's body, hand, or forearm.

Now turning to the Figures, FIG. 1A shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 40 kilograms to 160 kilograms.

A dosing protocol for insulin bolus, dosage amounts of potassium and dosage amounts of magnesium as generated by the diabetic treatment model using weight of a subject from 40 kilograms to 160 kilograms is shown. This chart can be used for one person or for a plurality of subjects.

Weight appears in the first column then a dosage amount of a ratio of potassium to saline, a dosage amount of a ratio of magnesium to saline, a dosage amount of a ratio of insulin to create the amount of insulin to saline to be used for a treatment session and an insulin reservoir volume is depicted mapped to the weight of the subject and to the potassium to saline dosage, and magnesium to saline dosage and insulin to saline dosage.

The insulin reservoir volume is a liquid volume containing (i) the insulin and saline, (ii) the insulin, saline and potassium, (iii) the insulin, saline and magnesium, or (iv) the insulin, saline, potassium and magnesium, used in the bolus for the subject.

An insulin bolus dosage minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

US 10,533,990 B2

11

An insulin bolus dosage volume maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A schedule of bolus introduction with a plurality of unequal time periods (in seconds) between bolus introduction is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A quantity of bolus per treatment cycle is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

FIG. 1B shows a diabetic treatment model with bolus volume dosage mounts for a subject with a weight from 161 kilograms to 275 kilograms.

A dosing protocol for insulin bolus, dosage amounts of potassium and dosage amounts of magnesium as generated by the diabetic treatment model using weight of a subject from 161 kilograms to 275 kilograms is shown. This chart can be used for one person or for a plurality of subjects.

Weight appears in the first column then a dosage amount of a ratio of potassium to saline, a dosage amount of a ratio of magnesium to saline, a dosage amount of a ratio of insulin to create the amount of insulin to saline to be used for a treatment session, and an insulin reservoir volume is depicted mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

The insulin reservoir volume is a liquid volume containing (i) the insulin and saline, (ii) the insulin, saline and potassium, (iii) the insulin, saline and magnesium, or (iv) the insulin, saline, potassium and magnesium, used in the bolus for the subject.

An insulin bolus dosage minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume minimum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

An insulin bolus dosage volume maximum is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A schedule of bolus introduction with a plurality of unequal time periods (in seconds) between bolus introductions is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

A quantity of bolus per treatment cycle is shown mapped to the weight of the subject and to the potassium to saline dosage, magnesium to saline dosage and insulin to saline dosage.

FIG. 2 shows a bolus volume dosage adjustment protocol based on tested blood glucose levels as produced by the diabetic treatment model.

A dosage adjustment protocol of insulin is shown for three time intervals: (i) a first time interval for hours 1 and 2 of each treatment session, (ii) a second time interval for a first

12

30 minutes of hour 3 of each treatment session, and (iii) a third time interval for a last 30 minutes of hour 3 of each treatment session.

A table of tested blood glucose level in view of dosage amounts of insulin are shown, which is generated by the diabetic treatment model.

This portion of the diabetic treatment model indicates that the amount of insulin or quantity of bolus can be increased or decreased based on real time test results of a subject's blood glucose level.

FIG. 3 depicts a glucose dosage adjustment protocol as produced by the diabetic treatment model.

A patient's tested blood glucose level ranging from 100 to 550 mg/dl is shown.

In the glucose dosage adjustment protocol, an amount of glucose to be administered using the method and system is depicted as mapped to a tested blood glucose level. The amount of glucose ranges from slightly above no glucose shown as 0.01 grams to 60 grams of glucose.

FIG. 4 depicts a metabolic enhancement protocol as produced by the diabetic treatment model and an exemplary metabolic enhancement by component.

The metabolic enhancement protocol shows dosage amounts of metabolic enhancement and respiratory quotients for a patient. The metabolic enhancement can be provided to a subject in dosage amounts as pills, in powder form, as a drink, a transdermal patch, or a delivery system known in the art.

The respiratory quotients range from 0.69 to 1.20. The dosage amounts of metabolic enhancement can range from 1 dose to 3 dosages daily, as shown corresponding to the tests of the subject showing the respiratory quotients.

Ingredients for an exemplary metabolic enhancement usable according to the diabetic treatment model are shown with minimum amounts per dosage and maximum amounts per dosage for the metabolic enhancement.

In embodiments, the ingredients for a usable metabolic enhancement can be formed from a synergistic combination of nine ingredients, namely:

Vitamin D—as Cholecalciferol ranging in amounts from 600 IU to 2000 IU.

Vitamin $B_6$—as Pyridoxal-5-Phosphate ranging in amounts from 10 mg to 100 mg.

Folic Acid—as Folate ranging in amounts from 200 mcg to 2000 mcg.

Vitamin $B_{12}$—as Cyanocobalamin ranging in amounts from 1000 mcg to 5000 mcg.

An amino acid that builds proteins in a subject—as N-Acetyl L-Cysteine (NAC) ranging in amounts from 200 mg to 600 mg.

A coenzyme that extracts energy from food for a subject—as Coenzyme Q10 (CoQ10) ranging in amounts from 60 mg to 400 mg.

An antioxidant that extracts energy from food for a subject—as Alpha lipoic acid ranging in amounts from 50 mg to 400 mg.

A protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for a subject—as Nicotinamide Adenine Dinucleotide (NADH) ranging in amounts from 0.5 mg to 5 mg.

A glucose utilization component to prevent or treat chromium deficiency in a subject and which additionally improves glucose utilization by insulin—as Chromium Picolinate ranging in amounts from 200 mg to 300 mg.

US 10,533,990 B2

13

The following are non-limiting examples.

EXAMPLE 1

A comparative analysis was generated for Fred Smith, Fred S. a 69-year-old man with Type 2 diabetes of 25 years' duration. Fred Smith arrived in a wheelchair, because walking was too painful for him. Fred Smith's left foot had all the toes amputated, and a non-healing wound on his other foot had caused his doctor to recommend amputation of a toe on his right foot.

Conventional wound care treatment, including aggressive wound care, wound debridement, and hyperbaric treatment had failed. Fred Smith also developed a debilitating peripheral neuropathy.

At this point Fred Smith weighed 107.95 kilograms and began an intensive treatment protocol of three treatment sessions per week, the first week includes two treatment sessions the second and third weeks include one treatment session per week thereafter for weeks 4 through 12. During each treatment session, Fred Smith received insulin and saline intravenously, alternating with glucose. Fred Smith received 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram, at a first set of unequal time periods of 5.3 minutes, 4 minutes, and 5.1 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Fred Smith received a total of 16 treatments during the three-month period, after the 6th treatment, he began to regain feeling in his feet.

Fred Smith due to the treatment was no longer in a wheelchair at the end of three months and was able to simply use a cane to get around.

Fred was able to decrease his hospital costs by $255,000 from the prior year without treatment.

Additionally, Fred was able to decrease one of his blood pressure medications.

Post treatment, Fred's A1c test result was down 2.7 points. Fred no longer experienced hypoglycemic events and he had reduced his long-acting insulin by 20 percent and his short-acting insulin by 50 percent.

The primary care physician noted that Fred's wound had healed and no amputation was needed.

EXAMPLE 2

A comparative analysis was generated for Marianne Rutledge, a 60-year-old woman with Type 2 diabetes of 12 years duration, who suffered from severe kidney disease and was fearful of becoming a dialysis patient.

Upon arrival Marianne Rutledge's blood test results showed an A1C of 10.2, blood glucose of 240 mg/dl, her blood pressure measured 150/92, and she weighed 212 pounds, or 96.3 kilograms.

Marianne Rutledge began an intensive treatment protocol of two treatment sessions per week the first two weeks, and one treatment session per week thereafter for weeks 3 through 12. During each treatment session, Marianne Rutledge received insulin and saline intravenously, alternating with glucose. Marianne Rutledge received 36 bolus per treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram, at a first set of unequal time periods of 5.1 minutes, 4.6 minutes, and 5.6 minutes, with each set

14

of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Marianne Rutledge received a total of 13 treatments during the three-month period, after the 2nd treatment, she noticed an extreme increase in her energy and stamina, and as she continued the treatment sessions, she reported that she looked forward to the next treatment session because it made her feel better than she had felt since she was diagnosed with diabetes and kidney disease.

Marianne Rutledge continued the therapy with regular treatment sessions each week, 3 to 4 hours each session, with the protocol of insulin and saline intravenously, alternating with glucose and using the schedule of bolus introduction having at least one unequal time period. After six months of treatment, her kidney function improved to the point that her doctor no longer considered dialysis probable.

EXAMPLE 3

Victoria Lord, a Type 2 diabetic on dialysis had vision problems including retinopathy and she also suffered from neuropathy and had trouble sleeping. A comparative analysis was generated for Victoria Lord, whose initial vital signs were blood glucose level 250, blood pressure 120/80, heart rate of 72, and HgbA1c of 9.2.

Victoria Lord began an intensive therapy of two treatment sessions on intravenous insulin alternating with oral glucose on consecutive days for the first two weeks then weekly treatment sessions thereafter for the next 10 weeks, then to be reevaluated.

Each treatment session consisted of 36 bolus. During each treatment session, Victoria Lord received insulin and saline intravenously, alternating with glucose. Victoria received the 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.0 minutes, 6.9 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After her first four treatments over two weeks, she reported that her neuropathy decreased, which was confirmed by autonomic tests. Her blood glucose was decreased to 110, and she reported such extremely increased energy that she no longer required an afternoon nap. She also reported that she was sleeping better. Her lab tests after 14 treatments over 12 weeks showed Hgb A1c of 6.5, down from 9.2, or a decrease of about 30 percent.

EXAMPLE 4

Jim Pierce had severe foot neuropathy and had experienced no feeling in his feet for several years. He had been diagnosed with Type 2 Diabetes about 15 years ago and was insulin dependent. A friend knew of his debilitating neuropathy and recommended that he begin the therapy.

Jim Pierce reported that when his neuropathy began, it was so painful; he could not even stand for a sheet to touch his toes when he went to bed at night. As his neuropathy progressed, he lost all feeling in his feet and began to suffer injuries from falling. His doctor continued to treat him with insulin and prescription drugs, such as Gabapentin.

Jim Pierce's test results were reviewed, and he was put on a therapy of two treatment sessions on consecutive days for three weeks, two treatment sessions on consecutive days for two weeks after that, and then one treatment session per week for the balance of the first 12-week period.

APPX0637

INSU_PI_000465

US 10,533,990 B2

15

16

Jim Pierce received 36 bolus during each treatment session using the schedule of bolus introduction having at least one unequal time period. During each treatment session Jim Pierce received insulin and saline intravenously, alternating with glucose.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.5 minutes, 5.1 minutes, and 5.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After the first two treatments, Jim Pierce reported that the feeling began to return to his feet.

After he completed 8 treatments sessions, his doctor reduced his Gabapentin, and after 12 weeks, he no longer took Gabapentin for his neuropathy. He reduced his insulin from 50 units every night to 30 units every night. His lab reports showed Hgb A1c 7.2, down from 10.5. After six months of the continued therapy he was able to do a three-mile hike on his vacation.

EXAMPLE 5

Sarah Hardin is a pre-diabetic with a genetic disposition to metabolic disorder and disease, including diabetes. Sarah's pre-treatment metabolic rate or respiratory quotient (RQ), was 0.84. After her initial test results were reviewed, she began one treatment session per week for 12 weeks.

Each of Sarah's treatment sessions consisted of 36 bolus and during each treatment session, Sarah received insulin and saline intravenously, alternating with glucose. Sarah received 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.2 minutes, 4.7 minutes, and 6.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Soon after starting the treatment therapy, Sarah Hardin noticed improvement in hair and nail growth, and she documented it with photographs.

Sarah reported that her energy increased to the point that she no longer needed help taking care of her children. After 5 treatment sessions, a comparative analysis was performed and her RQ increased to 0.93, which demonstrated that she was burning carbohydrates for energy.

EXAMPLE 6

Tatum Norris, age 18, a Type 1 diabetic diagnosed at age 10, had severe neuropathy and was housebound because of his pain. He began two treatment sessions on consecutive days, then 1 treatment session a week thereafter.

Each treatment session consisted of 36 bolus. During each treatment session, Tatum received insulin and saline intravenously, alternating with glucose. Tatum received 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.4 minutes, 5.3 minutes, and 5.2 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

A Nerve Conduction Velocity (NCV) with Electromyopathy (EMG) was conducted pre-treatment on Tatum and repeated 90 days after his initial treatment, which showed a marked decrease in his diabetic neuropathy.

After 8 or 10 treatments, Tatum began driving a car again and he was able to sit in movie theaters because the pain was now manageable. Tatum reported that he could now go visit his mom in Dallas and even hang out with friends.

EXAMPLE 7

Carmen Valdez, a 70-year-old Type 2 diabetic who had been diagnosed four years earlier, was on three types of blood pressure medication (Amlodipine, Lisinopril, and Lopressor) and three medications to control her blood sugar (Lantus, Metformin, and Onglyza). After her initial test results were reviewed, she began treatment sessions of two treatment sessions on consecutive days for the first two weeks and one treatment session per week thereafter for 12 weeks. Her pre-treatment RQ test result was 0.79.

During each treatment session, Carmen received insulin and saline intravenously, alternating with glucose. Carmen received 36 bolus using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 6.4 minutes, 7.2 minutes, and 7.6 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Carmen reported that she was surprised that she immediately experienced greatly increased energy and stamina, as well as a lowering of her daily blood pressure according to her self-tests, after only the first two treatments.

After three months, Carmen Valdez was able to discontinue taking Amlodipine, Lantus and Onglyzaone. At that point her RQ measured 0.95.

EXAMPLE 8

Harold Carson, a 65-year-old insulin-dependent Type 2 diabetic of 25 years, became insulin resistant and his medications were no longer working well. Mr. Carson was taking three 750-mg Glucophage tablets daily, 150 units of Humalog (short-acting) insulin daily, and a nighttime injection of 40 units of Humulin N (long-acting) insulin. He also took statin drugs for cholesterol and blood pressure medication.

After initial tests, his C-peptide was remarkable at 2.0. He began treatment sessions of two on consecutive days for two weeks, and then continued with weekly treatments for a total of 12 weeks.

During each treatment session, Mr. Carson received insulin and saline intravenously, alternating with glucose. He received 36 bolus per treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.7 minutes, 6.1 minutes, and 5.9 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After he began the treatment sessions, he reported that he immediately noticed a better night's sleep, that his mental clarity was sharper, and even his golf score improved.

After two months of treatment he decreased his insulin usage by 70 percent (from 150 units daily to 45 units daily) and his C-peptide test resulted in a significant improvement of 2.8.

Harold Carson's RQ was 0.75 pre-treatment and a perfect 1.00 after two months of treatment. Harold reported that his dry skin improved, the neuropathy in his legs vanished, and

APPX0638

INSU_PI_000466

US 10,533,990 B2

17      18

his wife reported that his hair had grown "unbelievably" after he began the treatment therapy.

EXAMPLE 9

Stephen Henderson, a pre-diabetic with metabolic disorder and hyperlipidemia, had initial test results of Triglycerides 1290, LDL 183, and Cholesterol 271; his RQ was 0.74. He began treatment sessions once a week for 12 weeks. During each treatment session, Mr. Henderson received insulin and saline intravenously, alternating with glucose. Mr. Henderson received 36 bolus each treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 4.8 minutes, 4.8 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Stephen reported that after only two treatments, his energy level increased and prior hair loss abruptly stopped. After five treatments, he noticed significant hair growth. His test results after 12 treatment sessions were Triglycerides 123, LDL 86, Cholesterol 144, and RQ 0.98.

Stephen also reported that he noticed significant improvement in quantitative and qualitative analysis capability.

EXAMPLE 10

Alan Henderson traveled from Denver to Houston for his treatments. At age 71 he had a history of 13 heart stints, he had been a Type 2 diabetic for 20 years, and he was insulin dependent.

After initial testing and a review of his results, Alan Henderson began treatment sessions of two per week on consecutive days for two weeks, then one treatment session weekly for 10 more weeks.

During each treatment session, Alan received insulin, saline, potassium, and magnesium intravenously, alternating with glucose. Alan received 36 bolus each treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 6.4 minutes, 6.8 minutes, and 7.1 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Alan's initial RQ was measured at 0.78, and his Hgb A1c was 13.4.

Over the course of three months, after his 12-week, 14-treatment therapy, he decreased his fast-acting insulin (Novalog) by 55 percent, down from 15-18 units to 10-12 units with meals and his long-acting insulin (Lantus) decreased by 65 percent, down from 75 units twice daily to 40 units daily.

After the first three months of treatment, Alan's Hgb A1c was down to 7.3 (more than 6-point decrease), and his RQ was 0.90.

Alan Henderson also suffered from diabetic neuropathy, for which he had been prescribed Gabapentin (six capsules per day) and a Lidocaine patch. After two months he reduced the amount of Gabapentin he was taking, and then completely eliminated it. He discontinued use of the Lidocaine patch. He reports that he now has no pain or neuropathy in his hands or feet, and his energy level is "way up."

EXAMPLE 11

George Gilbert had a wound on his foot for three months that would not heal. He was also a Type 2 diabetic on Metformin orally. After review of his test results, he began treatment sessions of two sessions on consecutive days for the first week and weekly treatment sessions thereafter.

During each treatment session, George received insulin, saline, glucagon, and somatostatin intravenously, alternating with oral glucose. George received 36 bolus each treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.7 minutes, 5.4 minutes, and 5.0 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After only three weeks of the treatment, he reduced the amount of Metformin he was taking, his wound healed, and his doctor made photographs of the wound before and after for the hospital record. George calls the treatment a "miracle."

EXAMPLE 12

Toby Rasmussen, a pre-diabetic of 8 years duration, began treatment sessions because of vision problems and a family history of diabetes. His initial RQ was 0.85. His Hgb A1c measured 7.0. He began treatment sessions once a week for 12 weeks.

During each treatment session, Toby received insulin and saline intravenously, alternating with glucose. Toby received 36 bolus each treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.3 minutes, 5.2 minutes, and 6.4 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Toby reports that after the 12 treatments, he has more energy and his eyesight has improved so much that he now uses only bifocals instead of trifocals. After treatments, his RQ measured 0.98 and his A1c measured 6.1.

EXAMPLE 13

Hank Anderson, a Type 2 diabetic of 27 years, had an Hgb A1c reading of 9.0, and was using Lantus insulin at 170 units during the day and another 70 units at night. He also reported severe leg cramps.

A comparative analysis was performed on Hank Anderson, and he began treatment sessions weekly. During each treatment session, Hank received insulin and saline intravenously, alternating with glucose. He also received potassium 40 meq orally with each treatment session and daily on non-treatment days. Mr. Anderson received 36 bolus per treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.6 minutes, 5.1 minutes, and 5.4 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

After 12 weeks of weekly treatment sessions, Hank reported that since starting the treatment, his blood sugar is now controlled and his eyesight has improved so much that he went from legally blind without glasses to being able to read captions on a television with no glasses.

Hank was able to discontinue his nightly Lantus and his insulin went down from 6 vials of insulin per month to only 3, a significant costs saving.

APPX0639

INSU_PI_000467

US 10,533,990 B2

**19**

Hank Anderson's A1c after 12 weeks of treatment sessions measured 8.3.

EXAMPLE 14

John Grayson, a Type 1 insulin-dependent diabetic, initially reported problems with his kidneys, eyes, low energy, mood swings, and erectile dysfunction. His RQ was 0.88 and his magnesium level was 1.5

After his test results were reviewed, John started treatment sessions of two sessions on consecutive days with weekly treatment sessions thereafter for a period of three months. During each treatment session, Hank received insulin and saline intravenously, alternating with oral glucose and somatostatin. Hank received 36 bolus per treatment session using the schedule of bolus introduction having at least one unequal time period.

Each bolus of insulin had an insulin concentration of 10 milli-units per kilogram at a first set of unequal time periods of 5.0 minutes, 5.2 minutes, and 5.3 minutes, with each set of unequal time periods between bolus introductions repeating for the entire treatment session, of about 3 to 4 hours.

Mr. Grayson also received magnesium chloride tablets of 40 mg orally with each treatment session and daily on non-treatment days.

After the first two treatments, Mr. Grayson decreased his insulin use by 5-10 units per sliding scale and was extremely happy to report that he experienced increased blood flow.

After the third treatment, Mrs. Grayson was deliriously excited about his improvement, especially with the blood flow.

FIGS. 5A-5C depict steps of a method of the invention according to one or more embodiments.

The method for providing an individualized intravenous exogenous insulin-based therapy can include creating a subject profile for a subject, as shown in box 500. The subject profile can include: a subject history, such as having type II diabetes for the past three years and cataract surgery 4 years ago, a subject's physical reports including weight of the subject and optionally objective physician reports, CT scans and other diagnostic reports, a subject's name, such as Carol Wilson, a subject's contact information such as a name, an address and a telephone number, and a subject's blood test results.

The method can include assessing metabolic factors of the subject and storing the metabolic factors in the subject profile, as shown in box 502. The metabolic factors needed in the subject file can include: a glucose level, such as an initial glucose level, a respiratory quotient, such as an initial respiratory quotient, an insulin sensitivity factor, such as an initial or pre-treatment insulin senility factor, and an individual target blood glucose level which the subject desires to achieve with the treatments using the diabetic treatment model.

The method can include creating a care plan with a plurality of treatment sessions for the subject and a plan goal, as shown in box 504. The care plan can indicate a schedule of bolus introduction with at least one unequal time period and the care plan can include a quantity and frequency of a plurality of bolus containing saline and insulin for sequential intravenous introduction to a subject.

The method can include introducing glucose to the subject to stimulate gastrointestinal hormone production, resulting in the release of enzymes from the subject's liver and causing blood glucose levels of the subject to be in a therapeutic range, as shown in box 506.

**20**

The method can include testing the subject for blood glucose levels to compare tested blood glucose levels to the plurality of therapeutic ranges and verify the subject is in the therapeutic range, as shown in box 508.

The method can include comparing tested blood glucose levels to a diabetic treatment model, as shown in box 510.

The method can include mapping tested blood glucose levels and insulin sensitive factors of the subject to the subject weight using the diabetic treatment model to determine a schedule for bolus introduction, wherein the schedule for bolus introduction has at least one unequal time period between at least one pair of bolus, as shown in box 512.

The method can include introducing, to the subject a plurality of bolus of insulin and saline sequentially using the schedule for bolus introduction having at least one unequal time period between at least one pair of bolus, as shown in box 513.

The method can include comparing the subject profile to a plurality of weight management protocols to identify a weight management protocol for the subject based upon assessed metabolic functions of the subject and saving the weight management protocol in the care plan, as shown in box 514.

The method can include implementing the identified weight management protocol and the care plan after a first treatment session to manage weight of the subject with a metabolic enhancement causing improved cellular ATP functioning for the subject while infusing insulin and modifying a quantity and duration of unequal time periods between bolus introduction in the schedule of bolus introduction having at least one unequal time period between at least one pair of bolus to improve impaired hepatic glucose processing, as shown in box 516.

The method can include using in the schedule of bolus introduction having at least one unequal time period, time periods varying from 2 minutes to 10 minutes. The unequal time periods can be time intervals from 1 percent to 30 percent different in length of time from each other.

The method can include introducing from 60 grams of glucose to 100 grams of glucose to the subject prior to initial bolus introduction to establish a blood glucose level of at least 125 mg/dl prior to introducing the plurality of bolus in a first treatment session.

The method can include comparing a respiratory quotient of the subject in a resting state to a plurality of metabolism scores, as shown in box 518.

The method can include modifying a quantity of bolus for the subject for each treatment session as identified in the care plan with schedule of bolus introduction having at least one unequal time period between bolus to improve a subject's respiratory quotient, as shown in box 520.

The method can include modifying the schedule of bolus introduction having at least one unequal time period between bolus introduction by modifying a quantity and duration of unequal time periods between bolus introductions to improve the respiratory quotient, as shown in box 522.

The method can include comparing a measured cardiac function of the subject in a resting state to a preset norm of cardiac function, as shown in box 524.

The method can include modifying a quantity of bolus for the subject identified in the care plan using the preset norm of cardiac function, as shown in box 526.

The method can include modifying the schedule of bolus introduction having at least one unequal time period by

APPX0640

INSU_PI_000468

US 10,533,990 B2

21

modifying a quantity and duration of unequal time periods between bolus introductions to improve cardiac function, as shown in box 528.

The method can include measuring a peripheral autonomic neuropathy and microcirculation of the subject in a resting state prior to bolus introduction comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of peripheral autonomic neuropathies and microcirculations, as shown in box 530.

The method can include comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state as bolus are sequentially introduced to the measured peripheral autonomic neuropathy and microcirculation, as shown in box 532.

The method can include comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state after all bolus have been introduced in a first treatment session to the measured peripheral autonomic neuropathy and microcirculation, as shown in box 534.

The method can include modifying a quantity of bolus for the subject identified in the care plan to treat peripheral autonomic neuropathy and microcirculation, as shown in box 536.

The method can include modifying the schedule of bolus introduction having at least one unequal time period by modifying a quantity and duration of unequal time periods between bolus introduction to improve the measured peripheral autonomic neuropathy and microcirculation, as shown in box 538.

The method can include viewing an initial retinal image of the subject captured by a non-mydriatic camera with the subject in a resting state to identify a diabetic retinopathy, as shown inbox 540.

The method can include viewing a post treatment retinal image of the subject in a resting state after a first treatment session, as shown in box 541.

The method can include comparing the initial retinal image to the post treatment retinal image, as shown in box 542.

The method can include modifying a quantity of bolus for the subject if no change in the diabetic retinopathy has occurred, as shown in box 544.

The method can include modifying the schedule of bolus introduction having at least one unequal time period between bolus to reduce the effects of diabetic retinopathy by modifying a quantity and duration of unequal time periods between bolus introductions to reduce the effects of diabetic retinopathy, as shown in box 546.

The method can include dimensionally measuring wounds by length, width, depth and identifying wound characteristics with the subject in a resting state, as shown in box 550.

The method can include dimensionally measuring wounds after at least one treatment session to identify skin integrity and changes in clinical wound characteristics, as shown in box 552.

The method can include modifying a quantity of bolus for the subject identified in the care plan for wound treatment using the identified skin integrity and changes in clinical wound characteristics, as shown in box 554.

The method can include modifying the schedule of bolus introduction having at least one unequal time period between bolus to improve wound healing by modifying a quantity and duration of unequal time periods between bolus introduction to reduce wound size and wound characteristics, as shown in box 556.

22

The method can include comparing C-peptides of the subject to a preset norm of C-peptides to identify an insulin sensitivity factor, as shown in box 560.

The method can include modifying a quantity of bolus for the subject for the insulin sensitivity factor, as shown in box 562.

The method can include modifying the schedule of bolus introduction having at least one unequal time period between bolus to improve an insulin sensitivity factor using analysis of C-peptides by modifying a quantity and duration of unequal time periods between bolus introductions, as shown in box 564.

In embodiments, the method can use at least one of: methylcobalamin, pyridoxal-5-phosphate, 5-MTHF, alpha lipoic acid, NADH, coenzyme Q10, chromium picolinate, and N-Acetyl cysteine, and vitamin $D_3$ as the metabolic enhancement.

In embodiments, a needle or a catheter can be used to introduce the bolus into the subject's hand or forearm to deliver the insulin bolus.

The method can include determining a quantity and frequency of dosage amounts of magnesium and introducing the dosage amounts of magnesium simultaneously to the subject with the schedule of bolus using the schedule of bolus introduction having at least one unequal time period, as shown in box 570.

The method can include determining a quantity and frequency of dosage amounts of potassium and introducing the dosage amounts of potassium simultaneously to the subject with the plurality of bolus using the schedule of bolus introduction having at least one unequal time period, as shown in box 572.

The method can include determining a quantity and frequency of dosage amounts of somatostatin and introducing the dosage amounts of somatostatin simultaneously to the subject with the plurality of bolus using the schedule of bolus introduction having at least one unequal time period, as shown in box 574.

In embodiments, the somatostatin can be administered orally or intravenously.

The method can include determining a quantity and frequency of dosage amounts of glucagon and introducing the dosage amounts of glucagon simultaneously to the subject with the plurality of bolus using the schedule of bolus introduction having at least one unequal time period, as shown in box 576.

In embodiments, the glucagon can be administered orally or intravenously

The method can include scheduling diagnostic tests after a first treatment session to modify the care plan for improved cellular ATP functioning for the subject and improved hepatic glucose processing, as shown in box 578.

FIG. 6 depicts a system of the invention according to one or more embodiments.

The system for individualized intravenous exogenous insulin-based therapy can have an administrative processor 602 connected to an administrative data storage 604.

The administrative processor, which can be a computer, can be connected to a network 606. In embodiments, the connection can be a wired or wireless connection. The network can be a cellular network, a satellite network, a global communication network, a local area network, a wide area network, a similar network known in the industry, or combinations thereof.

The system can connect to a plurality of client devices 608a, 608b, and 608c. The client devices can be computers, laptops, tablet computers, cellular phones or smart phones,

APPX0641

INSU_PI_000469

US 10,533,990 B2

23

or another digital input device that is cable of bidirectional communication and can be used to input subject information into a subject profile, which can be disposed in the administrative data storage 604.

In embodiments, the system can connect to a hospital processor 607 and/or an insurance processor 609. The hospital processor, the insurance processor or both can be in communication with the network 606 and can provide accelerated payment to the diabetic treatment center and provide improved data visibility for improved overall patient care by hospital doctors and medical staff treating the subject.

In embodiments, the system can connect to a doctor processor 611, which can be a computer. In embodiments, the doctor processor can be a group of processors, wherein each processor in the group can be connected to a different doctor specialist. In other embodiments, the doctor processor can be a processor accessible by a group of physicians.

In embodiments, the administrative processor can be a cloud based computing system.

FIGS. 7A and 7B depict an administrative data storage usable in the system according to one or more embodiments.

The administrative data storage 604 can contain at least one subject profile 610.

Each subject profile can contain a plurality of metabolic factors 605 of the subject, which can include, but is not limited to, a blood glucose level 612, a respiratory quotient 614, an insulin sensitivity factor 616, and an individual target blood glucose level 618.

The administrative data storage 604 can contain a plurality of care plan templates 620.

In embodiments, the administrative data storage can contain various computer instructions, which can be used to instruct the administrative processor to perform various tasks.

The administrative data storage 604 can contain computer instructions 200 configured to instruct the administrative processor to create a customized care plan from one of the plurality of care plan templates, wherein the customized care plan indicates a plurality of treatment sessions for the subject with the subject profile and a plan goal, each customized care plan indicating a schedule of bolus introduction having at least one unequal time period between bolus introduction, each bolus containing saline and insulin and each bolus introduced intravenously and sequentially to a subject

The administrative data storage 604 can contain computer instructions 202 configured to instruct the administrative processor to compare tested blood glucose levels to a diabetic treatment model after introducing glucose to a subject to stimulate gastrointestinal hormone production, release of enzymes from the subject's liver and cause blood glucose levels of the subject to be in a therapeutic range.

The administrative data storage 604 can contain a plurality of therapeutic ranges for blood glucose levels 203.

The administrative data storage 604 can contain computer instructions 204 configured to instruct the administrative processor to compare tested blood glucose levels to the plurality of therapeutic ranges for blood glucose levels and verify the subject is in the therapeutic range.

The administrative data storage 604 can contain a plurality of weight management protocols 205.

The administrative data storage 604 can contain computer instructions 206 configured to instruct the administrative processor to compare a subject profile to the plurality of

24

weight management protocols to identify a weight management protocol based upon metabolic functions of the subject.

The administrative data storage 604 can contain computer instructions 207 configured to instruct the administrative processor to save the identified weight management protocol in the generated customized care plan after saline with insulin in a plurality of bolus using the schedule of bolus introduction having at least one unequal time period have been administered to a subject.

It should be noted that the unequal time periods are determined by the diabetic treatment model and the care plan.

The administrative data storage 604 can contain computer instructions 208 configured to instruct the administrative processor to track weight management of the subject after a first treatment session and use of an identified weight management protocol and the care plan along with a metabolic enhancement to identify improved cellular ATP functioning for the subject and improve impaired hepatic glucose processing.

The administrative data storage 604 can contain a plurality of metabolism scores 209, a plurality of preset norms of cardiac function 210, a plurality of preset norms of peripheral autonomic neuropathies and microcirculations 211, a retinal image of the subject 212, wound characteristics 214 and a plurality of preset norms of C-peptides 215.

In embodiments, at least one the metabolic enhancements can be a synergistic combination of: Vitamin D ranging in amounts from 600 IU to 2000 IU, Vitamin $B_6$ ranging in amounts from 10 mg to 100 mg, Folic Acid ranging in amounts from 200 mcg to 2000 mcg, Vitamin $B_{12}$ ranging in amounts from 1000 mcg to 5000 mcg, an amino acid that builds proteins in a subject ranging in amounts from 200 mg to 600 mg, a coenzyme that extracts energy from food for a subject ranging in amounts from 60 mg to 400 mg, an antioxidant that extracts energy from food for a subject ranging in amounts from 50 mg to 400 mg, a protein binding component that binds to proteins and serves as a respiratory metabolic enhancement for a subject ranging in amounts from 0.5 mg to 5 mg, and a glucose utilization component to prevent or treat chromium deficiency in a subject which improves glucose utilization by insulin ranging in amounts from 200 mg to 300 mg.

A metabolic enhancement can consist of Cholecalciferol, Pyridoxal-5-Phosphate, Folate, Cyanocobalamin, N-Acetyl L-Cysteine (NAC), Coenzyme Q10 (CoQ10), an Alpha lipoic acid, Nicotinamide Adenine Dinucleotide (NADH), and Chromium Picolinate.

FIGS. 8A-8C provide exemplary subject profiles with an automatically generated care plan template and an automatically generated report according to one or more embodiments.

The care plan can be viewed in real time 24 hours a day, 7 days a week as each test is updated and the metabolic assessments are completed.

FIG. 8A shows a subject profile 610 with fields for a name 802, a patient ID number 804, a date of birth 806, a gender 808, an ethnicity 810, a blood type 812, allergies 814, a diagnosis 816, insurance 818, a primary care physician (PCP) 820, a primary care physician phone number 822, a primary care physician fax number 824, a patient address 826, a patient phone number 828, a patient email address 830, and a patient emergency contact 832.

APPX0642

INSU_PI_000470

US 10,533,990 B2

25

The subject profile 610 can include a narrative 834, which can be written by a medical professional, documenting the condition of the patient and the medical history of the patient with the subject profile.

The subject profile 610 can include assessed metabolic factors of the patient 605, which can include fasting blood sugar 836, A1c level in the blood 838, C-peptide level in the blood 840, a magnesium level in the blood 842, a potassium level in the blood 844, and urinalysis test results 846.

The subject profile 610 can include an insulin sensitivity factor 848 for the subject and diagnostic tests results 850.

The diagnostic test results 850 can include blood glucose level 612, respiratory quotient 614, blood pressure 852, weight 854, nerve conduction velocity 856, retinal image of the subject 212, autonomic test results for neuropathy 858, cognitive test results 860, and cardiac test results 862 indicating cardiac function. The cardiac tests can be EKG or 2D Echo tests.

The subject profile 610 can include current medications 864 of the subject, such as aspirin or prescription medications the subject is currently using.

The subject profile 610 can have a home button 950, a save button 952, a previous page button 954, a next page button 956, and an exit button 958. The buttons can be interchangeable with icons depending on software used on an industry standard computer screen.

FIG. 8B shows the subject profile with a care plan template.

In embodiments, the can plan template can be filled in partially or completely and can be editable.

The care plan template 620 can have an infusion schedule 866, which can indicate infusions by week, showing a quality of treatments and on which days the treatments must occur.

The care plan template 620 can include an infusion formulation 868, which can be a combination of insulin, saline, potassium, magnesium, glucagon, and somatostatin.

The care plan template 620 can include treatment cycles 870, a quantity of bolus per treatment cycle 872, and unequal time periods between bolus introductions in seconds 874.

The care plan template 620 can include a blood glucose level therapeutic range 876.

In embodiments, additional therapies can be tracked in the care plan, including but not limited to, a quantity and frequency of dosage amounts of potassium 878, a quantity and frequency of dosage amounts of magnesium 880, a quantity and frequency of dosage amounts of glucagon 882, and a quantity and frequency of dosage amounts of somatostatin 884.

The care plan template 620 can include diagnostic tests 886, which can be scheduled after a first treatment session.

The care plan template 620 can include metabolic enhancements 888, which can be a particular supplement and instructions on dosage amounts and frequency for the subject in view of the diagnostic tests or other data in the care plan.

The care plan template 620 can include a weight management protocol 205, which can be selected from the plurality of weight management protocols in the administrative data storage.

The care plan template 620 can include an education schedule 889, which can consist of a curriculum of education modules to be viewed or read by a subject by a certain date, which can be automatically transmitted to a client device of the subject on a predetermined schedule.

26

The care plan template 620 can include at least one plan goal 890, such as an increased metabolism for a subject, such as by 10 percent.

FIG. 8C shows the subject profile with a report.

The report 892 can show improved cellular ATP functioning for the subject identifying improve impaired hepatic glucose processing.

The report 892 can include a post treatment narrative 894, which can be completed by a health care professional, indicating subjective and analytical assessments of metabolic factors of the subject.

The report 892 can include post treatment assessed metabolic factors 896 of the patient, a post treatment insulin sensitivity factor 898, a post treatment patient testimonial 900, post treatment diagnostic tests results 902 and post treatment medications 904.

The report 892 can include an insulin sensitivity factor 848 for the subject and diagnostic tests results 850.

The diagnostic test results 850 can include blood glucose level 612, respiratory quotient 614, blood pressure 852, weight 854, nerve conduction velocity 856, retinal image of the subject 212, autonomic test results for neuropathy 858, cognitive test results 860, and cardiac test results 862 indicating cardiac function. The cardiac tests can be EKG or 2D Echo tests.

The report can include assessed metabolic factors of the patient 605, which can include fasting blood sugar 836, A1cc level in the blood 838, C-peptide level in the blood 840, a magnesium level in the blood 842, a potassium level in the blood 844, and urinalysis test results 846.

While these embodiments have been described with emphasis on the embodiments, it should be understood that within the scope of the appended claims, the embodiments might be practiced other than as specifically described herein.

What is claimed is:

1. A method for individualized intravenous exogenous insulin-based treatment, comprising the steps of:
   creating a subject profile for a subject, the subject profile comprising:
   (i) a subject history;
   (ii) subject physical reports including a subject weight;
   (iii) subject name;
   (iv) subject contact information; and
   (v) subject blood test results;
   assessing metabolic factors of the subject and storing the metabolic factors in the subject profile, wherein the metabolic factors include: a glucose level, an insulin-sensitivity factor, and an individual target blood glucose level;
   creating a care plan with a plurality of treatment sessions for the subject and a plan goal, wherein the care plan uses the assessed metabolic factors and indicates a schedule of bolus introductions with at least one unequal time period and a quantity and frequency of a plurality of boluses containing saline and insulin for sequential intravenous introduction to the subject;
   introducing glucose to the subject to stimulate gastrointestinal hormone production that results in a release of enzymes from the subject's liver and causing blood glucose levels of the subject to be in a therapeutic range;
   testing the subject for blood glucose levels, comparing tested blood glucose levels to a plurality of therapeutic ranges, and verifying that the subject is in at least one of the plurality of therapeutic ranges;

APPX0643

INSU_PI_000471

US 10,533,990 B2

**27**

comparing the tested blood glucose levels to a diabetic treatment model;

mapping the tested blood glucose levels and the assessed metabolic factors of the subject by using the diabetic treatment model to determine the schedule for bolus introductions;

introducing, sequentially, to the subject a plurality of boluses by using the determined schedule for bolus introductions based on the mapping;

comparing the subject profile to a plurality of weight management protocols to identify a weight management protocol for the subject based upon the assessed metabolic functions of the subject and saving the weight management protocol in the care plan; and

implementing the weight management protocol and the determined schedule of bolus introductions for the subject to improve insulin sensitivity, cellular ATP functioning, or both, of the subject.

**2.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising assessing at least one biomarker specific to diabetes of the subject and optionally storing the at least one biomarker in the subject profile.

**3.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, wherein the schedule of bolus introductions having the at least one unequal time period uses time periods varying from 2 minutes to 10 minutes, and wherein the unequal time periods are time intervals from 1 percent to 30 percent different in length of time from each other.

**4.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising introducing from 60 grams of glucose to 100 grams of glucose to the subject to establish a blood glucose level of at least 125 mg/dl prior to introducing the plurality of boluses in the first treatment session.

**5.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising:

comparing a measured cardiac function of the subject in a resting state to a plurality of preset norms of cardiac function;

modifying a quantity of bolus for the subject identified in the care plan using the plurality of preset norms of cardiac function; and

modifying the schedule of bolus introductions by modifying the quantity and duration of unequal time periods between the bolus introductions to improve cardiac function.

**6.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising:

measuring a peripheral autonomic neuropathy and microcirculation of the subject in a resting state prior to a bolus introduction and comparing the measured peripheral autonomic neuropathy and microcirculation to a plurality of preset norms of peripheral autonomic neuropathies and microcirculations;

comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state as boluses are sequentially introduced to the measured peripheral autonomic neuropathy;

comparing a peripheral autonomic neuropathy and microcirculation of the subject in a resting state after all boluses have been introduced in the first treatment session to the measured peripheral autonomic neuropathy and microcirculation;

**28**

modifying a quantity of boluses for the subject identified in the care plan to treat peripheral autonomic neuropathy and microcirculation; and

modifying the schedule of bolus introductions by modifying the quantity and duration of unequal time periods between the bolus introductions to improve the measured peripheral autonomic neuropathy and microcirculation.

**7.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising:

viewing an initial retinal image of the subject captured by a non-mydriatic camera with the subject in a resting state to identify a diabetic retinopathy;

viewing a post treatment retinal image of the subject in a resting state after the first treatment session;

comparing the initial retinal image to the post treatment retinal image;

modifying a quantity of bolus for the subject if no change m the diabetic retinopathy has occurred; and

modifying the schedule of bolus introductions by modifying the quantity and duration of unequal time periods between the bolus introductions to reduce the effects of diabetic retinopathy.

**8.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising:

dimensionally measuring wounds by length, width, and depth and identifying wound characteristics of the subject in a resting state;

dimensionally measuring wounds after at least one treatment session to identify skin integrity and changes in clinical wound characteristics;

modifying a quantity of bolus for the subject identified in the care plan for wound treatment using the identified skin integrity and changes in clinical wound characteristics; and

modifying the schedule of bolus introductions by modifying the quantity and duration of unequal time periods between the bolus introductions to reduce wound size and wound characteristics.

**9.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, comprising:

comparing C-peptides of the subject to a plurality of preset norms of C-peptides to identify an insulin sensitivity factor;

modifying a quantity of bolus for the subject for the insulin sensitivity factor; and

modifying the schedule of bolus introductions to improve the insulin sensitivity factor using analysis of the C-peptides by modifying the quantity and duration of unequal time periods between the bolus introductions.

**10.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, wherein the implementing the weight management protocol comprises implementing use of a metabolic enhancement comprising methylcobalamin, pyridoxal-5-phosphate, 5-MTHF, alpha lipoic acid, NADH, coenzyme Q10, chromium picolinate, N-Acetyl cysteine, vitamin $D_3$, or combinations thereof.

**11.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising determining a quantity and frequency of dosage amounts of magnesium and introducing the dosage amounts of magnesium simultaneously to the subject with the plurality of boluses using the schedule of bolus introductions.

**12.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, determining a quantity and frequency of dosage amounts of potassium and intro-

US 10,533,990 B2

29

ducing the dosage amounts of potassium simultaneously to the subject with the plurality of boluses using the schedule of bolus introductions.

**13.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, determining a quantity and frequency of dosage amounts of somatostatin and introducing the dosage amounts of somatostatin simultaneously to the subject with the plurality of boluses using the schedule of bolus introductions.

**14.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, determining a quantity and frequency of dosage amounts of glucagon and introducing the dosage amounts of glucagon simultaneously to the subject with the plurality of boluses using the schedule of bolus introductions.

**15.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, comprising scheduling diagnostic tests after the first treatment session to modify the care plan to improved the insulin sensitivity, cellular ATP functioning, or both, of the subject.

**16.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising modifying the determined schedule of bolus introductions.

**17.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising measuring at least one of the metabolic factors, at least one biomarker, or both.

**18.** The method for individualized intravenous exogenous insulin-based treatment of claim **1**, further comprising comparing the determined schedule of bolus introductions to the diabetic treatment model.

**19.** A system for individualized intravenous exogenous insulin-based therapy comprising:

an administrative processor connected to an administrative data storage, the administrative processor connected to a network;

a plurality of client devices, wherein the plurality of client devices is configured for inputting subject information into at least one subject profile in the administrative data storage, and wherein the at least one subject profile has a glucose level, an insulin sensitivity factor, and an individual target blood glucose level;

a plurality of care plan templates in the administrative data storage;

 computer instructions in the administrative data storage, wherein the computer instructions are configured to instruct the administrative processor to create

30

a care plan for a subject from one of the plurality of care plan templates, and wherein the care plan indicates:

 (i) a plurality of treatment sessions for the subject with the at least one subject profile with a plan goal; and

 (ii) a schedule of bolus introductions having at least one unequal time period between bolus introductions, wherein each bolus contains saline and insulin and each bolus is introduced intravenously and sequentially to the subject;

computer instructions in the administrative data storage configured to instruct the administrative processor to compare tested blood glucose levels to a diabetic treatment model after introducing glucose to the subject to stimulate gastrointestinal hormone production that result in a release of enzymes from the subject's liver;

a plurality of therapeutic ranges for blood glucose levels in the administrative data storage;

computer instructions in the administrative data storage configured to instruct the administrative processor to compare the tested blood glucose levels to the plurality of therapeutic ranges and verify that the subject is in at least one of the plurality of therapeutic ranges;

a plurality of weight management protocols in the administrative data storage;

computer instructions in the administrative data storage configured to instruct the administrative processor to compare the at least one subject profile for the subject to the plurality of weight management protocols to identify a weight management protocol based upon metabolic functions of the subject and to save the weight management protocol to the care plan;

computer instructions in the administrative data storage configured to map the tested blood glucose levels and the assessed metabolic factors of the subject by using the diabetic treatment model to determine the schedule for bolus introductions; and

computer instructions in the administrative data storage configured to instruct the administrative processor to track implementation of the weight management protocol and the determined schedule of bolus introductions of the subject after a first treatment session.

**20.** The system for individualized intravenous exogenous insulin-based therapy of claim **19**, further comprising computer instructions in the administrative data storage configured to assess at least one biomarker specific to diabetes of the subject and optionally to store the at least one biomarker in the at least one subject profile for the subject.

* * * * *

INSU_PI_000473

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Kay Tegh Clayett*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-452-464**

**Effective Date of Registration:**
September 14, 2017

## Title _____

**Title of Work:** Diabetes Relief Website

## Completion/Publication _____

Year of Completion: 2017
Date of 1st Publication: July 01, 2017
Nation of 1st Publication: United States

## Author _____

- **Author:** Diabetes Relief LLC
- **Author Created:** text
- **Work made for hire:** Yes
- **Citizen of:** United States
- **Year Born:** 2015

## Copyright Claimant _____

**Copyright Claimant:** Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States
**Transfer statement:** Various employees and associates

## Rights and Permissions _____

Organization Name: Diabetes Relief LLC
Name: Carol Ann Wilson
Email: carol@diabetesrelief.com
Telephone: (281)600-5000
Alt. Telephone: (281)600-6000
Address: 11511 Katy Fwy
Suite 101
Houston, TX 77079 United States

EXHIBIT

**A**

Page 1 of 2

4:22-CV-03062
Injunction Hearing

**EX 05**

DEFS "INSULINIC"

APPX0646

INSU_PI_000474

 diabetesrelief.com /testimonials/

**Here is What Patients Have to Say About Diabetes Relief**

**Diabetes Relief**<sup>SM</sup> *Get Your Life Back*<sup>SM</sup>

FOR PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT USHOMEFOR PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT US1-866-589-8639Click Here to Call Us!



"My blood sugar is now controlled and my eyesight has improved so much I went from legally blind without glasses to now being able to read the captions on the TV with no glasses, and I'm down from 6 vials of insulin per month to only 3."

**Bruce B., Brazoria, TX**
Type 2 Diabetic – 27 years

"I'm now taking 50% less insulin, my A1c is down 3.5 points, my neuropathy is gone and my energy is way up."

**Alan H., Colorado Springs, CO**
Type 2 Diabetic – 20+ years
Coronary Artery Diseases
Triple bypass, 13 cardiac stents

"Since I been getting treatment at Diabetes Relief, I have no more problems with neuropathy. My legs and feet use to burn, like it was on fire, but now I feel so good… I sleep well at night for the first time in years. I also experience weight loss."

**John J., Houston, TX**
Type 2 Diabetic for 5+ years
Hypertension
Neuropathy

"I haven't felt this good in years. It's like my neuropathy just disappeared and my energy level has increased."

**Wayne K., Houston, TX**
Type 2 Diabetic – 18 years
Neuropathy – 10 years
Retinopathy – 2 years

"It has given me my life back."

**Michael W., Crosby, TX**
Type 1 Diabetic – 7 years
Neuropathy – 2 years
Thyroid Disease – 9 years

"It's almost a miracle that my foot healed so well. I started treatment and within 3 weeks it had healed. The wound had been there for 3 months prior to treatment"

**Greg B., Houston, TX**
Type 2 Diabetic – 10 years
Hypertension – 5 years
Neuropathy – 8 years

"I have more energy and my eyesight has improved so much that I only use bifocals now and before I had to use trifocals."

APPX0647

**INSU_PI_000475**

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

**VA 2-185-843**

**Effective Date of Registration:**
November 15, 2019
**Registration Decision Date:**
January 14, 2020

---

## Title

Title of Work: Glucose Homeostasis V.2

## Completion/Publication

Year of Completion: 2019
Date of 1st Publication: October 15, 2019
Nation of 1st Publication: United States

## Author

- Author: Diabetes Relief LLC
  Author Created: technical drawing
  Work made for hire: Yes
  Citizen of: United States

## Copyright Claimant

Copyright Claimant: Diabetes Relief LLC
11511 Katy Fwy, Suite 100, Houston, TX, 77079, United States

---

## Rights and Permissions

Name: Scott A Hepford
Email: scott@diabetesrelief.com
Telephone: (281)600-5000
Address: 11511 Katy Fwy
Suite 100
Houston, TX 77079 United States

## Certification

---

Page 1 of 2

INSU_PI_000476

**Name:** Carol Wilson
**Date:** November 15, 2019

**Copyright Office notes:**   Regarding authorship information: Registered work is Artwork/Illustration

APPX0649

INSU_PI_000477



Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC 2019. All rights reserved.

APPX0650

**INSU_PI_000478**

**Registration #:**  VA0002185843
**Service Request #:**  1-8260679031



Diabetes Relief LLC
11511 Katy Fwy
Suite 100
Houston, TX 77079 United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Karyn A. Temple*

Acting United States Register of Copyrights and Director

**Registration Number**

**VAu 1-330-086**

**Effective Date of Registration:**
May 17, 2018

---

### Title

Title of Work:   Overcoming Metabolic Failure

### Completion/Publication

Year of Completion:   2018

### Author

- **Author:** Diabetes Relief LLC
  **Author Created:** 2-D artwork
  **Work made for hire:** Yes
  **Citizen of:** United States
  **Domiciled in:** United States

### Copyright Claimant

Copyright Claimant:   Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States

---

### Rights and Permissions

Organization Name:   Diabetes Relief LLC
Name:   Carol A Wilson
Email:   carolwilson@earthlink.net
Telephone:   (281)642-4050
Alt. Telephone:   (281)600-6000
Address:   8902 Sunnywood Dr
Houston, TX 77088 United States

### Certification

Name:   Carol Wilson

4:22-CV-03062
Injunction Hearing

**EX 06**

DEFS "INSULINIC"

Page 1 of 2

APPX0652

INSU_PI_000480

**Registration #:**   VAu001330086
**Service Request #:**   1-6592582541

Diabetes Relief LLC
Carol A Wilson
11511 Katy Fwy, Suite 101
Houston, TX 77079 United States

APPX0653

**INSU_PI_000481**

APPX0654
INSU_PI_000482



CAUSE NO. 2020-45718

| | | |
|---|---|---|
| **HUNTER CARR,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **STANLEY T. LEWIS, SCOTT** | § | |
| **HEPFORD, WELL CELL GLOBAL,** | § | |
| **LLC, and RESTOR METABOLIX, INC.** | § | |
| *Defendants.* | § | **127TH JUDICIAL DISTRICT** |
| | § | |

---

### VERIFICATION OF SCOTT HEPFORD

---

1.     My name is Scott Hepford. My date of birth is February 23, 1975, and my address is 19611 Cornerstone Arbor Drive, Cypress, TX 77433. I am over the age of twenty-one years, have never been convicted of a felony, and am competent to make this verification. The facts contained herein are true and correct and based upon my personal knowledge.

2.     I am currently a Manager and Member of Diabetes Relief LLC ("Diabetes Relief").

3.     Hunter Carr, Stanley Lewis, and I are the current members of Diabetes Relief.

4.     Diabetes Relief has been at all relevant times and is now run informally. We had intermittent meetings of the managers and typically waived formal notice as a matter of course. We did not have annual meetings of the members.

5.     On or about July 16, 2020, I sent written notice to Carr and Lewis of a meeting of the members of Diabetes Relief on July 24, 2020 to address (1) a buy-out offer of Carr's membership interests; (2) operations management moving forward; and (3)



4:22-CV-03062
Injunction Hearing
**EX 08**
DEFS "INSULINIC"

EXHIBIT
**2**
APPX0655

INSU_PI_000493

financial management moving forward.  Lewis and I agreed to have this meeting of the members, which constituted a majority of the members.

6.     Carr acknowledged the notice of the meeting set for July 24.

7.     The meeting was held via the Microsoft Teams platform and in-person. Lewis, Carr, and I all participated. Carr was physically in the office with me. Lewis participated by phone and by Teams.

8.     At the July 24, 2020 meeting, on a majority vote of Diabetes Relief's members, Carr was removed as a manager.  Lewis and I voted in favor. Carr was in the meeting during this vote and withheld his vote.

9.     Also at that meeting, the members voted on an acquisition purchase agreement with Well Cell, through which Well Cell would purchase substantially all the assets of Diabetes Relief. The purpose of the Well Cell deal was to generate cash that Diabetes Relief could use to pay back its debt and buy out Carr's membership interests. To incentivize Carr's voluntary exit from Diabetes Relief, Lewis and I were willing to sacrifice part of the proceeds from the Well Cell transaction to offer Carr a larger sum for his membership interests than he was entitled to if the proceeds were strictly divided based on ownership percentages. If Carr refused to accept that offer, those funds from the Well Cell sale would be repurposed, and the proceeds would be divided strictly based on ownership percentage. I advised Carr of this fact during the meeting on July 24, 2020.

10.     The Well Cell transaction is currently on hold because of Carr's actions. I am concerned about Diabetes Relief's ability to fund its operations, and also concerned about Diabetes Relief's ability find any other investor or lender given its current financial and

operations state and Carr's efforts to exercise unauthorized and unilateral control over the company.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED in Houston, Texas on the ___24___ day of August, 2020.

Scott Hepford

9/26/2022 5:22 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 68628713
By: CAROL WILLIAMS
Filed: 9/26/2022 5:22 PM



**ADAIR MYERS STEVENSON YAGI**

September 26, 2022

**VIA EFILE AND EMAIL**
Carol Williams
Clerk, 127th District Court
201 Caroline, 10th Floor
Houston, Texas 77002

  Re: Cause No. 2020-45718; *Hunter Carr, et al. v. Scott Hepford, et al.;*
    In the 127th Judicial District Court of Harris County, Texas.

Dear Ms. Williams,

   Pursuant to the court's rules, please accept this letter explaining the nature of the discovery dispute between the plaintiff, Hunter Carr, and defendant, Glenn Massey, in the above-referenced case.

   Plaintiff served its Third Request for Production on Defendant Glenn Massey on June 24, 2022. On the due date, counsel for the defendant, Ben Foster, contacted counsel for the plaintiff, Chris Stevenson, by email and requested an extension until August 1, 2022, which was granted by Mr. Stevenson on the same day by email. The responses received on the new due date all consisted of objections along with a statement that the defendant would produce responsive documents, if any. No documents were produced by the deadline. On August 15, 2022, plaintiff's counsel sent a letter to defendant stating that the responses were deficient and asking defendant to supplement their responses with document production. The letter also contained discussion of each of defendant's objections. Defendant has not responded to the letter.

   Plaintiff requests that defendant Massey be ordered to produce documents requested.

   We will await notification of the short video hearing on this matter from the Court.

   Thank you for your time and attention to this important matter.

         Best regards,

         /s/ Chris Stevenson
         Chris Stevenson
         Attorney for Plaintiff, Hunter Carr

> 4:22-CV-03062
> Injunction Hearing
> **EX 09**
> DEFS "INSULINIC"

24 Greenway Plaza, Suite 1305 | Houston, Texas 77046
P: 713.522.2270 | F: 713.522.3322
www.am-law.com

APPX0658

**INSU_PI_000496**



Begin forwarded message:

**From:** Dawn Davis <dawnlgrzesik@gmail.com>
**Date:** May 26, 2022 at 3:53:45 PM CDT
**To:** Shawn Calvit <shawnc@insulinic.com>, Alysia Broussard
<alysia@diabetesreliefla.com>, "Megan Scerbo\\" <hr@insulinic.com>, Glenn
Massey <glenn@wellcellglobal.com>, jamiecupp@hotmail.com, Danielle
Vanover <whocares8316@yahoo.com>, kimscricutcrafts@gmail.com
**Subject: Billing reviewed for last week and this week**


Hello Shawn,

Please be aware that we have reviewed the claims as they are coming through and
many have the following issues:

1. Use of diagnosis E11.9 (controlled DM2)  Cannot use this code because it will
not meet medical necessity for infusion.  If controlled then why the infusion?
2. Excessive billing under 99215 which when chart is reviewed does not meet
medical necessity for that level of care.  Please note that I have never seen a visit
which meets medical necessity for 99215 with infusion.  I have spoken with staff
regarding this issue on a call today as well.
3. Please note that claims are being processed over with several things such as
97110 and tobacco cessation with no tobacco use diagnosis, Alcohol counseling
without diagnosis for excessive alcohol use, and several other dietary counseling
ect and these are not covered with the infusion procedure same day and most will
not be covered at all with no diagnosis to cover.  Please also note that these are
something which is usually performed by PCP.  They have made most of these
inclusive to the procedure.
4. I have also reviewed the notes and would like to see more ROS and signature
by a supervising physician as well.
5. Please note that I have reviewed with your staff as well that as of today there is
not any participation with insurance companies other than Medicare so you will
see the rest in Denied status waiting for participation to send out again.
6. I have also advised the staff that if there are any issues with the claims they are
welcome to contact me via email and we can make changes as needed.  Please
note that the staff is NOT to make changes to the claims in the ClearPath as that is
part of the agreement.  My team can and will make any changes needed for claim
submission or appeal process.  Please note that this is a part of the liability

APPX0659

coverage and if a claim is changed by staff username this will cause a breach in contract and I will no longer be able to bill your office due to liability coverage.

That is the update thus far for the claims which have been produced and billed out the past two weeks.  Please be advised I will send out more reporting as claims are produced and coded accordingly.

Thank you,

Dawn L Davis
President/Owner
Davis Legacy Enterprises, LLC
davislegacyenterprises@gmail.com
dawnlgrzesik@gmail.com
612 Lakewood Dr, South Lyon, MI 48178
Phone:734-819-2266
Fax: 734-275-2195

**From:** Scott Hepford <scott@wellcellglobal.com>
**Sent:** Thursday, May 26, 2022 4:53 PM
**To:** Glenn Massey <glenn@wellcellglobal.com>; Paula Oschman
<paula@wellcellsupport.com>; Carol Wilson <carol@wellcellsupport.com>
**Subject:** RE: Billing reviewed for last week and this week

Glenn ~
As you know, and Shawn does as well, we do not and will not ever give them any billing
advice or guidance.  And with that said, I also trust Dawn's judgment and the things she
is calling out below would never be tolerated in any of the clinics we own and manage.
This looks wrong to me, and I want us to put him on notice immediately in the
strongest terms our license will allow with penalty of termination as fast as our license
will allow.

Carol ~
I am so sorry to ask this of you, with everyone being out this next week, but can you
please review the communication from Dawn below and prepare a formal notice with
an intention to revoke the license ASAP with _any_ failure to cure and then an airtight
probationary period following with a requirement of Dawn's oversight as the authority
to tell us if he is doing anything wrong?
It's not enough for him to just stop what he is doing, he must fix what he has done as
well.

Paula ~
Please make sure to bring whatever we need on the trip so I can digitally sign what
Carol prepares and get it sent out ASAP.

Respectfully,

**Scott Hepford**
_Co-Founder – CEO_

**From:** Glenn Massey <glenn@wellcellglobal.com>
**Sent:** Thursday, May 26, 2022 4:27 PM
**To:** Scott Hepford <scott@wellcellglobal.com>; Paula Oschman
<paula@wellcellsupport.com>
**Subject:** Fwd: Billing reviewed for last week and this week



4:22-CV-03062
Injunction Hearing

**EX 16**

INSU_PI_000940

We need to address this immediately

Respectfully,
Glenn Massey
Chief Growth Officer
Well Cell Global
M: +1 (713) 582-0449
O: +1 (888) 991-1012
W: wellcellglobal.com
This transmission may be strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy, or disseminate this information. If you are not the intended recipient, please contact the sender at (832-599-9552), or by reply email, and destroy all copies of the original message. Unauthorized interception of this e-mail is a violation of federal criminal law. This communication does not reflect an intention by the sender or the sender's principal to conduct a transaction or make any agreement by electronic means.

**From:** Dawn Davis <dawnlgrzesik@gmail.com>
**Sent:** Thursday, May 26, 2022 4:13:38 PM
**To:** Glenn Massey <glenn@wellcellglobal.com>
**Subject:** Re: Billing reviewed for last week and this week

Yes, I sure am with the billing coming over they are really stretching the limits and I am taking off the billing which is inappropriate but the girls today on the phone were speaking as though they were going to go into the claims and fix things that is why I have prepared them I will discontinue services if that happens.  I am concerned that they are trying to bill for anything and to be honest Shawn is a bit slithery and I do not trust him at all.  I will keep an eye out on these claims from this office and let you know but wanted to keep you in the loop.

Thank you,
Dawn L Davis
President/Owner
Davis Legacy Enterprises, LLC
davislegacyenterprises@gmail.com
dawnlgrzesik@gmail.com
612 Lakewood Dr, South Lyon, MI 48178
Phone:734-819-2266
Fax: 734-275-2195

On Thu, May 26, 2022 at 5:02 PM Glenn Massey <glenn@wellcellglobal.com> wrote:

> Dawn,
> Should we be concerned???

APPX0662

INSU_PI_000941

Respectfully,
Glenn Massey
Chief Growth Officer
Well Cell Global
M: +1 (713) 582-0449
O: +1 (888) 991-1012
W: wellcellglobal.com

This transmission may be strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy, or disseminate this information. If you are not the intended recipient, please contact the sender at (832-599-9552), or by reply email, and destroy all copies of the original message. Unauthorized interception of this e-mail is a violation of federal criminal law. This communication does not reflect an intention by the sender or the sender's principal to conduct a transaction or make any agreement by electronic means.

**NOTICE OF DEFAULT**

TO: SHAWN CALVIT  shawnc@insulinic.com

This is formal written notice to you regarding matters that have been discussed with you in the past and additional matters of which we have recently been informed.

Pursuant to Paragraph 5B of license agreements between Well Cell Support LLC and any of the clinics you manage or are authorized to control in any way or have referred for a license, this NOTICE OF DEFAULT is issued to you on June 9, 2022, and after the expiration of TEN (10) days, you will have THIRTY (30) days to cure. "You" and "your" in this Notice means Shawn Calvit and all of the licensed entities containing "Insulinic" in their names and all entities controlled, managed, influenced, or referred by Shawn Calvit for a license from Well Cell Support LLC or any of its affiliates.

You are in violation of Paragraph 5B and your assurance that you "at all material times have been in compliance in all material respects with all laws, regulations, rules, orders, judgments, decrees, and other requirements and policies imposed by any governmental entity applicable to it, its owners, its properties, or the operation of its business transactions. This especially applied to all matters involved with billing for services performed under your license agreements.

If you have not furnished proof to Well Cell Support LLC within 30 days that all violations have been cured, and the manner in which they have been cured, all licenses of entities guilty of the violations will be TERMINATED. "Proof" will be accepted if in the form of confirmation by a disinterested third party of all actions you have taken, which have been approved by Well Cell Support LLC.

SIGNED on June 9, 2022

Scott Hepford, Manager, Well Cell Support LLC

4:22-CV-03062
Injunction Hearing
**EX 17**
DEFS "INSULINIC"

APPX0664

**INSU_PI_000943**

| From: | Shawn Calvit |
| --- | --- |
| Sent: | Wednesday, June 22, 2022 5:30 PM CDT |
| To: | Scott Hepford; Glenn Massey |
| Subject: | Response on Billing and License |
| Attachments: | Insulinic of Lafayette Taxonomy.JPG, Addressing Issues from Dawn^J Glenn and Scott.pdf |

I have attached the response to the emails sent from each person in the Thread of emails and to address the revocation of License.

My attorney also has a copy and will follow up with further communication about this matter.



Shawn P. Calvit, CEO
ShawnC@insulinic.com
C (337)296-7722
O (337)254-9999
F (337)522-7543
www.insulinic.com

220 Johnston St. Lafayette LA 70501

4:22-CV-03062
Injunction Hearing

**EX 18**

DEFS "INSULINIC"

## Addressing Issues from Dawn, Glenn and Scott

Attention Scott, Glenn, Dawn:
    I will address each individually so that we all have 100% clarity on what is being discussed and ses how these actions allow you to threaten me with your license being revoked.

From Dawn email:

Please be aware that we have reviewed the claims as they are coming through, and many have the following issues:

1. Use of diagnosis E11.9 (controlled DM2)  Cannot use this code because it will not meet medical necessity for infusion.  If controlled then why the infusion?
Many patients have neuropathy and other problems that may not have been input into Sevocity but have been written on the paper charts that the clinic has.  Just need to update from paper to the electronic files.

2. Excessive billing under 99215 which when chart is reviewed does not meet medical necessity for that level of care.  Please note that I have never seen a visit which meets medical necessity for 99215 with infusion.  I have spoken with staff regarding this issue on a call today as well.
It is my understanding that this was done on only 2 patients.  Training on things needed besides just time would have been helpful in the beginning  If it was billed it was because time was spent with patients.  Since time is not the only factor used then let them know what the criteria are so they don't make the error in the future.
A simple call to discuss would have been the correct way to handle.

3. Please note that claims are being processed over with several things such as 97110 and tobacco cessation with no tobacco use diagnosis, Alcohol counseling without diagnosis for excessive alcohol use, and several other dietary counseling etc. and these are not covered with the infusion procedure same day and most will not be covered at all with no diagnosis to cover.  Please also note that these are something which is usually performed by PCP.  They have made most of these inclusive to the procedure.
1. Dr Leleux is registered as Internist and his scope of work includes preventive care treatments to include smoking cessation, obesity counseling and other preventive measures during any encounter with a patient (See copy of type of Dr that Patrick Leleux is shown as on NPI lookup).

2. PA also has a degree in Nutrition.  She practiced also in endocrinology for several years and her scope of work includes Nutrition therapy. Our scope of practice.
I have attached both the credentialing paperwork submitted and a copy of the Nutrition degree for review.

4. I have also reviewed the notes and would like to see more ROS and signature by a supervising physician as well.
I feel once we upload the paper charts to electronic this will help. Each file has tons of paperwork that has been filled out and just needs to be in the system to be able to clarify the reason for service.

5.  Please note that I have reviewed with your staff as well that as of today there is not any participation with insurance companies other than Medicare so you will see the rest in Denied status waiting for participation to send out again.
Credentialing should be addressed as they are very slow and made mistakes in the past. They had another NP listed on our practice that was not even with us. She works for Diabetes relief (Dr Fontenot)

6.  I have also advised the staff that if there are any issues with the claims they are welcome to contact me via email and we can make changes as needed.  Please note that the staff is NOT to make changes to the claims in the ClearPath as that is part of the agreement.  My team can and will make any changes needed for claim submission or appeal process. Please note that this is a part of the liability coverage and if a claim is changed by staff username this will cause a breach in contract and I will no longer be able to bill your office due to liability coverage.
Staff has only asked you to help in showing what documentation needs to be charted so that they can let the Dr know and he will be able to do in the future.  Sevocity is not very user friendly, and we get very little support from them.  Dr Leleux uses a completely different EMR and this has been a challenge with no good support.

That is the update thus far for the claims which have been produced and billed out the past two weeks.  Please be advised I will send out more reporting as claims are produced and coded accordingly.

**Glenn- emails**

1. **This is very upsetting after this long. What is going on? Your billing actions could kill us all?**

How does billing from one clinic affect all other clinics in the US?  What billing help have you done to ensure that each clinic is fully clear on all of the billing?  If billing from one can affect all then how are we protected from other clinics also not properly being trained and could also affect us?

Respectfully,

Glenn Massey

Chief Growth Officer

Well Cell Global

M: +1 (713) 582-0449

O: +1 (888) 991-1012

W: wellcellglobal.com


2. **Believe Dawn or you?**

**My phone is blowing up with people that want to go around you. I stay loyal until this billing issue. No more.**

**When you came to Houston you introduced me to an operations guy. I had some hope.**

**No more. This is unacceptable.**

Respectfully,

Glenn Massey

Chief Growth Officer

Well Cell Global

Lets address again.  What billing training does wellcell give to each licensee that can warrant Glenn threatening me that we have done something so wrong that anyone that I introduce he will just allow them to circumvent me?

**Dawn**

Yes, I sure am with the billing coming over they are really stretching the limits and I am taking off the billing which is inappropriate but the girls today on the phone were speaking as though they were going to go into the claims and fix things that is why I have prepared them I will discontinue services if that happens.  I am concerned that they are trying to bill for anything and to be honest Shawn is a bit <mark>slithery</mark> and I do not trust him at all.  I will keep an eye out on these claims from this office and let you know but wanted to keep you in the loop.

Thank you,

Dawn L Davis

President/Owner

Davis Legacy Enterprises, LLC

davislegacyenterprises@gmail.com

dawnlgrzesik@gmail.com

612 Lakewood Dr, South Lyon, MI 48178

Phone:734-819-2266

Fax: 734-275-2195

**I will have an Attorney handle this matter**.  Not sure how it is legal for a biller to share billing information between one clinic and another if they are not owned by the same person. I have not seen this in any agreement that we have signed.

Will also address the **SLITHERY** remark for defamation and Libel. She is stating an opinion that affects my business and overall livelihood of everyone employed by Insulinic of Lafayette.

**Scott**

Glenn ~
As you know, and Shawn does as well, we do not and will not ever give them any billing advice or guidance.  And with that said, I also trust Dawn's judgment and the things she is calling out below would never be tolerated in any of the clinics we own and manage.  This looks wrong to me, and I want us to put him on notice immediately in the strongest terms our license will allow with penalty of termination as fast as our license will allow.

Carol ~
I am so sorry to ask this of you, with everyone being out this next week, but can you please review the communication from Dawn below and prepare a formal notice with an intention

to revoke the license ASAP with _any_ failure to cure and then an airtight probationary period following with a requirement of Dawn's oversight as the authority to tell us if he is doing anything wrong?

It's not enough for him to just stop what he is doing, he must fix what he has done as well.

Paula ~

Please make sure to bring whatever we need on the trip so I can digitally sign what Carol prepares and get it sent out ASAP.

Respectfully,

**Scott Hepford**

_Co-Founder – CEO_

Scott has stated that no billing advice was given or would ever be given.

If that is the case then how would the license be revoked because of billing errors that have been done?

Apparently Dawn sharing information about billing from a clinic that is not even owned by the same person is the premise for Scott threatening to revoke a license from us.

Is the normal practice to engage with people that are allowed to share all confidential information about each business with any they want OK?

Why would we not be given the 1st opportunity to clarify what was being billed and why the Dr thought it was ok to include with each encounter?

**Is Dawn now part of the Well Cell company oversight team and either an owner or employee?**

What is the criteria that she is following to determine who keeps a license and who gets license revoked?

We would like to see some criteria in writing to make sure that everyone in the US is held to the same standard as we feel that we are being singled out because she thinks that Shawn is **SLITHERY** in her own words.

## Insulinic of Lafayette:

Definition of Primary Care from CMS

==Primary Care Physician==

A primary care physician is a specialist in family medicine, ==general internal medicine== or general pediatrics who provides definitive care to the undifferentiated patient at the point of first contact, and takes continuing responsibility for providing the patient's comprehensive care. This care may include chronic, preventive and acute care in both inpatient and outpatient settings. Such physicians are specifically trained to provide comprehensive primary care services through residency or fellowship training in acute and chronic care settings.

Primary care physicians devote most of their practice to providing primary care services to a defined patient population. The primary care practice style is such that the personal primary care physician serves as the entry point for the patient's health care needs - not limited by problem origin, organ system, or diagnosis. Primary care physicians advocate for the patient in coordinating the use of the entire health care system to benefit the patient.

**PATRICK D LELEUX JR, MD – NPI #1205028412 - *Internal Medicine***

**NPI Profile for Dr PATRICK D LELEUX JR in CROWLEY, LA**.

A physician who provides long-term, comprehensive care in the office and the hospital, managing both common and complex illness of adolescents, adults and the elderly. Internists are trained in the diagnosis and treatment of cancer, infections and diseases affecting the heart, blood, kidneys, joints and digestive, respiratory and vascular systems. They are also trained in the essentials of primary care internal medicine, which incorporates an understanding of disease prevention, wellness, substance abuse, mental health and effective treatment of common problems of the eyes, ears, skin, nervous system and reproductive organs

# NPPES NPI Registry

NPPES   Downloads   API   Help

| | |
|---|---|
| NPI | 1437815180 |
| Enumeration Date | 2021-11-16 |
| NPI Type | 2 - Organization |
| Status | Active |
| Authorized Official Information | Name: MS. MEGAN M SCERBO<br>Title: OFFICE MANAGER<br>Phone: 337-254-9999 |
| Mailing Address | 220 JOHNSTON ST<br>LAFAYETTE, LA 70501-8059<br>United States<br>Phone: 337-254-9999 \| Fax: 337-522-7543<br>View Map |
| Primary Practice Address | 220 JOHNSTON ST<br>LAFAYETTE, LA 70501-8059<br>United States<br>Phone: 337-254-9999 \| Fax: 337-522-7543<br>View Map |
| Secondary Practice Address | 4016 HIGHWAY 90 E STE 113<br>BROUSSARD, LA 70518-3548<br>United States<br>Phone: 337-254-9999 \| Fax: 337-522-7543<br>View Map |

## Health Information Exchange

| Endpoint Type | Endpoint | Endpoint Description | Use | Content Type | Affiliation | Endpoint Location |
|---|---|---|---|---|---|---|

## Other Identifiers

| Issuer | State | Number |
|---|---|---|

## Taxonomy

| Primary Taxonomy | Selected Taxonomy | State | License Number |
|---|---|---|---|
| Yes | 193200000X MULTI-SPECIALTY GROUP<br>207R00000X - Internal Medicine | | |

APPX0672

**INSU_PI_000951**

| | |
|---|---|
| **From:** | Lema Barazi |
| **Sent:** | Wednesday, September 7, 2022 5:11 PM CDT |
| **To:** | shawnc@insulinic.com |
| **CC:** | Feras Mousilli; Marlene Campbell; Megan Weiss; Scott Hepford; Carol Wilson; Litigation |
| **Subject:** | Demand to Cease and Desist from Infringing on Well Cell Global, LLC's  Intellectual Property |
| **Attachments:** | 2022-09-07 Termination of License and Demand to Cease and Desist.pdf, Exhibit A.pdf, Exhibit B.pdf, Exhibit C.pdf |

Mr. Calvit,

Attached please find legal correspondence directed to your attention.

Thank you,

**Lema Barazi**, Litigation Partner
Lloyd & Mousilli - Attorneys & Counselors at Law
Main: 512.609.0059 Direct: 713.306.4650
www.lloydmousilli.com



4:22-CV-03062
Injunction Hearing

**EX 19**

DEFS "INSULINIC"

APPX0673

**INSU_PI_000952**



## LLOYD&MOUSILLI

ATTORNEYS AND COUNSELORS AT LAW

**Lema Barazi**
713.306.4650
lema@lloydmousilli.com

September 7, 2022

_**Via Electronic Mail & Certified Mail**_
Shawn Calvit, Individually
100 Meadowlane
Lafayette, LA 70506
shawnc@insulinic.com

Insulinic of Lafayette LLC
220 Johnston Street Building
Lafayette, LA 70501

Insulinic of Hialeah LLC
220 Johnston Street Building
Lafayette, LA 70501

**Re: Termination of License and Demand to Cease and Desist**

Dear Mr. Calvit,

Please be advised that the undersigned law firm has been retained by Well Cell Support LLC, Well Cell Global LLC, and affiliates (hereinafter, **"Well Cell"**) to assert claims against Shawn Paul Calvit, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC and any other affiliated persons or entities involved in the unlawful behavior described herein (hereinafter, **"Insulinic"**) for patent infringement, copyright infringement, and misappropriation of trade secrets. Well Cell hereby demands that you immediately comply with the demands stated herein. This letter is notice of our client's claims and an attempt to resolve this matter before litigation.

### Unauthorized Use of Intellectual Property

We are in possession of evidence of Insulinic's continued unauthorized use of Well Cell proprietary information and technology, collectively referred to as "Physiologic Insulin Sensitization" treatment (**"PIS"**).

While Insulinic was formerly a licensee of PIS and related research, development, including patented and patent pending processes and technologies (**"License Material"**), that license has been previously terminated. All continued use of PIS and the associated License Materials is unauthorized and willful infringement of Well Cell intellectual property.

Well Cell hereby demands that Insulinic cease any and all use of the License Material immediately and confirm in writing compliance with this demand.

### Termination of Licenses

On June 9, 2022, Insulinic was put on written notice of breach of material terms of the licensing agreements (**"Well Cell License"**) for the License Materials.

September 7, 2022
Termination of License and
Demand to Cease and Desist
Page 2 of 3

Furthermore, Section B of the Well Cell License that Insulinic entered into outlines specific guidelines and rules for authorized licensees to operate under to remain in compliance. Insulinic was required, but failed, to adhere to strict standards regarding following certain protocols, record keeping, reporting and procedures at all times, or risk termination of the Well Cell License. These breaches include, but are not limited to, improper medical billing coding, which can cause irreparable harm to Well Cell and its ability to continue to operate.

In accordance with the Well Cell License, Insulinic was provided ten days of written notice for the thirty-day cure period of all violations and provide confirmation of compliance. Insulinic failed to correct the material breaches outlined within the cure period. Accordingly, any and all licenses, express or implied, previously granted to Insulinic by Well Cell were terminated before July 29, 2022.

Any continued use of the License Materials is unauthorized, unlawful, and constitutes willful infringement of both federally registered and common law intellectual property and trade secrets.

### Continuing Obligations

Insulinic is reminded that despite the termination of any and all licenses, express or implied, or related grants of rights, Insulinic has continuing obligations to Well Cell under the Well Cell License. Sections 8a and b of the Well Cell License consist of a two-year non-competition obligation. This non-compete obligation expires on July 29, 2024.

The Well Cell License confidentiality provisions under Section 16 for the License Material are also still in full force and effect.

### Demand to Cease and Desist Copyright Infringement

Insulinic is hereby demanded to immediately cease and desist from the unlawful use of Well Cell's registered copyrights. Copies of Well Cell's relevant copyright registration are attached as Exhibit A (**"Copyrighted Materials"**). Evidence of Insulinic infringement of the Well Cell's registered copyrights is attached as Exhibit B. This letter serves as formal written notice of copyright infringement as required per 17 U.S. Code § 501(b) before initiating litigation.

Copyright infringement is a strict liability offense and Insulinic is responsible for any infringing act, regardless of intent. Although Insulinic may stop using the Copyrighted Materials, Insulinic remains liable for past infringement. Statutory damages for copyright infringement are up to $150,000 per instance as set in Section 504(c)(2).

### Demand to Cease and Desist Patent Infringement

Insulinic has been on written notice that the License Materials contained patented material belonging to Well Cell. As of July 29, 2022, any use by Insulinic of the technology and processes that are the subject of Patent No. 9,654,595 and Patent No. 10,533,990 B2 (**"Well Cell Patents"**) has been unauthorized and constitutes patent infringement under 35 U.S. Code § 271. Well Cell

APPX0675
INSU_PI_000954

September 7, 2022
Termination of License and
Demand to Cease and Desist
Page 3 of 3

has a good faith belief that Insulinic is continuing the use of the patented process based on advertising materials Insulinic has disseminated. An example of such advertising materials is attached as Exhibit C.

Any continued use by Insulinic of technology or processes based on Well Cell Patents is unauthorized and constitutes willful infringement, with relief for treble damages and attorney fees.

<u>Next Steps</u>

These actions by Insulinic are causing irreparable harm to Well Cell and the value of the intellectual property developed. Immediate action is required by Insulinic to avoid further escalation.

**Insulinic must provide verified evidence of full compliance with all of the demands stated herein within 24 hours. Failure to do so will result in immediate litigation.**

Well Cell will use all available remedies under the law to protect its highly valuable intellectual property and all rights Well Cell is entitled to.

All further communication regarding the matters stated herein should be directed to the undersigned.

Sincerely,

Lloyd & Mousilli
Attorneys at Law

Lema Barazi for the Firm

Enclosures

9/7/22, 4:30 PM                                    New Diabetes Management Clinic Here on Oahu NOW! - News



# New Diabetes Management Clinic Here on Oahu NOW! 

📅 August 26, 2022   🏷 <u>Chamber</u>, <u>Members</u>



**Insulinic Hawaii**

**Marc Desgraves Chief Financial Officer**

📅 <u>August 26, 2022</u>

📞 <u>(808) 210-4444</u>

@ <u>Send Email</u>

Aloha!

Insulinic Hawaii ( <u>https://insulinic.com/</u> ) is a new innovative approach to diabetes management. Our first Hawaii location opens **Sept. 12th at 1360 S. Beretania**. The Insulinic mission is to serve the vast and growing Hawaiian diabetes population by <mark>first</mark> assisting Primary Care, Internal Medicine, Nephrology, and Podiatry providers with a diagnostic test that measures nerve conduction and vascular flow.  Nerve conduction and vascular flow are two key biomarkers that when measured can indicate the severity of diabetes. Our diagnostic testing provides unprecedented data in 1 test giving physicians a 10-page report with over 25 metabolic health markers ( <u>https://insulinic.com/tm-flow-system/</u> ).  Insulinic of Hawaii, at no cost to the provider, will supply the diagnostic equipment and associated nursing staff to perform this 20 minute test.  Insulinic believes in a care team approach and a collaboration of care. The ordering provider will interpret the diagnostic test results to inform treatment options and serve as a baseline to measure treatment progress.   **Reimbursement for report interpretation by the ordering physician can be billed by utilizing CPT codes: 95921 Autonomic Nervous System Test, 95923 Sudomotor Assessment, and 93923 Ankle Brachial Index.**  An additional differentiator and vital component of the Insulinic program is our Medicare approved insulin IV infusion modality. This approach is a patented approach that resensitizes cells by using insulin as a hormone rather than a drug. This approach has been scientifically proven to improve and reverse symptoms experienced by insulin resistant diabetics.  At Insulinic, we aim to help patients reverse insulin resistance, which is the root cause of many metabolic disorders. We are requesting a call to action from you to join us in the fight against diabetes in our great state of Hawaii!

## What our patients are saying:

*"I haven't felt this good in years. It's like my neuropathy just disappeared, and my energy level has increased."* -Wayne K.,  Type 2 Diabetic- 18 years, Neuropathy- 10 years, Retinopathy- 2 years

*"My blood sugar is now controlled, and my eyesight has improved so much. I went from legally blind without glasses to now being about to read  the captions on the TV with no glasses, and I'm down from six vials of insulin per month to only three."* -Bruce B., Type 2 Diabetic- 27 years

We'd love to drop by your office to show you more of how we can collaborate on care for diabetics here on Oahu!

Powered by


EXHIBIT
**C**

APPX0677

**INSU_PI_000956**

9/6/22, 3:25 PM                                                                                          Science



(http://insulinic.com)

**f** (https://www.facebook.com/insulinic)   **𝕏** (https://twitter.com/insulinic)

# The Science Behind Physiologic Insulin Resensitization

- Insulinic utilizes a unique and groundbreaking  patented approach where insulin is administered as a hormone rather than a drug addressing the primary cause of Diabetes which is metabolic failure
- By utilizing insulin in a manner that bio-mimics normal physiology, this modality is designed to reduce insulin resistance which helps blood sugar more readily enter each cell and be converted into energy
- Increasing cellular energy allows damaged tissues and organs to grow, repair, and regenerate. Thus, our approach not only stabilizes but in many instances has reversed complications of diabetes and other metabolic disorders.

## PIR For Insulin Resistance

PIR for insulin resistance
(http://insulinic.com/wp-content/uploads/2022/03/1.-PIR-for-insulin-resistance-1.pdf)

## Dynamic Diabetes Solution

Dynamic Diabetes Solutions-Pulse Insulin Resensitization (PIR)
(http://insulinic.com/wp-content/uploads/2022/03/4.-Article-Dynamic-Diabetes-Solutions-
Pulse-Insulin-Resensitization-PIR-Published-Medical-_-Clinical-Research-Dr.-Loveridge-
08.13.2021.pdf)

EXHIBIT
**B**

## Improved Kidney Function

Improved Kidney Function
(http://insulinic.com/wp-content/uploads/2022/03/3.-Villaverde-Improved-Kidney-
Function-Following-Physiologic-Insulin-Resensitization-Treatment-Modality_07.30.21.pdf)

APPX0678

**INSU_PI_000957**

9/6/22, 3:25 PM                                                                Science

# Reversal Of Diabetic Neuropathy

Reversal of Diabetic Neuropathy
(http://insulinic.com/wp-content/uploads/2022/03/2.-Loveridge-Reversal-of-Diabetic-
Neuropathy-Utilizing-Physiologic-Insulin-Resensitization-Case-Series_07.20.2021-
Copy.pdf)



## Stay Connected With Insulinic

(http
s://w
ww.f
aceb
ook.
com
/insu
linic)

(http
s://t
witte
r.co
m/in
sulin
ic)

### Quick Links

Home(http://insulinic.com/shawn/)

insulinic.com/science/

About Us(http://insulinic.com/shawn/about/)

Services(http://insulinic.com/shawn/services/)

Contact(http://insulinic.com/shawn/contact/)

## Make an Appointment

Getting an accurate diagnosis can be one of the most impactful experiences that you can have.

**Contact Now
(http://insulinic.com/shawn/contact/)**

Copyright © 2021 Insulinic | Powered by Tech Reshape (https://www.techreshape.com)

APPX0680

INSU_PI_000959

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay Tegle Clayeth*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-452-464**

**Effective Date of Registration:**
September 14, 2017

## Title

**Title of Work:** Diabetes Relief Website

## Completion/Publication

**Year of Completion:** 2017
**Date of 1st Publication:** July 01, 2017
**Nation of 1st Publication:** United States

## Author

- **Author:** Diabetes Relief LLC
**Author Created:** text
**Work made for hire:** Yes
**Citizen of:** United States
**Year Born:** 2015

## Copyright Claimant

**Copyright Claimant:** Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States
**Transfer statement:** Various employees and associates

## Rights and Permissions

**Organization Name:** Diabetes Relief LLC
**Name:** Carol Ann Wilson
**Email:** carol@diabetesrelief.com
**Telephone:** (281)600-5000
**Alt. Telephone:** (281)600-6000
**Address:** 11511 Katy Fwy
Suite 101
Houston, TX 77079 United States

EXHIBIT
**A**

Page 1 of 2

diabetesrelief.com /testimonials/

**Here is What Patients Have to Say About Diabetes Relief**

**Diabetes Relief<sup>SM</sup>** *Get Your Life Back<sup>SM</sup>*

FOR PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT USHOMEFOR
PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT US1-866-589-8639Click
Here to Call Us!



"My blood sugar is now controlled and my eyesight has improved so much I went from
legally blind without glasses to now being able to read the captions on the TV with no glasses, and I'm down from
6 vials of insulin per month to only 3."

**Bruce B., Brazoria, TX**
Type 2 Diabetic – 27 years

"I'm now taking 50% less insulin, my A1c is down 3.5 points, my neuropathy is gone and my energy is way up."

**Alan H., Colorado Springs, CO**
Type 2 Diabetic – 20+ years
Coronary Artery Diseases
Triple bypass, 13 cardiac stents

"Since I been getting treatment at Diabetes Relief, I have no more problems with neuropathy. My legs and feet
use to burn, like it was on fire, but now I feel so good… I sleep well at night for the first time in years. I also
experience weight loss."

**John J., Houston, TX**
Type 2 Diabetic for 5+ years
Hypertension
Neuropathy

"I haven't felt this good in years. It's like my neuropathy just disappeared and my energy level has increased."

**Wayne K., Houston, TX**
Type 2 Diabetic – 18 years
Neuropathy – 10 years
Retinopathy – 2 years

"It has given me my life back."

**Michael W., Crosby, TX**
Type 1 Diabetic – 7 years
Neuropathy – 2 years
Thyroid Disease – 9 years

"It's almost a miracle that my foot healed so well. I started treatment and within 3 weeks it had healed. The
wound had been there for 3 months prior to treatment"

**Greg B., Houston, TX**
Type 2 Diabetic – 10 years
Hypertension – 5 years
Neuropathy – 8 years

"I have more energy and my eyesight has improved so much that I only use bifocals now and before I had to use
trifocals."

APPX0682

**INSU_PI_000961**

## Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

## VA 2-185-843

**Effective Date of Registration:**
November 15, 2019
**Registration Decision Date:**
January 14, 2020

---

### Title

| | |
|---|---|
| **Title of Work:** | Glucose Homeostasis V.2 |

### Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2019 |
| **Date of 1st Publication:** | October 15, 2019 |
| **Nation of 1st Publication:** | United States |

### Author

| | |
|---|---|
| • **Author:** | Diabetes Relief LLC |
| **Author Created:** | technical drawing |
| **Work made for hire:** | Yes |
| **Citizen of:** | United States |

### Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | Diabetes Relief LLC |
| | 11511 Katy Fwy, Suite 100, Houston, TX, 77079, United States |

### Rights and Permissions

| | |
|---|---|
| **Name:** | Scott A Hepford |
| **Email:** | scott@diabetesrelief.com |
| **Telephone:** | (281)600-5000 |
| **Address:** | 11511 Katy Fwy |
| | Suite 100 |
| | Houston, TX 77079 United States |

### Certification

Page 1 of 2

**Name:**   Carol Wilson
**Date:**   November 15, 2019

**Copyright Office notes:**   Regarding authorship information: Registered work is Artwork/Illustration

APPX0684

INSU_PI_000963

# Glucose Homeostasis

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC 2019. All rights reserved.

APPX0685

INSU_PI_000964

**Registration #:**   VA0002185843
**Service Request #:**   1-8260679031



Diabetes Relief LLC
11511 Katy Fwy
Suite 100
Houston, TX 77079 United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay A. Ceyl*

Acting United States Register of Copyrights and Director

**Registration Number**

## VAu 1-330-086

**Effective Date of Registration:**
May 17, 2018

---

## Title

| | |
|---|---|
| **Title of Work:** | Overcoming Metabolic Failure |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2018 |

## Author

| | |
|---|---|
| **Author:** | Diabetes Relief LLC |
| **Author Created:** | 2-D artwork |
| **Work made for hire:** | Yes |
| **Citizen of:** | United States |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | Diabetes Relief LLC |
| | 11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States |

---

## Rights and Permissions

| | |
|---|---|
| **Organization Name:** | Diabetes Relief LLC |
| **Name:** | Carol A Wilson |
| **Email:** | carolwilson@earthlink.net |
| **Telephone:** | (281)642-4050 |
| **Alt. Telephone:** | (281)600-6000 |
| **Address:** | 8902 Sunnywood Dr |
| | Houston, TX 77088 United States |

## Certification

| | |
|---|---|
| **Name:** | Carol Wilson |

Page 1 of 2

**Registration #:**   VAu001330086
**Service Request #:**   1-6592582541

Diabetes Relief LLC
Carol A Wilson
11511 Katy Fwy, Suite 101
Houston, TX 77079 United States

APPX0689

INSU_PI_000968



## AFFIDAVIT OF SCOTT A. HEPFORD

| | |
|---|---|
| **THE STATE OF TEXAS** | § |
| | § |
| **COUNTY OF HARRIS** | § |

BEFORE ME, the undersigned authority, on this day personally appeared **SCOTT A. HEPFORD**, and being duly sworn upon his oath by me, deposed and stated as follows:

1.    "My name is SCOTT A. HEPFORD. I am over the age of eighteen. I am of sound mind and competent to make this Affidavit. The facts set forth herein are based on my personal knowledge and are true and correct.

2.    "I am a citizen and resident of Harris County, Texas. I am a Member and Manager of Well Cell Global LLC (**"Well Cell"**), a Texas Limited Liability Company that owns certain intellectual property rights formerly owned by Diabetes Relief LLC ("**DRL**"), a Texas Series Limited Liability Company of which I am also a Member and Manager.

3.    "Well Cell specializes in developing ground-breaking technology for the treatment of diabetes and licensing its proprietary technology to other entities so that they may operate comprehensive diabetes clinics throughout the world. Well Cell owns patents, copyrights, trademarks, and trade secrets pertaining to its proprietary technology for the treatment of diabetes which it always protects diligently. Well Cell possesses trade secrets in the form of business contacts, including clients, physicians, vendors, investors, borrowers, lenders, agents, brokers, banks, lending corporations, buyers, and sellers. These trade secrets are closely guarded by Well Cell and have been developed through extensive time, labor, skill, and money. Well Cell's trade secrets are of immeasurable value and are not easily duplicated nor readily

AFFIDAVIT OF SCOTT A. HEPFORD



4:22-CV-03062
Injunction Hearing
**EX 20**
DEFS "INSULINIC"

**EXHIBIT 1**

APPX0690

INSU_PI_000969

ascertainable. Well Cell never shares its trade secrets with third-parties without a robust confidentiality agreement in place.

4.      "I am also a Member and Manager of Well Cell Support LLC (**"WCS"**), a Texas Limited Liability Company that is authorized by Well Cell to issue licenses for its patented technology and processes for the treatment of diabetes and other metabolic disorders.

5.      "I am familiar with the matters in controversy in the litigation against Shawn Calvit (**"Mr. Calvit"**) and several of his "Insulinic" business entities and other individuals in the United States District Court for the Southern District of Texas ("**SDTX**") (herein referred to as the **"Insulinic Litigation"**).

6.      "I submit this Affidavit in support of Well Cell's emergency application for injunctive relief, filed in the SDTX in the Insulinic Litigation.

7.      "WCS issued a license to Insulinic of Lafayette LLC (**"Insulinic LA"**) on September 13, 2021, and to Insulinic of Hialeah LLC (**"Insulinic FL"**) on November 1, 2021 for their use of Well Cell's patented technology, patent-pending technology, and proprietary and confidential trade secrets. The licenses contained Rules and Regulations required to be followed by Licensee, which were violated by Mr. Calvit, Insulinic LA and Insulinic FL.

8.      "Prior to issuing the licenses referenced above, Mr. Calvit signed a five-year confidentiality, nondisclosure, non-circumvention agreement on April 19, 2021, with Diabetes Relief LLC.

9.      "On June 9, 2022, I sent a notice of default with intention to revoke the Insulinic licenses issued to Insulinic LA and Insulinic FL and gave them 30 days to cure their breaches of the license agreements. Discussions between Mr. Calvit, who is a principal member of Insulinic LA

AFFIDAVIT OF SCOTT A. HEPFORD

APPX0691

**INSU_PI_000970**

and Insulinic FL and Well Cell principals ensued and we made efforts to help Insulinic LA and Insulinic FL become compliant with the license agreement rules and requirements.

10.    "In July 2022, after Mr. Calvit, Insulinic LA, and Insulinic FL failed to remedy their breaches of the license agreement, Well Cell ended its business relationship and terminated the license agreements.

11.    "While I and others were attempting to work with Mr. Calvit to rectify matters and reinstate the licenses, Mr. Calvit was secretly making plans to steal the intellectual property belonging to Well Cell and open competing clinics using the formerly licensed technology, which is patent protected by Well Cell. One clinic I know about is in Hawaii and named Insulinic Hawaii, LLC (**"Insulinic HI"**).

12.    "I know that Mr. Calvit formed Insulinic HI on June 9, 2022. I also know that Shawn Calvit, Marc Pierre Desgraves IV, and Charles Alexander Elliot are Members of Insulinic HI. I believe Shawn Calvit, Marc Pierre Desgraves IV, and Charles Alexander Elliot are also Members of Insulinic LA and Insulinic FL.

13.    "Mr. Calvit and representatives from his Insulinic clinics had received training by me and others and instructions for using Well Cell's patented technology, all of which included know-how, show-how, and trade secrets belonging to Well Cell.

14.    "WCS had previously issued a license to a Hawaiian business entity on March 30, 2022, and I personally went to Hawaii to train the representatives for that clinic during the time period 8/21-31/22. That clinic is a legitimate licensee of WCS and could be harmed by the acts of Defendants.

15.    "Attached hereto as **Exhibit "A"** is a press release issued August 26, 2022 by "Insulinic" (**"Insulinic Press Release"**) about a grand opening of a new clinic in Hawaii, which refers to patented technology that is actually owned and patented by Well Cell, not Insulinic, and that uses quotations from a DRL Website protected by a Registered Copyright TX8-452-464 for the

---

3

AFFIDAVIT OF SCOTT A. HEPFORD

APPX0692

**INSU_PI_000971**

website and its contents, which is currently owned by Well Cell. Attached hereto as **Exhibit "B"** is the Certificate of Registration for the DRL Website, along with the page of patient testimonials contained on the DRL Website, which are also contained in Insulinic's Press Release and which Insulinic falsely claims are testimonials of their clients in the Insulinic Press Release.

16.     "As further evidence of Mr. Calvit's efforts to open a competing clinic, attached hereto as **Exhibit "C"** is a copy of Facebook postings I copied from Mr. Calvit's Facebook page on September 4, 2022, which concern Mr. Calvit's opening of a clinic in Hawaii, all during the time of discussions surrounding the "cease and desist" notices.

17.     "I know that Mr. Calvit has violated, and has plans to further violate Well Cell's protected intellectual property unless he is restrained immediately. I also know that Well Cell is suffering irreparable harm as a result of Shawn Calvit, Marc Pierre Desgraves IV, and Charles Alexander Elliot's infringement on and theft of Well Cell's invaluable intellectual property, and Well Cell will continue to suffer irreparable harm if they are not immediately stopped."

FURTHER AFFIANT SAYETH NOT.

SCOTT A. HEPFORD

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 9th day of September 2022, by Scott A. Hepford, to me personally known, to certify which witness my hand and official seal of office

Notary Public, State of Texas

CAROL ANN WILSON
Notary Public, State of Texas
Comm. Expires 12-31-2020
Notary ID 1207125

4

APPX0693

**INSU_PI_000972**

**EXHIBIT A to AFFIDAVIT OF SCOTT A. HEPFORD**

**PRESS RELEASE from Insulinic of Hawaii by Shawn Calvit**

Found at https://business.cochawaii.org/news/details/new-diabetes-management-clinic-here-on-oahu-now-08-26-2022





EXHIBIT

A

APPX0694

INSU_PI_000973

**EXHIBIT B TO AFFIDAVIT OF SCOTT A. HEPFORD**

**CERTIFICATE OF REGISTRATION OF DIABETES RELIEF WEBSITE AND**

**PAGE FROM TESTIMONIALS POSTED AT THE WEBSITE**

## Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Karyn Temple Claggett*

Acting United States Register of Copyrights and Director

Registration Number
**TX 8-452-464**

Effective Date of Registration:
September 14, 2017

### Title
Title of Work:   Diabetes Relief Website

### Completion/Publication
Year of Completion:   2017
Date of 1st Publication:   July 01, 2017
Nation of 1st Publication:   United States

### Author
Author:   Diabetes Relief LLC
Author Created:   text
Work made for hire:   Yes
Citizen of:   United States
Year Born:   2015

### Copyright Claimant
Copyright Claimant:   Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States
Transfer statement:   Various employees and associates

### Rights and Permissions
Organization Name:   Diabetes Relief LLC
Name:   Carol Ann Wilson
Email:   carol@diabetesrelief.com
Telephone:   (281)600-5000
Alt. Telephone:   (281)600-6000
Address:   11511 Katy Fwy
Suite 101
Houston, TX 77079 United States

Page 1 of 2





diabetesrelief.com

**Here is What Patients Have to Say About Diabetes Relief**

**Diabetes Relief**[SM] *Get Your Life Back*[SM]

FOR PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT USHOMEFOR
PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT US1-866-589-8639Click
Here to Call Us!

Diabetes Relief *Get your life back*

"My blood sugar is now controlled and my eyesight has improved so much I went from
legally blind without glasses to now being able to read the captions on the TV with no glasses, and I'm down from
6 vials of insulin per month to only 3."

**Bruce B., Brazoria, TX**
Type 2 Diabetic – 27 years

"I'm now taking 50% less insulin, my A1c is down 3.5 points, my neuropathy is gone and my energy is way up."

**Alan H., Colorado Springs, CO**
Type 2 Diabetic – 20+ years
Coronary Artery Diseases
Triple bypass. 13 cardiac stents

"Since I been getting treatment at Diabetes Relief, I have no more problems with neuropathy. My legs and feet
use to burn, like it was on fire, but now I feel so good… I sleep well at night for the first time in years. I also
experience weight loss."

**John J., Houston, TX**
Type 2 Diabetic for 5+ years
Hypertension
Neuropathy

"I haven't felt this good in years. It's like my neuropathy just disappeared and my energy level has increased."

**Wayne K., Houston, TX**
Type 2 Diabetic  – 18 years
Neuropathy – 10 years
Retinopathy – 2 years

"It has given me my life back."

**Michael W., Crosby, TX**
Type 1 Diabetic – 7 years
Neuropathy – 2 years
Thyroid Disease – 9 years

"It's almost a miracle that my foot healed so well. I started  treatment and within 3 weeks it had healed. The
wound had been there for 3 months prior to treatment"

**Greg B., Houston, TX**
Type 2 Diabetic – 10 years
Hypertension – 5 years
Neuropathy – 8 years

"I have more energy and my eyesight has improved so much that I only use bifocals now and before I had to use
trifocals."

1/2

APPX0696

**INSU_PI_000975**

**EXHIBIT C TO AFFIDAVIT OF SCOTT A. HEPFORD**

**Facebook Postings by Shawn Calvit on September 4, 2022,**

**as copied by Scott A. Hepford**



EXHIBIT
C
APPX0697

INSU_PI_000976


## UNSWORN DECLARATION OF KELLY MCDANIEL

Pursuant to 28 U.S. Code § 1746, I, **KELLY MCDANIEL**, declare under penalty of perjury the following is true and correct:

1.      "My name is KELLY MCDANIEL. I am over eighteen (18) years of age and I have never been convicted of a crime. I am of sound mind and capable of making this Declaration. The facts set forth herein are within my personal knowledge and are true and correct.

2.      "I am Kelly McDaniel. I am familiar with the matters involved in the case of Well Cell Global LLC (**"Well Cell"**) versus Shawn Calvit, the "Insulinic" business entities, and others in the Southern District of Texas (**"Insulinic Litigation"**).

3.      "I am a Certified Diabetes Care and Education Specialist (**"CDCES"**) living in Oʻahu, Hawaiʻi. I have been a Hawaiʻi resident for 10 years and provided health care services across the six main islands for the duration of that time. During my career here, I have developed a thorough understanding of the healthcare landscape in Hawaiʻi, and it has been disheartening to witness what happens as a result of limited access to healthcare services for diabetes that focus on education, prevention, and effective treatment modalities.

4.      "More specifically, Type 2 Diabetes runs rampant across the islands and people suffer from complications that markedly affect their quality of life. For this reason, the people of Hawaiʻi have a palpable desperation for relief from this progressive disease and Hawaiʻi has become a target for those profiting from the medical management of Type 2 Diabetes. I witnessed this firsthand as the Hawaiʻi Territory Clinical Manager for my former employer, who are the makers of a tubeless insulin pump. I often heard in the industry that Hawaiʻi has the largest untapped market for Type 2 Diabetes. I separated from the company because I did not

UNSWORN DECLARATION OF KELLY MCDANIEL

**EXHIBIT**

APPX0698 **2**

**INSU_PI_000977**

feel comfortable meeting the expected territory growth rates since I was given a warning to increase territory growth but chose not too even though I knew it may result in my termination.

5.      "Separating from my former position provided the space for me to learn more about Physiologic Insulin Resensitization (**"PIR"**) therapy, a treatment modality I was introduced to in February 2022. Targeting insulin resistance has been the focus of my education and research platforms for the latter half of my career, so a colleague asked me to review a recent publication on PIR as he was considering investing in it.

6.      "The results of the study were astonishing, and the mechanism of action made sense, so I fully supported my colleague in this investment. I also asked him to keep me involved when it came time to open his clinic, since I am deeply connected to our diabetes community in Hawai'i and wanted to ensure PIR was introduced in a manner that included care coordination with referring providers and a sustainability piece for patients and their families.

7.      "On August 23, 2022, I became affiliated with a new clinic for Well Cell that was to introduce PIR in a clinical setting and I agreed to become trained in the process. I completed the required online didactic modules the week prior and this was the date we started in-person training on O'ahu with the Well Cell Team.

8.      "The first day was a review of the material covered in the online didactic, and the remainder of training was spent in clinic delivering PIR therapy under supervision of the lead clinical trainer from Well Cell. Over the course of my training, I learned about the history of IV insulin infusion for the purpose of restoring insulin sensitivity and the role Scott Hepford played in developing the algorithm/protocol to make this therapy accessible for use. We also discussed his efforts to ensure PIR therapy is delivered by capable health care providers, as it requires specific skill sets in terms of understanding glucose metabolism, pathophysiology of insulin

2

resistance, and a willingness to let go of the "cookie cutter approach" commonly found across the healthcare arena.

9.      "Shortly after completing training on September 1, 2022, I was chatting with a colleague from another branch of my practice and she mentioned there was another new clinic opening up. She started telling me about this "IV insulin therapy" and how it can reverse neuropathy and proceeded to send me the link to the clinic's website. I immediately clicked on the link—which was to Insulinic--and I was directed to a website containing the words "Physiologic Insulin Resensitization" on the header. Knowing this was a term coined by Scott Hepford, my mind started questioning what was going on here. I continued to scroll down the page to find images that were specifically created for the Well Cell training, which led me to believe they were opening up another clinic here with this group.

10.      "At this point I was still on the phone with my colleague, and she shared another link, this time to the press release sent out via the Hawai'i Chamber of Commerce. I was intrigued by the approach the clinic was taking to introduce PIR therapy in tandem with a "nerve conduction and vascular flow diagnostic test," but what really piqued my interest was the title of the press release, "New Diabetes Management Clinic Here on Oahu NOW!"

11.      "My personal quest to shift diabetes care and education to be more meaningful and effective, combined with the longstanding relationships I have formed with diabetes care specialists and people living with diabetes across the islands, has made me the unofficial gatekeeper of innovations in diabetes care for Hawai'i. Because of this, I am invested in vetting anyone who comes here to offer new services and subsequently pursue a partnership with these folks if they have something valuable to offer our community. That being said, I reached out to Insulinic the very next day, September 2, 2022, to learn more.

12.     "I was able to reach Marc Desgraves, Chief Financial Officer for Insulinic, and we had a brief but informative conversation. I asked about the "insulin IV infusion modality" they are offering and he led with a general mention of the "peer reviewed and university studies" on the subject. He then proceeded to tell me the therapy "uses insulin as a hormone, not a drug, gives the pancreas a rest and gets insulin into the system faster, allowing people to wean off Metformin and other medications." The verbiage using insulin as a hormone, not a drug, supported my initial belief that Insulinic is affiliated with Well Cell, because these are the exact words used by Scott Hepford in one of the first online didactic modules. However, Marc did not mention Well Cell once during our conversation; I found this to be odd considering the details he shared throughout the remainder of our conversation.

13.     "Marc Desgraves informed me they had five operational clinics on the mainland--TX, AL, GA, FL, and LA--and the Hawaiʻi clinic would be opening soon. He was unable to give me a date due to "recent changes with their Medical Director relationship." I let him know I was at the clinic site hoping to catch someone there, but the suite was empty. He said contractors would be in and out for the next few days and he would also be stopping by intermittently and could meet with me in person to talk more.

14.     "In a phone conversation later that day, I informed him that I was scheduled to travel to Maui and may not be able to meet until next week. He said that would work great, corporate was scheduled to come in for training, and the entire core team would be present, so I could stop by on their lunch break. I thanked him for the opportunity and said I would be in touch once I solidified my schedule.

15.     "In closing, I left that conversation thoroughly perplexed. Things were not adding up in terms of the content on their website, the information Mark was sharing, and no mention of Well

Cell, Diabetes Relief, or Scott Hepford. Knowing what PIR therapy entails in terms of clinical expertise, I was deeply concerned about who would be delivering the therapy and even more concerned about who is training them if they aren't claiming to be affiliated with Well Cell.

16.    "To my knowledge, Well Cell is the only organization that is authorized to license clinics to deliver this specialized therapy and Well Cell holds the patents on this technology.

17.    "In an effort to protect our community, I am sharing the information above should Insulinic be involved in any type of wrongdoing by opening a clinic that offers PIR unbeknownst to Well Cell.

18.    "I submit this Declaration in support of Well Cell's emergency application for injunctive relief."

       Executed on September 9, 2022


                                        _Kelly McDaniel_____
                                        **KELLY MCDANIEL, Declarant**

INSU_PI_000981

**LLOYD&MOUSILLI**
ATTORNEYS AND COUNSELORS AT LAW

**Lema Barazi**
713.306.4650
lema@lloydmousilli.com

September 7, 2022

***Via Electronic Mail & Certified Mail***
Shawn Calvit, Individually
100 Meadowlane
Lafayette, LA 70506
shawnc@insulinic.com

Insulinic of Lafayette LLC
220 Johnston Street Building
Lafayette, LA 70501

Insulinic of Hialeah LLC
220 Johnston Street Building
Lafayette, LA 70501

Re: Termination of License and Demand to Cease and Desist

Dear Mr. Calvit,

Please be advised that the undersigned law firm has been retained by Well Cell Support LLC, Well Cell Global LLC, and affiliates (hereinafter, **"Well Cell"**) to assert claims against Shawn Paul Calvit, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC and any other affiliated persons or entities involved in the unlawful behavior described herein (hereinafter, **"Insulinic"**) for patent infringement, copyright infringement, and misappropriation of trade secrets. Well Cell hereby demands that you immediately comply with the demands stated herein. This letter is notice of our client's claims and an attempt to resolve this matter before litigation.

**Unauthorized Use of Intellectual Property**

We are in possession of evidence of Insulinic's continued unauthorized use of Well Cell proprietary information and technology, collectively referred to as "Physiologic Insulin Sensitization" treatment (**"PIS"**).

While Insulinic was formerly a licensee of PIS and related research, development, including patented and patent pending processes and technologies (**"License Material"**), that license has been previously terminated. All continued use of PIS and the associated License Materials is unauthorized and willful infringement of Well Cell intellectual property.

Well Cell hereby demands that Insulinic cease any and all use of the License Material immediately and confirm in writing compliance with this demand.

**Termination of Licenses**

On June 9, 2022, Insulinic was put on written notice of breach of material terms of the licensing agreements (**"Well Cell License"**) for the License Materials.

**EXHIBIT**
APPX0703 **3**

**INSU_PI_000982**

September 7, 2022
Termination of License and
Demand to Cease and Desist
Page 2 of 3

Furthermore, Section B of the Well Cell License that Insulinic entered into outlines specific guidelines and rules for authorized licensees to operate under to remain in compliance. Insulinic was required, but failed, to adhere to strict standards regarding following certain protocols, record keeping, reporting and procedures at all times, or risk termination of the Well Cell License. These breaches include, but are not limited to, improper medical billing coding, which can cause irreparable harm to Well Cell and its ability to continue to operate.

In accordance with the Well Cell License, Insulinic was provided ten days of written notice for the thirty-day cure period of all violations and provide confirmation of compliance. Insulinic failed to correct the material breaches outlined within the cure period. Accordingly, any and all licenses, express or implied, previously granted to Insulinic by Well Cell were terminated before July 29, 2022.

Any continued use of the License Materials is unauthorized, unlawful, and constitutes willful infringement of both federally registered and common law intellectual property and trade secrets.

### Continuing Obligations

Insulinic is reminded that despite the termination of any and all licenses, express or implied, or related grants of rights, Insulinic has continuing obligations to Well Cell under the Well Cell License. Sections 8a and b of the Well Cell License consist of a two-year non-competition obligation. This non-compete obligation expires on July 29, 2024.

The Well Cell License confidentiality provisions under Section 16 for the License Material are also still in full force and effect.

### Demand to Cease and Desist Copyright Infringement

Insulinic is hereby demanded to immediately cease and desist from the unlawful use of Well Cell's registered copyrights. Copies of Well Cell's relevant copyright registration are attached as Exhibit A (**"Copyrighted Materials"**). Evidence of Insulinic infringement of the Well Cell's registered copyrights is attached as Exhibit B. This letter serves as formal written notice of copyright infringement as required per 17 U.S. Code § 501(b) before initiating litigation.

Copyright infringement is a strict liability offense and Insulinic is responsible for any infringing act, regardless of intent. Although Insulinic may stop using the Copyrighted Materials, Insulinic remains liable for past infringement. Statutory damages for copyright infringement are up to $150,000 per instance as set in Section 504(c)(2).

### Demand to Cease and Desist Patent Infringement

Insulinic has been on written notice that the License Materials contained patented material belonging to Well Cell. As of July 29, 2022, any use by Insulinic of the technology and processes that are the subject of Patent No. 9,654,595 and Patent No. 10,533,990 B2 (**"Well Cell Patents"**) has been unauthorized and constitutes patent infringement under 35 U.S. Code § 271. Well Cell

APPX0704

INSU_PI_000983

September 7, 2022
Termination of License and
Demand to Cease and Desist
Page 3 of 3

has a good faith belief that Insulinic is continuing the use of the patented process based on advertising materials Insulinic has disseminated. An example of such advertising materials is attached as Exhibit C.

Any continued use by Insulinic of technology or processes based on Well Cell Patents is unauthorized and constitutes willful infringement, with relief for treble damages and attorney fees.

<u>**Next Steps**</u>

These actions by Insulinic are causing irreparable harm to Well Cell and the value of the intellectual property developed. Immediate action is required by Insulinic to avoid further escalation.

**Insulinic must provide verified evidence of full compliance with all of the demands stated herein within 24 hours. Failure to do so will result in immediate litigation.**

Well Cell will use all available remedies under the law to protect its highly valuable intellectual property and all rights Well Cell is entitled to.

All further communication regarding the matters stated herein should be directed to the undersigned.

Sincerely,

Lloyd & Mousilli
Attorneys at Law

Lema Barazi for the Firm

Enclosures

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayn Teyle Clayett*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-452-464

**Effective Date of Registration:**
September 14, 2017

## Title _____

Title of Work:   Diabetes Relief Website

## Completion/Publication _____

Year of Completion:   2017
Date of 1st Publication:   July 01, 2017
Nation of 1ˢᵗ Publication:   United States

## Author _____

•   Author:   Diabetes Relief LLC
Author Created:   text
Work made for hire:   Yes
Citizen of:   United States
Year Born:   2015

## Copyright Claimant _____

Copyright Claimant:   Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States
Transfer statement:   Various employees and associates

## Rights and Permissions _____

Organization Name:   Diabetes Relief LLC
Name:   Carol Ann Wilson
Email:   carol@diabetesrelief.com
Telephone:   (281)600-5000
Alt. Telephone:   (281)600-6000
Address:   11511 Katy Fwy
Suite 101
Houston, TX 77079 United States

EXHIBIT
**A**

Page 1 of 2

 diabetesrelief.com /testimonials/

**Here is What Patients Have to Say About Diabetes Relief**

**Diabetes Relief**$^{SM}$ *Get Your Life Back*$^{SM}$



FOR PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT USHOMEFOR
PHYSICIANSMEET THE TEAMPRODUCTSFAQSCONTACT US1-866-589-8639Click
Here to Call Us!

"My blood sugar is now controlled and my eyesight has improved so much I went from
legally blind without glasses to now being able to read the captions on the TV with no glasses, and I'm down from
6 vials of insulin per month to only 3."

**Bruce B., Brazoria, TX**
Type 2 Diabetic – 27 years

"I'm now taking 50% less insulin, my A1c is down 3.5 points, my neuropathy is gone and my energy is way up."

**Alan H., Colorado Springs, CO**
Type 2 Diabetic – 20+ years
Coronary Artery Diseases
Triple bypass, 13 cardiac stents

"Since I been getting treatment at Diabetes Relief, I have no more problems with neuropathy. My legs and feet
use to burn, like it was on fire, but now I feel so good… I sleep well at night for the first time in years. I also
experience weight loss."

**John J., Houston, TX**
Type 2 Diabetic for 5+ years
Hypertension
Neuropathy

"I haven't felt this good in years. It's like my neuropathy just disappeared and my energy level has increased."

**Wayne K., Houston, TX**
Type 2 Diabetic  – 18 years
Neuropathy – 10 years
Retinopathy – 2 years

"It has given me my life back."

**Michael W., Crosby, TX**
Type 1 Diabetic – 7 years
Neuropathy – 2 years
Thyroid Disease – 9 years

"It's almost a miracle that my foot healed so well. I started  treatment and within 3 weeks it had healed. The
wound had been there for 3 months prior to treatment"

**Greg B., Houston, TX**
Type 2 Diabetic – 10 years
Hypertension – 5 years
Neuropathy – 8 years

"I have more energy and my eyesight has improved so much that I only use bifocals now and before I had to use
trifocals."

1/2

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

## VA 2-185-843

**Effective Date of Registration:**
November 15, 2019
**Registration Decision Date:**
January 14, 2020

---

## Title

               **Title of Work:**   Glucose Homeostasis V.2

## Completion/Publication

         **Year of Completion:**   2019
      **Date of 1st Publication:**   October 15, 2019
   **Nation of 1st Publication:**   United States

## Author

               •   **Author:**   Diabetes Relief LLC
         **Author Created:**   technical drawing
    **Work made for hire:**   Yes
           **Citizen of:**   United States

## Copyright Claimant

     **Copyright Claimant:**   Diabetes Relief LLC
                 11511 Katy Fwy, Suite 100, Houston, TX, 77079, United States

## Rights and Permissions

             **Name:**   Scott A Hepford
              **Email:**   scott@diabetesrelief.com
      **Telephone:**   (281)600-5000
        **Address:**   11511 Katy Fwy
                    Suite 100
                    Houston, TX 77079 United States

## Certification

Page 1 of 2

APPX0708

**INSU_PI_000987**

**Name:**   Carol Wilson
**Date:**   November 15, 2019

**Copyright Office notes:**   Regarding authorship information: Registered work is Artwork/Illustration

APPX0709

**INSU_PI_000988**

APPX0710

INSU_PI_000989



Glucose Homeostasis

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC 2019. All rights reserved.

Revision – 10.15.19

**Registration #:**   VA0002185843
**Service Request #:**   1-8260679031



Diabetes Relief LLC
11511 Katy Fwy
Suite 100
Houston, TX 77079 United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay A. Tesle*

Acting United States Register of Copyrights and Director

**Registration Number**

## VAu 1-330-086

**Effective Date of Registration:**
May 17, 2018

---

## Title

**Title of Work:**   Overcoming Metabolic Failure

## Completion/Publication

**Year of Completion:**   2018

## Author

- **Author:**   Diabetes Relief LLC
  **Author Created:**   2-D artwork
  **Work made for hire:**   Yes
  **Citizen of:**   United States
  **Domiciled in:**   United States

## Copyright Claimant

**Copyright Claimant:**   Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States

---

## Rights and Permissions

**Organization Name:**   Diabetes Relief LLC
**Name:**   Carol A Wilson
**Email:**   carolwilson@earthlink.net
**Telephone:**   (281)642-4050
**Alt. Telephone:**   (281)600-6000
**Address:**   8902 Sunnywood Dr
Houston, TX 77088 United States

## Certification

**Name:**   Carol Wilson

Page 1 of 2

**Registration #:**   VAu001330086
**Service Request #:**   1-6592582541

Diabetes Relief LLC
Carol A Wilson
11511 Katy Fwy, Suite 101
Houston, TX 77079 United States

APPX0714

INSU_PI_000993





(http://insulinic.com)

FOLLOW US :

f (https://www.facebook.com/insulinic)   🐦 (https://twitter.com/insulinic)

## The Science Behind Physiologic Insulin Resensitization

- Insulinic utilizes a unique and groundbreaking  patented approach where insulin is administered as a hormone rather than a drug addressing the primary cause of Diabetes which is metabolic failure
- By utilizing insulin in a manner that bio-mimics normal physiology, this modality is designed to reduce insulin resistance which helps blood sugar more readily enter each cell and be converted into energy
- Increasing cellular energy allows damaged tissues and organs to grow, repair, and regenerate. Thus, our approach not only stabilizes but in many instances has reversed complications of diabetes and other metabolic disorders.

## PIR For Insulin Resistance

PIR for insulin resistance
(http://insulinic.com/wp-content/uploads/2022/03/1.-PIR-for-insulin-resistance-1.pdf)

## Dynamic Diabetes Solution

Dynamic Diabetes Solutions-Pulse Insulin Resensitization (PIR)
(http://insulinic.com/wp-content/uploads/2022/03/4.-Article-Dynamic-Diabetes-Solutions-
Pulse-Insulin-Resensitization-PIR-Published-Medical-_-Clinical-Research-Dr.-Loveridge-
08.13.2021.pdf)

EXHIBIT
**B**

## Improved Kidney Function

Improved Kidney Function
(http://insulinic.com/wp-content/uploads/2022/03/3.-Villaverde-Improved-Kidney-
Function-Following-Physiologic-Insulin-Resensitization-Treatment-Modality_07.30.21.pdf)

APPX0715

**INSU_PI_000994**

# Reversal Of Diabetic Neuropathy

Reversal of Diabetic Neuropathy
(http://insulinic.com/wp-content/uploads/2022/03/2.-Loveridge-Reversal-of-Diabetic-
Neuropathy-Utilizing-Physiologic-Insulin-Resensitization-Case-Series_07.20.2021-
Copy.pdf)



## Stay Connected With Insulinic

(http
s://w
ww.f
aceb
ook.
com
/insu
linic)

(http
s://t
witte
r.co
m/in
sulin
ic)

## Quick Links

Home(http://insulinic.com/shawn/)

About Us(http://insulinic.com/shawn/about/)

Services(http://insulinic.com/shawn/services/)

Contact(http://insulinic.com/shawn/contact/)

### Make an Appointment

Getting an accurate diagnosis can be one of the most impactful experiences that you can have.

**Contact Now
(http://insulinic.com/shawn/contact/)**

Copyright © 2021 Insulinic | Powered by Tech Reshape (https://www.techreshape.com)

APPX0717

INSU_PI_000996



# New Diabetes Management Clinic Here on Oahu NOW! 

🗓 August 26, 2022   🏷 Chamber, Members

Aloha!

Insulinic Hawaii ( https://insulinic.com/ ) is a new innovative approach to diabetes management. Our first Hawaii location opens **Sept. 12th at 1360 S. Beretania**. The Insulinic mission is to serve the vast and growing Hawaiian diabetes population by ==first== assisting **Primary Care, Internal Medicine, Nephrology, and Podiatry providers** with a diagnostic test that measures nerve conduction and vascular flow.  Nerve conduction and vascular flow are two key biomarkers that when measured can indicate the severity of diabetes. Our diagnostic testing provides unprecedented data in 1 test giving physicians a 10-page report with over 25 metabolic health markers ( https://insulinic.com/tm-flow-system/ ).  Insulinic of Hawaii, at no cost to the provider, will supply the diagnostic equipment and associated nursing staff to perform this 20 minute test.  Insulinic believes in a care team approach and a collaboration of care. The ordering provider will interpret the diagnostic test results to inform treatment options and serve as a baseline to measure treatment progress.   **Reimbursement for report interpretation by the ordering physician can be billed by utilizing CPT codes: 95921 Autonomic Nervous System Test, 95923 Sudomotor Assessment, and 93923 Ankle Brachial Index.**  An additional differentiator and vital component of the Insulinic program is our Medicare approved insulin IV infusion modality, which is a patented approach that resensitizes cells by using insulin as a hormone rather than a drug. This approach has been scientifically proven to improve and reverse symptoms experienced by insulin resistant diabetics.  At Insulinic, we aim to help patients reverse insulin resistance, which is the root cause of many metabolic disorders. We are requesting a call to action from you to join us in the fight against diabetes in our great state of Hawaii!

### What our patients are saying:

*"I haven't felt this good in years. It's like my neuropathy just disappeared, and my energy level has increased."* -Wayne K.,  Type 2 Diabetic- 18 years, Neuropathy- 10 years, Retinopathy- 2 years

*"My blood sugar is now controlled, and my eyesight has improved so much. I went from legally blind without glasses to now being about to read  the captions on the TV with no glasses, and I'm down from six vials of insulin per month to only three."* -Bruce B., Type 2 Diabetic- 27 years

We'd love to drop by your office to show you more of how we can collaborate on care for diabetics here on Oahu!


Powered by
GrowthZone

---


**Insulinic Hawaii**

**Marc Desgraves Chief Financial Officer**

🗓 August 26, 2022

📞 (808) 210-4444

@ Send Email

---

EXHIBIT

**C**

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayn Teigh Clayett*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-452-464**

**Effective Date of Registration:**
September 14, 2017

## Title

**Title of Work:** Diabetes Relief Website

## Completion/Publication

**Year of Completion:** 2017
**Date of 1st Publication:** July 01, 2017
**Nation of 1st Publication:** United States

## Author

- **Author:** Diabetes Relief LLC
  **Author Created:** text
  **Work made for hire:** Yes
  **Citizen of:** United States
  **Year Born:** 2015

## Copyright Claimant

**Copyright Claimant:** Diabetes Relief LLC
11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States
**Transfer statement:** Various employees and associates

## Rights and Permissions

**Organization Name:** Diabetes Relief LLC
**Name:** Carol Ann Wilson
**Email:** carol@diabetesrelief.com
**Telephone:** (281)600-5000
**Alt. Telephone:** (281)600-6000
**Address:** 11511 Katy Fwy
Suite 101
Houston, TX 77079 United States

**EXHIBIT**

**4**

APPX0719

**INSU_PI_000998**

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay A. Tesle*

Acting United States Register of Copyrights and Director

**Registration Number**

## VAu 1-330-086

**Effective Date of Registration:**
May 17, 2018

## Title
_____

  **Title of Work:**   Overcoming Metabolic Failure

## Completion/Publication
_____

  **Year of Completion:**   2018

## Author
_____

  •  **Author:**   Diabetes Relief LLC
  **Author Created:**   2-D artwork
  **Work made for hire:**   Yes
  **Citizen of:**   United States
  **Domiciled in:**   United States

## Copyright Claimant
_____

  **Copyright Claimant:**   Diabetes Relief LLC
  11511 Katy Fwy, Suite 101, Houston, TX, 77079, United States

## Rights and Permissions
_____

  **Organization Name:**   Diabetes Relief LLC
  **Name:**   Carol A Wilson
  **Email:**   carolwilson@earthlink.net
  **Telephone:**   (281)642-4050
  **Alt. Telephone:**   (281)600-6000
  **Address:**   8902 Sunnywood Dr
  Houston, TX 77088 United States

## Certification
_____

  **Name:**   Carol Wilson

**EXHIBIT**

**5**

APPX0720

**INSU_PI_000999**

**Registration #:**   VAu001330086
**Service Request #:**   1-6592582541

Diabetes Relief LLC
Carol A Wilson
11511 Katy Fwy, Suite 101
Houston, TX 77079 United States





(http://insulinic.com)

FOLLOW US :
f (https://www.facebook.com/insulinic)   🐦 (https://twitter.com/insulinic)

## Physiologic Insulin Resensitization

A groundbreaking approach designed to address the root cause of metabolic disorders instead of only suppressing the symptoms.

### Insulin Resistance

### The Root Cause of Metabolic Failure

- Occurs when your body's cells ignore insulin's signal to open
- Cells not opening to absorb glucose causes high blood sugar
- Excessive blood sugars can create the following symptoms:

  - Neuropathy
  - Weight gain
  - Lack of energy
  - Kidney failure

  - Uncontrolled blood sugar
  - Slow Healing Wounds
  - Memory Loss
  - Frequent Urination

EXHIBIT

6

APPX0723

INSU_PI_001002



## Reversing Insulin Resistance

**Physiologic Insulin Resensitization utilizes Insulin as a HORMONE rather than a DRUG**

- Using insulin as a hormone is like having a master key for your Bodys cells
- Glucose (sugars) enter your cells and convert into energy
- Increasing cellular energy allows damaged tissues and organs to grow, repair, and regenerate
- Thus, our approach not only stabilizes but in many instances has reversed complications of diabetes and other metabolic disorders

**WE ADDRESS THE ROOT CAUSE OF METABOLIC FAILURE BY REVERSING INSULIN RESISTANCE**



## What Patients are Reporting

**Improved Neuropathy**                                            95%

**Improvement in at least one diabetic complication**        76%

**HbA1c reduction**                                     63%

**Reduced diabetic medications**              41%



- **Neuropathy diminished**
- **Energy restored**
- **Weight controlled**
- **Erectile function restored**
- **Retinopathy diminished**

- **Amputations prevented**
- **Medications reduced**
- **Blood sugar controlled**
- **Mood and sleep improved**
- **Wounds healed**

- **Hair and nail growth**
- **Dementia mitigated**
- **Alzheimer's alleviated**
- **Stroke recovery accelerated**

APPX0725

INSU_PI_001004

Insulinic Health Solutions

- **Fatty Liver reduced**

**Insulin**
**(https://sevencosmos.com/delta/2022/aug/inl/)**

---

**Insulin Hawaii**
**(https://sevencosmos.com/delta/2022/aug/inl/)**

**Insulin Hammond**
**(https://sevencosmos.com/delta/2022/aug/inl/)**

**Insulinic of Tampa Bay**

## Stay Connected With Insulinic

f (http://www.facebook.com/insulinic)

🐦 (https://twitter.com/insulinic)

### Quick Links

Home(http://insulinic.com/shawn/)

About Us(http://insulinic.com/shawn/about/)

Services(http://insulinic.com/shawn/services/)

Contact(http://insulinic.com/shawn/contact/)

### Make an Appointment

Getting an accurate diagnosis can be one of the most impactful experiences that you can have.

**Contact Now**
**(http://insulinic.com/shawn/contact/)**

Copyright © 2021 Insulinic | Powered by Tech Reshape (https://www.techreshape.com)

insulinic.com

APPX0726

**INSU_PI_001005**



(http://insulinic.com)

FOLLOW US :

**f** (https://www.facebook.com/insulinic)   **🐦** (https://twitter.com/insulinic)

## The Science Behind Physiologic Insulin Resensitization

- Insulinic utilizes a unique and groundbreaking  patented approach where insulin is administered as a hormone rather than a drug addressing the primary cause of Diabetes which is metabolic failure
- By utilizing insulin in a manner that bio-mimics normal physiology, this modality is designed to reduce insulin resistance which helps blood sugar more readily enter each cell and be converted into energy
- Increasing cellular energy allows damaged tissues and organs to grow, repair, and regenerate. Thus, our approach not only stabilizes but in many instances has reversed complications of diabetes and other metabolic disorders.

## PIR For Insulin Resistance

PIR for insulin resistance
(http://insulinic.com/wp-content/uploads/2022/03/1.-PIR-for-insulin-resistance-1.pdf)

## Dynamic Diabetes Solution

Dynamic Diabetes Solutions-Pulse Insulin Resensitization (PIR)
(http://insulinic.com/wp-content/uploads/2022/03/4.-Article-Dynamic-Diabetes-Solutions-
Pulse-Insulin-Resensitization-PIR-Published-Medical-_-Clinical-Research-Dr.-Loveridge-
08.13.2021.pdf)

## Improved Kidney Function

Improved Kidney Function
(http://insulinic.com/wp-content/uploads/2022/03/3.-Villaverde-Improved-Kidney-
Function-Following-Physiologic-Insulin-Resensitization-Treatment-Modality_07.30.21.pdf)

APPX0727

**INSU_PI_001006**

# Reversal Of Diabetic Neuropathy

Reversal of Diabetic Neuropathy
(http://insulinic.com/wp-content/uploads/2022/03/2.-Loveridge-Reversal-of-Diabetic-
Neuropathy-Utilizing-Physiologic-Insulin-Resensitization-Case-Series_07.20.2021-
Copy.pdf)



## Stay Connected With Insulinic

(http
s://w
ww.f
aceb
ook.
com
/insu
linic)

s://t
witte
r.co
m/in
sulin
ic)

### Quick Links

Home(http://insulinic.com/shawn/)

APPX0728

2/3

INSU_PI_001007

About Us(http://insulinic.com/shawn/about/)

Services(http://insulinic.com/shawn/services/)

Contact(http://insulinic.com/shawn/contact/)

## Make an Appointment

Getting an accurate diagnosis can be one of the most impactful experiences that you can have.

**Contact Now
(http://insulinic.com/shawn/contact/)**

Copyright © 2021 Insulinic | Powered by Tech Reshape (https://www.techreshape.com)

APPX0729

**INSU_PI_001008**

INSU_PI_001009
APPX0730



**(866) 589-8639**   Schedule Now

# A Patented Approach
# to Metabolic Restoration

What makes Diabetes Relief different? Our unique approach to treating type 1 and type 2 diabetes is designed to offer real results and real relief. Diabetes Relief is an advanced diabetes healthcare center that treats patients using a combination of patented and traditional medicine. Our revolutionary treatment system includes an individualized, physician-directed metabolic restoration program and a proprietary metabolic-reconditioning supplement.

Our mission is to improve more than your symptoms. Our mission is to fight the root cause of diabetes: **metabolic failure.** Everything we do is guided by professional evaluation from specialized practitioners and personal counseling to promote lifestyle changes.





## 1. Metabolic Restoration

We use FDA-approved infusion pumps programmed uniquely and specifically for our patented treatment program, which retrains the signaling and communication processes between the liver and pancreas, thus kick-starting the metabolism and improving all diabetic complications. [/one_half_last]

‹   ›

· · · · · ·

EXHIBIT
7

APPX0731

INSU_PI_001010



## A Patented Approach to Metabolic Restoration

What makes Diabetes Relief different? Our unique approach to treating type 1 and type 2 diabetes is designed to offer real results and real relief. Diabetes Relief is an advanced diabetes healthcare center that treats patients using a combination of patented and traditional medicine. Our revolutionary treatment system includes an individualized, physician-directed metabolic restoration program and a proprietary metabolic-reconditioning supplement.

Our mission is to improve more than your symptoms. Our mission is to fight the root cause of diabetes: **metabolic failure.** Everything we do is guided by professional evaluation from specialized practitioners and personal counseling to promote lifestyle changes.





### 2. Hormone Optimization

Diabetes Relief provides diagnostic testing to identify hormonal imbalances contributing to metabolic failure. We include bioidentical hormones to optimize and improve lipids levels associated with improved brain, bone, heart, breast, and prostate health, which combine to improve quality of life and well-being.



APPX0732

**INSU_PI_001011**



__ **(866) 589-8639**        Schedule Now

# A Patented Approach to Metabolic Restoration

What makes Diabetes Relief different? Our unique approach to treating type 1 and type 2 diabetes is designed to offer real results and real relief. Diabetes Relief is an advanced diabetes healthcare center that treats patients using a combination of patented and traditional medicine. Our revolutionary treatment system includes an individualized, physician-directed metabolic restoration program and a proprietary metabolic-reconditioning supplement.

Our mission is to improve more than your symptoms. Our mission is to fight the root cause of diabetes: **metabolic failure.** Everything we do is guided by professional evaluation from specialized practitioners and personal counseling to promote lifestyle changes.





### 3. Weight Management

Obesity complicates many symptoms of diabetes, such as hypertension and hyperglycemia. Diabetes Relief provides a customized weight-loss treatment plan for each patient that is comprised of intramuscular injections, patented metabolism-optimization treatment, diet, and exercise.

‹                                                                              ›

APPX0733

**INSU_PI_001012**





**(866) 589-8639**   Schedule Now

## A Patented Approach to Metabolic Restoration

What makes Diabetes Relief different? Our unique approach to treating type 1 and type 2 diabetes is designed to offer real results and real relief. Diabetes Relief is an advanced diabetes healthcare center that treats patients using a combination of patented and traditional medicine. Our revolutionary treatment system includes an individualized, physician-directed metabolic restoration program and a proprietary metabolic-reconditioning supplement.

Our mission is to improve more than your symptoms. Our mission is to fight the root cause of diabetes: **metabolic failure.** Everything we do is guided by professional evaluation from specialized practitioners and personal counseling to promote lifestyle changes.





### 4. Wellness and Nutrition

Our total-patient care plan provides attention to diet and exercise while also monitoring medications, vitamins, and mineral needs. The program is designed to work in tandem with traditional medicine in order to reduce medications and eliminate the risk of harmful side effects, while preventing, improving, and potentially reversing serious complications.

‹                                                                                              ›





# New Diabetes Management Clinic Here on Oahu NOW! 

August 26, 2022  🏷 Chamber, Members



**Insulinic Hawaii**

**Marc Desgraves Chief Financial Officer**

📅 August 26, 2022

📞 (808) 210-4444

@ Send Email

Aloha!

Insulinic Hawaii ( https://insulinic.com/ ) is a new innovative approach to diabetes management. Our first Hawaii location opens **Sept. 12th at 1360 S. Beretania**. The Insulinic mission is to serve the vast and growing Hawaiian diabetes population by <mark>first</mark> <u>assisting Primary Care, Internal Medicine, Nephrology, and Podiatry providers</u> with a diagnostic test that measures nerve conduction and vascular flow.  Nerve conduction and vascular flow are two key biomarkers that when measured can indicate the severity of diabetes. Our diagnostic testing provides unprecedented data in 1 test giving physicians a 10-page report with over 25 metabolic health markers ( https://insulinic.com/tm-flow-system/ ).  Insulinic of Hawaii, at no cost to the provider, will supply the diagnostic equipment and associated nursing staff to perform this 20 minute test.  Insulinic believes in a care team approach and a collaboration of care. The ordering provider will interpret the diagnostic test results to inform treatment options and serve as a baseline to measure treatment progress.  <u>**Reimbursement for report interpretation by the ordering physician**</u> **can be billed by utilizing CPT codes: 95921 Autonomic Nervous System Test, 95923 Sudomotor Assessment, and 93923 Ankle Brachial Index.**  An additional differentiator and vital component of the Insulinic program is our Medicare approved insulin IV infusion modality, which is a patented approach that resensitizes cells by using insulin as a hormone rather than a drug. This approach has been scientifically proven to improve and reverse symptoms experienced by insulin resistant diabetics.  At Insulinic, we aim to help patients reverse insulin resistance, which is the root cause of many metabolic disorders. We are requesting a call to action from you to join us in the fight against diabetes in our great state of Hawaii!

### **What our patients are saying:**

*"I haven't felt this good in years. It's like my neuropathy just disappeared, and my energy level has increased."* -Wayne K.,  Type 2 Diabetic- 18 years, Neuropathy- 10 years, Retinopathy- 2 years

*"My blood sugar is now controlled, and my eyesight has improved so much. I went from legally blind without glasses to now being about to read  the captions on the TV with no glasses, and I'm down from six vials of insulin per month to only three."* -Bruce B., Type 2 Diabetic- 27 years

We'd love to drop by your office to show you more of how we can collaborate on care for diabetics here on Oahu!



Powered by
**GrowthZone**

```
┌─────────────┐
│  EXHIBIT    │
│             │
│     8       │
└─────────────┘
```

APPX0735

INSU_PI_001014

US009652595B1

(12) **United States Patent**
Carr et al.

(10) **Patent No.:** **US 9,652,595 B1**
(45) **Date of Patent:** **May 16, 2017**

(54) **KIT THAT IMPROVES IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS**

(71) Applicant: **DIABETES RELIEF LLC**, Houston, TX (US)

(72) Inventors: **Hunter Michael Alan Carr**, Houston, TX (US); **Scott Hepford**, Houston, TX (US); **Carol Ann Wilson**, Houston, TX (US)

(73) Assignee: **Diabetes Relief LLC**, Houston, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/362,963**

(22) Filed: **Nov. 29, 2016**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/042,087, filed on Feb. 11, 2016.

(60) Provisional application No. 62/117,393, filed on Feb. 17, 2015.

(51) **Int. Cl.**
*A61M 5/168* (2006.01)
*G06F 19/00* (2011.01)
*A61M 5/00* (2006.01)

(52) **U.S. Cl.**
CPC ........ *G06F 19/3468* (2013.01); *G06F 19/322* (2013.01)

(58) **Field of Classification Search**
CPC ........................... G06F 19/3468; G06F 19/322
USPC ........................................................ 436/95
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2014/0005633 A1*   1/2014   Finan .................. A61M 5/1723
604/504

* cited by examiner

*Primary Examiner* — Rebecca M Fritchman
(74) *Attorney, Agent, or Firm* — Buskop Law Group P.C.; Wendy Buskop

(57) **ABSTRACT**

A kit for individualized intravenous exogenous insulin-based therapy, which includes a portable data storage in communication with client device processor. The data storage can have computer instructions, a database of metabolic factors, a library of weight management protocols, a diabetic treatment model, and a library of care plan templates. The kit for individualized intravenous exogenous insulin-based therapy includes a blood glucose meter, a plurality of intravenous catheters fluidly engageable with a fluid source, and a plurality of metabolic enhancements.

**20 Claims, 19 Drawing Sheets**



DIABETIC TREATMENT MODEL WITH BOLUS VOLUME DOSAGE AMOUNTS

EXHIBIT
9

APPX0736

INSU_PI_001015

(12) **United States Patent**　　(10) **Patent No.:**　**US 10,533,990 B2**
Carr et al.　　(45) **Date of Patent:**　***Jan. 14, 2020**

(54) **PHYSIOLOGIC INSULIN-SENSITIVITY IMPROVEMENT**

(71) Applicant: **DIABETES RELIEF LLC**, Houston, TX (US)

(72) Inventors: **Hunter Michael Alan Carr**, Houston, TX (US); **Scott Hepford**, Houston, TX (US); **Carol Ann Wilson**, Houston, TX (US); **Stanley Tories Lewis, Jr.**, Houston, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/710,537**

(22) Filed: **Sep. 20, 2017**

(65) **Prior Publication Data**

US 2019/0086394 A1　Mar. 21, 2019

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/042,087, filed on Feb. 11, 2016.

(60) Provisional application No. 62/117,393, filed on Feb. 17, 2015.

(51) **Int. Cl.**
| | |
|---|---|
| *G01N 33/50* | (2006.01) |
| *G01N 33/487* | (2006.01) |
| *G06F 19/00* | (2018.01) |
| *G16H 20/17* | (2018.01) |
| *G01N 33/60* | (2006.01) |
| *G16H 30/40* | (2018.01) |
| *G16H 50/50* | (2018.01) |

(52) **U.S. Cl.**
CPC ... *G01N 33/5091* (2013.01); *G01N 33/48792* (2013.01); *G01N 33/5038* (2013.01); *G01N 33/60* (2013.01); *G06F 19/30* (2013.01); *G16H 20/17* (2018.01); *G16H 30/40* (2018.01); *G16H 50/50* (2018.01); *G01N 2800/042* (2013.01); *G01N 2800/70* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2014/0005633 A1　1/2014 Finan

*Primary Examiner* — G Steven Vanni
(74) *Attorney, Agent, or Firm* — Rao Deboer Osterrieder, PLLC; Erik J. Osterrieder

(57) **ABSTRACT**

An individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing. The therapy includes treatment sessions involving the assessment of metabolic factors, forming a subject profile, and matching the subject profile to a diabetic treatment model. Using the diabetic treatment model, a quantity and frequency of intravenous insulin bolus, dosage amounts of magnesium, and dosage amounts of potassium can be calculated. The methods that improve impaired hepatic glucose processing in subjects and patients can simultaneously introduce separated insulin bolus from an insulin reservoir, dosage amounts of magnesium, and dosage amounts of potassium. The subject profile can create a weight management protocol that uses a metabolic enhancement, wherein the individualized intravenous exogenous insulin-based therapy produces a subject or a patient with improved cellular ATP functioning.

**20 Claims, 13 Drawing Sheets**

**EXHIBIT**

**10**

APPX0737

**INSU_PI_001016**

11/5/2020 5:07 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 47863204
By: CAROL WILLIAMS
Filed: 11/5/2020 5:07 PM

### CAUSE NO. 2020-45718

| | | |
|---|---|---|
| HUNTER CARR, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| STANLEY T. LEWIS, SCOTT | § | |
| HEPFORD, WELL CELL GLOBAL, | § | |
| LLC, and RESTOR METABOLIX, INC. | § | |
| *Defendants*. | § | 127ᵀᴴ JUDICIAL DISTRICT |
| | § | |

---

## DEFENDANTS STANLEY LEWIS, SCOTT HEPFORD AND WELL CELL GLOBAL LLC'S SECOND AMENDED COUNTERCLAIM

---

Defendants Stanley Lewis, Scott Hepford, and Well Cell Global LLC submit this Second Amended Counterclaim.

### I.      DISCOVERY CONTROL PLAN

1.      Discovery shall be Level 3 subject to orders of this Court.

### II.      PARTIES

2.      Hunter Carr is the plaintiff in this lawsuit, has appeared and may be served via his counsel of record.

3.      Stanley Lewis is a defendant in this lawsuit, has appeared and may be served via his counsel of record.

4.       Scott Hepford is a defendant in this lawsuit, has appeared and may be served via his counsel of record.

5.      Well Cell Global LLC ("Well Cell") is a defendant in this lawsuit, has appeared and may be served via its counsel of record.



4:22-CV-03062
Injunction Hearing
**EX 21**
DEFS "INSULINIC"

**EXHIBIT**
1
APPX0738

INSU_PI_001017

### III.    JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter because the dispute involves an amount in controversy that greatly exceeds any minimum jurisdictional limit of this Court, to the extent such a minimum limit exists. This Court has personal jurisdiction over counter-Defendants because they are citizens of Texas, do business in Texas, and/or committed torts in Texas. Jurisdiction is proper in the district court pursuant to TEX. CONST. ART. V, § 8 and TEX. GOV'T CODE ANN. § 24.007.

7.      Venue is proper in Harris County because the subject matter of the dispute occurred wholly or in part in Harris County, Texas.

### IV.    FACTS

8.      Diabetes Relief provides innovative medical treatment to abate the symptoms of diabetes. Diabetes Relief is a "manager-managed" LLC, which means that managers oversee the day-to-day operations of Diabetes Relief, rather than the members (owners). Like many LLCs owned by a handful of people, Diabetes Relief is and always has been run informally. Diabetes Relief had intermittent meetings of its managers, without formal notice. Diabetes Relief did not have annual meetings of its members.

9.      Hunter Carr was once both a manager and member of Diabetes Relief LLC ("Diabetes Relief"), but at this time remains only a member.  He co-founded the company in 2015.  While he was a manager, he managed the company's financial recordkeeping.

10.     Scott Hepford co-founded Diabetes Relief in 2015, is a member and a manager, and runs the Company's business operations day-to-day.

11.     Lewis is the third and final member of Diabetes Relief.

2

12.     Over the last year or two, Diabetes Relief has been looking for a source of new capital to help repay its growing debt. The company's financial problems and the on-going disagreements between the members about the future of the company led the members of Diabetes Relief to begin looking for a way to finance the buy-out of Carr's membership interests.  Carr was aware of and a part of these efforts. Carr has rejected several potential deals to buy-out his interests and inject cash into the company. Carr's rejections created further friction among the members because Carr's rejections exacerbated the company's deteriorating financial condition.

13.     On or about July 16, 2020, Hepford sent written notice to Carr and Lewis of a meeting of the members that Hepford and Lewis wanted to have on July 24, 2020 to discuss (1) a buy-out offer of Carr's membership interests; (2) operations management moving forward; and (3) financial management moving forward.

14.     Carr acknowledged the notice of the meeting set for July 24.

15.     At the July 24 meeting, on a majority vote of Diabetes Relief's members, Carr was removed as a manager.  Hepford and Lewis voted in favor. Carr was in the meeting during this vote and withheld his vote.

16.     Also at that meeting, the members of Diabetes Relief voted on an acquisition purchase agreement with Well Cell, through which Well Cell would purchase substantially all the assets of Diabetes Relief. The purpose of the Well Cell deal was to generate cash that Diabetes Relief could use to pay back its debt and buy out Carr's membership interests. To incentivize Carr's voluntary exit from Diabetes Relief, the other members were willing to sacrifice part of the proceeds from the Well Cell transaction to offer Carr a larger sum for his membership interests than he was entitled to if the proceeds were strictly divided based on ownership percentages. If Carr refused to accept that offer, those funds from the Well Cell

APPX0740

INSU_PI_001019

sale would be repurposed, and the proceeds would be divided strictly based on ownership percentage. Carr was aware of such fact as it was discussed at the July 24, 2020 meeting.

17.     A majority of the Diabetes Relief members approved this transaction (Hepford and Lewis).  Carr was in the meeting for this vote but withheld his own vote.

*See, e.g.,* Ex. 1, Declaration of Scott Hepford; Ex. 2, Supplemental Declaration of Scott Hepford.

18.     After his removal as a manager, Carr remains a member of the company.  Although Carr's removal as a manager was effective, Carr has continued to hold himself out as a manager of Diabetes Relief. Carr has attempted to take actions impacting Diabetes Relief for which he lacks authority and that have interfered with the authorized Well Cell transaction.

19.     For example, on August 3, 2020, Carr sought and obtained a TRO proscribing the non-ordinary course movement of certain assets of Diabetes Relief and the movement of certain assets of Well Cell.  Carr attempted to have the ancillary judge also affirm that Carr retains all rights and powers of a manager of Diabetes Relief.  The ancillary court rejected that finding, striking that language from the proposed TRO. The ancillary court only found that Carr may continue to have access to Diabetes Relief's books and records during the pendency of the TRO. Although Carr later withdrew his request for a temporary injunction that could have extended the terms of the TRO, Carr has continued to maintain a request for a permanent injunction.  As set forth below, Carr's conduct has put at risk the Diabetes Relief sale to Well Cell.

20.     On August 4, 5 and 6, Carr went to Diabetes Relief's offices and disrupted the staff and Scott Hepford from their work. Carr threatened and made improper demands of several employees, including representing that he was still a manager and the employees needed to obey him.  *See* Ex. 3, Declaration of Melanie St. Laurent.

4

21.     On August 5, Carr, multiple times, attempted to change the credentials governing online access (aka online banking) to the Company's bank accounts at Frost Bank.  This would have prevented the Company from conducting the ordinary course operations that are expressly permitted by the existing TRO.  This also potentially would have enabled Carr to divert Company funds to his own, unauthorized use.  *See* Ex. 4, Declaration of Mardy Tessier.

22.     Recently, Carr took assets of Diabetes Relief that are subject to the sale with Well Cell by, among other things, removing furniture and other property from Diabetes Relief's offices. Carr did so after his counsel agreed that Carr would provide a list of property that Carr contended belonged to him so the parties could divide up the physical property in Diabetes Relief's offices in an orderly fashion. Rather than provide any list like Carr had agreed, Carr showed up at the Diabetes Relief offices while Hepford and Lewis were not present and removed various property, some of which belonged to Diabetes Relief and was subject to the Well Cell sale.

23.     Around that same time, a box of new checks for Diabetes Relief's bank account with Frost Bank arrived at Diabetes Relief's offices. Neither Hepford nor Lewis ordered these checks. To date, Hepford and Lewis have been unable to learn from Frost Bank who ordered these checks, but the only other person with the necessary authorization would have been Carr. The cash in Diabetes Relief's bank accounts, including the bank account connected to these checks, is also subject to the sale of all Diabetes Relief's assets to Well Cell.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION BY HEPFORD AND LEWIS:
### DECLARATORY JUDGMENT

24.     Hepford and Lewis incorporate all preceding paragraphs as if set forth herein.

25.     There is a live, subsisting, justiciable controversy as to whether Carr remains a manager of Diabetes Relief under the Company Agreement and the applicable provisions of the

APPX0742

**INSU_PI_001021**

Texas Business Organizations Code.  Hepford and Lewis assert that Carr is no longer a manager of Diabetes Relief as of July 24, 2020.  Carr believes otherwise.

26.     That controversy is ripe for a ruling by this Court.

## SECOND CAUSE OF ACTION BY HEPFORD AND LEWIS: HARMFUL ACCESS BY COMPUTER (TEXAS PENAL CODE CHAPTER 33 AND TEXAS CIVIL PRACTICE AND REMEDIES CODE CH. 143)

27.     Hepford and Lewis incorporate all preceding paragraphs.

28.     Carr violated Chapter 33 of the Texas Penal Code by intentionally and without consent or authority accessing Diabetes Relief's online banking information, permissions, logins etc.  Carr's access and manipulation of that online banking information was made with the intent to harm Hepford and Lewis.  As a result of Carr's violation, which was committed knowingly and intentionally, Hepford and Lewis have been injured.

29.     Hepford and Lewis also require injunctive relief to preserve the status quo and prevent Carr from further intrusion into, further changing of, and further misuse of Diabetes Relief's online banking information, permissions, logins and the like.

30.     Hepford and Lewis are entitled to attorney fees pursuant to this cause of action.

## THIRD CAUSE OF ACTION BY WELL CELL: TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

31.     Well Cell incorporates all preceding paragraphs.

32.     The asset purchase agreement between Diabetes Relief and Well Cell was an existing contract, which was approved by the majority of the members of Diabetes Relief.

33.     Pursuant to the terms of the asset purchase agreement, Diabetes Relief agreed to sell and Well Cell agreed to buy substantially all of Diabetes Relief's assets, including all the cash in its bank accounts, all its office furniture, and office supplies, among other things.

APPX0743

INSU_PI_001022

34.     Carr willfully and intentionally interfered with the performance of the asset purchase agreement between Diabetes Relief and Well Cell, including by, among other things, removing office furniture, equipment and/or supplies from Diabetes Relief's offices that Diabetes Relief had agreed to sell and Well Cell had agreed to buy in the asset purchase agreement.

35.     Carr's interference proximately caused injury to Well Cell by interfering with property to which Well Cell has rights under the asset purchase agreement.

## VI.     JURY DEMAND

36.     Defendants demand a trial by jury.

## VII.     APPLICATION FOR PERMANENT INJUNCTION

33.     Defendants fully incorporate the preceding paragraphs.

34.     Defendants are entitled to a permanent injunction against Carr (and his agents, servants, employees, and anyone in active concert or participation) that enjoins Carr as follows:

    a.    Carr is prohibited from accessing Diabetes Relief's online banking for any purpose other than as permitted by the Texas Business Organizations Code.

    b.    Carr is prohibited from attempting to alter or manipulate Diabetes Relief's online banking permissions, login, account access or passwords.

    c.    Carr is prohibited from attempting to convince any third party from making any changes of any kind to Diabetes Relief's online banking permissions, login, account access or passwords.

    d.    Carr is prohibited from holding himself out to any third party as authorized to make any changes of any kind to Diabetes Relief's online banking permissions, login, account access or passwords.

    e.    Carr is prohibited from holding himself out as a manager of Diabetes Relief or otherwise representing he has control over or management authority for Diabetes Relief to any employees of Diabetes Relief, its affiliates, or to any third parties.

7

APPX0744

**INSU_PI_001023**

## VIII.   CONDITIONS PRECEDENT

35.     All conditions precedent have been met, have occurred, or have been waived.

## IX.     PRAYER

36.     For these reasons, Defendants respectfully requests asks the Court to award them:

    a.  Actual, direct, indirect, incidental, and consequential
       damages, together with pre- and post-judgment interest;
    b.  Exemplary damages;
    c.  Reasonable attorneys' fees, expenses, court fees, and
       associated costs;
    d.  Permanent injunctive relief as requested above; and
    e.  All such other relief to which Defendants are entitled in equity or law.

Respectfully Submitted,

AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING, P.C.

/s/ P. Kevin Leyendecker
P. Kevin Leyendecker
Texas Bar No. 00784472
Shawn M. Bates
Texas Bar No. 24027287
Kelsi Stayart-White
Texas Bar No. 24098466
1221 McKinney, Suite 2500
Houston, Texas 77010
Telephone: 713.655.1101
Facsimile: 713.655.0062
kleyendecker@azalaw.com
sbates@azalaw.com
kwhite@azalaw.com

8

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of November 2020, a true and correct copy of the above and foregoing document was served on the following counsel of record:

THE KIRKLIN LAW FIRM, P.C.
Paul S. Kirklin
12600 N. Featherwood Dr., Suite 225
Houston, Texas 77034
pkirklin@kirklinlaw.com
Tel: 832-969-1821

Andrew K. Meade
Wayne D. Collins
MEADE & NEESE LLP
2118 Smith Street
Houston, Texas 77002
ameade@meadeneese.com
wcollins@meadeneese.com
Tel: 713-355-1200

**ATTORNEYS FOR HUNTER CARR**

*/s/ Kelsi S. White*
Kelsi S. White

APPX0746

**INSU_PI_001025**

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| HUNTER CARR, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| STANLEY T. LEWIS, SCOTT | § | |
| HEPFORD, WELL CELL GLOBAL, | § | |
| LLC, and RESTOR METABOLIX, INC. | § | |
| *Defendants.* | § | 127TH JUDICIAL DISTRICT |
| | § | |

---

## DECLARATION OF SCOTT HEPFORD

---

1.     My name is Scott Hepford. My date of birth is 2/23/1975, and my address is 19611 Cornerstone Arbor Drive, Cypress, TX 77433. I am over the age of twenty-one years, have never been convicted of a felony, and am competent to make this Declaration. The facts contained herein are true and correct and based upon my personal knowledge.

2.     I am currently a Manager and Member of Diabetes Relief LLC ("DR LLC"). I co-founded DR LLC in 2015 and have been with the Company ever since. I run DR LLC day-to-day.

3.     Hunter Carr co-founded DR LLC in 2015 and was once both a member and manager of the company.

4.     Prior to July 24, 2020, in his role as manager Carr repeatedly acted against the best interests of DR LLC. Carr was the manager in charge of the company's financial recordkeeping and oversight. He failed miserably in this job. He never caused the company to regularly produce audited or even auditable financial statements, never regularly maintained cash flow statements or balance sheets, or the like. This was a constant source of trouble for the company, as potential investors were scared away due to the lack of proper financial oversight and recordkeeping, all of which Carr was responsible for.

5.     Moreover, Carr torpedoed at least six deals proposed to the company by third parties that would have greatly benefitted the company and its members. For example, a third party offered to heavily capitalize DR LLC and provide a multi-million dollar buyout of Carr. Carr refused to agree. That third party required Carr be bought out as part of their offer because during their deal due diligence, they learned that Carr was in charge of the company's finances and they saw first hand the miserable condition the financial recordkeeping was in. That deal would have saved the company, and Carr refused.



1

6.     There were several more third party proposals along the same lines, all of which would have greatly benefitted the company and its members.  Carr torpedoed every one of them.  In each instance, the third party did their due diligence, determined that Carr was toxic to DR LLC and needed to be gone, and structured their proposal to save DR LLC with a very lucrative buyout offer for Carr.  Carr refused each and every one, preferring to watch DR LLC wither. There are more examples of the same kind of conduct by Carr, all to the company's detriment.

7.     In another example of this same problem, the company had an opportunity to do a clinic deal with Seneca Indian Nation.  During their due diligence, Seneca realized the same thing: that Carr, with his mismanagement of the company's financial records and his felony background (fraud conviction), could not be running DR LLC's finances if Seneca was to partner with DR LLC for clinics.  DR LLC agreed that Carr would recede into the background, and Seneca proceed with the deal.  That is, until Seneca representatives visited to finalize the deal.  During that visit, Carr pulled Seneca aside and told them basically that while he (Carr) was on paper not running the company with regard to the Seneca deal, he actually was still in charge.  Carr's ego in telling Seneca this led directly to that deal, worth around $500,000 to the company, being withdrawn by Seneca.

8.     There are numerous clinic deals that DR LLC lost due to Carr's presence on the team, his mismanagement of the company's financial recordkeeping, and/or his felony conviction for fraud.

9.     In effect, prior to July 24, 2020 Carr tried his level best to grind the Company's business to a halt and run the Company's business into the ground.

10.     Carr was succeeding. Due to his actions, the Company's financial condition was desperate, and Carr refused efforts that would financially enhance and save the company and benefit its members.  The bottom line is that his actions were killing the Company.

11.     In order to save the Company from ruin, on July 24, 2020, Carr was removed as a manager.

12.     Carr remains a member of the company.

13.     On August 6, 2020, in response to the TRO entered in this case, I caused Carr's access to the Company's Sharepoint file system to be restored.  Carr now has access to review/inspect those files.

14.     On that same day I provided to my legal counsel, PST files containing substantially all of Carr's company emails: those that, as of August 6, 2020, Carr had sent or received to/from his DR LLC email account.

15.     After issuance of the TRO in this case, Carr has falsely continued to hold himself out as a manager of DR LLC.

16.     He has disrupted the company's operations, harassed its staff, and attempted to manipulate and take over the company's online banking system.

2

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in Houston, Texas on the 7th day of August, 2020.

Scott Hepford

3

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| HUNTER CARR, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| STANLEY T. LEWIS, SCOTT | § | |
| HEPFORD, WELL CELL GLOBAL, | § | |
| LLC, and RESTOR METABOLIX, INC. | § | |
| *Defendants.* | § | 127TH JUDICIAL DISTRICT |
| | § | |

---

## VERIFICATION OF SCOTT HEPFORD

---

1. My name is Scott Hepford. My date of birth is February 23, 1975, and my address is 19611 Cornerstone Arbor Drive, Cypress, TX 77433. I am over the age of twenty-one years, have never been convicted of a felony, and am competent to make this verification. The facts contained herein are true and correct and based upon my personal knowledge.

2. I am currently a Manager and Member of Diabetes Relief LLC ("Diabetes Relief").

3. Hunter Carr, Stanley Lewis, and I are the current members of Diabetes Relief.

4. Diabetes Relief has been at all relevant times and is now run informally. We had intermittent meetings of the managers and typically waived formal notice as a matter of course. We did not have annual meetings of the members.

5. On or about July 16, 2020, I sent written notice to Carr and Lewis of a meeting of the members of Diabetes Relief on July 24, 2020 to address (1) a buy-out offer of Carr's membership interests; (2) operations management moving forward; and (3)



APPX0750

**INSU_PI_001029**

financial management moving forward.  Lewis and I agreed to have this meeting of the members, which constituted a majority of the members.

6.      Carr acknowledged the notice of the meeting set for July 24.

7.      The meeting was held via the Microsoft Teams platform and in-person. Lewis, Carr, and I all participated. Carr was physically in the office with me. Lewis participated by phone and by Teams.

8.      At the July 24, 2020 meeting, on a majority vote of Diabetes Relief's members, Carr was removed as a manager.  Lewis and I voted in favor. Carr was in the meeting during this vote and withheld his vote.

9.      Also at that meeting, the members voted on an acquisition purchase agreement with Well Cell, through which Well Cell would purchase substantially all the assets of Diabetes Relief. The purpose of the Well Cell deal was to generate cash that Diabetes Relief could use to pay back its debt and buy out Carr's membership interests. To incentivize Carr's voluntary exit from Diabetes Relief, Lewis and I were willing to sacrifice part of the proceeds from the Well Cell transaction to offer Carr a larger sum for his membership interests than he was entitled to if the proceeds were strictly divided based on ownership percentages. If Carr refused to accept that offer, those funds from the Well Cell sale would be repurposed, and the proceeds would be divided strictly based on ownership percentage. I advised Carr of this fact during the meeting on July 24, 2020.

10.      The Well Cell transaction is currently on hold because of Carr's actions. I am concerned about Diabetes Relief's ability to fund its operations, and also concerned about Diabetes Relief's ability find any other investor or lender given its current financial and

operations state and Carr's efforts to exercise unauthorized and unilateral control over the company.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED in Houston, Texas on the ___24___ day of August, 2020.

Scott Hepford

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| **HUNTER CARR,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **STANLEY T. LEWIS, SCOTT** | § | |
| **HEPFORD, WELL CELL GLOBAL,** | § | |
| **LLC, and RESTOR METABOLIX, INC.** | § | |
| *Defendants.* | § | **127TH JUDICIAL DISTRICT** |
| | § | |

---

### DECLARATION OF MELANIE ST LAURENT

---

1.      My name is Melanie St. Laurent. My date of birth is 10/4/1968, and my address is 20222 Emily Anne Court, Cypress, Texas 77433.  I am over the age of twenty-one years, have never been convicted of a felony, and am competent to make this Declaration.  The facts contained herein are true and correct and based upon my personal knowledge.

2.      I am currently Lead Nurse Practitioner and Global Training and Quality Assurance Director for Diabetes Relief LLC ("DR LLC") and have been with the Company since 2015.

3.      On August 4, 2020, at DR LLC's offices at 11511 Katy Freeway, Houston, Texas suite 101, at approximately 11:30am, I was sitting in Scott Hepford's office along with Samantha Hepford, conducting a business meeting in regards to training and quality assurance for DR LLC. Hunter Carr appeared in the doorway of Scott's office. He did not say anything initially, so I acknowledged him by saying, "Hi Hunter, how are you?". He replied, "Good thanks." He then looked at Scott and said something to the effect of "we need to talk."  To which Scott replied, "I'm sorry Hunter, but you said that I was not to talk to you and to go through are respective legal counsel. Also, we are conducting a business meeting and you cannot disrupt the day to day operations of the business so please just stop"

4.      From there, Hunter became aggressive and argumentative. During this time, he threw a copy of a document at Scott and told him, "You have been served." He then threw one in front of me and said, "You have been served too Melanie.".

5.      Scott then proceeded to explain to Hunter that he did not have the authority to serve anyone. Hunter continued to argue with Scott and then Hunter stated. "I never said that you were served." To which I replied, "Oh yes, you told me that I was served".  Hunter continued to argue and then finally said, "I misspoke".  After about 15 minutes of Hunter arguing and Scott repeatedly

1

**EXHIBIT**
**1**
APPX0753

**INSU_PI_001032**

telling Hunter he was harassing the staff and disrupting business, Hunter left Scott's office and went into his old office to make phone calls.

6.      I then returned to my office. During this entire encounter, Hunter demonstrated belligerent, aggressive behavior. He also had his phone out in his right hand and was basically shoving it in Scott's face so he could record the exchange.

7.      On August 6, 2020, at approximately 9:30 am, Hunter Carr came into my office and initial greetings (Hi, how are you) were exchanged.  He then continued with "Did Scott tell you not to talk to me?", which I responded, "No". He then proceeded to harass me about a transaction that transpired between the owners of DR LLC to which I replied "That has nothing to do with me and you need to talk with Scott about anything regarding that." He then said, "So you are refusing to talk to me." I again said, "No".  He then continued to harass me, by demanding answers. He then stated that, "I am still a manager of this place and you need to produce the documents to me." I repeatedly asked him to stop harassing me and to please leave my office. He still continued to press me for answers, and so I asked him to leave my office. He then stated again that he was a manager and turned around and left. Hunter's conduct basically created a hostile and volatile work environment.  I was distracted, disrupted, upset and unable to properly focus on my job.

8.      Pasted below is an email exchange I had with Scott Hepford about all of this.



APPX0754

INSU_PI_001033

9.      I declare under penalty of perjury that the foregoing is true and correct.


EXECUTED in Houston, Texas on the ~~7th~~ day of August, 2020.

Melanie St. Laurent

3

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| **HUNTER CARR,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **STANLEY T. LEWIS, SCOTT** | § | |
| **HEPFORD, WELL CELL GLOBAL,** | § | |
| **LLC, and RESTOR METABOLIX, INC.** | § | |
| *Defendants*. | § | **127TH JUDICIAL DISTRICT** |
| | § | |

---

### DECLARATION OF MARDY TESSIER

---

1.       My name is Mardy Tessier. My date of birth is 11/6/1947, and my address is 19611 Cornerstone Arbor Drive, Cypress, Texas.  I am over the age of twenty-one years, have never been convicted of a felony, and am competent to make this Declaration.  The facts contained herein are true and correct and based upon my personal knowledge.

2.       I am currently in charge of finance and human resources for Diabetes Relief LLC ("DR LLC") and have been with the Company since 2015.

3.       The afternoon of August 5, 2020, I tried to get into our DR LLC online Frost bank account, but was not able to as I had been locked out.  This was very odd so I called customer service and was told that Mr. Carr had called in earlier and told the representative that **my** log in ID was **his** and that they needed to change it from being linked from my debit card number over to being linked to his debit card.  This was also very odd, for obvious reasons, but also because, to the best of my knowledge being the one who manages all the bank accounts and debit cards and credit cards for DR LLC, I was not aware that Mr. Carr had a debit card on DR LLC's account.

4.       Then the Frost representative acknowledged my card number was the one used to set up the account back in the beginning when we opened it in 2015, so he was not sure why they made the changes he said Mr. Carr had just requested.  It's also very concerning that I do not know how he got my ID and password but I am sure when he tried to get on and the security question came up he could not answer any of them so he had to call customer service.

5.       On the Frost online banking system, once you are locked out and you get back on, the system automatically sends you to the security question page and you have to pick three.  Mr. Carr did this with **his own** three security questions and thus made it impossible for me to log in

1



APPX0756

INSU_PI_001035

and do my job, which is to pay our company's bills, administer our payroll, and keep track of DR LLC's money.

6.      The Frost representative told me to call Mr. Carr and tell him he has to set up his own log in with his new debit card and cannot continue to use mine.  I did not feel comfortable calling Mr. Carr to deliver this message as I'm not sure what he's up to in light of all this, so I reported these facts to Scott Hepford.

7.      That said, I wish this was the end of the story but, unfortunately after I was able to get the account all set back up properly the afternoon of August 5, it appears Mr. Carr **did it again** at approximately 6:30pm August 5, because at that time I was locked out of everything **again**.  I went back and fixed it again for the second time but this time I changed my password.

8.      Exhibit 1 attached to this declaration is an email I received yesterday from Frost about all of this.

APPX0757

**INSU_PI_001036**

9.     I declare under penalty of perjury that the foregoing is true and correct.


EXECUTED in Houston, Texas on the __06___ day of August, 2020.


_____

Mardy Tessier

APPX0758

**INSU_PI_001037**

# Ex 1 to Tessier Declaration

**Shawn Bates**

**Subject:**         RE: Change of E-Mail Address Notification

-----Original Message-----
From: Mardy Tessier <mardy@H360llc.com>
Sent: Thursday, August 6, 2020 1:23 PM
To: Scott Hepford <scott@wellcellglobal.com>
Cc: Kara Kirker <kara@diabetesrelief.com>
Subject: FW: Change of E-Mail Address Notification

FYI

-----Original Message-----
From: myfrostconfirmation@frostbank.com <myfrostconfirmation@frostbank.com>
Sent: Wednesday, August 5, 2020 4:59 PM
To: Mardy Tessier <mardy@H360llc.com>
Subject: Change of E-Mail Address Notification

To DIABETES RELIEF LLC:

The following e-mail address was changed in your My Frost Online Banking service:

From: MARDY@H360LLC.COM
To:   Hunter@huntercarr.com

Future e-mails from Frost will be sent to the new e-mail address.

If you have questions regarding this request, contact an Internet Banking Specialist by replying to this e-mail or calling 1-877-714-4932.

APPX0759

**INSU_PI_001038**

8/24/2020 5:11 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 45655801
By: Iris Collins
Filed: 8/24/2020 5:11 PM

<div align="center">

**CAUSE NO. 2020-45718**

</div>

| | | |
|---|---|---|
| **HUNTER CARR,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **STANLEY T. LEWIS, SCOTT** | § | |
| **HEPFORD, WELL CELL GLOBAL,** | § | |
| **LLC, and RESTOR METABOLIX, INC.** | § | |
| *Defendants*. | § | **127TH JUDICIAL DISTRICT** |
| | § | |

---

<div align="center">

**DEFENDANTS' STANLEY LEWIS, SCOTT HEPFORD AND WELL CELL GLOBAL, LLC'S ANSWER TO PLAINTIFF CARR'S SECOND AMENDED PETITION AND FIRST AMENDED COUNTERCLAIM, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTION**

</div>

---

Defendants Stanley Lewis, Scott Hepford and Well Cell Global LLC ("Defendants") file this Answer (solely on behalf of these defendants) to Plaintiff's Second Amended Petition, Application for TRO, Permanent Injunction and Counterclaim and would show the Court as follows:

<div align="center">

**I.   GENERAL DENIAL**

</div>

1.      Pursuant to the Texas Constitution and Texas Rules of Civil Procedure, Defendants generally deny all allegations in Plaintiff's petition and require that plaintiff provide strict proof thereof.

2.      Pursuant to the Texas Rules of Civil Procedure, Defendants reserve the right to amend this pleading before the trial of this cause on the merits.



**EXHIBIT**

**2**

APPX0760

INSU_PI_001039

## II.  AFFIRMATIVE DEFENSES

3.      Defendants assert the affirmative defenses of unclean hands, prior material breach, estoppel, waiver, lack of authority to sue or be sued, and all other affirmative defenses to which defendants are entitled.

## LEWIS, HEPFORD, AND WELL CELL'S FIRST AMENDED COUNTERCLAIM

### I.          DISCOVERY CONTROL PLAN

1.      Discovery shall be Level 3 subject to orders of this Court.

### II.          PARTIES

2.      Hunter Carr is the plaintiff in this lawsuit, has appeared and may be served via his counsel of record.

3.      Stanley Lewis is a defendant in this lawsuit, has appeared and may be served via his counsel of record.

4.       Scott Hepford is a defendant in this lawsuit, has appeared and may be served via his counsel of record.

5.      Well Cell Global LLC ("Well Cell") is a defendant in this lawsuit, has appeared and may be served via its counsel of record.

### III.          JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter because the dispute involves an amount in controversy that greatly exceeds any minimum jurisdictional limit of this Court, to the extent such a minimum limit exists. This Court has personal jurisdiction over counter-Defendants because they are citizens of Texas, do business in Texas, and/or committed torts in Texas.

APPX0761

**INSU_PI_001040**

Jurisdiction is proper in the district court pursuant to TEX. CONST. ART. V, § 8 and TEX. GOV'T CODE ANN. § 24.007.

      7.      Venue is proper in Harris County because the subject matter of the dispute occurred wholly or in part in Harris County, Texas.

## IV.    FACTS

      8.      Diabetes Relief provides innovative medical treatment to abate the symptoms of diabetes. Diabetes Relief is a "manager-managed" LLC, which means that managers oversee the day-to-day operations of Diabetes Relief, rather than the members (owners). Like many LLCs owned by a handful of people, Diabetes Relief is and always has been run informally. Diabetes Relief had intermittent meetings of its managers, without formal notice. Diabetes Relief did not have annual meetings of its members.

      9.      Hunter Carr was once both a member and manager of Diabetes Relief LLC ("Diabetes Relief").  He co-founded the company in 2015.  While he was a manager, he managed the company's financial recordkeeping.

      10.      Scott Hepford co-founded Diabetes Relief in 2015, is a member and a manager, and runs the Company's business operations day-to-day.

      11.      Lewis is the third and final member of Diabetes Relief.

      12.      Over the last year or two, Diabetes Relief has been looking for a source of new capital to help repay its growing debt. The company's financial problems and the on-going disagreements between the members about the future of the company led the members of Diabetes Relief to begin looking for a way to finance the buy-out of Carr's membership interests.  Carr was aware of and a part of these efforts. Carr has rejected several potential deals to buy-out his

<center>3</center>

APPX0762

**INSU_PI_001041**

interests and inject cash into the company. Carr's rejections created further friction among the members because Carr's rejections exacerbated the company's deteriorating financial condition.

13.     On or about July 16, 2020, Hepford sent written notice to Carr and Lewis of a meeting of the members that Hepford and Lewis wanted to have on July 24, 2020 to discuss (1) a buy-out offer of Carr's membership interests; (2) operations management moving forward; and (3) financial management moving forward.

14.     Carr acknowledged the notice of the meeting set for July 24.

15.     At the July 24 meeting, on a majority vote of Diabetes Relief's members, Carr was removed as a manager.  Hepford and Lewis voted in favor. Carr was in the meeting during this vote and withheld his vote.

16.     Also at that meeting, the members of Diabetes Relief voted on an acquisition purchase agreement with Well Cell, through which Well Cell would purchase substantially all the assets of Diabetes Relief. The purpose of the Well Cell deal was to generate cash that Diabetes Relief could use to pay back its debt and buy out Carr's membership interests. To incentivize Carr's voluntary exit from Diabetes Relief, the other members were willing to sacrifice part of the proceeds from the Well Cell transaction to offer Carr a larger sum for his membership interests than he was entitled to if the proceeds were strictly divided based on ownership percentages. If Carr refused to accept that offer, those funds from the Well Cell sale would be repurposed, and the proceeds would be divided strictly based on ownership percentage. Carr was aware of such fact as it was discussed at the July 24, 2020 meeting.

17.     A majority of the Diabetes Relief members approved this transaction (Hepford and Lewis).  Carr was in the meeting for this vote but withheld his own vote.

<div align="center">4</div>

*See, e.g.,* Ex. 1, Declaration of Scott Hepford; Ex. 2, Supplemental Declaration of Scott Hepford.

18.     After his removal as a manager, Carr remains a member of the company.  Although Carr's removal as a manager was effective, Carr has continued to hold himself out as a manager of Diabetes Relief. Carr has attempted to take actions impacting Diabetes Relief for which he lacks authority and that have interfered with the authorized Well Cell transaction.

19.     For example, on August 3, 2020, Carr sought and obtained a TRO proscribing the non-ordinary course movement of certain assets of Diabetes Relief and the movement of certain assets of Well Cell.  Carr attempted to have the ancillary judge also affirm that Carr retains all rights and powers of a manager of Diabetes Relief.  The ancillary court rejected that finding, striking that language from the proposed TRO. The ancillary court only found that Carr may continue to have access to Diabetes Relief's books and records during the pendency of the TRO. The Well Cell transaction is currently in limbo because of Carr's TRO.

20.     On August 4, 5 and 6, Carr went to Diabetes Relief's offices and disrupted the staff and Scott Hepford from their work. Carr threatened and made improper demands of several employees, including representing that he was still a manager and the employees needed to obey him. *See* Ex. 3, Declaration of Melanie St. Laurent.

21.     On August 5, Carr, multiple times, attempted to change the credentials governing online access (aka online banking) to the Company's bank accounts at Frost Bank.  This would have prevented the Company from conducting the ordinary course operations that are expressly permitted by the existing TRO.  This also potentially would have enabled Carr to divert Company funds to his own, unauthorized use.  *See* Ex. 4, Declaration of Mardy Tessier.

APPX0764

INSU_PI_001043

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION BY HEPFORD AND LEWIS:
### DECLARATORY JUDGMENT

22.     Hepford and Lewis incorporate all preceding paragraphs as if set forth herein.

23.     There is a live, subsisting, justiciable controversy as to whether Carr remains a manager of Diabetes Relief under the Company Agreement and the applicable provisions of the Texas Business Organizations Code.  Hepford and Lewis assert that Carr is no longer a manager of Diabetes Relief as of July 24, 2020.  Carr believes otherwise.

24.     That controversy is ripe for a ruling by this Court.

### SECOND CAUSE OF ACTION BY HEPFORD AND LEWIS: HARMFUL ACCESS BY COMPUTER (TEXAS PENAL CODE CHAPTER 33 AND TEXAS CIVIL PRACTICE AND REMEDIES CODE CH. 143)

25.     Hepford and Lewis incorporate all preceding paragraphs.

26.     Carr violated Chapter 33 of the Texas Penal Code by intentionally and without consent or authority accessing Diabetes Relief's online banking information, permissions, logins etc.  Carr's access and manipulation of that online banking information was made with the intent to harm Hepford and Lewis.  As a result of Carr's violation, which was committed knowingly and intentionally, Hepford and Lewis have been injured.

27.     Hepford and Lewis also require injunctive relief to preserve the status quo and prevent Carr from further intrusion into, further changing of, and further misuse of Diabetes Relief's online banking information, permissions, logins and the like.

28.     Hepford and Lewis are entitled to attorney fees pursuant to this cause of action.

6

**THIRD CAUSE OF ACTION BY WELL CELL: TORTIOUS INTERFERENCE WITH EXISTING CONTRACT**

29.    Well Cell incorporates all preceding paragraphs.

30.    The asset purchase agreement between Diabetes Relief and Well Cell was an existing contract, which was approved by the majority of the members of Diabetes Relief.

31.    Carr willfully and intentionally interfered with the performance of the asset purchase agreement between Diabetes Relief and Well Cell.

32.    Carr's interference proximately caused injury to Well Cell by prohibiting the completion of the Well Cell transaction.

33.    Carr's interference caused actual damage or loss.

**VI.    JURY DEMAND**

34.    Defendants demand a trial by jury.

**APPLICATION FOR TEMPORARY RESTRAINING ORDER**

33.    Defendants fully incorporate the preceding paragraphs and attached declarations as if stated herein.

34.    A temporary restraining order is necessary to stop Carr from disrupting and impeding the business of Diabetes Relief and its employees, improperly holding himself out as in control of the company, and improperly accessing and changing the company's computer and online banking information.

35.    Defendants have valid causes of action against Carr and are likely to succeed on the merits.

36.    The ongoing and threatened injury is immediate and will directly and proximately cause irreparable harm to the company and Defendants and their confidential information, trade

7

secrets, goodwill and business reputation. The total loss to Defendants cannot be accurately measured at this time. This entitles Defendants to injunctive relief pursuant to Chapters 134A.003(a) and 65.011 of the Texas Civil Practice and Remedies Code and Section 15.51(a) of the Texas Business and Commerce Code.

37.     Unless immediately restrained, Carr will continue to cause irreparable harm to Defendants for which there is no adequate remedy at law, including (without limitation) loss of confidential information, trade secrets, goodwill, and business reputation. *See Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 427 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 895-96 (Tex. App.— Houston [1st Dist.] 2011, no pet.). Moreover, should Carr's conduct go unabated, he will continue to improperly access the company's confidential banking information. The dollar value of the harm that continued misconduct will do to Defendants is not easily measured.

38.     The balance of equities is served by a temporary restraining order, as it protects Defendants' employees and banking information, business operations, goodwill, and business reputation. And the order would have no adverse effect on Carr apart from stopping his improper and illegal conduct that he has no right to in the first place. A temporary restraining order is necessary to preserve the status quo between the parties pending trial on the merits.

39.     Defendants are entitled to a temporary restraining order against Carr (and his agents, servants, employees, and anyone in active concert or participation) that:

a.     Carr is prohibited from accessing Diabetes Relief's online banking for any purpose other than as permitted by the Texas Business Organizations Code.

b.     Carr is prohibited from attempting to alter or manipulate Diabetes Relief's online banking permissions, login, account access or passwords in any way.

8

c. Carr is prohibited from attempting to convince any third party from making any changes of any kind to Diabetes Relief's online banking permissions, login, account access or passwords in any way.

d. Carr is prohibited from holding himself out to any third party as authorized to make any changes of any kind to Diabetes Relief's online banking permissions, login, account access or passwords in any way.

40. Defendants seek a temporary restraining order until a date set for hearing (not to exceed fourteen days from the date of the order) and, after notice and hearing, a temporary injunction (as set forth more fully below) preventing Carr from further violations.

41. Defendants are not opposed to posting a bond if required to do so by the Court, although Defendants asserts that no bond, or a low bond, is appropriate in this case because Carr would suffer no monetary losses because of a grant of injunctive relief.

### APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTIONS

42. Defendants fully incorporate the preceding paragraphs.

43. In addition to the above-requested relief, Defendants further requests that a temporary injunction be ordered after notice and hearing; and that a permanent injunction be ordered on the final trial of this cause, enjoining Carr from further violations.

44. The threatened injury is imminent and will directly and proximately cause irreparable harm to the company and Defendants' computer and banking information and current and future business opportunities.

45. The total loss to Defendants cannot be accurately measured at this time. This entitles Defendants to injunctive relief pursuant to Section 65.011 of the Texas Civil Practice and Remedies Code.

APPX0768

**INSU_PI_001047**

46.     Defendants further request that Carr be cited to appear at a hearing in which Defendants will demonstrate a likelihood of success on the merits, and that a balancing of equities favors the issuance of a temporary—and eventually a permanent—injunction against Carr.

47.     Defendants are entitled to temporary and permanent injunctions against Carr (and his agents, servants, employees, and anyone in active concert or participation) that enjoins Carr as follows:

    a.     Carr is prohibited from accessing Diabetes Relief's online banking for any purpose other than as permitted by the Texas Business Organizations Code.

    b.     Carr is prohibited from attempting to alter or manipulate Diabetes Relief's online banking permissions, login, account access or passwords.

    c.     Carr is prohibited from attempting to convince any third party from making any changes of any kind to Diabetes Relief's online banking permissions, login, account access or passwords.

    d.     Carr is prohibited from holding himself out to any third party as authorized to make any changes of any kind to Diabetes Relief's online banking permissions, login, account access or passwords.

    e.     Carr is prohibited from holding himself out as a manager of Diabetes Relief or otherwise representing he has control over or management authority for Diabetes Relief to any employees of Diabetes Relief, its affiliates, or to any third parties.

## CONDITIONS PRECEDENT

48.     All conditions precedent have been met, have occurred, or have been waived.

## PRAYER

49.     For these reasons, Defendants respectfully requests asks the Court to award them:

    a.     Actual, direct, indirect, incidental, and consequential damages, together with pre- and post-judgment interest;
    b.     Exemplary damages;
    c.     Reasonable attorneys' fees, expenses, court fees, and associated costs;
    d.     Temporary injunctive relief, as requested above;

10

   e.   Permanent injunctive relief as requested above; and

   f.   All such other relief to which Defendants are entitled in equity or law.

Respectfully Submitted,

**AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING, P.C.**

*/s/ P. Kevin Leyendecker*
P. Kevin Leyendecker
Texas Bar No. 00784472
Shawn M. Bates
Texas Bar No. 24027287
Kelsi Stayart-White
Texas Bar No. 24098466
1221 McKinney, Suite 2500
Houston, Texas 77010
Telephone: 713.655.1101
Facsimile: 713.655.0062
kleyendecker@azalaw.com
sbates@azalaw.com
kwhite@azalaw.com

11

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| **HUNTER CARR,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **STANLEY T. LEWIS, SCOTT** | § | |
| **HEPFORD, WELL CELL GLOBAL,** | § | |
| **LLC, and RESTOR METABOLIX, INC.** | § | |
| *Defendants*. | § | **127TH JUDICIAL DISTRICT** |
| | § | |

---

### DECLARATION OF SCOTT HEPFORD

---

1.      My name is Scott Hepford. My date of birth is 2/23/1975, and my address is 19611 Cornerstone Arbor Drive, Cypress, TX  77433.  I am over the age of twenty-one years, have never been convicted of a felony, and am competent to make this Declaration.  The facts contained herein are true and correct and based upon my personal knowledge.

2.      I am currently a Manager and Member of Diabetes Relief LLC ("DR LLC").  I co-founded DR LLC in 2015 and have been with the Company ever since.  I run DR LLC day-to-day.

3.      Hunter Carr co-founded DR LLC in 2015 and was once both a member and manager of the company.

4.      Prior to July 24, 2020, in his role as manager Carr repeatedly acted against the best interests of DR LLC.  Carr was the manager in charge of the company's financial recordkeeping and oversight.  He failed miserably in this job.  He never caused the company to regularly produce audited or even auditable financial statements, never regularly maintained cash flow statements or balance sheets, or the like.  This was a constant source of trouble for the company, as potential investors were scared away due to the lack of proper financial oversight and recordkeeping, all of which Carr was responsible for.

5.      Moreover, Carr torpedoed at least six deals proposed to the company by third parties that would have greatly benefitted the company and its members.  For example, a third party offered to heavily capitalize DR LLC and provide a multi-million dollar buyout of Carr.  Carr refused to agree.  That third party required Carr be bought out as part of their offer because during their deal due diligence, they learned that Carr was in charge of the company's finances and they saw first hand the miserable condition the financial recordkeeping was in.  That deal would have saved the company, and Carr refused.



1

APPX0771

**INSU_PI_001050**

6.      There were several more third party proposals along the same lines, all of which would have greatly benefitted the company and its members.  Carr torpedoed every one of them.  In each instance, the third party did their due diligence, determined that Carr was toxic to DR LLC and needed to be gone, and structured their proposal to save DR LLC with a very lucrative buyout offer for Carr.  Carr refused each and every one, preferring to watch DR LLC wither. There are more examples of the same kind of conduct by Carr, all to the company's detriment.

7.      In another example of this same problem, the company had an opportunity to do a clinic deal with Seneca Indian Nation.  During their due diligence, Seneca realized the same thing: that Carr, with his mismanagement of the company's financial records and his felony background (fraud conviction), could not be running DR LLC's finances if Seneca was to partner with DR LLC for clinics.  DR LLC agreed that Carr would recede into the background, and Seneca proceed with the deal.  That is, until Seneca representatives visited to finalize the deal.  During that visit, Carr pulled Seneca aside and told them basically that while he (Carr) was on paper not running the company with regard to the Seneca deal, he actually was still in charge.  Carr's ego in telling Seneca this led directly to that deal, worth around $500,000 to the company, being withdrawn by Seneca.

8.      There are numerous clinic deals that DR LLC lost due to Carr's presence on the team, his mismanagement of the company's financial recordkeeping, and/or his felony conviction for fraud.

9.      In effect, prior to July 24, 2020 Carr tried his level best to grind the Company's business to a halt and run the Company's business into the ground.

10.     Carr was succeeding. Due to his actions, the Company's financial condition was desperate, and Carr refused efforts that would financially enhance and save the company and benefit its members.  The bottom line is that his actions were killing the Company.

11.     In order to save the Company from ruin, on July 24, 2020, Carr was removed as a manager.

12.     Carr remains a member of the company.

13.     On August 6, 2020, in response to the TRO entered in this case, I caused Carr's access to the Company's Sharepoint file system to be restored.  Carr now has access to review/inspect those files.

14.     On that same day I provided to my legal counsel, PST files containing substantially all of Carr's company emails: those that, as of August 6, 2020, Carr had sent or received to/from his DR LLC email account.

15.     After issuance of the TRO in this case, Carr has falsely continued to hold himself out as a manager of DR LLC.

16.     He has disrupted the company's operations, harassed its staff, and attempted to manipulate and take over the company's online banking system.

2

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in Houston, Texas on the 7th day of August, 2020.

Scott Hepford

APPX0773

INSU_PI_001052

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of August 2020, a true and correct copy of the above and foregoing document was served on the following counsel of record:

The Kirklin Law Firm, P.C.
Paul S. Kirklin
12600 N. Featherwood Dr., Suite 225
Houston, Texas 77034
pkirklin@kirklinlaw.com
Tel: 832-969-1821

**ATTORNEY FOR HUNTER CARR**

Stephen R. Kirklin
skirklin312@gmail.com
529 Stone Crossing
Webster, Texas 77598
713-419-2789

**PURPORTED ATTORNEY FOR DIABETES RELIEF (SUBJECT TO MOTION TO SHOW AUTHORITY)**

*/s/ Kelsi S. White*
Kelsi S. White

12

APPX0774

**INSU_PI_001053**

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| **HUNTER CARR,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **STANLEY T. LEWIS, SCOTT** | § | |
| **HEPFORD, WELL CELL GLOBAL,** | § | |
| **LLC, and RESTOR METABOLIX, INC.** | § | |
| *Defendants.* | § | **127TH JUDICIAL DISTRICT** |
| | § | |

---

### VERIFICATION OF SCOTT HEPFORD

---

      1.     My name is Scott Hepford. My date of birth is February 23, 1975, and my address is 19611 Cornerstone Arbor Drive, Cypress, TX 77433. I am over the age of twenty-one years, have never been convicted of a felony, and am competent to make this verification. The facts contained herein are true and correct and based upon my personal knowledge.

      2.     I am currently a Manager and Member of Diabetes Relief LLC ("Diabetes Relief").

      3.     Hunter Carr, Stanley Lewis, and I are the current members of Diabetes Relief.

      4.     Diabetes Relief has been at all relevant times and is now run informally. We had intermittent meetings of the managers and typically waived formal notice as a matter of course. We did not have annual meetings of the members.

      5.     On or about July 16, 2020, I sent written notice to Carr and Lewis of a meeting of the members of Diabetes Relief on July 24, 2020 to address (1) a buy-out offer of Carr's membership interests; (2) operations management moving forward; and (3)



APPX0775

**INSU_PI_001054**

financial management moving forward.  Lewis and I agreed to have this meeting of the members, which constituted a majority of the members.

6.      Carr acknowledged the notice of the meeting set for July 24.

7.      The meeting was held via the Microsoft Teams platform and in-person. Lewis, Carr, and I all participated. Carr was physically in the office with me. Lewis participated by phone and by Teams.

8.      At the July 24, 2020 meeting, on a majority vote of Diabetes Relief's members, Carr was removed as a manager.  Lewis and I voted in favor. Carr was in the meeting during this vote and withheld his vote.

9.      Also at that meeting, the members voted on an acquisition purchase agreement with Well Cell, through which Well Cell would purchase substantially all the assets of Diabetes Relief. The purpose of the Well Cell deal was to generate cash that Diabetes Relief could use to pay back its debt and buy out Carr's membership interests. To incentivize Carr's voluntary exit from Diabetes Relief, Lewis and I were willing to sacrifice part of the proceeds from the Well Cell transaction to offer Carr a larger sum for his membership interests than he was entitled to if the proceeds were strictly divided based on ownership percentages. If Carr refused to accept that offer, those funds from the Well Cell sale would be repurposed, and the proceeds would be divided strictly based on ownership percentage. I advised Carr of this fact during the meeting on July 24, 2020.

10.     The Well Cell transaction is currently on hold because of Carr's actions. I am concerned about Diabetes Relief's ability to fund its operations, and also concerned about Diabetes Relief's ability find any other investor or lender given its current financial and

INSU_PI_001055

operations state and Carr's efforts to exercise unauthorized and unilateral control over the company.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED in Houston, Texas on the ___24___ day of August, 2020.

Scott Hepford

APPX0777

**INSU_PI_001056**

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| **HUNTER CARR,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **STANLEY T. LEWIS, SCOTT** | § | |
| **HEPFORD, WELL CELL GLOBAL,** | § | |
| **LLC, and RESTOR METABOLIX, INC.** | § | |
| *Defendants*. | § | **127TH JUDICIAL DISTRICT** |
| | § | |

---

### DECLARATION OF MELANIE ST LAURENT

---

1.      My name is Melanie St. Laurent. My date of birth is 10/4/1968, and my address is 20222 Emily Anne Court, Cypress, Texas 77433.  I am over the age of twenty-one years, have never been convicted of a felony, and am competent to make this Declaration.  The facts contained herein are true and correct and based upon my personal knowledge.

2.      I am currently Lead Nurse Practitioner and Global Training and Quality Assurance Director for Diabetes Relief LLC ("DR LLC") and have been with the Company since 2015.

3.      On August 4, 2020, at DR LLC's offices at 11511 Katy Freeway, Houston, Texas suite 101, at approximately 11:30am, I was sitting in Scott Hepford's office along with Samantha Hepford, conducting a business meeting in regards to training and quality assurance for DR LLC. Hunter Carr appeared in the doorway of Scott's office. He did not say anything initially, so I acknowledged him by saying, "Hi Hunter, how are you?". He replied, "Good thanks." He then looked at Scott and said something to the effect of "we need to talk."  To which Scott replied, "I'm sorry Hunter, but you said that I was not to talk to you and to go through are respective legal counsel. Also, we are conducting a business meeting and you cannot disrupt the day to day operations of the business so please just stop"

4.      From there, Hunter became aggressive and argumentative. During this time, he threw a copy of a document at Scott and told him, "You have been served." He then threw one in front of me and said, "You have been served too Melanie.".

5.      Scott then proceeded to explain to Hunter that he did not have the authority to serve anyone. Hunter continued to argue with Scott and then Hunter stated. "I never said that you were served." To which I replied, "Oh yes, you told me that I was served".  Hunter continued to argue and then finally said, "I misspoke".  After about 15 minutes of Hunter arguing and Scott repeatedly

1

EXHIBIT

1

APPX0778

telling Hunter he was harassing the staff and disrupting business, Hunter left Scott's office and went into his old office to make phone calls.

6.      I then returned to my office. During this entire encounter, Hunter demonstrated belligerent, aggressive behavior. He also had his phone out in his right hand and was basically shoving it in Scott's face so he could record the exchange.

7.      On August 6, 2020, at approximately 9:30 am, Hunter Carr came into my office and initial greetings (Hi, how are you) were exchanged.  He then continued with "Did Scott tell you not to talk to me?", which I responded, "No". He then proceeded to harass me about a transaction that transpired between the owners of DR LLC to which I replied "That has nothing to do with me and you need to talk with Scott about anything regarding that." He then said, "So you are refusing to talk to me." I again said, "No".  He then continued to harass me, by demanding answers. He then stated that, "I am still a manager of this place and you need to produce the documents to me." I repeatedly asked him to stop harassing me and to please leave my office. He still continued to press me for answers, and so I asked him to leave my office. He then stated again that he was a manager and turned around and left. Hunter's conduct basically created a hostile and volatile work environment.  I was distracted, disrupted, upset and unable to properly focus on my job.

8.      Pasted below is an email exchange I had with Scott Hepford about all of this.



9.     I declare under penalty of perjury that the foregoing is true and correct.


EXECUTED in Houston, Texas on the ⁓⁓ day of August, 2020.

Melanie St. Laurent

3

**CAUSE NO. 2020-45718**

| | | |
|---|---|---|
| HUNTER CARR, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| STANLEY T. LEWIS, SCOTT | § | |
| HEPFORD, WELL CELL GLOBAL, | § | |
| LLC, and RESTOR METABOLIX, INC. | § | |
| *Defendants*. | § | 127ᵀᴴ JUDICIAL DISTRICT |
| | § | |

---

### DECLARATION OF MARDY TESSIER

---

1.   My name is Mardy Tessier. My date of birth is 11/6/1947, and my address is 19611 Cornerstone Arbor Drive, Cypress, Texas.  I am over the age of twenty-one years, have never been convicted of a felony, and am competent to make this Declaration.  The facts contained herein are true and correct and based upon my personal knowledge.

2.   I am currently in charge of finance and human resources for Diabetes Relief LLC ("DR LLC") and have been with the Company since 2015.

3.   The afternoon of August 5, 2020, I tried to get into our DR LLC online Frost bank account, but was not able to as I had been locked out.  This was very odd so I called customer service and was told that Mr. Carr had called in earlier and told the representative that **my** log in ID was **his** and that they needed to change it from being linked from my debit card number over to being linked to his debit card.  This was also very odd, for obvious reasons, but also because, to the best of my knowledge being the one who manages all the bank accounts and debit cards and credit cards for DR LLC, I was not aware that Mr. Carr had a debit card on DR LLC's account.

4.   Then the Frost representative acknowledged my card number was the one used to set up the account back in the beginning when we opened it in 2015, so he was not sure why they made the changes he said Mr. Carr had just requested.  It's also very concerning that I do not know how he got my ID and password but I am sure when he tried to get on and the security question came up he could not answer any of them so he had to call customer service.

5.   On the Frost online banking system, once you are locked out and you get back on, the system automatically sends you to the security question page and you have to pick three.  Mr. Carr did this with **his own** three security questions and thus made it impossible for me to log in



EXHIBIT

**4**

APPX0781

INSU_PI_001060

and do my job, which is to pay our company's bills, administer our payroll, and keep track of DR LLC's money.

6. The Frost representative told me to call Mr. Carr and tell him he has to set up his own log in with his new debit card and cannot continue to use mine. I did not feel comfortable calling Mr. Carr to deliver this message as I'm not sure what he's up to in light of all this, so I reported these facts to Scott Hepford.

7. That said, I wish this was the end of the story but, unfortunately after I was able to get the account all set back up properly the afternoon of August 5, it appears Mr. Carr **did it again** at approximately 6:30pm August 5, because at that time I was locked out of everything **again**. I went back and fixed it again for the second time but this time I changed my password.

8. Exhibit 1 attached to this declaration is an email I received yesterday from Frost about all of this.

2

9.     I declare under penalty of perjury that the foregoing is true and correct.


EXECUTED in Houston, Texas on the __06___ day of August, 2020.


_____
Mardy Tessier

3

# Ex 1 to Tessier Declaration

**Shawn Bates**

---

**Subject:**　　　　　　　RE: Change of E-Mail Address Notification


-----Original Message-----
From: Mardy Tessier <mardy@H360llc.com>
Sent: Thursday, August 6, 2020 1:23 PM
To: Scott Hepford <scott@wellcellglobal.com>
Cc: Kara Kirker <kara@diabetesrelief.com>
Subject: FW: Change of E-Mail Address Notification

FYI

-----Original Message-----
From: myfrostconfirmation@frostbank.com <myfrostconfirmation@frostbank.com>
Sent: Wednesday, August 5, 2020 4:59 PM
To: Mardy Tessier <mardy@H360llc.com>
Subject: Change of E-Mail Address Notification

To DIABETES RELIEF LLC:

The following e-mail address was changed in your My Frost Online Banking service:

From: MARDY@H360LLC.COM
To:　Hunter@huntercarr.com

Future e-mails from Frost will be sent to the new e-mail address.

If you have questions regarding this request, contact an Internet Banking Specialist by replying to this e-mail or calling 1-877-714-4932.

APPX0784

**INSU_PI_001063**

8/3/2020 11:44:22 AM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 45036945
By: PATEL, DEVANSHI
Filed: 8/3/2020 11:44:22 AM

Pgs-3

TRORX
STBNX
CASO

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| HUNTER CARR and DIABETES | § | IN THE DISTRICT COURT OF |
| RELIEF, LLC | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| STANLEY T. LEWIS, SCOTT | § | |
| HEPFORD, WELL CELL | § | |
| GLOBAL, LLC, and RESTOR | § | |
| METABOLIX, INC. | § | |
| *Defendants.* | § | 127th JUDICIAL DISTRICT |

## TEMPORARY RESTRAINING ORDER

Plaintiff Hunter Carr has applied a temporary restraining order and temporary injunction in this cause.

On the basis of the application, the Court has ordered the issuance of a temporary restraining order because it appears to the Court that, unless you are restrained as ordered below before notice can issue and a hearing can be held, injury is imminent, Plaintiff will be irreparably injured because Defendants have been attempting to remove assets from Diabetes Relief LLC ("Company") improperly and excluding Hunter Carr from his position as Manager of the Company and from and applicant has shown he has plead for permanent relief, he has probable right to relief and that there is inadequate relief at law. participating in the operations of the Company improperly. Defendants are therefore commanded to obey the order of this Court and the Court ORDERS the following:

(1) Any attempts since July 1, 2020 to remove or transfer any assets of Diabetes Relief LLC to Stanley T. Lewis or Scott Hepford or any entity owned or controlled by Lewis or Hepford (including Well Cell Global

**EXHIBIT**

**3**

1 | Page

APPX0785

INSU_PI_001064

~~LLC and Restor Metabolix LLC) are null and void and have no legal force or effect until otherwise ruled by this Court;~~

~~(2) Any attempts by Defendants to remove Hunter Carr from his position as Manager of Diabetes Relief LLC are null and void and have no legal force or effect until otherwise ruled by this Court;~~

(3) Defendants are prohibited from taking any action on behalf of Diabetes Relief LLC except in the normal course of business ~~and only after such action is approved by Hepford and Carr as Managers;~~

(4) Defendants are prohibited from directly or indirectly transferring any assets, money, or other property of Diabetes Relief LLC to any person or entity except in the normal course of business ~~and only after such action is approved by Hepford and Carr as Managers;~~

(5) Defendants are prohibited from making or honoring any agreements with anyone that results in the assets of Diabetes Relief LLC being transferred, encumbered, or concealed from Diabetes Relief LLC or Carr;

(6) Defendants are prohibited from transferring or encumbering any assets, money, or other property of Well Cell Global, LLC. ~~without the written approval of Carr~~ received from Diabetes Relief LLC;

(7) Defendants are prohibited from transferring or encumbering any assets, money, or other property of Restor Metabolix, Inc. ~~without the written approval of Carr; and~~ received from Diabetes Relief LLC;

(8) Defendants are prohibited from excluding Carr from Diabetes Relief LLC's offices ~~property~~, records, documents, or emails ~~or from engaging in any other activities that a Manager is permitted to do according to the Amended Company Agreement dated March 2020.~~

You are further ordered to appear before this Court at  11   A .M. on

_____   at  201 Caroline, Houston  _____ Texas, to
August 17, 2020

show cause why a temporary injunction, effective until final judgment in this

cause, should not be granted as prayed for.

APPX0786

INSU_PI_001065

$1,000.00,

Bond is set at $~~$100;~~ and such bond may be used in support of a temporary

injunction if one is entered in this cause.

ISSUED at _____.M. on _____.

Signed:
8/3/2020
4:08 PM        *Rebecca Susan Collier*

Presiding Judge

APPX0787

INSU_PI_001066

**From:** Paul Kirklin <pkirklin@kirklinlaw.com>
**Sent:** Monday, August 31, 2020 3:43 PM
**To:** Kevin Leyendecker <kleyendecker@AZALAW.COM>; Williams, Carol (DCO) <Carol.Williams@hcdistrictclerk.com>
**Cc:** Patel, Devanshi (DCO) <Devanshi.Patel@hcdistrictclerk.com>; Syptak,Donnie (DCA) <Donnie_Syptak@Justex.net>
**Subject:** Re: 20-45718 Hunter Carr v. Scott Hepford (Temporary Injunctions set 08.31.2020)

Dear Court personnel:

In light of the Court's comments this morning, Mr. Carr is withdrawing his application for temporary injunction, and at least as to his application, he no longer needs to reserve any more time at 4:30 p.m. today.  Please advise the Judge. Thanks very much.


**Paul S. Kirklin**

**The Kirklin Law Firm, P.C.**

12600 N Featherwood Dr., Suite 225

Houston, TX 77034

Office: (713) 571-8300

Fax: (281) 922-6240


**From:** Kevin Leyendecker <kleyendecker@AZALAW.COM>
**Sent:** Monday, August 31, 2020 3:14 PM
**To:** Williams, Carol (DCO) <Carol.Williams@hcdistrictclerk.com>; Shawn Bates <sbates@AZALAW.COM>; Myrna Flores <mflores@AZALAW.COM>; Paul Kirklin <pkirklin@kirklinlaw.com>; 'skirklin312@gmail.com' <skirklin312@gmail.com>; Kelsi White <kwhite@azalaw.com>; Myrna Flores <mflores@AZALAW.COM>
**Cc:** Patel, Devanshi (DCO) <Devanshi.Patel@hcdistrictclerk.com>; Syptak,Donnie (DCA) <Donnie_Syptak@Justex.net>
**Subject:** RE: 20-45718 Hunter Carr v. Scott Hepford (Temporary Injunctions set 08.31.2020)



**EXHIBIT**

**1**

Carol,

Enclosed is a 4 page Bench Brief. Judge Sandill asked for it by 5 pm tomorrow, but it's ready and I don't care if the other side has time to absorb and make arguments in response.

Plus, I think it will help clarify his questions that he asked us to take up at 430 today.

It is in the process of being filed.

Thanks

Kevin

---

**From:** Williams, Carol (DCO) <Carol.Williams@hcdistrictclerk.com>
**Sent:** Wednesday, August 26, 2020 12:01 PM
**To:** Kevin Leyendecker <kleyendecker@AZALAW.COM>; Shawn Bates <sbates@AZALAW.COM>; Myrna Flores <mflores@AZALAW.COM>; 'Paul Kirklin' <pkirklin@kirklinlaw.com>; 'skirklin312@gmail.com' <skirklin312@gmail.com>; Kelsi White <kwhite@azalaw.com>
**Cc:** Patel, Devanshi (DCO) <Devanshi.Patel@hcdistrictclerk.com>; Syptak,Donnie (DCA) <Donnie_Syptak@Justex.net>
**Subject:** RE: 20-45718 Hunter Carr v. Scott Hepford (Temporary Injunctions set 08.31.2020)

Received, thanks.

**From:** Kevin Leyendecker <kleyendecker@AZALAW.COM>
**Sent:** Wednesday, August 26, 2020 12:00 PM
**To:** Williams, Carol (DCO) <Carol.Williams@hcdistrictclerk.com>; Shawn Bates <sbates@AZALAW.COM>; Myrna Flores <mflores@AZALAW.COM>; 'Paul Kirklin' <pkirklin@kirklinlaw.com>; 'skirklin312@gmail.com' <skirklin312@gmail.com>; Kelsi White <kwhite@azalaw.com>
**Cc:** Patel, Devanshi (DCO) <Devanshi.Patel@hcdistrictclerk.com>; Syptak,Donnie (DCA) <Donnie_Syptak@Justex.net>
**Subject:** RE: 20-45718 Hunter Carr v. Scott Hepford (Temporary Injunctions set 08.31.2020)

Defendants (Scott Hepford, Stanley Lewis and Well Cell) are ready to proceed on the 31st as scheduled, as is Diabetes Relief. These parties are represented by AZA.

To my understanding, the parties that are the subject of the competing requests for a TI have been properly serviced.

I anticipate 4 total witnesses for both sides and expect the total hearing time would be 4-5 hours *ish* on the record.

**From:** Williams, Carol (DCO) <Carol.Williams@hcdistrictclerk.com>
**Sent:** Wednesday, August 26, 2020 11:53 AM
**To:** Kevin Leyendecker <kleyendecker@AZALAW.COM>; Shawn Bates <sbates@AZALAW.COM>; Myrna Flores <mflores@AZALAW.COM>; 'Paul Kirklin' <pkirklin@kirklinlaw.com>; 'skirklin312@gmail.com' <skirklin312@gmail.com>; Kelsi White <kwhite@azalaw.com>
**Cc:** Patel, Devanshi (DCO) <Devanshi.Patel@hcdistrictclerk.com>; Syptak,Donnie (DCA) <Donnie_Syptak@Justex.net>
**Subject:** 20-45718 Hunter Carr v. Scott Hepford (Temporary Injunctions set 08.31.2020)

**Good Morning,**

**Please inform the court on:**

1. **Whether or not you are ready to proceed;**
2. **If the parties were properly served; and**
3. **The <mark>length of time</mark> and the <mark>number of witnesses</mark>.**

**Thanks 127th**

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in: Security, archiving and compliance. To find out more Click Here.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in: Security, archiving and compliance. To find out more Click Here.

8/31/2020 9:46 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 45821332
By: CAROL WILLIAMS
Filed: 8/31/2020 9:46 AM

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| HUNTER CARR | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| STANLEY T. LEWIS, SCOTT | § | HARRIS COUNTY, TEXAS |
| HEPFORD, GLENN MASSEY, | § | |
| BRIAN LOVERIDGE, ROY | § | |
| HINMAN, WELL CELL GLOBAL, | § | |
| LLC, and RESTOR METABOLIX, | § | |
| *Defendants.* | § | 127TH JUDICIAL DISTRICT |

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## INJUNCTION HEARING BREIF

---

Defendants' ignore TBOC Section 101.356(b) which requires approval of all of the company's governing persons for any action not apparently for carrying out the ordinary course of business of the company:

> …an action of a limited liability company not apparently for carrying out the ordinary course of business of the company must be approved by the affirmative vote of the majority of all of the company's governing persons.

Removing a Manager in this case would result in a dissolution of the Company, which is obviously an action not apparently for carrying out the ordinary course of business of the company, and it therefore requires approval by the affirmative vote of the majority of all of the company's governing persons, i.e., the Managers, both Carr and Hepford.

**EXHIBIT**

**1**

APPX0792

**INSU_PI_001071**

The Members could never act on behalf of the Company to sell substantially all of its assets because this would violate the provision in the Current Company Agreement in paragraph 7 that says:

> Except as otherwise expressly and specifically provided in this Agreement, **no…Member shall have authority to bind, act for, or assume any obligations or responsibilities on behalf of, any other Manager or Member or the Company.**

This strictly limits the Members powers, and there is no other provision in the Company Agreement that gives the Members any powers except for paragraph 14 which states that "The Company's profits and losses shall be allocated ot the Member Owners according to their proportionate percentages of ownership." All of the Members' statutory powers are given to the Managers in the Current Company Agreement in paragraph 8 as follows:

> The two Member-Managers shall manage the business and affairs of the Company as Managers on an equal basis. **The Managers shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by Members under the laws of the State of Texas.**

To the extent that the TBOC says something that conflicts with the company agreement, the company agreement controls according to TBOC 101.052:

> (a) …the company agreement of a limited liability company governs:
>     (1) the relations among members, managers, and
>     officers of the company, assignees of membership interests in the company, and the company itself; and
>     (2) other internal affairs of the company.
> (b) To the extent that the company agreement of a limited liability company does not otherwise provide, this title and the provisions of Title 1 applicable to a limited liability company govern the internal affairs of the company.

APPX0793

**INSU_PI_001072**

In this case, the Current Company Agreement delegates all of the Members'

statutory powers to the Managers, and the Members explicitly gave up their

powers to bind or act for the Managers, Members, or Company in any way.

Respectfully Submitted,

THE KIRKLIN LAW FIRM, P.C.

By: */s/ Paul S. Kirklin*
    Paul S. Kirklin
    Texas Bar No. 24070063
    Email:  pkirklin@kirklinlaw.com
    12600 N Featherwood Dr, Suite 225
    Houston, TX 77034
    Tel. (832) 969-1821
    Fax. (281) 922-6240
    *Attorney for Carr*

APPX0794

**INSU_PI_001073**

## CERTIFICATE OF SERVICE

I certify that the foregoing instrument was electronically served on all counsel of record on August 31, 2020 in accordance with the Texas Rules of Civil Procedure, including to the following:

Kevin Leyendecker
kleyendecker@azalaw.com
*Attorney for Hepford, Lewis, and Well Cell Global, LLC*

/s/ Paul S. Kirklin
Paul S. Kirklin

APPX0795

**INSU_PI_001074**

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| HUNTER CARR,<br>  *Plaintiff,* | §<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | |
| STANLEY T. LEWIS, SCOTT<br>HEPFORD, WELL CELL GLOBAL<br>LLC, and RESTOR METABOLIX, INC.<br>  *Defendants.* | §<br>§<br>§<br>§<br>§<br>§ | HARRIS COUNTY, TEXAS<br><br>127ᵀᴴ JUDICIAL DISTRICT |

## DECLARATION OF SCOTT HEPFORD

  1.  My name is Scott Hepford. My date of birth is 2/23/1975, and my address is 19611 Cornerstone Arbor Drive, Cypress, TX 77433. I am over the age of twenty-one years, have never been convicted of a felony, and am competent to make this Declaration. The facts contained herein are true and correct and based upon my personal knowledge. I am the CEO of Well Cell Global LLC ("Well Cell"), and I am also an owner and manager of Diabetes Relief LLC ("Diabetes Relief").

  2.  In late September 2020, a new box of checks was delivered to Diabetes Relief's offices. They were checks for the Diabetes Relief Frost bank account. I did not order these checks. I have investigated the situation to try to understand the source of the checks. These checks were not ordered through Frost, but through a third party, Checks Unlimited. I have since learned from Checks Unlimited that the checks were ordered on September 13, 2020, and that the name on the order was Frank D. Spires. No one with this name has worked at Diabetes Relief.

  3.  The slide deck attached to Well Cell's Response to Plaintiff Hunter Carr's Motion to Dismiss under the TCPA as Exhibit 10 is a true and correct copy of a slide deck I created and presented at the July 24, 2020 Members Meeting for Diabetes Relief. The agreement attached as Exhibit 15 to Well Cell's Response is a true and correct copy of the asset purchase agreement with Diabetes Relief.

  4.  Sometime on or around September 14 through September 21, Carr went to Diabetes Relief's office while I was out of town traveling. Stanley Lewis lives in California and is not usually present at the office. Carr removed numerous pieces of property from the office, despite that we had previously agreed via counsel that he would provide a list of the items he believed belonged to him prior to removing anything so that the parties could reach an agreement about who owned what or store disputed items for resolution in this case. Carr did not provide any list and instead took property from Diabetes Relief's offices while I was gone. Although it is hard for me to determine everything that was taken because he moved things around and left some of his

1



EXHIBIT<br>1<br>APPX0796

own old, bulky property at the office, it was obvious that Carr had removed at least the company's leather couches, wall decorations, and mirrors. These pieces of property are a part of the assets Diabetes Relief has agreed to sell to Well Cell under the asset purchase agreement that Diabetes Relief approved by majority action on July 24, 2020.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in Houston, Texas on the 19th day of January, 2021.

Scott Hepford

APPX0797

INSU_PI_001076

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| HUNTER CARR, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| STANLEY T. LEWIS, SCOTT | § | |
| HEPFORD, WELL CELL GLOBAL, | § | |
| LLC, and RESTOR METABOLIX, INC. | § | 127TH JUDICIAL DISTRICT |
| Defendants. | § | |
| | § | |

## DECLARATION OF STANLEY LEWIS

1. My name is Stanley Lewis. My date of birth is ___01/04/1967___, and my address is ___8410 WHALE WATCH WAY LAJOLLA CA 92037___. I am over the age of twenty-one years, have never been convicted of a felony, and am competent to make this Declaration. The facts contained herein are true and correct and based upon my personal knowledge. I am an owner of Well Cell Global LLC ("Well Cell") and am also an owner of Diabetes Relief LLC ("Diabetes Relief").

2. I did not order any checks for the Diabetes Relief Frost bank account in September 2020. I personally do not even know the full bank account number for Diabetes Relief's account at Frost.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in Houston, Texas on the 19th day of January, 2021.

Stanley Lewis

2

**EXHIBIT**

**7**

1/20/2021 1:28 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 49864160
By: Devanshi Patel
Filed: 1/20/2021 1:28 PM

**CAUSE NO. 2020-45718**

| | | |
|---|---|---|
| HUNTER CARR, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| STANLEY T. LEWIS, SCOTT | § | |
| HEPFORD, WELL CELL GLOBAL, | § | |
| LLC, and RESTOR METABOLIX, INC. | § | |
| *Defendants*. | § | 127TH JUDICIAL DISTRICT |
| | § | |

---

### SECOND AMENDED NOTICE OF ABANDONMENT

---

Defendant and counterclaimant Well Cell Global LLC ("Well Cell") hereby abandons with prejudice its tortious interference with existing contract counterclaim, alleged in the Defendants' Second Amended Counterclaims, ¶¶ 31–35.[1] This abandonment with prejudice **only** applies to this claim brought by Well Cell. *See* TEX. R. CIV. P. 165. The other Defendants will continue to pursue their claims against Plaintiff Hunter Carr.

**EXHIBIT**

**8**

---

[1]     Well Cell's Amended Notice of Abandonment on January 14 erroneously identified a prior, superseded pleading (the First Amended Counterclaim).

Respectfully Submitted,

**AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING, P.C.**

*/s/ P. Kevin Leyendecker*
P. Kevin Leyendecker
Texas Bar No. 00784472
Shawn M. Bates
Texas Bar No. 24027287
Kelsi Stayart-White
Texas Bar No. 24098466
1221 McKinney, Suite 2500
Houston, Texas 77010
Telephone: 713.655.1101
Facsimile: 713.655.0062
kleyendecker@azalaw.com
sbates@azalaw.com
kwhite@azalaw.com

2

**INSU_PI_001079**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been served on all counsel of record via the Court's electronic filing system on January 20, 2021.


*/s/ Kelsi S. White*
Kelsi S. White

3

| From: | Wayne D. Collins |
|---|---|
| To: | Kevin Leyendecker; Kelsi White |
| Cc: | Andrew Meade; Holly Barnes |
| Subject: | RE: Carr/Hepford |
| Date: | Wednesday, January 06, 2021 5:46:15 PM |

Kevin,

The anti-slapp motion will not be withdrawn.

The discussion started with me attempting to provide dates for the deposition you wanted to take related to the anti-slapp. You then indicated you were dropping the claim and followed with the statement "you can do what you want with the anti-slapp motion but we are dropping the tortious interference claim."

I nor Meade & Neese communicated or agreed to would drop the anti-slapp motion.

In the meantime, I inquired about the status of the loans and the status of any potential sale proceeds and received no meaningful response.

My position is that the tortious interference claim was an improper claim that was used to thwart the efforts of Mr. Carr to protect the assets of the company and his interest. The filing of improper claim played a role in completing the improper ouster of Mr. Carr and the improper sell of the assets of Diabetes Relief LLC and the assets of entities owned and controlled by my client.

The decision to drop the tortious interference claim after most of the damage was done is not lost on my client.

**Wayne D. Collins**
*Senior Counsel*



**Meade & Neese LLP**
2118 Smith Street | Houston, Texas 77002
713-658-9052 | 713-446-6239 (mobile)
**website** | **bio** | **vCard** | **map** | **email**

This email may be a privileged communication. If you are not the intended recipient, please delete it.

**From:** Kevin Leyendecker <kleyendecker@AZALAW.COM>
**Sent:** Wednesday, January 6, 2021 5:18 PM
**To:** Wayne D. Collins <wcollins@meadeneese.com>; Kelsi White <kwhite@azalaw.com>
**Cc:** Andrew Meade <ameade@meadeneese.com>; Holly Barnes <hbarnes@meadeneese.com>
**Subject:** RE: Carr/Hepford

Wayne,



INSU_PI_001081

Following up on our discussion from a few weeks ago in which you said you would drop the anti-slap if we nonsuited that claim, which we have now done.

Please advise if that is still your position and if so, when you are going to drop the anti-slap.

Kevin

---

**From:** Wayne D. Collins <wcollins@meadeneese.com>
**Sent:** Wednesday, December 9, 2020 3:12 PM
**To:** Kevin Leyendecker <kleyendecker@AZALAW.COM>; Kelsi White <kwhite@azalaw.com>
**Cc:** Andrew Meade <ameade@meadeneese.com>; Holly Barnes <hbarnes@meadeneese.com>
**Subject:** RE: Carr/Hepford

Mr. Leyendecker:

The statement was "In an effort to confer probable injunctive matters." Please forgive the omission of "on" probable injunctive matters. As we have previously discussed related to the SBA, loan a complete prohibition exists of disposal or transfer of assets without approval from the SBA. This prohibition also exists in the PPE funding, which I understand is in the process of being transferred from loan status to grant/forgiveness status. As we have not been made privy to the terms of the sale agreement/transfer of assets, as a signer/guarantor on the SBA and PPE, Mr. Carr has potential affirmative duties to mitigate and/or prevent a breach those agreements. As indicated before, we were prepared to seek injunctive relief on the SBA matter. This issue is still in "limbo" on the PPE.

Thank you for providing the status of these two matters. Any additional information you are able to provide will undoubtedly help to reduce the waste of the court's resources.

I hope you have wonderful day.

Sincerely,

**Wayne D. Collins**
*Senior Counsel*



**Meade & Neese LLP**

2118 Smith Street ǀ Houston, Texas 77002
713-658-9052 ǀ 713-446-6239 (mobile)

**website** ǀ **bio** ǀ **vCard** ǀ **map** ǀ **email**

---

This email may be a privileged communication. If you are not the intended recipient, please delete it.

---

**From:** Kevin Leyendecker <kleyendecker@AZALAW.COM>

**Sent:** Wednesday, December 9, 2020 2:54 PM
**To:** Wayne D. Collins <wcollins@meadeneese.com>; Kelsi White <kwhite@azalaw.com>
**Cc:** Andrew Meade <ameade@meadeneese.com>; Holly Barnes <hbarnes@meadeneese.com>
**Subject:** RE: Carr/Hepford

I don't understand what you mean by "in an effort to confer probably injunctive matters…"

If you are asking what is the status of the PPP and SBA loan, here is my response.

SBA has been paid in full.

The last I heard on the PPP loan was that the company was either in the process of applying for or had already applied for forgiveness pursuant to the terms of that PPP program. But no response has been received on that request for forgiveness.

Also, the wind down plan being implemented by the company includes setting aside sufficient proceeds from the sale to pay off the PPP loan in the event some or all of that is not forgiven.

---

**From:** Wayne D. Collins <wcollins@meadeneese.com>
**Sent:** Wednesday, December 9, 2020 2:34 PM
**To:** Kevin Leyendecker <kleyendecker@AZALAW.COM>
**Cc:** Andrew Meade <ameade@meadeneese.com>; Holly Barnes <hbarnes@meadeneese.com>
**Subject:** Carr/Hepford

Kevin:

In an effort to confer probable injunctive matters, please see the comments and questions below.

Please provide a status on the PPE loan/grant? The same language and issues as with the SBA loan are present. Injunctive relief to preserve remedies and protect from additional liabilities will be required. I would appreciate a prompt response.

Based on prior correspondence and communications, it is my understanding the SBA loan is paid in full, which would resolve any injunctive relief sought on this issue.  If this understanding is incorrect, please advise.

Feel free to contact me on my cell, below.

APPX0804

**INSU_PI_001083**

**Wayne D. Collins**
*Senior Counsel*



# Meade **&** Neese LLP

2118 Smith Street | Houston, Texas 77002
713-658-9052 | 713-446-6239 (mobile)

**website** | **bio** | **vCard** | **map** | **email**

This email may be a privileged communication. If you are not the intended recipient, please delete it.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

---

This email has been scanned for spam and viruses. Click here to report this email as spam.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

---

This email has been scanned for spam and viruses. Click here to report this email as spam.

APPX0805

**INSU_PI_001084**



# 360 COMPANIES



**Diabetes Relief** ®

*Get your life back*

## Physician Directed Physiologic Insulin Resensitization

## Members Meeting
### *"Burning Platform"*

**24th July 2020**

Diabetes Relief LLC
Glenn Massey – Chief Growth Officer
11511 Katy Freeway, Suite 100
Houston, Texas 77079

Revision – 07.24.20

E: glenn@diabetesrelief.com
M: 713-582-0449
O: 281-600-5000
W: diabetesrelief.com

**EXHIBIT**
**10**

exhibitsticker.com

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC APP 2020 – All rights reserved.

**INSU_PI_001085**




# Hunter's Buyout

## Highlights:

- Diabetes Relief (i.e. Scott & Stanley) is offering to Buyout Hunter for a $3m equivalent over time
  - **$3,000,000 – 41%** of all Outstanding AP + 41% of all cash on hand (as of 07.24.20)
- The Buyout is structured to be a "Redemption Agreement & Resignation Letter" therefore it should work nicely for Hunter's long-term cap gains
- The payout is structured in a manner that tries to balance between Hunter's needs and the future and the Companies needs and the future
- The offer is being made today, can be effective today, but needs to be responded to in 5 days or it will be revoked, and the funds will be alternatively purposed
- The Buyout is structured to be in exchange for ALL of Hunter's interest in ALL DRL, RMX, H360 etc. companies
- At the signing of Hunter's Buyout each of the 3 members will receive a **$100,000.00** payment as an incentive; however, if Hunter rejects the offer these funds will be alternatively purposed
- The Buyout is structured over a payment term of **48 months** with a balloon payment at the end

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC All rights reserved.

2

INSU_PI_001086




# Outstanding AP as of 7/24/20

| CATEGORY | ITEM | AMOUNT | DUE DATE |
|---|---|---|---|
| **Computer and Internet** | | | |
| **Equipment Purchases** | | | |
| | Zyno - Past Equipment | $123,981.50 | Past Due |
| | Zyno - Additional Inventory to satisfy current contracts | $63,351.00 | Past Due |
| | Zyno - Additional Inventory (Pari) | $21,180.00 | Past Due |
| **Marketing (and IC Commissions)** | | | |
| | Vince Liguori (Vapisen - paid 12/31/19) | $6,800.00 | 01/15/20 |
| | James Loveridge (Rising Health - paid 01/31/20) | $3,800.00 | 02/15/20 |
| **Payroll Expenses** | | | |
| | Q2 2020 TX SUTA | $454.90 | 07/31/20 |
| **Professional Fees (and Development)** | | | |
| | Dr. hall | $5,625.00 | 10/18/19 |
| | Lon Kirk | $3,000.00 | 07/01/20 |
| | Nommensen & Williams, P.C. – 2018 Tax Returns | $15,640.00 | 10/01/19 |
| | Nommensen & Williams, P.C. – 2019 Tax Returns / Clean Up | $45,000.00 | |
| | Great Lakes Medical Billing | $23,740.26 | 06/30/20 |
| **Property Taxes** | | | |
| **Rent** | | | |
| | Electric Recovery - Jun | $791.05 | 06/30/20 |
| **Software** | | | |
| | One Healthcare Solutions | $3,420.18 | 03/31/20 |
| **American Express** | | | |
| | Amex Balance - HIMAC (Old) | $32,827.92 | |
| | Amex Balance - HIMAC (New) | $49,807.01 | |
| | Amex Balance - SH (Old) | $44,045.35 | |
| | Amex Balance - SH (New) | $7,790.89 | |
| **Personal Loans** | | | |
| | Scott (Lloyd Loan) | $22,000.00 | 07/17/19 |
| | Scott (Zyno Payment) | $11,400.00 | 04/05/19 |
| | Hunter (Zyno Payment) | $9,216.01 | 03/11/20 |
| **Patents** | | | |
| | Patent Application Fee | $1,100.00 | |
| **Gov Loans** | | | |
| | PPP Loan | $292,400.00 | |
| | SBA Loan | $150,000.00 | |
| | Outstanding AP Total: | $932,374.07 | $ 384,322.14 |
| | Outstanding AP Less the PPP Loan | $544,971.07 | |

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC. All rights reserved.

INSU_PI_001087

3

# Carol's Chart of Entities




**Diabetes Relief**
**H360 COMPANIES**
Get your life back

Revision – 07.24.20

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC. All rights reserved.

**INSU_PI_001088**

---

## INTERNAL USE ONLY: NOT FOR DISTRIBUTION
### CHART OF H360 AND DR ENTITIES as of 7/21/20

### H360 Entities

**H360 LLC (Mothership)**
Carr, Hepford, Lewis are equal co-managers, members, and owners
formed 6/29/14          TaxID 47-1169682
Bank Account at Frost

**RenuMetabolix**, a d/b/a of H360 LLC.
Assumed Name Certificate issued by Texas SOS 11/3/16 filed in Harris County 11/8/16; purpose is to license DR treatment to new licensees who prefer a name that doesn't include "diabetes". Currently any income goes to and is processed by DR and DR pays all expenses

### Diabetes Relief Entities

**Diabetes Relief LLC (Mothership)**
Currently 18.2% (50 units) owned by Lewis; 40.9% (113 units) by Hepford; 40.9% (113 units) by Carr; all units formerly owned by H360, but Co. Agt. amended effective 3/22/20; Manager/Members are Carr and Hepford; Lewis is also a Member
1/8/15          47-2732526
Bank Account at Frost

**Diabetes Relief Management Series LLC** Mgr on/or DR clinics; Mgrs are Carr & Hepford; owned 100% by H360 LLC    3/9/16          81-1754858

**Diabetes Relief Greater Houston Series LLC** owned 100% by DR LLC 2/1/16          81-1417061

**Diabetes Relief Houston Westside Series LLC** (Indo Fwy Ste 100) (mm's each of Katy Fwy Treatment Center); billing done by DRLLC; Mgr agt with DR Mgr; owned 89% by DRLLC; 10% by Carr & Hepford; McConnell, Mgrs are Carr & Hepford; formed 3/22/16          81-1930164

### Utah Entity

**Diabetes Relief Utah Ogden LLC** (owned by DR LLC [26%] and investors [FK]; licensed treatment center in Layton UT has mgt contract with DR Mgr; in process of Rezoning (independent) 02/15/17          81-5337066

### DR Businesses Closed
**Entities Need to be Transferred or Dissolved or Changed**

**Diabetes Relief Houston The Woodlands LLC** (40% by DR LLC; 40% by YCS, LLC [Harding Yep's company], 17% by MBV LLC [Dr. Martin Valdes's company], 2% by Dr. Brian J. Conley  9/15/16     81-3868503 Last clinic was on Red Oak Isure settled and all items have been moved out

**Diabetes Relief Houston Southwest LLC** Managers, Carr, Lewis, Hepford; 90 units owned by DR LLC; Series by Quest IRA FBO Brian Dr. Base just signed purchase agt for 20 units, leaving DRHSW with 70   7/11/16   81-3271920
CLINIC CLOSED - TO BE DISSOLVED

---

### INACTIVE OR DORMANT ENTITIES

**H360 Series 1**
(orig. intended as "holding company"; nothing in it)  formed 7/7/14  Tax ID 47-1263094

**H360 LLC Series 100** (orig intended as the "management company", contracted with H360 LLC and Tim Dixon (RE)  No signed lease at 1355 Katy Fwy; intended    77714

**H360 Finance Series LLC** (orig intended to finance treatments; nothing in it) 1/17/14  47-2227394

**H360 Lighting Series LLC** (had contract with DR; owner/DR; Frost bank account closed; NO LONGER ACTIVE)  12/4/14  47-2488852

**H360 Labs Series LLC** (for supps & products; LABELS Magnesium lotion sold in DR clinics; Frost bank account CLOSED per Kara Kielsr)  7/14/15   47-4539607

**Advantage Revenue Solutions Series LLC** Managed by H360; Owned 67% H360 33%; Peters; (intended as billing company; Amended Articles have been filed with Manager voted to reject LLC to its plan)  NOT IN USE   1/12/16

**Advantage Revenue Solutions LLC** (set up to replace ARS Series LLC as billing co for Kristal because Chase would not open bank acct for Series LLC; Carr & Hepford Members; Managers Kristal Juul, exploded; IN LITIGATION; 03/13/17  82-0769757

**Diabetes Relief Series LLC Spring Branch East** (intended as DR treatment 9/10/15  82-474744 SETTLEMENT ACT WITH DR. DUNN AND DAVID HAYES. DISSOLUTION 3/21/16

---

**Diabetes Relief Houston Southside Series LLC** (set up per proposed deal that was never done) 4/12/16   81-2198031

**Diabetes Relief Houston South LLC**
NO BUSINESS CONDUCTED
(was owned 60 units by Carr [for BiomaRxics], 30 by Lewis, and 30 by Hepford; ALL CERTS CxLD; Then to be treatment center in Dr. Bush's ofc with Annelia L. Bass PLLC 60% owner; ALL CxLD FOR DR HSW LLC
1029/16    81-2696116

**Diabetes Relief Austin West LLC** (owned 50 units each by Diabetes Relief LLC and Stanley T. Lewis; status ????????? HAS NEVER DONE ANY BUSINESS 11/28/16    81-4353904

**Health Restoration Partners, LLC**, was d/b/a Trina Health West Houston; Mgrs are Hunter and Scott and author, but has appealed Medicare decision to not pay to Trina in 2013 & 2016.  Status unknown

**WYOMING CORDS (created 2016** all with Attorney Singleton as Registered Agent and Wyoming address in Cheyenne; all with Carr, Hepford, and Lewis as incorporators; Amended Articles have been filed with Wyoming; Annual reports have all been filed; NO PROFIT; NO BUSINESS, NOTHING HAPPENING

**Diabetes Relief International Inc.** Intended:  Hepford 35%; Carr 24.5%; Lewis 24.5%   2/15/18   81-4428952 1M pref; 10M common
Corp docs prepared but not signed

**Diabetes Relief USA Inc.** Intended:  Carr 51%; Hepford 24.5%; Lewis 24.5%   2/15/18   82-4455721 1M pref; 10M common
Corp docs signed

---

**H360 Inc.,** Owned equally among Lewis, Scott, and Hepford, with profits flowing up to it  5/23/18          83-0680422
100,0 pref; 500M common
Minutes and Bylaws Adopted; Minutes to be amended showing equal ownership

**NOT CONNECTED WITH DR:**

**Stone Mountain Way LLC TO BE CLOSED?** (Hunter & Scott are Member-Mgrs; Lewis is also a member; It is Co-General Partner of Stone Mountain Drilling LLP, with Dr. Lewis's Stone foundation not properly documented 12/22/16          81-4778411

**Stone Mountain Drilling LLP TO BE CLOSED?** controlled by Bill Wallace; CFO of Stripes Oil & Gas; Stanley Lewis and Stone Mountain Way LLC are Co-General Partners; Need EIN.

**INTERNAL USE ONLY**
**NOT FOR DISTRIBUTION**



# Asset Purchase

## Highlights:

- Substantially all DRL, H360, etc. assets will be sold to Well Cell Global LLC for **$3,793,511**
- The Asset Purchase Term will be 48 months

| Date | Amount | Date | Amount | Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|------|--------|------|--------|
| Jul-20 | $ 345,832 | Jan-21 | $ 60,832 | Jan-22 | $ 20,000 | Jan-23 | $ 20,000 | Jan-24 | $ 20,000 |
| Aug-20 | $ 60,832 | Feb-21 | $ 60,832 | Feb-22 | $ 20,000 | Feb-23 | $ 20,000 | Feb-24 | $ 20,000 |
| Sep-20 | $ 60,832 | Mar-21 | $ 60,832 | Mar-22 | $ 20,000 | Mar-23 | $ 20,000 | Mar-24 | $ 20,000 |
| Oct-20 | $ 60,832 | Apr-21 | $ 60,832 | Apr-22 | $ 20,000 | Apr-23 | $ 20,000 | Apr-24 | $ 20,000 |
| Nov-20 | $ 60,832 | May-21 | $ 60,832 | May-22 | $ 20,000 | May-23 | $ 20,000 | May-24 | $ 20,000 |
| Dec-20 | $ 60,832 | Jun-21 | $ 60,832 | Jun-22 | $ 20,000 | Jun-23 | $ 20,000 | Jun-24 | $ 20,000 |
|  |  | Jul-21 | $ 60,832 | Jul-22 | $ 20,000 | Jul-23 | $ 20,000 | Jul-24 | $ 1,813,539 |
|  |  | Aug-21 | $ 60,832 | Aug-22 | $ 20,000 | Aug-23 | $ 20,000 |  |  |
|  |  | Sep-21 | $ 60,832 | Sep-22 | $ 20,000 | Sep-23 | $ 20,000 |  |  |
|  |  | Oct-21 | $ 60,832 | Oct-22 | $ 20,000 | Oct-23 | $ 20,000 |  |  |
|  |  | Nov-21 | $ 60,832 | Nov-22 | $ 20,000 | Nov-23 | $ 20,000 |  |  |
|  |  | Dec-21 | $ 60,832 | Dec-22 | $ 20,000 | Dec-23 | $ 20,000 |  |  |

- The Asset Purchase will take place on 07/24/2020
- Operations events related to the purchase will be conducted on the following schedule
- Well Cell Global LLC intentions are contained in the following slides



Revision – 07.24.20

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC All rights reserved.

5

# Restructure Objectives (The What)





**Focus Areas**
- Current / Future IP Holder & IP Advancement
- Global Data Aggregation, Holding & Monetization
- Foster Research Advancement & Publications
- Master Licensor to Diabetes Relief & Restor Metabolix
- Provides Direct Licenses (Specialty Channels / No CMS)
  - Global Risk MSO Providers
  - Indian Country US & CA
  - International Licenses & Agreements
  - Cash Pay Licenses
    - Integrative Medicine
    - Functional Medicine
    - Regenerative Medicine
- Data Aggregation & Reporting
- Brand Management

**Brand License Options**







**RESTOR** METABOLIX. **INC**

**Focus Areas**
- Exclusive US Limited Sub Licensor
- Provide Insurance Practice Licenses
  - Current Ins. Practice Licensees
  - Future Limited Ins. Practice Licensees
- Data Aggregation & Reporting

**Brand License Options**

**Diabetes Relief** **RESTOR** METABOLIX.



**Diabetes Relief** **LLC**

**Focus Areas**
- Houston, TX Facility Management Transition
- Layton, UT Facility Management Transition
- Supports Current Licensees Needing Workout
- Data Aggregation & Reporting

**No New Licenses**

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC APP XXXX. All rights reserved.

**INSU_PI_001090**

Revision – 07.24.20

# Restructure Schedule (The How)







| Jul | Aug | Sep |
|---|---|---|

**Well Cell Global LLC:**

Execute Indian Country Channel Partner Agreement

Issue New Licenses to all Good Standing Indian Country & International Licensees

Start Selling Licenses to Dr. Hinman's Global Risk Managed Care MSO Pipeline

Establish Management Agreements with Diabetes Relief & Restor Metabolix

Funnel Organic Sales to the Correct Brands

Filter Low Performers and Support Licenses

7/24 – IP, Assets & Active Licensee Portfolio Transaction Closing

Draft Definitive Agreement

**Restor Metabolix INC:**

DR Inc Sub-Licenses to Limited Insurance Practices

Execute reFY's World Channel Partner Agreement

Issue New Sub Licenses to all Good Standing Licensees

WCG Issues DR INC Limited Master Sublicense

7/25 – Create RMX INC – TX

**Diabetes Relief LLC:**

Cancel all Good Standing Licensee Agreements

Payoff Outstanding AP & Creditors (Starting with Zyno & American Express)

Transfer All Pump & Set Sales Fulfillment and Training/Support into Well Cell Global

7/24 – IP, Assets & Active Licensee Portfolio Transaction Closing

Draft Definitive Agreement

**DR Houston Westside LLC**
**DR Utah Ogden LLC:**

DR Clinics Ownership (TX & UT) Transfers to SH & SL 50/50

Transition HWS Clinic Out of Big DR & Consolidate Greater Houston Investors

Transition UTAH Clinic Out of Big DR to be Independently Self Managed

DR Clinics are Stand Alone Practices

8/1 – Co-Founders Transaction Closing

Draft Definitive Agreement

**Hunter Carr**
**Scott Hepford**
**Stanley Lewis:**

Confirm Hunter's Buyout Intentions

Hunter Receives a Payment of $15k/Month for 17 Months following his $100k signing payment

When Obligations Cleared – Hunter Receives $20k/Mos. Up to 24 Months and then a Final Balloon

7/24 – Redemption of Ownership Interest & Severance Agreement Transaction Closing $100k @ Signing

Draft Offer

Revision – 07.24.20

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC APP XXX All rights reserved.   INSU_PI_001091



**Diabetes Relief**
*Get your life back*

# Asset Purchase to Sale

**Diabetes Relief**
*Get your life back*

RESTOR METABOLIX

H360 LABS

## All Assets: (Included but not limited to)

- Issued Patents
  - 05/16/17 – 1st U.S. Patent No. 9,652,595 issued by USPTO
  - 01/14/20 – 2nd U.S. Patent No. 10,533,990 issued by USPTO
- Pending Patents
  - 3rd U.S. Patent Application No. 15/042,087 pending by USPTO
- All Copyrights and Trade Secrets
- All Physiologic Insulin Resensitization dosing protocols, algorithms, protocols, charts, venn diagrams, presentations, webinars, whitepapers, studies, etc.
- Vendor Contracts
  - Zyno Solutions LLC Distribution Agreement
  - SmartLev & Jot.Form agreements and data
- Creative Materials
  - All logo's, pictures and artwork for all brands and companies associated with Diabetes Relief, RestorMetabolix, H360, etc.
  - All signage set ups, formats, designs and brand guides
  - All social media content and materials
  - All videos, animations, testimonials, pictures, VR platforms
- Office Furniture, Equipment & Supplies in the following locations:
  - 11511 Katy Freeway Houston, TX 77079 suites 100, 101, 135, 430
  - 11010 Old Katy Rd Houston, TX 77043 #D042
- Medical Supply Inventory
  - Infusion Pumps and Cassettes Inventory
- Software
  - Full Microsoft 365 Environment, CRM, EMR, PM, and all data contained within each system

- All intercompany agreements & Int'l authorized representative agreements
- All Cash in all accounts
- License Agreements (Non-Federal Payments)
  - Yeni Yuzyil Turkey License
  - Diabetes Relief Middle East
  - Dr. Hinman / Island Doctors
  - First American Health - Morongo
- License Agreement (Non-Federal Payments)
  - Dr. Wrobel
  - Dr. Valpiani
  - Diabetes Relief Houston Westside
  - TruMetabolics
  - Dr. Toole / TW Medical Group
  - Dr. Taylor Internal Medical
  - Synergize Health Center
  - Dr. Smith / Active Life Phys Med
  - Dr. Shah / Whole Health Austin
  - Dr. Sanchez / Del Rio Foot Clinic
  - Dr. Ross / WRE, LLC
  - Rising Health
  - Dr. Ramirez
  - Dr. Pham / Metabolic Recharge
  - Dr. Perijoc / North TX Inter. Med
  - NSI Cleanwater
  - Dr. Novak
  - Dr. Neret
  - Dr. McLean / McLean Cares
  - Dr. McConnell
  - Dr. Mbakwe
  - Diabetes Relief Utah Ogden
  - Dr. Grubbs / Vascular Spec.
  - Dr. Ghen, MD, PA / Total Health
  - Dr. George
  - Dr. Dembowski / ATL Med Clinic
  - Dr. Cavaciuti / Back to Life
  - Dr. Beeharilal
  - Dr. Avila

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC APP All rights reserved.

**INSU_PI_001092**



**Physician Directed Physiologic Insulin Resensitization**

Thank You

USA - 31
UT - 3
FL - 6
CA - 5
LA - 1
AL - 1
GA - 5
AZ - 3
TX - 6
MD - 1
NY – R COE

Turkey - 1
Lebanon - 2
Azerbaijan - 1
Zimbabwe – R COE
Jamaica – R COE

Diabetes Relief LLC
Glenn Massey – Chief Growth Officer
11511 Katy Freeway, Suite 100
Houston, Texas 77079

E: glenn@diabetesrelief.com
M: 713-582-0449
O: 281-600-5000
W: diabetesrelief.com

Get your life back

Confidential – Unauthorized Distribution Prohibited – Copyright © H360 LLC ARP XR14 rights reserved.

INSU_PI_001093

Revision – 07.24.20

# AMENDED
# COMPANY AGREEMENT
# Diabetes Relief LLC
## A TEXAS SERIES LIMITED LIABILITY COMPANY
### Manager Managed

This Amended Company Agreement (the "Agreement") of **Diabetes Relief LLC**, a Texas Series Limited Liability Company  ("the Company") is made and entered into effective **March 23, 2020**, by its Manager-Memberss, **HUNTER M. A. CARR** and **SCOTT HEPFORD** ("Managers" or "Manager-Members").  In this Agreement Hepford and Carr may be referred to as Managers or Members or Manager-Members. This series limited liability company was formed pursuant to and in accordance with the Texas Business Organizations Code, Title 3, Limited Liability Companies, Chapter 101, Subchapter M, Series Limited Liability Company, Sec. 101.601 through 101.621, effective September 1, 2009, as amended from time to time ("the Act") (*see* "Purpose" infra.). The Manager-Members hereby agree as follows:

1.      Formation

**A.** The Company was formed on January 5, 2015, by the filing of the Series Limited Liability Company Certificate of Formation with the Secretary of State of the State of Texas (the "Certificate of Formation").  Except as otherwise provided in this Agreement, the rights, duties, liabilities, and obligations of the Managers, and all other persons who become Managers or Members of the Company in the manner set forth herein, and the administration, dissolution, winding up, and termination of the Company shall be governed by the Act.

**B.** The Company's original managers were Hunter M. A. Carr and Scott Hepford. At a Meeting of the Managers held on November 17, 2017, Stanley T. Lewis was added as a new Member and Manager, with all three Managers having equal authority and responsibility.

-1-

**EXHIBIT**

**11**

APPX0815

INSU_PI_001094

**C.** Stanley Lewis has resigned as Manager due to other commitments, and his resignation has been accepted and consented to for all purposes, and is approved, affirmed, and confirmed by this Agreement.

**D.** This Agreement is made and entered into in order to clearly confirm the state of the Company and its ownership for going forward in carrying on its business.

## 2.      Offices

The principal business office of the Company is currently located at 11511 Katy Freeway, in  Suites 101 and 135, Houston, Texas 77079, which may change from time to time, depending upon necessity and circumstances. The Company's clinic is located at 11511 Katy Freeway, Suite 100, Houston, Texas 77079. The Company's registered office and the name of its initial registered agent at such address are 2500 Wilcrest Drive, Suite 300, Houston TX 77042, and Robert Sonfield,  as set forth in the initial Certificate of Formation  filed with the State of Texas.  The Company's registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name and the acceptance of the new registered agent with the Texas Secretary of State pursuant to the Act.

## 3.      Purpose

The Company was originally formed for the object and purpose of operating a comprehensive diabetes and metabolic disease treatment center in the building located at 11511 Katy Freeway, Houston, Texas 77079, and to operate additional centers, both licensed and managed, within and outside the State of Texas. Through experience, the Managers have determined that the Company's interests are best suited, and patients will best be served if the Company shifts its focus to the licensing of its patented procedures to existing medical clinics and professionals.  The clinic business of the Company has been transferred to Diabetes Relief Greater Houston Series LLC, a separate Texas Series LLC owned by Company and created February 11, 2016, with the clinic operated by Diabetes Relief Houston Westside Series LLC, which is owned by Company and others. Business may be conducted and promoted by the Company and it may engage in

-2-

any lawful activity for which limited liability companies may be formed under the Act and in any and all activities necessary or incidental to the foregoing. The Company and any future Series LLCs created thereunder will specifically be limited pursuant to Subsection (a), Sec. 101.602, Business Organizations Code, State of Texas, so that (1) the debts, liabilities, obligations, and expenses incurred, contracted for, or otherwise existing with respect to a particular series shall be enforceable against the assets of that series only, and shall not be enforceable against the assets of the limited liability company generally or any other series; and (2) none of the debts, liabilities, obligations, and expenses incurred, contracted for, or otherwise existing with respect to the limited liability company generally or any other series shall be enforceable against the assets of a particular series.

## 4.   Registered Agent

The name and address of the registered agent of the Company for service of process on the Company in the State of Texas is Robert Sonfield, 2500 Wilcrest Drive, Suite 300, Houston, Texas 77042.

## 5.   Managers

The names and the addresses of the Managers, who are also Members, are as follows:

Hunter M. A. Carr, 11511 Katy Fwy, Suite 101, Houston TX USA 77079
Scott Hepford, 11511 Katy Fwy, Suite 101, Houston TX USA 77079

A third Member, who is not a Manager, is:
Stanley T. Lewis, 8835 Robin Hood Lane, La Jolla, CA 92037

## 6.   Ownership

The Company was originally stated to be owned by H360 LLC, a Texas Series Limited Liability Company, and Certificate Number 1 issued to H360 LLC was

-3-

APPX0817

**INSU_PI_001096**

entered on the books and records of the Company. Each original Member-Manager of Company was also an equal Member-Manager and Owner of H360 LLC. The Managers hereby authorize that Certificate Number 1 and any subsequent ownership certificates be canceled and declared null and void for all purposes effective as of March 22, 2020. The Managers and Members further declare and affirm that Company has been reorganized and have re-apportioned ownership rights to confirm to Members' contributions, past and present, and therefore restate the Company's ownership and authorize the issuance of ownership certificates totaling Two Hundred Seventy-Six (276) membership units as follows:

> Hunter M. A. Carr, 113 ownership units, for 40.9% of Company
> Scott Hepford, 113 ownership units, for 40.9% of Company
> Stanley T. Lewis, 50 ownership units, for 18.2% of Company

### 7.   Powers-Scope of Managers' Authority

Except as otherwise expressly and specifically provided in this Agreement, no Manager or Member shall have authority to bind, act for, or assume any obligations or responsibilities on behalf of, any other Manager or Member or the Company.  Neither the Company nor any Manager or Member shall be responsible or liable for any indebtedness or obligation of any other Manager or Member incurred or arising either before or after the execution of this Agreement, except as to such joint responsibilities, liabilities, indebtedness, or obligations incurred after the date hereof pursuant to a written instrument. This Agreement shall not be deemed to create a partnership or other affiliation between the Managers or Members with respect to any activities whatsoever, other than activities within the purpose of the Company as specified in Paragraph 3 above.

### 8.   Management of the Company

The two Member-Managers shall manage the business and affairs of the Company as Managers on an equal basis.  The Managers shall have the power to do any and all acts necessary or convenient to or for the furtherance of the

-4-

purposes described herein, including all powers, statutory or otherwise, possessed by Members under the laws of the State of Texas.

9.     **Confidential Information**

The Company and each Manager or Member shall not use or disclose to others any confidential information received from the Company or any other Manager or Member that is not otherwise available to the public (or any confidential information made available to the public as a result of a breach of this Agreement by the breaching party) for any purpose other than for the benefit of the Company, as determined by the Managers, or as required by law.

10.     **Dissolution**

The Company shall dissolve, and its affairs shall be wound up, on the first to occur of the following: (a) the written consent of the Managers, (b) the death, retirement, resignation, expulsion, or bankruptcy of a Manager, or (c) upon the entry of a judicial dissolution under the laws of the State of Texas.

11.     **Capital Contributions**

The Members have contributed cash and work product consistent with their percentage of ownership.

12.     **Additional Contributions**

Managers may authorize Additional Capital Contributions to the Company that will be applied specifically towards working capital of the Company.  In the event of such authorization, each Manager or Member shall contribute to the capital of the Company (an "Additional Capital Contribution") in its proportionate share, based on his/her/its Percentage Interest, of the aggregate amount of any additional cash contributions called for by the Managers in accordance with this Agreement or any subsequent agreement or business plan. Both Manager-Members of Company must agree upon Additional Capital Contributions in writing.  Except as specifically provided herein, no additional

-5-

APPX0819

**INSU_PI_001098**

equity interest in the Company shall be issued upon receipt of any Additional Capital Contribution.

## 13.   Use of Capital Contributions

All contributions to capital of the Company shall be available to the Company to carry out the purposes of the Company.

## 14.   Allocation of Profits and Losses

The Company's profits and losses shall be allocated to the Member Owners according to their proportionate percentages of ownership.

## 15.   Ownership by Manager of Company

No Manager shall have any right of partition with respect to any property or assets of the Company.

## 16.   Return of Capital

Except as expressly provided herein, no Manager or Member shall have the right to demand or receive a distribution of any capital prior to the dissolution of the Company, and no manager or Member shall have the right to demand or receive property other than cash in return for any contribution to the capital of the Company, unless agreed by the Managers.

## 17.   No Interest

No Manager or Member shall be entitled to receive any interest with respect to its Capital Contributions or Capital Account.

## 18.   Accounting

The Managers, or their designees, shall keep books of account in which will be entered fully and accurately every transaction of the Company. The books of

APPX0820

INSU_PI_001099

account shall be kept on the accrual method of accounting and in accordance with GAAP.  Such books of account, together with all correspondence, papers, and other documents, shall be kept at such offices of the Company as the Managers shall designate and shall, upon reasonable notice shall be open to the examination of any Manager, or authorized representative thereof, who will be permitted to make copies of all or any part thereof at such Manager's cost.

## 19.   Distributions

Distributions shall be made to the Managers at the times and in the aggregate amounts determined by the Managers.  Such distributions shall be allocated among the Managers in equal proportion unless otherwise agreed to in writing by all Managers.

## 20.   Rights and Obligations of Managers and Members

Except as expressly set forth in this Agreement or mandated by the Act, no Manager or Member shall have any liability to the Company in excess of such Manager's or Member's Capital Contributions, and no Manager or Member shall have any liability to any other Manager or Member for the return or repayment of the Capital Contributions of such other Manager or Member or for the repayment of any loan by such other Manager or Member to the Company.  A Manager or Member will not be personally liable for any debts or losses of the Company beyond the Manager's or Member's obligation under paragraphs 11, 12, and 13 to make Capital Contributions or as otherwise required by the Act.

## 21.   Assignments

A Manager or Member may not assign in whole or in part his/her/its limited liability interest in the Company to any third party unless agreed to by all Managers.

## 22.   Resignation

A Manager or Member may resign from the Company only with the consent of the Managers.

-7-

### 23.   Admission of Additional Members

Up to ten (10) more additional members of the Company may be admitted to the Company with the consent of the Managers. The number of authorized units of ownership may be increased by consent of the Managers.

### 24.   Indemnification

The Company shall indemnify, to the fullest extent now or hereafter permitted by law, each Manager and Member of the Company who was or is made a party to or a witness in or is threatened to be made a party to or a witness in any threatened, pending, or completed action or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that such Manager or Member is or was an authorized representative of the Company, against all expenses (including attorney'' fees and disbursements), judgments, fines (including excise taxes and penalties), and amounts paid in settlement actually and reasonably incurred by such Manager or Member in connection with such action or proceeding.  Indemnification under this Paragraph shall not be made by the Company in any case where a court determines that the alleged act or failure to act giving rise to the claim for indemnification (i) is expressly prohibited by the Act or any successor statute in effect at the time of such alleged action or failure to take action, (ii) constitutes willful misconduct, bad faith, gross negligence, or reckless disregard of a Manager's or Member's duties or (iii) is outside the scope of such Manager's or member's duties performed in his or her official capacity or in another capacity at the Company's request.

### 25.   Personal Indemnification

No Manager or Member shall have any obligation to indemnify any other Manager, Member, officer, employee, agent, or other authorized representative of the Company under any circumstances.

APPX0822

INSU_PI_001101

26.   **Insurance**

The Company may purchase and maintain insurance on behalf of any person who is or was a Manager, or is or was an authorized representative of the Company, against any liability asserted against or incurred by such person in any such capacity, or arising out of the status of such person as such, whether or not the Company would have the power to indemnify such person against such liability under the provisions of this Agreement.

27.   **Liability**

The Managers and Members shall not have any liability for the obligations or liabilities of the Company except to the extent provided in the Act.

28.   **Governing Law**

The laws of the State of Texas shall govern this Agreement.

Executed and effective the 223rd day of March, 2020.

By: _____
    Hunter M. A. Carr

By: _____
    Scott Hepford

-9-

8/31/2020 8:17 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 45816712
By: CAROL WILLIAMS
Filed: 8/31/2020 8:17 AM

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| HUNTER CARR, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| STANLEY T. LEWIS, SCOTT | § | |
| HEPFORD, WELL CELL GLOBAL, | § | |
| LLC, and RESTOR METABOLIX, INC. | § | |
| *Defendants*. | § | 127TH JUDICIAL DISTRICT |

### DEFENDANTS LEWIS, HEPFORD, AND WELL CELL GLOBAL'S AND INTERVENOR DIABETES RELIEF'S TEMPORARY INJUNCTION HEARING BRIEF

Two fundamental facts resolve the parties' requested temporary injunctions in this business break-up dispute:

1. Diabetes Relief is a limited liability company with three members.

2. The majority of the members—two out of three—agreed to remove a manager and approve a sale of the company's assets to Well Cell Global LLC. The other member did not vote.

Under Texas law, the actions of members of a limited liability company are effective, with or without a meeting, so long as the action has the minimum votes that would be necessary to take the action at a meeting. Tex. Bus. Org. Code § 101.359. Under this "effective action" rule, limited liability companies can act through majority vote, whether at a properly noticed meeting, an improperly noticed meeting, or no meeting at all.

In this dispute, Plaintiff Hunter Carr is the removed manager and the single member that did not vote mentioned above. Carr seeks a temporary injunction to undo his removal as a manager and stop the approved Well Cell transaction.

Carr will say that he should have received two extra days' notice of the meeting at which the members voted (and he attended); that there should have been more detail in the agenda he

1

EXHIBIT

12

APPX0824

**INSU_PI_001103**

received; or that he did not agree to have a meeting in the first place. None of these complaints change the result. The only exception to the "effective action" rule is when the company's governing documents provide otherwise. But that exception does not apply here because, as Carr has admitted, the Diabetes Relief company agreement does not provide for how members exercise their rights as the owners, including their right to remove a manager or sell the company's assets.

Put simply, because Diabetes Relief took effective action under the Texas Business Organizations Code, Carr cannot undo his removal as a manager or prevent the Well Cell sale. He also has no authority to control Diabetes Relief's bank account, as he as attempted to do in the past. Carr's effort to wrestle control of Diabetes Relief away from its majority members lacks any legal basis, threatens Diabetes Relief's on-going viability, and warrants injunctive relief against Carr. Even if Carr's complaints about the value received from the Well Cell sale have any traction, his remedy under Texas law is damages. Carr has already identified the amount of damages he seeks. For these reasons, the Court should deny Carr's request for a temporary injunction and grant the Defendants' and Diabetes Relief's request.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Diabetes Relief has three members, all of whom were also managers until recently, and they ran the company informally.

Diabetes Relief provides innovative medical treatment to abate the symptoms of diabetes. Scott Hepford and Hunter Carr co-founded Diabetes Relief back in 2015 and were the original owners or "members." In November 2017, Stanley Lewis purchased units in Diabetes Relief and became the third member. At that time, each member owned a third of the company.

Diabetes Relief is a "manager-managed" limited liability company. This means the members select managers to handle the day-to-day business affairs rather than the members managing the company directly. Both original members Hepford and Carr served as managers

2

beginning with the company's creation in 2015. Because Hepford and Carr had equal authority as managers, disagreements between the two of them often led to an impasse. This was one reason that Lewis was brought in as a third member of the company who would have a tie-breaking vote. When Lewis joined as a member, Lewis became a manager too. This meant that while Diabetes Relief was technically "manager-managed," it was member-managed as a practical matter because all three members were managers.

Like many LLCs owned by a handful of people, Diabetes Relief was run informally. Diabetes Relief had intermittent meetings of its managers, often without formal notice. Diabetes Relief did not have annual meetings of its members. The three member-managers did, however, discuss and vote on issues related to the running of the company from time to time in addition to simply conferring day to day and taking action as a result thereof.

**B.      This year, Carr's response to Diabetes Relief's escalating financial problems and his behavior towards the other members caused fundamental and irreconcilable disagreements between Carr and the other members.**

In the last year or so, Diabetes Relief has encountered escalating financial and management problems. The members have disagreed about how to respond to these problems, with the lines often drawn between Carr on one side and Hepford and Lewis on the other. Carr had historically been responsible for the financial side of the business, including recordkeeping and oversight. Hepford and Lewis felt that Carr had managed the company's financials poorly, with the company unable to regularly produce financial statements, cash flow statements, or the like. The members' disagreements would lead to a logjam, which further exacerbated the company's problems.

As a result of this unsustainable situation, Diabetes Relief began looking for a new source of capital, either an investment or a loan, to help repay its growing debt and to facilitate a buy-out of Carr's membership interest. Carr was aware of and participated in the company's efforts. Carr's involvement in these efforts, however, only increased the conflict between Carr and the other

3

members. Hepford and Lewis felt that Carr took unreasonable positions with potential investors and ran them off. Hepford and Lewis saw that Carr prioritized his own interests over the company's need for cash. As recently as June of this year, Carr rejected a potential investment because Carr disliked the terms of his individual buy-out. Even after one investor tried to sweeten the deal just for Carr, Carr still refused.

Also in June of this year, Hepford and Lewis learned that Carr had manipulated Lewis in March 2020 to try and eliminate his tie-breaking vote. Hepford and Lewis had understood the Company Agreement needed to be amended to reduce Lewis's ownership interest.[1] But both relied on Carr's oral agreement that Lewis would maintain his tie-breaking vote. Thereafter, when Lewis tried to exercise his vote on an issue that arose in June, Carr told Lewis he no longer had a vote. This was the opposite of what Lewis had agreed to with Carr. And for Hepford and Lewis, this was the straw that broke the camel's back.

**C.    Faced with insolvency and fed up with Carr's behavior, the members took majority action to remove Carr as a manager and sell Diabetes Relief's assets to Well Cell Global to pay off debt and create an ability to buy-out Carr.**

Coming into July, Hepford and Lewis were faced with a company on the edge of insolvency and a co-member who had run off several potential lifelines for the company and who they no longer trusted. Hepford and Lewis determined that they could exercise their voting rights *as members* to address the problems facing the company, even though Lewis no longer had his vote *as a manager*.

Hepford identified another potential investor out of Florida, who was willing to provide capital to a company, Well Cell Global LLC, which would buy substantially all of Diabetes Relief's

---

[1]    The Amended Company Agreement is attached as Exhibit 1. Lewis had agreed to reduce his ownership interest because the company was seeking a loan from the Small Business Administration, which required certain actions from owners holding 20% or more of a company. Lewis did not agree to take those actions and so agreed to reduce his ownership below 20%.

4

assets.[2] This transaction would provide cash to pay off Diabetes Relief's creditors and buy out Carr's membership interest. The investor wanted to have Hepford and Lewis involved as owners and managers of Well Cell Global because of their valuable experience, knowledge, and skills.

After Hepford worked out the terms of this Well Cell transaction, Hepford and Lewis agreed that it was the best option for the company. They decided to have a members' meeting and hold a vote on (1) making a buy-out offer to Carr from the proceeds of the Well Cell transaction; (2) removing Carr as a manager; and (3) approving the Well Cell transaction.

On July 16, 2020, Hepford sent a calendar invitation to Lewis and Carr for a members' meeting on July 24. Carr then texted Hepford asking for the agenda, which Hepford provided. All three member attended the meeting, but Carr took the position that the members could not have a meeting without his approval as a manager.

At the July 24 meeting, a majority of the three members—Hepford and Lewis—voted in favor of making Carr a buy-out offer, removing Carr as a manager, and approving the Well Cell transaction. Carr withheld his vote. Hepford explained to Carr that Carr had five days to consider the buy-out offer and accept it. To incentivize Carr to accept the buy-out offer voluntarily, Hepford and Lewis were willing to sacrifice part of the proceeds from the Well Cell transaction to offer Carr a larger sum for his membership interests than he was entitled to if the proceeds were strictly divided based on ownership percentages.

If, however, Carr refused to accept that offer, those funds from the Well Cell transaction would be repurposed, and the proceeds would be divided strictly based on ownership percentage after the payment of the company's debts and liabilities. Carr was aware of that fact

---

[2] Well Cell Global LLC had originally been contemplated by Hepford years ago when he purchased the website URL. This was done at a time when the members had once all contemplated dividing up Diabetes Relief among themselves into separate companies, which they each owned. Since then, Well Cell Global LLC had been an empty entity with no business activity.

5

as it was discussed at the July 24 meeting. While Hepford and Lewis thought a unanimous decision on the Well Cell transaction was preferable, they made clear to Carr that if he refused then the decision would be effective by the majority vote.

Carr did not accept the buy-out offer. Instead, Carr filed a lawsuit and obtained a TRO on August 3 precluding the completion of the Well Cell transaction. Carr lacked authority to do this, whether as a former or current manager or even a member, because a majority of the members had approved the sale. The Well Cell transaction remains in limbo, while Diabetes Relief lacks the necessary cash to continue its operations for much longer, let alone for as long as it may take to find another investor if Carr uses this lawsuit to kill the Well Cell transaction.

Worse, on August 5, Carr tried to change the credentials for Diabetes Relief's online banking at Frost Bank multiple times. Carr's efforts would have prevented Diabetes Relief from accessing its online banking and enabled Carr to control company funds without any authority to do so. In response to Carr's activity, the Defendants (and now Diabetes Relief as an intervenor)[3] have sued Carr to stop his attempts to exercise unilateral and unauthorized control over Diabetes Relief and its bank accounts.  The ancillary judge entered a TRO to this effect on August 7.

## II.   ARGUMENT AND AUTHORITIES

The temporary injunction hearing involves competing requests for temporary injunctions from Plaintiff Carr, on the one hand, and Defendants Hepford, Lewis, Well Cell Global, and Intervenor Diabetes Relief, on the other hand.

---

[3]     Diabetes Relief filed its petition in intervention bringing claims against Carr on August 24, after attorney Steve Kirklin (some relative of Carr's attorney Paul Kirklin) non-suited a petition Steve Kirklin had purported to file on behalf of Diabetes Relief without authority to do so.

APPX0829

INSU_PI_001108

To obtain a temporary injunction, the applicant must offer "some evidence" in support of each of the following elements: (1) a cause of action against the other party; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Osaka Japanese Rest., Inc. v. Osaka Steakhouse Corp.*, No. 14-09-01031-CV, 2010 WL 3418206, at *2 (Tex. App.—Houston [14th Dist.] Aug. 31, 2010, no pet.) (mem. op.). On the evidence presented at the temporary injunction hearing, Diabetes Relief and the Defendants can meet this burden. Carr cannot.

The temporary injunction hearing revolves around one ultimate legal issue: the application and interpretation of provisions of the Business Organizations Code governing how limited liability companies take effective action. This brief first addresses that legal issue because it is fundamental to both sides' requests for temporary injunctions.

A. **Under Texas law, Diabetes Relief took effective action by majority vote in removing Carr as a manager and approving the Well Cell transaction.**

Under the Business Organizations Code, limited liability companies are governed by their company agreements. Tex. Bus. Org. Code § 101.052(a). Where a company agreement is silent, the Business Organizations Code provides the default rules. *Id.* at § 101.052(b). Where there is a conflict between different titles of the Business Organizations Code, the title addressing limited liability companies controls. Tex. Bus. Org. Code § 1.106.

The Diabetes Relief company agreement does not contain any provisions addressing the rights of members: how members exercise their right to hold and take action at meetings; how members take action without a meeting; when members can sell the company's assets; or how members can remove a manager. Therefore, the Business Organizations Code fills in these gaps.

There are several provisions of the Business Organizations Code addressing the mechanics for how members' exercise their rights.

7

In this case, the most important provision in the Business Organization Code relates to the members' right to take action with or without a meeting. This provision determines when an action taken by members of a limited liability company is effective: the "effective action" rule. *Id.* at § 101.359. This rule states that an action is *effective* in two situations: (1) if the action has the minimum number of votes it would need to pass at a meeting *or* (2) if each member consents to the action. The only exception is if the "governing documents" provide otherwise. *Id.* Subparagraph (1) applies to the facts of this case.

> Sec. 101.359.   EFFECTIVE ACTION BY MEMBERS OR MANAGERS WITH OR WITHOUT MEETING.  Members or managers of a limited liability company may take action at a meeting of the members or managers or without a meeting in any manner permitted by this title, Title 1, or the governing documents of the company.  Unless otherwise provided by the governing documents, an action is effective if it is taken:
>     (1)  by an affirmative vote of those persons having at least the minimum number of votes that would be necessary to take the action at a meeting at which each member or manager, as appropriate, entitled to vote on the action is present and votes; or

For this reason, the following actions of members are effective, regardless of whether notice of a meeting was properly given, so long as the action was or would have been agreed to by a majority of the members if a meeting had been properly noticed:

- Members can remove managers based on a majority vote. *See* §§ 101.304 (managers may be voted out by members), 101.354 (each member gets one vote), 101.353 (a quorum exists if a majority of members is at a meeting); 101.355 (generally a majority vote of those present at a meeting with a quorum means an action has passed); and

- Members can sell the company's assets on an affirmative vote of a majority of the members. *See id.* §§ 101.356(c) (fundamental business transactions require majority vote of members, not just majority vote of those at meeting with a quorum); 1.002(32) (sale of all or substantially all assets is a "fundamental business transaction").

Here, Hepford provided notice for a July 24 meeting to vote on the Well Cell transaction, go forward financial management, and go forward operations management, on or about July 16, eight days before the meeting, rather than ten. It is undisputed that Carr received this notice.

As set forth above, under the Business Organizations Code, the timing or content of the

8

notice is not what determines whether the actions taken at that meeting are effective. Instead, what counts is the number of votes in favor of the actions taken at that meeting, and there was a majority vote in favor of each action: (1) making a buy-out offer to Carr; (2) removing Carr as a manager; and (3) approving the Well Cell transaction. Because these three actions had the majority vote that "would be necessary" at a formally noticed meeting and the Amended Company Agreement does not address how members exercise their votes, the actions taken at the July 24 meeting are effective under Section 101.359.  Tex. Bus. Org. Code § 101.359.

Section 101.359 or the "effective action" rule ensures that limited liability companies can take action by majority vote even if they fail to comply with technical notice or meeting mechanisms in the Business Organizations Code, particularly because limited liability companies are often run informally. *See* Elizabeth S. Miller, Robert A. Ragazzo, 20 Tex. Prac., Business Organizations § 20:5 (3d ed.) ("The BOC makes it very clear that the members are not confined to the means of decision making specified in the statute but may provide for any means of formal or informal decision making desired by the members. . . . *Thus, the vote might take place at a meeting or gathering for which prior notice was not given*, or a member might poll the other members (e.g., in person, by telephone, e-mail, etc.) . . .") (emphasis added); *Chan Il Pak v. AD Villarai, LLC*, No. 05-14-01312-CV, 2018 WL 2077602 at *4 (Tex. App.—Dallas May 4, 2018, pet. denied) (applying Section 101.359 to find effective action under subparagraph (2) when there was no formal meeting or unanimous written consents).

Carr's arguments otherwise misinterpret the Amended Company Agreement and the Business Organizations Code. At the July 24 meeting, Carr took the position that the *members* could not have a meeting unless both the *managers*, Hepford and Carr, approved. This is incorrect. First, the Amended Company Agreement does not address meetings of the members. Second, Carr's

APPX0832

INSU_PI_001111

argument turns the Business Organizations Code on its head. Managers serve on behalf of the members, and members have the power to remove them. *See* Tex. Bus. Org. Code § 101.304. A manager does not have to approve a meeting at which the members will remove him. Instead, the rule is the opposite. If a quorum of the members desire to have a meeting, then the managers (the governing authority) *shall* give notice of the meeting. *See id.* at §§ 101.352(b); 101.353 (a quorum means the company can transact business at meeting). And in this case, a majority of the members (Hepford and Lewis) agreed to have the July 24 meeting and vote in favor as set forth above.

Carr also may point to the fact that the Amended Company Agreement states that the managers have all the powers of members, suggesting that this provision somehow eliminates the members' rights. *See* Ex. 1, § 8. The Amended Company Agreement does not address members' rights, let alone eliminate them. The provision Carr relies on, Section 8, means the managers have powers that are co-extensive with members, not powers that supersede members.

Finally, Carr likely will argue that a "special class or group of members" elected himself and Hepford as managers, and so only that "special class or group" can remove him. *See* Tex. Bus. Org. Code § 101.306(a). Carr claims the "special class or group" is the "original members" of Diabetes Relief: Hepford and Carr. *See* Plaintiff's 2nd Am. Pet., ¶ 9.

But Carr's argument fails under the plain language of the Business Organizations Code. *See* Tex. Bus. Org. Code § 101.104(a) (describing how a company agreement creates special classes or groups of members). Neither the Amended Company Agreement nor any prior version establishes any classes or groups of members that have "certain expressed relative rights, powers, and duties" compared to other members. *Id.* There are not sub-classes or groups of members of Diabetes Relief—there are just members. Under the "effective action" rule, those members can act by majority vote, regardless of whether that vote occurs at a formally noticed meeting.

<div align="center">10</div>

**B.    Carr is not entitled to a temporary injunction because Diabetes Relief's acts by its member-majority are effective and Carr's remedy is damages under Texas law.**

As a result of the above legal principles, Carr cannot make the required showing for a temporary injunction. Each of Carr's scattershot of claims involves Carr's complaint that the majority of the members of Diabetes Relief chose to sell the assets for an amount that Carr believes is less than what they are worth. All but one of Carr's theories have fundamental legal defects on these facts, as shown in the below chart:

| Claims[4] | Carr cannot show a probable likelihood of success on the merits: |
|---|---|
| Breach of Contract | There was no breach of the Amended Company Agreement. It is silent on how members exercise their rights. |
| Fraud | There is no false statement because Hepford and Lewis told Carr the facts of the Well Cell transaction. And Carr did not rely on any of their statements because he refused to vote at all. |
| Conversion/Money Had & Received | Carr will receive money for his share of the Well Cell proceeds after the company's debts are paid; his membership interests have not been taken from him. Carr does not own the assets of Diabetes Relief—Diabetes Relief does. |
| Tortious Interference with Existing Contract | Hepford and Lewis cannot interfere with the Amended Company Agreement because they are parties to it. *Community Health Sys. Prof. Servs. v. Hansen*, 525 S.W.3d 671, 690 (Tex. 2017) (party cannot interfere with own contract). Carr identifies no other contract in his petition to which he is a party. Regardless, there was no breach of the Amended Company Agreement because it is silent as to how members exercise their rights. |
| Tortious Interference with Prospective Relations | Carr has not identified any prospective contracts the Defendants interfered with. |

The only claim that is theoretically viable on these facts is breach of fiduciary duty, but Carr must first show that Hepford and Lewis owed fiduciary duties *to Carr*, separate from the duties

---

[4]    Carr's conspiracy claim cannot support a temporary injunction because it is a derivative tort and must be supported by an underlying tort, on which Carr can show a probable likelihood of success on the merits. *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

APPX0834

**INSU_PI_001113**

they owe to Diabetes Relief. Whether members of an LLC owe other members fiduciary duties is a fact-intensive question under Texas law. *See Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 395–96 (Tex. App.—Houston [1st Dist.] 2012, pet. granted, judgm't vacated w.r.m.) (discussing limited situations in which members owe other members a fiduciary duty, such as when a majority owner and sole member-manager of an LLC purchases or redeems a minority owner's interest, which did not occur here).[5]

Even if—and this is a big "if"—Carr could show a probable likelihood that Hepford and Lewis had fiduciary duties to him and they breached those duties, the remedy for that claim on these facts under Texas law is damages, not injunctive relief. *See Allen*, 367 S.W.3d at 405–11 (discussing damages theories for minority owner's claim that his interests were sold for less than their true value because of breach of majority member's fiduciary duty).

Carr has identified the amount of money he believes he is entitled to if Diabetes Relief's assets had been sold for the value that Carr believes they are worth: approximately $4 million. So, according to Carr, his "injury" can be calculated as money damages. That means Carr cannot get injunctive relief. *See SRS Prods. Co., Inc. v. LG Eng'g Co., Ltd.*, 994 S.W.2d 380, 386 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (upholding denial of temporary injunction where applicant's harm was clearly as damages).

---

[5]  In *Allen*, the parties settled while a petition for review to the Texas Supreme Court was pending. The parties asked the appellate court to withdraw the *Allen* opinion, but the appellate court denied that request, leaving the opinion as a statement of the law. *See Allen v. Devon Energy Holdings, L.L.C.*, No. 01-09-00643-CV, 2013 WL 273026 (Tex. App.—Houston [1st Dist.] Jan. 4, 2013, no pet.).

12

**C.     Because Diabetes Relief effectively acted by majority vote, Defendants and Diabetes Relief can show a probable likelihood of success on the merits and irreparable harm.**

The Defendants and Diabetes Relief can show a probable likelihood of success on the merits for their claims of tortious interference with existing contract, breach of fiduciary duty,[6] and harmful access by computer under Texas Civil Practice & Remedies Code Chapter 143.

*Tortious interference with existing contract.* The Defendants and Diabetes Relief can show "some evidence" on each element: Carr willfully and intentionally interfered with the asset purchase agreement between Diabetes Relief and Well Cell Global by seeking a TRO to stop the consummation of that agreement. Carr's TRO has stalled the Well Cell sale, preventing the parties from completing the transaction and further harming Diabetes Relief's financial situation. *See Gary E. Patterson & Associates, P.C. v. Holub*, 264 S.W.3d 180, 202 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *Khan v. GBAK Properties, Inc.*, 371 S.W.3d 347, 359–60 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ("Any interference that makes performance more burdensome or difficult or of less or no value to the one entitled to performance is actionable.").

*Breach of fiduciary duty.* Diabetes Relief can show Carr breached his fiduciary duty to Diabetes Relief because Carr did not place the interests of Diabetes Relief above his own in evaluating potential offers to invest in Diabetes Relief, as recently as June 2020. *See Haut v. Green Café Mgmt., Inc.*, 376 S.W.3d 171, 177–78, 182 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (finding that member had fiduciary duty to LLC and breached it). Further, Carr has taken actions to harm Diabetes Relief, including seeking to exercise unilateral control over its online banking with Frost Bank. *Id.* at 182 (explaining that a fiduciary must make "reasonable use of the confidence that was placed in him" and "act[] in the utmost good faith" towards the company).

---

[6]     This claim is unique to intervenor Diabetes Relief.

APPX0836

**INSU_PI_001115**

*Harmful access by computer.* Diabetes Relief and the Defendants will show a probable likelihood of success on the merits for Carr's unauthorized access of Diabetes Relief's online banking with Frost Bank. *See* Tex. Civ. Prac. & Rem. Code 134.001(a). Carr knowingly and intentionally sought to access and change the credentials for Diabetes Relief's online banking without consent of Diabetes Relief. *See* Tex. Penal Code §§ 33.02(a), 33.01(1), (5), (12).

*Irreparable harm and inadequate remedy at law.* The Defendants and Diabetes Relief can show that the harm they face is irreparable and damages are an inadequate remedy. Texas courts have recognized injunctive relief is appropriate for tortious interference with existing contract, particularly when there is a threatened injury to a company's goodwill, clientele, office stability, and the like. *See Graham v. Mary Kay Inc.*, 25 S.W.3d 749, 753 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Carr's actions threaten Diabetes Relief's goodwill with the investor in Well Cell and the viability of the Well Cell transaction, which is necessary to keep Diabetes Relief afloat and pay its creditors. *See Tex. Dep't of State Health Servs. v. Holmes*, 294 S.W.3d 328, 334 (Tex. App.—Austin 2009, pet. denied) (upholding trial court's finding of irreparable harm when company was faced with laying off employees or potentially going out of business).

For these reasons, the Defendants and Diabetes Relief seek to temporarily enjoin Carr from holding himself out as a manager of Diabetes Relief and from attempting to exercise unauthorized control over Diabetes Relief or its bank accounts. Carr will retain his rights as a member, including his rights to inspect the company's books and records. Tex. Bus. Org. Code § 101.109(a).

### III.    CONCLUSION

The Defendants and Diabetes Relief ask the Court to grant their injunctive relief, deny Carr's, and award any other relief to which they are entitled.

APPX0837

**INSU_PI_001116**

Respectfully Submitted,

**AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING, P.C.**

*/s/ P. Kevin Leyendecker*
P. Kevin Leyendecker
Texas Bar No. 00784472
Shawn M. Bates
Texas Bar No. 24027287
Kelsi Stayart White
Texas Bar No. 24098466
1221 McKinney, Suite 2500
Houston, Texas 77010
Telephone: 713.655.1101
Facsimile: 713.655.0062
kleyendecker@azalaw.com
sbates@azalaw.com
kwhite@azalaw.com

15

APPX0838

**INSU_PI_001117**

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of August 2020, a true and correct copy of the above and foregoing document was served on the following counsel of record:

The Kirklin Law Firm, P.C.
Paul S. Kirklin
12600 N. Featherwood Dr., Suite 225
Houston, Texas 77034
pkirklin@kirklinlaw.com
Tel: 832-969-1821

**ATTORNEY FOR HUNTER CARR**

Rupert Barron
Hirsch & Westheimer
1415 Louisiana, 36th Floor
Houston, TX 77002
rbarron@hirschwest.com
Tel: 713-220-9172

**ATTORNEY FOR KRISTEN ZINSER SMITH**

_/s/ Kelsi S. White_____
Kelsi S. White

16

# AMENDED
# COMPANY AGREEMENT
# Diabetes Relief LLC
## A TEXAS SERIES LIMITED LIABILITY COMPANY
### Manager Managed

This Amended Company Agreement (the "Agreement") of **Diabetes Relief LLC**, a Texas Series Limited Liability Company  ("the Company") is made and entered into effective **March 23, 2020**, by its Manager-Memberss, **HUNTER M. A. CARR** and **SCOTT HEPFORD** ("Managers" or "Manager-Members").  In this Agreement Hepford and Carr may be referred to as Managers or Members or Manager-Members. This series limited liability company was formed pursuant to and in accordance with the Texas Business Organizations Code, Title 3, Limited Liability Companies, Chapter 101, Subchapter M, Series Limited Liability Company, Sec. 101.601 through 101.621, effective September 1, 2009, as amended from time to time ("the Act") (*see* "Purpose" infra.). The Manager-Members hereby agree as follows:

1.      **Formation**

**A.** The Company was formed on January 5, 2015, by the filing of the Series Limited Liability Company Certificate of Formation with the Secretary of State of the State of Texas (the "Certificate of Formation").  Except as otherwise provided in this Agreement, the rights, duties, liabilities, and obligations of the Managers, and all other persons who become Managers or Members of the Company in the manner set forth herein, and the administration, dissolution, winding up, and termination of the Company shall be governed by the Act.

**B.** The Company's original managers were Hunter M. A. Carr and Scott Hepford. At a Meeting of the Managers held on November 17, 2017, Stanley T. Lewis was added as a new Member and Manager, with all three Managers having equal authority and responsibility.

**Exhibit**

**1**

-1-

**C.** Stanley Lewis has resigned as Manager due to other commitments, and his resignation has been accepted and consented to for all purposes, and is approved, affirmed, and confirmed by this Agreement.

**D.** This Agreement is made and entered into in order to clearly confirm the state of the Company and its ownership for going forward in carrying on its business.

## 2.   Offices

The principal business office of the Company is currently located at 11511 Katy Freeway, in  Suites 101 and 135, Houston, Texas 77079, which may change from time to time, depending upon necessity and circumstances. The Company's clinic is located at 11511 Katy Freeway, Suite 100, Houston, Texas 77079. The Company's registered office and the name of its initial registered agent at such address are 2500 Wilcrest Drive, Suite 300, Houston TX 77042, and Robert Sonfield,  as set forth in the initial Certificate of Formation  filed with the State of Texas.  The Company's registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name and the acceptance of the new registered agent with the Texas Secretary of State pursuant to the Act.

## 3.   Purpose

The Company was originally formed for the object and purpose of operating a comprehensive diabetes and metabolic disease treatment center in the building located at 11511 Katy Freeway, Houston, Texas 77079, and to operate additional centers, both licensed and managed, within and outside the State of Texas. Through experience, the Managers have determined that the Company's interests are best suited, and patients will best be served if the Company shifts its focus to the licensing of its patented procedures to existing medical clinics and professionals.  The clinic business of the Company has been transferred to Diabetes Relief Greater Houston Series LLC, a separate Texas Series LLC owned by Company and created February 11, 2016, with the clinic operated by Diabetes Relief Houston Westside Series LLC, which is owned by Company and others. Business may be conducted and promoted by the Company and it may engage in

-2-

APPX0841

**INSU_PI_001120**

any lawful activity for which limited liability companies may be formed under the Act and in any and all activities necessary or incidental to the foregoing. The Company and any future Series LLCs created thereunder will specifically be limited pursuant to Subsection (a), Sec. 101.602, Business Organizations Code, State of Texas, so that (1) the debts, liabilities, obligations, and expenses incurred, contracted for, or otherwise existing with respect to a particular series shall be enforceable against the assets of that series only, and shall not be enforceable against the assets of the limited liability company generally or any other series; and (2) none of the debts, liabilities, obligations, and expenses incurred, contracted for, or otherwise existing with respect to the limited liability company generally or any other series shall be enforceable against the assets of a particular series.

4.    **Registered Agent**

The name and address of the registered agent of the Company for service of process on the Company in the State of Texas is Robert Sonfield, 2500 Wilcrest Drive, Suite 300, Houston, Texas  77042.

5.    **Managers**

The names and the addresses of the Managers, who are also Members, are as follows:

Hunter M. A. Carr, 11511 Katy Fwy, Suite 101, Houston TX USA 77079
Scott Hepford, 11511 Katy Fwy, Suite 101, Houston TX USA 77079

A third Member, who is not a Manager, is:
Stanley T. Lewis, 8835 Robin Hood Lane, La Jolla, CA 92037

6.    **Ownership**

The Company was originally stated to be owned by H360 LLC, a Texas Series Limited Liability Company, and Certificate Number 1 issued to H360 LLC was

-3-

APPX0842

**INSU_PI_001121**

entered on the books and records of the Company. Each original Member-Manager of Company was also an equal Member-Manager and Owner of H360 LLC. The Managers hereby authorize that Certificate Number 1 and any subsequent ownership certificates be canceled and declared null and void for all purposes effective as of March 22, 2020. The Managers and Members further declare and affirm that Company has been reorganized and have re-apportioned ownership rights to confirm to Members' contributions, past and present, and therefore restate the Company's ownership and authorize the issuance of ownership certificates totaling Two Hundred Seventy-Six (276) membership units as follows:

> Hunter M. A. Carr, 113 ownership units, for 40.9% of Company
> Scott Hepford, 113 ownership units, for 40.9% of Company
> Stanley T. Lewis, 50 ownership units, for 18.2% of Company

### 7.    Powers-Scope of Managers' Authority

Except as otherwise expressly and specifically provided in this Agreement, no Manager or Member shall have authority to bind, act for, or assume any obligations or responsibilities on behalf of, any other Manager or Member or the Company.  Neither the Company nor any Manager or Member shall be responsible or liable for any indebtedness or obligation of any other Manager or Member incurred or arising either before or after the execution of this Agreement, except as to such joint responsibilities, liabilities, indebtedness, or obligations incurred after the date hereof pursuant to a written instrument. This Agreement shall not be deemed to create a partnership or other affiliation between the Managers or Members with respect to any activities whatsoever, other than activities within the purpose of the Company as specified in Paragraph 3 above.

### 8.    Management of the Company

The two Member-Managers shall manage the business and affairs of the Company as Managers on an equal basis.  The Managers shall have the power to do any and all acts necessary or convenient to or for the furtherance of the

-4-

purposes described herein, including all powers, statutory or otherwise, possessed by Members under the laws of the State of Texas.

9. **Confidential Information**

The Company and each Manager or Member shall not use or disclose to others any confidential information received from the Company or any other Manager or Member that is not otherwise available to the public (or any confidential information made available to the public as a result of a breach of this Agreement by the breaching party) for any purpose other than for the benefit of the Company, as determined by the Managers, or as required by law.

10. **Dissolution**

The Company shall dissolve, and its affairs shall be wound up, on the first to occur of the following: (a) the written consent of the Managers, (b) the death, retirement, resignation, expulsion, or bankruptcy of a Manager, or (c) upon the entry of a judicial dissolution under the laws of the State of Texas.

11. **Capital Contributions**

The Members have contributed cash and work product consistent with their percentage of ownership.

12. **Additional Contributions**

Managers may authorize Additional Capital Contributions to the Company that will be applied specifically towards working capital of the Company.  In the event of such authorization, each Manager or Member shall contribute to the capital of the Company (an "Additional Capital Contribution") in its proportionate share, based on his/her/its Percentage Interest, of the aggregate amount of any additional cash contributions called for by the Managers in accordance with this Agreement or any subsequent agreement or business plan. Both Manager-Members of Company must agree upon Additional Capital Contributions in writing.  Except as specifically provided herein, no additional

-5-

equity interest in the Company shall be issued upon receipt of any Additional Capital Contribution.

### 13.    Use of Capital Contributions

All contributions to capital of the Company shall be available to the Company to carry out the purposes of the Company.

### 14.    Allocation of Profits and Losses

The Company's profits and losses shall be allocated to the Member Owners according to their proportionate percentages of ownership.

### 15.    Ownership by Manager of Company

No Manager shall have any right of partition with respect to any property or assets of the Company.

### 16.    Return of Capital

Except as expressly provided herein, no Manager or Member shall have the right to demand or receive a distribution of any capital prior to the dissolution of the Company, and no manager or Member shall have the right to demand or receive property other than cash in return for any contribution to the capital of the Company, unless agreed by the Managers.

### 17.    No Interest

No Manager or Member shall be entitled to receive any interest with respect to its Capital Contributions or Capital Account.

### 18.    Accounting

The Managers, or their designees, shall keep books of account in which will be entered fully and accurately every transaction of the Company. The books of

APPX0845

INSU_PI_001124

account shall be kept on the accrual method of accounting and in accordance with GAAP. Such books of account, together with all correspondence, papers, and other documents, shall be kept at such offices of the Company as the Managers shall designate and shall, upon reasonable notice shall be open to the examination of any Manager, or authorized representative thereof, who will be permitted to make copies of all or any part thereof at such Manager's cost.

## 19.  Distributions

Distributions shall be made to the Managers at the times and in the aggregate amounts determined by the Managers. Such distributions shall be allocated among the Managers in equal proportion unless otherwise agreed to in writing by all Managers.

## 20.  Rights and Obligations of Managers and Members

Except as expressly set forth in this Agreement or mandated by the Act, no Manager or Member shall have any liability to the Company in excess of such Manager's or Member's Capital Contributions, and no Manager or Member shall have any liability to any other Manager or Member for the return or repayment of the Capital Contributions of such other Manager or Member or for the repayment of any loan by such other Manager or Member to the Company. A Manager or Member will not be personally liable for any debts or losses of the Company beyond the Manager's or Member's obligation under paragraphs 11, 12, and 13 to make Capital Contributions or as otherwise required by the Act.

## 21.  Assignments

A Manager or Member may not assign in whole or in part his/her/its limited liability interest in the Company to any third party unless agreed to by all Managers.

## 22.  Resignation

A Manager or Member may resign from the Company only with the consent of the Managers.

-7-

23.    **Admission of Additional Members**

Up to ten (10) more additional members of the Company may be admitted to the Company with the consent of the Managers. The number of authorized units of ownership may be increased by consent of the Managers.

24.    **Indemnification**

The Company shall indemnify, to the fullest extent now or hereafter permitted by law, each Manager and Member of the Company who was or is made a party to or a witness in or is threatened to be made a party to or a witness in any threatened, pending, or completed action or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that such Manager or Member is or was an authorized representative of the Company, against all expenses (including attorney'' fees and disbursements), judgments, fines (including excise taxes and penalties), and amounts paid in settlement actually and reasonably incurred by such Manager or Member in connection with such action or proceeding.  Indemnification under this Paragraph shall not be made by the Company in any case where a court determines that the alleged act or failure to act giving rise to the claim for indemnification (i) is expressly prohibited by the Act or any successor statute in effect at the time of such alleged action or failure to take action, (ii) constitutes willful misconduct, bad faith, gross negligence, or reckless disregard of a Manager's or Member's duties or (iii) is outside the scope of such Manager's or member's duties performed in his or her official capacity or in another capacity at the Company's request.

25.    **Personal Indemnification**

No Manager or Member shall have any obligation to indemnify any other Manager, Member, officer, employee, agent, or other authorized representative of the Company under any circumstances.

APPX0847

**INSU_PI_001126**

26. **Insurance**

The Company may purchase and maintain insurance on behalf of any person who is or was a Manager, or is or was an authorized representative of the Company, against any liability asserted against or incurred by such person in any such capacity, or arising out of the status of such person as such, whether or not the Company would have the power to indemnify such person against such liability under the provisions of this Agreement.

27. **Liability**

The Managers and Members shall not have any liability for the obligations or liabilities of the Company except to the extent provided in the Act.

28. **Governing Law**

The laws of the State of Texas shall govern this Agreement.

Executed and effective the 223rd day of March, 2020.

By: _____
    Hunter M. A. Carr

By: _____
    Scott Hepford

-9-

NO. 2020-45718

| HUNTER CARR, | § | IN THE DISTRICT COURT OF |
|---|---|---|
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| STANLEY T. LEWIS, SCOTT | § | |
| HEPFORD, WELL CELL GLOBAL, | § | |
| LLC, and RESTOR METABOLIX, INC. | § | |
| *Defendants*. | § | 127TH JUDICIAL DISTRICT |

<u>DEFENDANT'S BENCH BRIEF RE: RE-NOTICING MEMBERS MEETING & DISSOLUTION</u>

**<u>I. Re-Noticing the Members' Meeting Would Not Resolve Carr's Core Allegation</u>**

During the Temporary Injunction hearing this morning, the Court inquired about Defendants' and Diabetes Relief's willingness to re-notice the July 24, 2020 meeting of the members.

Defendants would gladly do so, but it will not resolve Carr's contention that paragraph 7 of the company agreement strips the members of their right to act on behalf of the company.[1]

> According to the Current Company Agreement, the Members gave up their rights to take action on behalf of Diabetes Relief when they agreed in paragraph 7:[30]

> Except as otherwise expressly and specifically provided in this Agreement, no Manager or Member shall have authority to bind, act for, or assume any obligations or responsibilities on behalf of, any other Manger or Member or the Company.

Contrary's to Carr's insistence during the hearing, this paragraph is silent on the question of whether the member**s** relinquished their rights. Plainly, it does not remove them. Moreover, it merely provides that no manager or member (singular) can unilaterally bind another manager or member.

---

[1] Plaintiff's August 31, 2020 "Supplement to Application for Temporary Injunction" at p. 14.

1

**EXHIBIT**

**13**

www.exhibitsticker.com

APPX0849

**INSU_PI_001128**

## II. The Members Don't Need a Meeting to Act on Behalf of the Company

Under Texas law, the actions of members of a limited liability company are effective, with *or without a meeting*, so long as the action has the minimum votes that would be necessary to take the action at a meeting. Tex. Bus. Org. Code § 101.359.

Sec. 101.359.   EFFECTIVE ACTION BY MEMBERS OR MANAGERS WITH OR WITHOUT MEETING.   Members or managers of a limited liability company may take action at a meeting of the members or managers or without a meeting in any manner permitted by this title, Title 1, or the governing documents of the company.   Unless otherwise provided by the governing documents, an action is effective if it is taken:

(1)   by an affirmative vote of those persons having at least the minimum number of votes that would be necessary to take the action at a meeting at which each member or manager, as appropriate, entitled to vote on the action is present and votes; or

Under this "effective action" rule, limited liability companies can act through majority vote, whether at a properly noticed meeting, an improperly noticed meeting, or no meeting at all. This is precisely what happened at the July 24th meeting.

## III. A Majority of the Members Voted to Voluntarily Unwind

On July 24, 2020, a majority of the members voted to remove Carr as a manager and approve the sale of substantially all of the company's assets to a company known as Well Cell.[2]

| Date: | Status: | Motion/Decisions: | Scott | Stanley | Hunter |
|---|---|---|---|---|---|
| 07/24/20 | Open | The members of DRL/H360 make Hunter M.A. Carr as a manager-member of Diabetes Relief, LLC effective July 24, 2020 a buy-out offer in accordance to the schedule presented to the Board | ☑ | ☑ | ☐ |
| 07/24/20 | Open | Based on insolvency Diabetes Relief will sell substantially all of its assets to Well Cell Global LLC for $3,793,511 over 4 years | ☑ | ☑ | ☐ |
| 07/24/20 | Open | Effective immediately, Hunter MA Carr will no longer serve as a manager in any capacity in any of the H360/DRL entities | ☑ | ☑ | ☐ |

---

[2] See DX 12, attached hereto.

2

Of the three items approved by a majority of members on July 24th, the sale of substantially all of the assets to Well Cell reflects the majority's decision to voluntarily unwind as contemplated by both the company agreement (paragraph 10) and the Business Organizations Code.[3]

10.   **Dissolution**

The Company shall dissolve, and its affairs shall be wound up, on the first to occur of the following: (a) the written consent of the Managers, (b) the death, retirement, resignation, expulsion, or bankruptcy of a Manager, or (c) upon the entry of a judicial dissolution under the laws of the State of Texas.

Sec. 11.152.   WINDING UP PROCEDURES.   (a)   Except as provided by the title of this code governing the domestic entity, on the occurrence of an event requiring winding up of a domestic entity, unless the event requiring winding up is revoked under Section 11.151 or canceled under Section 11.152, the owners, members, managerial officials, or other persons specified in the title of this code governing the domestic entity shall, as soon as reasonably practicable, wind up the business and affairs of the domestic entity.   The domestic entity shall:

(1)   cease to carry on its business, except to the extent necessary to wind up its business;

(2)   if the domestic entity is not a general partnership, send a written notice of the winding up to each known claimant against the domestic entity;

(3)   collect and sell its property to the extent the property is not to be distributed in kind to the domestic entity's owners or members; and

(4)   perform any other act required to wind up its business and affairs.

(b)   During the winding up process, the domestic entity may prosecute or defend a civil, criminal, or administrative action.

Here, the timing of the payments due Diabetes Relief under the Well Cell Asset purchase agreement[4] correspond, as a practical matter, to the new investor's obligations to fund Well Cell.[5]

Moreover, although the Well Cell transaction perhaps could have been accomplished more artfully, it satisfies the fundamental requirements of a voluntary unwinding under the Code.[6]   And more importantly, it saves the company's employees, the patients receiving treatment and the company's members from having to face the practical reality of being held hostage by Plaintiff Carr.

---

[3] DX 4 (March 23, 2020 Amended Operating Agreement).
[4] PX 11 (Well Cell Purchase Agreement) at Exhibit A.
[5] DX 11 (Promissory Note executed in favor of Well Cell) at Exhibit A.
[6] *See* Elizabeth S. Miller, Robert A. Ragazzo, 20 Tex. Prac., Business Organizations § 21:6, Winding up process in general (3d ed.) ("There are various ways for this process to occur. The LLC might shut down the business and liquidate the assets piecemeal, sell its assets as a going concern, or dispose of its assets using some combination of these methods.")

3

Indeed, the company lost hope of coming to a consensus to stave off disaster in early June when Plaintiff Carr botched a potential investment by a third party.  That potential investor made clear what the problem is[7] …

> -----Original Message-----
> From: Jouko J. Rissanen <jouko@joukor.com>
> Sent: Monday, June 1, 2020 12:59 PM
> To: Hunter Carr <hunter@diabetesrelief.com>
> Subject: Re: Future of Diabetes Relief
>
> No problem.
> Take your time.
> We are in no hurry to move until you are formally out of the company.

| | |
|---|---|
| From: | Jouko J. Rissanen <jouko@joukor.com> |
| Sent: | Saturday, June 6, 2020 10:41 AM |
| To: | Hunter  Carr |
| Cc: | Jeff Smith; Scott Hepford; Glenn Massey; Stanley Lewis; Bill Gafford |
| Subject: | Re: Future of Diabetes Relief |
| Categories: | - |

I see your response has been displayed yo others. Great.
There is no way to give you a bonus for such a fine job that you have done.
As I said in the last message. There is no room for this type of bargaining.
We will stick yo the original 2.5 at the time of sale.
Please tell your wet behind the ears lawyer that I just sold a company for 6 million, all the stock transferred to the buyer, however, should there be any type of default, I would step in and I would get to keep all the money paid. It's a 5 year payout.
The company is called Government Window.

This is what I was afraid of, dealing with a novice who does not understand fair deal terms.
No money will come from us.
The company will fail within 6 months.
Good luck with that.

Jouko

At bottom, there is no legitimate basis prevent the voluntary unwinding from going forward. If Plaintiff Carr can ultimately prove that Diabetes Relief's asserts were worth more than $3.7 million on July 24th, then he can recover money damages for that claim.

---

[7] DX 5 (June 2020 emails between Carr and potential third party investor Jouko Rissanen).

4

Respectfully Submitted,


**AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING, P.C.**

*/s/ P. Kevin Leyendecker*
P. Kevin Leyendecker
Texas Bar No. 00784472
Shawn M. Bates
Texas Bar No. 24027287
Kelsi Stayart-White
Texas Bar No. 24098466
1221 McKinney, Suite 2500
Houston, Texas 77010
Telephone: 713.655.1101
Facsimile: 713.655.0062
kleyendecker@azalaw.com
sbates@azalaw.com
kwhite@azalaw.com

5

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of August 2020, a true and correct copy of the above and foregoing document was served on the following counsel of record:

The Kirklin Law Firm, P.C.
Paul S. Kirklin
12600 N. Featherwood Dr., Suite 225
Houston, Texas 77034
pkirklin@kirklinlaw.com
Tel: 832-969-1821

**ATTORNEY FOR HUNTER CARR**


*/s/ P. Kevin Leyendecker*
P. Kevin Leyendecker

6

# AMENDED
# COMPANY AGREEMENT
# Diabetes Relief LLC
## A TEXAS SERIES LIMITED LIABILITY COMPANY
### Manager Managed

This Amended Company Agreement (the "Agreement") of **Diabetes Relief LLC**, a Texas Series Limited Liability Company ("the Company") is made and entered into effective **March 23, 2020**, by its Manager-Memberss, **HUNTER M. A. CARR** and **SCOTT HEPFORD** ("Managers" or "Manager-Members"). In this Agreement Hepford and Carr may be referred to as Managers or Members or Manager-Members. This series limited liability company was formed pursuant to and in accordance with the Texas Business Organizations Code, Title 3, Limited Liability Companies, Chapter 101, Subchapter M, Series Limited Liability Company, Sec. 101.601 through 101.621, effective September 1, 2009, as amended from time to time ("the Act") (*see* "Purpose" infra.). The Manager-Members hereby agree as follows:

**1.     Formation**

**A.** The Company was formed on January 5, 2015, by the filing of the Series Limited Liability Company Certificate of Formation with the Secretary of State of the State of Texas (the "Certificate of Formation"). Except as otherwise provided in this Agreement, the rights, duties, liabilities, and obligations of the Managers, and all other persons who become Managers or Members of the Company in the manner set forth herein, and the administration, dissolution, winding up, and termination of the Company shall be governed by the Act.

**B.** The Company's original managers were Hunter M. A. Carr and Scott Hepford. At a Meeting of the Managers held on November 17, 2017, Stanley T. Lewis was added as a new Member and Manager, with all three Managers having equal authority and responsibility.

**4**

**C.** Stanley Lewis has resigned as Manager due to other commitments, and his resignation has been accepted and consented to for all purposes, and is approved, affirmed, and confirmed by this Agreement.

**D.** This Agreement is made and entered into in order to clearly confirm the state of the Company and its ownership for going forward in carrying on its business.

## 2.     Offices

The principal business office of the Company is currently located at 11511 Katy Freeway, in Suites 101 and 135, Houston, Texas 77079, which may change from time to time, depending upon necessity and circumstances. The Company's clinic is located at 11511 Katy Freeway, Suite 100, Houston, Texas 77079. The Company's registered office and the name of its initial registered agent at such address are 2500 Wilcrest Drive, Suite 300, Houston TX 77042, and Robert Sonfield, as set forth in the initial Certificate of Formation filed with the State of Texas. The Company's registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name and the acceptance of the new registered agent with the Texas Secretary of State pursuant to the Act.

## 3.     Purpose

The Company was originally formed for the object and purpose of operating a comprehensive diabetes and metabolic disease treatment center in the building located at 11511 Katy Freeway, Houston, Texas 77079, and to operate additional centers, both licensed and managed, within and outside the State of Texas. Through experience, the Managers have determined that the Company's interests are best suited, and patients will best be served if the Company shifts its focus to the licensing of its patented procedures to existing medical clinics and professionals. The clinic business of the Company has been transferred to Diabetes Relief Greater Houston Series LLC, a separate Texas Series LLC owned by Company and created February 11, 2016, with the clinic operated by Diabetes Relief Houston Westside Series LLC, which is owned by Company and others. Business may be conducted and promoted by the Company and it may engage in

APPX0856

**INSU_PI_001135**

any lawful activity for which limited liability companies may be formed under the Act and in any and all activities necessary or incidental to the foregoing. The Company and any future Series LLCs created thereunder will specifically be limited pursuant to Subsection (a), Sec. 101.602, Business Organizations Code, State of Texas, so that (1) the debts, liabilities, obligations, and expenses incurred, contracted for, or otherwise existing with respect to a particular series shall be enforceable against the assets of that series only, and shall not be enforceable against the assets of the limited liability company generally or any other series; and (2) none of the debts, liabilities, obligations, and expenses incurred, contracted for, or otherwise existing with respect to the limited liability company generally or any other series shall be enforceable against the assets of a particular series.

### 4.    Registered Agent

The name and address of the registered agent of the Company for service of process on the Company in the State of Texas is Robert Sonfield, 2500 Wilcrest Drive, Suite 300, Houston, Texas  77042.

### 5.    Managers

The names and the addresses of the Managers, who are also Members, are as follows:

> Hunter M. A. Carr, 11511 Katy Fwy, Suite 101, Houston TX USA 77079
> Scott Hepford, 11511 Katy Fwy, Suite 101, Houston TX USA 77079

A third Member, who is not a Manager, is:
> Stanley T. Lewis, 8835 Robin Hood Lane, La Jolla, CA 92037

### 6.    Ownership

The Company was originally stated to be owned by H360 LLC, a Texas Series Limited Liability Company, and Certificate Number 1 issued to H360 LLC was

-3-

APPX0857

INSU_PI_001136

entered on the books and records of the Company. Each original Member-Manager of Company was also an equal Member-Manager and Owner of H360 LLC. The Managers hereby authorize that Certificate Number 1 and any subsequent ownership certificates be canceled and declared null and void for all purposes effective as of March 22, 2020. The Managers and Members further declare and affirm that Company has been reorganized and have re-apportioned ownership rights to confirm to Members' contributions, past and present, and therefore restate the Company's ownership and authorize the issuance of ownership certificates totaling Two Hundred Seventy-Six (276) membership units as follows:

Hunter M. A. Carr, 113 ownership units, for 40.9% of Company
Scott Hepford, 113 ownership units, for 40.9% of Company
Stanley T. Lewis, 50 ownership units, for 18.2% of Company

### 7.   Powers-Scope of Managers' Authority

Except as otherwise expressly and specifically provided in this Agreement, no Manager or Member shall have authority to bind, act for, or assume any obligations or responsibilities on behalf of, any other Manager or Member or the Company.  Neither the Company nor any Manager or Member shall be responsible or liable for any indebtedness or obligation of any other Manager or Member incurred or arising either before or after the execution of this Agreement, except as to such joint responsibilities, liabilities, indebtedness, or obligations incurred after the date hereof pursuant to a written instrument. This Agreement shall not be deemed to create a partnership or other affiliation between the Managers or Members with respect to any activities whatsoever, other than activities within the purpose of the Company as specified in Paragraph 3 above.

### 8.   Management of the Company

The two Member-Managers shall manage the business and affairs of the Company as Managers on an equal basis.  The Managers shall have the power to do any and all acts necessary or convenient to or for the furtherance of the

-4-

purposes described herein, including all powers, statutory or otherwise, possessed by Members under the laws of the State of Texas.

### 9.    Confidential Information

The Company and each Manager or Member shall not use or disclose to others any confidential information received from the Company or any other Manager or Member that is not otherwise available to the public (or any confidential information made available to the public as a result of a breach of this Agreement by the breaching party) for any purpose other than for the benefit of the Company, as determined by the Managers, or as required by law.

### 10.    Dissolution

The Company shall dissolve, and its affairs shall be wound up, on the first to occur of the following: (a) the written consent of the Managers, (b) the death, retirement, resignation, expulsion, or bankruptcy of a Manager, or (c) upon the entry of a judicial dissolution under the laws of the State of Texas.

### 11.    Capital Contributions

The Members have contributed cash and work product consistent with their percentage of ownership.

### 12.    Additional Contributions

Managers may authorize Additional Capital Contributions to the Company that will be applied specifically towards working capital of the Company.  In the event of such authorization, each Manager or Member shall contribute to the capital of the Company (an "Additional Capital Contribution") in its proportionate share, based on his/her/its Percentage Interest, of the aggregate amount of any additional cash contributions called for by the Managers in accordance with this Agreement or any subsequent agreement or business plan. Both Manager-Members of Company must agree upon Additional Capital Contributions in writing.  Except as specifically provided herein, no additional

-5-

equity interest in the Company shall be issued upon receipt of any Additional Capital Contribution.

### 13.   Use of Capital Contributions

All contributions to capital of the Company shall be available to the Company to carry out the purposes of the Company.

### 14.   Allocation of Profits and Losses

The Company's profits and losses shall be allocated to the Member Owners according to their proportionate percentages of ownership.

### 15.   Ownership by Manager of Company

No Manager shall have any right of partition with respect to any property or assets of the Company.

### 16.   Return of Capital

Except as expressly provided herein, no Manager or Member shall have the right to demand or receive a distribution of any capital prior to the dissolution of the Company, and no manager or Member shall have the right to demand or receive property other than cash in return for any contribution to the capital of the Company, unless agreed by the Managers.

### 17.   No Interest

No Manager or Member shall be entitled to receive any interest with respect to its Capital Contributions or Capital Account.

### 18.   Accounting

The Managers, or their designees, shall keep books of account in which will be entered fully and accurately every transaction of the Company. The books of

APPX0860

INSU_PI_001139

account shall be kept on the accrual method of accounting and in accordance with GAAP. Such books of account, together with all correspondence, papers, and other documents, shall be kept at such offices of the Company as the Managers shall designate and shall, upon reasonable notice shall be open to the examination of any Manager, or authorized representative thereof, who will be permitted to make copies of all or any part thereof at such Manager's cost.

## 19.   Distributions

Distributions shall be made to the Managers at the times and in the aggregate amounts determined by the Managers. Such distributions shall be allocated among the Managers in equal proportion unless otherwise agreed to in writing by all Managers.

## 20.   Rights and Obligations of Managers and Members

Except as expressly set forth in this Agreement or mandated by the Act, no Manager or Member shall have any liability to the Company in excess of such Manager's or Member's Capital Contributions, and no Manager or Member shall have any liability to any other Manager or Member for the return or repayment of the Capital Contributions of such other Manager or Member or for the repayment of any loan by such other Manager or Member to the Company. A Manager or Member will not be personally liable for any debts or losses of the Company beyond the Manager's or Member's obligation under paragraphs 11, 12, and 13 to make Capital Contributions or as otherwise required by the Act.

## 21.   Assignments

A Manager or Member may not assign in whole or in part his/her/its limited liability interest in the Company to any third party unless agreed to by all Managers.

## 22.   Resignation

A Manager or Member may resign from the Company only with the consent of the Managers.

-7-

23.    **Admission of Additional Members**

Up to ten (10) more additional members of the Company may be admitted to the Company with the consent of the Managers. The number of authorized units of ownership may be increased by consent of the Managers.

24.    **Indemnification**

The Company shall indemnify, to the fullest extent now or hereafter permitted by law, each Manager and Member of the Company who was or is made a party to or a witness in or is threatened to be made a party to or a witness in any threatened, pending, or completed action or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that such Manager or Member is or was an authorized representative of the Company, against all expenses (including attorney'' fees and disbursements), judgments, fines (including excise taxes and penalties), and amounts paid in settlement actually and reasonably incurred by such Manager or Member in connection with such action or proceeding.  Indemnification under this Paragraph shall not be made by the Company in any case where a court determines that the alleged act or failure to act giving rise to the claim for indemnification (i) is expressly prohibited by the Act or any successor statute in effect at the time of such alleged action or failure to take action, (ii) constitutes willful misconduct, bad faith, gross negligence, or reckless disregard of a Manager's or Member's duties or (iii) is outside the scope of such Manager's or member's duties performed in his or her official capacity or in another capacity at the Company's request.

25.    **Personal Indemnification**

No Manager or Member shall have any obligation to indemnify any other Manager, Member, officer, employee, agent, or other authorized representative of the Company under any circumstances.

APPX0862

**INSU_PI_001141**

26.   **Insurance**

The Company may purchase and maintain insurance on behalf of any person who is or was a Manager, or is or was an authorized representative of the Company, against any liability asserted against or incurred by such person in any such capacity, or arising out of the status of such person as such, whether or not the Company would have the power to indemnify such person against such liability under the provisions of this Agreement.

27.   **Liability**

The Managers and Members shall not have any liability for the obligations or liabilities of the Company except to the extent provided in the Act.

28.   **Governing Law**

The laws of the State of Texas shall govern this Agreement.

Executed and effective the 223rd day of March, 2020.

By: _____

Hunter M. A. Carr

By: _____

Scott Hepford

-9-

## Scott Hepford

**From:** Jouko J. Rissanen <jouko@joukor.com>
**Sent:** Saturday, June 6, 2020 10:41 AM
**To:** Hunter Carr
**Cc:** Jeff Smith; Scott Hepford; Glenn Massey; Stanley Lewis; Bill Gafford
**Subject:** Re: Future of Diabetes Relief

**Categories:** -

I see your response has been displayed yo others. Great.
There is no way to give you a bonus for such a fine job that you have done.
As I said in the last message. There is no room for this type of bargaining.
We will stick yo the original 2.5 at the time of sale.
Please tell your wet behind the ears lawyer that I just sold a company for 6 million, all the stock transferred to the buyer, however, should there be any type of default, I would step in and I would get to keep all the money paid. It's a 5 year payout.
The company is called Government Window.

This is what I was afraid of, dealing with a novice who does not understand fair deal terms.
No money will come from us.
The company will fail within 6 months.
Good luck with that.

Jouko


Jouko J. Rissanen
Jouko@joukor.com
404 229.7779 c.

> On Jun 6, 2020, at 10:37 AM, Hunter Carr <hunter@diabetesrelief.com> wrote:
>
> Jouko,
>
> Please, thank everyone, and a special thanks to you for considering the potential opportunities of Diabetes Relief.
> I personally, do appreciate the time provided to mediate and pray with my wife about our decision.
> Also, the time it allowed discussions with the other members on how my decision would impact Diabetes Relief LLC (DRL).
> As you could guess, everyone had different ideas but here is my response:
>
> I could accept the $3,000,000 but not the payout terms:
> Reasons: Part 1.
>   1.  If leaving Diabetes Relief - Total separation is the best procedure for both you and me.  I should not remain in any position where decision are direction of DRL should concern me.
>   2.  If I am paid on a long term basis that you have proposed, I would need certain controls built into the agreement. This becomes a more complicated transaction, right?
>   3. Releasing of my interest, according to my counsel, could occur until I was fully paid.
>   4. My ownership interest would be the collateral, and that would mean it could not be diluted, until fully paid.
> Part 2.

**5**

> You realize that I am 72 years young, and to expect any payout for 7 years is too long.  Especially, when I believe the future of DRL is extremely bright, NOW.
>
> Clearly, my only purpose in considering leaving Diabetes Relief is that major changes need to occur for DRL to reach its full potential.
> At the same time upon leaving - I will certainly need an initial stake to proceed to my next venture, therefore I need a larger cash amount on signing.
>
> All this makes me think of that old song by Mac Davis "Lubbock In My Rear View Mirror" - If I am leaving DRL, I need "Diabetes Relief In My Rear View Mirror."
>
> I look forward to your favorable response.
> Let me know your thoughts and I appreciate all your considerations.
>
> His and Yours,
>
> Hunter Carr
> Founder, Manager Diabetes Relief LLC
> O (281) 600-6000 x1
> M (713) 557 9100
>
>
>
> W www.diabetesrelief.com
> fb.com/diabetesreliefnow
>  twitter.com/diabetesrelief1
> YouTube - diabetesreliefnow
>
> Mission Statement:
> "Restoring health to individuals with impaired metabolism through modern technology, thus enhancing wellness throughout the world."
>
> Confidential transmission: If you are not the intended recipient of this message, you may not disclose, print, copy, or disseminate this information. If you are not the intended recipient, please contact the sender at (281 600 6000 ext. 2), or by reply email, and destroy all copies of the original message. Unauthorized interception of this e-mail is a violation of federal criminal law. This communication does not reflect an intention by the sender or the sender's principal to conduct a transaction or make any agreement by electronic means.
>
>
> -----Original Message-----
> From: Jouko J. Rissanen <jouko@joukor.com>
> Sent: Monday, June 1, 2020 12:59 PM
> To: Hunter Carr <hunter@diabetesrelief.com>
> Subject: Re: Future of Diabetes Relief
>
> No problem.
> Take your time.
> We are in no hurry to move until you are formally out of the company.
> After that, you certainly are welcome any time. You may be instrumental in the succession planning and morphing of the newly capitalized company, as you have the historical perspective.
> Jouko
>

APPX0865

INSU_PI_001144

> Jouko J. Rissanen
> Jouko@joukor.com
> 404 229.7779 c.
>
>> On Jun 1, 2020, at 12:16 PM, Hunter Carr <hunter@diabetesrelief.com> wrote:
>>
>> Jouko,
>>
>> Thank you, and I need to run my traps, and get back to you.
>> I appreciate the kind words, and our conversations, especially candor.
>>
>> Stay safe-
>>
>> Hunter Carr
>> Founder, Manager Diabetes Relief LLC
>> O (281) 600-5000
>> M (713) 557 9100
>>
>>
>>
>> W www.diabetesrelief.com
>> fb.com/diabetesreliefnow
>> twitter.com/diabetesrelief1
>> YouTube - diabetesreliefnow
>>
>> Mission Statement:
>> "Restoring health to individuals with impaired metabolism through modern technology, thus enhancing wellness throughout the world."
>>
>> Confidential transmission: If you are not the intended recipient of this message, you may not disclose, print, copy, or disseminate this information. If you are not the intended recipient, please contact the sender at (281 600 6000 ext. 2), or by reply email, and destroy all copies of the original message. Unauthorized interception of this e-mail is a violation of federal criminal law. This communication does not reflect an intention by the sender or the sender's principal to conduct a transaction or make any agreement by electronic means.
>>
>>
>> -----Original Message-----
>> From: Jouko J. Rissanen <jouko@joukor.com>
>> Sent: Monday, June 1, 2020 7:16 AM
>> To: Jouko J. Rissanen <jouko@joukor.com>; Hunter Carr
>> <hunter@diabetesrelief.com>
>> Subject: Future of Diabetes Relief
>>
>> Hunter,
>> Good morning.
>> Sorry for the delay in sending this to you. It's just that I had to convince Jeff to even consider a higher valuation as the present opportunity of 5 million valuation equates to 2 million payout to you, and is the "end of the earth offer" for this decaying company that has languished for the past 5/6 years.
>>
>> That being said, and the next issue you may find surprising, that my assessment of you, like me, in the declining phase of our lives...we still have honor, competence and value.

>> Your steady, articulate manner, steadfastly standing your ground as the Founder, instills in us a conciliatory tone, where you will be honored upon your exit, and called upon, at our request, to attend some meetings and functions where the Founder is also shown as someone who owns a piece of the rock and has a stake it our future growth.
>> Personally, I have no animosity, and actually enjoyed getting to know you by the conversation we had.
>>
>> After much thought about your rejection of the royalty arrangement due to lack of sales, I have taken it upon myself ( as an investor) to sweeten the pot to 3 million dollars.
>> It would be in two parts.
>>
>> 1. $500 thousand.   and   2. $2.5M.
>>
>> So, the Five Hundred will become part of the 3 million buy-out of all your shares.
>> The payout will be: $200,000.00 per year, paid quarterly.. in advance. For 10 equal payments of $50,000.00.
>>
>> At the end of 2 1/2 years, the $2.5 million remaining pot will start being reduced, so long as you are alive, with a royalty of 50 dollars per pump and one dollar per cassette.
>> Should you expire, the royalty will cease, and the remainder will be paid upon sale, transfer, etc.
>> The thinking here is that we have over two years to create traction and get the volumes up to get you the income that you now are accustomed. Example: if we sell 2000 pumps and 150,000 sets... then you receive $250K annually, paid quarterly. But, in this example, say it goes on for 4 years like that and you have received 1 million via royalty, then the pot at the end of the rainbow would be 1.5 million to you at the time of sale, or change of control.
>> Of course, if we are not able to get the sales up with us investing monies towards growth and next generation products and it does not grow, even with our collective efforts, then we lose big time, and you have done far  better than us.
>>
>> There are many hurdles to overcome. We need Scott and Glenn on board, Dr. Lakey, too. All this is not cheap. A big investment on our part. Thus, if these are not acceptable terms, please let me know and we will turn our focus somewhere else where we do not have to invest so much into weak infrastructure. There is no need to send a counter proposal as the valuation now reaches 7.5 million for something that is worth half of that.
>>
>> I hope this gives you something to think about. A quick resolution is needed, or you will be out of business. Just my risk assessment.
>>
>> Thank you
>>
>>
>>
>> Jouko J. Rissanen
>> Jouko@joukor.com
>> 404 229.7779 c.

APPX0867

INSU_PI_001146

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAW (COLLECTIVELY, THE "ACTS"), AND MAY NOT BE OFFERED, SOLD, OR OTHERWISE TRANSFERRED, ASSIGNED OR DISPOSED OF EXCEPT PURSUANT TO REGISTRATION UNDER SUCH ACTS OR UNLESS OFFERED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACTS OR AN OPINION OF COUNSEL SATISFACTORY TO THE PAYOR THAT SUCH REGISTRATION IS NOT REQUIRED.**

## WELL CELL GLOBAL LLC

### CONVERTIBLE PROMISSORY NOTE

Date of Issuance: July 23, 2020 (the "Date of Issuance")

Payor: ***Roy Hinman II, M.D.*** (the "Recipient")

Principal Amount: **Five Million Dollars and No/100 ($5,000,000.00)** (the "Principal Amount")

FOR VALUE RECEIVED, Roy Hinman II, M.D., an individual, (the "Recipient"), promises to pay to Well Cell Global LLC ("Company"), or its registered assigns, in lawful money of the United States of America the Principal Amount, or so much thereof as may be advanced to Recipient under this Agreement (as defined below) and outstanding from time to time thereon, in lawful money of the United States of America and immediately available funds at the time and place and in the manner set forth in this convertible promissory note ("Note").

1. *Definitions*. As used in this Note, the following capitalized terms have the following meanings:

    (a) "Agreement" means this Convertible Promissory Note, which may also be referred to as "Note."

    (b) "Equity Interest" means (a) with respect to a corporation, any and all shares of capital stock of such corporation, (b) with respect to a partnership, limited liability company, trust, or similar Person, any and all units, interests, or other partnership/limited liability company interests, and (c) any other direct or indirect equity, capital, ownership or participation in a Person or rights convertible thereto.

    (c) "Event of Default" has the meaning given in Section 6 hereof.

    (d) "Indebtedness" has the meaning given in Section 5(a) hereof.

    (e) "Interest" has the meaning given in Section 3 hereof.

Convertible Promissory Note

**CONFIDENTIAL**



Initial: _____   Initial: _____

APPX0868

**INSU_PI_001147**

(f) "Liquidation Event" shall mean each of (i) a liquidation, dissolution or winding up of the Recipient, either voluntary or involuntary, (ii) a consolidation or merger (within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended) of the Recipient with or into one or more other corporations or other business organizations, unless the owners of Equity Interest immediately prior to such transaction, including any of their affiliates, hold immediately after such transaction more than 50% of the voting equity of the acquiring or resulting entity, (iii) the sale, lease or transfer of all or substantially all of the assets of the Recipient, (iv) any form of corporate reorganization in which Equity Interests representing more than 50% of the outstanding voting power of the Recipient are exchanged for or converted into cash, securities of another corporation or business organization or other property or (v) any other form of corporate reorganization or transaction in which the holders of Equity Interest immediately prior to such transaction, including any of their affiliates, hold immediately after such transaction less than 50% of the voting equity of the acquiring or resulting entity.

(g) "Maturity Date" has the meaning given in Section 2 hereof.

(h) "Obligations" shall mean the terms and conditions of this Agreement.

(i) "Person" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(j) "Qualified Financing" has the meaning given in Section 5(d) hereof.

(k) "Payment Events" the meaning given in Section 4 hereof.

(l) "Securities Act" shall mean the Securities Act of 1933, as amended.

2. *Maturity*. Except as set forth in Section 4, Section 5 and Section 6, the entire outstanding Principal Amount, together with all accrued and unpaid Interest thereon, shall be due and payable on January 19, 2024 (the "Maturity Date").

3. *Interest*. This Note shall bear interest ("Interest") on the outstanding Principal Amount at the rate of 0.0% per annum, compounded annually, except as provided in Section 13. All accrued and unpaid Interest will be payable on the Maturity Date, unless the Note is prepaid in full, converted into an Equity Interest of the Recipient (as described below), or otherwise satisfied in full in accordance with the terms hereof.

4. *Payments*.

(a) Payment Schedule. Payment ("Payment Events") shall occur in accordance to the schedule attached hereto as Exhibit A ("Payment Schedule"), which contains a list of payments and the equity and rights awarded ("Award") for such payments. Recipient and Company have developed a payment schedule to be completed by Recipient no later than

Initial: _____   Initial: _____

CONFIDENTIAL

APPX0869

INSU_PI_001148

the Maturity Date. This payment schedule will be developed to allow Recipient to be in compliance with any federal regulations involving distributions, if applicable.

(b)   Prepayment. The Recipient may prepay this Note in whole or in part at any time as long as the payments meet or exceed the Payment Schedule up to the point where fifteen percent (15%) equity is awarded.  After Recipient is awarded fifteen percent (15%) of equity in Company, Company has the option to reject Payment Events and cancel this Note.

(c)   Cancellation of Note. If Company does not elect to covert the Note as provided below in Section 5, the Note shall be canceled, and the Award amount shall be contributed to the Recipient in its entirety and the Recipient shall be released of all covenants, liabilities and Obligations under this Agreement on and after the Maturity Date.

5. *Conversion.*

(a)   Conversion at Company's Option. Company shall have the right and option to convert the entire outstanding Principal Amount of this Note and all accrued and unpaid Interest thereon (collectively, the "Indebtedness"), or any portion of the Indebtedness, into an Equity Interest in the Recipient that is the greater of (i) a number of shares that equals up to 15% of the principal owner's shares at the time of conversion, or (ii) a number of shares determined in accordance with the formula in section 5(c). If Company elects to convert this Note, Company shall have the option of receiving shares from the most recent or currently open round of funding. Company will notify the Recipient of its intent to convert when a "Repayment Event" occurs or annually 90 days prior to the annual anniversary date of the agreement.

(b)   Liquidation Event; Initial Public Offering. In the event of a Liquidation Event or an initial public offering under the Securities Act or equivalent foreign public securities offering of capital stock of the Recipient, Company shall have the option of converting all or any portion of the Indebtedness into an Equity Interest in the Recipient. If Company elects to convert this Note, Company shall have the option of receiving shares from the most recent or currently open round of funding.

(c)   Conversion Price. The number of units or shares of Equity Interest to be issued to Recipient upon such exercise in subsections (a) and (b) of this Section 6 will equal the Payment Schedule listed as Exhibit A, attached hereto and incorporated within, as adjusted proportionately from time to time for any equity splits, reclassifications and dividends that have the effect of altering the number of Equity Interests outstanding.

(d)   Notice of Sale. The Recipient will give Company ten (10) business days prior written notice of any Liquidation Event, public offering, sale of the Recipient either through merger, a sale of all or mostly all of the material assets of the Recipient or otherwise, such that Company may exercise Company's rights to convert this Note as set forth in this section.

(e) Fractional Equity Interest; Interest; Effect of Conversion. No fractional unit or share Equity Interest shall be issued upon conversion of this Note. In lieu of the Recipient issuing any fractional unit or share to Company upon the conversion of this Note, the Recipient shall pay to Company an amount equal to the product obtained by multiplying the conversion price set forth in this Section by the fraction of a unit or share of Equity Interest not issued pursuant to the previous sentence.

(f) Repayment Obligation Ends Upon Conversion. Upon conversion of this Note in full, the Recipient shall be forever released from all its Obligations and liabilities under this Note.

    (i) Reservation of Equity Interest. The Recipient will at all times reserve and keep available, solely for issuance, sale and delivery upon the conversion of this Note a number of units or shares of Equity Interest equal to the number of units or shares issuable upon the conversion of this Note. The Recipient shall not sell, mortgage, or assign any interest in its property without the consent of Company.

6. *Events of Default*. The occurrence of any of the following shall constitute an "Event of Default" under this Note and under the Agreement:

(a) Non-Payment of Amounts Due Company. Default in the payment when due under this Note or with respect to any other Obligation owed to Company.

(b) Bankruptcy, Insolvency, Etc. Recipient becomes insolvent or generally fails to pay, or admits in writing its inability to pay, debts as they become due; or Recipient applies for, consents to, or acquiesces in the appointment of a trustee, receiver, or other custodian for Recipient or any property of, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent, or acquiescence, a trustee, receiver, or other custodian is appointed for Recipient or for a substantial part of the property of Recipient and is not discharged within 30 days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law or any dissolution or liquidation proceeding is commenced in respect of Recipient, and if such case or proceeding is not commenced by Recipient, it is consented to or acquiesced in by Recipient, or remains for 30 days un-dismissed; or Recipient takes any action to authorize, or in furtherance of, any of the foregoing.

(c) Breach of Agreement. Breach of this Note or failure by Recipient to comply with or to perform any of the Obligations and continuance of such failure for ten (10) days after notice thereof to Recipient from Company.

(d) Warranties. Any warranty made by Recipient under this Note is breached or is false or misleading in any material respect, or any schedule, certificate, financial statement, report, notice, or other writing furnished by Recipient to Company is false or misleading in any material respect.

(e) Death, Etc. of an Officer. Any Officer of the Recipient dies or becomes incapable of managing his or her own affairs; or serious illness or incapacity of any Officer occurs for

a period exceeding 6 months; or a trustee, receiver, guardian, custodian, or other legal representative is appointed for the person or any of the estate or assets of any Officer; or any Officer fails, neglects, or refuses for any reason to be or remain as manager of the Business. Notwithstanding any other provision to the contrary, the events described in this subsection (e) will not constitute an automatic Event of Default. The described events must be timely reported to Company, which will then determine whether to declare a default.

(f) Competition by an Officer. Without Company's prior written consent, Recipient becomes an employee of, or a 5% or more investor directly or indirectly in, any other business, or Recipient becomes involved with any other business operation, directly or indirectly, as owner, director, officer, shareholder, partner, venturer, manager, consultant, or otherwise, that competes with the Business.

7. *Rights of Company upon Default*. Upon the occurrence of an Event of Default and at any time thereafter until such Event of Default is cured to the satisfaction of Company, Company may enforce any or all of the following remedies.

(a) Company may refrain from disbursing the Award and any amount of the Award not previously disbursed; provided, however, Company may make such a disbursement after the occurrence of an Event of Default without thereby waiving its rights and remedies hereunder.

(b) Company may enforce any additional remedies it has in law or equity. The rights and remedies herein specified are cumulative and not exclusive of any rights or remedies that Company would otherwise possess.

8. *Successors and Assigns*. Subject to the restrictions on transfer described in Section 10 below, the rights and obligations of the Recipient and Company shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

9. *Waiver and Amendment*. Any provision of this Note may be amended, waived or modified only upon the written consent of the Recipient and Company.

10. *Assignment by the Recipient*. Neither this Note nor any of the rights, interests or Obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Recipient without the prior written consent of Company.

11. *Notices*. All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in this Note, or at such other address or facsimile number as the Recipient shall have furnished to Company in writing. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

12. *Payment*. Any payments due hereunder shall be made in lawful money of the United States.

13. *Default Rate; Usury*. During any period in which an Event of Default has occurred and is continuing, the Recipient shall pay interest on the unpaid principal balance hereof at a rate per annum equal to 18%. The parties expressly agree that the Obligations under this Note are not subject to usury laws because they contingent upon a future event that might not ever occur, rather than an absolute obligation, and thus cannot be characterized as a "loan" under Section 301.002(a)(10) of the Texas Finance Code. The Recipient hereby waives and agrees not to assert by way of motion, as a defense, or otherwise, in any suit, action or proceeding, any claim that the Obligations under this Note are loans that subject to federal or Texas usury laws. However, regardless of any provisions contained herein and in the Award Agreement, Company shall never be deemed to have contracted for or be entitled to receive, collect or apply as interest on this Note any amount in excess of the highest lawful rate, and, in the event that Company ever receives, collects or applies as interest any such excess, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance of the Note, and, if the principal balance of the Note is paid in full, then any remaining excess shall forthwith be paid to the Recipient. In determining whether or not the interest paid or payable under any specific contingency exceeds the highest lawful rate, the Recipient and Company shall, to the maximum extent permitted under applicable law,

    (a) characterize any non-principal payment (other than payments which are expressly designated as Interest payments hereunder) as an expense, fee or premium, rather than as interest,

    (b) exclude voluntary prepayments and the effect thereof, and

    (c) spread the total amount of Interest throughout the entire contemplated term of the Note so that the interest rate is uniform throughout such term.

14. *Expenses; Waivers*. If action is instituted to collect this Note, the Recipient promises to pay all costs and expenses, including without limitation reasonable attorneys' fees and costs, incurred in connection with such action. The Recipient hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

15. *Governing Law*. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Texas, without regard to the conflicts of law provisions of the State of Texas, or of any other state.

*[Remainder of page intentionally left blank.]*

## SIGNATURES

The Recipient has caused this Note to be issued as of the date first written above.

*Roy Hinman II, M.D.*

By: _____

Print Name: Roy H. Hinman II    Title: MD.

Address: 100 Arricola Ave, St Augustine 32080

Phone: 904 806-3737   Email: Islanddoc@aol.com

*Scott A. Hepford - Well Cell Global LLC authorized representative*

By: _____

Print Name: Scott Hepford    Title: B&R

Address: 19611 Cornstone Ash. Ct Cyms TX 77433

Phone: 832-599-9552   Email: scott@wellcellglobal.com

ATTACHMENTS INCORPORATED BY REFERENCE FOR ALL PURPOSES:
*Exhibit A:*    Payment Schedule



## Exhibit A
## CONFIDENTIAL

## PAYMENT SCHEDULE
### Effective December 23rd, 2020

| Timeline: | Investment: | Equity: | Other Consideration: |
|---|---|---|---|
| Q3 20: July 24th Transaction Closing | $750K | 5.00% | ▪ 1 Medical Advisory Board Seat<br>▪ 1 Scientific Advisory Board Seat<br>▪ Publication Participation<br>▪ Exit Participation |
| Q4 20: October 23rd | $300K | 7.00% | ▪ Island Doctors Converts to Favored Nations Pricing |
| Q1 21: January 22nd | $300K | 9.00% | |
| Q2 21: April 23rd | $300K | 11.00% | |
| Q3 21: July 23rd | $300K | 13.00% | |
| Q4 21: October 22nd | $300K | 15.00% | ▪ 1 Executive Board Seat |
| Q1 22: January 22nd | $300K | 17.00% | |
| Q2 22: April 22nd | $300K | 19.00% | |
| Q3 22: July 22nd | $300K | 21.00% | |
| Q4 22: October 21st | $300K | 23.00% | |
| Q1 23: January 20th | $300K | 25.00% | |
| Q2 23: April 21st | $300K | 27.00% | |
| Q3 23: July 21st | $300K | 29.00% | |
| Q4 23: October 20th | $300K | 31.00% | |
| Q1 24: January 19th | $350K | 33.33% | |

*ACKNOWLEDGMENT AND CONFIRMATION DATED* 7-23-20 :

By: _____

Printed Name: Roy H. Hinman II mo
Authorized Representative

Convertible Promissory Note          8 of 8          Initial _____ Initial _____

CONFIDENTIAL

APPX0875

INSU_PI_001154

# DRL/ H360 - ==Members Meeting of the Owners== - 7/24/20

## Attendees:

☑ Scott   ☑ Stanley   ☑ Hunter

## Agenda Items:

☑ **Call to Order - 7/24/2020 3:19 PM**
☑ **Roll Call / Acknowledge a Quorum**
☑ **Adoption of Meeting Minutes**
  ☑ We have no meeting minutes to Adoption because we have never had a meeting of the members
☑ **Old Business**
  ☑ We have no Old Business for the same reason as above
☑ **New Business**
  ☑ **Hunter's buyout**
    ☑ "I would like to propose a motion." (Clear to proceed.)
    ☑ "I move that the members make Hunter M.A. Carr as a manager-member of Diabetes Relief, LLC effective July 24, 2020 a buy-out offer in accordance to the schedule presented to the Board."
      ☑ I have a **slide** of the highlights for us to talk about and the formal offer in writing
      ☑ It needs a second to move to discussion.
      ☑ Seconded by? Stanley
    ☑ Discussion
    ☑ Vote (Motion Passes / Fails)?
    ☑ Record the vote: Stanley YES, Scott YES, Hunter Withheld his vote
  ☑ **Go forward operations management**
    ☑ "I would like to propose a motion." (Clear to proceed.)
    ☑ "I move that the members remove Hunter M.A. Carr as a manager-member of all Diabetes Relief, LLC and H360 entities et al effective July 24, 2020."
      ☑ I have a **slide** of Carol's Chart of Entities document and print outs for us to review if we need them
      ☑ It needs a second to move to discussion.
      ☑ Seconded by? Stanley Lewis
    ☑ Discussion
    ☑ Hunter - Asked for a 10 min break
    ☑ Hunter is back 7/24/2020 3:58 PM
    ☑ Vote (Motion Passes / Fails)?
    ☑ Record the vote: Stanley YES, Scott YES, Hunter Withheld his vote

  ☑ **Go forward financial management**
    ☑ "I would like to propose a motion." (Clear to proceed.)



**12**

- ☑ "I move that the members approve and ratify the following sale of assets from Diabetes Relief to Well Cell Global, LLC for $3.793,511 million dollars."
  - ☑ I have for us to review…
    - ☑ **Slide** of the highlights for us to talk about
    - ☑ **Slide** of which assets are for sale.
    - ☑ **Slide** asset list must be introduced into the record
    - ☑ & The Formal Asset Purchase Agreement
  - ☑ It needs a second to move to discussion.
  - ☑ Seconded by? Stanley
- ☑ Discussion
- ☑ Vote (Motion Passes / Fails)?
- ☑ Record the vote: Stanley YES, Scott YES, Hunter is withholding his vote and wants 5 day.

- ☑ **Recap the Motions/Resolutions**

- ☑ **Adjournment - 7/24/2020 5:02 PM**

| Date: | Status: | Motion/Decisions: | Scott | Stanley | Hunter |
|-------|---------|-------------------|-------|---------|--------|
| 07/24/20 | Open | The members of DRL/H360 make Hunter M.A. Carr as a manager-member of Diabetes Relief, LLC effective July 24, 2020 a buy-out offer in accordance to the schedule presented to the Board | ☑ | ☑ | ☐ |
| 07/24/20 | Open | Based on insolvency Diabetes Relief will sell substantially all of its assets to Well Cell Global LLC for $3.793,511 over 4 years | ☑ | ☑ | ☐ |
| 07/24/20 | Open | Effective immediately, Hunter MA Carr will no longer serve as a manager in any capacity in any of the H360/DRL entities | ☑ | ☑ | ☐ |
| 07/24/20 | Open | | ☐ | ☐ | ☐ |
| 07/24/20 | Open | | ☐ | ☐ | ☐ |

# Exhibit 11

APPX0878

**INSU_PI_001157**

 **ASSET PURCHASE AGREEMENT**

THIS ASSET PURCHASE AGREEMENT (the "Agreement") made and entered into this **24th day of July, 2020** (the "Execution Date"), between **Diabetes Relief LLC,** a Texas Series Limited Liability Company, (herein referred to as the "Seller") whose principal office address is 11511 Katy Freeway, Suite 100, Houston, TX of the First Part and **Well Cell Global LLC,** a Texas Limited Liability Company, (herein referred to as the "Purchaser") whose principal office address is 19611 Cornerstone Arbor Drive, Cypress, TX of the Second Part.

**Background**

    A. The Seller carries on the business of operating a comprehensive diabetes and metabolic disease treatment center in the State of Texas (the "Business").

    B. The Seller owns the assets of the Business and desires to sell certain assets (the "Assets"), to the Purchaser, subject to any exclusions set out in this Agreement and the Purchaser desires to buy the Assets.

    C. The Board of Directors for Seller has approved and ratified the sale of Assets in accordance with the laws of the State of Texas.

IN CONSIDERATION of the provisions contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which consideration is acknowledged, the Parties agree as follows:

**Definitions**

1. The following definitions apply in the Agreement:
    a. The "Assets" to be included in this Agreement include the following assets of the Business. There are no excluded assets. The Assets consist of the following:
        i. All cash in bank accounts
        ii. Issued Patents:
            1. 1st U.S. Patent No. 9,652,595 issued by the United States Patent and Trademark Office on May 16, 2017.
            2. 2nd U.S. Patent No. 10,533,990 issued by the United States Patent and Trademark Office on January 14, 2020.
        iii. Pending Patents:
            1. 3rd U.S. Patent Application No. 15/042,087 pending issuance by the United States Patent and Trademark Office
        iv. All Copyrights and Trade Secrets
        v. All Physiologic Insulin Resensitization dosing protocols, algorithms, protocols, charts, Venn diagrams, presentations, webinars, whitepapers, studies, and all work product produced in furtherance of said assets.
        vi. Assignment of Key Vendor Contracts:
            1. Distribution Agreement dated April 10, 2018 between Zyno Solutions LLC and Diabetes Relief.
            2. SmartLev & Jot.Form agreements and data
        vii. All creative materials, including the following:

APPX0879

**INSU_PI_001158**

1. All logos, pictures, artwork, and graphic design created for all brands and companies associated with Diabetes relief, RestorMetabolix, and H360.
2. All signage set-ups, formats, designs and brand guides.
3. All social media content and materials.
4. All videos, animations, testimonials, pictures, and virtual reality (VR) platforms.

viii. Full inventory of medical supplies

ix. All office furniture, equipment and supplies from the following locations:
1. 11511 Katy Freeway, Houston, Texas 77079 located in Suites 100, 101, 135, 430.
2. 11010 Old Katy Road, Houston, Texas 77043 located in #D042

x. Full inventory of infusion pumps and cassettes

xi. Software licenses and access to all data contained within each system:
1. Full Office 365 Environment
2. CRM
3. EMR
4. PM

xii. Assignment of all intercompany agreements.

xiii. Assignment of the following License Agreements:
1. Yeni Yuzyil Turkey License
2. Diabetes Relief Middle East
3. Dr. Hinman / Island Doctors
4. First American Health – Morongo

xiv. Assignment of the following License Agreement Options:
1. Dr. Wrobel
2. Dr. Valpiani
3. Diabetes Relief Houston Westside
4. TruMetabolics
5. Dr. Toole / TW Medical Group
6. Dr. Taylor Internal Medical
7. Synergize Health Center
8. Dr. Smith / Active Life Phys Med
9. Dr. Shah / Whole Health Austin
10. Dr. Sanchez / Del Rio Foot Clinic
11. Dr. Ross / WRE, LLC
12. Rising Health
13. Dr. Ramirez
14. Dr. Pham / Metabolic Recharge
15. Dr. Perijoc / North TX Inter. Med
16. NSI Clearwater
17. Dr. Novak
18. Dr. Neret
19. Dr. McLean / McLean Cares
20. Dr. McConnell
21. Dr. Mbakwe
22. Diabetes Relief Utah Ogden
23. Dr. Grubbs / Vascular Spec.
24. Dr. Ghen, MD, PA / Total Health
25. Dr. George
26. Dr. Dembowski / ATL Med Clinic
27. Dr. Cavaciuti / Back to Life
28. Dr. Beeharilal
29. Dr. Avila

b. "Closing" means the completion of the purchase and sale of the Assets as described in this Agreement by the payment of agreed consideration and the transfer of title to the Assets.

c. "Parties" means both the Seller and the Purchaser and "Party" means any one of them.

**Sale**

2. Subject to the terms and conditions of this Agreement, and in reliance on the representations, warranties, and conditions set out in this Agreement, the Seller agrees to sell the Assets to the Purchaser and the Purchaser agrees to purchase the assets from the Seller.

**Purchase Price**

3. The Parties agree that the Purchase Price for the Assets is as follows subject to required adjustments that are agreed upon by the Parties: <u>Three Million, Seven Hundred Ninety-Three Thousand, Five Hundred Eleven and No/100 ($3,793,511.00).</u>

4. The Parties agree to cooperate in the filing of elections under the Internal Revenue Code and under any applicable taxation legislation, in order to give the required or desired effect to the allocation of the Purchase Price.

**Closing**

5. The Closing of the purchase and sale of the Assets will take place on July 24, 2020 (the "Closing Date") at the offices of the Seller or at such other time and place as the Parties mutually agree.

6. At Closing and upon the Purchaser paying the Purchase Price in full to the Seller, the Seller will deliver the Assets to the Purchaser. The Seller will deliver to the Purchaser possession of the Assets, in the same condition as on the Execution Date, and Free and clear of any liens, charges, rights of third parties, or any other encumbrances, except those attached as a result of the Purchaser's actions.

7. At Closing and upon the Purchaser paying the Purchase Price in full to the Seller, the Seller will provide the Purchaser with duly executed forms and documents evidencing transfer of the Assets, where required including, but not limited to, bills of sale, assignments, assurances and consents. The Seller will also cooperate with the Purchaser as needed in order to effect the required registration, recording and filing with public authorities of the transfer of ownership of the Assets to the Purchaser.

**Payment**

8. The Purchase Price will be paid by the Purchaser or affiliated company in one upfront lump sum of Three Hundred Forty-Five Thousand, Eight Hundred Thirty-Two Dollars and No Cents ($345,832.00) to Diabetes Relief LLC, Seller.

9. The Seller will owner finance the remaining balance of Three Million, Four Hundred Forty-Seven Thousand, Six Hundred Seventy-Nine Dollars and No Cents ($3,447,679.00) at 0% interest to Purchaser or affiliated company.

10. The Purchaser will pay according to the Asset Payment Table, attached hereto and incorporated within as **Exhibit A**. First payment is due by August 15th, 2020 and continues according to the schedule until July 15, 2024, or until balance of $3,447,679.00 less prepaid expense (whichever comes first) is paid in full.

11. The Purchase Price for the Assets will be paid by the Purchaser to the Seller in the form of a check from an escrow agent or an electronic money or funds transfer. In the case of an electronic money or funds transfer, the Seller will give notice to the Purchaser of the bank account particulars at least 5 business days prior to the Closing Date.

12. The Purchaser is responsible for paying all applicable taxes, including federal sales tax, state sales tax, duties and any other taxes or charges payable pursuant to the transfer of the Assets from the Seller to the Purchaser.

**Seller's Representations and Warranties**

13.  The Seller represents and warrants to the Purchaser that:

a.  The Seller has full legal authority to enter into and exercise its obligations under this Agreement.

b.  The Seller is the absolute beneficial owner of the Assets, with good and marketable title, free and clear of any liens, charges encumbrances or rights of others.  The Seller is exclusively entitled to possess and dispose of the Assets.

c.  To the best knowledge of the Seller there is no pending or anticipated claim against the Assets or against the Seller's ownership or title in the Assets or against the seller's right to dispose of the Assets.

d.  No third party contract is outstanding that could result in a claim against or affecting the Assets in whole or in part either now or in the future.

e.  The Seller does not have any outstanding contracts, agreements or commitments of any kind, written or oral, with any third party regarding the Assets, except for any material contracts described in, and/or attached to this Agreement.  The Seller represents and warrants that no material default or breach exists with regard to any presently outstanding material contract.

f.  Execution of this Agreement will not hinder or unfairly disadvantage any pre-existing creditor.

g.  Except as otherwise provided in this Agreement, there has been no act or omission buy the Seller that would give rise to any valid claim relating to a brokerage commission, finder's fee or other similar payment.

h.  The Seller is a resident of the United States for the purposes of the Internal Revenue Code.

i.  The Seller has withheld all amounts required to be withheld under income tax legislation and has paid all amounts owing to the proper authorities.

j.  The Seller will not dismiss any current employees or hire any new employees, or substantially change the role or title of any existing employees, provide unscheduled or irregular increases in salary or benefits to employees or institute any significant changes to the terms of any employee's employment, after signing this Agreement, unless the Purchaser provides written consent.

k.  There are no claims threatened or pending against the Business by any current or plats employee relating to any matter arising from or relating to the employment of the employee.

l.  The Assets, while owned by Seller, have been maintained at all times in accordance with standard industry practice.  The Seller further warrants that all tangible assets are in good working order.

m.  The Seller is operating in accordance with all applicable laws, rules and regulations of the jurisdictions in which it is carried on.  In compliance with such laws, the Seller has duly licensed, registered, or qualified the Assets with the appropriate authorities and agencies.

n.  The Seller maintains insurance policies on the Assets and such policies are in full force and effect and of an adequate value as would be reasonable in its industry.  The Seller has neither defaulted under these insurance policies, whether as a result of failure to pay premiums or due to any other cause, nor as the Seller failed to give notice or make a claim under these insurance policies in a timely manner.

o.  The conduct of the Seller does not infringe on the patents, trademarks, trade names or copyrights, domestic or foreign of any other person, firm or corporation to the best knowledge of the officers of the Seller.

p.  The Seller owns or is licensed to use all necessary software and it can continue to use any and all computerized records, files and programs after the Closing Date in the same manner as before the Closing Date.

APPX0882

**INSU_PI_001161**

q. The Seller has filed all tax reports and returns required in the operation of the Business and has paid all taxes owed to all taxing authorities, including foreign taxing authorities, except amounts that are being property contested by the Seller, the details of this contest having been provided to the Purchaser.

r. This Agreement has been duly executed and delivered by the Seller and constitutes a legal and binding obligation of the Seller, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy and insolvency, by other laws affecting the rights of creditors generally, and by equitable remedies granted by a court of competent jurisdiction.

14. The representations and warranties given in this Agreement are the only representations and warranties. No other representation or warranty, either expressed or implied, has been given by the Seller to the Purchaser, including, without limitation, any representations or warranties regarding the merchantability of the Assets or their fitness for a particular purpose.

15. The Seller warrants to the Purchaser that each of the representations and warranties made by it is accurate and not misleading at the Closing Date. The seller acknowledges that the Purchaser is entering into this Agreement in reliance on each representation and warranty.

16. The Seller's representations and warranties will survive the Closing Date of this Agreement.

17. Where the Purchaser has a claim against the Seller relating to one or more representations or warranties made by the Seller, the Seller will have no liability to the Purchaser unless the Purchaser provides notice in writing to the Seller containing full details of the claim on or before the third anniversary of the Closing Date.

18. Where the Purchaser has a claim against the Seller relating to one or more representations or warranties made by the Seller, and the Purchaser is entitled to recover damages from a third party then the amount of the claim against the Seller will be reduced by the recovered or recoverable amount less all reasonable costs incurred by the Purchaser in recovering the amount from the third party.

**Purchaser's Representations and Warranties**

19. The Purchaser represents and warrants to the Seller the following:

a. The Purchaser has full legal authority to enter into and exercise its obligations under this Agreement.

b. The Purchaser has funds available to pay the full Purchase Price and any expenses accumulated by the Purchaser in connection with this Agreement and the Purchaser has not incurred any obligation, commitment, restriction or liability of any kind, absolute or contingent, present or future, which would adversely affect its ability to perform its obligations under this Agreement.

c. The Purchaser has not committed any act or omission that would give rise to any valid claim relating to a brokerage commission, finder's fee, or other similar payment.

d. The Purchaser is a resident of the United States for the purposes of the Internal Revenue Code.

e. This Agreement has been duly executed by the Purchaser and constitutes a legal and binding obligation of the Purchaser, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy and insolvency, by other laws affecting the rights of creditors generally, and by equitable remedies granted by a court of competent jurisdiction.

f. The Purchaser has no knowledge that any representation or warranty given by the Seller in this agreement is inaccurate or false.

20. The representations and warranties given in this Agreements are the only representations and warranties. The Purchaser has given no other representation or warranty, either expressed or implied, to the Seller.

21. The Purchaser warrants to the Seller that each of the representations and warranties made by it is accurate and not misleading at the date of Closing.  The Purchaser acknowledges that the Seller is entering into this Agreement in reliance on each representation and warranty.
22. The Purchaser's representations and warranties will survive the Closing Date of this Agreement.
23. Where the Seller has a claim against the Purchaser relating to one or more representations and warranties made by the Purchaser, the Purchaser will have no liability to the Seller unless the Seller provides notice in writing to the Purchaser containing full details of the claim on or before the third anniversary of the Closing Date.
24. Where the Seller has a claim against the Purchaser relating to one or more representations or warranties made by the Purchaser, and the Seller is entitled to recover damages from a third party then the amount of the claim against the Purchaser will be reduced by the recovered or recoverable amount less all reasonable costs incurred by the Seller in recovering the amount from the third party.

**Conditions Precedent to be Performed by the Purchaser**
25. The obligation of the Seller to complete the sale of the Assets under this Agreement is subject to the satisfaction of the following conditions precedent by the Purchaser, on or before the Closing date, each of which is acknowledged to be for the exclusive benefit of the Seller and may be waived by the Seller entirely or in part.
    a. All of the representations and warranties made by the Purchaser in this Agreement will be true and accurate in all material respects on the Closing Date.
    b. The Purchaser will obtain or complete all forms, documents, consents, approvals, registrations, declarations, orders, and authorizations from any person or any governmental or public body, required of the purchaser in connection with the execution of this agreement.

**Conditions Precedent to be Performed by the Seller**
26. The obligation of the Purchaser to complete the purchase of the Assets under this Agreement is subject to the satisfaction of the following conditions precedent by the Seller, on or before the Closing date, each of which is acknowledged to be for the exclusive benefit of the Purchaser and may be waived by the Purchaser entirely or in part:
    a. All of the representations and warranties made by the Seller in this Agreement will be true and accurate in all material respects on the Closing Date.
    b. The seller will obtain and complete any and all forms, documents, consents, approvals, registrations, declarations, orders and authorizations from any person or governmental or public body that are required of the Seller for the proper execution of this Agreement and transfer of the Assets to the Purchase.
    c. No substantial damage to or alteration of the Assets that would adversely affect their value will occur between the date this Agreement is signed and the Closing Date.
    d. The Seller will have obtained any necessary consents for assigning any leases to the Purchaser as well as providing estoppel certificates from such owners or landlords that there are no arrears of rent, no breaches under such leases and the amount of the security deposits held by such third parties.
    e. The Seller will execute and deliver bills of sale for the Assets in favor of the Purchaser.
    f. If applicable, the Seller will provide the Purchaser with complete information concerning the operation of the Assets, in order to put the Purchaser in a position to carry on in the place of the Seller.

**Conditions Precedent Not Satisfied**

27. If either Party fails to satisfy any of its conditions precedent as set out in this Agreement on or before the Closing Date and that condition precedent was not waived, then this Agreement will be null and void and there will be no further liability as between the Parties.

**Disclosure**

28. Upon the reasonable request of the Purchaser, the Seller will, from time to time, allow the Purchaser and its agents, advisors, accountants, employees, or other representatives to have reasonable access to the premises of the Seller and to all of the books, records, documents, and accounts of the business, during normal business hours, between the date of this Agreement and the Closing Date, in order for the Purchaser to confirm the representations and warranties given by the Seller in this Agreement.

**Non-Assumption of Liabilities**

29. It is understood and agreed between the Parties' that the Purchaser is not assuming and will not be liable for any of the liabilities, debts or obligations of the Seller arising out of the ownership or operation of the Business prior to and including the Closing Date.

30. The Seller will indemnify and save harmless the Purchaser, its officers, directors, employees and agents from and against all costs, expenses, losses, claims, and liabilities, including reasonable legal fees sand disbursements, or demands for income, sales, excise or other taxes, suffered or incurred by the Purchaser or any of the above mentioned persons arising out of the ownership or operation of this Business prior to and including the Closing Date.

**Transfer of Third Party Contracts**

31. This Agreement is not to be construed as an assignment of any third party contract from the Seller to the Purchaser if the assignment would be a breach of that third party contract.

32. The Seller shall assist Purchaser in assigning old contracts or acquiring new contracts with third parties where existing contracts are not legally assignable from the Seller to the Purchaser.

33. Notwithstanding any other provision in this Agreement to the contrary, the Seller will not be liable for any losses, costs of damages of any kind including loss of revenue or decrease in value of the Business resulting from the failure of the Purchaser to acquire any third party contracts.

**Notices**

34. Any notices or deliveries required in the performance of this Agreement will be deemed completed when hand delivered, delivered by agent, or seven (7) days after being placed in the post, postage prepaid, to the Parties at the addresses contained in this Agreement or as the Parties may later designate in writing.

**Expenses/Costs**

35. The Parties agree to pay all their own costs and expenses in connection with this Agreement.

**Severability**

36. The Parties acknowledge that this Agreement is reasonable, valid and enforceable; however, if any part of this Agreement is held by a court of competent jurisdiction to be invalid, it is the intent of the Parties that such provision be reduced in scope only to the extent deemed necessary to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected or invalidated as a result.

37. Where any provision in this Agreement is found to be unenforceable, the Purchaser and the Seller will then make reasonable efforts to replace the invalid or unenforceable provision with a valid and enforceable substitute provision, the effect of which is as close as possible to the intended effect of the original invalid or unenforceable provision.

APPX0885

**INSU_PI_001164**

**Governing Law**

38. This Agreement will be governed by and construed in accordance with the laws of the State of Texas.

39. The courts of the State of Texas will have jurisdiction to settle any dispute arising out of or in connection with this Agreement.

**General Provisions**

40. The Seller shall have the right to audit, to examine or to inspect all detailed financial and related records (in whatever form they may be kept, whether written, electronic, or other) relating to or pertaining to gross sales, returns and allowances, pre-paid accounts and net sales for the operation kept by or under the control of the Purchaser. Such records shall include, but not be limited to, accounting records, written policies and procedures; all paid vouchers including those for out-of-pocket expenses; other reimbursement supported by invoices; ledgers; cancelled checks; deposit slips; bank statements; journals; original estimates; estimating work sheets; contract amendments and change order files; back-charge logs and supporting documentation; insurance documents; payroll documents; timesheets; memoranda; and correspondence. The Seller shall have the ability to independently verify sales data through Monthly Sales and use tax returns filed with the Texas Comptroller's Office.

41. This Agreement contains all terms and conditions agreed to by the Parties. Statements or representations which may have been made by any Party to this Agreement in the negotiation states of this Agreement may in some way be inconsistent with this final written Agreement. All such statements are declared to be of no value to either Party. Only the written terms of this Agreement will bind the Parties.

42. This Agreement may only be amended or modified by a written instrument executed by all of the Parties.

43. A waiver by one Party of any right or benefit provided in this Agreement does not infer or permit a further waiver of that right or benefit, nor does it infer or permit a waiver of any other right or benefit provided in this Agreement.

44. This Agreement will not be assigned either in whole or in party by any Party without the written consent of the other Party.

45. This Agreement will pass to the benefit of and be binding upon the Parties' respective heirs, executors, administrators, successors, and permitted assigns.

46. The clauses, paragraphs, and subparagraphs contained in this Agreement are intended to be read and construed independently of each other. If any part of this Agreement is held to be invalid, this invalidity will not affect the operation of any other part of this Agreement.

47. All of the rights, remedies and benefits provided in this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law or equity.

48. Time is of the essence in this Agreement.

49. This Contract may be executed in any number of counterparts or duplicate originals, but shall not be binding upon any party hereto unless and until executed and accepted by all parties.

50. Headings are inserted for the convenience of the Parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender and feminine gender and vice versa.

*(remainder of page left intentionally blank, signatures following)*

## SIGNATURES

IN WITNESS WHEREOF the Parties have duly executed their signatures under hand and seal on this _____ day of _____, 2020.


**SELLER:  Diabetes Relief LLC**


By: _____
**SCOTT A. HEPFORD, MANAGER**
11511 Katy Fwy, Ste 100
Houston, Texas 77079
+1 (281) 600-5000; info@diabetesrelief.com


**PURCHASER:  Well Cell Global LLC**


By: _____
**SCOTT A. HEPFORD, MANAGER**
19611 Cornerstone Arbor DR
Cypress, Texas 77433
+1 (888) 991-1012; scott@wellcellglobal.com


ATTACHMENTS INCORPORATED BY REFERENCE FOR ALL PURPOSES:

*Exhibit A:*      Asset Payment Schedule from Well Cell Global LC to Diabetes Relief LLC



*Exhibit A*
**CONFIDENTIAL**

## ASSET PURCHASE SCHEDULE

Effective July 24th, 2020

| Asset Payment Schedule From Well Cell Global LLC to Diabetes Relief LLC | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Calendar Year 2020 | | Calendar Year 2021 | | Calendar Year 2022 | | Calendar Year 2023 | | Calendar Year 2024 | |
| Date | Amount | Date | Amount | Date | Amount | Date | Amount | Date | Amount |
| Jul-20 | $ 345,832 | Jan-21 | $ 60,832 | Jan-22 | $ 20,000 | Jan-23 | $ 20,000 | Jan-24 | $ 20,000 |
| Aug-20 | $ 60,832 | Feb-21 | $ 60,832 | Feb-22 | $ 20,000 | Feb-23 | $ 20,000 | Feb-24 | $ 20,000 |
| Sep-20 | $ 60,832 | Mar-21 | $ 60,832 | Mar-22 | $ 20,000 | Mar-23 | $ 20,000 | Mar-24 | $ 20,000 |
| Oct-20 | $ 60,832 | Apr-21 | $ 60,832 | Apr-22 | $ 20,000 | Apr-23 | $ 20,000 | Apr-24 | $ 20,000 |
| Nov-20 | $ 60,832 | May-21 | $ 60,832 | May-22 | $ 20,000 | May-23 | $ 20,000 | May-24 | $ 20,000 |
| Dec-20 | $ 60,832 | Jun-21 | $ 60,832 | Jun-22 | $ 20,000 | Jun-23 | $ 20,000 | Jun-24 | $ 20,000 |
| | | Jul-21 | $ 60,832 | Jul-22 | $ 20,000 | Jul-23 | $ 20,000 | Jul-24 | $ 1,913,639 |
| | | Aug-21 | $ 60,832 | Aug-22 | $ 20,000 | Aug-23 | $ 20,000 | | |
| | | Sep-21 | $ 60,832 | Sep-22 | $ 20,000 | Sep-23 | $ 20,000 | | |
| | | Oct-21 | $ 60,832 | Oct-22 | $ 20,000 | Oct-23 | $ 20,000 | | |
| | | Nov-21 | $ 60,832 | Nov-22 | $ 20,000 | Nov-23 | $ 20,000 | | |
| | | Dec-21 | $ 60,832 | Dec-22 | $ 20,000 | Dec-23 | $ 20,000 | | |

*ACKNOWLEDGMENT AND CONFIRMATION DATED* _____:

By: _____

Printed Name: _____

Authorized Representative

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| **HUNTER CARR,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **STANLEY T. LEWIS, SCOTT** | § | |
| **HEPFORD, WELL CELL GLOBAL,** | § | |
| **LLC, and RESTOR METABOLIX, INC.** | § | |
| *Defendants.* | § | **127TH JUDICIAL DISTRICT** |
| | § | |

---

### VERIFICATION OF SCOTT HEPFORD

---

1.      My name is Scott Hepford. My date of birth is February 23, 1975, and my address is 19611 Cornerstone Arbor Drive, Cypress, TX 77433. I am over the age of twenty-one years, have never been convicted of a felony, and am competent to make this verification. The facts contained herein are true and correct and based upon my personal knowledge.

2.      I am currently a Manager and Member of Diabetes Relief LLC ("Diabetes Relief").

3.      Hunter Carr, Stanley Lewis, and I are the current members of Diabetes Relief.

4.      Diabetes Relief has been at all relevant times and is now run informally. We had intermittent meetings of the managers and typically waived formal notice as a matter of course. We did not have annual meetings of the members.

5.      On or about July 16, 2020, I sent written notice to Carr and Lewis of a meeting of the members of Diabetes Relief on July 24, 2020 to address (1) a buy-out offer of Carr's membership interests; (2) operations management moving forward; and (3)



**EXHIBIT**

**14**

APPX0889

**INSU_PI_001168**

financial management moving forward.  Lewis and I agreed to have this meeting of the members, which constituted a majority of the members.

6.     Carr acknowledged the notice of the meeting set for July 24.

7.     The meeting was held via the Microsoft Teams platform and in-person. Lewis, Carr, and I all participated. Carr was physically in the office with me. Lewis participated by phone and by Teams.

8.     At the July 24, 2020 meeting, on a majority vote of Diabetes Relief's members, Carr was removed as a manager.  Lewis and I voted in favor.  Carr was in the meeting during this vote and withheld his vote.

9.     Also at that meeting, the members voted on an acquisition purchase agreement with Well Cell, through which Well Cell would purchase substantially all the assets of Diabetes Relief. The purpose of the Well Cell deal was to generate cash that Diabetes Relief could use to pay back its debt and buy out Carr's membership interests. To incentivize Carr's voluntary exit from Diabetes Relief, Lewis and I were willing to sacrifice part of the proceeds from the Well Cell transaction to offer Carr a larger sum for his membership interests than he was entitled to if the proceeds were strictly divided based on ownership percentages. If Carr refused to accept that offer, those funds from the Well Cell sale would be repurposed, and the proceeds would be divided strictly based on ownership percentage. I advised Carr of this fact during the meeting on July 24, 2020.

10.     The Well Cell transaction is currently on hold because of Carr's actions. I am concerned about Diabetes Relief's ability to fund its operations, and also concerned about Diabetes Relief's ability find any other investor or lender given its current financial and

INSU_PI_001169

operations state and Carr's efforts to exercise unauthorized and unilateral control over the company.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED in Houston, Texas on the _____24_____ day of August, 2020.

Scott Hepford

 **ASSET PURCHASE AGREEMENT**

THIS ASSET PURCHASE AGREEMENT (the "Agreement") made and entered into this **24ᵗʰ day of July, 2020** (the "Execution Date"), between **Diabetes Relief LLC,** a Texas Series Limited Liability Company, (herein referred to as the "Seller") whose principal office address is 11511 Katy Freeway, Suite 100, Houston, TX of the First Part and **Well Cell Global LLC,** a Texas Limited Liability Company, (herein referred to as the "Purchaser") whose principal office address is 19611 Cornerstone Arbor Drive, Cypress, TX of the Second Part.

### Background

A. The Seller carries on the business of operating a comprehensive diabetes and metabolic disease treatment center in the State of Texas (the "Business").

B. The Seller owns the assets of the Business and desires to sell certain assets (the "Assets"), to the Purchaser, subject to any exclusions set out in this Agreement and the Purchaser desires to buy the Assets.

C. The Board of Directors for Seller has approved and ratified the sale of Assets in accordance with the laws of the State of Texas.

IN CONSIDERATION of the provisions contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which consideration is acknowledged, the Parties agree as follows:

### Definitions

1. The following definitions apply in the Agreement:

   a. The "Assets" to be included in this Agreement include the following assets of the Business. There are no excluded assets. The Assets consist of the following:

      i. All cash in bank accounts

      ii. Issued Patents:

         1. 1ˢᵗ U.S. Patent No. 9,652,595 issued by the United States Patent and Trademark Office on May 16, 2017.

         2. 2ⁿᵈ U.S. Patent No. 10,533,990 issued by the United States Patent and Trademark Office on January 14, 2020.

      iii. Pending Patents:

         1. 3ʳᵈ U.S. Patent Application No. 15/042,087 pending issuance by the United States Patent and Trademark Office

      iv. All Copyrights and Trade Secrets

      v. All Physiologic Insulin Resensitization dosing protocols, algorithms, protocols, charts, Venn diagrams, presentations, webinars, whitepapers, studies, and all work product produced in furtherance of said assets.

      vi. Assignment of Key Vendor Contracts:

         1. Distribution Agreement dated April 10, 2018 between Zyno Solutions LLC and Diabetes Relief.

         2. SmartLev & Jot.Form agreements and data

      vii. All creative materials, including the following:

**EXHIBIT**

**15**

exhibitsticker.com

Asset Purchase Agreement
Revision – 07.24.20

1 of 10

Initial: _____   Initial: _____

APPX0892

INSU_PI_001171

     1. All logos, pictures, artwork, and graphic design created for all brands and companies associated with Diabetes relief, RestorMetabolix, and H360.
     2. All signage set-ups, formats, designs and brand guides.
     3. All social media content and materials.
     4. All videos, animations, testimonials, pictures, and virtual reality (VR) platforms.

viii. Full inventory of medical supplies
ix. All office furniture, equipment and supplies from the following locations:
     1. 11511 Katy Freeway, Houston, Texas 77079 located in Suites 100, 101, 135, 430.
     2. 11010 Old Katy Road, Houston, Texas 77043 located in #D042
x. Full inventory of infusion pumps and cassettes
xi. Software licenses and access to all data contained within each system:
     1. Full Office 365 Environment
     2. CRM
     3. EMR
     4. PM
xii. Assignment of all intercompany agreements.
xiii. Assignment of the following License Agreements:
     1. Yeni Yuzyil Turkey License
     2. Diabetes Relief Middle East
     3. Dr. Hinman / Island Doctors
     4. First American Health – Morongo
xiv. Assignment of the following License Agreement Options:
     1. Dr. Wrobel
     2. Dr. Valpiani
     3. Diabetes Relief Houston Westside
     4. TruMetabolics
     5. Dr. Toole / TW Medical Group
     6. Dr. Taylor Internal Medical
     7. Synergize Health Center
     8. Dr. Smith / Active Life Phys Med
     9. Dr. Shah / Whole Health Austin
     10. Dr. Sanchez / Del Rio Foot Clinic
     11. Dr. Ross / WRE, LLC
     12. Rising Health
     13. Dr. Ramirez
     14. Dr. Pham / Metabolic Recharge
     15. Dr. Perijoc / North TX Inter. Med
     16. NSI Clearwater
     17. Dr. Novak
     18. Dr. Neret
     19. Dr. McLean / McLean Cares
     20. Dr. McConnell
     21. Dr. Mbakwe
     22. Diabetes Relief Utah Ogden
     23. Dr. Grubbs / Vascular Spec.
     24. Dr. Ghen, MD, PA / Total Health
     25. Dr. George
     26. Dr. Dembowski / ATL Med Clinic
     27. Dr. Cavaciuti / Back to Life
     28. Dr. Beeharilal
     29. Dr. Avila

b. "Closing" means the completion of the purchase and sale of the Assets as described in this Agreement by the payment of agreed consideration and the transfer of title to the Assets.

c. "Parties" means both the Seller and the Purchaser and "Party" means any one of them.

APPX0893

INSU_PI_001172

**Sale**

2. Subject to the terms and conditions of this Agreement, and in reliance on the representations, warranties, and conditions set out in this Agreement, the Seller agrees to sell the Assets to the Purchaser and the Purchaser agrees to purchase the assets from the Seller.

**Purchase Price**

3. The Parties agree that the Purchase Price for the Assets is as follows subject to required adjustments that are agreed upon by the Parties: <u>Three Million, Seven Hundred Ninety-Three Thousand, Five Hundred Eleven and No/100 ($3,793,511.00).</u>

4. The Parties agree to cooperate in the filing of elections under the Internal Revenue Code and under any applicable taxation legislation, in order to give the required or desired effect to the allocation of the Purchase Price.

**Closing**

5. The Closing of the purchase and sale of the Assets will take place on July 24, 2020 (the "Closing Date") at the offices of the Seller or at such other time and place as the Parties mutually agree.

6. At Closing and upon the Purchaser paying the Purchase Price in full to the Seller, the Seller will deliver the Assets to the Purchaser. The Seller will deliver to the Purchaser possession of the Assets, in the same condition as on the Execution Date, and Free and clear of any liens, charges, rights of third parties, or any other encumbrances, except those attached as a result of the Purchaser's actions.

7. At Closing and upon the Purchaser paying the Purchase Price in full to the Seller, the Seller will provide the Purchaser with duly executed forms and documents evidencing transfer of the Assets, where required including, but not limited to, bills of sale, assignments, assurances and consents. The Seller will also cooperate with the Purchaser as needed in order to effect the required registration, recording and filing with public authorities of the transfer of ownership of the Assets to the Purchaser.

**Payment**

8. The Purchase Price will be paid by the Purchaser or affiliated company in one upfront lump sum of Three Hundred Forty-Five Thousand, Eight Hundred Thirty-Two Dollars and No Cents ($345,832.00) to Diabetes Relief LLC, Seller.

9. The Seller will owner finance the remaining balance of Three Million, Four Hundred Forty-Seven Thousand, Six Hundred Seventy-Nine Dollars and No Cents ($3,447,679.00) at 0% interest to Purchaser or affiliated company.

10. The Purchaser will pay according to the Asset Payment Table, attached hereto and incorporated within as **Exhibit A**. First payment is due by August 15th, 2020 and continues according to the schedule until July 15, 2024, or until balance of $3,447,679.00 less prepaid expense (whichever comes first) is paid in full.

11. The Purchase Price for the Assets will be paid by the Purchaser to the Seller in the form of a check from an escrow agent or an electronic money or funds transfer. In the case of an electronic money or funds transfer, the Seller will give notice to the Purchaser of the bank account particulars at least 5 business days prior to the Closing Date.

12. The Purchaser is responsible for paying all applicable taxes, including federal sales tax, state sales tax, duties and any other taxes or charges payable pursuant to the transfer of the Assets from the Seller to the Purchaser.

**Seller's Representations and Warranties**

13. The Seller represents and warrants to the Purchaser that:

   a. The Seller has full legal authority to enter into and exercise its obligations under this Agreement.

   b. The Seller is the absolute beneficial owner of the Assets, with good and marketable title, free and clear of any liens, charges encumbrances or rights of others. The Seller is exclusively entitled to possess and dispose of the Assets.

   c. To the best knowledge of the Seller there is no pending or anticipated claim against the Assets or against the Seller's ownership or title in the Assets or against the seller's right to dispose of the Assets.

   d. No third party contract is outstanding that could result in a claim against or affecting the Assets in whole or in part either now or in the future.

   e. The Seller does not have any outstanding contracts, agreements or commitments of any kind, written or oral, with any third party regarding the Assets, except for any material contracts described in, and/or attached to this Agreement. The Seller represents and warrants that no material default or breach exists with regard to any presently outstanding material contract.

   f. Execution of this Agreement will not hinder or unfairly disadvantage any pre-existing creditor.

   g. Except as otherwise provided in this Agreement, there has been no act or omission buy the Seller that would give rise to any valid claim relating to a brokerage commission, finder's fee or other similar payment.

   h. The Seller is a resident of the United States for the purposes of the Internal Revenue Code.

   i. The Seller has withheld all amounts required to be withheld under income tax legislation and has paid all amounts owing to the proper authorities.

   j. The Seller will not dismiss any current employees or hire any new employees, or substantially change the role or title of any existing employees, provide unscheduled or irregular increases in salary or benefits to employees or institute any significant changes to the terms of any employee's employment, after signing this Agreement, unless the Purchaser provides written consent.

   k. There are no claims threatened or pending against the Business by any current or plats employee relating to any matter arising from or relating to the employment of the employee.

   l. The Assets, while owned by Seller, have been maintained at all times in accordance with standard industry practice. The Seller further warrants that all tangible assets are in good working order.

   m. The Seller is operating in accordance with all applicable laws, rules and regulations of the jurisdictions in which it is carried on. In compliance with such laws, the Seller has duly licensed, registered, or qualified the Assets with the appropriate authorities and agencies.

   n. The Seller maintains insurance policies on the Assets and such policies are in full force and effect and of an adequate value as would be reasonable in its industry. The Seller has neither defaulted under these insurance policies, whether as a result of failure to pay premiums or due to any other cause, nor as the Seller failed to give notice or make a claim under these insurance policies in a timely manner.

   o. The conduct of the Seller does not infringe on the patents, trademarks, trade names or copyrights, domestic or foreign of any other person, firm or corporation to the best knowledge of the officers of the Seller.

   p. The Seller owns or is licensed to use all necessary software and it can continue to use any and all computerized records, files and programs after the Closing Date in the same manner as before the Closing Date.

q. The Seller has filed all tax reports and returns required in the operation of the Business and has paid all taxes owed to all taxing authorities, including foreign taxing authorities, except amounts that are being property contested by the Seller, the details of this contest having been provided to the Purchaser.

r. This Agreement has been duly executed and delivered by the Seller and constitutes a legal and binding obligation of the Seller, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy and insolvency, by other laws affecting the rights of creditors generally, and by equitable remedies granted by a court of competent jurisdiction.

14. The representations and warranties given in this Agreement are the only representations and warranties. No other representation or warranty, either expressed or implied, has been given by the Seller to the Purchaser, including, without limitation, any representations or warranties regarding the merchantability of the Assets or their fitness for a particular purpose.

15. The Seller warrants to the Purchaser that each of the representations and warranties made by it is accurate and not misleading at the Closing Date. The seller acknowledges that the Purchaser is entering into this Agreement in reliance on each representation and warranty.

16. The Seller's representations and warranties will survive the Closing Date of this Agreement.

17. Where the Purchaser has a claim against the Seller relating to one or more representations or warranties made by the Seller, the Seller will have no liability to the Purchaser unless the Purchaser provides notice in writing to the Seller containing full details of the claim on or before the third anniversary of the Closing Date.

18. Where the Purchaser has a claim against the Seller relating to one or more representations or warranties made by the Seller, and the Purchaser is entitled to recover damages from a third party then the amount of the claim against the Seller will be reduced by the recovered or recoverable amount less all reasonable costs incurred by the Purchaser in recovering the amount from the third party.

**Purchaser's Representations and Warranties**

19. The Purchaser represents and warrants to the Seller the following:

a. The Purchaser has full legal authority to enter into and exercise its obligations under this Agreement.

b. The Purchaser has funds available to pay the full Purchase Price and any expenses accumulated by the Purchaser in connection with this Agreement and the Purchaser has not incurred any obligation, commitment, restriction or liability of any kind, absolute or contingent, present or future, which would adversely affect its ability to perform its obligations under this Agreement.

c. The Purchaser has not committed any act or omission that would give rise to any valid claim relating to a brokerage commission, finder's fee, or other similar payment.

d. The Purchaser is a resident of the United States for the purposes of the Internal Revenue Code.

e. This Agreement has been duly executed by the Purchaser and constitutes a legal and binding obligation of the Purchaser, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy and insolvency, by other laws affecting the rights of creditors generally, and by equitable remedies granted by a court of competent jurisdiction.

f. The Purchaser has no knowledge that any representation or warranty given by the Seller in this agreement is inaccurate or false.

20. The representations and warranties given in this Agreements are the only representations and warranties. The Purchaser has given no other representation or warranty, either expressed or implied, to the Seller.

21. The Purchaser warrants to the Seller that each of the representations and warranties made by it is accurate and not misleading at the date of Closing. The Purchaser acknowledges that the Seller is entering into this Agreement in reliance on each representation and warranty.

22. The Purchaser's representations and warranties will survive the Closing Date of this Agreement.

23. Where the Seller has a claim against the Purchaser relating to one or more representations and warranties made by the Purchaser, the Purchaser will have no liability to the Seller unless the Seller provides notice in writing to the Purchaser containing full details of the claim on or before the third anniversary of the Closing Date.

24. Where the Seller has a claim against the Purchaser relating to one or more representations or warranties made by the Purchaser, and the Seller is entitled to recover damages from a third party then the amount of the claim against the Purchaser will be reduced by the recovered or recoverable amount less all reasonable costs incurred by the Seller in recovering the amount from the third party.

**Conditions Precedent to be Performed by the Purchaser**

25. The obligation of the Seller to complete the sale of the Assets under this Agreement is subject to the satisfaction of the following conditions precedent by the Purchaser, on or before the Closing date, each of which is acknowledged to be for the exclusive benefit of the Seller and may be waived by the Seller entirely or in part.

   a. All of the representations and warranties made by the Purchaser in this Agreement will be true and accurate in all material respects on the Closing Date.

   b. The Purchaser will obtain or complete all forms, documents, consents, approvals, registrations, declarations, orders, and authorizations from any person or any governmental or public body, required of the purchaser in connection with the execution of this agreement.

**Conditions Precedent to be Performed by the Seller**

26. The obligation of the Purchaser to complete the purchase of the Assets under this Agreement is subject to the satisfaction of the following conditions precedent by the Seller, on or before the Closing date, each of which is acknowledged to be for the exclusive benefit of the Purchaser and may be waived by the Purchaser entirely or in part:

   a. All of the representations and warranties made by the Seller in this Agreement will be true and accurate in all material respects on the Closing Date.

   b. The seller will obtain and complete any and all forms, documents, consents, approvals, registrations, declarations, orders and authorizations from any person or governmental or public body that are required of the Seller for the proper execution of this Agreement and transfer of the Assets to the Purchase.

   c. No substantial damage to or alteration of the Assets that would adversely affect their value will occur between the date this Agreement is signed and the Closing Date.

   d. The Seller will have obtained any necessary consents for assigning any leases to the Purchaser as well as providing estoppel certificates from such owners or landlords that there are no arrears of rent, no breaches under such leases and the amount of the security deposits held by such third parties.

   e. The Seller will execute and deliver bills of sale for the Assets in favor of the Purchaser.

   f. If applicable, the Seller will provide the Purchaser with complete information concerning the operation of the Assets, in order to put the Purchaser in a position to carry on in the place of the Seller.

**Conditions Precedent Not Satisfied**

27. If either Party fails to satisfy any of its conditions precedent as set out in this Agreement on or before the Closing Date and that condition precedent was not waived, then this Agreement will be null and void and there will be no further liability as between the Parties.

**Disclosure**

28. Upon the reasonable request of the Purchaser, the Seller will, from time to time, allow the Purchaser and its agents, advisors, accountants, employees, or other representatives to have reasonable access to the premises of the Seller and to all of the books, records, documents, and accounts of the business, during normal business hours, between the date of this Agreement and the Closing Date, in order for the Purchaser to confirm the representations and warranties given by the Seller in this Agreement.

**Non-Assumption of Liabilities**

29. It is understood and agreed between the Parties' that the Purchaser is not assuming and will not be liable for any of the liabilities, debts or obligations of the Seller arising out of the ownership or operation of the Business prior to and including the Closing Date.

30. The Seller will indemnify and save harmless the Purchaser, its officers, directors, employees and agents from and against all costs, expenses, losses, claims, and liabilities, including reasonable legal fees sand disbursements, or demands for income, sales, excise or other taxes, suffered or incurred by the Purchaser or any of the above mentioned persons arising out of the ownership or operation of this Business prior to and including the Closing Date.

**Transfer of Third Party Contracts**

31. This Agreement is not to be construed as an assignment of any third party contract from the Seller to the Purchaser if the assignment would be a breach of that third party contract.

32. The Seller shall assist Purchaser in assigning old contracts or acquiring new contracts with third parties where existing contracts are not legally assignable from the Seller to the Purchaser.

33. Notwithstanding any other provision in this Agreement to the contrary, the Seller will not be liable for any losses, costs of damages of any kind including loss of revenue or decrease in value of the Business resulting from the failure of the Purchaser to acquire any third party contracts.

**Notices**

34. Any notices or deliveries required in the performance of this Agreement will be deemed completed when hand delivered, delivered by agent, or seven (7) days after being placed in the post, postage prepaid, to the Parties at the addresses contained in this Agreement or as the Parties may later designate in writing.

**Expenses/Costs**

35. The Parties agree to pay all their own costs and expenses in connection with this Agreement.

**Severability**

36. The Parties acknowledge that this Agreement is reasonable, valid and enforceable; however, if any part of this Agreement is held by a court of competent jurisdiction to be invalid, it is the intent of the Parties that such provision be reduced in scope only to the extent deemed necessary to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected or invalidated as a result.

37. Where any provision in this Agreement is found to be unenforceable, the Purchaser and the Seller will then make reasonable efforts to replace the invalid or unenforceable provision with a valid and

APPX0898

**INSU_PI_001177**

enforceable substitute provision, the effect of which is as close as possible to the intended effect of the original invalid or unenforceable provision.

## Governing Law

38. This Agreement will be governed by and construed in accordance with the laws of the State of Texas.
39. The courts of the State of Texas will have jurisdiction to settle any dispute arising out of or in connection with this Agreement.

## General Provisions

40. The Seller shall have the right to audit, to examine or to inspect all detailed financial and related records (in whatever form they may be kept, whether written, electronic, or other) relating to or pertaining to gross sales, returns and allowances, pre-paid accounts and net sales for the operation kept by or under the control of the Purchaser. Such records shall include, but not be limited to, accounting records, written policies and procedures; all paid vouchers including those for out-of-pocket expenses; other reimbursement supported by invoices; ledgers; cancelled checks; deposit slips; bank statements; journals; original estimates; estimating work sheets; contract amendments and change order files; back-charge logs and supporting documentation; insurance documents; payroll documents; timesheets; memoranda; and correspondence. The Seller shall have the ability to independently verify sales data through Monthly Sales and use tax returns filed with the Texas Comptroller's Office.
41. This Agreement contains all terms and conditions agreed to by the Parties. Statements or representations which may have been made by any Party to this Agreement in the negotiation states of this Agreement may in some way be inconsistent with this final written Agreement. All such statements are declared to be of no value to either Party. Only the written terms of this Agreement will bind the Parties.
42. This Agreement may only be amended or modified by a written instrument executed by all of the Parties.
43. A waiver by one Party of any right or benefit provided in this Agreement does not infer or permit a further waiver of that right or benefit, nor does it infer or permit a waiver of any other right or benefit provided in this Agreement.
44. This Agreement will not be assigned either in whole or in party by any Party without the written consent of the other Party.
45. This Agreement will pass to the benefit of and be binding upon the Parties' respective heirs, executors, administrators, successors, and permitted assigns.
46. The clauses, paragraphs, and subparagraphs contained in this Agreement are intended to be read and construed independently of each other. If any part of this Agreement is held to be invalid, this invalidity will not affect the operation of any other part of this Agreement.
47. All of the rights, remedies and benefits provided in this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law or equity.
48. Time is of the essence in this Agreement.
49. This Contract may be executed in any number of counterparts or duplicate originals, but shall not be binding upon any party hereto unless and until executed and accepted by all parties.
50. Headings are inserted for the convenience of the Parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender and feminine gender and vice versa.

*(remainder of page left intentionally blank, signatures following)*

## SIGNATURES

IN WITNESS WHEREOF the Parties have duly executed their signatures under hand and seal on this _____ 24 _____ day of _____ July _____, 2020.

**SELLER:   Diabetes Relief LLC**

By: _____

SCOTT A. HEPFORD, Authorized Representative
11511 Katy Fwy, Ste 100
Houston, Texas 77079
+1 (281) 600-5000; info@diabetesrelief.com

By: _____

STANLEY LEWIS, MD, MPH, Authorized Representative
11511 Katy Fwy, Ste 100
Houston, Texas 77079
+1 (281) 600-5000; info@diabetesrelief.com

**PURCHASER:  Well Cell Global LLC**

By: _____

SCOTT A. HEPFORD, MANAGER
19611 Cornerstone Arbor DR
Cypress, Texas 77433
+1 (888) 991-1012; scott@wellcellglobal.com

ATTACHMENTS INCORPORATED BY REFERENCE FOR ALL PURPOSES:

*Exhibit A:*      Asset Payment Schedule from Well Cell Global LC to Diabetes Relief LLC

APPX0900

**INSU_PI_001179**



*Exhibit A*

**CONFIDENTIAL**

# ASSET PURCHASE SCHEDULE

Effective July 24th, 2020

| Asset Payment Schedule From Well Cell Global LLC to Diabetes Relief LLC | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Calendar Year 2020** | | **Calendar Year 2021** | | **Calendar Year 2022** | | **Calendar Year 2023** | | **Calendar Year 2024** | |
| Date | Amount | Date | Amount | Date | Amount | Date | Amount | Date | Amount |
| Jul-20 | $ 345,832 | Jan-21 | $ 60,832 | Jan-22 | $ 20,000 | Jan-23 | $ 20,000 | Jan-24 | $ 20,000 |
| Aug-20 | $ 60,832 | Feb-21 | $ 60,832 | Feb-22 | $ 20,000 | Feb-23 | $ 20,000 | Feb-24 | $ 20,000 |
| Sep-20 | $ 60,832 | Mar-21 | $ 60,832 | Mar-22 | $ 20,000 | Mar-23 | $ 20,000 | Mar-24 | $ 20,000 |
| Oct-20 | $ 60,832 | Apr-21 | $ 60,832 | Apr-22 | $ 20,000 | Apr-23 | $ 20,000 | Apr-24 | $ 20,000 |
| Nov-20 | $ 60,832 | May-21 | $ 60,832 | May-22 | $ 20,000 | May-23 | $ 20,000 | May-24 | $ 20,000 |
| Dec-20 | $ 60,832 | Jun-21 | $ 60,832 | Jun-22 | $ 20,000 | Jun-23 | $ 20,000 | Jun-24 | $ 20,000 |
| | | Jul-21 | $ 60,832 | Jul-22 | $ 20,000 | Jul-23 | $ 20,000 | Jul-24 | $ 3,613,535 |
| | | Aug-21 | $ 60,832 | Aug-22 | $ 20,000 | Aug-23 | $ 20,000 | | |
| | | Sep-21 | $ 60,832 | Sep-22 | $ 20,000 | Sep-23 | $ 20,000 | | |
| | | Oct-21 | $ 60,832 | Oct-22 | $ 20,000 | Oct-23 | $ 20,000 | | |
| | | Nov-21 | $ 60,832 | Nov-22 | $ 20,000 | Nov-23 | $ 20,000 | | |
| | | Dec-21 | $ 60,832 | Dec-22 | $ 20,000 | Dec-23 | $ 20,000 | | |

ACKNOWLEDGMENT AND CONFIRMATION DATED ___7-24-20___:

By: _____

Printed Name: ___STANLEY LEWIS___
Authorized Representative

By: _____

Printed Name: ___Scott Hepford___
Authorized Representative

Asset Purchase Agreement
Revision – 07.24.20

10 of 10

Initial: _____   Initial: _SH_

APPX0901

**INSU_PI_001180**

8/30/2020 5:21 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 45814533
By: CAROL WILLIAMS
Filed: 8/31/2020 12:00 AM

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| HUNTER CARR | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| STANLEY T. LEWIS, SCOTT | § | HARRIS COUNTY, TEXAS |
| HEPFORD, GLENN MASSEY, | § | |
| BRIAN LOVERIDGE, ROY | § | |
| HINMAN, WELL CELL GLOBAL, | § | |
| LLC, and RESTOR METABOLIX, | § | |
| *Defendants.* | § | 127TH JUDICIAL DISTRICT |

---

## PLAINTIFF'S THIRD AMENDED PETITION AND APPLICATION FOR TRO AND TEMPORARY AND PERMANENT INJUNCTION

---

NOW COMES, Hunter Carr, individually and derivatively on behalf of Diabetes Relief, LLC, (hereinafter "Plaintiff" or "Carr") and files this Third Amended Petition and Application for TRO and Temporary and Permanent Injunction complaining of Stanley T. Lewis, Scott Hepford, Glenn Massey, Brian Loveridge, Roy Hinman, Well Cell Global, LLC, and Restor Metabolix (collectively "Defendants") and in support would state as follows:

1.     Discovery in this lawsuit is intended to be conducted under Level 3 under the Texas Rules of Civil Procedure 190.4. Pursuant to Rule 47, Texas Rules of Civil Procedure, monetary relief being sought herein is over $1,000,000.00 and non-monetary relief which are within the jurisdictional limits of this Court. Plaintiffs demand judgment for all the other relief to which Plaintiff deems himself entitled.

**EXHIBIT**

**16**

1 | Page

APPX0902

**INSU_PI_001181**

## PARTIES

2.      Plaintiff, Hunter Carr ("Carr" or "Plaintiff") is a resident of Houston, Harris County.

3.      Defendant, Scott Hepford ("Hepford" or "Defendant")) is a resident of Houston, Harris County, Texas and can be served with process at 11511 Katy Fwy., Suite 100, Houston, Texas 77079.

4.      Defendant, Stanley T. Lewis ("Lewis"), is a resident of California and can be served with process by service on the Secretary of State of Texas through the Texas long arm statute. Lewis has committed breaches of contract and torts in whole or in part in the state of Texas which subjects him to the Texas long arm statute.

4a.      Defendant, Glenn Massey ("Massey") is an individual residing in Texas.

4b.      Defendant, Brian Loveridge ("Loveridge"), is an individual doing business in Texas and residing in Utah and can be served with process by service on the Secretary of State of Texas through the Texas long arm statute. Loveridge has committed breaches of contract and torts in whole or in part in the state of Texas which subjects him to the Texas long arm statute.

4c.      Defendant, Roy Hinman ("Hinman"), is an individual doing business in Texas and residing in Florida at 100 Arricola Ave, Saint Augustine, Florida 32080 and can be served with process by service on the Secretary of State

APPX0903

INSU_PI_001182

of Texas through the Texas long arm statute. Hinman has committed breaches of contract and torts in whole or in part in the state of Texas which subjects him to the Texas long arm statute.

5.     Well Cell Global, LLC ("Well Cell") is a Texas limited liability company located in Texas.

6.     Restor Metabolix ("RMX") is a Texas limited liability company located in Texas.

6a.    Diabetes Relief, LLC is a Texas limited liability company.

<div align="center">Jurisdiction and Venue</div>

7.     This Court has jurisdiction of this case.

8.     This Court has venue over this proceeding pursuant since Carr and Hepford reside in Harris County and the cause of action arose in Harris County.

<div align="center">Background Facts</div>

9.     Carr and Hepford formed Diabetes Relief, LLC ("Diabetes Relief" or the "Company") on January 5, 2015. Diabetes Relief was formed for the purpose of selling (directly and through licensees) medical treatments for diabetes. Carr and Hepford were the original Members and Managers of Diabetes Relief. At a meeting of the Managers held on November 17, 2017, Lewis was added as a Manager. Thereafter, Lewis resigned as a Manager and his resignation was accepted by the Original Members in the Amended Company Agreement ("Amended Company Agreement") dated March 23, 2020. Thereafter, the Amended Company Agreement in paragraph 8 on pages 4 - 5 provided that:

APPX0904

INSU_PI_001183

The two Member-Managers (Carr and Hepford) shall manage the business and affairs of the Company as Managers on an equal basis. **The Managers shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by Members under the laws of the State of Texas.** (emphasis added).

Diabetes Relief is owned as follows:

Hunter Carr, 113 ownership units, for 40.9% of Company;
Scott Hepford, 113 ownership units, for 40.9% of Company; and
Stanley T. Lewis, 50 ownership units, for 18.2% of Company.

10.     The Amended Agreement confers on the Managers all the powers of Members under the statutes of Texas, which includes the power to remove a Manager. The Managers, which includes both Managers, have the authority to manage the Company on an equal basis, which means neither Manager can act without the approval of the other Manager.

11.     Hepford told Carr that "to show the investor that we were all on the same page" Hepford had sent a request for a meeting with Carr and Lewis on July 16, 2020, which was to occur on July 24, 2020. Carr attended the meeting solely to object to the transaction of business at the meeting on the ground that the meeting was not lawfully called or convened. On July 24, 2020, at the beginning of the meeting, Hepford announced that Carr had already been removed as a Manager of the Company, which was impossible since no meetings or votes had previously been noticed or had occurred. Carr repeatedly objected to the meeting and objected to the taking of any votes. Carr demanded that he be permitted to consult his counsel prior to going forward with any votes on a proposed termination, sale

APPX0905

INSU_PI_001184

of the Company's assets, changes in Company operations and the purported meeting and purported votes.

12.     In spite of Carr's objections, Hepford then tried, without notice of such votes, to take votes on removing Carr as a Manager and approving the sale of substantially all the assets of the Company to a company called Well Cell Global, LLC, which has been identified as being founded by Hepford and Lewis. Carr objected to such votes and insisted that he did not agree to having an official meeting of the Members or Managers and further Carr wanted to consult with his attorney prior to considering any such meetings, votes, or actions. The activities were recorded on video and audio and a transcript was obtained by Carr for reference by the Court and parties.

13.     Despite the foregoing, Hepford stated to Carr that he had been removed as a Manager and the sale of assets of the Company was purportedly approved. Hepford stated that the assets of the Company were no longer the property of the Company but now belonged to Well Cell Global, LLC ("Well Cell"), a company that is owned and controlled by Hepford, Lewis, and their co-conspirators. Hepford is the sole manager of Well Cell Global, LLC. The assets of Diabetes Relief have been valued in excess of $10,000,000.00, but Hepford and Lewis are attempting to give them away to their own company Well Cell for a small fraction of their true value. Defendants are attempting to exclude Carr from the Company and his rightful place as Manager and Member of the Company and to steal substantially all Diabetes Relief's assets for themselves.

APPX0906

INSU_PI_001185

14.     Hepford's and Lewis's attempt to transfer substantially all of Diabetes Relief's assets to another company that they own and control (to the exclusion of Carr) amounts to an unauthorized distribution of Company money in violation of paragraph 19 of the Amended Company Agreement, which states:

> Distributions shall be made to the Managers at the times and in the aggregate amounts determined by the Managers. Such distributions shall be allocated among the Managers in equal proportion unless otherwise agreed to in writing by all Managers.

15.     Hepford and Lewis have also excluded Carr from the Company business and have locked Carr out of his Company email accounts, which is preventing Carr from receiving important Company communications that it is essential to monitor, such as communications from banks related to outstanding loans and pending financing activities.

16.     Defendants' actions are in violation of the Amended Company Agreement and a Loan Agreement with U.S. Small Business Administration ("SBA") whereby Diabetes Relief gave the SBA and other lenders a lien on all the assets of the Company and promised that it wouldn't sell or transfer any of the Company's assets.

17.     Defendants have caused harm, damage and injury to Carr and Diabetes Relief for which there is no adequate remedy at law if Defendants succeed in removing Carr as a Manager, taking substantially all of Diabetes Relief's assets, and ruining Diabetes Relief's relationship with the SBA and other

APPX0907

INSU_PI_001186

lenders. The facts asserted herein are sworn to by the Declaration of Hunter Carr which is attached hereto as Exhibit A and incorporated herein.

<div align="center">

### CAUSES OF ACTION
</div>

18.    **Breach of Contract:** Plaintiff incorporates paragraphs 1-17, above, the same as if set forth herein in full. Defendants are guilty of breaches of contracts, including breaches of the Amended Company Agreement and other breaches, which breaches have proximately caused and will cause damage and injury to Carr and Diabetes Relief. Plaintiff seeks attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code for these breaches of contract.

19.    **Fraud:** Plaintiff incorporates paragraphs 1-17, above, the same as if set forth herein in full. Defendants have made statements to Carr and Diabetes Relief that were false and known to be false at the time they were made by Defendants. These false statements were reasonably relied on by Carr and Diabetes Relief proximately causing them damage.

20.    **Conversion:** Plaintiff incorporates paragraphs 1-17, above, the same as if set forth herein in full. Carr and Diabetes Relief owned or had possession of property or entitlement to possession of it. Defendants unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, Carr's and Diabetes Relief's rights as an owner. Carr and Diabetes Relief demanded return of the property, and Defendants refused to return the property, all of which proximately caused damage to Carr and Diabetes Relief.

APPX0908

**INSU_PI_001187**

21.     **Tortious Interference with Existing Contracts**: Plaintiff incorporates paragraphs 1-17, above, the same as if set forth herein in full. Carr and Diabetes Relief had existing contracts subject to interference, including with the SBA and other lenders. Defendants willfully and intentionally acted to interfere with the contracts. Defendants' interference was the proximate cause of Carr's and Diabetes Relief's injuries and caused actual damages or loss.

22.     **Tortious Interference with Prospective Relations:** There was a reasonable probability that Carr and Diabetes Relief would have entered into a business relationship with third parties. Defendants intentionally and maliciously intervened or committed independently tortious or unlawful acts with a conscious desire to prevent relationships from occurring or with knowledge that interference was certain or substantially likely to occur as a result of their conduct. Defendants lacked any privilege or justification for their actions. Carr and Diabetes Relief suffered actual harm or damages as a result of Defendants' interference.

23.     **Breach of Fiduciary Duty**: Defendants had fiduciary duties to Carr and Diabetes Relief. Defendants breached those duties, thereby proximately causing damages to Carr and Diabetes Relief.

24.     **Assisting in Breach of Fiduciary Duty**: Defendants all assisted each other in breaching fiduciary duties that they owed to Carr and Diabetes Relief, thereby proximately causing them damages.

25.     **Money Had and Received/Unjust Enrichment**: Carr and Diabetes Relief are the legal, beneficial, and equitable owners of money or other property

APPX0909

**INSU_PI_001188**

that is in Defendants' possession. Carr and Diabetes Relief are entitled to obtain this money and other property held or controlled by Defendants under the theories of Money Had And Received and Unjust Enrichment as those terms are known and used under Texas law.

26.    **Civil Conspiracy**: Defendants were all part of a combination of two or more persons seeking to accomplish an object or course of action, reaching a meeting of the minds on the object or course of action, and one or more unlawful, overt acts were taken in pursuance of the object or course of action, and damages occurred as a proximate result. Defendants conspired to commit all the above-listed claims and causes of action.

27.    **Fraudulent Transfer:** Defendants' attempts to transfer the assets of Diabetes Relief, LLC to Well Cell Global, LLC and/or any other persons or entities constitutes a fraudulent transfer in violation of Chapter 24 of the Texas Business and Commerce Code. Plaintiff requests that these attempted transfers be made void, and award costs and reasonable attorney's fees as are equitable and just in accordance with Chapter 24 of the Texas Business and Commerce Code.

28.    **Declaratory Judgment:** Defendants seek a declaratory judgment finding the following:

a.    Carr was not removed as a Manager of Diabetes Relief, LLC on or about July 24, 2020;

b.    Diabetes Relief, LLC did not transfer any assets to Well Cell Global, LLC on or about July 24, 2020;

APPX0910

**INSU_PI_001189**

c.  Any votes taken at the July 24, 2020 alleged Members' meeting are null and void; and

d.  The Asset Purchase Agreement dated July 24, 2020 between Diabetes Relief, LLC and Well Cell Global, LLC is null and void.

28a.  Diabetes Relief is suffering irreparable injury and irreparable injury to the limited liability company would result by waiting for the expiration of the 90-day period.

## DAMAGES

29.  Plaintiff seeks all damages to which he is entitled including compensatory damages, actual damages, exemplary damages, lost profits, pre-judgment and post-judgment interest, loss of market value, loss of use, costs of court, and attorneys' fees under Chapter 38 of the Civil Practice and Remedies Code, Chapter 24 of the Texas Business Organizations Code, and Chapter 37 of the Texas Civil Practice and Remedies Code, among other statutes and law.  The wrongful actions and omissions on the part of the Defendants as set out above were committed intentionally and with malice. For these reasons and others, Plaintiff is entitled to and hereby seeks an award of punitive and/or exemplary damages as allowed by Texas law.

## APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION

30.  Plaintiff incorporates by reference paragraphs 1-17, above. Unless this Honorable Court temporarily restrains the Defendants until a final trial on the merits of Plaintiff's case, Carr and Diabetes Relief will suffer irreparable injury, for

APPX0911

INSU_PI_001190

which there is no adequate remedy at law to give Carr and Diabetes Relief complete, final, and equal relief. More specifically, Plaintiff will show the court the following:

*Probable Right of Recovery and Probable Right of Success on the Merits*

31.     A temporary restraining order, temporary injunction, and permanent injunction will protect the Plaintiff from further exploitation and financial loss. Courts sitting in equity possess clear authority and jurisdiction to protect the Plaintiff where it is liable to suffer harm, damage, and injury for which there is no adequate remedy at law.

32.     The factual allegations contained in this pleading provide ample evidence to sustain the causes of action alleged herein. These factual allegations and causes of action are incorporated herein and Plaintiff relies on these paragraphs in their application for temporary restraining order and temporary injunction. The terms of the Amended Company Agreement and Texas law give Plaintiff a probable right to recover on the claims set forth in this pleading.

*Probable, Imminent, and Irreparable Injury*

33.     If a temporary restraining order and temporary injunction are not issued, Carr and Diabetes Relief will remain subject to financial loss and dissipation of assets and loss of sales from this wrongful conduct of Defendants. Carr and Diabetes Relief are losing income every day that the wrongful conduct continues.

APPX0912

INSU_PI_001191

34.     If Defendants are not restrained and enjoined, assets will be lost and relationships will be ruined that cannot be recovered and may be forever lost. Carr and Diabetes Relief are losing income every day that the wrongful conduct is ongoing, and Carr and Diabetes Relief will suffer a probable, imminent, and irreparable injury in the interim.

*No Adequate Remedy at Law*

35.     If Defendants are not restrained and enjoined, Carr and Diabetes Relief may lose assets that become unrecoverable and lose rights that cannot later be exercised and will be destroyed. They also may lose relationships with third parties including with the SBA and other lenders and also with potential investors. All these valuable things and more that Carr and Diabetes Relief could lose in the absence of a temporary injunction are irreversible and, in some cases, unquantifiable and difficult or impossible to rectify. Thus, there is no adequate remedy at law except for a temporary injunction.

*Remedy*

36.     Plaintiff has met Plaintiff's burden by establishing each element which must be present before injunctive relief can be granted by this court; therefore, Plaintiff is entitled to the requested temporary injunction order.

37.     Plaintiff requests the Court to enter a temporary injunction finding the following ("Injunction Findings"):

(1) Any attempts since July 1, 2020 to remove or transfer any assets of Diabetes Relief LLC to Stanley T. Lewis or Scott Hepford or any entity

APPX0913

**INSU_PI_001192**

owned or controlled by Lewis or Hepford (including Well Cell Global LLC and Restor Metabolix) are null and void;

(2) The Asset Purchase Agreement dated July 24, 2020 between Well Cell Global LLC and Diabetes Relief LLC is null and void;

(3) The attempt by Defendants to remove Hunter Carr from his position as Manager of Diabetes Relief LLC is null and void;

(4) Defendants are prohibited from attempting to remove Hunter Carr from his position as Manager of Diabetes Relief, LLC;

(5) Defendants are prohibited from directly or indirectly transferring any assets, money, or other property of Diabetes Relief LLC to any person or entity except in the normal course of business and only after such action is approved by Hepford and Carr as Managers;

(6) Defendants are prohibited from making any agreements with anyone that results in the assets of Diabetes Relief LLC being transferred, encumbered, or concealed from Diabetes Relief LLC or Carr unless approved by Hepford and Carr as Managers;

(7) Defendants are prohibited from using, transferring, or encumbering any assets, money, or other property of Well Cell Global, LLC that was received directly or indirectly from Diabetes Relief, LLC;

(8) Defendants are prohibited from transferring or encumbering any assets, money, or other property of Restor Metabolix received directly or indirectly from Diabetes Relief, LLC;

(9) Defendants are prohibited from excluding Carr from Diabetes Relief LLC's offices, records, documents, or emails or from engaging in any other activities that a Manager is permitted to do according to the Amended Company Agreement dated March 2020; and

(10) Defendants are required to include Carr as a Manager of Diabetes Relief, LLC in any attempts to sell, market, or raise financing based on products, services, licenses, technology, or intellectual property used, developed, or owned by Diabetes Relief, LLC.

38.    It is essential that the Court temporarily enter these Injunction

Findings until final trial on the merits of Plaintiff's case. In order to preserve the

APPX0914

INSU_PI_001193

status quo during the pendency of this action, Defendants should be cited to appear and show cause why they should not be temporarily enjoined.

39.     On final trial on the merits, Plaintiff requests that the Court enter a permanent injunction upholding the Injunction Findings.

*Bond*

40.     Plaintiff is willing to post a reasonable temporary restraining order bond and temporary injunction bond. Plaintiff requests a nominal bond in the amount of $100.00 in view of the compelling claims by the Plaintiff.

*Request For Disclosure*

41.     Pursuant to Rule 194, you, Defendants are requested to disclose, within 30 days of service of this request, the information or material described in Rule 194.2 (a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (k) and (l).

*Demand For Jury Trial*

42.     Plaintiff hereby demands a jury trial. A jury fee is being paid contemporaneously with the filing of this pleading and demand.

*Prayer*

343.     WHEREFORE, PREMISE CONSIDERED, Plaintiff prays that:

(a) notice and citation be issued and served as required by law;

(b) upon final jury trial (which is hereby demanded) and hearing hereof that Plaintiff recover judgment from Defendants in accordance with law for all their actual and punitive and exemplary damages, lost profits, court costs, interest, and

APPX0915

**INSU_PI_001194**

attorneys' fees and a temporary restraining order, temporary injunction, and permanent injunction as prayed for above;

(c) such other and further legal or equitable relief to which Plaintiff may show itself justly entitled.

Respectfully Submitted,

THE KIRKLIN LAW FIRM, P.C.

By: */s/ Paul S. Kirklin*

Paul S. Kirklin
Texas Bar No. 24070063
Email:  pkirklin@kirklinlaw.com
12600 N Featherwood Dr, Suite 225
Houston, TX 77034
Tel. (832) 969-1821
Fax. (281) 922-6240
*Attorney for Carr*

APPX0916

INSU_PI_001195

**CERTIFICATE OF SERVICE**

I certify that the foregoing instrument was electronically served on all counsel of record on August 30, 2020 in accordance with the Texas Rules of Civil Procedure, including to the following:

Kevin Leyendecker
kleyendecker@azalaw.com
*Attorney for Hepford, Lewis, and Well Cell Global, LLC*

Steve Kirklin
skirklin312@gmail.com
*Attorney for Diabetes Relief LLC*

/s/ Paul S. Kirklin
Paul S. Kirklin

APPX0917

**INSU_PI_001196**

EXHIBIT A
## DECLARATION AND VERIFICATION OF HUNTER CARR

1.      Carr and Hepford formed Diabetes Relief, LLC ("Diabetes Relief" or

the "Company") on January 5, 2015. Diabetes Relief was formed for the purpose

of selling (directly and through licensees) medical treatments for diabetes. Carr

and Hepford were the original Members and Managers of Diabetes Relief. At a

meeting of the Managers held on November 17, 2017, Lewis was added as a

Manager. Thereafter, Lewis resigned as a Manager and his resignation was

accepted by the Original Members in the Amended Company Agreement

("Amended Company Agreement") dated March 23, 2020. Thereafter, the

Amended Company Agreement in paragraph 8 on pages 4 - 5 provided that:

> The two Member-Managers (Carr and Hepford) shall manage the
> business and affairs of the Company as Managers on an equal basis.
> **The Managers shall have the power to do any and all acts necessary**
> **or convenient to or for the furtherance of the purposes described**
> **herein, including all powers, statutory or otherwise, possessed by**
> **Members under the laws of the State of Texas.** (emphasis added).

Diabetes Relief is owned as follows:

> Hunter Carr, 113 ownership units, for 40.9% of Company;
> Scott Hepford, 113 ownership units, for 40.9% of Company; and
> Stanley T. Lewis, 50 ownership units, for 18.2% of Company.

2.      The Amended Agreement confers on the Managers all the powers of

Members under the statutes of Texas, which includes the power to remove a

Manager. The Managers, which includes both Managers, have the authority to

manage the Company on an equal basis, which means neither Manager can act

without the approval of the other Manager.

APPX0918

**INSU_PI_001197**

3.     Hepford told Carr that "to show the investor that we were all on the same page" Hepford had sent a request for a meeting with Carr and Lewis on July 16, 2020, which was to occur on July 24, 2020. Carr attended the meeting solely to object to the transaction of business at the meeting on the ground that the meeting was not lawfully called or convened. On July 24, 2020, at the beginning of the meeting, Hepford announced that Carr had already been removed as a Manager of the Company, which was impossible since no meetings or votes had previously been noticed or had occurred. Carr repeatedly objected to the meeting and objected to the taking of any votes. Carr demanded that he be permitted to consult his counsel prior to going forward with any votes on a proposed termination, sale of the Company's assets, changes in Company operations and the purported meeting and purported votes.

4.     In spite of Carr's objections, Hepford then tried, without notice of such votes, to take votes on removing Carr as a Manager and approving the sale of substantially all the assets of the Company to a company called Well Cell Global, LLC, which has been identified as being founded by Hepford and Lewis. Carr objected to such votes and insisted that he did not agree to having an official meeting of the Members or Managers and further Carr wanted to consult with his attorney prior to considering any such meetings, votes, or actions. The activities were recorded on video and audio and a transcript was obtained by Carr for reference by the Court and parties.

APPX0919

INSU_PI_001198

5.      Despite the foregoing, Hepford stated to Carr that he had been removed as a Manager and the sale of assets of the Company was purportedly approved. Hepford stated that the assets of the Company were no longer the property of the Company but now belonged to Well Cell Global, LLC ("Well Cell"), a company that is owned and controlled by Hepford, Lewis, and their co-conspirators. Hepford is the sole manager of Well Cell Global, LLC. The assets of Diabetes Relief have been valued in excess of $10,000,000.00, but Hepford and Lewis are attempting to give them away to their own company Well Cell for a small fraction of their true value. Defendants are attempting to exclude Carr from the Company and his rightful place as Manager and Member of the Company and to steal substantially all Diabetes Relief's assets for themselves.

6.      Hepford's and Lewis's attempt to transfer substantially all of Diabetes Relief's assets to another company that they own and control (to the exclusion of Carr) amounts to an unauthorized distribution of Company money in violation of paragraph 19 of the Amended Company Agreement, which states:

Distributions shall be made to the Managers at the times and in the aggregate amounts determined by the Managers. Such distributions shall be allocated among the Managers in equal proportion unless otherwise agreed to in writing by all Managers.

7.      Hepford and Lewis have also excluded Carr from the Company business and have locked Carr out of his Company email accounts, which is preventing Carr from receiving important Company communications that it is

APPX0920

INSU_PI_001199

essential to monitor, such as communications from banks related to outstanding loans and pending financing activities.

8.      Defendants' actions are in violation of the Amended Company Agreement and a Loan Agreement with U.S. Small Business Administration ("SBA") whereby Diabetes Relief gave the SBA and other lenders a lien on all the assets of the Company and promised that it wouldn't sell or transfer any of the Company's assets.

9.      Defendants have caused harm, damage and injury to Carr and Diabetes Relief for which there is no adequate remedy at law if Defendants succeed in removing Carr as a Manager, taking substantially all of Diabetes Relief's assets, and ruining Diabetes Relief's relationship with the SBA and other lenders.

10.     Unless this Honorable Court temporarily restrains the Defendants until a final trial on the merits of Plaintiff's case, Carr and Diabetes Relief will suffer irreparable injury, for which there is no adequate remedy at law to give Carr and Diabetes Relief complete, final, and equal relief. More specifically, Plaintiff will show the court the following:

*Probable Right of Recovery and Probable Right of Success on the Merits*

11.     A temporary restraining order, temporary injunction, and permanent injunction will protect the Plaintiff from further exploitation and financial loss. Courts sitting in equity possess clear authority and jurisdiction to

APPX0921

**INSU_PI_001200**

protect the Plaintiff where it is liable to suffer harm, damage, and injury for which there is no adequate remedy at law.

12.    The factual allegations contained in this pleading provide ample evidence to sustain the causes of action alleged herein. These factual allegations and causes of action are incorporated herein and Plaintiff relies on these paragraphs in their application for temporary restraining order and temporary injunction. The terms of the Amended Company Agreement and Texas law give Plaintiff a probable right to recover on the claims set forth in this pleading.

*Probable, Imminent, and Irreparable Injury*

13.    If a temporary restraining order and temporary injunction are not issued, Carr and Diabetes Relief will remain subject to financial loss and dissipation of assets and loss of sales from this wrongful conduct of Defendants. Carr and Diabetes Relief are losing income every day that the wrongful conduct continues.

14.    If Defendants are not restrained and enjoined, assets will be lost and relationships will be ruined that cannot be recovered and may be forever lost. Carr and Diabetes Relief are losing income every day that the wrongful conduct is ongoing, and Carr and Diabetes Relief will suffer a probable, imminent, and irreparable injury in the interim.

*No Adequate Remedy at Law*

15.    If Defendants are not restrained and enjoined, Carr and Diabetes Relief may lose assets that become unrecoverable and lose rights that cannot later

APPX0922

INSU_PI_001201

be exercised and will be destroyed. They also may lose relationships with third parties including with the SBA and other lenders and also with potential investors. All these valuable things and more that Carr and Diabetes Relief could lose in the absence of a temporary injunction are irreversible and, in some cases, unquantifiable and difficult or impossible to rectify. Thus, there is no adequate remedy at law except for a temporary injunction.

APPX0923

**INSU_PI_001202**

My name is Hunter Carr, my date of birth is December 27, 1947, and my address is 11615 Noblewood Crest Lane, Houston, Texas 77082, USA. I declare under penalty of perjury that the foregoing declaration is true and correct.

Executed in Harris County, State of Texas on the 30th day of August, 2020.

_____
Declarant

APPX0924

INSU_PI_001203

CAUSE NO. 2020-45718

| | | |
|---|---|---|
| HUNTER CARR | § | IN THE DISTRICT COURT OF |
|    *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| STANLEY T. LEWIS, SCOTT | § | HARRIS COUNTY, TEXAS |
| HEPFORD, GLENN MASSEY, | § | |
| BRIAN LOVERIDGE, ROY | § | |
| HINMAN, WELL CELL GLOBAL, | § | |
| LLC, and RESTOR METABOLIX, | § | |
|    *Defendants.* | § | 127TH JUDICIAL DISTRICT |

---

**ORDER GRANTING PLAINTIFF'S APPLICATION
FOR TEMPORARY INJUNCTION**

---

After considering Plaintiff Hunter Carr's ("Plaintiff") application (on behalf of himself individually and derivatively on behalf of Diabetes Relief, LLC) for temporary injunction, the pleadings, the evidence presented at the hearing on the application, and the arguments of counsel, the Court finds that Plaintiff is likely to succeed on the merits of Plaintiff's claims, that there is evidence that harm is imminent to Carr and Diabetes Relief, and if the Court does not issue the temporary injunction, Carr and Diabetes Relief will be irreparably injured.

THEREFORE, THE COURT ORDERS, ADJUDGES, AND DECREES that Stanley T. Lewis, Scott Hepford, Glenn Massey, Brian Loveridge, Roy Hinman, Well Cell Global, LLC, and Restor Metabolix ("Defendants"), and their officers, agents, servants, employees, and attorneys, and anyone in active concert or participation with Defendants who receives notice of this Order, are subject to the

APPX0925

**INSU_PI_001204**

following Court findings, which will remain in place until the completion of a trial on the merits:

(1) Any attempts since July 1, 2020 to remove or transfer any assets of Diabetes Relief LLC to Stanley T. Lewis or Scott Hepford or any entity owned or controlled in part by Lewis or Hepford (including Well Cell Global LLC and Restor Metabolix) are null and void;

(2) The Asset Purchase Agreement dated July 24, 2020 between Well Cell Global LLC and Diabetes Relief LLC is null and void;

(3) The attempt by Defendants to remove Hunter Carr from his position as Manager of Diabetes Relief LLC is null and void;

(4) Defendants are prohibited from attempting to remove Hunter Carr from his position as Manager of Diabetes Relief, LLC;

(5) Defendants are prohibited from directly or indirectly transferring any assets, money, or other property of Diabetes Relief LLC to any person or entity except in the normal course of business and only after such action is approved by Hepford and Carr as Managers;

(6) Defendants are prohibited from making any agreements with anyone that results in the assets of Diabetes Relief LLC being transferred, encumbered, or concealed from Diabetes Relief LLC or Carr unless approved by Hepford and Carr as Managers;

(7) Defendants are prohibited from using, transferring, or encumbering any assets, money, or other property of Well Cell Global, LLC that was received directly or indirectly from Diabetes Relief, LLC;

(8) Defendants are prohibited from transferring or encumbering any assets, money, or other property of Restor Metabolix received directly or indirectly from Diabetes Relief, LLC;

(9) Defendants are prohibited from excluding Carr from Diabetes Relief LLC's offices, records, documents, or emails or from engaging in any other activities that a Manager is permitted to do according to the Amended Company Agreement dated March 2020; and

(10) Defendants are required to include Carr as a Manager of Diabetes Relief, LLC in any attempts to sell, market, or raise financing based on

APPX0926

INSU_PI_001205

products, services, licenses, technology, or intellectual property used, developed, or owned by Diabetes Relief, LLC.

Plaintiff has already posted a bond for $1,000 for a temporary restraining order, and that bond will be used as a bond for this temporary injunction.

It is further ORDERED that the Temporary Restraining Orders entered in this case on August 3, 2020 and August 7, 2020 are hereby superseded and replaced.

This ORDER and the injunction provided herein shall remain in effect pending a full trial on the merits of this matter set for _____ [date].

_____
Presiding Judge

APPX0927

INSU_PI_001206

1                        CAUSE NO. 2020-45718

2   HUNTER CARR                     §        IN THE DISTRICT COURT OF
                                    §
3            Plaintiff              §
                                    §
4   VS.                             §
                                    §        HARRIS COUNTY, TEXAS
5   STANLEY T. LEWIS; SCOTT         §
    HEPFORD; WELL CELL GLOBAL,      §
6   LLC; RESTOR METABOLIX, INC.     §
                                    §
7            Defendants             §        127TH JUDICIAL DISTRICT

8

9      ------------------------------------------------

10              ORAL AND VIDEOTAPED DEPOSITION OF

11                      SCOTT HEPFORD

12                    AUGUST 12, 2021

13                  (Reported Remotely)

14     ------------------------------------------------

15           ORAL AND VIDEOTAPED DEPOSITION OF SCOTT

16   HEPFORD, produced as a witness at the instance of the

17   Plaintiff, and duly sworn, was taken in the above-styled

18   and numbered cause on the 12th of August, 2021, from

19   11:12 A.M. to 5:40 P.M., before Shelly M. Tucker,

20   Certified Shorthand Reporter for the State of Texas,

21   reported remotely by machine shorthand, with all parties

22   appearing remotely from Houston, Texas, pursuant to the

23   Texas Rules of Civil Procedure, the Fortieth Emergency

24   Order Regarding the COVID-19 State of Disaster, and the

25   provisions stated on the record.

4:22-CV-03062
Injunction Hearing

**EX 22**

DEFS "INSULINIC"



```
 1              A P P E A R A N C E S

 2

    FOR THE PLAINTIFF:
 3

          Wayne Collins
 4        MEADE & NEESE LLP
          2118 Smith Street
 5        Houston, Texas 77002
          Tel: 713-355-1200
 6        wcollins@meadeneese.com

 7

    FOR THE DEFENDANTS STANLEY T. LEWIS, SCOTT HEPFORD, AND
 8  WELL CELL GLOBAL LLC:

 9        Nathan Campbell
          AHMAD ZAVITSANOS ANAIPAKOS ALAVI & MENSING PC
10        1221 McKinney, Suite 2500
          Houston, Texas 77010
11        Tel: 713-600-4970
          Fax: 713-655-0062|
12        ncampbell@azalaw.com

13

    ALSO PRESENT:
14

          Avery Gross, Videographer
15        Hunter Carr
          Paula Oschman
16

17

18

19

20

21

22

23

24

25
```



1                        I N D E X

2                                                PAGE

3   Appearances.....................................   2

4   SCOTT HEPFORD

5        Examination by Mr. Collins..................   5

6   Changes and Signature...........................  174

7   Reporter's Certificate..........................  176

8

9                    E X H I B I T S

10  NUMBER           DESCRIPTION                     PAGE

11  Exhibit 1        SBA loan package                 69

12  Exhibit 2        PowerPoint                       103

13  Exhibit 3        Diabetes Relief Wind Down Plan   119

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  Good morning.  Today's
 3   date is Thursday, the 12th of August, 2021.  We're now on
 4   the record at 11:12 a.m.
 5              The court reporter will swear in the
 6   witness and we may begin.
 7              THE REPORTER:  This LegalView deposition is
 8   being reported by stenographic means from Hays County,
 9   Texas.
10              Will all parties in the room please state
11   who you are and who you represent.
12              MR. COLLINS:  Wayne Collins, and I
13   represent Hunter Carr, plaintiff, who is in attendance
14   with me today.
15              MR. CAMPBELL:  My name is Nathan Campbell,
16   and I represent the defendants.
17              THE REPORTER:  Is that everyone in the
18   room?
19              MR. CAMPBELL:  So we have the deponent in
20   the -- in the room.  We also have Paula --
21              MS. OSCHMAN:  Oschman.
22              MR. CAMPBELL:  -- Oschman in the room, on
23   behalf of the defendants.
24                    SCOTT HEPFORD,
25   having been first duly sworn, testified as follows:
```

LEXITAS

APPX0931

INSU_PI_001210

```
 1                E X A M I N A T I O N

 2   BY MR. COLLINS:

 3        Q.  Good morning.  Will you please state your full

 4   name for the record.

 5        A.  Scott Alan Hepford.

 6        Q.  Okay.  What's your current address?

 7        A.  19611 Cornerstone Arbor Drive, Cypress, Texas.

 8                  THE VIDEOGRAPHER:  This is the

 9   videographer.  Sir, you're going to need to speak up.

10   The court reporter is not going to be able to give you --

11   get a clean record.

12                  THE WITNESS:  Okay.  Where did you lose me?

13                  THE VIDEOGRAPHER:  We heard it, but it was

14   so low.  If you'd just raise your voice, it will be fine.

15                  THE WITNESS:  Okay.

16        A.  Zip code on it is 77433.

17        Q.  (BY MR. COLLINS)  And how long have you lived

18   there?

19        A.  I think a year and a half, maybe two years.

20        Q.  Okay.  And what was your address prior to that?

21        A.  What was our address?  I'm trying to remember.

22   I'm visualizing the house.  I don't remember.  It's --

23   it's still in Cypress.  It's just not there.  It's --

24   it's completely the other side of the subdivision.

25        Q.  Okay.  No problem.
```



APPX0932

INSU_PI_001211

1       A.   I don't remember the address off the top of my

2   head.  That's a little bizarre.

3       Q.   And what's your date of birth?

4       A.   February 23rd, 1975.

5       Q.   And where did you go to high school?

6       A.   Doherty High School in Colorado Springs.

7       Q.   And did you attend college?

8       A.   I did.

9       Q.   And did you graduate?

10      A.   I did.

11      Q.   And where did you attend and graduate from?

12      A.   I attended from -- a school in Arizona called

13  Universal Technical Institute.  Graduated in -- I want to

14  say '96.

15      Q.   And what type of degree did you obtain?

16      A.   It's an associate's degree.

17      Q.   Okay.  And did you get any other degrees or

18  anything after your associate degree?

19      A.   Additional school but no additional degrees.

20      Q.   So '96 -- what was the additional schooling?

21      A.   I went for business administration at

22  University of Regis in Colorado Springs.

23      Q.   Was that in-person classes or online classes?

24      A.   Oh, yeah.  Sorry.  Dating myself.  In person --

25      Q.   Okay.



1    A.  -- before --

2    Q.  Okay.

3    A.  My mind wasn't --

4    Q.  No, I -- I don't -- no judgment.  I just wanted

5  to get...

6           So how many classes did you take at Regis?

7    A.  Two.  One was a business class and one was

8  critical writing, critical thinking.

9    Q.  And once you got out of school -- were you

10  working when you were getting your associate's degree or

11  were --

12    A.  I was.

13    Q.  What -- what type of work were you doing?

14    A.  I was in the entertainment world.  I was

15  teaching dance lessons and deejaying at nightclubs in a

16  couple of different cities.

17    Q.  All right.  In what cities were you doing that?

18    A.  I deejayed in Phoenix, Arizona; Tempe, Arizona;

19  also in Las Vegas, Nevada; did a little bit in Denver,

20  Colorado; and a little bit in -- what's the city.  It was

21  in the Bahamas.  I can't remember -- oh, Freeport.

22    Q.  So in 1998 you started working for Checks

23  Unlimited Deluxe Corp, and you worked there until 2009?

24    A.  That sounds about right.

25    Q.  I mean 2001.  I apologize.



1            And explain to me what you did for them.

2       A.  So I had a variety of different jobs in that

3  time period.  Started out in a -- what they refer to as a

4  bindery, which is literally binding checks out of the

5  printer.

6       Q.  Okay.

7       A.  Went on to becoming a printer and actually

8  running the printing presses.  Moved through, I guess,

9  the -- the roles pretty quickly and was taken on as

10  the -- a trainer to train all the different positions.

11  And I started just finding latencies in process and

12  people, and that got me into industrial engineering.  And

13  the lead industrial engineer ended up leaving, and

14  because I had had experience with computer-aided drafting

15  and I was the only person on-site that was able to run

16  any of the computer designs of the manufacturing

17  facility, I ended up going into the industrial

18  engineering position, which was my final position there

19  before I left.

20       Q.  And when you're -- okay.  You're not a licensed

21  engineer.  Correct?

22       A.  No, I'm not.

23       Q.  Okay.  And then as -- when you're -- what

24  you're defining as industrial engineer work, can you give

25  me a definition of that?



1      A.   Yeah.   So check printing is obviously a very

2    manual process all the way from paper before it finally

3    is a shrink-wrapped box that shows up in your mail, and

4    there's many, many steps that go from the beginning to

5    end of that.   And in lean manufacturing and just-in-time

6    ordering and a lot of different methodologies that are

7    applied to the manufacturing space, having a person that

8    is engaged in all of that, and constantly finding a

9    better, faster, cheaper, more automated ways to increase

10   productivity and decrease quality defects and customer

11   service improvement is really sort of the key measures on

12   the person that's engineering the process.   Just, you

13   know, basically be profitable for the company and good

14   for the client.

15      Q.   And during that time was that your only source

16   of income or did you have any other vocations or jobs?

17      A.   Not that I recall.

18      Q.   Okay.   And what was the nature of the

19   separation that occurred in 2000?

20      A.   Oh, I -- I gave my notice and ended up going

21   into the -- into the banking space.   My -- actually, my

22   ex-manager hired me, who used to be my manager at the

23   check manufacturer, moved to another company and he ended

24   up making me a great offer and I switched industries.

25      Q.   Who was that?



1     A.  Gosh.  What was his name.  Dan -- I don't

2  recall his last name.  Sorry.

3     Q.  And then was that with Wells Fargo?

4     A.  Yes, Wells Fargo, their -- their equity

5  division.  So a big company broken apart into different

6  divisions, so the equity side of the company.

7     Q.  And describe to the ladies and gentlemen of the

8  jury what you mean by the equity division.

9     A.  So it's home equity second mortgages, and that

10 division is essentially the ones that took it from a

11 salesperson in the field selling it, all the way through

12 deciding whether a person was going to get the loan, all

13 the way through building the loan documents, securing the

14 collateral, and then ultimately providing everything for

15 closing.

16    Q.  So as a -- and prior to this time had you had

17 any experience with, you know, loans or doing any type of

18 accounting work?

19    A.  Not other than my own personal, you know,

20 mortgages and that kind of thing.

21    Q.  Okay.

22    A.  That wasn't what my job was there, though.  It

23 was in process engineering at this point.  It was a very

24 complicated system.  I got to work all around the United

25 States.



1     Q.  Well, explain to me what process engineering is

2   in the context of home equity loans.

3     A.  Sure.  So very similar to industrial

4   engineering, where you're deciding where do I put this

5   machine or this person or, you know, do we buy an

6   automated whatever.  As you're lining up the linear

7   process or -- or simultaneous process, those same things

8   apply to processes that are -- that have actually roughly

9   8 billion variations of how a loan would come in by the

10  time it actually gets funded.

11              So if a person's credit score is one thing

12  or another, that changes the path; if they have

13  collateral or don't have collateral, that's a path; if

14  they've been in business for two years or less.  All of

15  those are variables that change the process path, and

16  constantly looking for ways to, you know, sharpen the

17  process, sharpen the process.  Again, take out latency.

18  You know, that's really what process engineering is kind

19  of all about.

20    Q.  So you developed a program that Wells Fargo

21  used for these home equity loans or you were a part of it

22  or what role did you play?

23    A.  Oh, no.  I was -- I was brought on after.  You

24  know, Wells Fargo was about a 150-year-old company at

25  that point.  And this is the time period when home equity

1   lending -- there was a boom, and we were hiring over 120

2   employees per month in the operation, and we were

3   scaling.  So some of my industrial engineering experience

4   on bringing facilities up-to -- up-to-speed, getting all

5   the supplies and materials and all the things that they

6   need, some of that came in -- came in handy because as we

7   were building up actual new locations to house these

8   people, we were also simultaneously trying to improve the

9   process.  So I -- I played a part in a, you know, very,

10  very big company.

11       Q.  Okay.  And then was that in Colorado Springs

12  where you did that work?

13       A.  Initially, yeah.  That was the equity side.  I

14  ended up being given an offer to move to -- to Boston and

15  do that for home mortgage, which is the First Mortgage

16  side of Wells Fargo.

17       Q.  Did you actually move to Boston to do that?

18       A.  I moved to Danvers initially, stayed in

19  corporate housing for just short of a year, and then we

20  moved to New Hampshire to work out of Danvers.

21       Q.  And you did that from 2001 to 2004.  Correct?

22       A.  Sounds about right.

23       Q.  Okay.  And then after 2 -- what was the nature

24  of the separation in 2004?

25       A.  I received an offer from Washington Mutual to

1  do very, very similar processes in their First Mortgage

2  and Second Mortgage divisions in Houston, Texas.  I again

3  gave notice, exited the organization, moved my wife and I

4  to Houston.

5      Q.  Did -- so you were not terminated.  Correct?

6      A.  No, sir.

7      Q.  From Wells Fargo?

8      A.  No, sir.

9      Q.  Did you ever receive any discipline or

10 write-ups while you were at Wells Fargo?

11     A.  No, sir.

12     Q.  So you worked for Washington Mutual from 2004

13 to 2008?

14     A.  That's correct.

15     Q.  And then what was the nature of your separation

16 from Washington Mutual?

17     A.  So the nature of the separation there was a

18 layoff.  And this was -- you know, we were approaching

19 the -- a time that, you know, the equity lending space

20 crashed and all the banks shuttered and all of that, so

21 it was a pretty serious cutting of costs across the --

22 across the entire bank and really the entire industry.

23 And I was laid off, received a handsome severance

24 package, but nonetheless was -- was shown the door.

25     Q.  So with Lib -- with Washington Mutual were you



1    still dealing with loans or home loans in any way?

2         A.  So, initially, yes.  And then very similar to

3    what happened at Wells Fargo, after I got the process

4    optimized in the home loan space, we also did a bunch of

5    reserve -- reverse offshoring in India.  The request was

6    for me to move over to the business lending side and do

7    the same thing, and that led to me running a process

8    innovation team in the technology group.  So I had folks

9    that I -- I worked with that reported to me remotely in a

10   couple of different states.

11        Q.  During your time with Washington Mutual Bank

12   were you dealing with what's -- are you familiar with the

13   term "subprime loans"?

14        A.  I am familiar with that.

15        Q.  Were you dealing with subprime loans at

16   Washington Mutual Bank?

17        A.  No.  I was in the business lending division.

18        Q.  Well, but you indicated before that you were

19   dealing with home loans and --

20        A.  Yeah.

21        Q.  -- such.  And during that time period were

22   you --

23        A.  Yeah, home loans on the -- so -- so there's

24   three different loan portfolios.  So there's the home

25   mortgage, first mortgage, the second mortgage, and then



APPX0941

INSU_PI_001220

1    the business lending.  So the subprime gets into the less

2    favorable paper in any of those.  And essentially by the

3    time -- yeah, the -- actually, I'm not sure -- I'm not

4    sure that's actually true on -- on business lending.  But

5    I -- I spent the balance of my time in the business loan

6    space, if that makes sense.

7        Q.  And you indicated earlier on in your testimony

8    that once you got the home loan side situated, you moved

9    into the business loan --

10       A.  That's correct.

11       Q.  -- situation.  And my question is during the --

12   during the home loan period of that, were you dealing

13   with subprime loans or did you have any role in getting

14   those operations --

15       A.  The -- the answer is yes.  Because the process

16   that I was over and in the operations teams that I were

17   [sic] over handled the entire portfolio of "A" paper, all

18   the way down to, you know, "C" or "D" paper.  So this was

19   the process associated with making sure that these people

20   got -- the ones that qualified got their money in a

21   reasonable time period.

22               After it gets out of operations is when the

23   secondary market steps in and acquires the different

24   types of paper.  And so that's that secondary market;

25   that's where the subprime world sort of is.  So to the

LEXITAS
APPX0942

INSU_PI_001221

1  degree that -- that I worked on processes upstream, yes.

2  But in terms of managing portfolios, that wasn't in my

3  spectrum at all.

4      Q.  But you were involved in writing the -- in

5  writing and getting approval for the initial loans.

6  Correct?

7      A.  Yes.

8              MR. CAMPBELL:  Objection, form.

9      A.  The -- the operational processes that made the

10  company efficient to -- to offer those services is what I

11  was responsible for.

12      Q.  (BY MR. COLLINS)  When you say "operational

13  process," can you describe what that is?

14      A.  Sure.  So in, you know, the 30,000-foot level

15  of loan processing, whether you're talking about first or

16  second or business or probably, I would assume, any type

17  of loan at a big bank institution, you're going to have

18  the sales portion of it, then that's going to move over

19  to the intake, which is then going to move to

20  underwriting.  From there that moves to typically a loan

21  processing department, which then leads to a loan closing

22  department.

23              Each one of those steps that I just

24  mentioned, they're -- they're full departments.  There's

25  typically, you know, dozens to hundreds of people that --

1    that do those roles.  Many times those roles are also

2    offshored or onshored or it just depends.  And so each

3    one of them have a whole series of processes underneath

4    their department that they're responsible for.

5              So if you look at it like an input and

6    output, each one of the departments has a certain thing

7    that they're expecting to see a certain way.  And when

8    they're done with it, they produce an output of a certain

9    thing that has to look a certain way so it is ready for

10   the next department.

11             So each one of those departments -- all of

12   them run the risk of having inefficient processes or

13   inefficient protocols or inefficient people or

14   inefficient managers, and all of those things are

15   constantly looked at to -- to make the process again

16   better and more profitable for the company and at the

17   same time a more pleasant experience for the borrower

18   and -- and ultimately easier on the staff.

19       Q.  And then you worked for ARRYVE Management

20   Consulting from 2008 to 2009?

21       A.  Correct.

22       Q.  And what type of company is ARRYVE?

23       A.  It was a boutique private consulting forum --

24   firm that consulted for basically the -- their, I guess,

25   catchphrase is the Fortune 10 to the Fortune Someday.  So

1  we were -- we were based in Bellevue, Washington, and had

2  clients like Microsoft Intellectual Ventures, Starbucks,

3  Nintendo, a whole bunch of different companies that --

4  with a similar interest.  And technically -- I consulted

5  for them.  I was a -- I was a senior manager for them.

6      Q.  What did you consult on specifically?  It looks

7  like IT issues.  What else?

8      A.  Yeah.  Financial processes.  One of my

9  clients -- I don't know if my nondisclosure is still in

10  effect, so you'll have to forgive me for being a little

11  vague.  But one of the very largest software companies in

12  the world had a problem with their finance numbering.

13  That might sound a little crazy, but their -- they had a

14  five-digit platform that was responsible for all their

15  cost centers and their profit centers, and they had about

16  used up all the digits.  And they were about 45 days away

17  from not being able to run accounting through all of

18  their ERP platforms, and that would be catastrophic

19  because they wouldn't be able to report earnings to the

20  Street --

21              (Reporter clarified)

22      A.  -- report earnings to the -- to -- earnings to

23  the investors on Wall Street.  And I was brought in to

24  basically identify the problem, size the problem, assess

25  the options, and advise on how to fix it.  And ultimately

1  we did.  So that's an example of one of the clients

2  and -- and one of the projects that I was on.

3      Q.  (BY MR. COLLINS)  Explain to me what you did

4  for the merger and acquisition program management for

5  ARRYVE.

6      A.  So looking for opportunities for either --

7  clients to potentially acquire or merge with

8  strategically, and the firm itself also had some -- some

9  pretty big aspirations of becoming much, much, much

10 bigger, and potentially joining one of the top four, top

11 five consulting firms in the world, and so offered some

12 assistance in looking in that space.  Kind of think of it

13 as the entrepreneurial side of professional services

14 consulting.

15     Q.  During your one-year tenure there, were you

16 able to close any mergers or acquisitions on behalf of

17 ARRYVE?

18     A.  No, sir.

19     Q.  When you were there did you identify any

20 prospects at ARRYVE that were ultimately closed?

21     A.  Not to my knowledge, no.  Not as long as I was

22 there and even after I left.  I don't -- I don't believe

23 so.

24     Q.  So the extent of your merger and acquisition

25 program management, what did that entail?

1       A.   So a program -- I'll answer that part first so

2   you understand.  A program is a series of projects all

3   managed under one umbrella.  So they all are sort of

4   independent.  They all have their own scope.  They all

5   have their own cost and a timeline.  And so it was

6   identifying all of the different prospects and then

7   ultimately putting a program in place to be able to then

8   manage -- assign junior consultants to each of them and

9   then ultimately have a unified scorecard to report back

10  up to the firm on where's the current status of this.

11      Q.   And would that be, like, equivalent to

12  developing customer lists or a prospect list for

13  potential business?

14      A.   No.

15      Q.   Okay.

16      A.   It would be, like, building the internal

17  systems and process flows that -- that customer lists

18  would be managed through.

19      Q.   All right.  Then you worked for Expedia from

20  2009 to 2011?

21      A.   That's correct.

22      Q.   And you were terminated from Expedia.  Correct?

23      A.   That's not correct.

24      Q.   Okay.  What happened at Expedia?

25      A.   Can you --

LEXITAS
APPX0947

INSU_PI_001226

1          MR. CAMPBELL:  Objection, form.

2      A.  -- be specific in your question?

3      Q.  (BY MR. COLLINS)  Yeah.  How did your

4  employment end with Expedia?

5      A.  I gave my notice, had a wonderful farewell

6  party with all of my staff that was in Bellevue,

7  Washington.  We remoted in my -- my staff from other

8  parts of the world.  And I stayed in good standing with

9  the company and my -- and my team.

10     Q.  And why did you leave?

11     A.  I left because I took an opportunity at a

12 start-up investment company to help them develop their

13 operations.

14     Q.  Who was your direct supervisor at Expedia?

15     A.  Falk Wolf Richter.

16     Q.  Repeat that one more time.

17     A.  Falk, F-A-L-K.

18     Q.  Uh-huh.

19     A.  Wolf, like the wolf, Richter.

20     Q.  And you worked for them in Bellevue,

21 Washington, or another office?

22     A.  I -- that ranged.  So I went around the world

23 approximately four times a year to manage my staff.  My

24 staff was in multiple locations across the world.  I had

25 my -- my main office out of Bellevue, Washington.

1  However, for the last six months to possibly a year --

2  might have been a year -- I managed all of my teams

3  remotely out of my home in Canyon Lake, Texas.

4      Q.  All right.  With respect to River Oaks

5  Investment Group LLC, you were there from 2010 to 2012?

6      A.  That's correct, yes.

7      Q.  Okay.  And it says that you personally raised

8  funds of 1.7 million, alternative develop P fund

9  targeting gains for forex trading [as read].

10             What is that referring to?

11      A.  The purpose of the -- of the fund was to invest

12  into a variety of different alternative investments for,

13  you know, high-net-worth folks, to offset some of their

14  more modest things like, you know, 401(k)s and things

15  that turned -- you know, relatively low returns but, you

16  know, they were relatively lower risk.  This was

17  considered high risk.  And it was -- this particular fund

18  was focused on foreign exchange trading.

19      Q.  And who did you raise $1.7 million for?

20      A.  The company raised.  From 30 -- I want to say

21  32 individual people, myself being one of them.

22      Q.  So personally invested and helped raise funds.

23  So you invested money?

24      A.  Yes, I invested money.

25      Q.  And then how many -- how much funds did you



1  raise?

2      A.  I personally didn't raise any funds, but I, you

3  know, produced materials and presentations and things for

4  the -- for the company.  It ultimately, I think, ended up

5  raising -- I can't remember the exact number.  I'd have

6  to go back and look at the document.  But over -- over a

7  million dollars.  A hundred and -- I want to say 120,000

8  of that was mine.

9      Q.  And then "worked closely with our legal counsel

10 and several government agencies to bring charges against,

11 apprehend, and convict a fraudulent money manager"?

12     A.  Yes, sir.

13     Q.  What legal counsel did you work with?

14     A.  So Mark Townsend, the CEO, hired an in-house

15 counsel, lawyer Terry Dunken.  And Terry Dunken provided

16 us guidance on how to handle just -- it was a very, you

17 know, kind of scary and chaotic situation when you

18 discover that the person that's responsible for the

19 currency trading actually embezzled all the money.

20          I was the one that discovered that, because

21 I was trying to build an operational platform to be able

22 to show myself and the rest of the investors what the --

23 what -- what their account balances were.  And when I

24 couldn't get anything from the trader, I advised

25 Mr. Townsend that we needed to get a new trader or we

LEXITAS
APPX0950
INSU_PI_001229

1  needed something to change.  And in Mr. Townsend digging,

2  it was discovered that they -- that the guy had embezzled

3  it.

4      Q.  What law enforcement -- or governmental

5  agencies did you work with?

6      A.  This man was -- he lived in Montana.  And so

7  the Montana SEC.  Somehow the secret -- I think it was

8  Secret Service -- I remember that being really an awkward

9  thing.  But it was also mostly the FBI.

10      Q.  And so he had a current -- and who was this

11  individual?

12      A.  Oh, my goodness.  What's his name.  I -- I

13  don't recall his name off the top of my head.

14      Q.  What was the name of the company he was --

15      A.  He had -- it was Buffalo something, Buffalo --

16  Buffalo Investments or something.  He -- he -- they ended

17  up catching him.  He went on the run for five and a half

18  months, and they found him in a hotel in Kansas, if I

19  recall.  And he was sentenced to 64 years in prison.

20      Q.  And had you invested in this currency scheme

21  yourself?

22      A.  I invested in the -- the -- the fund that

23  invested into it.

24      Q.  How much of the -- what fund are you referring

25  to?



1      A.   The River Oaks Alternative Investment Fund.

2  And that may not be the exact name, but it's

3  directionally correct.

4      Q.   And who made the decision to invest with this

5  fraudulent money manager?

6      A.   Mark Townsend.

7      Q.   Okay.  And did you participate in getting

8  anyone else to invest into this fund or with this person?

9              MR. CAMPBELL:  Objection, form.

10             MR. COLLINS:   What's the basis?

11             MR. CAMPBELL:  Compound question, vague,

12  confusing.

13     Q.  (BY MR. COLLINS)  All right.  You can go ahead

14  and answer.

15     A.   Can you ask it again, please.

16     Q.   Did you participate in bringing investors into

17  this to invest with the fraudulent money manager person

18  for that company?

19             MR. CAMPBELL:  Objection, form.

20     Q.  (BY MR. COLLINS)  You can go ahead and answer.

21     A.   Yeah, so I'm not a lawyer, so I don't know the

22  legal definition involved.  To the degree that I was -- I

23  was there and my own family members invested based on

24  discussions, I would suppose I was -- I was involved.

25  But, again, I don't know the legal definition.

1      Q.   Okay.  Let's break it down.  Did you present

2   the investment in this -- what we'll call the fraudulent

3   money manager scheme to other potential investors?

4      A.   I -- I -- yes.

5      Q.   And who were those potential investors that you

6   presented that to?

7      A.   My mother and father, my sister, and one of my

8   best friends.

9      Q.   And was there any legal action that was --

10  civil legal proceedings that were instituted as a result

11  of this transaction with this fraudulent money manager?

12     A.   Yes.

13     Q.   And where were those located?

14     A.   My -- I -- I couldn't answer that question

15  fully because he defrauded people all over the United

16  States.  There was -- the FBI told me it was over 400

17  individuals.  So I -- I don't know the answer to that

18  question.

19     Q.   Did you participate in any legal proceedings?

20     A.   Yes.

21     Q.   What legal proceedings did you participate in?

22     A.   A lawsuit in Louisiana.

23     Q.   What parish was that or federal district court?

24     A.   I don't recall off the top of my head.

25     Q.   Do you remember what city it was located in?



APPX0953

INSU_PI_001232

1      A.  I don't.  Sorry.  At that point I had never

2  been to Louisiana so it -- I'm not -- I -- you know.

3      Q.  And what time frame would this legal action

4  have occurred?

5      A.  It would have been within the year -- well, I

6  don't know about the legal action.  But I'm -- I'm fuzzy

7  on it.  I'm not sure.

8      Q.  Sometime after 2012 or before 2012?

9      A.  It -- it would be a tough one.  From the time

10 that I left Expedia, it was within the year that we got

11 the operations kind of set up to the point where I think

12 I figured out what was going on.  I think the legal

13 action happened the following year.

14     Q.  And where -- did you have an understanding

15 where the criminal proceeding was located?

16     A.  I would be speculating Montana, but I don't

17 know.

18     Q.  And did you give testimony in any of these

19 legal proceedings?

20     A.  I didn't --

21     Q.  Or provide a statement?

22     A.  Yes.

23     Q.  Okay.  In which one?

24     A.  In the -- in the case against the fraudulent

25 money manager or foreign -- forex trader.  Provided many



1   statements, actually, to the FBI and others.

2        Q.   And in addition to your -- your parents, your

3   sister, and your good friend who you personally presented

4   this project to -- to -- for investment, did River Oaks

5   Investment Group have other investors who invested in

6   this?

7        A.   Yes.

8        Q.   Okay.   How many did they have?

9        A.   Again, I'm not a hundred percent sure on this

10  number, but it's approximately 32.

11       Q.   Okay.   And of those 32 what interaction did you

12  have with those folks?

13       A.   The different point -- I don't know if I

14  interacted with all of them.   I don't think I did.   At

15  different points I was on phone calls on some of them,

16  provided email communications on behalf of Mark Townsend

17  to try to keep people up-to-date as to what we knew and

18  when we knew it, mostly after the -- the embezzlement

19  took place, to try to keep everybody up-to-speed as best

20  we could on what we knew from the investigations.

21       Q.   And you're -- you're calling it embezzlement,

22  but it's better characterized as a Ponzi scheme?

23            MR. CAMPBELL:   Objection, form.

24       Q.   (BY MR. COLLINS)   You can go ahead and answer.

25       A.   I don't know the definition of -- I mean, I --

1    I would be speculating to say yes or no.  I don't know.

2        Q.  And did all the investors that you were aware

3    of -- did they lose their money in this investment?

4        A.  I -- I'm not sure how to answer that.  Because

5    some of those investors were able to get some of their --

6    they -- they -- they made withdrawals early just -- of

7    some of their capital.  But to the extent that whatever

8    was left in the accounts at -- when -- when it all, you

9    know, crashed, everyone, including myself, lost

10   everything that was -- that was there.

11       Q.  And how much did you invest in it?

12       A.  $120,000.

13       Q.  And who within River Oaks Investment Group

14   actually found the investment with this fraudulent money

15   manager?

16       A.  I'm sorry.  I don't understand the question.

17       Q.  Who -- who identified and located initially

18   the -- the investment with this money manager?

19            MR. CAMPBELL:  Objection, form.

20       A.  Mark Townsend.

21       Q.  (BY MR. COLLINS)  And before -- did you

22   participate in any due diligence that occurred with this

23   fraudulent money manager before you -- you invested or

24   other folks -- you had other folks invest in this?

25       A.  I did not.  I trusted the efforts that were

1  done by my friend Mark Townsend.

2      Q.  And then before you started with River Oaks

3  investment -- or when you started with River Oaks

4  Investment Group, had you met Hunter Carr before or after

5  that?

6      A.  It would have been -- I believe it would have

7  been just shortly after that I met Hunter through Mark

8  Townsend.

9      Q.  Okay.  So Mark Townsend introduced you to

10  Hunter Carr?

11      A.  Correct.

12      Q.  Okay.  And what were the circumstances of that

13  introduction?

14      A.  I don't recall the purpose of the meeting, but

15  I know that there was discussions on trying to position

16  River Oaks Investment Group to be able to be a public

17  company.  And Mark had explained to me that this -- this

18  guy that he knew named Hunter had experience in the space

19  and had taken tons of companies public, and so he would

20  be able to guide the company through that process.

21      Q.  And did you have -- ever have occasion to talk

22  to Hunter Carr about this investment with the fraudulent

23  money manager?

24      A.  Prior to me meeting him at his home that first

25  day, I had never -- never spoken to him, didn't -- didn't

1  know him.  So the only time that -- that I'm aware of

2  that there was discussion about it was at that -- that

3  day.  I was left with the impression, though, that since

4  him and Mark had known each other prior, that -- I had --

5  had assumed that there had been at least some degree of

6  conversation; otherwise, we wouldn't be showing up at

7  Hunter's doorstep for no reason.

8       Q.  Uh-huh.  And why did you conclude your

9  employment with River Oaks Investment Group?

10      A.  Oh, because it absolutely went defunct and

11 belly-up.  I -- I hung in there for a very long time

12 without any pay or anything.  I was trying to keep myself

13 and any of the other investors, including my family

14 members and friends, aware, as best I could, of what was

15 happening.  But the company absolutely failed.

16      Q.  So is the $1.7 million that was -- that you

17 personally invested and helped raise, was -- that money

18 end up going into this fraudulent money manager's

19 investments group?

20           MR. CAMPBELL:  Objection, form.

21      A.  I'm sorry.  If you could break that down a bit.

22      Q.  (BY MR. COLLINS)  The $1.7 million that was

23 raised --

24      A.  Uh-huh.

25      Q.  -- that's referenced in your resume --

1     A.  Uh-huh.

2     Q.  -- was it all invested in the fraudulent money

3  manager's scheme or was there another investment?

4     A.  I believe it was all invested there.  I -- I

5  vaguely remember there being two different placements,

6  but both of them went to the same place.  But I don't --

7  I'd have to refresh myself on, you know, documents and

8  records to really know for sure.  But I vaguely remember

9  there being two -- two different vehicles that went to

10  the exact same place.

11     Q.  Who did you co-found MCI Partners with?

12     A.  A man named Dave Gorham.

13     Q.  And why did that venture only appear to last

14  for one year?

15     A.  Well, because that venture -- it came to an end

16  after the efforts that that venture was focused on, up in

17  the Bakken in North Dakota, reached the point where two

18  companies went public, and me and Dave Gorham definitely

19  had a falling-out after he and our corporate lawyer

20  attempted to steal everything that I and actually

21  Mr. Carr had been due based on that public offering.

22     Q.  And in fact you and Mr. Carr participated in

23  a -- in expensive litigation regarding that issue.

24  Correct?

25     A.  Correct.

1      Q.   And how was Mr. Carr involved with that

2   prior -- I mean in this -- how was he involved in this?

3      A.   He was the consultant that advised us that were

4   working inside the businesses.   There was two companies

5   that we -- that we rolled up together, took it through

6   first acquisition into a public market.   And he served as

7   a consultant, essentially.

8      Q.   And with respect to MCI Partners LLC do you

9   have any criticisms of the way that Hunter Carr conducted

10  business in that context?

11     A.   Any --

12     Q.   Any criticisms.

13     A.   Of how he conducted himself in that

14  interaction?

15     Q.   Yeah, with respect to MCI Partners.

16     A.   I would say they're nitpicky.   I mean, there's

17  definitely critiques and criticisms.

18     Q.   What are they?

19     A.   I think he -- he presented himself as if he had

20  had tremendous amounts of experience in taking companies

21  public.   And it was actually news to me, after knowing

22  him for almost ten years, from his deposition yesterday,

23  that he had only taken two companies public.   I was under

24  the impression, because he told me -- not then, but

25  after -- that it was significantly more than that.   So --

1  so that was, you know, a little --

2      Q.  But the only source of the information you have

3  with respect to how many companies he took public was

4  sitting in his deposition yesterday --

5      A.  That's correct.

6      Q.  -- correct?  Okay.

7      A.  That's correct.

8              And in general, you know, we, myself

9  included, and the families that were up in North

10 Dakota -- we had never done this before.

11     Q.  Uh-huh.

12     A.  So the process, I found it to be very fuzzy and

13 not very clear as to exactly what has to happen and how.

14 I found a lawyer that he had known for a long time whose

15 name is Bob Sonfield to be tremendously more effective

16 in -- in articulating, "Here's the list.  This is exactly

17 how it works."  And so that became -- that -- that became

18 really the -- kind of the path on how to get this done.

19 But, again, I would characterize all that as nitpicky.

20     Q.  So why did y'all have a lawsuit regarding this?

21     A.  Approximately two weeks after we were

22 successful in -- in the public offering, my ex-business

23 partner at that point, Dave Gorham, and the same Terry

24 Dunken that I mentioned earlier from River Oaks decided

25 to partner up.  And Terry Dunken at this point -- because

1  this was a big lend for me and I didn't want the money to

2  just evaporate, so Terry Dunken assisted me in building a

3  trust for my kids and my wife that -- that I placed

4  everything in.

5              And if you go purely just by market cap --

6  this is not liquid cash -- we're talking about fairly

7  large amounts of value in that public company.  And Terry

8  Dunken and Dave Gorham signed a whole bunch of documents,

9  slip-sheeted a whole bunch of documents, misclassified a

10 whole bunch of documents that essentially said I gave it

11 to them and I exited the company.

12             They split it 40-60 between my ex-partner

13 at 60 percent and my ex-trustee and ex-corporate counsel

14 at 40 percent, who then gave it to his wife.  And they

15 also defrauded Hunter out of his consulting fee that he

16 was due and his partner, Robert Rhodes, at the time.

17     Q.  So how much interest did you have in these --

18 the company that went public?

19     A.  I'd have to go back and look at the records to

20 be specific, but I believe it may have been close to 30

21 percent.

22     Q.  We've been going for a little while.  I would

23 like to take a short break, if you don't mind.

24     A.  Thank you.

25             THE VIDEOGRAPHER:  Going off -- going off

LEXITAS
APPX0962

1    the record at 12:05.

2              (Recess)

3              THE VIDEOGRAPHER:  We are back on the

4    record at 12:27.  You may proceed.

5        Q.  (BY MR. COLLINS)  Mr. Hepford, I want to go

6    back to the River Oaks Investment Group.  And we were

7    talking about the investments with the fraudulent money

8    manager.  And there was a lawsuit in Louisiana.  You

9    indicated that was a civil lawsuit?

10       A.  Yes.

11       Q.  Okay.  Were you named as a defendant

12   individually in that case?

13       A.  Yes.

14       Q.  And who sued you in that case?

15       A.  I don't remember all -- I don't -- I don't

16   remember exactly.

17       Q.  Was it -- was -- was it investors who sued you

18   or --

19       A.  Yes, it was investors.

20       Q.  Okay.  And what was the outcome or disposition

21   of that matter?

22       A.  I don't know.  It was abandoned for -- up until

23   now.  Apparently, it's -- yeah, I don't know.

24       Q.  Is the case still going on?

25       A.  I don't believe so.



Scott Hepford                                                        Pages 37

1       Q.   Okay.  Did you have legal counsel who

2  represented you in that matter?

3       A.   Yes.

4       Q.   Who was your legal counsel?

5       A.   There was -- I don't remember.  There was legal

6  counsel River Oaks got, and it was them.

7       Q.   Did you pay for the legal counsel?

8       A.   I did not, no.

9       Q.   So the River Oaks group paid for it?

10       A.   I don't think that's true either.

11       Q.   Okay.  Do you know who paid for it?

12       A.   I think Mark Townsend.  I don't know.

13       Q.   Okay.  And do you know if the case was settled,

14  resolved, dismissed, or anything?

15       A.   I believe it was abandoned.

16       Q.   Abandoned?

17       A.   Yeah.

18       Q.   Okay.  Approximately when was it abandoned?

19       A.   Oh, I -- I couldn't tell you.  I don't know

20  exactly.

21       Q.   And do you know --

22            THE VIDEOGRAPHER:  Sir, this is the

23  videographer.  The court reporter is not able to take

24  your testimony.  Is there any way to get closer to the

25  microphone?



1              THE WITNESS:  I don't know where the

2    microphone is.

3              THE VIDEOGRAPHER:  Oh, I don't -- okay.  So

4    speak -- or speak louder.

5              THE WITNESS:  I'll try.

6              THE VIDEOGRAPHER:  Thank you, sir.  We're

7    still on the record.

8         Q.  (BY MR. COLLINS)  And do you remember who the

9    opposing counsel was?

10        A.  I do not.

11        Q.  Was your -- your deposition was taken in that

12   case?

13        A.  I'm sorry.  Are you talking about the River --

14   are you talking about the Louisiana case?

15        Q.  Yeah.

16        A.  I don't believe so.

17        Q.  Okay.  Did you offer any testimony in that

18   case?

19        A.  I don't recall.  It was a long time ago.

20        Q.  And with respect -- with MCI Partners and those

21   dealings with that company, there was a lawsuit that was

22   filed.  You were a plaintiff in that case.  Correct?

23        A.  Correct.

24        Q.  And who were the other plaintiffs in that case?

25        A.  You'll have to be more specific.



1      Q.   Who were the other -- were there any other

2   plaintiffs in that case along with you?

3      A.   I'm not trying to be difficult.   There was 18

4   cases.

5      Q.   Okay.

6      A.   So I -- I can't answer your question.

7      Q.   And did Hunter Carr participate in those cases

8   as a plaintiff in some of or all -- or all of them?

9      A.   Yes.

10     Q.   Okay.   And who was your lawyer in that case --

11  in the MCI Partners case?

12     A.   We had several -- oh, I'm sorry.   Did you say

13  MCI Partners cases?

14     Q.   Yeah.   I mean, the case -- you said there were

15  18 cases?

16     A.   Sorry.   I confused -- I thought you were

17  talking about the MCI Partners in -- in North Dakota.   Is

18  that what you're talking about?

19     Q.   Yeah, I am.   And out of that, y'all went -- my

20  understanding is the company went public and then shortly

21  after, there --

22     A.   Yes.

23     Q.   -- there were some, you know --

24     A.   Okay.

25     Q.   -- shenanigans, and then there was multiple



Scott Hepford                                              Pages 40

1    lawsuits afterwards.  Right?

2         A.  I'm following you.  Yes.  Sorry.

3         Q.  Okay.  And my first question is who were your

4    lawyers in the -- in those cases that came out of that?

5         A.  Lloyd Kelley.  There was Darryl -- I don't

6    remember his last name.  He would have been the second

7    chair.  A gentleman -- a lawyer named George Gore, a Jim

8    Pierce.  We had representation in Nevada, but I do not

9    remember the lawyer's name there.  I think that's it.

10        Q.  And did you give testimony in any of the cases

11   related to MCI Partners issues?

12        A.  Yes.

13        Q.  How many times were you deposed?

14        A.  I lost track, but four, maybe.

15        Q.  Okay.  And in that case were your lawyers

16   working on a contingency fee arrangement or hourly fee

17   arrangement?

18        A.  Contingency.

19        Q.  And --

20        A.  Well --

21        Q.  -- at --

22        A.  Sorry.  I don't want to --

23        Q.  Go ahead, yeah.

24        A.  I don't know if the lawyers in Nevada were on

25   contingency.

1      Q.  Okay.  And did y'all have an agreement where

2   you as the plaintiffs were providing the expense cost for

3   the litigation?

4      A.  Yes.  I believe that's how it was structured.

5      Q.  Okay.  And do you remember who helped find

6   these lawyers for you?

7      A.  Yes.

8      Q.  Who was that?

9      A.  A combination between Hunter Carr and Robert

10  Rhodes and Jim Pierce.

11     Q.  And would the -- who were the other plaintiffs

12  that were associated with this case?

13     A.  Sorry.  You'd have to be more specific.

14     Q.  Yeah.  Who were the other people suing the bad

15  guys in this case?

16     A.  Myself, Hunter Carr, Robert Rhodes.  There may

17  have been others sort of peripheral to the case, but I

18  don't recall if they were specifically plaintiffs or not.

19     Q.  And did y'all all contribute to the -- the

20  people you just named, did y'all all contribute to paying

21  the expenses for the litigation?

22     A.  Yes.

23     Q.  Okay.  Including Mr. Carr?

24     A.  Yes.

25     Q.  And did Mr. Carr manage the funds for the



1  payment of the expenses?

2      A.  Yes, he did.

3      Q.  Do you have any criticisms in the manner in

4  which he managed those funds?

5      A.  Yes, I do.

6      Q.  What is the criticism?

7      A.  The criticisms are that over my observation of

8  Mr. Carr in the last ten years, that he is very creative

9  with expenses in his favor.  And I suspect that that's

10  exactly what happened in that case, and I've seen it

11  numerous times since.

12     Q.  And what is your basis for that suspicion?

13     A.  Him not being transparent, keeping things very

14  murky for a very long period of time, not wanting to be

15  pinned down on any particular position as it relates to

16  finances specifically.

17     Q.  And out of those funds that were accumulated or

18  managed by Mr. Carr for that litigation did you submit

19  expenses to be reimbursed?

20     A.  Yes.

21     Q.  It was approximately $284,000?

22     A.  That's approximately -- that's probably close,

23  yes.

24     Q.  Okay.  And out of that $284,000, did you

25  produce any receipts or documentation for those expenses?

1      A.  I believe I did.

2      Q.  What format did that documentation come?

3      A.  There was an Excel spreadsheet at one point

4  that documented my actual cash contributions at different

5  points where we paid book fees or whatever it was, and

6  then there was the others that were -- Hunter worked

7  through with me.  Put it that way.

8      Q.  What do you mean by Hunter worked through with

9  you?

10      A.  So prior to engaging in the -- the lawsuit,

11  I -- because my ex-partner and lawyer stole everything I

12  had, I went back to work.  And it became very clear in

13  one of the very first meetings with Lloyd Kelley --

14  actually, not one of -- the very first meeting with Lloyd

15  Kelley that I was the person that held a super-voting

16  preferred stock that controlled the entity that was in

17  question.  Lloyd said, "You're the guy in the room that

18  has the case," and proceeded to focus on my claims.

19          It was pretty apparent that without my

20  claims, their case was weaker.  I wouldn't say it was

21  entirely weak, but it was weaker.  So the agreement that

22  I had with Robert Rhodes and Hunter Carr at the very

23  beginning of it was, "If I'm going to put all of my time

24  into this and not go get a job, I -- I -- my family has

25  to be able to eat.  So we've got to land on some kind of

1 | a number that I can -- I can receive in some form of a

2 | compensation so that I can engage in this, because I have

3 | no money to pay for this."

4 |          The agreement early on was that we would

5 | end up splitting third-third-third amongst the three of

6 | us, as long as they covered all the expenses and covered

7 | my salary during the case.  That was never paid, and in

8 | lieu of that payment tried to massage the expenses, which

9 | gets me right back to my earlier point of he's very

10 | creative with expenses.  And he put the amount that I

11 | would have been able to have, if they would have lived up

12 | to their end of the bargain, in the expense number.

13 |          In doing that, in his mind that made me

14 | whole.  However, I ended up living on credit cards,

15 | liquidation of everything I had, the sale of my home, a

16 | personal loan from one of my lawyers, to be able to make

17 | it through to the end of that case.  So all that

18 | reimbursement did was offset all of the debt that I

19 | incurred because they didn't live up to their end of the

20 | bargain.  I still divided it with them a

21 | third-third-third at the end, one of the biggest regrets

22 | of my life.

23 |    Q.  And the Excel -- and y'all were able to get a

24 | settlement in that case?

25 |    A.  We did.



Scott Hepford                                          Pages 45

1    Q.  And what -- approximately $18 million?

2    A.  I don't know if that was the number.

3    Q.  Okay.  Was it more or less than that?

4    A.  It's probably very close.

5    Q.  Okay.  So you took one-third of that?

6    A.  No.

7    Q.  Okay.  What happened?

8    A.  It was a contingency case.

9    Q.  Okay.

10   A.  We had over -- I would say 50 percent of it

11   consumed by the lawyers.  Hunter produced a document that

12   showed that I received 7 million, and him and the others

13   much lower than that.  The document has played out to

14   haunt me in other cases because folks think I have a lot

15   more than I did.  And I am 100 percent positive that if

16   it ever came out, after you really did a financial

17   forensic audit of his true expenses and what he claimed,

18   that Hunter ended up with tremendously more, probably

19   several hundred thousands dollars more than me and

20   Mr. Rhodes.

21   Q.  Where did the -- when the settlement was paid,

22   what account did it go into?

23   A.  I believe Hunter created some kind of a --

24   either a shell company or a -- one of the existing

25   entities that he had -- I don't remember the exact name



1  of it.  But, again, he channeled it in there to then

2  distribute it across the rest of -- the rest of the

3  plaintiffs and the folks that were involved.

4      Q.  Did it initially go to the attorneys?

5      A.  I -- I would assume it did.

6      Q.  Okay.  IOLTA trust account?

7      A.  Yes.

8      Q.  Okay.  Going back to the Excel spreadsheet that

9  you submitted for your expenses, was there backup

10 receipts and information for the information that was on

11 the Excel spreadsheet?

12     A.  For the items that were actual cash, yes.

13     Q.  Were there some for which there was not?

14     A.  Yeah.  The entire back-due salary.

15     Q.  Back-due salary part?  Okay.

16     A.  Yes.

17     Q.  And that agreement -- you said there were some

18 other peripheral persons that contributed to the expenses

19 besides you and Mr. Rhodes and Hunter Carr.

20     A.  Uh-huh.

21     Q.  Were they aware of that agreement where you

22 were going to be paid your salary in the interim?

23     A.  I don't know if they were.  I don't believe so.

24     Q.  And who were those folks that you remember, the

25 peripheral folks?



1      A.   I believe Bob Sonfield and Bill McIlwain.   The

2  others I don't recall.

3      Q.   So did you contribute any funds for the

4  expenses in the matter?

5      A.   I did.

6      Q.   How much did you contribute?

7      A.   I don't recall.   I'd have to go back and look.

8      Q.   More or less than $100,000?

9      A.   No.   Less.

10     Q.   Do you know how much -- how much Hunter Carr

11 contributed?

12     A.   No.

13     Q.   What about Robert -- Mr. Rhodes?

14     A.   No.

15     Q.   Do you know what the expenses were in the case?

16     A.   At the time, Hunter showed up with a number.   I

17 don't know it now.

18     Q.   What was the number then?

19     A.   I -- I don't recall.

20     Q.   Okay.   What is Lunaria Holdings LLC?

21     A.   It's a Texas LLC.

22     Q.   And is -- do you own it?

23     A.   I do.

24     Q.   And what's the purpose of it?

25     A.   I'm sorry.   Let me amend what I just said.   I



1  believe the Lunaria Heritage Trust actually owns it.  I'm

2  the manager of it.

3      Q.  And that trust is for -- you're the beneficiary

4  or your family is the beneficiary of that trust?

5      A.  My wife and my children are the beneficiaries.

6  I'm not a beneficiary.

7      Q.  Okay.  And what's the purpose of Lunaria

8  Holdings Inc.?

9      A.  It was an LLC for me to try to do some

10  entrepreneurial activity.

11      Q.  And then we come to Diabetes Relief, and 2014

12  is when your involvement began?  Is that when your

13  involvement began with Diabetes Relief?

14      A.  Yes.

15      Q.  And how was it that you became involved with

16  Diabetes Relief?

17      A.  I was the co-founder of Diabetes Relief in

18  2015.

19      Q.  And who were you a co-founder with?

20      A.  Mr. Carr.

21      Q.  Okay.  And what did you do to co-found Diabetes

22  Relief?

23      A.  Built the company from the ground up.

24      Q.  When you first started with Diabetes Relief,

25  what company was in place or what was the status of it?

1      A.   You would have to be more specific.

2      Q.   There was another company which you were

3  involved in, or did Diabetes Relief already exist at that

4  point?

5      A.   I'm sorry.  Again, could you break it down?

6      Q.   Yeah.  When you came to be involved with

7  Diabetes Relief LLC, was that the name of the company, or

8  was there another company involved with it at that time?

9      A.   There was one -- I filed and paid for Diabetes

10  Relief LLC in Texas, and our legal secretary at the time

11  created that company, I believe, January 20th of 2015.

12  There was no -- it was a clean, brand-new entity in

13  January.

14      Q.   And what was the initial idea or understanding

15  between you and Hunter about the creation or co-founding

16  of Diabetes Relief?  What were y'all going to do?

17              MR. CAMPBELL:  Objection, form.

18      A.   I'm not sure I understand the question.

19      Q.   (BY MR. COLLINS)  I mean, what was the basic

20  understanding between you and Hunter at that point?

21              MR. CAMPBELL:  Objection, form.

22      A.   Are you talking about cap table or are you

23  talking about just in -- that's a pretty broad question

24  so --

25      Q.   (BY MR. COLLINS)  No, I understand.  I mean,



1  I'm looking for a bird's-eye view.  What was -- what were

2  y'all going to do with this?

3      A.  Okay.

4      Q.  And then break it down after that and follow

5  its progression.

6      A.  We were splitting the company 50-50 from a cap

7  table perspective.  We were contributing equally 50-50,

8  so all things associated to it.  We were trying to figure

9  out how to take a medical technology to the market.

10     Q.  And who -- did you present this idea to Hunter

11 or did Hunter present this idea to you or how did that

12 happen?

13     A.  You talking about the Diabetes Relief company?

14     Q.  Yeah.

15     A.  Hunter and I were already working on a project

16 at that point in the same space.  I don't recall who came

17 up with, "We need to put this -- all of -- all of our

18 efforts into a new, different company."  I don't -- I

19 don't recall.

20     Q.  And what project were y'all working on before

21 the formation of Diabetes Relief?

22     A.  We were looking at a distressed asset called

23 Health Restoration Partners and trying to figure out if

24 there was any merit to it, trying to figure out if there

25 was an opportunity, if it was -- if it was -- if it was a

1  viable venture that we were interested in putting our

2  time and money into.

3      Q.  And Health Restoration Partners was offering

4  some type of diabetes treatment.  Correct?

5      A.  Yes.

6      Q.  Okay.  And what was your understanding of the

7  treatment they were offering at the time?

8      A.  That it was an absolute catastrophic disaster.

9      Q.  Okay.  What exactly were they offering, though?

10     A.  Health Restoration Partners was an entity that

11  was trying to be in the healthcare space, and it was

12  owned by an operational -- I think he sold pipe or

13  something in the oil and gas industry, didn't know

14  anything about medical, and a pastor at a -- at a church

15  that was nearby their -- the location, again, who didn't

16  understand anything about medical.

17             And over the course of many months we were

18  able to uncover that they had probably been taken

19  advantage of by a bad actor based out of California that,

20  I guess, got them into the space.  The medical records

21  were terrible, based on the consultants we brought in to

22  look.  The billing practices were a debacle.  Their

23  operational systems and processes were just very --

24  beyond distressed asset is probably a good way to

25  describe what it -- what it was.

LEXITAS
APPX0978

INSU_PI_001257

1     Q.   What assets did the company have?

2     A.   They had a few recliners, some ratty office

3  furniture, some contracts with entities that were no

4  longer in good standing and a few medical devices and

5  what turned out to be a tremendous amount of liability.

6     Q.   What were the medical devices they had?

7     A.   That's -- a metabolism breathing machine.

8  There was, I think, two of those.  And they had a few

9  infusion pumps, I guess, if you want to call them that.

10     Q.   And were they actively doing diabetes

11  treatments during that time period prior to 2014?

12     A.   Yes.

13     Q.   What treatment were they doing?

14     A.   I think they referred to it as the artificial

15  pancreas treatment.

16     Q.   And what did that entail?

17     A.   A dose of insulin every certain number of

18  minutes on every patient, no matter sort of who they were

19  or what their -- if they were type 1 or type 2 or

20  whatever, so kind of a one-size-fits-nobody medicine.

21     Q.   So what did you and Hunter decide to do?

22  Y'all -- working in this project, what capacity were you

23  working in this project with this company?

24          MR. CAMPBELL:  Objection, form.

25     A.   Can you break it down?

LEXITAS
APPX0979

INSU_PI_001258

1      Q.  (BY MR. COLLINS)  Yeah.  I mean, you -- you

2  indicated earlier that you were working on a project

3  prior to forming Diabetes Relief, and you identified this

4  company.  Who was doing what between you and Hunter at

5  the time?  What were y'all doing?

6      A.  So the first major obstacle we had with Health

7  Restoration Partners is that we couldn't even get

8  material for due diligence.  So the first effort was

9  trying to figure out a way to even be able to get to

10  information to be able to determine whether there was

11  something viable or not.

12      Q.  Y'all were looking to buy it or something?

13      A.  We weren't sure at the time.

14      Q.  Okay.  All right.  And then what did y'all

15  ultimately decide?

16      A.  We decided to make an offer with a lot of

17  contingencies or stipulations so that we could get out

18  the information to be able to determine if there was any

19  value.  And so Hunter came up with a formula where -- I

20  don't remember the exact formula, but it -- the basis of

21  it was, "If you really put in this much like you said you

22  did and if you only took out this much like you said you

23  did and there's only this much liability, then we'd be

24  willing to pay you X," with the understanding that we

25  would have time -- and I don't remember the amount of

1  time -- but time to go in and go search for all that

2  ourselves, at our own cost.

3              So we go forward with that and started

4  digging, and that formula flipped upside down for the

5  sellers.  They had so much liability, they put in way

6  less than they said they did, and they took out more than

7  they said they did.  So in the end it would have been a

8  scenario where they would have had to pay Hunter and I --

9  I don't remember the number, but I remember it being

10 staggering, like $800,000 or something.

11     Q.  What do you mean pay?  Like, you know, to take

12 over the business and carry it forward?

13     A.  Yes, yes.  Because the asset was so distressed

14 that the liabilities far outweighed the gain.

15     Q.  So what did y'all decide to do instead of that?

16     A.  That was executed.

17     Q.  Huh?

18     A.  That was executed.

19     Q.  Okay.  So what actually was executed?

20     A.  The effort to start the due diligence and to

21 get their data to be able to do our own internal audit.

22     Q.  And then after you did that, what happened?

23     A.  We found a catastrophic mess, from medicine to

24 process to charting to everything.

25     Q.  And then y'all decided to form Diabetes Relief?

1      A.  Yes.

2      Q.  And at that point what was your ideas about

3  patents or trying to develop IP for the company?

4      A.  As I started digging into what the people

5  behind Health Restoration Partners were claiming, I kept

6  finding things that just did not make any sense.  And at

7  the time I didn't know very much about diabetes other

8  than my personal family and -- and Hunter, who's -- who's

9  a diabetic.  And the more we dug, the more we found

10  missing puzzle pieces.

11            And part of our due diligence, we paid

12  experts -- a variety of different healthcare people and

13  healthcare lawyers to help us fill in those puzzle pieces

14  that were missing.  By the time we got to the end of that

15  effort, to make it simple, we had identified and/or

16  discovered and/or created enough that it deemed us going

17  and protecting it and getting our own patents.

18      Q.  Okay.  So the experts you paid for, did that

19  predate the creation of Diabetes Relief LLC?

20      A.  Yes.

21      Q.  Okay.  And what experts did y'all retain?

22      A.  Healthcare lawyers, very reputable healthcare

23  lawyers, pharmacologists, doctors of pharmacology,

24  epidemiologists, internal medicine specialists.  We also

25  brought in revenue cycle managers to advise us on -- or

1  consult us, I guess, on how medical billing works, and

2  also transactional attorneys.

3      Q.   And were these individuals paid?

4      A.   Yes.

5      Q.   And who paid them?

6      A.   Hunter and I.

7      Q.   Did y'all split those 50-50?

8      A.   We did.

9      Q.   And how much did you pay?

10     A.   I can't answer that.  I don't know.  It's a

11  long time ago and those are a lot of individual people.

12     Q.   More or less than $100,000?

13     A.   More.

14     Q.   200,000?

15     A.   More.

16     Q.   300?

17     A.   More.

18     Q.   400?

19     A.   You're talking about the time before --

20     Q.   Yeah, the time before the creation of Diabetes

21  Relief.

22     A.   Probably not 4.

23     Q.   Okay.

24     A.   But we were probably in 200.

25     Q.   Each?

1        A.   Probably.  But, again, I don't know.

2        Q.   Okay.  But you paid approximately that much.

3   Right?

4        A.   Hunter and I were matched dollar for dollar.

5        Q.   Okay.  And -- and that's my point.  You're

6   saying that you paid approximately $200,000 to these

7   individuals prior to the creation of Diabetes Relief in

8   doing this due diligence and trying to come up with this

9   company.  Right?  And you would expect that Hunter paid

10  the same amount.  Correct?

11       A.   You asked about three questions in the middle

12  there.

13       Q.   Okay.  That's all right.

14            First of all, you -- prior to the creation

15  of Diabetes Relief, you paid approximately $200,000 to

16  these healthcare lawyers, pharmacologists,

17  epidemiologists, some medical people, and a transactional

18  attorney and medical attorneys.  Right?

19       A.   Let me help you out.  My lawyer's going to

20  throw something at me.

21       Q.   Yeah.

22       A.   I don't know the exact amount.

23       Q.   Okay.

24       A.   So don't hold me on the 2.  But Hunter and I

25  equally paid dollar for dollar on all of that that was



1  done prior to Diabetes Relief.

2      Q.  And I'm not trying to hold you to the 2.  But

3  it's more than 100.  Right?

4      A.  I believe it is, yes.

5      Q.  Okay.  Probably close to 2?

6      A.  Probably.

7      Q.  Give or take.  Right?

8      A.  Yes.

9      Q.  Okay.  That's -- that's all I really, you know,

10 need to know at this point.

11            And at that point it's your -- if you paid

12 that much, that's -- you would expect that Hunter paid

13 that much too?

14     A.  Yes.

15     Q.  Okay.  All right.  And then after Diabetes

16 Relief was formed -- I believe you said the understanding

17 was you and Hunter were going to go into this as 50-50.

18 Correct?

19     A.  Correct.

20     Q.  And, basically, when we say 50-50, generally

21 division of labor, money, capital, everything.  Right?

22     A.  Yes.

23     Q.  Okay.  In 2014 do you have an understanding of

24 how much capital that was put into Diabetes Relief?

25     A.  I can't answer your question the way you asked

1   it.

2       Q.  Okay.  And why can't you answer it the way I

3   asked it?

4       A.  Diabetes Relief didn't exist in 2014.

5       Q.  Okay.  Oh, 2015.  I'm sorry.  Okay.

6            So 2014 was this period where we're talking

7   about you were looking at the other company.  July -- I

8   mean January 20th, I think, of 2015 is when Diabetes

9   Relief was created.  After that date, once it was

10  created, how much was put into Diabetes Relief to

11  capitalize the company and go forward in 2015?

12      A.  All of 2015?

13      Q.  Yeah.

14      A.  I don't know.

15      Q.  Okay.  Do you remember any amounts that were --

16  of money that was -- that was put into the company to

17  create it?

18      A.  I do.

19      Q.  And how much was that?

20      A.  I believe Hunter and I both did $1,000,

21  something like that, to capitalize the bank account,

22  just make sure that it's going.  Again, it's probably

23  directionally correct.  I don't know if 1,000 is correct.

24      Q.  Uh-huh.

25      A.  And then every time there was a payroll, every

1   time -- every time we had to pay rent, we were -- the

2   first year, we were writing a lot of checks.

3       Q.  And how much was payroll, approximately,

4   running you in 2015 --

5       A.  I don't recall.

6       Q.  -- a month?  Do you know?

7       A.  I don't recall.

8       Q.  30, 40, 50 thousand bucks?

9       A.  I don't know.  That was Hunter's area of the --

10  of the company.

11      Q.  Okay.  But you were writing checks.  Right?

12      A.  No.

13      Q.  Okay.  Where was the money going to pay

14  these -- to pay payroll and fund operations?

15      A.  The company bank account.

16      Q.  Okay.  And how did the money get in the company

17  bank account?

18      A.  Hunter and I both deposited money into the

19  company bank account.

20      Q.  Okay.  How much did y'all deposit into it?

21      A.  I -- I don't know.

22      Q.  Was it more than $100,000?

23      A.  Yes.

24      Q.  More than 200?

25      A.  Yes.

LEXITAS
APPX0987

INSU_PI_001266

1    Q.  300?

2    A.  I would assume so.

3    Q.  400?

4    A.  I believe so.

5    Q.  500?

6    A.  I don't know.

7    Q.  And that was total, right?  Or individually?

8    A.  I don't know.  I'd be speculating.

9    Q.  Okay.  For 2015 is there any doubt in your mind

10   that both of you contributed equally to the money that

11   was put in the bank account to fund operations?

12   A.  Yes.

13   Q.  There's a doubt in your mind?

14   A.  Yes.

15   Q.  Okay.  And what's that -- what's the foundation

16   of that doubt?  Or "basis" is a better word.

17   A.  In the process of funding the company when it

18   needed capital, the process was way less formal than I

19   would have liked.  And Hunter and I at the time had

20   multiple entities, not just this one that we're talking

21   about.  And so there would be a bit of an, "Oh, well, you

22   pay that one and I'll pay this one."  And it's roughly

23   close.

24   Q.  Okay.

25   A.  And so I believe that there were -- there were

1   times where -- where it wasn't even, and there would

2   typically be time to have the other catch up.

3       Q.  And what multiple entities did y'all have in

4   existence in 2015?

5       A.  It's a long list.

6       Q.  Okay.  We -- we can get to some documents

7   later.  I mean, were they all related to Diabetes Relief

8   or were --

9       A.  Not all of them.

10      Q.  Okay.  And why did y'all have to have multiple

11  entities?

12      A.  That's a great --

13              MR. CAMPBELL:  Objection, form.

14      A.  That's a really good question.

15      Q.  (BY MR. COLLINS)  Did you form the multiple

16  entities?

17      A.  I did not.

18      Q.  Who formed the multiple entities?

19      A.  Carol Wilson.

20      Q.  And what was Carol Wilson's role, for the

21  ladies and gentlemen of the jury?

22      A.  Carol Wilson was our executive secretary.

23      Q.  And who was telling her to form these multiple

24  entities?

25      A.  It would have been Hunter telling her.

1      Q.   And how do you know Hunter was telling her to

2  do that?

3      A.   I don't recall personally ever telling her to

4  create the entities.   However, I don't recall at that

5  time any entities being created that I wasn't already

6  aware of through discussion with Hunter.   So if I didn't

7  tell her, then he probably did.

8      Q.   And in 2015 how many people were working for

9  Diabetes Relief?

10     A.   Approximately seven.

11     Q.   And who were they?

12     A.   I believe Melanie St. Laurent, Jen -- I'm

13  drawing a blank on her last name.

14     Q.   Jen?   Okay.

15     A.   Jennifer; she's a medical assistant.   One

16  registered nurse.   Two receptionists: one, Elise Massey;

17  the other one Ginger.   I don't remember Ginger's last

18  name.   And a billing collector named Laura.   And Carol

19  Wilson.

20     Q.   And was the clinic running in 2015?

21     A.   Yes, sir.

22     Q.   Okay.   Who was the doctor in charge of the

23  clinic?

24     A.   You'd have to break it down by month.

25     Q.   Okay.   In the spring of 2015.



1        A.   I believe it was Dr. Dunn.

2        Q.   Okay.   Why did Dr. Dunn leave?

3              MR. CAMPBELL:   Objection, form.

4        A.   I don't know.

5        Q.   (BY MR. COLLINS)   And what was the next doctor?

6        A.   I don't know the timing, so I don't know.

7        Q.   Okay.   Just tell me who are the other doctors

8   that you remember working in 2015.

9        A.   Dr. Lewis didn't come on until 2016 or 2017, so

10  there's -- there's a gap in the timeline that I can't

11  remember.   And we would not have had a gap in medical

12  doctors, so I would just -- I would need to refresh

13  myself with the -- with the company records.

14       Q.   And in 2015 what efforts were made by the

15  company or you and Hunter to obtain patents or

16  identify -- yeah, to obtain patents?

17       A.   We filed multiple patents that year.

18       Q.   What role did you play in the filing of those

19  patents?

20       A.   Instrumental in the actual initial interview on

21  what it is and how it works and all the mechanisms of

22  action and all the dosing and the workflows and

23  everything associated to actually conducting the

24  modality.   And then in that process there was a

25  tremendous amount of homework that goes into developing



1   scenarios that get written into those patents to prove

2   out certain top and bottom end measures of the -- of the

3   thing you're trying to protect.

4                   And so there was many, many hours working

5   with Carol Wilson, and sometimes Hunter Carr as well,

6   developing the scenarios that end up going into the

7   patent.  There are drawings that are always submitted

8   with patents.  I created all of them and then continued

9   to enhance and improve as the process carried out, and

10  then was instrumental in final reviews, both in office

11  with the patent attorneys, as well as, you know,

12  personally involved there at the office.

13      Q.  In 2015 what pumps were y'all using to pump --

14  for the process that y'all were attempting to patent?

15      A.  You're going to have to break that year down.

16      Q.  In 2015 what were the different pumps that you

17  tried -- utilized to -- for your process that you were

18  attempting to patent?

19      A.  The pump that we utilized is the Zyno

20  InfuTronix pump.

21      Q.  Was that from inception or did y'all have other

22  pumps that you tested or tried to use?

23      A.  There was a pump that was associated to the --

24  Health Restoration Partners called the Bionica pump.  And

25  later that was proven by a third party to be inferior and

1    potentially dangerous.  We used the Zyno pump in Diabetes

2    Relief.

3        Q.  And Mr. Carr located Zyno -- the Zyno pumps?

4        A.  I believe he -- I believe he did.

5        Q.  Did he negotiate the initial deal with Zyno on

6    the provision of those pumps for your process --

7        A.  He was --

8        Q.  -- for Diabetic -- Diabetes Relief?

9        A.  He was part of it.

10       Q.  Did you participate in that negotiation?

11       A.  I did.

12       Q.  And who did you interact with in the

13   negotiation of those pumps?

14       A.  We interacted with Gary Foster and Chao, their

15   CEO.

16       Q.  And for the ladies and gentlemen of the jury,

17   when were y'all able to obtain the patents for the

18   process for the services that were being offered by

19   Diabetes Relief?

20       A.  I believe our first patent issued in 2017, and

21   our second patent issued in early 2020.  I believe it was

22   January.

23       Q.  And before you had the patents, did that stop

24   you from pursuing business operations for Diabetes

25   Relief?



APPX0993

INSU_PI_001272

1       A.  It did not.

2       Q.  Okay.  In 2015 what type of business

3  opportunities were you pursuing on behalf of Diabetes

4  Relief?  And you can categorize them.  Like, what type

5  of -- how were y'all going to make money?

6       A.  We were trying to make the -- the location --

7  the only location profitable.

8       Q.  To the clinic?

9       A.  Right.

10      Q.  From the operation of the clinic?

11      A.  Yes, sir.

12      Q.  And so the focus in 2015 was the operation of

13  the Diabetes Relief clinic here over -- in Houston.

14  Right?

15      A.  I would say that's fair.

16      Q.  Okay.  And when did you expand to the possible

17  operations of other clinics or opening clinics in

18  different parts of the nation?

19      A.  It depends on how you define "when did you

20  start."

21      Q.  Okay.  When did y'all have the first idea to

22  open up more than one clinic?

23      A.  I'm sure back in 2014.

24      Q.  In 2014?  Okay.  So that was always the plan,

25  was go more than one clinic.  And it would be fair to say

1   to get the Houston clinic up and running and use it as a

2   prototype to expand?

3       A.  That's fair, yes.

4       Q.  Okay.  And when did y'all first start taking

5   active steps to expand into other markets or open other

6   clinics?

7       A.  I'd make the argument that the foundation

8   itself is what enables us to do that.

9       Q.  Okay.

10      A.  Is it fair to say somewhere between 2014 and

11  2019 or something that the opening of the clinics and

12  pursuing that business model was becoming problematic for

13  Diabetes Relief?

14              MR. CAMPBELL:  Objection, form.

15      A.  I'm not -- I'm not sure how to answer it.  Try

16  one more time.

17      Q.  (BY MR. COLLINS)  I mean, the opening of

18  clinics, was it -- did it ultimately prove to be more

19  difficult than originally anticipated?

20      A.  Yes.

21      Q.  Okay.  And one of the hurdles or difficulties

22  with opening the clinics and operating the clinics -- one

23  would be the actual billing itself.  Right?

24      A.  100 percent.

25      Q.  Okay.  And, you know, I'll put another general



1  category of just getting the locations and getting the

2  personnel to run those locations.  Right?

3      A.  (Moving head up and down.)

4      Q.  The logistics of it?

5      A.  I would agree, yes.

6      Q.  Okay.  I mean, there might be a better word but

7  kind of the logistics of opening a new facility?

8      A.  Yeah.

9      Q.  Okay.

10              MR. CAMPBELL:  When -- whenever you're --

11              MR. COLLINS:  Yeah, we can go ahead and

12  take a break now.  This is a good time to stop.

13              THE WITNESS:  Thank you.

14              (Lunch recess at 1:20 P.M.)

15              THE VIDEOGRAPHER:  Okay.  So we are back on

16  the record at 2:14.  You may proceed.

17              (Exhibit 1 marked)

18      Q.  (BY MR. COLLINS)  I'm going to hand you what

19  I'm going to mark as Exhibit Number 1 to your deposition.

20  No stickers, but I want you to look at that just real

21  quick and see if you can identify the document for me.

22              MR. CAMPBELL:  Do you have a copy for me?

23              MR. COLLINS:  Yeah, I sure do.

24      Q.  (BY MR. COLLINS)  And, in particular, what --

25  the Bates is going to be Carr 00013, is what I want to



1  ask about.

2       A.  Okay.  What page?

3       Q.  Yeah, 00 -- Carr 00013.

4       A.  Okay.

5       Q.  And do you generally recognize this document as

6  the SBA loan package that was submitted to the SBA on

7  behalf of Diabetes Relief?

8       A.  No.

9       Q.  Why not?

10      A.  Because I've never seen this package all

11 together.

12      Q.  Okay.  Fair enough.

13           If you'll look at Carr 00013 through

14 00150 -- 15, does that appear to be your -- Scott Alan

15 Hepford's personal financial statement for disaster

16 programs?

17      A.  It does.

18      Q.  And on page 00 -- on 15, is that your

19 signature?

20      A.  Yes, it is.

21      Q.  Okay.  Have you seen this document before?

22      A.  I have seen this document before.

23      Q.  Okay.  Do you agree with the contents of this

24 document?

25      A.  I do.

1      Q.   Okay.  This portion of the document, 13 through

2  15?

3      A.   Yes.  I -- I didn't submit any of this.  Hunter

4  was the one that was running it and submitted all the --

5  this is the signatures on all of it except for this

6  section right here, these three pages.

7      Q.   Okay.  And with respect to this loan -- this

8  personal financial statement, did you review and put

9  those numbers in, or did someone else put those numbers

10  in?

11      A.   I -- I don't know.

12      Q.   Okay.  And if you'll look by your signature in

13  the paragraph immediately above that, will you read that

14  paragraph, "By signing this form."  What does that say?

15      A.   Do you want me to read it --

16      Q.   Yeah, read it --

17      A.   -- for the record?

18      Q.   -- now -- yeah, read it into the record.  I'm

19  going to ask you a question.

20      A.   "By signing this form I certify under penalty

21  of criminal" -- sorry, I don't have glasses and my arms

22  aren't long enough -- "criminal prosecution that all

23  information on this form and any additional supporting

24  information submitted with this form is true and complete

25  to the best of my knowledge.  I understand that SBA will

1    rely on this information when making decisions regarding

2    an application for a loan from SBA."

3        Q.  So consistent with that affirmation to SBA as

4    of 3/25/2020, the numbers and the information provided in

5    the financial statement for yourself were true and

6    accurate?

7        A.  To the best of my knowledge at the time.

8        Q.  Okay.

9        A.  The issue with the question prior was there was

10   a problem submitting and they wouldn't take it, and I

11   believe I got some assistance from Carol.

12       Q.  What wouldn't they take?

13       A.  It was a technical problem trying to actually

14   get it to go into the system.

15       Q.  Okay.

16       A.  So I don't know if I pushed send or she pushed

17   send.

18       Q.  Okay.  No, I understand that.  But as far as

19   the numbers that are on there, you -- those are accurate

20   and you reviewed them at the time.  Right?

21       A.  To the best of my knowledge.

22       Q.  Okay.  And then -- so let's look at the assets

23   column.

24       A.  Okay.

25       Q.  The first one is cash on hand.  It's



1  approximately $4,000.  That was correct, right?

2       A.  That was, yes, pulled from a bank, yes.

3       Q.  Okay.  How many bank accounts did you have at

4  that time?

5       A.  I don't know.  One that we used mainly.  I

6  don't -- I don't know.

7       Q.  Okay.  But personal bank accounts, one.  Where

8  did you bank?

9       A.  Chase.

10      Q.  Okay.  And does this reflect your personal

11 banking account balance?

12      A.  Yes, sir.

13      Q.  Okay.  And then the IRAs, retirement accounts,

14 you had -- that accurately reflects the value of those at

15 that time?  4,750?

16      A.  The 4,750 reflects what's in the trust for my

17 wife and kids.  And I didn't know of a better place to

18 put it on here so --

19      Q.  Okay.

20      A.  -- that's where it went.

21      Q.  And then the accounts and notes receivable of

22 62,350, what -- where did that number come from?

23      A.  I created an Excel spreadsheet of the different

24 things that made up that exact number to generate that

25 number, and I spent quite a bit of time tracking down

1  dates and things to make sure that I was being accurate.

2      Q.  At that time who owed you money, I guess, is my

3  question, to the best of your recollection?

4      A.  Best of my recollection, the two people that --

5  that owed -- that Hunter mentioned yesterday in his

6  deposition, Jim Maddox being one of them; the other one,

7  Linda Hawk.  In addition to that, there was -- oh, there

8  was money out to -- I don't want to say something wrong.

9  I -- I don't remember.  Sorry.

10     Q.  What did Jim Maddox owe you money for?

11     A.  Jim Maddox is a personal friend of Hunter's,

12 somebody that I had come to know through Hunter.  And he

13 was in -- kind of falling on hard times and needed --

14 needed a personal loan to -- to pay his bills.

15     Q.  Okay.

16     A.  Hunter and I -- I believe Hunter and I

17 contributed equally to that loan to him.  I think we both

18 put in --

19     Q.  Did y'all have a written contract with him on

20 that?

21     A.  I don't recall if we did.

22     Q.  Okay.  Linda Hawk.  Explain to me the nature of

23 that obligation she owed you.

24     A.  My goodness.  Somehow Hunter knew Linda Hawk,

25 and she had a pretty wild tale about how her family are



1  the descendants of some major oil family in the United --

2  or in Texas, and they had been duped out of their oil

3  rights across several different oilfields and that with

4  the help of our lawyers and some of our assistants and

5  maybe some consulting, that we may be able to help them

6  get back this huge thing that they were due.  They just

7  needed some money to, again, pay their bills and -- so

8  somehow all the details -- but somehow in that, Hunter

9  and I ended up loaning, again, you know, a sizable amount

10 of cash -- $25,000, if I remember right, to them.

11            And -- and Hunter effectively, since it was

12 his relationships, predominantly did the interacting with

13 both groups that was involved, in some meetings from time

14 to time.  But effectively bad debt, I would suppose, at

15 this point.

16     Q.  What about the debt to Jim Maddox that -- that

17 he owes?

18     A.  He still owes it.

19     Q.  Okay.  Do you consider that bad debt too?

20     A.  I don't know.

21     Q.  Okay.

22     A.  It's Hunter's connection.  So I don't -- I

23 haven't reached out to them.  I have no idea if those

24 people intended on paying me back since they're Hunter's

25 friends.

1        Q.   And then the 1.547 in stocks and bonds, what

2   did that -- what was that comprised of?

3        A.   So it's comprised of, again, the spreadsheet

4   that I created, calculating the -- the different

5   estimated values that I have on the different -- the

6   different equity positions I had in different companies.

7   Even though it says stocks and bonds, Hunter and I had a

8   conversation about it.  And since we have ownership

9   units, I -- that's where I put it.

10       Q.   And what companies did you have an equity

11  position in at the time of this?

12       A.   At the time of the -- at the time of this,

13  the -- I'm just going to say the Diabetes Relief

14  companies.  If you ask me to dig deeper, we're going to

15  be here a long time.

16       Q.   Okay.  That's fine.

17       A.   So it's a lot -- it's a lot of companies.

18            And then some -- some small positions in a

19  couple other privately held companies.

20       Q.   What were the names of those?

21       A.   I'm not -- again, I'd have to consult the

22  spreadsheet.  I don't know if there was anything for

23  Lunaria Holdings because there's not much going on there

24  but some.  Also with a company on the West Coast --

25  again, the name of the company is escaping me now because

1   it's super tiny.  Yeah, I -- again, I'd have to -- I'd

2   have to look at the spreadsheet.

3       Q.  How much of that 1.547 was comprised of the

4   Diabetes Relief-related companies?

5       A.  I would say a significant portion represents 41

6   percent of my ownership of that entity.  So, you know,

7   better -- maybe a million bucks or so.

8       Q.  Okay.  And -- and how did you come up with the

9   valuation for the ownership interest you had in Diabetes

10  Relief and related companies in this 3/25 statement?

11      A.  I consulted with Hunter, asked him what he was

12  doing on that.  He gave me a very vague answer and said,

13  "Just come up with something."

14          I didn't feel comfortable with that.  So I

15  went back and I started trying to assess how much cash

16  had gone in and kind of the distress of the entity at

17  that point, and I came up with my best guess I could come

18  up with at the time.

19      Q.  And how did you go about that thought -- I

20  mean, what was the process or formula that you used to do

21  that?

22      A.  I'd have to look at the formula to answer that

23  question.

24      Q.  Okay.  Where did you keep the spreadsheet?

25      A.  I'm sure on a computer.

1     Q.   Are you aware of whether or not you've produced
2  this in this litigation --
3     A.   Whether --
4     Q.   -- this spreadsheet?
5     A.   I -- I don't know.  I believe I produced this
6  portion but not all the rest of this that I'd never seen
7  until the litigation.
8     Q.   No.  I'm talking about the spreadsheet that
9  backed up the --
10    A.   Backed up the numbers?
11    Q.   The numbers.
12    A.   I don't know.
13    Q.   Okay.  And you believe that somewhere over a
14  million was an appropriate valuation for your share --
15  ownership share in the company as of 3/25/2020?
16              MR. CAMPBELL:  Objection, form.
17    Q.   (BY MR. COLLINS)  Can you ask that again?
18    A.   Yeah.
19    Q.   Do you believe that was a fair valuation of
20  your ownership interest in those companies?
21              MR. CAMPBELL:  Objection, form.
22    Q.   (BY MR. COLLINS)  You can go ahead and answer.
23    A.   So I'm not a professional evaluator, so I don't
24  know the answer to your question.
25    Q.   And to be fair, I mean, just for the ladies and



1  gentlemen of the jury, at the time Diabetes Relief was --

2  and the related entities, none of them were a publicly

3  traded company.  Correct?

4      A.  No, sir.

5      Q.  And so the value of the stock or the ownership

6  interest was subject to really only internal

7  interpretation.  Correct?

8              MR. CAMPBELL:  Objection, form.

9      A.  I don't know if that's true.  I would assume

10  internal and external folks have opinions.  I don't know.

11      Q.  (BY MR. COLLINS)  At the time of this

12  representation to the SBA, what was your understanding of

13  the value of the IP or patents that Diabetes Relief and

14  related entities had at that time, as of this date?

15      A.  That's a really tough question.  I don't -- I

16  want -- I want to be factual, and I don't know.

17      Q.  Okay.  What did you at this time -- you had

18  already been talking about a potential sale of the

19  company with various individuals as of 3/25/2020.

20  Correct?

21      A.  I'm not sure about your date, but we'd been

22  talking about different ways for capitalization for a

23  long time.

24      Q.  Okay.  And in that process and -- when you were

25  going through and making those presentations or coming up



1  with those numbers, what value did you tell potential

2  buyers that the IP or the, slash, patents had?

3       A.  We didn't.

4       Q.  So your testimony is you never represented the

5  value of the IP or the patents to anyone -- any potential

6  buyer --

7       A.  No.

8       Q.  -- or a person who was going to put capital

9  into the company?

10      A.  I don't recall ever valuing IP specifically.

11      Q.  What about valuing the IP as a component part

12  of the overall valuation of the company to come up with a

13  sales price?

14      A.  I don't know.  It would depend on the time

15  period that you're talking.  The concern that you get

16  into is that you give a valueless -- I mean, and it's

17  almost worse than valueless, right?  Because when you

18  have an entity that can't make payroll, has missed four

19  payrolls, has at least 960-ish thousand dollars in

20  outstanding AR, and if you add SBA and that kind of stuff

21  on top of it, another 580 -- 580,000, and you have a

22  corporate lockup and you're -- got 85,000 in the bank and

23  150-plus in monthly nut to keep the company alive, that

24  you are on the verge of bankruptcy.

25              It's almost more akin to a scenario where

1  two very poor people are getting a divorce, and you're in

2  a scenario where who's arguing -- and who gets the debt,

3  right?  Who gets the credit card debt.  It doesn't matter

4  if there's high hopes and intentions when all there is is

5  debt.

6          So it may have been a shining star, may

7  have had hopes and dreams, but at different points in the

8  time period we're talking about, you're ranging from

9  optimistic to valueless.

10          MR. COLLINS:  Okay.  I'm going to object to

11  the nonresponsiveness to that.

12     Q.  (BY MR. COLLINS)  But I'll -- I'll follow up

13  with this.  You have to agree the company, even as of

14  3/25/2020, had value.  Right?

15     A.  There was still hope at this time.  I would say

16  there was value.

17     Q.  Okay.  And even in a bankruptcy, are you aware

18  that basically they'll take the debts and liabilities --

19  much like a balance sheet that you just provided right

20  here -- and then they'll list the assets, right, of the

21  company?

22          MR. CAMPBELL:  Objection, form.

23     Q.  (BY MR. COLLINS) I mean, that's a basic --

24  that's where you start with this.  And one of the assets

25  would have been the IP.  Right?



INSU_PI_001287

1      A.   Is that a question?

2      Q.   Yeah.   I mean, one of the assets of this

3  company was the IP?

4      A.   Yes.

5      Q.   And as of this time probably the most valuable

6  asset that the company had.   Right?

7      A.   No.

8      Q.   What was the most valuable asset?

9      A.   So -- try and explain the answer.   My

10 experience walking this planet, most people put a lot of

11 value on the invention.   They don't put very much value

12 on the ability to scale and actually deploy the thing.

13 Right?   And an invention without the ability to

14 operationally deploy it efficiently is valueless.

15           So it's hard.   Because on one hand my

16 answer would be the know-how, the show-how, the --

17 everything that goes into being able to do something with

18 it.   And the other side of it is a lot of that is all

19 messed up, too, at the company at this time.   It's sort

20 of the age-old "a basketball is just a basketball until

21 you put it in the hands of Michael Jordan."   Right?

22     Q.   That's correct.

23     A.   And -- and I'd argue that not Hunter and not I

24 and definitely not Diabetes Relief was Michael Jordan.

25     Q.   But, I mean, do you disagree with me that the

1    Smith Group and their investors, with the IP -- to take

2    that and deploy it in the way that you were talking

3    about?

4        A.  Can you ask your question one more time?

5        Q.  Yeah.  I mean, you believe the Smith Group,

6    they could deploy that -- take that IP and deploy it.

7    Right?

8        A.  No.

9            MR. CAMPBELL:  Objection, form.

10       Q.  (BY MR. COLLINS)  Okay.  Well, wasn't the

11   deploy problem partially solved by this time with the

12   change in the business strategy of starting -- selling

13   license agreements?

14       A.  No.

15       Q.  What was the problem with deploying that?

16       A.  Can you be specific.

17       Q.  Yeah, no.  I mean, there's a --  you're saying

18   there's a deploy problem.  You have the IP.  You're going

19   to license it.  What's -- what -- what's the problem with

20   deploying that?

21       A.  That it wasn't cash flowing positive, that we

22   were hemorrhaging money, that we were completely

23   incapable internally of having a functional operation,

24   that we were being held hostage in a corporate lockup

25   scenario.  And every time we tried to put something in



1   place, the negative control that your client exerted

2   would not allow that to happen.

3       Q.  Okay.

4       A.  And that put us in that scenario that -- it

5   doesn't matter if we had saw something.  Too little, too

6   late.  The company was dying.

7       Q.  By the end of 2019 what was the license

8   agreements that -- what were the terms of the license

9   agreements Diabetes Relief were selling to people?

10      A.  I'm not trying to be difficult.  What you just

11  asked is contained in like a 24-page document.

12      Q.  Uh-huh.

13      A.  I would -- it would take me a long time to go

14  through --

15      Q.  What's the basic structure of that?  What -- in

16  the license agreement, once -- what are -- what are

17  Diabetes Relief's duties after that license agreement's

18  executed?

19      A.  30,000-foot?

20      Q.  Yeah, yeah.  Let's break it down.

21      A.  Providing the pumps and the infusion cassettes,

22  both being proprietary, basically being a reseller,

23  buying them from one party and then selling them to

24  another, and providing that party with the knowledge and

25  refresher stuff they would have learned in medical school

1   of how the body works, what mechanisms of action cause

2   insulin resistance and other things in the metabolic

3   pathways, and then showing them a set of protocols and

4   approaches and, you know, just general dynamic -- the

5   ability to utilize the modality dynamically and

6   individually based on that individual physician's

7   decision of a medical necessity on their patient.

8              So, said differently, providing a physician

9   with a new tool and an awareness of how they could use

10  that tool to accomplish something very beneficial for a

11  patient and then supporting them, supporting their needs

12  as they grow, and -- and provide care to their patient

13  base.

14     Q.  Let's just cut to the chase.  How in your view

15  did Hunter Carr interfere with your ability or Diabetes

16  Relief's ability to provide these license -- licenses and

17  the support to its customers?  How did Hunter Carr

18  prevent that?

19     A.  Hunter Carr prevented that -- wow, that's a big

20  one.  Here we go.  Hunter Carr prevented that a variety

21  of different ways.  First off, probably the most

22  catastrophic way was causing corporate lockup on a

23  regular basis, meaning prior to Stan Lewis joining and us

24  giving him a vote, our dispute resolution basically

25  boiled down to agree or fight to the death, which is the

LEXITAS
APPX1012

1 epitome of a corporate lockup.  The main reason why I was

2 an advocate of having Stan Lewis added was because we

3 needed a way to break the logjam every time Hunter would

4 exert that he knows better because he did something once

5 in a past life.

6          The other big challenge was, whether he

7 disputes it or not, he was absolutely fully in control of

8 the financial management of the company, and every time

9 myself or Dr. Lewis would try to interject or offer

10 anything or -- or express concerns or frustrations or

11 anger about something, he would absolutely bow up and,

12 you know, "Stay in your lane," constantly, doing sort of

13 the -- the typical, "This is operational and I'm taking

14 over," typical terrible human trait of projecting onto

15 others.

16          And now that I can officially tell that

17 we're never going to be business partners again, I can

18 let you know one of his tells.  One of his tells is

19 Hunter is notorious at projecting onto you what he's

20 actually doing behind the scenes.  So if he starts

21 accusing me of, "You're trying to move this, you're

22 trying to do that, you're trying to do this," all I had

23 to go do was look for the thing, and sure enough I found

24 it.

25          So this constant -- while I and others were



1  over actually working every day trying to solve problems,

2  trying to move things forward, he rolls in with this

3  "best boss of the year" mug and tries to exert influence

4  or decision on something that he's completely unaware of

5  all the facts on the ground operationally.  It made it

6  really, really challenging.

7           We endlessly tried to figure out ways to

8  delineate tasks:  "How about you cover this?  How about I

9  cover that?"  And it just never failed.  There was no

10 value being added on this side of the table, but yet

11 there's no getting him out.

12          We discussed him being bought out.  We

13 discussed his retirement, which drove him insane, for us

14 to use that term.  We discussed other ways to capitalize

15 the company, all of which were basically surrounding

16 trying to infuse capital into the company while giving

17 him a respectful exit.  He never was willing to take any

18 of those.  Each time we engaged, typically what would

19 happen is the opposing party would -- they would -- they

20 would either back off or they would be very uncomfortable

21 with how he interacted with them or he treated them.

22          And, again, since this is just my opinion,

23 to understand what it was like to work with him, go look

24 up textbook personality narcissist, right -- narcissistic

25 personality disorder, and he checks every box.  So

1   there's no negotiating with somebody like that.  You can

2   only try like crazy to appease them as best you can but

3   not give up all ground in every single thing in the

4   company.

5          That made for a very uncomfortable

6   workplace.  It made for a difficult day every day to get

7   up and go in there and try to do something, not just for

8   me but for a majority of our patients, and knowing the

9   entire time that there's a very special thing here that

10  patients are benefitting from and -- and -- and they're

11  all going to suffer if this thing fails.  The patients

12  are going to suffer.  The staff is going to suffer.  Our

13  personal investments are going to suffer.  So it's like

14  walking in a minefield and threading needles for a living

15  working with him, and it was just very, very challenging

16  and not productive.

17          One other very, very important thing, he

18  was never a fan of doing research and development and --

19  and publications.  Because in this particular space, the

20  body of work is very weak.  It's getting stronger.  We're

21  contributing to the strength of that.  But he was never

22  interested in doing that.  The closest we ever came was

23  his connection for a group that -- that did a study and

24  we got completely taken advantage of for that, his -- his

25  contact, and ultimately we ended up basically wasting



1  $50,000 doing that.

2          The other piece would be a catastrophic

3  mistake.  He does not, did not, understand how to manage

4  a medical company that has billing.  We brought a

5  consultant in very, very, very early, and he argued that

6  we need to be able to tick-and-tie every single tiny

7  thing that gets billed, and that consultant advised us

8  you don't do that in this space because you're talking

9  about potentially hundreds of codes per day.  You need to

10  go off of more of a macro view.  Hunter absolutely

11  resisted that.  We were very devastated by that because

12  we could never get allocations straight under his helm of

13  the financial group, financial folks internally and

14  externally.

15          The other -- and he also made a decision to

16  use our NPI number across multiple locations.  We argued

17  about it, didn't -- wasn't a fan of it.  Ultimately he

18  made this very, you know, screaming, yelling, argument

19  of, you know, "We can't afford to give up time to get

20  that location credentialed."  I regret this, but I

21  yielded to him.  We used the NPI in two locations.  And

22  ultimately here we are, you know, many years later doing

23  the wind-down plan finally, finally fixing all of that.

24          And I'm sure there's a ton of other things

25  but -- I'm quite surprised you asked that question.



Scott Hepford                                                    Pages 90

1     Q.  Can you point to me one license agreement -- a

2  potential customer who wanted to buy a license agreement

3  that Hunter interfered with that transaction?

4     A.  Absolutely.

5     Q.  Which one?

6     A.  He interfered with a location in Boca Raton.

7  He interfered with the location in -- just south of

8  Palo Alto, California.  Both of those are very

9  challenging to resolve.

10    Q.  How did he interfere with the license agreement

11 with the Boca Raton client?

12    A.  I was on vacation, and he drafted up the

13 license agreement based off of old versions.  He had

14 language in there that could be interpreted that there

15 was a guarantee to 100 infusions and that they were --

16 per pump, and that this person was going to have

17 territory rights to a number of states.  And there were

18 other -- other agreements that were made in there.

19           I had called him before it was executed

20 from my vacation.  He and I got into a verbal

21 altercation, to which he ended the call with, "You ain't

22 the only manager, bud.  I already made the decision," and

23 hung up on me.

24           That proved out to be absolutely a

25 nightmare with that client, that client is not active,



LEXITAS
APPX1017

INSU_PI_001296

1  and that client potentially has a claim against the

2  company because he was promised exclusive territory by

3  Mr. Carr.

4      Q.  Did he -- did the Boca Raton -- what's the name

5  of the Boca Raton client?

6      A.  I don't know the name of the client.

7      Q.  Okay.  And did they -- he executed a license

8  agreement.  Correct?

9      A.  Yes.

10     Q.  Palo Alto, California.  How did he interfere

11 with that one?

12     A.  Again, he engaged -- went into the room with

13 the physician that was here -- sorry -- in Houston for

14 training and unilaterally negotiated the agreement while

15 we were in the other side of the company actually

16 training all of the folks that were there for that week.

17            He comes out with a signed agreement, with

18 a picture of the two guys shaking hands, and what comes

19 out of that thing is -- is a whole bunch of nightmares in

20 terms of them never having to give back their devices.

21 They still have not given back their devices, which is a

22 key tenet to our entire business model in that the

23 devices need to be returned after 240 hours.  As we sit

24 here in this room, they still have not turned those

25 devices back in to us.  It puts us potentially at risk

APPX1018

INSU_PI_001297

1  with our distributor.  It puts us potentially at risk of

2  them not being able to pass their regulatory audits

3  because those aren't accounted for.

4            So those are some of the challenges, and

5  they all basically roll to the point of there's lost

6  revenue.  When we're not reselling pumps, we're losing

7  revenue.  And that's where that license currently sits

8  too.

9      Q.  But the Palo Alto client signed a license

10  agreement.  Correct?

11      A.  Yes, sir.

12      Q.  And on the Boca Raton client, how much --

13      A.  Well, sorry.

14      Q.  -- revenue has that -- how much revenue has

15  that license agreement --

16      A.  I'm sorry.

17      Q.  -- generated?

18      A.  I'm sorry.  Can we go back to your first

19  question?  I just remembered right after you asked that.

20            His execution of that license, if I

21  recall -- and I'm pretty sure this is right.  He executed

22  part of it.  He didn't execute all of it.

23      Q.  Has there been performance on that license

24  agreement?

25      A.  It depends on how you characterize

1   "performance."

2        Q.   Has Diabetes Relief provided pumps?

3        A.   Yes, sir.

4        Q.   Has the Palo Alto client paid Diabetes Relief

5   for those pumps?

6        A.   Only the original pumps.

7        Q.   Okay.  How much revenue has been generated from

8   the Palo Alto client?

9        A.   I don't know.  Whatever the initial license

10  was, plus any possible cassettes that they've ordered

11  since then.

12       Q.   What about the Boca Raton client?

13       A.   Again, I don't know the exact number.

14       Q.   Is he -- they're both existing clients of who,

15  under the license agreement?

16       A.   I wouldn't characterize it that way.

17       Q.   How would you characterize it?

18       A.   The Palo Alto location currently has a license

19  with Diabetes Relief.  The -- the Boca Raton location is

20  inactive and in the process of being terminated.

21       Q.   Is the Boca Raton entity in negotiations with

22  Well Cell or its related entities to continue the license

23  agreement in some shape, form, or fashion?

24       A.   Absolutely not.

25       Q.   At the close of 2019 how many license



1   agreements had you participated in negotiation of on

2   behalf of Diabetes Relief and its related entities?

3       A.  I couldn't give you an exact number.

4       Q.  Well, how many had been signed?

5       A.  Give me the date again.

6       Q.  As -- by the close of 2019.

7       A.  I'd estimate 32.

8       Q.  By the end of 2019?

9       A.  I'd estimate 32.

10      Q.  Okay.  Of those 32, how many were generating

11  revenue by the close of 2019?

12      A.  I can't give you an exact number.  I can tell

13  you that about 60 percent of them by 20 -- first quarter

14  of 2020?

15      Q.  Uh-huh.

16      A.  60 percent of them were not -- not reordering

17  pumps and sets.

18      Q.  And at the first quarter of 2020, that's when

19  the COVID outbreak started?

20      A.  I -- I guess that would depend on where you

21  were in the world.

22      Q.  Yeah.  I mean, but that's when COVID started

23  hitting -- certainly by the -- in the first quarter.

24  Correct?

25      A.  I'd yield to that, yeah.



1      Q.   Yeah.   Of those 60 percent that were not

2   reordering in the first quarter of 2020, did that change

3   throughout the year in 2020?   Did they start reordering?

4      A.   No.   All the way up to the members meeting that

5   happened on July 24th, I know 60 percent of the portfolio

6   was not -- not reordering pumps and sets.   There's no

7   revenue coming off of those entities for a variety of

8   reasons, COVID just being one of them.

9      Q.   What were the other reasons besides COVID?

10      A.   Oh, there were partner disputes with some of

11   them.   There were docs that -- one particular doc had

12   some huge amount of payday loans, like 40 of them or

13   something, that all came due.   And he went bankrupt.

14   Some -- some were ER physicians that just -- they -- they

15   saw a lot of patients but they didn't -- they didn't have

16   many patients and they struggled.

17      Q.   In 2019 do you have an idea how much revenue

18   was generated from license agreements?

19      A.   2019?

20      Q.   Yeah.   On the year-end financial.

21      A.   I don't.

22      Q.   What about in 2018?

23      A.   I know that we lost 1.1 million in 2018,

24   approximately.

25      Q.   Did y'all have any executed license agreements



APPX1022

INSU_PI_001301

1   in 2018?

2        A.   We did.

3        Q.   How many?

4        A.   I'd be speculating but I -- I don't know.

5   Sorry.

6        Q.   Approximately how many?

7        A.   Approximately how many?  Probably around 20.

8   25, maybe.  I don't know.

9        Q.   And in 2017 how many license agreements did

10  y'all have in place?

11       A.   Not very many.

12       Q.   Less than five?

13       A.   Can you be specific in 2017?

14       Q.   I mean, anytime -- by the end of 2017 did y'all

15  have less than five license agreements in place?

16       A.   No.

17       Q.   More than ten?

18       A.   No.

19       Q.   So somewhere between five and ten?

20       A.   Yes.

21       Q.   Okay.  All right.  And in 2016 how many license

22  agreements were in place?

23       A.   I'd say approximately four.

24       Q.   In 2015, none.  Is that fair?

25       A.   No, no.



1      Q.  Okay.  So the trend with respect to the license

2  agreements going into 2019 and into 2020 was that that

3  was a growing aspect of the business.  Correct?

4      A.  Can you ask it one more time?

5      Q.  Yeah.  With respect to the license agreements,

6  you know, I know there was other myriad of problems and

7  everything, but y'all were increasing your sales of

8  license agreements from 2016 to 2019?

9      A.  From 2016 to 2019, that's true.

10     Q.  And then in 2020 they weren't renewing, but the

11  license agreements were still in place?

12     A.  I wouldn't -- no, I wouldn't say that.

13     Q.  Okay.

14     A.  That's not how I would say that.

15     Q.  How would you say that?

16     A.  I would say that folks were falling off in

17  terms of, you know, that -- that -- that nonactive

18  percentage was increasing.  The reorder population was

19  suffering in our own clinics and our licensees.  Because

20  when patients aren't going out of their house, they're --

21  they're not going to get infusions.  So our licensee

22  revenue was down.  New license issuing was abysmal.  So

23  yeah, no, I would not characterize it that way.

24     Q.  So now how many license agreements does Well

25  Cell and related entities have in place for the



1  technology that came from Diabetes Relief?

2      A.  Ask it one more time.

3      Q.  How many license agreements does Well Cell now

4  have in place for the technology that came from Diabetes

5  Relief?

6      A.  Well Cell has approximately ten licenses.

7      Q.  What about related entities to Well Cell?

8      A.  It's -- yeah, that's the only -- yeah, it's the

9  same answer, same thing.

10      Q.  And what's the revenue being generated off of

11  those license agreements?

12      A.  We're not --

13          MR. CAMPBELL:  Objection, form.

14      A.  Can you ask it one more time?

15      Q.  (BY MR. COLLINS)  Yeah.  What is the revenue

16  being generated over the ten license agreements that Well

17  Cell currently has sold?

18          MR. CAMPBELL:  Same objection.

19      A.  Can you -- can you be more specific?

20      Q.  (BY MR. COLLINS)  What is the revenue?  Not the

21  profit.  What is the revenue being generated from the

22  license agreement that Well Cell has executed with the

23  ten people that you identified?

24      A.  Again, I don't -- are you asking per month, per

25  year?  Like, what's the -- I don't understand the

1   question.

2       Q.  All right.  Did you have all ten licenses --

3   when did you get all -- how -- when did you have a total

4   of ten licenses?

5       A.  As of right now you're asking me that question?

6       Q.  Yeah.  I mean, when did you first get them?

7       A.  When was the --

8       Q.  First license agreement was signed?

9       A.  I'm going to say approximately August or

10  September, maybe -- I think September.

11      Q.  Who was that with?

12      A.  I believe it was with an FQHC out of Atlanta.

13      Q.  How much revenue has been generated to date off

14  of that license agreement?

15      A.  I don't know.

16      Q.  Approximately.

17      A.  Off of that license agreement?

18      Q.  The first one you signed.

19      A.  You said approximately?

20      Q.  Uh-huh.

21      A.  I think it's $60,000.

22      Q.  And generally what's the terms?  Does it pay

23  monthly or does it pay up-front costs or what are the

24  terms of those license agreements?

25      A.  Generally the terms are there's a start-up

1  package and so -- so they would choose a certain number

2  of pumps, a certain number of -- of infusion sets, a

3  certain number of people to be -- to be trained.

4      Q.  Okay.

5      A.  And then there's a price for reordering and --

6  and that's it.  It's pretty simple.

7      Q.  What was the second license agreement Well Cell

8  signed?

9          MR. CAMPBELL:  Objection, form.

10     A.  I don't remember.

11     Q.  (BY MR. COLLINS)  Approximately how much

12 revenue has been generated off of that license agreement?

13         MR. CAMPBELL:  Objection, form.

14     A.  Can you be a little more specific?  Which --

15     Q.  (BY MR. COLLINS)  No, I'm talking -- the second

16 license agreement that Well Cell signed, how much has

17 been generated from that agreement?

18         MR. CAMPBELL:  Objection, form.

19     Q.  (BY MR. COLLINS)  You can go ahead and answer.

20     A.  It's hard for me to know because I don't

21 remember which one it was.

22     Q.  When was it signed?

23     A.  Again, I don't know the date exactly.  A

24 general answer, though, is $38,000.  Whether it would

25 have been that one or one of the other ones.

1      Q.  And what are the -- of the ten, what are the

2  names of clients who -- or customers who signed the

3  license agreements?

4      A.  So we have nondisclosures with all of them.  I

5  have no idea if I can answer that or not.  So I don't

6  know how to answer that.  Sorry.  I'm not a lawyer.  I

7  don't know what to --

8              MR. CAMPBELL:  So, yeah, we'll -- we'll

9  object to form.  Is there relevance to the -- the names?

10             MR. COLLINS:  Yeah, there's absolute

11 relevance to the names because it goes to what business

12 opportunities were placed where and when and whether they

13 were originally, you know, issues dealing with Diabetes

14 Relief or not.  And I'm entitled to know the discovery of

15 the -- where these license agreements were, the names of

16 these people, so I can research that and verify it

17 myself.

18             MR. CAMPBELL:  So I think the average

19 amount for Well Cell as it relates to Diabetes Relief is

20 relevant.  I think the specific distributions is not

21 relevant.

22             MR. COLLINS:  Is that your objection?

23             MR. CAMPBELL:  Yeah.

24             MR. COLLINS)  Okay.  What about the names?

25             MR. CAMPBELL:  So I don't think the



1  identities are relevant either.  All you need to know is

2  how much is Well Cell getting now that relates to

3  Diabetes Relief from before.

4              THE WITNESS:  I'm sorry.  I'm --

5              MR. COLLINS:  So are you trying to say

6  you're stipulating that every one of these license

7  agreements that they signed up were from leads from --

8  that emanated from when Diabetes Relief existed?

9              MR. CAMPBELL:  No, I'm not stipulating to

10 that.

11             MR. COLLINS:  Okay.

12             MR. CAMPBELL:  I'm saying there's --

13 there's no relevance beyond that line of questioning.

14             MR. COLLINS:  All right.  So you're going

15 to object on relevance and tell him not to tell the names

16 or more than what the general amounts per license

17 agreement were?

18             MR. CAMPBELL:  Yes.

19             MR. COLLINS:  Okay.  I need to take a break

20 for a minute.  I need to think about that.

21             THE VIDEOGRAPHER:  Going off the record at

22 3:06.

23             (Recess )

24             THE VIDEOGRAPHER:  We are back on the

25 record at 3:33.  You may proceed.



1          (Exhibit 2 marked)

2      Q.  (BY MR. COLLINS)  I'll hand you what I'm going

3  to mark as Exhibit Number 2.  Mr. Hepford, I've since --

4  handed you Exhibit Number 2, which is apparently dated

5  the 24th day of July 2020.  Have you seen this document

6  before?

7      A.  Yes, sir.

8      Q.  And it has Glenn Massey's name at the very --

9  at the -- on the front of it.  Did he prepare this

10 document or did someone else prepare this document?

11     A.  Someone else.

12     Q.  Who prepared it?

13     A.  I did.

14     Q.  Okay.  And did you prepare it on or about July

15 24, 2020?

16     A.  On or about, yes.

17     Q.  Okay.  And was this the final draft?

18     A.  To the extent that you're representing to me

19 that this is the one that's -- you know, the exact one

20 that's in the -- in the record, yes, I assume it is.

21     Q.  Yeah.  I mean, this is -- comes -- I mean, I'll

22 represent to you this is the one that comes from your

23 production.

24     A.  Yes, sir.

25     Q.  So, I mean, is this the final draft?

LEXITAS

APPX1030

INSU_PI_001309

1      A.  Yes.

2      Q.  How many different times?  Is there other

3  drafts of this or was it saved over or was it revised a

4  number of times?

5      A.  A lot of questions there.

6      Q.  Well --

7      A.  It --

8      Q.  Okay.  How many times did you revise this final

9  draft?

10     A.  I don't remember.

11     Q.  Okay.  More than once?

12     A.  I don't know.

13     Q.  When did you begin drafting this document?

14     A.  I saved over top of it, though, to answer that

15  one question.

16     Q.  Okay.  What computer did you use to draft it?

17     A.  Just my personal computer.

18     Q.  Describe it to me.

19     A.  It's a black Lenovo laptop.

20     Q.  And where -- do you still have that computer?

21     A.  I believe so.

22     Q.  Okay.  Where is it located?

23     A.  I believe it's at my home.

24     Q.  Okay.  When is the last time you used it?

25     A.  Probably September/October time frame of 2020.

1      Q.  And has the computer been altered since that

2  time in any way?

3             MR. CAMPBELL:  Objection, form.

4      A.  Can you ask it again?

5      Q.  (BY MR. COLLINS)  Has the computer been altered

6  in any way since the last time you used it?

7             MR. CAMPBELL:  Objection, form.

8      A.  I'm not sure how to answer.  I just stopped

9  using it.

10     Q.  (BY MR. COLLINS)  Okay.  Since July 24, 2020,

11  have you deleted files or information from the computer

12  that you just identified?

13             MR. CAMPBELL:  Objection, form.

14             MR. COLLINS:  On what basis?

15             MR. CAMPBELL:  Vague, overbroad.  Deleted

16  files?  Files?  What files?  Files related to what?

17             MR. COLLINS:  I can talk loud too so you

18  can ease up.  Deleted any files on the computer.

19             MR. CAMPBELL:  How is that relevant?

20             MR. COLLINS:  Okay.  You don't get to be --

21  if you want to make a judge and jury -- if they deleted

22  documents off of this in the operative time period, it's

23  absolutely relevant as to whether or not everything's

24  been produced.

25             MR. CAMPBELL:  Off his personal computer?



1  You're asking about his personal computer right now.

2              MR. COLLINS:  He -- the personal computer

3  is the one he used to draft this, so he must have been

4  using it for Diabetes Relief business.

5              MR. CAMPBELL:  But your -- your line of

6  questioning now, sir, would encompass things like

7  personal email, did he delete personal emails --

8              MR. COLLINS:  I want to know did he delete

9  anything on it or not.

10     Q.  (BY MR. COLLINS)  Are you refusing to answer

11  the question --

12              MR. CAMPBELL: I think it's --

13     Q.  (BY MR. COLLINS)  -- based on advise of

14  counsel?

15              MR. CAMPBELL:  I think it's objection,

16  form.  I think the question needs to be rephrased to be

17  relevant and less overbroad.

18              If you understand the question, I think you

19  can answer it.

20     A.  The answer is I don't know.  I transitioned

21  computers.  I predominantly use the cloud.  I don't know

22  if it deleted or anything.  I just stopped using the

23  computer.

24     Q.  (BY MR. COLLINS)  All right.  Are you -- are

25  you and -- as a matter of course, when you used this

1   computer, did you, you know, routinely delete any emails

2   or deleted emails or junk emails?  Did you have something

3   set up where that happened?

4       A.   Sure.

5       Q.   Okay.  What about files such as PowerPoint

6   presentation, Word documents, or PDFs?  Did you delete

7   any files off that computer since 7/24/20?

8       A.   Again, I don't know.

9       Q.   Okay.  Did you have a practice of routinely

10  deleting such files?

11      A.   No.

12      Q.   Okay.  Did you keep your drafts of multiple

13  documents?

14      A.   From time to time.  It kind of depends on what

15  it is, but I make a habit of being able to go back and

16  reference old materials.

17      Q.   Okay.  And so would this document -- do you

18  know whether or not you saved over or created a new draft

19  each time?

20      A.   I don't know.

21      Q.   Okay.

22      A.   I -- I spent a considerable amount of time on

23  this.  Literally leading right up to the moment of this

24  meeting, I was draft -- I was finalizing it.  Matter of

25  fact, I may have even been a couple minutes late to this

1  meeting because I was actually building this.

2     Q.  Yeah.  So the date on -- even though it says

3  July 24, 2020, it could have been worked up until as late

4  as July 28, 2020.  Correct?

5     A.  No.

6     Q.  Okay.  Why not?

7     A.  Because I presented --

8     Q.  Oh, the meeting was that day.  I'm sorry.

9     A.  Yeah.

10    Q.  I'm sorry.

11         But the one that was produced is the final

12  draft that you had ready to go at the meeting?

13    A.  Yes, sir.

14    Q.  Okay.  And you said you'd worked on it many --

15  for a long time before.  Do you have an estimate on how

16  long you'd been working on this?

17    A.  I'm sure probably a few hours.

18    Q.  Okay.  Is there any information off which this

19  document was based or you cut and pasted from that you'd

20  been working on prior to that when you started putting

21  the PowerPoint presentation together?

22    A.  Yes.

23    Q.  Okay.  What was the source of information for

24  this PowerPoint presentation?

25    A.  This was our standard template at that time,



1    and this thing had been used -- I don't know -- thousands

2    of times.

3        Q.  And I'm talking about the text of the

4    documents.  Is there -- was this pulled from anywhere or

5    any other documents, as far as you remember?

6        A.  I don't recall, no.  This one.  That's a

7    screenshot of a spreadsheet.

8        Q.  Okay.  And that's a screenshot of an ongoing

9    spreadsheet from -- accounting spreadsheet for the books

10   of Diabetes Relief?

11       A.  Correct.

12       Q.  Okay.

13       A.  And on the next page --

14       Q.  Uh-huh.

15       A.  This is also screenshots of scanned images

16   of [sic] our corporate secretary to represent -- when you

17   asked me the question earlier what entities, that's the

18   gigantic list.

19       Q.  Uh-huh.

20       A.  And so she kept that for us, so we used that as

21   a reference.

22       Q.  And that was -- it says "Chart of H360 and

23   other entities as of 7/21/20"?

24       A.  Yeah.  That's her -- that's her -- her -- that

25   is the record that she kept for the -- for the company,

1  and that was her dates of when she had last updated it.

2  And that's a screenshot.

3     Q.  And what about the next document?  Where did

4  that come -- the next page, the asset purchase page?

5     A.  Yeah, this is the -- this is the schedule of

6  payments that Well Cell Global was committed to make to

7  Diabetes Relief over the -- the dates and the amounts

8  that you see here in the schedule.

9     Q.  When was Well Cell Global formed?

10    A.  I don't know the exact date, but July of 2020.

11    Q.  And who formed it?

12    A.  I did.

13    Q.  And did anybody else have any ownership

14  interest or any -- in Well Cell at that time?

15    A.  I was the single -- the only person that formed

16  it, so no.

17    Q.  And nobody had any other ownership interest?

18    A.  Not at formation, no.

19    Q.  Was there anybody involved with Well Cell

20  before -- from the time of its formation and 7/24/2020?

21    A.  I'm sorry.  Can you ask it one more time?

22    Q.  Was there anybody else that was involved in

23  Well Cell -- with Well Cell from the time of its

24  formation to 7/24/2020?

25    A.  I don't know the legal definition of



1    "involved."  My -- my mother-in-law filed the secretary

2    of state paperwork and helped me open a bank account.

3        Q.  When was the bank account opened?

4        A.  I don't know the answer to that.  Sometime

5    between the 17th and the 23rd.

6        Q.  Okay.  What was Stanley Lewis's participation

7    in Well Cell before 7/24/2020?

8        A.  Nothing.

9        Q.  What about Glenn Massey?  Same question.

10       A.  Again, no -- no involvement.

11       Q.  So if I go down a list of people, no one else

12   was involved with the company?

13       A.  There was -- I was the only person that created

14   the company.

15       Q.  And the money that was used to open up the bank

16   account, who provided that money?

17       A.  I did.

18       Q.  And how much was it?

19       A.  I don't recall.  Whatever the minimum that

20   the -- that Chase required was put in.

21       Q.  And what was the purpose of forming Well Cell

22   at that time?

23       A.  The purpose of forming Well Cell was to be able

24   to put an offer in front of Hunter -- this is part of the

25   purpose of it -- was to offer -- be able to put an offer



1  in front of Hunter that had as much meat behind it as we

2  possibly could that was real and able to be done.

3      Q.  Let's go -- there's a cover page.  Right?

4      A.  Uh-huh.

5      Q.  And then it says "Highlights."  Next page,

6  "Hunter's Buyout."

7              And you drafted this page.  Correct?

8      A.  Yes, sir.

9      Q.  Okay.  It says, "Diabetes Relief is offering to

10 buy out Hunter for a 3 million equivalent over time,

11 41" -- "and $3 million - 41 percent of all outstanding

12 AP, + 41 percent of all cash on hand as of 7/24/20."

13             What are -- tell me what the -- break that

14 down as far as -- the buyout of Hunter for 3 million,

15 what does that mean?

16     A.  Hunter told us that his number was 3 million.

17 We then went and tried to figure out a viable way to pay

18 that amount.  It was clear that because of the corporate

19 lockup that he was trying to force into play and the fact

20 that he had blown up -- you know, whether they were

21 trying or real offers, blew up everything that came at

22 us, the company is dying.  It's -- it's missed four

23 payrolls at this point.  It's going to miss another one.

24 So the price of the -- of the ransom is 3 -- 3 million

25 bucks.  So that's -- that's what we went out to go figure

LEXITAS
APPX1039

INSU_PI_001318

1  out how to do.

2      Q.  Okay.

3      A.  So --

4      Q.  All right.

5      A.  So the 3 million for everything he's got so

6  that he will go away, that is essentially what we're

7  trying to do.  I suspected that -- because he's made

8  points in the past that -- well, that he would own the

9  cash that the company has, so I put that in there

10  thinking that that would be one of the things that he

11  would push back on.  Okay, fine.  41 percent of the cash.

12  The company had about $85,000 in its bank at that point.

13  And so that's -- that's the -- basically the logic behind

14  why 3 and why 41 percent and why 41 percent of cash.

15      Q.  So -- yeah.  And so, basically, when I'm

16  reading this here, instead of dashes -- that's actually a

17  math formula, which would mean $3 million is the price,

18  minus 41 percent of the -- all outstanding --

19      A.  Yes.

20      Q.  -- accounts payable, plus 41 percent of the

21  cash on hand?

22      A.  Correct, yes.  So the 3 million was the -- you

23  know, the amount he said, 41 percent of the debt because

24  he's -- I mean, we've got to go fix all that, right?

25      Q.  You --

1      A.  We had to go fix all of that.  As part of the

2  wind-down plan, we have fixed all that.  So he was

3  responsible for 41 percent of it.  And he also, I felt,

4  should be entitled to 41 percent of the cash on hand.  If

5  you average all that together, then you get what the

6  total number would have been over the structured buyout.

7      Q.  And where was the 3 million going to come from?

8      A.  The 3 million -- in the design, there's --

9  there's ultimately two ways that that's possible.

10 There's what I mentally refer to as the backstop.  It's

11 not the preferred way, but it is "the way," which is -- I

12 was very, very careful to structure the investment that's

13 being made over time into Well Cell to fund it to make

14 sure that we had enough money to pay -- he instructed me

15 to go -- very similar to this, right here -- in order for

16 our slide 5, in order for that to be able to be

17 fulfilled.  And then the third transaction is the buyout

18 offer to Hunter, which then -- this right here is how

19 that's able to be made.

20     Q.  And where are the source of these funds that

21 are coming in on this time frame coming from?

22     A.  These sources are -- here are coming from Well

23 Cell Global.

24     Q.  And where is Well Cell Global getting them

25 from?

1    A.   That's where -- there's two parts, right?  So

2  there's the seed capital investment that Dr. Hinman made,

3  and then there's the hope and the desire and the effort

4  to grow and be able to generate revenue.  The hope would

5  be to not have to use all the investment capital but to

6  be able to pay for it.  That's where it would generate

7  revenue.  But if that were not possible, then the

8  backstop is the investment directly into Well Cell Global

9  that's able to come over and cover this.

10    Q.   And how much of this -- the -- these numbers in

11  here represent the seed capital that is being provided by

12  him in slide 5?

13    A.   Sorry.  I don't understand that question.

14    Q.   Okay.  So it says July 20th -- or '20.  I'm

15  sorry.  I assume that's 2020.  It says the amount,

16  $345,000.  Right?

17    A.   Yes.

18    Q.   Is that money being provided by Hinman?

19    A.   No.

20    Q.   Where is that money coming from?

21    A.   I had that money and the check in my hand the

22  day that I presented this to Hunter in the members

23  meeting.  That check is from Well Cell Global to Diabetes

24  Relief.

25    Q.   And what were the source of those funds?

LEXITAS
APPX1042

INSU_PI_001321

1      A.  Are you talking about -- I think I just said

2  that.

3      Q.  I know.  But where was the source of the

4  $334,000?  Was that your money?

5      A.  It's coming from Well Cell Global.

6      Q.  Okay.  What was the source of Well Cell --

7  where did Well Cell Global get that money?  They had been

8  in existence for, what, less than seven days.

9      A.  It was --

10     Q.  Where did they get $345,000?

11     A.  It was a portion of the seed capital that

12  started Well Cell Global.

13     Q.  And how much seed capital that -- and that came

14  from Hinman?

15     A.  Yes.

16     Q.  How much seed capital total did -- was received

17  by Well Cell from Hinman?

18     A.  Can you be more specific with your question?

19     Q.  Yes.  As of July 2020, how much seed capital

20  had Well Cell received from Hinman?

21     A.  I want to be accurate, so approximately?

22     Q.  Uh-huh.

23     A.  Is that okay?

24     Q.  Yeah.

25     A.  Approximately 600,000.  Possibly a little more,

1   but I think it was around 6.

2       Q.   And then the next day, from August 20 through

3   it looks like December 2021 there's an amount referenced

4   that's 6,000 -- per month, $6,832.  Do you see that?

5       A.   No.  I see 60,000.

6       Q.   60,832.  I'll claim dyslexia and you can blame

7   it on me.

8       A.   Me too.  So --

9       Q.   Okay.  So 60,832.  Where would -- where was

10  that money coming from?

11      A.   Well Cell Global.

12      Q.   And where was Well Cell Global going to get

13  that money from?

14      A.   From sales, from -- from capitalization if it

15  had to.

16      Q.   And how much was Well Cell slated to receive

17  each month during this time frame in seed capital?  Were

18  there going to be monthly payments of seed capital?

19      A.   No.

20      Q.   Okay.  When was the next payment of seed

21  capital that Well Cell was going to receive under this

22  program?

23      A.   I'd have to look at the document to be exact,

24  but approximately a quarter later.

25      Q.   A quarter later?  And how much was that going

1   to be?

2        A.   300,000.

3        Q.   So it's 300,000 per quarter for how long?

4        A.   Again, I'd have to refer to the document.  But

5   I think over --

6        Q.   Due --

7        A.   You can actually back into it if you --

8        Q.   Due by June 2024.  Does that sound right?

9        A.   Sounds right.

10        Q.   And then there's a balloon payment that -- of

11   seed capital of how much on July 2024?

12        A.   Sorry.  Which are you talking about?

13        Q.   It looks like to me there's probably a balloon

14   payment at the end -- in July of 2024.  Is there more

15   seed capital coming in in a balloon payment style or --

16        A.   No.  It doesn't -- it doesn't work that way.

17        Q.   Okay.  How does it work?

18        A.   Quarterly payment that walks all the way up

19   over time.

20        Q.   Okay.

21        A.   And that quarterly payment is larger than

22   the -- what's needed to cover this.

23        Q.   Gotcha.  So you're giving yourself some room on

24   that.  I got it.

25        A.   Essentially what you're trying to do is thread

 1   three needles at the same time.  To be able to -- to do

 2   this -- not this -- well, this, but the next thing that

 3   comes, right, which is being able to -- being able to

 4   fund Mr. Carr's buyout, simultaneous with covering all

 5   the debts and removing all liabilities, and the key piece

 6   being making sure that there's enough operating capital

 7   to stay alive to be able to effectuate this, to be able

 8   to effectuate Mr. Carr's payments.  Can't if the balance

 9   is too far in one direction or there is no -- there is no

10   source at that point.

11                  (Exhibit 3 marked)

12      Q.  Okay.  I'm going to hand you what I've marked

13   as -- we're going to mark as Exhibit Number 3.  You can

14   keep that one out too.

15      A.  Okay.

16                  MR. CAMPBELL:  Is there a copy for me?

17   Thanks.

18      Q.  (BY MR. COLLINS)  Do you recognize this

19   document?

20      A.  Again, the same -- as long as it's the same as

21   what was produced, yes, I do.

22      Q.  Okay.  And what do you recognize this document

23   to be?

24      A.  This is -- this is the wind-down plan for

25   Diabetes Relief.

1      Q.   Okay.  And it says wind-down plan for Diabetes

2   Relief.  Can you define that -- all that encompasses for

3   me?  Or let me ask it this way.  What companies does that

4   encompass?

5      A.   Slide 4.

6      Q.   Okay.  So in slide 4 -- so let me make sure

7   we're all on the same page here.  All those companies

8   that are listed there are encompassed in what's called

9   the Diabetes Relief Wind Down Plan.  Right?

10      A.   Even if I had glasses, I wouldn't be able to

11   read exactly here.

12      Q.   Uh-huh.

13      A.   As long as what this represents -- which is

14   what I think it does, but as long as what this represents

15   is the Diabetes Relief H360 Companies, not any of the

16   ones that are not associated with this at all, if they're

17   on here --

18      Q.   Uh-huh.

19      A.   -- and Hunter and I have co-ownership in them,

20   but that's not part of this.  But I'm just -- you know,

21   as an example, if he and I owned a lawn care service,

22   it's not going to be on here.  It's not part of this.

23   And if it is on here, it's not part of the wind-down

24   plan.

25      Q.   And this is important, so I'm going to go ahead



1   and read this real quick.  So --

2        A.  Okay.

3        Q.  And as -- part of the wind-down plan would

4   include H360 LLC (Mothership).  Right?

5        A.  Yes.

6        Q.  Okay.  And then it would -- Restor Metabolix.

7   Right?

8        A.  That's a D/B/A of H360.

9        Q.  Yeah.

10       A.  It includes that.

11       Q.  And then Diabetes Relief LLC (Mothership).

12       A.  Yes.

13       Q.  Diabetes Relief Management Services LLC.

14       A.  Yes.

15       Q.  Diabetes Relief Houston Westside Series LLC.

16       A.  Yes.

17       Q.  Diabetes Relief Utah Ogden LLC.  Right?

18       A.  I'm sorry.  Go back.  So no, because that's a

19   clinic and it has 20-some-odd other investors.

20       Q.  Okay.

21       A.  And so is Diabetes Relief Houston Westside.

22   Not Series, but the clinic itself.

23       Q.  All right.  So those aren't included in the --

24       A.  The two clinics are not.

25       Q.  Okay.



1      A.   To the extent that they remain able to cash

2  flow.

3      Q.   Is there -- does Diabetes Relief or any related

4  entities, H360, still hold an interest in those -- in the

5  clinic or the Utah entity?

6      A.   I'm not sure how to answer that question

7  because I think it's a legal question.

8      Q.   I'm not trying to make it a legal -- tricky

9  question.  Do they have any ownership or any kind of --

10     A.   There's 89 percent in the Houston clinic and

11  there's 26 percent in the Utah clinic.

12     Q.   And where is that?  Who holds it?

13     A.   So that -- both of those -- both of those

14  percentages respectively were owned by Diabetes Relief

15  LLC.

16     Q.   Okay.

17     A.   However, as part of the asset purchase that was

18  executed on July 24th, it is substantially all the

19  options -- substantially all the assets with Well Cell

20  Global's option on assets, meaning it can pick through

21  and determine which ones are liabilities and which ones

22  are assets.  Because just because something may be an

23  asset to one person, if it's, you know, hemorrhaging

24  cash, it might be not an asset.  So that's -- yeah,

25  that's the best I can answer that --



APPX1049

INSU_PI_001328

1        Q.   All right.

2        A.   -- that makes sense.

3        Q.   And who else is -- is there anybody else

4   involved now with Well Cell LLC?   Does anybody else have

5   any ownership interest?

6        A.   Yes.

7        Q.   And who is that?

8        A.   Dr. Roy Hinman.

9        Q.   How much interest does he have?

10       A.   I --

11            MR. CAMPBELL:   Object to form.   Don't

12   answer that.

13            MR. COLLINS:   On what basis?

14            MR. CAMPBELL:   It's outside the scope of

15   discovery, purely harassing.

16       Q.   (BY MR. COLLINS)   When did Mr. Hinman obtain an

17   ownership interest in Well Cell LLC --

18       A.   Are --

19       Q.   -- Well Cell Global LLC?

20       A.   Are you looking for a date?

21       Q.   Yeah.

22       A.   Approximately July 23rd, 2020.

23       Q.   Okay.   With respect to -- what position do you

24   currently hold with Well Cell?

25       A.   I'm a co-founder and CEO.



1      Q.  And who are the officers and directors of Well

2  Cell?

3      A.  I'd have to look at the company records.  I

4  don't know.

5      Q.  All right.  With respect to Diabetes Relief

6  Houston of The Woodlands LLC, what's -- where does that

7  currently reside?

8      A.  Defunct entity, closed.

9      Q.  When was it closed?

10     A.  I would have to ask Carol.  I don't know.

11     Q.  Approximately when?

12     A.  When it stopped operating versus when it closed

13  down, that's probably a pretty big gap.  I would probably

14  be spitballing but I'm assuming somewhere around '18.

15     Q.  Okay.  All right.  And then Diabetes Relief

16  Houston Southwest LLC?

17     A.  The same thing, defunct entity.  And it was

18  later done in '18.  It was probably in '19.

19     Q.  H360 Series 1, holding company?

20     A.  Yeah, a nonused entity.  I don't know -- I

21  believe -- several of these, there was a -- I don't

22  remember the right term.  Carol drafted it for me.  But

23  there was an effectuation of all of the entities that

24  Hunter and I and Stanley all voted to wind down outside

25  of the wind-down plan but -- so Hunter was still in the



1  organization --

2      Q.  Uh-huh.

3      A.  -- and just filed final tax returns on them.

4  And I believe that's one of them.  And several of these

5  happened as well.  She sent out a communication that

6  Hunter has refused to respond to.  But they're shut down

7  because it was done by unanimous consent.

8      Q.  Okay.  H360 LLC Series 100?

9      A.  Yeah.

10      Q.  H360 Finance Services LLC?

11      A.  Yes.

12      Q.  H360 Lighting Services LLC?

13      A.  Yes.

14      Q.  H360 Labs Services LLC?

15      A.  Yes.

16      Q.  Advantage Revenue Solutions Series LLC?

17      A.  No.  That one is in a litigation.  It's

18  currently open and set for trial.

19      Q.  What's it in litigation about?

20      A.  While Hunter was financing -- managing finance,

21  also covering billing and anything that dealt with money

22  coming in or going out of the company, he also was

23  responsible for our billing vendors.  He hired a vendor

24  who came in, and I found out over time that he fronted

25  about $64,000 in cash to her associated to helping her

1  cover her payroll to try to keep her alive so that she

2  could continue to keep helping our company.

3              She eventually, I guess, decided that she

4  was never going to pay that.  Hunter set up a lawsuit,

5  sued her.  She countersued the company and -- for the

6  exact same amount.  I think it was for $64,000.  And then

7  she countersued for $64,000.  And this happened in 2017,

8  and it's been sitting there ever since waiting for trial.

9      Q.  And why is there an entity set up that's

10 related to that, I guess is what's confusing to me?

11     A.  I remember Hunter and I having a discussion

12 before we created that entity --

13     Q.  Uh-huh.

14     A.  -- or I'm sorry -- before -- I'm trying to be

15 very accurate here for you -- before Carol created that

16 entity for us that -- we didn't want medical billing to

17 be associated with all the rest of our stuff because we

18 weren't experts at that.

19     Q.  Okay.  I understand.

20              Advantage Revenue Solutions LLC?

21     A.  Uh-huh.  That's connected to that same

22 litigation.

23     Q.  Okay.  Diabetes Relief Spring Branch?

24     A.  I --

25     Q.  Dissolution 3/21/16?

LEXITAS
APPX1053

INSU_PI_001332

Scott Hepford                                          Pages 127

1      A.  I would be assuming.  I don't even know what

2  that is, but yeah.

3      Q.  Diabetes Relief Houston Southside Series?

4      A.  That was created -- Hunter created that with

5  Carol somehow to bring in investment from Stanley Lewis.

6  I know that that eventually was, again, dissolved.  I

7  don't -- I don't remember the exact details around how

8  and why.

9      Q.  And it says "Diabetes Relief Houston South, no

10  business conducted."  Is that true?

11      A.  Assuming it is.  I would trust Carol.

12      Q.  Okay.  Diabetes Relief Austin?

13      A.  I'm not sure what that is either.  Again, I

14  think -- that had something to do at the same time as the

15  Southside, I think.

16      Q.  Okay.

17      A.  At one point Hunter was having discussions with

18  Stanley about opening a clinic in Austin because he at

19  the time lived there.  He doesn't anymore.  But I believe

20  that's what that was for.  And to the extent it's still

21  around, it's definitely part of the wind-down.

22      Q.  Health Restoration Partners LLC was a D/B/A

23  with Trina.

24      A.  So that is not part of the wind-down.

25      Q.  Not part of it?



1      A.  Not at all, no.

2      Q.  Where is it?

3      A.  It is sitting doing nothing.  Carol -- Carol

4  answers the phone every once in a while.

5      Q.  Wyoming Corps, created in 2018?

6      A.  These are corporations that Hunter told me

7  about.  I objected.  He then unilaterally created three

8  companies.  Big fight for a long time over that.  These

9  are absolutely part of the wind-down.  I don't think they

10  still exist.

11      Q.  What was the purpose of these entities?

12      A.  Hunter had a theory that we were going to

13  divide -- based on a conversation that I had coming back

14  from Istanbul, Turkey, saying that we're going to somehow

15  divide the company into international, USA, and somehow

16  Stanley was supposed to run the Houston clinic.

17          And, again, that made a lot of sense to

18  Hunter.  It made no sense to the rest of us.  And then

19  went and created them and then came back and said,

20  "Here's what we all agreed to."  It was a massive,

21  massive internal fight.  Plenty of emails, plenty of

22  stuff that you can discover on that.

23      Q.  All right.  Let's go to -- I believe it's going

24  to be page 6 from the PowerPoint presentation and then --

25  Restructure Objections (The What), and then it says Focus

1  Areas, Well Cell Global.  That's related to the -- your

2  entity, right, that you founded?

3      A.  Yes.

4      Q.  And it says it's going to be the current and

5  future holder -- future IP holder and IP advancement.

6  What is IP -- first of all, explain to the ladies and

7  gentlemen of the jury "future IP holder."  What does that

8  mean?

9      A.  So there's a lot of meat to it.  First off, IP

10  is intellectual property.

11      Q.  Uh-huh.

12      A.  So it's -- it's obviously anything that is

13  intellectual property, the know-how, the show-how, how

14  things work.  And you have to put yourself back into

15  where I was sitting on July 23rd --

16      Q.  Uh-huh.

17      A.  -- not July 24th.  I didn't know if Hunter was

18  going to accept this offer or not.  I was hopeful, but I

19  didn't know.  And two options: essentially be able to

20  thread three needles at the same time, be able to provide

21  Hunter a vehicle to get the number that he was asking

22  for, cover all of our liabilities that were over all of

23  our heads, and stay alive long enough to effectuate those

24  things and go forward into the future.  But that's

25  possibly not going to happen.

1            So the capitalization that went into Well

2   Cell is to essentially effectuate me being able to run

3   the operation, to bring the right people to the table, to

4   forward all the advancements of this modality, hopefully

5   being able to utilize a portion of that capital, the seed

6   capital, to be able to acquire anything that would be

7   helpful.  But if that's not enough, then advancements in

8   IP into the future.

9            So I'm sitting there with an investment

10  either putting a portion of it over here to -- to solve

11  all of this or just walk and start all over again in Well

12  Cell Global.  So future IP holdings and advancements is

13  the -- is the focus.  What's currently out there in the

14  world today is nothing compared to where we hope this

15  could be someday.  But it requires a heck of a lot of

16  work, effort, and energy to make that happen.

17      Q.  And what IP advancement were you anticipating

18  at this time?

19      A.  Better understanding -- so -- so this is where

20  research ties in tightly, right?  Because you can have a

21  theory, especially when you're dealing with medical.  But

22  you don't know if that's real.  And so there's a lot of

23  research that has to be done -- animal, human, clinical

24  trials -- to be able to confirm hypothesis to get you far

25  enough to know if you're actually onto something or not.

LEXITAS
APPX1057
INSU_PI_001336

1          That's not easy and it's not fast and it's

2   not something that's going to turn a profit quickly.

3   It's always, in my opinion, been something that's been

4   needed and -- and fought over.  Money is not allocated to

5   it.  And we can cry over spilled milk, but I'm not doing

6   that going forward.  We don't have shortsighted visions

7   to make huge money, really.  We have a focus to get this

8   to the entire world, and there's a lot more that has to

9   be discovered to get there.

10     Q.  I understand this was a proposal, but as it

11  sits today, Well Cell Global -- it comes down and says

12  "Master Licensor to Diabetes Relief and Restor

13  Metabolix."  Is that --

14          (Reporter interrupted)

15     Q.  The line that says "Master Licensor to Diabetes

16  Relief and Restor Metabolix" -- I'm never going to be

17  able to say that right -- is that the structure that is

18  in place that actually came into place now, or is there

19  something different?

20     A.  Something different.

21     Q.  And what is different about that?

22     A.  Because Hunter rejected this, he had five days

23  to consider it.  And we were very clear multiple times

24  that if he rejects this, then, like, where are we, right?

25  So we'll have to utilize the -- the capital that's being

1  invested into Diabetes Relief for other purposes.  Well,

2  it turns out the wind-down plan is where we end up.

3  Because at this point the company is locked.  It's run

4  out of money.  It's gone.

5           The thing that's important to see that

6  still lives through here is that the intention -- and

7  this was pre any understanding of a wind-down plan.

8  Notice the words "no new licenses."  It was impossible

9  for us to know at the time -- at least we felt it was --

10 to know what all liability was hiding.  We didn't know

11 what Hunter did or didn't do.  Our other partner was

12 accusing Hunter of embezzlement, and it's just -- it was

13 a -- it was a very crazy time.  We didn't know what

14 liabilities were there or not.

15          And there was never -- from this inception

16 all the way over to what ended up here, there was never

17 an intention to carry forward with the Diabetes Relief

18 LLC company because of unknown liability.  The brand,

19 okay.  We can operate with a sign out that says "Diabetes

20 Relief."  But not that entity.

21          So that entity was going to be dissolved

22 over time, but over time, like a four-year time period,

23 where we could take the -- what we believed at this time,

24 this day -- I believed Hunter's numbers -- that we had

25 640,000 in outstanding AR -- or sorry -- AP bills,

1  outstanding debt, and we weren't able to fulfill the

2  obligation that we were getting ready to get into to

3  Hunter to pay him a buyout and keep the operation alive

4  if we paid off all that debt right away.  So we were

5  looking at how do we finance our debt, essentially, over

6  a four-year period and financing the wind-down of this

7  over a period that we could keep it in balance.

8              The wind-down has actually hurt this plan

9  because it forced not four years to pay off $640,000 in

10  debt, but by the time -- a couple of weeks to a couple

11  months after Hunter was no longer in the finance world

12  responsible for it, myself and the rest of the finance

13  folks were able to find roughly -- again, please don't

14  hold me to the exact number -- but approximately 960-ish

15  thousand dollars of -- of past-due bills and obligations,

16  not including the 580,000-ish that was due for PPPs and

17  SBAs and the rest of it.  Those were either forgiven or

18  ultimately paid back.  But the 960-ish is a very big

19  number, and it was not accounted for because it was not

20  understood.  So that's put a serious strain -- a serious

21  strain on being able to keep it all balanced.

22      Q.  Okay.  With respect to the difference between

23  the 640 and the 900, do you have an idea of what debts

24  that weren't accounted for make up that spread?

25      A.  It's very large.  I don't know it off the top



1   of my head.  But you can get to that number by looking at

2   this exhibit right here that you have in front of me.

3        Q.  Uh-huh.

4        A.  Sorry.  This exhibit right here.  So it's page

5   3 of this plan.

6        Q.  Uh-huh.

7        A.  And then it's -- it's what ends up on the final

8   version of the wind-down plan that you guys received.

9   And what we were able to do -- we've tried to be very,

10  very transparent.  I have no doubt that we -- you know,

11  he had already sued us, so I knew I would have to account

12  for every single one of these.

13              So we were very transparent on showing what

14  we had, what we found, when we paid it.  And some of

15  these we made payments -- because, again, we didn't have

16  the cash flow, so we made payments to pay them down.  And

17  so you guys have gotten copies as this has been

18  effectuated.  And -- and so you just compare the two of

19  those together, and you can see the ones that --

20       Q.  So this document that we have on page 3, you

21  will accept -- this is what Hunter was representing near

22  or at the time of 7/24/20 as the accounts payable.

23  Right?

24       A.  I don't know if I would characterize that that

25  way based on his testimony yesterday.  I was --

1      Q.   This is what --

2      A.   I would say that this is --

3      Q.   -- what you understood the accounts payable to

4   be at that time?

5      A.   Yes.

6      Q.   Okay.  And Hunter had been the one primarily

7   working on it up until that point?

8      A.   Yes.

9      Q.   Okay.

10      A.   His -- him and his staff.

11      Q.   All right.  So it actually says "Outstanding AP

12   total, 937,374.07."

13      A.   It does.  But then if you look at the one

14   underneath, "Outstanding AP Less PPP loans."

15      Q.   Uh-huh.

16      A.   So that's the 640 that I'm talking about.  It's

17   actually 6 -- I think it says $644,971.07.

18      Q.   And the PPP loan was -- that was a loan that

19   was forgiven.  Correct?

20      A.   Eventually it was.  But at this point we had no

21   idea if it was going to or not.

22      Q.   Okay.

23      A.   So that's not just one loan.  There's multiple.

24      Q.   But -- and I understand that.  That was a

25   process that took -- dealing with the SBA program --



1       A.   Right.

2       Q.   -- and stuff.  But, I mean, ultimately most

3  people understood at this point that the balance -- a

4  pretty good balance of these loans were going to be

5  forgiven in some shape, or form, or fashion.  Correct?

6                 MR. CAMPBELL:  Objection, form.

7       A.   Can you ask --

8       Q.   (BY MR. COLLINS)  Yeah.  I mean, what --

9       A.   -- the question one more time?

10       Q.   -- was your belief at the time on whether or

11  not those loans were going to be forgiven?

12       A.   At the time it was unknown.  And our internal

13  comptroller was concerned because some of the language

14  early on -- because this is still relatively early on

15  when the PPP program was -- was being rolled out.

16       Q.   Uh-huh.

17       A.   And there was some conflicting language between

18  does it cover vendors -- or not -- sorry, not vendors --

19  contractors or W-2 employees or -- and so there -- it --

20  so there was some internal concern that there would be at

21  least a portion of it that wouldn't be returned.

22       Q.   And then --

23       A.   We had high hopes that the majority of it would

24  be -- would be re- -- would be forgiven.

25       Q.   Okay.  And so the one that has liability,

1  expense, and escrow details on the -- I think Exhibit 5

2  [sic], on the wind-down plan --

3       A.  Yeah.  Which page are you on?

4       Q.  It's going to be the page --

5       A.  This one?

6       Q.  Yeah.  It's where the green starts.  It says

7  the total existing liabilities of 906.

8       A.  This is 906 as of 10/6.

9       Q.  Uh-huh.

10       A.  We continued to find things for weeks and

11  months following.  So that number moves.  But this is

12  what our understanding was from when we terminated Hunter

13  on July 24th as of 10/6.  And so that's what the number

14  was.

15       Q.  But if you add back in the PP --

16       A.  Yeah.

17       Q.  The PPP loan wasn't forgiven by then.  Right?

18       A.  No, it wasn't -- well, the PP -- yeah, let me

19  look up here.  It was definitely not forgiven.  Sorry.

20  To answer your question, yes, it was definitely not

21  forgiven.

22       Q.  All right.  So what accounts for the difference

23  between this one as of 7/24 and this one over here?

24       A.  We can go down through it if you'd like.

25       Q.  I mean, yeah.  I'd like to know the ones that



1   y'all found subsequent, that were not on the original one

2   that you're talking about.

3       A.  All right.  Looks like past equipment was 123

4   [sic].  It went to --

5       Q.  Wait.  Just a second.

6       A.  Zyno past equipment.

7       Q.  113?

8       A.  Yes.  We -- that shows we made a payment.  The

9   rest of those look the same.  There is --

10      Q.  Well, was that equipment -- as of 10/6/20, as

11  of 3/11 -- okay.

12      A.  Yeah.  So what you're looking at there is

13  Diabetes Relief had licensed locations and not provided

14  them all of their inventory, and it didn't have inventory

15  in stock.  If those licensees called and said, "Hey, send

16  me my equipment," Well Cell Global is now on the hook for

17  an obligation that Diabetes Relief signed up for.

18      Q.  Okay.

19      A.  This was known.

20      Q.  Okay.  But --

21      A.  And this had to be fulfilled in order to be

22  able to not be a Ponzi scheme and be able to actually

23  make sure that we fulfilled our orders that we were

24  obligated to in our licenses.  I --

25      Q.  But were these incurred -- would these

1   113,713 -- was that equipment expenses incurred after

2   7/24/20?

3       A.  Absolutely not.  This is going back almost two

4   years in past-due debt in some cases.

5               I do see that the Houston SBA loan on there

6   and the latent PPP loan is not represented.  I know in --

7   in later versions --

8       Q.  What happened with the SBA loan?

9       A.  We paid the SBA loan off.

10      Q.  Who's "we"?

11      A.  Sorry.  Diabetes Relief paid off the SBA loan

12  as part of the wind-down plan.

13      Q.  Okay.

14      A.  And later --

15      Q.  And --

16      A.  And later --

17      Q.  -- remind me how much the PPE loan was -- PPP

18  loan was.

19      A.  Total, you end up with, all of them -- your --

20  I don't know the exact number.  It's approximately

21  500-and-some-odd thousand when you put the Houston, the

22  Utah, main office, SBA -- you put all that together, it's

23  around 500 and something.

24      Q.  And those were all forgiven.  Right?

25      A.  Except for the SBA, which was paid back.



1      Q.   Okay.  Got you.  All right.

2      A.   In later versions of this, the PPP loans are --

3  it's -- they're delineated out like they are over here.

4  I'm not sure how that got in there.

5      Q.   And what is the "Scott - Note Payable"

6  reference line in the green?

7      A.   Where are you?

8      Q.   Right under "PPP loan."  For 32,000.

9      A.   It's two parts.  Our lawyer, a lawyer that

10  Hunter and I both know, so I say "our lawyer" meaning

11  he's -- he's represented us both in the past.  He -- we

12  asked him to help us with payroll at one point, and he

13  insisted that he'd loan it to me directly.  And I turned

14  around and -- and paid it directly to the company.  And

15  that represented 22 of that 32.

16           The other 10 is me personally putting

17  payroll on my credit card and notating that that has to

18  be a note because I've got to get paid back for it.  So

19  that was not considered to be an investment.  It was

20  considered to be a note.

21      Q.   So was that 10,000 incurred before or after

22  7/24/20?

23      A.   Well before.

24      Q.   Okay.  And then "Scott (Zyno Payment),"

25  that's -- is that a payment you made to Zyno?

1     A.   Yeah.   This is me, again, putting pumps on my

2  credit card personally to be able to effectuate the

3  orders that had been sold prior to that.

4     Q.   All right.   So -- and that was before 7/24/20?

5     A.   Yes, sir.

6     Q.   Okay.   And then "Stanley - Note Payable Loan,

7  $10,000," I assume that's a payroll or something like

8  that -- yeah, a payroll loan?

9     A.   Correct.

10     Q.   And that wasn't reflected on the priors?

11     A.   No.   It is --

12     Q.   There's a Scott loan for 2020 -- 22.

13     A.   Yeah.

14     Q.   And then there's a Scott loan for 12,592.

15     A.   Correct.

16     Q.   And then Hunter payment 9,216.

17     A.   Okay.

18     Q.   So the Stanley loan doesn't look like it was on

19  there.

20     A.   Correct.

21     Q.   All right.   Dr. Amy Basa --

22     A.   Uh-huh.

23     Q.   -- 43,000.   I think there was some indication

24  that that issue had been resolved and then wasn't

25  resolved, or what -- what happened there?

1      A.   Hunter's recollection of what happened in the

2   meeting with Amy Basa and Amy Basa's recollection of what

3   happened in that meeting are not the same.

4      Q.   Okay.

5      A.   And the loose agreement that was in place

6   between Amy Basa and Diabetes Relief was that Amy Basa

7   would continue to keep being paid -- I don't remember the

8   exact amount, but approximately 3,000-something per

9   month, and that was ultimately how much her Ascentium

10  note payment was that she had to take out to fund the

11  launch of her facility.

12           In winding down Diabetes Relief, there's

13  no -- we're not going to continue to keep paying her so

14  that she can pay off a loan that she took out.  Because

15  we're shutting the company down.  And so through guidance

16  of counsel, we terminated that entire thing and freed her

17  of the overhang of sitting there having to wait for a

18  check, maybe, to cover a loan that she took out to open

19  up a practice.

20           And at the same time period, you can see

21  Bill Bain -- again, through the guidance of counsel.

22  Bill Bain is a personal associate of Hunter Carr.  We

23  believe he's a nonaccredited investor.  And he cleared

24  out a retirement plan to invest based on Hunter talking

25  to him to try to open up the clinic.  This was without my

1   knowledge and understanding, without Stanley Lewis's

2   knowledge and understanding.  We found out after the

3   fact.

4              And we felt that there was significant risk

5   to the company to have a nonaccredited investor, who

6   invested $50,000 out of a retirement plan, to -- elderly,

7   by the way, who then ended up getting nothing for that

8   clinic because that clinic folded.  So we felt it best,

9   again, through guidance of counsel and guidance of CPAs

10  to just return his capital to him.  And so that's what

11  that is.

12      Q.  So the next one that says "AmEx Balance - HMAC

13  (New)," what is that referring to?

14      A.  So Hunter and I both had two AmEx cards --

15      Q.  Uh-huh.

16      A.  -- that were connected to our personal credit.

17  And this one represents new, meaning the newer one,

18  versus the older one.  And so that's just how our

19  bookkeepers kept track of which part they were paying.

20      Q.  But that's Hunter's card?

21      A.  The first one right there, the 30,650?

22      Q.  Yeah.

23      A.  Yes, sir.

24      Q.  Okay.  And then the next one is your -- your

25  balance?

1       A.  Correct.

2       Q.  Do you know if those balances are existing on

3  the credit card or if they've been paid or --

4       A.  They were absolutely paid off.  You guys should

5  have record -- remember, this is only one of these.  You

6  guys have seen -- you've received several of them as

7  they've been paid off.  Oh.  Actually, look right next to

8  it.  As of 3/11, the balances are all zero.

9       Q.  Okay.  You've got to excuse me.  This is my

10 chance to ask stupid questions --

11      A.  No, you're fine.

12      Q.  -- sometimes.

13      A.  You're good.

14      Q.  Because I don't do math.

15              And I want to get an understanding of the

16 wind-down plan.  If you'd look at the "Use of Expected DR

17 Sale Proceeds," and then it says "Expected Proceeds from

18 Well Cell purchase."  I guess explain to me why the

19 expected proceeds from Well Cell purchase is being

20 factored into the Diabetes Relief wind-down plan.

21      A.  Because Well Cell is purchasing substantially

22 all the assets over time, and the payment in the Asset

23 Purchase agreement right here on this slide --

24      Q.  Uh-huh.

25      A.  This 3.7635111 [sic], that's exactly the same

LEXITAS
APPX1071

INSU_PI_001350

1    thing that's there.

2        Q.  Okay.

3        A.  That's where that comes from.

4        Q.  And where is the valuation of the assets of

5    Diabetes Relief, you know, in this late July 2020 time

6    period?

7        A.  There is none.

8        Q.  So how did you go about setting what would be a

9    fair sales price?

10              MR. CAMPBELL:  Objection, form.

11       Q.  (BY MR. COLLINS)  Go ahead and answer.

12       A.  Hunter's number was 3 million.

13       Q.  Okay.

14       A.  If we didn't pay the hostage sticker, the

15   hostage wasn't going to be freed.  If the hostage stayed

16   for another two weeks, it all exploded.  We were at the

17   end of the end.  He said 3 million.  We gave him 3

18   million in this structure because it was his number.

19              The company at this point has, you know,

20   around -- unknown to us, but the company has roughly --

21   almost a million dollars of -- of -- of, you know,

22   outstanding bills.  Hunter and I personally are probably

23   over a couple hundred thousand in personal credit card

24   debt.  We've got COVID breathing down our neck.  And

25   Hunter just blew up his one chance from a third party to

1  possibly get some kind of an out.

2            So we're looking at that going, "If he

3  didn't take that deal, he ain't going to take any deal."

4  So at this point I asked him in his office, "Hunter, we

5  know your number now.  We know it's 3.  Will you please

6  let Glenn and I have a little time to go figure out a way

7  to get you 3 million?"  And he said, "Sure."

8            We spent the next several weeks trying to

9  figure out a plan to do all three things at the same

10  time, give the hostage -- take him what he wanted, have

11  enough capital to survive and try to move forward and try

12  to clear out all of our liabilities.  That's how the

13  number happened.

14            If you want the exact math, here it is.  3

15  million to Hunter.  640,000 because -- and, actually, I

16  will be more specific.  $644,971 to cover what we thought

17  was there, and an extra 100,000 because we figured that

18  this probably wasn't right.  Let's give ourselves a

19  little bit of wiggle room.  We had no idea it was going

20  to be 900 and -- whatever the number ever became.

21      Q.  And so I understand where that number came

22  from.  What was done in the time leading up -- I mean, in

23  late 2019 to 2020 what efforts did you take in

24  conjunction with anyone else to put some type of value on

25  the IP and the li -- ability to do license agreements?



```
 1              MR. CAMPBELL:  Objection, form.

 2       A.  Absolutely zero.  It was never about the value

 3  of it at all.  You're dealing with a company that's

 4  upside down and about ready to end up in bankruptcy

 5  court.  It had nothing to do with value at all.  The only

 6  thing we spent time doing was trying to figure out how

 7  the heck to solve this.

 8       Q.  (BY MR. COLLINS)  So at the time you were a

 9  manager.  Right?  At all times you were a manager.

10  Right?

11       A.  Yes, sir.

12       Q.  And you were a member?

13       A.  Yes, sir.

14       Q.  And you had at least one investor, arguably,

15  with Stanley Lewis.  Right?  I mean, would you call him

16  an investor?

17       A.  I'd call him an owner --

18       Q.  Okay.

19       A.  -- to the degree that Hunter and I are owners

20  and investors.  I don't know if that's a term of art or a

21  legal term but...

22       Q.  And you believe -- I mean, as a manager and a

23  member, you have a duty to do what's best for the

24  company.  Right?

25       A.  Yes, sir.
```

1      Q.  All right.  And your testimony is to this day

2  you have not put a value on the IP --

3                MR. CAMPBELL:  Objection, form.

4      Q.  (BY MR. COLLINS)  -- that --

5                MR. CAMPBELL:  Sorry.

6      Q.  (BY MR. COLLINS)  -- that Diabetes Relief owned

7  as of 7/24/2020?

8                MR. CAMPBELL:  Objection, form.

9      A.  Can -- I'm sorry.  Can you do that one more

10  time?

11      Q.  (BY MR. COLLINS)  As of 7/24/2020 you never put

12  a value on the IP that Diabetes Relief had?

13                MR. CAMPBELL:  Objection, form.

14      A.  I don't believe so.  I -- I -- I don't know

15  exactly what you mean because I'm not a -- I'm not a

16  professional valuator.  Do we have high hopes for the

17  future?  Yeah.  But no.  I guess the answer is just no.

18      Q.  (BY MR. COLLINS)  With the IP the way it's set,

19  you didn't -- you didn't have any anticipated revenue

20  streams off of what the IP could generate off license

21  agreements?

22      A.  Not -- not profitable revenue streams at the

23  time.  And even currently, right now, there's -- the

24  answer is no.  Again, there's a very big difference

25  between what the charter Diabetes Relief was trying to do



1   and what Well Cell is charting a path to do now.

2       Q.   Will you agree or disagree that by the end of

3   2019 the license agreements alone for the IP owned by

4   Diabetes Relief had generated 1.8 million in revenue?

5       A.   No, I don't agree with that.

6       Q.   You don't agree with that?  Okay.

7       A.   No, sir.

8       Q.   And when we're talking about revenue, I'm not

9   doing a profit analysis.  I'm talking about how much

10  money those developed in any contract -- licensor

11  contracts.

12      A.   Okay.

13      Q.   I mean, so I'm not deducting the expenses from

14  it or anything.  I'm just saying it generated that much

15  money.  Do you disagree that it generated $1.8 million?

16      A.   I'm trying to understand your question.  You're

17  saying the IP --

18      Q.   Uh-huh.

19      A.   -- broad term -- generated revenue in 2019?

20      Q.   That by 20 -- by the close of 2019 it generated

21  $1.8 million through license agreements.

22      A.   I don't know if that number is exactly right,

23  but it did generate.

24      Q.   Okay.  So -- and that was roughly based on 32

25  license agreements that were in place at the time?

1      A.   Again, time period is in 2019.  Correct?

2      Q.   By the close of 2019.

3      A.   That's, yeah, probably true.

4      Q.   How many prospective license agreements did you

5   have on tap in the early part of 2020 and late 2019 that

6   you thought you could execute?

7      A.   I don't know.  COVID had already started

8   towards the end of that year.  It was, like, the November

9   time period that it started being a thing.  I don't know.

10  I don't honest -- I don't know the answer.

11     Q.   So in late 2019, the 38 -- you deny

12  representing to anyone that you were holding back

13  30-some-odd deals -- license deals from Diabetes Relief?

14     A.   I never --

15          MR. CAMPBELL:  Objection, form.

16     A.   Can you ask it one more time?

17     Q.   (BY MR. COLLINS)  You deny that -- okay.  Let

18  me put it this way.  Were you holding back any deals --

19  licensing deals that you had on -- coming up from

20  Diabetes Relief in the 2019 or 2020 time frame?

21     A.   Absolutely --

22          MR. CAMPBELL:  Objection, form.

23     A.   -- not.

24          MR. COLLINS:  What's the basis for the

25  objection?

1           MR. CAMPBELL:  It's very confusing, your

2   question.

3       Q.  (BY MR. COLLINS)  Well, okay.  We'll break it

4   down.  Were you chasing any leads in 2020?

5       A.  Yes.

6       Q.  License leads in late 2019?

7       A.  Yes, sir.

8       Q.  Okay.  How many leads were you chasing?

9       A.  I -- I can't give you a number.

10      Q.  Okay.

11      A.  We chased everything we could chase.

12      Q.  Did you wait to close any of those license

13  deals until after you got Hunter out of the company?

14      A.  Absolutely not.  We were hemorrhaging, and

15  everything I and he had put into it was on the line.  We

16  were missing payrolls.  We were in debt.

17      Q.  And so --

18      A.  Every dollar counted.

19      Q.  Okay.

20      A.  Every dollar.

21      Q.  So you deny that you ever told anybody that you

22  were holding deals pending Hunter being -- getting Hunter

23  out of Diabetes Relief?  You deny that under oath?

24      A.  A hundred percent.

25      Q.  And you are -- and some indication that you're

Scott Hepford                                                Pages 152

1  holding deals and will soon see why?  You never said that

2  to anybody?

3      A.  I have absolutely no recollection of what

4  you're talking about at all.

5      Q.  Okay.  So it's your testimony you never said

6  that to anybody?

7      A.  I don't remember saying anything like that to

8  anyone.

9      Q.  Okay.  And you -- and your testimony is you

10  didn't hold back any deals --

11      A.  I absolutely didn't hold back any deals.  We

12  needed every penny we could get to keep the company

13  alive.

14      Q.  And you agree that during that time or any

15  time, if you had pending deals, it was your duty to bring

16  those to Diabetes Relief.  Right?

17      A.  It was every officer, member, or -- whatever.

18  It's everybody's duty to bring whatever is going to

19  benefit the company forward.

20      Q.  And not to hold back on them or divert them to

21  any other entity.  Right?

22      A.  A hundred percent.

23      Q.  Okay.

24          MR. CAMPBELL:  Wayne, we've been going for

25  a bit over an hour.



1          MR. COLLINS:  You want to take a break?

2          THE VIDEOGRAPHER:  Shall we go off the

3  record?  Going off the record at 4:45.

4          (Recess)

5          THE VIDEOGRAPHER:  And we are back on the

6  record at 5:06.

7     Q.  (BY MR. COLLINS)  How much has Mr. Hinman

8  committed to Well Cell as an investment or some type of

9  purchase agreement, total?

10          MR. CAMPBELL:  Objection, form.  Don't

11  answer it.

12          MR. COLLINS:  What's the basis?

13          MR. CAMPBELL:  Outside the scope of

14  discovery.  Invasion of personal and commercial privacy

15  interest, purely harassing.

16     Q.  (BY MR. COLLINS)  Has Mr. Hinman ever provided

17  you a valuation of the IP that was owned by Diabetes

18  Relief in July of 2020?

19     A.  No, sir.

20     Q.  Was there any discussion on what he thought

21  that value of that IP was?

22     A.  Absolutely zero.  Meaning discussion, not

23  value.

24     Q.  Okay.

25     A.  No discussion.



Scott Hepford                                    Pages 154

1      Q.  Because absolutely zero wouldn't be correct

2  because he's paying something for it.  Correct?

3              MR. CAMPBELL:  Objection, form.

4      A.  No.

5      Q.  (BY MR. COLLINS)  When did you start

6  participating in discussions on ways to get Mr. Carr out

7  of Diabetes Relief?

8              MR. CAMPBELL:  Objection, form.

9      A.  Can you be a bit more specific?

10      Q.  (BY MR. COLLINS)  Yeah.  I mean, when did you

11  first start having discussions with anyone regarding

12  methods on how to get Hunter Carr out of Diabetes Relief?

13              MR. CAMPBELL:  Objection, form.

14      A.  I wouldn't characterize it the way you did at

15  the end of that, so the answer is never.

16      Q.  (BY MR. COLLINS)  Okay.  What about my -- how

17  would you characterize it?

18      A.  I would characterize it as there were

19  discussions for years about how to get Hunter an amount

20  that would work, that would work for whoever, you know,

21  "they" are out there, or even us, meaning Stanley and I,

22  and -- and -- and, you know, having -- it's not a "get

23  him out."  It's get him what he's asking for but in a way

24  that people can afford to do it.

25      Q.  Okay.  So, I mean, it's clear you want -- you



1  did not want him to be a manager in early 2020.  Right?

2  You did not want Hunter to be -- no longer be a manager

3  of Diabetes Relief?

4      A.  I would say on July 24th and definitely leading

5  up to July 24th a couple of weeks, I absolutely did not

6  want Hunter to be a manager anymore.  I -- I can't

7  pinpoint when that was absolutely definitive in my mind

8  that we can't work anymore with him being a manager.  I

9  can tell you that it was probably right around when he --

10  I won't mince words -- when Stanley and I feel like he

11  was tricked out of his manager vote.

12          And Hunter and I had a history of clearly

13  not seeing eye to eye operationally.  We're not wired the

14  same.  We don't -- we just don't see the world the same.

15  And that was the big reason why Stanley came in to vote,

16  right?  So he could -- he could try to break ties.  That

17  was -- that was at least part of the plan.

18          It -- it is -- it's, like -- it's, like,

19  flashback PTSD when all of a sudden I'm thrust into a

20  scenario where I no longer have a tie-breaker and I'm

21  back into corporate lockup with Hunter.  That was

22  shocking to me.  It was definitely disappointing to

23  Stanley.  And that's probably about the time when I -- I

24  started to realize that I can't placate him anymore.  I

25  can't work with him anymore.  I can't yield to him every

LEXITAS
APPX1082
INSU_PI_001361

1  time he gets upset about anything.  Like, it's just --

2  it's over.  Like, we're all going to die if we stay on

3  this path.

4       Q.  So during corporate lockout in the -- most of

5  2020 or after that time when Stanley lost his -- a

6  vote -- and which, by the way, you agreed to a new

7  manage -- or new agreement with Mr. Carr, where Stanley

8  was no longer going to have a voting right as a manager.

9  Right?

10      A.  That's not correct.

11      Q.  So the agreement y'all signed in March of 2020

12 between you and Carr didn't acknowledge that Stanley was

13 no longer going to have a vote?

14      A.  I'd have to review that document.  Carol

15 produced that document at Hunter's request.  The

16 conversation that Hunter and I and Stanley had, Hunter

17 and I had separately -- and according to Hunter's

18 testimony, him and Stanley had separately -- all

19 indicated -- because it was very important to us that,

20 "He still has a vote.  He still has a vote, correct?"

21 And it was affirmed to us over and over and over that

22 that was the case.

23           What showed up in that next operating

24 agreement, again, I don't think reflected that, and that

25 is not what we were told.  And, again, we were relying on

1  a partner to put together the documents.

2      Q.  And is it your testimony that you did not have

3  any discussions with anyone outside of Diabetes Relief

4  before that time period on how to remove Hunter as a

5  manager or a member?

6      A.  I wouldn't say that.

7      Q.  Who did you have the discussions with?

8      A.  I have no idea.  I -- I wouldn't, again,

9  articulate it as trying to get him out.  We had

10  discussions with him, with counsel, with -- and, I mean,

11  we -- there was tons of discussions --

12     Q.  No, and I said removed him as a manager.  And

13  I'm -- so I'm not just saying "get out" but --

14     A.  I'm sorry.

15     Q.  -- remove him as a manager and --

16     A.  I must have misunderstood your question.  Can

17  you ask it one more time?

18     Q.  Yeah.  I mean, before March of 2020 did you

19  have discussions with anyone about -- with Lewis about

20  removing Carr as a manager or member?

21     A.  No.

22              MR. CAMPBELL:  Objection, form.

23              THE WITNESS:  Oh, sorry.

24     Q.  (BY MR. COLLINS)  Okay.  What about anyone

25  outside of Diabetes Relief about removing Carr as a



1  member or a manager?

2          MR. CAMPBELL:  Objection, form.

3      A.  My recollection, there was no -- no --

4  literally no discussion with anybody about removing Carr

5  as a manager at all until way later, closer to the time

6  period where July happened when Hunter and I had the

7  conversation saying, "We know your number is 3 million.

8  Give us a chance to go look at it."  I was able to seek

9  guidance of counsel to help me understand what my rights

10  were.  And that's the first time I ever remember having a

11  discussion about that.

12      Q.  (BY MR. COLLINS)  Did anyone -- did Hinman

13  suggest to you prior to July 24, 2020, that Hunter should

14  be removed as a manager or member?

15      A.  Absolutely not.  I don't think Hinman even

16  remembers Hunter's name.

17      Q.  What about Smith?

18      A.  Absolutely not.  Smith was in active

19  negotiations with the company and also Hunter

20  individually, and you've seen all that.  That's all in

21  the -- all in the record.

22      Q.  And as of July 24th, 2020, what was your

23  understanding of Lewis's voting rights or rights as a

24  manager at that time?

25      A.  That they were heavily in dispute between us

1  and Hunter.

2      Q.  Okay.  What about his rights as a member?

3      A.  Can you ask the question again?

4      Q.  Yeah.  What was your understanding of Stanley

5  Lewis's rights as a member as of July 24, 2020?

6      A.  That -- I didn't give it any thought, but that

7  he had full rights as a member, you know, that the Texas

8  business operating code would entitle him to have.

9      Q.  Okay.  Did -- and his membership interest at

10 that time, was it disputed whether it was 18 percent or

11 20 percent or what -- what percentage was it?

12     A.  I don't think that was disputed.

13     Q.  Okay.

14     A.  I think he had stipulated to that in his

15 deposition.  It's -- I think -- I'll be precise for you.

16 I think the ownership is 40.2, 40.2, and his is

17 18-point -- something like that.

18     Q.  Okay.

19     A.  You get to 100 -- it's not exactly 41-41-18 but

20 it's -- it's in that ballpark.

21     Q.  Okay.

22     A.  I don't think that that's disputed by any one

23 of the three of us.

24     Q.  And what was the authority in your meeting on

25 July 24, 2020, by which you voted Hunter Carr out as a



1  manager?

2      A.  We were there as members, meeting as members:

3  Hunter, member; Scott, member; Stanley, member.

4      Q.  And you don't dispute that you signed the

5  agreement -- the new operating agreement.  Right?

6      A.  No, I don't dispute that.  I trust Carol.  What

7  she puts in front of me, I -- I sign it.

8      Q.  So previously you indicated that on July 23rd,

9  I believe, that Hinman provided Well Cell a check for

10  $600,000?

11      A.  Approximately.

12      Q.  Are you sure that check was not $750,000?

13      A.  It could have been.

14      Q.  Okay.  And is the total payout that Hinman is

15  obligated to make 5 million and not 3.793 million?

16      A.  Could be.

17      Q.  Is he obligated to -- or -- to pay any more

18  than 5 million?

19      A.  No.

20      Q.  Okay.  And what accounts for the difference

21  between the 3.793 and the 5 million?  What is he getting

22  for the other money?

23              MR. CAMPBELL:  Objection, form.

24      A.  Can you ask that again?

25      Q.  (BY MR. COLLINS)  Yeah.  I mean -- okay.  On

LEXITAS
APPX1087

INSU_PI_001366

1  the wind-down plan, you have 3.793511 going to the

2  Well -- I mean the Diabetes Relief family of entities.

3  Right?

4      A.  No.  Going to Diabetes Relief LLC.

5      Q.  LLC.  But earlier -- I mean -- okay.  That's

6  right.  It's going to the LLC.  But you've also told me

7  that the Diabetes Relief wind-down plan that you provided

8  encompasses --

9      A.  Yes.

10     Q.  -- everything.

11     A.  Correct.

12     Q.  So that's going to pay for all those assets,

13  the 3.7.  Right?

14     A.  The mechanism that we used to get capital into

15 Diabetes Relief to effectuate three things at the same

16 time is that 3.7 and the rest of -- whatever -- the exact

17 amount.

18     Q.  Okay.  And there was a total of 5 million paid

19 to Well Cell.  What is the other 1.2-ish for?

20     A.  That's not true.

21     Q.  Okay.  What's not true about that?

22     A.  There was not a total of 5 million paid to Well

23 Cell.

24     Q.  Is it promised to be paid to Well Cell by

25 Hinman?



1      A.   No.

2      Q.   Is there a loan agreement for the total of 5

3  million?

4      A.   There's a promissory note.   That's the name of

5  the agreement.   The terms are not what you stated.

6      Q.   Okay.   So there's -- is the 3.79 million that's

7  coming in -- is that in the form of a promissory note or

8  is that -- is that characterized somewhere else?

9      A.   Asset purchase.

10      Q.   Asset purchase agreement.   So the balance of

11  that is a promissory note?

12      A.   No, that's not correct.

13      Q.   Okay.   What is it?

14      A.   You're confusing multiple things here.

15           Hinman did a seed capital investment into

16  an entity that -- a specific charter for specific things.

17      Q.   And that's Well Cell?

18      A.   Correct.

19      Q.   Okay.

20      A.   And his -- his only requirements in that, and

21  for me to be a good partner and honor this as part of my

22  governing thing that I have to do to do all the rest of

23  it --

24      Q.   Uh-huh.

25      A.   He wants to work with me.   The man runs



1    literally over 200 doctors, 46,000 patients or something.

2    He doesn't have time to run operations.  He wants me

3    running operations in an entity that's furthering the

4    understanding of what this is and deploying it

5    specifically into the global risk provider world.

6    That's -- that's literally all he cares about.  I've

7    confirmed it with him multiple times.

8                      Effectively that means I need to be free to

9    do that.  Part of my freedom is what you're saying in the

10   three seven.  I'm -- I'm buying my freedom and trying to

11   leave as little damage in the wake.  I'm trying to make

12   sure that all debts are covered, all -- that there's

13   no -- you know, we're not tied up in bankruptcy courts,

14   that Hunter gets what he asked for, that the clinics stay

15   open, and that we have enough operating capital to

16   accomplish those things.  There was always an alternative

17   option of walking from all of it and using the total

18   investment into the new, clean-balance-sheet company to

19   start over.

20        Q.  Uh-huh.

21        A.  I chose not to do that.  I chose to try to

22   solve all these other things.  And, thus far, we're --

23   you know, obviously we're litigating, but we've cleared

24   the debts.  We've -- we've executed the things that we

25   set out to do thus far.  The clinics are still alive.



1  The -- finally almost at break-even or right at

2  break-even.

3              Aside from Hunter not accepting the offer

4  that we felt was very fair because it's what he asked for

5  on his side -- I still think it's overpaid.  I still

6  think it's a hostage fee.  But I was willing to go down

7  with the ship because he wasn't willing to be reasonable.

8  So you're willing to pay the ransom to get your freedom

9  to try another day.  He got to go home -- if he would

10  have accepted it, he got to go home and sit with his

11  wife.  I got to work for the next --

12      Q.  And --

13      A.  -- ten years.

14      Q.  No, no -- I -- you know, I can object to that

15  being nonresponsive, but I know you're trying to be

16  responsive to it.

17      A.  I'm trying to.

18      Q.  And what I'm just trying to understand is the

19  structure of the money that was coming in there.  But

20  I -- and I think I have a pretty good idea.  I want to

21  ask one other question.

22              Is there any other investor or group of

23  investors outside of Hinman that have provided seed

24  capital or any kind of financing or money in any shape,

25  form, or fashion?

1        A.  No, sir.  I mean, license -- you know, selling

2  licenses and --

3        Q.  I mean, you're selling licenses.

4        A.  Yeah.

5        Q.  I --

6        A.  Are you talking about investing in --

7        Q.  In some type of investment, whatever form that

8  took -- you know, loans or however that could go.

9        A.  No, sir.

10       Q.  Okay.  All right.  That helps me.

11                 Then, also, the next question I want to ask

12  is is Well Cell -- I understand that there was -- the

13  asset purchase agreement that got -- that was --

14  purchased Diabetes Relief IP -- which was mainly the

15  patents.  Right?

16       A.  No, I wouldn't say it that way.

17       Q.  Okay.  And how would you say it?

18       A.  What's there?

19       Q.  Uh-huh.

20       A.  Options on these things.  But in the limited

21  amount of time, I had to come up with a way to do this

22  and to be able to make sure there's money that backstops

23  what we're offering Hunter.  I scrambled to throw this

24  together.  The wording in the asset purchase agreement

25  itself is obviously more accurate, but this was the

LEXITAS
APPX1092

1  spirit of what we were trying to do.  So it's not just,

2  you know, patents, I mean.  But, honestly, we operated

3  before there were patents.

4      Q.  No, and what I'm saying is, is that Well Cell

5  has got these -- this -- these two patents and the one

6  pending.  Right?

7      A.  The one pending has been abandoned.

8      Q.  Okay.  So we -- we got the -- the issued

9  patents and the pending patents.

10     A.  Uh-huh.

11     Q.  All copyrights and trade secrets, all insulin

12  and all that, charts, vendor contracts with Zyno.

13     A.  Uh-huh.

14     Q.  And SmartLev and then creative materials.

15     A.  Yes.

16     Q.  Office furniture, medical supply inventory,

17  infusion pumps, software, all intercompany agreements,

18  all cash account -- in accounts, license agreements --

19  okay.  And then -- so that's what it got.  That's what

20  Well Cell got.  Right?

21     A.  Yes.

22     Q.  So everything on this list it got.  It might be

23  a little bit broader but --

24     A.  Yes.

25     Q.  -- in the agreement, but they at least got all



1  this.  Right?

2      A.  Uh-huh.

3      Q.  Okay.  And so outside of the diabetes business

4  that at least Diabetes Relief was trying to do, is Well

5  Cell doing any other type of business?

6      A.  Yes.

7      Q.  Okay.  You can -- just list that category and

8  I'll see how detailed I have to get into it before I draw

9  an objection.  I just want to get a picture of it.

10     A.  Okay.  I hesitate -- oh, sorry.

11     Q.  No, go ahead.  Yeah.

12     A.  I hesitate because it's -- I don't know if I'd

13  characterize it as a business.  It's -- it's a -- it's --

14  it's effectuating research, publications, and

15  understanding of what's unknown.  There's only so much

16  that Diabetes Relief figured out.  There's a lot that's

17  unknown.

18           And you -- you -- there's -- Diabetes

19  Relief struggled for all the things that we've said in

20  here --

21     Q.  Uh-huh.

22     A.  -- all the acrimony and all that.  But there's

23  also fundamental things that are just missing in it.  It

24  doesn't have, you know, a specific code associated to it.

25  There's things that make it very, very difficult for it



1  to -- to survive.

2      Q.  And let me help you out, because that's

3  probably an inartful question and I'll blame myself on

4  that.

5              But what I'm asking is, other than the --

6  these treatments that Diabetes Relief had or had patents

7  on or were trying to implement --

8      A.  Uh-huh.

9      Q.  -- and while I understand there might be other

10  applications possible or other research to be done, is

11  there any other type -- like, that fall completely out of

12  that category, the type of business --

13      A.  No.

14      Q.  -- that Well Cell is doing?

15              Okay.  So my point is, is at its core, it's

16  still the same type of business that Diabetes Relief was

17  doing?

18      A.  No.

19              MR. CAMPBELL:  Objection, form.

20      Q.  (BY MR. COLLINS)  Okay.

21      A.  I couldn't characterize it that way.

22      Q.  Okay.  Why not?

23      A.  Because it's focused on being a global leader

24  and -- and driving the understanding of this and pushing

25  it up into upper, upper, upper levels of -- of academia

1  here in the United States and worldwide.  It has to keep

2  itself alive.  So it sells licenses but with the focus --

3  it's, like, what are you doing with that revenue?  You're

4  pointing at this bigger objective.

5       Q.  Okay.  And what do you mean, like, a global --

6  what was the -- global --

7       A.  So academia.  So -- so --

8       Q.  No.  You said another word before "global."

9  Player or influence or -- academia, but you had

10  "global" --

11      A.  Global risk providers?

12      Q.  Yeah.  What do you mean by that?

13      A.  So global risk provider is a specific type of

14  medical company, I guess, or practice.

15      Q.  Uh-huh.

16      A.  And they have signed contracts directly with

17  Medicare or whoever, and they're taking full risk,

18  meaning if -- this is just a hypothetical.  Don't --

19  don't -- don't clobber me on the numbers.

20           Let's say Medicare paid $800 per person per

21  month, period.  Like, that's how much it knows that it's

22  spending on every single Medicare patient.  A global risk

23  provider would sign a contract where they would come in

24  and say, "We'll do it for 700."  And now they're a global

25  risk.  So if that patient falls down and breaks their

LEXITAS
APPX1096

INSU_PI_001375

 1  knee, it comes out of that doctor's pocket.  Medicare

 2  isn't reimbursing anymore.  They're giving them, you

 3  know, a discount, but they get the whole budget to now

 4  deploy.

 5              There's a lot more -- that world is that

 6  the physician is effectively also the insurance company.

 7  That's -- they're both.  And so they're incented to try

 8  to keep the costs down because they get to keep -- that's

 9  their business model.  They get to keep the net revenue

10  of whatever they don't spend.  So they're incented to

11  keep the patient healthy and keep them alive a long time.

12  And they are the decision-maker.  There is no Medicare

13  coming over their shoulder or anybody else.  They -- they

14  are the decision-maker.

15              So this is a perfect model for somebody

16  like that, albeit they're kind of unicorns.  There's not

17  a ton of them out there.  But it's a perfect model

18  because it helps them give good care, reduce the costs,

19  and that's a good place, in my opinion, for this to -- to

20  live while, at the same time, we're trying to get the

21  whole world to understand eventually what it is and how

22  it works along the path of us understanding better too.

23      Q.  Okay.  And on -- just go back to the asset

24  purchase to sell.  It says "License Agreement (Nonfederal

25  Payments)."

1     A.  That's just other wording for not Medicare

2  versus Medicare.

3     Q.  Okay.  And then -- I guess I'm trying to figure

4  out what the difference between these -- it says the same

5  thing, "License Agreements (Nonfederal Payment)," then it

6  has Yeni Yuzyil Turkey license, Diabetes Relief Middle

7  East, Dr. Hinman, and First American Health.

8          And why are those in -- license agreements

9  in a different category than the list below it that says

10  the same thing?  That says "License Agreement (Nonfederal

11  Payment)" and it has mainly doctors' names in there, with

12  a few exceptions.

13     A.  I should have had you proofread this before

14  I -- I turned it in.  Sorry.

15          What it should say is "Federal Payments" in

16  the bottom one.

17     Q.  Okay.

18     A.  And that was just a typo.  I messed up.

19     Q.  I'm -- I'm the world's worst.  So that makes

20  total sense to me.

21          And so at the time there was a license

22  agreement in place with Turkey that -- as of 7/24?

23     A.  Yes, sir.

24     Q.  Diabetes Relief Middle East?

25     A.  Oh.  I'm sorry.  Go back.  There was not a

LEXITAS
APPX1098

INSU_PI_001377

1   license in place with Yeni Yuzyil in Turkey.  There was

2   a -- I don't know the name of the contract.  There was an

3   agreement in place with a -- with a broker kind of person

4   that -- an independent contractor.

5       Q.  Uh-huh.

6       A.  And we -- we never got a signed license with

7   that university from -- from that -- from that

8   contractor.

9       Q.  And that had to deal with -- there was some

10  issue -- operational issue with design of -- not having a

11  CE certification?

12      A.  No.

13      Q.  Okay.

14      A.  Not -- not the way you asked that.

15      Q.  Okay.  Why didn't that deal go through, then?

16      A.  Which deal?

17      Q.  I mean the Turkey deal.  I mean, there was an

18  agreement in place but it wasn't performing?  Or what

19  happened there?

20      A.  I think the independent contractor wasn't

21  running a very tight ship and just never did it.

22      Q.  Okay.  Got it.  At the time of 7/24/2020 how

23  much revenue was -- or what was the deal with Dr. Hinman

24  and Island Doctors with Diabetes Relief?

25      A.  He was a licensed location.

1      Q.   Okay.  And did that include the other 200

2   doctors that you mentioned earlier that he had access to?

3      A.   How do I answer that?  It -- our -- the

4   licenses are for the location with a specific -- with a

5   specific address.  So this is his first location.

6      Q.   Uh-huh.

7      A.   If he wanted to expand, he could, but he

8   couldn't under that license.  He would have to -- he

9   would have to get a new license.

10             MR. COLLINS:  Go off the record for two

11   minutes.  I think I'm almost done.

12             THE VIDEOGRAPHER:  Going off the record at

13   5:34.

14             (Recess)

15             THE VIDEOGRAPHER:  We're back on the record

16   at 5:40.  You may proceed.

17             MR. COLLINS:  This is Wayne Collins for the

18   plaintiff.  We'll reserve our questions till the time of

19   trial.

20             MR. CAMPBELL:  And we'd like to read and

21   sign, but otherwise we'll reserve our questions for

22   trial.

23             THE VIDEOGRAPHER:  Okay.  Going off the

24   record at 5:40.  Thank you, everyone.

25                  (DEPOSITION ADJOURNED)

1                       CHANGES AND SIGNATURE

2    WITNESS:   SCOTT HEPFORD

3    DEPOSITION DATE:   AUGUST 12, 2021

4    Reason Codes:  (1) to clarify the record; (2) to conform
     to the facts; (3) to correct a transcription error; (4)
5    other (please explain).

6

7    PAGE    LINE    CHANGE              REASON CODE

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____



APPX1101

INSU_PI_001380

Scott Hepford                                                          Pages 175

```
 1            I, SCOTT HEPFORD, have read the foregoing

 2   deposition and hereby affix my signature that same is

 3   true and correct, except as noted on the previous page.

 4

 5                              _____

 6                              SCOTT HEPFORD

 7

 8   STATE OF _____  )

 9   COUNTY OF _____  )

10            Before me, _____, on this day

11   personally appears SCOTT HEPFORD, known to me (or proved

12   to me under oath or through _____)

13   (description of identity card or other document) to be

14   the person whose name is subscribed to the foregoing

15   instrument and acknowledged to me that they executed the

16   same for the purposes and consideration therein

17   expressed.

18            Given under my hand and seal of office this

19   _____ day of _____, 2021.

20

21                              _____

22                              NOTARY PUBLIC IN AND FOR
                                THE STATE OF _____
23

24                              COMMISSION EXPIRES: _____

25
```



APPX1102

INSU_PI_001381

```
 1                   CAUSE NO. 2020-45718

 2  HUNTER CARR                  §      IN THE DISTRICT COURT OF
                                 §
 3       Plaintiff               §
                                 §
 4  VS.                          §
                                 §      HARRIS COUNTY, TEXAS
 5  STANLEY T. LEWIS; SCOTT      §
    HEPFORD; WELL CELL GLOBAL,   §
 6  LLC; RESTOR METABOLIX, INC.  §
                                 §
 7       Defendants             §      127TH JUDICIAL DISTRICT

 8                   - - - - - -
                 REPORTER'S CERTIFICATION
 9     ORAL AND VIDEOTAPED DEPOSITION OF SCOTT HEPFORD
                    AUGUST 12, 2021
10                 (Reported Remotely)
                     - - - - - -

11

12        I, Shelly M. Tucker, RPR, CRR, Certified

13  Shorthand Reporter in and for the State of Texas, hereby

14  certify to the following:

15        That the witness, SCOTT HEPFORD, was duly sworn

16  by the officer and that the transcript of the oral

17  deposition is a true record of the testimony given by the

18  witness;

19        That the deposition transcript was submitted on

20  August 30, 2021, to the witness or to the attorney for

21  the witness for examination, signature, and return to

22  Lexitas by September 20, 2021.

23        That the amount of time used by each party at

24  the deposition is as follows:

25        Mr. Collins - 4 hours, 14 minutes
```



```
1            Mr. Campbell - no time used

2

3            That pursuant to information given to the

4    deposition officer at the time said testimony was taken,

5    the following includes counsel for all parties of record:

6    FOR THE PLAINTIFF:

7         Wayne Collins
          MEADE & NEESE LLP
8         2118 Smith Street
          Houston, Texas 77002
9         Tel: 713-355-1200
          wcollins@meadeneese.com
10

11   FOR THE DEFENDANTS STANLEY T. LEWIS, SCOTT HEPFORD, AND
     WELL CELL GLOBAL LLC:
12
          Nathan Campbell
13        AHMAD ZAVITSANOS ANAIPAKOS ALAVI & MENSING PC
          1221 McKinney, Suite 2500
14        Houston, Texas 77010
          Tel: 713-600-4970
15        Fax: 713-655-0062|
          ncampbell@azalaw.com
16

17            I further certify that I am neither counsel

18   for, related to, nor employed by any of the parties or

19   attorneys in the action in which this proceeding was

20   taken, and further that I am not financially or otherwise

21   interested in the outcome of the action.

22            Further certification requirements pursuant to

23   Rule 203 of TRCP will be certified to after they have

24   occurred.

25            Certified to by me this 28th day of August,
```



1   2021.

2

3   *Shelly M. Tucker*

4   _____

    SHELLY M. TUCKER, RPR, CRR

5   Texas CSR 4419 - Expires 7/31/2023

    Lexitas - Firm Registration No. 17

6   1016 La Posada, Suite 294

    Austin, Texas 78752

7   (512) 465-9100

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            FURTHER CERTIFICATION PURSUANT TO RULE 203

 2

 3            The original deposition was/was not returned to

 4   the deposition officer on _____;

 5            If returned, the attached Changes and

 6   Corrections page contains any changes and the reasons

 7   therefor;

 8            If returned, the original deposition was

 9   delivered to Wayne D. Collins, Custodial Attorney;

10            That $_____ is the deposition officer's

11   charges to the Plaintiff for preparing the original

12   deposition transcript and any copies of exhibits;

13            That the deposition was delivered in accordance

14   with Rule 203.3, and that a copy of this certificate was

15   served on all parties shown herein and filed with the

16   Clerk.

17            Certified to by me this _____ day of

18   _____, 2021.

19

20                        _Shelly M. Tucker_____

21

22                        SHELLY M. TUCKER, RPR, CRR
                          Texas CSR 4419 - Expires 7/31/2023
                          Lexitas - Firm Registration No. 17
23                        1016 La Posada, Suite 294
                          Austin, Texas 78752
24                        (512) 465-9100

25
```

Scott Hepford                                    s Index: $1,000..2015

### Exhibits

**Hepford 001** 3:11 69:17, 19

**Hepford 002** 3:12 103:1,3, 4

**Hepford 003** 3:13 119:11, 13

---

### $

**$1,000** 59:20

**$1.7** 22:19 31:16,22

**$1.8** 149:15,21

**$10,000** 141:7

**$100,000** 47:8 56:12 60:22

**$120,000** 29:12

**$18** 45:1

**$200,000** 57:6,15

**$25,000** 75:10

**$284,000** 42:21,24

**$3** 112:11 113:17

**$334,000** 116:4

**$345,000** 115:16 116:10

**$38,000** 100:24

**$4,000** 73:1

**$50,000** 89:1 143:6

**$6,832** 117:4

**$60,000** 99:21

**$600,000** 160:10

**$64,000** 125:25 126:6,7

**$640,000** 133:9

**$644,971** 146:16

**$644,971.07** 135:17

**$750,000** 160:12

---

**$800** 169:20

**$800,000** 54:10

**$85,000** 113:12

---

### 0

**00** 70:3,18

**00013** 69:25 70:3,13

**00150** 70:14

---

### 1

**1** 52:19 69:17,19 124:19

**1,000** 59:23

**1.1** 95:23

**1.2-ish** 161:19

**1.547** 76:1 77:3

**1.7** 22:8

**1.8** 149:4

**10** 17:25 140:16

**10,000** 140:21

**10/6** 137:8,13

**10/6/20** 138:10

**100** 45:15 58:3 68:24 90:15 125:8 159:19

**100,000** 146:17

**113** 138:7

**113,713** 139:1

**11:12** 4:4

**12,592** 141:14

**120** 12:1

**120,000** 23:7

**123** 138:3

**12:05** 36:1

**12:27** 36:4

---

**12th** 4:3

**13** 71:1

**15** 70:14,18 71:2

**150-plus** 80:23

**150-year-old** 11:24

**17th** 111:5

**18** 39:3,15 124:14,18 159:10

**18-point** 159:17

**19** 124:18

**19611** 5:7

**1975** 6:4

**1998** 7:22

**1:20** 69:14

---

### 2

**2** 12:23 52:19 57:24 58:2,5 103:1,3,4

**20** 94:13 96:7 115:14 117:2 149:20 159:11

**20-some-odd** 121:19

**200** 56:24 60:24 163:1 173:1

**200,000** 56:14

**2000** 9:19

**2001** 7:25 12:21

**2004** 12:21,24 13:12

**2008** 13:13 17:20

**2009** 7:23 17:20 20:20

**2010** 22:5

**2011** 20:20

**2012** 22:5 27:8

**2014** 48:11 52:11 58:23 59:4,6 67:23,24 68:10

**2015** 48:18 49:11 59:5,8,

Scott Hepford                                                    s Index: 2016..600,000

11,12 60:4 61:9 62:4
63:8,20,25 64:8,14 65:13,
16 67:2,12 96:24

**2016** 64:9 96:21 97:8,9

**2017** 64:9 66:20 96:9,13,
14 126:7

**2018** 95:22,23 96:1 128:5

**2019** 68:11 84:7 93:25
94:6,8,11 95:17,19 97:2,
8,9 146:23 149:3,19,20
150:1,2,5,11,20 151:6

**2020** 66:21 94:14,18 95:2,
3 97:2,10 103:5,15
104:25 105:10 108:3,4
110:10 115:15 116:19
123:22 141:12 145:5
146:23 150:5,20 151:4
153:18 155:1 156:5,11
157:18 158:13,22 159:5,
25

**2021** 4:3 117:3

**2024** 118:8,11,14

**20th** 49:11 59:8 115:14

**22** 140:15 141:12

**23rd** 6:4 111:5 123:22
129:15 160:8

**24** 103:15 105:10 108:3
158:13 159:5,25

**24-page** 84:11

**240** 91:23

**24th** 95:5 103:5 122:18
129:17 137:13 155:4,5
158:22

**25** 96:8

**26** 122:11

**28** 108:4

**2:14** 69:16

---

## 3

**3** 112:10,14,16,24 113:5,
14,22 114:7,8 119:11,13
134:5,20 145:12,17
146:5,7,14 158:7

**3,000-something** 142:8

**3.7** 161:13,16

**3.7635111** 144:25

**3.79** 162:6

**3.793** 160:15,21

**3.793511** 161:1

**3/11** 138:11 144:8

**3/21/16** 126:25

**3/25** 77:10

**3/25/2020** 72:4 78:15
79:19 81:14

**30** 22:20 35:20 60:8

**30,000-foot** 16:14 84:19

**30,650** 143:21

**30-some-odd** 150:13

**300** 56:16 61:1

**300,000** 118:2,3

**32** 22:21 28:10,11 94:7,9,
10 140:15 149:24

**32,000** 140:8

**38** 150:11

**3:06** 102:22

**3:33** 102:25

---

## 4

**4** 56:22 120:5,6

**4,750** 73:15,16

**40** 35:14 60:8 95:12

**40-60** 35:12

---

**40.2** 159:16

**400** 26:16 56:18 61:3

**401(k)s** 22:14

**41** 77:5 112:11,12 113:11,
14,18,20,23 114:3,4

**41-41-18** 159:19

**43,000** 141:23

**45** 18:16

**46,000** 163:1

**4:45** 153:3

---

## 5

**5** 114:16 115:12 137:1
160:15,18,21 161:18,22
162:2

**50** 45:10 60:8

**50-50** 50:6,7 56:7 58:17,
20

**500** 61:5 139:23

**500-and-some-odd**
139:21

**580** 80:21

**580,000** 80:21

**580,000-ish** 133:16

**5:06** 153:6

**5:34** 173:13

**5:40** 173:16,24

---

## 6

**6** 117:1 128:24 135:17

**6,000** 117:4

**60** 35:13 94:13,16 95:1,5

**60,000** 117:5

**60,832** 117:6,9

**600,000** 116:25

---

LEXITAS
APPX1108

INSU_PI_001387

**62,350** 73:22

**64** 24:19

**640** 133:23 135:16

**640,000** 132:25 146:15

---

**7**

**7** 45:12

**7/21/20** 109:23

**7/24** 137:23 171:22

**7/24/20** 107:7 112:12 134:22 139:2 140:22 141:4

**7/24/2020** 110:20,24 111:7 148:7,11 172:22

**700** 169:24

**77433** 5:16

---

**8**

**8** 11:9

**85,000** 80:22

**89** 122:10

---

**9**

**9,216** 141:16

**900** 133:23 146:20

**906** 137:7,8

**937,374.07** 135:12

**96** 6:14,20

**960-ish** 80:19 133:14,18

---

**A**

**a.m.** 4:4

**abandoned** 36:22 37:15, 16,18 166:7

**ability** 82:12,13 85:5,15, 16 146:25

**absolute** 51:8 101:10

**absolutely** 31:10,15 86:7, 11 89:10 90:4,24 93:24 105:23 128:9 139:3 144:4 147:2 150:21 151:14 152:3,11 153:22 154:1 155:5,7 158:15,18

**abysmal** 97:22

**academia** 168:25 169:7,9

**accept** 129:18 134:21

**accepted** 164:10

**accepting** 164:3

**access** 173:2

**accomplish** 85:10 163:16

**account** 23:23 45:22 46:6 59:21 60:15,17,19 61:11 73:11 111:2,3,16 134:11 166:18

**accounted** 92:3 133:19,24

**accounting** 10:18 18:17 109:9

**accounts** 29:8 73:3,7,13, 21 113:20 134:22 135:3 137:22 160:20 166:18

**accumulated** 42:17

**accurate** 72:6,19 74:1 116:21 126:15 165:25

**accurately** 73:14

**accusing** 86:21 132:12

**acknowledge** 156:12

**acquire** 19:7 130:6

**acquires** 15:23

**acquisition** 19:4,24 33:6

**acquisitions** 19:16

**acrimony** 167:22

**action** 26:9 27:3,6,13 64:22 85:1

**active** 68:5 90:25 158:18

**actively** 52:10

**activity** 48:10

**actor** 51:19

**actual** 12:7 43:4 46:12 64:20 68:23

**add** 80:20 137:15

**added** 86:2 87:10

**addition** 28:2 74:7

**additional** 6:19,20 71:23

**address** 5:6,20,21 6:1 173:5

**ADJOURNED** 173:25

**administration** 6:21

**advancement** 129:5 130:17

**advancements** 130:4,7,12

**advantage** 51:19 88:24 125:16 126:20

**advise** 18:25 55:25 106:13

**advised** 23:24 33:3 89:7

**advocate** 86:2

**affirmation** 72:3

**affirmed** 156:21

**afford** 89:19 154:24

**age-old** 82:20

**agencies** 23:10 24:5

**agree** 69:5 70:23 81:13 85:25 149:2,5,6 152:14

**agreed** 128:20 156:6

**agreement** 41:1 43:21 44:4 46:17,21 84:16 90:1, 2,10,13 91:8,14,17 92:10,

LEXITAS
APPX1109

INSU_PI_001388

Scott Hepford

15,24 93:15,23 98:22
99:8,14,17 100:7,12,16,
17 102:17 142:5 144:23
153:9 156:7,11,24 160:5
162:2,5,10 165:13,24
166:25 170:24 171:10,22
172:3,18

**agreement's** 84:17

**agreements** 83:13 84:8,9
90:18 94:1 95:18,25 96:9,
15,22 97:2,5,8,11,24
98:3,11,16 99:24 101:3,
15 102:7 146:25 148:21
149:3,21,25 150:4
166:17,18 171:5,8

**ahead** 25:13,20 28:24
40:23 69:11 78:22 100:19
120:25 145:11 167:11

**akin** 80:25

**Alan** 5:5 70:14

**albeit** 170:16

**alive** 80:23 119:7 126:1
129:23 133:3 152:13
163:25 169:2 170:11

**allocated** 131:4

**altercation** 90:21

**altered** 105:1,5

**alternative** 22:8,12 25:1
163:16

**Alto** 90:8 91:10 92:9 93:4,
8,18

**amend** 47:25

**American** 171:7

**Amex** 143:12,14

**amount** 44:10 52:5 53:25
57:10,22 64:25 75:9
95:12 101:19 107:22
112:18 113:23 115:15
117:3 126:6 142:8 154:19
161:17 165:21

**amounts** 33:20 35:7 59:15
102:16 110:7

**Amy** 141:21 142:2,6

**analysis** 149:9

**and/or** 55:15,16

**anger** 86:11

**animal** 130:23

**answers** 128:4

**anticipated** 68:19 148:19

**anticipating** 130:17

**anymore** 127:19 155:6,8,
24,25 170:2

**anytime** 96:14

**AP** 112:12 132:25 135:11,
14

**apologize** 7:25

**apparent** 43:19

**apparently** 36:23 103:4

**appease** 88:2

**application** 72:2

**applications** 168:10

**applied** 9:7

**apply** 11:8

**apprehend** 23:11

**approaches** 85:4

**approaching** 13:18

**approval** 16:5

**approximately** 21:23
28:10 34:21 37:18 42:21,
22 45:1 57:2,6,15 60:3
63:10 73:1 95:24 96:6,7,
23 98:6 99:9,16,19
100:11 116:21,25 117:24
123:22 124:11 133:14
139:20 142:8 160:11

**AR** 80:20 132:25

**Arbor** 5:7

**area** 60:9

**Areas** 129:1

**arguably** 147:14

**argue** 82:23

**argued** 89:5,16

**arguing** 81:2

**argument** 68:7 89:18

**Arizona** 6:12 7:18

**arms** 71:21

**arrangement** 40:16,17

**ARRYVE** 17:19,22 19:5,
17,20

**art** 147:20

**articulate** 157:9

**articulating** 34:16

**artificial** 52:14

**Ascentium** 142:9

**aspect** 97:3

**aspirations** 19:9

**assess** 18:24 77:15

**asset** 50:22 51:24 54:13
82:6,8 110:4 122:17,23,
24 144:22 162:9,10
165:13,24 170:23

**assets** 52:1 72:22 81:20,
24 82:2 122:19,20,22
144:22 145:4 161:12

**assign** 20:8

**assistance** 19:12 72:11

**assistant** 63:15

**assistants** 75:4

**assisted** 35:2

**associate** 6:18 142:22

**associate's** 6:16 7:10

LEXITAS
APPX1110

INSU_PI_001389

**assume**  16:16 46:5 61:2
79:9 103:20 115:15 141:7

**assumed**  31:5

**assuming**  124:14 127:1,
11

**Atlanta**  99:12

**attempted**  32:20

**attempting**  65:14,18

**attend**  6:7,11

**attendance**  4:13

**attended**  6:12

**attorney**  57:18

**attorneys**  46:4 56:2 57:18
65:11

**audit**  45:17 54:21

**audits**  92:2

**August**  4:3 99:9 117:2

**Austin**  127:12,18

**authority**  159:24

**automated**  9:9 11:6

**average**  101:18 114:5

**aware**  29:2 31:1,14 46:21
63:6 78:1 81:17

**awareness**  85:9

**awkward**  24:8

---

**B**

**back**  20:9 23:6 35:19
36:3,6 43:12 44:9 46:8
47:7 67:23 69:15 75:6,24
77:15 87:20 91:20,21,25
92:18 102:24 107:15
113:11 118:7 121:18
128:13,19 129:14 133:18
137:15 139:3,25 140:18
150:12,18 152:10,11,20
153:5 155:21 170:23
171:25 173:15

**back-due**  46:14,15

**backed**  78:9,10

**backstop**  114:10 115:8

**backstops**  165:22

**backup**  46:9

**bad**  41:14 51:19 75:14,19

**Bahamas**  7:21

**Bain**  142:21,22

**Bakken**  32:17

**balance**  15:5 73:11 81:19
119:8 133:7 136:3,4
143:12,25 162:10

**balanced**  133:21

**balances**  23:23 144:2,8

**balloon**  118:10,13,15

**ballpark**  159:20

**bank**  13:22 14:11,16
16:17 59:21 60:15,17,19
61:11 73:2,3,7,8 80:22
111:2,3,15 113:12

**banking**  9:21 73:11

**bankrupt**  95:13

**bankruptcy**  80:24 81:17
147:4 163:13

**banks**  13:20

**bargain**  44:12,20

**Basa**  141:21 142:2,6

**Basa's**  142:2

**base**  85:13

**based**  18:1 25:23 32:21
51:19,21 85:6 90:13
106:13 108:19 128:13
134:25 142:24 149:24

**basic**  49:19 81:23 84:15

**basically**  9:13 17:24
18:24 58:20 81:18 84:22
85:24 87:15 88:25 92:5

113:13,15

**basis**  25:10 42:12 53:20
61:16 85:23 105:14
123:13 150:24 153:12

**basketball**  82:20

**Bates**  69:25

**began**  48:12,13

**begin**  4:6 104:13

**beginning**  9:4 43:23

**behalf**  4:23 19:16 28:16
67:3 70:7 94:2

**belief**  136:10

**believed**  132:23,24

**Bellevue**  18:1 21:6,20,25

**belly-up**  31:11

**beneficial**  85:10

**beneficiaries**  48:5

**beneficiary**  48:3,4,6

**benefit**  152:19

**benefitting**  88:10

**big**  10:5 12:10 16:17 19:9
35:1 85:19 86:6 124:13
128:8 133:18 148:24
155:15

**bigger**  19:10 169:4

**biggest**  44:21

**Bill**  47:1 142:21,22

**billed**  89:7

**billing**  51:22 56:1 63:18
68:23 89:4 125:21,23
126:16

**billion**  11:9

**bills**  74:14 75:7 132:25
133:15 145:22

**bindery**  8:4

**binding**  8:4

**Bionica** 65:24

**bird's-eye** 50:1

**birth** 6:3

**bit** 7:19,20 31:21 61:21
73:25 146:19 152:25
154:9 166:23

**bizarre** 6:2

**black** 104:19

**blame** 117:6 168:3

**blank** 63:13

**blew** 112:21 145:25

**blown** 112:20

**Bob** 34:15 47:1

**Boca** 90:6,11 91:4,5 92:12
93:12,19,21

**body** 85:1 88:20

**boiled** 85:25

**bonds** 76:1,7

**book** 43:5

**bookkeepers** 143:19

**books** 109:9

**boom** 12:1

**borrower** 17:17

**boss** 87:3

**Boston** 12:14,17

**bottom** 65:2 171:16

**bought** 87:12

**boutique** 17:23

**bow** 86:11

**box** 9:3 87:25

**Branch** 126:23

**brand** 132:18

**brand-new** 49:12

**break** 26:1 31:21 35:23
49:5 50:4 52:25 63:24

65:15 69:12 84:20 86:3
102:19 112:13 151:3
153:1 155:16

**break-even** 164:1,2

**breaks** 169:25

**breathing** 52:7 145:24

**bring** 23:10 127:5 130:3
152:15,18

**bringing** 12:4 25:16

**broad** 49:23 149:19

**broader** 166:23

**broken** 10:5

**broker** 172:3

**brought** 11:23 18:23
51:21 55:25 89:4

**bucks** 60:8 77:7 112:25

**bud** 90:22

**budget** 170:3

**Buffalo** 24:15,16

**build** 23:21

**building** 10:13 12:7 20:16
35:2 108:1

**Built** 48:23

**bunch** 14:4 18:3 35:8,9,10
91:19

**business** 6:21 7:7 11:14
14:6,17 15:1,4,5,9 16:16
20:13 33:10 54:12 66:24
67:2 68:12 83:12 86:17
91:22 97:3 101:11 106:4
127:10 159:8 167:3,5,13
168:12,16 170:9

**businesses** 33:4

**buy** 11:5 53:12 90:2
112:10

**buyer** 80:6

**buyers** 80:2

**buying** 84:23 163:10

**buyout** 112:6,14 114:6,17
119:4 133:3

---

**C**

**calculating** 76:4

**California** 51:19 90:8
91:10

**call** 26:2 52:9 90:21
147:15,17

**called** 6:12 50:22 65:24
90:19 120:8 138:15

**calling** 28:21

**calls** 28:15

**Campbell** 4:15,19,22 16:8
21:1 25:9,11,19 28:23
29:19 31:20 49:17,21
52:24 62:13 64:3 68:14
69:10,22 78:16,21 79:8
81:22 83:9 98:13,18
100:9,13,18 101:8,18,23,
25 102:9,12,18 105:3,7,
13,15,19,25 106:5,12,15
119:16 123:11,14 136:6
145:10 147:1 148:3,5,8,
13 150:15,22 151:1
152:24 153:10,13 154:3,
8,13 157:22 158:2 160:23
168:19 173:20

**Canyon** 22:3

**cap** 35:5 49:22 50:6

**capacity** 52:22

**capital** 29:7 58:21,24
61:18 80:8 87:16 115:2,5,
11 116:11,13,16,19
117:17,18,21 118:11,15
119:6 130:5,6 131:25
143:10 146:11 161:14
162:15 163:15 164:24

**capitalization** 79:22
117:14 130:1



**capitalize** 59:11,21 87:14

**card** 81:3 140:17 141:2 143:20 144:3 145:23

**cards** 44:14 143:14

**care** 85:12 120:21 170:18

**careful** 114:12

**cares** 163:6

**Carol** 62:19,20,22 63:18 65:5 72:11 124:10,22 126:15 127:5,11 128:3 156:14 160:6

**Carr** 4:13 30:4,10,22 32:21,22 33:1,9 39:7 41:9,16,23,25 42:8,18 43:22 46:19 47:10 48:20 65:5 66:3 69:25 70:3,13 85:15,17,19,20 91:3 142:22 154:6,12 156:7,12 157:20,25 158:4 159:25

**Carr's** 119:4,8

**carried** 65:9

**carry** 54:12 132:17

**case** 27:24 36:12,14,24 37:13 38:12,14,18,22,24 39:2,10,11,14 40:15 41:12,15,17 42:10 43:18, 20 44:7,17,24 45:8 47:15 156:22

**cases** 39:4,7,13,15 40:4, 10 45:14 139:4

**cash** 35:6 43:4 46:12 72:25 75:10 77:15 83:21 112:12 113:9,11,14,21 114:4 122:1,24 125:25 134:16 166:18

**cassettes** 84:21 93:10

**catastrophic** 18:18 51:8 54:23 85:22 89:2

**catch** 62:2

**catching** 24:17

**catchphrase** 17:25

**categorize** 67:4

**category** 69:1 167:7 168:12 171:9

**causing** 85:22

**CE** 172:11

**Cell** 93:22 97:25 98:3,6,7, 17,22 100:7,16 101:19 102:2 110:6,9,14,19,23 111:7,21,23 114:13,23,24 115:8,23 116:5,6,7,12,17, 20 117:11,12,16,21 122:19 123:4,17,19,24 124:2 129:1 130:2,12 131:11 138:16 144:18,19, 21 149:1 153:8 160:9 161:19,23,24 162:17 165:12 166:4,20 167:5 168:14

**centers** 18:15

**CEO** 23:14 66:15 123:25

**certification** 172:11

**certify** 71:20

**chair** 40:7

**challenge** 86:6

**challenges** 92:4

**challenging** 87:6 88:15 90:9

**chance** 144:10 145:25 158:8

**change** 11:15 24:1 83:12 95:2

**channeled** 46:1

**Chao** 66:14

**chaotic** 23:17

**characterize** 34:19 92:25 93:16,17 97:23 134:24 154:14,17,18 167:13 168:21

**characterized** 28:22 162:8

**charge** 63:22

**charges** 23:10

**Chart** 109:22

**charter** 148:25 162:16

**charting** 54:24 149:1

**charts** 166:12

**chase** 73:9 85:14 111:20 151:11

**chased** 151:11

**chasing** 151:4,8

**cheaper** 9:9

**check** 9:1,23 115:21,23 142:18 160:9,12

**checks** 7:22 8:4 60:2,11 87:25

**children** 48:5

**choose** 100:1

**chose** 163:21

**church** 51:14

**circumstances** 30:12

**cities** 7:16,17

**city** 7:20 26:25

**civil** 26:10 36:9

**claim** 91:1 117:6

**claimed** 45:17

**claiming** 55:5

**claims** 43:18,20

**clarified** 18:21

**class** 7:7

**classes** 6:23 7:6

**clean** 5:11 49:12

**clean-balance-sheet** 163:18



Scott Hepford                                                s Index: clear..confusing

**clear** 34:13 43:12 112:18 131:23 146:12 154:25

**cleared** 142:23 163:23

**client** 9:14 84:1 90:11,25 91:1,5,6 92:9,12 93:4,8, 12

**clients** 18:2,9 19:1,7 93:14 101:2

**clinic** 63:20,23 67:8,10, 13,22,25 68:1 121:19,22 122:5,10,11 127:18 128:16 142:25 143:8

**clinical** 130:23

**clinics** 67:17 68:6,11,18, 22 97:19 121:24 163:14, 25

**clobber** 169:19

**close** 19:16 35:20 42:22 45:4 58:5 61:23 93:25 94:6,11 149:20 150:2 151:12

**closed** 19:20 124:8,9,12

**closely** 23:9

**closer** 37:24 158:5

**closest** 88:22

**closing** 10:15 16:21

**cloud** 106:21

**co-found** 32:11 48:21

**co-founder** 48:17,19 123:25

**co-founding** 49:15

**co-ownership** 120:19

**Coast** 76:24

**code** 5:16 159:8 167:24

**codes** 89:9

**collateral** 10:14 11:13

**collector** 63:18

**college** 6:7

**Collins** 4:12 5:2,17 16:12 19:3 21:3 25:10,13,20 28:24 29:21 31:22 36:5 38:8 49:19,25 53:1 62:15 64:5 68:17 69:11,18,23, 24 78:17,22 79:11 81:10, 12,23 83:10 98:15,20 100:11,15,19 101:10,22, 24 102:5,11,14,19 103:2 105:5,10,14,17,20 106:2, 8,10,13,24 119:18 123:13,16 136:8 145:11 147:8 148:4,6,11,18 150:17,24 151:3 153:1,7, 12,16 154:5,10,16 157:24 158:12 160:25 168:20 173:10,17

**Colorado** 6:6,22 7:20 12:11

**column** 72:23

**combination** 41:9

**comfortable** 77:14

**commercial** 153:14

**committed** 110:6 153:8

**communication** 125:5

**communications** 28:16

**companies** 18:3,11 30:19 32:18 33:4,20,23 34:3 76:6,10,14,17,19 77:4,10 78:20 120:3,7,15 128:8

**company** 9:13,23 10:5,6 11:24 12:10 16:10 17:16, 22 21:9,12 22:20 23:4 24:14 25:18 30:17,20 31:15 35:7,11,18 38:21 39:20 45:24 48:23,25 49:2,7,8,11 50:6,13,18 52:1,23 53:4 55:3 57:9 59:7,11,16 60:10,15,16, 19 61:17 64:13,15 76:24, 25 78:15 79:3,19 80:9,12, 23 81:13,21 82:3,6,19

84:6 86:8 87:15,16 88:4 89:4 91:2,15 109:25 111:12,14 112:22 113:9, 12 124:3,19 125:22 126:2,5 128:15 132:3,18 140:14 142:15 143:5 145:19,20 147:3,24 151:13 152:12,19 158:19 163:18 169:14 170:6

**compare** 134:18

**compared** 130:14

**compensation** 44:2

**complete** 71:24

**completely** 5:24 83:22 87:4 88:24 168:11

**complicated** 10:24

**component** 80:11

**Compound** 25:11

**comprised** 76:2,3 77:3

**comptroller** 136:13

**computer** 8:16 77:25 104:16,17,20 105:1,5,11, 18,25 106:1,2,23 107:1,7

**computer-aided** 8:14

**computers** 106:21

**concern** 80:15 136:20

**concerned** 136:13

**concerns** 86:10

**conclude** 31:8

**conducted** 33:9,13 127:10

**conducting** 64:23

**confirm** 130:24

**confirmed** 163:7

**conflicting** 136:17

**confused** 39:16

**confusing** 25:12 126:10

151:1 162:14

**conjunction** 146:24

**connected** 126:21 143:16

**connection** 75:22 88:23

**consent** 125:7

**considerable** 107:22

**considered** 22:17 140:19, 20

**consistent** 72:3

**constant** 86:25

**constantly** 9:8 11:16 17:15 86:12

**consult** 18:6 56:1 76:21

**consultant** 33:3,7 89:5,7

**consultants** 20:8 51:21

**consulted** 17:24 18:4 77:11

**consulting** 17:20,23 19:11,14 35:15 75:5

**consumed** 45:11

**contact** 88:25

**contained** 84:11

**contents** 70:23

**context** 11:2 33:10

**contingencies** 53:17

**contingency** 40:16,18,25 45:8

**continue** 93:22 126:2 142:7,13

**continued** 65:8 137:10

**contract** 74:19 149:10 169:23 172:2

**contractor** 172:4,8,20

**contractors** 136:19

**contracts** 52:3 149:11 166:12 169:16

**contribute** 41:19,20 47:3, 6

**contributed** 46:18 47:11 61:10 74:17

**contributing** 50:7 88:21

**contributions** 43:4

**control** 84:1 86:7

**controlled** 43:16

**conversation** 31:6 76:8 128:13 156:16 158:7

**convict** 23:11

**copies** 134:17

**copy** 69:22 119:16

**copyrights** 166:11

**core** 168:15

**Cornerstone** 5:7

**Corp** 7:23

**corporate** 12:19 32:19 80:22 83:24 85:22 86:1 109:16 112:18 155:21 156:4

**corporations** 128:6

**Corps** 128:5

**correct** 8:21 12:21 13:5, 14 15:10 16:6 17:21 20:21,22,23 22:6 25:3 30:11 32:24,25 34:5,6,7 38:22,23 51:4 57:10 58:18,19 59:23 73:1 79:3, 7,20 82:22 91:8 92:10 94:24 97:3 108:4 109:11 112:7 113:22 135:19 136:5 141:9,15,20 144:1 150:1 154:1,2 156:10,20 161:11 162:12,18

**cost** 18:15 20:5 41:2 54:2

**costs** 13:21 99:23 170:8, 18

**counsel** 23:9,13,15 35:13 37:1,4,6,7 38:9 106:14 142:16,21 143:9 157:10 158:9

**counted** 151:18

**countersued** 126:5,7

**County** 4:8

**couple** 7:16 14:10 76:19 107:25 133:10 145:23 155:5

**court** 4:5 5:10 26:23 37:23 147:5

**courts** 163:13

**cover** 87:8,9 112:3 115:9 118:22 126:1 129:22 136:18 142:18 146:16

**covered** 44:6 163:12

**covering** 119:4 125:21

**COVID** 94:19,22 95:8,9 145:24 150:7

**CPAS** 143:9

**crashed** 13:20 29:9

**crazy** 18:13 88:2 132:13

**create** 59:17 63:4

**created** 45:23 49:11 55:16 59:9,10 63:5 65:8 73:23 76:4 107:18 111:13 126:12,15 127:4 128:5,7, 19

**creation** 49:15 55:19 56:20 57:7,14

**creative** 42:8 44:10 166:14

**credentialed** 89:20

**credit** 11:11 44:14 81:3 140:17 141:2 143:16 144:3 145:23

**criminal** 27:15 71:21,22



**critical** 7:8

**criticism** 42:6

**criticisms** 33:9,12,17
42:3,7

**critiques** 33:17

**cry** 131:5

**currency** 23:19 24:20

**current** 5:6 20:10 24:10
129:4

**customer** 9:10 20:12,17
90:2

**customers** 85:17 101:2

**cut** 85:14 108:19

**cutting** 13:21

**cycle** 55:25

**Cypress** 5:7,23

**D**

**D/b/a** 121:8 127:22

**Dakota** 32:17 34:10 39:17

**damage** 163:11

**Dan** 10:1

**dance** 7:15

**dangerous** 66:1

**Danvers** 12:18,20

**Darryl** 40:5

**dashes** 113:16

**data** 54:21

**date** 4:3 6:3 59:9 79:14,21
94:5 99:13 100:23 108:2
110:10 123:20

**dated** 103:4

**dates** 74:1 110:1,7

**Dating** 6:24

**Dave** 32:12,18 34:23 35:8

**day** 30:25 31:3 87:1 88:6
89:9 103:5 108:8 115:22
117:2 132:24 148:1 164:9

**days** 18:16 116:8 131:22

**deal** 66:5 146:3 172:9,15,
16,17,23

**dealing** 14:1,12,15,19
15:12 101:13 130:21
135:25 147:3

**dealings** 38:21

**deals** 150:13,18,19
151:13,22 152:1,10,11,15

**dealt** 125:21

**death** 85:25

**debacle** 51:22

**debt** 44:18 75:14,16,19
81:2,3,5 113:23 133:1,4,
5,10 139:4 145:24 151:16

**debts** 81:18 119:5 133:23
163:12,24

**December** 117:3

**decide** 52:21 53:15 54:15

**decided** 34:24 53:16
54:25 126:3

**deciding** 10:12 11:4

**decision** 25:4 85:7 87:4
89:15 90:22

**decision-maker** 170:12,
14

**decisions** 72:1

**decrease** 9:10

**deducting** 149:13

**deejayed** 7:18

**deejaying** 7:15

**deemed** 55:16

**deeper** 76:14

**defects** 9:10

**defendant** 36:11

**defendants** 4:16,23

**define** 67:19 120:2

**defining** 8:24

**definition** 8:25 25:22,25
28:25 110:25

**definitive** 155:7

**defrauded** 26:15 35:15

**defunct** 31:10 124:8,17

**degree** 6:15,16,18 7:10
16:1 25:22 31:5 147:19

**degrees** 6:17,19

**delete** 106:7,8 107:1,6

**deleted** 105:11,15,18,21
106:22 107:2

**deleting** 107:10

**delineate** 87:8

**delineated** 140:3

**Deluxe** 7:23

**Denver** 7:19

**deny** 150:11,17 151:21,23

**department** 16:21,22
17:4,10

**departments** 16:24 17:6,
11

**depend** 80:14 94:20

**depends** 17:2 67:19 92:25
107:14

**deploy** 82:12,14 83:2,6,
11,18 170:4

**deploying** 83:15,20 163:4

**deponent** 4:19

**deposed** 40:13

**deposit** 60:20

**deposited** 60:18

LEXITAS
APPX1116

INSU_PI_001395

Scott Hepford                                        s Index: deposition..document

**deposition** 4:7 33:22 34:4 38:11 69:19 74:6 159:15 173:25

**descendants** 75:1

**describe** 10:7 16:13 51:25 104:18

**design** 114:8 172:10

**designs** 8:16

**desire** 115:3

**detailed** 167:8

**details** 75:8 127:7 137:1

**determine** 53:10,18 122:21

**devastated** 89:11

**develop** 21:12 22:8 55:3

**developed** 11:20 149:10

**developing** 20:12 64:25 65:6

**development** 88:18

**devices** 52:4,6 91:20,21, 23,25

**diabetes** 48:11,13,16,17, 21,24 49:3,7,9,16 50:13, 21 51:4 52:10 53:3 54:25 55:7,19 56:20 57:7,15 58:1,15,24 59:4,8,10 62:7 63:9 66:1,8,19,24 67:3,13 68:13 70:7 76:13 77:4,9 79:1,13 82:24 84:9,17 85:15 93:2,4,19 94:2 98:1,4 101:13,19 102:3,8 106:4 109:10 110:7 112:9 115:23 119:25 120:1,9,15 121:11,13,15,17,21 122:3,14 124:5,15 126:23 127:3,9,12 131:12,15 132:1,17,19 138:13,17 139:11 142:6,12 144:20 145:5 148:6,12,25 149:4 150:13,20 151:23 152:16 153:17 154:7,12 155:3

157:3,25 161:2,4,7,15 165:14 167:3,4,16,18 168:6,16 171:6,24 172:24

**diabetic** 55:9 66:8

**die** 156:2

**difference** 133:22 137:22 148:24 160:20 171:4

**differently** 85:8

**difficult** 39:3 68:19 84:10 88:6 167:25

**difficulties** 68:21

**dig** 76:14

**digging** 24:1 54:4 55:4

**digits** 18:16

**diligence** 29:22 53:8 54:20 55:11 57:8

**direct** 21:14

**direction** 119:9

**directionally** 25:3 59:23

**directly** 115:8 140:13,14 169:16

**directors** 124:1

**disagree** 82:25 149:2,15

**disappointing** 155:22

**disaster** 51:8 70:15

**discipline** 13:9

**discount** 170:3

**discover** 23:18 128:22

**discovered** 23:20 24:2 55:16 131:9

**discovery** 101:14 123:15 153:14

**discussed** 87:12,13,14

**discussion** 31:2 63:6 126:11 153:20,22,25 158:4,11

**discussions** 25:24 30:15 127:17 154:6,11,19 157:3,7,10,11,19

**dismissed** 37:14

**disorder** 87:25

**disposition** 36:20

**dispute** 85:24 158:25 160:4,6

**disputed** 159:10,12,22

**disputes** 86:7 95:10

**Dissolution** 126:25

**dissolved** 127:6 132:21

**distress** 77:16

**distressed** 50:22 51:24 54:13

**distribute** 46:2

**distributions** 101:20

**distributor** 92:1

**district** 26:23

**divert** 152:20

**divide** 128:13,15

**divided** 44:20

**division** 10:5,8,10 14:17 58:21

**divisions** 10:6 13:2

**divorce** 81:1

**doc** 95:11

**docs** 95:11

**doctor** 63:22 64:5

**doctor's** 170:1

**doctors** 55:23 64:7,12 163:1 172:24 173:2

**doctors'** 171:11

**document** 23:6 45:11,13 69:21 70:5,21,22,24 71:1 84:11 103:5,10 104:13



INSU_PI_001396

107:17 108:19 110:3
117:23 118:4 119:19,22
134:20 156:14,15

**documentation** 42:25
43:2

**documented** 43:4

**documents** 10:13 32:7
35:8,9,10 62:6 105:22
107:6,13 109:4,5 157:1

**Doherty** 6:6

**dollar** 57:4,25 151:18,20

**dollars** 23:7 45:19 80:19
133:15 145:21

**door** 13:24

**doorstep** 31:7

**dose** 52:17

**dosing** 64:22

**doubt** 61:9,13,16 134:10

**dozens** 16:25

**draft** 103:17,25 104:9,16
106:3 107:18,24 108:12

**drafted** 90:12 112:7
124:22

**drafting** 8:14 104:13

**drafts** 104:3 107:12

**draw** 167:8

**drawing** 63:13

**drawings** 65:7

**dreams** 81:7

**Drive** 5:7

**driving** 168:24

**drove** 87:13

**due** 29:22 32:21 35:16
53:8 54:20 55:11 57:8
75:6 95:13 118:6,8
133:16

**dug** 55:9

**duly** 4:25

**Dunken** 23:15 34:24,25
35:2,8

**Dunn** 64:1,2

**duped** 75:2

**duties** 84:17

**duty** 147:23 152:15,18

**dying** 84:6 112:22

**dynamic** 85:4

**dynamically** 85:5

**dyslexia** 117:6

                  **E**

**earlier** 15:7 34:24 44:9
53:2 109:17 161:5 173:2

**early** 29:6 44:4 66:21 89:5
136:14 150:5 155:1

**earnings** 18:19,22

**ease** 105:18

**easier** 17:18

**East** 171:7,24

**easy** 131:1

**eat** 43:25

**effect** 18:10

**effective** 34:15

**effectively** 75:11,14 163:8
170:6

**effectuate** 119:7,8 129:23
130:2 141:2 161:15

**effectuated** 134:18

**effectuating** 167:14

**effectuation** 124:23

**efficient** 16:10

**efficiently** 82:14

**effort** 53:8 54:20 55:15
115:3 130:16

**efforts** 29:25 32:16 50:18
64:14 146:23

**elderly** 143:6

**Elise** 63:16

**email** 28:16 106:7

**emails** 106:7 107:1,2
128:21

**emanated** 102:8

**embezzled** 23:19 24:2

**embezzlement** 28:18,21
132:12

**employees** 12:2 136:19

**employment** 21:4 31:9

**enables** 68:8

**encompass** 106:6 120:4

**encompassed** 120:8

**encompasses** 120:2
161:8

**end** 9:5 21:4 31:18 32:15
44:5,12,17,19,21 54:7
55:14 65:2,6 84:7 94:8
96:14 118:14 132:2
139:19 145:17 147:4
149:2 150:8 154:15

**ended** 8:13,17 9:20,23
12:14 23:4 24:16 44:14
45:18 75:9 88:25 90:21
132:16 143:7

**endlessly** 87:7

**ends** 134:7

**energy** 130:16

**enforcement** 24:4

**engage** 44:2

**engaged** 9:8 87:18 91:12

**engaging** 43:10

LEXITAS
APPX1118

INSU_PI_001397

engineer 8:13,21,24

engineering 8:12,18 9:12 10:23 11:1,4,18 12:3

enhance 65:9

entail 19:25 52:16

entertainment 7:14

entire 13:22 15:17 46:14 88:9 91:22 131:8 142:16

entities 45:25 52:3 61:20 62:3,11,16,18,24 63:4,5 79:2,14 93:22 94:2 95:7 97:25 98:7 109:17,23 122:4 124:23 128:11 161:2

entitle 159:8

entitled 101:14 114:4

entity 43:16 49:12 51:10 77:6,16 80:18 93:21 122:5 124:8,17,20 126:9, 12,16 129:2 132:20,21 152:21 162:16 163:3

entrepreneurial 19:13 48:10

epidemiologists 55:24 57:17

epitome 86:1

equally 50:7 57:25 61:10 74:17

equipment 138:3,6,10,16 139:1

equity 10:4,6,8,9 11:2,21, 25 12:13 13:19 76:6,10

equivalent 20:11 112:10

ER 95:14

ERP 18:18

escaping 76:25

escrow 137:1

essentially 10:10 15:2 33:7 35:10 113:6 118:25

129:19 130:2 133:5

estimate 94:7,9 108:15

estimated 76:5

evaluator 78:23

evaporate 35:2

eventually 126:3 127:6 135:20 170:21

everybody's 152:18

everything's 105:23

ex-business 34:22

ex-corporate 35:13

ex-manager 9:22

ex-partner 35:12 43:11

ex-trustee 35:13

exact 23:5 25:2 32:10 45:25 53:20 57:22 73:24 93:13 94:3,12 103:19 110:10 117:23 126:6 127:7 133:14 139:20 142:8 146:14 161:16

Excel 43:3 44:23 46:8,11 73:23

exceptions 171:12

exchange 22:18

exclusive 91:2

excuse 144:9

execute 92:22 150:6

executed 54:16,18,19 84:18 90:19 91:7 92:21 95:25 98:22 122:18 163:24

execution 92:20

executive 62:22

exert 86:4 87:3

exerted 84:1

exhibit 69:17,19 103:1,3,4 119:11,13 134:2,4 137:1

exist 49:3 59:4 128:10

existed 102:8

existence 62:4 116:8

existing 45:24 93:14 137:7 144:2

exit 87:17

exited 13:3 35:11

expand 67:16 68:2,5 173:7

expect 57:9 58:12

expected 144:16,17,19

expecting 17:7

Expedia 20:19,22,24 21:4, 14 27:10

expense 41:2 44:12 137:1

expenses 41:21 42:1,9, 19,25 44:6,8,10 45:17 46:9,18 47:4,15 139:1 149:13

expensive 32:23

experience 8:14 10:17 12:3 17:17 30:18 33:20 82:10

experts 55:12,18,21 126:18

explain 8:1 11:1 19:3 74:22 82:9 129:6 144:18

explained 30:17

exploded 145:16

express 86:10

extent 19:24 29:7 103:18 122:1 127:20

external 79:10

externally 89:14

extra 146:17

eye 155:13

Scott Hepford

**F**

**F-A-L-K** 21:17

**facilities** 12:4

**facility** 8:17 69:7 142:11

**fact** 32:22 107:25 112:19 143:3

**factored** 144:20

**facts** 87:5

**factual** 79:16

**failed** 31:15 87:9

**fails** 88:11

**fair** 67:15,25 68:3,10 70:12 78:19,25 96:24 145:9 164:4

**fairly** 35:6

**Falk** 21:15,17

**fall** 168:11

**falling** 74:13 97:16

**falling-out** 32:19

**falls** 169:25

**familiar** 14:12,14

**families** 34:9

**family** 25:23 31:13 43:24 48:4 55:8 74:25 75:1 161:2

**fan** 88:18 89:17

**farewell** 21:5

**Fargo** 10:3,4 11:20,24 12:16 13:7,10 14:3

**fashion** 93:23 136:5 164:25

**fast** 131:1

**faster** 9:9

**father** 26:7

**favor** 42:9

**favorable** 15:2

**FBI** 24:9 26:16 28:1

**February** 6:4

**federal** 26:23 171:15

**fee** 35:15 40:16 164:6

**feel** 77:14 155:10

**fees** 43:5

**felt** 114:3 132:9 143:4,8 164:4

**field** 10:11

**fight** 85:25 128:8,21

**figure** 50:8,23,24 53:9 87:7 112:17,25 146:6,9 147:6 171:3

**figured** 27:12 146:17 167:16

**filed** 38:22 49:9 64:17 111:1 125:3

**files** 105:11,16,18 107:5, 7,10

**filing** 64:18

**fill** 55:13

**final** 8:18 65:10 103:17,25 104:8 108:11 125:3 134:7

**finalizing** 107:24

**finally** 9:2 89:23 164:1

**finance** 18:12 125:10,20 133:5,11,12

**finances** 42:16

**financial** 18:8 45:16 70:15 71:8 72:5 86:8 89:13 95:20

**financing** 125:20 133:6 164:24

**find** 41:5 133:13 137:10

**finding** 8:11 9:8 55:6

**fine** 5:14 76:16 113:11 144:11

**firm** 17:24 19:8 20:10

**firms** 19:11

**five-digit** 18:14

**fix** 18:25 113:24 114:1

**fixed** 114:2

**fixing** 89:23

**flashback** 155:19

**flipped** 54:4

**flow** 122:2 134:16

**flowing** 83:21

**flows** 20:17

**focus** 43:18 67:12 128:25 130:13 131:7 169:2

**focused** 22:18 32:16 168:23

**folded** 143:8

**folks** 14:8 22:13 28:12 29:24 45:14 46:3,24,25 79:10 89:13 91:16 97:16 133:13

**follow** 50:4 81:12

**force** 112:19

**forced** 133:9

**foreign** 22:18 27:25

**forensic** 45:17

**forex** 22:9 27:25

**forgive** 18:10

**forgiven** 133:17 135:19 136:5,11,24 137:17,19,21 139:24

**form** 16:8 21:1 25:9,19 28:23 29:19 31:20 44:1 49:17,21 52:24 54:25 62:13,15,23 64:3 68:14



Scott Hepford                                   s Index: formal..global

71:14,20,23,24 78:16,21
79:8 81:22 83:9 93:23
98:13 100:9,13,18 101:9
105:3,7,13 106:16 123:11
136:5,6 145:10 147:1
148:3,8,13 150:15,22
153:10 154:3,8,13 157:22
158:2 160:23 162:7
164:25 165:7 168:19

**formal** 61:18

**format** 43:2

**formation** 50:21 110:18,
20,24

**formed** 58:16 62:18
110:9,11,15

**forming** 53:3 111:21,23

**formula** 53:19,20 54:4
77:20,22 113:17

**Fortune** 17:25

**forum** 17:23

**forward** 54:3,12 59:11
87:2 129:24 130:4 131:6
132:17 146:11 152:19

**Foster** 66:14

**fought** 131:4

**found** 24:18 29:14 34:12,
14 54:23 55:9 86:23
125:24 134:14 138:1
143:2

**foundation** 61:15 68:7

**founded** 129:2

**four-year** 132:22 133:6

**FQHC** 99:12

**frame** 27:3 104:25 114:21
117:17 150:20

**fraudulent** 23:11 25:5,17
26:2,11 27:24 29:14,23
30:22 31:18 32:2 36:7

**free** 163:8

**freed** 142:16 145:15

**freedom** 163:9,10 164:8

**Freeport** 7:21

**friend** 28:3 30:1 74:11

**friends** 26:8 31:14 75:25

**front** 103:9 111:24 112:1
134:2 160:7

**fronted** 125:24

**frustrations** 86:10

**fulfill** 133:1

**fulfilled** 114:17 138:21,23

**full** 5:3 16:24 159:7
169:17

**fully** 26:15 86:7

**functional** 83:23

**fund** 22:8,11,17 24:22,24
25:1,8 60:14 61:11
114:13 119:4 142:10

**fundamental** 167:23

**funded** 11:10

**funding** 61:17

**funds** 22:8,22,25 23:2
41:25 42:4,17 47:3
114:20 115:25

**furniture** 52:3 166:16

**furthering** 163:3

**future** 129:5,7,24 130:8,
12 148:17

**fuzzy** 27:6 34:12

## G

**gain** 54:14

**gains** 22:9

**gap** 64:10,11 124:13

**Gary** 66:14

**gas** 51:13

**gave** 9:20 13:3 21:5
35:10,14 77:12 145:17

**general** 34:8 68:25 85:4
100:24 102:16

**generally** 58:20 70:5
99:22,25

**generate** 73:24 115:4,6
148:20 149:23

**generated** 92:17 93:7
95:18 98:10,16,21 99:13
100:12,17 149:4,14,15,
19,20

**generating** 94:10

**gentleman** 40:7

**gentlemen** 10:7 62:21
66:16 79:1 129:7

**George** 40:7

**get all** 99:3

**get allocations** 89:12

**gigantic** 109:18

**Ginger** 63:17

**Ginger's** 63:17

**give** 5:10 8:24 27:18
40:10 58:7 80:16 88:3
89:19 91:20 94:3,5,12
146:10,18 151:9 158:8
159:6 170:18

**giving** 85:24 87:16 118:23
170:2

**glasses** 71:21 120:10

**Glenn** 103:8 111:9 146:6

**global** 110:6,9 114:23,24
115:8,23 116:5,7,12
117:11,12 123:19 129:1
130:12 131:11 138:16
163:5 168:23 169:5,6,8,
10,11,13,22,24



Scott Hepford                                                s Index: Global's..hold

**Global's** 122:20

**good** 4:2 5:3 9:13 21:8
28:3 51:24 52:4 62:14
69:12 136:4 144:13
162:21 164:20 170:18,19

**goodness** 24:12 74:24

**Gore** 40:7

**Gorham** 32:12,18 34:23
35:8

**Gosh** 10:1

**Gotcha** 118:23

**governing** 162:22

**government** 23:10

**governmental** 24:4

**graduate** 6:9,11

**Graduated** 6:13

**great** 9:24 62:12

**green** 137:6 140:6

**ground** 48:23 87:5 88:3

**group** 14:8 22:5 28:5
29:13 30:4,16 31:9,19
36:6 37:9 83:1,5 88:23
89:13 164:22

**groups** 75:13

**grow** 85:12 115:4

**growing** 97:3

**guarantee** 90:15

**guess** 8:8 17:24 51:20
52:9 56:1 74:2 77:17
94:20 126:3,10 144:18
148:17 169:14 171:3

**guidance** 23:16 142:15,21
143:9 158:9

**guide** 30:20

**guy** 24:2 30:18 43:17

**guys** 41:15 91:18 134:8,
17 144:4,6

**H**

**H360** 109:22 120:15
121:4,8 122:4 124:19
125:8,10,12,14

**habit** 107:15

**half** 5:19 24:17

**Hampshire** 12:20

**hand** 69:18 72:25 82:15
103:2 112:12 113:21
114:4 115:21 119:12

**handed** 103:4

**handle** 23:16

**handled** 15:17

**hands** 82:21 91:18

**handsome** 13:23

**handy** 12:6

**happen** 34:13 50:12 84:2
87:19 129:25 130:16

**happened** 14:3 20:24
27:13 42:10 45:7 54:22
95:5 107:3 125:5 126:7
139:8 141:25 142:1,3
146:13 158:6 172:19

**happening** 31:15

**harassing** 123:15 153:15

**hard** 74:13 82:15 100:20

**haunt** 45:14

**Hawk** 74:7,22,24

**Hays** 4:8

**head** 6:2 24:13 26:24 69:3
134:1

**heads** 129:23

**Health** 50:23 51:3,10 53:6
55:5 65:24 127:22 171:7

**healthcare** 51:11 55:12,
13,22 57:16

**healthy** 170:11

**heard** 5:13

**heavily** 158:25

**heck** 130:15 147:7

**held** 43:15 76:19 83:24

**helm** 89:12

**helped** 22:22 31:17 41:5
111:2

**helpful** 130:7

**helping** 125:25 126:2

**helps** 165:10 170:18

**hemorrhaging** 83:22
122:23 151:14

**Hepford** 4:24 5:5 36:5
103:3

**Hepford's** 70:15

**Heritage** 48:1

**hesitate** 167:10,12

**Hey** 138:15

**hiding** 132:10

**high** 6:5,6 22:17 81:4
136:23 148:16

**high-net-worth** 22:13

**Highlights** 112:5

**Hinman** 115:2,18 116:14,
17,20 123:8,16 153:7,16
158:12,15 160:9,14
161:25 162:15 164:23
171:7 172:23

**hired** 9:22 23:14 125:23

**hiring** 12:1

**history** 155:12

**hitting** 94:23

**HMAC** 143:12

**hold** 57:24 58:2 122:4
123:24 133:14 152:10,11,

Scott Hepford                                                          s Index: holder..India

20

**holder** 129:5,7

**holding** 124:19 150:12,18
151:22 152:1

**holdings** 47:20 48:8 76:23
130:12

**holds** 122:12

**home** 10:9 11:2,21,25
12:15 14:1,4,19,23,24
15:8,12 22:3 30:24 44:15
104:23 164:9,10

**homework** 64:25

**honest** 150:10

**honestly** 166:2

**honor** 162:21

**hook** 138:16

**hope** 81:15 115:3,4
130:14

**hopeful** 129:18

**hopes** 81:4,7 136:23
148:16

**hostage** 83:24 145:14,15
146:10 164:6

**hotel** 24:18

**hour** 152:25

**hourly** 40:16

**hours** 65:4 91:23 108:17

**house** 5:22 12:7 97:20

**housing** 12:19

**Houston** 13:2,4 67:13
68:1 91:13 121:15,21
122:10 124:6,16 127:3,9
128:16 139:5,21

**huge** 75:6 95:12 131:7

**human** 86:14 130:23

**hundred** 23:7 28:9 45:19
145:23 151:24 152:22

**hundreds** 16:25 89:9

**hung** 31:11 90:23

**Hunter** 4:13 30:4,7,10,18,
22 33:9 35:15 39:7 41:9,
16 43:6,8,22 45:11,18,23
46:19 47:10,16 49:15,20
50:10,11,15 52:21 53:4,
19 54:8 55:8 56:6 57:4,9,
24 58:12,17 59:20 60:18
61:19 62:25 63:1,6 64:15
65:5 71:3 74:5,12,16,24
75:8,11 76:7 77:11 82:23
85:15,17,19,20 86:3,19
89:10 90:3 111:24 112:1,
10,14,16 114:18 115:22
120:19 124:24,25 125:6,
20 126:4,11 127:4,17
128:6,12,18 129:17,21
131:22 132:11,12 133:3,
11 134:21 135:6 137:12
140:10 141:16 142:22,24
143:14 145:22,25 146:4,
15 147:19 151:13,22
154:12,19 155:2,6,12,21
156:16 157:4 158:6,13,19
159:1,25 160:3 163:14
164:3 165:23

**Hunter's** 31:7 60:9 74:11
75:22,24 112:6 132:24
142:1 143:20 145:12
156:15,17 158:16

**hurdles** 68:21

**hurt** 133:8

**hypothesis** 130:24

**hypothetical** 169:18

---

**I**

**idea** 49:14 50:10,11 67:21
75:23 95:17 101:5 133:23
135:21 146:19 157:8
164:20

**ideas** 55:2

**identified** 29:17 53:3
55:15 98:23 105:12

**identify** 18:24 19:19 64:16
69:21

**identifying** 20:6

**identities** 102:1

**images** 109:15

**immediately** 71:13

**implement** 168:7

**important** 88:17 120:25
132:5 156:19

**impossible** 132:8

**impression** 31:3 33:24

**improve** 12:8 65:9

**improvement** 9:11

**in-house** 23:14

**in-person** 6:23

**inactive** 93:20

**inartful** 168:3

**incapable** 83:23

**incented** 170:7,10

**inception** 65:21 132:15

**include** 121:4 173:1

**included** 34:9 121:23

**includes** 121:10

**including** 29:9 31:13
41:23 133:16

**income** 9:16

**increase** 9:9

**increasing** 97:7,18

**incurred** 44:19 138:25
139:1 140:21

**independent** 20:4 172:4,
20

**India** 14:5

**indication** 141:23 151:25

**individual** 22:21 24:11 56:11 85:6

**individually** 36:12 61:7 85:6 158:20

**individuals** 26:17 56:3 57:7 79:19

**industrial** 8:12,13,17,24 11:3 12:3

**industries** 9:24

**industry** 13:22 51:13

**inefficient** 17:12,13,14

**inferior** 65:25

**influence** 87:3 169:9

**information** 34:2 46:10 53:10,18 71:23,24 72:1,4 105:11 108:18,23

**infuse** 87:16

**infusion** 52:9 84:21 100:2 166:12

**infusions** 90:15 97:21

**Infutronix** 65:20

**initial** 16:5 49:14 64:20 66:5 93:9

**initially** 12:13,18 14:2 29:17 46:4

**innovation** 14:8

**input** 17:5

**insane** 87:13

**inside** 33:4

**insisted** 140:13

**Institute** 6:13

**instituted** 26:10

**institution** 16:17

**instructed** 114:14

**instrumental** 64:20 65:10

**insulin** 52:17 85:2 166:11

**insurance** 170:6

**intake** 16:19

**intellectual** 18:2 129:10, 13

**intended** 75:24

**intention** 132:6,17

**intentions** 81:4

**interact** 66:12

**interacted** 28:14 66:14 87:21

**interacting** 75:12

**interaction** 28:11 33:14

**intercompany** 166:17

**interest** 18:4 35:17 77:9 78:20 79:6 110:14,17 122:4 123:5,9,17 153:15 159:9

**interested** 51:1 88:22

**interfere** 85:15 90:10 91:10

**interfered** 90:3,6,7

**interim** 46:22

**interject** 86:9

**internal** 20:16 54:21 55:24 79:6,10 128:21 136:12,20

**internally** 83:23 89:13

**international** 128:15

**interpretation** 79:7

**interpreted** 90:14

**interrupted** 131:14

**interview** 64:20

**introduced** 30:9

**introduction** 30:13

**Invasion** 153:14

**invention** 82:11,13

**inventory** 138:14 166:16

**invest** 22:11 25:4,8,17 29:11,24 142:24

**invested** 22:22,23,24 24:20,22,23 25:23 28:5 29:23 31:17 32:2,4 132:1 143:6

**investigations** 28:20

**investing** 165:6

**investment** 21:12 22:5 25:1 26:2 28:4,5 29:3,13, 14,18 30:3,4,16,22 31:9 32:3 36:6 114:12 115:2,5, 8 127:5 130:9 140:19 153:8 162:15 163:18 165:7

**investments** 22:12 24:16 31:19 36:7 88:13

**investor** 142:23 143:5 147:14,16 164:22

**investors** 18:23 23:22 25:16 26:3,5 28:5 29:2,5 31:13 36:17,19 83:1 121:19 147:20 164:23

**involved** 16:4 25:22,24 33:1,2 46:3 48:15 49:3,6, 8 65:12 75:13 110:19,22 111:1,12 123:4

**involvement** 48:12,13 111:10

**IOLTA** 46:6

**IP** 55:3 79:13 80:2,5,10,11 81:25 82:3 83:1,6,18 129:5,6,7,9 130:8,12,17 146:25 148:2,12,18,20 149:3,17 153:17,21 165:14

**IRAS** 73:13

**Island** 172:24



**issue** 32:23 72:9 141:24
172:10

**issued** 66:20,21 166:8

**issues** 18:7 40:11 101:13

**issuing** 97:22

**Istanbul** 128:14

**items** 46:12

---

**J**

**January** 49:11,13 59:8
66:22

**Jen** 63:12,14

**Jennifer** 63:15

**Jim** 40:7 41:10 74:6,10,11
75:16

**job** 10:22 43:24

**jobs** 8:2 9:16

**joining** 19:10 85:23

**Jordan** 82:21,24

**judge** 105:21

**judgment** 7:4

**July** 59:7 95:5 103:5,14
105:10 108:3,4 110:10
115:14 116:19 118:11,14
122:18 123:22 129:15,17
137:13 145:5 153:18
155:4,5 158:6,13,22
159:5,25 160:8

**June** 118:8

**junior** 20:8

**junk** 107:2

**jury** 10:8 62:21 66:16 79:1
105:21 129:7

**just-in-time** 9:5

---

**K**

**Kansas** 24:18

**keeping** 42:13

**Kelley** 40:5 43:13,15

**key** 9:11 91:22 119:5

**kids** 35:3 73:17

**kind** 10:20 11:18 19:12
23:17 27:11 34:18 43:25
45:23 52:20 69:7 74:13
77:16 80:20 107:14 122:9
146:1 164:24 170:16
172:3

**knee** 170:1

**knew** 28:17,18,20 30:18
74:24 134:11

**know-how** 82:16 129:13

**knowing** 33:21 88:8

**knowledge** 19:21 71:25
72:7,21 84:24 143:1,2

---

**L**

**labor** 58:21

**Labs** 125:14

**ladies** 10:7 62:21 66:16
78:25 129:6

**laid** 13:23

**Lake** 22:3

**land** 43:25

**lane** 86:12

**language** 90:14 136:13,17

**laptop** 104:19

**large** 35:7 133:25

**larger** 118:21

**largest** 18:11

---

**Las** 7:19

**late** 84:6 107:25 108:3
145:5 146:23 150:5,11
151:6

**latencies** 8:11

**latency** 11:17

**latent** 139:6

**launch** 142:11

**Laura** 63:18

**Laurent** 63:12

**law** 24:4

**lawn** 120:21

**lawsuit** 26:22 34:20 36:8,
9 38:21 43:10 126:4

**lawsuits** 40:1

**lawyer** 23:15 25:21 32:19
34:14 39:10 40:7 43:11
101:6 140:9,10

**lawyer's** 40:9 57:19

**lawyers** 40:4,15,24 41:6
44:16 45:11 55:13,22,23
57:16 75:4

**layoff** 13:18

**lead** 8:13

**leader** 168:23

**leading** 107:23 146:22
155:4

**leads** 16:21 102:7 151:4,
6,8

**lean** 9:5

**learned** 84:25

**leave** 21:10 64:2 163:11

**leaving** 8:13

**led** 14:7

**left** 8:19 19:22 21:11
27:10 29:8 31:3

Scott Hepford

**legal** 23:9,13 25:22,25 26:9,10,19,21 27:3,6,12, 19 37:1,4,5,7 49:10 110:25 122:7,8 147:21

**Legalview** 4:7

**lend** 35:1

**lending** 12:1 13:19 14:6, 17 15:1,4

**Lenovo** 104:19

**lessons** 7:15

**level** 16:14

**levels** 168:25

**Lewis** 64:9 85:23 86:2,9 127:5 147:15 157:19

**Lewis's** 111:6 143:1 158:23 159:5

**li** 146:25

**liabilities** 54:14 81:18 119:5 122:21 129:22 132:14 137:7 146:12

**liability** 52:5 53:23 54:5 132:10,18 136:25

**Lib** 13:25

**license** 83:13,19 84:7,8, 16,17 85:16 90:1,2,10,13 91:7 92:7,9,15,20,23 93:9,15,18,22,25 95:18, 25 96:9,15,21 97:1,5,8, 11,22,24 98:3,11,16,22 99:8,14,17,24 100:7,12, 16 101:3,15 102:6,16 146:25 148:20 149:3,21, 25 150:4,13 151:6,12 165:1 166:18 170:24 171:5,6,8,10,21 172:1,6 173:8,9

**licensed** 8:20 138:13 172:25

**licensee** 97:21

**licensees** 97:19 138:15

**licenses** 85:16 98:6 99:2, 4 132:8 138:24 165:2,3 169:2 173:4

**licensing** 150:19

**licensor** 131:12,15 149:10

**lieu** 44:8

**life** 44:22 86:5

**Lighting** 125:12

**limited** 165:20

**Linda** 74:7,22,24

**linear** 11:6

**lining** 11:6

**liquid** 35:6

**liquidation** 44:15

**list** 20:12 34:16 62:5 81:20 109:18 111:11 166:22 167:7 171:9

**listed** 120:8

**lists** 20:12,17

**literally** 8:4 107:23 158:4 163:1,6

**litigating** 163:23

**litigation** 32:23 41:3,21 42:18 78:2,7 125:17,19 126:22

**live** 44:19 170:20

**lived** 5:17 24:6 44:11 127:19

**lives** 132:6

**living** 44:14 88:14

**LLC** 22:5 33:8 47:20,21 48:9 49:7,10 55:19 121:4, 11,13,15,17 122:15 123:4,17,19 124:6,16 125:8,10,12,14,16 126:20 127:22 132:18 161:4,5,6

**Lloyd** 40:5 43:13,14,17

**loan** 10:12,13 11:9 14:4, 24 15:5,8,9,12 16:15,17, 20,21 44:16 70:6 71:7 72:2 74:14,17 135:18,23 137:17 139:5,6,8,9,11,17, 18 140:8,13 141:6,8,12, 14,18 142:14,18 162:2

**loaning** 75:9

**loans** 10:17 11:2,21 14:1, 13,15,19,23 15:13 16:5 95:12 135:14 136:4,11 140:2 165:8

**located** 26:13,25 27:15 29:17 66:3 104:22

**location** 51:15 67:6,7 89:20 90:6,7 93:18,19 172:25 173:4,5

**locations** 12:7 21:24 69:1, 2 89:16,21 138:13

**locked** 132:3

**lockout** 156:4

**lockup** 80:22 83:24 85:22 86:1 112:19 155:21

**logic** 113:13

**logistics** 69:4,7

**logjam** 86:3

**long** 5:17 19:21 31:11 34:14 38:19 42:14 44:6 56:11 62:5 71:22 76:15 79:23 84:13 108:15,16 118:3 119:20 120:13,14 128:8 129:23 170:11

**longer** 52:4 133:11 155:2, 20 156:8,13

**looked** 17:15

**loose** 142:5

**lose** 5:12 29:3

**losing** 92:6

**lost** 29:9 40:14 92:5 95:23 156:5

LEXITAS
APPX1126

INSU_PI_001405

**lot** 9:6 45:14 53:16 56:11 60:2 76:17 82:10,18 95:15 104:5 128:17 129:9 130:15,22 131:8 167:16 170:5

**loud** 105:17

**louder** 38:4

**Louisiana** 26:22 27:2 36:8 38:14

**low** 5:14 22:15

**lower** 22:16 45:13

**Lunaria** 47:20 48:1,7 76:23

**lunch** 69:14

## M

**machine** 11:5 52:7

**macro** 89:10

**Maddox** 74:6,10,11 75:16

**made** 16:9 25:4 29:6 44:13 64:14 73:24 87:5 88:5,6 89:15,18 90:18,22 113:7 114:13,19 115:2 128:17,18 134:15,16 138:8 140:25

**mail** 9:3

**main** 21:25 86:1 139:22

**major** 53:6 75:1

**majority** 88:8 136:23

**make** 17:15 44:16 53:16 55:6,15 59:22 67:5,6 68:7 74:1 80:18 105:21 107:15 110:6 114:13 120:6 122:8 130:16 131:7 133:24 138:23 160:15 163:11 165:22 167:25

**makes** 15:6 123:2 171:19

**making** 9:24 15:19 72:1 79:25 119:6

**man** 24:6 32:12 162:25

**manage** 20:8 21:23 41:25 89:3 156:7

**managed** 20:3,18 22:2 42:4,18

**management** 17:19 19:4, 25 86:8 121:13

**manager** 9:22 18:5 23:11 25:5,17 26:3,11 27:25 29:15,18,23 30:23 36:8 48:2 90:22 147:9,22 155:1,2,6,8,11 156:8 157:5,12,15,20 158:1,5, 14,24 160:1

**manager's** 31:18 32:3

**managers** 17:14 55:25

**managing** 16:2 125:20

**manner** 42:3

**manual** 9:2

**manufacturer** 9:23

**manufacturing** 8:16 9:5,7

**March** 156:11 157:18

**mark** 23:14 25:6 28:16 29:20 30:1,7,9,17 31:4 37:12 69:19 103:3 119:13

**marked** 69:17 103:1 119:11,12

**market** 15:23,24 33:6 35:5 50:9

**markets** 68:5

**massage** 44:8

**Massey** 63:16 111:9

**Massey's** 103:8

**massive** 128:20,21

**Master** 131:12,15

**matched** 57:4

**material** 53:8

**materials** 12:5 23:3 107:16 166:14

**math** 113:17 144:14 146:14

**matter** 36:21 37:2 47:4 52:18 81:3 84:5 106:25 107:24

**MCI** 32:11 33:8,15 38:20 39:11,13,17 40:11

**Mcilwain** 47:1

**meaning** 85:23 122:20 140:10 143:17 153:22 154:21 169:18

**means** 4:8 163:8

**measures** 9:11 65:2

**meat** 112:1 129:9

**mechanism** 161:14

**mechanisms** 64:21 85:1

**medical** 50:9 51:14,16,20 52:4,6 56:1 57:17,18 63:15 64:11 84:25 85:7 89:4 126:16 130:21 166:16 169:14

**Medicare** 169:17,20,22 170:1,12 171:1,2

**medicine** 52:20 54:23 55:24

**meeting** 30:14,24 43:14 95:4 107:24 108:1,8,12 115:23 142:2,3 159:24 160:2

**meetings** 43:13 75:13

**Melanie** 63:12

**member** 147:12,23 152:17 157:5,20 158:1,14 159:2, 5,7 160:3

**members** 25:23 31:14 95:4 115:22 160:2

**membership** 159:9

LEXITAS
APPX1127

**mentally** 114:10

**mentioned** 16:24 34:24 74:5 173:2

**merge** 19:7

**merger** 19:4,24

**mergers** 19:16

**merit** 50:24

**mess** 54:23

**messed** 82:19 171:18

**met** 30:4,7

**metabolic** 85:2

**metabolism** 52:7

**Metabolix** 121:6 131:13, 16

**methodologies** 9:6

**methods** 154:12

**Michael** 82:21,24

**microphone** 37:25 38:2

**Microsoft** 18:2

**middle** 57:11 171:6,24

**milk** 131:5

**million** 22:8,19 23:7 31:16,22 45:1,12 77:7 78:14 95:23 112:10,11, 14,16,24 113:5,17,22 114:7,8 145:12,17,18,21 146:7,15 149:4,15,21 158:7 160:15,18,21 161:18,22 162:3,6

**mince** 155:10

**mind** 7:3 35:23 44:13 61:9,13 155:7

**mine** 23:8

**minefield** 88:14

**minimum** 111:19

**minus** 113:18

**minute** 102:20

**minutes** 52:18 107:25 173:11

**misclassified** 35:9

**missed** 80:18 112:22

**missing** 55:10,14 151:16 167:23

**mistake** 89:3

**misunderstood** 157:16

**modality** 64:24 85:5 130:4

**model** 68:12 91:22 170:9, 15,17

**modest** 22:14

**moment** 107:23

**money** 15:20 22:23,24 23:11,19 25:5,17 26:3,11 27:25 29:3,14,18,23 30:23 31:17,18 32:2 35:1 36:7 44:3 51:2 58:21 59:16 60:13,16,18 61:10 67:5 74:2,8,10 75:7 83:22 111:15,16 114:14 115:18, 20,21 116:4,7 117:10,13 125:21 131:4,7 132:4 149:10,15 160:22 164:19, 24 165:22

**Montana** 24:6,7 27:16

**month** 12:2 60:6 63:24 98:24 117:4,17 142:9 169:21

**monthly** 80:23 99:23 117:18

**months** 22:1 24:18 51:17 133:11 137:11

**morning** 4:2 5:3

**mortgage** 12:15 13:1,2 14:25

**mortgages** 10:9,20

**mother** 26:7

**mother-in-law** 111:1

**Mothership** 121:4,11

**move** 12:14,17 14:6 16:18,19 86:21 87:2 146:11

**moved** 8:8 9:23 12:18,20 13:3 15:8

**moves** 16:20 137:11

**moving** 69:3

**mug** 87:3

**multiple** 21:24 39:25 61:20 62:3,10,15,18,23 64:17 89:16 107:12 131:23 135:23 162:14 163:7

**murky** 42:14

**Mutual** 12:25 13:12,16,25 14:11,16

**myriad** 97:6

**N**

**named** 30:18 32:12 36:11 40:7 41:20 63:18

**names** 76:20 101:2,9,11, 15,24 102:15 171:11

**narcissist** 87:24

**narcissistic** 87:24

**Nathan** 4:15

**nation** 67:18

**nature** 9:18 12:23 13:15, 17 74:22

**nearby** 51:15

**necessity** 85:7

**neck** 145:24

**needed** 23:25 24:1 61:18 74:13,14 75:7 86:3 118:22 131:4 152:12

LEXITAS
APPX1128

INSU_PI_001407

Scott Hepford

**needles** 88:14 119:1 129:20

**negative** 84:1

**negotiate** 66:5

**negotiated** 91:14

**negotiating** 88:1

**negotiation** 66:10,13 94:1

**negotiations** 93:21 158:19

**net** 170:9

**Nevada** 7:19 40:8,24

**newer** 143:17

**news** 33:21

**nightclubs** 7:15

**nightmare** 90:25

**nightmares** 91:19

**Nintendo** 18:3

**nitpicky** 33:16 34:19

**nonaccredited** 142:23 143:5

**nonactive** 97:17

**nondisclosure** 18:9

**nondisclosures** 101:4

**nonetheless** 13:24

**nonfederal** 170:24 171:5, 10

**nonresponsive** 164:15

**nonresponsiveness** 81:11

**nonused** 124:20

**North** 32:17 34:9 39:17

**notating** 140:17

**note** 140:5,18,20 141:6 142:10 162:4,7,11

**notes** 73:21

**notice** 9:20 13:3 21:5 132:8

**notorious** 86:19

**November** 150:8

**NPI** 89:16,21

**number** 23:5 28:10 44:1, 12 45:2 47:16,18 52:17 54:9 69:19 73:22,24,25 89:16 90:17 93:13 94:3, 12 100:1,2,3 103:3,4 104:4 112:16 114:6 119:13 129:21 133:14,19 134:1 137:11,13 139:20 145:12,18 146:5,13,20,21 149:22 151:9 158:7

**numbering** 18:12

**numbers** 71:9 72:4,19 78:10,11 80:1 115:10 132:24 169:19

**numerous** 42:11

**nurse** 63:16

**nut** 80:23

---

## O

**Oaks** 22:4 25:1 28:4 29:13 30:2,3,16 31:9 34:24 36:6 37:6,9

**oath** 151:23

**object** 81:10 101:9 102:15 123:11 164:14

**objected** 128:7

**objection** 16:8 21:1 25:9, 19 28:23 29:19 31:20 49:17,21 52:24 62:13 64:3 68:14 78:16,21 79:8 81:22 83:9 98:13,18 100:9,13,18 101:22 105:3,7,13 106:15 136:6 145:10 147:1 148:3,8,13 150:15,22,25 153:10 154:3,8,13 157:22 158:2

160:23 167:9 168:19

**Objections** 128:25

**objective** 169:4

**obligated** 138:24 160:15, 17

**obligation** 74:23 133:2 138:17

**obligations** 133:15

**observation** 42:7

**obstacle** 53:6

**obtain** 6:15 64:15,16 66:17 123:16

**occasion** 30:21

**occurred** 9:19 27:4 29:22

**offer** 9:24 12:14,25 16:10 38:17 53:16 86:9 111:24, 25 114:18 129:18 164:3

**offered** 19:11 66:18

**offering** 32:21 34:22 51:3, 7,9 112:9 165:23

**offers** 112:21

**office** 21:21,25 52:2 65:10,12 139:22 146:4 166:16

**officer** 152:17

**officers** 124:1

**officially** 86:16

**offset** 22:13

**offset all** 44:18

**offshored** 17:2

**offshoring** 14:5

**Ogden** 121:17

**oil** 51:13 75:1,2

**oilfields** 75:3

**older** 143:18

**on-site** 8:15

LEXITAS
APPX1129

INSU_PI_001408

Scott Hepford                    s Index: one-size-fits-nobody..partners

**one-size-fits-nobody**
52:20

**one-third** 45:5

**one-year** 19:15

**ongoing** 109:8

**online** 6:23

**onshored** 17:2

**open** 67:22 68:5 111:2,15
125:18 142:18,25 163:15

**opened** 111:3

**opening** 67:17 68:11,17,
22 69:7 127:18

**operate** 132:19

**operated** 166:2

**operating** 68:22 119:6
124:12 156:23 159:8
160:5 163:15

**operation** 12:2 67:10,12
83:23 130:3 133:3

**operational** 16:9,12 23:21
51:12,23 86:13 172:10

**operationally** 82:14 87:5
155:13

**operations** 15:14,16,22
21:13 27:11 60:14 61:11
66:24 67:17 163:2,3

**operative** 105:22

**opinion** 87:22 131:3
170:19

**opinions** 79:10

**opportunities** 19:6 67:3
101:12

**opportunity** 21:11 50:25

**opposing** 38:9 87:19

**optimistic** 81:9

**optimized** 14:4

**option** 122:20 163:17

**options** 18:25 122:19
129:19 165:20

**order** 114:15,16 138:21

**ordered** 93:10

**ordering** 9:6

**orders** 138:23 141:3

**organization** 13:3 125:1

**original** 93:6 138:1

**originally** 68:19 101:13

**Oschman** 4:21,22

**outbreak** 94:19

**outcome** 36:20

**output** 17:6,8

**outstanding** 80:20 112:11
113:18 132:25 133:1
135:11,14 145:22

**outweighed** 54:14

**overbroad** 105:15 106:17

**overhang** 142:17

**overpaid** 164:5

**owe** 74:10

**owed** 74:2,5,23

**owes** 75:17,18

**owned** 51:12 120:21
122:14 148:6 149:3
153:17

**owner** 147:17

**owners** 147:19

**ownership** 76:8 77:6,9
78:15,20 79:5 110:13,17
122:9 123:5,17 159:16

**owns** 48:1

---

**P**

**P.M.** 69:14

**package** 13:24 70:6,10
100:1

**pages** 71:6

**paid** 37:9,11 43:5 44:7
45:21 46:22 49:9 55:11,
18 56:3,5 57:2,6,9,15,25
58:11,12 93:4 133:4,18
134:14 139:9,11,25
140:14,18 142:7 144:3,4,
7 161:18,22,24 169:20

**Palo** 90:8 91:10 92:9 93:4,
8,18

**pancreas** 52:15

**paper** 9:2 15:2,17,18,24

**paperwork** 111:2

**paragraph** 71:13,14

**parents** 28:2

**parish** 26:23

**part** 11:21 12:9 20:1 46:15
55:11 66:9 80:11 92:22
111:24 114:1 120:20,22,
23 121:3 122:17 127:21,
24,25 128:9 139:12
143:19 150:5 155:17
162:21 163:9

**partially** 83:11

**participate** 25:7,16 26:19,
21 29:22 39:7 66:10

**participated** 32:22 94:1

**participating** 154:6

**participation** 111:6

**parties** 4:10

**partner** 34:23,25 35:16
95:10 132:11 157:1
162:21

**partners** 32:11 33:8,15
38:20 39:11,13,17 40:11
50:23 51:3,10 53:7 55:5
65:24 86:17 127:22

LEXITAS
APPX1130

INSU_PI_001409

**parts** 21:8 67:18 115:1 140:9

**party** 21:6 65:25 84:23,24 87:19 145:25

**pass** 92:2

**past** 86:5 113:8 138:3,6 140:11

**past-due** 133:15 139:4

**pasted** 108:19

**pastor** 51:14

**patent** 65:7,11,14,18 66:20,21

**patents** 55:3,17 64:15,16, 17,19 65:1,8 66:17,23 79:13 80:2,5 165:15 166:2,3,5,9 168:6

**path** 11:12,13,15 34:18 149:1 156:3 170:22

**pathways** 85:3

**patient** 52:18 85:7,11,12 169:22,25 170:11

**patients** 88:8,10,11 95:15, 16 97:20 163:1

**Paula** 4:20

**pay** 31:12 37:7 44:3 53:24 54:8,11 56:9 60:1,13,14 61:22 74:14 75:7 99:22, 23 112:17 114:14 115:6 126:4 133:3,9 134:16 142:14 145:14 160:17 161:12 164:8

**payable** 113:20 134:22 135:3 140:5 141:6

**payday** 95:12

**paying** 41:20 75:24 142:13 143:19 154:2

**payment** 42:1 44:8 117:20 118:10,14,15,18,21 138:8 140:24,25 141:16 142:10 144:22 171:5,11

**payments** 110:6 117:18 119:8 134:15,16 170:25 171:15

**payout** 160:14

**payroll** 59:25 60:3,14 80:18 126:1 140:12,17 141:7,8

**payrolls** 80:19 112:23 151:16

**PDFS** 107:6

**penalty** 71:20

**pending** 151:22 152:15 166:6,7,9

**penny** 152:12

**people** 8:12 12:8 15:19 16:25 17:13 22:21 26:15 28:17 41:14,20 55:4,12 56:11 57:17 63:8 74:4 75:24 81:1 82:10 84:9 98:23 100:3 101:16 111:11 130:3 136:3 154:24

**percent** 28:9 35:13,14,21 45:10,15 68:24 77:6 94:13,16 95:1,5 112:11, 12 113:11,14,18,20,23 114:3,4 122:10,11 151:24 152:22 159:10,11

**percentage** 97:18 159:11

**percentages** 122:14

**perfect** 170:15,17

**performance** 92:23 93:1

**performing** 172:18

**period** 8:3 11:25 14:21 15:12,21 42:14 52:11 59:6 80:15 81:8 105:22 132:22 133:6,7 142:20 145:6 150:1,9 157:4 158:6 169:21

**peripheral** 41:17 46:18,25

**person** 6:24 8:15 9:7,12 10:12 11:5 23:18 25:8,17 43:15 80:8 90:16 110:15 111:13 122:23 169:20 172:3

**person's** 11:11

**personal** 10:19 44:16 55:8 70:15 71:8 73:7,10 74:11, 14 88:13 104:17 105:25 106:1,2,7 142:22 143:16 145:23 153:14

**personality** 87:24,25

**personally** 22:7,22 23:2 28:3 31:17 63:3 65:12 140:16 141:2 145:22

**personnel** 69:2

**persons** 46:18

**perspective** 50:7

**pharmacologists** 55:23 57:16

**pharmacology** 55:23

**Phoenix** 7:18

**phone** 28:15 128:4

**physician** 85:8 91:13 170:6

**physician's** 85:6

**physicians** 95:14

**pick** 122:20

**picture** 91:18 167:9

**piece** 89:2 119:5

**pieces** 55:10,13

**Pierce** 40:8 41:10

**pinned** 42:15

**pinpoint** 155:7

**pipe** 51:12

**placate** 155:24

**place** 20:7 28:19 32:6,10



APPX1131

INSU_PI_001410

48:25 73:17 84:1 96:10,
15,22 97:11,25 98:4
131:18 142:5 149:25
170:19 171:22 172:1,3,18

**placements** 32:5

**plaintiff** 4:13 38:22 39:8
173:18

**plaintiffs** 38:24 39:2 41:2,
11,18 46:3

**plan** 67:24 89:23 114:2
119:24 120:1,9,24 121:3
124:25 132:2,7 133:8
134:5,8 137:2 139:12
142:24 143:6 144:16,20
146:9 155:17 161:1,7

**planet** 82:10

**platform** 18:14 23:21

**platforms** 18:18

**play** 11:22 64:18 112:19

**played** 12:9 45:13

**Player** 169:9

**pleasant** 17:17

**plenty** 128:21

**pocket** 170:1

**point** 10:23 11:25 27:1,11
28:13 32:17 34:23,25
43:3 44:9 49:4,20 50:16
55:2 57:5 58:10,11 75:15
77:17 90:1 92:5 112:23
113:12 119:10 127:17
132:3 135:7,20 136:3
140:12 145:19 146:4
168:15

**pointing** 169:4

**points** 28:15 43:5 81:7
113:8

**Ponzi** 28:22 138:22

**poor** 81:1

**population** 97:18

**portfolio** 15:17 95:5

**portfolios** 14:24 16:2

**portion** 16:18 71:1 77:5
78:6 116:11 130:5,10
136:21

**position** 8:18 30:15 42:15
76:11 123:23

**positions** 8:10 76:6,18

**positive** 45:15 83:21

**possibly** 22:1 112:2
116:25 129:25 146:1

**potential** 20:13 26:3,5
79:18 80:1,5 90:2

**potentially** 19:7,10 66:1
89:9 91:1,25 92:1

**Powerpoint** 107:5 108:21,
24 128:24

**PP** 137:15,18

**PPE** 139:17

**PPP** 135:14,18 136:15
137:17 139:6,17 140:2,8

**PPPS** 133:16

**practice** 107:9 142:19
169:14

**practices** 51:22

**pre** 132:7

**precise** 159:15

**predate** 55:19

**predominantly** 75:12
106:21

**preferred** 43:16 114:11

**prepare** 103:9,10,14

**prepared** 103:12

**present** 26:1 50:10,11

**presentation** 107:6
108:21,24 128:24

**presentations** 23:3 79:25

**presented** 26:6 28:3
33:19 108:7 115:22

**presses** 8:8

**pretty** 8:9 13:21 19:9
43:19 49:23 74:25 92:21
100:6 124:13 136:4
164:20

**prevent** 85:18

**prevented** 85:19,20

**previously** 160:8

**price** 80:13 100:5 112:24
113:17 145:9

**primarily** 135:6

**printer** 8:5,7

**printing** 8:8 9:1

**prior** 5:20 10:16 30:24
31:4 33:2 43:10 52:11
53:3 57:7,14 58:1 72:9
85:23 108:20 141:3
158:13

**priors** 141:10

**prison** 24:19

**privacy** 153:14

**private** 17:23

**privately** 76:19

**problem** 5:25 18:12,24
72:10,13 83:11,15,18,19

**problematic** 68:12

**problems** 87:1 97:6

**proceed** 36:4 69:16
102:25 173:16

**proceeded** 43:18

**proceeding** 27:15

**proceedings** 26:10,19,21
27:19

**proceeds** 144:17,19



Scott Hepford

**process**  8:11 9:2,12 10:23 11:1,7,15,17,18 12:9 14:3,7 15:15,19 16:13 17:15 20:17 30:20 34:12 54:24 61:17,18 64:24 65:9,14,17 66:6,18 77:20 79:24 93:20 135:25

**processes**  11:8 13:1 16:1, 9 17:3,12 18:8 51:23

**processing**  16:15,21

**produce**  17:8 42:25

**produced**  23:3 45:11 78:1,5 105:24 108:11 119:21 156:15

**production**  103:23

**productive**  88:16

**productivity**  9:10

**professional**  19:13 78:23 148:16

**profit**  18:15 98:21 131:2 149:9

**profitable**  9:13 17:16 67:7 148:22

**program**  11:20 19:4,25 20:1,2,7 117:22 135:25 136:15

**programs**  70:16

**progression**  50:5

**project**  28:4 50:15,20 52:22,23 53:2

**projecting**  86:14,19

**projects**  19:2 20:2

**promised**  91:2 161:24

**promissory**  162:4,7,11

**proofread**  171:13

**property**  129:10,13

**proposal**  131:10

**proprietary**  84:22

**prosecution**  71:22

**prospect**  20:12

**prospective**  150:4

**prospects**  19:20 20:6

**protect**  65:3

**protecting**  55:17

**protocols**  17:13 85:3

**prototype**  68:2

**prove**  65:1 68:18

**proved**  90:24

**proven**  65:25

**provide**  27:21 85:12,16 129:20

**provided**  23:15 27:25 28:16 72:4 81:19 93:2 111:16 115:11,18 138:13 153:16 160:9 161:7 164:23

**provider**  163:5 169:13,23

**providers**  169:11

**providing**  10:14 41:2 84:21,24 85:8

**provision**  66:6

**PTSD**  155:19

**public**  30:16,19 32:18,21 33:6,21,23 34:3,22 35:7, 18 39:20

**publications**  88:19 167:14

**publicly**  79:2

**pulled**  73:2 109:4

**pump**  65:13,19,20,23,24 66:1 90:16

**pumps**  52:9 65:13,16,22 66:3,6,13 84:21 92:6 93:2,5,6 94:17 95:6 100:2 141:1 166:17

**purchase**  110:4 122:17 144:18,19,23 153:9 162:9,10 165:13,24 170:24

**purchased**  165:14

**purchasing**  144:21

**purely**  35:5 123:15 153:15

**purpose**  22:11 30:14 47:24 48:7 111:21,23,25 128:11

**purposes**  132:1

**pursuing**  66:24 67:3 68:12

**push**  113:11

**pushed**  72:16

**pushing**  168:24

**put**  11:4 43:7,23 44:10 50:17 53:21 54:5 58:24 59:10,16 61:11 68:25 71:8,9 73:18 74:18 76:9 80:8 82:10,11,21 83:25 84:4 111:20,24,25 113:9 129:14 133:20 139:21,22 146:24 148:2,11 150:18 151:15 157:1

**puts**  91:25 92:1 160:7

**putting**  20:7 51:1 108:20 130:10 140:16 141:1

**puzzle**  55:10,13

**Q**

**qualified**  15:20

**quality**  9:10

**quarter**  94:13,18,23 95:2 117:24,25 118:3

**quarterly**  118:18,21

**question**  15:11 21:2 25:11 26:14,18 29:16 39:6 40:3 43:17 49:18,23 58:25

LEXITAS
APPX1133

Scott Hepford    s Index: questioning..Relief

62:14 71:19 72:9 74:3
77:23 78:24 79:15 82:1
83:4 89:25 92:19 99:1,5
104:15 106:11,16,18
109:17 111:9 115:13
116:18 122:6,7,9 136:9
137:20 149:16 151:2
157:16 159:3 164:21
165:11 168:3

**questioning** 102:13 106:6

**questions** 57:11 104:5
144:10 173:18,21

**quick** 69:21 121:1

**quickly** 8:9 131:2

---

### R

**raise** 5:14 22:19,22 23:1,2
31:17

**raised** 22:7,20 31:23

**raising** 23:5

**ranged** 21:22

**ranging** 81:8

**ransom** 112:24 164:8

**Raton** 90:6,11 91:4,5
92:12 93:12,19,21

**ratty** 52:2

**re-** 136:24

**reached** 32:17 75:23

**read** 22:9 71:13,15,16,18
120:11 121:1 173:20

**reading** 113:16

**ready** 17:9 108:12 133:2
147:4

**real** 69:20 112:2,21 121:1
130:22

**realize** 155:24

**reason** 31:7 86:1 155:15

**reasonable** 15:21 164:7

**reasons** 95:8,9

**recall** 9:17 10:2 24:13,19
26:24 30:14 38:19 41:18
47:2,7,19 50:16,19 60:5,7
63:3,4 74:21 80:10 92:21
109:6 111:19

**receipts** 42:25 46:10

**receivable** 73:21

**receive** 13:9 44:1 117:16,
21

**received** 12:25 13:23
45:12 116:16,20 134:8
144:6

**receptionists** 63:16

**recess** 36:2 69:14 102:23
153:4 173:14

**recliners** 52:2

**recognize** 70:5 119:18,22

**recollection** 74:3,4 142:1,
2 152:3 158:3

**record** 4:4 5:4,11 36:1,4
38:7 69:16 71:17,18
102:21,25 103:20 109:25
144:5 153:3,6 158:21
173:10,12,15,24

**records** 32:8 35:19 51:20
64:13 124:3

**reduce** 170:18

**refer** 8:3 114:10 118:4

**reference** 107:16 109:21
140:6

**referenced** 31:25 117:3

**referred** 52:14

**referring** 22:10 24:24
143:13

**reflect** 73:10

**reflected** 141:10 156:24

**reflects** 73:14,16

**refresh** 32:7 64:12

**refresher** 84:25

**refused** 125:6

**refusing** 106:10

**Regis** 6:22 7:6

**registered** 63:16

**regret** 89:20

**regrets** 44:21

**regular** 85:23

**regulatory** 92:2

**reimbursed** 42:19

**reimbursement** 44:18

**reimbursing** 170:2

**rejected** 131:22

**rejects** 131:24

**related** 40:11 62:7 77:10
79:2,14 93:22 94:2 97:25
98:7 105:16 122:3 126:10
129:1

**relates** 42:15 101:19
102:2

**relationships** 75:12

**relevance** 101:9,11
102:13,15

**relevant** 101:20,21 102:1
105:19,23 106:17

**Relief** 48:11,13,16,17,22,
24 49:3,7,10,16 50:13,21
53:3 54:25 55:19 56:21
57:7,15 58:1,16,24 59:4,
9,10 62:7 63:9 66:2,8,19,
25 67:4,13 68:13 70:7
76:13 77:10 79:1,13
82:24 84:9 93:2,4,19 94:2
98:1,5 101:14,19 102:3,8
106:4 109:10 110:7 112:9
115:24 119:25 120:2,9,15
121:11,13,15,17,21

LEXITAS
APPX1134

INSU_PI_001413

122:3,14 124:5,15 126:23
127:3,9,12 131:12,16
132:1,17,20 138:13,17
139:11 142:6,12 144:20
145:5 148:6,12,25 149:4
150:13,20 151:23 152:16
153:18 154:7,12 155:3
157:3,25 161:2,4,7,15
165:14 167:4,16,19
168:6,16 171:6,24 172:24

**Relief's** 84:17 85:16

**Relief-related** 77:4

**rely** 72:1

**relying** 156:25

**remain** 122:1

**remember** 5:21,22 6:1
7:21 23:5 24:8 26:25
32:5,8 36:15,16 37:5 38:8
40:6,9 41:5 45:25 46:24
53:20,25 54:9 59:15
63:17 64:8,11 74:9 75:10
100:10,21 104:10 109:5
124:22 126:11 127:7
142:7 144:5 152:7 158:10

**remembered** 92:19

**remembers** 158:16

**remind** 139:17

**remoted** 21:7

**remotely** 14:9 22:3

**remove** 157:4,15

**removed** 157:12 158:14

**removing** 119:5 157:20,
25 158:4

**renewing** 97:10

**rent** 60:1

**reorder** 97:18

**reordering** 94:16 95:2,3,6
100:5

**Repeat** 21:16

**rephrased** 106:16

**report** 18:19,22 20:9

**reported** 4:8 14:9

**reporter** 4:5,7,17 5:10
18:21 37:23 131:14

**represent** 4:11,13,16
103:22 109:16 115:11

**representation** 40:8 79:12

**represented** 37:2 80:4
139:6 140:11,15

**representing** 103:18
134:21 150:12

**represents** 77:5 120:13,
14 143:17

**reputable** 55:22

**request** 14:5 156:15

**required** 111:20

**requirements** 162:20

**requires** 130:15

**research** 88:18 101:16
130:20,23 167:14 168:10

**reseller** 84:22

**reselling** 92:6

**reserve** 14:5 173:18,21

**reside** 124:7

**resistance** 85:2

**resisted** 89:11

**resolution** 85:24

**resolve** 90:9

**resolved** 37:14 141:24,25

**respect** 22:4 33:8,15 34:3
38:20 71:7 97:1,5 123:23
124:5 133:22

**respectful** 87:17

**respond** 125:6

**responsible** 16:11 17:4

18:14 23:18 114:3 125:23
133:12

**responsive** 164:16

**rest** 23:22 46:2 78:6
126:17 128:18 133:12,17
138:9 161:16 162:22

**Restor** 121:6 131:12,16

**Restoration** 50:23 51:3,10
53:7 55:5 65:24 127:22

**Restructure** 128:25

**result** 26:10

**resume** 31:25

**retain** 55:21

**retirement** 73:13 87:13
142:24 143:6

**return** 143:10

**returned** 91:23 136:21

**returns** 22:15 125:3

**revenue** 55:25 92:6,7,14
93:7 94:11 95:7,17 97:22
98:10,15,20,21 99:13
100:12 115:4,7 125:16
126:20 148:19,22 149:4,
8,19 169:3 170:9 172:23

**reverse** 14:5

**review** 71:8 156:14

**reviewed** 72:20

**reviews** 65:10

**revise** 104:8

**revised** 104:3

**Rhodes** 35:16 41:10,16
43:22 45:20 46:19 47:13

**Richter** 21:15,19

**rights** 75:3 90:17 158:9,23
159:2,5,7

**risk** 17:12 22:16,17 91:25
92:1 143:4 163:5 169:11,
13,17,22,25

LEXITAS
APPX1135

INSU_PI_001414

Scott Hepford

**River**  22:4 25:1 28:4 29:13 30:2,3,16 31:9 34:24 36:6 37:6,9 38:13

**Robert**  35:16 41:9,16 43:22 47:13

**role**  11:22 15:13 62:20 64:18

**roles**  8:9 17:1

**roll**  92:5

**rolled**  33:5 136:15

**rolls**  87:2

**room**  4:10,18,20,22 43:17 91:12,24 118:23 146:19

**roughly**  11:8 61:22 133:13 145:20 149:24

**routinely**  107:1,9

**Roy**  123:8

**run**  8:15 17:12 18:17 24:17 69:2 128:16 130:2 132:3 163:2

**running**  8:8 14:7 60:4 63:20 68:1 71:4 163:3 172:21

**runs**  162:25

_____

**S**

_____

**salary**  44:7 46:14,15,22

**sale**  44:15 79:18 144:17

**sales**  16:18 80:13 97:7 117:14 145:9

**salesperson**  10:11

**saved**  104:3,14 107:18

**SBA**  70:6 71:25 72:2,3 79:12 80:20 135:25 139:5,8,9,11,22,25

**SBAS**  133:17

**scale**  82:12

**scaling**  12:3

**scanned**  109:15

**scary**  23:17

**scenario**  54:8 80:25 81:2 83:25 84:4 155:20

**scenarios**  65:1,6

**scenes**  86:20

**schedule**  110:5,8

**scheme**  24:20 26:3 28:22 32:3 138:22

**school**  6:5,6,12,19 7:9 84:25

**schooling**  6:20

**scope**  20:4 123:14 153:13

**score**  11:11

**scorecard**  20:9

**Scott**  4:24 5:5 70:14 140:5,24 141:12,14 160:3

**scrambled**  165:23

**screaming**  89:18

**screenshot**  109:7,8 110:2

**screenshots**  109:15

**search**  54:1

**SEC**  24:7

**secondary**  15:23,24

**secret**  24:7,8

**secretary**  49:10 62:22 109:16 111:1

**secrets**  166:11

**section**  71:6

**securing**  10:13

**seed**  115:2,11 116:11,13, 16,19 117:17,18,20 118:11,15 130:5 162:15 164:23

**seek**  158:8

**sell**  170:24

**sellers**  54:5

**selling**  10:11 83:12 84:9, 23 165:1,3

**sells**  169:2

**send**  72:16,17 138:15

**senior**  18:5

**sense**  15:6 55:6 123:2 128:17,18 171:20

**sentenced**  24:19

**separately**  156:17,18

**separation**  9:19 12:24 13:15,17

**September**  99:10

**September/october**  104:25

**series**  17:3 20:2 121:15, 22 124:19 125:8,16 127:3

**served**  33:6

**service**  9:11 24:8 120:21

**services**  16:10 19:13 66:18 121:13 125:10,12, 14

**set**  27:11 85:3 107:3 125:18 126:4,9 148:18 163:25

**sets**  94:17 95:6 100:2

**setting**  145:8

**settled**  37:13

**settlement**  44:24 45:21

**severance**  13:23

**shaking**  91:18

**shape**  93:23 136:5 164:24

**share**  78:14,15

**sharpen**  11:16,17

**sheet**  81:19

LEXITAS
APPX1136

**shell** 45:24

**shenanigans** 39:25

**shining** 81:6

**ship** 164:7 172:21

**shocking** 155:22

**short** 12:19 35:23

**shortly** 30:7 39:20

**shortsighted** 131:6

**shoulder** 170:13

**show** 23:22

**show-how** 82:16 129:13

**showed** 45:12 47:16
   156:23

**showing** 31:6 85:3 134:13

**shown** 13:24

**shows** 9:3 138:8

**shrink-wrapped** 9:3

**shut** 125:6

**shuttered** 13:20

**shutting** 142:15

**sic** 15:17 109:16 137:2
   138:4 144:25

**side** 5:24 10:6 12:13,16
   14:6 15:8 19:13 82:18
   87:10 91:15 164:5

**sign** 132:19 160:7 169:23
   173:21

**signature** 70:19 71:12

**signatures** 71:5

**signed** 35:8 91:17 92:9
   94:4 99:8,18 100:8,16,22
   101:2 102:7 138:17
   156:11 160:4 169:16
   172:6

**significant** 77:5 143:4

**significantly** 33:25

**signing** 71:14,20

**similar** 11:3 13:1 14:2
   18:4 114:15

**simple** 55:15 100:6

**simultaneous** 11:7 119:4

**simultaneously** 12:8

**single** 88:3 89:6 110:15
   134:12 169:22

**sir** 5:9 13:6,8,11 19:18
   23:12 37:22 38:6 63:21
   67:11 73:12 79:4 92:11
   93:3 103:7,24 106:6
   108:13 112:8 141:5
   143:23 147:11,13,25
   149:7 151:7 153:19
   165:1,9 171:23

**sister** 26:7 28:3

**sit** 91:23 164:10

**sits** 92:7 131:11

**sitting** 34:4 126:8 128:3
   129:15 130:9 142:17

**situated** 15:8

**situation** 15:11 23:17

**sizable** 75:9

**size** 18:24

**slash** 80:2

**slated** 117:16

**slide** 114:16 115:12
   120:5,6 144:23

**slip-sheeted** 35:9

**small** 76:18

**Smartlev** 166:14

**Smith** 83:1,5 158:17,18

**software** 18:11 166:17

**sold** 51:12 98:17 141:3

**Solutions** 125:16 126:20

**solve** 87:1 130:10 147:7
   163:22

**solved** 83:11

**someday** 17:25 130:15

**Sonfield** 34:15 47:1

**sort** 9:11 15:25 20:3 41:17
   52:18 82:19 86:12

**sound** 18:13 118:8

**sounds** 7:24 12:22 118:9

**source** 9:15 34:2 108:23
   114:20 115:25 116:3,6
   119:10

**sources** 114:22

**south** 90:7 127:9

**Southside** 127:3,15

**Southwest** 124:16

**space** 9:7,21 13:19 14:4
   15:6 19:12 30:18 50:16
   51:11,20 88:19 89:8

**speak** 5:9 38:4

**special** 88:9

**specialists** 55:24

**specific** 21:2 35:20 38:25
   41:13 49:1 83:16 96:13
   98:19 100:14 101:20
   116:18 146:16 154:9
   162:16 167:24 169:13
   173:4,5

**specifically** 18:6 41:18
   42:16 80:10 163:5

**spectrum** 16:3

**speculating** 27:16 29:1
   61:8 96:4

**spend** 170:10

**spending** 169:22

**spent** 15:5 73:25 107:22
   146:8 147:6

Scott Hepford                                     s Index: spilled..supposed

**spilled** 131:5

**spirit** 166:1

**spitballing** 124:14

**split** 35:12 56:7

**splitting** 44:5 50:6

**spoken** 30:25

**spread** 133:24

**spreadsheet** 43:3 46:8,11 73:23 76:3,22 77:2,24 78:4,8 109:7,9

**spring** 63:25 126:23

**Springs** 6:6,22 12:11

**St** 63:12

**staff** 17:18 21:6,7,23,24 88:12 135:10

**staggering** 54:10

**Stan** 85:23 86:2

**standard** 108:25

**standing** 21:8 52:4

**Stanley** 111:6 124:24 127:5,18 128:16 141:6,18 143:1 147:15 154:21 155:10,15,23 156:5,7,12, 16,18 159:4 160:3

**star** 81:6

**Starbucks** 18:2

**start** 54:20 67:20 68:4 81:24 95:3 130:11 154:5, 11 163:19

**start-up** 21:12 99:25

**started** 7:22 8:3,11 30:2,3 48:24 54:3 55:4 77:15 94:19,22 108:20 116:12 150:7,9 155:24

**starting** 83:12

**starts** 86:20 137:6

**state** 4:10 5:3 111:2

**stated** 162:5

**statement** 27:21 70:15 71:8 72:5 77:10

**statements** 28:1

**states** 10:25 14:10 26:16 90:17 169:1

**status** 20:10 48:25

**stay** 86:12 119:7 129:23 156:2 163:14

**stayed** 12:18 21:8 145:15

**steal** 32:20

**stenographic** 4:8

**steps** 9:4 15:23 16:23 68:5

**sticker** 145:14

**stickers** 69:20

**stipulated** 159:14

**stipulating** 102:6,9

**stipulations** 53:17

**stock** 43:16 79:5 138:15

**stocks** 76:1,7

**stole** 43:11

**stop** 66:23 69:12

**stopped** 105:8 106:22 124:12

**straight** 89:12

**strain** 133:20,21

**strategically** 19:8

**strategy** 83:12

**streams** 148:20,22

**Street** 18:20,23

**strength** 88:21

**stronger** 88:20

**structure** 84:15 114:12 131:17 145:18 164:19

**structured** 41:4 114:6

**struggled** 95:16 167:19

**study** 88:23

**stuff** 80:20 84:25 126:17 128:22 136:2

**stupid** 144:10

**style** 118:15

**subdivision** 5:24

**subject** 79:6

**submit** 42:18 71:3

**submitted** 46:9 65:7 70:6 71:4,24

**submitting** 72:10

**subprime** 14:13,15 15:1, 13,25

**subsequent** 138:1

**substantially** 122:18,19 144:21

**successful** 34:22

**sudden** 155:19

**sued** 36:14,17 126:5 134:11

**suffer** 88:11,12,13

**suffering** 97:19

**suggest** 158:13

**suing** 41:14

**super** 77:1

**super-voting** 43:15

**supervisor** 21:14

**supplies** 12:5

**supply** 166:16

**support** 85:17

**supporting** 71:23 85:11

**suppose** 25:24 75:14

**supposed** 128:16

Scott Hepford                         s Index: surprised..time

**surprised** 89:25

**surrounding** 87:15

**survive** 146:11 168:1

**suspect** 42:9

**suspected** 113:7

**suspicion** 42:12

**swear** 4:5

**switched** 9:24

**sworn** 4:25

**system** 10:24 72:14

**systems** 20:17 51:23

---

### T

**table** 49:22 50:7 87:10
  130:3

**taking** 33:20 68:4 86:13
  169:17

**tale** 74:25

**talk** 30:21 105:17

**talking** 16:15 35:6 36:7
  38:13,14 39:17,18 49:22,
  23 50:13 56:19 59:6
  61:20 78:8 79:18,22
  80:15 81:8 83:2 89:8
  100:15 109:3 116:1
  118:12 135:16 138:2
  142:24 149:8,9 152:4
  165:6

**tap** 150:5

**targeting** 22:9

**tasks** 87:8

**tax** 125:3

**teaching** 7:15

**team** 14:8 21:9

**teams** 15:16 22:2

**technical** 6:13 72:13

**technically** 18:4

**technology** 14:8 50:9
  98:1,4

**telling** 62:23,25 63:1,3

**tells** 86:18

**Tempe** 7:18

**template** 108:25

**ten** 33:22 42:8 96:17,19
  98:6,16,23 99:2,4 101:1
  164:13

**tenet** 91:22

**tenure** 19:15

**term** 14:13 87:14 124:22
  147:20,21 149:19

**terminated** 13:5 20:22
  93:20 137:12 142:16

**terms** 16:2 84:8 91:20
  97:17 99:22,24,25 162:5

**terrible** 51:21 86:14

**territory** 90:17 91:2

**Terry** 23:15 34:23,25 35:2,
  7

**tested** 65:22

**testified** 4:25

**testimony** 15:7 27:18
  37:24 38:17 40:10 80:4
  134:25 148:1 152:5,9
  156:18 157:2

**Texas** 4:9 5:7 13:2 22:3
  47:21 49:10 75:2 159:7

**text** 109:3

**textbook** 87:24

**theory** 128:12 130:21

**thing** 10:20 11:11 14:7
  17:6,9 24:9 65:3 75:6
  82:12 86:23 88:3,9,11,17
  89:7 91:19 98:9 109:1
  119:2 124:17 132:5

142:16 145:1 147:6 150:9
  162:22 171:5,10

**things** 11:7 12:5 17:14
  22:14 23:3 42:13 50:8
  55:6 73:24 74:1 85:2 87:2
  89:24 106:6 113:10
  129:14,24 137:10 146:9
  161:15 162:14,16 163:16,
  22,24 165:20 167:19,23,
  25

**thinking** 7:8 113:10

**third-third-third** 44:5,21

**thought** 39:16 77:19
  146:16 150:6 153:20
  159:6

**thousand** 60:8 80:19
  133:15 139:21 145:23

**thousands** 45:19 109:1

**thread** 118:25 129:20

**threading** 88:14

**throw** 57:20 165:23

**thrust** 155:19

**Thursday** 4:3

**tick-and-tie** 89:6

**tie-breaker** 155:20

**tied** 163:13

**ties** 130:20 155:16

**tight** 172:21

**tightly** 130:20

**till** 173:18

**time** 8:3 9:15 10:16 11:10,
  25 13:19 14:11,21 15:3,5,
  21 17:17 21:16 27:3,9
  31:1,11 34:14 35:16
  38:19 42:14 43:23 47:16
  49:8,10 51:2,7 52:11
  53:5,13,25 54:1 55:7,14
  56:11,19,20 59:25 60:1
  61:19 62:2 63:5 68:16

---



69:12 72:7,20 73:4,15,25 74:2 75:13,14 76:11,12, 15 77:18 79:1,11,14,17, 23 80:14 81:8,15 82:5,19 83:4,11,25 84:13 86:3,8 87:18 88:9 89:19 97:4 98:2,14 104:24,25 105:2, 6,22 107:14,19,22 108:15,25 110:14,20,21, 23 111:22 112:10 114:13, 21 117:17 118:19 119:1 125:24 127:14,19 128:8 129:20 130:18 132:9,13, 22,23 133:10 134:22 135:4 136:9,10,12 142:20 144:22 145:5 146:6,10,22 147:6,8 148:10,23 149:25 150:1,9,16,20 152:14,15 155:23 156:1,5 157:4,17 158:5,10,24 159:10 161:16 163:2 165:21 170:11,20 171:21 172:22 173:18

**timeline** 20:5 64:10

**times** 17:1 21:23 40:13 42:11 62:1 74:13 104:2,4, 8 109:2 131:23 147:9 163:7

**timing** 64:6

**tiny** 77:1 89:6

**today** 4:14 130:14 131:11

**Today's** 4:2

**told** 26:16 33:24 112:16 128:6 151:21 156:25 161:6

**ton** 89:24 170:17

**tons** 30:19 157:11

**tool** 85:9,10

**top** 6:1 19:10 24:13 26:24 65:2 80:21 104:14 133:25

**total** 61:7 99:3 114:6 116:16 135:12 137:7

139:19 153:9 160:14 161:18,22 162:2 163:17 171:20

**tough** 27:9 79:15

**Townsend** 23:14,25 24:1 25:6 28:16 29:20 30:1,8,9 37:12

**track** 40:14 143:19

**tracking** 73:25

**trade** 166:11

**traded** 79:3

**trader** 23:24,25 27:25

**trading** 22:9,18 23:19

**train** 8:10

**trained** 100:3

**trainer** 8:10

**training** 91:14,16

**trait** 86:14

**transaction** 26:11 90:3 114:17

**transactional** 56:2 57:17

**transitioned** 106:20

**transparent** 42:13 134:10, 13

**treated** 87:21

**treatment** 51:4,7 52:13,15

**treatments** 52:11 168:6

**tremendous** 33:20 52:5 64:25

**tremendously** 34:15 45:18

**trend** 97:1

**trial** 125:18 126:8 173:19, 22

**trials** 130:24

**tricked** 155:11

**tricky** 122:8

**Trina** 127:23

**true** 15:4 37:10 45:17 71:24 72:5 79:9 97:9 127:10 150:3 161:20,21

**trust** 35:3 46:6 48:1,3,4 73:16 127:11 160:6

**trusted** 29:25

**Turkey** 128:14 171:6,22 172:1,17

**turn** 131:2

**turned** 22:15 52:5 91:24 140:13 171:14

**turns** 132:2

**type** 6:15 7:13 10:17 16:16 17:22 51:4 52:19 67:2,4 146:24 153:8 165:7 167:5 168:11,12,16 169:13

**types** 15:24

**typical** 86:13,14

**typically** 16:20,25 62:2 87:18

**typo** 171:18

## U

**Uh-huh** 21:18 31:8,24 32:1 34:11 46:20 59:24 84:12 94:15 99:20 109:14,19 112:4 116:22 120:12,18 125:2 126:13, 21 129:11,16 134:3,6 135:15 136:16 137:9 141:22 143:15 144:24 149:18 162:24 163:20 165:19 166:10,13 167:2, 21 168:8 169:15 172:5 173:6

**ultimately** 10:14 17:18 18:25 19:20 20:7,9 23:4




53:15 68:18 88:25 89:17,
22 114:9 133:18 136:2
142:9

**umbrella**  20:3

**unanimous**  125:7

**unaware**  87:4

**uncomfortable**  87:20 88:5

**uncover**  51:18

**underneath**  17:3 135:14

**understand**  20:2 29:16
49:18,25 51:16 71:25
72:18 87:23 89:3 98:25
106:18 115:13 126:19
131:10 135:24 146:21
149:16 158:9 164:18
165:12 168:9 170:21

**understanding**  27:14
39:20 49:14,20 51:6
53:24 58:16,23 79:12
130:19 132:7 137:12
143:1,2 144:15 158:23
159:4 163:4 167:15
168:24 170:22

**understood**  133:20 135:3
136:3

**underwriting**  16:20

**unicorns**  170:16

**unified**  20:9

**unilaterally**  91:14 128:7

**United**  10:24 26:15 75:1
169:1

**units**  76:9

**Universal**  6:13

**university**  6:22 172:7

**unknown**  132:18 136:12
145:20 167:15,17

**Unlimited**  7:23

**up-front**  99:23

**up-to**  12:4

**up-to-date**  28:17

**up-to-speed**  12:4 28:19

**updated**  110:1

**upper**  168:25

**upset**  156:1

**upside**  54:4 147:4

**upstream**  16:1

**USA**  128:15

**Utah**  121:17 122:5,11
139:22

**utilize**  85:5 130:5 131:25

**utilized**  65:17,19

---

**V**

**vacation**  90:12,20

**vague**  18:11 25:11 77:12
105:15

**vaguely**  32:5,8

**valuable**  82:5,8

**valuation**  77:9 78:14,19
80:12 145:4 153:17

**valuator**  148:16

**valueless**  80:16,17 81:9
82:14

**values**  76:5

**valuing**  80:10,11

**variables**  11:15

**variations**  11:9

**variety**  8:2 22:12 55:12
85:20 95:7

**Vegas**  7:19

**vehicle**  129:21

**vehicles**  32:9

**vendor**  125:23 166:12

**vendors**  125:23 136:18

**venture**  32:13,15,16 51:1

**Ventures**  18:2

**verbal**  90:20

**verge**  80:24

**verify**  101:16

**version**  134:8

**versions**  90:13 139:7
140:2

**versus**  124:12 143:18
171:2

**viable**  51:1 53:11 112:17

**view**  50:1 85:14 89:10

**visions**  131:6

**visualizing**  5:22

**vocations**  9:16

**voice**  5:14

**vote**  85:24 155:11,15
156:6,13,20

**voted**  124:24 159:25

**voting**  156:8 158:23

---

**W**

**W-2**  136:19

**wait**  138:5 142:17 151:12

**waiting**  126:8

**wake**  163:11

**walk**  130:11

**walking**  82:10 88:14
163:17

**walks**  118:18

**Wall**  18:23

**wanted**  7:4 90:2 146:10
173:7

**wanting**  42:14



Scott Hepford                                                              s Index: Washington..zyno

**Washington** 12:25 13:12, 16,25 14:11,16 18:1 21:7, 21,25

**wasting** 88:25

**Wayne** 4:12 152:24 173:17

**ways** 9:9 11:16 79:22 85:21 87:7,14 114:9 154:6

**weak** 43:21 88:20

**weaker** 43:20,21

**week** 91:16

**weeks** 34:21 133:10 137:10 145:16 146:8 155:5

**Wells** 10:3,4 11:20,24 12:16 13:7,10 14:3

**West** 76:24

**Westside** 121:15,21

**wife** 13:3 35:3,14 48:5 73:17 164:11

**wiggle** 146:19

**wild** 74:25

**Wilson** 62:19,22 63:19 65:5

**Wilson's** 62:20

**wind** 120:9 124:24

**wind-down** 89:23 114:2 119:24 120:1,23 121:3 124:25 127:21,24 128:9 132:2,7 133:6,8 134:8 137:2 139:12 144:16,20 161:1,7

**winding** 142:12

**wired** 155:13

**withdrawals** 29:6

**wolf** 21:15,19

**wonderful** 21:5

**Woodlands** 124:6

**word** 61:16 69:6 107:6 169:8

**wording** 165:24 171:1

**words** 132:8 155:10

**work** 7:13 8:24 10:18,24 12:12,20 23:13 24:5 43:12 87:23 88:20 118:16,17 129:14 130:16 154:20 155:8,25 162:25 164:11

**worked** 7:23 13:12 14:9 16:1 17:19 20:19 21:20 23:9 43:6,8 108:3,14

**workflows** 64:22

**working** 7:10,22 33:4 40:16 50:15,20 52:22,23 53:2 63:8 64:8 65:4 87:1 88:15 108:16,20 135:7

**workplace** 88:6

**works** 34:17 56:1 64:21 85:1 170:22

**world** 7:14 15:25 18:12 19:11 21:8,22,24 94:21 130:14 131:8 133:11 155:14 163:5 170:5,21

**world's** 171:19

**worldwide** 169:1

**worse** 80:17

**worst** 171:19

**wow** 85:19

**write-ups** 13:10

**writing** 7:8 16:4,5 60:2,11

**written** 65:1 74:19

**wrong** 74:8

**Wyoming** 128:5

## Y

**y'all** 34:20 39:19 41:1,19, 20 44:23 49:16 50:2,20 52:22 53:5,12,14 54:15, 25 55:21 56:7 60:20 62:3, 10 65:13,14,21 66:17 67:5,21 68:4 74:19 95:25 96:10,14 97:7 138:1 156:11

**year** 5:19 12:19 21:23 22:1,2 27:5,10,13 32:14 60:2 64:17 65:15 87:3 95:3 98:25 150:8

**year-end** 95:20

**years** 5:19 11:14 24:19 33:22 42:8 89:22 133:9 139:4 154:19 164:13

**yelling** 89:18

**Yeni** 171:6 172:1

**yesterday** 33:22 34:4 74:5 134:25

**yield** 94:25 155:25

**yielded** 89:21

**Yuzyil** 171:6 172:1

## Z

**Zip** 5:16

**zyno** 65:19 66:1,3,5 138:6 140:24,25 166:12

LEXITAS
APPX1142

INSU_PI_001421

## AFFIDAVIT OF SCOTT A. HEPFORD

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

BEFORE ME, the undersigned authority, on this day personally appeared **SCOTT A. HEPFORD**, Affiant, who being duly sworn, under oath, stated the following:

1.　　"My name is SCOTT A. HEPFORD. I am over the age of eighteen. I am of sound mind and competent to make this Affidavit. The facts set forth herein are based on my personal knowledge and are true and correct.

2.　　"I am a citizen and resident of Harris County, Texas. I am a Member and Manager of Well Cell Global LLC (**"WCG"**), a Texas Limited Liability Company that owns certain intellectual property rights formerly owned by Diabetes Relief LLC ("**DRL**"), a Texas Series Limited Liability Company of which I am also a Member and Manager.

3.　　"I am also a Member and Manager of Well Support LLC (**"WCS"**), a Texas Limited Liability Company that is authorized by WCG to issue licenses for its patented technology and processes for the treatment of diabetes and other metabolic disorders.

4.　　"I am familiar with the matters in controversy in the litigation against Shawn Calvit and his "Insulinic" business entities and others in the United States District Court for the Southern District of Texas (**"SDTX"**) (herein referred to as the **"Insulinic Litigation"**).

5.　　"I submit this Affidavit in support of WCG's Petition for Temporary Restraining Order filed in the SDTX in the Insulinic Litigation.

6.　　"Attached hereto are 29 pages of records from WCG. These 29 pages of records are kept by WCG in the regular course of business, and it was the regular course of business of WCG for an employee or representative of WCG, with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record. The record

4:22-CV-03062
Injunction Hearing

# EX 23

DEFS *APPX 0163

AFFIDAVIT OF SCOTT A. HEPFORD

INSU_PI_001422

was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

7.      "WCS issued a license to Defendant Insulinic of Lafayette, LLC on September 13, 2021, and to Defendant Insulinic of Hialeah, LLC on November 1, 2021. The License Agreement with Insulinic of Lafayette, LLC is attached hereto as Exhibit "A." The License Agreement with Insulinic of Hialeah, LLC is attached hereto as Exhibit "B."

8.      "Prior to issuing the licenses referenced above, Defendant Shawn Calvit signed a five-year confidentiality, nondisclosure, noncircumvention agreement on April. 19, 2021, with Diabetes Relief LLC. The Non-Disclosure Agreement with Shawn Calvit is attached hereto as Exhibit "C."

        FURTHER AFFIANT SAYETH NOT.



                        SCOTT A. HEPFORD

        SUBSCRIBED AND SWORN TO BEFORE ME, on this the 13th day of September 2022, by Scott A. Hepford, to me personally known, to certify which witness my hand and official seal of office

MEGAN MATTHEES
Notary Public, State of Texas
Comm. Expires 11-04-2023
Notary ID 13226223-9

_Megan Matthees_
Notary Public, State of Texas



(http://insulinic.com)

FOLLOW US :
f (https://www.facebook.com/insulinic)   🐦 (https://twitter.com/insulinic)

4:22-CV-03062
Injunction Hearing
**EX 24**
DEFS "INSULINIC"

## The Science Behind Physiologic Insulin Resensitization

- Insulinic utilizes a unique and groundbreaking patented approach where insulin is administered as a hormone rather than a drug addressing the primary cause of Diabetes which is metabolic failure
- By utilizing insulin in a manner that bio-mimics normal physiology, this modality is designed to reduce insulin resistance which helps blood sugar more readily enter each cell and be converted into energy
- Increasing cellular energy allows damaged tissues and organs to grow, repair, and regenerate. Thus, our approach not only stabilizes but in many instances has reversed complications of diabetes and other metabolic disorders.

### PIR For Insulin Resistance

PIR for insulin resistance
(http://insulinic.com/wp-content/uploads/2022/03/1.-PIR-for-insulin-resistance-1.pdf)

### Dynamic Diabetes Solution

Dynamic Diabetes Solutions-Pulse Insulin Resensitization (PIR)
(http://insulinic.com/wp-content/uploads/2022/03/4.-Article-Dynamic-Diabetes-Solutions-Pulse-Insulin-Resensitization-PIR-Published-Medical-_-Clinical-Research-Dr.-Loveridge-08.13.2021.pdf)

### Improved Kidney Function

EXHIBIT
**B**

Improved Kidney Function
(http://insulinic.com/wp-content/uploads/2022/03/3.-Villaverde-Improved-Kidney-Function-Following-Physiologic-Insulin-Resensitization-Treatment-Modality_07.30.21.pdf)

APPX1145

INSU_PI_001424

9/6/22, 3:25 PM                                                     Science

# Reversal Of Diabetic Neuropathy

Reversal of Diabetic Neuropathy
(http://insulinic.com/wp-content/uploads/2022/03/2.-Loveridge-Reversal-of-Diabetic-
Neuropathy-Utilizing-Physiologic-Insulin-Resensitization-Case-Series_07.20.2021-
Copy.pdf)



## Stay Connected With Insulinic

(http
s://w
ww.f
aceb
ook.
com
/insu
linic)

(http
s://t
witte
r.co
m/in
sulin
ic)

### Quick Links

Home(http://insulinic.com/shawn/)

APPX1146

INSU_PI_001425

About Us(http://insulinic.com/shawn/about/)

Services(http://insulinic.com/shawn/services/)

Contact(http://insulinic.com/shawn/contact/)

## Make an Appointment

Getting an accurate diagnosis can be one of the most impactful experiences that you can have.

**Contact Now
(http://insulinic.com/shawn/contact/)**

Copyright © 2021 Insulinic | Powered by Tech Reshape (https://www.techreshape.com)

APPX1147

INSU_PI_001426

**Registration #:** VAu001330086
**Service Request #:** 1-6592582541

Diabetes Relief LLC
Carol A Wilson
11511 Katy Fwy, Suite 101
Houston, TX 77079 United States

APPX1149

INSU_PI_001428



# New Diabetes Management Clinic Here on Oahu NOW!   

📅 August 26, 2022   🏷 <u>Chamber</u>, <u>Members</u>



**Insulinic Hawaii**

**Marc Desgraves Chief Financial Officer**

📅 <u>August 26, 2022</u>

📞 <u>(808) 210-4444</u>

@ <u>Send Email</u>

Aloha!

Insulinic Hawaii ( <u>https://insulinic.com/</u> ) is a new innovative approach to diabetes management. Our first Hawaii location opens **Sept. 12th at 1360 S. Beretania**. The Insulinic mission is to serve the vast and growing Hawaiian diabetes population by ==first== <u>assisting Primary Care, Internal Medicine, Nephrology, and Podiatry providers</u> with a diagnostic test that measures nerve conduction and vascular flow.  Nerve conduction and vascular flow are two key biomarkers that when measured can indicate the severity of diabetes. Our diagnostic testing provides unprecedented data in 1 test giving physicians a 10-page report with over 25 metabolic health markers ( <u>https://insulinic.com/tm-flow-system/</u> ).  Insulinic of Hawaii, at no cost to the provider, will supply the diagnostic equipment and associated nursing staff to perform this 20 minute test.  Insulinic believes in a care team approach and a collaboration of care. The ordering provider will interpret the diagnostic test results to inform treatment options and serve as a baseline to measure treatment progress.  <u>**Reimbursement for report interpretation by the ordering physician**</u> **can be billed by utilizing CPT codes: 95921 Autonomic Nervous System Test, 95923 Sudomotor Assessment, and 93923 Ankle Brachial Index.**  An additional differentiator and vital component of the Insulinic program is our Medicare approved insulin IV infusion modality, which is a patented approach that resensitizes cells by using insulin as a hormone rather than a drug. This approach has been scientifically proven to improve and reverse symptoms experienced by insulin resistant diabetics.  At Insulinic, we aim to help patients reverse insulin resistance, which is the root cause of many metabolic disorders. We are requesting a call to action from you to join us in the fight against diabetes in our great state of Hawaii!

<u>**What our patients are saying:**</u>

*"I haven't felt this good in years. It's like my neuropathy just disappeared, and my energy level has increased."* -Wayne K.,  Type 2 Diabetic- 18 years, Neuropathy- 10 years, Retinopathy- 2 years

*"My blood sugar is now controlled, and my eyesight has improved so much. I went from legally blind without glasses to now being about to read  the captions on the TV with no glasses, and I'm down from six vials of insulin per month to only three."* -Bruce B., Type 2 Diabetic- 27 years

We'd love to drop by your office to show you more of how we can collaborate on care for diabetics here on Oahu!


Powered by
GrowthZone

┌─────────────────┐
│    EXHIBIT      │
│       C         │
└─────────────────┘


4:22-CV-03062
Injunction Hearing
**EX 25**
DEFS "INSULINIC"

APPX1150

**INSU_PI_001429**

US007682351B2

(12) **United States Patent**       (10) **Patent No.:**       **US 7,682,351 B2**
   Aoki                             (45) **Date of Patent:**       **Mar. 23, 2010**

(54) **METHOD FOR INFUSING INSULIN TO A SUBJECT TO IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING**

(76) Inventor: **Thomas T. Aoki**, 1021 El Sur Way, Sacramento, CA (US) 95864

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1260 days.

(21) Appl. No.: **10/738,897**

(22) Filed: **Dec. 17, 2003**

(65) **Prior Publication Data**

US 2005/0137572 A1     Jun. 23, 2005

(51) Int. Cl.
   *A61M 31/00*     (2006.01)
(52) **U.S. Cl.** ..................................... **604/504**
(58) **Field of Classification Search** .............. 604/500, 604/65–67, 503, 504, 507
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,826,810 A *   5/1989   Aoki ............................. 514/3

* cited by examiner

*Primary Examiner*—Nicholas D Lucchesi
*Assistant Examiner*—Theodore J Stigell
(74) *Attorney, Agent, or Firm*—Eric G. Masamori

(57)         **ABSTRACT**

The present invention is a method for delivering insulin to a subject to improve impaired hepatic glucose processing. The method delivers a series of pulses of insulin to the subject over a period of time accompanied by ingestion of glucose in the form of a carbohydrate containing meal. The amount of insulin in each pulse, the interval between pulses and the amount of time to deliver each pulse to the subject are selected so that the hepatic processing of glucose is restored in the subject. In subjects whose hepatic glucose processing has been restored there is a subsequent fall in circulating blood glucose levels of 50 mg/dl or more directly as a result of improved hepatic glucose processing.

**9 Claims, No Drawings**

4:22-CV-03062
Injunction Hearing

**EX 26**

DEFS "INSULINIC"

US 7,682,351 B2

1

## METHOD FOR INFUSING INSULIN TO A SUBJECT TO IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING

### FIELD OF INVENTION

The present invention is a method for delivering a series of pulses of insulin over a period of time to a subject to improve impaired hepatic glucose processing. More specifically, the amount of insulin in each pulse, the interval between pulses and the amount of time to deliver each pulse to the subject are selected such that the subject's hepatic processing of glucose is restored. In subjects whose hepatic glucose processing has been restored there is a subsequent fall in circulating blood glucose levels of 50 mg/dl or more directly as a result of hepatic glucose processing being restored to the liver.

### BACKGROUND OF THE INVENTION

Diabetic retinopathy is a major cause of blindness. While earlier detection and major advances in laser therapies have made significant impact on this chronic complication of diabetes, the number of diabetic patients suffering from diabetic retinopathy continues to increase.

Glucose control is typically measured by a blood test, which determines the level of hemoglobin A1c, which has been the desired result of insulin therapy in diabetic patients for many years. However, it is clear that tight circulating glucose control was insufficient in 25% or more of the study participants to protect them from the onset or progression of diabetic retinopathy, nephropathy or neuropathy.

A major cause of death for patients with diabetes mellitus is cardiovascular disease in its various forms. Existing evidence indicates that diabetic patients are particularly susceptible to heart failure, primarily in association with atherosclerosis of the coronary arteries and autonomic neuropathy. There is little doubt that a metabolic component is present in various forms of cardiovascular disease in diabetic patients. Cardiac dysfunction (lower stroke volume, cardiac index and ejection fraction and a higher left ventricular end diastolic pressure) frequently manifested by patients with diabetes, can be explained at least partially by metabolic abnormalities, and is likely secondary to insulin deficiency since appropriate insulin administration can restore normal patterns of cardiac metabolism (Avogaro et al, Am J Physiol 1990, 258:E606-18).

The pathophysiology of diabetic nephropathy is only partially understood. The most consistent morphologic finding in diabetic nephropathy is the enlargement of the mesangium, which can compress the glomerular capillaries and thus alter intraglomerular hemodynamics.

Diabetes is the number one cause of non-traumatic amputations. The common sources of amputations are wounds that will not heal and progress to necrosis and gangrene. It is generally observed that diabetic patients have greater difficulty in healing and in overcoming infections. Diabetes in general and poor circulating glucose control in particular are thought to be causally related to poor wound repair in diabetic patients. Poor circulating glucose control is also a source of a lack of energy and a general feeling of malaise.

As reported in *Diabetes mellitus and the risk of dementia* A. Ott, R. P. Stolk, F. Van Harskamp, The Rotterdam Study, Neurology, 1999, vol. 53, pp. 1937-1942, patients with diabetes have an increased risk of dementia. Having diabetes almost doubled the risk of having dementia (the risk was 1.9 times greater). The risk of diabetics getting Alzheimer's disease was also nearly double. And in diabetics taking insulin,

2

the risk was over 4 times that in non-diabetics. Even after adjusting for possible effects of sex, age, educational level and the other factors measured, the findings were the same. Therefore, it can be concluded that diabetes is a risk factor for the development of dementias, including Alzheimer's disease.

What is needed is a method which can restore metabolism; increase retinal and neural glucose oxidation by enhancing pyruvate dehydrogenase activity; treat retinopathy and central nervous system disorders; increase stroke volume, that improves cardiac index; increases ejection fraction, and that lowers ventricular end diastolic pressure, thus improving cardiac function, as well as improving the quality of life in diabetic patients. A similar method is also needed to significantly reverse the cardiac dysfunction common to diabetic patients with heart disease. The same method should be capable of providing improved blood glucose control as measured by hemoglobin A1c. Additionally a similar method is needed to improve the entire metabolic process and through its multiplicity of effects on neurovascular reactivity, intraglomerular pressure and hemodynamics, arrest the progression of overt diabetic nephropathy, improve intraglomerular hemodynamics, and thus arrest the progression of diabetic nephropathy and reduce the risk of development of End-Stage Renal Disease (ESRD). Further a similar method is also needed to increase glucose oxidation in the affected areas and therefore provide more energy for the same amount of oxygen delivered for treating wounds, promote healing and avoid lower extremity amputations in both diabetic and non-diabetic patients. A method is required to improve the metabolism in the brain of patients suffering with any of a number of diseases causing senile dementia and hence improve mental function of patients suffering senile dementia.

In a previous patent, U.S. Pat. No. 4,826,810, which is hereby incorporated in the description of this invention, the inventor describes a method of delivering pulses of insulin to a patient after ingestion of a glucose containing meal. The pulses of insulin are adjusted to produce a series of peaks in the free insulin concentration so that successively there are increasing free insulin concentration minima between the said peaks. In order to make this a viable treatment for clinical purposes there needs to be a simple, low-cost way of measuring free insulin to determine said peaks to insure that the correct levels are present to insure that the dietary carbohydrate processing capabilities of the subject's liver are activated. The only viable method for measuring "free" insulin is costly and time consuming, often taking days to obtain results. In the mean time it is not known whether or not the liver has been activated. What is needed is a way to determine, in real time while pulses are being administered and the base line of free insulin is rising, that in fact the patient's liver has been activated.

### SUMMARY OF THE INVENTION

According to the present invention is a method for delivering insulin to a subject to improve impaired hepatic glucose processing. The method delivers a series of pulses of insulin to the subject over a period of time accompanied by ingestion of glucose in the form of a carbohydrate containing meal. The amount of insulin in each pulse, the interval between pulses and the amount of time to deliver each pulse to the subject such as a patient are selected so that the hepatic processing of glucose is restored in the subject.

Coincident with or shortly following the establishment of elevated circulating glucose levels in the patient, the first pulse of insulin delivery is administered. This pulse of insulin

APPX1152

INSU_PI_001431

US 7,682,351 B2

3

results in a peak "free" insulin concentration in the blood. When the "free" insulin concentration decreases by about 50%, a second pulse of insulin is administered. When the "free" insulin concentration again decreases by about 50% the next pulse of insulin is administered. Repetition of this process will result in increasing interpeak "free" insulin concentration. The pulses of insulin are regulated so that the interpeak "free" insulin concentration increases by 10 to 500 μU/ml from one pulse to the next. In order to activate the liver, an increasing interpeak "free" insulin concentration after ingestion of a carbohydrate containing meal is required to activate the liver and for the circulating blood glucose level to drop 50 mg/dl in subjects with impaired hepatic glucose processing. However, there are times that even though the interpeak "free" insulin levels are rising, they do not rise sufficiently fast to activate the liver. In those circumstances the drop in circulating glucose will not fall by 50 mg/dl or more.

It is desirable to administer the least amount of insulin consistent with activation of the hepatic glucose processing. However, the amount of insulin required to activate a patient will vary from patient to patient or even from day to day in the same patient. For the same patient on one day a pulse regimen will be successful in activation of hepatic glucose processing while the same patient on the following day may require significantly more insulin per pulse or more frequent pulses to attain activation. Measuring "free" insulin levels in the blood is an expensive and time-consuming procedure, which cannot provide the necessary information in real time. The current invention is a method to measure in real time when the patient has actually activated hepatic glucose processing allowing positive confirmation of successful patient response and signaling when the pulses no longer need to be administered.

In subjects whose hepatic glucose processing has been restored there is a subsequent fall in circulating blood glucose levels of 50 mg/dl or more directly as a result of hepatic glucose processing being restored to the liver. This circulating glucose signal is easy and low cost to obtain, can be done by the patient easily in a home health care environment under the supervision of a doctor, and provides information in real time that, for example, the liver's ability to oxidize glucose is restored. Patients are usually well trained and fully capable of obtaining their own circulating glucose levels without the need of a doctor to assist with the procedure and evaluate the results. Other means to determine whether the liver has been activated are costly, do not provide information in real time, require a doctor's evaluation or cannot be used in a home health care environment. There must be more than a minimum of two pulses in the series of insulin pulses; for example, three, four, five or six. In the preferred embodiment of the method an infusion device delivers a series of ten pulses over a period of one hour. The infusion device is preferably controlled by a programmable processor unit, which controls the amount of insulin in each pulse, the time to deliver each pulse, and the time between pulses. Circulating blood glucose levels can be measured by any appropriate circulating glucose measuring method including finger stick methods.

## DESCRIPTION OF PREFERRED EMBODIMENTS

Accordingly, the present invention is a method for delivering a series of pulses of insulin over a period of time to a subject to improve impaired hepatic glucose processing. The amount of insulin in each pulse, the interval between pulses and the amount of time to deliver each pulse to the subject are selected such that hepatic processing of glucose is restored in

4

the subject. The pulses of insulin are accompanied by the ingestion of glucose in the form of a carbohydrate containing meal. Circulating glucose measurements are made periodically to insure proper hepatic processing of glucose has been restored. In subjects whose hepatic glucose processing has been restored there is a subsequent fall in circulating blood glucose levels of 50 mg/dl or more directly as a result of improved hepatic glucose processing.

Hepatic processing of glucose includes proper uptake of glucose in the liver cells, oxidation of glucose by the liver cells, storage of glucose as hepatic glycogen in the liver cells, and conversion of glucose to fat or alanine, an amino acid, by the liver cells. Hepatic processing is impaired when the liver fails to produce hepatic enzymes (specifically hepatic glucokinase, phosphofructokinase, and pyruvate kinase) needed in proper glucose processing. Impaired processing of glucose is a fundamental condition of type 1 and type 2 diabetic patients, for patients whose pancreas is not producing sufficient insulin, and for patients experiencing significant insulin resistance, or a combination of these factors. After the ingestion of glucose, even with intravenous insulin administration, decreased glucose oxidation, low alanine production, and little glycogen formation and deposition in the liver in a timely manner are all indications that hepatic glucose processing is impaired. Glucose tolerance tests and measurements of hemoglobin A1c can be used as indications that hepatic processing of glucose has been impaired.

The preferred embodiment of the method for delivering insulin pulses to a patient to improve impaired hepatic glucose processing is as follows. On the morning of the procedure, the patient is preferably seated in a blood drawing chair and a 23 gauge needle or catheter is preferably inserted into a hand or forearm vein to obtain vascular access. However, any system of such access may accomplish the needed result, including indwelling catheters, PICC lines and PORTA-CATHS. After a short equilibration period, the patient is asked to make a circulating glucose measurement prior to starting the actual infusion of insulin. A steady baseline circulating glucose level is achieved when two identical consecutive measurements taken 5 minutes apart is obtained. It is preferable that patients have circulating glucose levels close to 200 mg/dl prior to using the infusion method. In the case of pregnant diabetic women, however, every attempt is made to keep the maximum circulating glucose level to 150 mg/dl or less.

After the circulating glucose measurement has been taken and the patient has the proper circulating glucose starting level, the patient is asked to consume a liquid or food containing glucose. The amount of glucose given to s diabetic patient ranges from 60 to 100 grams, but for small framed people the amount could be as low as 40 grams of glucose. However, the amount of initial glucose given to the patient may vary. Liquid or food containing glucose is consumed by the patient to prevent the patient from becoming hypoglycemic. The preferred liquid or food is GLUCOLA, but any similar type of liquid or high glycemic food, including but not limited to cake and bread, containing glucose may be given to the patient. In a non-diabetic patient more glucose may be required than in the diabetic patient, but the other parameters would remain the same, including the need for a pulsed delivery of insulin.

Pulses of insulin are then administered intravenously at planned intervals of time, usually every six minutes. However other intervals may be used from as low as every three minutes up to every 30 minutes. For diabetic patients the amount of insulin in each pulse is 10-200 milliunits of insulin per

APPX1153

INSU_PI_001432

US 7,682,351 B2

5

kilogram of body weight; for non-diabetic patients the amount of insulin in each pulse is slightly lower.

In the preferred embodiment of the invention, a programmable insulin infusion device is used to deliver intravenous insulin in precisely measured pulses. However, any method of infusing measured amounts of insulin may be used, including simple injection with a syringe. It is preferable that the infusion device be capable of providing measured pulses of insulin on a prearranged interval, so long as there is sufficient glucose in the blood to keep the patient from becoming hypoglycemic. It is also preferable that the infusion device is capable of delivering the pulses of insulin in as short duration of time as possible, without adversely affecting the vein at the site of infusion is used. One preferred infusion device is the BIONICA MD-110. However, less accurate devices and slower devices, including a simple syringe, may deliver the pulses of insulin to achieve the needed infusion profile. In the preferred embodiment, there must be more than a minimum of two pulses in the series of insulin pulses; for example, three, four, five or six. In the preferred embodiment of the method an infusion device delivers a series of ten pulses over a period of one hour.

In the preferred insulin infusion device, programmed values can be input to a control processor via a keyboard, through firmware in the infusion device or by software via a communications link from a higher level computer or any other appropriate input method. Automated entry of blood glucose levels is also desired. The communications link may also be used to send alarm and status messages to a higher level computer via any acceptable communications protocol and medium. Infusion device status, alarm status and circulating-glucose levels, among other parameters of the system may be displayed on a display panel of the infusion device.

A circulating glucose measuring instrument, configured to communicate directly with the infusion device through the communications link can provide timely values of circulating glucose. Alternatively, wireless communications systems can send information from a circulating glucose sensor automatically to the infusion device without operator intervention. Typical circulating glucose sensors include but are not limited to finger stick devices, non-invasive instruments using near infrared spectroscopy or radio frequency, and implanted sensors. Alternatively the circulating glucose signal can come from an implantable system for monitoring pancreatic beta cell electrical activity in a patient in order to obtain a measure of a patient's insulin demand and circulating glucose level. Any other method for either directly or indirectly obtaining an accurate measure of the change in circulating glucose levels is also acceptable. The communications link may also be used to send alarm and status messages to a higher level computer via any acceptable communications protocol and medium.

When the infusion device is activated, it dispenses the programmed pulse of insulin in the programmed amount of time to the subject. The insulin travels through an infusion tube into a needle that is inserted intravenously into the subject's forearm. The intravenous site can also be any convenient location such as the body or hand. The time to deliver each pulse should be as short as possible and at least less than one minute and preferably on the order of seconds. The infusion device status, alarm status and circulating-glucose levels, among other parameters of the method may be displayed on a display panel.

In the preferred embodiment the subject's circulating glucose levels are measured as frequently as possible. The measurements are either automatically or manually input into the preferred infusion device. Adjustments to ingested glucose and infused insulin are made to produce the desired results of

6

activating the liver without the unwanted side effects of either hypoglycemia or hyperglycemia.

When finger pricks are used to determine the circulating glucose level it is recommended that readings be taken every 30 minutes. When less invasive methods of measuring circulating glucose are used readings can be taken more frequently, preferably after the infusion of each pulse of insulin. It is recommended that a period of one to two minutes is allowed after the infusion of each pulse of insulin before circulating glucose levels are measured. In patients whose hepatic glucose processing has been restored there may be a fall in circulating glucose levels by as much as 50-100 mg/dl by the third treatment. In patients who have yet to obtain proper hepatic glucose processing, there will be no fall or a fall considerably less than 50 mg/dl by the third treatment. The fall in circulating glucose levels, indicating restoration of hepatic processing of glucose, is generally achieved within one hour of initiation of the first pulse of insulin using the preferred embodiment of this invention; however, the time required may be shorter or longer than one hour. It is possible to decrease the amount of insulin in each pulse and to lengthen the time between pulses so that it takes in excess of two or even three hours or more for a fall of 50 mg/dl to occur. The longer the time it takes to activate the patient, however, the longer the patient must be under treatment and the less desirable the treatment is for the patient. This decrease in circulating glucose level is caused by the combination of increased glucose utilization by muscles and the use of glucose by the liver.

Another indication that hepatic activation of the liver has been reestablished is that gradually the amount of insulin required to reduce the circulating glucose levels by 50 mg/dl or more will decrease with time. Lowering hemoglobin A1c levels are a more mid-term manifestation that hepatic processing has been restored. Longer-term manifestations are seen in the decrease of a number of complications related to diabetes, including but not limited to retinopathy, nephropathy, neuropathy, hypoglycemia, cardiovascular disease, and hypertension.

The phase during which a series of pulses of insulin is administered and glucose ingested lasts typically for 56 minutes (ten pulses with a six minute interval between pulses) and is followed by a rest period of usually one or two hours. The rest period allows the elevated insulin levels to return to baseline. During periods when insulin is not being infused, the intravenous site is preferably converted to a heparin or saline lock. The entire procedure is repeated until the desired effect is obtained. Typically the procedure is repeated three times for each treatment day, but can be repeated as few as two times and up to 8 times in one day. Prior to the patient being discharged from the procedure, whether in the clinic or home environment, in the preferred embodiment circulating glucose levels stabilize at 100-200 mg/dl for approximately 3045 minutes.

Coincident with or shortly following the establishment of elevated circulating glucose levels in the patient, the first pulse of insulin delivery is administered. This pulse results in a peak "free" insulin concentration in the blood. When the "free" insulin concentration decreases by about 50%, a second pulse of insulin is administered. The concentration of "free" insulin will rise as a result of the second pulse of insulin. When the "free" insulin concentration again decreases by about 50%, the next pulse of insulin is administered. Repetition of this process will result in increasing interpeak "free" insulin concentration. The pulses of insulin are regulated so that the interpeak "free" insulin concentration increases by 10 to 500 µU/ml from one pulse to the next.

APPX1154

INSU_PI_001433

US 7,682,351 B2

7

In order to activate the liver, an increasing interpeak "free" insulin concentration after ingestion of a carbohydrate containing meal is required to activate the liver and for the circulating blood glucose level to drop 50 mg/dl in subjects with impaired hepatic glucose processing. However, there are times that even though the interpeak "free" insulin levels are rising, they do not rise sufficiently fast to activate the liver. In those circumstances the drop in circulating glucose will not reach 50 mg/dl.

It is desirable to administer the least amount of insulin consistent with activation of the hepatic glucose processing. However, the amount of insulin required to activate a patient will vary from patient to patient or even from day to day in the same patient. For the same patient on one day a pulse regimen will be successful in activation of hepatic glucose processing while the same patient on the following day may require significantly more insulin per pulse or more frequent pulses to attain activation. Measuring "free" insulin levels in the blood is an expensive and time-consuming procedure, which cannot provide the necessary information in real time. The current invention is a method to measure in real time when the patient has actually activated hepatic glucose processing, to allow positive confirmation of successful patient response and signal when the pulses no longer need to be administered.

Accordingly, the present invention is used to increase retinal and neural glucose oxidation by enhancing pyruvate dehydrogenase activity and therefore treats retinopathy and central nervous system disorders in both diabetic and non-diabetic patients. One method of monitoring retinal and neural glucose oxidation is PET (Positron Emission Tomography) scans. Alternatively, one may look for stabilization/reversal of diabetic retinopathy. In terms of neural function, there will be improvement in peripheral neuropathy manifested as increased perception of sensation, especially in the feet, and a loss of the painful "burning" or "pins and needles" sensation in the feet. There will also be improvement in autonomic neuropathy, especially gastroparesis and improvement in postural or orthostatic hypotension.

Diabetic heart disease is the one of the more common complications of diabetes, experienced by both type I and type II diabetic patients. Experts generally agree that the primary fuel for both the normal and diabetic heart is free fatty acids, a fuel that requires more oxygen on a per calorie basis than glucose as a fuel. As a consequence, the heart of both diabetic and non-diabetic individuals is particularly vulnerable to ischemia. If the involved tissue had been primarily utilizing free fatty acids for energy generation, even a slight or temporary decrease in blood flow or oxygen supply would be catastrophic. On the other hand, if that tissue had been oxidizing glucose rather than free fatty acids, for the generation of an equivalent amount of energy, a temporary disruption of blood or oxygen supply would not be as deleterious, since that tissue's oxygen requirements would be less. Thus, for the same amount of oxygen delivered to the myocardium, glucose utilization rather than free fatty acid utilization would result in increased energy (ATP) generation. The present invention is capable of improving the dietary fuel processing capabilities by allowing for more glucose to be burned or oxidized and correcting over utilization of free fatty acids associated with heart disease and cardiovascular disease in both diabetic and non-diabetic patients.

Still further, the present invention is capable of improving the entire metabolic process, and, through its multiplicity of effects on neurovascular reactivity, intraglomerular pressure and hemodynamics, of arresting the progression of overt diabetic nephropathy, of improving intraglomerular hemodynamics, thus arresting the progression of diabetic nephropa-

8

thy, and reducing the risk of development of ESRD in both diabetic and non-diabetic patients.

Further, the present invention is capable of increasing glucose oxidation in an affected area and thereby providing more energy with the same oxygen delivery for treating wounds, promoting healing and avoiding amputations in both diabetic and non-diabetic patients. The rationale for this improved healing is that the tissue surrounding the affected area suffers from inadequate blood supply, leading to insufficient oxygenation. When this tissue is fueled through enhanced glucose oxidation in lieu of free fatty acid utilization, thereby switching from a predominantly lipid based fuel economy to one based more on glucose oxidation, more energy is available for wound healing for the same amount of blood flow and hence, more healing from the amount of oxygen delivered. In addition, the ability to achieve more energy from less oxygen, thereby addresses a general malaise associated with diabetic individuals who have energy levels which are less than normal.

On many occasions patients who have been diabetics as well as having dementia have been treated with the method of the current invention. Dementia appears to be related to poor metabolism of glucose in the brain, which may well be the result of constricted flow of blood. This poor metabolism is at least in part the cause of the dementia. Use of the present invention in patients suffering from senile dementia has clearly shown improvement in confusion, weakness, disorientation, cognitive function and lack of memory associated with dementia as well as improvement in the blood glucose management. Constricted flow of blood to the brain is also prevalent in demented patients without diabetes and the method of the current invention provides improved metabolism as well to those patients and hence is effective in treating both demented patients with and without diabetes.

In the preferred embodiment, with a new patient two successive days of three treatments are performed the first week. For continuing patients the procedure is performed once a week. For patients who need/require a more intensive approach, the procedure may be repeated 3 or more times, including continuously, each week until the desired clinical outcome is achieved.

The following non-limiting examples are given by way of illustration only.

Example I

A study was conducted to assess the effects of Chronic Intermittent Intravenous Insulin Therapy (CIIIT) on the progression of diabetic nephropathy in patients with type 1 diabetes mellitus (DM). This 18-month multi-center, prospective, controlled study involved 49 type 1 DM patients with nephropathy who were following the Diabetes Control and Complications Trial (DCCT) intensive therapy (IT) regimen. Of these, 26 patients formed the control group C, which continued on IT, while 23 patients formed the treatment group (T) and underwent, in addition to IT, weekly CIIIT. All study patients were seen in clinic weekly for 18 months, had monthly glycohemoglobin HbA1c checked, and every 3-months urinary protein excretion and creatinine clearance (CrCl) determinations. CrCl declined significantly in both groups as expected, but the rate of CrCl decline in the T group ($2.21 \pm 1.62$ ml/min/yr) was significantly less than in the C group ($7.69 \pm 1.88$ ml/min/yr, $P=0.0343$). The conclusion is that when CIIIT is added to IT in type 1 DM patients with overt nephropathy, it appears to markedly reduce the progression of diabetic nephropathy.

APPX1155

INSU_PI_001434

US 7,682,351 B2

9

## Example 2

A middle-aged woman with Type 1 diabetes for more than 22 years suffered from polyneuropathy. She had generalized pain and was unable to walk or even wear stockings because of the pain. After receiving treatment with the subject method the pain has been reduced to the point where the woman enjoys rigorous exercise such as roller blading.

## Example 3

A middle-aged woman with Type 1 diabetes for more than 30 years had severe peripheral neuropathy, was in constant pain below the knees and had difficulty sleeping at night. After receiving treatment with the subject method, she no longer takes pain medication and has no twinges of pain in her legs. She has been using the treatment for eight years.

## Example 4

A middle-aged woman with type 2 diabetes for 17 years was suffering from severe dilated cardiomyopathy (ejection fraction 14-19%). She was placed on the list to receive a heart transplant prior to starting treatment with the subject method. After receiving treatment, the subject reduced her insulin intake from 150 units a day to 24-26 units/day, and she stabilized to the point where she no longer required a heart transplant and, indeed, was removed from the heart transplant list. The patient has been receiving treatment for 10 years and is still off the heart transplant list. Her ejection fraction is currently 29-32%.

## Example 5

A middle-aged male with type 1 diabetes for 38 years suffered from macular degeneration (retinopathy). He was unable to drive at night. After receiving treatment with the subject method, the man's eyesight improved to the point where night driving was no longer a concern. The patient has been receiving treatment for 4 years.

## Example 6

A middle-aged type 2 diabetic male patient had severe heart disease including congestive heart failure and severe arterosclerotic heart disease. The patient was scheduled for heart surgery but because of his poor condition, surgeons refused to operate. After using the subject method, the doctors were convinced that he could withstand 4-vessel by-pass surgery. The patient had a normal postoperative recovery, which is virtually unheard of for diabetic patients with his stage of heart disease.

## Example 7

An older type 2 diabetic male patient was exercising and had excellent circulating glucose control under intense insulin therapy including 3-4 injections per day of subcutaneous insulin. Even so, his diabetes related kidney disease had progressed to the point where he was discharging 1500 milligrams of protein during a 24-hour period and the rate of increase was 500 milligrams/24 hours/year. After using the subject method, the patient's proteinuria was reduced to 600-800 milligrams/24 hours. He has been using the method for 5 years.

## Example 8

An older type 1 diabetic female patient who was diabetic from age 5 years old was scheduled for a coronary artery

10

by-pass graft to correct her diabetes related heart disease. The surgeons were reluctant to operate in the condition she was in because of her advanced diabetes related arteriosclerosis. She was scheduled for a single vessel graft. After using the subject method, her condition improved to the point where the doctors performed two instead of one grafts. She had a normal recovery. She continuing using the subject method for several years after the surgery with no further deterioration in her diabetes related heart disease.

## Example 9

An older type 2 diabetic male suffering with autonomic neuropathy had very elevated blood pressure readings of 200/120 despite a rigorous program to regulate his circulating glucose using intensive insulin therapy of 3 to 4 subcutaneous insulin injections daily. As a result of using the subject method, his blood pressure decreased to 120/80. He has been using the method for 5 years.

## Example 10

An older type 2 diabetic male patient had one amputated leg as a result of diabetes related ulcers on that leg. He had developed ulcers on the other leg that would not respond to any available therapy and was in danger of losing the other leg to amputation. As a result of using the subject method, the ulcers on his second leg healed, and the leg was saved from amputation. This patient used the subject method for several more years, and no additional ulcers formed.

## Example 11

A middle-aged type 1 female diabetic patient had developed severe ulcers on both legs, which would not heal with any available treatment. As a result of using the subject method, the ulcers healed and have never returned. The patient has been using the subject method now for 13 years.

## Example 12

A middle-aged type 2 male diabetic patient had proliferative diabetic retinopathy with severe bleeding. Multiple photocoagulation scars made additional photocoagulation impossible. As a result of using the subject method the bleeding stopped, and there was no further deterioration of the retina, preserving what eyesight he had left. The patient has been using the subject method for 5 years, and he has had no further bleeding of the retina and no further photocoagulation.

## Example 13

An elder type 2 female diabetic patient had severe painful peripheral neuropathy to the point that she was unable to walk and used a wheelchair. After six months of using the subject method, the pain had subsided to the point where she no longer used a wheelchair. Because of financial reasons, she stopped the therapy. As a result, the neuropathy returned, and she returned to using a wheelchair.

## Example 14

A middle-aged type 1 female diabetic patient had severe neuropathy. She was a mother of two children who was bedridden with autonomic neuropathy before using the subject method two years ago. Her muscles had atrophied, she could

APPX1156

INSU_PI_001435

US 7,682,351 B2

11

not digest her food, she had been told that her nerves were dying inside her as a result of her diabetes. She stated that if she had not have two children, she would have taken her life. She had to quit her job, went on disability and was in an out of the hospital very often. She had welts on her head causing hair loss. She had no sensation in her feet, she had constant nausea, and she couldn't sleep at night because of the pain. She had insulin absorption problems and tried all different ways to improve the absorption of insulin into her body. For a number of years she injected herself intramuscularly because she felt that she obtained the best absorption of insulin that way. Since using the subject method she has reversed all of the diseases to the point where she has taken herself off disability and is gainfully employed. She has not been in the hospital since. The numbness in her legs has gone away. If she skips the treatment for a week, she can feel the numbness return to her legs. Her gastroparesis was reversed, and she no longer suffers symptoms. Since using the subject method she has no inpatient medical costs now.

Example 15

A 79 year old female diabetic who was suffering from advanced senile dementia was placed in a nursing home because of excessive confusion, weakness, disorientation and lack of memory. Because the nursing home was not keeping up the strict four shot regimen needed by the patient for her diabetic blood sugar control, the patient's children removed the patient from the nursing home. The attending doctor recommended Hepatic Activation. Once the patient was activated, she returned to a totally independent living style. She had significant improvement in her motor skills, memory, and cognitive function. Hepatic Activation clearly had a positive effect on her senile dementia.

For all of the above listed examples, after the initial few days of treatment, the patients underwent treatment once a week. each treatment day consisting of three infusions of insulin accompanied by ingestion of carbohydrates. The infusion device used to infuse the insulin was the BIONICA MD-110 pump. Typically there were ten pulses given over a period of one hour, and a rest period of one hour was taken between infusions of insulin. The form in which the carbohydrates were ingested changed from time to time and included eating foods of high glycemic index including but not limited to bread and cake. The patients' circulating glucose was measured once every thirty minutes by the finger stick method currently used by most diabetic patients. Circulating glucose levels initially rose by 100-150 mg/dl during the first treatment and then fell between 50 and 100 mg/dl by the second and third treatments indicating that in fact the liver had been activated. Table 1 below summarizes by the above examples the number of units of insulin per pulse administered and the amount of glucose ingested for each series of pulses:

The preferred embodiments described herein are illustrative only, and although the examples given include many specificity's, they are intended as illustrative of only a few possible embodiments of the invention. Other embodiments and modifications will, no doubt, occur to those skilled in the art. The examples given should only be interpreted as illustrations of some of the preferred embodiments of the invention, and the full scope of the invention should be determined by the appended claims and their legal equivalents.

12

TABLE 1

Summary of the above examples: The number of units of insulin per pulse administered and the amount of glucose ingested for each series of pulses

| Example Number | Number of milliunits of insulin/Kg of body weight per Pulse | Grams of Glucose per Series of Insulin Pulses. |
|---|---|---|
| 1* | 15-195 | 40-100 grams |
| 2 | 30-45 | 50-60 grams |
| 3 | 35-50 | 40-60 grams |
| 4 | 45-60 | 40-60 grams |
| 5 | 30-45 | 50-60 grams |
| 6 | 70-100 | 50-70 grams |
| 7 | 40-60 | 50-70 grams |
| 8 | 15-45 | 50-70 grams |
| 9 | 40-55 | 50-70 grams |
| 10 | 45-60 | 40-60 grams |
| 11 | 15-45 | 50-70 grams |
| 12 | 130-170 | 50-70 grams |
| 13 | 30-60 | 50-70 grams |
| 14 | 30-60 | 50-70 grams |
| 15 | 30-60 | 50-70 grams |

*This study included 23 patients in the treatment group with varying amounts of insulin per pulse and varying ingestion of glucose. Hence general limits of what they used are included.

The invention claimed is:

1. A method for infusing insulin intravenously to a subject to improve impaired hepatic glucose processing comprising the steps of:

a. determining a baseline circulating glucose level of the subject and obtaining a subsequent circulating glucose level at least every 30 minutes,

b. having the subject ingest a carbohydrate containing meal to cause a rise in circulating glucose levels,

c. administering a series of insulin pulses until the rise in circulating glucose levels falls a threshold of at least 50 to 100 milligram per deciliter within two hours of administering an initial pulse of insulin; the series of insulin pulses having an amount of insulin in each pulse, an interval of time between pulses and a total time to deliver the series of pulses;

d. repeating steps a, b and c at least one more time during a treatment day when said threshold is met;

e. changing the amount of ingested carbohydrate of step b or changing the amount of insulin in each pulse, the interval of time between pulses or the total time to deliver the series of pulses of step c when said threshold is not met and repeating steps a, b, c and d;

the threshold of 50 milligrams per deciliter fall in circulating glucose levels being an indicator that the amount of ingested carbohydrate, the amount of insulin in each pulse, the interval of time between pulses, and the total time to deliver the series of pulses is sufficient to achieve an improvement in hepatic glucose processing;

wherein said method measures in real time when the subject has actually activated hepatic glucose processing allowing positive confirmation of successful patient response.

2. The method of claim 1, wherein the carbohydrate containing meal contains 40 to 100 grams of glucose.

3. The method of claim 1, wherein the amount of insulin in each pulse is 10 to 200 milliunits of insulin per kilogram of body weight of said subject.

APPX1157

INSU_PI_001436

US 7,682,351 B2

13

4. The method of claim 1, wherein the interval of time between pulses is 3 to 30 minutes.

5. The method of claim 1, wherein the total time to deliver the series of pulses is 6 to 180 minutes.

6. The method of claim 1, wherein the administering the series of insulin pulses is by an intravenous infusion device.

7. The method of claim 1, wherein the administering the series of insulin pulses is by a syringe.

8. The method of claim 1, wherein the amount of insulin in each pulse, the interval of time between pulses and the total

14

time to deliver the series of insulin pulses to the subject are controlled by a programmable processor unit of an intravenous infusion pump.

9. The method of claim 8, wherein the step for obtaining the subsequent circulating glucose levels and the step for administering the series of insulin pulses are coordinated through a communications link between a circulating blood glucose sensor and said programmable processor unit of the intravenous infusion pump.

* * * * *

INSU_PI_001437

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,682,351 B2                                                                   Page 1 of 1
APPLICATION NO.   : 10/738897
DATED                  : March 23, 2010
INVENTOR(S)        : Thomas T. Aoki

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 6
Line 53 states "3045", it should read -- 30-45 --.

Signed and Sealed this
Second Day of August, 2011

David J. Kappos
Director of the United States Patent and Trademark Office

Current Therapeutic Research 90 (2019) 61–67

Contents lists available at ScienceDirect



# Current Therapeutic Research

journal homepage: www.elsevier.com/locate/curtheres



# Effects of Periodic Intensive Insulin Therapy: An Updated Review



Shu Dong, FNP[1], Hien Lau, BSc[1], Cody Chavarria, BSc[1], Michael Alexander, MSc[1],
Allison Cimler, FNP[2], John P. Elliott, MD[2], Sandra Escovar, MD[3], Jack Lewin, MD[4],
James Novak, MD[5], Jonathan R.T. Lakey, PhD, MSM[1,6*]

[1] Department of Surgery, University of California Irvine, Orange, California
[2] Alium Health, Scottsdale, Arizona
[3] SAFE Medical Group, Miami, Florida
[4] Lewin and Associates, New York, New York
[5] Novak Medical Group, San Diego, California
[6] Department of Biomedical Engineering, University of California Irvine, Irvine, California

### ARTICLE INFO

*Article history:*
Received 8 February 2019
Accepted 25 April 2019

*Keywords:*
Diabetes
Complications
Infusion
Insulin
Intravenous

### ABSTRACT

*Background:* Traditional insulin treatment for diabetes mellitus with insulin administered subcutaneously yields nonpulsatile plasma insulin concentrations that represent a fraction of normal portal vein levels. Oral hypoglycemic medications result in the same lack of pulsatile insulin response to blood glucose levels. Intensive treatments of significant complications of diabetes are not recommended due to complicated multidrug regimens, significant weight gain, and the high risk of hypoglycemic complications. Consequently, advanced complications of diabetes do not have an effective treatment option because conventional therapy is not sufficient. Intensive insulin therapy (IIT) simulates normal pancreatic function by closely matching the periodicity and amplitude of insulin secretion in healthy subjects; however, the mechanisms involved with the observed improvement are not clearly understood.

*Objective:* The current review aims to analyze the pathophysiology of insulin secretion, discuss current therapies for the management of diabetes, provides an updates on the recent advancements of IIT, and proposes its mechanism of action.

*Methods:* A literature search on PubMed, MEDLINE, Embase, and CrossRef databases was performed on multiple key words regarding the history and current variations of pulsatile and IIT for diabetes treatment. Articles reporting the physiology of insulin secretion, advantages of pulsatile insulin delivery in patients with diabetes patients, efficacy and adverse effects of current conventional insulin therapies for the management of diabetes, benefits and shortcomings of pancreas and islet transplantation, or clinical trials on patients with diabetes treated with pulsed insulin therapy or advanced IIT were included for a qualitative analysis and categorized into the following topics: mechanism of insulin secretion in normal subjects and patients with diabetes and current therapies for the management of diabetes, including oral hypoglycemic agents, insulin therapy, pancreas and islet transplantation, pulsed insulin therapy, and advances in IIT.

*Results:* Our review of the literature shows that IIT improves the resolution of diabetic ulcers, neuropathy, and nephropathy, and reduces emergency room visits. The likely mechanism responsible for this improvement is increased insulin sensitivity from adipocytes, as well as increased insulin receptor expression.

*Conclusions:* Recent advancements show that IIT is an effective option for both type 1 diabetes mellitus and type 2 diabetes mellitus patient populations. This treatment resembles normal pancreatic function so closely that it has significantly reduced the effects of relatively common complications of diabetes in

* Address correspondence to: Jonathan R.T. Lakey, PhD, MSM, Department of Surgery and Biomedical Engineering, University of California Irvine, 333 City Blvd W, Ste 1600, Orange, CA 92868.
E-mail address: jlakey@uci.edu (J.R.T. Lakey).



4:22-CV-03062
Injunction Hearing

# EX 27

DEFS "INSULINIC"

https://doi.org/10.1016/j.curtheres.2019.04.003

0011-393X/© 2019 The Authors. Published by Elsevier Inc. This is an open access article under the CC BY-NC-ND license. (http://creativecommons.org/licenses/by-nc-nd/4.0/)

APPX1160

**INSU_PI_001439**

*S. Dong, S.H. Lau and C. Chavarria et al./Current Therapeutic Research 90 (2019) 61–67*

comparison to standard treatments. Thus, this new treatment is a promising advancement in the management of diabetes. (Curr Ther Res Clin Exp. 2019; 80:XXX–XXX).

© 2019 The Authors. Published by Elsevier Inc.
This is an open access article under the CC BY-NC-ND license.
(http://creativecommons.org/licenses/by-nc-nd/4.0/)

## Introduction

Diabetes is a chronic disease with dire consequences for personal health and a staggering effect on society and the economy. Since the discovery of insulin extracted from bovine pancreas in 1922, subcutaneous insulin injection has remained a standard treatment for patients with diabetes. Despite the widespread use of subcuticular insulin, diabetes remains a progressive disease. In comparison to intensive insulin therapy (IIT), the current conventional insulin therapy fails to achieve the tight glycemic control that could prevent long-term complications.[1,2] Although multiple factors, such as medication adherence and lifestyle habits, can affect diabetes management and outcomes, improvements in insulin therapy are easier to explore and implement. The lack of efficacy from the current insulin therapy may be attributable to the method of administration rather than quality of exogenous insulin.[3] The subcutaneous delivery of insulin does not have the ability to activate the liver to start a physiologic metabolic cycle. Because the liver normally accounts for approximately 50% of the glucose absorbed in a meal, the loss of proper hepatic glucose metabolism is a key contributor to the inability of patients with diabetes to achieve blood glucose hemostasis.[4] Intensive studies and numerous published articles show evidence suggesting it is not possible to obtain the concentration of insulin required for normal liver functioning through subcutaneous injections of insulin due to its limited absorption rate and blunted strength.[5] Thus, it was theorized that those enzymatic processes in a normal liver that are required to initiate carbohydrate metabolism can be "reactivated" in patients with diabetes with proper signals; that is, concurrent high levels of oral glucose and intravenous insulin administration. This hypothesis is responsible for the development of hepatic activation process via pulsed intravenous insulin delivery under controlled pressure.

This category of insulin treatment is also referred to as pulsatile intravenous insulin therapy, outpatient intravenous insulin therapy, chronic intermittent intravenous insulin infusion, hepatic activation therapy, metabolic activation therapy, or the Harvard Protocol. During each 6-hour session, insulin is infused intravenously in 7 to 10 pulses of approximately 2 units of insulin per pulse over 1 hour along with oral glucose administration, followed by a 1-hour rest period.[6] A patient's blood glucose is maintained between 8.33 mmol/L and 13.9 mmol/L throughout the session. A total of 3 treatments per session are given on the same day once per week.[7,8] Because hepatocytes and adipose tissues have been shown to have increased insulin receptors and enhanced insulin sensitivity when insulin is delivered in a pulsatile manner, this treatment attempts to provide insulin in a novel way that mimics the physiologic secretion of insulin in response to a carbohydrate load.[9,10] The initial trials provided encouraging but limited success.[6] The initial treatment as attempted did not effectively mimic normal human insulin bursts and it did not replicate the periodicity and amplitude of normal pancreatic function. In recent years, significant advancements have been made in pulse intravenous insulin treatment through the use of an insulin pump that infuses microdoses of insulin intravenously, causing oscillations of insulin consistent with the amplitude of normal insulin secretion without an ever-increasing baseline of insulin. Although previous treatment delivered a succession of increasing insulin concentrations to slowly increase the level of free insulin, the improved treatment delivers an insulin burst every 6 minutes to closely mimic the natural burst of insulin secretion from a normal pancreas.

The advanced IIT is an improvement over the original treatment. It mimics both the periodicity and amplitude of normal pancreatic insulin release and provides advantages in managing both type 1 and type 2 diabetes and associated secondary complications. The improved treatment involves 2 to 3 approximately 1-hour sessions during which pulses of microburst intravenous insulin and concurrent weight-based oral glucose doses are administered according to a standard protocol and under medical supervision, typically on an outpatient basis.[9,11] The treatment is individualized to each patient's ability to regulate resting carbohydrate metabolism measured through respiratory quotients and volume of carbon dioxide ($VCO_2$) using a metabolic cart. Although this treatment has shown remarkable advantages for patients with both type 1 and type 2 diabetes mellitus, the mechanisms involved with the improvement are not clearly understood.

This review highlights the pathophysiology of insulin secretion, discusses current therapies for managing diabetes, provides updates on the advancements of IIT, and proposes mechanisms that may explain the observed prevention or amelioration of diabetes complications by this treatment.

## Methods

A comprehensive literature search was conducted on PubMed, MEDLINE, Embase, and CrossRef databased using the search terms *insulin secretion AND oscillations AND diabetic patients, pulsatile insulin secretion AND diabetic patients, diabetes management AND oral hyperglycemic agents, diabetes management AND insulin therapy, pancreas transplantation, islet transplantation, pulsed insulin therapy, pulsatile insulin therapy,* and *burst insulin infusion.* A screening of the title and abstract was conducted on original research, review articles, and case reports published in English from 1970 to 2019 using the following criteria: molecular mechanisms of insulin secretion; pulsatile insulin secretion in normal subjects and patients with diabetes; advantages of pulsatile insulin delivery in patients with diabetes; efficacy and adverse effects of current conventional insulin therapies for the management of patients with diabetes, including oral hypoglycemic agents, subcutaneous insulin therapy, and intrapulmonary insulin therapy; benefits and shortcomings of pancreas and islet transplantation; or clinical trials on patients with diabetes treated with pulsed insulin therapy or advanced IIT. Editorial letters were excluded from the analysis. A qualitative analysis was performed on each article after screening and articles were organized by topic: the mechanism of insulin secretion in normal subjects and patients with diabetes and current therapies for the management of diabetes, including oral hypoglycemic agents, insulin therapy, pancreas and islet transplantation, pulsed insulin therapy, and advances in IIT.

*Insulin secretion in healthy subjects and patients with diabetes*

Insulin secretion in pancreatic beta cells is mediated by the oscillations in the ratio of adenosine triphosphate to adenosine

INSU_PI_001440

S. Dong, H. Lau and C. Chavarria et al./Current Therapeutic Research 90 (2019) 61–67

63

diphosphate (ATP:ADP) and cytoplasmic calcium ion concentration in response to changes in glucose concentration.[12]

In brief, glucose transporter 2 allows the rapid diffusion of glucose into cells.[13] At high glucose levels (>2.5 mM), glucokinase phosphorylates glucose, leading to a dose-dependent increase in ATP:ADP.[14] ATP-sensitive potassium channels close in response to the rise in ATP:ADP, causing membrane depolarization.[15] Voltage-dependent calium ion channels open to allow the influx of calcium ions that signal the exocytosis of insulin granules.[16]

In both experimental animal and healthy humans, insulin is secreted in a pulsatile manner into portal circulation with a mean period of 5 minutes.[17] Two years after the discovery that plasma insulin levels oscillate in healthy subjects, patients with type 2 diabetes were demonstrated to have an altered pattern of pulsatile insulin release.[18] A similar impairment in the insulin pulsatility was observed in patients with type 1 diabetes compared with control patients with similar plasma glucose levels after fasting.[19] Type 2 diabetes is characterized by increased insulin resistance with decreased glucose clearance rate, and patients with type 2 diabetes were found to have irregular insulin pulses with higher frequency.[9] Another study revealed that a longer insulin pulse period was associated with decreased insulin sensitivity, indicating that increased pulse frequency could be linked to insulin resistance as noted in patients with type 2 diabetes.[20] More specifically, a study that measured insulin pulses over a 24-hour period found that insulin pulses of patients with type 2 diabetes have reduced amplitude when compared with matched controls.[21] Patients with obesity and diabetes were also shown to have insulin pulses with lower amplitude than control patients with obesity, and weight loss in these patients was accompanied by an increase in pulse amplitude.[22] Further studies found that ability of entrainment to small oscillations in plasma glucose concentrations was lost in patients with type 2 diabetes, which contributed to the diminished abilities to regulate insulin pulses.[23,24]

Pulsatile insulin delivery is superior to continuous delivery in patients with diabetes by enhancing hepatic insulin action and signaling.[25] In patients with type 1 diabetes mellitus, insulin delivered in a pulsatile manner markedly reduces hepatic glucose production in comparison to continuous insulin delivery, possibly due to the increased insulin sensitivity by limiting the downregulation of hepatic insulin receptors.[26] A higher level of hepatic insulin extraction was observed with insulin pulses of larger amplitude than smaller insulin pulses or continuous insulin infusion, leading to a lower fluctuation in the amplitude of peripheral insulin pulses.[27]

### Current therapies for diabetes

Diabetes is a progressive disease that often requires multiple therapies to effectively maintain long-term glycemic control and prevent further complications. Biguanides are recommended as a first-line agent by reducing hepatic glucose production and improve insulin sensitivity.[28,29] Sulfonylureas are commonly used to increase endogenous insulin production by increasing beta-cell function.[30] Thiazolidinediones acts as insulin sensitizers to lower insulin resistance by activating the peroxisome proliferator-activated receptors.[31] Treatment of diabetes with incretin-based therapies can increase insulin secretion and inhibit glucagon secretion and is associated with lower rates of hypoglycemia compared with other diabetes treatment.[32] However, they have been linked to the suppression of gastrointestinal motility and pancreatitis.[33] Alpha-glucosidase inhibitors are used to lower postprandial blood glucose and insulin levels by delaying carbohydrate absorption.[34] Sodium-coupled glucose cotransporter 2 inhibitors have been used to inhibit glucose reabsorption in the proximal tubule to lower blood glucose independently of patient's insulin secretion or sensitivity, but their long-term side effects are still unclear.[35] Failure of

monotherapy in patients with diabetes is common and requires additional therapies and insulin use to maintain long-term glycemic control, leading to significant weight gain, high risk of severe hypoglycemia, and low adherence to complicated multidrug regimens.

### Insulin therapy

Bovine insulin was first extracted and used as a subcutaneous treatment for patients with type 1 diabetes by Banting and Best in 1922.[36] Since its discovery, subcutaneous insulin administration still remains an essential therapy to achieve tight glycemic control. As indicated in the Diabetes Control and Complications Trial, intensive insulin injection regimens are associated with significant weight gain and an increase in severe hypoglycemic events.[1] Rapid- and long-acting insulin analogues as well as insulin-infusion pumps have been developed in an attempt to attain and maintain near-euglycemia.[37] Studies have suggested that continuous insulin delivery using insulin pumps could be beneficial in patients with diabetes with frequent, unpredictable hypoglycemia or dawn phenomenon.[38] Intrapulmonary insulin administration through inhalation offer a more convenient method for insulin delivery and has been demonstrated have a longer duration with a comparable absorption rate to rapid-acting insulin.[39] Its short-term efficacy and safety have been studied in both patients with type 1 and type 2 diabetes, showing either similar or improvement in glycemic control in comparison to conventional insulin injections after 3 months with no marked change in pulmonary function.[40,41] The benefits of inhaled insulin are mainly due to a reduction in the need of multiple insulin injections, leading to a reduction in the significant weight gain phenomenon and improved adherence, especially in patients who are unwilling to comply with insulin injections.[42] Although inhaled insulin therapy is an appealing option, its cost is significantly higher than subcutaneous insulin.[43] Studies to establish clear dosage guidelines, particularly in patients with compromised lung function, and the clinical consequence of increased production of anti-insulin antibody are still lacking.[44,45] In addition, limited large-scale studies on the long-term potency and safety of inhaled insulin prevent its widespread clinical use. Despite significant developments, current insulin therapy has limited success in replicating the pulsatile pattern of natural insulin secretion or effectively maintains long-term glycemic control, leading to the development of microvascular and macrovascular complications.

### Pancreas and islet transplantation

Beta-cell replacement is an appealing therapy by allowing patients with type 1 diabetes to be insulin independent with higher quality of life and reduced vascular complications. Pancreas transplantation is recommended for patients who undergo kidney transplant because they are required to take immunosuppressants.[46] Donor pancreas supplies are limited and the procedure carriers a significant risk of surgical complications.[47] Islet transplantation is a less invasive procedure in which islets are infused into the liver via the portal vein. In comparison to pancreas transplantation, islet transplantation has lower rates of long-term complications with a comparable rate of insulin independence after 3 years.[48,49] Similar to normal insulin secretion, insulin secreted by transplanted islets directly enters the liver via the hepatic sinusoid for extraction.[50] In addition, studies have reported that intraportally transplanted islets secrete insulin in a pulsatile manner and response to glucose stimulation through the amplification of pulse size.[50,51] Barriers to the widespread application of islet transplantation are the lack of donors and difficulty achieving sufficient adequate quality islets after isolation. However, islet transplantation is a rapidly evolving therapy and undergoing extensive research to improve

APPX1162

INSU_PI_001441

islet isolation, enhance posttransplant islet function and survival, develop alternative islet sources, and reduce immune response activity.

### Pulsed intravenous insulin treatment

Early trials conducted at the University of California, Davis, and Scripps Clinic using pulsed insulin therapy attempted to replicate the normal insulin secretion of the pancreas by delivering a series of successively increased insulin bursts into an intravenous catheter, leading to an increasing free insulin level during the treatment. Studies have suggested that insulin delivered through intravenous pulses could reach the hepatic sinusoids of patients with diabetes to restore normal liver metabolic processes similar to those seen in individuals without diabetes.[5] In comparison to healthy subjects, pulsed insulin therapy exposes other organs, such as the heart, lungs, kidneys, and central nervous system, to concentrated pulses of insulin, which perhaps could be a contributing factor to its clinical benefits. In a study of 20 patients with type 1 diabetes with brittle diabetes, treatment with pulsed intravenous insulin for an average of 41 months reduced the average glycated hemoglobin (HbA1c) level to 7.0% compared with the baseline level of 8.5%.[7] Both major and minor hypoglycemic events also decreased from 3.0 to 0.1 per month and 13.0 to 2.4 per month, respectively. Patients with type 1 diabetes with hypertension and nephropathy had a significant improvement in blood pressure control after 3 months of pulsed insulin therapy, as evidenced by a lower dose of antihypertensive medication required to maintain a blood pressure ≤140/90 mm Hg.[32] Similarly, the addition of pulsed insulin therapy to conventional insulin therapy in a multicenter, prospective, controlled clinical trial significantly lowered HbA1c level and rate of decline in creatinine clearance compared with pulsed insulin therapy alone after 18 months.[33] In a clinical trial involving 74 patients with type 1 diabetes, pulsed insulin therapy in addition to intensive subcutaneous insulin therapy significantly decreased the HbA1c level and prevented worsening of abnormal circadian blood pressure pattern in the group receiving pulse intravenous insulin treatment but not the control group that received only intensive subcutaneous insulin therapy after 3 months.[34] In a small clinical trial, pulsed insulin therapy was found to alleviate symptoms of severe orthostatic hypotension in patients with type 1 diabetes.[8]

### Advances in IIT

In comparison to conventional IIT, which does not closely mimic the periodicity and amplitude of normal pancreatic function, a new alternative is improved treatment for patients with diabetes wherein insulin is administered intravenously in a microburst pulsatile manner with an amplitude of normal insulin release without increasing the baseline level of insulin. A treatment session consists of 2 to 3 1-hour intravenous insulin infusions with a 30-minute rest between each treatment using an insulin pump, which involves the pulsatile delivery of microburst insulin under controlled pressure based on programmed information that includes oral glucose intake and the average caloric need of the individual in accordance with body weight. This insulin pump delivers fast-acting insulin every 6 minutes through a peripheral vein in the hand or forearm. Capillary blood glucose levels are monitored every 24 minutes. One method used to determine the effectiveness of this treatment involves measurement of carbohydrate metabolism. To measure carbohydrate metabolism, indirect calorimetry is used. This process involves measurement of oxygen consumption and VCO₂. The respiratory exchange ratio (RER) indicates the metabolic rate by measuring the carbon dioxide produced per unit of oxygen indicated in the following equation:

**Table 1**
The effects of intensive insulin therapy on metabolic rate measurements.

| | Baseline mean (n = 311) | End-of-treatment mean (n = 311) |
|---|---|---|
| $VO_2$ (L/min) | 271.7 | 283.8 |
| $VCO_2$ (L/min) | 246.9 | 270.5 |
| CHO oxidized (%) | 66.1 | 78.0 |
| Respiratory exchange ratio[*] | 0.91 | 0.96 |
| Resting metabolic rate (kcal) | 1916 | 2021 |

CHO = carbohydrate; $VCO_2$ = carbon dioxide output; $VO_2$ = oxygen consumption.
  * $VO_2/VCO_2$.

$VCO_2$/oxygen consumption. This ratio varies depending upon the metabolic component utilized. In lipid metabolism, which is typically present in diabetic patients, the RER is 0.7. In efficient carbohydrate metabolism, this ratio equates to 1.0, which is the greatest value of all macronutrients. Thus, a greater RER value is indicative of greater carbohydrate metabolism and less lipid metabolism. In a recent study, including 311 patients, this advanced IIT was used in addition to their typical insulin regimen and oral hypoglycemic agents. The results demonstrated a significant change in the post-treatment RER relative to both baseline and midtreatment RER (Table 1). Therefore, carbohydrate oxidation significantly increased with the addition of this treatment, which indicated that insulin favors carbohydrate oxidation rather than lipids for energy production.[11] The results demonstrated that this type of pulsed insulin infusion has a dramatic effect on carbohydrate metabolism, overcoming the reduction of resting metabolic rate seen with conventional subcutaneous insulin treatment. This improvement is especially important because the inability to properly metabolize carbohydrates represents a core dysfunction in diabetes. By preferentially converting energy production to carbohydrate metabolism, relative to lipids, patients with diabetes avoid the consequences of elevated free fatty acids, which trigger a cascade of inflammatory processes. Several other studies assessing various complications of diabetes have demonstrated the effectiveness of this new therapy.

### Diabetic neuropathy

Peripheral diabetic neuropathy is a common complication of diabets occurring in 16% to 34% of the population with diabetes. The pathophysiology of this condition is not completely understood; however, it has been theorized to be a result of mechanisms such as the polyol pathway, microvascular changes, and oxidative stress.[35] Currently, this condition is treated by a variety of pharmacological interventions, including selective-serotonin reuptake inhibitors, tricyclic antidepressants, and anticonvulsants. These medications are typically used as adjunctive therapies to analgesic medications such as opiates because they have limited effectiveness when used alone. In a study of 412 patients with diabetes, this advanced IIT was implemented using the same methodology mentioned above to assess for a reduction in painful neuropathy. The patients were treated with this therapy on a weekly basis over a period of 3 months. No neurologic or analgesic treatments were used over the course of the study. The participants were assessed into 3 categories: no symptom improvement, significant symptom improvement, or complete resolution of symptoms. After 3 months of treatment, 47.5% of patients reported a complete resolution of symptoms, 45.5% reported a significant improvement in symptoms, and 7% reported no difference in symptoms.[11] Thus, this advancement is a viable treatment option for peripheral neuropathy.

APPX1163

INSU_PI_001442

S. Dong, H. Lau and C. Chavarria et al. / Current Therapeutic Research 90 (2019) 61–67                 65

**Table 2**
The effects of intensive insulin therapy on wound healing of peripheral diabetic ulcerations.

| Case study | Ulcer size (cm$^2$) | Total pulsed intravenous insulin treatment | Days to heal |
|---|---|---|---|
| 1 | 1 | 19 | 180 |
| 2 | 6.4 | 38 | 32 |
| 3 | 12 | 30 | 36 |
| 4 | 18 | 19 | 71 |
| 5 | 228.6 | 20 | 102 |
| Literature cases[1]* | 6.12 | None | 133[†] |

[1] Zimny S, Schatz H. Determinants and Estimation of Healing Times in Diabetic Foot Ulcers. J Diabetes Complications 2002;16(5): 327-32.
* Eight cases.
[†] Only 5 healed.

**Table 3**
A comparison of hospital utilization rates (adjusted for 2 years) in patients with diabetes treated with pulsed intravenous insulin and matched National Hospital Discharge Survey (NHDS) data.

| | Study group | NHDS data |
|---|---|---|
| Total number of events counted | 5 | 94 |
| Total person-years | 1524 | 1000 |
| Incidence rate | 0.003281 | 0.047 |
| Incidence rate difference | –0.04372 | |

**Table 4**
A comparison of emergency room utilization rates (adjusted for 2 years) in patients with diabetes treated with pulsed intravenous insulin and matched US Agency for Healthcare Statistics (USAHS) data.

| | Study group | USAHS data |
|---|---|---|
| Total number of events counted | 7 | 116 |
| Total person-years | 1524 | 1000 |
| Incidence rate | 0.004593 | 0.058 |
| Incidence rate difference | –0.005341 | |

## Diabetic ulcerations

Diabetic foot ulcerations are a complication present in 4% to 10% of the population with diabetes with 5% to 24% resulting in amputation. Peripheral diabetic ulcerations occur in part from neuropathy, which can result in trauma to an extremity due to loss of sensation. These ulcerations commonly occur on the foot due to a combination of neuropathy, tissue deformities, poor wound healing, and possibly repetitive trauma. Traditional treatment includes wound debridement accomplished by implementing enzymatic, mechanical, and/or autolytic methods.[56]

A recent study entailed the aforementioned IIT for the diabetic ulcerations of 5 patients (Table 2). In that study, treatment was administered in the same fashion mentioned above up to 5 times a week. It was utilized as an adjunctive therapy to traditional diabetic wound care. The mean healing time of these wounds was 84.2 days compared with the average of 133 days. Therefore, the addition of this treatment yielded quicker healing time by 49 days, which equates to a 37% reduction relative to the average wound healing time.[57] There were also no amputations in the treatment group, which was an unexpected, but encouraging outcome.

## Emergency room use

A retrospective analysis was conducted to determine whether or not advanced IIT has a beneficial effect on patients with diabetes as determined by hospital and emergency room use when compared with matched National Hospital Discharge Survey and US Agency for Healthcare Statistics for homologous patients.[11] Tables 3 and 4 show a 2-year retrospective study conducted at 14 treatment centers involving 1524 patients with type 1 and type 2 diabetes with 2 or more secondary complications of diabetes, that included patients with histories of multiple hospitalizations and emergency department visits before initiation of treatment. All study patients were treated with the protocol as described previously in addition to their regular hypoglycemic therapy. The clinical advantages of this advanced treatment on emergency room admissions and hospitalizations was clear: This retrospective study observed reduced hospitalization in a large group of patients with diabetes with 2 or more serious comorbidities to 1.65/1000/ year (vs National Hospital Discharge Survey estimated rate of 46.7/1000/year) and emergency department visits to 2.3/1000/year (vs US Agency for Healthcare Statistics estimated rate of 58.4/1000/year). This represents a significant reduction in hospital admissions and emergency department use.

## Diabetic nephropathy

Diabetic nephropathy occurs in one third of all patients with type 1 diabetes and is the number-1 cause of chronic renal failure in developed nations. Several factors contribute to the development of nephropathy, which include activation of the polyol pathway, genetic expression, atypical protein kinase activation, oxidative stress, and generation of advanced glycation end products.[58] Typical treatment focuses on pharmacologic blood pressure management, diet and lifestyle changes, lipid level control, and glycemic control. Glycemic control is traditionally maintained using subcutaneous insulin injections and diet and activity regulation.[59]

The advanced IIT previously mentioned is a possible treatment option; however, it is still a relatively new technology. Consequently, no retrospective studies have been performed. Albeit less similar to normal insulin secretion than the newer treatment, IIT has been effective for diabetic nephropathy in recent research. A clinical study conducted in 2010 including 65 patients was conducted over a 6- to 22-month period. That study demonstrated a significant increase in serum creatinine in the control group, but not in the group receiving weekly IIT. Creatinine clearance decreased in both groups, although the decrease was less significant in the group receiving weekly IIT compared with standard care.[60]

## Potential mechanisms

Considering that insulin is secreted into the portal vein, hepatocytes are the first cells to respond to changes in insulin release. A pulsatile secretion of insulin has been shown to decrease hepatic glucose production by 25% to 30% relative to typical treatment with the same insulin dosage regimen.[61] In addition, adipocytes displayed increased insulin sensitivity with pulsatile insulin release.[8] It is likely that the increased hypoglycemic action produced by this treatment is associated with greater expression of insulin receptors present in the target tissues. Insulin receptor expression was demonstrated to increase significantly in conjunction with oscillatory insulin release.[10] These oscillatory patterns could possibly lead to down-regulation of insulin receptors, which is significant due to the presence of insulin receptors on the beta cell itself.[62]

## Cost-effectiveness, pitfalls, and practical applications of IIT

Unfortunately, the cost of pulsed insulin therapy or IIT has not been documented in the literature. However, the significant reduction in the number of hospital admissions and emergency room visits in patients treated with this therapy could considerably lower health care expenditures. In addition, the substantially faster recovery of diabetic foot ulcers and reduction in diabetic neuropathy pain after undergoing this therapy could not only improve the quality of life in patients with diabetes, but also represent a marked savings opportunity compared with

APPX1164

INSU_PI_001443

prolonged traditional therapies. Although pulsed insulin therapy is an appealing treatment for patients with diabetes with promising results, the inconvenience of having to visit a clinic that offers the therapy could be a concern that leads to decreased adherence. Each weekly therapy session, which lasts approximately 5 hours, requires time commitments from both patients and medical professionals. Although the side effects from this therapy have not been well studied, a trial has shown that no adverse complications were observed in more than 60 treated patients.[3] Patients undergo advanced IIT in addition to their standard diabetes regimen, which can include insulin injections, oral hypoglycemic agents, exercise, and diet.[11] The recent encouraging outcomes of advanced IIT in patients with diabetic foot ulcers, diabetic neuropathy, and diabetic nephropathy suggest that this promising treatment is a referral option that general practitioners can use to supplement conventional therapies and prevent long-term complications as part of preventative care for patients with diabetes.

## Conclusions

Traditional insulin regimens are less efficacious than IIT due to its delivery, which is inferior in juxtaposition to a pulsatile administration. Recent advancements have shown that IIT is an effective option for patient populations with both type 1 and type 2 diabetes. This treatment resembles normal pancreatic function so closely that it has significantly reduced the effects of relatively common complications from diabetes such as neuropathy, nephropathy, and ulcerations in comparison to standard treatments. In addition, the improved IIT improves carbohydrate metabolism as well as decreases emergency room and hospital visits associated with diabetes. Thus, this new treatment is a promising advancement in the management of diabetes.

## Acknowledgments

This work was supported by the Department of Surgery, University of California Irvine. S. Dong was responsible for conceptualization, methodology, and writing of the original draft; H. Lau and C. Chavarria were responsible for writing of the original draft and review editing; M. Alexander was responsible for formal analysis, project administration, supervision, and review editing; A. Cimler was responsible for methodology, formal analysis, and review editing; J. P. Elliott, S. Escovar, L. Lewin, and J. Novak were responsible for review editing; and J. R. T. Lakey was responsible for conceptualization, resources, and supervision.

## Conflicts of Interest

A. Cimler, J. Elliott, S. Escovar, and J. Novak have previously treated patients using the pulsed insulin treatment described in this work and are employed by companies using the treatment. The authors have indicated that they have no other conflicts of interest regarding the content of this article.

## References

1. The DCCT Research Group. Effect of intensive diabetes treatment on the development and progression of long-term complications in adolescents with insulin-dependent diabetes mellitus: Diabetes Control and Complications Trial. *J Pediatr.* 1994;125(2):177–188. https://doi:10.1016/S0022-3476(94)70190-3.
2. UK Prospective Diabetes Study Group. U.K. Prospective diabetes study 16: Overview of 6 years' therapy of type II diabetes: A progressive disease. *Diabetes.* 1995;44(11):1249–1258. https://doi:10.2337/diabetes.44.11.1249.
3. Katsoyannis PG. The chemical synthesis of human and sheep insulin. *Am J Med.* 1996;40(5):652–661. https://doi:10.1016/0002-9343(66)90144-6.
4. Krssak M, Brehm A, Bernroider E, Anderwald C, Nowotny P, Dalla Man C, et al. Alterations in postprandial hepatic glycogen metabolism in type 2 diabetes. *Diabetes.* 2004;53(12):3048–3056. https://doi:10.2337/diabetes.53.12.3048.
5. Aoki TT, Grecu EO, Arcangeli MA, Benbarka MM, Prescott P, Ahn JH. Chronic intermittent intravenous insulin therapy: a new frontier in diabetes therapy. *Diabetes Technol Ther.* 2001;3(1):111–123. https://doi:10.1089/152091501750220073.
6. Reza Mirbolooki M, Taylor GE, Knutzen VK, Scharp DW, Willcourt R, Lakey JRT. Pulsatile intravenous insulin delivery: The best practice to reverse diabetes complications? *Med Hypotheses.* 2009;73(3):363–369. https://doi:10.1016/j.mehy.2009.02.042.
7. Aoki TT, Benbarka MM, Okimura MC, et al. Long-term intermittent intravenous insulin therapy and type 1 diabetes mellitus. *Lancet.* 1993;342:515–518. https://doi.org/10.1016/0140-6736(93)91645-3.
8. Aoki TT, Grecu EO, Arcangeli MA. Chronic intermittent intravenous insulin therapy corrects orthostatic hypotension of diabetes. *Am J Med.* 1995;99:683–684. https://doi:10.1016/S0002-9343(99)80257-5.
9. Hunter SJ, Atkinson AB, Ennis CN, Sheridan B, Bell PM. Association between insulin secretory pulse frequency and peripheral insulin action in NIDDM and normal subjects. *Diabetes.* 1996;45(5):683–686. https://doi:10.2337/diab.45.5.683.
10. Goodner CJ, Sweet IR, Harrison Jr HC. Rapid reduction and return of surface insulin receptors after exposure to brief pulses of insulin in perifused rat hepatocytes. *Diabetes.* 1988;37:1316–1323. https://doi:10.2337/diab.37.10.1316.
11. Elliott J, Zaias N, Escovar S, Deguzman L, Counce D, Dixit R, et al. Microburst Insulin Infusion: Results of Observational Studies – Carbohydrate Metabolism, Painful Diabetic Neuropathy, and Hospital/Emergency Department Utilization. *J Diabetes, Metab Disord Control.* 2017;4(4):116–121. https://doi:10.15406/jdmdc.2017.04.00118.
12. Schuit FC, Huypens P, Heimberg H, Pipeleers DG. Glucose Sensing in Pancreatic β-Cells. *Diabetes.* 2001;50(1):1–11. https://doi:10.2337/diabetes.50.1.1.
13. Thorens B, Sarkar HK, Kaback HR, Lodish HF. Cloning and functional expression in bacteria of a novel glucose transporter present in liver, intestine, kidney, and β-pancreatic islet cells. *Cell.* 1988;55(2):281–290. https://doi:10.1016/0092-8674(88)90051-7.
14. Detimary P, Dejonghe S, Ling Z, Pipeleers D, Schuit F, Henquin JC. The changes in adenine nucleotides measured in glucose-stimulated rodent islets occur in β-cells but not in α-cells and are also observed in human islets. *J Biol Chem.* 1998;273(51):33905–33908. https://doi:10.1074/jbc.273.51.33905.
15. Aguilar-Bryan L, Bryan J. Molecular Biology of Adenosine Triphosphate-Sensitive Potassium Channels 1. *Endocr Rev.* 1999;20(2):101–135. https://doi:10.1210/edrv.20.2.0361.
16. Ashcroft FM, Proks P, Smith PA, Ämmälä C, Bokvist K, Rorsman P. Stimulus–secretion coupling in pancreatic β cells. *J Cell Biochem.* 1994;55(Suppl):54–65. https://doi:10.1002/jcb.240550007.
17. Goodner CJ, Walike BC, Koerker DJ, Ensinck JW, Brown AC, Chideckel EW, et al. Insulin, glucagon, and glucose exhibit synchronous, sustained oscillations in fasting monkeys. *Science.* 1977;195(4274):177–179. https://doi:10.1126/science.401543.
18. Lang DA, Matthews DR, Burnett M, Turner RC. Brief, irregular oscillations of basal plasma insulin and glucose concentrations in diabetic man. *Diabetes.* 1981;30(5):435–439. https://doi:10.2337/diab.30.5.435.
19. Bingley PJ, Matthews DR, Williams AJK, Bottazzo GF, Gale EAM. Loss of regular oscillatory insulin secretion in islet cell antibody positive non-diabetic subjects. *Diabetologia.* 1992;35(1):32–38. https://doi:10.1007/BF00400849.
20. Peiris AN, Stagner JI, Vogel RL, et al. Body fat distribution and peripheral insulin sensitivity in healthy men: role of insulin pulsatility. *J Clin Endocrinol Metab.* 1992;75(1):290–294. https://doi:10.1210/jcem.75.1.1619021.
21. Polonsky KS, Given BD, Hirsch LJ, Tillil H, Shapiro ET, Beebe C, et al. Abnormal Patterns of Insulin Secretion in Non-Insulin-Dependent Diabetes Mellitus. *N Engl J Med.* 1988;318(19):1231–1239. https://doi:10.1056/NEJM198805123181903.
22. Gumbiner B, Van Cauter E, Beltz WF, et al. Abnormalities of insulin pulsatility and glucose oscillations during meals in obese noninsulin-dependent diabetic patients: effects of weight reduction. *J Clin Endocrinol Metab.* 1996;81:2061–2068. https://doi:10.1210/jcem.81.6.8964829.
23. O'Meara NM, Sturis J, Herold KC, et al. Alterations in the patterns of insulin secretion before and after diagnosis of IDDM. *Diabetes Care.* 1995;18:568–571. https://doi:10.2337/diacare.18.4.568.
24. Hollingdal M, Juhl CB, Pincus SM, Sturis J, Veldhuis JD, Polonsky KS, et al. Failure of physiological plasma glucose excursions to entrain high-frequency pulsatile insulin secretion in type 2 diabetes. *Diabetes.* 2000;49(8):1334–1340. https://doi:10.2337/diabetes.49.8.1334.
25. Matveyenko AV, Liuwantara D, Gurlo T, et al. Pulsatile portal vein insulin delivery enhances hepatic insulin action and signaling. *Diabetes.* 2012;61(9):2269–2279. https://doi:10.2337/db11-1462.
26. Bratusch-Marrain PR, Komjati M, Waldhausl WK. Efficacy of pulsatile versus continuous insulin administration on hepatic glucose production and glucose utilization in type I diabetic humans. *Diabetes.* 1986;35(8):922–926. https://doi:10.2337/diab.35.8.922.
27. Meier JJ, Veldhuis JD, Butler PC. Pulsatile insulin secretion dictates systemic insulin delivery by regulating hepatic insulin extraction in humans. *Diabetes.* 2005;54(6):1649–1656. https://doi:10.2337/diabetes.54.6.1649.
28. Handelsman Y, Bloomgarden ZT, Grunberger G, Umpierrez G, Zimmerman RS, Bailey TS, et al. American Association of Clinical Endocrinologists and American College of Endocrinology - clinical practice guidelines for developing a diabetes mellitus comprehensive care plan - 2015. *Endocr Pract.* 2015;21(suppl 1):1–87. https://doi:10.4158/EP15672.GL.

APPX1165

INSU_PI_001444

29. Viollet B, Guigas B, Sanz Garcia N, Leclerc J, Foretz M, Andreelli F. Cellular and molecular mechanisms of metformin: an overview. *Clin Sci (Lond)*. 2012;122(6):253–270. https://doi.org/10.1042/CS20110386.

30. Proks P, Reimann F, Green N, Cribble F, Ashcroft F. Sulfonylurea Stimulation of insulin secretion. *Diabetes*. 2002;51(suppl 3):S368–S376. https://doi.org/10.2337/diabetes.51.2007.S368.

31. Gastaldelli A, Ferrannini E, Miyazaki Y, Matsuda M, Mari A, DeFronzo RA. Thiazolidinediones improve β-cell function in type 2 diabetic patients. *Am J Phys Endocrinol Metab*. 2007;292(3):E871–E883. https://doi.org/10.1152/ajpendo.00551.2006.

32. Inzucchi SE, Majumdar SK. Current therapies for the medical management of diabetes. *Obstetrics and Gynecology*. 2016;127(4):780–794. 127. https://doi.org/10.1097/AOG.0000000000001332 .

33. Claus TH, Pan CQ, Buxton JM, Yang L, Reynolds JC, Barucci N, et al. Dual-acting peptide with prolonged glucagon-like petide-1 receptor agonist and glucagon receptor antagonist activity for the treatment of type 2 diabetes. *Journal of Endocrinology*. 2007;192(2):371–380. https://doi.org/10.1677/JOE-06-0018.

34. Derosa G, Maffioli P. α-Glucosidase inhibitors and their use in clinical practice. *Arch Med Sci*. 2012;8(5):899–906. https://doi.org/10.5114/aoms.2012.31621

35. Ehrenkranz JR, Lewis NG, Kahn CR, Roth J. Phlorizin: a review. *Diabetes Metab Res Rev*. 2005;21(1):31–38. https://doi.org/10.1002/dmrr.532

36. Banting FG, Best CH, Collip JB, Campbell WR, Fletcher AA. Pancreatic extracts in the treatment of diabetes mellitus. *Can Med Assoc J*. 1922;12(3):141–146. https://doi.org/10.1097/00005053-192401000-00013.

37. Owens DR, Zinman B, Bolli GB. Insulins today and beyond. *Lancet*. 2001;358(9283):739–746. https://doi.org/10.1016/S0140-6736(01)05842-1

38. Pickup J, Keen H. Continuous Subcutaneous Insulin Infusion at 25 Years. *Diabetes Care*. 2002;25(3):593–598. https://doi.org/10.2337/diacare.25.3.593

39. Owens DR. New horizons — alternative routes for insulin therapy. *Nat Rev Drug Discov*. 2002;1(7):529–540. https://doi.org/10.1038/nrd836

40. Cefalu WT, Skyler JS, Landschulz WH, Balagtas CC, Cheng S, Gelfand RA, et al. Inhaled human insulin treatment in patients with type 2 diabetes mellitus. *Ann. Int. Med.*. 2001;134(3):203–207. https://doi.org/10.7326/0003-4819-134-3-200102060-00011.

41. Skyler JS, Cefalu WT, Kourides IA, Landschulz WH, Balagtas CC, Cheng SL, et al. Efficacy of inhaled human insulin in type 1 diabetes mellitus: A randomised proof-of-concept study. *Lancet*. 2001;357(9253):331–335. https://doi.org/10.1016/S0140-6736(00)03638-2.

42. Skyler JS, Jovanovic L, Klioze S, Reis J, Duggan Wthe Inhaled Human Insulin Type 1 Diabetes Study Group. Two-year safety and efficacy of inhaled human insulin (Exubera) in adult patients with type 1 diabetes. *Diabetes Care*. 2007;30(3):579–585. https://doi.org/10.2337/dc06-1863.

43. Selam JL. Inhaled insulin: promises and concerns. *J Diabetes Sci Technol*. 2008;2(2):311–315. https://doi.org/10.1177/193229680800200225

44. Teeter JG, Riese RJ. Dissociation of lung function changes with humoral immunity during inhaled human insulin therapy. *Am J Respir Crit Care Med*. 2006;173(11):1194–1200. https://doi.org/10.1164/rccm.200512-1866TOC

45. Fineberg SE, Kawabata T, Finco-Kent D, Liu C, Krasner A. Antibody response to inhaled insulin in patients with type 1 or type 2 diabetes. An analysis of initial phase II and III inhaled insulin (Exubera) trials and a two-year extension trial. *J Clin Endocrinol Metab*. 2005;90(6):3287–3294. https://doi.org/10.1210/jc.2004-2229.

46. Chiang JL, Kirkman MS, Laffel LMB, Peters AL. Type 1 diabetes through the life span: A position statement of the American Diabetes Association. *Diabetes Care*. 2014;37(7):2034–2054. https://doi.org/10.2337/dc14-1140

47. Hampson FA, Freeman SJ, Ertner J, Drage M, Butler A, Watson CJ, et al. Pancreatic transplantation: surgical technique, normal radiological appearances and complications. *Insights Imaging*. 2010;1(5-6):339–347. https://doi.org/10.1007/s13244-010-0046-3.

48. Maffi P, Scavini M, Socci C, Piemonti L, Caldara R, Gremizzi C, et al. Risks and benefits of transplantation in the cure of type 1 diabetes: Whole pancreas versus islet transplantation. A single center study. *Rev Diabet Stud*. 2011;8(1):44–50. https://doi.org/10.1900/RDS.2011.8.44

49. Moassesfar S, Masharani U, Frassetto LA, Szot GL, Tavakol M, Stock PG, et al. A Comparative Analysis of the Safety, Efficacy, and Cost of Islet Versus Pancreas Transplantation in Nonuremic Patients with Type 1 Diabetes. *Am J Transplant*. 2016;16(2):518–526. https://doi.org/10.1111/ajt.13536

50. Meier JJ, Hong-McAtee I, Galasso R, Veldhuis JD, Moran A, Hering BJ, et al. Intrahepatic transplanted islets in humans secrete insulin in a coordinate pulsatile manner directly into the liver. *Diabetes*. 2006;55(8):2324–2332. https://doi.org/10.2337/db06-0069.

51. Pørksen N, Munn S, Ferguson D, O'Brien T, Veldhuis J, Butler P. Coordinate pulsatile insulin secretion by chronic intraportally transplanted islets in the isolated perfused rat liver. *J Clin Invest*. 1994;94(1):219–227. https://doi.org/10.1172/JCI117310.

52. Aoki TT, Grecu EO, Prendergast JJ, et al. Effect of chronic intermittent intravenous insulin therapy on antihypertensive medication requirements in IDDM subjects with hypertension and nephropathy. *Diab Care*. 1995;18(9):1260–1265. https://doi.org/10.2337/diacare.18.9.1260

53. Dailey GE, Boden GH, Creech RH, Johnson DG, Gleason RE, Kennedy FP, et al. Effects of pulsatile intravenous insulin therapy on the progression of diabetic nephropathy. *Metabolism*. 2000;49(11):1491–1495. https://doi.org/10.1053/meta.2000.17700.

54. Aoki TT, Grecu EO, Arcangeli MA, Meisenheimer R. Effect of intensive insulin therapy on abnormal circadian blood pressure pattern in patients with type I diabetes mellitus. *Online J Curr Clin Trials*. 1995 Doc No 199.

55. Schreiber AK, Nones CF, Reis RC, Chichorro JG, Cunha JM. Diabetic neuropathic pain: Physiopathology and Treatment. *World J Diabetes*. 2015;6:432–444. https://doi.org/10.4239/wjd.v6.i3.432.

56. Tecilazich F, Veves A. Role of Peripheral Neuropathy in the Development of Foot Ulceration and Impaired Wound Healing in Diabetes. In: *Nutritional and Therapeutic Interventions for Diabetes and Metabolic Syndrome*. Elsevier; 2018:95–104. https://doi.org/10.1016/B978-0-12-812019-4.00007-6.

57. Elliott J, Elliott A, Cimler A, Zaias N, Escovar S. Extraordinary Rapid Wound Healing Time in Diabetic Patients Treated with Microburst Insulin Infusion. *International Research Journal of Public Health*. 2018;2:14. https://doi.org/10.28933/irjph-2018-08-1001.

58. Duran-Salgado MB, Rubio-Guerra AF. Diabetic Nephropathy and Inflammation. *World J Diabetes*. 2014;5(3):393–398. https://doi.org/10.4239/wjd.v5.i3.393.

59. Gnudi L, Coward RJM, Long DA. Diabetic nephropathy: Perspective on Novel Molecular Mechanisms. *Trends Endocrinol Metab*. 2016;27:820–830. https://doi.org/10.1016/j.tem.2016.07.002.

60. Weinrauch LA, Sun J, Gleason RE, Boden GH, Creech RH, Dailey G, et al. Pulsatile intermittent intravenous insulin therapy for attenuation of retinopathy and nephropathy in type 1 diabetes mellitus. *Metabolism*. 2010;59(10):1429–1434. https://doi.org/10.1016/j.metabol.2010.01.004.

61. Kindmark H, Kohler M, Arkhammar P, Efendic S, Larsson O, Linder S, et al. Oscillations in cytoplasmic free calcium concentration in human pancreatic islets from subjects with normal and impaired glucose tolerance. *Diabetologia*. 1994;37:1121–1131.

62. Xu GG, Rothenberg PL. Insulin receptor signaling in the beta cell influences insulin gene expression and insulin content: evidence for autocrine beta-cell regulation. *Diabetes*. 1998;47:1243–1252. https://doi.org/10.2337/diab.47.8.1243

APPX1166

INSU_PI_001445

**From:**        Glenn Massey
**Sent:**        Thursday, May 27, 2021 1:19 PM CDT
**To:**          Shawn Calvit
**Subject:**     Fwd: Trina response slides
**Attachments:**  IV Pulsatile Insulin  BackgroundV2.pptx, image001.png, image002.jpg

Glenn Massey
Chief Growth Officer
Diabetes Relief
Mobile: 713-582-0449
Email: glenn@diabetesrelief.com
(281)600-5000 ○ 11511 Katy Freeway Suite 100 Street ○ Houston, TX 77079
CONFIDENTIALITY NOTICE: This email, including attachments, is for the sole use of the
intended recipient(s) and may contain confidential and privileged information. Any unauthorized
review, use, or disclosure or distribution is prohibited. If you are not the intended recipient,
please contact the sender immediately and destroy all copies of the original message.
**From:** Glenn Massey
**Sent:** Tuesday, November 10, 2020 3:30:49 PM
**To:** jamie Howard <JHOWARD@howardrisk.com>; Jamie Holmes <jholmes@thepelongroup.com>; Paul
Henriksen <phenriksen1@icloud.com>; John Mendell <jmendell@ypsanesthesia.com>; Paul Henriksen
<phenriksen1@icloud.com>
**Subject:** FW: Trina response slides

May 2018
More to come



Glenn Massey
Chief Growth Officer
Diabetes Relief
Mobile: 713-582-0449
Email: glenn@diabetesrelief.com

(281)600-5000 ○ 11511 Katy Freeway Suite 100 Street ○ Houston, TX 77079

CONFIDENTIALITY NOTICE: This email, including attachments, is for the sole use of
the intended recipient(s) and may contain confidential and privileged information. Any
unauthorized review, use, or disclosure or distribution is prohibited. If you are not the
intended recipient, please contact the sender immediately and destroy all copies of the
original message.



**From:** Glenn Massey
**Sent:** Tuesday, May 15, 2018 9:52 AM
**To:** Gaurav Jain <gauravjain123@gmail.com>; Vipul Shah <docvips@gmail.com>
**Subject:** RE: Trina response slides

Dr. Jain,
Attachment added this time.
Our meeting last night went fantastic.
Ben wants us to do a few additional "webinars" to other members of his group. We will be setting up those in short order.
They are VERY interested in going forward.e addressed Trina and it was NO issue once they understood we have ZERO in common and work under two completely different patents.
Stand by.


**Glenn Massey**
Marketing Director/New Business Development



O (281) 600-5000
M (713) 582-0449
W www.diabetesrelief.com

[x] fb.com/diabetesreliefnow

[x] twitter.com/diabetesrelief1

[x] YouTube - diabetesreliefnow

This transmission may be strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy, or disseminate this information. If you are not the intended recipient, please contact the sender at (281 600 6000 x 2), or by reply email, and destroy all copies of the original message. Unauthorized interception of this e-mail is a violation of federal criminal law. This communication does not reflect an intention by the sender or the sender's principal to conduct a transaction or make any agreement by electronic means.

**From:** Gaurav Jain <gauravjain123@gmail.com>
**Sent:** Monday, May 14, 2018 8:23 PM
**To:** Glenn Massey <glenn@diabetesrelief.com>
**Cc:** Vipul Shah <docvips@gmail.com>; Ronald Tosh <rontosh72@gmail.com>; John Hatcher <jhatcher@accessiumgroup.com>; Brian Loveridge <brian@diabetesrelief.com>; Scott Hepford <scott@diabetesrelief.com>; Hunter Carr <hunter@diabetesrelief.com>
**Subject:** Re: Trina response slides

I don't see an attachment. Can you resend it please.

Sent from my iPhone

On May 14, 2018, at 11:34 AM, Glenn Massey <glenn@diabetesrelief.com> wrote:

Dr. Jain,
These are the slides we will use tonight in the NKDHC presentation.
If questions arise please call.

**Glenn Massey**
Marketing Director/New Business Development

**<image001.png>**

O (281) 600-5000
M (713) 582-0449
W www.diabetesrelief.com

fb.com/diabetesreliefnow

twitter.com/diabetesrelief1

YouTube - diabetesreliefnow

This transmission may be strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy, or disseminate this information. If you are not the intended recipient, please contact the sender at (281 600 6000 x 2), or by reply email, and destroy all copies of the original message. Unauthorized interception of this e-mail is a violation of federal criminal law. This communication does not reflect an intention by the sender or the sender's principal to conduct a transaction or make any agreement by electronic means.



APPX1170

INSU_PI_001449



APPX1171

INSU_PI_001450



# IV Pulsatile Insulin – Background Part 1

- The origin of the IV pulsatile insulin approach goes back decades with a broad spectrum of scientists and doctors from around the world

- Late 1970s Thomas Aoki MD, Assoc. Prof. of Harvard Medical School, worked on a precursor version of the approach while head of the Metabolism Section of Boston's Joslin Diabetes Center

- G. Ford Gilbert became involved with Dr. Aoki as his lawyer and through licenses of Dr. Aoki's protocol using various names and companies, all of which wound up in 14 years of litigation in several courts and an injunction against Gilbert in Nevada

- The current Aoki-Gilbert litigation began in 2011 and is set for trial on July 23, 2018, in the USDC, Eastern District of California, before Judge Troy Nunley

- Documents on file in that litigation detail the history between Dr. Aoki and Ford Gilbert and are open to public research (Case No. 2:11-cv-02797-TLN-CKD)

- Gregory Ford Gilbert's federal court troubles continue, and he has now been indicted in a serious criminal matter involving bribery in the Middle District of Alabama

Confidential - Copyright © H360 LLC 2018. All rights reserved.



# IV Pulsatile Insulin – Background Part 2

## DR has <u>NO</u> connection or affiliation with Trina Health or Ford Gilbert

☐ Founders of Diabetes Relief (DR) interacted with Gilbert several years ago but came to question his honesty, character, and business ethics and dealings, so they immediately moved in a different direction

☐ After consulting with highly respected and experienced medical professionals, they formed Diabetes Relief LLC in Jan 2015 and proceeded to develop and patent the procedures they use today through licensees

☐ DR's licensed facilities are open in Texas, Utah, California, Turkey, and others are imminent

☐ Patients consistently report successful outcomes of DR's treatment

☐ DR is moving forward with a double-blind, randomized, clinically controlled, multi-center, multinational study of DR's processes and procedures

*Confidential* - Copyright © H360 LLC 1028. All rights reserved.

APPX1173

**INSU_PI_001452**

1



ORIGINAL RESEARCH
published: 12 August 2021
doi: 10.3389/fpubh.2021.600906



# Efficacy Evaluation Study for Microburst Insulin Infusion: A Novel Model of Care

Steven W. Howard[1]*, Zidong Zhang[1], Jacob Linomaz[1], Wing Lam[1], Zhengmin Qian[2], Jerry Thurman[3] and Rhonda BeLue[1]

[1] Department of Health Management and Policy, College for Public Health and Social Justice at Saint Louis University, St. Louis, MO, United States, [2] Department of Epidemiology and Biostatistics, Saint Louis University, St. Louis, MO, United States, [3] SSM Health Care, St. Louis, MO, United States

4:22-CV-03062
Injunction Hearing

**EX 29**

DEFS "INSULINIC"

OPEN ACCESS

**Edited by:**
Stephanie Bernell,
Oregon State University, United States

**Reviewed by:**
Connie J. Evashwick,
George Washington University,
United States
Vasco Fonseca,
Universidade de Lisboa, Portugal

**\*Correspondence:**
Steven W. Howard
Steven.Howard@SLU.edu

**Specialty section:**
This article was submitted to
Public Health Policy,
a section of the journal
Frontiers in Public Health

**Received:** 31 August 2020
**Accepted:** 05 July 2021
**Published:** 12 August 2021

**Citation:**
Howard SW, Zhang Z, Linomaz J,
Lam W, Qian Z, Thurman J and
BeLue R (2021) Efficacy Evaluation
Study for Microburst Insulin Infusion: A
Novel Model of Care.
Front. Public Health 9:600906.
doi: 10.3389/fpubh.2021.600906

**Objectives:** This study aims to evaluate the impact of Microburst Insulin Infusion (MII) treatment on Type 1 and 2 diabetic patients' HbA1c, lipids, peripheral neuropathy, and patient-reported health status.

**Methods:** We reviewed clinical charts, including lab results, for more than 80 diabetic and pre-diabetic patients treated at one U.S. outpatient clinic in St. Louis, Missouri between February 2017 and December 2019. Data included patient demographics, treatment data, lab and neuropathy tests, and self-reported patient health status questions.

The explanatory variable was number of months of MII treatment. Treatments are 3–4 h in length, with two intensive infusions the first week and one treatment each week thereafter, usually for 12 weeks total. Lab tests were at 12-week intervals.

Generalized linear modeling and t-tests assessed the significance of differences between patients' baseline lab values, neuropathy measures, and health status before treatment vs. after final treatment.

**Results:** Number of MII treatments per patient ranged from 1 to 262, over 1–24 months. Time in MII treatment was significantly associated with reductions in HbA1c by nearly 0.04 points per month, and triglycerides declined 3 points per month. Neuropathy measures of large toe vibratory sensation (clanging tuning fork) improved significantly, as did patient-reported health and feelings of improvement since beginning treatment.

**Discussion:** The MII therapy appears to be efficacious in treating diabetic patients, particularly those with complications like neuropathy. Our findings affirmed several other studies. We uniquely incorporated patient health questionnaires, and empirically studied MII treatment efficacy for diabetes in a population large enough to permit statistically valid inferences. With multiple waves of data for over 80 patients, this is one of the most extensive quantitative studies of microburst insulin infusion therapy conducted to date, with protocols more uniformly implemented and survey instruments more consistently administered by the same clinical team. Given the advances in insulin infusion therapy brought by MII, and early indications of its efficacy, the time is right for more in-depth studies of the outcomes patients can achieve, the physiological mechanisms by which they occur, MII's comparative effectiveness vis-à-vis traditional treatments, and cost-effectiveness.

**Keywords:** insulin infusion, efficacy, neuropathy, diabetes, diabetic complications

APPX1174

INSU_PI_001453

# INTRODUCTION

Diabetes mellitus is one of the most prevalent chronic diseases, affecting nearly 10% of the world's population, and imposing a cost of nearly $1 trillion USD globally (1–3). This chronic health condition is characterized by hyperglycemia which results from defects in glucose homeostasis stemming from relative or absolute deficiencies in insulin. Type 2 diabetes, comprising 90–95% of all diabetics, stems from a relative insulin deficiency as a result of the body becoming increasing resistant to the glucose lowering effects of insulin. Between 5 and 10% of diabetics are type 1, characterized by an autoimmune process with genetic predispositions and potential environmental factors that results in destruction of insulin-producing Beta cells in the pancreas (4). Complications from both Type 1 and Type 2 diabetes are an increasing public health challenge, and the prevalence of conditions like neuropathy can be as high as 50% among diabetics (5). Most research and clinical interventions have focused on managing blood sugar and/or insulin to healthy levels, which delays the onset of complications or slows their advance. Few interventions have been effective in improving the body's production or utilization of insulin. For patients in the outpatient environment, subcutaneous insulin injection is the most common management approach for insulin-resistant patients. In the inpatient environment, continuous insulin infusion may be used. While these interventions have helped slow the decline in the health of diabetics, they have not been able to halt or reverse complications such as neuropathy. In this exploratory study, we begin to evaluate the hypothesis that Microburst Insulin Infusion (MII) may be efficacious in treating HbA1c and complications of diabetes.

Limited research exists on the efficacy of MII, the pulsatile mode of insulin delivery most similar to that naturally occurring in the body. Earlier forms of insulin infusion included outpatient intravenous insulin therapy (OIVIT), pulsatile intravenous insulin therapy (PIVIT), hepatic activation therapy (HAT), chronic intermittent intravenous insulin infusion (CIIIT), metabolic activation therapy (MAT), and the Harvard Protocol. These techniques pulsed insulin via intravenous infusion, but at increasing levels that progressively built up insulin levels in the body. If the magnitude of these insulin pulses is reduced or absent there can be a defect in hepatic intracellular signaling resulting in increased hepatic output of glucose and reduced glucose utilization in animal models resulting in onset of Type 2 diabetes (6). In an animal study, researchers evaluated three different insulin delivery methods. One subgroup received pulsatile insulin (PII), one received a continuous insulin infusion while the last had reduced amplitude pulsatile insulin as seen in Type 2 diabetes. They found that those that received PII had improved insulin action, while those who received a stable insulin infusion or reduced amplitude pulses of insulin (as seen in Type 2 Diabetes) had abnormal liver metabolism resulting in increased liver production of glucose and worsening hyperglycemia with insulin resistance. Previous researchers further postulated the abnormal liver response may be contributing to some complications of diabetes such

as abnormal lipid metabolism and cardiovascular disease (7). Other researchers have had similar findings in human studies, supporting the potential for MII to produce superior blood glucose management compared to continuous insulin infusion (8, 9).

MII is a newer mode of delivery and works differently. It aims to more closely simulate the function of a healthy pancreas, which delivers insulin from the pancreatic Beta cell to the circulation in a pulsatile fashion that varies with glucose levels in the bloodstream. MII aims to coordinate the timing and pulsed levels/quantities of insulin secretion, mimicking the workings of a healthy pancreas. These pulses are in approximate 5–6 min intervals and adjust insulin dosage to the glucose levels in the patient's blood (10, 11).

The literature includes early human studies of PII, in its various stages of evolution from PIVIT to MII. To mimic normal insulin delivery to the body, early researchers investigated patients with Type 1 diabetes mellitus on multiple daily injections of insulin and poor control. These patients were given 7–10 pulses of intravenous insulin over an hour while ingesting carbohydrates in the form of glucose. These sessions were given three times per day. After 2 days of treatments, therapy was then 1 day per week (12, 13). The literature contains more detailed explanation of the MII protocol and the mechanism by which it functions (10, 11). In a systematic review article by Dong et al. (10), the authors concluded that intravenous pulsatile insulin therapy in diabetics can lead to normal liver insulin levels as seen in non-diabetic individuals, and improvements in peripheral neuropathy symptoms (10). The liver in a Type 2 diabetic relies on metabolism of lipids over that of carbohydrates. It was also determined that pulsatile insulin therapy can change hepatic glucose metabolism favoring carbohydrate metabolism over lipid metabolism, thereby reducing free fatty acids which can promote inflammatory responses elsewhere (11). Given the findings of this research and the experiences of clinicians treating diabetics using MII, we purposed to study the efficacy of MII in controlling blood sugar, lipids, peripheral neuropathy, and patient-reported health status.

# METHODS

## Hypotheses and Methodological Strategy

We hypothesize that the longer a patient is treated with MII, the more their HbA1c, triglycerides, neuropathy, and self-reported health and wellbeing will improve, compared to the baseline of their first patient encounter. This is a retrospective cohort study delineating trajectories in each subject of laboratory and clinical measures from baseline. Should statistically significant improvement be observed for MII patients, a subsequent controlled trial may be in order.

## Data

We reviewed clinical charts, including lab results, for all diabetic and pre-diabetic patients treated at one outpatient clinic in St. Louis, Missouri, USA between February 2017 and December 2019. There were 86 patients in total (Table 3A), of whom 60 had

APPX1175

INSU_PI_001454

lab data (of whom Table 2 shows 52–56 had lab result data for each of the five outcome measures studied).

The explanatory variable of interest was the number of months (continuous) that patients were treated. The MII treatment sessions are ~3–4 h in length. The patient receives two intensive intravenous infusions the first week of treatment (typically 1–2 days apart), and one treatment each week thereafter, usually for 12 weeks total. Some patients choose to continue receiving MII treatments longer term, though frequency may reduce to bi-weekly or monthly. Lab tests were drawn at ~12-week intervals (a baseline panel of labs pre-treatment, another lab panel at week-12, and every 12 weeks thereafter for patients who opted to continue treatment).

The data abstracted from patient charts and questionnaires included lab values [HbA1c, total cholesterol, low-density lipids (LDL), triglycerides, and estimated glomerular filtration rate (eGFR)—all coded as continuous variables], patient demographics (age, sex, race, BMI, and diabetes type—all categorical variables), the duration of vibratory sensation from the CTF test (in seconds—continuous), and patient-reported health questions (0–10, 1–10, or percentage change—all coded as continuous). Each patient had between 1 and 262 MII treatments. At each treatment, a Family Nurse Practitioner (NP) administered the health questionnaire and clanging tuning-fork test (CTF) to assess neuropathy [14]. The descriptive statistics are reported in Table 3B.

With the questionnaire, the NP asked each patient a series of standard self-reported health questions, coding their responses on the commonly-used 0–10 or 1–10 scale (i.e., "How is your diabetes-related pain on a scale of 1–10?"). The same Nurse Practitioner conducted all the patient questionnaires, and also recorded the duration of vibratory sensation from the big toe of each foot using a 128 Hz tuning fork (with a 15-s maximum/top-coding).

The questionnaire asked patients:

- How are you feeling today? (1–10 scale)
- How is your overall health? (1–10 scale)
- How is your diabetes-related level of pain? (1–10 scale)
- How does your diabetes-related pain interfere with your activities of daily living (ADLs)? (1–10 scale)
- How has your physical activity level changed since your last treatment? (% change)
- How has your energy level changed since your last treatment? (% change)
- How has your neuropathy changed since your last treatment? (% change)
- How has your sleep quality (including sleep pattern) changed since your last treatment? (% change)
- How has your vision changed since your last treatment? (% change)
- To what degree has your overall health changed since your FIRST treatment? (% change)

All the aforementioned measures were assessed at baseline and at each treatment session, and entered by the NP on the patient intake form. All data were subsequently abstracted into the analytic data set.

## IRB Approval

The Institutional Review Board of the academic institution determined that ethical approval for this study was not required in accordance with local legislation and national guidelines, as no individually identifying information was available to the research team.

## Statistical Modeling

Separate ordinary least squares regression models were run for the change in each outcome of interest (HbA1c, LDL cholesterol, triglycerides, total cholesterol, eGFR, vibratory sensation, and multiple self-reported health questions), comparing each patient's value at time of final (or most recent) treatment vs. the patient's baseline measures. Patient encounters that were missing data were omitted from the regression, and Table 2 includes the number of patients with complete data included in each model (out of a total of 60 patients with lab results). Due to the smaller number of subjects, we used $t$-tests to gauge

TABLE 1A | Baseline descriptive statistics—lab data (categorical variables).

| Variable | N (%) at baseline |
|---|---|
| **Sex** | |
| Male | 24 (40.0%) |
| Female | 36 (60.0%) |
| **Race** | |
| White | 56 (93.3%) |
| Black/African–American | 4 (6.7%) |
| **Age (at first encounter)** | |
| <45 years | 9 (15.0%) |
| 45–64 years | 34 (56.7%) |
| ≥65 years | 17 (28.3%) |
| **BMI category** | |
| Normal or overweight | 16 (26.7%) |
| Mild obesity | 24 (40.0%) |
| Severe obesity | 20 (33.3%) |
| **Diabetes type** | |
| Type 1 | 26 (43.3%) |
| Type 2 | 31 (51.7%) |
| Pre-diabetic | 3 (5.0%) |
| **HbA1c** | |
| Well-controlled (<7.0) | 16 (28.5%) |
| Fair-control (≥7.0, <9.0) | 24 (42.9%) |
| Poor-control (≥9.0) | 16 (28.5%) |

TABLE 1B | Baseline descriptive statistics, continuous variables.

| Variable | Mean | Minimum, Maximum |
|---|---|---|
| HbA1c | 7.6 | 5.6, 10.9 |
| eGFR | 87.4 | 19, 173 |
| LDL cholesterol | 98.9 | 39, 170 |
| Triglycerides | 240.1 | 72, 617 |
| Total cholesterol | 170.4 | 106, 258 |

APPX1176
INSU_PI_001455

**TABLE 2 |** Regression models—lab data (changes in outcome measures).

| Variable | HbA1c β (p-value) | LDL β (p-value) | Triglyceride β (p-value) | Total Cholest-erol β (p-value) | eGFR β (p-value) |
|---|---|---|---|---|---|
| Months in MII treatment | −0.038 (**p = 0.067**) | −0.291 (p = 0.534) | −3.115 (**p = 0.035**) | −0.440 (p = 0.390) | −0.045 (p = 0.801) |
| Male gender | −0.230 (p = 0.558) | −14.353 (p = 0.079) | 62.776 (**p = 0.013**) | 2.100 (p = 0.809) | −2.375 (p = 0.441) |
| Black/African American | −0.679 (p = 0.397) | −40.762 (**p = 0.020**) | 9.659 (p = 0.858) | −42.617 (**p = 0.029**) | 11.232 (p = 0.098) |
| **Age (at first encounter)** | | | | | |
| <45 years (vs. age 45–64) | 0.061 (p = 0.886) | 4.969 (p = 0.611) | −49.157 (p = 0.102) | 3.038 (p = 0.772) | −6.401 (p = 0.086) |
| ≥65 years (vs. age 45–64) | −0.129 (p = 0.795) | 2.873 (p = 0.790) | −35.029 (p = 0.308) | 2.957 (p = 0.807) | −5.552 (p = 0.198) |
| **BMI category** | | | | | |
| Mild obesity (vs. normal/overweight) | −0.460 (p = 0.259) | −7.07 (p = 0.444) | 2.689 (p = 0.925) | −2.743 (p = 0.787) | −0.672 (p = 0.853) |
| Severe obesity (vs. normal/overweight) | −0.136 (p = 0.757) | −1.178 (p = 0.906) | 14.180 (p = 0.648) | −2.323 (p = 0.832) | −6.349 (p = 0.113) |
| **HbA1c control category** | | | | | |
| Fair control (vs. good control) | −0.033 (p = 0.939) | N/A | N/A | N/A | N/A |
| Poor control (vs. good control) | −1.299 (**p = 0.017**) | N/A | N/A | N/A | N/A |
| Model $R^2$ goodness of fit statistic | 0.371 | 0.188 | 0.238 | 0.143 | 0.236 |
| Model F-statistic and p-value | 3.02 (**p = 0.007**) | 1.46 (p = 0.208) | 2.10 (p = 0.062) | 1.12 (p = 0.368) | 1.99 (p = 0.078) |
| Number of patients w/usable data | 56 | 52 | 55 | 55 | 53 |

Bold p-values indicate statistically significant coefficients.

the significance of differences between patients' continuous self-reported, subjective outcome measures before treatment vs. after final (or most recent) treatment. To test for non-linear relationships, we produced a scatter plot of HbA1c by weeks of MII treatment (Supplementary Figure 1). We also performed t-tests on the differences in self-reported, subjective measures between the baseline and the final treatments, and further stratified the statistics based on the categories of patients who only completed 1–5, 6–10, 11–15, or >15 treatments (Table 4). We used SAS University Edition version 2.8, to generate separate generalized linear models (GLM command) to identify statistically significant differences for each outcome variable between patients' first treatment and final treatment.

## RESULTS: LAB TEST DATA

Descriptive statistics for the Lab Test analyses are presented in Tables 1A,B. Most patients were age 45–64 (56.7%), though 15% were younger than 45, and 28.3% older than 64. Sixty percent were female. All but 4 were white (93.3%). Three were prediabetic, 26 Type 1, and 31 Type 2 diabetics. With respect to weight, 26.7% were normal or overweight, 40% were mildly obese, and 33.3% were severely obese.

HbA1c measures ranged from 5.6 to 10.9 with a mean of 7.6 (Table 1B) (the CDC defines A1c levels below 5.7 as

normal, 5.7–6.4 as pre-diabetic, and >6.4 as diabetic) 28.5% (16 patients) had well-controlled HbA1c; while 42.9% (24 patients) were moderately controlled (7.0 ≤ A1c < 9.0); and 28.5% (16 patients) had poorly controlled A1c (≥9.0) (Table 1A). Estimated glomerular filtration rates (eGFR) ranged from 19 mL/min/1.73 $m^2$ to 173 mL/min/1.73 $m^2$ with a mean of 87.4 mL/min/1.73 $m^2$ (the CDC defines eGFR levels >90 mL/min as normal, 30–90 as mild or moderate reductions in kidney function, and <30 ml/min as severe reduction in kidney function) LDL ranged from 39 to 170 mg/dLwith a mean of 98.9 mg/dL (the CDC defines LDL levels <100 mg/dL as normal) Triglycerides ranged from 72 to 617 mg/dL with a mean of 240.1 mg/dL (the CDC defines Triglyceride levels <150 mg/dL as normal) Total cholesterol ranged from 106 to 258 mg/dL with a mean of 170.4 mg/dL (the CDC defines Total Cholesterol levels < 200 mg/dL as normal).

The results of each model for the Lab Test data are presented in Table 2. The primary explanatory variable of interest, the time variable for months of MII treatment, was associated with reductions in HbA1c levels by 0.038 A1c points per month, with a p-value of 0.067. This supported the hypothesis that MII can reduce triglycerides (p = 0.035), and HbA1c (p = 0.067) (Having poorly controlled HbA1c at baseline was also associated with reducing HbA1c). None of the other covariates had statistically significant associations in any of the models (Black/African–American race appears to be associated with lower LDL and Total Cholesterol levels, but there were only three African-Americans

APPX1177
INSU_PI_001456

in the data). The significance of the F-statistic and magnitude of $R^2$ coefficient indicate the model is a strong predictor of reduced HbA1c among the diabetic patients in the study.

## RESULTS: NEUROPATHY AND PATIENT-REPORTED DATA

Separately, descriptive statistics for the Neuropathy and Patient-Reported Data Set (hereafter referred to as "Subjective Data") are presented in Tables 3A,B. Twenty-six patients had these data in their charts, but no lab results data. Consequently, the Subjective Data had 86 patients, whereas the lab data had only 60. Patient ages ranged from 19 to 85 with a mean of 57. Fifty-two were female and 34 were male. All but five were white. Four were prediabetic and averaged 11 treatments per patient during the study period. Fifty-three were Type 1 and averaged 28.6 treatments per patient, and 29 were Type 2 diabetics and averaged 24.5 treatments each. Number of MII treatments per patient ranged from 1 to 262.

Patients were asked to self-report on 10 health status questions, and the clinic NP measured vibratory sensation in both feet using a 128 Hz clanging tuning fork (CTF). Patients reported a mean of 9.1 and 9.4 s of vibratory sensation in the left and right feet, respectively, with a range of 0–15 s. Patients reported averages of 7.29 and 7.22 on the "How are you feeling?" and "How is your overall health?" questions, respectively, with ranges of 1–10. On the "How is your diabetes-related level of pain?" and "How is that pain interfering with your Activities of Daily Living (ADLs)?" questions, patients' average responses were 4.8 and 4.72, respectively, with ranges of 0–10. Patients were asked to rate their overall percentage health improvement since beginning treatment. Assessed at each treatment encounter, responses indicated a 47.2% improvement, ranging from −25% to 120%. The final five patient self-reported measures and their mean percentage changes were: physical activity change (33.4%), energy change (34.5%), neuropathy change (38.7%), changes in sleep patterns or sleep quality (39.4%), and vision change (24.2%).

The results of the *t*-tests are presented below in Table 4, including pre-/post-treatment differences and the *p*-values of their differences to indicate statistical significance ($p < 0.05$ indicates significant differences).

Statistically significant improvements of 3–3.5 s were observed for the CTF vibratory sensation for the right and left feet, respectively. Patient self-reports of feeling better and experiencing improved overall health, 0.54 and 0.69, respectively (on a scale of 1–10), were also statistically significant. Lastly, patients reported a statistically significant improvement, >25%, since beginning the MII treatment.

## DISCUSSION

We aimed to study relationships between patients' number of weeks in MII treatment (changes between baseline and last or most recent treatment) and their associated HbA1c, triglycerides, neuropathy symptoms, and self-reported health. Overall, patients

experienced improvements in both lab values and self-reported measures the longer they were in treatment. Table 4 showed short-term reductions in self-reported health scores, and the NP and clinic medical director posited that patients' reports of how they are feeling, diabetic-related pain and overall health may worsen in the short-run as neuropathy symptoms diminish,

**TABLE 3A |** Descriptive statistics—self-report/subjective data (categorical variables).

| Variable | N (%) |
|---|---|
| **Sex** | |
| Male | 34 (39.5%) |
| Female | 52 (60.5%) |
| **Race** | |
| White | 81 (94.2%) |
| Black/African-American | 5 (5.8%) |
| **Age (at first encounter)** | |
| <45 years | 11 (12.8%) |
| 45 to 64 years | 47 (54.7%) |
| ≥65 years | 27 (31.4%) |
| **BMI category** | |
| Normal or overweight | 16 (18.6%) |
| Mild obesity | 24 (27.9%) |
| Severe obesity | 19 (22.1%) |
| **Diabetes type** | |
| Type 1 | 53 (61.6%) |
| Type 2 | 29 (33.7%) |
| Pre-diabetic | 4 (4.6%) |
| **HbA1c** | |
| Well-controlled (<7.0) | 16 (18.6%) |
| Fair-control (≥7.0, <9.0) | 22 (25.6%) |
| Poor-control (>9.0) | 15 (17.4%) |
| (missing data) | 33 (38.4%) |

**TABLE 3B |** Descriptive statistics—self-report/subjective data (continuous variables).

| Variable | Mean | Minimum, Maximum |
|---|---|---|
| Age (years) | 57 | 19, 85 |
| Total # of MII treatments per patient | 24.7 | 1, 262 |
| How are you feeling? | 7.29 | 1, 10 |
| How is your overall health? | 7.22 | 1, 10 |
| How is your diabetes-related pain? | 4.80 | 1, 10 |
| Diabetes pain interference w/ ADLs? | 4.72 | 1, 10 |
| Vibratory sensation—right foot (seconds) | 9.37 s | 0, 15 |
| Vibratory sensation—left foot (seconds) | 9.13 s | 0, 15 |
| Overall improvement since starting MII? | 47.2% | −25, 120% |
| Physical activity change? (since last treatment) | 33.4% | −65, 200% |
| Energy change? (since last treatment) | 34.5% | −65, 100% |
| Neuropathy change? (since last treatment) | 38.7% | −40, 100% |
| Sleep pattern/quality change? (since last treatment) | 39.4% | −50, 100% |
| Vision change? (since last treatment) | 24.2% | −10, 100% |

APPX1178

INSU_PI_001457

**TABLE 4 |** $T$-tests: significance of pre-/post-differences in outcome measures—patient-reported/subjective data.

| Variable | Overall pre-/post: last visit vs. baseline | Categorized: 1–5 visits vs. baseline | Categorized: 6-10 visits vs. baseline | Categorized: 11–15 visits vs. baseline | Categorized: 16–30 visits vs. baseline |
|---|---|---|---|---|---|
| Vibratory sensation—right foot (seconds) | 2.99 **($p < 0.001$)** | 2.67 | 1.86 | 1.27 | 4.32 |
| Vibratory sensation—left foot (seconds) | 3.46 **($p < 0.001$)** | 3.67 | 1.29 | 2.43 | 4.00 |
| How are you feeling? | 0.54 **($p = 0.011$)** | −0.45 | 1.18 | 0.50 | 0.79 |
| How is your overall health? | 0.69 **($p < 0.001$)** | −0.34 | 0.18 | 0.67 | 1.29 |
| How is your diabetes-related pain? | −0.52 ($p = 0.131$) | 0.00 | −0.85 | 0.33 | −0.33 |
| Diabetes pain interference w/ADLs? | 0.01 ($p = 0.977$) | −1.00 | −0.70 | 0.57 | −1.05 |
| Overall improvement since starting MII?* | 25.38% **($p < 0.001$)** | 7.17% | 6.15% | 23.91% | 38.88% |
| Physical activity change? (since last treatment) | NS | NS | NS | NS | NS |
| Energy change? (since last treatment) | NS | NS | NS | NS | NS |
| Neuropathy change? (since last treatment) | NS | NS | NS | NS | NS |
| Sleep pattern/quality change? (since last treatment) | NS | NS | NS | NS | NS |
| Vision change? (since last treatment) | NS | NS | NS | NS | NS |

*MII, Microburst Insulin Infusion therapy. Bold p-values indicate statistically significant coefficients.

sensation returns, and they begin to experience pain again. Our generalized linear models show HbA1c declining approximately 0.038 A1c points per month, and triglyceride levels declining ~3 mg/dl per month in MII therapy. This finding is in line with, and potentially higher than the ~4–12% reductions observed over 1–4 years in other studies, including results from studies of metformin or metformin plus additional drugs [15], sulphonylureas [16], TZD drugs [17], and inhaled insulin [18]. Vibratory sensation measures also improved, as did patients' self-reported measures of how they were feeling, and their overall health also improved at statistically significant levels. These findings are also in line with results published over the past 10–20 years, including those of Elliott et al. [11] [8–13, 19–23].

## Previous Research

Our findings were consistent with some of the earlier research on PII generally, or MII more specifically. Multiple studies supported the hypothesis that pulsed insulin infusions could be more efficacious than continuous insulin infusion [8, 9, 20–22]. Our results were also consistent with the findings of the systematic literature review by Dong et al. [10] and Elliott et al. [11], we also found improvements in neuropathy [10, 11]. However, most studies of MII have focused on metabolic measures estimated from patients' respiratory $O_2$ and $CO_2$ [10, 11]. We focused on the lipid, HbA1c, eGFR, neuropathy measures, and patient self-reported health screening questions more commonly used in ambulatory care clinics globally. Our study is differentiated by incorporating the differences between MII and earlier pulsatile insulin infusion approaches, longer period of study (up to 3 years), a relatively large sample size, stronger methodology, and focus on clinical measures

more commonly used by clinicians treating diabetics. Taken together, these differentiating factors make the current research an important addition to the body of literature on diabetes care.

## Strengths

This is one of the few studies to empirically study the efficacy of the MII treatment for diabetes in a population large enough to permit statistically valid inferences. With multiple waves of data on over 80 patients, this is one of the most extensive quantitative studies of microburst insulin infusion therapy conducted to date, with protocols more uniformly implemented and survey instruments more consistently administered by the same clinical team. Consistent with our hypotheses, we found statistically significant improvements in HbA1c, triglycerides, neuropathy, and 3 self-reported patient survey measures of health and well-being, supporting the hypothesis that the MII therapy is efficacious in treating diabetic patients, particularly those with complications like neuropathy. This study is also one of the few to implement surveys of patients' self-reported health and quality of life. Like the findings of Dong et al. [10] and Elliott et al. [11], patients reported significantly improved health after the 12-week course of treatment, and frequently even longer-term.

## Limitations

While this study is pioneering, it has inherent limitations. Our hypothesis was that MII would show early indications of potential efficacy, using solely existing chart data for patients served from February 2017 through December 2019. Given frequent contact with patients over time, the Hawthorne effect and regression to the mean may have impacted results. In the current retrospective cohort study context, we were not able to include a control group,

APPX1179

INSU_PI_001458

Howard et al.                                                                    Microburst Insulin Infusion Efficacy Evaluation

and the *t*-tests and regression models effectively used subjects as their own controls over weeks of time in treatment. Sample size is also a concern. While this is one of the largest studies yet conducted on the MII treatment, statistical power was reduced, limiting our options for statistical modeling. This may also have contributed to lack of statistical significance of the findings for low-density lipids (LDL cholesterol) and estimated glomerular filtration rate (eGFR), measures we expected to improve with time in treatment.

The CDC estimates over 30 million Americans have diabetes, and the WHO estimated the global count at over 400 million in 2014 and identify the disease as a major cause of heart disease, stroke, blindness, and amputations (2, 3, 24, 25). In 2017, diabetes-related costs of care were ~$10,000 per diabetic patient, with the disease imposing billions of dollars in indirect costs just in the U.S. alone (25). Better managing the degenerative effects of diabetes would not only decrease pain and suffering of patients, but could also save trillions of dollars in direct and indirect costs worldwide.

Given the promising preliminary findings of this retrospective study, further research is warranted. The research team plans a second phase of the study to compare MII results observed to-date with results observed among a retrospective cohort of diabetic patients managed through traditional lifestyle modification (diet and exercise) treatment protocols at their affiliated academic medical center. If that study shows comparatively superior outcomes, a multi-center, prospective clinical trial should be pursued. Given the advances in insulin infusion therapy brought by MII, and early indications of its efficacy, the time is right for more in-depth studies of the outcomes patients can achieve, the physiological mechanisms by which they occur, MII's comparative effectiveness vis-à-vis traditional treatments, and cost-effectiveness.

## DATA AVAILABILITY STATEMENT

The raw data supporting the conclusions of this article will be made available, subject to approval by the clinic leadership.

## ETHICS STATEMENT

The studies involving human participants were reviewed and approved by the Saint Louis University Institutional Review Board. Written informed consent for participation was not required for this study in accordance with the national legislation and the institutional requirements. Data were provided de-identified to the researchers, and the study was deemed exempt.

## AUTHOR CONTRIBUTIONS

SH and ZZ managed the entirety of the study. JL and WL provided valuable assistance with literature review, data entry, and writing. ZQ, JT, and RB provided important subject matter consultation, advice on study design, and contributed to the writing process. All authors contributed to the article and approved the submitted version.

## SUPPLEMENTARY MATERIAL

The Supplementary Material for this article can be found online at: https://www.frontiersin.org/articles/10.3389/fpubh.2021.600906/full#supplementary-material

## REFERENCES

1. Saeedi P, Petersohn I, Salpea P, Malanda B, Karuranga S, Unwin N, et al. Global and regional diabetes prevalence estimates for 2019 and projections for 2030 and 2045: results from the International Diabetes Federation Diabetes Atlas. *Diabetes Res Clin Pract*. (2019) 157:107843. doi: 10.1016/j.diabres.2019.107843
2. World Health Organization. *Diabetes Fact Sheet*. (2020). Available online at: https://www.who.int/news-room/fact-sheets/detail/diabetes
3. Centers for Disease Control and Prevention. *National Diabetes Statistics Report*. Atlanta, GA: Centers for Disease Control and Prevention, U.S. Dept of Health and Human Services. (2020). Available online at: https://www.cdc.gov/diabetes/pdfs/data/statistics/national-diabetes-statistics-report.pdf (accessed June 25, 2021).
4. American Diabetes Association. 2. Classification and diagnosis of diabetes: standards of medical care in diabetes-2020. *Diabetes Care*. (2020) 43(Suppl. 1):S14–S31. doi: 10.2337/dc20-S002
5. Hicks CW, Selvin E. Epidemiology of peripheral neuropathy and lower extremity disease in diabetes. *Curr Diab Rep*. (2019) 19:86. doi: 10.1007/s11892-019-1212-8
6. Wahren J, Kallas Å. Loss of pulsatile insulin secretion: a factor in the pathogenesis of type 2 diabetes? *Diabetes*. (2012) 61:2228–9. doi: 10.2337/db12-0664
7. Matveyenko AV, Liuwantara D, Gurlo T, Kirakossian D, Dalla Man C, Cobelli C, et al. Pulsatile portal vein insulin delivery enhances hepatic insulin action and signaling. *Diabetes*. (2012) 61:2269–79. doi: 10.2337/db11-1462
8. Matthews DR, Naylor BA, Jones RG, Ward GM, Turner RC. Pulsatile insulin has greater hypoglycemic effect than continuous delivery. *Diabetes*. (1983) 32:617–21. doi: 10.2337/diab.32.7.617
9. Komjati M, Bratusch-Marrain P, Waldhäusl W. Superior efficacy of pulsatile versus continuous hormone exposure on hepatic glucose production *in vitro*. *Endocrinology*. (1986) 118:312–9. doi: 10.1210/endo-118-1-312
10. Dong S, Lau H, Chavarria C, Alexander M, Cimler A, Elliott JP, et al. Effects of periodic intensive insulin therapy: an updated review. *Curr Ther Res*. (2019) 90:61–7. doi: 10.1016/j.curtheres.2019.04.003
11. Elliott J, Zaias N, Escovar S, Deguzman L, Counce D, Dixit R. Microburst insulin infusion: results of observational studies-carbohydrate metabolism, painful diabetic neuropathy, and hospital/emergency department utilization. *J Diabetes Metab Disord Control*. (2017) 4:116–21. doi: 10.15406/jdmdc.2017.04.00118
12. Aoki TT, Benbarka MM, Okimura MC, Arcangeli MA, Walter Jr RM, Wilson LD, et al. Long-term intermittent intravenous insulin therapy and type 1 diabetes mellitus. *Lancet*. (1993) 342:515–8. doi: 10.1016/0140-6736(93)91645-3
13. Aoki TT, Grecu EO, Arcangeli MA, Benbarka MM, Prescott P, Ahn JH. Chronic intermittent intravenous insulin therapy: a new frontier in diabetes therapy. *Diabetes Technol Ther*. (2001) 3:111–23. doi: 10.1089/15209150175020073
14. Oyer DS, Saxon D, Shah A. Quantitative assessment of diabetic peripheral neuropathy with use of the clanging tuning fork test. *Endocr Pract*. (2007) 13:5–10. doi: 10.4158/EP.13.1.5

APPX1180

INSU_PI_001459

Howard et al.                                                                                                    Microburst Insulin Infusion Efficacy Evaluation

15. Viollet B, Guigas B, Sanz Garcia N, Leclerc J, Foretz M, Andreelli F. Cellular and molecular mechanisms of metformin: an overview. *Clin Sci (Lond).* (2012) 122:253–70. doi: 10.1042/CS20110386

16. Inzucchi SE, Majumdar SK. Current therapies for the medical management of diabetes. *Obstet Gynecol.* (2016) 127:780–94. doi: 10.1097/AOG.000000000001332

17. Gastaldelli A, Ferrannini E, Miyazaki Y, Matsuda M, Mari A, DeFronzo RA. Thiazolidinediones improve β-cell function in type 2 diabetic patients. *Am J Phys Endocrinol Metab.* (2007) 292:E871–E83. doi: 10.1152/ajpendo.00551.2006

18. Cefalu WT, Skyler JS, Kourides IA, Landschulz WH, Balagtas CC, Cheng SL, et al. Inhaled human insulin treatment in patients with type 2 diabetes mellitus. *Ann Intern Med.* (2001) 134:203–7. doi: 10.7326/0003-4819-134-3-200102060-00011

19. Aoki TT, Grecu EO, Arcangeli MA. Chronic intermittent intravenous insulin therapy corrects orthostatic hypotension of diabetes. *Am J Med.* (1995) 99:683–4. doi: 10.1016/S0002-9343(99)80257-5

20. Paolisso G, Sgambato S, Torella R, Varricchio M, Scheen A, D'onofrio F, et al. Pulsatile insulin delivery is more efficient than continuous infusion in modulating islet cell function in normal subjects and patients with type 1 diabetes. *J Clin Endocrinol Metab.* (1988) 66:1220–6. doi: 10.1210/jcem-66-6-1220

21. Paolisso G, Sgambato S, Gentile S, Memoli P, Giugliano D, Varricchio M, et al. Advantageous metabolic effects of pulsatile insulin delivery in noninsulin-dependent diabetic patients. *J Clin Endocrinol Metab.* (1988) 67:1005–10. doi: 10.1210/jcem-67-5-1005

22. Jakobsen J, Christiansen JS, Kristoffersen I, Christensen CK, Hermansen K, Schmitz A, et al. Autonomic and somatosensory nerve function after 2 years of continuous subcutaneous insulin infusion in type I diabetes. *Diabetes.* (1988) 37:452–5. doi: 10.2337/diabetes.37.4.452

23. Dailey GE, Boden GH, Creech RH, Johnson DG, Gleason RE, Kennedy FP, et al. Effects of pulsatile intravenous insulin therapy

24. Centers for Disease Control and Prevention. *National Diabetes Statistics Report.* Atlanta, GA: Centers for Disease Control and Prevention, U.S. Dept of Health and Human Services. (2020). Available online at: https://www.cdc.gov/diabetes/data/statistics-report/index.html (accessed June 25, 2021).

25. American Diabetes Association. Economic costs of diabetes in the U.S. in 2017. *Diabetes Care.* (2018) 41:917–28. doi: 10.2337/dci18-0007

on the progression of diabetic nephropathy. *Metab Clin Exp.* (2000) 49:1491–5. doi: 10.1053/meta.2000.17700

**Conflict of Interest:** SH previously consulted on a clinical improvement and strategic planning project with Mitokon Health Center, the St. Louis clinic from which the de-identified data were obtained.

The remaining authors declare that the research was conducted in the absence of any commercial or financial relationships that could be construed as a potential conflict of interest.

**Publisher's Note:** All claims expressed in this article are solely those of the authors and do not necessarily represent those of their affiliated organizations, or those of the publisher, the editors and the reviewers. Any product that may be evaluated in this article, or claim that may be made by its manufacturer, is not guaranteed or endorsed by the publisher.

*Copyright © 2021 Howard, Zhang, Linomaz, Lam, Qian, Thurman and BeLue. This is an open-access article distributed under the terms of the Creative Commons Attribution License (CC BY). The use, distribution or reproduction in other forums is permitted, provided the original author(s) and the copyright owner(s) are credited and that the original publication in this journal is cited, in accordance with accepted academic practice. No use, distribution or reproduction is permitted which does not comply with these terms.*

APPX1181

INSU_PI_001460

| | |
|---|---|
| **From:** | Glenn Massey |
| **Sent:** | Monday, February 28, 2022 8:35 PM CST |
| **To:** | Shawn Calvit |
| **Subject:** | TRINA RESPONSE / VARIOUS-Well Cell Global - Physiologic Insulin  Resensitization (PIR) |
| **Attachments:** | Article-Dynamic Diabetes Solutions Pulse Insulin Resensitization (PIR) Published Medical & Clinical Research-Dr. Loveridge 08.13.2021.pdf, Article-Improved Kidney Function Following Physiologic Insulin Resensitization (PIR) Treatment Modality Case Series-Dr. Villaverde 07.30.21.pdf, Article-Reversal of Diabetic Neuropathy Utilizing Physiologic Insulin Resensitization (PIR)-Dr. Loveridge 07.20.2021.pdf, One-Page Summary 04.22.21.pdf, Paper- Insulin Resistance Physiology-Satin-04.22.21.pdf, Paper-Chronic Intermittent IV Insulin Therapy-Nephropathy-Dr. Aoki-04.22.21.pdf, Receptor Story Summary-04.22.21.pdf, PatentExcerpt2017Kit.pdf, Patent2Excerpt.pdf, image001.png, image002.png, image003.png, image004.png, image005.png, image007.png |

To:
Shawn Calvit
Insulinic Inc.

From:
Glenn Massey
Chief Growth Officer
Well Cell Global

Shawn,
STOCK RESPONSE
I feel that we owe you a formal response to the Trina and OVIT information. It will be something you may encounter from time to time.

My name is Glenn Massey, I currently hold the position of Chief Growth Officer for Well Cell Global. I have been associated with Diabetes Relief LLC now Well Cell Global for over 6 years (since 2016).

During my association with the company, we have faced many obstacles, as you can imagine, trying to roll out an amazing technology in a world of medical dogma and "I have never heard of this before".

Challenges in order of magnitude since our inception have been:

1. The PIR science
2. Research
3. Billing for the modality
4. Financing
5. Trina

After opening over 74 Licensee locations worldwide with 123 on the drawing board to open in 2022 we still get pushback on the 1,2,3,4. Number 5 not so much anymore as outcomes improve and our research, billing and financing strategies continue to be successful.

The primary goal of this communication is to address your concerns with respect to the information circulating on the internet around Mr. Ford Gilbert and Trina. To be 100% clear, our company Diabetes Relief LLC/Well Cell Global has nothing to do with Ford Gilbert and his company Trina (now defunct). Nevertheless, ever so often, we still must explain that we are not Trina, nor associated with Mr. Gilbert (Trina's embattled X-CEO).

I dug out my old slides and pieced this response together for you. Some of the information may be outdated but will give you context:

Trina background:

4:22-CV-03062
Injunction Hearing

**EX 31**

DEFS "INSULINIC"

## IV Pulsatile Insulin – Background Part 1 

- ❑ The origin of the IV pulsatile insulin approach goes back decades with a broad spectrum of scientists and doctors from around the world

- ❑ Late 1970s Thomas Aoki MD, Assoc. Prof. of Harvard Medical School, worked on a precursor version of the approach while head of the Metabolism Section of Boston's Joslin Diabetes Center

- ❑ G. Ford Gilbert became involved with Dr. Aoki as his lawyer and through licenses of Dr. Aoki's protocol using various names and companies, all of which wound up in 14 years of litigation in several courts and an injunction against Gilbert in Nevada

- ❑ The current Aoki -Gilbert litigation began in 2011 and is set for trial on July 23, 2018, in the USDC, Eastern District of California, before Judge Troy Nunley

- ❑ Documents on file in that litigation detail the history between Dr. Aoki and Ford Gilbert and are open to public research (Case No. 2:11 -cv-02797-TLN-CKD)

- ❑ Gregory Ford Gilbert's federal court troubles continue, and he has now been indicted in a serious criminal matter involving bribery in the Middle District of Alabama

Confidential · Copyright © H360 LLC 2018. All rights reserved.    1

## IV Pulsatile Insulin – Background Part 2 

### DR has <u>NO</u> connection or affiliation with Trina Health or Ford Gilbert

- ❑ Founders of Diabetes Relief (DR) interacted with Gilbert several years ago but came to question his honesty, character, and business ethics and dealings, so they immediately moved in a different direction

- ❑ After consulting with highly respected and experienced medical professionals, they formed Diabetes Relief LLC in Jan 2015 and proceeded to develop and patent the procedures they use today through licensees

- ❑ DR's licensed facilities are open across the US and the world

- ❑ Patients consistently report successful outcomes of DR's (PIR) treatment

- ❑ DR is moving forward with a double -blind, randomized, clinically controlled, multi -center, multinational study of DR's processes and procedures

Confidential · Copyright © H360 LLC 2018. All rights reserved.    2

It's sad, because comparing the two companies/technologies is like comparing an I-Phone to a rotary telephone:

1. Patents are completely different
2. Hardware and Technology completely different
3. Training and protocols completely different
4. Billing completely different

5. Research strategy completely different

6. Outcomes completely different

The back story on our story started several years ago when we were approached by our X-partner about investing in Trina Clinic. Our X-partner was a 38-year type 2 diabetic and had heard about Trina, a company located on the fifth floor of the very same building our inaugural clinic is currently located. Our X-partner became a Trina Patient and was being administered "Trina Oivit infusion" protocols.  We were intrigued about the possibilities of helping Diabetic Patients and decided to investigate possibly owning a Trina Franchise.  After doing our due diligence we decided against moving forward for the following reasons:

- The Trina franchise price of $500,000 was too expensive
- Our medical advisors were skeptical that the science was proper
- Improper billing practices
- Lack of Physician over site

Based on the above findings we formed our own Pulse Insulin Resensitization PIR strategy Licensing model. We embarked on assembling a team of science and medical professionals to work on the new project. See below our Medical & Scientific Advisory Board responsible for developing our patented PIR protocols and developing the research strategy that we currently employ.



We completed two patents, one in 2017 & one in 2020 and currently have submission documents on eight subsequent patents all within a long-term patent strategy. **Patent Excerpts attached.**

See below and attached several **Key Video Links** and supporting articles published by our team with many more to come.

**Key Video Links:**

- Modality Webinar (CMO - Brian Loveridge, M.D.)
    - https://diabetes-relief.s3.amazonaws.com/DiabetesRelief-AutomatedWebinar.mp4
- Diabetics Patient Testimonial
    - https://youtu.be/0QOvaWCj9zU
- Parkinson's Patient (Before and After)

- o https://youtu.be/hZoT5pzR53c
- Diabetes Relief Animated Commercial
    - o https://www.youtube.com/watch?v=nz6q670ehaE

**Attachments:**

- **Article - Dynamic Diabetes Solutions Pulse Insulin Resensitization (PIR) -**Published Medical & Clinical Research-Dr. Loveridge 08.13.2021

- **Article - Improved Kidney Function Following Physiologic Insulin Resensitization (PIR) Treatment Modality-**Dr. Villaverde 07.30.21

- **Article - Reversal of Diabetic Neuropathy Utilizing Physiologic Insulin Resensitization (PIR) Case Series-**Dr. Loveridge 07.20.2021

- **One-Page Summary-** 04.22.2021(This is a 1-page invitation and overview for Doctors that includes numerous study references)

- **Paper-Insulin Resistance Physiology-**Satin 04.22.21

- **Paper-Chronic Intermittent IV Insulin Therapy-Nephropathy-**Dr. Aoki- 04.22.21

- **Receptor Story Summary-** (Simple physiologic summary of the mechanisms of action) 04.22.2021

- **CPT Codes-** recommended by our biller since 2016

- **Patent Excerpts**



Year to date we have done over 150k infusions worldwide and have demonstrated substantial cost savings under a Humana Global Risk Provider program in Florida. You will see and learn more tomorrow.

Our company has been growing steadily and we have been receiving reimbursements from Medicare and other insurers for **our PIR** treatments to our patients, we have won all appeals, and we have never experienced any chargebacks.

With no CMS CPT code designated to our modality we find ourselves in the same position Dialysis was over 30 years ago. We use a bundle of codes that are used every day within a practice. These codes coupled with a Letter of Medical Necessity has given us a 98.7% payment rate on claims we have submitted.

ONE EXAMPLE-Well Cell Support Licensee, Dr. Allison Key, **https://www.316healthcare.us/** , from 7/26/21 to 10/29/21 billed 548 patient PIR treatments. Of these 548 PIR Treatments, approximately 80% of the treatments were commercial insurance claims "Blue Cross, United Healthcare" patients initial treatment EOBs were $520 on average, and the continued treatments for the patient were $380 average. As discussed, Dr. Key's staff provides excellent Medical Necessity determination and Progress Notes in each patient claim file. Dr. Key started with 4 chairs in June of 2021 and has grown into a dedicated PIR 12 chair infusion suite that opened in Dec 2021. We trained her 8th "PIR Infusion Pilot" the week of January 3rd, 2022.

Dr. Key is available by phone for a "Peer to Peer" call if necessary.

PIR outcomes speak for themselves:



# Physiologic Insulin Resensitization

**Improvement in Complications of Diabetes**

- **95%** Reported improved neuropathy
- **76%** Improvement in at least one diabetic complication
- **24%** Maintained status and did not get worse
- **63%** Reported HbA1c reduction
- **41%** Reduced Diabetic medications



Data from the Schull Institute — Insulin Infusion Therapy on Diabetic Complications (Oct 27, 2015)

**Improved Painful Diabetic Neuropathy (PDN)**

- **93%** Elimination or significant reduction in pain scores

**Reduction in Health Care Utilization**

- **96%** Reduction in Admits: 1.7/1,000/yr vs. 46.7/1000/yr
- **96%** Reduction in ER Visits: 2.2/1,000/yr vs. 58.4/1000/yr

Data from Effects of Periodic Intensive Therapy, j.curtheros.2019.04.003.

**Arrest in progression of chronic kidney disease (CKD)**

- **CrCl Unchanged** from 46.1 to 46.0 mL/min per 1.73 m2 at the end of the observation period (1 -3 years)
- **Halted Decline** of diabetic nephropathy



- **HbA1c Declined** from 8.6 to 7.6 during the study

Data from Treatment of Diabetic Nephropathy, Aoki, et al.

**Island Doctors Results (after 3 -6 months)**

- **52%** Showed weight reduction
- **67%** Showed lower HbA1c (1 patient from 11.8 to 8.2)
- **62%** Showed improved EGFR (1 patient from 19 to 42)
- **57%** Showed LDL reduction
  - 8 of 21 reduced over 30%
  - 3 of 21 reduced over 50%



Island Doctors 21 patient sample, Oct 23, 2020

Revision-11,18,20

Confidential- Unauthorized Distribution ProhibitedCopyright © WELL CELL GLOBAL LLC 2021. All rights reserved

In short – Well Cell Global offers a patented adjunct infusion modality that administers insulin in a bio-identical way to the body's way of physiologically secreting the insulin peptide hormone.

Said differently, this approach administers insulin as a hormone vs. a drug, which gives physicians an innovative tool to achieve all the benefits of Insulin they are looking for; however, through our individualized precision dosing, providers have the ability to avoid the number one side effect of using insulin… Insulin Resistance. In fact, one of our objective clinical outcome measures is reversing insulin resistance.

Hope this helps.

Respectfully,

**Glenn Massey**
Chief Growth Officer/Executive Board Member



**M:**  +1 (713) 582-0449
**O:**  +1 (888) 991-1012
**W:**  wellcellglobal.com

This transmission may be strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy, or disseminate this information. If you are not the intended recipient, please contact the sender at (832-599-9552), or by reply email, and destroy all copies of the original message. Unauthorized interception of this e-mail is a violation of federal criminal law. This communication does not reflect an intention by the sender or the sender's principal to conduct a transaction or make any agreement by electronic means.



## Deliver Better Outcomes & Reduce Healthcare Costs

### Physiologic Insulin Resensitization

Physiologic insulin resensitization has been studied extensively in scientific and pre- clinical settings.[1-6]

The published literature features many studies showing that type 2 diabetes results from dysfunctional insulin secretions, and restoration of these hormone signals has significant clinical benefits, including improved glycemic control, reduction in painful diabetic neuropathy, and delayed progression of diabetic nephropathy.[7-10]

Many of the studies are retrospective or observational with a few being prospective; therefore, Well Cell Global is engaged in several significant prospective studies to further validate the positive clinical outcomes we see on a daily basis using this protocol. The ultimate goal is to help patients combat the complications of diabetes while becoming a standard of care adjunct in diabetes management.

### For more information, please contact:





www.wellcellglobal.com

### About Well Cell Global & Our Patented Approach

Well Cell Global offers a groundbreaking multi-patented modality to clinicians called Physiologic Insulin Resensitization where insulin is administered as a hormone rather than a drug; addressing the primary cause of Diabetes which is metabolic failure. More than 70,000 treatments have been administered to patients, both internationally and domestic, with diabetes and other metabolic disorders since its inception, with a remarkable safety record and outstanding clinical outcomes.

Well Cell Global fosters clinical and scientific advancements through global data aggregation to be utilized in multi-centered, case-controlled, prospective studies, in order to better inform physicians everywhere of this process of physiologic insulin administration and its amazing reductions in diabetic complications and costs.

We are looking for qualified clinicians to help us in confronting the diabetes epidemic and improving patient outcomes using this physiologic approach.

### Studies / References

[1] Disordered insulin secretion in the development of insulin resistance and Type 2 diabetes. 2012 Schofield CJ, Sutherland C

[2] Abnormal patterns of insulin secretion in non-insulin-dependent diabetes mellitus. 1988 Polonsky KS, et al

[3] Association between insulin secretory pulse frequency and peripheral insulin action in NIDDM and normal subjects. 1996 Hunter, et al

[4] Impaired pulsatile secretion of insulin in relatives of patients with non-insulin-dependent diabetes. 1998 O'Rahilly S, et al.

[5] Pulsatile portal vein insulin delivery enhances hepatic insulin action and signaling. 2012 Matveyenko AV

[6] Disordered insulin secretion in the development of insulin resistance and Type 2 diabetes. 2012 Schofield CJ, Sutherland C

[7] Effects of pulsatile intravenous insulin therapy on the progression of diabetic nephropathy. 2000, Dalley et al.

[8] Effect of Intensive Insulin Therapy on Progression of Overt nephropathy in Patients with Type 1 Diabetes Mellitus. 2000 Aoki, et al.

[9] Pulsatile insulin secretion, impaired glucose tolerance and type 2 diabetes. 2015, Satin, et al.

[10] Insulin Infusion Therapy on Diabetic Complications. 2015, Schull Institute.

APPX1188

INSU_PI_001469



11511 Katy Freeway, Suite 102
Houston, TX 77079
wellcellglobal.com
+1 (888)991-1012

    

# Insulin Resistance: A Receptor Story

Diabetes and other metabolic disorders have reached epidemic proportions. "Insulin resistance" – a pathologic condition in which cells fail to respond normally to insulin – is at the core of metabolic dysfunction. To achieve insulin resensitization, we use the physiologic insulin resensitization modality to overcome insulin resistance at the cellular insulin receptor level--in essence, bio-mimicking normal physiology.

1) Insulin is released from the pancreas in a physiologic cyclical pattern, a fact known for decades.

2) Insulin oscillations are mediated, in part, by firing of a pancreatic neuronal network that connects beta cells (Islets of Langerhans).

3) An insult (auto-immune, obesity, toxin, trauma, stress etc.) causes inflammation in the pancreas that disrupts pancreatic insulin rhythmicity.

4) When this physiologic pattern is impaired, a relative hyperglycemia results; pancreatic insulin secretion is dysregulated, and the loss of troughs results in relative hyperinsulinemia.

5) Hyperinsulinemia triggers a negative feedback loop and essentially functions as a toxin to insulin receptors; insulin receptors downregulate, refract, and unopposed glucagon decreases transcription of receptors.

6) **Inadequate receptor function is the phenotype of insulin resistance** and ultimately leads to metabolic disorders; genetics and/or differential receptor dysfunction determine the presenting symptoms, which most often include development of diabetes and many other metabolic disorders.

7) Peripheral precision administration of physiologic insulin intravenously (*i.e.* physiologic insulin resensitization) replaces these lost signals in an effort to re-sensitize receptors to insulin by bio-mimicking the normal pancreatic axis.

8) When exposed to a dynamic rhythm of bioidentically randomized physiologic insulin, receptors upregulate, and the ability to metabolize carbohydrates while decreasing fat metabolism inflammation is temporarily restored.

9) Binding of insulin to receptors facilitates the uptake of glucose into cells which can relieve hyperglycemia (if present); once inside the cell, glucose is readily processed (metabolized) through oxidative phosphorylation (TCA cycle) and other pathways to produce adenosine triphosphate (ATP), also known as cellular energy.

10) As cellular energy from carbohydrate metabolism becomes more readily available, energy-starved tissues can undergo growth and repair (cellular restoration). Neuronal tissues in particular are extremely sensitive to decreases in energy from carbohydrate metabolism.

      Copyright © Well Cell Global LLC 2020. All rights reserved.

APPX1189

INSU_PI_001470





**ISSN 2475-5451**

**Case Report**

*International Journal of Diabetes & Metabolic Disorders*

# Case Series: Reversal of Diabetic Neuropathy Utilizing Physiologic Insulin Resensitization

**Tori Tucker[1], Jennifer Hadley[2], Michael Alexander[3], Jonathan RT Lakey[3,4] and Brian Loveridge[5*]**

[1]*Department of Developmental and Cell Biology, University of California Irvine, Irvine, CA*

[2] *Well Cell Global, Ogden, UT*

[3]*Department of Surgery, University of California Irvine, Orange, CA*

[4] *Department of Biomedical Engineering, University of California Irvine, Irvine, CA*

[5]*Well Cell Global, Houston, TX*

*Corresponding author:*
Brian Loveridge, M.D., F.A.A.E.M. Diabetes Relief Utah, 2086 North 1700 West Suite D, Layton, Utah 84041.

**Submitted:** 09 July 2021; **Accepted:** 14 July 2021; **Published:** 20 July 2021

*Citation:* Tori Tucker, Jennifer Hadley, Michael Alexander, Jonathan RT Lakey, Brian Loveridge (2021) Case Series: Reversal of Diabetic Neuropathy Utilizing Physiologic Insulin Resensitization. Int J Diabetes Metab Disord 6(2): 160-163.

**Abstract**
*Diabetes is a growing global problem that is currently on the rise. Type 2 diabetes (T2D) is a chronic condition that results from aberrant B-cell function coupled with progressive insulin resistance. The majority of Type 2 diabetic patients develop diabetic neuropathy, which can lead to devastating complications (i.e., infection, ulceration, osteomyelitis, & amputation). The proinflammatory state of diabetes, along with prolonged hyperglycemia damages peripheral nerves (most common in the lower extremities). Additionally, compromised wound healing exacerbates the risk when skin breakdown occurs in this patient population. To overcome these risks for T2D, physiologic insulin resensitization (PIR) has been used as a novel protocol to treat patients with severe neuropathy symptoms. In our case study, we present two patients who initially experienced a loss of sensation in their extremities and decreased wound healing. Using PIR treatment, we demonstrate that both patients experienced neuropathy reversal and improved wound healing.*

**Keywords:** Diabetes, Insulin Sensitivity, Wound Healing, Neuropathy

## Introduction

Diabetes is a chronic disease that results in the inability to regulate glucose metabolism and affects more than 30 million Americans. Type 2 diabetes (T2D) is a condition that affects the way in which insulin is secreted, and carbohydrates are processed. In T2D, the β-cells of the pancreas no longer secrete insulin in a coordinated cyclical pattern, leading to progressive insulin resistance [1, 2]. This resulted from a multifactorial pathway, including increasing tolerance at the receptor level (due to a negative feedback loop); receptor lag (from asynchronous signals); and decreased insulin receptor expression (secondary to unopposed glucagon) [2, 3]. Neuropathy is a common side effect of T2D, often resulting in numbness, pain, increased risk of falls, infection and amputation [4, 5, 6].

Traditionally in T2D, severity of the insulin resistance and beta-cell function is calculated based on the homeostatic model assessment (HOMA) [7]. Currently, T2D can be treated by diet and exercise, and oral medications such as metformin that are used to

lower blood glucose and improve the body's response to insulin. As the incidence of T2D continues to rise, finding molecules to treat diabetes has become a growing challenge because many of the medications used by T2D patients can cause side effects. In severe cases with HOMA1-IR >2.5 or HOMA2-IR >1.8, exogenous insulin is needed to compensate for insufficient endogenous insulin to overcome the insulin resistance [7]. However, these treatments do not affect the underlying resistance to insulin.

These challenges have led to the development of a novel therapeutic protocol that bio mimics the body's own regulation of insulin to treat diabetes [8]. The development of physiologic insulin resensitization (PIR) uses precision dosing patterns of insulin that is consistent with normal hormone secretion and closely resembles the body's natural signaling pathway [9, 10, 11]. As the patient's insulin resistance improves, healthcare providers can titrate other medications to optimize treatment regimens further. PIR permits the ability to lower the dosing of subcutaneous insulin and other diabetic medications which most often promote the secretion of

**INSU_PI_001471**

insulin or inhibit glucose production [9, 10]. It is well established that progressive exposure to insulin can lead to worsening of insulin resistance [12, 13]. Using PIR treatment prevents the over-exposure of insulin receptors to toxic insulin levels.

In our case study we report on the improvement in diabetic neuropathy symptoms in two patients who received PIR treatment. Both patients have experienced a return of sensation in previous insensate extremities and improved wound healing. Additionally, both patients experienced a substantial decrease in the amount of insulin requirements to manage their blood glucose level.

## Consent Approval
All patients who underwent the PIR treatment have consented for anonymous inclusion of their health records in scientific publications.

## Case Report
## Patient 1
Patient 1 is a 73-year-old male who was diagnosed with T2D in 2002 (Table 1). The diagnosis was made after presenting to primary care physician (PCP) with polydipsia, polyuria, and extreme fatigue/muscle weakness at work. He presented to our clinic in November of 2018 with concerns regarding slow wound healing and neuropathy, referred by podiatrist. Diabetic complications included neuropathy, erectile dysfunction, hyperlipidemia, and hypertension. HbA1c results typically ranged 7-7.4% on 60 units Lantus daily, 60-65 units Novolog daily, and Glucophage 1000 mg daily. Neuropathy was described as numbness in the feet that had slowly progressed over the years. He developed his first foot ulcer in September of 2018 after unknowingly injuring his right great toe. He was seen by a podiatrist shortly thereafter and was officially diagnosed with diabetic neuropathy. Patient states, "I had no sensation whatsoever in my feet." He received wound care to the right great toe for 2-3 months. Decreased sensation in feet resulted in poor balance and multiple falls.

**Table 1: Improved Neuropathy with Physiologic Insulin Resensitization (PIR) Treatment**

| Patient Exam | Patient Cases | | | |
|---|---|---|---|---|
| | Patient 1 | | Patient 2 | |
| | Before Treatment | After Treatment | Before Treatment | After Treatment |
| Weight/BMI: | 253lbs/33.4kg/m² | 242lbs | 239lbs/37.44kg/m² | 206lbs/32.3kg/m² |
| A1c: | 6.6% | 6.5% | 9.9% | 7.1% |
| Lantus Dose: | 60 units | 28 units | 60 units | 20-30 units |
| Insulin Dose: | 60-65 units | 0 units (weaned off) | Sliding scale | Off completely |
| Neuropathy Symptoms: | Numbness, poor balance, foot ulcer, lack of sensation | Resensitization, wound healing, improved balance | Numbness, tingling, pain in feet, ulcer, slow wound healing, amputation to toes | Increased sensation, improved wound healing, discontinue Gabapentin |

Initial physical exam revealed an obese (253 lbs., BMI 33.4 kg/m2) male with a blood pressure of 158/86 mmHg and pulse of 57 bpm. Lower extremity exam showed 1+ pitting edema to the bilateral lower extremities and 2mm scabs to the tips of the 3rd-5th toes bilaterally. He had no sensation from the toes up to the level of the ankles bilaterally with monofilament testing. Laboratory testing revealed an HbA1c of 6.6% (normal < 6.5%); a vitamin D, 25-Hydroxy of 14.9 ng/mL (normal 30.0-100.00 ng/mL); and normal complete blood count, complete metabolic panel, urinalysis, lipid panel, TSH, c-peptide, magnesium, and vitamin B12. Prescribed medications included Lantus, Novolog, Glucophage, Aldactone, Cozaar, Lipitor, Plavix, Protonix, and Synthroid.

Within a few months of starting PIR treatments, patient began to experience improved sensation which started in the back of the heels and slowly worked its way up to the toes. Most recent monofilament testing showed reduced sensation rather than absent sensation. Patient states, "I can feel the bottom of my feet again." Balance has improved along with improved sensation in the feet and patient is no longer experiencing as many falls. Wounds that have developed since starting treatments have healed faster per patient report. He currently sees a podiatrist every 10 weeks for evaluation. He was completely weaned off Novolog within 7 months of starting treatment. Lantus dose has decreased from 60 units daily

to 28 units daily. Weight is down from 253 lbs. to 242 lbs, and his current HbA1c is 6.5%.

## Patient 2
Patient 2 is a 74-year-old female who was diagnosed with T2D in 1998 (Table 1). The diagnosis was made by routine exam with PCP. She presented to our clinic in March of 2018 with concerns regarding elevated blood sugars, weight gain, and slow wound healing. Diabetic complications included uncontrolled blood sugars, neuropathy (diagnosed in 2000), hypertension, stage 4 chronic kidney disease, impaired skin integrity, and foot ulcers. Her glycemic control had never been optimal despite a multiple-dose insulin regimen. Hemoglobin A1c results typically ranged 8-9%. Neuropathy was described as numbness, tingling, and pain that started in the feet and progressed upwards and into her ankles. Eventually, tingling and pain sensations subsided, and numbness predominated. She developed her first ulcer in 2018 after unknowingly injuring her left foot. Delayed treatment, due to delayed identification of the injury, and poor wound healing led to infection. She was treated with antibiotics, frequent wound care visits, a skin graft, and ultimately required an amputation of the tip of her left 2nd toe. She later developed additional ulcers, which led to the amputation of tip of the left 3rd and 4th toes. She was seen in the emergency room two times for complications related to diabetic ulcers and

APPX1191

INSU_PI_001472

was seeing her podiatrist one to two times per week for wound care.

Initial physical exam revealed an obese (239 lbs., BMI 37.44 kg/m2) woman with a blood pressure of 160/73 mmHg and pulse of 60 bpm. Lower extremity exam showed decreased sensation from the toes up to the level of the ankles bilaterally with monofilament testing. Laboratory testing revealed an HbA1c of 9.9% (normal < 6.5%); a serum creatinine of 2.07 mg/dL (normal 0.57-1.00 mg/dL); a GFR of 24 mL/min/1.73 (normal >59 mL/min/1.73); a vitamin D, 25-Hydroxy of 22.3 ng/mL (normal 30.0-100.00 ng/mL); and normal complete blood count, TSH, c-peptide, magnesium, and vitamin B12. Over-the-counter and prescribed medications included Lantus, Humalog, Tanzeum, Lasix, Coreg, Amlodipine, Benicar, Vitamin D3, Vitamin B Complex, Simvastatin, Prevalite, and Gabapentin.

Within a few weeks of beginning PIR, the patient began to develop increased sensation in her feet. With continued treatments, patient states, "I was able to feel the gas pedal while driving" and "I could feel it when I bumped my feet." Due to improved sensation, she was able to identify injuries to her feet when they occurred and was able to seek treatment earlier for any wounds that developed. Wound healing time also improved. Patient states, "My wounds were healing within weeks rather than months." Her most recent foot ulcer healed within one week without intervention. She currently sees a podiatrist every 60 days for evaluation and toenail clippings. She has required no further amputations for difficult wound infections. She was able to completely discontinue use of Gabapentin for neuropathy pain. Additionally, she has been able to reduce her daily lantus from 60 U/day to 25 U/day. She was able to discontinue her sliding scale Humalog completely. Most recent follow-up labs indicated stable kidney function and an improved HbA1c of 7.10%. Improvements in energy over the course of her treatments resulted in more motivation to increase physical activity. Current weight is down 33 lbs. from baseline (206 lbs., BMI 32.3 kg/m2).

## Discussion

The total economic cost of diabetes in the U.S. increased from $205 billion in 2007, to $327 billion in 2017, with Medicare spending $11 Billion in 2013 on dialysis alone. Amputations cost between $73,000 to $120,000 for hospital and follow up care [14]. In recent years, the US FDA has approved several diabetes drugs with novel mechanisms of action. However, the magnitude of such benefits to these drugs is limited in scope, and is further limited due to significant costs and material adverse GI side effects, which preclude many patients from tolerating these novel drugs [15, 16].

Over-aggressive HbA1c control have been shown to be counter-productive and harmful, because of the ensuing hypoglycemia. This included data from the landmark ACCORD trial that was terminated prematurely, because intensive HbA1C control led to increased morbidity and mortality. This led to American College of Physicians (ACP) new guideline targeting patients' HbA1c between 7-8%. This highlights the evolving challenges to current treatment of diabetes [17].

Given this dynamic landscape, an augmented approach to treating diabetes and other metabolic disorders is needed. As such, an ideal approach that utilizes insulin as a biologic agent to closely mimic normal physiology is warranted. This case study demonstrates the clinical benefits of PIR [8-10]. The cases presented show marked improvements in longstanding diabetic neuropathy, with meaningful objective measures noted by both the patients and clinical team. These improvements have resulted in greater mobility, functionality, and protective proprioception. To our knowledge, reversing longstanding diabetic neuropathy in this manner is a novel treatment success. Furthermore, these patients also experienced improvements in HbA1c, wound healing, obesity, and blood pressure control. These benefits were accomplished while being able to reduce reliance on pharmacologic agents as insulin sensitivity improved with the addition of PIR.

## Conclusion

We report in this case study that utilizing PIR as an adjunctive modality can reverse longstanding diabetic neuropathy, improve wound healing and several other important endpoints in diabetic management. As insulin sensitivity improves, many other positive clinical outcomes are demonstrated. When treating the underlying insulin resistance that progresses in the setting of type 2 diabetes, dramatic clinical improvements are possible with PIR. Our research team is aggressively pursuing larger case-controlled studies to demonstrate the clinical benefits possible by utilizing PIR as an adjunctive modality for this patient population.

## Declaration
### Funding
This manuscript was funded internally by Well Cell Global.

## Conflicting Interests

Brian Loveridge and Jennifer Hadley are employees of Well Cell Global, which performs PIR treatment.

## References

1. Lang DA, Matthews DR, Peto J, Turner RC (1979) Cyclic oscillations of basal plasma glucose and insulin concentrations in human beings. N Engl J Med 301: 1023-1027.

2. Hunter SJ, Atkinson AB, Ennis CN, Sheridan B, Bell PM (1996) Association between insulin secretory pulse frequency and peripheral insulin action in niddm and normal subjects. Diabetes 45: 683-686.

3. Satin LS, Butler PC, Ha J, Sherman AS (2015) Pulsatile insulin secretion, impaired glucose tolerance and type 2 diabetes. Mol Aspects Med 42: 61-77.

4. Gupta M, Knezevic NN, Abd Elsayed A, Ray M, Patel K, et al. (2021) Treatment of painful diabetic neuropathy-a narrative review of pharmacological and interventional approaches. Biomedicines 9: 573.

5. Reeves ND, Orlando G, Brown SJ (2021) Sensory-motor mechanisms increasing falls risk in diabetic peripheral neuropathy. Medicina (Kaunas) 57: 457.

6. Sloan G, Selvarajah D, Tesfaye S (2021) Pathogenesis, diagnosis and clinical management of diabetic sensorimotor peripheral neuropathy. Nat Rev Endocrinol 17: 400-420.

7. Wallace TM, Levy JC, Matthews DR (2004) Use and abuse of homa modeling. Diabetes care 27: 1487-1495.

8. Dong S, Lau H, Chavarria C, Alexander M, Cimler A, et al. (2019) Effects of periodic intensive insulin therapy: An updated review. Curr Ther Res Clin Exp 90: 61-67.

APPX1192

INSU_PI_001473

9.  Aoki TT, Grecu EO, Gollapudi GM, Barber AR, Arcangeli MA, et al. (1999) Effect of intensive insulin therapy on progression of overt nephropathy in patients with type 1 diabetes mellitus. Endocr Pract 5: 174-178.

10. Dailey GE, Boden GH, Creech RH, Johnson DG, Gleason RE, et al. (2000) Effects of pulsatile intravenous insulin therapy on the progression of diabetic nephropathy. Metabolism 49: 1491-1495.

11. Polonsky KS, Given BD, Hirsch LJ, Tillil H, Shapiro ET, et al. (1988) Abnormal patterns of insulin secretion in non-insulin-dependent diabetes mellitus. N Engl J Med 318: 1231-1239.

12. O'Rahilly S, Turner RC, Matthews DR (1988) Impaired pulsatile secretion of insulin in relatives of patients with non-insulin-dependent diabetes. N Engl J Med 318: 1225-1230.

13. Schofield CJ, Sutherland C (2012) Disordered insulin secretion in the development of insulin resistance and type 2 diabetes. Diabetic medicine : a journal of the British Diabetic Association 29: 972-979.

14. Matt Petersen (2013) Economic costs of diabetes in the u.S. In 2012. Diabetes care 36: 1033-1046.

15. Gerstein HC, Colhoun HM, Dagenais GR, Diaz R, Lakshman-an M, et al. (2019) Dulaglutide and cardiovascular outcomes in type 2 diabetes (rewind): A double-blind, randomised placebo-controlled trial. Lancet 394: 121-130.

16. Wiviott SD, Raz I, Bonaca MP, Mosenzon O, Kato ET, et al. (2019) Dapagliflozin and cardiovascular outcomes in type 2 diabetes. N Engl J Med 380: 347-357.

17. Qaseem A, Wilt TJ, Kansagara D, Horwitch C, Barry MJ, et al. (2018) Clinical Guidelines Committee of the American College of, P. Hemoglobin a1c targets for glycemic control with pharmacologic therapy for nonpregnant adults with type 2 diabetes mellitus: A guidance statement update from the american college of physicians. Ann Intern Med 168: 569-576.

*Copyright: ©2021 Brian Loveridge, et al. This is an open-access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.*

APPX1193

INSU_PI_001474

DIABETES TECHNOLOGY & THERAPEUTICS
Volume 3, Number 1, 2001
Mary Ann Liebert, Inc.

# Chronic Intermittent Intravenous Insulin Therapy: A New Frontier in Diabetes Therapy

THOMAS T. AOKI, M.D., EUGEN O. GRECU, M.D., Ph.D.,
MICHAEL A. ARCANGELI, M.S., MAHMOUD M. BENBARKA, M.D.,
PAMELA PRESCOTT, M.D., and JONG HO AHN, M.D.

## ABSTRACT

The limited success achieved in controlling diabetes and its complications with conventional insulin therapy suggests the need for reevaluation of the appropriateness of insulin administration protocols. Indeed, conventional subcutaneous insulin administration produces slowly changing blood insulin levels and suboptimal hepatocyte insulinization resulting in impaired hepatic capacity for processing incoming dietary glucose. The novel approach to insulin administration known as chronic intermittent intravenous insulin therapy (CIIIT) delivers insulin in a pulsatile fashion and achieves physiological insulin concentration in the portal vein. Done as a weekly outpatient procedure combined with daily intensive subcutaneous insulin therapy, this procedure has been shown to (1) significantly improve glycemic control while decreasing the incidence of hypoglycemic events, (2) improve hypertension control, (3) slow the progression of overt diabetic nephropathy, and (4) reverse some manifestations of diabetic autonomic neuropathy (e.g., abnormal circadian blood pressure pattern, severe postural hypotension, and hypoglycemia unawareness).

## INTRODUCTION

ALTHOUGH A RELATIVE OR ABSOLUTE insulin deficiency is generally considered as having the pivotal role in the development of diabetes mellitus (DM) and its complications, the availability of insulin for therapy over the last eight decades has led to only partial success in achieving glycemic control and even less in preventing or limiting the development of the chronic complications of this disease. Why have we not done better? As the quality of exogenous insulin has not been an issue since the advent of human insulins, the appropriateness of its administration regimens should be carefully reevaluated.

Normally, insulin is secreted in a pulsatile fashion[1] and in various amounts, in close relationship with meals.[2,3] Though not unanimous, the balance of available experimental evidence suggests a more potent hypoglycemic effect of pulsatile insulin as opposed to continuous insulin infusion.[4,5] Continuous exposure to insulin and glucagon is known to decrease the hormones' metabolic effectiveness on splanchnic glucose production in humans.[6] Down-regulation at the cellular level may partially explain the decreased action of steady-state levels while pulsatile hormone secretion may allow recovery of receptor affinity or receptor numbers. Intermittent intravenous insulin administration with peaks of insulin concentrations

University of California, Davis, and the Aoki Diabetes Research Institute, Sacramento, California.

APPX1194

INSU_PI_001475

may enhance suppression of gluconeogenesis and reduce hepatic glucose production (HGP).[4] Goodner et al.[7] showed in fasting rhesus monkeys that HGP oscillates in synchrony with the islet cells secretory cycle suggesting that the greater metabolic effects of pulsatile insulin occur at the liver. Similar results were obtained in *in vitro* systems.[5]

For induction and maintenance of insulin-dependent fuel-processing enzyme synthesis (e.g., hepatic glucokinase, phosphofructokinase, and pyruvate kinase), the hepatocytes require a defined insulin level (200–500 $\mu$U/mL in the portal vein)[8,9] concomitant with high glucose levels ("bimolecular signal").[10–12] In nondiabetic subjects, portal insulin concentrations are 2–3-fold greater than those in the peripheral circulation.[8] During the first pass through the liver, 50% of the insulin is removed,[13] pointing to the liver as the principal metabolic target organ of the gastrointestinal tract and the pancreas. The insulin retained by the hepatocytes may itself be essential for the long-term effects of insulin on hepatic glucose metabolism as well as growth and *de novo* enzyme synthesis.[14] After oral glucose intake, the liver accounts for an equal or greater proportion of total net glucose uptake as compared to the periphery.[15] Insulin exerts pivotal control of BG levels through its ability to regulate HGP directly[16] or indirectly.[17] The traditional subcutaneous (s.c.) insulin administration regimens used by diabetic patients (a) lack the pulsatile aspect (s.c. insulin administration achieves steady or slowly changing plasma concentrations), and (b) do not reach high enough insulin concentration at the hepatocyte level (e.g., 10 U regular insulin injected s.c. produce a peak systemic circulation concentration of 30–40 $\mu$U/mL and an even lower portal vein concentration of 15–20 $\mu$U/mL[18]).

A relative deficiency of insulin at the hepatocyte level leads to impaired capacity for processing of incoming dietary glucose. With the liver being the target organ of the pancreas, it appears, therefore, that the primary purpose of giving insulin to the diabetic patient should not be to control BG level ("control theory"), but rather the normalization of hepatic metabolism.

## RATIONALE AND METHODOLOGY

It has been shown that the diabetic patient's capacity to oxidize and store exogenous carbohydrate is markedly impaired.[19] In the resting postabsorptive nondiabetic subject, the energy requirement is met primarily by fat oxidation reflected by a respiratory quotient (RQ; V $CO_2$/V $O_2$) of 0.7–0.8 (indirect calorimetry[20]). After glucose administration, $CO_2$ production (and consequently the RQ) increases (0.9–1.0), indicating that glucose has become the primary source of energy. In contrast, in the patient with diabetes mellitus on conventional insulin therapy, no such increase in RQ[21,22] or $CO_2$ production[23] is observed. The possible fate of ingested glucose is (a) oxidation (liver, brain, muscle), (b) conversion to fat (liver, muscle, adipose tissue), (c) storage as glycogen (liver, muscle) or transamination of intermediary metabolites to form amino acids (e.g., alanine). Only the first two processes generate $CO_2$ to increase the RQ. Liver and muscle appear to be the most active tissues for glucose oxidation. In 1985, Meistas et al.[23] showed in nondiabetic postabsorptive men that resting muscle is not the source of the increase in $CO_2$ production after ingestion of a 100-g glucose meal. Glucose utilization by fat is minimal (ca. 2%),[24] and adipose tissue production of $CO_2$ after glucose administration has been reported to be insignificant.[25] Carbon dioxide production by the heart,[26] kidney,[27] brain,[28] and gut[29] has also been measured in other mammals, and cannot account for the large increment in total $CO_2$ production. Thus, both indirect *in vivo* human studies[23] and direct *in vitro* experimental data support the concept that the liver is the source of the majority of the $CO_2$ production associated with glucose ingestion.

The lack of increase in RQ (and $CO_2$ production) after glucose ingestion in patients with diabetes on conventional insulin therapy is consistent with the hypothesis that their liver is metabolically "dormant" and relatively incapable of oxidizing ingested carbohydrates. However, this ability to oxidize dietary-derived glucose can be restored to normal after several days of artificial beta cell-directed insulin administration (Biostator; Fig. 1),[22] or

APPX1195

PULSATILE INTRAVENOUS INSULIN THERAPY IN DIABETES                    113



**FIG. 1.** Nonprotein respiratory quotient (npRQ), carbohydrate (CHO), and lipid oxidation rates, and metabolic rates of normal subjects and diabetic patients on day 0 (conventional insulin therapy) and on day 4 (after 72 h on artificial B-cell), before (0 time = postabsorptive state) and during the 3-h oral 100-g glucose tests. Values shown are X ± SEM. (Adapted from Foss et al.[22])

with CIIIT within 6–7 h.[30] This process was initially called "hepatic activation." Though not tried (due to the obvious extreme practical difficulties), it is conceivable that several days of hyperinsulinemic euglycemic clamp procedure could also achieve RQ normalization.

This novel approach to insulin administration known as "hepatic activation" or "chronic intermittent intravenous insulin therapy" (CIIIT) corrects the above outlined drawbacks of conventional s.c. insulin therapy as follows:

1. It delivers insulin to the hepatocyte in the physiologically appropriate portal vein concentrations range (over 200 µU/mL).
2. Insulin is administered in pulses intravenously (i.v.) similar to the physiological insulin secretion pattern.

In essence, CIIIT uses a novel insulin algorithm consisting of a series of intravenous insulin pulses administered concomitantly with oral glucose. Pulses of insulin should have greater potential for hepatic activation than a continuous infusion of insulin since it is possible to manipulate the rate at which insulin concentration changes, the magnitude of each pulse, the duration of hepatic insulin exposure, and to superimpose the pulses on a rising baseline. Any or all of these may be metabolically important signals The insulin is injected by a programmed Bionica MD-100 infusion pump into a forearm vein, and each insulin pulse achieves a peak venous "free" insulin of at least 200 µU/mL (Fig. 2). The pulses are given during the first hour of a three hour treatment with three consecutive treatments given each treatment day. Initial CIIIT consists of two consecutive treatment days, followed by weekly treatment days. RQ measurements, using a Sensormedic Metabolic Measurement Cart (Sensormedics, Anaheim, CA), are obtained before and throughout the treatment period at 60-min intervals. An increase in the RQ to greater

APPX1196

AOKI ET AL.



**FIG. 2.**  Peripheral venous free insulin levels following intravenous insulin delivery by Bionica pump (35 mU/kg body weight, q6 min pulses × 10).

than 0.90 is used as the index of therapeutic efficacy.[21–23] It was postulated that if hepatic activation was achieved and maintained in patients with "brittle" IDDM by this treatment, the glycohemoglobin Alc (HbAlc) blood levels and the frequency of hypoglycemic reactions should decrease.

## CLINICAL EFFECTS OF CIIIT IN DIABETES

### CIIIT effect on glycemic control

In a study published in 1993,[30] the results of long-term CIIIT on 20 IDDM patients with "brittle" disease (wide swings in fingerstick blood glucose concentrations and frequent hypoglycemic episodes despite being on intensive subcutaneous insulin therapy [ISIT]—four daily insulin injection regimen—for at least 1 year) were reported. The patients received

CIIIT for an average of 41 months. The major results of the study indicated:

(a) A significant decline in HbAlc from the baseline of 8.5% to 7.0% at the end of the observation period ($p < 0.0003$; Fig. 3)



**FIG. 3.**  Changes in HbAlc levels and incidence of major and minor hypoglycemic events with chronic intermittent intravenous insulin therapy. (Adapted from Aoki et al.[30])

APPX1197

PULSATILE INTRAVENOUS INSULIN THERAPY IN DIABETES                    115

(b) A decline in the frequency of major hypoglycemic events from 3.0 to 0.1/month ($p < 0.0001$)

(c) A decline in the frequency of minor hypoglycemic events from 13.0 to 2.4/month ($p < 0.0001$)

The last two effects are contrary to the results of Diabetes Control and Complication Trial (DCCT) where the improvement in HbAlc was accompanied by a threefold increase in the frequency of major hypoglycemic events.[31] In many of the study patients, a gradual improvement in awareness to impending hypoglycemia was noted which became apparent after 3–4 months of therapy and led to a marked decrease in the frequency of major hypoglycemic events. Furthermore, the patients reported increased energy level and required shorter daily periods of rest leading to increased productivity and quality of life. There was no significant change in the patients' body weight during the study.

The exact mechanism by which CIIIT lowered HbAlc blood levels and decreased the frequency of hypoglycemic events is yet to be determined. Nondiabetic individuals stimulate hepatic processes, by way of high portal-vein concentrations of insulin and glucose, with every meal. The study patients' livers were stimulated three times during 1 day of the week rather than three times daily as in nondiabetic individuals. The reason for the effectiveness of CIIIT may lie in the long half-life of glucokinase. The half-life of rat glucokinase is 3–4 days[11] and that of the human enzyme may be longer because of the lower rate of human metabolism.[30]

*CIIIT effect on hypertension*

Systemic hypertension is a frequent complication found in both IDDM and NIDDM patients and has proved to be an important risk factor for the development of microangiopathy[32] and macroangiopathy.[33] In IDDM, the prevalence of hypertension increases with the duration of the disease and develops mainly in connection with the clinical emergence of nephropathy.[34] There appears to be a positive correlation between plasma glucose elevation and systolic blood pressure (BP) raising the possibility that the metabolic disorders associated with diabetes are acting to either cause or amplify the concurrent BP problem.[35] Significant reductions in systolic and diastolic BP after improvement in metabolic control in diabetic subjects have been reported.[36] Conversely, in IDDM subjects studied during controlled insulin withdrawal,[37] the worsening of metabolic control was accompanied by BP increases. These reports suggest that tight metabolic control in diabetic subjects may provide beneficial effects on BP levels.[38] We have recently assessed the effects of CIIIT on BP control in a prospective, randomized, crossover clinical trial involving 26 IDDM subjects with hypertension and nephropathy.[39] After a stabilization period (ISIT for glycemic control and normalization of BP on medication), the study subjects were randomly assigned to control (ISIT) or treatment (ISIT + CIIIT) groups for 3 months and then crossed over into the opposite phase for another 3 months. Addition of weekly CIIIT during the treatment phase was the only procedural difference between the control and treatment phases. Throughout the control and treatment phases, the BP values were maintained at the level established in each subject at the end of the stabilization period through appropriate adjustment in the antihypertensive medication (AHM) dosage. The AHM dosage requirements decreased significantly (46%; $p < 0.0001$) and linearly over time ($p < 0.0058$) during the treatment phase while remaining essentially unchanged during the control phase (Fig. 4). This study indicates that CIIIT markedly improves BP control in subjects with IDDM and hypertension.

Increased vascular smooth muscle (VSM) tone is the hallmark of the hypertensive state in both IDDM and NIDDM.[40] Human and animal studies suggest a role for insulin in the regulation of VSM tone.[41–43] Such insulin regulation of VSM function may be lost in insulinopenic states. Recent evidence suggests that insulin causes endothelium-derived nitric oxide-dependent vasodilation and that insulin's vasodilating action serves to both amplify insulin's overall effect to stimulate skele-

APPX1198



**FIG. 4.** Changes in antihypertensive medication requirements of patient groups A and B during the postrandomization period. (Adapted from Aoki et al.[39])

tal muscle glucose uptake and modulate vascular tone.[44] It is possible that CIIIT partially normalizes the "vascular reactivity," thus lowering the AHM dosage requirements.

### CIIIT effect on diabetic nephropathy

Diabetic nephropathy (DN) develops in 35–40% of patients with IDDM,[45] and it is the most common cause of end-stage renal disease (ESRD) in the United States.[46] It is generally agreed that DN is the result of hyperglycemia, whether alone or in combination with other factors.[47,48] However, once nephropathy is clinically overt (macroalbuminuria, decreased glomerular filtration rate), the degree of metabolic control is believed to have lost its significance as a risk factor with other mechanisms having greater influence.[47] Until recently, there was no known therapeutic strategy able to stop or reverse the progression to ESDR.[45] Suggested conventional ways to slow the progression of DN are effective antihypertensive therapy[49] and reduced protein intake.[50]

Several studies have indicated no effect of tight glycemic control on the progression of overt nephropathy.[51,52] The effect of CIIIT on the progression of DN was evaluated in a multicenter, retrospective, longitudinal study, involving 31 patients with type 1 diabetes mellitus and overt DN, on intensive subcutaneous insulin therapy (ISIT) and weekly CIIIT.[53] All studied patients were followed weekly for at least 12 months (average 37 ± 4.6 months), and appropriate adjustments were made weekly in their insulin dosage (ISIT) and in their antihypertensive medication with the goal of maintaining optimum glycemic control and blood pressures at or below 140/90 mm Hg for each patient. All patients had monthly HbAlc (HPLC) and semiannual creatinine clearance (CrCl) determinations. The HbAlc levels declined from 8.64 ± 0.57% to 7.60 ± 0.3% ($p$ = 0.0062) during the study period. The CrCl remained essentially unchanged (from 46.1 ± 2.19 mL/min at baseline, to 46.0 ± 3.9 mL/min at the end of the observation period, with an average annualized slope increase of 3.39 ± 1.5 mL/min/year ($p$ = NS). This study suggests that addition of CIIIT to ISIT in patients with type 1 DM appears to arrest or markedly reduce the progression of overt diabetic nephropathy. Similarly favorable results with CIIIT added to ISIT were reported in a larger multicenter, prospective, controlled clinical trial in patients with type 1 DM and overt DN.[54]

The mechanism by which CIIIT reduces the deterioration rate of renal function in patients with overt DN remains to be established. In a recent study, McLennan et al.[55] have shown

PULSATILE INTRAVENOUS INSULIN THERAPY IN DIABETES                    117

that a high glucose concentration inhibits mesangium degradation and could promote the mesangium enlargement known to occur in DN. Enlargement of the mesangium, the most consistent morphological finding in DN, can compress the glomerular capillaries and thus alter intraglomerular hemodynamics.[55] Improved glycemic control, as obtained in the CIIIT treated subjects, could promote mesangium degradation and improve renal hemodynamics. Indeed, we already have evidence that CIIIT improves systemic hemodynamics,[39] and it is likely that it has a similar effect on renal hemodynamics (e.g., decrease in glomerular efferent arteriolar vasoconstriction) resulting in the noted decrease in the progression of DN towards ESRD. Several animal experiments have demonstrated that glomerular expression of transforming growth factor–$\beta$, the key mediator between hyperglycemia and mesangial cell stimulation toward overproduction of extracellular matrix, is stimulated by hyperglycemia and/or hypoinsulinemia.[56] Both hyperglycemia and hypoinsulinemia are improved through the CIIIT procedure.

### CIIIT effect on diabetic autonomic neuropathy

Though clinical symptoms of diabetic autonomic neuropathy (DAN) develop in relatively few patients, the measurable autonomic defects are extremely common in diabetes.[57] DNA is known to be associated with a higher morbid-

ity and mortality rate,[58] as well with elevated HbAlc levels.[59]

### CIIIT effect on abnormal circadian blood pressure pattern.

Several studies have demonstrated a blunted diurnal variation in blood pressure (BP) in patients with DAN.[60,61] Insufficient BP decline during the night might be associated with increased target organ damage.[62,63] No data are available regarding the effects of tight glycemic control or intensive insulin therapy on the abnormal circadian BP pattern in patients with IDDM. We have recently reported the results of a randomized controlled clinical study involving 74 IDDM patients on intensive subcutaneous insulin therapy (ISIT)[64] of which 36 (group A) underwent, in addition, weekly CIIIT for 3 months. Group B (controls, $n = 38$) continued on ISIT alone. All study patients were seen weekly by the investigators and underwent monthly HbAlc determinations and monthly 24-h ambulatory BP monitoring. Glycemic control improved significantly in group A subjects (HbAlc declined from 7.9% to 7.2%, $p = 0.0002$), but remained essentially unchanged in group B (control). The night/day systolic BP ratio decreased from 0.97 to 0.94 ($-3.10\%$) in group A and increased from 0.95 to 0.98 ($+3.16\%$) in group B subjects ($p = 0.0224$), while the night/day diastolic BP ratio decreased from 0.93 to 0.90 ($-3.23\%$) in group A and increased from 0.91 to 0.94 ($+3.29\%$) in group B subjects ($p = 0.0037$; Fig. 5). Consider-



**FIG. 5.**   Changes in mean night/day blood pressure ratio with CIIIT in groups A (treated) and B (control) patients. (Adapted from Aoki et al.[64])

APPX1200

ing that all other aspects of therapy were similar for the two patient groups, the further improvement in the glycemic control and the significant improvement in the abnormal circadian BP pattern noted in group A patients was likely due to the addition of weekly CIIIT. The cause of the abnormal circadian BP pattern is secondary to or associated with abnormal glucose metabolism and reduced arterial wall distensibility[65,66] as well as the development of diabetic autonomic neuropathy.[67] The improvement/stabilization of this abnormal circadian pattern obtained in the group A patients might be the result of an improved metabolic milieu as suggested by the decline in HbAlc, with possible consequent improvement in arterial distensibility and diabetic autonomic neuropathy. The practical importance and clinical consequences of the improvement in the circadian BP pattern is conjectural at present. Insufficient BP decline during the night might be associated with increased target organ damage.[62,63] The reversal or at least prevention of further deterioration of the abnormal circadian BP pattern obtained in the patient group treated with ISIT + CIIIT might lessen target organ damage. Further studies with extended follow-up are necessary to confirm this possibility.

*CIIIT effect on orthostatic hypotension of diabetes.* Orthostatic hypotension (OH) of diabetes, another likely manifestation of DAN,[68] is defined as a decrease in diastolic BP greater than 10 mm Hg[69] or decline of systolic BP greater than 30 mm Hg after 2 min of standing,[70] in the presence of adequate blood volume. Diabetic patients with OH have decreased ability to release norepinephrine, leading to low plasma norepinephrine levels and supersensitive $\alpha$ and $\beta$ receptors.[71] Diabetic OH is likely due to impaired sympathetic vasoconstrictor activity, leading to an impaired compensatory increase in total peripheral resistance upon standing.[72] The current conventional therapy for orthostatic hypotension of diabetes is less than satisfactory.[73] Even the promising newer agents such as the somatostatin analogues, have a very limited duration of action and require frequent injections.[74]

We have recently reported[75] the correction of postural hypotension with CIIIT in three pa-

tients with IDDM and severe disabling postural hypotension who had previously failed all conventional therapeutic attempts. The patients underwent weekly CIIIT for 3 months while continuing their usual regimen of four daily subcutaneous insulin injections. Before and at the end of this therapeutic trial the patients had tilt-table tests, 24-h ambulatory BP measurements, cardiac autonomic function testing, and HbAlc determinations. Within the first month of CIIIT, a marked decrease in the intensity and frequency of postural dizziness was noted in all subjects, as well as the disappearance of syncopal episodes. After 2 months of CIIIT, the postural dizziness ceased entirely, and at the end of the third month of therapy, the subjects were able to resume their customary activities. The tilt-table test normalized in two and improved in one patient, HbAlc levels declined, the initial abnormal circadian BP pattern was corrected, and the score of the cardiovascular reflex tests also improved. These results suggest an improvement in the vasoconstrictor mechanisms in response to postural changes, possibly as a result of the improvement in diabetic autonomic neuropathy, as indicated by the normalization of the circadian blood pressure pattern and by the improved cardiovascular reflex score. The improvement in the autonomic neuropathy was likely secondary to the improved metabolic milieu during CIIIT as reflected by decreased HbAlc levels. The vascular endothelial cell secretion of the potent vasoconstrictor endothelin (ET1), has been shown to be enhanced by insulin in cultured cells.[76] An enhancement of endothelial cells' ET1 production following exposure to the high pulsatile insulin levels of CIIIT could have contributed to the improvement of the vasoconstrictor mechanism in our patients.

## CONCLUSIONS

The studies briefly reviewed above indicate that CIIIT improves glycemic control, concomitantly with marked decrease in the frequency of both major and minor hypoglycemic events and improved hypoglycemia awareness,[30] improves control of hypertension in diabetes,[39] retards progression of overt nephropathy,[53,54] reverses

PULSATILE INTRAVENOUS INSULIN THERAPY IN DIABETES 119

the abnormal circadian BP pattern,[64] and corrects postural hypotension of diabetes.[75]

Anecdotal clinical experiences suggest that CIIIT also improves diabetic peripheral polyneuropathy, diabetic cardiomyopathy,[77] diabetic retinopathy, and diabetic foot ulcer healing. Confirmation of these latter observations requires future larger, prospective clinical studies.

We believe that the above clinical outcomes with CIIT are due to weekly pulsatile insulin administration. As mentioned under the Rationale and Methodology sections, RQ normalization can also be achieved after several days of artificial beta cell–directed insulin administration (Biostator)[22] or, conceivably, after several days of a hyperinsulinemic euglycemic clamp procedure; however it is clearly impractical to perform weekly clamp procedures for extended period of time (years) and on a large scale. Furthermore, though we recognize that patients' enthusiasm and enhanced compliance might be a component of any research program's good results, the published results with CIIIT on improving glycemic control, decreased frequency of hypoglycemic events, and on chronic complications of diabetes (e.g., overt nephropathy), have been superior to intensive s.c. insulin therapy (multiple insulin injections or external insulin infusion pumps[31]).



**FIG. 7.** Rapid increases in respiratory quotient (RQ) in 14 type 1 diabetic patients following the administration of insulin pulses using the Bionica MD-110 infusion pump during the first day of CIIIT.

## HISTORICAL NOTE

Although the use of pulsatile insulin infusions in the treatment of diabetic patients, as opposed to square wave insulin infusions, had occurred to us in the 1970s, the need for such a waveform was not immediately apparent. During the course of our initial studies with the artificial pancreas (Biostator, Glucose Controlled Insulin Infusion System, Life Science Division, Ames, Elkhart, IN), which used a square wave infusion pattern, it quickly became apparent that a more efficient and powerful algorithm was needed. The GCIIS required 72 h to "activate" a type 1 diabetic patient and needed a great deal of "hands on" time. Could this period of enzyme induction be shortened?

The use of insulin pulses to stimulate hepatic metabolism was revisited. The liver appeared to respond to (1) the rate of change of insulin levels, (2) the peak insulin concentration, (3) a rising baseline (a pseudo second phase insulin release), and (4) the prompt return to baseline





**FIG. 6.** Venous free insulin concentrations in 6 type 1 diabetic patients following 5, 25, and 50 milliunits of insulin per kg body weight pulses using the artificial pancreas (GCIIS).



**FIG. 8.** Rapid increases in respiratory quotient (RQ) in six type 2 diabetic patients following the administration of insulin pulses using the Bionica MD-110 infusion pump during the first day of CIIIT.   APPX1202

INSU_PI_001483

insulin levels, that is, wide dynamic range. It was therefore decided to see if insulin pulses could more rapidly initiate the synthesis and activation of hepatic enzymes (e.g., hepatic glucokinase and pyruvate dehydrogenase complex respectively) with the biochemical outcome reflected by an increase in the respiratory quotient.

The artificial pancreas was first reverse engineered so that all of its functions could be controlled from the keyboard of an independent but linked Digital Equipment Company computer. Thus, insulin could be pulsed independent of the glucose levels, and glucose levels could be continuously monitored. In addition, the amounts of insulin and glucose infused could be quantified on a minute to minute basis.

The first question to be answered was whether the roller pumps used in the GCIIS could generate insulin pulses. Using this instrument, 5, 25, and 50 milliunits of insulin per kilogram body weight were successively infused into type 1 diabetic patients ($n = 6$) whose blood glucose levels were maintained at elevated levels with intermittent oral glucose administration. Arterial blood samples were withdrawn at 2-min intervals. As seen in Figure 6, even pulses of 5 milliunits of insulin/kg body weight could be identified and measured.

The next question to be answered was whether the insulin pulses generated by the reverse engineered GCIIS were physiologically and, hence, therapeutically more effective than square waves infusions of insulin. Using the respiratory quotient as the endpoint, studies were performed to determine if insulin pulses could accelerate the "activation" process in type 1 diabetic individuals, as reflected by rapid increases in the baseline respiratory quotient from 0.75 to values equal to or greater than 0.90. Fortunately, the answer was yes, and we quickly switched to simpler infusion pumps.

Initially, McGaw AccuPro pumps interfaced to an Epson laptop computer equipped with a floppy disc drive were used, but the BIONICA MD-110 pump subsequently replaced these. Using the latter pump, intravenous insulin pulses (Fig. 2) were administered to both type 1 and 2 diabetic patients concomitant with oral glucose ingestion, and the respiratory quotient responses monitored. In Figure 7, the increases in RQ during the first day of pulsatile intravenous insulin therapy in 14 type 1 diabetic patients new to the procedure are shown. In contrast to the modest RQ responses reported in type 1 diabetic patients after 24 h of GCIIS insulin administration,[22] marked increases in RQ to values consistently greater than 0.90 are seen within hours of initiating pulsatile intravenous insulin therapy. In Figure 8, prompt and marked increases in RQ during the first day of CIIIT in six type 2 diabetic patients are shown.

The implications of these observations were enormous. This procedure could be done efficiently, quickly, and relatively inexpensively on an outpatient basis for both patient care and research purposes. For these reasons, intravenous insulin pulses were used exclusively in all our studies, reviewed in this manuscript, from 1983 to the present.

## ACKNOWLEDGMENTS

We wish to thank Michael Bradley, Sheila Hargrave, and Elsie Soeldner for expert technical assistance.

## REFERENCES

1. Lang DA, Matthews DR, Peto J, Turner RC: Cyclic oscillations of basal plasma glucose and insulin concentrations in human beings. N Engl J Med 1979;301: 1023–1027.
2. Polonsky KS: The B-cell in diabetes: from molecular genetics to clinical research. Diabetes 1995;44:705–717.
3. Polonsky KS, Givens BD, Canter EV: Twenty-four-hour profiles and pulsatile patterns of insulin secretion in normal and obese subjects. J Clin Invest 1988 ;81:442–448.
4. Bratush-Marrain PR, Komjati M, Waldhausl WK: Efficacy of pulsatile versus continuous insulin administration on hepatic glucose production and glucose utilization in type 1 diabetic humans. Diabetes 1986; 35:922–926.
5. Komjati M, Bratush-Marrain PR, Waldhausl W: Superior efficacy of pulsatile versus continuous hormone exposure on hepatic glucose production *in vitro*. Endocrinology 1986;118:312–319.
6. Bomboy JD, Lewis SB, Lacy WW, Sinclair-Smith CC, Liljenquist JE: Transient stimulatory effect of sustained hyperglucagonemia on splanchnic glucose production in normal and diabetic man. Diabetes 1977;26:177–181.

APPX1203

7. Goodner CJ, Cherrington AD: Hepatic glucose production oscillates in synchrony with the islet secretary cycle in fasting rhesus monkeys. Science 1982; 215:1257–1259.

8. Blackard WG, Nelson NC: Portal and peripheral vein immunoreactive insulin concentrations before and after glucose infusion. Diabetes 1970;19:302–306.

9. Berger W, Goschke H, Moppert J, Kunzli H: Insulin concentrations in portal venous and peripheral venous blood in man following administration of glucose, galactose, xylitol and tolbutamide. Horm Metab Res 1972;5:4-8.

10. Cahill GF Jr, Ashmore J, Renold AE, Hastings AB: Blood glucose and the liver. Am J Med 1959;26:264–282.

11. Weinhouse S: Regulation of glucokinase in liver. In: Horecker BL, Stadtman ER, eds. Current Topics in Cell Research. New York: Academic Press, 1976:1–50.

12. Hers HG, Van Schaftingen E: Fructose 2.6-bisphosphate 2 years after its discovery. Biochem J 1982;206: 2–12.

13. Waldhausl M, Bratush-Marrain P, Gasic S, Korn A, Nowothy P: Insulin production rate, hepatic insulin retention, and splanchnic carbohydrate metabolism after oral glucose ingestion in hyperinsulinemic type II (non–insulin dependent) diabetes mellitus. Diabetologia 1982;23:6–15.

14. Griffen SC, Russell SM, Katz LS, Nicoll CS: Insulin exerts metabolic and growth-promoting effects by a direct action on the liver *in vivo*: clarification of the functional significance of the portal vascular link between the beta-cells of the pancreatic islets and the liver. Proc Natl Acad Sci USA 1987;84:7300–7304.

15. Felig P, Bergman M: Integrated physiology of carbohydrate metabolism. In: Ellenberg M, Rifkin H, eds. Diabetes Mellitus: Theory and Practice, 4th ed. New York: Elsevier 1990:51–59.

16. Hers HG: The control of glycogen metabolism in the liver. Annu Rev Biochem 1976;45:167–189.

17. Ader M, Bergman R: Peripheral effects of insulin dominate suppression of fasting hepatic glucose production. Am J Physiol 1990;258:E10220–E1032.

18. Ishida T, Chap Z, Chou J, Lewis RM, Hartley CJ, Entman ML, Field JB: Effect of portal and peripheral venous insulin infusion on glucose production and utilization in depancreatized, conscious dogs. Diabetes 1984;33:984–990.

19. Meyer HU, Curchod B, Maeder E, Pahud P, Jequier E, Felber JP: Modifications of glucose storage and oxidation in nonobese diabetics, measured by continuous indirect calorimetry. Diabetes 1980;29:752–756.

20. Ferrannini E: The theoretical bases of indirect calorimetry: a review. Metabolism 1988;37:287–301.

21. Aoki TT, Vlachokosta FV, Foss MC, Meistas MT: Evidence for restoration of hepatic glucose processing in type I diabetes mellitus. J Clin Invest 1983;71:837–839.

22. Foss MC, Vlachokosta FV, Cunningham IN, Aoki TT: Restoration of glucose homeostasis in insulin-dependent diabetic subjects. Diabetes 1982;31:46–52.

23. Meistas MT, Vlachokosta FV, Gleason RE, Arcangeli MA, Aoki TT: Role of muscle in $CO_2$ production after oral glucose administration in man. Diabetes 1985;34:960–963.

24. Bjorntrop P, Berchtold P, Holm J, Larsson B: The glucose uptake inhuman adipose tissue in obesity. Eur J Clin Invest 1971;1:480–485.

25. Bjorntorp P, Schlersten T, Gottfries A: Effects of glucose infusion on adipose tissue lipogenesis in man. Acta Med Scand 1968;183:565–571.

26. Cruickshank EWH, Startup CW: The effect of insulin on the respiratory quotient, oxygen consumption, sugar utilization and glycogen synthesis in the normal mammalian heart in hyper- and hypoglycemia. J Physiol 1933;77:365–385.

27. Gregg CM, Cohen JJ, Black AJ, Espeland MA, Feldstein ML: Effects of glucose and insulin on metabolism and function of perfused rat kidney. Am J Physiol 1978;235:F52–F61.

28. Rowe GC, Maxwell GM, Castillo CA, Freeman DJ, Crumpton CW: A study in man of cerebral blood flow and cerebral glucose, lactate and pyruvate metabolism before and after eating. J Clin Invest 1959;38:2154–2158.

29. Abumrad NN, Cherrington A, Williams P, Lacy W, Robin D: Absorption and disposition of a glucose load in the conscious dog. Am J Physiol 1982;242:E398–E406.

30. Aoki TT, Benbarka MM, Okimura MC, Arcangeli MA, Walter RM Jr, Wilson LD, Truong MP, Barber AR, Kumagai LF: Long-term intermittent intravenous insulin therapy and type 1 diabetes mellitus. Lancet 1993;342: 515–517.

31. DCCT Research Group. The effect of intensive treatment of diabetes on the development and progression of long-term complications in insulin-dependent diabetes mellitus. N Engl J Med 1993;329:977–986.

32. Janka HU, Warram JH, Rand LI, Krolewski AS: Risk factors for progression of background retinopathy in longstanding IDDM. Diabetes 1989;38:460–464.

33. Fuller JH, Head J: WHO Multinational Study Group: Blood pressure, proteinuria and their relationship with circulatory mortality: the WHO multinational study of vascular disease in diabetics. Diabetes Metab 1989;15:273–277.

34. Parving HH, Smidt UM, Frisberg B, Bonnevie-Nielsen V, Andersen AR: A prospective study of glomerular filtration rate and arterial blood pressure in insulin-dependent diabetes with diabetic nephropathy. Diabetologia 1981;20:457–461.

35. Tuck M: Management of hypertension in the patient with diabetes mellitus. Am J Hypertens 1988;1:384S–388S.

36. Ferris JB, O'Hare JA, Kelleher CCM: Diabetic control and the renin-angiotensin system, catecholamines and blood pressure. Hypertension 1985;7:II58–II63.

37. Gunderson HJG: Peripheral blood flow and metabolic control in juvenile diabetes. Diabetologia 1974;10:225–231.

38. Stern M, Tuck ML: Mechanisms of Hypertension in diabetes mellitus. In: Laragh JH, Brenner BM, eds. Hypertension Pathophysiology, Diagnosis and Management. Vol. 2. New York: Raven Press, 1990:1689–1702.

122                                                                 AOKI ET AL.

39. Aoki TT, Grecu EO, Prendergast JJ, Arcangeli MA, Meisenheimer R: Effect of chronic intermittent intravenous insulin therapy on antihypertensive medication requirements in IDDM subjects with hypertension and nephropathy. Diabetes Care 1995;18:1260–1265.

40. Levy J, Zemel MB, Sower JR: Role of cellular calcium metabolism in abnormal glucose metabolism and diabetic hypertension. Am J Med 1989;87:7S–16S.

41. Yagi S, Takata S, Kiyokawa H, Yamamoto M, Noto Y, Ikeda T, Hattori N: Effects of insulin on vasoconstrictive responses to norepinephrine and angiotensin II in rabbit femoral artery and vein. Diabetes 1988;37:1064–1067.

42. Hall JE, Brands MW, Mizelle HL, Gaillard CA, Hildebrandt DA: Chronic intrarenal hyperinsulinemia does not cause hypertension. Am J Physiol 1991;260:F663–F669.

43. Anderson EA, Hoffman RP, Balon TW, Sinkey CA, Mark AL: Hyperinsulinemia produces sympathetic neuronal activation and vasodilatation in normal humans. J Clin Invest 1991;87:2246–2252.

44. Baron AD: Insulin and the vasculature—old actors, new roles. J Invest Med 1996;44:406–412.

45. Viberti GC, Yip-Messent J, Morcutti A: Diabetic nephropathy. Diabetes Care 1992;15:1216–1225.

46. U.S. Renal Data System: USRDS 1989 Annual Data Report. Bethesda, MD, National Institute of Health, National Institute of Diabetes and Digestive and Kidney Diseases, August 15 and 16, 1989.

47. Hostetter TH: Diabetic nephropathy. N Engl J Med 1985;312:642–643.

48. McLennan SV, Fisher EJ, Yue D, Turtle JR: High glucose concentration causes a decrease in mesangium degradation. Diabetes 1994;43:1041–1045.

49. Parving HH, Andersen AR, Smidt UM, Hommel E, Mathiesen ER, Svendsen PA: Effect of antihypertensive treatment on kidney function in diabetic nephropathy. Br Med J (Clin Res Ed) 1987;294:1443–1447.

50. Zeller K, Whittaker E, Sullivan L, Raskin P, Jacobson HR: Effect of restricting dietary protein on the progression of renal failure in patients with insulin-dependent diabetes mellitus. N Engl J Med 1991;324:78–84.

51. Viberti GC, Bilous RW, Mackintosh D, Bending JJ, Keen H: Long term correction of hyperglycemia and progression of renal failure in insulin-dependent diabetes. BMJ 1983;268:598–602.

52. Taft JL, Nolan CJ, Yeung SP, Hewitson TD, Martin FIR: Clinical and histological correlations of decline in renal function in diabetic patients with proteinuria. Diabetes 1994;43:1046–1051.

53. Aoki TT, Grecu EO, Gollapudi GM, Barber AR, Arcangeli MA, Benbarka MM, Prescott P, Meisenheimer R: Effect of intensive insulin therapy on progression of overt diabetic nephropathy in patients with IDDM. Endocrine Practice 1999;5:174–178.

54. Dailey GE, Boden GH, Creech RH, Johnson DG, Gleason RE, Kennedy FP, Weinrauch LA, Weir M, D'Elia JA: Effects of pulsatile intravenous insulin therapy (PIVIT) on the progression of diabetic nephropathy. Metabolism 2000;49:1491–1495.

55. Steffes MW, Osterby R, Chavers B, Mauer SM: Mesangial expansion as a central mechanism for loss of kidney function in diabetic patients. Diabetes 1989;38:1077–1081.

56. Sharma K, Ziyadeh FM: Hyperglycemia and diabetic kidney disease: the case for transforming growth factor $\beta$ as a key mediator. Diabetes 1995;44:1139–1146.

57. O'Brian IAD, O'Hare JP, Lewin IG, Corral RJM: The prevalence of autonomic neuropathy in insulin-dependent diabetics: a controlled study based on heart rate variability. Q J Med 1986;61:957–967.

58. Ewing DJ, Campbell IM, Clarke BF: The natural history of diabetic autonomic neuropathy. Q J Med 1980;49:95–108.

59. DCCT Research group: Factors in the development of diabetic neuropathy: baseline analysis of neuropathy in the feasibility phase of Diabetes Control and Complications Trial. Diabetes 1988;37:476–481.

60. Liniger C, Favre L, Assal J-P: Twenty-four hour blood pressure and heart rate profiles of diabetic patients with abnormal cardiovascular reflexes. Diabetic Med 199;8:420–427.

61. Ikeda T, Matsabaro T, Sato J, Sakamoto M: Circadian blood pressure variation in diabetic patients with autonomic neuropathy. J Hypertens 1993;11:581–587.

62. Verdecchia P, Schillaci G, Guerrieri M: Circadian blood pressure changes and left ventricular hypertrophy in hypertension. Circulation 1990;1:528–536.

63. O'Brien E, Sheridan J, O'Malley K: Dippers and non-dippers. Lancet 1988;II:397.

64. Aoki TT, Grecu EO, Arcangeli MA, Meisenheimer R: Effect of intensive insulin therapy on abnormal circadian blood pressure pattern in patients with type 1 diabetes mellitus. Online J Curr Clin Trials [serial online], December 15, 1995, doc. no. 199.

65. Amar J, Chamotin B, Pelissier M, Garelli J, Salvador M: Influence of glucose metabolism on nictimeral blood pressure variability in hypertensives with an elevated waist hip ratio. Am J Hypertens 1995;8:426–428.

66. Lehman EO, Gosling RG, Sonksen PH: Arterial wall compliance in diabetes. Diabet Med 1992;9:114–119.

67. Ikeda T, Matsabaro T, Sato Y, Sakamoto M: circadian blood pressure variation in diabetic patients with autonomic neuropathy. J Hypertens 1993;11:581–587.

68. Dyrberg T, Benn J, Sandahl Christiansen J, Hilsted J, Nerup J: Prevalence of diabetic autonomic neuropathy measured by simple bed-site tests. Diabetologia 1981;20:190–194.

69. Shumer M, Burton G, Burton C, Crum D, Pfeiffer MA: Diabetic autonomic neuropathy. Am J Med 1988;85:137–146.

70. Vinik AI, Holland MT, Le Beau JM, Luizzi FJ: Diabetic neuropathies. Diabetes Care 1992;15:1926–1975.

71. Ziegler MG, Lake CR: Noradrenergic responses in postural hypotension: implications for therapy. In:

**INSU_PI_001486**

PULSATILE INTRAVENOUS INSULIN THERAPY IN DIABETES                    123

Lake CR, Zigler MG, eds. The catecholamines in psychiatric and neurologic disorders. Woburn, MA: Butterworth, 1985:121–136.

72. Hilstead J: Pathophysiology in diabetic autonomic neuropathy: cardiovascular, hormonal, and metabolic studies. Diabetes 1982;31:730–737.

73. Green DA, Sima AAF, Feldman EL, Stevens MJ: Diabetic neuropathy screening and management. Contemp Intern Med 1993;5:79–91.

74. Hoeldtke R, Israel CB: Treatment of orthostatic hypotension with octreotide. J Clin Endocrinol Metab 1989;68:1051–1059.

75. Aoki TT, Grecu EO, Arcangeli MA: Chronic intermittent intravenous insulin therapy corrects orthostatic hypotension of diabetes. Am J Med 1995;99:683–684.

76. Rubin SA, Levin ER: The endocrinology of vasoactive peptides: synthesis to function. J Clin Endocrinol Metab 1994;78:6–10.

77. Aoki TT, Grecu EO, Arcangeli MA: Reversal of severe nonischemic dilated cardiomyopathy by intensive intravenous insulin therapy in a patient with NIDDM [Abstract]. Diabetes 1996;45:1071.

Address reprint requests to:
*Thomas T. Aoki, M.D.*
*Division of Endocrinology*
*University of California, Davis*
*4150 V Street*
*PSSB Suite G400*
*Sacramento, CA 95817*

*E-mail:* ttaoki@ucdavis.edu



*From Patent No. US 10,533,990; Jan. 14, 2020*

"When three treatment sessions are performed using the method as described herein patients report energy restored, medications reduced, wounds healed, amputations prevented, weight controlled, blood sugar controlled, blood pressure reduced, neuropathy diminished, retinopathy diminished, mood improved, sleep improved and erectile function restored.

. . . .

"The goal of the individualized intravenous exogenous insulin-based therapy is to repair, recondition, and maintain a subject's impaired metabolism so that it functions and is maintained to provide a quality of life similar to that of a non-diabetic person."



US010533990B2

(12) **United States Patent**
Carr et al.

(10) Patent No.: **US 10,533,990 B2**
(45) Date of Patent: *Jan. 14, 2020

(54) PHYSIOLOGIC INSULIN-SENSITIVITY IMPROVEMENT

(71) Applicant: **DIABETES RELIEF LLC**, Houston, TX (US)

(72) Inventors: **Hunter Michael Alan Carr**, Houston, TX (US); **Scott Hepford**, Houston, TX (US); **Carol Ann Wilson**, Houston, TX (US); **Stanley Tories Lewis, Jr.**, Houston, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: 15/710,537

(22) Filed: Sep. 20, 2017

(65) **Prior Publication Data**
US 2019/0086394 A1   Mar. 21, 2019

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/042,087, filed on Feb. 11, 2016.

(60) Provisional application No. 62/117,393, filed on Feb. 17, 2015.

(51) **Int. Cl.**
| | |
|---|---|
| G01N 33/50 | (2006.01) |
| G01N 33/487 | (2006.01) |
| G06F 19/00 | (2018.01) |
| G16H 20/17 | (2018.01) |
| G01N 33/60 | (2006.01) |
| G16H 30/40 | (2018.01) |
| G16H 50/50 | (2018.01) |

(52) **U.S. Cl.**
CPC ..... *G01N 33/5091* (2013.01); *G01N 33/48792* (2013.01); *G01N 33/5038* (2013.01); *G01N 33/60* (2013.01); *G06F 19/30* (2013.01); *G16H 20/17* (2018.01); *G16H 30/40* (2018.01); *G16H 50/50* (2018.01); *G01N 2800/042* (2013.01); *G01N 2800/70* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2014/0005603 A1   1/2014 Finan

*Primary Examiner* — G Steven Vanni
(74) *Attorney, Agent, or Firm* — Rao Deboer Osterrieder, PLLC; Erik J. Osterrieder

(57) **ABSTRACT**

An individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing. The therapy includes treatment sessions involving the assessment of metabolic factors, forming a subject profile, and matching the subject profile to a diabetic treatment model. Using the diabetic treatment model, a quantity and frequency of intravenous insulin bolus, dosage amounts of magnesium, and dosage amounts of potassium can be calculated. The methods that improve impaired hepatic glucose processing in subjects and patients can simultaneously introduce separated insulin bolus from an insulin reservoir, dosage amounts of magnesium, and dosage amounts of potassium. The subject profile can create a weight management protocol that uses a metabolic enhancement, wherein the individualized intravenous exogenous insulin-based therapy produces a subject or a patient with improved cellular ATP functioning.

**20 Claims, 13 Drawing Sheets**

Case 4:22-cv-00862  Document 47-23  Filed on 10/28/22 in TXSD  Page 27 of 76



# IV Pulsatile Insulin – Background Part 2

## DR has <u>NO</u> connection or affiliation with Trina Health or Ford Gilbert

- Founders of Diabetes Relief (DR) interacted with Gilbert several years ago but came to question his honesty, character, and business ethics and dealings, so they immediately moved in a different direction

- After consulting with highly respected and experienced medical professionals, they formed Diabetes Relief LLC in Jan 2015 and proceeded to develop and patent the procedures they use today through licensees

- DR's licensed facilities are open across the US and the world

- Patients consistently report successful outcomes of DR's (PIR) treatment

- DR is moving forward with a double -blind, randomized, clinically controlled, multi -center, multinational study of DR's processes and procedures

*Confidential* - Copyright © H360 LLC 2018. All rights reserved.

2

INSU_PI_001489

### The Director of the United States Patent and Trademark Office

*Has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.*

*Therefore, this*

### United States Patent

*Grants to the person(s) having title to this patent the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States of America or importing the invention into the United States of America, and if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States of America, or importing into the United States of America, products made by that process, for the term set forth in 35 U.S.C. 154(a)(2) or (c)(1), subject to the payment of maintenance fees as provided by 35 U.S.C. 41(b). See the Maintenance Fee Notice on the inside of the cover.*

*Michelle K. Lee*

Director of the United States Patent and Trademark Office

INSU_PI_001490

US 9,652,595 B1

1

# KIT THAT IMPROVES IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS

## CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation in Part of co-pending U.S. patent application Ser. No. 15/042,087 filed on Feb. 11, 2016, entitled "METHODS THAT IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS", which claims priority to and the benefit of U.S. Provisional Patent Application Ser. No. 62/117,393 filed on Feb. 17, 2015, entitled "METHODS THAT IMPROVE IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS". These references are incorporated herein in their entirety.

## FIELD

The present embodiments generally relate to a kit for individualized intravenous exogenous insulin-based therapy.

## BACKGROUND

Diabetes Mellitus is a disease or disorder of the body's metabolic functions, characterized by abnormally high levels of blood glucose and inadequate levels of insulin. In 2012, 29.1 million Americans, or 9.3 percent of the population had diabetes, up from 25.8 million, or 8.3 percent, in 2010. New cases diagnosed in 2012 were 1.7 million, and in 2010 it was 1.9 million. Diabetes Mellitus Type 1, formerly known as juvenile diabetes, is usually diagnosed in children and young adults, and only 5 percent of people with diabetes have this form of the disease.

In Type 1 diabetes, the body does not produce insulin, a hormone necessary to convert sugar, starches, and other food into energy needed for daily life. Diabetes Mellitus Type 2 is far more common, and affects 90-95 percent of all diabetics in the United States of America. In Type 2 diabetes, the body does not use insulin properly, which is called insulin resistance. At first, the pancreas makes extra insulin to make up for it, but, over time the pancreas is not able to keep up and can't make enough insulin to keep blood glucose at normal levels. The long-term adverse effects include blindness, loss of kidney function, nerve damage, loss of sensation, and poor circulation in the periphery, and amputation of the extremities. As of Mar. 6, 2013, the total cost of diagnosed diabetes in the United States in 2012 was $245 billion dollars.

In the treatment of Diabetes Mellitus, many varieties of insulin formulations have been suggested and used, such as regular insulin, isophane insulin (designated NPH®), insulin zinc suspensions (such as SEMILENTE®, LENTE®, and ULTRALENTE®), and biphasic isophane insulin. As diabetic patients are treated with insulin for several decades, there is a major need for safe and life quality improving insulin formulations. Some of the commercially available insulin formulations are characterized by a fast onset of action and other formulations have a relatively slow onset but show a more or less prolonged action. Fast-acting insulin formulations are usually solutions of insulin, while retarded acting insulin formulations can have suspensions containing insulin in crystalline and/or amorphous form precipitated by addition of zinc salts alone, by addition of protamine, or by a combination of both.

In addition, some patients are using formulations having both a fast onset of action and a more prolonged action. Such

2

a formulation can be an insulin solution, wherein protamine insulin crystals are suspended. Some patients do prepare the final formulation themselves by mixing a fast acting insulin solution with a protracted acting insulin suspension formulation in the ratio desired by the patient in question.

Glucose control is typically measured by a blood test, which determines the level of hemoglobin A1c, which has been the desired result of insulin therapy in diabetic patients for many years. However, it is clear that tight circulating glucose control was insufficient in 25 percent or more of the study participants to protect them from the onset or progression of diabetic retinopathy, nephropathy, or neuropathy. One method of glucose control is Pulsed Insulin Therapy.

The core concept of Pulsed Insulin Therapy has been known for at least 20 years, by various names including Pulsatile Intravenous Insulin Therapy (PIVIT), Chronic Intermittent Intravenous Insulin Therapy (CIIIT), Metabolic Activation Therapy (MAT), and Hepatic Activation. In such therapies a patient's blood glucose is raised and lowered by about 50 mg/dL to 75 mg/dL over a period of several hours by alternating between doses of insulin and sugars or high carbohydrates foods. Although the mechanisms of action have not been clearly explained, it is apparent from the clinical results that the technique has usefulness in treating diabetic implications, including blindness and other ocular manifestations, nerve disease, cardiovascular disease, diabetic nephropathy, and poor wound healing.

Given the long history of these procedures, one would have expected that the treatment parameters would have been optimized long ago to produce the most favorable results. It turns out, however, that the known treatment parameters are insufficient in that regard.

A need exists for a kit that improves impaired hepatic glucose processing in subjects and produce superior results to those previously obtainable.

The present embodiments meet these needs.

## BRIEF DESCRIPTION OF THE FIGURES

The detailed description will be better understood in conjunction with the accompanying drawings as follows:

FIG. 1A shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 40 kilograms to 160 kilograms.

FIG. 1B shows a diabetic treatment model with bolus volume dosage amounts for a subject with a weight from 161 kilograms to 275 kilograms.

FIG. 2 shows a bolus volume dosage adjustment protocol based on tested blood glucose levels as produced by a diabetic treatment model.

FIG. 3 depicts glucose dosage adjustment protocol as produced by a diabetic treatment model.

FIG. 4 depicts a metabolic enhancement protocol as produced by a diabetic treatment model and an exemplary metabolic enhancement by component.

FIGS. 5A-5C depict steps of a method of the invention according to one or more embodiments.

FIG. 6 depicts a system of the invention according to one or more embodiments.

FIGS. 7A and 7B depict an administrative data storage usable in the system according to one or more embodiments.

FIGS. 8A-8C provide exemplary subject profiles with an automatically generated care plan template and an automatically generated report according to one or more embodiments.

FIG. 9 depicts the kit according to one or more embodiments.

INSU_PI_001491

US009652595B1

(12) **United States Patent**
Carr et al.

(10) **Patent No.:**   **US 9,652,595 B1**
(45) **Date of Patent:**      **May 16, 2017**

(54) **KIT THAT IMPROVES IMPAIRED HEPATIC GLUCOSE PROCESSING IN SUBJECTS**

(71) Applicant: **DIABETES RELIEF LLC**, Houston, TX (US)

(72) Inventors: **Hunter Michael Alan Carr**, Houston, TX (US); **Scott Hepford**, Houston, TX (US); **Carol Ann Wilson**, Houston, TX (US)

(73) Assignee: **Diabetes Relief LLC**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/362,963**

(22) Filed: **Nov. 29, 2016**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/042,087, filed on Feb. 11, 2016.

(60) Provisional application No. 62/117,393, filed on Feb. 17, 2015.

(51) Int. Cl.
| | |
|---|---|
| *A61M 5/168* | (2006.01) |
| *G06F 19/00* | (2011.01) |
| *A61M 5/00* | (2006.01) |

(52) U.S. Cl.
CPC ........ *G06F 19/3468* (2013.01); *G06F 19/322* (2013.01)

(58) **Field of Classification Search**
CPC ........................... G06F 19/3468; G06F 19/322
USPC ............................................................. 436/95
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2014/0005633 A1 * 1/2014 Finan ................. A61M 5/1723
604/504

* cited by examiner

*Primary Examiner* — Rebecca M Fritchman
(74) *Attorney, Agent, or Firm* — Buskop Law Group P.C.; Wendy Buskop

(57) **ABSTRACT**

A kit for individualized intravenous exogenous insulin-based therapy, which includes a portable data storage in communication with client device processor. The data storage can have computer instructions, a database of metabolic factors, a library of weight management protocols, a diabetic treatment model, and a library of care plan templates. The kit for individualized intravenous exogenous insulin-based therapy includes a blood glucose meter, a plurality of intravenous catheters fluidly engageable with a fluid source, and a plurality of metabolic enhancements.

**20 Claims, 19 Drawing Sheets**

APPX1211

**INSU_PI_001492**



# IV Pulsatile Insulin – Background Part 1

☐ The origin of the IV pulsatile insulin approach goes back decades with a broad spectrum of scientists and doctors from around the world

☐ Late 1970s Thomas Aoki MD, Assoc. Prof. of Harvard Medical School, worked on a precursor version of the approach while head of the Metabolism Section of Boston's Joslin Diabetes Center

☐ G. Ford Gilbert became involved with Dr. Aoki as his lawyer and through licenses of Dr. Aoki's protocol using various names and companies, all of which wound up in 14 years of litigation in several courts and an injunction against Gilbert in Nevada

☐ The current Aoki -Gilbert litigation began in 2011 and is set for trial on July 23, 2018, in the USDC, Eastern District of California, before Judge Troy Nunley

☐ Documents on file in that litigation detail the history between Dr. Aoki and Ford Gilbert and are open to public research (Case No. 2:11 -cv-02797 -TLN-CKD)

☐ Gregory Ford Gilbert's federal court troubles continue, and he has now been indicted in a serious criminal matter involving bribery in the Middle District of Alabama

*Confidential* – Copyright © H360 LLC 2018. All rights reserved.

APP/070
INSU_PL_001493



**Journal of Endocrinology and Disorders**

Jonathan Lakey *

Globalize your Research

Open Access                    Research Article

# Improved Kidney Function Following Physiologic Insulin Resensitization Treatment Modality

**Zach Villaverde[1], Tori Tucker[2], Michael Alexander[3], Scott A. Hepford[1], Jonathan RT Lakey[3,4*], Roy H. Hinman III[1]**

[1]Island Doctors, St. Augustine, FL with Well Cell Global, Houston, TX.

[2]Department of Developmental and Cell Biology, University of California Irvine, Irvine, CA.

[3] Department of Surgery, University of California Irvine, Orange, CA.

[4] Department of Biomedical Engineering, University of California Irvine, Irvine, CA.

***Corresponding Author:** Jonathan Lakey, Professor, Departments of Surgery and Biomedical Engineering University of California Irvine.*

**Received Date:** 07 July 2021 | **Accepted Date:** 28 July 2021 | **Published Date:** 30 July 2021

**Citation:** Z Villaverde, T Tucker, M Alexander, Scott A. Hepford, JRT Lakey, et al. (2021) Improved Kidney Function Following Physiologic Insulin Resensitization Treatment Modality. *J. Endocrinology and Disorders.* 5(4): DOI:10.31579/2640-1045/080

**Copyright:** © 2021 Jonathan Lakey. This is an open-access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

**Abstract**

Diabetes affects millions of people worldwide and is a leading cause of amputation, blindness, neuropathy, and chronic kidney disease. Chronic kidney disease results in the prolonged impairment of kidney function. Common medications and lifestyle modifications do not eliminate the long-term complications of diabetes, because they lack the ability to restore the periodic cycle of insulin that exists in healthy physiology. Our study used a precise administration of exogenous insulin, mimicking the physiologic profile of insulin secretion, which is more effective at stabilizing cellular blood glucose uptake and reducing diabetic complications than current drug and lifestyle modifications alone.

In this case study report, we evaluated three diabetic or pre-diabetic patients who showed improvements in kidney function after beginning this treatment modality. We monitored their chronic kidney disease symptoms before and after the physiological insulin resensitization (PIR) process.

We showed that the patients improved in kidney function after several months based on their laboratory metrics and CKD stage classification.

**Key Words:** diabetes; chronic kidney disease; treatment modality; physiological insulin resensitization

## Introduction

Diabetes mellitus affects millions of people worldwide, and its complications cost hundreds of billions of dollars to treat. Diabetes is a metabolic disorder that affects the way humans metabolize glucose [1]. Glucose is of vital importance to human health, as it is the main energy molecule for muscles and organs such as the brain. Diabetes is typically identified via sustained hyperglycemia [1]. This hyperglycemia is caused by at least one defect along the insulin secretion and reception pathway in the body [1].

The two most common types of diabetes are Type 1 and Type 2 diabetes [1]. Type 1 diabetes (T1D) is an autoimmune disease that results in the immune system destroying insulin-producing beta cells in the pancreas. T1D typically manifests itself in early adolescence, and T1D patients are dependent on exogenous insulin for survival [1]. Type 2 diabetes (T2D) is the more common of the two and is typically believed to be caused by inadequate insulin secretion from the pancreas or decreased cellular response to insulin [1]. Onset of T2D is typically believed to be associated

with obesity or poor diet [1]. In people developing T2D, hyperglycemia is caused by either a decrease in insulin sensitivity, a failure to produce enough insulin or both. In the case of decreased insulin sensitivity, abnormal insulin secretion from the pancreas results in consistent exposure of cells to insulin. Cells consequently downregulate the associated insulin receptors, and the patient takes up less glucose into his or her cells, prompting the pancreas to produce more insulin in a positive feedback loop [1]. Eventually, the patient has so few responsive receptors that glucose cannot be taken up into cells, and the patient suffers from chronic hyperglycemia [1]. In the case of insulin deficiency, genetic defects or chronic overproduction of insulin can result in not enough insulin being secreted from the pancreas. In this case, hyperglycemia is sustained because a patient does not produce enough insulin for the cells to uptake the glucose in the bloodstream [1]. Both of the above scenarios result in T2D characterized by hyperglycemia, which can lead to other detrimental effects on the body.

One potential effect of diabetes is increased inflammatory response. Inflammation has been hypothesized to originate from decreased insulin

INSU_PI_001494

J. Endocrinology and Disorders

*Copy rights@ Jonathan Lakey et.al.*

sensitivity, as well as obesity and increased lipolysis [2]. Insulin has been shown to suppress certain inflammation-promoting transcription factors such as IL-6, CRP, and TNF-α. Diabetes can decrease production or uptake of insulin, which removes the suppression of these transcription factors and results in inflammation [2]. Type 2 diabetics can develop obesity because their blood sugar is not being effectively metabolized; thus, the body stores the blood sugar as fat before it can be utilized through the fat metabolism pathway [2]. Obesity results in increased numbers of adipocytes, which constitutively express inflammatory markers, like IL-6 and CRP as mentioned above [2]. Finally, increased lipolysis because of T2D results in higher free fatty acid concentrations in the blood, which contributes to increased cellular oxidative stress through the buildup of oxygen radicals, and tissue inflammation [2]. The combination of sustained hyperglycemia and inflammation in the body as a result of diabetes contributes to many of the complications that arise in diabetic patients [2].

Many complications can arise from chronic hyperglycemia and inflammation associated with diabetes and other metabolic disorders. Some of the more common complications include cardiovascular disease, wound ulceration, peripheral neuropathy in limbs, and nephropathy leading to chronic kidney disease (CKD) and kidney failure [3]. Chronic kidney disease is of growing concern, as the number of people per year initiating treatment for diabetic CKD leading to end-stage kidney disease (ESKD) and dialysis increased more than 18-fold between 1980 and 2011, with numbers continuing to climb [3]. Diabetic CKD, also known as diabetic kidney disease (DKD), is also the single strongest predictor of mortality in diabetic patients, warranting it special attention in medicine [3].

Chronic kidney disease is the result of prolonged impairment of kidney function. Kidney function is best measured through a patient's estimated Glomerular Filtration Rate, or (e) GFR [4]. Clinically, a patient is diagnosed with CKD if he or she exhibits one or both of the following for at least three months: an eGFR of below 60mL/min or at least one other marker of kidney damage [4]. These markers include albuminuria or proteinuria, abnormal urine electrolyte levels, structural abnormalities in the kidney, and others [4]. Diabetic patients are at unique risk for developing CKD because two of the side effects of diabetes, hyperglycemia and inflammation, affect pathways that lead to impaired kidney function [3]. Hyperglycemia changes the typical progression of glycolysis in cells, resulting in upregulation of transcription factors and substrates that lead to glomerular hyperfiltration or capillary obstruction. Over time, hyperfiltration and blood vessel obstruction damage the kidneys and can result in DKD [3]. Inflammation results in increased levels of inflammatory cytokines in the blood, which are hypothesized to increase endothelial cell permeability as well as induce apoptosis in endothelial cells. Degradation of endothelial linings can contribute to abnormal amounts of protein or electrolytes in urine, as well as decreased eGFR in damaged nephrons [3].

Chronic kidney disease is generally separated into six stages based on a patient's eGFR. Stage 1 CKD is "normal" and is characterized as an eGFR of 90 mL/min or higher. Stage 2 CKD is within the range of 60 mL/min to 89 mL/min, and kidneys are considered mildly impaired. Patients with an eGFR below 60 mL/min are then diagnosed with CKD and placed into CKD stage 3. Stage 3 is further divided into 3a and 3b and signals moderate impairment in kidney function. Stage 3a falls within eGFR ranges of 45 mL/min to 59 mL/min and stage 3b within 30 mL/min and 44 mL/min. CKD Stage 4 denotes significant impairment and risk for renal failure. Stage 4 eGFRs range from 15 mL/min to 29 mL/min. Below 15 mL/min is CKD Stage 5, which is essentially renal failure [4]. Patients at CKD Stage 5 are highly likely to require dialysis or a kidney transplant [4]. Dialysis and surgery can be costly and significantly impact a patient's quality of life. Current widely accepted treatments focus on slowing the

progression of CKD and attempt to restore "reversible" factors of CKD to normal to reduce its severity [5]. Once a diabetic patient begins to lose kidney function, however, it is extremely difficult to arrest this progression, because the underlying contributors, high blood sugar and inflammatory tissue damage, are still present in the patient. This study seeks to explore the effect of Physiologic Insulin Resensitization on diabetic and pre-diabetic patients in varying stages of CKD. More specifically, we want to determine whether physiologic insulin resensitization displayed any noticeable effects on the kidney function of patients currently receiving the treatment modality in a real-world clinical setting.

## Description of Physiologic Insulin Resensitization (PIR)

In our study, we utilize a novel therapeutic protocol that uses insulin as a biologic adjunct in treating the systemic complications of diabetes regarding kidney function. The advantage of this protocol is mimicking the body's own method of insulin regulation, especially mimicking the normal physiologic and periodic insulin signaling. This protocol was designed to counter the negative effect of insulin messaging, as well as unopposed glucagon effect on reducing insulin receptor expression [2]. Effectively, this protocol serves as a potent adjunctive companion method to overcome insulin resistance, or insulin toxicity and improve carbohydrate metabolism.

This bio-mimicry precision dosing ranges dynamically between 4- to 8-minutes intervals where adjustments to concentrations, volumes, pressures, and oscillations of insulin are varied on an individualized basis. Oral glucose is used at individualized intervals to trigger carbohydrate metabolism, which as carbohydrate metabolism improves, ATP production is increased, and inflammatory markers are reduced, leading to higher available cellular energy [7].

The PIR precision dosing pattern of insulin is consistent with normal hormone secretion and more closely approximates the body's natural signaling pathways. As the patient's insulin resistance improves, healthcare providers can titrate other medications to optimize treatment regimens. In general, PIR permits lowering dosing of subcutaneous insulin and other diabetes medications, which often promote the secretion of insulin or inhibit the production of glucose and are costly [7]. This study was performed as an observational evaluation of patients who are already undergoing PIR treatment at Island Doctors and have their kidney function monitored as a part of the treatment.

## Consent for study

Before any patient begins the PIR treatment modality at the Island Doctors clinic in Palm Coast, Florida, the patient signs a consent document to their information being used anonymously for the purpose of scientific studies. Patient data shown in this manuscript complies with the terms of this agreement.

## Clinical Presentation

Tables 1-3 are results from three male patients who have been on PIR infusion treatment for at least five weeks. These three patients were selected from more than 80 current patients for exceptional changes in metrics related to kidney function. Table 1 identifies patients based on their ID number at the clinic where they receive their PIR infusion treatments. Their ages are also noted. These patients range from 75 at the youngest to 85 at the oldest. It is worth noting that only one of the patients, patient 8, was referred to the PIR clinic for CKD stage 3. The other two patients were referred for other reasons relating to PIR. Only patient 32 is clinically diabetic. The other two patients are pre-diabetic, but all three of them have low eGFR scores that would classify them as CKD stage 3 or higher.

INSU_PI_001495

*J. Endocrinology and Disorders* *Copy rights@ Jonathan Lakey et.al.*

| Table 1: PIR Patient Demographic Information | | |
|---|---|---|
| **Patient ID** | **Age** | **Reason for Starting the PIR Treatment Modality** |
| 8 | 77 | CKD Stage 3/Peripheral Neuropathy |
| 30 | 75 | Ulcerated Wound |
| 32 | 85 | Diabetic Neuropathy |

**Table 1:** Patient characteristics enrolled in this study. Basic demographic information as well as the reason for referral to the PIR treatment modality is also shown.

Table 2 outlines the relevant metrics for assessment of patient kidney function. Each of the three patients observed in this case study was on the treatment modality for at least 5 weeks prior to re-evaluation of these metrics. This translates to a minimum of 8-10 infusions for patient 32, and approximately 20 for patients 8 and 30 after 15 weeks of the treatment modality. The primary indicator for CKD, eGFR, showed a positive percent change between the base and the first test for each of the three patients. Patient 8 showed the highest percentage increase of 67%, but all

three of these patients increased at least 25% in this short window of treatments. Furthermore, patient 8 regressed classification from CKD stage 3b to 3a, and patient 30 regressed from 3a to 2. These patients additionally showed decreases in both BUN and Creatinine in their urinalysis tests. The patients' BUN scores decreased anywhere from 21% to 46% over this timeframe, and Creatinine decreased between 18% and 34%. These changes are all positive developments in kidney health of these patients.

| Table 2: CKD Specific Metrics by Patient – Before and During PIR Treatment Modality | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Patient ID | Lab Date | Weeks on Infusion Treatment | BUN (mg/dL) | % Chg | Creatinine (mg/dL) | %Chg | eGFR (mL/min) | %Chg | Potassium (mmol/L) | %Chg |
| 8 | 9/19/2020 | 0 | 28 | | 1.9 | | 33 | | 5.1 | |
| 8 | 1/12/2021 | 15 | 15 | -46% | 1.25 | -34% | 55 | 67% | 4.7 | -8% |
| 30 | 8/27/2020 | 0 | 19 | | 1.3 | | 53.8 | | 3.8 | |
| 30 | 1/13/2021 | 15 | 15 | -21% | 0.99 | -24% | 74 | 38% | 4 | 5% |
| 32 | 9/17/2020 | 0 | 35 | | 1.81 | | 33 | | 5.9 | |
| 32 | 1/18/2021 | 5 | 19 | -46% | 1.49 | -18% | 42 | 27% | 4.3 | -27% |

**Table 2:** Kidney lab markers before and after beginning physiologic insulin resensitization for kidney function. Relevant metrics for kidney function as well as percent changes from baseline are outlined for each patient. Green labels indicate strictly positive developments in percent change. The date of the baseline labs – 0 weeks on the treatment modality – does not correspond with the first day of patient treatment. These dates correspond to the patients' most recent labs prior to beginning the treatment modality. The number of weeks on infusion treatments is tabulated separately.

Another development to note is the potassium level in patient 32. At the beginning of this treatment modality, this patient showed a potassium level of 5.9 mmol/L, which is higher than the normal upper boundary of 5.2. After 5 weeks of treatments, this patient showed a potassium of 4.3 mmol/L, decreasing 27%, and falling back within normal levels. Likewise, patient 8 showed potassium of 5.1mmol/L, which is almost at the upper limit of normal levels. After 15 weeks of treatments, that number decreased 8% to 4.7 mmol/L.

In terms of diabetes-specific results, Table 3 shows the change in each patient from their baseline labs. For the three patients, fasting blood glucose gave ambiguous results, with one patient decreasing, one patient increasing, and one staying roughly the same. However, Hemoglobin A1c did decrease in all three patients, even those who are not clinically diabetic. Hemoglobin A1C decreased most drastically in patient 32, the one patient of these three who is clinically diabetic, decreasing a full percentage point from 7.3% to 6.3%.

| Table 3: Diabetes Specific Metrics by Patient – Before and During the PIR Treatment Modality | | | | | | |
|---|---|---|---|---|---|---|
| Patient ID | Lab Date | Weeks on Infusion Treatment | Fasting BG (mg/dL) | %Chg | A1C (%) | %Chg |
| 8 | 9/19/2020 | 0 | 116 | | 6.3 | |
| 8 | 1/12/2021 | 15 | 100 | -14% | 6 | -5% |
| 30 | 8/27/2020 | 0 | 94 | | 5.7 | |
| 30 | 1/13/2021 | 15 | 96 | 2% | 5.6 | -2% |
| 32 | 9/17/2020 | 0 | 100 | | 7.3 | |
| 32 | 1/18/2021 | 5 | 142 | 42% | 6.3 | -14% |

**Table 3:** Diabetic lab markers before and after beginning physiologic insulin resensitization. Relevant metrics for diabetes as well as percent changes from baseline are outlined for each patient. Green labels indicate strictly positive developments in percent change. This information corresponds to the same rows/columns as Table 2

INSU_PI_001496

J. Endocrinology and Disorders
*Copy rights @ Jonathan Lakey et.al.*

## Discussion

The link between insulin resistance and progressive CKD is becoming apparent as more research shows physiologic effects on the kidneys of insulin resistance. A 2012 study by the American Society of Nephrology noted insulin resistance as a known complication of ESRD. [8] The study went on to show an inverse relation between insulin resistance and measured eGFR, which is one of the key metrics in determining severity of CKD. [8, 9]. Diabetic patients suffer from insulin resistance with or without CKD and ESRD, but this study also notes that insulin resistance is prevalent in non-diabetic ESRD patients as well. [8]

The goal of the PIR treatment is to return insulin secretion to normal physiological conditions, thereby reducing the level of insulin resistance in affected patients. The patients sampled in the results above display increased eGFR, which is correlated with reduced insulin resistance in both the diabetic and nondiabetic patients. This is potentially attributable to the PIR treatment.

Insulin resistance has also been shown to create structural changes in the kidney, including excess proliferation of cells, apoptosis inhibition, and reduction in endothelial functionality [6]. All these effects carry a risk of kidney injury and progressive CKD [6]. The PIR modality recalibrates the endogenous production of insulin to its physiologic "pulse-rest" intervals, which may allow these alternative insulin-signaling pathways to regain ordinary functionality. This may result in a restructuring of kidney tissues back to normal, and furthermore an improvement in kidney function after beginning the PIR treatment modality.

## Conclusion

The principal objective of this study was to determine if the PIR treatment modality has any noticeable effect on kidney function in patients with diabetic CKD. Given the above results, it is possible that this modality has positive effects on kidney function in diabetic patients. Because the study was a real-world analysis and not a controlled study with explicit variables, further data and studies are required to support this notion. The next steps after this preliminary case study would be design and execution of a full controlled study among diabetic patients with CKD, in which the independent variable is the PIR treatment modality itself.

## Funding

This work was supported by internal funding by Well Cell Global LLC and volunteered time by providers and staff members at Island Doctors.

## Declaration of Interests

Dr. Roy Hinman, and Zach Villaverde are employees of Island Doctors, which administers the PIR treatment modality. Scott Hepford is employed by Well Cell Global LLC, which researches, advances and licenses the PIR treatment modality. Tori Tucker, Michael Alexander, and Dr. Jonathan Lakey are employees of the University of California Irvine and have no conflicts of interest in this study.

## Consent for Publication

Patients provided their consent for anonymous inclusion of their data in publications.

## References

1. American Diabetes Association. (2005) Diagnosis and Classification of Diabetes Mellitus. Diabetes Care. 28(supply 1):s37-s42.
2. Paresh D, Ahmad A, Ajay C, Priya M, Rajesh G. (2005) Metabolic Syndrome. Circulation.111 (11):1448-1454.
3. Toth-Manikowski S, Atta MG. (2015) Diabetic Kidney Disease: Pathophysiology and Therapeutic Targets. J Diabetes Res. e697010.
4. Webster AC, Nagler EV, Morton RL, Masson P. (2017) Chronic Kidney Disease. The Lancet. 389(10075):1238-1252.
5. Johnson CA, Levey AS, Coresh J, Levin A, Lau J, Eknoyan G. (2004) Clinical Practice Guidelines for Chronic Kidney Disease in Adults: Part 1. Definition, Disease Stages, Evaluation, Treatment, and Risk Factors. Am Fam Physician. 70(5):869-876.
6. Abernethy A. (2020) Insulin Gains New Pathway to Increased Competition.
7. Dong S, Lau H, Chavarria C, Alexander M, Cimler A, Elliott JP, et al. (2019) Effects of Periodic Intensive Insulin Therapy: An Updated Review. Curr Ther Res Clin Exp. 90:61-67.
8. Pham H, Robinson-Cohen C, Biggs ML, Ix JH, Mukamal KJ, Fried LF, Kestenbaum B, Siscovick DS, de Boer IH. (2012) "Chronic Kidney Disease, Insulin Resistance, and Incident Diabetes in Older Adults." Clinical Journal of the American Society of Nephrology. 7;4: 588–594.
9. Spoto B, Pisano A, Zoccali C. (2016) "Insulin Resistance in Chronic Kidney Disease: A Systematic Review." American Journal of Physiology-Renal Physiology. 311:6:F1087–1108.

This work is licensed under Creative Commons Attribution 4.0 License

To Submit Your Article Click Here: **Submit Manuscript**

**DOI: 10.31579/2640-1045/080**

**Ready to submit your research? Choose Auctores and benefit from:**

- ❖ fast, convenient online submission
- ❖ rigorous peer review by experienced research in your field
- ❖ rapid publication on acceptance
- ❖ authors retain copyrights
- ❖ unique DOI for all articles
- ❖ immediate, unrestricted online access

At Auctores, research is always in progress.

Learn more https://auctoresonline.org/journals/cancer-research-and-cellular-therapeutics

APPX1216

INSU_PI_001497



ISSN: 2577 - 8005

**Review article**

## *Medical & Clinical Research*

# Dynamic diabetes solutions: physiologic insulin resensitization

**Brian Loveridge[1],\*, Tori Tucker[2], Melanie St. Laurent[1], Scott Hepford[1], Michael Alexander[3], Jonathan RT Lakey [3,4]**

[1]*Well Cell Global, Houston, TX, USA.*

[2]*Department of Developmental and Cell Biology, University of California Irvine, Irvine, CA, USA.*

[3]*Department of Surgery, University of California Irvine, Orange, CA, USA.*

[4]*Department of Biomedical Engineering, University of California Irvine, Irvine, CA, USA.*

***\*Corresponding author***
Brian Loveridge, Well Cell Global, 2086 North 1700 West Suite D, Layton, Utah 84041, Houston, TX, USA.

**Submitted**: 29 July 2021; **Accepted**: 05 Aug 2021; **Published**: 13 Aug 2021

*Citation: Brian Loveridge, Tori Tucker, Melanie St. Laurent, Scott Hepford, Michael Alexander, Jonathan RT Lakey (2021) Dynamic diabetes solutions: physiologic insulin resensitization. Medical & Clinical Research 6(8): 656-660.*

**Abstract**
*Diabetes is a disease currently affecting over 30 million Americans and is a leading cause of amputation, blindness, and chronic kidney disease. Treatment of diabetes with medications and lifestyle modifications alone have not eliminated these complications, because in part they lack the ability to restore the periodic cycles and rest periods of insulin that exist in healthy physiology. Insulin is excreted in a cyclical and oscillatory pattern by the pancreas, that is critical to maintain adequate insulin sensitivity at the insulin receptor level. Administration of exogenous insulin bio identically matching this physiologic profile is more effective at controlling blood glucose level and reducing complications of diabetes than standard drug therapy and lifestyle modifications alone. This matching of physiological insulin helps reduce inflammatory cascades responsible for a number of diabetic complications. In this article, we will review how insulin is secreted and functions physiologically and highlight a dynamic insulin delivery modality that mimics normal secretion profiles. This biomimicry reduces insulin exposure, which appears to reduce the progression to or worsening of insulin resistance. We will review how administration of insulin in this manner has been associated with reduction of diabetic complications.*

**Keywords:** Diabetes, Biomimicry, Treatment, Insulin Resistance, Insulin, Physiologic Insulin Resensitization, PIR.

## Introduction

The Food and Drug Administration approved 15 new diabetes drugs between 2013 and 2016. Almost 300 companies are involved in developing drugs for type 2 diabetes alone, and additional companies are working on type 1 diabetes and diabetes complications [1]. Still others are developing new drug delivery devices. The teams dedicated to discovering new molecules should be applauded; diabetes mellitus is an immense public health issue reaching pandemic proportion.

According to the American Diabetes Association, the total economic cost of diabetes in the U.S. increased from $205 Billion in 2007, to $327 Billion in 2017 [2]. Medicare spent $11 Billion in 2013 on dialysis alone. Amputations cost between $73,000 to $120,000 for hospital and follow-up care. As the occurrence of diabetes continues to rise along with the ballooning costs of treatments, pharmaceutical companies continue to seek proprietary compounds for development. In recent years, the US FDA has approved several drugs with novel mechanisms of action. These include GLP-1 agonists, DPP-4 inhibitors and SGLT2 inhibitors. It is encouraging to see reductions in major cardiovascular endpoints and positive data for those suffering with renal complications of diabetes. However, the magnitude of such benefits is limited in scope, and is further limited due to significant costs and material adverse GI side effects, which preclude many patients from tolerating these novel drugs [3,4].

Recent guidelines published March 5, 2018, from the American College of Physicians on diabetic management outline that over-aggressive HbA1c control can be counterproductive and harm patients due to complications of hypoglycemia and other untoward effects. This evidence-based review includes data from the landmark ACCORD trial that was terminated prematurely, because intensive glycosylated hemoglobin management led to increased morbidity and mortality. As such, ACP guidelines now target a HbA1c between 7-8%, rather than previous targets of 6.5-7%. Thus, the standard of practice for diabetic management is in flux, highlighting the significant limitations in addressing complications of diabetes with current treatment modalities [5]. Furthermore, on March 23, 2020, insulin was officially moved to the biologic regulatory framework

APPX 121

INSU_PI_001498

by the FDA, highlighting the physiologic nature of this hormone peptide in regulating carbohydrate metabolism [6].

Given this dynamic landscape, an augmented approach to treating diabetes and other metabolic disorders is needed. Ideally, an approach that closely mimics the body's natural method of regulating insulin might also allow for restoration of normal physiology to achieve optimal clinical results. The science behind rhythmic or physiologic insulin excretion by the pancreas is not new; the phenomenon has been documented by researchers for decades. Likewise, attempts to investigate the potential therapeutic benefits of this approach have been studied and as technology and understanding improves, efforts to further maximize clinical benefits and deploy such treatment modalities should be undertaken.

## Physiology of Insulin Release

Rather than a continuous flow or stream, the pancreas releases insulin in the same way many other hormones are secreted—in short periodic waves that dynamically change, based on the body's demands. The beta-cells in the islets of Langerhans excrete insulin in a dynamic fashion. This phenomenon was first observed in 1979 when researchers observed healthy fasting subjects and monitored insulin levels every minute for one to two hours (Figure 1) [7].



**Figure 1: A three-minute moving average (continuous line) of the fasting plasma insulin, C-peptide and glucose concentrations taken at one-minute intervals.** The dashed line shows the "unsmoothed" data. Smoothing reduces the rapid fluctuations, which are probably due to "noise," and also blunts the amplitude. The simultaneous insulin and C-peptide cycles disappear after 50 minutes. Reproduced from [7].

Insulin levels in the blood are not static but oscillate every few minutes. C-peptide, which is secreted along with insulin, follows the same pattern. Corresponding changes in glucose levels are present but less dramatic. After consuming a carbohydrate meal, the height of each peak increases as more insulin is released in each pulse while the pulses and rest period continue at the roughly the same frequency. These dynamic peaks and troughs of insulin are approximately every 4-8 minutes. Insulin levels drop to near zero at the center of the troughs while glucagon levels remain above zero in their respective troughs. Since the half-life of IV insulin being approximately 2 minutes, this physiology would suggest the insulin finished its effects in 2 minutes, thus leaving at least 2 more minutes for the insulin receptors to have adequate time to reset in an environment of near zero stimulant. In addition to these fast cycles, an ultradian rhythm made up of slower oscillations of insulin every 80-180 minutes has also been observed [8].

Physiologic insulin secretion is characteristic of a normal hormone secretion and appears to be more effective at activating insulin receptors than a constant exposure of insulin. The phenomenon is most readily observed in the liver. The pancreas releases insulin into the portal vein, which flows directly into the liver before spreading out through the rest of the body; so, the liver experiences the most direct impact of these insulin pulses. In contrast, a continuous exposure to insulin results in downregulation of insulin receptors and results in the phenomenon of insulin resistance [9].

Type 2 diabetes is characterized by a disruption of this physiologic rhythm of insulin by the pancreas. This disruption is believed to be in part a result of inflammation in the pancreas that may result from a variety of causes including obesity, toxins, trauma, etc., and the resulting inflammation ultimately disrupts the neuronal network that coordinates this dynamic oscillating pattern. The slower, longer ultradian cycles of insulin secretion was found to be disrupted in diabetic patients. In addition to the longer cycles, shorter rhythms are affected in diabetes mellitus as well. Individuals with type 2 diabetes compared to normal individuals have been found to have shorter and highly irregular waveforms related to their insulin secretion profile [10].

The question of causality was explored to determine whether the disruption in physiologic secretion of insulin is a sequela of, or a catalyst for diabetes. First-degree relatives of diabetic patients were studied in 1998 and were found to have abnormal insulin pulses compared to unrelated controls, suggesting that the abnormal oscillations in insulin secretion may be an early phenomenon in the development of type 2 diabetes [11]. Research performed more recently shed additional light on the role that abnormal insulin patterns play in the subsequent onset of diabetes [12]. The physiologically normal pattern of insulin waveforms is important for hepatic insulin signaling and glycemic control, and liver insulin resistance in diabetes is likely, in part, due to impaired physiologic insulin signaling. Additionally, as disordered insulin secretion may cause intracellular insulin resistance, it may be an initiating factor in the progression to type 2 diabetes [12]. This phenomenon and the implications were explored in even greater detail in a recent review article published by the American Diabetes Association [13].

To summarize the sampling from the research above, the physiologic secretion of insulin by the pancreas is well established, as is the evidence that impaired oscillations of insulin play a significant role in the development of insulin resistance and diabetes.

APPX1218

INSU_PI_001499

## Development of Physiologic Insulin Resensitization (PIR)

Even though there are many academic and commercial teams of scientists developing molecules to manage the progression of the disease, the incidence and negative impact of diabetes continues to grow. This challenge has led to the development of a novel therapeutic modality that has potential to produce superior outcomes by biomimicking the body's own method of regulating insulin. This treatment employs a precise dosing to approximate the normal physiologic insulin signaling which serves to counter the negative feedback of aberrant insulin messaging and to minimize the negative effects of unopposed glucagon that leads to decreased insulin receptor expression [14]. This modality is focused on transforming the way diabetes is traditionally managed via symptom suppression by providing clinicians a potent adjunctive method to overcome insulin resistance and improve carbohydrate metabolism. The goal of PIR is to enable cellular repair by attempting to restore physiologic secretory insulin patterns necessary to alleviate the systemic complications of diabetes. Simultaneously, by inducing the body to shift metabolic activity to consume carbohydrate rather than fat, the harmful effects of increased oxidative stress and free radical production adding to endothelial tissue damage can be reduced. In addition, this shift of metabolism potential to increase the level of adenosine triphosphate available for performance of vital cellular functions.

Several clinical studies have shown the safety and efficacy of early iterations of such a treatment strategy. Dailey GE et al. performed a study to assess the effects of a dynamic insulin approach on the progression of diabetic nephropathy in patients with type 1 diabetes mellitus (DM) [15]. This 18-month multicenter, prospective, controlled study involved 49 type 1 DM patients with nephropathy who were following the Diabetes Control and Complications Trial (DCCT) intensive therapy (IT) regimen. Of these, 26 patients formed the control group (C), which continued on IT, while 23 patients formed the treatment group (T) and underwent, in addition to IT, weekly treatment. Blood pressure in all patients was maintained below 140/90 mm Hg on antihypertensive medication, preferentially using angiotensin-converting enzyme (ACE) inhibitors. All study patients were seen in the clinic weekly for 18 months, had monthly HbA1c monitoring, as well as 24-hour urinary protein excretion and creatinine clearance (CrCl) determinations performed every 3 months. The HbA1c levels declined from 8.61% +/- 0.33% to 7.68% +/- 0.31% (P=.0028) in the T group and from 9.13% +/- 0.36% to 8.19% +/- 0.33% (P=.0015) in the C group during the study period. CrCl declined significantly in both groups, as expected, but the rate of CrCl decline in the T group (2.21 +/- 1.62 mL/min/yr) was significantly less than in the C group (7.69 +/- 1.88 mL/min/yr, P=.0343). The authors conclude that when this treatment is added to IT in type 1 DM patients with overt nephropathy, it appears to markedly reduce the progression of diabetic nephropathy. The effect appears independent of ACE inhibitor therapy, blood pressure, or glycemic control [15].

Subsequent to these findings, a follow up study was done by Aoki et al. [16]. In this clinical trial, the investigators set out to assess the effects of dynamic insulin delivery on the progression of overt nephropathy in patients with type 1 diabetes mellitus. This retrospective longitudinal three-center study of 31 patients with type 1 diabetes mellitus and overt nephropathy who were receiving intensive subcutaneous insulin therapy (four insulin injections daily) and weekly dynamic insulin. Study patients had follow-up consultations weekly for at least 12 months, monthly hemoglobin A1c (by high-performance liquid chromatography), and semiannual creatinine clearance determinations. The results showed hemoglobin A1c declined significantly from 8.6% +/- 0.6% to 7.6 % +/- 0.3% (P=0.0062) during the study period, while the creatinine clearance remained essentially unchanged. The authors concluded that such an approach in patients with type 1 diabetes mellitus seems to arrest or appreciably reduce the progression of overt diabetic nephropathy, as well as substantially improve their glycemic control [16].

In 2021, a case series reported that longstanding diabetic neuropathy was reversed using PIR. In addition, these patients also noted improved wound healing, decreased A1c, and decreased insulin requirements [17]. Furthermore, another case series published in 2021 reported improved kidney function in patients with CKD utilizing PIR treatment modality [18]. These case reports suggest that longstanding complications of diabetes may be reversable. Prospective data sets are needed to validate these findings.

A recent prospective study, published in 2021, evaluated the potential to improve kidney function in type 2 diabetics with stage 3 kidney disease in an attempt to deliver physiologic signals. The results reported are as follows: Of 22 enrolled type 2 patients, 17 completed the trial per protocol (7 women, 10 men, age: $69 \pm 7$ yrs., HbA1c: $7.9 \pm 1.0$%). After 3 months, mean GFR improved by 12% (from $47.6 \pm 10.0$ mL/min to $53.3 \pm 11.9$ mL/min, p<0.01) and mean serum creatinine decreased by 7% ($1.4 \pm 0.3$ mg/dL/$1.3 \pm 0.3$ mg/dL, p<0.05). Systolic blood pressure improved by 6% (p<0.05), while HbA1c and body weight remained stable. The treatment satisfaction score improved from $3.7 \pm 2.7$ to $2.7 \pm 2.1$ (p<0.005). The treatments were well tolerated and only few cases of muscle cramps were reported in the study group [19]. In totality, the numerous potential clinical benefits of this modality are summarized in Table 1. The documented improvements in diabetic nephropathy and CKD are highlighted in Table 2.

## Clinical Outcomes Utilizing Physiologic Insulin Resensitization

**Table 1: Summary of documented benefits utilizing PIR modality.**

| |
|---|
| Decrease in Hemoglobin A1c [16,17] |
| Reversal of Diabetic Neuropathy [17] |
| Improvement in Wound Healing [17] |
| Decrease in Insulin Requirements [17] |
| Improvement in Estimated Glomerular Filtration Rate (EGFR) [18,19] |
| Decrease in Systolic Blood Pressure (SBP) [19] |
| Reduce/Arrest Progression of Diabetic Nephropathy [15,16,18,19] |

APPX1219

INSU_PI_001500

## Improvements in Diabetic Nephropathy/CKD

**Table 2: Summary of benefits utilizing physiologic insulin resensitization in the treatment of diabetic nephropathy/CKD.**

| | |
|---|---|
| Reduced Progression of CKD: CrCl (18months) [15] | -348% |
| Halted Progression of CKD: CrCl (12 months) [16] | Ø |
| Reversed CKD with Improved EGFR (3.75months) [18] | +44% |
| Reversed CKD with Improved EGFR (3months) [19] | +12% |

Employing PIR, clinicians are able to administer bio identical randomized doses of insulin to help reverse insulin resistance at the cellular insulin receptor level. This bio-mimicry dosing ranges from 4-8-minute intervals where adjustments to concentrations, volumes, pressures, and oscillations all occur on a patient-by-patient individualized basis. In addition to the patient receiving a physiologic pattern of insulin during a typical infusion, oral glucose is administered at individualized intervals to stimulate the digestive system and trigger the metabolism. As carbohydrate metabolism improves, ATP production is increased and inflammatory markers are reduced, cellular energy is then available for optimal tissue growth, repair, and regeneration.

The PIR dosing pattern is consistent with normal hormone secretion and more closely approximates the body's natural signaling pathways. As the patient's insulin resistance improves, healthcare providers can titrate other medications to optimize treatment regimens. In general, PIR permits lowering dosing of subcutaneous insulin and other diabetes medications that often promote the secretion of insulin or inhibit the production of glucose.

Furthermore, it is well established that progressive insulin use leads to worsening insulin resistance. This approach averts hyperinsulinemia and avoids "toxic" exposure to insulin receptors. Thus, a clinician can avoid the three major causes of progressive insulin resistance in diabetic patients: insulin receptor negative feedback downregulation from constant insulin exposure, refractory delay from aberrant signals, and unopposed glucagon (which decreases transcription of insulin receptors).

By overcoming insulin resistance, PIR may help amplify the benefits of other therapeutic modalities. Glucose can more readily enter the oxidative phosphorylation cycle and promote carbohydrate metabolism. This provides cells with more energy for tissue growth, repair, and regeneration. At the same time, this reduces the fat metabolism demands and begins to counter the inflammatory cascade of lipid ketosis, lactic acid and free fatty acids. This modality can reduce the pharmaceutical needs of patients by mitigating the "toxicity" of excessive insulin exposure.

## Conclusion

PIR is a dynamic modality for clinicians that can be used as the centerpiece of an individualized treatment plan that includes traditional recommendations for diet and exercise. While other treatments seek to control the symptom of hyperglycemia, the goal of PIR is to reduce insulin resistance by re-sensitizing insulin receptors by biomimicry. PIR provides clinicians with a toolset

that can overcome the negative feedback loop of constant insulin exposure, recalibrate the refractory dysregulation of signaling, and overcome excessive glucagon exposure that leads to decreasing insulin receptor expression. The complications of diabetes are not only due to the direct toxic effect of hyperglycemia but also the metabolic compromise that leads to energy deficits, inflammation, and inability to repair and replace aging cells. By addressing impaired pancreatic signaling and restoring metabolic dysfunction, it may be possible to repair damaged tissues while also improving glycemic control.

The medical literature is replete with detailed descriptions of cellular signals between the pancreases and liver which affect carbohydrate metabolism. PIR however, approximates the normal physiologic signaling to restore insulin sensitivity at the cellular receptor level. Other treatments continue to create and exploit ways to increase the availability of insulin that increases hyperinsulinemia and may ultimately desensitize and downregulate receptors. PIR offers a dynamic, dosing approach designed to improve the efficiency of insulin by providing a more precise physiologic delivery. With minimal abatement from current treatments, it is clear that, treatment must go beyond control of hyperglycemia and address the core defects that have propelled this condition into a global health crisis.

## Declaration of Funding

Expenses incident to publication were paid by Well Cell Global, which owns the intellectual property described in the article. Co-authors Loveridge, St. Laurent and Hepford are employed by companies partially owned by Well Cell Global.

## References

1. Buse JB, Harmel M. New Diabetes Drugs in Development. 2017.
2. American Diabetes Association (2018) Economic Costs of Diabetes in the U.S. in 2017. Diabetes Care. 41(5):917-928.
3. Gerstein HC, Colhoun HM, Dagenais GR, Diaz R, Lakshmanan M, et al. (2019) Dulaglutide and cardiovascular outcomes in type 2 diabetes (REWIND): a double-blind, randomised placebo-controlled trial. Lancet 394(10193):121-30.
4. Wiviott SD, Raz I, Bonaca MP, Mosenzon O, Kato ET, et al. (2019) Dapagliflozin and Cardiovascular Outcomes in Type 2 Diabetes. N Engl J Med 380(4):347-57.
5. Qaseem A, Wilt TJ, Kansagara D, Horwitch C, Barry MJ, et al. (2018) Hemoglobin A1c Targets for Glycemic Control With Pharmacologic Therapy for Nonpregnant Adults With Type 2 Diabetes Mellitus: A Guidance Statement Update From the American College of Physicians. Ann Intern Med 168(8):569-76.
6. Abernethy A (2021) Insulin Gains New Pathway to Increased Competition. https://www.fda.gov/news-events/press-announcements/insulin-gains-new-pathway-increased-competition.
7. Lang DA, Matthews DR, Peto J, Turner RC (1979) Cyclic oscillations of basal plasma glucose and insulin concentrations in human beings. N Engl J Med 301(19):1023-1027.
8. Hunter SJ, Atkinson AB, Ennis CN, Sheridan B, Bell PM (`1996) Association between insulin secretory pulse frequency and peripheral insulin action in NIDDM and normal subjects. Diabetes 45(5):683-686.

APPX1220

INSU_PI_001501

9.  Meier JJ, Veldhuis JD, Butler PC (2005)  Pulsatile insulin secretion dictates systemic insulin delivery by regulating hepatic insulin extraction in humans. Diabetes 54(6):1649-656.

10. Polonsky KS, Given BD, Hirsch LJ, Tillil H, Shapiro ET, et al. (1988) Abnormal patterns of insulin secretion in non-insulin-dependent diabetes mellitus. N Engl J Med 318(19):1231-1239.

11. O'Rahilly S, Turner RC, Matthews DR (1988)  Impaired pulsatile secretion of insulin in relatives of patients with non-insulin-dependent diabetes. N Engl J Med 318(19):1225-1230.

12. Schofield CJ, Sutherland C (2012) Disordered insulin secretion in the development of insulin resistance and Type 2 diabetes. Diabet Med 29(8):972-979.

13. Bertram R, Satin LS, Sherman AS (2018)  Closing in on the Mechanisms of Pulsatile Insulin Secretion. Diabetes 67(3):351-359.

14. Satin LS, Butler PC, Ha J, Sherman AS (2015) Pulsatile insulin secretion, impaired glucose tolerance and type 2 diabetes. Mol Aspects Med 42:61-77.

15. Dailey GE, Boden GH, Creech RH, Johnson DG, Gleason RE, et al. (2000) Effects of pulsatile intravenous insulin therapy on the progression of diabetic nephropathy. Metabolism 49(11):1491-1495.

16. Aoki TT, Grecu EO, Gollapudi GM, Barber AR, Arcangeli MA, et al. (1999) Effect of intensive insulin therapy on progression of overt nephropathy in patients with type 1 diabetes mellitus. Endocr Pract 5(4):174-178.

17. Tucker T, Hadley J, Alexander M, Lakey JRT, Loveridge B (2021) Case Series: Reversal of Diabetic Neuroapthy Utilizing Physiologic Insulin Resensitization. Int J Diabetes Metab Disord 6(2):160-163.

18. Villaverde Z, Tucker T, Alexander M, Hepford SA, Lakey JRT, et al. (2021) Improved Kidney Function Following Physiologic Insulin Resensitization Treatment Modality. J Endocrinology and Disorders 5(4).

19. Manessis A, Hanna MR, Sachsenheimer D, Do L, Lewin JC, et al. (2021)Pulsatile Insulin Infusion as a Treatment Option for Patients with Type 2 Diabetes and Stage III Kidney Failure-Results from a Pilot Study. EC Endocrinol Metabolic Res 6(4):49-54.

*Copyright:* ©2021: Brian Loveridge, et al. This is an open-access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

APPX1221

**INSU_PI_001502**

# Physiologic Insulin Resensitization



**Diabetes Relief℠**
Rx
*Get your life back℠*

## Improvement in Complications of Diabetes

- **95%** Reported improved neuropathy
- **76%** Improvement in at least one diabetic complication
- **24%** Maintained status and did not get worse
- **63%** Reported HbA1c reduction
- **41%** Reduced Diabetic medications



Data from the Schill Institute — Insulin Infusion Therapy on Diabetic Complications (Oct 27, 2015)

## Improved Painful Diabetic Neuropathy (PDN)

- **93%** Elimination or significant reduction in pain scores

## Reduction in Health Care Utilization

- **96%** Reduction in Admits: 1.7/1,000/yr vs. 46.7/1000/yr
- **96%** Reduction in ER Visits: 2.2/1,000/yr vs. 58.4/1000/yr

Data from Effects of Periodic Intensive Therapy, j.curtheres.2019.04.003.

## Arrest in progression of chronic kidney disease (CKD)



- **CrCl Unchanged** from 46.1 to 46.0 mL/min per 1.73 m2 at the end of the observation period (1 -3 years)
- **Halted Decline** of diabetic nephropathy

- **HbA1c Declined** from 8.6 to 7.6 during the study

Data from Treatment of Diabetic Nephropathy, Aoki, et al.

## Island Doctors Results (after 3 -6 months)

- **52%** Showed weight reduction
- **67%** Showed lower HbA1c (1 patient from 11.8 to 8.2)
- **62%** Showed improved EGFR (1 patient from 19 to 42)
- **57%** Showed LDL reduction
  - 8 of 21 reduced over 30%
  - 3 of 21 reduced over 50%

**island DOCTORS**

Island Doctors 21 patient sample, Oct 23, 2020

Confidential- Unauthorized Distribution Prohibited. Copyright © WELL CELL GLOBAL, LLC 2021. All rights reserved
IMSU_PI_001503



# Medical & Scientific Advisory Board



**Brian Loveridge, M.D.,**
**F.A.A.E.M**
*Emergency Medicine*
*Medical & Scientific*
*Advisory Board– Co Chair*



**Roy Hinman II, M.D.**
*General Family Medicine*
*Island Doctors– CEO*
*Medicare Advantage*
*Advisory Board Member*



**Stanley Lewis, M.D., M.P.H.**
*Internal Medicine*
*Eselle Health – CEO*
*Medical & Scientific*
*Advisory Board Member*



**Justin W. Fontenot, M.D.,**
**ECNU**
*Endocrinologist*
*Medical Director*
*Advisory Board Member*

**Jonathan RT Lakey PhD, MSM**
*Prof. Director*
*Clinical Islet Program, Surgery*
*Medical & Scientific*
*Advisory Board– Co Chair*



**Scott A. Hepford**
*CEO – Chairman*
*Well Cell Global*
*Medical & Scientific*
*Advisory Board Member*



**Melanie St. Laurent**
**MSN, RN, CNS, ENP-C**
*Global Training & Clinical*
*Compliance Director*
*Advisory Board Member*



**David Hall, M.D.**
*Emergency Medicine*
*Regional Medical Director*
*Medical & Scientific*
*Advisory Board Member*



**Anelita Basa, M.D.**
*Endocrinologist*
*Medical Director*
*Medical & Scientific*
*Advisory Board Member*



**Adam M. Starr, M.D., F.A.A.O.S**
*Orthopedic Surgeon*
*Chief of Hand Surgery*
*Advisory Board Member*
*Restor Metabolix*

Medical & Scientific Advisory Board
Revision- 05.15.21

Confidential- Unauthorized Distribution Prohibited. Copyright © WELL CELL GLOBAL, LLC 2021. All rights reserved

3

INSU_PL_001504

APPX1224

**INSU_PI_001505**



# HHS Public Access

Author manuscript
*Mol Aspects Med*. Author manuscript; available in PMC 2016 April 01.

Published in final edited form as:
*Mol Aspects Med*. 2015 April ; 42: 61–77. doi:10.1016/j.mam.2015.01.003.

# Pulsatile insulin secretion, impaired glucose tolerance and type 2 diabetes

**Leslie S. Satin, Ph.D**[*],
Department of Pharmacology, Brehm Diabetes Research Center, University of Michigan Medical School, Ann Arbor, MI, 48105

**Peter C. Butler, M.D**,
Department of Medicine, David Geffen School of Medicine, UCLA, Los Angeles, CA. 90095-7073

**Joon Ha, Ph. D**, and
Laboratory of Biological Modeling, National Institutes of Diabetes and Digestive and Kidney Diseases, National Institutes of Health, Bethesda, MD. 20892

**Arthur S. Sherman, Ph.D**
Laboratory of Biological Modeling, National Institutes of Diabetes and Digestive and Kidney Diseases, National Institutes of Health, Bethesda, MD. 20892

## Abstract

Type 2 diabetes (T2DM) results when increases in beta cell function and/or mass cannot compensate for rising insulin resistance. Numerous studies have documented the longitudinal changes in metabolism that occur during the development of glucose intolerance and lead to T2DM. However, the role of changes in insulin secretion, both amount and temporal pattern has been understudied. Most of the insulin secreted from pancreatic beta cells of the pancreas is released in a pulsatile pattern, which is disrupted in T2DM. Here we review the evidence that changes in beta cell pulsatility occur during the progression from glucose intolerance to T2DM in humans, and contribute significantly to the etiology of the disease. We review the evidence that insulin pulsatility improves the efficacy of secreted insulin on its targets, particularly hepatic glucose production, but also examine evidence that pulsatility alters or is altered by changes in peripheral glucose uptake. Finally, we summarize our current understanding of the biophysical mechanisms responsible for oscillatory insulin secretion. Understanding how insulin pulsatility contributes to normal glucose homeostasis and is altered in metabolic disease states may help improve the treatment of T2DM.

## Keywords

Islets; oscillations; insulin pulsatility; insulin resistance; diabetes

[*]To whom reprint requests should be addressed. Dr. Leslie S. Satin, University of Michigan Medical School, Brehm Tower, Room 5128, Kellogg Eye Center, 1000 Wall St., Ann Arbor, MI 48105.

**Publisher's Disclaimer:** This is a PDF file of an unedited manuscript that has been accepted for publication. As a service to our customers we are providing this early version of the manuscript. The manuscript will undergo copyediting, typesetting, and review of the resulting proof before it is published in its final citable form. Please note that during the production process errors may be discovered which could affect the content, and all legal disclaimers that apply to the journal pertain.

APPX1225

**INSU_PI_001506**

Case 4:22-cv-03062   Document 47-23   Filed on 10/28/22 in TXSD   Page 45 of 76

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

## INTRODUCTION

Type 2 diabetes (T2DM) is associated with both a reduction in beta-cell mass and impaired beta-cell function. Less attention has been paid to beta cell function, which may begin to decline prior to the reduction in beta cell mass or the development of T2DM [1]. For example, the early loss of first phase secretion has long been considered a hallmark of T2DM [2][3][4]. From a therapeutic standpoint, improving insulin secretion pharmacologically is a more realistic alternative to stimulating beta cell mass expansion, in part because the latter is likely to occur on a much slower time scale than improvements in beta cell function. Even in rodents, where robust changes in beta cell mass can occur, beta cell function changes more rapidly and more markedly than mass [5]. Compensatory changes in beta cell function would be expected to be even more important in humans, where mass expansion is two orders of magnitude slower [6][7][8].

As is the case for other hormones, insulin is secreted from the pancreas in a pulsatile manner in both experimental animals and humans, and in patients with T2DM and other metabolic disorders the pattern of pulsatile release is disturbed. Thus, soon after the first report that fasting plasma insulin and glucagon levels oscillate in non-human primates *in vivo* ([9]), Turner's group in the UK demonstrated that pulsatility occurs in healthy human subjects [10] and found disturbed pulsatility in subjects with T2DM [11].

The main focus of this review is the pulsatile insulin secretion of humans, particularly 'fast oscillations' in plasma insulin that have a period reported to range from 5–15 minutes. Readers with a special interest in ultradian insulin oscillations (period $\approx$ 80–180 minutes) are directed to other reviews [12].

### Insulin levels oscillate in fasted humans

Lang and colleagues were the first to report insulin oscillations in the peripheral circulation of fasted but otherwise healthy human subjects. The oscillations they observed had a mean period of 15 minutes or so [10]. Peripheral blood was sampled once per minute for a total duration of 1–2 hours. An example from their paper shows, at least initially, clear oscillations in insulin, C peptide, and glucose concentrations in peripheral blood, as shown in Fig. 1. The continuous lines depict three-minute moving averages of the data, while the dashed lines show the raw, unsmoothed data. Small oscillations in glucose are also apparent in the lower part of the figure, but are difficult to resolve.

Using records such as this, Lang et al applied autocorrelation to aid in pulse detection. Autocorrelation involves creating a mirror image of smoothed time series data, translating it stepwise along the original data, and then calculating a correlation coefficient for each time point in the interval. Plots of these coefficients reveal peaks that occur at multiples of the dominant oscillation period(s). Although Lang et al and other early studies of *in vivo* insulin pulsatility [13] reported an oscillation period of 10–15 minutes, more recent studies have determined the *in vivo* period of insulin oscillations to be closer to 5 minutes. In a later section, we will discuss why limitations in the technical approaches that were available at

APPX1226

INSU_PI_001507

the time are likely to explain the prolonged insulin periods originally reported in this literature.

**Individuals with T2DM have impaired insulin pulsatility**

Using the same approach, Lang et al [11] reported that individuals with diabetes (their mean fasting glucose was 7 mM) displayed shorter and highly irregular oscillations having a mean period of 8.8 minutes (vs. controls having a period of 10.7 minutes). Later studies confirmed the impaired insulin pulsatility of T2DM patients (e.g.[14], [15], [16]; but see [17]).

O'Rahilly et al [18] extended these studies in individuals with T2DM to their first-degree relatives who lacked fasting hyperglycemia, to see whether pulsatility defects were an early event in the progression to diabetes. Control subjects were matched by age, gender and BMI to the relatives of patients with diabetes. While the control subjects exhibited regular insulin oscillations, these were lacking in relatives of T2DM subjects. However, the relatives studied were already glucose intolerant and insulin resistant and had reduced first phase insulin secretion, so the loss of pulsatility may have been secondary to reduced pulse amplitude, which may have reduced the signal-to-noise ratio.

In a similar study, Schmitz et al studied the transition from normal to abnormal glucose tolerance to fasting hyperglycemia to determine whether the loss of first phase and pulsatile secretion was due to intrinsic beta cell defects or glucotoxicity [19]. Insulin action and insulin pulsatility were measured in healthy offspring of T2DM patients vs. controls matched by age, gender and BMI.

Approximate entropy (ApEn), a measure of the likelihood that a similar pattern of observed activity will be repeated in a given time interval was used to gauge the level of irregularity of plasma insulin pulses; consistent with the general sense that entropy quantifies disorder, high ApEn indicates less regular pulses. Both first-degree relatives and their matched controls had normal OGTTs and no differences were noted in their plasma glucose or insulin levels. However, the relatives of T2DM patients had decreased insulin sensitivity, increased ApEn, and lacked regular autocorrelations. The data were interpreted as supporting the hypothesis that the relatives of diabetic subjects have an intrinsic beta cell defect that precedes the development of hyperglycemia as diabetes progresses. These data do not, however, indicate whether the beta cell defect precedes the onset of insulin resistance.

To test whether type 1 diabetes is also linked to changes in pulsatile secretion, Bingley et al (1992) studied insulin pulsatility in subjects who tested positive for a type 1 biomarker, islet cell antibody (ICA; [20]). Plasma glucose levels were similar in ICA-positive subjects and controls after an overnight fast. However, whereas control subjects exhibited a dominant pulse period, as determined by autocorrelation, regular insulin oscillations were lacking in ICA positive subjects, and only faster, highly irregular oscillations were observed. However, the authors had no way to assess beta cell mass, which could have been reduced in subjects who were ICA positive.

APPX1227

INSU_PI_001508

**Abnormal insulin pulsatility and increased insulin resistance**

From an evolutionary standpoint, it is likely that the highly complex and tightly controlled nature of pulsatile insulin release confers a survival advantage to the organism because maintenance of the machinery for pulsatility is costly. Modeling of beta cell exocytosis has shown that one possible advantage of pulsatile insulin secretion is that it may permit more insulin to be secreted by allowing the "readily releasable pool" of insulin granules (or RRP), sufficient time to be refilled during the resting intervals between pulses of secretion[21].

Pulsatile insulin may also act more efficiently on insulin target tissues [11]. Thus, exposing insulin receptors to continuous insulin might down regulate or internalize the insulin receptor, leading to reduced insulin action, and this might be mitigated by releasing insulin in an intermittent fashion [22–24]. Post-receptor signaling defects may also contribute, as discussed later. Goodner et al measured insulin binding to isolated hepatocytes to test the plausibility of this concept [22]. After being exposed to insulin, insulin receptors are rapidly internalized and only reappear at the cell surface after a recovery period. Once insulin receptors have been autophosphorylated, release bound insulin, and are then dephosphorylated, they return to the cell surface, a process that is broadly compatible with the timing of insulin pulsatility [24].

Interestingly, recent work suggests the possibility that zinc, which is co-released with insulin by the beta cell [25] may suppress hepatic insulin clearance by inhibiting insulin receptor internalization by the liver [26]. However, it is unlikely this mechanism confounds studies of the effects of insulin pulses on hepatic insulin clearance as large amplitude insulin pulses, whether they are experimentally imposed [27] or secreted endogenously result in *more extensive insulin clearance* than smaller pulses as demonstrated in dogs [28], rats [29] and humans [30], as discussed below.

Using hyperinsulinemic euglycemic clamp, it was reported that 20 hours of insulin exposure (vs. a saline control) at a constant glucose level decreased insulin action in healthy volunteers, as evidenced by decreased insulin-induced glucose disposal and a reduction in insulin sensitivity.

To test whether the distribution of abdominal body fat and peripheral insulin sensitivity were associated with changes in insulin pulsatility, Peiris et al [31] measured oscillations in plasma insulin during fasting in subjects whose peripheral insulin sensitivity was determined using glucose clamp. Insulin pulse interval appeared to be positively correlated with peripheral insulin sensitivity, such that insulin sensitivity increased as the measured period of insulin pulses increased from 7 to 12 minutes. No correlation was found between basal insulin levels and peripheral insulin sensitivity. These results suggest that sufficiently long rest periods between pulses are required to avoid decreased insulin sensitivity.

Another study of the possible linkage between insulin pulse frequency and peripheral insulin action compared T2DM and control subjects after an overnight fast [15]. Blood from the dorsal hand vein was sampled once every two minutes for 90 minutes, and the resulting insulin time series analyzed was using the PULSAR algorithm. Hepatic glucose production and glucose utilization were determined using hyperinsulinemic euglycemic clamp and an

APPX1228

INSU_PI_001509

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Satin et al. Page 5

infusion of $^3$H-glucose tracer. Levels of fasting glucose and insulin were greater in subjects with diabetes, while glucose clearance and insulin sensitivity were higher in controls, indicating that T2DM subjects had increased peripheral insulin resistance and greater hepatic glucose output. The number of pulses observed was positively associated with decreased glucose clearance, especially in subjects with diabetes, as in [31]. In addition to being more frequent, the insulin pulses observed were more irregular in T2DM subjects. The results were interpreted in support of the hypothesis that abnormal insulin secretion and impaired insulin action are linked.

An alternative explanation for the findings of the latter two studies is that the observed inverse relationship between measured pulse frequency and insulin sensitivity was driven by the detection of a higher proportion of pulses in insulin resistant individuals in which insulin pulse amplitude might reasonably be expected to be enhanced. This explanation gains credence given the difficulties of insulin pulse detection at the time of the studies. Another consideration is that hepatic glucose production could have been affected by glucagon pulses, which were not assessed in the above studies. We discuss this further below.

### Difficulties measuring insulin pulses under fasting conditions in the peripheral circulation, especially using older methods

Most of the studies of peripheral insulin pulsatility discussed so far were carried out in fasted human subjects whose plasma insulin levels approached the limits of detection of the insulin assays available at the time (prior to 1990). Also, peripheral insulin levels are low due to extensive hepatic insulin extraction, the relatively small amount of insulin secreted under basal conditions, and because plasma insulin is diluted by the peripheral circulation. In addition to the technical difficulties involved in measuring the low insulin levels, the analytical techniques and computing power available to detect and quantify insulin pulsatility were not as advanced 20 years ago as they are today.

These factors must therefore be kept in mind when considering the significance of the older, albeit clearly pioneering, research to our current understanding of insulin pulsatility. In particular, older reports concluding that insulin oscillates in the periphery with periods exceeding 4–6 minutes or concluding that pulsatility is more irregular or varies in period in T2DM subjects are not definitive at best. Also, the possibility that insulin pulse frequency contributes to the development of insulin resistance in T2DM patients, while highly interesting, remain to be confirmed using more up to date methodology. Those readers interested in more detailed and in depth discussions of the strengths and weaknesses of the different approaches used to detect and quantify insulin pulses *in vivo* and *in vitro* are referred to [32][33][34][35].

In our view, the most reliable data obtained to date that most convincingly demonstrate the functional importance of pulsatile insulin secretion come from studies where insulin was directly measured in the hepatic portal circulation using quantitatively validated methods to detect the pulses and determine their period. In most of the newer studies period is generally invariant and in the range of 4–6 minutes [36][37][38][35]. It is of interest that insulin is secreted from isolated islets with a similar pulse period [39][40][41][42].

*Mol Aspects Med*. Author manuscript; available in PMC 2016 April 01.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Satin et al. Page 6

### Pulsatile insulin regulates hepatic function more efficiently

Insulin pulses in the hepatic portal circulation are larger than those in the peripheral circulation; these larger pulses suppress hepatic glucose production by activating hepatic insulin receptors. [43][30]. Many studies have shown that insulin administered in a pulsatile pattern augments insulin modulation of hepatic glucose ([44][45][30][46][37]; but see [47] [48]). Bratusch-Marrain et al showed that pulsed insulin more effectively suppressed hepatic glucose output than continuous insulin in Type 1 patients, which they interpreted as showing that pulsatile insulin increased the insulin sensitivity of the liver[44].

More recent studies have continued to explore the ramifications of pulsatile insulin action on liver function. In [30], pulsatile insulin secretion regulated hepatic insulin extraction, and in so doing, systemic insulin delivery. Large pulses of insulin presented to the liver via the hepatic portal circulation (under conditions where endogenous insulin secretion was inhibited experimentally by an infusion of exogenous somatostatin) were more extensively extracted than small insulin pulses or constant insulin, thus limiting the variation in peripheral pulse amplitude homeostatically. In contrast, insulin pulses of reduced amplitude were less extensively extracted by the liver, which resulted in relatively greater systemic insulin levels. These features account for the strong attenuation of insulin pulses in the periphery, which is much greater than expected based on dilution in the circulation alone.

Matveyenko and colleagues studied the relative effectiveness of infusing either pulsatile or continuous insulin into the portal circulation, keeping the total amounts of insulin fixed, and then compared downstream insulin receptor signaling in the livers of animals at different time points [37]. They found that liver insulin receptor signaling was potentiated by pulsatile compared to continuous insulin administration. Not only did pulsed insulin blunt the rise in plasma glucose seen with continuous insulin in T2DM, but post-insulin receptor signaling in biopsied liver (as evidenced by immunoblotting liver lysates with phosphospecific antibodies) was clearly facilitated by pulsatile vs. continuous insulin delivery. As shown in Fig. 2, measuring liver phospho-IRS1 and PI3K activation revealed increased activation when pulsatile rather than continuous insulin was imposed in the portal circulation. In addition, greater activation of the more distal insulin signaling molecules Akt and Foxo was also seen. An important advantage of the study was its use of portal catheterization to circumvent difficulties inherent in trying to alter hepatic insulin responses by changing systemic insulin levels. While a previous study failed to find differences in the ability of pulsatile and continuous insulin to inhibit hepatic glucose output [48], the higher insulin levels that were used completely suppressed hepatic glucose output, which might have prevented the authors from differentiating the two methods of insulin administration.

### The relationship between pulsatile insulin and insulin resistance

We have discussed evidence that pulsatile insulin delivery is more efficacious, at least for the liver. In addition to receptor down-regulation, discussed previously, negative feedback within the insulin signaling pathway is a likely candidate, and may involve S6 kinase and/or PKC targeting of IRS-1 [23][49]. Rest periods that occur between bursts of granule exocytosis during pulsatile secretion would allow the negative feedback present in the insulin signaling pathway sufficient time to decay away.

APPX1230

INSU_PI_001511

We show here, for the first time, with a mathematical model for insulin action that in the presence of negative feedback, it is advantageous to present insulin to its targets in a pulsatile manner. Square waves of insulin were compared to continuous insulin using the model of Sedaghat et al [49]. As shown in Fig. 3, pulses of insulin produce pulses in the percentage of phospho-Akt, an index of insulin receptor pathway activation.

The model with negative feedback shows higher peak Akt activation in response to pulses (solid lines) than to continuous insulin (dashed lines). The increased peak Akt activation from negative feedback results from recovery of the insulin signaling in the target tissue from the negative feedback during the silent phases that follow each pulse of insulin response. Note that despite differences in peak Akt activation, activation averaged over the pulses is not much affected. In the absence of negative feedback, in contrast, the increase in the peak is nearly abolished, and the mean response is lower than the pulsed input. We view the lower peak response to steady insulin as a "frictional effect" in the sense that it is immediately relieved when pulses resume after a hiatus.

It is not clear if this frictional effect is related to chronic insulin resistance, but both are thought to involve inhibition of IRS-1 by serine phosphorylation, as mentioned above. There is evidence that chronic hyperinsulinemia, which can be imposed experimentally by transplanting extra islets into mice [50] or by increasing insulin secretion by blocking leptin receptors on the beta cells of mice [51] can lead to insulin resistance, but it is not clear whether the insulin resistance would be relieved by lowering insulin or how rapidly this would occur. Shimomura et al exposed isolated hepatocytes to high insulin to produce insulin resistance [52], and found that it was reversed 24 hours after washing out the insulin. Similarly, Alemzadeh et al [53] reduced insulin resistance in normoglycemic, highly insulin resistant subjects by partially suppressing insulin secretion with diazoxide. The subjects studied were also on a weight-loss regimen, which raises the possibility that some of the improvement in insulin action observed was due to the increased weight loss in diazoxide rather than inhibition of insulin secretion per se.

## Physiological glucose modifies the amplitude but generally not the frequency of insulin pulse bursts

In principle, an increase in plasma glucose could increase plasma insulin by increasing the amplitude (sometimes referred to as the "burst mass" or "pulse mass"), altering the frequency of the insulin pulses, increasing plateau fraction or all three. Matthews et al [54] observed that elevated glucose increases the mass but not the frequency of plasma insulin bursts, and this has been confirmed in numerous studies ([55][56][57]). The action of glucose mainly to increase insulin pulse amplitude has also been observed in isolated human islets, where small numbers of islets could be perifused while insulin was sampled in their effluent [39].

In an *in vivo* study of canine insulin secretion, where plasma glucose was increased following glucose ingestion, both the amplitude and the frequency of portal vein insulin pulses were increased by the sugar ([58]; Fig. 4A). As can be seen in Fig. 2 of their paper, which shows portal vein insulin profiles for two representative dogs, the insulin pulses of the portal system were large and the effect of glucose ingestion was dramatic (however,

APPX1231

INSU_PI_001512

ingestion of course invokes not only the direct actions of glucose on the pancreatic islets, but also incretins secreted by the gut which in turn potentiate secretion). Their Fig. 3, using deconvolution to calculate underlying secretory rates, confirms the profound effect of glucose to amplify secretory burst mass in this example. Quantification of each subject's response to glucose, for both insulin pulse frequency and mass, in their Fig. 4 shows that both frequency and mass increase postprandially. However, it is possible that the assay that was employed did not distinguish smaller insulin pulses that might have been present under low glucose conditions, which would have underestimated the basal insulin pulse frequency. If this was the case, the net effect of ingested glucose on pulse frequency (but not amplitude) might have been much smaller.

Using indwelling intrahepatic shunts to sample the portal circulation of human subjects, Song et al (2000) carried out a study of insulin pulsatility that included measurements from the portal vein [59]. As shown in Fig. 4B, simultaneous sampling of both the portal and arterial circulation under glucose clamp demonstrated that levels of insulin in the portal vein were far greater than in the periphery, and moreover that hyperglycemic clamp resulted in an increase in the amplitude of the insulin pulses [53]. Deconvolution was used to determine the underlying insulin secretory rates, as in other studies, and showed that increasing glucose increased the size of insulin pulses in both the portal and arterial circulation.

**Ultradian oscillations and their entrainment by small glucose fluctuations are disrupted in T2DM**

Besides "fast" oscillations having a period of 6–15 minutes, slower "ultradian" insulin oscillations having a period of 80–180 minutes have also been observed in longer duration studies. In a study of 16 T2DM patients vs. 14 matched control subjects, where blood was sampled at 15–20 minute intervals for up to 24 hours and three meals were provided between 9 AM and 11 PM, changes in ultradian pulsatility were observed in the diabetic subjects. While $\approx 8$ pulses of insulin were detected during the measurement period (1 pulse every 2 hours) in both controls and diabetics, the pulses of the diabetic subjects were of diminished amplitude, occurred less frequently paired with a glucose pulse, and were more irregular [60]. Polonsky's group has shown that *entrainment*, the process whereby small, subthreshold changes in plasma glucose regulate the insulin pulsatility of islets and contribute to their synchronization, is lost in T2DM patients [61, 62].

In a study of both healthy and diabetic obese subjects, diurnal insulin pulsatility was identified as the occurrence of 10 insulin oscillations over a 12 hour period. A decrease in the number of pulses was observed in the obese diabetic subjects, and an increase in pulse amplitude was noted after weight loss occurred. The insulin pulses of obese controls had the largest amplitude, while subjects with overt T2DM had pulses of the lowest amplitude. In addition, the pulsatile insulin secretion elicited by the administration of secretagogues was reduced in frank diabetic as well as subclinical T2DM subjects with fasting hyperglycemia [14]. The insulin pulses observed for healthy obese subjects were regular in appearance, while those of T2DM patients were markedly disorganized. The cross-sectional nature of this study, however, precludes assessment of whether the changes in the ultradian oscillations were a cause or consequence of the pre-diabetic and diabetic states.

INSU_PI_001513

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

### Pulsatility of other islet hormones

Although the focus of this review is pulsatile insulin release and its metabolic consequences, glucagon and insulin have reciprocal actions on blood glucose, and reciprocal oscillations in glucagon have also been reported. These oscillations have been observed in isolated islets *in vitro*, albeit at high glucose levels (20 mM); see [63][42]. As insulin [64][65]and somatostatin [66][67] restrain glucagon secretion, glucagon pulses likely occur because constant glucagon secretion is periodically inhibited by pulses of secretion from beta and delta cells. There is evidence that glucagon secretion from the alpha cell can be intrinsically pulsatile [68][69], but this would not be manifest in secretion from islets because, in contrast to beta cells, alpha cells are not coupled to each other by gap junctions. Anti-synchronous oscillations of glucagon and insulin have also been observed *in vivo* [70][9][71]. Human glucagon and insulin levels were reported to exist in an inverse relationship in control subjects, but not subjects exhibiting impaired fasting/postprandial glucose together with elevated glucagon [72]. Assuming the hormones normally oscillate in an anti-synchronous manner *in vivo*, as has been proposed [73], this raises the question of what would be the physiological benefit, as the two hormones seem to be working at cross purposes. Recent data [74] have revealed that glucagon can directly contribute to the loss of insulin secretion by stimulating secretion from the liver of kisspeptin, a peptide that inhibits insulin secretion. The loss of the anti-synchronous oscillations of the two hormones would then be both a symptom of the impairment in insulin secretion and a contributor to that process.

In addition to glucagon, somatostatin, which is secreted from delta cells of the islet is also pulsatile, and occurs in synchrony with insulin [63][42]. Such oscillations would not be possible unless the delta cells were stimulated by the beta cells, possibly through GABA or ATP [75] as the delta cells, like the alpha cells, are not coupled to each other. Another islet hormone, amylin, which is co-stored in the beta cell with insulin in large dense core granules also shows pulsatile secretion, with a mean period of around 5 minutes [76]. ATP, also co-released with insulin, is hydrolyzed to adenosine, which appears to play a role in maintaining reciprocal glucagon and insulin as the out-of-phase pattern is lost in adenosine $A_1$ receptor null mice [77]. A common theme of all these oscillations is that they appear to be orchestrated by the core machinery driving insulin oscillations in the beta cells, rather than being intrinsic to the otherwise uncoupled alpha and delta cells.

### Mechanisms governing the intrinsic pulsatility of an islet

It has been known since the 1970s that pulsatility is intrinsic to the pancreatic islet, when Dean and Matthews showed that even after being completely isolated, individual mouse islets exposed to glucose concentrations > 7 mM were electrically active. This activity consisted of bursts of action potentials riding on plateau depolarizations that occurred every 15 seconds or so in the steady state [78]. Single dispersed beta cells are also pulsatile [79]. Later work established that beta-cell electrical activity is dependent on the influx of $Ca^{2+}$ ions [80][81], that its oscillations increase in duty cycle or plateau fraction as glucose increases [80, 82, 83], and that it leads to the rise in beta cell intracellular free $Ca^{2+}$ that drives the periodic exocytosis of insulin from the beta cells [79].

*Mol Aspects Med*. Author manuscript; available in PMC 2016 April 01.

The advent of free $Ca^{2+}$ measurements in islets using the dye fura-2 established that islets with oscillatory periods in the range of 3–5 minutes could be commonly observed (slower electrical changes had been seen earlier as well; see [84, 85]). The slower patterns are of particular interest here as their periodicity corresponds to that of plasma insulin seen *in vivo*, as described above.

Many hypotheses have been proposed to account for islet pulsatility, and some of these have been formalized as mathematical models. Readers are referred to earlier reviews for an overview of the different mechanisms proposed for islet oscillations ([86, 87],[88],[89],[90–92],[93]).

Islet modelers face many challenges. First, islets have a wide dynamic range as glucose varies, and islet activity can range from seconds to many minutes [41]. This flexibility possibly contributes to the ability of the beta cell to regulate insulin secretion very precisely in a dynamic milieu. Second, while models of oscillations of human islets are now becoming available [92, 94], much less is known about the basic biophysical properties of human islets, including their electrical activity. This stems from the greater heterogeneity of human subjects along with the fragility of human islets and their limited availability to researchers; even those that have become more widely available at the time of this writing can be of highly variable quality. Thus, it is still necessary to carefully model mouse islets, with an eye to extending and adapting these models to humans as more high quality data appear in the literature.

As pulses in plasma insulin result from the synchronized activity of many intrinsically oscillatory islets, and humans exhibit pulsatile insulin in the circulation similar to that of rodents, it is expected that isolated human islets, like those of mouse or rat, should show glucose-dependent slow oscillations. However, and surprisingly, this issue has been somewhat controversial. Thus, while oscillations in intracellular free Ca, and in some instance, bursts of electrical activity have been reported in isolated human islets ([95][96, 97][98]; Merrins and Satin, unpublished), it has also been claimed that human islets lack regular oscillations [99]. As the cellular architecture of the human islet lacks the stereotypical pattern seen in rodents, where there is a pronounced alpha cell mantle and beta cell core, it has been claimed that human and rodent islets function in fundamentally different ways. Indeed, the specific ion channels expressed in human beta cells are different from those of mouse, with rapidly inactivating T type Ca channels and voltage gated Na channels playing prominent roles in human, but not mouse, beta cells [100, 101]. Nonetheless, observations of isolated human islets confirm that, despite important differences in ion channels and spiking patterns, they exhibit slow oscillations and synchrony similar to those of rodents [73, 95, 96, 98].

Our current model of islet oscillations, which we call the Dual Oscillator Model (DOM), consists of a slow metabolic oscillator based on the glycolytic enzyme phosphofructokinase (PFK), and an electrical or ionic oscillator, which is mediated by negative feedback of intracellular free Ca on KCa channels and changes in ATP/ADP acting on the ATP-sensitive potassium channels of the beta cell (KATP channels; FIG. 5.;[41, 102]). Tornheim originally proposed that slow oscillations in the activity of the M-isoform of PFK1 could result from

APPX1234

INSU_PI_001515

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

the allosteric activation of PFKm by its product, fructose-1-6-bisphosphate ('FBP'; [103]). According to this hypothesis, the cyclic activity of PFK leads to slow oscillations in ATP/ ADP, which cyclically regulate KATP channel activity in the beta cell plasma membrane. The oscillations in KATP conductance in turn produce oscillatory membrane depolarization and action potentials, resulting in the increase in Ca that triggers insulin granule exocytosis. Our model combines this scenario with a model for ion channels and Ca handling by the endoplasmic reticulum. An additional component of the DOM not addressed in the scenario of Tornheim is the mitochondria, which couple glycolytic oscillations to oscillations in oxidative phosphorylation and ATP production [102, 104].

In the DOM, cytosolic Ca oscillations are not mandatory for slow oscillations in metabolism to occur, and we have investigated this possibility in detail both theoretically and experimentally (e.g. [105][106][107][108]). Therefore, while other experimental observations have been cited in support of the hypothesis that free Ca oscillations drive beta cell metabolic oscillations [109][110], this cannot be the whole story. We note that the interplay between oscillatory free Ca and metabolism is complex [107], and that Ca must be clamped to a permissive level in order to see metabolic oscillations in the absence of Ca oscillations [105], which may account for why this feature has not been universally observed. In contrast to the predictions of the DOM, however, the mitochondrial substrates ketoisocaproate (KIC) and leucine have been found by some investigators to trigger slow oscillations in mouse islets even in glucose-free solutions [111][112]. However, other workers have observed that some glucose is required for islets to exhibit slow oscillations in response to KIC, for reasons that remain unclear ([113]; Zhang and Satin, unpublished).

The DOM shows that not only are the ion channels responsible for generating electrical spiking activity governed by the metabolic drive through the KATP channels, but that the metabolic oscillator by itself would be unable to generate large amplitude Ca oscillations without the nonlinear threshold properties of the electrical subsystem [107]. The model is able to account for a wide variety of phenomena not explained by other beta cell models, including compound (mixed fast and slow) Ca and membrane potential oscillations and metabolic oscillations when Ca is held fixed. Pure fast oscillations in free Ca or electrical activity, also known as 'electrical bursting', occur in the model because of feedback interactions between the Ca and K channels of the beta cells when metabolism (represented as the level of FBP in the leftmost panel of Fig. 5) is fixed. Pure slow oscillations, reflecting metabolic oscillations, produce smooth oscillations in FBP and downstream variables, shown in the rightmost panel of Fig. 5. Concurrent activity of both oscillators results in 'compound' or 'mixed' oscillations [40, 102, 113, 114], as shown in the center panel of Fig. 5. Shifts in the glucose thresholds of the ionic and metabolic oscillators can account for the wide variety of oscillatory patterns described in the islet literature (see [41, 115])

For more comprehensive reviews of the DOM, readers are directed to other recent papers [41, 102]. Experimental validation of the DOM can be found in [105, 106, 115–117]. Some alternative islet models are described in [90, 93].

APPX1235

INSU_PI_001516

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Satin et al. Page 12

### The Metronome Hypothesis

Our work, and that of others [115][40, 118], has shown that in isolated mouse islets, increasing the concentration of glucose applied to the islet tends to evoke one of three canonical Ca oscillatory patterns: fast oscillations exhibiting a period of 15–60 seconds; slow oscillations exhibiting a period of $\geq 2$ minutes; and mixed or compound oscillations consisting of fast oscillations superimposed upon the slower oscillations [78] [114]. We here use the DOM to propose distinct roles for the fast and slow oscillations. We call this the "metronome model" because the metabolic oscillations control the pacing of the secretory oscillations while the electrical oscillations control how much insulin is secreted during each slow cycle. This is illustrated in Fig. 6A, where secretion in response to a compound oscillation is shown. This arrangement also explains why increased glucose metabolism increases the amplitude of insulin pulses more than their frequency, as indicated by the data reviewed above.

In the DOM, the slow outer oscillation is determined by the cyclic activation of the glycolytic oscillator, PFKM [41, 103, 116], which sets the period of the insulin oscillations. The plateau fraction of the fast inner oscillations determines the free Ca concentration during each episode of fast bursting. Increasing glucose increases the amplitude of the insulin pulses because insulin is a slow function of the Ca level set by the fast oscillation. In contrast, the width and frequency of the metabolic pulses is relatively insensitive to the level of glucose, as shown in Fig. 6A. Glucose is raised at 20 min., resulting in an increase in plateau fraction but little change in oscillation period, while insulin secretion pulse amplitude is approximately doubled. Absolute Ca does increase somewhat, as observed in some experiments [115], but the main effect is an increase in plateau fraction.

We have confirmed this result with a more complex version of the DOM that includes more details of mitochondrial metabolism and in which insulin secretion is not merely a function of Ca, but is determined by incorporating a model for insulin granule trafficking and exocytosis[21]. In Fig. 6B the pure slow oscillations simulated in lower glucose are shown in black, those in higher glucose in red. Increasing glucose does not change the period much ($\approx 5$ min for both high and low glucose), nor the amplitude of the Ca pulses produced. However, by increasing the duration of the Ca active phase, the pulse amplitude of insulin secretion goes up markedly in higher glucose. The incorporation of the exocytosis model into the DOM allows the simulation to reproduce the rising second phase of secretion in higher glucose, which is due to increased granule trafficking from the reserve pool to the plasma membrane. This illustrates the idea that an increase in the size of the RRP is the most important factor controlling the amplitude of the burst mass. The fraction of the RRP that is secreted depends on Ca, which determines the release probability per granule in the model. This does not change much because peak Ca does not change much in this case, but mean Ca does increase as a result of the increased plateau fraction of the electrical bursts and results in release of more vesicles.

The demonstration of amplitude rather than frequency modulation of insulin secretion by glucose in Fig. 6, using two different versions of the DOM, two different models for the Ca dependence of secretion and two distinct slow patterns is an encouraging sign that the

APPX1236

**INSU_PI_001517**

phenomenon is robust and not dependent on the particular assumptions made for each simulation.

In contrast to the slow oscillations exhibited in Fig. 6, fast oscillations would not leave sufficient time between bursts for the RRP to be replenished and would result in non-pulsatile insulin secretion (see Fig. 3 in [21]). The rest period between pulses was likewise crucial for the simulations of insulin action in Fig. 3, in that case because of the time needed for negative feedback in the insulin signaling cascade to recover. The two sets of simulations together lead to a picture in which pulsatility integrates the nanoscale behavior of insulin granules in the beta cells with the nanoscale behavior of metabolic enzymes in the liver, allowing the two tissues to coordinate their activities and regulate glucose homeostasis at the whole body level.

**How are islets synchronized across the pancreas in vivo?**

The integrative consequences of pulsatility described above depend on coordinated activity by the whole beta-cell population in the pancreas, but it is not obvious how this coordination is achieved. Beta cells within a single islet have an intrinsic oscillatory mechanism that is dependent on glucose metabolism and ion channels and is modulated by a spectrum of neuroendocrine factors (reviewed in [119]). Within the islet, beta cells are electrically coupled to neighboring beta cells through gap junctions [120–122], ensuring a high degree of synchronicity among the interconnected cells.

Within the intact human pancreas, however, are hundreds of thousands of islets, whose pulsations must be highly synchronized for pancreatic insulin output and plasma insulin levels to be pulsatile [123]. A lack of synchronization between the islets would obliterate the regular pulsatile pattern that has been observed *in vivo*, and in the perfused pancreas where pulsatility is well maintained. It is likely that islets are the intrinsic pacemakers of pulsatile secretion, even in vivo, if they are highly coordinated, as the periods we observed for isolated islets are highly correlated with the *in vivo* periods of insulin pulsatility, at least in mouse [124].

It has been proposed that islet to islet communication within the pancreas is enabled by an intrapancreatic nerve network that is also connected to the pancreatic ganglia [125, 126]. Many investigators have tested for the presence of such a network using indirect approaches such as injecting pharmacological inhibitors of cholinergic [126] or adrenergic [127] transmitter release, or other blockers into animals while monitoring plasma insulin oscillations, mostly with no success [125]. One positive result was the finding that the pulse pattern could be disrupted by exposure to the Na channel blocker tetrodotoxin, which eliminates nerve action potentials [125]. Still, the nature of the endogenous pacemaker or nerve net is not known.

However, we have found that we can synchronize the oscillatory activity of groups of islets exposed to 11.1 mM glucose in vitro by briefly applying a cholinergic agonist. Thus, exposing islets to a 15 second pulse of carbachol completely synchronized the oscillations of a group of islets for as long as 30 minutes [123]. Within the framework of the Dual Oscillator Model, the release of Ca from the beta cell endoplasmic reticulum can result in

APPX1237

INSU_PI_001518

islet synchronization because rapid changes in Ca can reset the slow glycolytic oscillator, and after such a reset it takes considerable time for the oscillations of the individual islets to drift apart. We showed through modeling that even if only a fraction of the pancreatic islet population were regularly exposed to episodic acetylcholine release, say due to the activity of intrapancreatic cholinergic neurons, the effect could entrain the entire islet population [128]. However, this result remains to be tested *in vivo*. The model showed that maintenance of synchrony by neural pulses is greatly facilitated if the intrinsic frequencies of the individual islets are similar. We have found, remarkably, that this is indeed the case when islets from a given mouse are compared [124], but the mechanism behind this remains to be elucidated. We also point out that other coupling factors released by beta cells may be important paracrine factors in islets, including ATP [129][130].

**Therapeutic implications of insulin pulsatility for pharmacotherapy of Type 2 diabetes and for improving the efficacy of insulin administration**

Several well-known classes of pharmacologic agents that are used to treat patients with T2DM have been shown to increase plasma insulin pulsatility in both human and animal subjects. Sulfonylureas, for example, which increase insulin secretion by closing KATP channels in the beta cell plasma membrane, acutely increase the amplitude, but not the frequency, of insulin pulse bursts or the basal insulin levels when studied in dogs [131], or in humans with T2DM [56]. An example of the modulation resulting from tolbutamide infusion is shown in Fig. 7. In dogs having a portal vein catheter, the IV infusion of tolbutamide, or its oral ingestion, increased the amplitude of portal vein insulin pulses without significantly modifying insulin pulse frequency [132]. Deconvolution to reveal pulses in insulin secretory rate further delineated the amplitude increase after tolbutamide.

Pulse burst amplitude, but not pulse frequency, was also increased in T2DM subjects who were treated with rosiglitazone [133]. This may have been a consequence of reduced overall insulin secretion, which might prevent depletion of the RRP. Similar results were obtained in Zucker diabetic fatty rats, which also exhibited improved glucose entrainment after such treatment [61]. Rosiglitazone, a thiazolidinedione, is a PPAR gamma agonist that increases peripheral insulin sensitivity [133]. Furthermore, it has been shown that treating healthy human subjects with repaglinide, a meglitinide that provokes rapid insulin secretion and damps postprandial glucose, increases insulin pulse burst amplitude, but not frequency [55]. All of the drugs mentioned did not affect the regularity of insulin pulse production.

Drugs that potentiate endogenous levels of the incretin GLP-1 [57][134] or are themselves GLP-1 agonists [134] have currently found wide acceptance in diabetes pharmacotherapy. Several studies have now appeared documenting the ability of GLP-1 to potentiate insulin pulse mass and pulse regularity without altering insulin pulse frequency [135]. These observations suggest that modulation of insulin pulsatility may contribute to the actions of GLP-1 agonists or DPP4 inhibitors for treating T2DM in humans [136]. Mechanistically, this may be the case because GLP-1 increases the size of the RRP of insulin granules in the beta cell, the granules that serve as the substrate for the recurrent pulses of insulin that constitute the pulse burst [137]. This would be complementary to the action of rosiglitazone to preserve the RRP, but by enhancing supply of vesicles to the plasma membrane, rather

APPX1238

INSU_PI_001519

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

than reducing release of vesicles. Alternatively, long term GLP-1 treatment could also increase pulse burst mass by increasing beta cell mass [138].

Pharmacologically inhibiting beta cell insulin secretion for a period of time (e.g. overnight) has also been shown to potentiate secretion when the inhibition is removed, a phenomenon known as 'beta cell rest' [139][140]. This can be accomplished using somatostatin or its analogs, or drugs that cause the sustained opening of KATP channels, such as diazoxide. Laedtke et al (2000) suppressed insulin secretion overnight in T2DM subjects using somatostatin, while preventing hyperglycemia by insulin infusion. They found that resting beta cells in this way increased insulin burst mass and burst orderliness, without affecting pulse frequency. Beta cell rest might work similarly to rosiglitazone treatment, by increasing the size of the RRP of insulin granules that contributes to insulin pulse mass or by generally disinhibiting exocytosis. Rest may, however, have other effects as well [141].

Besides these documented actions of known drugs and peptides, our recent work to decipher the underlying mechanism of the slow oscillations in calcium and metabolism of isolated mouse islets, and other work, suggests additional ways to possibly increase the diminished insulin pulses of T2DM patients to control levels. We summarize several potential approaches below.

First, while closing KATP channels by increased glucose metabolism triggers insulin secretion by raising intracellular free Ca [41, 87, 142], insulin release is also controlled by a 'KATP-independent' amplification pathway, which likely reflects the release of mitochondrial metabolites or an increase in beta cell cyclic AMP [143][144] to potentiate secretion at a site distal to the rise in intracellular free Ca [3, 145]. While the definitive nature of this metabolite or pathway has been elusive, its identification would potentially provide a way to amplify secretion, and hence increase pulse burst amplitude without incurring further rises in Ca or metabolism and concomitant damaging reactive oxygen species production.

Second, it may be feasible to improve the regularity of the pulse bursts by strengthening the glycolytic oscillations that we propose drive the slow oscillations [41]. This could be accomplished by removing inhibitory influences on PFKM, such as excess intracellular citrate or ATP binding to PFKM. This could be done using selective site-specific antagonists, or by modifying PFKM activity through altering the activity of the PFK2/FBPase2 modulatory pathway [117]. As defective synchronization of islets within the pancreas can also contribute to the production of abnormal insulin pulses, a better understanding of intrapancreatic islet synchronization might also provide novel drug targets for future treatments. Our own work suggests that muscarinic agonists might have promise based on our *ex vivo* experiments [123].

The very nature of pulsatile secretion and its biological advantages could have translational significance for diabetes treatment. Thus, providing insulin in a pulsatile fashion using a device to make pulses of exogenous insulin or by applying insulin secretagogues such as tolbutamide in a pulsatile pattern, would be expected to affect insulin target tissues more effectively by more closely mimicking the changes in plasma insulin observed in normal

APPX1239

INSU_PI_001520

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

individuals. As mentioned earlier in the review, this could result in increased peripheral as well as hepatic insulin sensitivity, increased preservation of beta cell function, and increased glucagon suppression by plasma insulin or better liver insulin extraction. While it is difficult to envisage a way in which insulin injected subcutaneously could produce plasma insulin pulses due to the lags inherent in this method of administration, recent simulations suggest the approach may be feasible [146]. Alternatively, intravenous insulin injection using an artificial pancreas control system could be used to produce physiological insulin pulse patterns in individuals with diabetes where traditional therapy is insufficient [147].

## Summary and Conclusions

Insulin secretion occurs in a pulsatile manner in the plasma of both humans and animals, with fast pulses exhibiting a period in the range of 5 – 15 minutes, and slower ultradian oscillations having periods ranging from 80 – 180 minutes. Insulin pulsatility is disrupted in diabetes, most clearly as reduced pulse amplitude, and this appears to be an early marker of diabetes, as it is observed not only in pre-diabetics but also in first-degree relatives of patients with diabetes who lack significant metabolic abnormalities. Conversely, pulsatile insulin is more effective at mediating the metabolic effects of insulin, most clearly suppression of hepatic glucose production but possibly also enhanced uptake by peripheral tissues. The pulsatility of insulin secretion is intrinsic to the islet and may involve close coupling between slow metabolic oscillations mediated by glycolysis and faster oscillations involving beta cell ion channels and Ca mediated negative feedback. Some key coordination mechanism must also be present to synchronize islets within the intact pancreas, but the nature of this mechanism, which is likely neural, remains obscure. The essential features of the human islet oscillatory mechanism are likely to closely resemble those of mouse islets, but a complete analysis of the biophysical mechanisms of human islet oscillations has been hampered by the lack of readily available human islets of high quality. Lastly, new pharmacological agents to treat diabetes may be developed that take advantage of our improved understanding of the mechanisms controlling physiological insulin pulse patterns and their connection to insulin granule release.

## Acknowledgments

The authors gratefully acknowledge research support from the National Institutes of Health as follows: RO1 DK46409 (L. Satin), RO1 DK059579 (P. Butler), and the intramural research program of the NIDDK (A. Sherman, J. Ha). We are also grateful to Mariana R. Ortiz for providing excellent editorial assistance.

## References Cited

1. Rahier J, Guiot Y, Goebbels RM, et al. Pancreatic beta-cell mass in European subjects with type 2 diabetes. Diabetes Obes Metab. 2008; 10(Suppl 4):32–42.10.1111/j.1463-1326.2008.00969.x [PubMed: 18834431]

2. Ward WK, Beard JC, Porte D Jr. Clinical aspects of islet B-cell function in non-insulin-dependent diabetes mellitus. Diabetes Metab Rev. 1986; 2:297–313. [PubMed: 3527617]

3. Straub SG, Sharp GWG. Glucose-stimulated signaling pathways in biphasic insulin secretion. Diabetes Metab Res Rev. 2002; 18:451–463.10.1002/dmrr.329 [PubMed: 12469359]

4. Nesher R, Cerasi E. Modeling phasic insulin release: immediate and time-dependent effects of glucose. Diabetes. 2002; 51(Suppl 1):S53–S59. [PubMed: 11815459]

APPX1240

INSU_PI_001521

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

5. Topp BG, Atkinson LL, Finegood DT. Dynamics of insulin sensitivity, -cell function, and -cell mass during the development of diabetes in fa/fa rats. Am J Physiol Endocrinol Metab. 2007; 293:E1730–E1735.10.1152/ajpendo.00572.2007 [PubMed: 17895283]

6. Teta M, Long SY, Wartschow LM, et al. Very slow turnover of beta-cells in aged adult mice. Diabetes. 2005; 54:2557–2567. [PubMed: 16123343]

7. Kushner JA. The role of aging upon β cell turnover. J Clin Invest. 2013; 123:990–995.10.1172/JCI64095 [PubMed: 23454762]

8. Saisho Y, Butler AE, Manesso E, et al. β-cell mass and turnover in humans: effects of obesity and aging. Diabetes Care. 2013; 36:111–117.10.2337/dc12-0421 [PubMed: 22875233]

9. Goodner CJ, Walike BC, Koerker DJ, et al. Insulin, glucagon, and glucose exhibit synchronous, sustained oscillations in fasting monkeys. Science. 1977; 195:177–179. [PubMed: 401543]

10. Lang DA, Matthews DR, Peto J, Turner RC. Cyclic oscillations of basal plasma glucose and insulin concentrations in human beings. N Engl J Med. 1979; 301:1023–1027.10.1056/NEJM197911083011903 [PubMed: 386121]

11. Lang DA, Matthews DR, Burnett M, Turner RC. Brief, irregular oscillations of basal plasma insulin and glucose concentrations in diabetic man. Diabetes. 1981; 30:435–439. [PubMed: 7014311]

12. Polonsky KS. Evolution of beta-cell dysfunction in impaired glucose tolerance and diabetes. Exp Clin Endocrinol Diabetes Off J Ger Soc Endocrinol Ger Diabetes Assoc. 1999; 107(Suppl 4):S124–S127.10.1055/s-0029-1212166

13. Hansen BC, Jen KC, Belbez Pek S, Wolfe RA. Rapid oscillations in plasma insulin, glucagon, and glucose in obese and normal weight humans. J Clin Endocrinol Metab. 1982; 54:785–792.10.1210/jcem-54-4-785 [PubMed: 7037815]

14. Gumbiner B, Van Cauter E, Beltz WF, et al. Abnormalities of insulin pulsatility and glucose oscillations during meals in obese noninsulin-dependent diabetic patients: effects of weight reduction. J Clin Endocrinol Metab. 1996; 81:2061–2068.10.1210/jcem.81.6.8964829 [PubMed: 8964829]

15. Hunter SJ, Atkinson AB, Ennis CN, et al. Association between insulin secretory pulse frequency and peripheral insulin action in NIDDM and normal subjects. Diabetes. 1996; 45:683–686. [PubMed: 8621023]

16. Meier JJ, Pennartz C, Schenker N, et al. Hyperglycaemia is associated with impaired pulsatile insulin secretion: effect of basal insulin therapy. Diabetes Obes Metab. 2013; 15:258–263.10.1111/dom.12022 [PubMed: 23039360]

17. Lin J-M, Fabregat ME, Gomis R, Bergsten P. Pulsatile insulin release from islets isolated from three subjects with type 2 diabetes. Diabetes. 2002; 51:988–993. [PubMed: 11916916]

18. O'Rahilly S, Turner RC, Matthews DR. Impaired pulsatile secretion of insulin in relatives of patients with non-insulin-dependent diabetes. N Engl J Med. 1988; 318:1225–1230.10.1056/NEJM198805123181902 [PubMed: 3283553]

19. Schmitz O, Pørksen N, Nyholm B, et al. Disorderly and nonstationary insulin secretion in relatives of patients with NIDDM. Am J Physiol. 1997; 272:E218–E226. [PubMed: 9124326]

20. Bingley PJ, Matthews DR, Williams AJ, et al. Loss of regular oscillatory insulin secretion in islet cell antibody positive non-diabetic subjects. Diabetologia. 1992; 35:32–38. [PubMed: 1541379]

21. Pedersen MG, Sherman A. Newcomer insulin secretory granules as a highly calcium-sensitive pool. Proc Natl Acad Sci U S A. 2009; 106:7432–7436.10.1073/pnas.0901202106 [PubMed: 19372374]

22. Goodner CJ, Sweet IR, Harrison HC Jr. Rapid reduction and return of surface insulin receptors after exposure to brief pulses of insulin in perifused rat hepatocytes. Diabetes. 1988; 37:1316–1323. [PubMed: 3046965]

23. Hirashima Y, Tsuruzoe K, Kodama S, et al. Insulin down-regulates insulin receptor substrate-2 expression through the phosphatidylinositol 3-kinase/Akt pathway. J Endocrinol. 2003; 179:253–266. [PubMed: 14596677]

24. Hori SS, Kurland IJ, DiStefano JJ3rd. Role of endosomal trafficking dynamics on the regulation of hepatic insulin receptor activity: models for Fao cells. Ann Biomed Eng. 2006; 34:879–892.10.1007/s10439-005-9065-5 [PubMed: 16708271]

APPX1241

INSU_PI_001522

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

25. Robertson RP, Zhou H, Slucca M. A role for zinc in pancreatic islet β-cell crosstalk with the α-cell during hypoglycaemia. Diabetes Obes Metab. 2011; 13(Suppl 1):106–111.10.1111/j.1463-1326.2011.01448.x [PubMed: 21824263]

26. Tamaki M, Fujitani Y, Hara A, et al. The diabetes-susceptible gene SLC30A8/ZnT8 regulates hepatic insulin clearance. J Clin Invest. 2013; 123:4513–4524.10.1172/JCI68807 [PubMed: 24051378]

27. Matveyenko AV, Veldhuis JD, Butler PC. Adaptations in pulsatile insulin secretion, hepatic insulin clearance, and beta-cell mass to age-related insulin resistance in rats. Am J Physiol Endocrinol Metab. 2008; 295:E832–E841.10.1152/ajpendo.90451.2008 [PubMed: 18664594]

28. Pørksen N, Munn SR, Steers JL, et al. Effects of somatostatin on pulsatile insulin secretion: elective inhibition of insulin burst mass. Am J Physiol. 1996; 270:E1043–E1049. [PubMed: 8764190]

29. Matveyenko AV, Veldhuis JD, Butler PC. Mechanisms of Impaired Fasting Glucose and Glucose Intolerance Induced by a −50% Pancreatectomy. Diabetes. 2006; 55:2347–2356.10.2337/db06-0345 [PubMed: 16873700]

30. Meier JJ, Veldhuis JD, Butler PC. Pulsatile insulin secretion dictates systemic insulin delivery by regulating hepatic insulin extraction in humans. Diabetes. 2005; 54:1649–1656. [PubMed: 15919785]

31. Peiris AN, Stagner JI, Vogel RL, et al. Body fat distribution and peripheral insulin sensitivity in healthy men: role of insulin pulsatility. J Clin Endocrinol Metab. 1992; 75:290–294.10.1210/jcem.75.1.1619021 [PubMed: 1619021]

32. Pørksen N, Hollingdal M, Juhl C, et al. Pulsatile insulin secretion: detection, regulation, and role in diabetes. Diabetes. 2002; 51(Suppl 1):S245–S254. [PubMed: 11815487]

33. Veldhuis JD, Keenan DM, Pincus SM. Motivations and methods for analyzing pulsatile hormone secretion. Endocr Rev. 2008; 29:823–864.10.1210/er.2008-0005 [PubMed: 18940916]

34. Pørksen N. The in vivo regulation of pulsatile insulin secretion. Diabetologia. 2002; 45:3–20.10.1007/s001250200001 [PubMed: 11845219]

35. Pørksen N, Munn S, Steers J, et al. Impact of sampling technique on appraisal of pulsatile insulin secretion by deconvolution and cluster analysis. Am J Physiol. 1995; 269:E1106–E1114. [PubMed: 8572204]

36. Kjems LL, Kirby BM, Welsh EM, et al. Decrease in beta-cell mass leads to impaired pulsatile insulin secretion, reduced postprandial hepatic insulin clearance, and relative hyperglucagonemia in the minipig. Diabetes. 2001; 50:2001–2012. [PubMed: 11522665]

37. Matveyenko AV, Liuwantara D, Gurlo T, et al. Pulsatile portal vein insulin delivery enhances hepatic insulin action and signaling. Diabetes. 2012; 61:2269–2279.10.2337/db11-1462 [PubMed: 22688333]

38. Pørksen N, Munn S, Steers J, et al. Pulsatile insulin secretion accounts for 70% of total insulin secretion during fasting. Am J Physiol. 1995; 269:E478–E488. [PubMed: 7573425]

39. Ritzel RA, Veldhuis JD, Butler PC. Glucose stimulates pulsatile insulin secretion from human pancreatic islets by increasing secretory burst mass: dose-response relationships. J Clin Endocrinol Metab. 2003; 88:742–747.10.1210/jc.2002-021250 [PubMed: 12574208]

40. Beauvois MC, Merezak C, Jonas J-C, et al. Glucose-induced mixed [Ca2+]c oscillations in mouse beta-cells are controlled by the membrane potential and the SERCA3 Ca2+-ATPase of the endoplasmic reticulum. Am J Physiol Cell Physiol. 2006; 290:C1503–C1511.10.1152/ajpcell.00400.2005 [PubMed: 16381799]

41. Bertram R, Sherman A, Satin LS. Metabolic and electrical oscillations: partners in controlling pulsatile insulin secretion. Am J Physiol Endocrinol Metab. 2007; 293:E890–E900.10.1152/ajpendo.00359.2007 [PubMed: 17666486]

42. Hellman B, Salehi A, Gylfe E, et al. Glucose generates coincident insulin and somatostatin pulses and antisynchronous glucagon pulses from human pancreatic islets. Endocrinology. 2009; 150:5334–5340.10.1210/en.2009-0600 [PubMed: 19819962]

43. Field JB, Rojdmark S, Harding P, et al. Role of liver in insulin physiology. Diabetes Care. 1980; 3:255–260. [PubMed: 6993136]

*Mol Aspects Med*. Author manuscript; available in PMC 2016 April 01.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

44. Bratusch-Marrain PR, Komjati M, Waldhäusl WK. Efficacy of pulsatile versus continuous insulin administration on hepatic glucose production and glucose utilization in type I diabetic humans. Diabetes. 1986; 35:922–926. [PubMed: 3525288]

45. Paolisso G, Scheen AJ, Albert A, Lefebvre PJ. Effects of pulsatile delivery of insulin and glucagon in humans. Am J Physiol. 1989; 257:E686–E696. [PubMed: 2688437]

46. Komjati M, Bratusch-Marrain P, Waldhäusl W. Superior efficacy of pulsatile versus continuous hormone exposure on hepatic glucose production in vitro. Endocrinology. 1986; 118:312–319.10.1210/endo-118-1-312 [PubMed: 3000741]

47. Dobbins RL, Davis SN, Neal DW, et al. Pulsatility does not alter the response to a physiological increment in glucagon in the conscious dog. Am J Physiol. 1994; 266:E467–E478. [PubMed: 8166269]

48. Grubert JM, Lautz M, Lacy DB, et al. Impact of continuous and pulsatile insulin delivery on net hepatic glucose uptake. Am J Physiol Endocrinol Metab. 2005; 289:E232–E240.10.1152/ajpendo. 00567.2004 [PubMed: 15755768]

49. Sedaghat AR, Sherman A, Quon MJ. A mathematical model of metabolic insulin signaling pathways. Am J Physiol Endocrinol Metab. 2002; 283:E1084–E1101.10.1152/ajpendo.00571.2001 [PubMed: 12376338]

50. Declercq J, Kumar A, Van Diepen JA, et al. Increased beta-cell mass by islet transplantation and PLAG1 overexpression causes hyperinsulinemic normoglycemia and hepatic insulin resistance in mice. Diabetes. 2010; 59:1957–1965.10.2337/db09-1446 [PubMed: 20522588]

51. Gray SL, Donald C, Jetha A, et al. Hyperinsulinemia precedes insulin resistance in mice lacking pancreatic beta-cell leptin signaling. Endocrinology. 2010; 151:4178–4186.10.1210/en.2010-0102 [PubMed: 20631001]

52. Shimomura I, Matsuda M, Hammer RE, et al. Decreased IRS-2 and increased SREBP-1c lead to mixed insulin resistance and sensitivity in livers of lipodystrophic and ob/ob mice. Mol Cell. 2000; 6:77–86. [PubMed: 10949029]

53. Alemzadeh R, Langley G, Upchurch L, et al. Beneficial effect of diazoxide in obese hyperinsulinemic adults. J Clin Endocrinol Metab. 1998; 83:1911–1915.10.1210/jcem.83.6.4852 [PubMed: 9626118]

54. Matthews DR, Lang DA, Burnett MA, Turner RC. Control of pulsatile insulin secretion in man. Diabetologia. 1983; 24:231–237. [PubMed: 6345247]

55. Juhl CB, Pørksen N, Hollingdal M, et al. Repaglinide acutely amplifies pulsatile insulin secretion by augmentation of burst mass with no effect on burst frequency. Diabetes Care. 2000; 23:675–681. [PubMed: 10834429]

56. Juhl CB, Pørksen N, Pincus SM, et al. Acute and short-term administration of a sulfonylurea (gliclazide) increases pulsatile insulin secretion in type 2 diabetes. Diabetes. 2001; 50:1778–1784. [PubMed: 11473038]

57. Pørksen N, Grøfte B, Nyholm B, et al. Glucagon-like peptide 1 increases mass but not frequency or orderliness of pulsatile insulin secretion. Diabetes. 1998; 47:45–49. [PubMed: 9421373]

58. Pørksen N, Munn S, Steers J, et al. Effects of glucose ingestion versus infusion on pulsatile insulin secretion. The incretin effect is achieved by amplification of insulin secretory burst mass. Diabetes. 1996; 45:1317–1323. [PubMed: 8826965]

59. Song SH, McIntyre SS, Shah H, et al. Direct measurement of pulsatile insulin secretion from the portal vein in human subjects. J Clin Endocrinol Metab. 2000; 85:4491–4499.10.1210/jcem. 85.12.7043 [PubMed: 11134098]

60. Polonsky KS, Given BD, Hirsch LJ, et al. Abnormal patterns of insulin secretion in non-insulin-dependent diabetes mellitus. N Engl J Med. 1988; 318:1231–1239.10.1056/NEJM198805123181903 [PubMed: 3283554]

61. O'Meara NM, Sturis J, Van Cauter E, Polonsky KS. Lack of control by glucose of ultradian insulin secretory oscillations in impaired glucose tolerance and in non-insulin-dependent diabetes mellitus. J Clin Invest. 1993; 92:262–271.10.1172/JCI116560 [PubMed: 8325993]

62. O'Meara NM, Sturis J, Herold KC, et al. Alterations in the patterns of insulin secretion before and after diagnosis of IDDM. Diabetes Care. 1995; 18:568–571. [PubMed: 7497873]

63. Hellman B, Salehi A, Grapengiesser E, Gylfe E. Isolated mouse islets respond to glucose with an initial peak of glucagon release followed by pulses of insulin and somatostatin in antisynchrony with glucagon. Biochem Biophys Res Commun. 2012; 417:1219–1223.10.1016/j.bbrc.2011.12.113 [PubMed: 22227186]

64. Franklin I, Gromada J, Gjinovci A, et al. Beta-cell secretory products activate alpha-cell ATP-dependent potassium channels to inhibit glucagon release. Diabetes. 2005; 54:1808–1815. [PubMed: 15919803]

65. Leung YM, Ahmed I, Sheu L, et al. Insulin regulates islet alpha-cell function by reducing KATP channel sensitivity to adenosine 5'-triphosphate inhibition. Endocrinology. 2006; 147:2155–2162.10.1210/en.2005-1249 [PubMed: 16455778]

66. Gromada J, Høy M, Olsen HL, et al. Gi2 proteins couple somatostatin receptors to low-conductance K+ channels in rat pancreatic alpha-cells. Pflüg Arch Eur J Physiol. 2001; 442:19–26.

67. Gromada J, Høy M, Buschard K, et al. Somatostatin inhibits exocytosis in rat pancreatic alpha-cells by G(i2)-dependent activation of calcineurin and depriming of secretory granules. J Physiol. 2001; 535:519–532. [PubMed: 11533141]

68. Berts A, Gylfe E, Hellman B. Ca2+ oscillations in pancreatic islet cells secreting glucagon and somatostatin. Biochem Biophys Res Commun. 1995; 208:644–649.10.1006/bbrc.1995.1387 [PubMed: 7695619]

69. Quoix N, Cheng-Xue R, Mattart L, et al. Glucose and pharmacological modulators of ATP-sensitive K+ channels control [Ca2+]c by different mechanisms in isolated mouse alpha-cells. Diabetes. 2009; 58:412–421.10.2337/db07-1298 [PubMed: 19008345]

70. Menge BA, Grüber L, Jørgensen SM, et al. Loss of inverse relationship between pulsatile insulin and glucagon secretion in patients with type 2 diabetes. Diabetes. 2011; 60:2160–2168.10.2337/db11-0251 [PubMed: 21677283]

71. Lang DA, Matthews DR, Burnett M, et al. Pulsatile, synchronous basal insulin and glucagon secretion in man. Diabetes. 1982; 31:22–26. [PubMed: 6759209]

72. Rohrer S, Menge BA, Grüber L, et al. Impaired crosstalk between pulsatile insulin and glucagon secretion in prediabetic individuals. J Clin Endocrinol Metab. 2012; 97:E791–E795.10.1210/jc.2011-3439 [PubMed: 22399501]

73. Hellman B. Pulsatility of insulin release--a clinically important phenomenon. Ups J Med Sci. 2009; 114:193–205.10.3109/03009730903366075 [PubMed: 19961265]

74. Song W-J, Mondal P, Wolfe A, et al. Glucagon regulates hepatic kisspeptin to impair insulin secretion. Cell Metab. 2014; 19:667–681.10.1016/j.cmet.2014.03.005 [PubMed: 24703698]

75. Gylfe E, Tengholm A. Neurotransmitter control of islet hormone pulsatility. Diabetes Obes Metab. 2014; 16(Suppl 1):102–110.10.1111/dom.12345 [PubMed: 25200303]

76. Juhl CB, Pørksen N, Sturis J, et al. High-frequency oscillations in circulating amylin concentrations in healthy humans. Am J Physiol Endocrinol Metab. 2000; 278:E484–E490. [PubMed: 10710503]

77. Salehi A, Parandeh F, Fredholm BB, et al. Absence of adenosine A1 receptors unmasks pulses of insulin release and prolongs those of glucagon and somatostatin. Life Sci. 2009; 85:470–476.10.1016/j.lfs.2009.08.001 [PubMed: 19682463]

78. Dean PM, Matthews EK. Glucose-induced electrical activity in pancreatic islet cells. J Physiol. 1970; 210:255–264. [PubMed: 5501294]

79. Tengholm A, Gylfe E. Oscillatory control of insulin secretion. Mol Cell Endocrinol. 2009; 297:58–72.10.1016/j.mce.2008.07.009 [PubMed: 18706473]

80. Meissner HP, Schmelz H. Membrane potential of beta-cells in pancreatic islets. Pflüg Arch Eur J Physiol. 1974; 351:195–206.

81. Malaisse WJ, Herchuelz A, Devis G, et al. Regulation of calcium fluxes and their regulatory roles in pancreatic islets. Ann N Y Acad Sci. 1978; 307:562–582. [PubMed: 360949]

82. Beigelman PM, Ribalet B, Atwater I. Electric activity of mouse pancreatic beta-cells. II. Effects of glucose and arginine. J Physiol (Paris). 1977; 73:201–217. [PubMed: 330839]

83. Henquin JC. Regulation of insulin release by ionic and electrical events in B cells. Horm Res. 1987; 27:168–178. [PubMed: 2447002]

*Mol Aspects Med*. Author manuscript; available in PMC 2016 April 01.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

84. Cook DL. Isolated islets of Langerhans have slow oscillations of electrical activity. Metabolism. 1983; 32:681–685. [PubMed: 6345990]

85. Henquin JC, Meissner HP, Schmeer W. Cyclic variations of glucose-induced electrical activity in pancreatic B cells. Pflüg Arch Eur J Physiol. 1982; 393:322–327.

86. Ashcroft FM, Rorsman P. Electrophysiology of the pancreatic beta-cell. Prog Biophys Mol Biol. 1989; 54:87–143. [PubMed: 2484976]

87. Cook DL, Satin LS, Hopkins WF. Pancreatic B cells are bursting, but how? Trends Neurosci. 1991; 14:411–414. [PubMed: 1720583]

88. Sherman A. Lessons from models of pancreatic beta cells for engineering glucose-sensing cells. Math Biosci. 2010; 227:12–19.10.1016/j.mbs.2010.05.005 [PubMed: 20580727]

89. Satin LS, Tavalin SJ, Smolen PD. Inactivation of HIT cell Ca2+ current by a simulated burst of Ca2+ action potentials. Biophys J. 1994; 66:141–148.10.1016/S0006-3495(94)80759-3 [PubMed: 8130333]

90. Fridlyand LE, Tamarina N, Philipson LH. Bursting and calcium oscillations in pancreatic beta-cells: specific pacemakers for specific mechanisms. Am J Physiol Endocrinol Metab. 2010; 299:E517–E532.10.1152/ajpendo.00177.2010 [PubMed: 20628025]

91. Fridlyand LE, Tamarina N, Philipson LH. Modeling of Ca2+ flux in pancreatic beta-cells: role of the plasma membrane and intracellular stores. Am J Physiol Endocrinol Metab. 2003; 285:E138–E154.10.1152/ajpendo.00194.2002 [PubMed: 12644446]

92. Fridlyand LE, Jacobson DA, Philipson LH. Ion channels and regulation of insulin secretion in human β-cells: a computational systems analysis. Islets. 2013; 5:1–15.10.4161/isl.24166 [PubMed: 23624892]

93. Cha CY, Powell T, Noma A. Analyzing electrical activities of pancreatic β cells using mathematical models. Prog Biophys Mol Biol. 2011; 107:265–273.10.1016/j.pbiomolbio. 2011.08.001 [PubMed: 21843545]

94. Pedersen MG. A biophysical model of electrical activity in human β-cells. Biophys J. 2010; 99:3200–3207.10.1016/j.bpj.2010.09.004 [PubMed: 21081067]

95. Martín F, Soria B. Glucose-induced [Ca2+]i oscillations in single human pancreatic islets. Cell Calcium. 1996; 20:409–414. [PubMed: 8955555]

96. Kindmark H, Köhler M, Nilsson T, et al. Measurements of cytoplasmic free Ca2+ concentration in human pancreatic islets and insulinoma cells. FEBS Lett. 1991; 291:310–314. [PubMed: 1936280]

97. Kindmark H, Köhler M, Arkhammar P, et al. Oscillations in cytoplasmic free calcium concentration in human pancreatic islets from subjects with normal and impaired glucose tolerance. Diabetologia. 1994; 37:1121–1131. [PubMed: 7867884]

98. Riz M, Braun M, Pedersen MG. Mathematical modeling of heterogeneous electrophysiological responses in human β-cells. PLoS Comput Biol. 2014; 10:e1003389.10.1371/journal.pcbi.1003389 [PubMed: 24391482]

99. Cabrera O, Berman DM, Kenyon NS, et al. The unique cytoarchitecture of human pancreatic islets has implications for islet cell function. Proc Natl Acad Sci U S A. 2006; 103:2334–2339.10.1073/pnas.0510790103 [PubMed: 16461897]

100. Braun M, Ramracheya R, Bengtsson M, et al. Voltage-gated ion channels in human pancreatic beta-cells: electrophysiological characterization and role in insulin secretion. Diabetes. 2008; 57:1618–1628.10.2337/db07-0991 [PubMed: 18390794]

101. Braun M. The αβδ of ion channels in human islet cells. Islets. 2009; 1:160–162.10.4161/isl. 1.2.9405 [PubMed: 21099266]

102. Bertram R, Sherman A, Satin LS. Electrical bursting, calcium oscillations, and synchronization of pancreatic islets. Adv Exp Med Biol. 2010; 654:261–279.10.1007/978-90-481-3271-3_12 [PubMed: 20217502]

103. Tornheim K. Are metabolic oscillations responsible for normal oscillatory insulin secretion? Diabetes. 1997; 46:1375–1380. [PubMed: 9287034]

104. Bertram R, Satin LS, Pedersen MG, et al. Interaction of glycolysis and mitochondrial respiration in metabolic oscillations of pancreatic islets. Biophys J. 2007; 92:1544–1555.10.1529/biophysj. 106.097154 [PubMed: 17172305]

APPX1245

INSU_PI_001526

Author Manuscript     Author Manuscript     Author Manuscript     Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

105. Merrins MJ, Fendler B, Zhang M, et al. Metabolic oscillations in pancreatic islets depend on the intracellular Ca2+ level but not Ca2+ oscillations. Biophys J. 2010; 99:76–84.10.1016/j.bpj.2010.04.012 [PubMed: 20655835]

106. Ren J, Sherman A, Bertram R, et al. Slow oscillations of KATP conductance in mouse pancreatic islets provide support for electrical bursting driven by metabolic oscillations. Am J Physiol Endocrinol Metab. 2013; 305:E805–E817.10.1152/ajpendo.00046.2013 [PubMed: 23921138]

107. Goel P, Sherman A. The Geometry of Bursting in the Dual Oscillator Model of Pancreatic $\beta$-cells. SIAM J Appl Dyn Syst. 2009; 8:1664–1693.10.1137/08074427X

108. Nunemaker CS, Dishinger JF, Dula SB, et al. Glucose metabolism, islet architecture, and genetic homogeneity in imprinting of [Ca2+](i) and insulin rhythms in mouse islets. PloS One. 2009; 4:e8428.10.1371/journal.pone.0008428 [PubMed: 20037650]

109. Luciani DS, Misler S, Polonsky KS. Ca2+ controls slow NAD(P)H oscillations in glucose-stimulated mouse pancreatic islets. J Physiol. 2006; 572:379–392.10.1113/jphysiol.2005.101766 [PubMed: 16455690]

110. Li J, Shuai HY, Gylfe E, Tengholm A. Oscillations of sub-membrane ATP in glucose-stimulated beta cells depend on negative feedback from Ca(2+). Diabetologia. 2013; 56:1577–1586.10.1007/s00125-013-2894-0 [PubMed: 23536115]

111. Heart E, Smith PJS. Rhythm of the beta-cell oscillator is not governed by a single regulator: multiple systems contribute to oscillatory behavior. Am J Physiol Endocrinol Metab. 2007; 292:E1295–E1300.10.1152/ajpendo.00648.2006 [PubMed: 17213468]

112. Leclercq-Meyer V, Marchand J, Woussen-Colle MC, et al. Multiple effects of leucine on glucagon, insulin, and somatostatin secretion from the perfused rat pancreas. Endocrinology. 1985; 116:1168–1174.10.1210/endo-116-3-1168 [PubMed: 2857640]

113. Dahlgren GM, Kauri LM, Kennedy RT. Substrate effects on oscillations in metabolism, calcium and secretion in single mouse islets of Langerhans. Biochim Biophys Acta. 2005; 1724:23–36.10.1016/j.bbagen.2005.04.007 [PubMed: 15882932]

114. Zhang M, Goforth P, Bertram R, et al. The Ca2+ dynamics of isolated mouse beta-cells and islets: implications for mathematical models. Biophys J. 2003; 84:2852–2870.10.1016/S0006-3495(03)70014-9 [PubMed: 12719219]

115. Nunemaker CS, Bertram R, Sherman A, et al. Glucose modulates [Ca2+]i oscillations in pancreatic islets via ionic and glycolytic mechanisms. Biophys J. 2006; 91:2082–2096.10.1529/biophysj.106.087296 [PubMed: 16815907]

116. Merrins MJ, Van Dyke AR, Mapp AK, et al. Direct measurements of oscillatory glycolysis in pancreatic islet β-cells using novel fluorescence resonance energy transfer (FRET) biosensors for pyruvate kinase M2 activity. J Biol Chem. 2013; 288:33312–33322.10.1074/jbc.M113.508127 [PubMed: 24100037]

117. Merrins MJ, Bertram R, Sherman A, Satin LS. Phosphofructo-2-kinase/fructose-2,6-bisphosphatase modulates oscillations of pancreatic islet metabolism. PloS One. 2012; 7:e34036.10.1371/journal.pone.0034036 [PubMed: 22532827]

118. Gilon P, Ravier MA, Jonas J-C, Henquin J-C. Control mechanisms of the oscillations of insulin secretion in vitro and in vivo. Diabetes. 2002; 51(Suppl 1):S144–S151. [PubMed: 11815474]

119. Satin LS, Kinard TA. Neurotransmitters and their receptors in the islets of Langerhans of the pancreas: what messages do acetylcholine, glutamate, and GABA transmit? Endocrine. 1998; 8:213–223.10.1385/ENDO:8:3:213 [PubMed: 9741825]

120. Benninger RKP, Zhang M, Head WS, et al. Gap junction coupling and calcium waves in the pancreatic islet. Biophys J. 2008; 95:5048–5061.10.1529/biophysj.108.140863 [PubMed: 18805925]

121. Benninger RKP, Head WS, Zhang M, et al. Gap junctions and other mechanisms of cell-cell communication regulate basal insulin secretion in the pancreatic islet. J Physiol. 2011; 589:5453–5466.10.1113/jphysiol.2011.218909 [PubMed: 21930600]

122. Head WS, Orseth ML, Nunemaker CS, et al. Connexin-36 gap junctions regulate in vivo first-and second-phase insulin secretion dynamics and glucose tolerance in the conscious mouse. Diabetes. 2012; 61:1700–1707.10.2337/db11-1312 [PubMed: 22511206]

APPX1246

INSU_PI_001527

123. Zhang M, Fendler B, Peercy B, et al. Long lasting synchronization of calcium oscillations by cholinergic stimulation in isolated pancreatic islets. Biophys J. 2008; 95:4676–4688.10.1529/biophysj.107.125088 [PubMed: 18708464]

124. Nunemaker CS, Zhang M, Wasserman DH, et al. Individual mice can be distinguished by the period of their islet calcium oscillations: is there an intrinsic islet period that is imprinted in vivo? Diabetes. 2005; 54:3517–3522. [PubMed: 16306370]

125. Stagner JI, Samols E. Perturbation of insulin oscillations by nerve blockade in the in vitro canine pancreas. Am J Physiol. 1985; 248:E516–E521. [PubMed: 3887939]

126. Stagner JI, Samols E. Role of intrapancreatic ganglia in regulation of periodic insular secretions. Am J Physiol. 1985; 248:E522–E530. [PubMed: 3887940]

127. Cyrus J, Stagner J, Samols E. Abolition of dopaminergic insulin secretion by beta-adrenergic antagonism. Endocrinology. 1982; 111:214–218.10.1210/endo-111-1-214 [PubMed: 6123430]

128. Fendler B, Zhang M, Satin L, Bertram R. Synchronization of pancreatic islet oscillations by intrapancreatic ganglia: a modeling study. Biophys J. 2009; 97:722–729.10.1016/j.bpj.2009.05.016 [PubMed: 19651030]

129. Grapengiesser E, Dansk H, Hellman B. Pulses of external ATP aid to the synchronization of pancreatic beta-cells by generating premature Ca(2+) oscillations. Biochem Pharmacol. 2004; 68:667–674.10.1016/j.bcp.2004.04.018 [PubMed: 15276074]

130. Hellman B, Dansk H, Grapengiesser E. Pancreatic beta-cells communicate via intermittent release of ATP. Am J Physiol Endocrinol Metab. 2004; 286:E759–E765.10.1152/ajpendo.00452.2003 [PubMed: 14722025]

131. Schmitz O, Rungby J, Edge L, Juhl CB. On high-frequency insulin oscillations. Ageing Res Rev. 2008; 7:301–305.10.1016/j.arr.2008.04.002 [PubMed: 18583199]

132. Pørksen NK, Munn SR, Steers JL, et al. Mechanisms of sulfonylurea's stimulation of insulin secretion in vivo: selective amplification of insulin secretory burst mass. Diabetes. 1996; 45:1792–1797. [PubMed: 8922367]

133. Juhl CB, Hollingdal M, Pørksen N, et al. Influence of rosiglitazone treatment on beta-cell function in type 2 diabetes: evidence of an increased ability of glucose to entrain high-frequency insulin pulsatility. J Clin Endocrinol Metab. 2003; 88:3794–3800.10.1210/jc.2002-021181 [PubMed: 12915671]

134. Drucker DJ. Incretin action in the pancreas: potential promise, possible perils, and pathological pitfalls. Diabetes. 2013; 62:3316–3323.10.2337/db13-0822 [PubMed: 23818527]

135. Ritzel R, Schulte M, Pørksen N, et al. Glucagon-like peptide 1 increases secretory burst mass of pulsatile insulin secretion in patients with type 2 diabetes and impaired glucose tolerance. Diabetes. 2001; 50:776–784. [PubMed: 11289042]

136. Schmitz O, Brock B, Hollingdal M, et al. High-frequency insulin pulsatility and type 2 diabetes: from physiology and pathophysiology to clinical pharmacology. Diabetes Metab. 2002; 28:4S14–4S20. [PubMed: 12703061]

137. Kwan EP, Xie L, Sheu L, et al. Interaction between Munc13-1 and RIM is critical for glucagon-like peptide-1 mediated rescue of exocytotic defects in Munc13-1 deficient pancreatic beta-cells. Diabetes. 2007; 56:2579–2588.10.2337/db06-1207 [PubMed: 17639022]

138. Tortosa F, Dotta F. Incretin hormones and beta-cell mass expansion: what we know and what is missing? Arch Physiol Biochem. 2013; 119:161–169.10.3109/13813455.2013.795175 [PubMed: 23697580]

139. Brown RJ, Rother KI. Effects of beta-cell rest on beta-cell function: a review of clinical and preclinical data. Pediatr Diabetes. 2008; 9:14–22.10.1111/j.1399-5448.2007.00272.x [PubMed: 18221429]

140. Laedtke T, Kjems L, Pørksen N, et al. Overnight inhibition of insulin secretion restores pulsatility and proinsulin/insulin ratio in type 2 diabetes. Am J Physiol Endocrinol Metab. 2000; 279:E520–E528. [PubMed: 10950818]

141. Remedi MS, Nichols CG. Chronic antidiabetic sulfonylureas in vivo: reversible effects on mouse pancreatic beta-cells. PLoS Med. 2008; 5:e206.10.1371/journal.pmed.0050206 [PubMed: 18959471]

APPX1247

INSU_PI_001528

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

142. Ashcroft FM, Rorsman P. Electrophysiology of the pancreatic beta-cell. Prog Biophys Mol Biol. 1989; 54:87–143. [PubMed: 2484976]

143. Dyachok O, Idevall-Hagren O, Sågetorp J, et al. Glucose-induced cyclic AMP oscillations regulate pulsatile insulin secretion. Cell Metab. 2008; 8:26–37.10.1016/j.cmet.2008.06.003 [PubMed: 18590690]

144. Tengholm A. Cyclic AMP dynamics in the pancreatic β-cell. Ups J Med Sci. 2012; 117:355–369.10.3109/03009734.2012.724732 [PubMed: 22970724]

145. Henquin J-C. The dual control of insulin secretion by glucose involves triggering and amplifying pathways in β-cells. Diabetes Res Clin Pract. 2011; 93(Suppl 1):S27–S31.10.1016/S0168-8227(11)70010-9 [PubMed: 21864748]

146. Skjaervold NK, Ostling D, Hjelme DR, et al. Blood glucose control using a novel continuous blood glucose monitor and repetitive intravenous insulin boluses: exploiting natural insulin pulsatility as a principle for a future artificial pancreas. Int J Endocrinol. 2013; 2013:245152.10.1155/2013/245152 [PubMed: 24369461]

147. Juhl CB, Gjedsted J, Nielsen MF, Schmitz O. Increased action of pulsatile compared to non-pulsatile insulin delivery during a meal-like glucose exposure simulated by computerized infusion in healthy humans. Metabolism. 2012; 61:1177–1181.10.1016/j.metabol.2011.12.014 [PubMed: 22386942]

148. Quon MJ, Campfield LA. A mathematical model and computer simulation study of insulin receptor regulation. J Theor Biol. 1991; 150:59–72. [PubMed: 1890848]

APPX1248

INSU_PI_001529

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript



**FIG. 1.**
Oscillations in plasma insulin, C-peptide, and glucose measured in a peripheral vein in a
fasted human subject. Dashed lines show unsmoothed data, continuous lines show three
point moving averages of the data. Reprinted from [10] with permission of the New England
Journal of Medicine.

APPX1249

**INSU_PI_001530**

Satin et al.



**FIG. 2.**
The time course of IRS-1 activation by insulin in liver of rats exposed to either full amplitude insulin pulses, diminished pulses (to mimic T2DM), or constant insulin for up to 10 minutes. After portal vein infusion of these insulin patterns, livers were biopsied and IRS-1 activation was analyzed by immunoprecipitation with IRS-1 antibody, followed by immunoblotting with pY or p85/PI3K antibodies. Full amplitude insulin pulses potentiated insulin signaling in the liver, as evidenced by increases in pY-IRS-1 and p85-IRS-1. Similar results were obtained for IRS-2 activation (not shown). Statistics were ANOVA followed by Fisher's post hoc test; p<0.05 was deemed significant. Reprinted from [37] with permission of Diabetes.

APPX1250

INSU_PI_001531



Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript



**FIG. 3.**
A model of the insulin receptor signaling pathway demonstrating that due to frictional resistance, insulin receptor signaling is potentiated by insulin applied in a pulsatile rather than continuous manner. As shown, negative feedback in the signaling pathway facilitates insulin pulse responses because frictional resistance is allowed to fade between applied pulses of insulin. Details are provided in the text.

APPX1251

INSU_PI_001532

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Satin et al.

Page 28



**FIG. 4.**
Glucose increases insulin pulse amplitude. A. Glucose ingestion (arrow) causes an increase in insulin secretory burst mass and frequency in the portal circulation of catheterized dogs (top left). The data from two representative dogs are shown. Deconvolution shows potentiation of insulin secretory pulse amplitude and frequency (top right), which are plotted for a total of 15 dogs in the lower part of the figure. Reprinted from [58] with permission of Diabetes. B. Insulin pulses in the portal circulation of human subjects (as well as in the periphery) are also increased in amplitude after glucose is increased. Samples taken during

*Mol Aspects Med.* Author manuscript; available in PMC 2016 April 01.

APPX1252

INSU_PI_001533

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

first 40 minutes of the experiment under basal conditions are shown on the left, while samples collected during the second 40 minutes of samples once hyperglycemia was established are shown on the right of the figure. Note the profound differences in scale of for the respective ordinates shown. Reprinted from [59] with permission of The Journal of Clinical Endocrinology and Metabolism.

APPX1253

**INSU_PI_001534**

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Satin et al. Page 30



**FIG. 5.**
Three types of oscillations typically observed in islets. Top row of panels is from islet measurements of $Ca^{2+}$. Middle row shows simulated $Ca^{2+}$ oscillations using the Dual Oscillator Model (DOM). Bottom row shows simulations of the glycolytic intermediate fructose 1,6 bisphosphate (FBP), indicating that glycolysis is stationary (c) or oscillatory (f, i). Reprinted from [41] with permission of the American Journal of Physiology.

APPX1254

**INSU_PI_001535**

Satin et al. Page 31



**FIG. 6.**
The Metronome Hypothesis. A. Simulation obtained using a model of an isolated
'compound bursting' islet showing that increasing the plateau fraction of an islet $Ca^{2+}$
oscillation as glucose is raised results in a dramatic increase in insulin pulse amplitude, but
little or no change in oscillation frequency. Note that there was a small increase in the $Ca^{2+}$
baseline as well. B. Simulation showing that increasing the duration of the islet $Ca^{2+}$
oscillations in a slow islet lacking faster oscillations superimposed on the slower ones also
results in potentiation of the insulin pulse amplitude, but no change in pulse frequency.

APPX1255

**INSU_PI_001536**

Satin et al.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript



**FIG. 7.**
Tolbutamide infused into the portal vein of three representative dogs results in increased insulin pulse amplitude (left hand side of the figure). Deconvolution of the data reveals that tolbutamide greatly increased the amplitudes of the insulin secretory rates. Tolbutamide infusion occurred from 40–110 minutes.

APPX1256

INSU_PI_001537



# Key Milestones

**2021 — Inflection Point**

- 05/03 – Comanche, TX Licensed
- 04/15 – Warrenville, IL Licensed
- 02/22 – Tampa, FL Licensee training in GA

- 02/04 – 1ˢᵗ Lafayette, LA Licensee training in TX
- 01/26 – 1ˢᵗ RestorMetabolik Distributor Licensed
- 01/18 – 1ˢᵗ Baxley, GA Licensee training in TX

- 02/17 – 1ˢᵗ Riverside, CA Licensee Trained in TX
- 02/03 – 1ˢᵗ St. Augustin, FL Licensee Trained in TX
- 01/20 – 1ˢᵗ Bay City, TX Licensee Trained in TX
- 01/14 – 2ⁿᵈ U.S. Patent No. 10,533,990 issued by USPTO
- 01/06 – 1ˢᵗ Kingman, AZ Licensee Trained in TX

- 08/19 – 1ˢᵗ Phoenix, AZ Licensee Trained
- 07/29 – 1ˢᵗ Boca Raton, FL Licensee Trained & Launched in FL
- 07/10 – 1ˢᵗ Tripoli Lebanon (Mazloum Hospital) Launched
- 07/08 – 1ˢᵗ Selina, AL & 1ˢᵗ Ellicott City, MD Licensees Trained
- 06/03 – 1ˢᵗ San Diego, CA & 1ˢᵗ Plano, TX Licensees Trained
- 04/26 – 1ˢᵗ Banning, CA Licensed
- 02/13 – 1ˢᵗ San Antonio, TX Licensee Trained
- 02/11 – 1ˢᵗ Jacksonville, FL Trained & Launched in FL
- 01/30 – 1ˢᵗ Thousand Oaks, CA Licensees Trained

**2020 — Restructure**

- 12/14 – 1ˢᵗ Alexandria, LA Licensee training in TX
- 09/14 – 1ˢᵗ Atlanta, GA FQHC Licensee trained in GA
- 07/15 – Well Cell Global LLC is founded in TX
- 03/02 – 2ⁿᵈ Salt Lake City Licensee training in UT
- 03/02 – 1ˢᵗ Statesboro, GA Licensee Trained in GA

- 12/18 – 2ⁿᵈ San Antonio, TX & Green Valley, AZ Licensees Trained in TX
- 12/02 – 1ˢᵗ Canton, GA Licensee Trained in UT
- 11/19 – 1ˢᵗ Thomasville, GA Licensee Trained in TX
- 11/15 – RestorMetabolik a division of H360 LLC created in UT
- 10/21 – 1ˢᵗ Salt Lake City, UT Licensee Trained in UT
- 10/16 – 1ˢᵗ Atlanta, GA, 1ˢᵗ Clearwater, FL, 1ˢᵗ Sarasota, FL
- 10/07 – 1ˢᵗ West Palm Beach, FL Licensee Trained
- 09/10 – 1ˢᵗ East Baton Rouge, LA Licensed
- 09/04 – 2ⁿᵈ U.S. Patent about by USPTO

- 05/02 – Amy Bass, MD Endocrinologist joins DR
- 02/13 – 1ˢᵗ Azerbaijan Facility License granted
- 02/01 – 1ˢᵗ San Jose Licensed Facility announced
- 01/18 – 1ˢᵗ Layton, UT Owned Trained & Launched in TX&UT

**2019 — Expansion**

- 11/28 – 1ˢᵗ Austin, TX Licensee Trained
- 11/26 – Attained a private label for use as a clinic financing partner
- 08/28 – 1ˢᵗ Beirut Lebanon Trained & Launched in Lebanon
- 07/24 – 1ˢᵗ Waycross, GA Trained & Launched in GA
- 07/10 – Trademark No. 5,511,669 received

- 08/20 – 1ˢᵗ International Licenses Granted
- 05/26 – Copyright Registration No VAu 805,789
- 05/16 – 1ˢᵗ U.S. Patent No. 9,652,595 issued by USPTO

- 03/31 – Stanley T. Lewis Jr., MD, MPH joins DR
- 03/09 – Diabetes Relief Management Series LLC created in TX
- 02/17 – Development of private label Magnesium Gel

**2018 — Growth**

- 12/03 – 1ˢᵗ San Jose, CA Trained & Launched in CA
- 11/27 – Brian Loveridge, MD, FAAEM joins DR
- 09/24 – 1ˢᵗ Istanbul, Turkey Trained & Launched in Turkey
- 09/14 – Copyright Registration No. TX852464

- 01/20 – 1ˢᵗ Houston, TX Owned Facility Launched
- 01/08 – Diabetes Relief LLC created in TX

**2017 — Turning Point**

- 09/15 – David A. Hall, MD joins DR
- 09/15 – 2ⁿᵈ Houston, TX Owned Facility Trained & Launched in TX
- 06/25 – Hormone Optimization service offering launched

**2016 — Early Stage**

- 07/01 – Development of private label Metab360
- 04/01 – Publication of first monthly DR Newsletter
- 02/07 – Provisional Patent application filed with USPTO

**2015 — Founded**

Confidential- Unauthorized Distribution Prohibited  Copyright © WELL CELL GLOBAL, LLC 2021. All rights reserved.

Key Milestones
Revision -05.04.21

2

IMSU_PI_001538

| | |
|---|---|
| **From:** | Glenn Massey |
| **Sent:** | Tuesday, March 15, 2022 10:13 AM CDT |
| **To:** | Shawn Calvit |
| **Subject:** | FW: Help |
| **Attachments:** | OPINION_ALJ032720_17pgs.pdf, image001.png, image002.png, image003.png, image004.png |

See attached and read below.
Link with more information coming.

Respectfully,
**Glenn Massey**
*Chief Growth Officer*
*Executive Board Member*



**M:** +1 (713) 582-0449 
**O:** +1 (888) 991-1012
**W:** wellcellglobal.com

  

This transmission may be strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy, or disseminate this information. If you are not the intended recipient, please contact the sender at (832-599-9552), or by reply email, and destroy all copies of the original message. Unauthorized interception of this e-mail is a violation of federal criminal law. This communication does not reflect an intention by the sender or the sender's principal to conduct a transaction or make any agreement by electronic means.

**From:** Carol Wilson <carol@wellcellsupport.com>
**Sent:** Tuesday, March 15, 2022 10:10 AM
**To:** Glenn Massey <glenn@wellcellglobal.com>
**Cc:** Paula Oschman <paula@wellcellsupport.com>
**Subject:** RE: Help

Glenn, first of all, the attached RECENT (2020) LEGAL OPINION FROM THE ADMINISTRATIVE LAW JUDGE in a case where we appealed an insurance company's denial of payment is very strong support. This is a COURT RULING that the insurance company had to pay. (Has anybody ever sent this to you?)

The attachment is 17 pages, and on page 13 of the attachment (bottom of page 9 of the Opinion) "experimental" is mentioned.

Bottom line: the insurance company was ordered to pay.



4:22-CV-03062
Injunction Hearing
**EX 32**
DEFS "INSULINIC"

I can send you more, but I can also send Shawn Calvit a link to the Dropbox folder that has many other articles (including our recent published ones), as well as a copy of this Opinion (name starts with "2020").

Carol

**Carol Ann Wilson**
Research and Writing



11511 Katy Freeway, Suite 102
Houston, TX  77079
carol@wellcellsupport.com
(P) 281.600.5000 ext: 112
(M) 281.642.4050

**From:** Glenn Massey <glenn@wellcellglobal.com>
**Sent:** Tuesday, March 15, 2022 9:33 AM
**To:** Carol Wilson <carol@wellcellsupport.com>
**Cc:** Shawn Calvit <shawnc@insulinic.com>
**Subject:** Re: Help

Thank you.
Yes, it never ends.

Respectfully,
Glenn Massey
Chief Growth Officer
Well Cell Global
M: +1 (713) 582-0449
O: +1 (888) 991-1012
W: wellcellglobal.com
This transmission may be strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy, or disseminate this information. If you are not the intended recipient, please contact the sender at (832-599-9552), or by reply email, and destroy all copies of the original message. Unauthorized interception of this e-mail is a violation of federal criminal law. This communication does not reflect an intention by the sender or the sender's principal to conduct a transaction or make any agreement by electronic means.

**From:** Carol Wilson <carol@wellcellsupport.com>
**Sent:** Tuesday, March 15, 2022 9:32:08 AM

**To:** Glenn Massey <glenn@wellcellglobal.com>
**Cc:** Shawn Calvit <shawnc@insulinic.com>
**Subject:** RE: Help

Boy, we really do have to keep inventing the wheel, don't we?
I'll look and get you copies.
Carol

**Carol Ann Wilson**
Research and Writing



11511 Katy Freeway, Suite 102
Houston, TX  77079
carol@wellcellsupport.com
(P) 281.600.5000 ext: 112
(M) 281.642.4050

**From:** Glenn Massey <glenn@wellcellglobal.com>
**Sent:** Tuesday, March 15, 2022 9:30 AM
**To:** Carol Wilson <carol@wellcellsupport.com>
**Cc:** Shawn Calvit <shawnc@insulinic.com>
**Subject:** Help

Carol,
In all of our writings do we have anything written that dispels PIR as "experimental". In nature. I also
have a call into Dawn Davis to discuss.
Let me know.

Respectfully,
Glenn Massey
Chief Growth Officer
Well Cell Global
M: +1 (713) 582-0449
O: +1 (888) 991-1012
W: wellcellglobal.com
This transmission may be strictly confidential. If you are not the intended recipient of this message, you
may not disclose, print, copy, or disseminate this information. If you are not the intended recipient,
please contact the sender at (832-599-9552), or by reply email, and destroy all copies of the original
message. Unauthorized interception of this e-mail is a violation of federal criminal law. This
communication does not reflect an intention by the sender or the sender's principal to conduct a
transaction or make any agreement by electronic means.



INSU_PI_001542



INSU_PI_001543



APPX1263

**INSU_PI_001544**

APPX1264



INSU_PI_001545



Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Phoenix Field Office
230 N. 1st Avenue  Suite 7220
Phoenix, AZ 85003
602-603-8500 (Main)
602-603-8603 (ALJ Carpenter Team)
602-379-3035 (Fax)
833-636-1476 (Toll Free)

Date: 3/27/2020

ALISIA SALINAS
11511 KATY FWY
STE 100
HOUSTON, TX 77079

## NOTICE OF DECISION

Appellant:              C. TUTE
OMHA Appeal Number:     1-9232173843

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

### What if I disagree with the decision?

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

### How much time do I have to file an appeal?

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

OMHA-1051                    Page 1 of 4

APPX1265

**INSU_PI_001546**

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

**How do I file an appeal?**

To appeal, you must ask the Medicare Appeals Council to review the decision.  Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below.  Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods:  mail, fax, or electronic filing (E-File).  **Please do not submit your request for review using more than one method**.  Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the  adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

> Department of Health and Human Services
> Departmental Appeals Board
> Medicare Appeals Council, MS 6127
> Cohen Building Room G-644
> 330 Independence Ave., S.W.
> Washington, D.C.  20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

APPX1266

INSU_PI_001547

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:

(1) Clicking **Register** on the MOD E-File home page;
(2) Entering the information requested on the "Register New Account" form; and
(3) Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**.  You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

(1) Logging into MOD E-File;
(2) Clicking the **File New Appeal** menu button on the top right of the screen;
(3) Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
(4) Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal – Medicare Operations Division" form.  You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

(1) Request for Review;
(2) Appointment of Representative form (OMB Form 0938-0950);
(3) Copy of Administrative Law Judge or attorney adjudicator decision;
(4) Memorandum or brief or other written statement in support of your appeal; and
(5) Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.**  You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of

OMHA-1051                                            Page 3 of 4

APPX1267

**INSU_PI_001548**

decision.  The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited if (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

### How will the Medicare Appeals Council respond to my appeal?

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee.  It may change the parts of the decision that you agree with.  It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action.  It may also dismiss your appeal.

### Questions?

You may call or write our office.  A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/.  You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

      C. TUTE                         MAXIMUS
      APT 3304 5105 AIRLINE DR       IRE Part C Appeals—ALJ
      HOUSTON, TX 77022-2640       3750 Monroe Avenue, Suite 702
                                    Pittsford, NY 14534-1302

Enclosures:

      OMHA-152, Decision
      OMHA-156, Exhibit List
      DAB-101, Request for Review

APPX1268

INSU_PI_001549



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Phoenix Field Office
Phoenix, AZ

| Appeal of:  **C. TUTE** | ALJ Appeal No.:  **1-9232173843** |
|---|---|
| Beneficiary:  **C. TUTE** | **Medicare Part C** |
| HICN:  *****4847A | Before:  **Sarah D. Carpenter**<br>**U.S. Administrative Law Judge** |

## DECISION

After considering the evidence and arguments presented in the administrative record, the undersigned Administrative Law Judge (ALJ) has entered a **FULLY FAVORABLE** Decision for the Appellant and the Beneficiary, Ms. C. Tute.  The items/services at issue in this appeal are the out-of-network services furnished by the Provider, Diabetes Relief, which the Appellant requested the Respondent Medicare Advantage Organization (MAO), Humana, pre-authorize until December 31, 2020, which is the date the Appellant's current health plan with the Respondent MAO ends.[1]  The liability of the Appellant and the Respondent MAO is not at issue.

## PROCEDURAL HISTORY

The Appellant submitted a pre-service authorization request for the Plan to allow her to receive services from out-of-network provider, "Diabetes Relief" (the "Provider") via Kristi Justice, FNP, who works as a Family Nurse Practitioner for the Provider, beginning on November 12, 2019.[2]  By *Notice of Denial of Medical Coverage* (NDMC) dated November 26, 2019, the Respondent informed the Appellant that it had denied the Appellant's request.  (*Ex. 1*, pp. 11-14, 94-95).  On December 5, 2019, the Appellant's representative, Ms. Alisia Salinas, appealed the Respondent's initial determination.  On December 6, 2019, the Respondent issued a redetermination decision wherein the Respondent informed the Appellant that:  it was denying the Appellant's pre-service authorization request for the Plan to allow her to receive services from out-of-network provider, Kristi Justice, FNP, beginning November 12, 2019; it had approved a visit (99214) for the Appellant to see an out-of-network physician so that the Appellant could receive the requested service; and, its authorization would be active from 12/06/2019 to 01/19/2020.  (*Ex. 1*, pp. 88-91).

After the Respondent issued its redetermination decision, the Respondent forwarded the Appellant's case to MAXIMUS Federal Services, the Medicare Part C Qualified Independent Contractor (the "QIC").  (*Ex. 1*, pp. 89-90).  Later, in an unfavorable reconsideration decision dated December 9, 2019, the QIC determined that the Plan did not have to approve the Appellant's request to allow her to receive services from out-of-network provider, Kristi Justice,

---

[1]  In 2019 and 2020, the Appellant was (and currently still is) an enrolled member in a health plan (the "Appellant's health plan" or the "Plan") provided by the Respondent MAO.

[2]  Kristi Justice, FNP (also referred to herein as "Nurse Kristi Justice" or "Nurse Justice") is a Family Nurse Practitioner who works for the Provider, "Diabetes Relief," which provides patients with a patented treatment program that involves an infusion of insulin and IV fluids in a manner designed to reduce the chance of its patients developing various diabetic complications like diabetic neuropathy.  (*Ex. 1*, p. 89).

1

FNP.[3]  (*Ex. 1*, pp. 2-5).  On January 30, 2020, the Appellant submitted a request for an ALJ hearing to the Office of Medicare Hearings and Appeals (OMHA).  (*Ex. 3*, p. 1).  Since the Appellant's request for an ALJ hearing was timely filed and the amount in controversy satisfies the jurisdictional requirements, there is ALJ jurisdiction to adjudicate the Appellant's instant appeal.  *See* 42 C.F.R. §§ 405.1006, 405.1014; 42 C.F.R. §§ 422.600, 422.602; *see also*, CMS Medicare Managed Care Manual (MMCM), Pub. 100.16, Ch. 13, § 70.2 ("…  In general, the amount in controversy (AIC) is computed as the actual amount charged (or amount enrollee would have been charged) minus applicable deductible or coinsurance…  For Part C, if the basis for the appeal is the MA plan's refusal to provide services, the AIC is computed using the projected value of those services…").

On March 13, 2020, a telephonic ALJ hearing was held at the OMHA Phoenix Field Office.  The Appellant was present at this hearing and testified.  The Appellant's son and Representative, Mr. Jarvis Sampson, was also present at the hearing and testified on behalf of the Appellant.  In addition, the Provider's Representative, Family Nurse Practitioner Kristi Justice attended the hearing and testified on behalf of the Provider while lending testimonial support for the Appellant's request to receive the relevant out-of-network services from the Provider.  Moreover, the Respondent MAO's Medical Director and Representative, Dr. Bruce Niebylski, M.D., along with the Respondent MAO's Appeals Specialist and witness, Ms. Marcia Taylor, attended the hearing and testified on behalf of the Respondent MAO.  (*Hearing CD*).  Although notified of the ALJ hearing, the QIC elected not to participate in the hearing.  (*Ex. 4*, pp. 1-5).  All exhibits have been entered into evidence and are part of the administrative record.

## ISSUE

The issue on appeal is whether the Respondent MAO is required to provide coverage for the medical treatment the Appellant has requested be furnished to her by the Provider, who is an out-of-network provider, under Medicare statutory law, regulatory authority, policy guidelines, and/or the contractual terms of the Appellant's health plan with the Respondent.[4]

## APPLICABLE LAW AND POLICY

The obligations of a MAO, such as the Respondent MAO, to its enrollees are set forth in Section 1852 of the Social Security Act and the implementing regulations in 42 Code of Federal Regulations (C.F.R.) Part 422.  These sections state that MAOs must provide their members with the same benefits provided under parts A and B of Medicare.

Section 1852 of the Act states: (a) Basic Benefits.— (1)    In General.--Except as provided in section 1859(b)(3) for MSA plans … each [MAO] plan shall provide to members enrolled under this part, through providers and other persons that meet the applicable requirements of this title

---

[3] Despite the QIC's unfavorable reconsideration decision, the testimony at the ALJ hearing established that the Respondent MAO covered, and paid for, the Appellant to receive medical treatment services from Diabetes Relief from sometime in April 2019 through December 2019.  (*Hearing CD*).

[4] The infusion therapy treatment the Appellant received from the Provider during the time period of April 2019 through December 2019 are not at issue; and, as the Appellant has not sought or received infusion therapy treatment services from the Provider in 2020, the only services that are at issue include the future services, if any, the Appellant receives from the Provider.  (*Hearing CD*).

2

and part A of title XI— (A) those items and services … for which benefits are available under parts A and B to individuals residing in the area served by the plan, and (B) additional benefits required under § 1854(f)(1)(A).  Social Security Act, § 1852.

§ 1852(c) of the Act requires Medicare Advantage Organizations to make certain disclosures to its enrollees regarding its services and benefits.  This section states, in relevant part, that: (1) A Medicare+Choice organization shall disclose, in clear, accurate, and standardized form to each enrollee with a Medicare+Choice plan offered by the organization under this part at the time of enrollment and at least annually thereafter, the following information regarding such plan:… (B) BENEFITS- Benefits offered under the plan, including information described in § 1851(d)(3)(A) and exclusions from coverage and, if it is an MSA plan, a comparison of benefits under such a plan with benefits under other Medicare+Choice plans.  Social Security Act, § 1852(c).

§ 1851(d)(3)(A) of the Act provides the following:  (d) PROVIDING INFORMATION TO PROMOTE INFORMED CHOICE--… (3) GENERAL INFORMATION.—General information under this paragraph, with respect to coverage under this part during a year, shall include the following: (A) BENEFITS UNDER ORIGINAL MEDICARE FEE-FOR-SERVICE PROGRAM OPTION.—A general description of the benefits covered under the original Medicare fee-for-service program under parts A and B, including— (i) covered items and services, (ii) beneficiary cost sharing, such as deductibles, coinsurance, and copayment amounts, and (iii) any beneficiary liability for balance billing.  Id.

Subject to the conditions and limitations set forth in this subpart, an MAO offering an MA plan must provide enrollees in that plan with coverage of the basic benefits described in paragraph (c) of this section (and, to the extent applicable, the benefits described in § 422.102) by furnishing the benefits directly or through arrangements, or by paying for the benefits.  CMS reviews these benefits subject to the requirements of § 422.100(g) and the requirements in subpart G of this part.  42 C.F.R. § 422.100.

An MAO must provide coverage of, by furnishing, arranging, arranging for, or making payment for, "all services that are covered by Part A and Part B of Medicare (if the enrollee is entitled to benefits under both parts) or by Medicare Part B (if entitled only under Part B) and that are available to beneficiaries residing in the plan's service area."  42 C.F.R. § 422.101(a).  These are known as "basic benefits."  In providing basic benefits, a MAO is obligated to comply with Centers for Medicare and Medicaid Services (CMS) national coverage determinations (NCDs), "[g]eneral coverage guidelines included in original Medicare manuals and instructions unless superseded by regulations in 42 C.F.R. Part 422 or related instructions; and… written coverage decisions of local Medicare contractors."  42 C.F.R. § 422.101(b).  At its discretion, a MAO may also offer additional (or "supplemental") benefits beyond those covered by "original" Medicare. 42 C.F.R. §§ 422.2, 422.102.  (*Emphasis added*).

An enrollee may be "locked in" the MA plan and medical services through the plan's physicians and suppliers.  42 C.F.R. § 422.112(a) provides that an MAO that offers a Medicare Advantage coordinated care plan may specify the networks of providers from whom enrollees may obtain services [including specialty services] if the MAO ensures that all covered services are available and accessible under the plan.  Id.

Generally, approval of a MAO physician or representative is needed to obtain services within or outside the plan.  An MAO is obligated to pay for out-of-plan, unauthorized services furnished to

3

INSU_PI_001552

an enrollee in only limited circumstances, *e.g.*, emergency or urgently needed services. 42 C.F.R. § 422.100(b).  An MAO must make timely and reasonable payment to or on behalf of the plan enrollee for the following services obtained from a provider or supplier that does not contract with the MAO to provide services covered by the MA Plan: "services for which coverage has been denied by the MAO and found (upon appeal under subpart M of this part) to be services the enrollee was entitled to have furnished, or paid for, by the MAO." 42 C.F.R. § 422.100(b)(1)(v).

Section 1862(a)(1) of the Social Security Act provides that no reimbursement may be made under Part A or Part B of Title XVIII for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.  Social Security Act, § 1862(a)(1).  This exclusion from coverage has been interpreted to include services and/or supplies that are considered experimental or investigational.  *See* 42 C.F.R. §§ 411.15(o), 405.201 et. seq.; 60 Fed.Reg. 48417-25; *see also*, Smith v. Thompson, 210 F.Supp.2d 994, 1000 (N.D. Ill. 2002); Yale-New Haven Hospital, Inc. v. Thompson, 162 F.Supp.2d 54, 60-61 (D. Conn. 2001).

Section 1833(e) of the Act places the burden on the provider to provide documentation sufficient to support payment of claims submitted to Medicare for reimbursement. Social Security Act, § 1833(e); 42 C.F.R. § 410, Subpart B.

Under section 1852(d)(3)(A) of the Act, Congress defined "emergency services" as covered inpatient and outpatient services that are furnished by a provider qualified to furnish such services under [title XVIII], and are needed to evaluate or stabilize an emergency medical condition (as defined in [§ 1852(d)(3)(B)]). Id.

Section 1852(d)(3)(B) of the Act defines the term "emergency medical condition" as a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part. Id; 42 C.F.R. § 422.113(b)(i).

42 C.F.R. § 422.113(b)(1)(iii) defines "urgently needed services" to mean covered services that are not emergency services as defined in this section, provided when an enrollee is temporarily absent from the MAO plan's service area… when the services are medically necessary and immediately required- (A) As a result of an unforeseen illness, injury, or condition; and (B) It was not reasonable given the circumstances to obtain the services through the organization offering the MAO plan.  (2)  MAO financial responsibility.  The MAO is financially responsible for urgently needed services- (i) Regardless of whether the services are obtained within or outside the MAO; (ii) Regardless of whether there is prior authorization for the services… Id.

Section 1871(a)(2) of the Act states that unless promulgated as a regulation by CMS, no rule, requirement, or statement of policy, other than a National Coverage Determination (NCD), can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. Id; 42 C.F.R. § 405.860.

4

The statutory and policy framework within which NCDs are made may be found in title XVIII of the Act, and in Medicare regulations and rulings. The NCD Manual describes whether specific medical items, services, treatment procedures, or technologies can be paid for under Medicare. NCDs have been made on items addressed in this manual. All decisions that items, services, etc. are not covered are based on §1862(a)(1) of the Act (the "not reasonable or necessary" exclusion) unless otherwise specifically noted… Where coverage of an item or service is provided for specified indications or circumstances but is not explicitly excluded for others, *or where the item or service is not mentioned at all in the CMS Manual System the Medicare contractor is to make the coverage decision, in consultation with its medical staff, and with CMS when appropriate, based on the law, regulations, rulings and general program instructions…* MNCD Manual, CMS Pub. 100-3, Ch. 1, Part 1, Sec. A. (*Emphasis added*).

As noted above, the Act states that unless promulgated as a regulation by CMS, no rule, requirement, or statement of policy, other than a NCD, can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. Social Security Act, § 1871(a)(2); 42 C.F.R. § 405.860. In addition, however, in lieu of binding regulations with the full force and effect of law, CMS and its contractors have issued policy guidance that describe criteria for coverage of selected types of medical items/services in the form of manuals and local medical review policies or local coverage determinations (LCDs).

42 C.F.R. §405.1062 states the regulation regarding the applicability of LCDs and other policies not binding on the ALJ as follows: (a) ALJs are not bound by LCDs, LMRPs, or CMS program guidance, such as program memorandum and manual instructions, but will give substantial deference to these policies if they are applicable to a particular case. (b) If an ALJ declines to follow a policy in a particular case, the ALJ decision must explain the reasons why the policy was not followed. An ALJ decision to disregard such policy applies only to the specific claim being considered and does not have precedential effect. (c) An ALJ may not set aside or review the validity of an LMRP or LCD for purposes of the claim appeal. An ALJ may review or set aside an LCD (or any part of an LMRP that is an LCD) pursuant to part 426 of this title. Id.

## FINDINGS OF FACT AND ANALYSIS

### Findings of Fact:

The Provider, Diabetes Relief, utilizes a proprietary method of infusion therapy to infuse its patients with small amounts of IV fluids (*i.e.*, 10 ml of normal saline per infusion) and small amounts of insulin (*i.e.*, 10 units of insulin over 3 hours) to treat patients with secondary diabetic complications, such as diabetic neuropathy. The infusion pump that the Provider uses pumps insulin into the Provider's patients in such a way as to mimic the way a patient's pancreas pumps insulin out in small pulses every 3 to 5 minutes. By mimicking the normal pancreas physiology, the Provider's patients are more receptive to insulin and can breakdown sugars into energy better to repair and improve diabetic complications like neuropathy. (*Hearing CD*).

The Appellant, who is currently 69 years old, has been diagnosed as suffering from type 2 diabetes mellitus (DMII) with peripheral neuropathy and retinopathy along with congestive heart failure, obstructive sleep apnea, anxiety, hypertensive disorder, amnesia, and stage 3 chronic kidney disease. The symptomatology related to the Appellant's health problems include: difficulty sleeping, fatigue, bilateral leg pain, joint pain, and chronic diabetic foot ulcer. (*Ex. 1*, pp. 94-95; *Ex. 2*, pp. 8-9, 15, 23; *Ex. 4*, p. 21). On January 1, 2019, the Appellant became an

5

INSU_PI_001554

enrolled member in the Plan, which is a health plan provided by the Respondent MAO. In April 2019, the Appellant began receiving infusion therapy services from the Provider after she had been referred to, or learned of, the Provider's services from her podiatrist. (*Hearing CD*).

Prior to the end of 2019, on or about November 12, 2019, the Appellant submitted a pre-service authorization request for the Respondent MAO to allow her to continue to receive infusion therapy services from the Provider. On November 26, 2019, the Respondent MAO issued a NDMC, which informed the Appellant that the Respondent MAO had denied the Appellant's pre-service authorization request. (*Ex. 1*, pp. 11-14). On December 5, 2019, the Appellant's representative, Ms. Alisia Salinas, requested a redetermination of the Respondent's initial unfavorable determination. (*Ex. 1*, p. 95). On December 4, 2019, the day before the Respondent received the Appellant request for redetermination, Kristi Justice, FNP-C, wrote a letter entitled, "Medical Necessity Letter for Continuation of Treatment," which stated the following in part:

"… [The Appellant] qualifies to continue treatment at Diabetes Relief for Type 2 diabetes (E11.65). She was first diagnosed with Type 2 diabetes in 1997. Her condition was complicated with presence of [various health problems]… [The Appellant] is now undergoing a plan of care that includes diet therapy, monitoring blood glucose levels at home, a diabetic regimen of [various medications] and our individualized treatment plan her at Diabetes Relief. We have seen considerable improvement and believe it should be continued. [The Appellant] needs continued intervention to avoid or limit known chronic and debilitating complications of diabetes including: neuropathy, nephropathy, cardiovascular disease, and retinopathy.

In my professional opinion, continuation of the Diabetes Relief Program is a medical necessity at this time for [the Appellant] in order to continue to effectively treat her diabetes and prevent a recurrence of her symptoms. The treatment duration is 12 months with periodic review of outcomes/progress. The treatment plan at Diabetes Relief for [the Appellant] is individualized and comprehensive. The care plan includes metabolic restoration via Diabetic Relief's patented process, as well as instruction/education on nutrition and exercise, optimization of medications to minimize side effects and toxicities, micronutrient and vitamin supplement therapy, and hormone evaluation and optimization.

The treatment program at Diabetes Relief is needed for [the Appellant] to continue to achieve glycemic control as measured by HbA1c and serum glucose levels and improve insulin sensitivity as measured by HOMA score, insulin/c-Peptide levels, and glucose tolerance testing, as previous treatments have failed to do so. I anticipate with compliance and commitment to the comprehensive program, [the Appellant] will have continued improvements in all aspects of her diabetes and reduce the need for costly healthcare services such as physical/occupational therapies and possibly hospitalizations for common long-term complications of diabetes, including amputations and dialysis…"

(*Ex. 1*, pp. 27-28).

Thereafter, the Respondent MAO provided coverage for, and paid for, the medical infusion therapy treatment services the Appellant received from the Provider from April 2019 through December 2019. (*Hearing CD*). In addition, in December 2019, the Respondent MAO issued a redetermination decision and the QIC issued an unfavorable reconsideration decision. Later, on January 30, 2020, the Appellant submitted a timely request for ALJ hearing to the OMHA; and, on March 13, 2020, a telephonic ALJ hearing was conducted at the OMHA Phoenix Field Office, which is located in Phoenix, Arizona. (*Infra.* at. p. 1). After December 2019, up through at least the date of the ALJ hearing on March 13, 2020, while her request that the Respondent MAO

6

grant her pre-authorization to receive the Provider's medical infusion therapy services has been ongoing, and the Appellant has been appealing the Respondent MAO's decision not to grant her pre-authorization request, the Appellant did not seek or receive medical treatment services from the Provider. (*Hearing CD*).

**Analysis:**

I.     The Record On Appeal Does **Not** Support That The Appellant Had Adequate Notice That The Respondent MAO Would Discontinue Coverage Of The Provider's Infusion Therapy Services In 2020.

At the ALJ hearing, the Respondent MAO's witness, Ms. Marcia Taylor, testified that, as per its usual course of business, the Respondent MAO sends its Plan enrollees, like the Appellant, a copy of the Plan's Evidence of Coverage.  Also at the ALJ hearing, the Respondent MAO's representative, Dr. Bruce Niebylski, M.D., attested that the Appellant has a PPO plan with the Respondent MAO and, while she could receive medical services from out-of-network providers, the Appellant could not receive the services at issue from the Provider because the services the Provider furnishes is not considered medically reasonable and necessary because the treatment is not the accepted standard of medical care.  When the undersigned ALJ asked Dr. Niebylski why the Respondent MAO covered and paid for the Appellant to receive the Provider's medical services from April 2019 through December 2019, Dr. Niebylski stated that he assumed the services were not reviewed by a physician and were paid for automatically by a computer since the billed codes were not prior authorized items.  In addition, the Appellant's representative, Mr. Jarvis Sampson, testified at the ALJ hearing that he was not aware that the Appellant received a copy of the Plan's Evidence of Coverage.  The Appellant testified that she just remembered getting something from the Respondent MAO at some time, which indicated the Respondent MAO would no longer pay for the Appellant to receive the Provider's medical services. (*Hearing CD*).

Section 1852(c) of the Act requires MAOs to make certain disclosures to its enrollees regarding its services and benefits.  This section states, in relevant part, that: (1) A Medicare+Choice organization shall disclose, in clear, accurate, and standardized form to each enrollee with a Medicare+Choice plan offered by the organization under this part at the time of enrollment and at least annually thereafter, the following information regarding such plan:... (B) BENEFITS-Benefits offered under the plan, including information described in § 1851(d)(3)(A) and exclusions from coverage and, if it is an MSA plan, a comparison of benefits under such a plan with benefits under other Medicare+Choice plans.  See Social Security Act, § 1852(c).  Also, section 1851(d)(3)(A) of the Act provides the following: (d) PROVIDING INFORMATION TO PROMOTE INFORMED CHOICE--... (3) GENERAL INFORMATION.—General information under this paragraph, with respect to coverage under this part during a year, shall include the following: (A) BENEFITS UNDER ORIGINAL MEDICARE FEE-FOR-SERVICE PROGRAM OPTION.—A general description of the benefits covered under the original Medicare fee-for-service program under parts A and B, including— (i) covered items and services, (ii) beneficiary cost sharing, such as deductibles, coinsurance, and copayment amounts, and (iii) any beneficiary liability for balance billing.  See Social Security Act, §1851(d)(3).

In the instant case, the Respondent MAO has submitted, and the administrative record contains, a copy of one of health plan's 2019 and 2020 Evidence of Coverage ("EOCs"), which the Respondent MAO has indicated correspond to the Appellant's health plan with the Respondent

7

INSU_PI_001556

MAO. (*Ex. 1*; *Ex. 5*, CD).  However, both the 2019 EOC and the 2020 EOC that the Respondent MAO provided, which are included in the record, correspond to an "HMO" health plan as opposed to a PPO health plan, which is the type of health plan Dr. Niebylski attested was the Appellant's health plan with the Respondent MAO.

Accordingly, the undersigned ALJ finds that a preponderance of the evidence in the record does <u>not</u> support that the Respondent MAO provided the Appellant with sufficient and adequate notice of the change in the Appellant's health plan coverage in 2020 so as to allow the Appellant to make an informed choice as is required by Medicare statutory law.  This is particularly true where, as here, the Respondent MAO covered and paid for the Appellant to receive the Provider's infusion therapy services during the entire time she received such services from April to December 2019.  While the Respondent MAO may argue that it informed the Appellant that the Provider's infusion therapy services were not covered in or about November 2019 and that the Respondent MAO informed the Appellant that the Respondent MAO would not cover the Provider's medical services again in 2020 at the ALJ hearing that was held on March 13, 2020, this "notice" is not sufficient under Medicare law because:  the evidence supports that the Respondent MAO did not provide the Appellant with an EOC that corresponds to her PPO health plan with the Respondent MAO in 2019 and 2020; and, without evidence that the Respondent MAO provided the Appellant with her 2019 and 2020 PPO EOCs, there is no way for the undersigned ALJ to determine if the notice of non-coverage and NDMC the Respondent MAO sent the Appellant in or about November 2019, was proper or consistent with the contractual terms of the Appellant's 2019 PPO plan or 2020 PPO Plan with the Respondent MAO.  *See* Social Security Act §§ 1851(d)(3)(A), 1852(c).

Under these facts, where the Respondent MAO did not provide the Appellant with sufficient and adequate statutory notice that it would not cover and pay for the Appellant to continue to receive infusion therapy services from the Provider, which would have allowed the Appellant to have made an informed choice of whether she wanted to continue to be enrolled in a health plan with the Respondent MAO or change to another MAO health plan that would cover the Provider's infusion therapy services, the undersigned ALJ finds that the Respondent MAO is required to grant the Appellant's pre-authorization request and provide Plan coverage for the Appellant to continue to receive the Provider's infusion therapy services as requested by the Appellant through December 2020.

II.     <u>Even If the Respondent MAO Had Provided The Appellant With Adequate Statutory Notice of Her Plan Benefits, A Preponderance Of The Evidence In The Appeal Record Supports That, Under These Case Facts, The Respondent MAO Is Required To Provide Coverage For The Appellant To Receive The Services At Issue Because The Services Are Medically Reasonable And Necessary And Covered by Medicare.</u>

Assuming that the 2019 and 2020 EOCs contained in the record reflect the Appellant's health plan contract with the Respondent MAO in 2019/2020 and the Respondent MAO provided the Appellant with adequate statutory notice of its Plan's coverage, the undersigned ALJ finds that a preponderance of the evidence in the record supports that the Respondent MAO is still required to provide coverage for the Appellant to receive the services at issue because Medicare requires the Plan to cover these medical services and the Plan's in-network providers cannot provide such care.  *See* 2020 EOC, Ch. 3, § 1.2 ("… In most cases, care you receive from an out-of-network provider (a provider who is not part of our plan's network) will not be covered. *Here are three exceptions*:…  If you need medical care that Medicare requires our plan to cover and the

8

providers in our network cannot provide this care, you can get this care from an out-of-network provider.  You must obtain authorization from the plan prior to seeking care from an out-of-network provider. In this situation, you will pay the same as you would pay if you got the care from a network provider…").  (*Ex. 5*, CD, pp. 45-46 of the 2020 EOC); *see also*, Social Security Act, § 1852.  ("… (a) Basic Benefits. — (1) In General.--Except as provided in section 1859(b)(3) for MSA plans … each [MAO] plan shall provide to members enrolled under this part, through providers and other persons that meet the applicable requirements of this title and part A of title XI— (A) those items and services … for which benefits are available under parts A and B to individuals residing in the area served by the plan…").

To begin with, at the ALJ hearing, the Respondent MAO's representative, Dr. Bruce Niebylski, M.D., testified that there was no NCD or LCD that directly addressed the services at issue and that the only applicable CMS manual policy guidance on point was general CMS manual statements about the fact that Medicare covers the standard of care for the treatment of illnesses. (*Hearing CD*).  The undersigned ALJ finds this portion of Dr. Niebylski's testimony credibly supports that there is, in fact, no specific NCD, LCD, or CMS Manual provision that directly addresses the medical services at issue in this case.

Also at the ALJ hearing, Dr. Niebylski testified that, after he had reviewed the general CMS manual statements about the fact that Medicare covered the standard of care for the treatment of illnesses and reviewed the Respondent MAO's coverage of the services at issue, Dr. Niebylski reversed the Respondent's MAO's earlier conclusion the services at issue were covered.  In particular, Dr. Niebylski asserted that he had reversed the Respondent MAO's prior coverage decision because he had determined that:  (1) the services at issue, which were experimental, were not the accepted medical standard of care for the Appellant's diabetic complications and that such services could actually be medically harmful; and, (2) medically necessary services could be provided to treat the Appellant's diabetic complications by in-network providers.  In support of his assertions, Dr. Niebylski, who, upon further questioning by the undersigned ALJ, later conceded that he had no evidence that the relevant services could be harmful and thought that such services could perhaps just have no effect on the Appellant's diabetic neuropathy, stated that:  the fact that services at issue were experimental and not the accepted medical standard of care for the Appellant's diabetic complications was evidenced by the absence of medical literature on the Provider's treatment outcomes; and, the Plan's in-network providers, which included endocrinologists and diabetic specialists, could provide the Appellant with the care necessary to treat her diabetic complications. (*Hearing CD*).

In response to this testimony, Nurse Kristi Justice testified that Provider's infusion therapy treatment was not experimental.  In fact, Nurse Justice stated that all aspects of the Provider's infusion therapy treatment that the Appellant received is approved by the FDA.  Further, Nurse Justice testified that the FDA had informed Diabetic Relief that no review and approval of the process as a whole was necessary.  In addition, Nurse Justice noted that most Medicare Part C MAO plans (besides the Respondent MAO) covered the Provider's services; and, Nurse Justice continued, the Provider's infusion therapy was a proprietary treatment process that was only furnished by the Provider, who had several patents related to the treatment, which had resulted in hundreds of patients having their diabetic neuropathy reduced or eliminated after only months of treatment.  Also, Nurse Justice explained that by providing its patients with small amounts of IV fluids and small amounts of insulin in a way that mimicked the physiology of the pancreas, the Provider's patients, and especially DMII patient's like the Appellant, became more receptive to insulin (as opposed to being insulin resistant) such that their bodies could breakdown sugars into

<center>9</center>

INSU_PI_001558

energy better so as to repair their bodies and improve their diabetic complications (*i.e.*, diabetic neuropathy). (*Hearing CD*).

With respect to the Appellant, Nurse Justice attested that she had witnessed significant improvement in the Appellant's health over the nine months the Provider had treated the Appellant during the time period of April 2019 through December 2019. Nurse Justice stated the Appellant had not attained such improvements from other in-network plan providers of diabetic treatment services. For example, Nurse Justice noted that, when the Appellant had started receiving the Provider's services in April 2019, the Appellant could barely walk with a walker and required an aide to help her get around. Whereas, after time went on with her treatment, the Appellant could go to the Provider's office to receive treatment by herself and take the metro by herself. Consistent with this testimony, the Appellant's Representative, Mr. Jarvis Sampson, testified that he had also witnessed significant improvement in the Appellant's health since she had been receiving the Provider's services. In particular, Mr. Sampson stated that, since receiving the Provider's services, the Appellant's blood sugars had stabilized, she no longer blacked out and had to be taken to the hospital by paramedics, and she had gone from needing a walker to ambulate to being able to ambulate without the assistance of walker. Similarly, the Appellant testified at the ALJ hearing that she felt much better since receiving the Provider's treatment. Her blood sugar levels had stabilized, and the amount of pain she had was significantly reduced. (*Hearing CD*).

After reviewing the evidence in the administrative record, the undersigned finds that the testimony of the Appellant, Mr. Sampson, and Nurse Justice is credible, probative, and persuasive of the fact that the infusion therapy treatment the Appellant received from the Provider, which is not available to the Appellant by her Plan's in-network providers, is medically reasonable and necessary and covered by Medicare as the acceptable standard of care within the medical community of Houston, Texas, where the Appellant currently resides. Accordingly, the undersigned further finds that the testimony of Dr. Niebylski and Ms. Taylor, while probative, is not persuasive of the fact that the Respondent MAO is <u>not</u> required to provide Plan coverage for the Appellant to receive the Provider's future infusion therapy services for 2020.

First, Dr. Niebylski asserted the infusion therapy provided by the Provider was not covered by Medicare as the accepted medically reasonable and necessary standard of care to treat the Appellant's diabetic neuropathy, and the services at issue are contrary to the accepted medically reasonable and necessary medical standard of care for treatment of the Appellant's diabetic condition. However, his only evidence to support this assertion is the absence of published literature. The undersigned ALJ does not find this argument persuasive and notes that the absence of literature does not equal rejection or censure of the Provider's treatment. To the contrary, the Provider's infusion therapy treatment is medically reasonable and necessary standard of care for treatment of the Appellant's diabetic condition , as evidence by: the Appellant's significant health improvements since receiving the Provider's treatment; the fact that most MAO plans cover the Provider's infusion therapy services; the significant beneficial outcomes the Provider's patients realize with respect to their diabetic complication after receiving the Provider's services for a few months; and, the fact that all the processes used by the Provider to furnish its patented services are approved by the FDA and require no further FDA approval when administered together as a whole. (Hearing CD).

Second, the Respondent MAO covered the infusion therapy services the Appellant received from the Provider for nine months from April 2019 through December 2019. The Respondent MAO

APPX1278

INSU_PI_001559

failed to provide adequate evidence to justify its sudden coverage reversal decision. Significantly, Dr. Niebylski has provided no tangible proof to back up his assertion that the treatment furnished by the Provider is considered "bad care" or would "worsen" neuropathy. In fact, the medical records along with the testimony of the Appellant, Mr. Sampson, and Nurse Justice provide ample evidence to the contrary.

Third, at the ALJ hearing, the Appellant recollected learning about the Provider's services from her local podiatrist in Houston, Texas, but she could not recall if her podiatrist formally referred her to the Provider's services or whether she had received prior-authorization to receive such services from the Respondent MAO. However, Dr. Niebylski and Ms. Taylor stated that they did not know, based on the records, whether the Appellant had been referred to the Provider's services by one of its in-network physicians or whether the Appellant had received prior-authorization to receive the Provider's services. Yet, given the fact that the Respondent MAO provided coverage for the Appellant to receive the Provider's services for nine months in 2019, and neither Dr. Niebylski or Ms. Taylor could say that the Appellant was not referred to or receive prior-authorization for the Provider's services, the undersigned finds it highly probable that both steps occurred as required by the Appellant's Plan. There is no evidence to the contrary, and, without those required prerequisites having been met, the Respondent MAO would not have approved the nine months of treatment to begin with. *See* 2020 EOC, Ch. 3, § 1.2 ("… In most situations, your network PCP may give you approval in advance before you can use other providers in the plan's network, such as specialists, hospitals, [SNFs], or home health care agencies. This is called giving you a "referral." For more information about this, see § 2.3 of this chapter…). (*Ex. 5*, CD, pp. 45-46 of the 2020 EOC). Thus, absent evidence to the contrary, and given the Respondent MAO's past practice of paying for the Appellant to receive the Provider's infusion therapy services for nine months in 2019, the undersigned ALJ finds that any required referral or prior-authorization took place. In support of this finding, the undersigned notes that the burden is on the Respondent MAO to provide evidence to the contrary, and the Respondent stated on the record that it cannot do so. (Hearing CD).

Finally, the undersigned ALJ also finds that the appeal record demonstrates that the Provider's infusion therapy services, which are covered by Medicare as the accepted medically reasonable and necessary standard of care to treat the Appellant's diabetic condition/complications, cannot be provided by the Appellant's health plan in-network providers given that it is a patented proprietary process that is only offered by the Provider at this time.

For the aforementioned reasons and authority, it is the determination of the undersigned that the Respondent MAO is required to provide coverage for the medical treatment the Appellant has requested be furnished to her by the Provider, who is an out-of-network provider, under Medicare statutory law, regulatory authority, policy guidelines, and/or the contractual terms of the Appellant's health plan with the Respondent MAO.

III.    The Liability Of The Parties Is Not At Issue In This Appeal.

At the ALJ hearing, the Respondent MAO's witness, Ms. Marcia Taylor, testified that the Respondent MAO had paid all the claims it had received from the Provider, which were related to the infusion therapy services the Appellant received from the Provider during the time period of April 2019 through December 2019. In addition, the Respondent MAO's representative, Dr. Bruce Niebylski, M.D., testified at the ALJ hearing that, with respect to the claim amounts the Respondent MAO had paid for the infusion therapy services the Appellant had received from

11

the Provider in 2019, the Respondent MAO was not seeking to recoup those monies. Instead, Dr. Niebylski continued, the Respondent MAO was only concerned about the issue of whether it was obligated to provide coverage for the Appellant to receive future infusion therapy services from the Provider. Moreover, the Appellant testified at the ALJ hearing that she had not sought or received the Provider's infusion therapy service since December 2019. (*Hearing CD*).

Given these facts, the undersigned ALJ finds that the liability of the parties is not at issue because the instant case involves the issue of whether the Respondent MAO is required to provide coverage for the Appellant to receive the Provider's future infusion therapy services.

## CONCLUSIONS OF LAW

Under the facts of this case, the Respondent MAO is required to provide coverage for the medical treatment the Appellant has requested be furnished to her by the Provider, who is an out-of-network provider, under Medicare statutory law, regulatory authority, policy guidelines, and/or the contractual terms of the Appellant's health plan with the Respondent.

## ORDER

The Appellant's appeal is **WHOLLY GRANTED** and the prior determination of the QIC is **REVERSED**. The Respondent MAO is **DIRECTED** to grant the Appellant's pre-authorization request in accordance with this Decision.

### SO ORDERED.

Dated: MAR 27 2020
_____

Sarah D. Carpenter
**Sarah D. Carpenter**
**U.S. Administrative Law Judge**

12



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Phoenix, Arizona**

| | | | |
|---|---|---|---|
| Appeal of: | **C. TUTE** | OMHA Appeal No.: | **1-9232173843** |
| Enrollee: | **C. TUTE** | Medicare: | **Part C** |
| Medicare No.: | *****4847A | Before: | **Sarah Carpenter** Administrative Law Judge |

## EXHIBIT LIST

| EXHIBIT NUMBER | DESCRIPTION | PAGE NUMBERS |
|---|---|---|
| 1 | Organization Determination, MAO Reconsideration and Part C QIC Reconsidered Decision Procedural Documents | 324 |
| 2 | Medical Records/Evidence received by MAO and CMS contractors | 42 |
| 3 | Request for ALJ Hearing | 7 |
| 4 | OMHA Proceedings | 51 |

Dated:

APPX1281

**INSU_PI_001562**

| | |
|---|---|
| **From:** | Paula Oschman |
| **Sent:** | Thursday, June 23, 2022 12:40 PM CDT |
| **To:** | Shawn Calvit |
| **CC:** | Glenn Massey; Scott Hepford |
| **Subject:** | Meeting with Scott |
| **Attachments:** | image001.png, image002.png |

Scott and Glenn would like to set up an in-person meeting with you to discuss further your conversation with them today.  Looking at Scott and Glenn's calendars, it's looking like July 14th or July 15th can work with them.  Are you able to come to Houston, or do we need to send Scott and Glenn to you?


Thank you,

## Paula Oschman
Executive Assistant to:
Scott Hepford, Co-Founder and Chief Executive Officer
Glenn Massey, Chief Growth Officer



11511 Katy Freeway, Suite 102
Houston, TX  77079
Paula@wellcellsupport.com
(P) 281-600-5000 ext: 308
(M) 713-203-9887

   

This transmission may be strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy, or disseminate this information. If you are not the intended recipient, please contact the sender at (281-600-5000), or by reply email, and destroy all copies of the original message. Unauthorized interception of this e-mail is a violation of federal criminal law. This communication does not reflect an intention by the sender or the sender's principal to conduct a transaction or make any agreement by electronic means.

4:22-CV-03062
Injunction Hearing

## EX 33
DEFS " NSUL N C"

**DEMONSTRATIVE EXHIBIT**
**CHRONOLOGY**

| Date | Summary of Event | Exhibit/Docket |
|------|------------------|----------------|
| 06/09/2022 | Notice of Default sent by Scott Hepford to Shawn Calvit | 17 |
| 06/23/2022 | Shawn Calvit conference call with Scott Hepford & Glenn Massey stating they would not terminate license | 11 (INSU_PI_000700) 33 |
| 08/26/2022 | Press Release - Information about Insulinic Hawaii Clinic posted by Chamber of Commerce Hawaii | 25 |
| 09/07/2022 | Termination of License and Demand to Cease and Desist Letter sent to Shawn Calvit | 19 |
| 09/08/2022 | Suit Filed - Plaintiff Well Cell Global, LLC's Original Complaint and Request for Injunction Relief | Docket No. 01 |
| 09/09/2022 | Application for Temporary Restraining Order and Preliminary Injunction Filed | Docket No. 04 |
| 09/15/2022 | Temporary Restraining Order Issued | Docket No. 18 |



4:22-CV-03062
Injunction Hearing

**EX 34**

DEFS "INSULINIC"

APPX1283

**INSU_PI_001564**